Raymond M. DiGuiseppe
California State Bar No. 228457
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE NGUYEN, et al, Plaintiffs<br><br>vs.<br><br>ROB BONTA, in his official capacity as Attorney General of California, et al, Defendants. | Case No. 3:20-cv-02470-WQH-WVG<br><br>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

i

# Table of Contents

**Table of Contents** ........................................................................................**ii**

**Table of Authorities** ...................................................................................**iii**

**I.    Introduction** ......................................................................................**1**

**II.   Standards of Review** .........................................................................**1**

**III.  The Statutory Scheme and Affected Parties** .................................**2**

**IV.   The OGM Law Targets Protected Arms and Protected Conduct** .............**4**

**V.    No Historical Precedent Exists for OGM Laws** ...........................**6**

**VI.   The OGM Law is Categorically Unconstitutional** ........................**9**

**VII.  The Law is Unconstitutional Under Any Means-End Scrutiny** ...........**11**

  **A.   The Standards of Means-End Scrutiny** ...............................**12**

  **B.   The OGM Law Fails Even the Most Lenient Form of Scrutiny** ...........**14**

**VIII. The OGM Law Violates Equal Protection Just as Clearly** ..................**25**

# Table of Authorities

*Americans for Prosperity Foundation v. Bonta*, __ U.S. __, 141 S.Ct. 2373 (2021)……………………………………………………………….……13

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)……………...…………..2

*B & L Productions, Inc. v. 22nd District Agricultural Assoc.,* 394 F.Supp.3d 1226 (S.D. Cal. 2019)…………...………………………………………………13

*Bauer v. Harris,* 858 F.3d 1216 (9th Cir. 2015)………...……………………12

*Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469 (1989)…………………..14

*Binderup v. Att'y Gen.,* 836 F.3d 336 (3d Cir. 2016)……………………..………13

*Caetano v. Massachusetts,* 577 U.S. 411 (2016)……………………………..........4

*Carey v. Brown,* 447 U.S. 455 (1980). …………………………………………13

*City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432 (1985)…………27

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,* 657 F.3d 936 (9th Cir. 2011)……………………………………………………………16

District of Columbia v. Heller, 554 U.S. 570 (2008)…………..…...4, 5, 6, 7, 9, 12, 13

*Doe v. Harris,* 772 F.3d 563  (9th Cir. 2014)…………………………………14, 18

*Edwards v. City of Coeur d'Alene,* 262 F.3d 856 (9th Cir. 2001)………………..13

*Ehrman v. U.S.,* 429 F. Supp. 2d 61 (D.D.C. 2006)………………………….......1

iii

*Ezell v. City of Chicago,* 651 F.3d 684 (9th Cir. 2011)……………………………………6

*Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two,* 249 F.3d 1132 (9th Cir. 2001)………………………………………………………………………………1

*Fouts v. Bonta,* 2021 WL 4311013 (S.D. Cal. 2021)……………………………………10

*Jackson v. City and County of San Francisco,* 746 F.3d 953 (9th Cir. 2014)…………………………………………………………………………………………5, 10, 12

*Luis v. United States,* 578 U.S. 5 (2016)………………………………………………5

*Mai v. United States,* 952 F.3d 1106 (9th Cir. 2020)………………………………12, 14

*Mass. Bd. of Retirement v. Murgia,* 427 U.S. 307 (1976)……………………………25

*McCullen v. Coakley,* 573 U.S. 464 (2014)……………………………………14, 23

*McDonald v. City of Chicago,* 561 U.S. 742……………………………………4, 6

*Miller v. Bonta,* 542 F.Supp.3d 1009 (S.D. Cal. 2021)………………………………5

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,* 804 F.3d 242 (2d Cir. 2015)…….13

*Pacific Coast Horeshoeing School, Inc. v. Kirchmeyer,* 961 F.3d 1062 (9th Cir. 2020)……………………………………………………………………………22

