ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JERRY T. YEN
Deputy Attorney General
State Bar No. 247988
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
  Fax: (916) 324-8835
  E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Rob Bonta, in his official
capacity as California Attorney General, and
Luis Lopez, in his official capacity as
Director of the Department of Justice Bureau
of Firearms*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,**<br><br>                              Plaintiffs,<br><br>        **v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California, et al.,**<br><br>                              Defendants. | Case No. 3:20-cv-02470-WQH-MDD<br><br>**DEFENDANTS' NOTICE OF MOTION; MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:          May 20, 2022<br>Time:          No oral argument unless requested by the Court<br>Judge:         Hon. William Q. Hayes<br>Courtroom:  14B<br>Action Filed: Dec. 18, 2020 |

1

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2

3     TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

4     PLEASE TAKE NOTICE that on May 20, 2022, or as soon thereafter as the

5   matter may be heard before the Honorable William Q. Hayes (no oral argument

6   unless requested by the Court (Dkt No. 22)), Defendants California Attorney

7   General Rob Bonta and Director Luis Lopez will and hereby do move under Rule

8   56 of the Federal Rules of Civil Procedure for an order granting summary judgment

9   in favor of Defendants.  This motion is based on this Notice of Motion and Motion,

10   the accompanying Memorandum of Points and Authorities, Defendants' statement

11   of undisputed facts, Defendants' request for judicial notice, Defendants' notice of

12   legislative facts, the declarations and evidence filed concurrently herewith, all

13   pleadings and papers on file in this action, and such other matters as may properly

14   come before the Court.

15     Defendants seeks summary judgment on the grounds that California laws

16   limiting the purchase of handguns and semiautomatic centerfire rifles are

17   constitutional because (1) they advance the State's interests in curtailing illegal

18   firearms trafficking and making it more difficult for criminals to obtain firearms,

19   and (2) Plaintiffs have not meet their burden of negating every conceivable basis for

20   the State's exemptions to those laws.

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  April 8, 2022

Respectfully submitted,

ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General


*/s/ Jerry T. Yen*
JERRY T. YEN
Deputy Attorney General
*Attorneys for Rob Bonta, in his official capacity as California Attorney General, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms*

Defendants' Motion for Summary Judgment (3:20-cv-02470)

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................1

Background....................................................................................................1

    I.     History of OGM Laws .....................................................................1

    II.    California's OGM Law ....................................................................3

    III.   Studies Show that OGM Laws Prevent Illegal Firearms
         Trafficking ...................................................................................4

    IV.   Studies Show that Firearms Acquired as Part of a Multiple Sale
         Were More Likely to Be Used in Crimes ........................................7

    V.    Experts Opine that OGM Laws Prevent Illegal Firearms
         Trafficking and Improve Public Safety ..........................................7

    VI.   Procedural History .........................................................................9

Legal Standard ..............................................................................................9

Argument.....................................................................................................10

    I.     California's OGM Law Does Not Violate the Second
         Amendment .................................................................................11

         A.    Intermediate Scrutiny is the Appropriate Standard in this
              Case .................................................................................11

         B.    California's OGM Law is Substantially Related to
              Important Government Interests.............................................12

             1.    OGM Laws Reduce Illegal Firearms Trafficking ..........13

             2.    OGM Laws Improve Public Safety by Making It
                 More Difficult for Criminals to Acquire Firearms........16

    II.    There is No Merit to Plaintiffs' Equal Protection Claim....................20

         A.    Plaintiffs Fail to Identify a Similarly Situated Group that
              the OGM Law Treats Differently............................................20

          B.    Plaintiffs Fail to Meet Their Burden Under Rational Basis
              Review.............................................................................20

              1.    Plaintiffs' Equal Protection Claim Fails Under
                 Rational Basis Review Because California's OGM
                 Law Survives Intermediate Scrutiny .............................21

             2.    Plaintiffs Fail to Meet Their Burden of Proving
                 That There is No Rational Basis for the Exemptions
                 to California's OGM Law .............................................22

Conclusion...................................................................................................23

1

**TABLE OF AUTHORITIES**

2

**Page**

3

4

**CASES**

5

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)..........................................................................10

6

*Bolger v. Youngs Drug Prods. Corp.*
    463 U.S. 60 (1983)............................................................................10

7

8

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)..........................................................................10

9

10

*Currier v. Potter*
    379 F.3d 716 (9th Cir. 2004)............................................................21

11

12

*District of Columbia v. Heller*
    554 U.S. 570 (2008)....................................................................11, 12

13

14

*Duncan v. Bonta*
    19 F.4th 1087 (9th Cir. 2021)...........................................................11

15

16

*FCC v. Beach Commc'ns, Inc.*
    508 U.S. 307 (1993)....................................................................21, 22

17

18

*Fyock v. City of Sunnyvale*
    779 F.3d 991 (9th Cir. 2015)......................................................12, 15

19

20

*Gallinger v. Becerra*
    898 F.3d 1012 (9th Cir. 2018)..........................................................20

21

22

*Gould v. Morgan*
    907 F.3d 659 (1st Cir. 2018)............................................................16

23

24

*Hightower v. City of Boston*
    693 F.3d 61 (1st Cir. 2012) .............................................................21

25

26

*Jackson v. City & Cnty. of S.F.*
    746 F.3d 953 (9th Cir. 2014) ................................................11, 12, 13

27

28

*Kachalsky v. Cnty. of Westchester*
    701 F.3d 81 (2d Cir. 2012)...............................................................13

# TABLE OF AUTHORITIES
### (continued)

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017)...............................................................19

*Kwong v. Bloomberg*
  723 F.3d 160 (2d Cir. 2013)................................................................21

*Mai v. United States*
  952 F.3d 1106 (9th Cir. 2020)............................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
  475 U.S. 574 (1986).........................................................................10

*Minority Television Project, Inc. v. FCC*
  736 F.3d 1192 (9th Cir. 2013)...........................................................10

*National Rifle Association v. McGraw*
  719 F.3d 338, 348-50 (5th Cir. 2013)................................................22

*Nordyke v. King*
  681 F.3d 1041 (9th Cir. 2012) ...........................................................21

*Ohralik v. Ohio State Bar Ass'n*
  436 U.S. 447 (1978).........................................................................10

*Pena v. Lindley*
  898 F.3d 969 982 (9th Cir. 2018)......................................... 13, 21, 23

*Silvester v. Harris*
  843 F.3d 816 (9th Cir. 2016).............................................................12

*T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*
  809 F.2d 626 (9th Cir. 1987).............................................................10

*Teixeira v. County of Alameda*
  873 F.3d 670 (9th Cir. 2017).............................................................11

