ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JERRY T. YEN
Deputy Attorney General
State Bar No. 247988
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7836
Fax: (916) 324-8835
E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Rob Bonta, in his official capacity as California Attorney General, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California, et al.,**<br><br>Defendants. | Case No. 3:20-cv-02470-WQH-MDD<br><br>**DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; EXHIBITS 17-19**<br><br>Date: May 20, 2022<br>Time: No oral argument unless requested by the Court<br>Judge: Hon. William Q. Hayes<br>Courtroom: 14B<br>Action Filed: Dec. 18, 2020 |

## DECLARATION OF JERRY T. YEN

I, Jerry T. Yen, declare:

1. I am a Deputy Attorney General for the Office of the Attorney General for the State of California, attorney of record for Defendants in this action.

2. I am competent to testify to the matters set forth in this declaration, and if called to do so, I would and could so testify. I make this declaration in support of Defendants' Motion for Summary Judgment.

3. On November 19, 2021, Defendants served Plaintiffs with the Expert Report and Declaration of Dr. Louis J. Klarevas. A true and correct copy of the Expert Report and Declaration of Dr. Louis J. Klarevas with relevant exhibits is attached as **Exhibit 17**.[1]

4. On December 17, 2021, Defendants served Plaintiffs with the Expert Rebuttal Report and Declaration of Dr. Louis J. Klarevas. A true and correct copy of the Expert Rebuttal Report and Declaration of Dr. Louis J. Klarevas is attached as **Exhibit 18**.

5. On November 19, 2021, Defendants served Plaintiffs with the Expert Report and Declaration of Joseph L. Bisbee. A true and correct copy of the Expert Report and Declaration of Joseph L. Bisbee with relevant exhibits is attached as **Exhibit 19**.

6. On November 19, 2021, Plaintiffs served Defendants with the Expert Report of Dr. Carlisle E. Moody. A true and correct copy of the Expert Report of Dr. Carlisle E. Moody (without exhibits) is attached as **Exhibit 20**.

7. On November 19, 2021, Plaintiffs served Defendants with the Declaration of George A. Mocsary. A true and correct copy of the Declaration of George A. Mocsary (without exhibits) is attached as **Exhibit 21**.

8. On December 17, 2021, Plaintiffs served Defendants with the Expert Rebuttal Report of Dr. Carlisle E. Moody. A true and correct copy of the Expert

[1] The documents submitted in this declaration are a subset of the documents submitted in support of Defendants' Motion for Summary Judgment. To keep the numbering of the exhibits consistent, Defendants begin with Exhibit 17 in this declaration.

Rebuttal Report of Dr. Carlisle E. Moody (without supplementary files and log regression results) is attached as **Exhibit 22**.

9. A true and correct copy of Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996) is attached as **Exhibit 23**.

10. A true and correct copy of Anthony A. Braga, *Long-Term Trends in the Sources of Boston Crime Guns*, 3 RSF: The Russell Sage Found. J. Soc. Sci. 76 (2017) is attached as **Exhibit 24**.

11. A true and correct copy of Virginia State Crime Commission, *Study of Virginia's Law on Handgun Purchase Limits*, House Document No. 28 (1996) is attached as **Exhibit 25**.

12. A true and correct copy of Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749 (2005) is attached as **Exhibit 26**.

13. A true and correct copy of Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, 30 J. Quantitative Criminology 285 (2014) is attached as **Exhibit 27**.

14. A true and correct copy of Mona A. Wright, et al., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances that Suggest Gun Trafficking*, 87 J. Urban Health 352 (2010) is attached as **Exhibit 28**.

15. A true and correct copy of Ronald L. Wasserstein, et al., Editorial, *Moving to a World Beyond "p < 0.05"*, 73 The American Statistician S1 (2019) is attached as **Exhibit 29**. This document is available at https://doi.org/10.1080/00031305.2019.1583913.

16. A true and correct copy of relevant excerpts from Transcript of Oral Argument, *Trojan v. Settle*, Case No. CL20000474-00 (Va. Cir. June 25, 2020) is attached as **Exhibit 30**.

17. A true and correct copy of the July 14, 2020 order denying plaintiffs' motion for temporary injunction in *Trojan v. Settle*, Case No. CL20000474-00 (Va. Cir.) is attached as **Exhibit 31**.

18. On January 12, 2022, Defendants deposed Plaintiffs' expert, Dr. Carlisle Moody. A true and correct copy of relevant excerpts of the Reporter's Transcript of the Deposition of Dr. Carlisle Moody is attached as **Exhibit 32**.

19. A true and correct copy of Plaintiff Dominic Boguski's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission is attached as **Exhibit 33**.

20. A true and correct copy of Plaintiff Frank Colletti's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission is attached as **Exhibit 34**.

21. A true and correct copy of Plaintiff Jay Medina's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission is attached as **Exhibit 35**.

22. A true and correct copy of Plaintiff Michelle Nguyen's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission is attached as **Exhibit 36**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 8, 2022.

*/s/ Jerry T. Yen*
JERRY T. YEN
Deputy Attorney General

**EXHIBITS**

**TABLE OF CONTENTS**


| Exhibit | Description | Pages |
|---|---|---|
| Exhibit 17 | Expert Report and Declaration of Dr. Louis J. Klarevas (with relevant exhibits) | 00001-00067 |
| Exhibit 18 | Expert Rebuttal Report and Declaration of Dr. Louis J. Klarevas | 00068-00081 |
| Exhibit 19 | Expert Report and Declaration of Joseph L. Bisbee (with relevant exhibits) | 00082-00099 |
| Exhibit 20 | Expert Report of Dr. Carlisle E. Moody (without exhibits) | 00100-00122 |
| Exhibit 21 | Declaration of George A. Mocsary (without exhibits) | 00123-00131 |
| Exhibit 22 | Expert Rebuttal Report of Dr. Carlisle E. Moody (without supplementary files and log regression results) | 00132-00147 |
| Exhibit 23 | Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996) | 00148-00151 |
| Exhibit 24 | Anthony A. Braga, *Long-Term Trends in the Sources of Boston Crime Guns*, 3 RSF: The Russell Sage Found. J. Soc. Sci. 76 (2017) | 00152-00172 |
| Exhibit 25 | Virginia State Crime Commission, *Study of Virginia's Law on Handgun Purchase Limits*, House Document No. 28 (1996) | 00173-00243 |
| Exhibit 26 | Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749 (2005) | 00244-00274 |

| **Exhibit** | **Description** | **Pages** |
|---|---|---|
| Exhibit 27 | Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, 30 J. Quantitative Criminology 285 (2014) | 00275-00306 |
| Exhibit 28 | Mona A. Wright, et al., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances that Suggest Gun Trafficking*, 87 J. Urban Health 352 (2010) | 00307-00320 |
| Exhibit 29 | Ronald L. Wasserstein, et al., Editorial, *Moving to a World Beyond "$p < 0.05$"*, 73 The American Statistician S1 (2019) | 00321-00340 |
| Exhibit 30 | Transcript of Oral Argument, *Trojan v. Settle*, Case No. CL20000474-00 (Va. Cir. June 25, 2020) (Excerpts) | 00341-00353 |
| Exhibit 31 | Order denying plaintiffs' motion for temporary injunction, *Trojan v. Settle*, Case No. CL20000474-00 (Va. Cir. July 14, 2020) | 00354-00356 |
| Exhibit 32 | Deposition Transcript of Dr. Carlisle Moody (Excerpts) | 00357-00387 |
| Exhibit 33 | Plaintiff Dominic Boguski's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00388-00397 |
| Exhibit 34 | Plaintiff Frank Colletti's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00398-00407 |
| Exhibit 35 | Plaintiff Jay Medina's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00408-00417 |

| **Exhibit** | **Description** | **Pages** |
|---|---|---|
| Exhibit 36 | Plaintiff Michelle Nguyen's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00418-00427 |

# Exhibit 17

ROB BONTA, State Bar No. 202668
Acting Attorney General of California
ANTHONY R. HAKL, State Bar No. 197335
Supervising Deputy Attorney General
JERRY T. YEN, State Bar No. 247988
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7836
Fax: (916) 324-8835
E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official capacity as California Attorney General, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,**<br>Plaintiffs,<br>**v.**<br>**ROB BONTA, in his official capacity as Attorney General of California, et al.,**<br>Defendants. | Case No. 3:20-cv-02470-WQH-MDD<br><br>**EXPERT REPORT AND DECLARATION OF PROFESSOR LOUIS KLAREVAS** |

# EXPERT REPORT AND DECLARATION OF PROFESSOR LOUIS KLAREVAS

## BACKGROUND AND QUALIFICATIONS

1. I am a public safety and security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York. I am also a co-founding member of Columbia University's Scientific Union for the Reduction of Gun Violence (SURGE).

2. I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University. During the course of my 20-year career as an academic, I have served on the faculties of the George Washington University, the City University of New York, New York University, and the University of Massachusetts. I have also served as Defense Analysis Research Fellow at the London School of Economics and Political Science and as a United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

3. I am the author of the book Rampage Nation, one of the most comprehensive studies on mass shootings in the United States.[1] I am also the author or co-author of more than 20 scholarly articles and over 70 commentary pieces. During the course of my career, I have made well over 100 media and public-speaking appearances, many of which addressed the topic of gun violence.

4. My current research examines the nexus between American public safety and gun violence. As part of this research agenda, I am serving as Co-Investigator on a project funded by the National Institutes of Health that examines intentional firearm violence (including active shootings) and school safety.

---

[1] Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016).

5. Besides the present case, I have been previously retained by the California Attorney General's Office in *Duncan v. Becerra*, Case No. 17-cv-1017-BEN-JLB, Southern District of California; *Wiese v. Becerra*, Case No. 2:17-cv-00903-WBS-KJN, Eastern District of California; *Miller v. Becerra*, Case No. 19-cv-1537-BEN-JLB, Southern District of California; and *Jones v. Becerra*, Case No. 19-cv-01226-L-AHG, Southern District of California. *Duncan* and *Wiese* both involve Second Amendment challenges to California's regulation of large-capacity magazines. *Miller* involves a Second Amendment challenge to California's regulation of assault weapons. *Jones* involves a Second Amendment challenge to California's age-based regulation of firearms sales. In 2017, I served as an expert for the State of Colorado, as it defended a legal challenge to its restrictions on large-capacity magazines in *Rocky Mountain Gun Owners, et al. v. Hickenlooper*, Case No. 2013CV33879, District Court, City and County of Denver, Colorado. While I was never deposed in *Wiese, Miller,* or *Jones*, I was deposed in *Duncan* and *Rocky Mountain Gun Owners*. I also testified in court in *Miller* and *Rocky Mountain Gun Owners*. These are the only times that I have been deposed or testified in legal proceedings in the past five years.

6. A more detailed list of my credentials and professional experiences, including a list of all publications authored by me in the last ten years, can be found in my curriculum vitae (see Ex. 1).

7. I am being compensated at a rate of $420 per hour for my work on this matter.

## SCOPE OF ANALYSIS AND PROFESSIONAL OPINION

8. I have been retained by the California Attorney General's Office to provide my professional opinion on whether one-gun-a-month laws (OGM laws hereinafter) like California Penal Code sections 27535-27540—limiting firearm purchases to one handgun or one semiautomatic centerfire rifle per month—can

help reduce illegal firearms trafficking and firearm homicides (including mass shootings).[2]

9. Based upon my extensive review and analysis of the relevant literature and evidence, it is my professional opinion that:

- Bulk and multiple firearm purchases pose serious risks, particularly in terms of facilitating straw purchases and illegal firearm trafficking as well as the acquisition of multiple weapons by potential active shooters seeking to perpetrate mass murder.
- State laws restricting the purchase and/or sale of firearms—both handguns and long guns—to one gun per month are tailored policies that seek to mitigate the risks and dangers associated with bulk and multiple firearm purchases.
- Law enforcement and academic analyses establish that OGM laws disrupt illicit firearm markets, reduce firearm trafficking and straw purchases, and have the potential to save lives.

10. Based on these findings, it is my conclusion that OGM laws are reasonable measures for helping reduce illegal firearm trafficking and firearm homicides, including mass shootings.

**THE RISKS ASSOCIATED WITH BULK AND MULTIPLE FIREARM PURCHASES**

11. Firearms are an instrumental tool for perpetrating violent crime in the United States. According to the annual National Crime Victimization Survey, in

[2] It is my understanding that California's OGM law does not preclude individuals from acquiring firearms, but merely limits the number of handguns and semiautomatic centerfire rifles that they can purchase within a 30-day time period.

2020, approximately 8% of all violent victimizations involved a firearm.[3] FBI Uniform Crime Reports indicate that, in 2020, approximately 35% of aggravated assaults, 37% of robberies, and 77% of murders involved a firearm.[4] Similarly, 75% of all attacks resulting in four or more victims being killed are perpetrated with a firearm.[5]

12. The Bureau of Alcohol, Tobacco, and Firearms (ATF) refers to firearms used in the commission of a crime as "crime guns."[6] A 2016 U.S. Department of Justice survey of prisoners found that approximately 1-in-5 inmates possessed a firearm at the time they were committing the crime for which they were incarcerated. That same survey found that nearly 7-in-10 prisoners had either acquired their crime gun "off the street or from an underground market" (43%) or from a family member or friend (25%). Only 7% of prisoners surveyed indicated that they purchased their crime gun, under their own name, from a licensed firearms

---

[3] Rachel E. Morgan and Alexandra Thompson, *Criminal Victimization, 2020*, Bureau of Justice Statistics Bulletin, NCJ 301775 (October 2021), *available at* https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/cv20.pdf.

[4] Federal Bureau of Investigation, Crime Data Explorer (2021), *available at* https://crime-data-explorer.app.cloud.gov/pages/explorer/crime/crime-trend.

[5] Based on my analysis of data in Juan Thomassie, et al., *Explore the Data: U.S. Mass Killings since 2006*, USA Today (2018), *available at* https://www.gannett-cdn.com/GDContent/mass-killings/index.html#explore.

[6] The ATF defines a crime gun as "any firearm that is illegally possessed, used in a crime, or suspected to have been used in a crime." ATF, Crime Gun Trace Reports (1999): National Report (November 2000), Appendix A, *available at* https://www.atf.gov/resource-center/docs/ycgii-report-1999-appendix-apdf-0/download. The full ATF report, excluding the appendixes, is *available at* https://www.atf.gov/resource-center/docs/ycgii-report-1999-national-reportpdf-0/download.

dealer. An important takeaway from this survey is that unregulated and/or illicit transfers are the primary means by which criminals obtain their firearms.[7]

13. One well-known manner in which firearms are illegally trafficked in the United States is through a process known as straw purchasing. Straw transactions generally involve individuals, who are not prohibited from possessing firearms, buying guns in legal purchases from licensed firearm dealers on the primary market and then reselling the weapons on the secondary market to individuals who are prohibited from possessing or purchasing firearms (e.g., minors or convicted felons). Because demand is high among violent criminals who are prohibited from possessing a firearm, the laws of economics dictate that straw purchasers can sell their guns in the underground market for sizable price markups, generating substantial profits for such weapons trafficking activities.[8]

14. Straw purchases are facilitated when the initial buyer can purchase multiple firearms—handguns and/or long guns—in a single transaction or within a few days.[9] Such transactions are known, respectively, as "bulk firearm purchases"

---

[7] Mariel Alper and Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, Bureau of Justice Statistics Special Report, NCJ 251776 (January 2019), *available at* https://bjs.ojp.gov/content/pub/pdf/suficspi16.pdf.

[8] See, for example, Philip J. Cook and Anthony A. Braga, *Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets*, 43 Arizona Law Review 277 (2001), *attached as* Ex. 2; Glenn L. Pierce, et al., *Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy*, 21 Justice Quarterly 391 (2004), *attached as* Ex. 3; Jon S. Vernick and Daniel W. Webster, *Policies to Prevent Firearms Trafficking*, 13 Injury Prevention 78 (2007), *attached as* Ex. 4; Philip J. Cook, *Gun Markets*, 1 Annual Review of Criminology 359 (2018), *attached as* Ex. 5.

[9] ATF, *supra* note 6, at 40. See also Pierce, et al., *supra* note 8; Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Public Policy 749 (2005), *attached as* Ex. 6; Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking*

and "multiple firearm purchases."[10] Quite simply, the more firearms that weapons traffickers or straw purchasers can buy and then resell, the more revenue they can typically generate. In one example noted by the ATF that occurred in the Los Angeles area in the mid-1990s, prior to the enactment of California's OGM law, unlicensed street dealers had four straw purchasers take turns buying 200 handguns over the course of a four-month period, including one sale that involved the purchase of 40 guns in a single transaction.[11] This is but one example of the dangers inherent when illicit market vendors utilize straw purchasers to buy firearms in bulk and/or in multiple sales from retail gun dealers.

15. Shortly before California enacted its OGM law in 1999, data showed that 1-in-4 handguns sold in the state were purchased in multiple-firearm transactions. According to 1996 California Dealer Record of Sales (DROS) data, nearly half of these transactions involved handguns that were all purchased on the same-day—totaling over 20,000 handguns bought in bulk sales. The remaining multiple sale firearms were acquired across multiple days within a 30-day period. An analysis that cross-checked DROS data against ATF trace records found that a handgun purchased in California as part of a same-day bulk firearm purchase had a 33% higher likelihood of becoming a trace crime gun than a handgun purchased in

---

*and Criminal Gun Use*, 30 Journal of Quantitative Criminology 285 (2014), *attached as* Ex. 7.

[10] A purchase of more than one gun by the same buyer in the same transaction is a bulk purchase/sale. Giffords Law Center to Prevent Gun Violence, "Bulk Gun Purchases" (2021), *available at* https://giffords.org/lawcenter/gun-laws/policy-areas/crime-guns/bulk-gun-purchases. A purchase of more than one gun by the same buyer in the different transactions within a 30-day period is a multiple purchase/sale. Koper (2005), *supra* note 9, at 757.

[11] Julius Wachtel, *Sources of Crime Guns in Los Angeles, California*, 21 Policing: An International Journal of Police Strategies & Management 220 (1998), at 232, *attached as* Ex. 8 and also *available at* https://www.policeissues.org/Sources.pdf.

a single-firearm transaction. For handguns that were purchased in bulk sales on the same day as other similar handguns (i.e., same manufacturer, type, and caliber), it was 58% more likely that they would be used in crime, when compared to non-bulk single-purchase handguns.[12] In other words, handguns sold in California in same-day bulk transactions had a higher likelihood of becoming crime guns prior to the enactment of the state's OGM law.

16. The other area of concern that has arisen is the use of multiple weapons to perpetrate mass shootings. In research that I conducted on high-fatality mass shootings (defined as mass shootings resulting in six or more victims being shot to death), I found that 53% of all such gun massacres between 1966 and 2015 involved shooters possessing multiple firearms as they perpetrated their attacks.[13] One prominent example of a multiple-firearm mass shooting occurred in 2017 when a gunman fired on a crowd of people attending a concert on the Las Vegas strip, killing 60 and wounding over 400 others. A total of 24 firearms were recovered from the crime scene—23 of them semiautomatic, centerfire rifles. The subsequent law enforcement investigation uncovered that in the 12 months leading up to the attack, the gunman legally purchased at least 43 firearms—all of them acquired less than 30 days of another gun purchase. Included among these 43 firearms were all 23 of the semiautomatic centerfire rifles recovered at the crime scene.[14] The Las Vegas massacre, which involved a rampage gunman amassing what in essence was

---

[12] Mona A. Wright, Garen J. Wintemute, and Daniel W. Webster, *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime under Circumstances That Suggest Gun Trafficking*, 87 Journal of Urban Health 352 (2010), at 355-358, *attached as* Ex. 9.

