ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JERRY T. YEN
Deputy Attorney General
State Bar No. 247988
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
  Fax: (916) 324-8835
  E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Rob Bonta, in his official
capacity as California Attorney General, and
Luis Lopez, in his official capacity as
Director of the Department of Justice Bureau
of Firearms*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,** | Case No. 3:20-cv-02470-WQH-MDD |
| Plaintiffs, | **DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS** |
| **v.** | |
| **ROB BONTA, in his official capacity as Attorney General of California, et al.,** | Date: May 20, 2022<br>Time: No oral argument unless requested by the Court<br>Judge: Hon. William Q. Hayes<br>Courtroom: 14B<br>Action Filed: Dec. 18, 2020 |
| Defendants. | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 7.1.f.1, and the Court's Chamber Rules and Procedures, Defendants Rob Bonta, in his official capacity as Attorney General of California, and Luis Lopez, in his official capacity as the Director of the California Department of Justice Bureau of Firearms, submit the following Response to Plaintiffs' Statement of Material Facts.

1

| | | **Plaintiffs' Stated Undisputed Fact** | **Defendants' Response** |
|---|---|---|---|
| | 1. | Defendants have enforced and are continuing to enforce California's OGM law. | Admit. |
| | 2. | Individual Plaintiffs (Nguyen, Boguski, Medina, Colletti, Phillips, and Prince) are California residents and members of the Institutional Plaintiffs (Firearms Policy Coalition, Inc., San Diego Gun Owners PAC, and Second Amendment Foundation). | Admit. |
| | 3. | None of them is disqualified from owning or possessing firearms under federal or state law. | Solely for purposes of establishing standing and ripeness in this litigation, admit that Individual Plaintiffs are not disqualified by federal or state law from owning or possessing firearms. |
| | 4. | Institutional Plaintiffs bring this action on behalf their members and supporters similarly situated to Individual Plaintiffs. | Admit. |
| | 5. | Each Individual Plaintiff actively desires and intends to purchase two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more of the same in a single transaction within a | Admit. |

Defs.' Resp. to Pls.' Statement of Material Facts (3:20-cv-02470)

| | | |
|---|---|---|
| | 30-day period from a licensed dealer, and each would do so but for California's OGM law. | |
| 6. | Plaintiffs Prince and Phillips are licensed firearms dealers for Retailer Plaintiffs, North County Shooting Center Inc. ("NCSC") and PWGG L.P. ("PWGG"), respectively. | Admit that Plaintiffs Prince and Phillips are listed as firearms dealers in the California DOJ's Centralized List of Firearms Dealers for Retailer Plaintiffs North County Shooting Center Inc. ("NCSC") and PWGG L.P. ("PWGG"), respectively. |
| 7. | Plaintiffs NCSC and PWGG are licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as Federal Firearms Licensees ("FFL"). | Admit. |
| 8. | Because of the OGM law, Retailer Plaintiffs are prevented from selling two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more of the same in a single transaction within a 30-day period to individuals not otherwise disqualified by federal or state law from owning or possessing firearms. | Admit. |
| 9. | The broad class of arms targeted under | For summary judgment purposes |

3

| | | |
|---|---|---|
| | California's OGM law—handguns and semiautomatic centerfire rifles—are indisputably protected under the Second Amendment. | only, admit that California's OGM law implicates the Second Amendment.  Deny that California's OGM imposes a ban on any class of firearms or eliminates the ability to obtain a firearm. |
| 10. | Plaintiffs' constitutional expert, Professor George Mocsary, "could find no laws in the founding era limiting the quantity or frequency" and concluded that instead, "it appears that the policy of the time embraced private collections of arms." | Admit that Prof. Mocsary stated in his declaration that he "could find no laws in the founding era limiting the quantity or frequency" and that "it appears that the policy of the time embraced private collections of arms." |
| 11. | More specifically, Mocsary found that "[t]he otherwise-legal purchase of protected arms has been unregulated as to the quantity of firearms that may be purchased within a given timeframe for practically all of American history." | Admit. |
| 12. | Mocsary further found that "[t]ransacting in protected firearms free of quantity-over-time restrictions remains a lawful Second Amendment activity in a large majority of jurisdictions across the United States." | Admit. |
| 13. | As he explained, the first such | Admit that Prof. Mocsary stated in |

