1   Raymond M. DiGuiseppe
    California State Bar No. 228457
2   The DiGuiseppe Law Firm, P.C.
    4320 Southport-Supply Road, Suite 300
3   Southport, NC 28461
    Tel.: 910-713-8804
4   Email: law.rmd@gmail.com
    *Attorneys for Plaintiffs*

5

6

7                   UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF CALIFORNIA
8

9   MICHELLE NGUYEN, et al,            Case No. 3:20-cv-02470-WQH-MDD
    Plaintiffs
10                                      PLAINTIFFS' OPPOSITION TO
    vs.                                 DEFENDANTS' MOTION FOR
11                                      SUMMARY JUDGMENT
    ROB BONTA, in his official capacity as
12  Attorney General of California, et al,   Date: May 20, 2022
    Defendants.                          Time: No oral argument unless
13                                       requested by the Court
                                         Judge: Hon. William Q. Hayes
14                                       Courtroom: 14B
                                         Action Filed: Dec. 18, 2020
15

16

17

18

19

20
                                  i

# Table of Contents

Page

I.   Introduction                                                                                          1

II.  Defendants Set Up Artificially Lenient Standards for Themselves,
     Which Ignore Crucial Evidence and Bypass the Burdens They Must
     Carry                                                                                                 1

III. The Stark Absence of Tailoring is Fatal to the OGM Law and Thus
     Fatal to Defendants' Motion for Summary Judgment                                                     7

     A.   Defendants' Own Theory of the Case in Support of the OGM
          Law Underscores the Law's Intolerably Broad Sweep                                               8

     B.   Defendants Make No Effort to Show that the State Has Tried
          and Failed with All the Less Restrictive Alternatives Readily
          Available to It                                                                                 10

     C.   Defendants Also Fail to Prove California's OGM Law
          Alleviates the Claimed Harms in Any Direct or Material Way                                      12

          1.   Defendants Fail to Show the Other OGM Laws Are
               Material                                                                                   13

          2.   Defendants' Studies Do Nothing Except Highlight the
               Deficiencies                                                                               14

          3.   The Expert Evidence Can Only Bolster Plaintiffs' Claims                                    17

          4.   Defendants' Attempted Maneuvering Shows They're
               Grasping at Straws                                                                         23

IV.  Defendants' Motion on the Equal Protection Also Flatly Fails                                         24

# Table of Authorities

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............ 1

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ............ 6

*Caetano v. Massachusetts,* 577 U.S. 411 (2016) ............ 2

*City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985) ............ 24-25

*City of Emerson v. Robinson*, 621 F.3d 1251 (9th Cir. 2010) ............ 3, 23

*Clady v. Los Angeles County*, 770 F.2d 1421 (9th Cir. 1985) ............ 21-22

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach* 657 F.3d 936, 948 (9th Cir. 2011) ............ 6

*Contreras v. City of Los Angeles*, 656 F.2d 1267 (9th Cir. 1981) ............ 21

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............ *passim*

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ............ 6-7, 12

*Dukes v. Wal-Mart Stores, Inc.*, 964 F.Supp.2d 1115 (N.D. Cal. 2013) ............ 21

*EEOC v. General Telephone Co. of Northwest, Inc.*, 885 F.2d 575 (9th Cir. 1989) ............ 22

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............ 2

*Fouts v. Bonta*, 2021 WL 4311013 (S.D. Cal. 2021) ............ 4

*Glassybaby, LLC v. Provide Gifts, Inc.*, 2011 WL 4571876 (W.D. Wash. 2011) ............ 3

*In re Roundup Products Liability Litigation*, 390 F.Supp.3d 1102 (N.D. Cal. 2018) ............ 21

iii

1

**Table of Authorities (continued)**

Page

2

**Cases**

3

*International Broth. of Teamsters v. U.S.*, 431 U.S. 324 (1977)                          21

4

*Isabel v. Reagan*, 987 F.3d 1220 (2021)                                                        4

5

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)   2, 4, 6

6

*Mai v. United States*, 952 F.3d 1106 (2020)                                                  22

7

*McCullen v. Coakley*, 573 U.S. 464 (2014)                                          7, 8, 10, 11

8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)                                        9

9

*Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012)                                          24

10

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018)                                        24, 25

11

*Playboy Entm't Grp.*, 529 U.S. 803 (2000)                                                  6

12

*Porter v. Gore*, 517 F.Supp.3d 1109 (S.D. Cal. 2012)                                    6

13

*Schweiker v. Wilson*, 450 U.S. 221 (1981)                                                  25

14

*Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259 (N.D. Cal. 1992)                      22

15

*Teixeira v. Cty. of Alameda*, 873 F.3d 670 (9th Cir. 2017)                              2

16

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994)                                  6, 7

17

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 208 (1997)                            12

18

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)                                6

19

*United States v. Singh*, 979 F.3d 697 (9th Cir. 2020)                                    2

20

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019)                                6

iv

1

**Table of Authorities (continued)**

2

                                                                            **Page**

**Cases**

3

*United States v. Virginia*, 518 U.S. 515 (1996)                                23

4

*Wiese v. Becerra*, 306 F.Supp.3d 1190 (E.D. Cal. 2018)                        24, 25

5

6

**Plaintiffs' Exhibits[1]**

7

PMSJ, Ex. 2 (Mocsary Expert Declaration)                                          4

8

PMSJ, Ex. 3 (Mocsary Deposition)                                                 4

9

PMSJ, Ex. 4 (Halbrook Publication)                                               4

10

PSMJ, Ex. 6 (APPS Report)                                                       10

11

PMSJ, Ex. 8 (Klarevas Expert Report)                                       11, 18-19

12

PMSJ, Ex. 11 (Bisbee Declaration)                                            11-12

13

PMSJ, Ex. 13 (Moody Expert Rebuttal)                                         17, 20

14

PMSJ, Ex. 14 (Klarevas Deposiotion)                                        8, 18, 19

15

PMSJ, Ex. 15 (Webster Report)                                                16-17

16

PMSJ, Ex. 16 (Moody Deposition)                                                 21

17

18

19

[1]   "PMSJ" refers to Plaintiffs' Motion for Summary Judgment.

