Raymond M. DiGuiseppe
California State Bar No. 228457
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE NGUYEN, et al, Plaintiffs<br><br>vs.<br><br>ROB BONTA, Attorney General of California, et al, Defendants. | Case No. 3:20-cv-02470-WQH-MDD<br><br>PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>Date: May 20, 2022<br>Time: No oral argument unless requested by the Court<br>Judge: Hon. William Q. Hayes<br>Courtroom: 14B<br>Action Filed: Dec. 18, 2020 |

Pursuant to Rule 7.1(f) of the Civil Local Rules, Plaintiffs submit the following Reply to Defendants' Response to Plaintiffs' Statement of Material Facts in support of Plaintiffs' Motion for Summary Judgment ("SOMF"). All materials referenced herein are already before the Court as part of its docket and are already in the possession of or readily accessible to Defendants, with all the same having previously been lodged by the parties in connection with their respective filings in support of and in opposition to the pending cross-motions for summary judgment.

1

| **SOMF ¶1** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| Defendants have enforced and are continuing to enforce California's OGM law.<br><br>Record Citations:<br>• Stipulation of Facts (Ex. 1), p. 2<br>• Complaint (Dkt. No. 1) ¶¶ 18, 19, 73, 74, 75, 76, 77, 103<br>• Answer (Dkt. No. 2) ¶¶ 18, 19, 103, 121, 128 | Admit. | Therefore, this fact stands undisputed. |
| **SOMF ¶2** | **Defendants' Response** | **Plaintiffs' Reply** |
| Individual Plaintiffs (Nguyen, Boguski, Medina, Colletti, Phillips, and Prince) are California residents and members of the Institutional Plaintiffs (Firearms Policy Coalition, Inc., San Diego Gun Owners PAC, and Second Amendment Foundation).<br><br>Record Citations:<br>• Stipulation of Facts (Ex. 1), p. 2 | Admit. | Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| • Complaint (Dkt. No. 1) ¶¶ 7, 8, 9, 10, 11, 13, 73, 74, 75, 76, 77 | | |
| **SOMF ¶3** | **Defendants' Response** | **Plaintiffs' Reply** |
| None of them is disqualified from owning or possessing firearms under federal or state law.<br><br>Record Citations:<br>• Stipulation of Facts (Ex. 1), p. 2<br>• Complaint (Dkt. No. 1) ¶¶ 73, 74, 75, 76, 77, 78 | Solely for purposes of establishing standing and ripeness in this litigation, admit that Individual Plaintiffs are not disqualified by federal or state law from owning or possessing firearms. | Therefore, this fact stands undisputed. |
| **SOMF ¶4** | **Defendants' Response** | **Plaintiffs' Reply** |
| Institutional Plaintiffs bring this action on behalf their members and supporters similarly situated to Individual Plaintiffs.<br><br>Record Citations:<br>• Stipulation of Facts (Ex. 1), p. 2<br>• Complaint (Dkt. No. 1) ¶¶ 15, 16, 17 | Admit. | Therefore, this fact stands undisputed. |

| **SOMF ¶5** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| Each Individual Plaintiff actively desires and intends to purchase two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more of the same in a single transaction within a 30-day period from a licensed dealer, and each would do so but for California's OGM law.<br><br>Record Citations:<br>• Stipulation of Facts (Ex. 1), p. 2<br>• Complaint (Dkt. No. 1) ¶¶ 73, 74, 75, 76, 77, 100, 121, 128 | Admit. | Therefore, this fact stands undisputed. |
| **SOMF ¶6** | **Defendants' Response** | **Plaintiffs' Reply** |
| Plaintiffs Prince and Phillips are licensed firearms dealers for Retailer Plaintiffs, North County Shooting Center Inc. ("NCSC") and | Admit that Plaintiffs Prince and Phillips are listed as firearms dealers in the California DOJ's Centralized List of Firearms Dealers for Retailer Plaintiffs North | Defendants' response does not contest the asserted fact that Plaintiffs Prince and Phillips are licensed firearms dealers for Retailer Plaintiffs, North County Shooting Center Inc. |

| PWGG L.P. ("PWGG"), respectively. Record Citations:<br>• Stipulation of Facts (Ex. 1), p. 2<br>• Complaint (Dkt. No. 1) ¶¶ 11, 13, 82, 83<br>• Answer (Dkt. No. 7) ¶¶ 11, 13, 82, 83 | County Shooting Center Inc. ("NCSC") and PWGG L.P. ("PWGG"), respectively. | ("NCSC") and PWGG L.P. ("PWGG"), respectively. Therefore, this fact effectively stands undisputed. |
|---|---|---|
| **SOMF ¶7**<br>Plaintiffs NCSC and PWGG are licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as Federal Firearms Licensees ("FFL"). Record Citations:<br>• Stipulation of Facts (Ex. 1), p. 2<br>• Complaint (Dkt. No. 1) ¶¶ 12, 14, 82, 83<br>• Answer (Dkt. No. 7) ¶¶ 11, 13, 82, 83 | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |
| **SOMF ¶8**<br>Because of the OGM law, Retailer Plaintiffs are prevented from selling two or more handguns, | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

| two or more semiautomatic centerfire rifles, or a combination of two or more of the same in a single transaction within a 30-day period to individuals not otherwise disqualified by federal or state law from owning or possessing firearms.<br><br>Record Citations:<br>• Stipulation of Facts (Ex. 1), p. 3<br>• Complaint (Dkt. No. 1) ¶¶ 86, 87, 88, 91, 93, 103<br>• Answer (Dkt. No. 7) ¶¶ 103, 121, 128 | | |
| --- | --- | --- |
| **SOMF ¶9**<br><br>The broad class of arms targeted under California's OGM law—handguns and semiautomatic centerfire rifles—are indisputably protected under the Second Amendment.<br><br>Record Citations: | **Defendants' Response**<br><br>For summary judgment purposes only, admit that California's OGM law implicates the Second Amendment. Deny that California's OGM imposes a ban on any class of firearms or eliminates the ability to obtain a firearm. | **Plaintiffs' Reply**<br><br>Defendants' response does not contest the asserted fact that "the broad class of arms targeted under California's OGM law—handguns and semiautomatic centerfire rifles—are indisputably protected under the Second Amendment." Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| • Complaint (Dkt. No. 1) ¶¶ 98, 114, 120, 121, 128, 132<br>• Answer (Dkt. No. 7) ¶¶ 98, 121, 128, 132<br>• The above factual allegations are otherwise not subject to genuine or reasonable dispute. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) ("An issue is 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party"). | | |
| **SOMF ¶10**<br><br>Plaintiffs' constitutional expert, Professor George Mocsary, "could find no laws in the founding era limiting the quantity or frequency" and concluded that instead, "it appears that the policy of the time embraced private collections of arms."<br><br>Record Citations | **Defendants' Response**<br><br>Admit that Prof. Mocsary stated in his declaration that he "could find no laws in the founding era limiting the quantity or frequency" and that "it appears that the policy of the time embraced private collections of arms." | **Plaintiffs' Reply**<br><br>Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| • Exhibit 2 (George Mocsary Expert Declaration), p. 4 | | |
| **SOMF ¶11**<br><br>More specifically, Mocsary found that "[t]he otherwise-legal purchase of protected arms has been unregulated as to the quantity of firearms that may be purchased within a given timeframe for practically all of American history."<br><br>Record Citations:<br>• Exhibit 2 (George Mocsary Expert Declaration), p. 5 | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |
| **SOMF ¶12**<br><br>Mocsary further found that "[t]ransacting in protected firearms free of quantity-over-time restrictions remains a lawful Second Amendment activity in a large majority of | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

jurisdictions across the United States."