*Pena v. Lindley,* 898 F.3d 969 (9th Cir. 2018)………………………………………12

*Playboy Entm't Grp.,* 529 U.S. 803 (2000)…………………………………………14

*Porter v. Gore,* 517 F.Supp.3d 1109 (S.D. Cal. 2012)………………………………14

iv

*Romer v. Evans,* 517 U.S. 620 (1996)………………………………………………25

*Rupp v. Becerra,* 401 F.Supp.3d 978 (C.D. Cal. 2019)…………………………1

*Silvester v. Harris,* 843 F.3d 816 (9th Cir. 2016)………………………10, 12, 15

*Staples v. United States,* 511 U.S. 600 (1994)…………………………………5

*Teixeira v. Cty. of Alameda,* 873 F.3d 670 (9th Cir. 2017)………………...5, 6, 10

*Teter v. Connors,* 460 F.Supp.3d 989 (D. Haw. 2020)…………………………12

*Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622 (1994)…………………………14, 22

*Twitter, Inc. v. Barr,* 445 F.Supp.3d 295 (N.D. Cal. 2020)…………………………1

*United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803 (2000)………13

*United States v. Singh,* 979 F.3d 697 (9th 2020)…………………………………10

*Young v. Hawaii,* 992 F.3d 765 (9th 2021)……………………………...10, 11, 12

*Yukutake v. Conners,* 2021 WL 3625307 (D. Hawaii 2021)…………10, 11, 12, 18


**US Constitution**

U.S. Const. Amend. II…………………………………………………...4

**Fed. Statutes:**

18 U.S.C §§ 922…………………………………………………...16

**State Statutes:**

Cal. Pen. Code § 11101……………………………………………………………..16

Cal. Pen. Code § 11105……………………………………………………………...16

Cal. Pen. Code § 11106……………………………………………………………...16

Cal. Pen. Code § 26150……………………………………………………………...16

Cal. Pen. Code § 26185……………………………………………………………...16

Cal. Pen. Code § 26195……………………………………………………………...16

Cal. Pen. Code § 26225……………………………………………………………...16

Cal. Pen. Code § 26800…………………………………………………………….....3

Cal. Pen. Code § 27535…………………………………………………….. *passim*

Cal. Pen. Code § 27590………………………………………………………………2

Cal. Pen. Code § 28220……………………………………………………………...16

Cal. Pen. Code § 29800……………………………………………………………...16

Cal. Pen. Code § 29805……………………………………………………………...16

Cal. Pen. Code § 29815……………………………………………………………...16

Cal. Pen. Code § 29825……………………………………………………………...16

# I.  Introduction

Plaintiffs move this Court for summary judgment on their claims challenging California's laws and related enforcement policies, practices, and customs that prohibit ordinary law-abiding citizens like Plaintiffs from purchasing multiple handguns or semiautomatic centerfire rifles within a 30-day period ("OGM law"). The OGM law is in reality just another part of California's insatiably bloated regulatory regime that increasingly chokes off the flow of Second Amendment guarantees to its citizens behind a veil of pretextual and untailored claims of pursuing public safety. But even granting the State the greatest benefit of the doubt, Plaintiffs are entitled to summary judgment because the law is indisputably unconstitutional under even the most lenient standards of scrutiny that could possibly be applied.

# II.  Standards of Review

On cross-motions for summary judgment under Rule 56, "'[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Twitter, Inc. v. Barr*, 445 F.Supp.3d 295, 301 (N.D. Cal. 2020) (quoting *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001)). Similarly, "'each must carry its own burden under the applicable legal standard.'" *Rupp v. Becerra*, 401 F.Supp.3d 978, 984 (C.D. Cal. 2019) (quoting *Ehrman v. U.S.*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006)). A party's motion for

summary judgment must be granted if there is "no *genuine* issue of *material* fact" under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion." *Lil' Man in the Boat, Inc. v. City and County of San Francisco*, 5 F.4th 952, 956 (9th Cir. 2021).

### III.    The Statutory Scheme and Affected Parties

Under its OGM law, since 2000, California has prohibited the average, law-abiding citizen from making any "application to purchase more than one handgun within any 30-day period," Pen. Code § 27535(a), and, effective July 1, 2021, this multiple-purchase prohibition applies to semiautomatic centerfire rifles so as to now ban any application to purchase more than one handgun and/or semiautomatic centerfire rifle in any 30-day period. Stats. 2019, Ch. 737, Sec. 5 (Senate Bill 61).

The OGM law creates a narrow set of exceptions to this multiple-purchase prohibition for special categories of people or transaction types: law enforcement and private security agencies; licensed collectors; motion picture, television, video, entertainment, and theatrical companies; and exchanges, replacements, or returns of previously-acquired firearms. § 27535(b). Beyond that, any attempted purchase of more than one handgun and/or semiautomatic centerfire rifle within any 30-day period renders the would-be purchaser criminally liable, § 27590(e)(4)(B), and

subjects the dealer to forfeiture of his or her license, § 26800. Defendants have enforced and are continuing to enforce California's OGM law. SOMF ¶1.

Individual Plaintiffs (Nguyen, Boguski, Medina, Colletti, Phillips, and Prince) are California residents and members of the Institutional Plaintiffs (Firearms Policy Coalition, Inc., San Diego Gun Owners PAC, and Second Amendment Foundation). SOMF ¶2. None of them is disqualified from owning or possessing firearms under federal or state law. SOMF ¶3. Institutional Plaintiffs bring this action on behalf their members and supporters similarly situated to Individual Plaintiffs. SOMF ¶4.