*Trojan v. Settle*
  Case No. CL20000474-00 (Va. Cir. June 25, 2020)............................. 11, 15, 16

*Turner Broad. Sys., Inc. v. FCC*
  512 U.S. 622 (1994)...................................................................13, 16

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Turner Broad. Sys., Inc. v. FCC*
  520 U.S. 180 (1997).............................................................................................13

*United States v. Chovan*
  735 F.3d 1127 (9th Cir. 2013).............................................................................12

*United States v. Perez*
  6 F.4th 448 (2nd Cir. 2021)...........................................................................13, 14

*United States v. Torres*
  911 F.3d 1253 (9th Cir. 2019).............................................................................12

*United States v. Tribunella*
  749 F.2d 104 (2d Cir. 1984)..................................................................................3

*Wiese v. Becerra*
  306 F. Supp. 3d 1190 (E.D. Cal. 2018)..............................................................22

*Wollard v. Gallagher*
  712 F.3d 865 (4th Cir. 2014)...............................................................................13

**STATUTES**

California Penal Code
  § 17140..................................................................................................................3
  § 27535..................................................................................................... 1, 2, 3, 4
  § 27535(a)..............................................................................................................3
  § 27535(b)..............................................................................................................4
  § 27535(b)(6)........................................................................................................20
  § 27535(b)(7)..........................................................................................................4
  § 27535(b)(8)..........................................................................................................4

California Statutes
  1999, Chapter 128, § 2...........................................................................................2
  2019, Chapter 737, § 5...........................................................................................4

Maryland Code Annotated
  Article 27, § 442A (1996) ......................................................................................2
  Public Safety § 5-128(b) ........................................................................................2

vi

# TABLE OF AUTHORITIES
### (continued)

**Page**

New Jersey Code Annotated
    § 2c:58-2(a)(7)...................................................................................2
    § 2c:58-3(i)......................................................................................2

New York City Administrative Code
    § 10-302.1(b)..................................................................................2

Virginia Code Annotated
    § 308.2:2(R)...................................................................................2

**COURT RULES**

Federal Rule of Civil Procedure
    56(a)..............................................................................................9
    56(d).............................................................................................10

**OTHER AUTHORITIES**

144 Congressional Record
    S11365 (daily ed. Oct. 2, 1998)...................................................16
    S11803 (daily ed. Oct. 7, 1998).............................................17, 18

145 Congressional Record
    S1430 (daily ed. Feb. 10, 1999) .............................................14, 15

Act Concerning Handgun Sales and Purchases,
    Chapter 104, 2009 New Jersey Session Laws 1323...........................2

Act Concerning Public Safety,
    Chapter 5, § 2, 2003 Maryland Acts 14..........................................2

Act to Amend Act 330 of 1965,
    No. 250, 1975 South Carolina Acts 582.........................................2

Act to Amend and Reenact § 18.2-308.2:2 of the Code of Virginia,
    Chapter 486, 1993 Virginia Acts 580..............................................2
    Chapter 257, 2012 Virginia Acts 442..............................................2
    Chapter 991, 2020 Virginia Acts 1900............................................2

Act to Amend § 23-31-140,
    No. 242, 2004 South Carolina Acts 2134........................................1

1

# TABLE OF AUTHORITIES
### (continued)

**Page**

Maryland Gun Violence Act of 1996,
  Chapter 561, 1996 Md. Acts 3139......................................................................2

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Over twenty years ago, California limited the purchase of handguns to one every thirty days in an effort to curtail the illegal gun market and make it more difficult for criminals to acquire guns.  Cal. Penal Code § 27535.[1]  This limitation is typically referred to as one-gun-a-month or OGM.  As rifles became more prevalent, California's OGM law was expanded to the purchase of semiautomatic centerfire rifles.  Plaintiffs now bring this action claiming that the OGM law violates the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs' Second Amendment claim fails as a matter of law because, under the applicable level of scrutiny, intermediate scrutiny, California's limitation is substantially related to important government interests: curtailing the illegal transfer and trafficking of firearms.  Plaintiffs' related equal protection claim also fails because the statute is a valid exercise of the State's police power and is rationally related to its important interests.  Thus, the Court should grant Defendants' motion for summary judgment.

## BACKGROUND

### I.   HISTORY OF OGM LAWS

Five states, including California, have passed OGM laws.  In 1975, South Carolina passed the first law limiting the purchase of handguns to one every thirty days.[2]  Defendants' Statement of Undisputed Facts ("DSUF") No. 1; Defendants'

---

[1] All subsequent statutory references are to the California Penal Code, unless otherwise noted.

[2] South Carolina's OGM law was repealed in 2004.  DSUF No. 2; RJN, Exh. 2 (Act to Amend Section 23-31-140, no. 242, 2004 S.C. Acts 2134).

1

Request for Judicial Notice ("RJN"), Exh. 1 (Act to Amend Act 330 of 1965, no. 250, 1975 S.C. Acts 582) at 584 (sec. 5).  Virginia passed a similar statute in 1993.[3]  DSUF No. 3; RJN, Exh. 3 (Act to Amend and Reenact § 18.2-308.2:2 of the Code of Virginia, ch. 486, 1993 Va. Acts 580) at 582.  Maryland then passed its OGM law in 1996.  DSUF No. 6; RJN, Exh. 6 (Maryland Gun Violence Act of 1996, ch. 561, 1996 Md. Acts 3139) at 3159 (codified as Md. Code Ann., Art. 27, § 442A (1996))[4].

In 1999, California passed a law limiting the purchase of handguns to one every thirty days.  DSUF No. 8; Cal. Stats. 1999, ch. 128 (Assemb. B. 202), § 2 (codified as § 27535).  New Jersey became the fifth state to pass an OGM law in 2009.  DSUF No. 12; RJN, Exh. 8 (Act Concerning Handgun Sales and Purchases, ch. 104, 2009 N.J. Sess. Laws 1323) at 1325-26, 1331 (codified as N.J. Code Ann. §§ 2c:58-2(a)(7) and 2c:58-3(i)).

In 2005, New York City passed a law preventing firearms dealers from selling a rifle or shotgun to any individual who purchased a firearm within the prior ninety days.  DSUF No. 13; RJN, Exh. 9 (New York City Local Law No. 9 Int. 490-A (2005)).  In 2006, New York City expanded the law so that individuals could only acquire one firearm every ninety days.  DSUF No. 14; RJN, Exh. 10 (New York City Local Law No. 31 Int. 364 (2006)); RJN, Exh. 11 (New York City Admin. Code § 10-302.1(b)).