[13] Klarevas, *supra* note 1, at 224, *excerpt attached as* Ex. 10.

[14] Joseph Lombardo, Las Vegas Metropolitan Police Department Criminal Investigative Report of the 1 October 2017 Mass Casualty Shooting (Aug. 3, 2018), at 96-104, 120-122, *available at* https://www.lvmpd.com/en-us/Documents/1-October-FIT-Criminal-Investigative-Report-FINAL_080318.pdf.

a personal arsenal, highlights the risks associated with unregulated bulk firearm purchases—handguns and long guns alike.

**THE PURPOSE OF OGM LAWS**

17. With the exception of homemade guns (e.g., do-it-yourself ghost guns and 3D printed guns), all crime guns were at one point—initially at least—sold by licensed firearms dealers to people who were legally eligible to purchase and own firearms.[15] In other words, nearly all crime guns enter circulation in society through the primary firearms market.[16] As such, one way to try to keep legal guns from becoming crime guns is by enacting laws that regulate lawful transactions in primary markets in such a manner that reduces opportunities for firearms to then make their way into illicit secondary markets or into the hands of dangerous, ill-intentioned individuals.

18. As discussed above, bulk purchases and multiple sales facilitate weapons trafficking and straw purchases. Bulk and multiple firearm purchases also allow potential active shooters to amass private, personal arsenals in a relatively short period of time, which can then be used to commit mass murder. Two of the primary policy objectives of OGM laws are to reduce opportunities for (1) traffickers and straw purchasers to obtain firearms for criminals or others who are unable to purchase a firearm themselves, or that they can then resell for profit through unregulated, private transactions, and (2) potential active shooters to amass multiple firearms in a short amount of time that they can then use to perpetrate a mass murder.

**<u>Firearm Trafficking and Straw Purchases</u>**

19. In light of the threat posed by firearm trafficking and straw purchases, states have enacted measures aimed at reducing opportunities for criminals and

---

[15] Vernick and Webster, *supra* note 8, at 78.

[16] Cook, *supra* note 8.

other people prohibited from possessing firearms to acquire guns. OGM laws that prohibit the sale of multiple firearms to the same individual within a 30-day period are currently in effect in California, Maryland, New Jersey, and Virginia.[17] From 1976 until 2004, South Carolina also had an OGM law in effect.

20. South Carolina was the first state to enact an OGM law, which went into effect in 1976. However, South Carolina repealed its OGM law in 2004.[18] Following the repeal of its OGM law, South Carolina has reportedly again become a major source for trafficked crime guns.[19]

21. Virginia's OGM law initially took effect in 1993. In 2012, Virginia repealed its OGM law. However, Virginia resumed being plagued by firearm trafficking after the repeal of its OGM law, leading the state to enact a new OGM law, which went into effect on July 1, 2020.[20] In one multi-jurisdictional investigation of an interstate firearm trafficking operation that occurred during the time period when Virginia's OGM law was no longer in effect, police wiretaps caught traffickers "mocking Virginia's weak gun laws."[21] Referencing the absence

---

[17] For an overview of OGM laws that are currently in effect in the United States, see Giffords Law Center to Prevent Gun Violence, *supra* note 10.

[18] Clay Barbour, *Law Ends Limit on Handguns*, Post and Courier (May 25, 2004), *attached as* Ex. 11.

[19] Kaitlinn Stansell, *Feds Say South Carolina Is a Top Source for Illegal Guns Found in Northeastern Cities*, WCSC—Channel 5, Charleston (Aug. 7, 2021), *attached as* Ex. 12 and *available at* https://www.live5news.com/2021/08/07/feds-say-south-carolina-is-top-source-illegal-guns-found-northeastern-cities.

[20] Brad Kutner, *Judge Won't Enjoin Virginia's One-Gun-a-Month Law*, Courthouse News Service (Jun. 25, 2020), *attached as* Ex. 13 and *available at* https://www.courthousenews.com/judge-denies-gun-rights-advocates-attempt-to-block-states-one-gun-a-month-law.

[21] Ali Rockett, *17 From Richmond Area Indicted as NYC Police Bust Virginia Gun Ring; 217 Weapons Purchased in Virginia Recovered*, Richmond Times-Dispatch (Mar. 9, 2017), *attached as* Ex. 14 and *available at* https://richmond.com/news/local/city-of-richmond/from-richmond-area-indicted-as-

of an OGM law in Virginia (which resulted from the 2012 repeal), one suspect was recorded as saying, "There's no limit to how many guns I can go buy from the store. I can go get 20 guns from the store tomorrow. I can do that Monday through Friday."[22]

22. In California, the state legislature passed AB 202 (Knox) in 1999, enacting a statewide OGM law which is codified at California Penal Code sections 27535-27540. The initial law limited the sale of handguns by a licensed dealer to one purchase per person within a 30-day period. According to the legislative history of AB 202:

> The goal of this bill is to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself. Such a transfer is referred to as a 'straw transaction.' Typically, straw transactions involve a third party who is under 21 years of age, has a disqualifying prior conviction, has a mental disorder, or is not a resident.[23]

At the time, the legislature's rationale for focusing exclusively on bulk and multiple purchases of *handguns* was identified as follows:

---

nyc-police-bust-virginia-gun/article_e0d9760b-803d-5a4e-8190-97ad2f11729e.html.

[22] *Id.*

[23] Analysis of the Assembly Committee on Public Safety on AB 202 (Knox) (Mar. 16, 1999), *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=199920000AB202. In its analysis of AB 202 (Knox), the Senate Committee on Public Safety provided a useful, yet simple, definitional conceptualization of straw transactions: "A straw transaction usually involves 'A' buying the gun for 'B' because 'B' may not legally buy the gun." Analysis of the Senate Committee on Public Safety on AB 202 (Knox) (Jun. 8, 1999), *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=199920000AB202. The ATF defines a straw purchase as "the acquisition of a firearm(s) from a federally licensed firearms dealer by an individual (the 'straw' purchaser) for the purpose of concealing the identity of the true intended receiver of the firearm(s)." ATF, *supra* note 6, Appendix A.

> Handguns make up an overwhelming share of crime guns and a significant number are traceable to dealer transactions. AB 202 will curtail the illegal gun market, disarm criminals, and save lives by preventing multiple purchases of handguns through legitimate channels. Preventing multiple purchases takes the profit out of black market sales and puts gun traffickers and straw purchasers out of business.[24]

**<u>Firearm Homicides and Mass Murders</u>**

23. In 2019, the California legislature amended the state's OGM law to regulate the sale of semiautomatic centerfire rifles in addition to handguns. According to the legislative history of SB 61 (Portantino), it was noted that "[m]ore and more shootings are occurring with long guns."[25] During hearings on SB 61, it was brought to the legislature's attention that "mass homicides" are a particular threat to public safety that the bill could help reduce.[26] With the passage of SB 61, California joins Maryland in regulating the bulk purchase of certain long guns in addition to handguns.[27]

## THE EFFECT OF OGM LAWS

24. The analytical and scholarly literature on the effect of OGM laws generally falls into two categories: (1) studies that address the relationship between OGM laws and the trafficking of crime guns; and (2) studies that address the relationship between OGM laws and firearm mortality, particularly firearm homicides.

---

[24] Analysis of the Assembly Committee on Public Safety on AB 202 (Knox) (Mar. 16, 1999), *supra* note 22.

[25] Analysis of the Assembly Committee on Public Safety on SB 61 (Portantino) (Jun. 25, 2019), *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB61.

[26] *Id*.

[27] Giffords Law Center to Prevent Gun Violence, *supra* note 10. New Jersey and Virginia only regulate the bulk purchase of handguns. *Id*.

**OGM Laws and Crime Gun Trafficking**

25. There are numerous studies—the vast majority of which are peer-reviewed—finding that OGM laws are associated with reductions in firearm trafficking. The most seminal studies on the relationship between OGM laws and firearm trafficking are those which utilize crime gun trace data for purposes of analysis. A crime gun trace—defined by the ATF as "the systematic process of tracking a recovered crime gun's history from its source (manufacturer/importer) through the chain of distribution (wholesaler/retailer) to the individual who first purchases the firearm"—is a well-established measure of crime gun activity in both law enforcement as well as academic circles.[28]

26. Some of the first assessments of how OGM laws impact firearm trafficking were conducted by law enforcement agencies examining patterns in the so-called "Iron Pipeline"—a reference to the Interstate-95-corridor-route through which firearms have been trafficked from the Southeast region of the United States, where gun laws have been traditionally more permissive, to the Northeast region, where gun laws have been traditionally more restrictive. According to the ATF, just prior to the implementation of its OGM law in 1976, South Carolina accounted for as many as 39% of all of crime guns that were recovered at crime scenes in New York City and traced by the ATF. By 1992, only 3% of all crime guns recovered in New York City were traced back to South Carolina.[29] This before-and-after pattern reflects a 92% reduction in New York City crime guns sourced to South Carolina. This disruption in the Iron Pipeline led the Virginia State Crime Commission—which examined South Carolina's experience as part of its duties to provide

[28] For the ATF definition of firearm tracing, see ATF, *supra* note 6, Appendix A. See also Cook and Braga, *supra* note 8; Pierce, et al., *supra* note 8; Koper (2005), *supra* note 9.

[29] Virginia State Crime Commission, Study of Virginia's Law on Handgun Purchase Limits, House Document No. 28 (1996), at 3, *attached as* Ex. 15.

guidance on OGM laws to the state of Virginia—to conclude that "[f]ollowing the implementation of the [OGM] law, South Carolina virtually dropped off of the statistical list of source states for firearms trafficked to the northeast."[30] Maryland experienced a similar downward trend associated with the enactment of its OGM law. According to the Maryland State Police: "In 1991, Maryland was nationally ranked second in terms of suppliers of crime guns to the City of New York. By 1997, one year after the passage of Maryland's one gun a month law, Maryland moved out of the top ten suppliers of crime guns to New York City."[31]

27. The first peer-reviewed study on the effect of OGM laws on interstate firearm trafficking was an analysis of Virginia's restrictions on bulk and multiple firearm purchases. Using ATF data on crime gun traces, Douglas Weil and Rebecca Knox found that, prior to implementation of Virginia's OGM law in July 1993, 27% of all crime guns recovered in the United States and traced to a gun dealer in the Southeast region were traced specifically to a gun dealer in Virginia. After Virginia's OGM law was in effect, 19% of all crime guns recovered in the United States and traced to the Southeast were traced specifically to a gun dealer in Virginia—a 30% decrease. When the crime guns were recovered in the Northeast region and traced to a gun dealer in the Southeast region, the share of guns traced back to a gun dealer in Virginia was 35% before and 16% after Virginia's enactment of its OGM law—a 54% decrease. In terms of odds ratios, Weil and Knox determined that for firearms purchased after Virginia's OGM law took effect in 1993, compared to firearm purchases prior to Virginia's law being implemented, there was a 36% reduction in the likelihood that a traced crime gun recovered in

[30] *Id.*

[31] *The Stop Gun Trafficking Act*, 145 Congressional Record S1430 (Feb. 10, 1999), *available at* https://www.congress.gov/106/crec/1999/02/10/CREC-1999-02-10-pt1-PgS1430.pdf.

any of the 50 states was acquired in Virginia relative to another Southeastern state. For traced crime guns recovered in the Northeast, the odds ratio reflected an even more pronounced 66% reduction in the likelihood that the firearm was acquired in Virginia relative to another Southeastern state.[32] These findings led the authors of the study to conclude that "limiting the purchase of handguns to no more than 1 per month per person is an effective means of disrupting the illegal interstate transfer of firearms."[33]

28. In a follow-up, peer-reviewed study, which assessed not only the effect of Virginia's initial OGM law, but also the impact of the repeal of that law, Anthony Braga uncovered patterns that were "congruent" to those observed by Weil and Knox in their study.[34] Using the Boston Police Department's comprehensive crime gun trace data, Braga found that the likelihood that a handgun recovered as part of a criminal investigation in Boston would be traced back to a Virginia gun dealer, relative to licensed firearms dealers in the Southeast, fell by 66% following the enactment of Virginia's OGM law in 1993. In contrast, following the repeal of Virginia's OGM law in 2012, the likelihood that a Boston crime handgun would be traced back to a Virginia gun dealer, relative to licensed firearms dealers in the Southeast, rose by 88%.[35]

---

[32] Douglas S. Weil and Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 Journal of the American Medical Association (JAMA) 1759 (1996), at 1760, *attached as* Ex. 16.

[33] *Id.*, at 1761.

[34] Anthony A. Braga, *Long-Term Trends in the Sources of Boston Crime Guns*, 3 RSF: The Russell Sage Foundation Journal of the Social Sciences 76 (2017), at 90, *attached as* Ex. 17.

[35] *Id.*, at 89-90. It should be noted that, while the effect of Virginia's OGM law was statistically significant at the $p < .05$ level, the effect following the repeal was only marginally significant, meaning it was statistically significant only at the $p < .10$ level. *Id.*

29. Another peer-reviewed study that focused on the effect of OGM laws analyzed Maryland's restrictions on multiple firearm purchases in an effort to try and ascertain the extent to which handguns sold as part of a multiple firearm sale were likely to become crime guns. Coupling crime gun trace data with firearm dealer sales records, Christopher Koper found that during the early to mid-1990s one quarter of the crime guns sold in Maryland that were recovered by the police were sold as part of a multiple sale involving more than one handgun being purchased by the same customer within a 30-day period. When Koper assessed the "time-to-crime" status of recovered crime guns, he found that "handguns sold in multiple sales were roughly 4% to 12% more likely to be used in crime than other guns during the first two years after sale."[36] Given that a gun with a time-to-crime of three years or less is generally considered likely to have been trafficked, Koper concluded that "handguns sold in multiple sales were more likely to be used in crime."[37] Based on his results, Koper offered the following guidance: "An OGM law should disrupt straw purchasing operations, thereby reducing the flow of guns from the primary market into criminal channels."[38]

30. Koper's 2005 study examined data from prior to Maryland's OGM law taking effect in 1996. In a follow-up, peer-reviewed study conducted nearly a

---

[36] Koper (2005), *supra* note 9, at 761. According to the ATF, time-to-crime is "the period of time between a firearm's acquisition by an unlicensed person from a retail licensee and law enforcement's recovery of that firearm during use, or suspected use, in a crime." ATF, *supra* note, 6, Appendix A.

[37] Koper (2005), *supra* note 9, at 763. According to the ATF, "A short time-to-crime suggests the firearm will be easier to trace. This measure can be an important indicator of illegal firearms trafficking." ATF, *supra* note, 6, Appendix A. Generally, a short time-to-crime is considered to be a recovery that occurs 3 years or less since retail sale by a licensed firearms dealer. Pierce, et al., *supra* note 8.

[38] Koper (2005), *supra* note 9, at 770.

decade later, Koper was able to examine data from the Baltimore metropolitan area from before and after the enactment of Maryland's OGM law. In terms of the purchase of more than one firearm within a month, Koper found that the transfer of guns as part of a multiple sale was a "significant risk factor," increasing the likelihood of recovery as a crime gun by 23% when dealing with recoveries associated with someone other than the last known buyer—an indicator that such weapons were likely part of a straw purchase or a trafficking enterprise.[39] In a supplemental analysis that examined guns sold in the Maryland suburbs of Washington, D.C., the risk of such a gun being recovered by police in Washington, D.C., "declined significantly (by up to 50%)" after Maryland's OGM law went into effect. Koper interpreted this finding as suggesting that Maryland's "one-gun-a-month provision reduced trafficking from Maryland into Washington, D.C., via multiple sales."[40]

31. While OGM laws were not their focus, two other studies of crime guns and illegal firearm markets in cities that were part of the ATF's Youth Crime Gun Interdiction Initiative (YCGII) deserve brief mention, given that they touched upon possible associations between restrictions on bulk firearm purchases and intrastate firearm trafficking. One of these studies—an analysis of policies aimed at disrupting illegal firearms markets—observed that most YCGII cities did not experience sizable annual reductions in crime gun traces of newer firearms, but a few did. Given the particular cities that saw such decreases, the authors suggested that "[t]he passage of laws limiting retail purchasers to one handgun a month in Maryland and Virginia may have contributed to the decline in newer crime guns in Baltimore and Richmond."[41] The other study—an analysis of the relationship

---

[39] Koper (2014), *supra* note 9, at 304-305.

[40] *Id.*, at 305.

[41] Anthony A. Braga and Glenn L. Pierce, *Disrupting Illegal Firearms*

between firearm sales regulations and intrastate trafficking—found that in the specific YCGII cities under examination, those that were located in states where OGM laws were in effect had an "intrastate gun trafficking indicator" that was about half of what it was for cities located in states where OGM laws were not in effect.[42] While neither of these two studies were primarily focused on assessing the effects of OGM laws, by addressing crime guns recovered within the states to which they were traced, these two studies expanded the research on intrastate trafficking of firearms.[43]

32. In discussing the effect of OGM laws on firearm trafficking, it is important to note that OGM laws do not exist in a vacuum. They are often part of broader state firearm regulation frameworks. On this front, several analyses show that states with more comprehensive and restrictive state firearm laws tend to be less impacted by intrastate firearm trafficking as well as less frequent sources for

---

*Markets in Boston: The Effects of Operation Ceasefire on the Supply of New Handguns to Criminals*, 4 Criminology & Public Policy 717 (2005), at 740, *attached as* Ex. 18.

[42] Daniel W. Webster, Jon S. Vernick, and Maria T. Bulzacchelli, *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 Journal of Urban Health 525 (2009), at 531, *attached as* Ex. 19.

[43] The only other study that I am familiar with which addressed OGM laws is an examination of the relationship between numerous state firearms laws and the rate of export of crime guns to criminals outside the state of purchase. While incidence rate ratio calculations suggested a 19% decrease in the export rate for OGM laws, the findings were not statistically significant. Unfortunately, this study is covered in 4 pages of a chapter in an edited book. Given the brevity of this study, a broader picture of the data and the statistical modeling is not available, making a fuller assessment of the study difficult. Daniel W. Webster, et al., *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, in Daniel W. Webster and Jon S. Vernick, eds., Reducing Gun Violence in America: Informing Policy with Evidence and Analysis (2013), at 109-121, *attached as* Ex. 20 and *available at* https://jhupress.files.wordpress.com/2013/01/1421411113_updf.pdf.

crime guns trafficked across state borders. In other words, firearm dealers and sellers in states with more permissive or "weaker" gun laws are more likely to contribute to illegal firearm markets than firearm dealers and sellers in states with more restrictive or "stronger" gun laws.[44]

**OGM Laws and Firearm Mortality**

33. In addition to studies that examine the relationship between OGM laws and firearm trafficking, there have been a few studies that address OGM laws as part of a broader examination of the relationship between state firearm laws and firearm mortality. Unlike firearm trafficking, which is directly tied to the legislative intent of OGM laws, firearm mortality entails at least an additional degree of separation. Nevertheless, by focusing on firearm homicides—a key outcome variable that is arguably more connected to crime guns than other firearm mortality events like accidental deaths or suicides—the results of these studies can still offer beneficial insights.