4

Defs.' Resp. to Pls.' Statement of Material Facts (3:20-cv-02470)

|   |   |   |
|---|---|---|
|   | regulation appeared in 1975, with a South Carolina law restricting handgun sales to one per person per month, which was repealed in 2004. | his declaration that "[t]he first in American law forcing the spacing of gun purchases over time was South Carolina's 1975 law restricting handgun sales to one per person per month.  The law was repealed in 2004." |
| 14. | Virginia passed a one-handgun-per-month law in 1993, repealed it in 2020, and reenacted another one in 2020. | Admit that Virginia passed a law limiting the purchase of handguns to one every thirty days in 1993. Deny that Virginia repealed that law in 2020.  Virginia repealed that law in 2012.  Defs' Request for Judicial Notice (RJN), Dkt. No. 29-2, Exh. 4 at 445-46.  Admit that Virginia reenacted its law limiting the purchase of handguns to one every thirty days in 2020. |
| 15. | Maryland enacted a one-handgun-per-month law in 2003. | Deny.  Maryland passed a law limiting the purchase of handguns and assault weapons to one every thirty days in 1996.  RJN, Exh. 6 at 3150, 3159. |
| 16. | New Jersey restricted handgun purchases to one-per-month in 2008. | Deny.  New Jersey passed a law limiting the purchase of handguns to one every thirty days in 2009. RJN, Exh. 8 at 1325-26. |

5

| 17. | The District of Columbia enacted a pistol registration requirement in 2008 (after *Heller*) that effectively limited them to one per month, although that was struck down as unconstitutional in 2015. | Admit that the District of Columbia enacted firearms registration requirements in 2008, including a prohibition on registration of more than one pistol per person in any 30-day period.  In declaring that prohibition unconstitutional, the United States Court of Appeals for the District of Columbia stated that "the suggestion that a gun trafficker would bring fewer guns into the District because he could not register one per month there lacks the support of experience and of common sense.  Indeed, . . . the efficacy of purchasing limitations in preventing trafficking may have little bearing upon the efficacy of registration limitations in doing so." *Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015). |
| 18. | In his deposition, Mocsary reaffirmed his conclusions that there is "no historical precedent" for OGM laws, which are instead "a very new thing." | Admit. |
| 19. | As detailed in a publication the defense itself introduced, generally, | Admit that a Vermont Law Review article, introduced during Prof. |

6

| | | |
|---|---|---|
| | "gun control laws were unknown to Founding Fathers." | Mocsary's deposition, stated that "a declaration [by the Massachusetts Supreme Court] seem[ed] inconsistent with actual history, considering that even concealed weapons were not prohibited at common law, and gun control laws were unknown to Founding Fathers, most of whom believed in the *code duello*." |
| 20. | "There was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." | Admit that the Vermont Law Review article stated that "[t]here was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." |
| 21. | The right of the general public to keep and bear arms was of the highest order in civilized society at this time. "Newspaper attacks on the religious guarantees and other matters were extreme and persistent, but the right to bear arms was not once questioned." | Admit that the Vermont Law Review article stated that "[n]ewspaper attacks on the religious guarantees and other matters were extreme and persistent, but the right to bear arms was not once questioned." Deny that the article stated that the "right |

7

| | | to keep and bear arms was of the highest order in civilized society at this time." |
|---|---|---|
| 22. | Instead, "it appears that having arms was manifestly an attribute of free citizenship" during this period. | Admit that the Vermont Law Review article stated that "it appears that having arms was manifestly an attribute of free citizenship." |
| 23. | As one delegate to Pennsylvania's constitutional convention put it in 1787, "however wide and various the firearms of power may appear, they may all be traced to one source, the people." | Admit. |
| 24. | Consistent with a largely unregulated right of highest order in the scheme of individual liberties, people commonly in the colonial states engaged in the purchase and sale of multiple firearms in single or frequent transactions. "Symbolic of the times, the following newspaper advertisement began to appear regularly: 'WANTED immediately, a quantity of good HORSE PISTOLS AND CARBINES, for which ready money, and a liberal price, will be given . . . Has a quantity | Admit that the Vermont Law Review article quoted a 1776 newspaper advertisement stating "WANTED immediately, a quantity of good HORSE PISTOLS AND CARBINES, for which ready money, and a liberal price, will be given . . . Has a quantity of Muskets. . . to sell." Deny that the article described how "people commonly in the colonial states engaged in the purchase and sale of multiple firearms in single or |