20

v

**Table of Authorities (continued)**

Page

**Plaintiffs' Exhibits**

PMSJ, Ex. 18 (Moody Expert Report) 20

PMSJ, Ex. 19 (Moody Expert Report Exhibits 1) 21

PMSJ, Ex. 25 (Rampage Nation) 9

PMSJ, Ex. 26 (Klarevas Guns & Ammo Article) 9

PMSJ, Ex. 27 (Klarevas Handgun Article) 9

PMSJ, Ex. 30 (Klarevas Teacher's College Seminar) 9

PMSJ, Ex. 31 (Klarevas Twitter Posts) 9


**Defense Exhibits[2]**

DX-17 (Klarevas Expert Report) 17-18

DX-19 (Bisbee Declaration) 19

DX-20 (Moody Expert Report) 20

DX-22 (Marvell-Moody) 17

DX-23 (Weil & Knox) 14

---

[2] "DX" refers to Defendants' exhibits in support of Defendants' Motion for Summary Judgment. "NLF" refers to Defendants' Notice of Legislative Facts.

**Table of Authorities (continued)**

| | Page |
|---|---|
| **Defense Exhibits** | |
| DX-24 (Bragg) | 14-15 |
| DX-25 (Virginia State Crime Commission) | 15 |
| DX-26 (Criminology and Public Policy) | 15-16 |
| DX-27 (Journal of Quantitative Criminology) | 16 |
| DX-28 (Wright) | 16 |
| DX-29 (Wasserstein) | 29-30 |
| DX-30 (*Trojan v. Settle* trial transcript) | 3 |
| NLF, Ex. 12 (AB 202 Leg. History) | 12 |
| NLF, Ex. 13 (SB 61 Leg. History) | 23 |
| | |
| **Rules** | |
| Fed. R. Civ. P. Rule 56 | 1 |
| | |
| **Dictionaries** | |
| Merriam-Webster (https://www.merriam-webster.com/dictionary/salutary) | 12 |

# I.   Introduction

Motions for summary judgment are, of course, about the *material* facts: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Arguing for summary judgment on Plaintiffs' challenge to California's one-gun-per-month ("OGM") law, Dkt. No. 29 ("DMSJ"), Defendants distort the governing legal standards and, in turn, distort the facts relevant to a proper resolution of the case. They also mischaracterize and misconstrue the facts that are material. These errors are fatal to their case. Plaintiffs are the ones entitled to summary judgment here, as they contend in their cross motion ("PMSJ") and supporting statement of undisputed material facts ("SOMF"), Dkt. Nos. 23-1 & 23-2, because the OGM law is unconstitutional.

## II.   Defendants Set Up Artificially Lenient Standards for Themselves, Which Ignore Crucial Evidence and Bypass the Burdens They Must Carry

Defendants turn a blind eye to all the cases and principles clearly establishing that California's OGM law directly targets arms and conduct protected under the Second Amendment. As it now stands undisputed, the handguns and long guns prohibited from lawful transfer under the OGM law are unquestionably protected because they

1

are in common use for lawful purposes and are neither "dangerous" nor "unusual." *Caetano v. Massachusetts,* 577 U.S. 411, 417 (2016) (Alito, J., concurring); *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). And so it is with the conduct involved—the purchase and sale of such arms—because the law directly implicates the acquisition rights at the heart of the right to keep and bear arms. *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) ("the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense"); *id.* at 677 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (the "core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms").

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," that is just as true for the Second Amendment right, and there's no power for today's legislatures or courts to "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 at 634-35. Even the Ninth Circuit's "two-step" test recognizes that, at "step one," "we must determine whether the law burdens the Second Amendment 'based on a historical understanding of the scope of the [Second Amendment] right.'" *United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014); *accord Teixeira*, 873 F.3d at 783.

2

Defendants elide the entire historical dimension of the case, saying only, "the Attorney General assumes, at step one of the analysis, that California's OGM law implicates the Second Amendment." Defendants' attempt to just "assume" away any consideration of the relevant history is particularly specious given their attempt to sneak in through a footnote the claim that the OGM law is a "presumptively lawful" commercial regulation. DMSJ at 11, n. 10. In this footnote, Defendants characterize the law as among those "imposing conditions and qualifications on the commercial sale of same," quoting *Heller*, 554 U.S. at 626-27, and analogize it to Virginia's OGM law by pointing to the transcript of a state court proceeding in which a trial judge said Virginia's law "can be interpreted to fall within *Heller's* commercial category of permissible limitations," DMSJ at 11, n. 10; DX-30, 29:10-12.