Record Citations:
• Exhibit 2 (George Mocsary Expert Declaration), pp. 5-6

| **SOMF ¶13** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| As he explained, the first such regulation appeared in 1975, with a South Carolina law restricting handgun sales to one per person per month, which was repealed in 2004.<br><br>Record Citations:<br>• Exhibit 2 (George Mocsary Expert Declaration), p. 4 | Admit that Prof. Mocsary stated in his declaration that "[t]he first in American law forcing the spacing of gun purchases over time was South Carolina's 1975 law restricting handgun sales to one per person per month. The law was repealed in 2004." | Therefore, this fact stands undisputed. Plaintiffs reassert that neither the existence nor any purported efficacy of this law is material to the determination of the issues in this case under the applicable legal standards, as they contend in Plaintiffs' briefing on the parties' cross-motions for summary judgment and in Plaintiffs' Objections and Responses to Defendants' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment (hereafter |

| | | collectively referred to as "Plaintiffs' MSJ Briefing"). |
|---|---|---|
| **SOMF ¶14**<br><br>Virginia passed a one-handgun-per-month law in 1993, repealed it in 2020, and reenacted another one in 2020.<br><br>Record Citations:<br>• Exhibit 2 (George Mocsary Expert Declaration), pp. 4-5 | **Defendants' Response**<br><br>Admit that Virginia passed a law limiting the purchase of handguns to one every thirty days in 1993. Deny that Virginia repealed that law in 2020. Virginia repealed that law in 2012. Defs' Request for Judicial Notice (RJN), Dkt. No. 29-2, Exh. 4 at 445-46. Admit that Virginia reenacted its law limiting the purchase of handguns to one every thirty days in 2020. | **Plaintiffs' Reply**<br><br>Therefore, it is undisputed that Virginia enacted an OGM law in 1993, later repealed that law, and enacted a new one in 2020. Plaintiffs reassert that neither the existence nor any purported efficacy of this law is material to the determination of the issues in this case under the applicable legal standards, as they contend in Plaintiffs' MSJ Briefing. |
| **SOMF ¶15**<br><br>Maryland enacted a one-handgun-per-month law in 2003.<br><br>Record Citations: | **Defendants' Response**<br><br>Deny. Maryland passed a law limiting the purchase of handguns and assault weapons to one every thirty days in | **Plaintiffs' Reply**<br><br>Therefore, it is undisputed that Maryland enacted an OGM law no earlier than 1996. |

| | | |
|---|---|---|
| • Exhibit 2 (George Mocsary Expert Declaration), p. 5 | 1996. RJN, Exh. 6 at 3150, 3159. | Plaintiffs reassert that neither the existence nor any purported efficacy of this law is material to the determination of the issues in this case under the applicable legal standards, as they contend in Plaintiffs' MSJ Briefing. |
| **SOMF ¶16** | **Defendants' Response** | **Plaintiffs' Reply** |
| New Jersey restricted handgun purchases to one-per-month in 2008.<br><br>Record Citations:<br>• Exhibit 2 (George Mocsary Expert Declaration), p. 5 | Deny. New Jersey passed a law limiting the purchase of handguns to one every thirty days in 2009. RJN, Exh. 8 at 1325-26. | Therefore, it is undisputed that New Jersey enacted an OGM law no earlier than 2009. Plaintiffs reassert that neither the existence nor any purported efficacy of this law is material to the determination of the issues in this case under the applicable legal standards, as they contend in Plaintiffs' MSJ Briefing. |
| **SOMF ¶17** | **Defendants' Response** | **Plaintiffs' Reply** |
| The District of Columbia enacted a pistol registration requirement in 2008 (after *Heller*) that | Admit that the District of Columbia enacted firearms registration requirements in 2008, | Therefore, the fact asserted—that the District of Columbia enacted a pistol registration |

effectively limited them to one per month, although that was struck down as unconstitutional in 2015.

Record Citations:
• Exhibit 2 (George Mocsary Expert Declaration), p. 5

including a prohibition on registration of more than one pistol per person in any 30-day period. In declaring that prohibition unconstitutional, the United States Court of Appeals for the District of Columbia stated that "the suggestion that a gun trafficker would bring fewer guns into the District because he could not register one per month there lacks the support of experience and of common sense. Indeed, . . . the efficacy of purchasing limitations in preventing trafficking may have little bearing upon the efficacy of registration limitations in doing so." *Heller v. District of Columbia*,

requirement in 2008 (after *Heller*) that effectively limited them to one per month, although that was struck down as unconstitutional in 2015—is undisputed.

Plaintiffs reassert that neither the existence nor any purported efficacy of this law is material to the determination of the issues in this case under the applicable legal standards, as they contend in Plaintiffs' MSJ Briefing. Further, the case law quotation that Defendants cite in response here bolsters Plaintiffs' contention by highlighting the law's apparent lack of efficacy in actually deterring illegal firearms trafficking in D.C.

| | 801 F.3d 264, 280 (D.C. Cir. 2015). | |
|---|---|---|
| **SOMF ¶18** | **Defendants' Response** | **Plaintiffs' Reply** |
| In his deposition, Mocsary reaffirmed his conclusions that there is "no historical precedent" for OGM laws, which are instead "a very new thing." | Admit. | Therefore, this fact stands undisputed. |
| Record Citations: • Exhibit 3 (Depo. of George Mocsary), pp. 34, 37-40, 55-56, 58, 68-69 | | |
| **SOMF ¶19** | **Defendants' Response** | **Plaintiffs' Reply** |
| As detailed in a publication the defense itself introduced, generally, "gun control laws were unknown to Founding Fathers." | Admit that a Vermont Law Review article, introduced during Prof. Mocsary's deposition, stated that "a declaration [by the Massachusetts Supreme Court] seem[ed] inconsistent with actual history, considering that even concealed | Therefore, this fact stands undisputed. |
| Record Citations: • Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), p. 263 | | |

| | weapons were not prohibited at common law, and gun control laws were unknown to Founding Fathers, most of whom believed in the *code duello*." | |
|---|---|---|
| **SOMF ¶20** "There was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." Record Citations: • Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), p. 318 | **Defendants' Response** Admit that the Vermont Law Review article stated that "[t]here was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." | **Plaintiffs' Reply** Therefore, this fact stands undisputed. |
| **SOMF ¶21** The right of the general public to keep and bear arms was of the highest | **Defendants' Response** Admit that the Vermont Law Review article stated that "[n]ewspaper | **Plaintiffs' Reply** Therefore, it is undisputed that "[n]ewspaper attacks on the religious guarantees and |

14

| | | |
|---|---|---|
| order in civilized society at this time. "Newspaper attacks on the religious guarantees and other matters were extreme and persistent, but the right to bear arms was not once questioned."<br><br>Record Citations:<br>• Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), p. 268 | attacks on the religious guarantees and other matters were extreme and persistent, but the right to bear arms was not once questioned." Deny that the article stated that the "right to keep and bear arms was of the highest order in civilized society at this time." | other matters were extreme and persistent, but the right to bear arms was not once questioned."<br>Further, there can be no genuine dispute that the "right of the general public to keep and bear arms was of the highest order in civilized society at this time," based on the above-referenced quote and similar evidence within the same publication, such as the founding era state constitutional provisions expressly declaring that this right "*shall* not be questioned." PSMJ, Ex. 4 (Halbrook Publication), pp. 275-79 (italics added). |
| **SOMF ¶22**<br>Instead, "it appears that having arms was manifestly an attribute of free citizenship" during this period. | **Defendants' Response**<br>Admit that the Vermont Law Review article stated that "it appears that having arms was | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