Each Individual Plaintiff actively desires and intends to purchase two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more of the same in a single transaction within a 30-day period from a licensed dealer, and each would do so but for the OGM law. SOMF ¶5. Plaintiffs Prince and Phillips are licensed firearms dealers for Retailer Plaintiffs, North County Shooting Center Inc. ("NCSC") and PWGG L.P. ("PWGG"), respectively. SOMF ¶6. Plaintiffs NCSC and PWGG are licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives as Federal Firearms Licensees. SOMF ¶7. Because of the OGM law, Retailer Plaintiffs are prevented from selling two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more of the same in a single transaction within a 30-day period to individuals not otherwise disqualified by federal or state law from owning or possessing firearms. SOMF ¶8.

### IV.    The OGM Law Targets Protected Arms and Protected Conduct

"A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. Amend. II. This "right to keep and bear *arms*"—in the plural—"is guaranteed by the Fourteenth Amendment as a privilege of American citizenship." *McDonald v. City of Chicago*, 561 U.S. 742, 858 (Thomas, J., concurring) (italics added). And "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. The Second Amendment "protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," *id.* at 780, and it "guarantee[s] the individual right to possess and carry weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

And this right to keep and bear *arms* "'extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Caetano v. Massachusetts,* 577 U.S. 411, 416 (2016) (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 582). All weapons "'typically possessed by law-abiding citizens for lawful purposes'" *today* are "covered by the Second Amendment," *id.* (quoting *Heller* at 625), including all arms in common use for lawful purposes that are not *both* "dangerous per se" and "unusual," *id.* at 417.

The broad class of arms targeted under California's OGM law—handguns and semiautomatic centerfire rifles—are indisputably protected under the Second Amendment. *Heller*, 554 U.S. at 628-29 (the handgun is "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense); *Staples v. United States*, 511 U.S. 600, 603 (1994) ("[t]he AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon"); *see also Miller v. Bonta*, 542 F.Supp.3d 1009, 1021 (S.D. Cal. 2021) (such rifles are "commonly owned by law-abiding citizens" and "the overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home"); SOMF ¶9.

And this protection unquestionably extends to the conduct prohibited by the OGM law—the purchase and sale of these arms—because it targets the acquisition rights necessarily incidental to keeping and bearing constitutionally protected arms. "Constitutional rights … implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). Thus, the Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017); *see also Luis* at 26 (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (the "'corresponding right to obtain

5

1    the bullets necessary to use [firearms]'"); *Ezell v. City of Chicago*, 651 F.3d 684,

2    704 (9th Cir. 2011) ("the training and practice that make [the right] effective").

3        As the Ninth Circuit itself has observed, the "core Second Amendment right to

4    keep and bear arms for self-defense 'wouldn't mean much' without the ability to

5    acquire arms." *Teixeira*, 873 F.3d at 677 (quoting *Ezell*, 651 F.3d at 704).

6                    **V. No Historical Precedent Exists for OGM Laws**

7        The principle at the center of it all is that the nature and scope of the Second

8    Amendment right as originally defined is impervious to later legislative or judicial

9    judgment. "[T]he enshrinement of constitutional rights necessarily takes certain

10   policy choices off the table." *Heller*, 554 U.S. at 636. "Constitutional rights are

11   enshrined with the scope they were understood to have when the people adopted

12   them, whether or not future legislatures or (yes) even future judges think that scope

13   too broad." *Id.* at 634-35. The Second Amendment right must be accorded the same

14   respect. *McDonald*, 561 U.S. at 778-79, 780 (it is not a "second-class right, subject

15   to an entirely different body of rules than the other Bill of Rights guarantees"). And

16   "[t]he very enumeration of the right takes out of the hands of government—even the

17   Third Branch of Government—the power to decide on a case-by-case basis whether

18   the right *is really worth* insisting upon." *Heller* at 634 (italics original).

19       The right as defined at the time of the nation's founding fully embraced the

20   unregulated trade of firearms among the general population, with no restrictions on

6

the number or frequency of such acquisitions. Plaintiffs' constitutional expert, Professor George Mocsary, studied the evidence and "could find no laws in the founding era limiting the quantity or frequency," concluding instead that "it appears the policy of the time embraced private collections of arms." SOMF ¶10. More specifically, Mocsary found that "[t]he otherwise-legal purchase of protected arms has been unregulated as to the quantity of firearms that may be purchased within a given timeframe for practically all of American history." SOMF ¶11.

Mocsary further found that "[t]ransacting in protected firearms free of quantity-over-time restrictions remains a lawful Second Amendment activity in a large majority of jurisdictions across the United States." SOMF ¶12. As he explained, the first such regulation appeared in 1975, with a South Carolina law restricting handgun sales to one per person per month, which was repealed in 2004. SOMF ¶13. Virginia passed a one-handgun-per-month law in 1993, repealed it in 2020, and reenacted another one in 2020. SOMF ¶14. Maryland first enacted a one-handgun-per-month law in 2003. SOMF ¶15. New Jersey restricted handgun purchases to one-per-month in 2008. SOMF ¶16. The District of Columbia enacted a pistol registration requirement in 2008 (after *Heller*) that effectively limited them to one per month, although that was struck down as unconstitutional in 2015. SOMF ¶17. California's OGM law became effective in 2000 and was extended to long guns in July of 2021.