---

[3] Virginia repealed its OGM law in 2012 and then reenacted it again in 2020.  DSUF No. 4; RJN, Exh. 4 (Act to Amend and Reenact § 18.2-308.2:2 of the Code of Virginia, ch. 257, 2012 Va. Acts 442) at 445-46; DSUF No. 5; RJN, Exh. 5 (Act to Amend and Reenact § 18.2-308.2:2 of the Code of Virginia, ch. 991, 2020 Va. Acts 1900) at 1903 (codified as Va. Code Ann. § 308.2:2(R)).

[4] Maryland's OGM law was later moved to the Public Safety Code.  DSUF No. 7, RJN, Exh. 7 (Act Concerning Public Safety, ch. 5, § 2, 2003 Md. Acts 14) at 238 (codified as Md. Code Ann., Pub. Safety § 5-128(b)).

2

## II.   CALIFORNIA'S OGM LAW

The primary OGM statute in California – California Penal Code section 27535 ("California's OGM law") – currently states that "[a] person shall not make an application to purchase more than one handgun or semiautomatic centerfire rifle[5] within any 30-day period.  This subdivision does not authorize a person to make an application to purchase both a handgun and semiautomatic centerfire rifle within the same 30-day period." § 27535(a).  The purpose of this law is "to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself.  Such a transfer is referred to as a 'straw transaction'." DSUF No. 15; Defendants' Notice of Legislative Facts ("NLF"), Exh. 12 (Assemb. B. 202, March 16, 1999 Assembly Committee on Public Safety Hearing, 1999-2000 Reg. Sess. (Cal. 1999)) at 3.  Without a limit on the number of handguns that may be purchased, it is easier for "straw purchasers to acquire guns for another person or for street dealers to acquire guns legitimately."  DSUF No. 16; NLF, Exh. 12.  Thus, the Legislature found that the law would "curtail the illegal gun market, disarm criminals, and save lives . . . ."  *Id*.

---

[5] A "semiautomatic pistol" is defined as "a pistol . . . the operating mode of which uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of the trigger." § 17140.  With respect to the "centerfire" and "rimfire" distinction, in centerfire ammunition, the primer that ignites the gunpowder and causes the cartridge to fire is located in the center of the base of the cartridge.  In rimfire ammunition, the primer is located inside a soft outer rim around the edge at the base of the cartridge. Centerfire firearms are generally more powerful because centerfire cartridges are stronger and can withstand higher pressures than rimfire cartridges.  *See generally United States v. Tribunella*, 749 F.2d 104, 107 (2d Cir. 1984) (describing centerfire weapons); Allen Rostron, *High-Powered Controversy: Gun Control, Terrorism, and the Fight Over .50 Caliber Rifles*, 73 U. Cin. L. Rev. 1415, 1469 n.12 (2005) (explaining rimfire and centerfire design).

3

In 2019, California expanded its OGM law to semiautomatic centerfire rifles, and the expansion went into effect on July 1, 2021.  DSUF No. 9; Cal. Stats. 2019, ch. 737 (S.B. 61), § 5 (amending § 27535).  In doing so, the Legislature noted that "[m]ore and more shootings [were] occurring with long guns."  DSUF No 17; NLF, Exh. 13 (S.B. 61, June 25, 2019 Assembly Committee on Public Safety Hearing, 2019-2020 Reg. Sess. (Cal. 2019)) at 3.  And, in support of this expansion, at least one local board of supervisors noted that it would "support[] legislation that reduces the likelihood of accidental or intentional homicides and, in particular, mass homicides."  DSUF No. 18; NLF, Exh. 13 at 4.

There are some limited exceptions to California's OGM law.  For example, peace officers, licensed private security businesses, licensed gun collectors, and movie production companies are exempt.  DSUF No. 10; § 27535(b).  Private party transactions conducted through a licensed dealer as well as transactions conducted through a law enforcement agency are also exempt.  DSUF No. 11; § 27535(b)(7) and (8).  The Legislature provided these exemptions because they are "salutary" and "encourage a person who may be involved lawfully in multi-gun exchanges to go to a licensed dealer, or to the local sheriff, in order to facilitate the exchange."  DSUF No. 19; NLF, Exh. 12 at 4.

### III.  STUDIES SHOW THAT OGM LAWS PREVENT ILLEGAL FIREARMS TRAFFICKING

Several research studies have found that, after a state implemented an OGM law, there was a reduction in the number of crime guns traced back to that state.  Those studies conclude that OGM laws reduce illegal firearms trafficking.  A study in the *Journal of the American Medical Association* compared the likelihood that a firearm purchased would be traced back to Virginia prior to and after Virginia's

implementation of its OGM law.  DX-23[6] (Weil & Knox 1996).  In that study, researchers found that "[t]he likelihood that a traced gun recovered anywhere in the nation was acquired in Virginia relative to another southeastern state, for firearms purchased after the 1-gun-a-month law took effect compared with guns purchased prior to the enactment of the law, was reduced 36%."  DSUF No. 20; DX-23 at 1760.  "The results of our study provide evidence that restricting purchases of handguns to 1 per month is an effective way to disrupt the illegal movement of guns across state lines."  DSUF No. 20; DX-23 at 1761.

Another study analyzed firearms recovered by the Boston Police Department and the trace data on where those firearms originated.  DX-24 (Braga 2017).  The study found that "[t]he likelihood that a Boston handgun would be traced to a Virginia [federal firearms licensed dealer] relative to licensed dealers elsewhere in I-95 southern decreased by 66.3 percent after the one-gun-a-month law took effect . . . ."  DSUF No. 21; DX-24 at 89-90.  The researcher concluded that results of his study were "congruent with the findings of Weil and Knox's 1996 study and suggest that restricting handgun purchases to one per month may change where criminals get their guns."  DSUF No. 21; DX-24 at 90.

The Virginia State Crime Commission also undertook a study of Virginia's OGM law.  DX-25.  The Commission reported that "Virginia no longer [was] the main source state for firearms trafficking to New York City since the one-gun-a-month law was passed."  DSUF No. 22; DX-25 at 5.  The Commission ultimately found that Virginia's OGM "had its intended effect of reducing Virginia's status as a source state for gun trafficking."  DSUF No. 22; DX-25 at 7.  The Commission also noted that "prior to passage of the one-gun-a-month law, South Carolina was a

---

[6] "DX" followed by the exhibit number are citations to Defendants' exhibits accompanying the Declaration of Jerry T. Yen in support of Defendants' Motion for Summary Judgment.

leading source state for guns traced to New York City, accounting for 39% of guns recovered in criminal investigations.  Following implementation of the law, South Carolina virtually dropped off of the statistical list of source states for firearms trafficked to the northeast."  DSUF No. 23; DX-25 at 3.