34. In a study on the impact of Maryland's so-called "Saturday night special" ban, the authors also assessed Maryland's OGM law, which was enacted in the same year as the state's law regulating cheap, poor-quality handguns. The statistical analysis found that Maryland's OGM law was associated with statistically significant reductions in firearm homicides. Indeed, regardless of the

---

[44] See, for example, Brian Knight, *State Gun Policy and Cross-State Externalities: Evidence from Crime Gun Tracing*, 5 American Economic Journal: Economic Policy 200 (2013), *attached as* Ex. 21; Glenn L. Pierce, Anthony A. Braga, and Garen J. Wintemute, *Impact of California Firearms Sales Laws and Dealer Regulations on the Illegal Diversion of Guns*, 21 Injury Prevention 179 (2015), *attached as* Ex. 22; Tessa Collins et al. *State Firearm Laws and Interstate Transfer of Guns in the USA*, 2006–2016, 95 Journal of Urban Health 322 (2018), *attached as* Ex. 23; Erin G. Andrade, et al., *Firearm Laws and Illegal Firearm Flow between US States*, 88 Journal of Trauma and Acute Care Surgery 752 (2020), *attached as* Ex. 24.

model that the authors employed, Maryland's OGM law was associated with a consistent 10-11% decrease in the state firearm homicide rate.[45]

35. In an analysis of the relationship between state firearm laws and firearm mortality, a slightly lower firearm homicide rate was detected for states with OGM laws in effect, when compared to states without OGM laws. However, the association between OGM laws and firearm homicide rates was not statistically significant.[46] A more recent evaluation of firearm homicides published as a policy brief for the Rockefeller Institute of Government reached a similar conclusion. The analysis found that, despite an immaterial decline in firearm homicide rates when and where OGM laws were in effect, the relationship between OGM laws and firearm homicide rates was not statistically significant.[47]

---

[45] Daniel W. Webster, Jon S. Vernick, and Lisa M. Hepburn, *Effects of Maryland's Law Banning "Saturday Night Special" Handguns on Homicides*, 155 American Journal of Epidemiology 406 (2002), at 409, *attached as* Ex. 25.

[46] Matthew Rosengart, et al., *An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates*, 11 Injury Prevention 77 (2005), at 81, *attached as* Ex. 26. The relationship between OGM laws and firearm suicides was also not statistically significant. *Id*., at 82.

[47] Michael Siegel and Claire Boine, What Are the Most Effective Policies in Reducing Gun Homicides? Rockefeller Institute of Government Policy Brief (Mar. 29, 2019), at 31, *attached as* Ex. 27 and *available at* https://rockinst.org/wp-content/uploads/2019/08/8-13-19-Firearm-Laws-Homicide-Brief.pdf. In addition to the 2005 Rosengart et al. and the 2019 Siegel and Boine studies, a 2016 study also attempted to tease out the relationship between OGM laws and firearm mortality. It found that restrictions of multiple firearm purchases were associated with an 81% increase in firearm homicides and a 30% increase in firearm suicides during the narrow timeframe of 2008-2010. Bindu Kalesan, et al., *Firearm Legislation and Mortality in the USA: A Cross-Sectional, State-Level Study,* 387 The Lancet 1847 (Apr. 30, 2016), at 1853, *attached as* Ex. 28. However, this study has been described as far-fetched and lacking credibility in the academic literature and in news media reports. In particular, the study's incredible main conclusion—if the entire United States was subject to just three firearms regulations (universal background checks for firearm purchases, universal background checks for ammunition purchases, and ballistic fingerprinting for firearm identification), gun

36. Two additional assessments have also observed a relationship between OGM laws and firearm homicide rates. In an article that was largely addressing a methodological concern pertaining to statistical regressions, one of the tests the authors ran found that there was a marginally significant relationship between OGM laws and murders, indicating that states with OGM laws experienced lower homicide rates.[48] The other study is an unpublished paper that acknowledges *prima facie* evidence that OGM laws are associated with reductions in murder rates—statistically significant decreases in some cases—in the states that enacted OGM laws. To quote from the paper, "This data suggests that passage of one gun a month laws may reduce murder rates."[49] Later on, in the concluding section, the author reiterates, "New Jersey, South Carolina, and California might be evidence that such [OGM] laws reduce murder rates."[50] However, the author, employing an

---

deaths (homicides, suicides, and accidents) would be reduced by 90%—has led to strong criticism and rejection of the entire study, especially on methodological grounds. See, for example, Lois Beckett, *Gun Control Study's Dramatic Results 'Implausible,' Say Leading Researchers*, Guardian (Mar. 10, 2016), *attached as* Ex. 29 and *available at* https://www.theguardian.com/us-news/2016/mar/10/gun-control-study-flawed-researchers; Carolyn Y. Johnson, *Why This Gun Control Study Might Be Too Good To Be True*, Washington Post (Mar. 10, 2016), *attached as* Ex. 30 and *available at* https://www.washingtonpost.com/news/wonk/wp/2016/03/10/why-this-gun-control-study-might-be-too-good-to-be-true; David Hemenway, *Firearm Legislation and Mortality in the USA*, 387 *The Lancet* 1796 (Apr. 30, 2016), *attached as* Ex. 31; *Gun Violence Prevention*, 388 *The Lancet* 233 (Jun. 16, 2016), *attached as* Ex. 32.

[48] Carlisle E. Moody and Thomas B. Marvell, *On the Choice of Control Variables in the Crime Equation*, 72 Oxford Bulletin of Economics and Statistics 696 (2010), at 708, *attached as* Ex. 33.

[49] Clayton E. Cramer, *One Gun a Month Laws: Do They Reduce Murder Rates*, Social Science Research Network Paper 2732735 (Feb. 18, 2016; Revised Oct. 20, 2017), at 6, *attached as* Ex. 34 and *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2732735.

[50] *Id.*, at 11.

unorthodox and flawed methodological approach, unpersuasively attempts to offer an alternative explanation—declining social order—for the observed correlation between OGM laws and reductions in murder rates.[51] This is an unpublished paper, so it is not peer-reviewed. Regardless, both studies provide evidence consistent with the hypothesis that OGM laws reduce murder rates.[52]

37. The other area of concern in terms of firearm mortality, given the legislative intent of California's OGM laws, pertains to the relationship between OGM laws and mass shootings. To date, no studies have assessed this relationship directly. Nevertheless, OGM laws can make it harder for active shooters to acquire firearms in a relatively short period of time. In addition, as mentioned above, it is

---

[51] *Id.*, at 5-10.

[52] There is also a paper examining the relationship between safe storage laws and violent crime ran regressions that included OGM laws as part of its analysis. This study found that OGM laws were associated with an increase in violent crime, although these relationships were not statistically significant. For a variety of reasons, including methodological shortcoming such as excluding a full discussion of state law coding determinations, a thorough assessment of this paper is not possible. John R. Lott, Jr., and John E. Whitley, *Safe-Storage Gun Laws: Accidental Deaths, Suicides, and Crime*, 44 Journal of Law & Economics 659 (2001), at 679-680, *attached as* Ex. 35. There are, however, additional reasons for not giving the paper much weight. One in particular is that the lead author, John Lott, has a long history of employing questionable and faulty practices to advance arguments against firearms regulations, resulting in accusations that his gun violence research is "junk science." If nothing else, his analyses should be treated with caution. For more on Lott's questionable and faulty practices, see Evan DeFilippis & Devin Hughes, *Shooting Down the Gun Lobby's Favorite 'Academic': A Lott of Lies*, Armed with Reason (Dec. 1, 2014), *attached as* Ex. 36 and *available at* http://www.armedwithreason.com/shooting-down-the-gun-lobbys-favorite-academic-a-lott-of-lies; Piers Morgan, *Lawyer Alan Dershowitz on the Research of Author John Lott Jr.: 'Junk Science … Paid for by the National Rifle Association'*, CNN.com (Jul. 24, 2012), *attached as* Ex. 37 and *available at* http://piersmorgan.blogs.cnn.com/2012/07/24/lawyer-alan-dershowitz-on-the-research-of-author-john-lott-jr-junk-sciencepaid-for-by-the-national-rifle-association.

important to recall that OGM laws do not exist in a vacuum. They are often part of broader state firearm regulation frameworks. As analyses establish, the more comprehensive and restrictive state firearm laws are, the fewer firearm homicides as well as mass shootings occur.[53]

38. Furthermore, as we learned from the 2017 Las Vegas strip massacre, the absence of OGM laws facilitated the gunman's efforts to amass a personal arsenal, which he then used to kill 60 people and wound over 400 others. As discussed above, in the 12 months leading up to the worst mass shooting in modern American history, the gunman purchased at least 43 firearms through bulk and multiple firearm sales.[54] Had the gunman's efforts been restricted by OGM laws, it would have been more difficult for him to purchase so many firearms in such a short timeframe.

## SUMMARY OF OPINIONS

39. Based upon my extensive review and analysis of the relevant literature and evidence, it is my professional opinion that:

- Bulk and multiple firearm purchases pose serious risks, particularly in terms of facilitating straw purchases and illegal firearm trafficking as well as the acquisition of multiple weapons by potential active shooters seeking to perpetrate mass murder.

- State laws restricting the purchase and/or sale of firearms—both handguns and long guns—to one gun per month are tailored policies that seek to mitigate the risks and dangers associated with bulk and multiple firearm purchases.

[53] See, for example, Eric W. Fleeger, et al., *Firearm Legislation and Firearm-Related Fatalities in the United States*, 173 JAMA Internal Medicine 732 (2013), *attached as* Ex. 38; Paul M. Reeping, et al., *State Gun Laws, Gun Ownership, and Mass Shootings in the U.S.: Cross Sectional Time Series*, 364 British Medical Journal (BMJ) l542 (2019), *attached as* Ex. 39.

[54] Lombardo, *supra* note 14, at 96-104, 120-122.

- Law enforcement and academic analyses establish that OGM laws disrupt illicit firearm markets, reduce firearm trafficking and straw purchases, and have the potential to save lives.

40. Based on the above findings, it is my conclusion that one-gun-a-month laws, like California's law limiting the purchase of handguns or semiautomatic centerfire rifles to one every 30 days, are reasonable measures for helping reduce illegal firearm trafficking and firearm homicides, including mass shootings.[55]

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently to the above.

Executed in Queens, New York, on November 19, 2021.

Louis Klarevas

[55] California's OGM law includes several exemptions, identified at California Penal Code § 27535(b). Based on my review of the relevant literature and data, I came across no evidence that would lead me to alter my conclusions in light of California's exemptions.

# EXHIBIT 1

# Louis J. Klarevas
**Email: ljk2149@tc.columbia.edu**


## Education

Ph.D. International Relations, 1999
School of International Service
American University
Washington, DC

B.A. Political Science, *Cum Laude*, 1989
School of Arts and Sciences
University of Pennsylvania
Philadelphia, PA

## Author

*Rampage Nation: Securing America from Mass Shootings*

## Current Positions

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

## Professional Experience

*Academic Experience (Presented in Academic Years)*
Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*
Expert for State of California, *Nguyen v. Bonta*, United States District Court for Southern District of California, Case Number 20-cv-02470-WQH-MDD, San Diego, CA, 2021-

Expert for State of California, *Jones v. Bonta*, United States District Court for Southern District of California, Case Number 19-cv-01226-L-AHG, San Diego, CA, 2021-

Expert for State of California, *Miller v. Becerra*, United States District Court for Southern District of California, Case Number 19-cv-1537-BEN-JLB, San Diego, CA, 2019-

Expert for Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019-

Expert for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 17-cv-1017-BEN-JLB, San Diego, CA, 2017-

Expert for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2017-

Expert for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, Denver, CO, 2016-2017

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, Academy for International Conflict Management and Peacebuilding, United States Institute of Peace, Washington, DC, 2008-2009

Consultant, United States Institute of Peace, Washington, DC, 2005

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*
Counter-Terrorism and Homeland Security
International Political Economy
International Politics in a Post-Cold War Era
International Security
Machinery and Politics of American Foreign Policy
Role of the United States in World Affairs
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy

*Undergraduate*
American Government and Politics
European-Atlantic Relations
International Political Economy
International Relations
Transnational Terrorism
United States Foreign Policy

**Scholarship**

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974, Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009
"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti*, University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997,* Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis)

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

**Commentaries and Correspondence**

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993

**Commentaries Written for *New York Daily News* – https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007

**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)

**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)

**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Expert for State of California, *Nguyen v. Bonta*, United States District Court for Southern District of California, Case Number 20-cv-02470-WQH-MDD, San Diego, CA, 2021-

Expert for State of California, *Jones v. Bonta*, United States District Court for Southern District of California, Case Number 19-cv-01226-L-AHG, San Diego, CA, 2021-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Expert for State of California, *Miller v. Becerra*, United States District Court for Southern District of California, Case Number 19-cv-1537-BEN-JLB, San Diego, CA, 2019-

Expert for Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019-

Expert for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 17-cv-1017-BEN-JLB, San Diego, CA, 2017-

Expert for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2017-

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Expert for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, Denver, CO, 2016-2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

Museum of Modern Art (MoMA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Sigma Nu Fraternity

Social Science Research Network (SSRN)

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Charles Branas and Sonali Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

# EXHIBIT 19

Journal of Urban Health: Bulletin of the New York Academy of Medicine, Vol. 86, No. 4
doi:10.1007/s11524-009-9351-x
© 2009 The New York Academy of Medicine

# Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking

Daniel W. Webster, Jon S. Vernick, and Maria T. Bulzacchelli

**ABSTRACT** *Criminals illegally obtaining firearms represent a great risk to many urban residents. This cross-sectional study of 54 US cities uses data on state laws governing gun sales, a survey of law enforcement agencies' practices to promote compliance with gun sales laws, and crime gun trace data to examine associations between these policies and practices with gun trafficking indicators. Higher levels of local gun ownership were linked with greater intrastate gun trafficking. Regression models estimate that comprehensive regulation and oversight of gun dealers and state regulation of private sales of handguns were each associated with significantly lower levels of intrastate gun trafficking. Discretionary permit-to-purchase licensing laws' negative association with intrastate trafficking disappeared when local gun ownership is controlled. The effects of these relatively restrictive gun purchase laws on trafficking may be mediated by the laws' lowering of gun ownership. Relatively low prevalence of gun ownership may also be a prerequisite for passage of discretionary purchase. We observed no effect on intrastate trafficking of laws limiting handgun sales to a maximum of one per person per month.*

**KEYWORDS** *Gun policy, Violence prevention, Policy evaluation*

## INTRODUCTION

Gun violence is arguably the most significant threat to the safety of urban residents in the USA. In 2005 in the USA, firearms were used in more than 12,000 homicides, 84% of which occurred in large- or medium-sized metropolitan areas.[1] Firearm homicide rates in the USA are highest among young men in large urban centers and have been rapidly increasing in this population in recent years.[2] This disturbing trend has occurred despite a general decline in violent crime in most US cities.[3] The annual social costs from gun violence in the USA have been estimated at $100 billion.[4]

Although perpetrators of gun violence are commonly proscribed from possessing a firearm,[5] many obtain firearms through an illicit market or theft.[6] Surveys of incarcerated offenders indicate that most armed criminals obtained their firearms directly from a friend, family member, or "on the street."[6]

Because deterring such transactions is difficult, it may be prudent to focus on how firearms initially become diverted from the legal to the illegal market. A national study of gun trafficking investigations found that corrupt retail gun dealers accounted for more guns diverted into the illegal market than any other single trafficking channel.[7] Although a very small proportion of gun dealers sell the

Webster and Vernick are with the Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, USA; Bulzacchelli is with the Department of Public Health, School of Public Health and Health Sciences, University of Massachusetts at Amherst, Amherst, MA, USA.

Correspondence: Daniel W. Webster, Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, USA. (E-mail: dwebster@jhsph.edu)

majority of guns traced to crime,[8] a national phone survey of retail gun dealers found that half of the gun dealers indicated a willingness to make a sale under circumstances of questionable legality.[9] But when retail sellers of firearms become vulnerable to undercover stings by law enforcement, lawsuits by city officials for making illegal sales, or even bad publicity, the flow of new guns into the illicit market often decreases significantly.[10,11]

Given the threat to public safety associated with illegal gun trafficking, some government regulation and oversight of retail firearm sellers is warranted. US federal law requires retail firearm dealers to obtain a license from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and to adhere to several regulations designed to ensure accountability. These include limiting sales to purchasers who pass a background check, mandatory record keeping of all acquisitions and sales of firearms, requirements to cooperate with ATF crime gun trace requests, and mandatory reporting of theft or loss of firearms.

Yet there are also important weaknesses in current federal laws regarding firearm dealers and in the enforcement of those laws. Federal laws require very high standards of evidence for license revocation or criminal prosecutions of dealers. In addition, only one compliance inspection per dealer per year is permitted[12] and penalties for some gun sale law violations are weak. As a result, license revocations and criminal prosecutions of firearm retailers are rare, though they have increased in recent years. The US Department of Justice's Inspector General issued a report in 2004 on the ATF's oversight of firearm retailers and concluded that "inspections are infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic...[e]ven when firearm law violations have been numerous and serious."[13]

Another way in which federal laws provide limited accountability and enable gun trafficking is by limiting most firearm sales regulations to licensed dealers. Federal law permits private sellers to transfer their firearms with no background check or other paperwork. This is a crucial omission. Eighty-five percent of guns traced to crime were recovered from someone who was not the original retail purchaser.[14]

Given these limitations in federal laws and enforcement practices, efforts by states and local governments to hold gun sellers accountable may be necessary to curtail gun trafficking. Seventeen states have laws requiring retail firearm dealers to be licensed by state or local government; however, five of these states do not even require dealers to both maintain acquisition and sales records and make those records available for compliance inspections. Ten additional states require firearm dealers to maintain sales records and permit law enforcement inspections, but do not require a state or local license.[15] Twenty-two states require buyers of guns from private individuals to undergo a background check to ensure that the potential purchaser is legally eligible to possess a firearm.[16]

Rather than examine whether comprehensive regulatory schemes designed to deter illegal sales are effective, most prior studies of gun control laws attempt to estimate the independent effects of discrete laws[17] that, by themselves, may be inadequate for reducing gun availability to criminals.[18] Our prior research found that in states with more comprehensive gun sales regulations, including both handgun registration and a permit-to-purchase licensing system, the guns criminals used were much more likely to have been originally sold by out-of-state retail dealers, typically in states with much weaker firearm sales regulations.[19] Criminals' reliance on out-of-state sources for guns was negatively correlated with measures of

gun availability to criminals.[19] This prior study, however, examined a rather limited indicator of illegal gun trafficking and did not formally assess the effects of several laws that could deter illegal firearm sales. In addition, as is the case for virtually every other evaluation of firearm sales laws, our prior research did not consider enforcement practices.

The current study attempts to enhance our understanding of the effects of gun policies on gun trafficking by estimating the effects of key components—both individually and jointly—of a regulatory scheme designed to prevent diversion of firearms into the illicit market. These components include: (1) regulation and oversight of gun retailers, (2) private sales regulations requiring potential buyers to undergo a background check prior to purchasing a gun from private individuals, and (3) permit-to-purchase licensing laws that provide law enforcement agencies some discretion to deny purchase applications to those who might pose some risk.

## METHODS

### Study Design

We used a cross-sectional study design with city-level data to examine associations between firearm sales regulations, oversight of gun dealers, and indicators of the diversion of guns into the illegal market.

### Data and Measures

Data for our outcome measure were drawn from crime gun traces conducted by the ATF of guns recovered by police from 2000 through 2002 in 54 cities that were participating in the Youth Crime Gun Interdiction Initiative (YCGII; Washington, DC, which essentially banned all handgun sales from 1977 to June 2008, was excluded). Cities that participate in the YCGII agreed to submit information to the ATF for all crime guns recovered by local law enforcement agencies.[20]

Our primary outcome variable was the ratio of likely "trafficked" crime guns sold by an in-state firearm dealer to the number of older crime guns (firearms recovered in the city that had been recovered by police three or more years after retail sale or for which the ATF determined the gun was too old to trace) multiplied by 100. The denominator of this ratio is used to control for differences across cities in gun crime and proactive efforts by police to recover guns from criminals. We considered a crime gun likely to have been trafficked if the interval between retail sale and recovery by the police was less than 1 year, as long as the criminal possessor was not the legal purchaser of record. We also created a trafficking indicator with a cutoff of less than 2 years from retail sale to recovery in crime as a second measure of potential trafficking. Because there was a near-perfect correlation between two indicators ($r=0.975$), we do not present data for the <2-year sale-to-crime dependent variable.