| | | |
|---|---|---|
| | of Muskets. . . to sell.'" | frequent transactions." |
| 25. | Another example of "the unquestioned freedom to have arms" was a sales advertisement for "100 Pair Horsemens Pistols." | Admit that the Vermont Law Review article stated that "the unquestioned freedom to have arms was exemplified in the following advertisement . . . 'To be Sold . . . 100 Pair Horsemen's Pistols . . . .'" |
| 26. | For example, "Vermont's founding fathers" "carried a gun and a brace [a pair] of pistols on their persons as a common practice." | Admit that the Vermont Law Review article stated that "the framers of this [right to bear arms] provision carried a gun and a brace of pistols on their persons as a common practice." |
| 27. | "Pistols in the pocket and an arsenal at home were options available to every free citizen" of Vermont. | Admit that the Vermont Law Review article stated that "[p]istols in the pocket and an arsenal at home were options available to every free citizen of the Green Mountain State." |
| 28. | In 1796, Ira Allen, a general in the Vermont militia, was able to purchase and ultimately distribute 20,000 muskets to the general population. | Admit that the Vermont Law Review article described how, in 1796, Ira Allen, a major-general of the Vermont militia, acquired 20,000 muskets in France and distributed them to the American public. |
| 29. | The stated purpose of the original | Deny that AB 202 was enacted in |

9

| | | |
|---|---|---|
| | OGM law as enacted under Assembly Bill No. 202 in 2000 was to "curtail the illegal gun market, disarm criminals, and save lives by preventing multiple purchases of handguns through legitimate channels," on the rationale that "[p]reventing multiple purchases takes the profit out of black market sales and puts gun traffickers and straw purchasers out of business." | 2000.  AB 202 was enacted in 1999 and went into effect on January 1, 2000.  Cal. Stats. 1999, ch. 128 (Assemb. B. 202), § 2 (codified as Cal. Penal Code § 27535). Otherwise, admit. |
| 30. | More specifically, the stated goal of the law was "to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself," in particular those who are underage, have a disqualifying prior conviction, a mental disorder, or are not residents. | Admit. |
| 31. | When the law was expanded to semiautomatic centerfire rifles effective July of 2021 under Senate Bill No. 61, the Legislature stated that AB 202 had been "intended to reduce the illegal flow of handguns by eliminating the opportunity to sell guns from bulk purchases on the black | Admit. |

| | | |
|---|---|---|
| | market" and that applying this same law to long guns "would be part of the solution in reducing gun violence." | |
| 32. | Throughout all relevant times, Defendants have implemented and enforced a multitude of statutes, regulations, and policies that strictly regulate and criminalize the acquisition, possession, and use of firearms by all prohibited persons, including those who become prohibited after a lawful acquisition. *See e.g.*, Cal. Penal Code §§ 29800, 29805, 29815, 29825; 18 U.S.C §§ 922(b)(2), 922(d), 922(g). | Admit that the California Department of Justice enforces the California Penal Code sections prohibiting the acquisition and possession of firearms by prohibited persons. |
| 33. | Throughout all relevant times, Defendants have also implemented and enforced a multitude of statutes, regulations, policies, and systems that collect, maintain, and monitor identifying information of those who are currently prohibited persons, who lawfully acquire, sale, and transfer firearms, and who later become prohibited persons, including, for example: Cal. Penal Code §§ 11101, 11105, 11106, 26150, 26185, 26195, | Admit that the California Department of Justice enforces the California Penal Code sections prohibiting the acquisition and possession of firearms by prohibited persons, and utilizes certain records, databases, and systems in determining whether an individual is prohibited by state or federal law from possessing or acquiring a firearm. |

| | | |
|---|---|---|
| | 26225, 28220; the Dealer's Record of Sale (DROS) DROS Entry System (DES); the Armed Prohibited Persons System (APPS); Mental Health Reporting System (MHRS); Mental Health Firearms Prohibition System (MHFPS); Prohibited Applicant (PA); and many other such regulatory programs. | |
| 34. | Through the APPS, DOJ agents regularly and readily "locate and disarm prohibited persons," "thereby preventing and reducing incidents of violent crime," with "daily manual queries of the databases that cross-reference the population of known firearms owners against individuals who may have had a PTE [potentially triggering events] within the past 24 hours," such that "[n]ew individuals are added daily, creating a constantly changing and growing dataset." | Admit that the California Department of Justice special agents "locate and disarm prohibited persons identified through the APPS database, thereby preventing and reducing incidents of violent crime." Admit that "[p]rohibited individuals are identified by daily manual queries of the databases that cross-reference the population of known firearms owners against individuals who may have had a PTE [potentially triggering events] within the past 24 hours" and that "[n]ew individuals are added daily, creating a constantly changing and growing dataset." |