Defendants' use of a footnote to raise any such a claim is improper. "If it is worth saying, it should be said in the body of the brief." *Glassybaby, LLC v. Provide Gifts, Inc.*, 2011 WL 4571876, *4 (W.D. Wash. 2011); *id.* ("As a warning to all parties, the Court strongly urges parties to avoid the use of footnotes, particularly for any substantive purpose."). It is settled that the failure to present an argument with supporting points and authorities in the body of the brief generally forfeits the point. *See e.g.*, *City of Emerson v. Robinson*, 621 F.3d 1251, 1262, n. 10 (9th Cir. 2010) (waiver of a claim raised solely in a footnote); *id.* (cases barring arguments raised in

3

footnotes); *accord Isabel v. Reagan*, 987 F.3d 1220, 1225, n. 7 (2021). This Court should reject Defendants' attempt to defend the law through a footnote argument.

In any event, what controls whether the OGM law could qualify for any presumption of lawfulness is the very historical record that Defendants ignore. *Fouts v. Bonta*, 2021 WL 4311013 at \*5 (S.D. Cal. 2021) (quoting *Jackson*, 746 F.3d at 760) (this presumption only applies when "'the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment"'). The undisputed evidence shows the absence of any historical precedent for OGM laws during the founding era and throughout American history until 1975. PMSJ at 6; SOMF ¶¶10-11 (PMSJ, Ex. 2 at 4-5). Not only was "[t]ransacting in protected firearms free of quantity-over-restrictions" entirely unregulated until modern times, but the ability of the average citizen to freely trade, possess, and use an unlimited number of arms was deemed of the highest order in the scheme of personal liberties at the time of the founding. PMSJ at 6-9; SOMF ¶¶12-28 (PMSJ, Ex. 2 at 4-6; PMSJ, Ex. 3 at 37-40, 55-56, 58, 68-69; PMSJ, Ex. 4 at 263, 266, 268, 276, 285-286, 291-92, 295, 304, 318).

California's OGM law is presumptively *unlawful*—indeed categorically unconstitutional—considering this history demonstrating that the arms and conduct it targets were protected without exception at the relevant time. *Heller*, 554 U.S. at 634-35. Another important consequence of the historical dimension is that it negates

any potential significance of the OGM laws in other jurisdictions: they're creatures of modernity whose existence and purported efficacies have no *material* relevance, because the rights at stake are "enshrined with the scope they were understood to have when the people adopted them." *Id.* Yet, Defendants rest their case for summary judgment on the purported efficacies of varying OGM laws enacted between 1975 and 2020 in a handful of jurisdictions along the eastern seaboard (South Carolina, Virginia, Maryland, New Jersey, and New York City). DMSJ at 1-2, 4-9, 13-15, 17.

After ignoring the important implications of the historical dimension of the case, Defendants run straight to "intermediate" scrutiny as the governing standard. DMSJ at 11-12. Initially, the only real justification Defendants provide for jumping from strict scrutiny to (their version of) intermediate scrutiny is the argument that Plaintiffs "already own, or could obtain, a firearm for self-defense." *Id.* at 12. Yet, as *Heller* made clear, "it is no answer" for the government to point to other channels through which people might engage in the prohibited activity. *Heller*, 554 U.S. at 629. Rather, the government must justify cutting off the channels for the constitutionally protected activity that would otherwise be available. *Id.* at 634-35.

That Defendants would nevertheless employ such an argument reveals the broader agenda behind their skewed construction of the constitutional standards: to obscure the actual burdens they must carry. Not once do Defendants mention that it's *their* burden, even under intermediate scrutiny, to *prove* the constitutionality of

5

1    the OGM law, and not once do they acknowledge their obligation to demonstrate the

2    law is "narrowly tailored." Notably, Defendants cite a bevy of First Amendment

3    principles and cases, DMSJ at 10, 12-13, which shows they must recognize this

4    jurisprudence guides the analysis, *see e.g.*, *Heller*, 554 U.S. at 635; *Jackson*, 746

5    F.3d at 961. The cases they cite actually emphasize the government "carries the

6    burden of justifying" the restraint. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S.

7    60, 71, n. 3 (1983); *accord United States v. Chovan*, 735 F.3d 1127, 1140 (9th Cir.

8    2013), and *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (*Turner I*).

9        This guiding jurisprudence also makes clear that even under the most lenient

10    form of scrutiny possibly applicable, *see United States v. Torres*, 911 F.3d 1253,

11    1262 (9th Cir. 2019) ("laws burdening Second Amendment rights must withstand

12    more searching scrutiny than rational basis review"), "the intermediate scrutiny

13    analysis requires the challenged law to be 'narrowly tailored to serve a significant

14    government interest,'" *Porter v. Gore*, 517 F.Supp.3d 1109, 1127 (S.D. Cal. 2012)

15    (quoting *Playboy Entm't Grp.*, 529 U.S. 803, 816–17 (2000)). Specifically, "the

16    Government ... bears the burden of showing that the remedy it has adopted does not

17    'burden substantially more speech than is necessary to further the government's

18    legitimate interests.'" *Comite de Jornaleros de Redondo Beach v. City of Redondo*

19    *Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (quoting *Turner I*, 512 U.S. at 665); *Turner*

20    *I* at 668 (such a demonstration is "critical" to the analysis). To do this, it must

6

1   '"demonstrate that the recited harms are real ... and that the regulation will in fact

2   alleviate these harms in a direct and material way."' *Doe v. Harris*, 772 F.3d 563,

3   577 (9th Cir. 2014) (quoting *Turner I* at 664). And, even if it proves that the law is

4   effective in this way, the restriction still must fail unless the government shows it

5   "seriously undertook to address the problem with less intrusive tools readily

6   available to it." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

7       But instead, Defendants design their case for summary judgment around a

8   framework of watered-down standards that require they simply show the OGM law

9   is "substantially related to important governments interests" because it "make[s] it

10  more difficult for criminals to acquire multiple firearms in a short period of time," it

11  "can help reduce the use of firearms in crimes," and it "makes people safer." DMSJ

12  at 1, 16-17, 19. Defendants have set themselves up to fail, and fail hard they do.