15

| | | |
|---|---|---|
| Record Citations:<br>• Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), pp. 285-286 | manifestly an attribute of free citizenship." | |
| **SOMF ¶23**<br>As one delegate to Pennsylvania's constitutional convention put it in 1787, "however wide and various the firearms of power may appear, they may all be traced to one source, the people."<br><br>Record Citations:<br>• Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), p. 276 | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |
| **SOMF ¶24**<br>Consistent with a largely unregulated right of highest order in the scheme of individual liberties, people commonly in the colonial states engaged in the | **Defendants' Response**<br>Admit that the Vermont Law Review article quoted a 1776 newspaper advertisement stating "WANTED immediately, a quantity | **Plaintiffs' Reply**<br>Therefore, it is undisputed that "Symbolic of the times, the following newspaper advertisement began to appear regularly: 'WANTED immediately, a quantity of good HORSE |

| | | |
|---|---|---|
| purchase and sale of multiple firearms in single or frequent transactions. "Symbolic of the times, the following newspaper advertisement began to appear regularly: 'WANTED immediately, a quantity of good HORSE PISTOLS AND CARBINES, for which ready money, and a liberal price, will be given . . . Has a quantity of Muskets. . . to sell.'"<br>Record Citations:<br>• Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), p. 266 | of good HORSE PISTOLS AND CARBINES, for which ready money, and a liberal price, will be given . . . Has a quantity of Muskets. . . to sell." Deny that the article described how "people commonly in the colonial states engaged in the purchase and sale of multiple firearms in single or frequent transactions." | PISTOLS AND CARBINES, for which ready money, and a liberal price, will be given . . . Has a quantity of Muskets. . . to sell.'"<br>Further, there can be no genuine dispute that "people commonly in the colonial states engaged in the purchase and sale of multiple firearms in single or frequent transactions," based on the above-referenced quote and similar evidence within the same publication, including, for example, the evidence from the article which is cited in SOMF ¶¶ 25, 26, 27, and 28 and which Defendants do not dispute. |
| **SOMF ¶25**<br>Another example of "the unquestioned freedom to have arms" was a sales | **Defendants' Response**<br>Admit that the Vermont Law Review article stated that "the unquestioned freedom | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| advertisement for "100 Pair Horsemens Pistols." Record Citations: • Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), p. 304 | to have arms was exemplified in the following advertisement . . . 'To be Sold . . . 100 Pair Horsemen's Pistols . . . .'" | |
| **SOMF ¶26** For example, "Vermont's founding fathers" "carried a gun and a brace [a pair] of pistols on their persons as a common practice." Record Citations: • Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.) at pp. 291-292 • A "brace of pistols" is a pair. *See* https://www.merriam-webster.com/dictionary/brace ("brace" means "one of two" or a "pair") | **Defendants' Response** Admit that the Vermont Law Review article stated that "the framers of this [right to bear arms] provision carried a gun and a brace of pistols on their persons as a common practice." | **Plaintiffs' Reply** Therefore, this fact stands undisputed. |
| **SOMF ¶27** "Pistols in the pocket and an arsenal at home were options available to every free citizen" of Vermont. | **Defendants' Response** Admit that the Vermont Law Review article stated that "[p]istols in the pocket and an | **Plaintiffs' Reply** Therefore, this fact stands undisputed. |

| Record Citations:<br>• Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), p. 295 | arsenal at home were options available to every free citizen of the Green Mountain State." | |
|---|---|---|
| **SOMF ¶28**<br>In 1796, Ira Allen, a general in the Vermont militia, was able to purchase and ultimately distribute 20,000 muskets to the general population.<br><br>Record Citations:<br>• Exhibit 4 (Halbrook Publication; Ex. 7 to Mocsary Depo.), p. 295 | **Defendants' Response**<br>Admit that the Vermont Law Review article described how, in 1796, Ira Allen, a major general of the Vermont militia, acquired 20,000 muskets in France and distributed them to the American public. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |
| **SOMF ¶29**<br>The stated purpose of the original OGM law as enacted under Assembly Bill No. 202 in 2000 was to "curtail the illegal gun market, disarm criminals, and save lives by preventing multiple purchases of handguns through legitimate | **Defendants' Response**<br>Deny that AB 202 was enacted in 2000. AB 202 was enacted in 1999 and went into effect on January 1, 2000. Cal. Stats. 1999, ch. 128 (Assemb. B. 202), § 2 (codified as Cal. Penal Code § | **Plaintiffs' Reply**<br>Therefore, it is undisputed that the stated purpose of the original OGM law as enacted under Assembly Bill No. 202 in 2000 was to "curtail the illegal gun market, disarm criminals, and save lives by preventing multiple purchases of handguns through legitimate |

| channels," on the rationale that "[p]reventing multiple purchases takes the profit out of black market sales and puts gun traffickers and straw purchasers out of business."<br><br>Record Citations:<br>• Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), p. 2 | 27535). Otherwise, admit. | channels," on the rationale that "[p]reventing multiple purchases takes the profit out of black market sales and puts gun traffickers and straw purchasers out of business." |
|---|---|---|
| **SOMF ¶30**<br>More specifically, the stated goal of the law was "to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself," in particular those who are underage, have a disqualifying prior conviction, a mental | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| disorder, or are not residents.<br><br>Record Citations:<br>• Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), p. 2 | | |
| **SOMF ¶31**<br>When the law was expanded to semiautomatic centerfire rifles effective July of 2021 under Senate Bill No. 61, the Legislature stated that AB 202 had been "intended to reduce the illegal flow of handguns by eliminating the opportunity to sell guns from bulk purchases on the black market" and that applying this same law to long guns "would be part of the solution in reducing gun violence."<br><br>Record Citations:<br>• Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), p. 34 | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

| **SOMF ¶32** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| Throughout all relevant times, Defendants have implemented and enforced a multitude of statutes, regulations, and policies that strictly regulate and criminalize the acquisition, possession, and use of firearms by all prohibited persons, including those who become prohibited after a lawful acquisition. *See e.g.*, Cal. Penal Code §§ 29800, 29805, 29815, 29825; 18 U.S.C §§ 922(b)(2), 922(d), 922(g). | Admit that the California Department of Justice enforces the California Penal Code sections prohibiting the acquisition and possession of firearms by prohibited persons. | Therefore, this fact stands undisputed. |
| Record Citations: <br> • Complaint (Dkt. No. 1) ¶¶ 64, 65 <br> • Answer (Dkt. No. 7) ¶¶ 65 <br> • The above factual allegations are otherwise not subject to genuine or reasonable dispute. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. | | |

| | | |
|---|---|---|
| 242, 248-49 (1986) ("An issue is 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party"). | | |
| **SOMF ¶33** Throughout all relevant times, Defendants have also implemented and enforced a multitude of statutes, regulations, policies, and systems that collect, maintain, and monitor identifying information of those who are currently prohibited persons, who lawfully acquire, sale, and transfer firearms, and who later become prohibited persons, including, for example: Cal. Penal Code §§ 11101, 11105, 11106, 26150, 26185, 26195, 26225, 28220; the Dealer's Record of Sale (DROS) DROS Entry System (DES); the | **Defendants' Response** Admit that the California Department of Justice enforces the California Penal Code sections prohibiting the acquisition and possession of firearms by prohibited persons, and utilizes certain records, databases, and systems in determining whether an individual is prohibited by state or federal law from possessing or acquiring a firearm. | **Plaintiffs' Reply** Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| Armed Prohibited Persons System (APPS); Mental Health Reporting System (MHRS); Mental Health Firearms Prohibition System (MHFPS); Prohibited Applicant (PA); and many other such regulatory programs.<br><br>Record Citations:<br>• https://des.doj.ca.gov/ (DROS DES)<br>• Complaint (Dkt No. 1) ¶¶ 46, 47, 49, 50, 51, 52, 53, 54, 55, 67, 68, 69<br>• Answer (Dkt. No. 7) ¶¶ 46, 47, 49, 50, 51, 52, 53, 54, 55, 67, 68, 69<br>• Exhibit 6 (APPS Report; Ex. 11 to Klarevas Depo.), pp. 109-110<br>• The above factual allegations are otherwise not subject to genuine or reasonable dispute. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) ("An issue is 'genuine' only if there is sufficient evidence for a reasonable | | |