In his deposition, Mocsary reaffirmed his conclusions that there is "no historical precedent" for OGM laws, which are instead "a very new thing." SOMF ¶18.

The historical record firmly supports this. As detailed in a publication the defense itself relied on, generally, "gun control laws were unknown to Founding Fathers." SOMF ¶19. "There was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." SOMF ¶20.

The right of the general public to keep and bear arms was of the highest order in civilized society. "Newspaper attacks on the religious guarantees and other matters were extreme and persistent, but the right to bear arms was not once questioned." SOMF ¶21. Instead, "it appears that having arms was manifestly an attribute of free citizenship" during this period. SOMF ¶22. As one delegate to Pennsylvania's constitutional convention put it in 1787, "however wide and various the firearms of power may appear, they may all be traced to one source, the people." SOMF ¶23.

Consistent with a largely unregulated right of highest order in the scheme of individual liberties, people in the colonial states commonly engaged in the purchase and sale of multiple firearms in single or frequent transactions. "Symbolic of the times, the following newspaper advertisement began to appear regularly: 'WANTED immediately, a quantity of good HORSE PISTOLS AND CARBINES, for which ready money, and a liberal price, will be given . . . Has a quantity of

8

Muskets. . . to sell.'" SOMF ¶24. Another example of "the unquestioned freedom to have arms" was a sales advertisement for "100 Pair Horsemens Pistols." SOMF ¶25.

The citizenry also commonly possessed and used multiple arms at any given time. For example, "Vermont's founding fathers" "carried a gun and a brace [a pair] of pistols on their persons as a common practice." SOMF ¶26. "Pistols in the pocket and an arsenal at home were options available to every free citizen" of Vermont. SOMF ¶27. In 1796, Ira Allen, a general in the Vermont militia, was able to purchase and ultimately distribute 20,000 muskets to the general population. SOMF ¶28.

## VI.   The OGM Law is Categorically Unconstitutional

As the pronouncements in *Heller* make clear, the true test for the constitutionality of restrictions on the Second Amendment right involves a simple, single inquiry: Is the prohibited conduct protected under the scope of the Second Amendment as defined and understood "when the people adopted" it? *Heller*, 554 U.S. at 634-35. If so, then the prohibition is unconstitutional—period. *Id.* That inquiry would end the analysis here and quickly dismantle the OGM law at issue, given the clear historical record securing the right of law-abiding people like Plaintiffs to purchase multiple firearms without any restriction on the number or frequency of such acquisitions.

The Ninth Circuit's current case law requires more. It has "created a two-step framework" to review such challenges: the court first analyzes whether "the challenged law affects conduct that is protected by the Second Amendment" and, "if

the challenged restriction burdens conduct protected by the Second Amendment," the court then determines whether the restriction passes constitutional muster based on its own assessment of the relative burden and benefits of the law under "the appropriate level" of means-end scrutiny. *Young v. Hawaii*, 992 F.3d 765, 783-84 (9th 2021).

Nevertheless, the Ninth Circuit recognizes that the historical meaning of the right controls at "step one." "Under the first step, we must determine whether the law burdens the Second Amendment 'based on a historical understanding of the scope of the [Second Amendment] right.'" *United States v. Singh*, 979 F.3d 697, 724 (9th 2020) (quoting *Jackson*, 746 F.3d at 960); *accord Teixeira*, 873 F.3d at 682; *Young*, 992 F.3d at 783; *Yukutake v. Conners*, 2021 WL 3625307, 6 (D. Hawaii 2021). The historical record dictates whether a restriction may be considered "longstanding and presumptively lawful," because any such exception can only apply when "'the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment.'" *Fouts v. Bonta*, 2021 WL 4311013 at *5 (S.D. Cal. 2021) (quoting *Jackson*, 746 F.3d at 760).

Further, if the conduct is deemed protected at "step one" and the regulation "amounts to a destruction of the Second Amendment right," it must be declared as "unconstitutional under any level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821

(9th Cir. 2016); *accord Young*, 992 F.3d at 784. That is, there's no "interest-balancing" at "step two" in such instances. It is only when the regulation "burdens" protected conduct without effecting "a destruction of the Second Amendment right" that the Ninth Circuit's test permits courts to weigh the relative burdens and benefits of the law under "the appropriate level" of means-end scrutiny. *Young* at 784.