A study in *Criminology and Public Policy* looked into crime gun data for handguns sold in Maryland before and after the passage of Maryland's Gun Violence Act.  DX-26 (Koper 2005).  The study distinguished between what the academic literature often refers to as a "single sale," which is a sale involving one gun, and a "multiple sale," which is a sale involving two or more guns to the same individual in a short period.[7]  *See id.* at 750.  The study found that "guns sold in multiple sales in Maryland before the state's OGM law were roughly 25% more likely than those sold in single sales to be recovered by police in the neighboring jurisdiction of Washington, D.C. . . . ."  DSUF No. 24; DX-26 at 769.  "This research [] supports the efficacy of OGM laws as a method for disrupting gun trafficking."  DSUF No. 24; DX-26 at 770.  The author also concluded that "[a]n OGM law should disrupt straw purchasing operations, thereby reducing the flow of guns from the primary market into criminal channels."  *Id*.  In a follow-up article published in the *Journal of Quantitative Criminology*, the same author found that the risk of guns sold as part of a multiple sale in the Maryland suburbs of Washington, DC being recovered in DC "declined significantly (by up to 50%) after the passage of the Maryland [Gun Violence Act], which suggests that the law's one-gun-a-month provision reduced trafficking from Maryland into Washington, DC via multiple sales."  DSUF No. 26; DX-27 (Koper 2014) at 305.  The results of the study suggest that guns sold in a multiple sale "were more likely

---

[7] In this study, the term "multiple sale" referred to the purchase of two or more handguns by the same person from any dealer(s) within a thirty-day period.  *Id*. at 757.

to have been purchased by straw purchasers or traffickers."  DSUF No. 26; DX-27 at 306.

### IV. STUDIES SHOW THAT FIREARMS ACQUIRED AS PART OF A MULTIPLE SALE WERE MORE LIKELY TO BE USED IN CRIMES

The same two studies in *Criminology and Public Policy* and the *Journal of Quantitative Criminology* also concluded that guns sold as part of a multiple sale were more likely to be used in a crime.  DX-26; DX-27.  In particular, the results from the study in *Criminology and Public Policy* showed that "handguns sold in multiple sales were 24% to 29% more likely to have been used in crime at each year of follow-up."  DSUF No. 25; DX-26 at 767.  That study concluded that "[g]uns sold in multiple sales accounted for about one quarter of crime guns and, more importantly, were at elevated risk for criminal use."  DSUF No. 25; DX-26 at 769.  The study in the *Journal of Quantitative Criminology* confirmed that "[g]uns sold in multiple sales were also more likely to be used in a crime . . . ."  DSUF No. 27; DX- 27 at 306.

Another study analyzed data for handguns purchased in California in 1996, before California's OGM law was passed.  DX-28 (Wright 2010).  In that study, the researchers found that "[h]andguns purchased by individuals who bought multiple similar guns were 58% more likely to be used in crime than were handguns purchased by individuals who purchased only one handgun in 1996."  DSUF No. 28; DX-28 at 362.

### V. EXPERTS OPINE THAT OGM LAWS PREVENT ILLEGAL FIREARMS TRAFFICKING AND IMPROVE PUBLIC SAFETY

The State retained and designated two experts, Louis Klarevas, Ph.D., a professor at Columbia University and co-founding member of Columbia University's Scientific Union for the Reduction of Gun Violence, and Joseph L. Bisbee, a former special agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  DX-17 (Klarevas Expert Rept.); DX-19 (Bisbee Expert Rept.).

7

Plaintiffs also retained and designated two experts, Dr. Carlisle Moody, a professor of economics at the College of William & Mary, and George A. Mocsary, a law professor at the University of Wyoming.  DX-20 (Moody Expert Rept.); DX-22 (Mocsary Decl.)

Professor Klarevas is an expert in gun violence and public safety.  *See* DX-17 ¶¶ 3-4.  He is the author of a book providing a comprehensive study on mass shootings in the United States.  *Id.* ¶ 3.  Based on his expertise and review of the relevant literature and evidence, Professor Klarevas offers three main opinions.  First, multiple sales[8] facilitate straw purchases, illegal firearms trafficking, and the acquisition of multiple firearms by potential active shooters.  DSUF No. 30; DX-17 ¶ 39.  Second, laws restricting the purchase of firearms to one per month mitigate the risks and dangers associated with bulk and multiple sales.  *Id.*  Third, OGM laws disrupt illicit firearm markets, reduce firearms trafficking and straw purchases, and have the potential to save lives.  *Id.*  Professor Klarevas concludes that California's OGM laws are "reasonable measures for helping reduce illegal firearm[s] trafficking and firearm homicides, including mass shootings."  DSUF No. 31; DX-17 ¶ 40.

Mr. Bisbee is an expert in illegal firearms trafficking.  *See* DX-19 ¶¶ 3-5.  He was a special agent at ATF for more than 25 years where he focused on firearms trafficking investigations, analyzed how criminals acquire firearms, and other issues related to the illegal acquisition and disposition of firearms.  *Id.* ¶ 3.  He has been involved in hundreds of illegal firearms trafficking investigations, including investigations into organized groups illegally acquiring firearms.  *Id.* ¶ 4.  Based on his extensive experience in illegal firearms trafficking, Mr. Bisbee opines that

---

[8] The State's experts generally use the terms "multiple sales" and "multiple purchases" to mean the same thing, i.e., the sale of more than one gun to the same individual in a single transaction or within a short period of time.  *See* DX-17 ¶ 14; DX-19 ¶ 10.

1   California's OGM law helps reduce the incidence of illegal firearms trafficking and

2   the use of firearms in crimes.  DSUF No. 32; DX-19 ¶¶ 25-26.

3   **VI.   PROCEDURAL HISTORY**

4        On December 18, 2020, Plaintiffs filed a complaint challenging the

5   constitutionality of California's OGM law.  Dkt. No. 1 (Complaint).  The plaintiffs

6   comprise four individuals – Michelle Nguyen, Dominic Boguski, Jay Medina, and

7   Frank Colletti (collectively, "Individual Plaintiffs"); two firearm retailers – PWGG,

8   L.P. and North County Shooting Center, Inc. – and their respective owners – John

9   Phillips and Darin Prince (collectively, "Retailer Plaintiffs"); and three nonprofit

10  entities focused on Second Amendment rights – Firearms Policy Coalition, San

11  Diego County Gun Owners PAC, and Second Amendment Foundation

12  (collectively, "Institutional Plaintiffs").  *Id.* ¶¶ 7-17.  The Individual Plaintiffs

13  desire to purchase two or more handguns and semiautomatic rifles in a single

14  transaction within a thirty-day period.  DSUF No. 36; Complaint ¶¶ 73-77.  The

15  Retailer Plaintiffs allege that they are prevented from selling two or more handguns

16  and semiautomatic rifles in a single transaction within a thirty-day period to

17  individuals.  Complaint ¶¶ 87-88.  The Institutional Plaintiffs claim to have an

18  interest in defending the Second Amendment rights of their members.  *See id.*

19  ¶ 104.