We focus primarily on likely trafficked guns originally sold by dealers located in the same state in which they were recovered by the police because the state-level gun sales regulations being examined can only directly affect such guns. For our secondary indicator of gun trafficking, we relax the precondition of the gun having been sold by an *in-state* dealer to examine the net effect of these measures on *any* diversion of guns into the illegal market, including guns sold by out-of-state dealers within 1 year of being recovered by the police. For 12 cities, we did not use data for all 3 years because large fluctuations in the number of trace requests per year

suggested that comprehensive crime gun traces practices had either never been instituted or had been discontinued during the study period.

Legal research was conducted to gather detailed data on state laws concerning the licensing and regulation of retail firearm dealers, private firearm sales regulations, and other key laws such as permit-to-purchase licensing of firearm buyers and laws limiting handgun purchases to one per month.[14] States were classified by their overall level of firearm dealer regulation. A state is classified as having relatively "strong" firearm dealer regulations if state law requires: (1) a state or local dealer license, (2) record keeping of firearm sales, (3) dealers' records and premises to be available to law enforcement for inspections, and (4) prompt reporting of thefts of firearms from dealers. A state is classified as having relatively "moderate" firearm dealer regulation if state law requires a dealer license, but not all of the other requirements for strong oversight are met. Finally, a state is considered to have "weak" regulation if its law does not require a dealer license.

We also conducted a survey of state and local law enforcement officials to identify policies and practices regarding oversight, inspection, and undercover enforcement efforts to encourage firearm dealers' compliance with gun sales laws. For each state, we contacted a person responsible for oversight of gun dealers and/or investigating gun trafficking to participate in the survey. Where state gun dealer licenses are issued at the local level, city agencies were also surveyed. State surveys were conducted from July to September of 2003; city surveys were conducted from October to December of 2004. For this city-level analysis, enforcement activity was considered to be occurring in a city if indicated by either a local agency or a state agency. Two enforcement practices that we focus on in this study are whether the law enforcement agency conducted audits of licensed gun dealers at some regular interval (e.g., annually) and whether the agency ever do undercover "stings" of gun dealers to see whether the dealer would make an illegal sale.

Whether criminals in a city obtain new guns through trafficking may depend on the city's proximity to states with relatively weak gun sales laws. We used two variables to control for a city's proximity to states with weak gun laws: (1) the proportion of the population within a 50-mile radius of the city residing out-of-state in a state that did not have strong gun dealer sales regulations in 2000 and (2) the straight-line distance from the city center to the border of the nearest state without strong gun dealer regulations. All of the geographic population and distance data were obtained using ArcMap 9.1 software (ESRI, Inc. 1999–2005). State populations for 2000 were obtained from the US Census Bureau's Census 2000 summary files.[21]

We also incorporated measures of the prevalence of gun ownership into some of the analyses. Conceptually, the prevalence of firearm ownership within an area may be related to both the key explanatory variables and outcomes of interest. Higher levels of gun ownership are likely to decrease the chance that firearm sales regulations are adopted. Firearm sales regulations may also depress firearm ownership within an area, thereby making it more difficult for criminals to obtain a firearm through a private sale or through theft. We measured local firearm ownership with a commonly used and validated proxy—the percentage of suicides committed with firearms within a jurisdiction—in this case, the county in which the city resides, during 2000 to 2002. Suicide data were obtained from CDC Wonder.[22]

### Data Analysis

The distribution of the outcome measures was approximately normal. Therefore, we used ordinary least-squares linear regression analysis to estimate the effects of

firearm sales policies and compliance efforts on the gun trafficking indicator while controlling for proximity to population in states with weak gun sales regulations. We assessed possible confounding of the prevalence of gun ownership by estimating models with and without the local gun ownership prevalence proxy in the model. Multicollinearity among explanatory variables was identified based on variance inflation factor scores. Cook's distance and standardized DfBetas were examined to identify observations with unusual combinations of values for the explanatory variables that exerted disproportionate influence on model coefficients.

There was a very high concordance between having strong state laws concerning the regulation of gun dealers and state and/or local law enforcement agencies having policies to inspect all gun dealers within some specified interval (e.g., every year, every other year). Furthermore, there was no difference in the intrastate gun trafficking indicator between states with laws rated as "moderate" strength or "weak." Therefore, in the regression analyses, we used an indicator variable set equal to 1 if the city was in a state that had both a strong dealer regulation law and also a state or local law enforcement agency that regularly inspected all gun dealers licensed by the state or local government, and set to 0 if otherwise.

We regressed the intrastate gun trafficking indicator on each of the policy indicator variables: (1) strong gun dealer regulation and oversight, (2) state or local law enforcement agency ever conducts undercover stings of gun dealers, (3) regulation of private handgun sales, (4) discretionary permit-to-purchase handgun licensing, and (5) limiting handgun purchases to one per customer per month. The one-gun-per-month variable was dropped from the model after it was found to have no independent effect on gun trafficking levels, and its inclusion in the model inflated the variance of other estimates. For statistically significant policy effects, we derived estimates of the effects of the policies on cities where the policies were in place by calculating the percentage difference between what the model predicted for the trafficking indicator with and without each policy's estimated effect on trafficking.

An examination of Cook's distance statistics for each model revealed that Gary, IN exerted an unusually high degree of influence on the model estimates, particularly estimates of the effects of the city's proximity to population in other states lacking comprehensive gun sales regulations. Analyses were run with and without Gary's data in the model and with and without the population covariate, with minimal effect on the point estimates for the effects of the policies of interest (data are available from the lead author upon request). The primary model estimates discussed below are based on data from 53 cities with Gary excluded.

## RESULTS

Table 1 displays the data for each of the 54 cities in ascending order on the intrastate gun trafficking indicator and the three primary regulatory measures hypothesized to affect gun trafficking. Across the 54 cities studied, the intrastate gun trafficking measure ranged from 0 (Santa Ana, CA) to 9.4 (Gary, IN), with a mean of 3.2 and a median of 2.9. Cities with values at the 10th percentile and lower included Santa Ana, Camden, Newark, New York, and Boston. Each of these five cities was in states that regulated private sales of handguns, four had strong gun dealer oversight, and four had discretionary handgun purchase licensing systems. Cities in the 90th percentile and higher were Gary, Tucson, Phoenix, Albuquerque, and Indianapolis. None of these cities had any of the gun sales accountability measures examined in this study.

**TABLE 1 Gun trafficking indicator and firearm sales regulations in 54 US cities**

| City, state | Intrastate gun trafficking indicator | Strong dealer oversight[1] | Ever sting gun dealers | Private sales regulated | Discretionary purchase permits | 1 gun a month limit |
|---|---|---|---|---|---|---|
| Santa Ana, CA | 0.00 | Yes | Yes | Yes | | Yes |
| New York, NY | 0.17 | | | Yes | Yes | |
| Camden, NJ | 0.17 | Yes | Yes | Yes | Yes | |
| Newark, NJ | 0.24 | Yes | Yes | Yes | Yes | |
| Boston, MA | 0.40 | Yes | | Yes | Yes | |
| Saint Louis, MO | 0.67 | | | Yes | | |
| Jersey City, NJ | 0.89 | Yes | Yes | Yes | Yes | |
| Long Beach, CA | 1.07 | Yes | Yes | Yes | | Yes |
| Detroit, MI | 1.11 | | | Yes | | |
| Los Angeles, CA | 1.20 | Yes | Yes | Yes | | Yes |
| San Jose, CA | 1.21 | Yes | Yes | Yes | | Yes |
| Oakland, CA | 1.30 | Yes | Yes | Yes | | Yes |
| Anaheim, CA | 1.34 | Yes | Yes | Yes | | Yes |
| Winston-Salem, NC | 1.54 | | | Yes | | |
| Seattle, WA | 1.63 | | | | | |
| Salinas, CA | 1.69 | Yes | Yes | Yes | | Yes |
| Baltimore, MD | 1.74 | | | Yes | | Yes |
| High Point, NC | 1.81 | | | Yes | | |
| Stockton, CA | 2.10 | Yes | Yes | Yes | | Yes |
| Miami, FL | 2.16 | | | | | |
| Chicago, IL | 2.18 | | | Yes | | |
| Tampa, FL | 2.19 | | | | | |
| Cleveland, OH | 2.22 | | | | | |
| Las Vegas, NV | 2.25 | | | | | |
| Buffalo, NY | 2.43 | | | Yes | Yes | |
| Oklahoma City, OK | 2.66 | | | | | |
| Minneapolis, MN | 2.81 | | | | | |
| Portland, OR | 2.97 | | | | | |
| Houston, TX | 3.01 | | | | | |
| Louisville, KY | 3.10 | | | | | |
| San Antonio, TX | 3.11 | | | | | |
| Cincinnati, OH | 3.63 | | | | | |
| Jacksonville, FL | 3.63 | | | | | |
| Greensboro, NC | 3.65 | | | Yes | | |
| Dallas, TX | 3.83 | | | | | |
| Austin, TX | 4.25 | | | | | |
| Memphis, TN | 4.27 | | | | | |
| Pittsburgh, PA | 4.32 | | | Yes | | |
| Denver, CO | 4.35 | | Yes | | | |
| Milwaukee, WI | 4.50 | | | | | |
| Birmingham, AL | 4.68 | | | | | |
| Nashville, TN | 4.94 | | | | | |
| Charlotte, NC | 5.07 | | | Yes | | |
| Richmond, VA | 5.56 | | | | | Yes |
| New Orleans, LA | 5.78 | | | | | |
| Philadelphia, PA | 5.79 | | | Yes | | |
| Atlanta, GA | 5.83 | | | | | |
| Aurora, CO | 5.94 | | | | | |

**TABLE 1 (Continued)**

| City, state | Intrastate gun trafficking indicator | Strong dealer oversight[1] | Ever sting gun dealers | Private sales regulated | Discretionary purchase permits | 1 gun a month limit |
|---|---|---|---|---|---|---|
| Baton Rouge, LA | 6.03 | | | | | |
| Indianapolis, IN | 6.21 | | | | | |
| Albuquerque, NM | 6.76 | | | | | |
| Phoenix, AZ | 7.08 | | | | | |
| Tucson, AZ | 7.83 | | | | | |
| Gary, IN | 9.44 | | | | | |
| Totals | | 12 | 12 | 24 | 6 | 10 |

[1]State required: 1) state or local license for firearm dealers; 2) record keeping of firearm sales; 3) dealers records and premises to be available for law enforcement inspections; 4) state or local law enforcement report regular dealer inspections; and 5) prompt reporting of lost or stolen firearms

Bivariate comparisons of means for the intrastate gun trafficking indicator are shown in Table 2. Intrastate gun trafficking was significantly lower in the presence of each of the measures of gun sales accountability examined. Intrastate gun trafficking was two to four times higher in cities located in states without the gun sales regulations, with the greatest differences associated with strong gun dealer regulations and discretionary handgun purchase permit licensing.

Table 3 provides the estimates from two models for regressions on intrastate gun trafficking, model 1 without the local gun ownership prevalence proxy covariate and model 2 with this covariate. When not controlling for local gun ownership levels, strong gun dealer regulation and oversight ($\beta$=−1.92, $p$=0.042), regulation of private handgun sales ($\beta$=−1.60, $p$=0.006), and discretionary permit-to-purchase licensing ($\beta$=−1.50, $p$=0.040) were each associated with statistically significant lower levels of intrastate trafficking. We used the model estimates to calculate the percentage difference between predicted intrastate trafficking had a city not had each of the policies that were significantly associated with lower intrastate gun trafficking and the estimated trafficking levels with each of the policies. Using model

**TABLE 2 Comparison of means of intrastate gun trafficking indicator by state and local gun sales regulations**

| Firearm seller accountability policy | | Mean | SD | $t$ | Signif. |
|---|---|---|---|---|---|
| Strong state/local regulation of gun dealers | Yes ($n$=14) | 1.02 | 0.75 | 8.04 | <0.001 |
| | No ($n$=40) | 4.01 | 1.99 | | |
| Minimum frequency of gun dealer audits | Yes ($n$=13) | 1.33 | 1.10 | 5.60 | <0.001 |
| | No ($n$=41) | 3.84 | 2.11 | | |
| Will conduct undercover stings of gun dealers | Yes ($n$=14) | 1.85 | 1.77 | 2.95 | 0.005 |
| | No ($n$=40) | 3.72 | 2.13 | | |
| Private sales of handguns regulated | Yes ($n$=24) | 1.76 | 1.54 | 5.70 | <0.001 |
| | No ($n$=30) | 4.42 | 1.91 | | |
| Discretionary gun purchase permit licensing | Yes ($n$=6) | 0.72 | 0.88 | 6.02 | <0.001 |
| | No ($n$=48) | 3.55 | 2.10 | | |
| One handgun per customer per month | Yes ($n$=10) | 1.72 | 1.46 | 3.28 | 0.004 |
| | No ($n$=44) | 3.58 | 2.20 | | |

**TABLE 3 Model statistics for linear regressions on intrastate gun trafficking with and without controlling for local gun ownership levels**

| | Model 1 $R^2$=0.520 | | Model 2 $R^2$=0.565 | |
|---|---|---|---|---|
| Model covariates | *B* (SE) | Signif. | *B* (SE) | Signif. |
| Constant | 4.86 (0.47) | <0.001 | 1.57 (1.59) | 0.329 |
| Strong gun dealer regulation and oversight | −1.92 (0.91) | 0.042 | −1.76 (0.89) | 0.053 |
| Law enforcement ever does undercover stings of retail gun dealers | 0.88 (0.78) | 0.266 | 0.94 (0.75) | 0.220 |
| Private handgun sales regulated | −1.60 (0.56) | 0.006 | −1.27 (0.58) | 0.027 |
| Discretionary purchase permit licensing | −1.50 (0.71) | 0.040 | −0.23 (0.90) | 0.803 |
| % population in 50-mile radius of city in other states lacking comprehensive gun sales regulations | −0.07 (0.04) | 0.079 | −0.05 (0.04) | 0.186 |
| Distance (miles) to border of nearest state lacking strong gun dealer regulation | −0.005 (0.003) | 0.158 | 0.004 (0.003) | 0.235 |
| Local gun ownership proxy | | | 0.06 (0.03) | 0.036 |

Excludes data for Gary, IN due to influential outlier

coefficients to estimate intrastate trafficking levels had these policies not been in place, we calculated that intrastate gun trafficking was 64% lower in places with strong gun dealer regulations and oversight than, 68% lower in cities where the state had discretionary permit-to-purchase licensing, and 48% lower in cities where the state regulated private handgun sales. Reports by state or local law enforcement that they ever undertake undercover stings of gun dealers were not independently associated with intrastate trafficking levels.

When the measure of local gun availability is included in the model, it is positively associated with intrastate gun trafficking ($\beta$=0.061, $p$=0.036). Controlling for the effects of the prevalence of local gun ownership reduced the strength of the estimated effects for regulating private sales of handguns ($\beta$=–1.27, $p$=0.027) and for strong gun dealer regulation and oversight and ($\beta$=–1.76, $p$=0.053) and eliminated the effects of discretionary purchase permit laws.

Data in Table 4 present the independent associations between the firearm sales accountability measures and likely trafficked crime guns regardless of whether the crime gun had originally been sold within the state in which it was recovered by the police. The model estimates are similar to those in Table 3 for trafficking of intrastate guns with some exceptions. In model 1 in Table 4, regulation of private handgun sales was associated with lower levels of gun trafficking ($\beta$=–1.66, $p$= 0.041). The effects of strong gun dealer regulation and oversight within a state was linked with less overall gun trafficking ($\beta$=–1.79, $p$=0.083), but only at the 0.10 level of significance. Discretionary permit-to-purchase licensing was unrelated to gun trafficking from any state. Law enforcement reports that they ever conduct undercover stings of gun dealers were also unrelated to trafficking. In model 2 in Table 4, higher levels of gun availability in the county where the city was located were associated with more trafficked crime guns. Controlling for local gun ownership reduces the estimated effect of regulating private handgun sales ($\beta$= –1.37, $p$=0.035) and of strong gun dealer oversight ($\beta$=–1.64, $p$=0.104) such that the effects of the latter is no longer statistically significant. In a separate model (not displayed in the table) in which we examined the combined effects of having both strong gun dealer oversight and regulation of private handgun sales, we found that

**TABLE 4 Model statistics for linear regressions on all gun trafficking with and without controlling for local gun ownership levels**

| | Model 1 $R^2$=0.381 | | Model 2 $R^2$=0.422 | |
|---|---|---|---|---|
| | *B* (SE) | Signif. | *B* (SE) | Signif. |
| Constant | 5.47 (0.52) | <0.001 | 2.44 (1.78) | 0.179 |
| Strong gun dealer regulation and oversight | −1.79 (1.01) | 0.083 | −1.64 (0.99) | 0.104 |
| Law enforcement ever does undercover stings of retail gun dealers | 0.99 (0.86) | 0.258 | 1.04 (0.84) | 0.215 |
| Private handgun sales regulated | −1.66 (0.61) | 0.009 | −1.36 (0.62) | 0.035 |
| Discretionary purchase permit licensing | 0.09 (0.78) | 0.905 | 1.27 (1.01) | 0.215 |
| % population in 50-mile radius of city in other states lacking comprehensive gun sales regulations | −.05 (0.04) | 0.199 | −0.04 (0.04) | 0.370 |
| Distance (miles) to border of nearest state lacking strong gun dealer regulation | −0.006 (0.004) | 0.109 | −0.005 (0.004) | 0.159 |
| Local gun ownership proxy | | | 0.05 (0.03) | 0.082 |

Excludes data for Gary, IN due to influential outlier

these comprehensive measures were associated with significantly fewer trafficked guns ($\beta$=–2.60, $p$=0.024).

## DISCUSSION

This study is the first to gather and incorporate measures of the enforcement of gun sale laws into a study of the effectiveness of those laws in preventing the diversion of new guns into the illicit market. This enabled us to stratify cities in states that had strong laws regulating gun dealers based on whether or not state or local law enforcement regularly conducted compliance checks on all gun dealers. Prior research has documented how comprehensive enforcement of gun sale laws reduced gun trafficking to criminals in Boston.[23]

Laws restricting gun purchase to one per month per person have been touted as important deterrents to illegal gun trafficking. A study which focused on interstate gun trafficking of guns sold in Virginia before and after that state adopted a one-gun-a-month law found a reduction in the proportion of crime guns recovered in east coast cities with restrictive gun laws that had been initially purchased in Virginia following the law's implementation.[24] We suspect that the discrepancy between our findings and those of the prior study is due to bulk transactions being more common for individuals involved in interstate trafficking across hundreds of miles from states with weak gun laws to states with strict laws than is the case for intrastate efforts to arm criminals.

Our findings indicated that comprehensive regulation and regular compliance inspections of retail gun dealers as well as the regulation of private handgun sales were each associated with significantly lower levels of gun trafficking. As would be expected, these relationships were strongest for guns originally sold within the same state in which they were recovered from criminals. Although cities in states with the most comprehensive gun sale regulations attract some guns from states with weaker gun laws, the combination of strong gun dealer regulations and regulation of private handgun sales were still associated with fewer trafficked guns even after controlling for local levels of gun ownership. Consistent with our findings, a recent study found

that states which regulate private gun sales exported crime guns to other states at a rate that was half as high as that of states that did not regulate private guns sales.[25]

These findings have important implications for gun policy. Federal laws require retail firearm dealers to be licensed and place basic requirements on them in order to enhance accountability for the guns dealers acquire. Nevertheless, it is very difficult for the ATF to sanction gun dealers or to revoke the licenses of dealers who do not comply with firearm sale laws. Rather than examining a crude measure of whether or not a state required local or state licenses of gun dealers, we delved more closely into the nuances of the laws to determine which states' laws had provisions that should best enable law enforcement to hold gun dealers accountable for illegal or negligent sales practices. Only those cities located in states with comprehensive gun dealer regulations and oversight had significantly lower levels of gun trafficking. Weak dealer regulations appeared to have no effect on gun trafficking.