12

| | | |
|---|---|---|
| 35. | "Cases are pursued until all investigative leads are exhausted." | Admit. |
| 36. | The legislative history of AB 202 and SB 61 recognized the existence of these various schemes and how they already compel ordinary law-abiding citizens to obtain special certification, pass a background check, wait ten days, and complete a safe handling demonstration as preconditions to any lawful purchase. | Admit that the legislative histories of AB 202 and SB 61 list and summarize various laws regulating the sale, transfer, purchase, and possession of firearms, such as a background check, a ten-day waiting period, and a basic firearm safety certificate. |
| 37. | It also recognized the myriad state and federal laws that specifically criminalize straw purchasing and illegal firearms trafficking | Admit. |
| 38. | State law separately "[p]rohibits the sale, loan, or transfer of a firearm to any person who is not the actual purchaser or transferee if the intent is to avoid the statutory requirements for lawful transfer," and "[t]he Federal Gun Control Act forbids straw transactions" because it "prevents a person from purchasing guns in a state with lax laws and then returning to his or her state of residency." | Admit. |
| 39. | Further, all federal licensees must | Admit. |

13

| | | |
|---|---|---|
| | report to ATF and all related state law enforcement agencies all sales, transfers, or disposals of two or more handguns "at one time or during any five consecutive business days," and they must make this report "not later than the close of business on the day that the multiple sale or other disposition occurs." | |
| 40. | As the legislative history acknowledged, only the District of Columbia and three other states—Virginia, Maryland, and New Jersey—have OGM laws, and they target only handguns, not handguns *and* long guns like California does. | Admit that the legislative history of SB 61 lists the District of Columbia, Virginia, Maryland, and New Jersey with OGM laws for handguns.  Maryland's OGM law also includes assault weapons.  Md. Code Ann., Pub. Safety § 5-128(b). |
| 41. | What data the State did cite in discussing its claimed interests in the OGM law concerned multiple firearms purchased in a single transaction or in "bulk" or data which otherwise included *all* multiple-firearms purchases without distinguishing multiple purchases over a 30-day period from the lot of transactions. | Deny.  For example, the legislative history of SB 61 includes a discussion on the effect of Virginia's OGM law on the reduction of crime guns traced to Virginia firearms dealers.  Pltfs' Exh. 5, Dkt. No. 23-8, at 54 [S.B. 61, Sept. 13, 2019 Senate Rules Committee, 2019-2020 Reg. Sess., at 5 (Cal. 2019)]. |
| 42. | The defense's expert, Louis Klarevas, | Deny.  For example, Professor |

14

| | | |
|---|---|---|
| | also relied on data concerning multiple-firearms purchases in single or "bulk" transactions, on the same day, within a handful of days, or aggregated data concerning all forms and timing of multiple-firearms purchases without distinguishing such purchases over a 30-day period of time. | Klarevas relied on data that specifically considered purchases of more than one gun by the same buyer in different transactions within a 30-day period.  *See* DX-17[1] (Klarevas Expert Rept.), Dkt. No. 29-4, at p. 7 n.10 (citing Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749, 757 (2005) (Koper 2005)). |
| 43. | The same is true of the data on which Joseph Bisbee, the defense's other expert, relied because that concerned aggregate "multiple sales" data. | Deny.  For example, Mr. Bisbee cited an article containing data for multiple sales "based on federal criteria (i.e., the purchase of two or more handguns by the same individual from the same dealer within five consecutive days)."  *See* DX-19 (Bisbee Expert Rept.), Dkt. No. 29-4, at p. 8 n.5 (citing Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction* |

[1] "DX" followed by the exhibit number are citations to Defendants' exhibits accompanying the Declaration of Jerry T. Yen in support of Defendants' Motion for Summary Judgment (Dkt. No. 29-4).