13      **III.   The Stark Absence of Tailoring is Fatal to the OGM Law
        and Thus Fatal to Defendants' Motion for Summary Judgment**

14

15      Defendants fail hard on both counts: they have not even carried their

16  preliminary burden of proving "the recited harms are real ... and that the regulation

17  will in fact alleviate these harms in a direct and material way," *Harris*, 772 F.3d at

18  577, as discussed below. But the complete absence of the necessary tailoring, or even

19  any effort to narrowly tailor the OGM law, is so stark and obviously catastrophic to

20  their case for summary judgment that it only makes sense to start there.

7

**A.     Defendants' Own Theory of the Case in Support of the OGM Law Underscores the Law's Intolerably Broad Sweep**

There's been no attempt to show California's OGM law does not burden "substantially more" protected conduct "than is necessary" to further the claimed goals of curtailing straw purchases and keeping guns out of the hands of prohibited persons. Defendants' primary expert, Louis Klarevas, conceded no evidence exists "to show that a five-day or a seven-day or a ten-day is not alone as effective as a 30-day" limitation in meeting these claimed ends. PMSJ, Ex. 14 (Klarevas Depo.) at 190. Indeed, the essence of their theory of constitutionality is that the State could reasonably conclude the OGM law would make it easier to prevent criminals from getting guns, to reduce gun-related crimes, and to keep people safe. That says it all.

The government pursued essentially the same theory in *McCullen*, defending "buffer zone" speech restrictions as beneficial to law enforcement officers because they "would 'make our jobs so much easier.'" *McCullen*, 573 U.S. at 495. The Supreme Court flatly rejected this justification, saying, "Of course they would. But that is not enough to satisfy the First Amendment." *Id.* "To meet the narrow tailoring requirement, the government must demonstrate that alternative measures that burden substantially less speech would *fail* to achieve the government's interests, not simply that the chosen route is easier." *Id.* A law may be "easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id.* It's no different with the

8

1  Second Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778-79, 780

2  (2010) (the Second Amendment right is not a "second-class right, subject to an

3  entirely different body of rules than the other Bill of Rights guarantees").

4      Countless restrictions conceivably *could* "make people safer," "help reduce" gun-

5  related crimes, and "make it harder for criminals to acquire multiple firearms in a

6  short period of time." If that were the constitutional measure, governments could get

7  away with preventing people from acquiring no more than one firearm per year or

8  per decade and even get away with imposing a total ban on acquiring any firearms.

9      Notably, this appears to be a driving philosophy of Defendants' primary expert,

10  Louis Klarevas, a gun control advocate in his professional and private life, who has

11  argued for disarmament of the public as an effective—indeed the most effective—

12  way to address gun violence. *See e.g.*, PMSJ, Ex. 25 ("Rampage Nation," where

13  Klarevas "shows that gun possession often prods aggrieved, mentally unstable

14  individuals to go on shooting sprees"); *id.* at Ex. 26 (arguing in an opinion article

15  that "depriving the weapon" "is far more effective in enhancing public safety" than

16  just "dissuading the perpetrator" or "defending the target"); *id.* at Ex. 27 (penning,

17  "It's the Guns, Stupid: Why Handguns Remain One of the Biggest Threats To

18  Homeland Security"); *id.* at Ex. 30 ("You can't have a mass shooting without a gun.

19  It's simple. No gun, no mass shooting."); *id.* at Ex. 31 (posts on Klarevas's Twitter

20

9

account where he wrote and shared messages in 2021 advocating for stricter gun control measures and criticizing or patronizing gunowners and gun rights groups).

Defendants, the State, and their advocates may wish to question whether the right *is really worth* insisting upon," but they have no power to deny it. *Heller*, 554 U.S. at 634. Would we ever say that governments could limit people to publishing no more than one political message per month on social media or in newspapers? Of course not. Governments could claim that doing so "makes people safer" since such restrictions *can* reduce the use of public media sources for the dissemination of harmful forms of speech, but obviously any such laws are untenable.

**B.     Defendants Make No Effort to Show that the State Has Tried and Failed with All the Less Restrictive Alternatives Readily Available to It**

Nothing at all shows the State "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 573 U.S. at 494. In fact, Defendants stay completely silent about the State's vast network of statutes, regulations, policies, and law enforcement mechanisms that it aggressively pursues in systematically targeting the same claimed interests behind the OGM law—curtailing straw purchases and the "illegal gun market," disarming criminals, and keeping firearms out of the hands of prohibited persons. *See* PMSJ at 16-17; SOMF ¶¶32-35 (detailing the numerous components of this vast regulatory network); *see e.g.*, PSMJ, Ex. 6 (APPS Report), https://des.doj.ca.gov/ (DROS DES), etc.

1    In the *McCullen* case, the Supreme Court emphasized it was "not enough for

2    Massachusetts simply to say that other approaches have not worked" in addressing

3    its concerns about adequately maintaining safety in public speech zones, because it

4    had to prove that to be true. *McCullen*, 573 U.S. at 497. Here, Defendants have not

5    only failed to prove "other approaches have not worked," but they have not even

6    *said* that they've tried and failed at other approaches. They justify this law by

7    essentially just arguing that it makes their jobs "easier." That's just "not enough" to

8    satisfy the narrow tailoring requirement. *Id.* at 495. The State must prove that it has

9    tried and failed at meeting the stated interests with the other tools readily available

10   to it, particularly all those tools within California's vast network of regulations

11   targeting the same interests. *See id.* at 493-94 ("The point is that the [State] has

12   available to it a variety of approaches that appear capable of serving its interests").