| | | |
|---|---|---|
| fact finder to find for the non-moving party"). | | |
| **SOMF ¶34** | **Defendants' Response** | **Plaintiffs' Reply** |
| Through the APPS, DOJ agents regularly and readily "locate and disarm prohibited persons," "thereby preventing and reducing incidents of violent crime," with "daily manual queries of the databases that cross-reference the population of known firearms owners against individuals who may have had a PTE [potentially triggering events] within the past 24 hours," such that "[n]ew individuals are added daily, creating a constantly changing and growing dataset."<br><br>Record Citations: | Admit that the California Department of Justice special agents "locate and disarm prohibited persons identified through the APPS database, thereby preventing and reducing incidents of violent crime." Admit that "[p]rohibited individuals are identified by daily manual queries of the databases that cross reference the population of known firearms owners against individuals who may have had a PTE [potentially triggering events] within the past 24 hours" and that "[n]ew individuals are | Therefore, this fact stands undisputed. |

| • Exhibit 6 (APPS Report; Ex. 11 to Klarevas Depo.), pp. 88-89 | added daily, creating a constantly changing and growing dataset." | |
|---|---|---|
| **SOMF ¶35**<br><br>"Cases are pursued until all investigative leads are exhausted."<br><br>Record Citations:<br>• Exhibit 6 (APPS Report; Ex. 11 to Klarevas Depo), p. 99 | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |
| **SOMF ¶36**<br><br>The legislative history of AB 202 and SB 61 recognized the existence of these various schemes and how they already compel ordinary law-abiding citizens to obtain special certification, pass a background check, wait ten days, and complete a safe handling demonstration as preconditions to any lawful purchase.<br><br>Record Citations: | **Defendants' Response**<br>Admit that the legislative histories of AB 202 and SB 61 list and summarize various laws regulating the sale, transfer, purchase, and possession of firearms, such as a background check, a ten-day waiting period, and a basic firearm safety certificate. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| • Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), pp. 34-35, 109-110 | | |
| **SOMF ¶37**<br><br>It also recognized the myriad state and federal laws that specifically criminalize straw purchasing and illegal firearms trafficking.<br><br>Record Citations:<br>• Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), pp. 1-2, 12 | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |
| **SOMF ¶38**<br>State law separately "[p]rohibits the sale, loan, or transfer of a firearm to any person who is not the actual purchaser or transferee if the intent is to avoid the statutory requirements for lawful transfer," and "[t]he Federal Gun Control Act forbids straw | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

transactions" because it "prevents a person from purchasing guns in a state with lax laws and then returning to his or her state of residency."

Record Citations:
• Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), p. 2

| **SOMF ¶39** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| Further, all federal licensees must report to ATF and all related state law enforcement agencies all sales, transfers, or disposals of two or more handguns "at one time or during any five consecutive business days," and they must make this report "not later than the close of business on the day that the multiple sale or other disposition occurs."<br><br>Record Citations: | Admit. | Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| • 18 USC 923(g)(3)(A)<br>• Exhibit 7 (18 USC 923; Ex. 10 to Klarevas Depo.)<br>• The above factual allegations are otherwise not subject to genuine or reasonable dispute. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) ("An issue is 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party"). | | |
| **SOMF ¶40**<br><br>As the legislative history acknowledged, only the District of Columbia and three other states—Virginia, Maryland, and New Jersey—have OGM laws, and they target only handguns, not handguns *and* long guns like California does.<br><br>Record Citations:<br>• Exhibit 2 (George Mocsary Expert Declaration), pp. 4-5 | **Defendants' Response**<br><br>Admit that the legislative history of SB 61 lists the District of Columbia, Virginia, Maryland, and New Jersey with OGM laws for handguns. Maryland's OGM law also includes assault weapons. Md. Code Ann., Pub. Safety § 5 128(b). | **Plaintiffs' Reply**<br><br>Therefore, it is undisputed that the legislative history acknowledged only the District of Columbia and three other states—Virginia, Maryland, and New Jersey—have OGM laws. Further, it is undisputed that California's OGM law is the only state law that targets all long guns falling within the general class of semiautomatic centerfire rifles, not just those |

| | | |
|---|---|---|
| • Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), pp. 53-54<br>• The above factual allegations are otherwise not subject to genuine or reasonable dispute. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) ("An issue is 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party"). | | statutorily defined as "assault" firearms. Further, Plaintiffs reassert that neither the existence nor any purported efficacy of these laws is material to the determination of the issues in this case under the applicable legal standards, as they contend in Plaintiffs' MSJ Briefing. |
| **SOMF ¶41**<br>What data the State did cite in discussing its claimed interests in the OGM law concerned multiple firearms purchased in a single transaction or in "bulk" or data which otherwise included *all* multiple-firearms purchases without distinguishing multiple purchases over a | **Defendants' Response**<br>Deny. For example, the legislative history of SB 61 includes a discussion on the effect of Virginia's OGM law on the reduction of crime guns traced to Virginia firearms dealers. Pltfs' Exh. 5, Dkt. No. 23-8, at 54 [S.B. 61, Sept. 13, 2019 Senate Rules Committee, 2019-2020 | **Plaintiffs' Reply**<br>Defendants' response does not raise a genuine dispute in light of the actual legislative history, which shows the State's supporting evidence focused on multiple firearms purchased in a single transaction or in "bulk" or data which otherwise included all multiple-firearms purchases. Further, the discussion that |

| | | |
|---|---|---|
| 30-day period from the lot of transactions.<br><br>Record Citations:<br>• Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), pp. 56-57<br>• The above factual allegations are otherwise not subject to genuine or reasonable dispute. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) ("An issue is 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party"). | Reg. Sess., at 5 (Cal. 2019)]. | Defendants cite for counter-support (which appears on page 53, not page 54, Ex. 5 to PMSJ) is drawn from https://giffords.org/lawcenter/gun-laws/policy-areas/crime-guns/bulk-gun-purchases/, PSMJ, Ex. 5, at 53, which in turn was based on the Weil and Knox's 1996 study, as noted in footnote 7 to the Giffords publication. The findings and conclusions of that study are unreliable as discussed in Plaintiffs' responses to DSUF No. 21. Additionally, Plaintiffs reassert that neither the existence nor any purported efficacy of Virginia's OGM law is material to the determination of the issues in this case under the applicable legal standards, as they contend in Plaintiffs' MSJ Briefing. |