Given the clear historical record in this case, at "step one," the conduct at issue is unquestionably protected and the OGM law's restriction of it is unquestionably neither a "longstanding" nor a "presumptively lawful" regulation. *Yukutake*, 2021 WL 3625307 at *10 (citing *Young*, 992 F.3d at 783) ("in order to be deemed presumptively valid, [citations], the law must be sufficiently similar to historical regulations to demonstrate that the law's restrictions accord with historical understanding of the scope of the Second Amendment right."). The only real issue is whether the law survives at "step two." Because the law bans the exercise of acquisition rights fully protected as ancillary to the Second Amendment right to keep and bear arms, it should be deemed categorically "unconstitutional under any level of scrutiny"—just as it would be under the *Heller* one-step test.

## VII.   The Law is Unconstitutional Under Any Means-End Scrutiny

The trouble with any means-end scrutiny under this "two-step" test is that it devolves into "a judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of

proportion to the statute's salutary effects upon other important governmental interests.'" *Heller*, 554 U.S. at 634. Such scrutiny ultimately questions "whether the right *is really worth* insisting upon." *Id.* And *Heller* flatly rejected such analyses as improper in the Second Amendment context. *Id.* Nevertheless, any such interest-balancing still weighs heavily against the OGM and ultimately dismantles it.

**A. The Standards of Means-End Scrutiny**

Ninth Circuit case law recognizes that "rational basis review is not appropriate" and some form of "heightened scrutiny" is required. *Jackson*, 746 F.3d. at 960; *Mai*, 952 F.3d at 1115; *Teter v. Connors*, 460 F.Supp.3d 989, 1001 (D. Haw. 2020). It also requires "strict" scrutiny for any law that "implicates the core of the Second Amendment right and severely burdens that right." *Silvester*, 843 F.3d at 824; *accord Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018); *Young*, 992 F.3d at 784.

Moreover, as a general matter, whatever form of "heightened scrutiny" is applied, courts are to be "guided by First Amendment principles" in this context. *Jackson*, 746 F.3d at 961; *accord Bauer v. Harris*, 858 F.3d 1216, 1224 (9th Cir. 2015). Thus, in *Jackson*, the court followed "strong analogies to the Supreme Court's free-speech caselaw" in analyzing a Second Amendment challenge to city's handgun storage mandate and restrictions on ammunition sales. *Id.* at 960; *see also Yukutake*, WL 3625307 at *7 (applying First Amendment jurisprudence in resolving a challenge to Hawaii laws that placed constraints on the ability of ordinary citizens to lawfully

acquire new firearms). Other circuits do the same. *See e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015); *Binderup v. Att'y Gen.*, 836 F.3d 336, 344 (3d Cir. 2016), *Ezell*, 651 F.3d at 706-07). Indeed, it was the Supreme Court that set the example here in *Heller*. *Heller*, 554 U.S. at 582, 635 (analogizing to First Amendment jurisprudence).

An overriding principle of this jurisprudence is that the government bears the ultimate burden. "When the Government restricts speech, it bears the burden of proving the constitutionality of its actions," and the risk of nonpersuasion— operative in all trials—must rest with the Government, not with the citizen."' *Twitter*, 445 F.Supp.3d at 302 (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 818 (2000). This flows from the fundamental rule applicable to any restriction on constitutional liberties: while the government surely "'has a substantial interest in safeguarding its citizens against violence,' *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001), 'even the most legitimate goal may not be advanced in a constitutionally impermissible manner,' *Carey v. Brown*, 447 U.S. 455, 464–65 [citations] (1980)." *B & L Productions, Inc. v. 22nd District Agricultural Assoc.*, 394 F.Supp.3d 1226, 1248 (S.D. Cal. 2019).

To survive strict scrutiny, the government must prove it has "adopt[ed] '*the least restrictive* means of achieving a compelling state interest." *Americans for Prosperity Foundation v. Bonta*, __ U.S. __, 141 S.Ct. 2373, 2383 (2021) (quoting

13

*McCullen v. Coakley*, 573 U.S. 464, 478 (2014) (italics added). Generally, "[t]o satisfy intermediate scrutiny, the government's statutory objective must be significant, substantial, or important, and there must be a reasonable fit between the challenged law and that objective." *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020). Intermediate is still a rigorous test for the government to satisfy.

"[T]he intermediate scrutiny analysis requires the challenged law to be 'narrowly tailored to serve a significant government interest.'" *Porter v. Gore*, 517 F.Supp.3d 1109, 1127 (S.D. Cal. 2012) (quoting *Playboy Entm't Grp.*, 529 U.S. 803, 816–17 (2000)). The government must prove the necessary fit. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)) ("the Government ... bears the burden of showing that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests'"); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (The government "must affirmatively establish the reasonable fit we require."). To do this, the government must '"demonstrate that the recited harms are real ... and that the regulation will in fact alleviate these harms in a direct and material way."' *Doe v. Harris*, 772 F.3d 563, 577 (9th Cir. 2014) (quoting *Turner* at 664).