20       Plaintiffs claim that California's OGM law violates the Second Amendment

21  and the Equal Protection Clause of the Fourteenth Amendment.  *Id.* at 32-42

22  (Counts I and II).  The Complaint seeks declaratory and injunctive relief.  *Id.* at 42-

23  43 (Prayer for Relief).

**LEGAL STANDARD**

25       A court must grant summary judgment in favor of a moving party that shows

26  "there is no genuine dispute as to any material fact and the movant is entitled to

27  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is entitled

28  to judgment as a matter of law when the nonmoving party fails to make a sufficient

9

showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253, (1986); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## ARGUMENT

The evidence overwhelmingly demonstrates that limiting the purchase of firearms to one every thirty days advances the State's interest in public safety by reducing the number of firearms in the black market and the acquisition of firearms for use in crimes, such as mass shootings.[9] Accordingly, Plaintiffs cannot prevail on their Second Amendment or Equal Protection claims.

---

[9] In response to a constitution challenge like this one, under an intermediate scrutiny analysis, the State may advance any important government interest, including ones not expressly stated by the Legislature. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 (1983) (permitting government to "advance[] interests that concededly were not asserted when the prohibition was enacted into law. This reliance is permissible since the insufficiency of the original motivation does not diminish other interests that the restriction may now serve"); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("[T]he fact that the original motivation behind the ban on solicitation today might be considered an insufficient justification for its perpetuation does not detract from the force of the other interests the ban continues to serve."). Courts have also recognized this principle in intermediate-scrutiny First Amendment cases. *See, e.g., Minority Television Project, Inc. v. FCC*, 736 F.3d 1192 (9th Cir. 2013) (en banc) (stating that, "[a]s a matter of course, in multiple First Amendment cases, the [Supreme] Court has looked beyond the record before Congress at the time of enactment"). Accordingly,

**I.   CALIFORNIA'S OGM LAW DOES NOT VIOLATE THE SECOND AMENDMENT**

When analyzing a Second Amendment claim, courts employ a two-step analysis.  First, they ask whether "the challenged law affects conduct that is protected by the Second Amendment." *Duncan v. Bonta*, 19 F.4th 1087, 1100 (9th Cir. 2021) (en banc).  If the law does not, then the "analysis ends." *Id*.  "If, on the other hand, the law implicates the Second Amendment," courts must proceed to the second step and "choose and apply an appropriate level of scrutiny." *Id*.; *see also Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc).

For the purposes of this motion only, the Attorney General assumes, at step one of the analysis, that California's OGM law implicates the Second Amendment.[10]  That said, the law easily withstands the applicable level of scrutiny, intermediate scrutiny, at step two.

**A.   Intermediate Scrutiny is the Appropriate Standard in this Case**

In Second Amendment cases, the Ninth Circuit—and every other circuit court to have considered the issue—selects the appropriate level of scrutiny based on a consideration of "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Jackson v.*

---

to avoid awkward constructions, this brief attributes the reasons advanced in this case to the State and the Legislature.

[10] The Second Amendment does not provide "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  Rather, the right to keep and bear arms, like other constitutional rights, is limited in scope and subject to regulation, including "laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626-27.  With respect to OGM laws, a Virginia state court noted that Virginia's OGM law could be considered a limitation on whom licensed firearms dealers can sell to, which is permitted under *Heller*.  DX-30 (Transcript of Oral Argument at 29:10-12, *Trojan v. Settle*, Case No. CL20000474-00 (Va. Cir. June 25, 2020)).

---

11

1   *City & Cnty. of S.F.*, 746 F.3d 953, 960-61 (9th Cir. 2014) (quotation omitted).  So

2   long as a law does not amount to "a destruction of the Second Amendment right" or

3   "severely burden[] that right,"  "intermediate scrutiny is appropriate." *Silvester v.*

4   *Harris*, 843 F.3d 816, 821 (9th Cir. 2016).

5       Here, California's OGM law does not impose a ban on any class of firearm

6   nor does it eliminate anyone's ability to obtain a firearm. *See Heller*, 554 U.S. at

7   628-29; *Jackson*, 746 F.3d at 967; *Fyock v. City of Sunnyvale*, 779 F.3d 991, 999

8   (9th Cir. 2015).  Further, it "does not effectively disarm individuals or substantially

9   affect their ability to defend themselves." *Fyock*, 779 F.3d at 999 (citation

10  omitted).  In fact, the Individual Plaintiffs admit that they already own, or could

11  obtain, a firearm for self-defense.  DSUF Nos. 34-35; DX-33, DX-34, DX-35, and

12  DX-36.  Thus, the law does not severely burden Plaintiffs' Second Amendment

13  right and intermediate scrutiny applies.

14      **B.    California's OGM Law is Substantially Related to Important**
        **Government Interests**
15

16      Intermediate scrutiny requires that (1) the government's stated objective must

17  be "significant, substantial, or important," and (2) there must be a "reasonable fit"

18  between the challenged regulation and the asserted objective. *United States v.*

19  *Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013).  The challenged regulation must be

20  "substantially related" to an important government interest. *Id.* at 1140.

21  Intermediate scrutiny does not require a perfect fit, nor does it require that the

22  regulation be the least restrictive means of serving the government's interest.

23  *Jackson*, 746 F.3d at 969; *Fyock*, 779 F.3d at 1000; *see also United States v.*

24  *Torres*, 911 F.3d 1253, 1263 (9th Cir. 2019) ("A statute need not utilize the least

25  restrictive means of achieving its interest in order to withstand intermediate

26  scrutiny") (internal quotation marks omitted).  Rather, the government "must be

27  allowed a reasonable opportunity to experiment with solutions to admittedly serious

28  problems." *Jackson*, 746 F.3d at 969-70 (quoting *City of Renton v. Playtime*

*Theatres, Inc.*, 475 U.S. 41, 52 (1986)).  The Court's narrow role is to "assure that, in formulating its judgments, [the government] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (plurality) ("*Turner I*").

In applying intermediate scrutiny, the Court may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Jackson*, 746 F.3d at 966.  In so doing, the Court must "accord substantial deference to the predictive judgments of the [legislature]." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) ("*Turner II*").  Under intermediate scrutiny, the "question is not whether [the government], as an objective matter, was correct." *Id.* at 211; *see also Jackson*, 746 F.3d at 966.  Instead, the "evidence need only 'fairly support[]' [the government's] conclusions." *Pena v. Lindley*, 898 F.3d 969 982 (9th Cir. 2018) (quoting *Jackson*, 746 F.3d at 969).  Even when the record contains conflicting evidence, "[i]t is the legislature's job, not [the courts'], to weigh conflicting evidence and make policy judgments." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012); *accord Wollard v. Gallagher*, 712 F.3d 865, 881-82 (4th Cir. 2014).