In the USA, it is rarely easy to enact legislation that enhances gun sales regulations, but laws regulating gun dealers may be easier to pass than other laws that more directly impact law-abiding purchasers. In addition, some states might reduce gun trafficking by better enforcing existing laws. For example, Georgia, which has a high prevalence of gun ownership and otherwise generally lax gun sale laws, has relatively strong laws that empower local and state officials to curtail illegal gun sales by retail gun dealers. Unfortunately, law enforcement officials in Atlanta reported that they had not conducted gun dealer law compliance inspections.

We found no relationship between law enforcement reporting to us that they ever do undercover stings of gun stores and gun trafficking. In contrast to this finding, previous research found that undercover stings and lawsuits against scofflaw gun dealers[11,26] were associated with fewer new guns subsequently diverted to criminals. There are at least two plausible reasons for these apparently discrepant findings. First, undercover stings of gun stores may only have broad impact on gun dealer business practices that enable guns to be diverted to criminals when the stings are done on a large scale, announced in a very public way, and accompanied by other deterrents such as litigation and prosecution. Recent US federal law now provides retail gun dealers extremely broad protections against lawsuits, thus limiting this deterrent against negligent business practices that help supply guns to criminals.[27] Another plausible reason for these discrepant findings is that our measure—law enforcement located in places where gun dealers are licensed by state or local governments reporting whether they "*ever* do undercover operations on gun dealers suspected of involvement in illegal sales..."—is a crude measure of this activity. Survey responses indicated that very few agencies undertake such operations with much frequency.

The lack of federal regulations for firearm sales by private owners is arguably the most important gap in existing laws that inhibit law enforcement's ability to prevent illegal gun sales. Straw purchasers and traffickers are likely to face far less risk in states that do not regulate private firearm sales. Our findings suggest that closing this gap would deter illegal gun trafficking. These findings are consistent with the results of an observational study of illegal sales at gun shows revealing far more illegal gun sales at gun shows in states where private gun sales were not regulated than in California where private sales can only be made after the potential buyer has undergone and passed a background check.[28]

Our estimates of the effects of state laws allowing local law enforcement discretion when issuing permits to purchase firearms were not robust; the laws' negative effects on within-state trafficking were negated when we control for local

gun ownership prevalence. There are several possible relationships between discretionary permit systems and gun trafficking. Discretionary permit systems could reduce gun trafficking by depressing the prevalence of gun ownership. This policy generally requires potential purchasers to have considerable interaction with and scrutiny by local law enforcement officials, longer wait times, and higher fees—each of which could discourage gun ownership. In such an environment, criminals seeking guns are likely to find it harder to identify private sellers. This is supported by the positive associations we find between local gun ownership proxies and gun trafficking even after controlling for the effects of gun sale regulations. Thus, the effects of discretionary permit-to-purchase laws on gun trafficking may be mediated, at least in part, by the laws lowering the prevalence of gun ownership. These laws may also serve as a deterrent for potential straw purchasers who must apply for the purchase permits directly with a local law enforcement agency. Finally, low levels of gun ownership are likely a political precondition for the passage of discretionary purchase permit laws. If this is true, at least some of the negative relationship between discretionary permit-to-purchase laws and gun trafficking is probably explained by the states' historically low levels of gun ownership. Lack of sufficient longitudinal data makes it difficult to know the degree to which low gun ownership is a cause or a precondition for discretionary permit-to-purchase systems or both.

Our inability to disentangle the temporal relationships between levels of gun ownership and the most restrictive gun sales policies is the primary limitation of this study. A longitudinal study was not possible because most of the policies of interest were adopted long before many cities began routinely submitting information on all of the guns they recover from criminals and crime scenes to ATF for tracing.

Another limitation of this study is that it focuses only on the trafficking of new guns—those that were recovered by police within a year of retail sale. By focusing solely on a trafficking indicator based on close temporal connection to a retail sale, we may exaggerate the importance of gun dealer regulations relative to the regulation of private sales. When we relaxed our sale-to-crime interval for the trafficking indicator from $<1$ to $<2$ years, the effects of gun dealer licensing and oversight were slightly reduced as would be expected.

Furthermore, gun sale regulations, of course, are intended not only to deter illegal gun trafficking but also seek to prevent potentially dangerous individuals from purchasing guns directly rather than through an intermediary. Discretionary permit-to-purchase systems are likely to result in far fewer potentially dangerous individuals lawfully purchasing guns and thus enhance public safety in ways unrelated to gun trafficking.

Further research is needed to examine the relationships between gun trafficking indicators and severe acts of violence including homicides and whether comprehensive regulation and enforcement of gun sales laws deter criminal gun use sufficiently to affect these outcomes. While much of the prior research on the effects of gun sale regulations on violent crime has examined relatively weak measures such as mandatory background checks and waiting periods for firearm sales by licensed dealers, future work should attempt to isolate the effects of more comprehensive systems of regulations.

## ACKNOWLEDGMENTS

This research was supported by grants from The John D. and Catherine T. MacArthur Foundation and The Joyce Foundation.

## REFERENCES


1. Centers for Disease Control and Prevention, National Center for Health Statistics. Compressed Mortality File 1999-2005. CDC WONDER On-line Database, compiled from Compressed Mortality File 1999-2005 Series 20 No. 2K, 2008. http://wonder.cdc.gov/cmf-icd10.html. Accessed on Aug 27, 2008.
2. Hu G, Webster DW, Baker SP. Hidden homicide trends in the U.S., 1999-2004. *J Urban Health*. 2008; 85: 597–603.
3. Butts JA. *Violent Crime Trends in 100 U. S. Cities*. Chicago: Chapin Hall Center for Children and the University of Chicago; 2008.
4. Cook PJ, Ludwig J. *The Real Cost of Gun Violence*. New York: Oxford University Press; 2000.
5. Cook PJ, Ludwig J, Braga AA. Criminal records of homicide offenders. *JAMA*. 2005; 294: 598–601.
6. Harlow CW. Firearm Use by Offenders: Survey of Inmates in State and Federal Correctional Facilities. Bureau of Justice Statistics Special Report. NCJ 189369. Washington, DC: U.S. Department of Justice, November 2001. Revised February 2002.
7. Bureau of Alcohol, Tobacco and Firearms. *Commerce in Firearms in the United States*. Washington, DC: U.S. Department of the Treasury; 2000.
8. Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime Gun Trace Reports (2000): The Youth Gun Interdiction Initiative*. Washington, DC: U.S. Department of the Treasury; 2002.
9. Sorenson SB, Vittes KA. Buying a handgun for someone else: Firearm dealers' willingness to sell. *Inj Prev*. 2003; 9: 147–150.
10. Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. *Inj Prev*. 2006; 12: 225–230.
11. Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *J Urban Health*. 2006; 83: 778–787.
12. Firearm Owners Protection Act, codified at 18 U.S.C. Section 923(g)(1)(B)(ii).
13. Inspector General of the United States Department of Justice. Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives. Report I-2004-2005. Washington, DC, July 2004.
14. Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime Gun Trace Reports (2000): The Youth Gun Interdiction Initiative*. Washington, DC: U.S. Department of the Treasury; 2002.
15. Vernick JS, Webster DW, Bulzacchelli MT. Regulating firearms dealers in the United States: an analysis of state law and opportunities for improvement. *J Law Med Ethics*. 2006; 34: 765–775.
16. Bowling M, Hickman MJ, Adams DB. Background Checks for Firearm Transfers, 2004. *Bureau of Justice Statistics Bulletin*. NCJ 210117, U.S. Department of Justice, Washington, DC, October 2005.
17. Hahn RA, Bilhuka O, Crosby A. Firearms laws and the reduction of violence: a systematic review. *Am J Prev Med*. 2005; 28(2 Suppl 1): 40–71.
18. Cook PJ, Ludwig J. Principles for effective gun policy. *Fordham Law Rev*. 2004; LXXIII: 589–613.
19. Webster DW, Vernick JS, Hepburn LM. The relationship between licensing, registration and other state gun sales laws and the source state of crime guns. *Inj Prev*. 2001; 7: 184–189.
20. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms. *Crime Gun Trace Reports (2000) National Report*. July 2002. http://www.atf.gov/firearms/ycgii/2000/index.htm. Accessed October 15, 2008.
21. U.S. Census Bureau. Table GCT-PH1: Population, Housing Units, Area, Density. Census 2000 Summary File 1. http://factfinder.census.gov. Accessed May 18, 2006.

22. CDC Wonder Compressed Mortality File, Underlying Cause of Death. http://wonder.cdc.gov/mortSQL.html. Accessed on November 29, 2006.
23. Braga AA, Pierce GL. Disrupting illegal firearms markets in Boston: The effects Operation Ceasefire on the supply of new handguns to criminals. *Criminol Public Policy*. 2005; 4(4): 717–748.
24. Weil D, Knox R. Effects of limiting handgun purchases to interstate transfer of firearms. *JAMA*. 1996; 275: 1759–1761.
25. Mayors Against Illegal Guns. *The Movement of Illegal Guns in America: The Link Between Gun Laws and Interstate Gun Trafficking*. December 2008.
26. Webster DW. Supplemental expert report submitted for *City of New York V. A-1 Jewerly & Pawn, Inc. et al., 06 CV 2233, City of New York V. Bob Moates' Sport Shop, INC., et al., 06 CV 6504*, May 27, 2008.
27. Vernick JS, Rutkow L, Salmon DA. Availability of litigation as a public health tool for firearm injury prevention: A comparison of guns, vaccines, and motor vehicles. *Am J Public Health*. 2007; 97: 1991–1997.
28. Wintemute GJ. Gun shows across a multistate American gun market: observational evidence of the effects of regulatory policies. *Inj Prev* 2007; 13:150-155. Erratum in: *Inj Prev* 2007; 13: 286.

View publication stats

# EXHIBIT 25

American Journal of Epidemiology
Copyright © 2002 by the Johns Hopkins Bloomberg School of Public Health
All rights reserved
Vol. 155, No. 5
Printed in U.S.A.

# Effects of Maryland's Law Banning "Saturday Night Special" Handguns on Homicides

Daniel W. Webster, Jon S. Vernick, and Lisa M. Hepburn

Small, inexpensive, often poorly made handguns known as "Saturday night specials" are disproportionately involved in crime. Maryland banned the sale of Saturday night specials effective January 1, 1990. During the 2 years between the law's passage in 1988 and its effective date, legal handgun sales in Maryland were 34% higher than expected ($p = 0.09$). Interrupted time-series analysis of age-adjusted homicide rates for 1975–1998 with statistical controls for trends in two neighboring states, social and economic variables, and temporal patterns in Maryland's homicide rates was used to assess the effect of the law. Estimates of the Saturday night special ban effects depended on the assumption made about the timing of the law's effects. Models that assumed a delayed or gradual effect of the Saturday night special ban produced estimates indicating that firearm homicide rates were 6.8–11.5% lower than would have been expected without the Saturday night special ban ($p \leq 0.05$). The model that assumed an immediate, constant change in response to the law showed no law effect, unless an outlier was excluded from the analysis. Excluding this outlier, the model estimated a 15% increase in firearm homicides associated with the Saturday night special ban. None of the models revealed significant law effects on nonfirearm homicides. *Am J Epidemiol* 2002;155:406–12.

evaluation studies; firearms; homicide; violence

"Saturday night specials" or "junk guns" are colloquial names for small, inexpensive handguns of low quality. Saturday night specials' short barrel length (usually ≤3 inches or 7.62 cm) makes them easy to conceal but decreases their accuracy. Low quality materials and construction make Saturday night specials prone to malfunctions. For these reasons, Saturday night specials are generally viewed as unreliable weapons for self-defense and a potential hazard to consumers (1). Saturday night specials have traditionally been low-caliber weapons, but many Saturday night specials now being produced fire medium- and high-caliber ammunition (2) and, consequently, are more deadly (3).

Saturday night specials are prominent among handguns involved in crime. In 1993, Saturday night special handguns accounted for eight of the 10 gun models most commonly confiscated by law enforcement agencies in California (1). In 1999, Saturday night specials accounted for five of the top 10 firearm models recovered by police in a geographically diverse set of 32 US cities and seven of the top 10 firearm models recovered from juveniles (4).

The involvement of Saturday night specials in crime appears to be disproportionate to their share of the handgun market. Comparing police trace requests per 1,000 guns manufactured over a 4-year period, Wintemute (1) found that handguns made by manufacturers that specialize in Saturday night specials were 3.4 times more likely to be traced to crime than were handguns made by manufacturers that do not produce Saturday night specials. Handgun purchasers with a history of arrest are more likely than other handgun purchasers to select a Saturday night special (5). Among handgun purchasers with no prior criminal record, Saturday night special purchasers were more likely than other purchasers to be involved in crimes subsequent to their gun purchase (5).

Although Saturday night specials appear to be overrepresented in crime, the effects of Saturday night special bans on violent crime are uncertain. Although some criminals may prefer small, inexpensive handguns, they may still be able to find acceptable weapon substitutes when Saturday night special sales are prohibited. Furthermore, Saturday night special bans may deter handgun acquisition by low-income persons; opponents of Saturday night special bans argue that this will leave poor persons less able to defend themselves against violent crime.

Four states enacted laws in the late 1960s and early 1970s requiring that handguns sold by licensed dealers meet certain standards that, in effect, banned the sale of Saturday night specials by licensed dealers. Kleck and Patterson (6) examined the effects of these four state laws using a cross-sectional design and 1990 city-level data. After controlling for a broad range of variables related to levels of violence

Received for publication December 11, 2000, and accepted for publication September 13, 2001.

Abbreviations: AR, autoregressive; ARIMA, autoregressive integrated moving average.

From the Center for Injury Research and Policy and the Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD.

Correspondence to Dr. Daniel W. Webster, Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 624 N. Broadway, Rm. 593, Baltimore, MD 21205-1996 (e-mail: dwebster@jhsph.edu).

including other gun laws, they found no statistically significant effects of Saturday night special bans on violent crime. However, the cross-sectional, quasi-experimental design of the study leaves its findings vulnerable to potential biases.

In May 1988, Maryland passed a law that was intended as a ban of the sale of Saturday night special handguns. The law created a Handgun Roster Board to determine which handguns could be legally sold in Maryland as of January 1, 1990. The law instructs the Board to consider nine factors when deciding whether to approve a particular gun model for sale, including its concealability, quality, reliability, and utility for legitimate uses (7). Opponents of the legislation mounted a highly publicized but unsuccessful campaign to overturn the law via a referendum in November 1988 (8).

Increases in gun sales prior to the implementation of restrictions on new gun sales can be an unintended "side effect" of gun control laws (9). Evaluations of gun control laws, therefore, may need to account for this effect. During 1988, potential handgun buyers in Maryland were likely to see news stories and advertisements and/or to receive mailings from antiban groups that informed them that it would no longer be possible to buy inexpensive handguns from licensed dealers after the law's effective date. Information disseminated by some groups working to overturn the law via referendum suggested that *all* handguns might be banned for sale after the law's effective date. Gun dealers also had an incentive to clear out their inventories of handguns that were likely to be banned as of January 1, 1990. Together, these conditions could have led to an increase in handgun sales in Maryland during the period just prior to the law's effective date.

The current study was designed to estimate the effect of Maryland's ban of Saturday night specials on homicide rates. In contrast to many previous evaluations of gun control laws, our evaluation examined several different methods for specifying the temporal relation between the law and hypothesized effects on homicides. These specifications were informed by analyses of the association between Maryland's Saturday night special ban and handgun sales by licensed dealers in the state.

## MATERIALS AND METHODS

### Study design

To estimate the association between Maryland's Saturday night special ban and homicide rates, we used an interrupted time-series design, with the homicide rates of two neighboring comparison states used as covariates in the statistical models. Trends for firearm and nonfirearm homicide rates were analyzed separately to determine whether changes were specific to gun homicides and to examine possible weapon substitution effects.

### Data

The annual age-adjusted homicide rate was the primary outcome for the study. Homicide data for the years 1975–1998 were obtained from the National Center for Health Statistics' multiple cause of death data files using *International Classification of Diseases*, Ninth Revision, external cause of death codes E960–969. Population data were obtained from the US Census Bureau. Age-adjusted homicide rates were calculated using the direct method with the age structure of the 1980 population as the standard.

The intermediate outcome of interest was annual per capita handgun sales by licensed dealers in Maryland. Data on this outcome were provided by the Maryland State Police for the years 1976 through 1998. Comparable data were obtained from the neighboring state of Pennsylvania but were available only from 1983 through 1998. Historical data on handgun sales were not available from other nearby states for a large portion of the study period.

Covariates considered in the statistical models are discussed below. Income and poverty data for the years 1975–1998 were collected from US Census documents (10, 11). Data on unemployment were obtained from the US Bureau of Labor Statistics (12).

### Analyses

*Estimating law effects on handgun sales.* For per capita sales of handguns, we examined whether handgun sales during the period between the law's passage and its effective date (1988–1989), and then the period after Saturday night specials were banned (1990–1998), were significantly different from what would have been expected if the law had not been passed. To test these hypotheses, we used autoregressive integrated moving average (ARIMA) time-series analytical techniques (13) with covariates. Dummy variables were included in the models to represent the pre- and postlaw periods.

ARIMA models can be used to identify and control for autocorrelation in the data and to predict the value of an outcome variable at a given time ($Y_t$) based upon previous values of that variable (e.g., $Y_{t-1}$, $Y_{t-2}$) and exogenous variables ($X_t$). For accurate estimation of the effect of an intervention using ARIMA models, the time series being analyzed must be stationary, that is, have a constant mean and variance over time. To obtain a constant mean, the series was first differenced so that the new series represented the annual change in handguns legally sold per capita ($Y_t' = Y_t - Y_{t-1}$). Exogenous variables for these analyses include indicators of purchasing power (per capita income, median family income, household poverty rate, male unemployment), lagged firearm homicide rates (a correlate of the demand for handguns) (14, 15), and per capita handgun sales in Pennsylvania. Covariates not significantly associated with the annual change in handgun sales were excluded from the final model.

*Estimating law effects on homicides.* Homicide rates in Maryland were increasing rapidly before the law was implemented and, therefore, the series was transformed into first differences ($y_t - y_{t-1}$) to produce a stationary series for analysis. Thus, the outcome modeled was the annual change in homicide rates rather than the actual rates.

Explanatory variables considered for inclusion in each of the models were as follows: the percentage of adult males that were unemployed, the percentage of the population

below the poverty line, per capita income, and the percentage of the population whose race was Black. Homicide trends within the United States vary by region (16) and are influenced by factors that are difficult to measure directly, such as drug markets and changing social norms (17). To control for unmeasured factors common to the mid-Atlantic region, we included age-adjusted homicide rates for the neighboring states of Pennsylvania and Virginia as covariates in the models.

Although not the primary focus of this study, the initial effects of a second gun control law, the Maryland Gun Violence Act of 1996, effective October 1, 1996, were controlled for in the model. This law had three main provisions: 1) To deter gun trafficking, each eligible handgun purchaser was limited to one handgun purchase per month; 2) criminal background checks and registration for handguns sold by private gun owners were mandated; and 3) greater authority was given to police and judges to confiscate firearms owned by domestic violence offenders. The effects of this law were assessed using a dummy variable that indicated whether the law was in effect for all or most of the year.