| | | |
|---|---|---|
| | | *Characteristics Associated with Gun Trafficking and Criminal Gun Use*, 30 J. Quantitative Criminology 285 (2014) (Koper 2014)); Koper 2014 at 297-98.  The same article noted that "[m]ultiple sales were also examined using a broader 'state definition' that corresponds to the purchase of two or more handguns by the same person from any gun dealer(s) within a 30-day period."  Koper 2014, Dkt. No. 29-6, at 298 n.22.  Mr. Bisbee also considered other articles analyzing the effect of OGM laws on illegal firearms trafficking.  *See* DX-19 ¶¶ 22-23. |
| 44. | In fact, one source on which Klarevas relied found that "handguns purchased by the same individual within 30 days of another handgun purchase, but not on the same day, were *less* likely to be traced." | Admit. |
| 45. | Plaintiffs' expert statistician, Carl Moody, calculated this percentage and found that "a handgun acquired in a series of purchases over 30 days has a | Admit that Dr. Moody's Rebuttal report stated that "a handgun acquired in a series of purchases over 30 days has a 38% smaller |

16

| | | |
|---|---|---|
| | 38% smaller likelihood of being a trace gun," such that "only a tiny fraction of those (0.4 percent) became crime guns." | likelihood of being a trace gun" and that "only a tiny fraction of those (0.4 percent) became crime guns." DX-22 (Moody Rebuttal Rept.), Dkt. No. 29-5, at p. 10.  Dr. Moody did not perform these calculations, but reported and interpreted data from an article.  *Id.* |
| 46. | This represents only 722 firearms out of a data set totaling more than 180,000 firearms. | Admit that the 0.4 percent was calculated based on 722 handguns that were successfully traced by ATF out of a sample data set of 180,321 handguns. |
| 47. | Another source on which Klaveras relied even found a lesser risk *in general* as between multiple-firearms sales and single firearm sales, specifically indicating that "guns sold in multiple sales had a lower risk of being used in crime." | Admit that the Koper 2005 article stated that "the percentage of multiple sales recovered (3.3%) was somewhat smaller than that for single sales (3.7%), which suggests that guns sold in multiple sales had a lower risk of being used in crime."  DX-26, Dkt. No. 29-6, at 760. |
| 48. | That same source acknowledged while "there are indications" that OGM laws "affect the interstate flow of guns," "there is scant evidence they actually reduce gun crime." | Admit that the Koper 2005 article, in summarizing the studies of OGM laws available at that time, stated that "there are indications these laws affect the interstate flow of |

17

| | | | |
|---|---|---|---|
| | | | guns, particularly that from states with lenient gun controls to those with more restrictive gun laws (Weil and Knox, 1996), but there is scant evidence they actually reduce gun crime (Coggeshall, 2001; Lott and Whitley, 2001; Webster et al., 2002)."  DX-26, Dkt. No. 29-6, at 754. |
| 49. | Klarevas relied on a later study of the same researcher for the proposition that "Maryland's one-gun-a month provision reduced trafficking from Maryland into Washington, D.C., via multiple sales." | Admit. |
| 50. | But that study was based on several factors unrelated to the potential effect of the "multiple-sale" factor, it only considered "multiple sales" in the aggregate to the extent that factor was considered, and even then it found only 3.2% of all the firearms sold during the relevant period had a "chance" of becoming crime guns. | Deny that the Koper 2014 study was based on factors unrelated to "multiple sales."  For example, the study analyzed data prior to and after passage of Maryland's Gun Violence Act (GVA), and that analysis considered whether crime guns were obtained through "multiple sales."  *See* DX-27, Dkt. No. 29-6, at 300, Table 4.  Admit that the Koper 2014 article stated that "[a]djusting for exposure time, |

| | | guns sold in the Baltimore area had a 3.2 % chance of being recovered by police in Baltimore within 5 years." *Id*. at 285. |
|---|---|---|
| 51. | Further, the study ultimately found no "statistically significant" risk that "guns would be at higher risk if sold in multiple sales and/or before the GVA" (Maryland's OGM law). | Admit that the Koper 2014 article stated that the transaction characteristics involving multiple sales made prior to GVA, single sales made after GVA, and multiple sales after GVA were not "statistically significant, contrary to the hypotheses that guns would be at higher risk if sold in multiple sales and/or before the GVA,"  DX-27, Dkt. No. 29-6, at 304. |
| 52. | And it also agreed with the general conclusion in the Wright Report that "guns purchased in same-day multiple sales were at *greater* risk of criminal use than those purchased in other 30-day multiple sales." | Admit that the Koper 2014 article, in a footnote, stated that "preliminary analysis . . . is consistent with Wright et al.'s (2010) finding that guns purchased in same-day multiple sales were at greater risk of criminal use than those purchased in other 30-day multiple sales."  DX-27, Dkt. No. 29-6, at 298 n.22. |
| 53. | Klarevas cited another study for the proposition that "Maryland's OGM | Admit. |