13   The legitimacy of California's OGM law as an additional restraint among the

14   plethora of related firearms regulations is further undermined by the blanket

15   exceptions the State has arbitrarily granted its preferred classes. Defendants' experts

16   have nothing to offer here, except to "imagine" generic justifications for the movie

17   industry exemption that would apply equally to countless other industries, PMSJ,

18   Ex. 8 (Klarevas Expert Report) at 23-24, n. 55; PMSJ, Ex. 14 (Klarevas Depo.) at

19   205-207, and to baldly declare that "many of these exempt entities have rarely, if

20   ever, been involved in the criminal misuse of firearms purchased as part of a multiple

11

1    sale," PMSJ, Ex. 11 (Bisbee Declaration) at 9, when this would certainly include the

2    law-abiding citizens like Plaintiffs who are excluded from these exemptions.

3        The only thing else Defendants cite here is the similarly arbitrary rationale that

4    the selected exemptions are "salutary because they encourage a person who may be

5    involved lawfully in multi-gun exchanges to go to a licensed dealer, or to the local

6    sheriff, in order to facilitate the exchange." DMSJ at 4; NLF, Ex. 12 at 4. Of course,

7    so do the myriad other regulations targeted at achieving the same goal. Further, there

8    is no evidence that each and every, or even most, of the exemptions are actually

9    "salutary" in their effect. *See* https://www.merriam-webster.com/dictionary/salutary

10   ("salutary" means "producing a beneficial effect" in the sense of being "remedial"

11   or "promoting health" in the sense of being "curative"). And there is no evidence, or

12   any claim, that multi-gun exchanges conducted in accordance with the exemptions

13   are the *only* such transactions that can or would otherwise be conducted "lawfully."

14   **C.    Defendants Also Fail to Prove California's OGM Law Alleviates the
           Claimed Harms in Any Direct or Material Way**

15       The recited harms must not only be "real," but the government also must prove

16   "the regulation will *in fact* alleviate these harms in a direct and material way."

17   *Harris*, 772 F.3d at 577; *see e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 208

18   (1997) (*Turner II*) (finding sufficient to satisfy this standard where Congress had

19   demonstrated "substantial evidence to support its conclusion" that certain television

20

12

1    stations were at "serious risk of financial difficulty" and "would deteriorate to a

2    substantial degree or fail altogether" without the challenged speech regulation).

3    **1.  Defendants Fail to Show the Other OGM Laws Are Material**

4         The thrust of Defendants' claim that the evidence "overwhelmingly" supports the

5    OGM law is that "studies show" OGM laws in other jurisdictions "reduce illegal

6    firearms trafficking," reduce the likelihood that "firearms acquired as part of a

7    multiple sale" will be "used in crimes," and "improve public safety by making it

8    more difficult for criminals to acquire firearms in a short period of time." DMSJ at

9    1-2, 4-8, 13-17, 19. But Defendants fail to show the OGM laws in these remote

10   jurisdictions are or ever have been part of a firearms regulatory scheme involving

11   restrictions substantially similar in nature, scope, or depth to California's vast

12   firearms regulatory network. Nor have Defendants shown that these OGM laws are

13   or ever have been subject to exemptions substantially similar in nature, scope, or

14   depth of the exemptions under California's OGM law. Indeed, in addition to having

15   one of the most oppressive regulatory schemes in the nation, California is the *only*

16   jurisdiction with an OGM law that extends to both handguns and long guns.

17   Defendants have failed to show the existence and purported efficacy of any of these

18   other OGM laws is of material relevance to the issues in this case.

19        Even assuming Defendants had drawn a reliable evidentiary link to these other

20   OGM laws, the studies and analyses on which they rely cannot carry their burden of

13

1    establishing a "direct and material" impact. A major problem running through the

2    body of Defendants' evidence is that it rests primarily on studies and analyses drawn

3    from data concerning the potential relationship between criminal activities and

4    firearms acquired through multiple sales at the same time, during a single day, or

5    within no more than five days, DMSJ at 6-9, 16-17—not multiple sales over longer

6    periods, like 30 days. This undermines any substantive value of the evidence. It also

7    casts further doubt on the legitimacy of the OGM law by highlighting that law

8    enforcement agencies across the country already monitor all sales of more than one

9    firearm to the same person within a period of five days. *See* 18 USC 923(g)(3)(A).

10    Beyond this general deficiency in Defendants' evidence, each of the sources

11    on which they rely suffers from significant limitations that negate any materiality.

12    **2.   Defendants' Studies Do Nothing Except Highlight the Deficiencies**

13    The Weil & Knox study of the impact of Virginia's OGM law on illegal firearms

14    trafficking within a handful of southeastern states, DMSJ at 4, 14-15, was hampered

15    by "several limitations," the need for "additional research" to clarify the potential

16    impact of certain factors, and uncertainty of other factors "that could lead to results

17    that are inappropriately attributed to implementation of the law." DX-23 at 1761.