| **SOMF ¶42** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| The defense's expert, Louis Klarevas, also relied on data concerning multiple-firearms purchases in single or "bulk" transactions, on the same day, within a handful of days, or aggregated data concerning all forms and timing of multiple-firearms purchases without distinguishing such purchases over a 30-day period of time.<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Louis Klarevas; Ex. 13 to Klarevas Depo.), pp. 6, 7-8, 17-18<br>• Exhibit 8 (Expert Report of Louis Klarevas; Ex. 13 to Klarevas Depo.), p. 16, relying on 2005 Koper Report (Exhibit 9)<br>• Exhibit 9 (2005 Koper Report; Ex. 16 to Klarevas Depo.), pp. 753, 754, 761 (discussing aggregated data | Deny. For example, Professor Klarevas relied on data that specifically considered purchases of more than one gun by the same buyer in different transactions within a 30-day period. See DX-171 (Klarevas Expert Rept.), Dkt. No. 29-4, at p. 7 n.10 (citing *Christopher S. Koper, Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749, 757 (2005) (Koper 2005)). | Defendants' response does not raise a genuine dispute in light of the sources on which Klarevas focused in reaching his findings and conclusions. Defendants point only to the 2005 Koper study for counter-support here. Plaintiffs specifically cited that report in their SOMF, as an example of the sources focused on aggregated data concerning "multiple sales" in general.<br><br>Indeed, the 2005 Koper study readily acknowledges that the vast majority of the subject firearm sales occurred on the same day or, at most, within no more than five days. PMSJ, Ex. 9 at 757 ("82% of the guns purchased in multiple sales as defined herein also met the federal definition of a multiple sale (i.e., the |

| | | |
|---|---|---|
| concerning "multiple sales" in general)<br>• Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), p. 17, relying on 2014 Koper Report (Exhibit 10A & 10B)<br>• Exhibit 10A (2014 Koper Report; Ex. 17 to Klarevas Depo.), p. 285 (same) | | purchase of more than one handgun from the same dealer within five business days), in almost all cases involving same-day, same-dealer purchases"). |
| **SOMF ¶43**<br><br>The same is true of the data on which Joseph Bisbee, the defense's other expert, relied because that concerned aggregate "multiple sales" data.<br><br>Record Citations:<br>• Exhibit 11 (Expert Report of Joseph Bisbee), pp. 4, 5, 8-9 | **Defendants' Response**<br><br>Deny. For example, Mr. Bisbee cited an article containing data for multiple sales "based on federal criteria (i.e., the purchase of two or more handguns by the same individual from the same dealer within five consecutive days)." See DX-19 (Bisbee Expert Rept.), Dkt. No. 29-4, at p. 8 n.5 (citing Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction* | **Plaintiffs' Reply**<br><br>Defendants' response does not raise a genuine dispute in light of the sources on which Bisbee focused in reaching his findings and conclusions. As Plaintiffs have already pointed out, the 2014 Koper study was based on several factors unrelated to the potential effect of the "multiple-sale" factor, it only considered "multiple sales" in the aggregate to the extent that factor was considered, and even then it found only 3.2% of all the firearms sold during the relevant period |

| | | |
|---|---|---|
| | *Characteristics Associated with Gun Trafficking and Criminal Gun Use*, 30 J. Quantitative Criminology 285 (2014) (Koper 2014)); Koper 2014 at 297-98. The same article noted that "[m]ultiple sales were also examined using a broader 'state definition' that corresponds to the purchase of two or more handguns by the same person from any gun dealer(s) within a 30-day period." Koper 2014, Dkt. No. 29- 6, at 298 n.22. Mr. Bisbee also considered other articles analyzing the effect of OGM laws on illegal firearms trafficking. See DX-19 ¶¶ 22-23. | had a "chance" of becoming crime guns. Further, the study ultimately found no "statistically significant" risk that "guns would be at higher risk if sold in multiple sales and/or before the GVA" (Maryland's OGM law). And it also agreed with the general conclusion in the Wright Report that "guns purchased in same-day multiple sales were at greater risk of criminal use than those purchased in other 30-day multiple sales." PMSJ at 20. The "other articles" to which Defendants cite are the same Koper study, the 1996 Weil & Knox study, and the Virginia State Commission study, and Plaintiffs have already explained why those sources are unreliable. PMSJ at 14-15. |

| **SOMF ¶44** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| In fact, one source on which Klarevas relied found that "handguns purchased by the same individual within 30 days of another handgun purchase, but not on the same day, were *less* likely to be traced."<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), pp. 7-8, relying on pages 355 through 358 of the Wright Report (Exhibit 12)<br>• Exhibit 12 (Wright Report; Ex. 14 to Klarevas Depo.), pp. 356-357 | Admit. | Therefore, this fact stands undisputed. |
| **SOMF ¶45** | **Defendants' Response** | **Plaintiffs' Reply** |
| Plaintiffs' expert statistician, Carl Moody, calculated this percentage and found that "a handgun acquired in a series of purchases over 30 days has a 38% | Admit that Dr. Moody's Rebuttal report stated that "a handgun acquired in a series of purchases over 30 days has a 38% smaller likelihood of being a | Therefore, these findings are undisputed. Further, Moody did in fact calculate the 0.4 percent result himself. PMSJ, Ex. 13, pp. 10-11 ("I computed the weighted average of the two |

| | | |
|---|---|---|
| smaller likelihood of being a trace gun," such that "only a tiny fraction of those (0.4 percent) became crime guns."<br><br>Record Citations:<br>• Exhibit 13 (Moody Expert Rebuttal; Ex. 6 to Moody Depo.), p. 10 | trace gun" and that "only a tiny fraction of those (0.4 percent) became crime guns." DX-22 (Moody Rebuttal Rept.), Dkt. No. 29-5, at p. 10. Dr. Moody did not perform these calculations, but reported and interpreted data from an article. *Id.* | proportions, weighting by the number of crime guns of each type, as follows: (111/(111+62))*.5+(62/(111+62))*.3=.64*.5+.36*.3=.32+.11=.43. [¶] So, approximately 0.43% of multiple sales will wind up as crime guns, compared to 0.4 percent of single sales.") |

| **SOMF ¶46** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| This represents only 722 firearms out of a data set totaling more than 180,000 firearms.<br><br>Record Citations:<br>• Exhibit 13 (Moody Expert Rebuttal; Ex. 6 to Moody Depo.), p. 10<br>• Exhibit 12 (Wright Report; Ex. 14 to Klarevas Depo.), p. 361<br>• Exhibit 14 (Deposition of Louis Klarveas), pp. 160-162 | Admit that the 0.4 percent was calculated based on 722 handguns that were successfully traced by ATF out of a sample data set of 180,321 handguns. | Therefore, it is undisputed that, of the more than 180,000 subject firearms, only 722 were deemed to be "crime guns." |