14

## B. The OGM Law Fails Even the Most Lenient Form of Scrutiny

Because the OGM law bans the exercise of fundamental guarantees secured under the Second Amendment, it necessarily "implicates the core of the Second Amendment right and severely burdens that right," and it thus must survive strict scrutiny in any means-end analysis. *Silvester*, 843 F.3d at 824. But it fails in any event because it cannot survive means-end scrutiny even at the intermediate level.

### 1.    The Stated Interests Behind the OGM Law

The stated purpose of the original OGM law as enacted under Assembly Bill No. 202 in 2000 was to "curtail the illegal gun market, disarm criminals, and save lives by preventing multiple purchases of handguns through legitimate channels," on the rationale that "[p]reventing multiple purchases takes the profit out of black market sales and puts gun traffickers and straw purchasers out of business." SOMF ¶29. More specifically, the stated goal of the law was "to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself," in particular those who are underage, have a disqualifying prior conviction, a mental disorder, or are not residents. SOMF ¶30. When the law was expanded to semiautomatic centerfire rifles effective July of 2021 under Senate Bill No. 61, the Legislature stated that AB 202 had been "intended to reduce the illegal flow of handguns by eliminating the opportunity to sell guns

1   from bulk purchases on the black market" and that applying this same law to long

2   guns "would be part of the solution in reducing gun violence." SOMF ¶31.

3       **2.    The State Has a Litany of Less Restrictive Alternatives Within Its
            Vast Array of Other Regulations Aimed at the Same Claimed
4           Interests**

5       Throughout all relevant times, Defendants have implemented and enforced a

6   multitude of statutes, regulations, and policies that strictly regulate and criminalize

7   the acquisition, possession, and use of firearms by all prohibited persons, including

8   those who become prohibited after a lawful acquisition. *See e.g.*, Cal. Penal Code §§

9   29800, 29805, 29815, 29825; 18 U.S.C §§ 922(b)(2), 922(d), 922(g). SOMF ¶32.

10  Throughout all relevant times, Defendants have also implemented and enforced a

11  multitude of statutes, regulations, policies, and systems that collect, maintain, and

12  monitor identifying information of those who are currently prohibited persons, who

13  lawfully acquire, sell, and transfer firearms, and who later become prohibited

14  persons, including, for example: Cal. Penal Code §§ 11101, 11105, 11106, 26150,

15  26185, 26195, 26225, 28220; the Dealer's Record of Sale (DROS) DROS Entry

16  System (DES); the Armed Prohibited Persons System (APPS); Mental Health

17  Reporting System (MHRS); Mental Health Firearms Prohibition System (MHFPS);

18  Prohibited Applicant (PA); and many other such regulatory programs. SOMF ¶33.

19      Through the APPS, DOJ agents regularly and readily "locate and disarm

20  prohibited persons," "thereby preventing and reducing incidents of violent crime,"

16

with "daily manual queries of the databases that cross-reference the population of known firearms owners against individuals who may have had a PTE [potentially triggering events] within the past 24 hours," such that "[n]ew individuals are added daily, creating a constantly changing and growing dataset." SOMF ¶34. "Cases are pursued until all investigative leads are exhausted." SOMF ¶35.

The legislative history of AB 202 and SB 61 recognized the existence of these various schemes and how they already compel ordinary law-abiding citizens to obtain special certification, pass a background check, wait ten days, and complete a safe handling demonstration as preconditions to any lawful purchase. SOMF ¶36.

It also recognized the myriad state and federal laws that specifically criminalize straw purchasing and illegal firearms trafficking. SOMF ¶37. State law separately "[p]rohibits the sale, loan, or transfer of a firearm to any person who is not the actual purchaser or transferee if the intent is to avoid the statutory requirements for lawful transfer," and "[t]he Federal Gun Control Act forbids straw transactions" because it "prevents a person from purchasing guns in a state with lax laws and then returning to his or her state of residency." SOMF ¶38. Further, all federal licensees must report to ATF and all related state law enforcement agencies all sales, transfers, or disposals of two or more handguns "at one time or during any five consecutive business days," and they must make this report "not later than the close of business on the day that the multiple sale or other disposition occurs." SOMF ¶39.

Even under intermediate scrutiny, Defendants must prove "the regulation will in fact alleviate [the stated] harms in a direct and material way." *Harris*, 772 F.3d at 577. Nowhere in the legislative record does the State even attempt to explain—much less *prove*—why California's OGM law is at all necessary or of any meaningful effect in achieving the same interests the State already aggressively pursues through its layers upon layers of regulations that directly target the "illegal gun market," "disarm criminals," and keep firearms out of the hands of prohibited persons.