Here, curtailing illegal firearms trafficking and preventing criminals from acquiring firearms constitute important government interests.  The evidence demonstrates that California's OGM law is substantially related to those interests and withstands intermediate scrutiny.

### 1.   OGM Laws Reduce Illegal Firearms Trafficking

One of the goals of California's OGM law is to "curtail the illegal gun market."  DSUF No. 16; NLF, Exh. 12 at 3.  There should be no dispute that this an important government interest impacting public safety.  *See United States v. Perez*, 6 F.4th 448, 455 (2nd Cir. 2021) (finding that preventing firearms trafficking is substantially related to the government's interest in promoting public safety).  By preventing numerous purchases of handguns and semiautomatic centerfire rifles

within a single thirty-day period, the OGM law hinders gun trafficking and straw purchases, i.e. purchasing a firearm and transferring that firearm to another person who does not have the legal ability to buy a gun.  *See id.*  This is supported by numerous studies.  DX-17 ¶ 25.

Several research studies looked into the effect of South Carolina's, Virginia's, and Maryland's OGM laws, which were enacted before California.[11]  Researchers found a significant reduction in the number of crime guns coming from those states after passage of the OGM laws.  DX-17 ¶¶ 26-30; DSUF No. 20 (DX-23 at 1760); DSUF No. 21 (DX-24 at 89); DSUF No. 22 (DX-25 at 3, 5, 7); DSUF No. 26 (DX-27 at 305).  The reduction in crime guns traced to states with an OGM law has been confirmed by Virginia and Maryland State Police.  NLF, Exh. 14 (145 Cong. Rec. S1430 (daily ed. Feb. 10, 1999)) (statement of Sen. Lautenberg) ("officers from the Virginia State Police testified that after Virginia passed its one-handgun-a-month limit in 1993, the number of crime guns traced back to Virginia from the Northeast dropped by nearly 40 percent." "According to testimony from the Maryland State Police . . . [b]y 1997, one year after the passage of Maryland's one gun a month law, Maryland moved out of the top ten suppliers of crime guns to New York City.")

On the other hand, when Virginia repealed its OGM law, there was an increase in the likelihood that crime guns originating from the Southeast came from Virginia.  *See* DX-17 ¶ 28; DX-24 at 90 ("before [Virginia's OGM] law was repealed, 10.8 percent of recovered handguns [in Boston] originating from an I-95 southern state were first purchased at a Virginia [federal firearms licensed dealer]; after repeal, the figure was 18.5 percent").  Similarly, after South Carolina repealed its OGM law, South Carolina became a significant source of trafficked crime guns

---

[11] As mentioned earlier, OGM laws were enacted in 1975 for South Carolina, in 1993 for Virginia, and in 1996 for Maryland.  DSUF Nos. 1, 3, and 6 (RJN, Exhs. 1, 3, and 6).

to the Northeast.  *See* DX-17 ¶ 20 (citing Kaitlin Stansell, *Feds Say South Carolina is a Top Source for Illegal Funs Found in Northeastern Cities*, WCSC Television, Aug. 6, 2021, https://www.live5news.com/2021/08/07/feds-say-south-carolina-is-top-source-illegal-guns-found-northeastern-cities/ (last visited March 22, 2022)).

There are also studies suggesting that states with OGM laws saw fewer crime guns traced to those states and a lower likelihood of gun trafficking compared to states without OGM laws.  DX-17 ¶ 31 (citing Daniel W. Webster, et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. Urban Health 525, 531 (2009)); DX-18 ¶ 12 (finding that states with an OGM law typically had longer time-to-crime averages, which generally reflects less illegal firearms trafficking, for intrastate crime guns).  In sum, several studies support the conclusion that OGM laws are an effective means of disrupting illegal firearms trafficking.  *See, e.g.,* DSUF No. 20 (DX-23 at 1761); DSUF No. 24 (DX-26 at 770).

This is confirmed by former ATF special agent Joseph Bisbee.  DX-19 ¶¶ 3-4, 25.  For more than 25 years at the ATF, Mr. Bisbee investigated a number of cases where firearms were purchased as part of a multiple sale and later illegally sold and used in various crimes.  *Id.* at ¶¶ 13-17.  His extensive experience leaves "no doubt that firearms traffickers utilize multiple sales to procure quantities of firearms for illegal use." *Id.* at ¶ 25.  Thus, OGM laws, like the one in California, "decrease[] the chance of illegal [firearms] trafficking."  *Id.*  In fact, a convicted firearms trafficker in one Mr. Bisbee's cases acknowledged that Virginia's OGM law made it more difficult for him to acquire firearms.  *Id.* at ¶¶ 19-21.

Defendants have clearly shown that California's OGM law "promotes a 'substantial government interest that would be achieved less effectively absent the regulation.'"  *Fyock*, 779 F.3d at 1000 (citation omitted); *see also* DX-31 (Order, *Trojan v. Settle*, Case No. CL20000474-00 (Va. Cir. July 14, 2020) (denying plaintiffs' motion to temporarily enjoin implementation and enforcement of

Virginia's OGM law for the reasons stated at the June 25, 2020 hearing); DX-30 (Transcript of Oral Argument at 29:21-25, *Trojan v. Settle*, Case No. CL20000474-00 (Va. Cir. June 25, 2020) (finding that Virginia has a substantial governmental interest in deterring illegal gun trafficking between Virginia and the Northeast corridor).  In passing a regulation, a "legislature often must sift through competing strands of empirical support and make predictive judgments to reach its conclusion." *Gould v. Morgan*, 907 F.3d 659, 676 (1st Cir. 2018) (citing *Turner I*, 512 U.S. at 665).  Indeed, when "dealing with a complex societal problem like gun violence, there will almost always be room for reasonable minds to differ about the optimal solution.  It follows, [] that a court must grant the legislature flexibility to select among reasonable alternatives." *Id*.  And as discussed above, the People here have "drawn [a] reasonable inference" that OGM laws reduce firearms trafficking "based on substantial evidence." *See Turner I*, 512 U.S. at 666.  Accordingly, Defendants are entitled to summary judgment that California's OGM law does not violate the Second Amendment.