Because the outcome time series was differenced, all explanatory variables were also differenced. Cross-correlation functions were calculated to determine whether any of the explanatory variables should be lagged. Explanatory variables were removed one by one from each model in a backward, step-by-step fashion if the variable did not have a theoretically plausible and statistically significant effect on homicide rates ($p < 0.10$), and if its removal from the model did not change the estimated effect of the law by more than 10 percent.

The manner in which the pre- and postlaw effects of the Saturday night special ban were specified in the models was informed by our analysis of the law's effects on handgun sales. Alternative transfer functions were used to contrast four different ways to estimate the temporal relation between the Saturday night special ban and the annual change in homicide rates: 1) an immediate, constant effect beginning in 1990; 2) a delayed, constant effect beginning 1 year after the law's effective date; 3) an immediate, gradual effect that increased linearly during the first 4 years the law was in effect; and 4) a delayed, gradual effect that increased linearly for 4 years beginning 1 year after the law went into effect. The rationale behind the gradual effect models is based on previous research indicating that, among in-production Saturday night specials traced to youth crime, approximately 35 percent are connected to crimes within a year of their first sale, and the vast majority were sold less than 4 years before their involvement in crime (18). Only slight increases in the cumulative number of a "cohort" of Saturday night specials sold in a given year were traced to crime more than 4 years after their sale.

The adequacy of the models was assessed to ensure that the residuals were randomly distributed over time with no evidence of autocorrelation. In addition to carefully examining temporal plots of the residuals, we formally tested whether the models produced systematic error in predicting Maryland's homicide trends. To test whether there was any linear trend in the error term, we regressed the year variable on the model error term. Evidence of autocorrelation in the error term was assessed by examining the autocorrelation function and the partial autocorrelation function of the residuals for final models. Overall model fit was assessed by visual inspection of plots of the observed and model-predicted trends and by the Akaike Information Criterion statistic (19).

## RESULTS

### Saturday night special ban effects on handgun sales from licensed dealers

Our final model of per capita handgun sales in Maryland included per capita handgun sales in Pennsylvania, lagged firearm homicide rates in Maryland, and the prelaw and postlaw dummy variables. The prelaw period between the introduction of the legislation in early 1988 and its ultimate implementation on January 1, 1990, was associated with annual changes in those years that were 34 percent higher than would have been expected if there had been no Saturday night special ban prelaw effect ($p = 0.09$). The annual change in per capita handgun sales dropped sharply in the first year the Saturday night special ban was in effect and was 15 percent lower during the entire postlaw period of 1990–1998 than would have been expected with no Saturday night special ban. However, this difference was not statistically significant.

### Effect of Saturday night special ban on homicide rates

Table 1 summarizes the model estimates for the effects of Maryland's Saturday night special ban and of the 1996 gun law on age-adjusted firearm homicide rates for each of the four alternative models for specifying the timing of the effects of the Saturday night special ban. In addition to the law-related variables, each model includes the following covariates that were significantly associated with annual changes in firearm homicide rates: age-adjusted firearm homicide rates for both Pennsylvania and Virginia, Maryland's male unemployment rate, and autoregressive (AR) process parameters of order 2 (AR(1) and AR(2)). The statistically significant negative AR(1) and AR(2) parameters in each model indicated that the change in firearm homicide rates in year $t$ was negatively associated with the change in firearm homicide rates in the previous 2 years.

Table 1 depicts the model estimates for the gun law variables under four assumptions about the temporal relation between the post-Saturday night special ban effects and firearm homicide rates. The immediate, constant post-Saturday night special ban model estimated a 7.2 percent increase associated with the postlaw effects of the Saturday night special ban that was not statistically significant. Each of the three alternative postlaw effect specifications produced statistically significant negative associations between the Saturday night special ban and firearm homicide rates. These estimates ranged from –6.8 percent (95 percent confidence interval: –13.2, –0.3 percent) for the delayed start, gradual effect model to –11.5 percent (95 percent confidence interval: –17.3, –2.4 percent) for the delayed start,

**TABLE 1. Estimates of the effects of Maryland's 1990 ban of SNS† handguns and the Maryland Gun Violence Act of 1996 on age-adjusted firearm homicide rates under various assumptions about the timing of hypothesized SNS ban postlaw effects‡**

| Assumed impact model for "Saturday night special" ban | Law-related variables | Effects on age-adjusted firearm homicide rates (% change) | 95% confidence interval on law effects (% change) | AIC† measure of model fit |
|---|---|---|---|---|
| | Prelaw | 8.6 | −3.3, 20.5 | 40.91 |
| Immediate start, constant effect | SNS ban | 7.2 | −6.8, 21.2 | |
| | 1996 gun law | −10.3* | −16.7, −3.9 | |
| | Prelaw | 2.5 | −3.7, 8.6 | 34.50 |
| Delayed start, constant effect | SNS ban | −11.5* | −17.3, −2.4 | |
| | 1996 gun law | −10.7** | −16.0, −5.3 | |
| | Prelaw | −1.6 | −7.7, 4.5 | 31.35 |
| Immediate start, gradual effect | SNS ban | −8.6** | −14.5, −2.6 | |
| | 1996 gun law | −11.4*** | −16.7, −6.2 | |
| | Prelaw | 2.5 | −4.6, 9.5 | 36.71 |
| Delayed start, gradual effect | SNS ban | −6.8* | −13.2, −0.3 | |
| | 1996 gun law | −11.0* | −17.5, −4.5 | |

* $p \leq 0.05$; ** $p \leq 0.01$; *** $p \leq 0.001$.
† SNS, Saturday night special; AIC, Akaike Information Criterion.
‡ All models include the following covariates: age-adjusted firearm homicide rates in Virginia and Pennsylvania, male unemployment rate in Maryland, and autoregressive process parameters of order 2 (AR(1) and AR(2)).

constant effect model. The model that assumed an immediate but gradual effect of the Saturday night special ban estimated that Maryland's age-adjusted firearm homicide rates were 8.6 percent lower (95 percent confidence interval: –14.5, –2.6) during the post-Saturday night special ban period than would have been expected without the ban. This model produced the best model fit of the four alternative models; the model that assumed an immediate, constant law effect fit the observed data least well.

Figure 1 contrasts trends in age-adjusted firearm homicide rates in Maryland with the rates predicted by the model that assumed a gradual Saturday night special ban effect beginning in 1990. In the postlaw period, the figure shows the observed rates in relation to those expected in the absence of the Saturday night special ban.

The models revealed no statistically significant pre-Saturday night special ban effects on firearm homicides. However, the introduction of Maryland's 1996 gun law was associated with statistically significant reductions in firearm homicide rates ranging from 10.3 to 11.4 percent.

An analysis of model residuals revealed the presence of an outlier (year 1976) that, when excluded, had a significant effect on one of the four Saturday night special ban estimates. When the Saturday night special ban effect was assumed to be immediate and constant and the 1976 observation was excluded from the analysis, the ban was associated with a 15.1 percent increase in firearm homicide rates (95 percent confidence interval: 7.1, 23.1), and the preban effect was associated with a 12.1 percent increase (95 percent confidence interval: 5.9, 18.3).

The Saturday night special ban effect estimates under each of the four models were also sensitive to the inclusion of the AR(1) and AR(2) parameters in the models to control for autocorrelation in the model residuals. When these parameters are not included in the models, none of the Saturday night special ban effect estimates is statistically significant.

Each of the four post-Saturday night special ban specifications was also used in models that assessed whether age-adjusted nonfirearm homicide rates changed in response to the law (table 2). The ARIMA analysis indicated that an AR(4) model reflected the autocorrelation structure of this time series. Thus, each of the models included statistically significant AR(4) parameters. None of the other covariates was independently associated with changes in nonfirearm homicide rates, and excluding them from the models did not significantly affect the law-related estimates. There were no gun law effect estimates that approached statistical significance in any of the four alternative models.

## DISCUSSION

This study demonstrates that estimates of the effects of Maryland's ban of Saturday night specials are highly dependent upon whether the intervention model assumed the full effects of the law would be realized immediately after its implementation. Models that assumed a delayed and/or gradual effect of the Saturday night special ban estimated statistically significant reductions in firearm homicide rates ranging from 6.8 to 11.5 percent associated with the ban and fit the data better than the immediate, constant law effect model. The magnitude of these effect estimates is consistent with our prior research that indicated crime guns recovered in 1996 and 1997 in Baltimore, Maryland,



Exhibit 17
Page 00064




**FIGURE 1.** Observed age-adjusted firearm homicide rates in Maryland during 1975–1998 versus rates predicted by an autoregressive integrated moving average regression model that assumes a gradual effect of the state's 1990 ban of "Saturday night special" handguns. During 1990–1998 the predicted series represents the rates that would have been expected without the Saturday night special ban.

were much less likely to be banned Saturday night specials than was the case in 15 other cities without a Saturday night special ban (8.7 percent vs. 19.7 percent of crime guns) (20).

A model based on an immediate, constant law effect assumption produced an estimate of a statistically significant 15 percent increase in firearm homicide rates associated with the Saturday night special ban and a 12 percent

**TABLE 2. Estimates of the effects of Maryland's 1990 ban of SNS* handguns and the Maryland Gun Violence Act of 1996 on age-adjusted nonfirearm homicide rates under various assumptions about the timing of hypothesized SNS ban effects†**

| Assumed impact model for "Saturday night special" ban | Law-related variables | Effects on age-adjusted nonfirearm homicide rates (% change)‡ | 95% confidence interval on law effects (% change) | AIC* measure of model fit |
|---|---|---|---|---|
| | Prelaw | 12.8 | −5.0, 30.6 | 32.60 |
| Immediate start, constant effect | SNS ban | 2.6 | −18.2, 23.3 | |
| | 1996 gun law | −15.6 | −36.3, 5.0 | |
| | Prelaw | 9.9 | −6.3, 26.0 | 32.62 |
| Delayed start, constant effect | SNS ban | −2.3 | −21.0, 16.3 | |
| | 1996 gun law | −28.2 | −63.7, 7.3 | |
| | Prelaw | 7.7 | −10.1, 25.4 | 32.47 |
| Immediate start, gradual effect | SNS ban | −2.7 | −15.2, 9.9 | |
| | 1996 gun law | −29.8 | −67.4, 25.1 | |
| | Prelaw | 8.5 | −8.1, 25.1 | 32.47 |
| Delayed start, gradual effect | SNS ban | −3.5 | −21.0, 14.0 | |
| | 1996 gun law | −15.4 | −35.9, 5.2 | |

* SNS, Saturday night special; AIC, Akaike Information Criterion.
† All models include the following covariates: autoregressive process parameters of order 4 (AR(1), AR(2), AR(3), and AR(4)). No other covariates were significantly associated with changes in nonfirearm homicide rates.
‡ No values reached statistical significance at $p \leq 0.05$.



Exhibit 17
Page 00065

increase associated with the 2-year, preban period. This law effect model is suspect on theoretical grounds for three reasons. First, the sharp rise in handgun sales during the 2 years prior to the law’s effective date suggests that any effects of Saturday night special sales prevented in 1990 would likely be offset by increased sales in 1988 and 1989. Second, Saturday night special sales prevented during 1990 could decrease homicide risks for several years after the prevented sale. Finally, it seems logically inconsistent that both the prelaw period of higher handgun sales and the Saturday night special ban would each increase homicides.

The plausibility of our estimates of the effects of the law on homicides should also be evaluated within the context of relevant theories about how Saturday night special handgun availability might influence homicide rates. Many homicides stem from spontaneous altercations that end in gunfire (21). Ready access to a firearm can increase the lethality of violent altercations because firearms are much more lethal than other personal weapons (21, 22). Prohibiting the sale of Saturday night special handguns could reduce the likelihood of these fatal encounters by either decreasing handgun ownership (particularly among high-risk persons) by making handguns more expensive or decreasing the incidence of concealed gun carrying. Aggregate handgun sales in Maryland were 15 percent lower after the ban than would have been expected without the law. However, this reduction was not significantly significant. Because legal purchasers of Saturday night specials are more likely than other handgun purchasers to have been arrested prior to the purchase and to be subsequently arrested for violent crimes involving guns (5), the ban may have nevertheless significantly reduced handgun acquisition by persons at increased risk of homicide perpetration. The law may have also reduced concealed gun carrying by banning the sale of easily concealable handguns. Efforts to deter illegal gun carrying in high-crime areas have been shown to significantly reduce criminal shootings (23, 24).

The fact that the law’s effects were specific to homicides committed with firearms increases the likelihood that the effects are attributable to the gun law and not to unmeasured factors that affect trends for all homicides. Furthermore, there was no evidence that the reduction in firearm homicide rates associated with the law was negated by an increase in homicides committed with other weapons.

Opponents of the law predicted that it would leave low-income citizens more vulnerable to crime by increasing the price of handguns and would increase the lethality of shootings, because criminals would acquire higher caliber substitutes for Saturday night specials. We could not examine these possible intermediate effects with the data available. Absent such data, the net effects of the law suggest that any negative consequences for homicide rates were apparently outweighed by the law’s benefits.

### Study limitations

This study did not assess the effects of Maryland’s law on nonfatal violent crimes because of inadequacies of available surveillance systems. The Federal Bureau of Investigation’s system of uniform crime reports is the only surveillance system that collects longitudinal data on nonfatal crime at the state or local level. Several analyses of this system caution against using data from the uniform crime reports on nonfatal crimes to make comparisons across time and place because of potential inconsistencies in reporting (25–27).

Homicide rates are determined by a multitude of factors, many of which cannot be measured by studies of this type. However, our models were accurate in predicting changes in firearm homicide rates in Maryland over time (figure 1). We used changes in regional homicide rates, as well as historical patterns of homicide rates within Maryland, in an attempt to control for variation that could not be accounted for by standard social, demographic, and economic covariates.

We could not control for the effects of one potentially relevant policy change, because its timing was so coincident with the implementation of the Saturday night special ban. A law that increased penalties for drug crimes committed with firearms went into effect in Maryland on July 1, 1989. It is possible that some or all of the estimated beneficial effects of the Saturday night special ban are attributable to this sentence enhancement law. However, previous research on the effects of laws that increase penalties for crimes committed with firearms has shown mixed results (28, 29). The most comprehensive and recent analysis found no evidence that these laws reduce homicides or other violent crimes (28). Furthermore, if the law did have a deterrent effect on homicides, one would expect these effects to be realized relatively soon after the law was adopted and to be relatively constant over time. Our data indicate, however, that homicide rates were higher than what would have been expected in 1989 and that reductions in homicide rates were most pronounced 2–4 years after the sentence enhancement law was implemented.

Finally, the study carefully assesses the effects of a single state’s ban of Saturday night specials. Our findings may not generalize to other states that have banned Saturday night specials, and they may not accurately predict the effects of subsequent bans of Saturday night specials.

### Conclusions

The findings from this study and our prior study of the effects of Maryland’s Saturday night special ban on handguns used in crime (20) provide important lessons for gun policy development, implementation, and evaluation. Banning a particular category of guns is likely to significantly increase sales for those guns after the laws are passed but before they go into effect (14), and this should be considered in evaluations of such laws. Strategies for mitigating preban spikes in handgun sales include laws restricting handgun purchases to one per eligible buyer per month and limiting the amount of time between passage of such laws and their implementation. Our findings that Maryland’s one-gun-per-month law was associated with a significant decrease in firearm homicide rates suggest that such laws may also have important independent effects. The findings concerning the effects of this law, however, must be viewed as preliminary because they are based on only 2 full years of postlaw data.

Our findings concerning the effects of Maryland's ban of Saturday night special handguns clearly demonstrate how gun law effect estimates can be sensitive to the assumptions made about the plausible timing of their effects. Further development and testing of theories about mechanisms by which specific gun control laws could affect gun availability to high-risk persons are needed. The implications of this research should inform future development of models to assess the ultimate impact of these laws on lethal violence.


## ACKNOWLEDGMENTS

This research was supported by grant R49/CCR302486 from the Centers for Disease Control and Prevention to the Johns Hopkins Center for Injury Research and Policy.


## REFERENCES


1. Wintemute GJ. Ring of fire: the handgun makers of southern California. Sacramento, CA: Violence Prevention Research Program, University of California, Davis, 1994.
2. Wintemute GJ. Firearm design and firearm violence: handguns in the 1990s. JAMA 1996;275:1749–53.
3. Zimring FE. The medium is the message: firearm caliber as a determinant of death from assault. J Leg Stud 1972;1:97–123.
4. Bureau of Alcohol, Tobacco, and Firearms. Crime gun trace reports (1999) national report. Washington, DC: US Department of the Treasury, November 2000.
5. Wintemute GJ, Parham CA, Wright MA, et al. Weapons of choice: previous criminal history, later criminal activity, and firearm preference among legally authorized young adult purchasers of handguns. J Trauma 1998;44:155–60.
6. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. J Quant Criminol 1993;9: 249–88.
7. MD Code Ann. § 36J(b)(2)(i)-(ix).
8. Teret SP, Alexander GR, Bailey LA. The passage of Maryland's gun law: data and advocacy for injury prevention. J Public Health Policy 1990;11:26–38.
9. Roth JA, Koper CS. Impacts of the 1994 assault weapons ban: 1994–1996. Washington, DC: National Institute of Justice, March 1999.
10. US Bureau of the Census. Statistical abstract of the United States. Washington, DC: US Bureau of the Census, 1975–1995.
11. US Bureau of the Census. Current population report, consumer income, series P-60, poverty in the United States. Washington, DC: US Bureau of the Census, 1990–1996.
12. US Bureau of Labor Statistics. Geographic profile of employment and unemployment. Washington, DC: US Department of Labor, 1975–1994.
13. Box GEP, Jenkins GM. Time series analysis forecasting and control. 2nd ed. San Francisco, CA: Holden-Day, 1976.
14. Kleck G. The relationship between gun ownership levels and rates of violence in the United States. In: Kates DB Jr, ed. Firearms and violence: issues in public policy. Cambridge, MA: Ballinger, 1984:99–135.
15. McDowall D, Loftin C. Collective security and the demand for legal handguns. Am J Sociol 1983;88:1146–61.
16. Fox JA, Zawitz MW. Homicide trends in the United States: regional trends. Washington, DC: Bureau of Justice Statistics, US Department of Justice, March 2001. (http://www.ojp.usdoj.gov/bjs/homicide/region.htm).
17. Blumstein A, Rivara FP, Rosenfeld R. The rise and decline of homicide—and why. Annu Rev Public Health 2000;21: 505–41.
18. Kennedy DM, Piehl AM, Braga AA. Youth violence in Boston: gun markets, serious youth offenders, and a use-reduction strategy. Law Contemp Prob 1996;59:147–96.
19. Akaike H. A Bayesian extension of the minimum AIC procedure of autoregressive model fitting. Biometrika 1979;66:237–42.
20. Vernick JS, Webster DW, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on crime guns. Inj Prev 1999;5:259–63.
21. Cook PJ. The technology of personal violence. In: Tonry M, ed. Crime and justice: a review of the research. Vol 14. Chicago, IL: University of Chicago Press, 1991:1–71.
22. Zimring FE, Zuehl J. Victim injury death in urban robbery: a Chicago study. J Leg Stud 1986;15:1–40.
23. Villaveces A, Cummings P, Espitia VE, et al. Effect of a ban on carrying firearms on homicide rates in 2 Colombian cities. JAMA 2000;283:1205–9.
24. Sherman LW, Rogan DR. Effects of gun seizures on gun violence: "hot spots" patrol in Kansas City. Justice Q 1995;12: 673–93.
25. Schneider VW, Wiersema B. Limits and use of the uniform crime reports. In: MacKenzie DL, Baunach PJ, Roberg RR, eds. Measuring crime: large-scale, long-range efforts. Albany, NY: State University of New York Press, 1990:21–48.
26. Deidman D, Couzens M. Getting the crime rate down: political pressure and crime reporting. Law Soc Rev 1974;8: 457–93.
27. McCleary R, Nienstedt BC, Erven JM. Uniform crime reports as organizational outcomes: three time-series experiments. Soc Probl 1982;29:361–72.
28. McDowall D, Loftin C, Wiersema B. A comparative study of the preventive effects of mandatory sentencing laws for gun crimes. J Crim Law Criminol 1992;83:378–94.
29. Marvel TB, Moody CE. The impact of enhanced prison terms on felonies committed with guns. Criminology 1995;33: 247–81.