| | | |
|---|---|---|
| | law was associated with a consistent 10-11% decrease in the state firearm homicide rate." | |
| 54. | However, that study was focused the effect of banning "Saturday Night Special" handguns, it did not consider the potential impact of the other major firearms regulations simultaneously instituted by that multi-faceted law, and the results were only "preliminary" as it was. | Admit that the Webster study focused on the effects of Maryland's ban on "Saturday Night Special" handguns and that the results were "preliminary because they [were] based on only 2 full years of postlaw data." Pltfs' Exh. 15, Dkt. No. 24, at 411 [Daniel W. Webster, et al., *Effects of Maryland's Law Banning "Saturday Night Special" Handguns on Homicides*, 155 Am. J. of Epidemiology 406, 411 (2002)]. Otherwise, deny. The Webster study stated that "[o]ur findings that Maryland's one-gun-per-month law was associated with a significant decrease in firearm homicide rates suggest that such laws may also have important independent effects." *Id.* |
| 55. | Klarevas conceded that other data on which he relied was not "primarily focused on assessing the effects of | Deny. Professor Klarevas stated in his expert report that "two studies were [not] primarily focused on |

| | | |
|---|---|---|
| | OGM laws" and, in any event, yielded findings that "were not statistically significant" in showing a link between OGM laws and rates of violence. | assessing the effects of OGM laws, [but] . . . expanded the research on intrastate trafficking of firearms." DX-17, Dkt. No. 29-4, ¶ 31.  Two different articles found that the relationship between OGM laws and firearm homicide rates were not statistically significant.  *Id*. ¶ 35. However, there were other studies that found a "marginally significant relationship between OGM laws and murders" and that "OGM laws are associated with reductions in murder rates – statistically significant decreases in some cases – in the states that enacted OGM laws."  *Id*. ¶ 36. |
| 56. | He further conceded relying on an unpublished report that employed "an unorthodox and flawed methodological approach" to reach an "unpersuasive[]" explanation. | Admit that Professor Klarevas stated in his expert report that the author of an unpublished report "employ[ed] an unorthodox and flawed methodological approach" and "unpersuasively attempts to offer an alternative explanation – declining social order – for the observed correlation between OGM laws and reductions in murder |

21

| | | rates." DX-17, Dkt. No. 29-4, ¶ 36. |
|---|---|---|
| 57. | Klarevas cited an older report that Moody had co-authored, to "suggest" that OGM laws "may" reduce murder rates. | Admit that Professor Klarevas cited an article co-authored by Dr. Moody which found "that there was a marginally significant relationship between OGM laws and murders, indicating that states with OGM laws experienced lower homicide rates." DX-17, Dkt. No. 29-4, ¶ 36. |
| 58. | However, through his rebuttal report and deposition testimony, Moody has explained in detail that this report does not support any reliable connection between OGMs and murder rates. | Admit that, in his rebuttal expert report and deposition testimony, Dr. Moody attempts to explain one of his paper "does not support the hypothesis that OGM laws save lives." *See* DX-22, Dkt. No. 29-5, at pp. 3-4. |
| 59. | Klarevas claimed that a "primary policy objective" was to "reduce opportunities" for "potential active shooters to amass multiple firearms in a short amount of time that they can then use to perpetrate a mass murder." | Admit. |
| 60. | However, the *sole* reference to a mass shooting in the entire record is an argument in support of SB 61 from the Ventura County Board of Supervisors, which referenced one local mass | Admit. |