18    In the Braga study of the impact of Virginia's OGM law on firearms trafficking

19    in Boston, DMSJ at 5, 14, the authors emphasized major limitations in their research

20    too: the "direct evidence" of effects was "scant," DX-24 at 77, the "measureable

14

impact on gun violence remain[s] unclear," *id.* at 93, "[f]urther research on the structure of illegal gun markets and experimentation with market disruption tactics is sorely needed," *id.* at 77, and "[e]xperimental evidence also needs to be developed" to determine if such laws "can indeed reduce gun violence," *id.* at 79.

In the Virginia State Crime Commission study regarding the impact of Virginia's OGM law on illegal firearms trafficking in New York City, DMSJ at 5-6, 14-15, the authors admitted "the Virginia law does not necessarily reduce the number of guns used in criminal activity." DX-25 at 6. And this study was apparently based primarily on the questionable findings of the Weil & Knox study. *See id.* at Appendix D.

As for the Criminology and Public Policy study of the impact of Maryland's OGM law on recovery of crime guns, DMSJ at 6, 15-16, the study acknowledged the inherent unreliability of drawing any potential link between this law and a reduction in firearm violence "because the law was passed simultaneously with other state gun control measures," DX-26 at 754, n. 12, 772; *see id.* at 769 ("We must also be cautious about generalizing these findings to other states."). The data available for studying this potential link was also very limited. *See e.g.*, *id.* at 753, 754, 771-72 (it was "fragmentary," "scant," "sparse," "cloud[ed]" by uncertainties). And, the focus was on multiple-firearm sales occurring simultaneously or within no more than five days. *Id.* at 757 (82% of the subject firearms were purchased "from the same dealer within five business days," and "in almost all cases involve[e] same-day,

1    same-dealer purchases"). Finally, the study documented the finding that "guns sold

2    in multiple sales had a *lower* risk of being used in crime." *Id.* at 760 (italics added).

3        The report in the Journal of Quantitative Criminology regarding the impact of

4    Maryland's OGM law on illegal trafficking in the Washington, D.C. area, DMSJ at

5    6, 16, was based on several unrelated factors, it only considered "multiple sales" in

6    the aggregate, and even then, it found only 3.2% of all the subject firearms had a

7    "chance" of becoming crime guns. PMSJ at 20; SOMF ¶50; DX-27 at 285, 290.

8    Further, the study ultimately found no "statistically significant" risk that "guns

9    would be at higher risk if sold in multiple sales and/or before" the law was enacted.

10   PMSJ at 20; SOMF ¶51; DX-27 at 304. And it also noted that "guns purchased in

11   same-day multiple sales were at *greater* risk of criminal use than those purchased in

12   other 30-day multiple sales." PMSJ at 20; SOMF ¶52; DX-27 at 298 (italics added).

13       The Wright study concerning the relationship between multiple sales and crime

14   guns in California before the OGM law, DMSJ at 7 (DX-28), lacked any connection

15   to the *one-gun-per-month* restriction. The data concerned multiple purchases in a

16   *single* transaction. And this study actually found that "handguns purchased by the

17   same individual within 30 days of another handgun purchase, but not on the same

18   day, were less likely to be traced." PMSJ at 19; SOMF ¶44; DX-28 at 356-357.

19       The Webster study, DMSJ at 17, was a "preliminary" analysis of the effect of

20   Maryland's OGM law on firearm homicides and murder rates that focused on the

1    effect of banning "Saturday Night Special" handguns and did not consider the impact

2    of the other firearms regulations enacted simultaneously. PMSJ, Ex. 15 at 409, 411.

3        Finally, Defendants cite the 2010 Marvell-Moody study for the proposition that

4    it found a "statistically significant relationship between a firearms ownership

5    regulation and lower murder rates." DMSJ at 17; DX-22. As Dr. Moody explained,

6    that study was about "the effect of abortion on crime, not the effect of one gun per

7    month laws on crime," PMSJ, Ex. 13 (Moody Rebuttal Report) at 2, and any finding

8    concerning OGM laws would be "spurious" based on the data, *id.* at 3-4. Defendants

9    have in no way rebutted this conclusion with any contrary evidence or analysis.

10    **3. The Expert Evidence Can Only Bolster Plaintiffs' Claims**

11        Defendants invoke Klarevas' opinions that (1) "multiple sales facilitate straw

12    purchases, illegal firearms trafficking, and the acquisition of multiple firearms by

13    potential active shooters"; (2) "laws restricting the purchase of firearms to one per

14    month mitigate the risks and dangers associated with bulk and multiple sales"; and

15    (3) "OGM laws disrupt illicit firearm markets, reduce firearms trafficking and straw

16    purchases, and have the potential to save lives." DMSJ at 8; DX-17 ¶¶14, 39.

17    Defendants further rely on Klarevas's conclusion that "California's OGM laws are

18    'reasonable measures for helping reduce illegal firearm[s] trafficking and firearm

19    homicides, including mass shootings.'" DMSJ at 8; DX-17 ¶40.

20

17

1    Once again, Klarevas's opinions are based largely on data concerning multiple-

2    firearm purchases in single transactions, on the same day, within a handful of days,

3    or aggregated data concerning all forms and timing of multiple-firearms purchases,

4    which reveals a logical and legal disconnect between the data and the matter actually

5    at issue—multiple purchases *over a one-month period*. There's also no support for

6    Klarevas's claim that California's OGM law is a "tailored" policy, DX-17 at ¶9,

7    something Defendants themselves don't even repeat. The actual evidence shows any

8    risks associated with multiple-firearm purchases exist only in relation to multiple

9    purchases made on the same day or within short window of time, generally five days

10   or fewer, and there is no evidence that a period greater than five days but less than

11   30 days would not be just as effective. PMSJ at 22-23; PMSJ, Ex. 14 at 190.