| **SOMF ¶47** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| Another source on which Klaveras relied even found a lesser risk *in general* as between multiple-firearms sales and single firearm sales, specifically indicating that "guns sold in multiple sales had a lower risk of being used in crime." | Admit that the Koper 2005 article stated that "the percentage of multiple sales recovered (3.3%) was somewhat smaller than that for single sales (3.7%), which suggests that guns sold in multiple sales had a lower risk of being used in crime." DX-26, Dkt. No. 29-6, at 760. | Therefore, this fact stands undisputed. |
| Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), p. 16, relying on 2005 Koper Report (Exhibit 9)<br>• Exhibit 9 (2005 Koper Report; Ex. 16 to Klarevas Depo.), p. 760 | | |
| **SOMF ¶48** | **Defendants' Response** | **Plaintiffs' Reply** |
| That same source acknowledged while "there are indications" that OGM laws "affect the interstate flow of guns," "there is scant | Admit that the Koper 2005 article, in summarizing the studies of OGM laws available at that time, stated that "there are indications | Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| evidence they actually reduce gun crime." Record Citations: • Exhibit 9 (2005 Koper Report; Ex. 16 to Klarevas Depo.), p. 754 | these laws affect the interstate flow of guns, particularly that from states with lenient gun controls to those with more restrictive gun laws (Weil and Knox, 1996), but there is scant evidence they actually reduce gun crime (Coggeshall, 2001; Lott and Whitley, 2001; Webster et al., 2002)." DX-26, Dkt. No. 29-6, at 754. | |
| **SOMF ¶49** Klarevas relied on a later study of the same researcher for the proposition that "Maryland's one-gun-a month provision reduced trafficking from Maryland into Washington, D.C., via multiple sales." | **Defendants' Response** Admit. | **Plaintiffs' Reply** Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), p. 17, relying on 2014 Koper Report (Exhibit 10A & 10B) | | |
| **SOMF ¶50**<br><br>But that study was based on several factors unrelated to the potential effect of the "multiple-sale" factor, it only considered "multiple sales" in the aggregate to the extent that factor was considered, and even then it found only 3.2% of all the firearms sold during the relevant period had a "chance" of becoming crime guns.<br><br>Record Citations:<br>• Exhibit 10A (2014 Koper Report; Ex. 17 to Klarevas Depo.), pp. 285, 290 | **Defendants' Response**<br><br>Deny that the Koper 2014 study was based on factors unrelated to "multiple sales." For example, the study analyzed data prior to and after passage of Maryland's Gun Violence Act (GVA), and that analysis considered whether crime guns were obtained through "multiple sales." See DX-27, Dkt. No. 29-6, at 300, Table 4. Admit that the Koper 2014 article stated that "[a]djusting for exposure time, guns sold in the Baltimore | **Plaintiffs' Reply**<br><br>Therefore, it is undisputed that only 3.2% of all the firearms sold during the relevant period had a "chance" of becoming crime guns. Defendants' denial that the 2014 Koper study was based on factors unrelated to "multiple sales" does not raise a genuine dispute and is wrong in any event. As the study itself says, the analysis was based on several other factors, including the purchasers' age, race, gender, proximity to Baltimore City, prior history of purchasing crime guns, and whether the guns were semiautomatic, medium to large caliber, |

| | | |
|---|---|---|
| | area had a 3.2 % chance of being recovered by police in Baltimore within 5 years." *Id.* at 285. | easily concealable, and "cheap." PMSJ, Ex. 10A at pp. 285, 290. Additionally, Plaintiffs reassert that neither the existence nor any purported efficacy of this OGM law is material to the determination of the issues in this case under the applicable legal standards, as they contend in Plaintiffs' MSJ Briefing. |
| **SOMF ¶51** | **Defendants' Response** | **Plaintiffs' Reply** |
| Further, the study ultimately found no "statistically significant" risk that "guns would be at higher risk if sold in multiple sales and/or before the GVA" (Maryland's OGM law).<br><br>Record Citations:<br>• Exhibit 10B (2014 Koper Report; Ex. 17 to Klarevas Depo.), p. 304 | Admit that the Koper 2014 article stated that the transaction characteristics involving multiple sales made prior to GVA, single sales made after GVA, and multiple sales after GVA were not "statistically significant, contrary to the hypotheses that guns would be at higher risk if sold in multiple sales | Therefore, this fact stands undisputed. |

| | and/or before the GVA," DX-27, Dkt. No. 29-6, at 304. | |
|---|---|---|
| **SOMF ¶52** | **Defendants' Response** | **Plaintiffs' Reply** |
| And it also agreed with the general conclusion in the Wright Report that "guns purchased in same-day multiple sales were at *greater* risk of criminal use than those purchased in other 30-day multiple sales." | Admit that the Koper 2014 article, in a footnote, stated that "preliminary analysis . . . is consistent with Wright et al.'s (2010) finding that guns purchased in same-day multiple sales were at greater risk of criminal use than those purchased in other 30-day multiple sales." DX-27, Dkt. No. 29-6, at 298 n.22. | Therefore, this fact stands undisputed. For clarity, the complete statement here is: "preliminary analyses revealed that federally-defined multiple sales [i.e., multiple same-day sales or multiple sales within no more than five days to the same individual] were at a greater risk of recovery than were state-defined multiple sales. This is consistent with Wright et al.'s (2010) finding that guns purchased in same-day multiple sales were at greater risk of criminal use than those purchased in other 30-day multiple sales." PMSJ, Ex. 10A, p. 298, n. 22. |
| Record Citations:<br>• Exhibit 10A (2014 Koper Report; Ex. 17 to Klarevas Depo.), p. 298 | | |

| **SOMF ¶53** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| Klarevas cited another study for the proposition that "Maryland's OGM law was associated with a consistent 10-11% decrease in the state firearm homicide rate."<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), p. 19, relying on page 409 of the Webster Report (Exhibit 15)<br>• Exhibit 15 (Webster Report; Ex. 18 to Klarevas Depo.), pp. 409, 411<br>• Exhibit 13 (Moody Expert Rebuttal; Ex. 6 to Moody Depo.), pp. 5-6 | Admit. | Therefore, this fact stands undisputed. |

| **SOMF ¶54** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| However, that study was focused on the effect of banning "Saturday Night Special" handguns, it did not consider the potential impact of the other major firearms regulations simultaneously instituted | Admit that the Webster study focused on the effects of Maryland's ban on "Saturday Night Special" handguns and that the results were "preliminary because | Therefore, it is undisputed that this study was focused on the effect of banning "Saturday Night Special" handguns and the results were only "preliminary." Defendants' further response, denying that the |

by that multi-faceted law, and the results were only "preliminary" as it was.

Record Citations:
• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), p. 19, relying on page 409 of the Webster Report (Exhibit 15)
• Exhibit 15 (Webster Report; Ex. 18 to Klarevas Depo.), pp. 409, 411
• Exhibit 13 (Moody Expert Rebuttal; Ex. 6 to Moody Depo.), pp. 5-6

they [were] based on only 2 full years of postlaw data." Pltfs' Exh. 15, Dkt. No. 24, at 411 [Daniel W. Webster, et al., *Effects of Maryland's Law Banning "Saturday Night Special" Handguns on Homicides*, 155 Am. J. of Epidemiology 406, 411 (2002)]. Otherwise, deny. The Webster study stated that "[o]ur findings that Maryland's one-gun-per-month law was associated with a significant decrease in firearm homicide rates suggest that such laws may also have important independent effects." *Id.*

study did not consider the potential impact of the other major firearms regulations simultaneously instituted by that multi-faceted law, does not raise a genuine dispute and is wrong in any event, because the analysis makes no mention of having considering the potential effects of the other major firearms regulations simultaneously instituted, including restrictions on secondhand sales of handguns and a state provision explicitly banning straw purchases. *See* PMSJ, Ex. 9 at pp. 754, n. 12, 771-72. Further, Plaintiffs reassert that neither the existence nor any purported efficacy of this OGM law is material to the determination of the issues in this case under the applicable legal standards,

| | | as they contend in Plaintiffs' MSJ Briefing. |
|---|---|---|
| **SOMF ¶55** | **Defendants' Response** | **Plaintiffs' Reply** |
| Klarevas conceded that other data on which he relied was not "primarily focused on assessing the effects of OGM laws" and, in any event, yielded findings that "were not statistically significant" in showing a link between OGM laws and rates of violence.<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), pp. 17-18, 20 | Deny. Professor Klarevas stated in his expert report that "two studies were [not] primarily focused on assessing the effects of OGM laws, [but] . . . expanded the research on intrastate trafficking of firearms." DX-17, Dkt. No. 29-4, ¶ 31. Two different articles found that the relationship between OGM laws and firearm homicide rates were not statistically significant. *Id.* ¶ 35. However, there were other studies that found a "marginally significant relationship between OGM laws and murders" and that "OGM laws are | Therefore, it is undisputed that Klarevas did rely on data that was not primarily focused on the effects of OGM laws and which yielded findings that were not statistically significant in showing a link between OGM laws and rates of violence.<br>Defendants' citation to two "other studies" does not raise a genuine dispute here. As for the first study, Klarevas himself conceded it was an "unpublished paper" that was "not peer-reviewed" and "employed unorthodox and flawed methodological approach" to reach an "unpersuasive" explanation, PMSJ, Ex. 8, pp. 21-22, which Defendants themselves |