### 3. There is No Evidence that California's OGM Law Advances the State's Claimed Interests in Any Direct or Material Way

As the legislative history acknowledged, only the District of Columbia and three other states—Virginia, Maryland, and New Jersey—have OGM laws, and they target only handguns, not handguns *and* long guns like California. SOMF ¶40; *see Yukutake*, 2021 WL 3625307 at *8 ("it is worth noting that if it really were common sense that a 10-day permit use period promoted public safety, Hawaii likely would not be the *only* state in the nation to maintain such a restrictive requirement").

What data the State did cite in discussing its claimed interests in the OGM law concerned multiple firearms purchased in a single transaction or in "bulk," or data which otherwise included *all* multiple-firearms purchases without distinguishing multiple purchases over a 30-day period from the whole lot. SOMF ¶41.

18

The defense's expert, Louis Klarevas, also relied on data concerning multiple-firearms purchases in single or "bulk" transactions, on the same day, within a handful of days, or aggregated data concerning all forms and timing of multiple-firearms purchases without distinguishing such purchases over a 30-day period of time. SOMF ¶42. The same is true of the data on which Joseph Bisbee, the defense's other expert, relied because that concerned aggregate "multiple sales" data. SOMF ¶43.

In fact, one source on which Klarevas relied found "handguns purchased by the same individual within 30 days of another handgun purchase, but not on the same day, were *less* likely to be traced." SOMF ¶44 (Ex. 12, Wright Report). Plaintiffs' expert statistician, Carl Moody, calculated this percentage and found that "a handgun acquired in a series of purchases over 30 days has a 38% smaller likelihood of being a trace gun," such that "only a tiny fraction of those (0.4 percent) became crime guns," SOMF ¶45, specifically 722 out of more than 180,000 firearms, SOMF ¶46.

Another source on which Klaveras relied even found a lesser risk *in general* as between multiple-firearms sales and single firearm sales, specifically indicating that "guns sold in multiple sales had a lower risk of being used in crime." SOMF ¶47 (Ex. 9, 2005 Koper Report). This same source acknowledged that, as a general matter, while "there are indications" that OGM laws "affect the interstate flow of guns," "there is scant evidence they actually reduce gun crime." SOMF ¶48.

19

Klarevas relied on a later study of the same researcher for the proposition that "Maryland's one-gun-a month provision reduced trafficking from Maryland into Washington, D.C., via multiple sales." SOMF ¶49 (Ex. 10A & 10B, 2014 Koper Report). But that study was based on several factors unrelated to the potential effect of the "multiple-sale" factor, it only considered "multiple sales" in the aggregate to the extent that factor was considered, and even then it found only 3.2% of all the firearms sold during the relevant period had a "chance" of becoming crime guns. SOMF ¶50. Further, the study ultimately found no "statistically significant" risk that "guns would be at higher risk if sold in multiple sales and/or before the GVA" (Maryland's OGM law). SOMF ¶51. And it also agreed with the general conclusion in the Wright Report that "guns purchased in same-day multiple sales were at *greater* risk of criminal use than those purchased in other 30-day multiple sales." SOMF ¶52.

Similarly, Klarevas cited another study for the proposition that "Maryland's OGM law was associated with a consistent 10-11% decrease in the state firearm homicide rate." SOMF ¶53. However, that study was focused the effect of banning "Saturday Night Special" handguns, it did not consider the potential impact of the other major firearms regulations simultaneously instituted by that multi-faceted law, and the results were only "preliminary" as it was. SOMF ¶54.

Klarevas conceded that other data on which he relied was not "primarily focused on assessing the effects of OGM laws" and, in any event, yielded findings that "were

20

not statistically significant." SOMF ¶55. He further conceded relying on an unpublished report that employed "an unorthodox and flawed methodological approach" to reach an "unpersuasive[]" explanation. SOMF ¶56.

Klarevas cited an older report that Moody had co-authored, to "suggest" that OGM laws "may" reduce murder rates. SOMF ¶57. However, through his rebuttal report and deposition testimony, Moody has explained in detail that this report does not support any reliable connection between OGMs and murder rates. SOMF ¶58.

Lastly, Klarevas claimed that a "primary policy objective" of California's OGM law was to "reduce opportunities" for "potential active shooters to amass multiple firearms in a short amount of time that they can then use to perpetrate a mass murder." SOMF ¶59. However, the *sole* reference to mass shootings in the entire record is an *argument* in support of SB 61 from the Ventura County Board of Supervisors, which referenced one local mass shooting in 2018. SOMF ¶60. And there is no indication that the shooter used multiple firearms—much less multiple firearms acquired within a 30-day period. SOMF ¶61. Nothing else in the record claims any effectiveness of the OGM law in reducing instances of mass shootings.