## 2.   OGM Laws Improve Public Safety by Making It More Difficult for Criminals to Acquire Firearms

There should be no dispute that OGM laws make it harder for criminals, including potential mass shooters, to acquire multiple firearms in a short period of time.  DX-17 ¶¶ 37-38; DX-19 ¶ 25.  Because they make it harder for criminals to acquire firearms, OGM laws can help reduce the use of firearms in crimes.  DX-19 ¶ 26.  In fact, there is a clear link between guns sold as a part of a multiple purchase and their use in crimes.  *See id*. ¶ 13 ("During my time investigating illegal firearms trafficking, I frequently saw that firearms recovered in crimes originated from a multiple sale"); *see also* DSUF No. 25(DX-26 at 769); DSUF No. 27 (DX-27 at 306); NLF, Exh. 15 (144 Cong. Rec. S11365 (daily ed. Oct. 2, 1998)) (testimony of Philadelphia Mayor Edward G. Rendell) ("At least 20 percent of all multiple gun purchasers can be linked to guns used in the commission of crime, particularly

16

violent crime, in Philadelphia"  "A total of 608 handguns that were purchased in multiple purchase transactions have been directly linked to a homicide or other violent crime in Philadelphia"); NLF, Exh. 16 (144 Cong. Rec. S11803 (daily ed. Oct. 7, 1998)) (testimony of Captain Thomas Bowers, Director of the Office of Crime Gun Enforcement for the Maryland State Police) ("The straw purchase of firearms through multiple sales was determined to be the source of the majority of regulated firearms used in the commission of violent crime").  Therefore, prohibiting the multiple sale of firearms can reduce the use of firearms in committing crimes, and the Legislature could have reasonably concluded that an OGM law makes people safer.

Additionally, in studying the effects of OGM laws, researchers have found a slightly lower murder rate in States with OGM laws.  For example, one research study found that firearm homicides decreased after passage of Maryland's 1996 gun law, which included an OGM limitation.  *See* DX-17 (Klarevas Expert Rept.) ¶ 34 (citing Daniel W. Webster, et al., *Effects of Maryland's Law Banning "Saturday Night Special" Handguns on Homicides*, 155 Am. J. of Epidemiology 406, 409 (2002)).  Another study concluded that "passage of one gun a month laws may reduce murder rates."  *Id.* ¶ 36 (citing Clayton E. Cramer, *One Gun a Month Laws: Do They Reduce Murder Rates*, Social Science Research Network Paper 2732735 (Feb. 18, 2016, Revised Oct. 20, 2017), *available at* https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=2732735).

Finally, a 2010 study by Plaintiffs' expert, Dr. Carlisle Moody, found that states with OGM laws experienced lower homicide rates.  *Id.* (citing Carlisle E. Moody and Thomas B. Marvell, *On the Choice of Control Variable in the Crime Equation*, 72 Oxford Bull. Econ. & Stat. 696, 708 (2010)).  Even though that study was done correctly at the time, Dr. Moody now claims it could result in a "spurious correlation."  DX-22 at pp. 3-4.  Nevertheless, the results of that 2010 study, in a publication unrelated to this case, was the only time that Dr. Moody ever found a

statistically significant relationship between a firearms ownership regulation and lower murder rates.  *See* DX-32 (Moody Depo.) at 204:2-11, 205:16-24.

For this case, Dr. Moody also performs a number of statistical analyses in an effort to show that there is no relationship between OGM laws and firearm homicides.  *See* DX-20.  This completely ignores the primary purpose of OGM laws – to disrupt illegal firearms trafficking – and Dr. Moody's report does not even mention illegal firearms trafficking.  *See id.*; *see also* DX-18 ¶ 10; DX-32 at 16:8-17:4 (ignoring articles related to the effect of OGM laws).  Instead, Dr. Moody focuses solely on firearm homicides because data on other types of crimes are harder to obtain and assumes that public safety in this case refers to saving lives.  *See* DX-20 at p. 21; DX-32 at 152:2-153:8.  There is no basis for such an assumption or to ignore data for other types of crime.  Indeed, based on data from ATF, only two percent of all crime guns are involved in a homicide and thus Dr. Moody's analysis completely ignores 98 percent of other crimes involving a firearm.  *See* DX-18 ¶ 11 (citing U.S. Dept. of Justice ATF, *California Data Source: Firearms Tracing System*, *January 1, 2019 – December 31, 2019*, *available at* https://www.atf.gov/file/146966/download; U.S. Dept. of Justice ATF, *California Data Source: Firearms Tracing System*, *January 1, 2020 – December 31, 2020*, *available at* https://www.atf.gov/resource-center/firearms-trace-data-california-2020).

Moreover, all of Dr. Moody's analyses fail to consider whether the firearms used in homicides originated from a multiple firearm purchase.  *See id.* ¶ 10.  And, the results of those analyses hinged on whether there was a "significant" effect on firearm homicides.  DX-20 at pp. 6, 9-10, 16, and 19-20; *see also* DX-32 at 39:9-16 (Dr. Moody testifying about his belief that a law does not achieve its legislative intent if it does not have a statistically "significant" effect).  In fact, Dr. Moody's final analysis goes even further to conclude that handgun sale denials have "no

[statistically] significant effect on murder or firearm homicide."[12]  DX-20 at pp. 19-20.  Not only does this analysis lack any connection whatsoever to OGM laws, but, taken to its logical conclusion, any denial of a handgun purchase for any reason would violate the Second Amendment.  At bottom, whether or not a firearms regulation is constitutional should not be based solely on the statistically "significant effect" on firearm homicides.  *See, e.g., Mai v. United States*, 952 F.3d 1106, 1120-21 (9th Cir. 2020) (finding that a law prohibiting individuals who were involuntarily committed to a mental institution from purchasing a firearm furthers the goal of reducing gun violence and that "[e]ven a small decrease in the number of suicides is [] a significant public benefit."); *see also* DX-29 (Wasserstein) at p. 2 ("a label of statistical significance does not mean or imply that an association or effect is highly probable, real, true, or important.  Nor does a label of statistical nonsignificance lead to the association or effect being improbable, absent, false, or unimportant").

Even if reasonable minds disagree as to whether California's OGM law makes people safer, courts should defer to the Legislature's judgment.  *See Kolbe v. Hogan*, 849 F.3d 114, 140 (4th Cir. 2017) ("The judgment made by the [legislature] in enacting the [firearms regulation] is precisely the type of judgment that legislatures are allowed to make without second-guessing by a court.").  The evidence in this case clearly substantiates the Legislature's decision that limiting the purchase of handguns and semiautomatic centerfire rifles to one every thirty days makes people safer by reducing the use of firearms in crimes.  Thus, California's OGM law survives intermediate scrutiny and does not violate the Second Amendment.  Defendants are therefore entitled to summary judgment on Plaintiff's Second Amendment claim.

---

[12] Dr. Moody defines significance based on a statistical methodology.  DX-32 (Moody Depo.) at 12:6-13:21.