# Exhibit 18

ROB BONTA, State Bar No. 202668
Acting Attorney General of California
ANTHONY R. HAKL, State Bar No. 197335
Supervising Deputy Attorney General
JERRY T. YEN, State Bar No. 247988
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7836
Fax: (916) 324-8835
E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official capacity as California Attorney General, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,**<br>Plaintiffs,<br>**v.**<br>**ROB BONTA, in his official capacity as Attorney General of California, et al.,**<br>Defendants. | Case No. 3:20-cv-02470-WQH-MDD<br>**EXPERT REBUTTAL REPORT AND DECLARATION OF PROFESSOR LOUIS KLAREVAS** |

**EXPERT REBUTTAL REPORT AND DECLARATION OF PROFESSOR LOUIS KLAREVAS**

1. I have been asked to review the expert report submitted by Dr. Carlisle Moody ("Moody" hereinafter) in support of Plaintiffs' challenge to California's one-gun-a-month law ("OGM law" hereinafter), which limits firearm purchases to one handgun or one semiautomatic centerfire rifle every thirty days, and to submit a rebuttal expert report.[1] I have already submitted an expert report in the present case, providing my professional opinion on whether OGM laws like California Penal Code sections 27535-27540 can help reduce illegal firearms trafficking and firearm homicides (including mass shootings).[2] To avoid redundancy, a summary of my background and qualifications can be found in my initial report.[3]

2. In his report, Moody notes, "I have been unable to find a single study that links OGM laws to violence reduction in the states that have enacted such laws."[4] After claiming that no relevant studies exist, Moody then adds, "In the absence of any detailed statistical analyses of the effect of OGM laws on murder or firearm homicide in the state of passage, I will do such an analysis here."[5] Moody

---

[1] Expert Report of Dr. Carlisle E. Moody, *Nguyen v. Bonta*, Case No. 3:20-cv-02470-WQH-MDD, S.D. Cal., served on Nov. 19, 2021 (Hereinafter "Moody Report").

[2] Expert Report and Declaration of Professor Louis Klarevas, *Nguyen v. Bonta*, Case No. 3:20-cv-02470-WQH-MDD (S.D. Cal. Nov. 19, 2021) (Hereinafter "Klarevas Report").

[3] *Id*., Paras. 1-6

[4] Moody Report, p. 2.

[5] *Id*., p. 3.

then goes on to convey his findings from four separate analyses—all limited to homicides—that he undertook for purposes of his report.[6] Moody concludes his report by opining that "the California one gun per month law does not make the people of California safer."[7]

3. There are numerous problems with Moody's report that render the entire report unreliable. Among the many issues hampering the report, three significant flaws are: (1) Moody's initial premise that no studies on the effect of OGM laws exist is erroneous; (2) Moody's analyses of homicides, which he undertakes in an effort to fill the purported void in the literature, do not address the direct objectives of OGM laws; and (3) Moody's overall conclusion—that OGM laws do not contribute to the public safety of California—lacks foundation.

**MOODY'S INITIAL PREMISE IS ERRONEOUS**

4. Moody begins his report by insisting that he has been "unable to find a single study that links OGM laws to *violence reduction* in the states that have enacted such laws."[8] There are two problems with this statement. First, while he never defines "violence reduction," by all indications he is equating it strictly with homicide reduction. However, homicide reduction is not the direct objective of OGM laws. To imply that homicide reduction is the main goal of OGM laws, as Moody seems to do, is misleading. Second, as reviewed in my report, there are

[6] *Id*., pp. 4-20.

[7] *Id*., p. 21.

[8] *Id*., p. 2 (emphasis added).

several studies that link OGM laws to violence reduction.[9] One of these studies was conducted by Moody.[10] Yet, Moody's report fails to mention any of these studies, including his own study.

5. As Moody acknowledges in his report, the Analysis of California's Assembly Committee on Public Safety states that California's OGM law "is intended to '…curtail the illegal gun market, disarm criminals, and save lives by preventing multiple purchases of handguns through legitimate channels.'"[11] However, Moody appears to ignore the following sentence, which states that "Preventing multiple purchases takes the profit out of black market sales and puts gun traffickers and straw purchasers out of business."[12] Indeed, the same Assembly Committee analysis states:

> The goal of this bill is to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself. Such a transfer is referred to as a "straw transaction."[13]

---

[9] Klarevas Report, Paras. 24-38.

[10] Carlisle E. Moody and Thomas B. Marvell, *On the Choice of Control Variables in the Crime Equation*, 72 Oxford Bulletin of Economics and Statistics 696 (2010), discussed in Klarevas Report, Para. 36, and attached as Ex. 33.

[11] Moody Report, p. 2, *quoting* Analysis of the Assembly Committee on Public Safety on AB 202 (Knox) (Mar. 16, 1999), *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=199920000AB202.

[12] Analysis of the Assembly Committee on Public Safety on AB 202 (Knox), *supra* note 11.

[13] *Id.*

6. First and foremost, OGM laws—including California's OGM law—seek to disrupt illegal firearms trafficking, including straw purchases. Yet, nowhere in Moody's report is there even a mention of "trafficking" or "straw purchases." Moody appears to be of the view that the direct objective of OGM laws is to reduce homicides. There is no doubt that a goal of many firearm regulations, including OGM laws, is to help reduce crime, including homicides. But reducing homicides is not the direct, let alone sole, purpose of OGM laws. As I explain in my report:

> With the exception of homemade guns (e.g., do-it-yourself ghost guns and 3D printed guns), all crime guns were at one point—initially at least—sold by licensed firearms dealers to people who were legally eligible to purchase and own firearms. In other words, nearly all crime guns enter circulation in society through the primary firearms market. As such, one way to try to keep legal guns from becoming crime guns is by enacting laws that regulate lawful transactions in primary markets in such a manner that reduces opportunities for firearms to then make their way into illicit secondary markets or into the hands of dangerous, ill-intentioned individuals.
>
> As discussed above, bulk purchases and multiple sales facilitate weapons trafficking and straw purchases. Bulk and multiple firearm purchases also allow potential active shooters to amass private, personal arsenals in a relatively short period of time, which can then be used to commit mass murder. Two of the primary policy objectives of OGM laws are to reduce opportunities for (1) traffickers and straw purchasers to obtain firearms for criminals or others who are unable to purchase a firearm themselves, or that they can then resell for profit through unregulated, private transactions, and (2) potential active shooters to amass multiple firearms in a short amount of time that they can then use to perpetrate a mass murder.[14]

Moody, however, does not analyze the effect of OGM laws on either illegal firearms trafficking or mass shootings. For that matter, Moody never examines multiple or bulk purchases of firearms at any point in his report.

[14] Klarevas Report, Paras. 17-18 (citations omitted).

7. The other problem with Moody's premise—which appears to serve as the foundation for his entire report—is his claim that there are no studies that link OGM laws to "violence reduction." In my report, I identified at least eight analyses that linked OGM laws to reductions in trafficking of crime guns and at least three analyses that linked OGM laws to reductions in firearm mortality.[15] One of those studies was authored by Moody.[16] As shown in Fig. 1 below, which is an unaltered reproduction of a statistical analysis performed by Moody and his co-author Thomas Marvell, OGM laws (denoted as "onegun") were associated with a reduction in murder rates, which is why Moody places the variable in bold. Not only does Moody fail to report his own findings, but he also does not consider the findings of other studies which found statistically significant relationships between OGM laws and homicides.

[15] *Id.*, Paras. 33-36. One of these papers, while unpublished, remains readily available through the Social Science Research Network (where it is posted) and was funded by the Firearms Policy Coalition. *Id.*, Para. 36, and p. 21, note 49.

[16] *Id.*, Para. 36, and p. 21, note 48.

**Figure 1. Reproduction of Table 3 from Moody and Marvell (2010)**

TABLE 3

*Unrestricted murder equation*

| *Variable* | *Coefficient* | *t-ratio* | *Variable* | *Coefficient* | *t-ratio* |
|---|---|---|---|---|---|
| **assaultpc** | **0.019** | **2.11*** | pctfemhs | 0.019 | 0.41 |
| **empconpc** | **0.011** | **3.02*** | pctforborn | −0.004 | −0.16 |
| employpc | −0.001 | −1.30 | pctrep | −0.004 | −0.17 |
| empmilpc | 0.005 | 0.69 | pctwm | −3.337 | −0.58 |
| fse | 0.018 | 0.66 | permithg | −0.076 | −1.57 |
| jban | 0.028 | 1.21 | **policepc** | **−0.131** | **−2.92*** |
| **lmurderpc_1** | **0.152** | **2.74*** | **prisonpc** | **−0.081** | **−4.07*** |
| **onegun** | **−0.064** | **−1.82** | rincpc | 0.022 | 0.29 |
| pctbm | 13.790 | 1.57 | **robberypc** | **0.146** | **6.05** |
| pctcoll | 0.000 | −0.03 | **strike3** | **0.057** | **2.00** |
| *N* | | | | | **1,050** |
| $R^2$ | | | | | **0.97** |
| Encompassing *F*-test | | | | | 1.25 |

*Notes*: The dependent variable is the log of murders per 1,000 population. Coefficients in **bold** are significant at the 0.10 level, two-tailed; * indicates significance at the 0.05 level. Regressions are weighted by population. *t*-ratios are robust and clustered on states. The Breusch–Godfrey test for first-order serial correlation was not significant. State dummies, year dummies and individual state trends are significant as groups but the coefficients are suppressed to conserve space.

## MOODY'S ANALYSES DO NOT DIRECTLY ADDRESS THE PRIMARY PURPOSE OF OGM LAWS

8. After wrongly indicating that there are no relevant studies on the impact of OGM laws, Moody offers to conduct his own analyses on the issue—three different analyses on OGM laws and homicide as well as a separate analysis on handgun sale denials and homicide.[17] As mentioned above, scholars interested in assessing the primary objectives of OGM laws would analyze the impact of such laws on either illegal firearms trafficking or mass shootings. Moody does neither. Instead, he only examines murders and firearm homicides (neither with a focus on

[17] Moody Report, pp. 4-20.

mass shootings). But as I noted in my report, "Unlike firearm trafficking, which is directly tied to the legislative intent of OGM laws, firearm mortality entails *at least* an additional degree of separation."[18] In other words, analyses like Moody's are not directly on point. Therefore, such analyses should not serve as the sole basis for judging the effectiveness of OGM laws, given that assessments of the relationship between OGM laws and illicit firearms trafficking exist.

9. The following analogy helps explain the problem with Moody's approach. In the United States, states have enacted laws that prohibit the purchase of alcohol by individuals under the age of 21 ("under 21s" hereinafter). These laws work by criminalizing the purchase of alcohol by under 21s and/or the sale of alcohol to under 21s. The primary objective of these laws is to prevent under 21s from obtaining alcohol.[19] If such laws are effective, we should observe fewer under 21s acquiring and consuming alcohol. This can be measured, for example, by comparing hospital records from before and after the enactment of the laws that show the rate of under 21s being treated for alcohol-related issues.[20] A before-and-after comparison of fatal motor vehicle accidents might also offer some insights.

[18] Klarevas Report, Para. 33 (emphasis added).

[19] It is also generally illegal for people 21 years of age or older to buy alcohol and then resell it to under 21s.

[20] Another feasible before-and-after analysis would be to compare survey data of the alcohol consumption patterns of under 21s. However, a before-and-after comparison of arrest/citation records for illegal alcohol purchase or possession is not possible because there would be no such records prior to the law's enactment, as alcohol purchase or possession would not have been a crime prior to the law's enactment.

However, such a comparison on its own (just like Moody's analysis of all homicides) would not really capture the true of effect of under 21 alcohol laws because most fatal motor vehicle accidents do not involve drivers under the age of 21, much less alcohol-impaired drivers under the age of 21.[21] Unless analysts isolate the fatal crashes that involved drivers under the age of 21 who were impaired by alcohol at the time, using a before-and-after comparison of fatal motor vehicle accidents entails severe limitations.

10. The same limitations apply to Moody's report. Without isolating murders involving a crime gun that was traced back to a California firearms dealer, especially one that was acquired as part of a multiple or bulk purchase, any analysis of murders is not directly on point. Therefore, when Moody performs time-series, synthetic control, and difference-in-differences analyses where the outcome variables are homicides and firearm homicides, without accounting for guns legally purchased in California, especially as part of bulk or multiple firearm purchases, his findings run a serious risk of being specious. And, as for Moody's analysis of the relationship between handgun sale denials and murder, there is no connection to OGM laws at all. This latter analysis is a classic red herring. In fact, nowhere in the section containing his analysis of handgun sale denials does Moody even mention OGM laws, let alone tie OGM laws to handgun denials. In other words, all

[21] National Center for Statistics and Analysis, National Highway Traffic Safety Administration, *Young Drivers: 2019 Data*, Traffic Safety Facts, Report No. DOT HS 813 130, July 2021, *available at* https://crashstats.nhtsa.dot.gov/Api/Public/Publication/813130.

four analyses that Moody undertakes in his report fail to consider the principal objective of OGM laws—to disrupt illegal firearms trafficking.[22]

## MOODY'S OVERALL CONCLUSION LACKS FOUNDATION

11. Moody concludes his report by opining that "the California one gun per month law does not make the people of California *safer*."[23] Moody reaches this conclusion based solely on his very narrow examination of homicides. But firearm laws, like OGM laws, work to keep people safe from a plethora of dangers. As I mentioned in my report, firearms are used to perpetrate a variety of crimes, including but not limited to homicide.[24] According to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), in both 2019 and 2020, the percentage of traced crime guns in California that were involved in a homicide was 2%.[25] It is inappropriate to ignore 98% of the other crimes for which California crime guns were traced—let alone failing to examine which of those crime guns were traced back to purchases made in California—yet conclude that the people of California do not receive a public safety benefit from OGM laws.

---

[22] In addition to the shortcomings associated with his exclusive focus on homicides, Moody fails to adequately explain the reasons for the selection of his particular statistical tests. Therefore, this rebuttal report should not be construed as an endorsement of his statistical analyses or conclusions.

[23] Moody Report, p. 21 (emphasis added).

[24] Klarevas Report, Paras. 11-12.

[25] ATF, *Firearms Trace Data: California-2019* (August 24, 2020), *available at* https://www.atf.gov/file/146966/download; ATF, *Firearms Trace Data: California-2020*, December 8, 2021, *available at* https://www.atf.gov/resource-center/firearms-trace-data-california-2020.

12. One of the primary focuses of OGM laws is to reduce the illegal trafficking of firearms that are acquired as part of a legal transaction in the state where OGM laws are in effect. Turning to *intra*state firearm trafficking patterns, which Moody highlights in Section II of his report, the latest trace data published by the ATF shows a highly relevant pattern. Out of the 48 contiguous states in the continental United States, the 5 states with the longest time-to-crime averages for intrastate crime guns traced by the ATF in 2020 were California, Maryland, Massachusetts, New Jersey, and New York.[26] Three of these states (California, Maryland, and New Jersey) have OGM laws currently in effect.[27] And another state (New York) has local laws in its largest city that restrict firearm purchases to one gun per 90-day period.[28] As longer time-to-crime averages generally reflect less illegal trafficking of firearms, the ATF data contradicts Moody's overall

---

[26] ATF, "Firearms Trace Data: 2020" (December 8, 2021), *available at* https://www.atf.gov/resource-center/firearms-trace-data-2020. As noted in my report, time-to-crime is defined by the ATF as "the period of time between a firearm's acquisition by an unlicensed person from a retail licensee and law enforcement's recovery of that firearm during use, or suspected use, in a crime." Klarevas Report, note 36, quoting ATF, Crime Gun Trace Reports (1999): National Report (November 2000), Appendix A, *available at* https://www.atf.gov/resource-center/docs/ycgii-report-1999-appendix-apdf-0/download.

[27] The fourth state that currently has an OGM law in effect, Virginia, is notably missing from this group. However, it is important to note that Virginia's OGM law only took effect midway through 2020, so it would not be expected to have a sizable impact in just a few short months. Giffords Law Center to Prevent Gun Violence, "Bulk Gun Purchases" (2021), *available at* https://giffords.org/lawcenter/gun-laws/policy-areas/crime-guns/bulk-gun-purchases.

[28] *Id.*

conclusion that OGM laws do not make people safer.[29] If anything, it seems that, in terms of intrastate trafficking of crime guns, states with OGM laws that have been in effect for a reasonable amount of time—including California—are the safest states in the United States.

## CONCLUSION

13. OGM laws seek to disrupt illegal gun markets and to prevent potential active shooters from amassing personal arsenals. As noted in my expert report, there is a sizable body of evidence that OGM laws help reduce illegal firearms trafficking. There is also anecdotal evidence that OGM law could help reduce mass shootings. Nothing in Moody's expert report contradicts either of these key findings. As such, the evidence continues to support the conclusion that one-gun-a-month laws, like California's law limiting the purchase of handguns or semiautomatic centerfire rifles to one every thirty days, are reasonable measures for helping reduce illegal firearm trafficking and firearm homicides, including mass shootings.

---

[29] According to the ATF, "A short time-to-crime suggests the firearm will be easier to trace. This measure can be an important indicator of illegal firearms trafficking." Klarevas Report, note 37, quoting ATF, Crime Gun Trace Reports (1999): National Report (November 2000), Appendix A, *available at* https://www.atf.gov/resource-center/docs/ycgii-report-1999-appendix-apdf-0/download.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently to the above.

Executed in Queens, New York, on December 17, 2021.

Louis Klarevas

# Exhibit 19

ROB BONTA, State Bar No. 202668
Acting Attorney General of California
ANTHONY R. HAKL, State Bar No. 197335
Supervising Deputy Attorney General
JERRY T. YEN, State Bar No. 247988
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7836
Fax: (916) 324-8835
E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official capacity as California Attorney General, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**MICHELLE NGUYEN, et al.,**

Plaintiffs,

**v.**

**ROB BONTA, in his official capacity as Attorney General of California, et al.,**

Defendants.

Case No. 3:20-cv-02470-WQH-MDD

**EXPERT REPORT AND DECLARATION OF JOSEPH L. BISBEE**

# EXPERT REPORT AND DECLARATION OF JOSEPH L. BISBEE

## INTRODUCTION AND QUALIFICATIONS

1. I have been retained by the Attorney General's Office for the State of California to provide my opinion on whether California law (Cal. Penal Code § 27535) limiting individuals from purchasing more than one handgun or semiautomatic centerfire rifle every thirty days can help reduce illegal firearms trafficking and subsequent illegal activity. It is my understanding that this law does not preclude individuals from acquiring firearms, but merely limits the number they can purchase within a specified time period. This law also does not limit the overall number of firearms an individual can possess.

2. I am the principal officer of Armed With Knowledge (AWK), a business aimed at education and outreach in regards to firearms issues. AWK focuses on several areas including public education, policy development, strategies to reduce firearms-related violent crime, and expert consulting.