| | | |
|---|---|---|
| | shooting in 2018. | |
| 61. | And there is no indication that the shooter used multiple firearms—much less multiple firearms acquired within a 30-day period. | Admit. |
| 62. | Similarly, Klarevas's expert reports neither claim nor establish any causal link between the number or frequency of firearm purchases and the ability to, or the likelihood that a person will, carry out a mass shooting. | Deny.  Professor Klarevas noted in his expert report that the gunman in the 2017 Las Vegas strip massacre "purchased at least 43 firearms through bulk and multiple firearm sales."  DX-17, Dkt. No. 29-4, ¶ 38. |
| 63. | Klarevas conceded as much in his deposition and further acknowledged that "a mass shooter or a mass shooting can certainly be perpetrated with a single firearm." | Admit that Professor Klarevas acknowledged that "a mass shooter or a mass shooting can certainly be perpetrated with a single firearm." |
| 64. | He also conceded in his report that "no studies have assessed this relationship directly." | Admit that Professor Klarevas stated in his expert report that "no studies have assessed [the relationship between OGM laws and mass shootings] directly." |
| 65. | Moody conducted his own statistical analyses, using multiple standard methods, to assess for any statistically meaningful impact on murder or firearm homicide rates in California, and he found none as to either rate. | Admit. |

| | | |
|---|---|---|
| 66. | In fact, Moody has "been unable to find a single study that links OGM laws to violence reduction in the states that enacted such laws." | Admit. |
| 67. | Moody also found no evidence of any impact on the public safety of California by virtue of its attempt to regulate straw purchasing through the OGM law. | Admit that Dr. Moody's expert report stated that studies "link[ing] firearm homicide with interstate flow of firearms" and studies "linking gun violence to interstate transfer of firearms" "have little relevance to the California OGM law." DX-20 (Moody Expert Rept.), Dkt. No. 29-5, at p. 3. |
| 68. | Moody reaffirmed his conclusions and opinions in his deposition with further details and justifications. | Admit. |
| 69. | Indeed, their own expert, Klarevas, conceded in his deposition that there is no evidence "to show that a five-day or a seven-day or a ten-day is not alone as effective as a 30-day" limitation in meeting the claimed justifications behind California's OGM law. | Admit that, in his deposition, Professor Klarevas did not recall whether the studies breakdown the effectiveness of a "five-day or a seven-day or a ten-day" compared to a "30-day" limitation. |
| 70. | The legislative record frequently notes the existence of various "exceptions" and "exemptions" to the OGM law, | Deny.  The legislative history of AB 202 states that "The bill also provides numerous exemptions |

| | | |
|---|---|---|
| | but in none of those instances does it provide an explanation or supporting justification for them. | which are salutary because they encourage a person who may be involved lawfully in multi-gun exchanges to go to a licensed dealer, or to the local sheriff, in order to facilitate the exchange." Defendants' Notice of Legislative Facts in Support of Their Motion for Summary Judgment ("NLF"), Dkt. No. 29-3, Ex. 12 at 3. |
| 71. | For his part, Klarevas simply says "[b]ased on my review of the relevant literature and data, I came across no evidence that would lead me to alter my conclusions in light of California's exemptions," offering no supporting reasons or rationale for their existence. | Admit. |
| 72. | When pressed on this point during his deposition, Klarevas said he could "imagine that part of what was the rationale behind" exemption for the movie industry was that this industry provides an important economic benefit for the State. | Admit. |
| 73. | Klarevas further "imagine[d]" that "there are protocols" "for how these weapons are supposed to be handled | Admit. |

25

| | | |
|---|---|---|
| | and stored" by those in the movie industry. | |
| 74. | Of course, as he had to admit, law-abiding citizens have to follow a multitude of such "protocols" too. | Admit that, in his deposition, Professor Klarevas acknowledged that law-abiding citizens "have protocols they have to follow in the form of criminal laws." |
| 75. | With no evidence or further explanation, Bisbee says, "many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale." | Deny.  Mr. Bisbee states in his expert report that "[i]n my experience [as an ATF special agent for more than 25 years], many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale."  DX-19, Dkt. No. 29-4, ¶ 24. |

Dated:  April 29, 2022

Respectfully submitted,

ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General


*/s/ Jerry T. Yen*
JERRY T. YEN
Deputy Attorney General
*Attorneys for Rob Bonta, in his official capacity as California Attorney General, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms*

26

# CERTIFICATE OF SERVICE

Case Name:   **Nguyen, Michelle, et al. v. Rob**          No.      **3:20-cv-02470**
             **Bonta, et al.**

I hereby certify that on <u>April 29, 2022,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 29, 2022,</u> at Sacramento, California.

|  |  |
|---|---|
| Eileen A. Ennis | |
| Declarant | Signature |

SA2020305120
36137396.docx