12       It's easy enough to just say that "one-gun-a-month laws disrupt illicit firearm

13   markets," "reduce firearms trafficking and straw purchases," "have the potential to

14   save lives," and are generally "reasonable measures" towards those ends, but the

15   claim lacks any weight or materiality in the absence of any evidence that purchase

16   bans greater than five days but less than 30 days wouldn't be just as effective.

17       There's also no evidence of an established link between California's OGM law

18   and a reduction in the instances, frequency, severity of, or "potential" for "mass"

19   shootings or other "active" shooter gun crimes (Defendants never explain or define

20   any of these vague terms), or any other established link between that law and the

18

1   number or frequency of firearm purchases by perpetrators of such gun violence.

2   Klarveas has conceded as much. PMSJ at 21; SOMF ¶¶59-61; PMSJ, Ex. 8 (Klarevas

3   Expert Report) at 22-23; PMSJ, Ex. 14 (Klarevas Depo.) at 90-91, 199-201.

4   The assertions of Defendants' other expert, Joseph Bisbee, that California's OGM

5   law "helps reduce" illegal firearms trafficking and gun crimes, DMSJ at 8-9, 15, are

6   also of no evidentiary value here. Like Klarevas, Bisbee's opinions are based largely

7   on his experience with "the sale of more than one handgun to an individual by a

8   licensed retail gun dealer within five consecutive business days" or otherwise within

9   "a short period of time," and not sales or purchases over longer periods like the 30-

10  day period actually at issue here. DX-19 at ¶¶10, 11, 13, 14, 15, 16, 17, 22.

11  When it comes to his opinions specifically about one-gun-per-month laws, Bisbee

12  makes bald declarations resting on inadmissible hearsay. DX-19 at ¶18 (quoting

13  himself in a March 2008 news article (Exhibit 3 to Bisbee's report), where Bisbee

14  was defending the handgun ban later struck down in *Heller*); *id.* at ¶¶19-21

15  (repeating the out-of-court statements from an online publication that was quoting

16  someone convicted of illegal firearms trafficking (Exhibit 4 to Bisbee's report)). The

17  other assertions Bisbee makes about one-gun-per-month laws are based on the 2014

18  Koper study, the 1996 Weil & Knox study, and the Virginia State Crime

19  Commission report, DX-19 at ¶22-23, which are not reliable sources, as discussed.

20

19

1    On the other hand, Plaintiffs' expert, Dr. Moody, conducted his own statistical

2    analyses using multiple standard methods, and he found no statistically significant

3    impact on either murder or firearm homicide rates in California. PMSJ, Ex. 18

4    (Moody Expert Report) at 2-3, 5-8, 11-16; PMSJ, Ex. 13 (Moody Rebuttal) at 8, 12-

5    13. In fact, he has "been unable to find a single study that links OGM laws to violence

6    reduction in the states that enacted such laws." PMSJ, Ex. 18 at 2.

7    Defendants claim Moody's focus on firearm homicide and murder rates

8    undermines his opinions, DMSJ at 18, which is specious when they recognize the

9    relevance of such rates in relying on the same kind of data themselves, *id.* at 17-18.

10   They also claim that Moody "completely ignores" the topic of illegal firearms

11   trafficking. *Id.* at 18. To the contrary, he specifically addressed the studies on this

12   subject in his expert report and specifically explained why they are not pertinent in

13   a proper analysis of the potential effects of California's OGM law. DX-20 at 2.

14   Defendants try to insulate themselves against the damaging statistical evidence

15   by suggesting any finding that any law lacks a statistically "significant" impact

16   should be disregarded as outmoded thinking, based on a study that discusses the

17   evolution of statistical research methodologies over time. DMSJ at 19; DX-29

18   (Wasserstein). The thrust of this study was simply that statistical research should be

19   "thoughtful," by demonstrating the practical implications and preciseness of

20   estimates, the correctness of the model employed, the validity of the assumption

20

used, and by "hold[ing] up when other modeling choices are made." DX-29 at 3. Moody laid out his statistical analyses in detail, providing all this information, and he tested his results under multiple models. PMSJ, Ex. 19 (Moody Expert Report Exhibits, with over 100 pages of statistical data). Moody further detailed his methodologies throughout his deposition. *See generally* PMSJ, Ex. 16. Defendants do not and cannot show his analyses fail to meet the standards of the industry.

Moreover, the existence or non-existence of statistically "significant" findings is undoubtedly germane. *See Contreras v. City of Los Angeles*, 656 F.2d 1267, 1273 (9th Cir. 1981) (relying on expert witness testimony that "the statistics calculable from such a small sample are not significant at a .05 level of statistical significance"); *In re Roundup Products Liability Litigation*, 390 F.Supp.3d 1102, 1117 (N.D. Cal. 2018) ("statistical significance remains a useful metric for determining whether the results of a given study likely show a real association"); *Dukes v. Wal-Mart Stores, Inc.*, 964 F.Supp.2d 1115, 1121 (N.D. Cal. 2013) (plaintiffs failed to carry their burden on their discrimination claims where they failed to present "statistically significant disparities" in the challenged pay and promotion decisions).