| | | |
|---|---|---|
| | associated with reductions in murder rates – statistically significant decreases in some cases – in the states that enacted OGM laws." *Id.* ¶ 36. | admit in their response to SOMF ¶56 below. Moody similarly criticized this study as unreliable. PMSJ, Ex. 13, pp. 5-6. As for the second study, one of Moody's prior studies, Moody has explained in detail why this study cannot legitimately support the proposition for which Klarevas has cited it, PMSJ, Ex. 13, pp. 2-4, 8-9, and Defendants have presented no evidence refuting that Moody's study is limited in its meaning and effect as he, the researcher of the data, has described it. |
| **SOMF ¶56** | **Defendants' Response** | **Plaintiffs' Reply** |
| He further conceded relying on an unpublished report that employed "an unorthodox and flawed methodological approach" to reach an | Admit that Professor Klarevas stated in his expert report that the author of an unpublished report "employ[ed] an unorthodox and flawed | Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| "unpersuasive[]" explanation.<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), p. 20, n. 50<br>• Exhibit 13 (Moody Expert Rebuttal; Ex. 6 to Moody Depo.), pp. 4-5<br>• Exhibit 16 (Deposition of Carl Moody), pp. 161, 163 | methodological approach" and "unpersuasively attempts to offer an alternative explanation –declining social order –for the observed correlation between OGM laws and reductions in murder rates." DX-17, Dkt. No. 29-4, ¶ 36. | |
| **SOMF ¶57**<br><br>Klarevas cited an older report that Moody had co-authored, to "suggest" that OGM laws "may" reduce murder rates.<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Louis Klarevas; Ex. 13 to Klarevas Depo.), p. 20 | **Defendants' Response**<br><br>Admit that Professor Klarevas cited an article co-authored by Dr. Moody which found "that there was a marginally significant relationship between OGM laws and murders, indicating that states with OGM laws experienced lower homicide rates." DX-17, Dkt. No. 29-4, ¶ 36. | **Plaintiffs' Reply**<br><br>Therefore, this fact stands undisputed. Plaintiffs reiterate that this study does not provide material support for Defendants' position because Moody has explained in detail why this report does not support any reliable connection between OGMs and murder rates, and Defendants have presented no evidence refuting that Moody's report is limited in its meaning and |

46

| | | effect as he, the researcher of the data, has described it. PMSJ, Ex. 13, pp. 2-4. |
|---|---|---|
| **SOMF ¶58** | **Defendants' Response** | **Plaintiffs' Reply** |
| However, through his rebuttal report and deposition testimony, Moody has explained in detail that this report does not support any reliable connection between OGMs and murder rates.<br><br>Record Citations:<br>• Exhibit 13 (Moody Expert Rebuttal; Ex. 6 to Moody Depo.), pp. 2-4<br>• Exhibit 16 (Deposition of Carl Moody), pp. 56, 154-160, 166 | Admit that, in his rebuttal expert report and deposition testimony, Dr. Moody attempts to explain one of his paper [*sic*] "does not support the hypothesis that OGM laws save lives." See DX-22, Dkt. No. 29-5, at pp. 3-4. | Defendants' response does not dispute the asserted fact and instead attempts to sidestep the assertion with a partial admission based a partial citation of Moody's explanation. Therefore, the asserted fact effectively stands undisputed. Further, to clarify, Moody explained unequivocally and without hesitation (i.e., he did not merely "attempt to explain") that the prior study was unreliable as constituting a "spurious" result. PMSJ, Ex. 13, pp. 2-4, 8-9; PMSJ, Ex. 16, pp. pp. 56, 154-160, 166. Again, Defendants have presented no evidence refuting that Moody's paper |

| | | is limited in its meaning and effect as he, the researcher of the data, has described it. PMSJ, Ex. 13, pp. 2-4. |
|---|---|---|
| **SOMF ¶59**<br><br>Klarevas claimed that a "primary policy objective" was to "reduce opportunities" for "potential active shooters to amass multiple firearms in a short amount of time that they can then use to perpetrate a mass murder."<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), pp. 8-9 | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |
| **SOMF ¶60**<br><br>However, the *sole* reference to a mass shooting in the entire record is an argument in support of SB 61 from the Ventura County | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| Board of Supervisors, which referenced one local mass shooting in 2018.<br><br>Record Citations:<br>• Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), pp. 37, 42 | | |
| **SOMF ¶61**<br><br>And there is no indication that the shooter used multiple firearms—much less multiple firearms acquired within a 30-day period.<br><br>Record Citations:<br>• Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.), pp. 37, 42 | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |
| **SOMF ¶62**<br><br>Similarly, Klarevas's expert reports neither claim nor establish any causal link between the number or frequency of firearm purchases and the | **Defendants' Response**<br>Deny. Professor Klarevas noted in his expert report that the gunman in the 2017 Las Vegas strip massacre "purchased at least 43 | **Plaintiffs' Reply**<br>Defendants' response does not dispute that neither of Klarevas's reports actually *establishes* any causal link between the number or frequency of firearm |

| | | |
|---|---|---|
| ability to, or the likelihood that a person will, carry out a mass shooting.<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), pp. 8-9<br>• Exhibit 17 (Klarevas Expert Rebuttal Report), p. 12 | firearms through bulk and multiple firearm sales." DX-17, Dkt. No. 29-4, ¶ 38. | purchases and the ability to, or the likelihood that a person will, carry out a mass shooting. Therefore, this fact stands undisputed. Defendants' response merely suggests that Klarevas may have implicitly *claimed* the existence of such a connection through the quote they cite from his report. Any such suggestion does not give rise to a genuine dispute; in the absence of any evidence actually showing a connection—Defendants otherwise have conceded none exists—any such *claim* by Klarevas is unsupported speculation. |
| **SOMF ¶63**<br>Klarevas conceded as much in his deposition and further acknowledged that "a mass shooter or a | **Defendants' Response**<br>Admit that Professor Klarevas acknowledged that "a mass shooter or a mass shooting can | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| mass shooting can certainly be perpetrated with a single firearm."<br><br>Record Citations:<br>• Exhibit 14 (Deposition of Louis Klarevas), pp. 90-91, 199-201 | certainly be perpetrated with a single firearm." | |
| **SOMF ¶64**<br><br>He also conceded in his report that "no studies have assessed this relationship directly."<br><br>Record Citations:<br>Exhibit 8 (Expert Report of Louis Klarevas; Ex. 13 to Klarevas Depo.), pp. 22-23 | **Defendants' Response**<br><br>Admit that Professor Klarevas stated in his expert report that "no studies have assessed [the relationship between OGM laws and mass shootings] directly." | **Plaintiffs' Reply**<br><br>Therefore, this fact stands undisputed. |
| **SOMF ¶65**<br><br>Moody conducted his own statistical analyses, using multiple standard methods, to assess for any statistically meaningful impact on murder or firearm homicide rates in | **Defendants' Response**<br><br>Admit. | **Plaintiffs' Reply**<br><br>Therefore, this fact stands undisputed. |

California, and he found none as to either rate.