Similarly, Klarevas's expert reports do not establish any causal link between the number or frequency of firearm purchases and the ability to, or the likelihood that a person will, carry out a mass shooting. SOMF ¶62. He conceded as much in his deposition and further acknowledged that "a mass shooter or a mass shooting can

21

certainly be perpetrated with a single firearm." SOMF ¶63. He has also conceded that "no studies have assessed this relationship directly." SOMF ¶64.

Plaintiffs' evidence confirms the absence of any evidence-backed justification for the OGM law as a means to achieve the claimed ends. Moody conducted his own statistical analyses using multiple standard methods, and he found no statistically meaningful impact on murder or firearm homicide rates in California. SOMF ¶65. In fact, he has "been unable to find a single study that links OGM laws to violence reduction in the states that enacted such laws." SOMF ¶66. Moody also found no evidence of any impact on the public safety of California by virtue of the State's attempt to regulate straw purchasing through its OGM law. SOMF ¶67. Moody reaffirmed these conclusions and opinions in his deposition. SOMF ¶68.

### 4.   The OGM Law Fails In Any Event for Lack of Tailoring

Regardless, the OGM law is unconstitutional because it violates even the most lenient tailoring standards. Under "intermediate scrutiny," Defendants must *prove* the law does not burden "'substantially more'" protected conduct "'than necessary'" to further the asserted interest. *Pacific Coast Horeshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) (quoting *Turner*, 512 U.S. at 189).

As outlined above, whatever causal or correlative relationship may exist between multiple purchases and the criminal activity the State claims to be targeting, the evidence shows any such risk exists only in relation to multiple purchases made on

the same day or within short window of time, generally five days or fewer. And, again, ATF *already* monitors all multiple purchases within a five-day period. Not a shred of evidence suggests that a <u>30</u>-day ban between purchases does anything.

Why aren't all the other regulatory schemes good enough when the evidence suggests increased risks are only associated with purchases on the same day or within five days? For that matter, where is the evidence that a shorter period would *not* be just as effective for any OGM law that the State insists upon having? What about seven days, or ten days? Defendants have no answer here. Indeed, their own expert, Klarevas, conceded in his deposition that there is no evidence "to show that a five-day or a seven-day or a ten-day is not alone as effective as a 30-day" limitation in meeting the claimed justifications behind California's OGM law. SOMF ¶69; *McCullen*, 573 U.S. at 494 (the government must show it "seriously undertook to address the problem with less intrusive tools readily available to it").

The clear failure to meet even the most lenient tailoring standards is underscored by the exceptions the State has arbitrarily carved out for its favored classes. The legislative record frequently notes the existence of various "exceptions" and "exemptions" to the OGM law, but in none of those instances does it provide an explanation or supporting justification for them. SOMF ¶70. For his part, Klarevas simply says "[b]ased on my review of the relevant literature and data, I came across no evidence that would lead me to alter my conclusions in light of California's

23

exemptions," offering no supporting reasons or rationale for their existence. SOMF ¶71. When pressed on this point during his deposition, Klarevas said he could "*imagine* that part of what was the rationale behind" the exemption for the movie industry was that this industry provides an important economic benefit for the State. SOMF ¶72. If that were the test, why aren't the countless other economically beneficial industries granted a wholesale exemption? Klarevas further "imagine[d]" that "there are protocols" "for how these weapons are supposed to be handled and stored" by those in the movie industry. SOMF ¶73. Of course, as he had to admit, law-abiding citizens have to follow a multitude of such "protocols" too. SOMF ¶74.

With no evidence or further explanation, Bisbee says, "many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale." SOMF ¶75. By this rationale, exemptions should be granted for all those who "rarely, if ever" have been involved in "the criminal misuse of firearms." Myriad individuals and groups would fall into this broad category, *including* law-abiding citizens like the Plaintiffs.

Defendants cannot and have not seriously disputed that the OGM law prohibits "substantially more" protected conduct "than necessary." It is unconstitutional.

## VIII.  The OGM Law Violates Equal Protection Just as Clearly

Because the OGM law "impermissibly interferes with the exercise of a fundamental right," its favored classifications are subject to strict scrutiny under the Equal Protection Clause. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). But the law could not even survive the lowest level of scrutiny here. Under a "rational basis" test, the State "may not rely on a classification whose relationship to the asserted goal is so attenuated as to render the decision arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 446 (1985). There must be a demonstrated "relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). The exemption classifications that California has created here can only be seen as "arbitrary or irrational" and as bearing no relation at all to the "object to be attained," particularly when the only rationale Defendants have proffered—that the favored groups "rarely, if ever" have been involved in "the criminal misuse of firearms"—applies with equal force to Plaintiffs and all the law-abiding citizens they represent in this action.

Plaintiffs are entitled to summary judgment on their claims.

Respectfully submitted April 8, 2022,

/s/ *Raymond M. DiGuiseppe*
Raymond M. DiGuiseppe