## II.   THERE IS NO MERIT TO PLAINTIFFS' EQUAL PROTECTION CLAIM

### A.   Plaintiffs Fail to Identify a Similarly Situated Group that the OGM Law Treats Differently

Plaintiffs cannot prevail on their equal protection claim because they are not similarly situated with another group that is exempt from California's OGM law. In analyzing an equal protection claim the first step "is to identify the state's classification of groups.  Once we have identified a classified group, we look for a control group, composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy.  If the two groups are similarly situated, we determine the appropriate level of scrutiny and then apply it.  *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (internal quotations and citations omitted).  Here, Plaintiffs appear to claim that Individual Plaintiffs are the control group and motion picture, television, and other entertainment companies, which are exempt from California's OGM law, are the classified group.  *See* Complaint ¶ 138.  However, Plaintiffs fail to explain how the Individual Plaintiffs are similarly situated to motion picture, television, or other entertainment companies.  On the contrary, the two groups are completely different. The Individual Plaintiffs admittedly seek to acquire firearms for "self-defense, proficiency, competition, sport, and hunting."  *Id.*  However, motion picture, television and other entertainment companies acquire firearms to produce films or television shows that involve the use of firearms.  *See* § 27535(b)(6).  Because the Individual Plaintiffs are not similarly situated to a group exempt from California's OGM law, Plaintiffs' equal protection claim fails as a matter of law.

### B.   Plaintiffs Fail to Meet Their Burden Under Rational Basis Review

Even if the Individual Plaintiffs were similarly situated to the entertainment industry (they are not), Plaintiffs' equal protection claim is not based on a suspect classification and, as discussed above, cannot be based on infringement of a Second

20

Amendment right.[13]  Thus, rational basis review applies.  *Nordyke v. King,* 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc) (explaining that rational basis scrutiny applies to an equal protection claim when the challenged law does not involve a suspect classification and is found not to violate the First or Second Amendment); *see also Kwong v. Bloomberg* 723 F.3d 160, 170 n.19 (2d Cir. 2013) (stating that where a litigant asserts corresponding Second Amendment and equal protection claims, and the Second Amendment claim fails, "courts have applied 'rational basis' review to Equal Protection claims on the theory that the Second Amendment analysis sufficiently protects one's rights") (citations omitted); *Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012) ("Given that the Second Amendment challenge fails, the equal protection claim is subject to rational basis review.").

Under rational basis review, statutes are presumed valid and "must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  The burden is on Plaintiffs "to negative every conceivable basis which might support it."  *Id.* at 320 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  Plaintiffs fail to meet their burden.

> **1.   Plaintiffs' Equal Protection Claim Fails Under Rational Basis Review Because California's OGM Law Survives Intermediate Scrutiny**

As an initial matter, when a case, like this one, does not involve a suspect classification and a law withstands strict or intermediate scrutiny under an enumerated rights challenge, courts have held that the law will also survive an equal protection challenge applying rational basis review.  For example, in *Currier v. Potter*, the Court concluded that the "regulations [at issue] do not violate the First

---

[13] To the extent that Plaintiffs' equal protection claim is based on a Second Amendment right, that claim would be subsumed in their Second Amendment claim.  *Pena*, 898 F.3d at 986 (citation omitted).

Amendment, [the] equal protection challenge must fail" under a rational basis review.  379 F.3d 716, 731-32 (9th Cir. 2004).  Similarly, in *National Rifle Association v. McGraw*, the Fifth Circuit applied intermediate scrutiny and found that a Texas law prohibiting 18-20 year olds from public carry of a handgun did not violate the Second Amendment.  719 F.3d 338, 348-50 (5th Cir. 2013).  Given that the law in question "survives the more stringent intermediate scrutiny," the Court also upheld the law "against plaintiffs' equal protection challenge." *Id*. at 350.  So it is here.  Because, as discussed earlier, California's OGM law survives intermediate scrutiny, Plaintiffs' equal protection challenge necessarily fails under rational basis review.

>        **2.  Plaintiffs Fail to Meet Their Burden of Proving That There is No Rational Basis for the Exemptions to California's OGM Law**

Plaintiffs also fail to produce any evidence that there is no rational relationship between California's OGM law and the government's compelling interests in reducing firearms trafficking.  As discussed earlier, Plaintiffs' equal protection claim appears to focus on the exemptions to California's OGM law, and, in particular, the exemption for motion picture, television, and other entertainment companies.  Complaint ¶ 138.  However, Plaintiffs have not meet their burden of negating every conceivable basis for allowing a motion picture, television, or other entertainment company to purchase more than one firearm every thirty days. *See FCC*, 508 U.S. at 313.

On the other hand, the Legislature could have rationally believed that the multiple purchase of firearms by motion picture, television, and video production companies would benefit an important sector of the California economy. *See Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1204 (E.D. Cal. 2018) (finding that "the California electorate could have rationally believed that large capacity magazines used solely as props were not at risk of being used in mass shootings and that such an exception would benefit an important sector of the California economy").  The

Legislature could have also rationally believed that motion picture, television, and video production companies would not engage in illegal firearms trafficking. *See Pena*, 898 F.3d at 987 (stating that "the video-production exemption [to California's Unsafe Handgun Act] is rational because [] weapons [used in film and television], one anticipates, are not intended to be used for live fire"). This is actually supported by Defendant's expert in firearms trafficking. Based on over 25 years of experience investigating firearms trafficking, former ATF agent Bisbee has rarely, if ever, seen any of the entities exempt from California's OGM law, including the entertainment industry, involved in "criminal misuse of firearms purchased as part of a multiple sale." DSUF No. 33; DX-19 ¶ 24.

Thus, California's OGM law and its exemptions survive rational basis review.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment.

Dated:  April 8, 2022                    Respectfully submitted,

ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General


*/s/ Jerry T. Yen*
JERRY T. YEN
Deputy Attorney General
*Attorneys for Rob Bonta, in his official capacity as California Attorney General, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms*

# CERTIFICATE OF SERVICE

Case Name: **Nguyen, Michelle, et al. v. Rob Bonta, et al.**    No.    **3:20-cv-02470**

I hereby certify that on <u>April 8, 2022</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' NOTICE OF MOTION; MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT; DECLARATION OF JERRY T. YEN**

**DEFENDANTS' NOTICE OF LEGISLATIVE FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT; DECLARATION OF JERRY T. YEN**

**DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; EXHIBITS 17-19**

**EXHIBITS 20-22 TO THE DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**EXHIBITS 23-29 TO THE DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**EXHIBITS 30-36 TO THE DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 8, 2022</u>, at Sacramento, California.

|     |     |
| --- | --- |
| <u>Lindsey Cannan</u> | <u>/s/ *Lindsey Cannan*</u> |
| Declarant | Signature |

SA2020305120
36067699