3. Prior to creating AWK, I was a special agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for more than 25 years. During my career as an ATF special agent, I focused on firearms trafficking investigations, analyzing how criminals acquire firearms, training other law enforcement officers on firearms investigations, assessing and recommending "best practices" to law enforcement agencies on issues involving illegal firearms, and other issues related to the illegal acquisition and disposition of firearms both domestically and internationally. Exhibit 1 provides an overview of my ATF career.

4. As a special agent for the ATF, I have been involved in hundreds of investigations into illegal firearms trafficking and have been the case agent on numerous investigations involving organized groups illegally acquiring and disposing of firearms. These investigations have involved thousands of firearms.

The majority of these cases involved the interstate and intrastate movement of firearms, but I have also been involved in the investigation of international firearms trafficking.

5. While I was at ATF, I testified as an expert witness in U.S. District Court and Superior Court (Washington, D.C.). I have testified to the identification of firearms, as well as the movement of firearms across state lines. As seen in *U.S. v. Thomas Bing*, D.D.C., Case No. 01cr00270–05, I am one of very few individuals that have been recognized as an expert in firearms trafficking in federal criminal court.

6. I have also served as an expert in *LaManno v. WalMart*, Circuit Court of Jackson County, Missouri, Case Number 1616-CV08764, and in *City of Kansas City, Missouri v. Jimenez Arms*, Circuit Court of Jackson County, Missouri, Case Number 2016-CV00829. I was deposed in both cases.

7. In preparing this report, I have relied on my general knowledge, training, experience, and expertise. In addition, I have reviewed in whole or in part the materials cited in my report below.

8. I am being compensated for my time in this matter at my normal billing rate, currently $150 per hour ($250 per hour for depositions and trial testimony.) This compensation is not contingent upon the nature of my findings or on the outcome of this litigation.

## IMPACT OF LIMITING FIREARMS PURCHASES ON FIREARMS TRAFFICKING AND CRIME

9. The Gun Control Act of 1968, which was later amended by the Brady Handgun Violence Prevention Act in 1993, sets forth specific requirements for the purchase and sale of firearms. While ATF has been tasked with enforcing the Gun Control Act since its passage, based on my experience, ATF did not begin a uniform, agency-wide effort to identify and investigate firearms trafficking

organizations until the mid-1980s. Around that time, ATF developed a program to more effectively trace firearms and track multiple firearm sales.

10. Early in my career as an ATF special agent, I learned the significance of monitoring "multiple sale" information, and that multiple sales were a key firearms trafficking indicator that could be used to help identify individuals involved in illegal firearms trafficking. At the ATF, "multiple sale," also called a "multiple purchase," generally refers to the sale of more than one handgun to an individual by a licensed retail gun dealer within five consecutive business days. This definition has evolved for certain States to now include some long guns. A "multiple sale" triggers a notification be sent to ATF. The presence of this indicator alone provides important data regarding potential firearms trafficking. Indeed, the fact that ATF, which is tasked with reducing the criminal misuse of firearms, requires notification of multiple purchases by an individual reinforces the connection between multiple purchases and illegal firearms activity.

11. As I progressed in my career and worked on complex conspiracy firearms trafficking investigations involving a number of individuals, I continued to utilize multiple sales information to identify criminal organizations. I also found that many criminals prefer firearms that are "new in the box", and thus traffickers benefited from being able to purchase multiple firearms from licensed dealers in a short period of time. The ability to deal in volume is also important to traffickers in order to maximize their profits. In other words, the more firearms that can be acquired in a short period of time, the more money traffickers can make.

12. I have personally created training programs and trained well over one thousand law enforcement officers on firearms trafficking investigations. These training programs cover all aspects of investigations, from pre-planning to investigative analysis to investigative tactics. A large component of the training programs involve identifying suspected trafficking operations. All of my firearms trafficking training programs instruct investigators to utilize multiple sales as a way

to identify firearms trafficking operations and/or further firearms trafficking investigations.

*Firearms Acquired in Multiple Sales Have Been Used in Crimes*

13. During my time investigating illegal firearms trafficking, I frequently saw that firearms recovered in crimes originated from a multiple sale. These crime gun recoveries were "traced" in order to determine their first retail purchaser. Firearms tracing is the systematic tracking of the history of a gun from manufacturer through the wholesale and retail distribution chain and ultimately to a retail purchaser. ATF is the only agency capable of performing crime gun traces on a national level. Crime gun recoveries traced back to a multiple sale are particularly worrisome due to the likelihood that all the firearms purchased as part of that multiple sale have been sold to, or otherwise acquired, by other criminals.

14. The *U.S. v. Bing* case, where I was recognized as an expert, is a good example of the interplay between the sale of firearms in a short period of time to an individual and illegal firearms trafficking. This case involved a group of individuals acquiring multiple firearms from gun dealers in the State of Georgia. By having the ability to make multiple purchases, the group was able to illegally traffic at least 35 firearms from Georgia to other states, as well as Washington, D.C., for criminal use.

15. While receiving reports of multiple sales can provide investigative leads, the fact remains that illegally trafficked firearms associated with a multiple sale have already been obtained by criminals before law enforcement can step in and recover those guns. Rarely, if ever, do all firearms associated with illegal trafficking get recovered before at least some are used in a crime.

16. One example is an investigation I conducted into Reginald Edwards. Mr. Edwards lived in Ocala, Florida, and made multiple purchases of firearms for criminals in Washington, D.C. I initiated this case after one of Mr. Edwards' firearms was used in a drive-by shooting that injured a child. During my

investigation, none of the roughly ten firearms purchased by Mr. Edwards were recovered prior to being involved in a crime. Mr. Edwards was convicted on federal firearms trafficking charges in the Middle District of Florida.[1]

17. Another example is an investigation I conducted into Rasi Robinson. Mr. Robinson had previously been convicted of a firearms offense in Washington, D.C., but told police he "would get more guns once that case was over."[2] Mr. Robinson moved to Columbus, Ohio, and kept that promise. Mr. Robinson recruited a number of straw purchasers and began illegally supplying firearms to criminals in Washington, D.C. In total, I was able to identify 21 firearms associated with Mr. Robinson's criminal enterprise. On a number of occasions, Mr. Robinson instructed the straw purchasers to buy multiple firearms at one time. The difficulty in coordinating straw purchasers often leads traffickers to engage in multiple sales. The firearms involved in this case were recovered in a number of crimes including illegal firearms possession, drug offenses, and a homicide committed by Mr. Robinson himself.

*Criminals Use Multiple Sales to Engage in Firearms Trafficking*

18. Of particular note, during my time assigned to a Firearms Trafficking Group in Washington, D.C., Virginia had a "one handgun per month" law. This meant that under most circumstances unlicensed individuals could only purchase one handgun within a 30-day period. During this time, I was recognized in a *Washingtonian* magazine article as the "top federal gun-hunter in D.C." and was quoted saying "(t)he one-gun-a-month law in Virginia has affected people's ability to bring a quantity of guns into the District."[3]

---

[1] *U.S. v Edwards*, M.D. Fla., Case No. 5:01cr00009.

[2] Theodore Decker, "Ohio gun-sale laws easily circumvented," *The Columbus Dispatch*, May 30, 2011, https://www.dispatch.com/article/20110530/news/305309835 (last visited Oct. 15, 2021), Exh. 2.

[3] Harry Jaffe, "DC Gun Rights: Do You Want This Next To Your Bed?",

19. This *Washingtonian* magazine article also highlighted a firearms trafficking investigation that circumvented Virginia's one handgun per month law. Garfield Headlam was enlisted in the Navy and stationed in Norfolk, Virginia. However, Mr. Headlam had ties to a criminal gang operating in Washington, D.C. Mr. Headlam recruited numerous straw purchasers to buy him one handgun per month that he subsequently provided to criminals in Washington, D.C. Having to recruit more straw purchasers increases the likelihood that one of those straw purchasers gets caught and leads law enforcement to the trafficker. This is what happened in the Headlam case.

20. The Headlam investigation uncovered 57 illegally acquired firearms. As the case agent, I was leading surveillance of Mr. Headlam in Virginia and witnessed him purchase one handgun and one semi-automatic rifle, destined for Washington, D.C. Virginia's law at the time only prevented the multiple purchase of handguns, not rifles, within a 30-day period, which allowed him to purchase both types of firearms in a single transaction. Mr. Headlam was eventually convicted of firearms trafficking.

21. While serving his prison sentence, Mr. Headlam was interviewed by *The Virginian-Pilot*.[4] In that interview, Mr. Headlam admitted that Virginia's one-gun-a-month law hampered his ability to traffic firearms because it required him to recruit a number of straw purchasers. As stated by Mr. Headlam, "I'm proof the law works." In fact, when I interviewed Mr. Headlam after his arrest, he told me that he wanted to be a big-time trafficker, but the Virginia restriction on multiple

---

*Washingtonian*, March 1, 2008, https://www.washingtonian.com/2008/03/01/dc-gun-rights-do-you-want-this-next-to-your-bed/, Exh. 3.

[4] Joanne Kimberlin, "As street values rise, gun thieves get bolder," *The Virginian-Pilot*, March 4, 2008, https://www.pilotonline.com/government/nation/article_e9f0e3d2-5bc4-5a0d-90dd-a1e3cd6c2b51.html, Exh. 4.

sales made it hard for him to acquire large quantities of firearms in a short period of time.

22. I have reviewed numerous publications and reports that support the fact that multiple purchases are a strong firearms trafficking indicator. For example, one article concluded that multiple sales "appear to account for roughly a quarter of guns used in crime and a number of studies provide indirect indications that guns sold in these transactions are more likely to be trafficked and used in crime."[5] Another article found that "restricting purchases of handguns to 1 per month [was] an effective way to disrupt the illegal movement of guns across state lines."[6] Finally, according to a United States Government Accountability Office Report, "ATF has identified multiple sales or purchases of firearms by a nonlicensee as a 'significant indicator' of firearms trafficking."[7]

23. I have also reviewed the analysis evaluating the effectiveness of Virginia's one gun per month law in reducing the number of illegal firearms sourced from the state. According to one report, "Virginia's one-gun-a-month statute…has had its intended effect of reducing Virginia's status as a source state for gun trafficking."[8]

---

[5] Christopher S. Koper, "Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use," *Journal of Quantitative Criminology* (2014) 30:285-315, 290, Exh. 5.

[6] Douglas Weil and Rebecca Knox, "Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms," *The Journal of the American Medical Association*, June 12, 1996, 275:1759-1761, 1761, Exh. 6.

[7] United States Government Accountability Office Report, Firearms Trafficking, "U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges," June 2009, https://www.gao.gov/assets/gao-09-709.pdf.

[8] Virginia State Crime Commission, "Study of Virginia's Law on Handgun Purchase Limits," House Document No. 28, 1996, Exh. 7.

24. My understanding is that the California law limiting handgun and semiautomatic centerfire rifle purchases to one every thirty days contains a number of exemptions. For example, some of those exemptions permit law enforcement agencies, peace officer, licensed collectors, security companies, and the entertainment industry to purchase more than one handgun or semiautomatic centerfire rifle within a thirty-day period. In my experience, many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale.

## CONCLUSIONS

25. In my opinion, the California law limiting the purchase of handguns and semiautomatic centerfire rifles to one every thirty days helps reduce the incidence of illegal firearms trafficking. My training and experience leave no doubt that firearms traffickers utilize multiple sales to procure quantities of firearms for illegal use. Limiting the ability of criminals to acquire multiple firearms in a short period of time reduces the profit motive and decreases the chances of illegal trafficking.

26. In addition, my investigations into illegal firearms trafficking has shown that firearms initially acquired through multiple sales have been used in crimes. Therefore, it is my opinion that limiting purchases of handguns and semiautomatic centerfire rifles to one every thirty days can also help reduce the use of firearms in crimes.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently to them.

Executed on November 18, 2021, at Seattle, Washington.

Joseph L. Bisbee

# EXHIBIT 1

**QUALIFICATIONS OF JOSEPH L. BISBEE**

1) I was employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) between September 1989 and March 2015. During this time I held the positions of special agent, project officer, assistant country attaché, and group supervisor.

2) Between September 1989 and April 1995, I was assigned to the Youngstown, Ohio Field Office. The majority of my investigations related to firearms violations, including the identification and investigation of firearms traffickers operating between Ohio and such market areas as Detroit, Michigan; Philadelphia, Pennsylvania; and others.

3) In April 1995, I was promoted to the Firearms Enforcement Branch, Bureau Headquarters (BHQ) as a project officer. During this time, I was an active participant in the development and implementation of firearms related investigative programs within ATF. I also met with high ranking Bureau and Treasury representatives regarding monitored cases and conducted training sessions on firearms trafficking related issues. In 1998, BHQ asked me to lead the ATF/US Customs, Country Assessment for Barbados in relation to their capabilities in addressing firearms related violent crime as well as investigations of illegal firearms.

4) Between November 1997 and February 2001, I was assigned to ATF's Washington Group II Field Office. This office is devoted to the investigation of firearms trafficking violations. During this period, I conducted numerous domestic illegal firearms trafficking investigations and because of my expertise in this area, was selected by BHQ to be the case agent on a sensitive investigation involving the attempted assassination of the Police Commissioner of Japan.

5) Between February 2001 and January 2004, I was assigned to the US Consulate in Vancouver, B.C., Canada, as ATF's Assistant Country Attaché. In this position I was tasked with coordinating international firearms trafficking investigations as well as providing training to Canadian law enforcement on firearms related matters. In 2002, BHQ assigned me to be the US representative to the Trafficking in Small Arms Working Group in relation to the G-8 Summit in Alberta, Canada.

6) Between January 2004 and September 2012, I returned to ATF's Washington Group II Field Office and again focused on illegal firearms trafficking investigations. I have been the case agent on numerous investigations in which hundreds of firearms have been identified as illegally moving between source States such as Ohio, West Virginia, Kentucky, North Carolina, and others; and market areas including the Washington, D.C. metropolitan region. As a result of my experience in the firearms trafficking arena, the March 2008 issue of the Washingtonian Magazine profiled me as "the top federal gun-hunter in DC". Also, in 2010, BHQ asked that I be the ATF investigative representative for the El Salvador Country Assessment. I utilized information gathered from meetings with numerous law enforcement, military, and government leaders to recommend ways El Salvador can improve its efforts in addressing firearms crime.

7) In September 2012, I was promoted to the Seattle Field Division as the Group Supervisor for the ATF Violent Gang Task Force. This Group focuses on armed violent criminals and criminal

organizations utilizing firearms illegally. Many of the investigations I oversaw involved the illegal trafficking of firearms to criminal street gangs and Mexican Drug Trafficking Organizations in which Washington was the source State.

8) I have received instruction in both general and specific courses in pursuing firearms trafficking investigations. This training includes study at the Federal Law Enforcement Training Center with successful completion of Criminal Investigator School and New Agent Training, which dealt with ATF specific instruction. I also attended and successfully completed ATF Firearms Interstate Nexus School and Advanced Interstate Nexus School, which provided specific instruction on determining the origin and movement of firearms and ammunition.

9) I have been an instructor on firearms related investigative activity to local law enforcement officers in the State of Ohio; the International Law Enforcement Academies in Budapest, Hungary and Gaborone, Botswana; the Vancouver, B.C., Police Department; the Royal Canadian Mounted Police; and many others, as well as providing instruction at ATF's International Firearms Trafficking Conferences. I was asked to prepare and present a case study on one of my firearms trafficking investigations to the FBI's National Academy for State and Local Law Enforcement. I have also provided firearms trafficking training to new agents at ATF's National Academy in Glynco, Georgia.

10) I have previously testified as an expert witness in the areas of determining the origin and movement of firearms, illicit prices of illegally trafficked firearms, firearm trafficking indicators, and other issues related to illegal firearms trafficking.

11) I am currently the Principal Officer for Armed with Knowledge, a business dedicated to educating the public on firearms issues and providing assistance on policy development and investigations to government, law enforcement and related organizations.

# EXHIBIT 2

The Columbus Dispatch

# Ohio gun-sale laws easily circumvented

Posted May 30, 2011 at 12:01 AM
Updated May 30, 2011 at 9:59 AM

When Rasi Robinson was arrested with a gun in 1999, he told Washington, D.C., police he probably would get more guns once that case was over.

When Rasi Robinson was arrested with a gun in 1999, he told Washington, D.C., police he probably would get more guns once that case was over.

He kept his word. Robinson is now serving time for gun trafficking and manslaughter.

Officials say his case illustrates how easily gun laws can be circumvented and how guns bought at a central Ohio store can be used in crimes both near and far.

Robinson, now 33, called D.C. home, but he moved to Columbus around 2002 and started dealing drugs. He also used “straw buyers” to purchase guns here that he would then sell in D.C.

Wayne L. Dixie Jr., assistant special agent in charge of the Columbus field division of the Bureau of Alcohol, Tobacco, Firearms and Explosives, explained how it’s done.

“An individual who has a criminal history who legally can’t purchase firearms, he or she then goes and gets a number of individuals who have clean criminal histories or no criminal history at all and has them straw purchase firearms,” Dixie said. “I’ve had cases myself where, for example, they paid a college student 25 bucks.”

By November 2004, Robinson had recruited at least four women to buy guns for him. Two were drug customers. Two others were romantically involved with him.

"It's pretty common for a male with a strong personality to use women to get what they want," said ATF agent Joseph L. Bisbee. "It works the same with firearms trafficking."

Together, the women bought at least 16 guns.

Bisbee, who is based in D.C., said he got onto the Robinson case when a gun seized in the district was traced back to a woman who had bought it at Vance's Shooters Supplies on Cleveland Avenue in Clinton Township.

Bisbee talked to the woman and people around her and tracked down the other straw buyers. He learned that the man for whom they had bought guns was known as "Dre" and sold drugs from a Columbus apartment complex off Dresden Street. He also learned Dre might have killed someone.

Columbus homicide detectives told the ATF that Dre likely was Robinson, a suspect in the Nov. 20, 2004, slaying of 18-year-old Sharif Sharif.

All four women eventually pleaded guilty. Based largely on their testimony, Robinson was indicted on gun charges in September 2006. He fled to Kentucky but was arrested there in late 2007.

With Robinson locked up, Bisbee teamed up with Columbus cold-case detective Dana Farbacher to close the homicide by speaking to once-skittish witnesses.

A break came when a gun pulled on a police officer in D.C. was found to be the same gun that had killed Sharif.

It also had been bought by one of Robinson's straw purchasers, though she told police she had purchased it for herself. She reported it stolen in July 2004 and remembered only later that Robinson had had access to her place when it disappeared, police said.

Farbacher said Sharif was killed because he sold drugs on turf that Robinson considered his.

Robinson was sentenced to 41 months in federal prison for gun trafficking. He now is serving 10 years in state prison for the death of Sharif.

Of the 16 firearms linked to his ring, police have found only three. The rest, agents say, might still be on the streets.

tdecker@dispatch.com

# CERTIFICATE OF SERVICE

Case Name: **Nguyen, Michelle, et al. v. Rob Bonta, et al.** No. **3:20-cv-02470**

I hereby certify that on April 8, 2022, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' NOTICE OF MOTION; MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT; DECLARATION OF JERRY T. YEN**

**DEFENDANTS' NOTICE OF LEGISLATIVE FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT; DECLARATION OF JERRY T. YEN**

**DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; EXHIBITS 17-19**

**EXHIBITS 20-22 TO THE DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**EXHIBITS 23-29 TO THE DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**EXHIBITS 30-36 TO THE DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on April 8, 2022, at Sacramento, California.

| Lindsey Cannan | /s/ *Lindsey Cannan* |
|---|---|
| Declarant | Signature |

SA2020305120
36067699