If Defendants had any favorable statistically "significant" evidence, we can bet they would have showcased it here. *See International Broth. of Teamsters v. U.S.*, 431 U.S. 324, 339 (1977) (citations omitted) ("our cases make it unmistakably clear that '(s)tatistical analyses have served and will continue to serve an important role'

in cases in which the existence of discrimination is a disputed issue"); *Clady v. Los Angeles County*, 770 F.2d 1421, 1429 (9th Cir. 1985) ("Significantly, the district court found that there was '[n]o statistically significant difference between hires of Blacks and Hispanics and their representation in the Civilian Labor Force....'").

But Defendants have offered no statistical analyses rebutting Moody's findings or demonstrating them as unreliable in any way. *See EEOC v. General Telephone Co. of Northwest, Inc.*, 885 F.2d 575, 580 (9th Cir. 1989) ("when statistical evidence is challenged on methodological grounds, the burden should be on the challenger to present evidence that the statistics are defective and how that flaw biases the results"); *Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259, 332-33 (N.D. Cal. 1992) (noting defendant failed to rebut plaintiffs' statistical evidence of discrimination).

Defendants' citation to the *Mai* case, which found "[e]ven a small decrease in the number of suicides is [] a significant public benefit," DMSJ at 19, only hurts them more. In *Mai*, the government had developed evidence that those targeted by the firearms prohibition—those released from involuntary commitment—"are 39 times more likely to commit suicide than those not previously committed." *Mai v. United States*, 952 F.3d 1106, 1121 (2020). No such evidence of a causal connection between the OGM law and the asserted interests exists here. In fact, the *Mai* court emphasized that the prohibition at issue did *not* apply to those "who *theoretically* might be dangerous at some point in their lives. Instead, it applie[d] only to those

22

who were found, through procedures satisfying due process, *actually* dangerous in the past." *Id.* Here, the OGM law targets law-abiding citizens like Plaintiffs who have not even been shown to be *theoretically* dangerous at any point in their lives.

### 4. Defendants' Attempted Maneuvering Shows They're Grasping at Straws

Lastly, through another footnote, Defendants suggest they can backfill the law's purported benefits with "any important government interests, including ones not expressly stated by the Legislature." DMSJ at 10, n. 9. First, this is wrong. *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."). But again, these attempts to inject substantive arguments through footnotes should be rejected. *Emerson*, 621 F.3d at 1262, n. 10. At any rate, the only *post hoc* justification they cite is the phenomenon of mass shootings. As Defendants are forced to acknowledge, the only mention of this phenomenon throughout the record is the argument of an advocate for SB 61 that generally supported "legislation that reduces the likelihood of accidental or intentional homicides and, in particular, mass homicides." DMSJ at 4 (citing NLF, Ex. 13 at 4). And again, Defendants' own expert conceded no evidence exists of a causal or correlative relationship between this law and mass shootings. PMSJ, Ex. 8 (Klervas Expert Report) at 8-9. So, while Defendants say they *could* rely on this *post hoc* justification, being hamstrung here, at no point do they claim any connection between the OGM law and mass shootings actually exists.

Thus, Defendants fall far short of "clearly substantiat[ing] the Legislature's decision that limiting the purchase of handguns and semiautomatic centerfire rifles to one every thirty days makes people safer by reducing the use of firearms in crimes." DMSJ at 19. But even if they did, their motion fails because, as their own sweepingly broad justification for the law shows, the law is completely untailored.

## IV. Defendants' Motion on the Equal Protection Also Flatly Fails

Defendants' motion for summary judgment on the equal protection claim rests on the same failed thesis that "California's OGM law survives intermediate scrutiny" against the Second Amendment claim. DMSJ at 20-21. As the cases they cite make clear, the rational basis standard that Defendants invoke is inappropriate when the regulation infringes a constitutional right. *Pena v. Lindley*, 898 F.3d 969, 986 (9th Cir. 2018); *Nordyke v. King*, 681 F.3d 1041, 1043, n. 2 (9th Cir. 2012); *Wiese v. Becerra*, 306 F.Supp.3d 1190, 1203 (E.D. Cal. 2018). So, again, the question comes down to whether the law violates the Second Amendment. It does, for all the reasons discussed. Even so, Defendants sink their own case under a rational basis standard.

Defendants' support for the State's exemption classifications is Bisbee's bald declaration that "many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale." DMSF at 23; DX-19 ¶24. Thus, Defendants prove the fatal point that the State is relying on classifications "whose relationship to the asserted goal is so attenuated as to render

24

the decision arbitrary or irrational," *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 446 (1985), since countless non-exempted individuals and groups "rarely, if ever" have been involved in "the criminal misuse of firearms," *including* law-abiding citizens like the Plaintiffs. Defendants' citation to *Wiese* only digs a deeper hole for them. DMSJ at 22. The court there hypothesized that "the California electorate could have rationally believed that large capacity magazines used solely as props were not at risk of being used in mass shootings and that such an exception would benefit an important sector of the California economy." *Wiese*, 306 F.Supp.3d at 1204. But the government had provided no explanation or justification for the movie industry exemption. *Id.* ("The court cannot know for certain why this exemption was included."). Here, the government has put forth a specific justification, so we must look at that. (*Schweiker v. Wilson*, 450 U.S. 221, 233 (1981) (the rational basis standard "does not allow us to substitute our personal notions of good public policy for those of Congress"); *Pena*, 898 F.3d at 979 ("Nor do we substitute our own policy judgment for that of the legislature."). As discussed, the justification is specious and must be rejected as arbitrary and irrational.

Defendants' motion for summary judgment must be denied.

Respectfully submitted April 29, 2022,

/s/ *Raymond M. DiGuiseppe*
Raymond M. DiGuiseppe

25