Record Citations:
• Exhibit 18 (Expert Report of Carl Moody; Ex. 1 to Moody Depo.), pp. 2-3, 5-8, 11-16
• Exhibit 13 (Moody Expert Rebuttal; Ex. 6 to Moody Depo.), pp. 8, 12-13

| **SOMF ¶66** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| In fact, Moody has "been unable to find a single study that links OGM laws to violence reduction in the states that enacted such laws."<br><br>Record Citations:<br>• Exhibit 18 (Expert Report of Carl Moody; Ex. 1 to Moody Depo.), p. 2 | Admit. | Therefore, this fact stands undisputed. |
| **SOMF ¶67** | **Defendants' Response** | **Plaintiffs' Reply** |
| Moody also found no evidence of any impact on the public safety of California by virtue of its attempt to regulate straw | Admit that Dr. Moody's expert report stated that studies "link[ing] firearm homicide with interstate flow of | Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| purchasing through the OGM law.<br><br>Record Citations:<br>• Exhibit 18 (Expert Report of Carl Moody; Ex. 1 to Moody Depo.), pp. 2-3 | firearms" and studies "linking gun violence to interstate transfer of firearms" "have little relevance to the California OGM law." DX-20 (Moody Expert Rept.), Dkt. No. 29-5, at p. 3. | |
| **SOMF ¶68**<br><br>Moody reaffirmed his conclusions and opinions in his deposition with further details and justifications.<br><br>Record Citations:<br>• Exhibit 16 (Deposition of Carl Moody), pp. 9-10, 39-40, 50, 53, 55, 71-72, 85-87, 89-93, 106, 119, 145-147, 152-153 | **Defendants' Response**<br><br>Admit. | **Plaintiffs' Reply**<br><br>Therefore, this fact stands undisputed. |
| **SOMF ¶69**<br><br>Indeed, their own expert, Klarevas, conceded in his deposition that there is no evidence "to show that a five-day or a seven-day | **Defendants' Response**<br><br>Admit that, in his deposition, Professor Klarevas did not recall whether the studies breakdown the | **Plaintiffs' Reply**<br><br>Therefore, this fact stands undisputed. To clarify, Klarevas testified, "I don't recall them doing a breakdown like that [i.e., |

| | | |
|---|---|---|
| or a ten-day is not alone as effective as a 30-day" limitation in meeting the claimed justifications behind California's OGM law. | effectiveness of a "five-day or a seven-day or a ten-day" compared to a "30-day" limitation. | demonstrating that a five-day, seven-day, or ten-day limitation is not alone as effective as a 30-day limitation]. I'm – I'm almost positive that Weil and Knox article does not." PMSJ, Ex. 14, p. 190. |
| Record Citations: • Exhibit 14 (Deposition of Klarveas), p. 190 | | |
| **SOMF ¶70** | **Defendants' Response** | **Plaintiffs' Reply** |
| The legislative record frequently notes the existence of various "exceptions" and "exemptions" to the OGM law, but in none of those instances does it provide an explanation or supporting justification for them. | Deny. The legislative history of AB 202 states that "The bill also provides numerous exemptions which are salutary because they encourage a person who may be involved lawfully in multi-gun exchanges to go to a licensed dealer, or to the local sheriff, in order to facilitate the exchange." Defendants' Notice of Legislative Facts in Support of Their Motion for Summary | Therefore, it is undisputed that the single quote Defendants cite is the only aspect of the legislative history that includes any sort of rationale for the exemptions. Defendants' denial of the asserted fact on the basis of this citation does not give rise to a genuine dispute. As Plaintiffs have emphasized in points that Defendants have not disputed, any claim of a "salutary" effect is entirely generic, as the same could |
| Record Citations: • Exhibit 5 (Legislative History; Ex. 9 to Klarevas Depo.) at pp. 13, 14, 20, 21, 28, 33, 34, 37, 39, 40, 42, 45, 46, 50, 52, 61, 62, 71, 72, 75, 79, 80 | | |

| | | Judgment ("NLF"), Dkt. No. 29-3, Ex. 12 at 3. | be said of the myriad other regulations targeted at achieving the same goal. Further, there is no evidence that each and every, or even most, of the exemptions are actually "salutary" in their effect. See https://www.merriam-webster.com/dictionary/salutary ("salutary" means "producing a beneficial effect" in the sense of being "remedial" or "promoting health" in the sense of being "curative"). And there is no evidence, or any claim, that multi-gun exchanges conducted in accordance with the exemptions are the *only* such transactions that can or would otherwise be conducted "lawfully." Pltf. Opp. to DMSJ at 12. |
| **SOMF ¶71** For his part, Klarevas simply says "[b]ased on | **Defendants' Response** Admit. | **Plaintiffs' Reply** Therefore, this fact stands undisputed. |

55

| | | |
|---|---|---|
| my review of the relevant literature and data, I came across no evidence that would lead me to alter my conclusions in light of California's exemptions," offering no supporting reasons or rationale for their existence.<br><br>Record Citations:<br>• Exhibit 8 (Expert Report of Luis Klarevas; Ex. 13 to Klarevas Depo.), p. 23, n. 55 | | |
| **SOMF ¶72**<br>When pressed on this point during his deposition, Klarevas said he could "imagine that part of what was the rationale behind" exemption for the movie industry was that this industry provides an important economic benefit for the State.<br><br>Record Citations: | **Defendants' Response**<br>Admit. | **Plaintiffs' Reply**<br>Therefore, this fact stands undisputed. |

| | | |
|---|---|---|
| • Exhibit 14 (Deposition of Louis Klarevas), pp. 205-207 | | |
| **SOMF ¶73** | **Defendants' Response** | **Plaintiffs' Reply** |
| Klarevas further "imagine[d]" that "there are protocols" "for how these weapons are supposed to be handled and stored" by those in the movie industry.<br><br>Record Citations:<br>• Exhibit 14 (Deposition of Louis Klarevas), p. 209 | Admit. | Therefore, this fact stands undisputed. |
| **SOMF ¶74** | **Defendants' Response** | **Plaintiffs' Reply** |
| Of course, as he had to admit, law-abiding citizens have to follow a multitude of such "protocols" too.<br><br>Record Citations:<br>• Exhibit 14 (Deposition of Louis Klarevas), pp. 209-210 | Admit that, in his deposition, Professor Klarevas acknowledged that law-abiding citizens "have protocols they have to follow in the form of criminal laws." | Therefore, this fact stands undisputed. |

| **SOMF ¶75** | **Defendants' Response** | **Plaintiffs' Reply** |
|---|---|---|
| With no evidence or further explanation, Bisbee says, "many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale."<br><br>Record Citations:<br>• Exhibit 11 (Expert Report of Joseph Bisbee), p. 9 | Deny. Mr. Bisbee states in his expert report that "[i]n my experience [as an ATF special agent for more than 25 years], many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale." DX-19, Dkt. No. 29-4, ¶ 24. | Therefore, it is undisputed that Bisbee provides no evidence or explanation for his claim, which he supports solely by reference to his "experience." Further, Plaintiffs reiterate that Defendants' reliance on this statement as a purportedly material supportive fact can only further bolster Plaintiffs' case, as asserted in Plaintiffs' MSJ Briefing. PMSJ at 24-25. |

Respectfully submitted May 13, 2022,

> /s/ *Raymond M. DiGuiseppe*
> Raymond M. DiGuiseppe
> The DiGuiseppe Law Firm, P.C.
> 4320 Southport-Supply Road, Suite 300
> Southport, NC 28461
> Tel.: 910-713-8804
> Email: law.rmd@gmail.com
> *Attorney for Plaintiffs*