Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

MICHELLE NGUYEN, et al,

     Plaintiffs,

vs.

ROB BONTA, Attorney General of
California, et al,

     Defendants.

Case No. 3:20-cv-02470-WQH-MDD

PLAINTIFFS' SUPPLEMENTAL
BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

Judge: Hon. William Q. Hayes
Courtroom: 14B

## Table of Contents

I.    Introduction…………………………………………………...1

II.   Background……………………………………………………2

III.  *Bruen*………………………………………………………...5

    A.   The Analysis Required Under *Bruen*…………………………7

    B.   Essential Guiding Principles…………………………………10

IV.   The OGM Law Flatly Fails Under the *Bruen* Framework………………12

    A.   The Existing Historical Record in This Case…………………...13

    B.   Additional Compelling Historical Evidence…………………………14

        1.   General Traditions…………………………………15

        2.   Loyalty Oath and Allegiance Conditions…………………...17

        3.   Militia Laws…………………………………………18

        4.   Race and Ethnicity Based Prohibitions…………………19

        5.   Age-Based Restrictions…………………………………19

        6.   Gunpowder Storage…………………………………20

        7.   Hunting Regulations…………………………………20

        8.   Firearm Discharge…………………………………20

        9.   Public Carry Restrictions…………………………………21

        10.  Sales Regulations…………………………………21

    C.   Defendants Cannot Avoid the Inevitable by Claiming the OGM Law Enjoys Any Sort of "Longstanding" or "Presumptively Lawful" Status…………………………………………………23

V.    Plaintiffs are Entitled to Judgment on the Equal Protection Claim Too

## Table of Authorities

*Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………………………2

*Andrews v. State*, 50 Tenn. 165 (1871)…………………………………...2

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)…………………………2

1

## Table of Authorities (continued)

2

*Cases*

3   *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985)...............25

4   *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)...........................5

5   *District of Columbia v. Heller*, 554 U.S. 570 (2008)................................*passim*

6   *Espinoza v. Montana Dept. of Revenue*, 140 S.Ct. 2246 (2020).........................22

7   *Ezell v. City of Chicago*, 651 F.3d 684 (9th Cir. 2011)......................................2

8   *Gamble v. United States*, __ U.S. __, 139 S. Ct. 1960 (2019).........................8, 9

9   *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).....................9, 24

10   *Hirschfeld v. BATFE*, 5 F.4th 407, 421 (4th Cir. 2021)....................................20

11   *Kachalsky v. Cnty. Of Westchester*, 701 F.3d 81 (2d Cir. 2012)..........................4

12   *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)................................................5

13   *Khan v. State Oil Co.*, 93 F.3d 1358 (7th Cir. 1996)........................................8

14   *Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961).......................................6

15   *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976)..........................24

16   *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)...................................7

17   *Military Obligation: The American Tradition*, vol. 2 (Arthur Vollmer ed., 1947)......16

18   *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)...........*passim*

19   *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018)......................................3, 19, 24

20   *Renna v. Becerra*, 535 F.Supp.3d 931 (S.D. Cal. 2021)...................................3

21   *Romer v. Evans*, 517 U.S. 620 (1996)......................................................25

22   *Staples v. United States*, 511 U.S. 600 (1994).............................................2

23   *State Oil Co. v. Khan*, 522 U.S. 3 (1997)...................................................8

24   *Teixeira v. Cty. of Alameda*, 873 F.3d 670 (9th Cir. 2017)...........................2, 22

25   *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)...............................4

26   *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000)..............6

27

28

## <u>Table of Authorities</u> (continued)

***Statutes***

Cal. Pen. Code § 27535……………………………………………………………..1

***United States Constitution***

Second Amendment……………………………………………………………….*passim*

Fourth Amendment…………………………………………………………………..18

***Publications***

C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)…………...7

*Cramer, Clayton E., Colonial Firearms Regulation* (2016)…………………16, 19, 20

*Firearms Law and the Second Amendment: Regulation, Rights, and Policy*, Third Edition, 2021, Nicholas J. Johnson, David B. Kopel, George A. Mocsary, E. Gregory Wallace, Donald E. Kilmer…………………………………………...15, 17, 18, 19, 20

*Gun Law History in the United States* (2017)………………………………...19, 20, 22

*How the British Gun Control Program Precipitated the American Revolution*, Charleston L. Rev., Vol. 6, No. 2, David B. Kopel (2012)……………………………18

*James Lindgren and Justin L. Heather, Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777 (2002)………………………………………………………………16

Saul Cornell and Nathan DeDino, *A Well Regulated Right:*……………...15, 19, 20, 21
*The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004)

## I.    Introduction

Plaintiffs continue their challenge to California's laws prohibiting ordinary law-abiding citizens from purchasing more than one handgun, semiautomatic centerfire rifle, or any combination thereof, within any 30-day period, while arbitrarily carving out special exemption classifications for people in certain favored industries. Cal. Pen. Code § 27535(a)-(b) (colloquially, "one-gun-per-month" or "OGM" law).[1] Now, after the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*"), courts are bound to travel along a historically rooted path in adjudicating Second Amendment claims like this. Plaintiffs have been forging this path from the start, as best they could while navigating the now-abrogated but then-controlling "two-step" interest balancing test of the Ninth Circuit. Envisioning what the constitutional framework *should be* and how the claim *should be* resolved under the clear directives of *Heller*, Plaintiffs argued in their summary judgment motion:

> As the pronouncements in *Heller* make clear, the true test for the constitutionality of restrictions on the Second Amendment right involves a simple, single inquiry: Is the prohibited conduct protected under the scope of the Second Amendment as defined and understood 'when the people adopted' it? *Heller*, 554 U.S. at 634-35. If so, then the prohibition is unconstitutional—period. *Id.* That inquiry would end the analysis here and quickly dismantle the OGM law at issue, given the clear historical record securing the right of law-abiding people like Plaintiffs to purchase multiple firearms without any restriction on the number or frequency of such acquisitions.

Pltf. Mtn. for Summary Judgment ("PMSJ") at 9.

That's pretty much it in a nutshell. This supplemental brief will walk through the steps of the path that *Bruen* requires and show why the outcome that Plaintiffs' complaint has foretold from the beginning is now inevitable: the proper inquiry based on the relevant historical record indeed dismantles California's OGM law.

---

[1]    And the clamping down on these rights continues: under recent Assembly Bill No. 1621, the OGM law will extend the same purchase prohibitions to all arms falling within an expanded definition of "firearm," so as to include "completed frames or receivers" and all other "firearm precursor parts," effective January 1, 2024.

## II.    Background

A review of the parties' competing arguments in the pre-*Bruen* world helps illustrate where everything currently stands, what remains in dispute, and how those disputes should be resolved under the *Bruen* framework in deciding whether "there is no genuine dispute as to any material fact and [Plaintiffs are] entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

There was never any dispute that the OGM law targets conduct and arms protected under the Second Amendment. *See* Reply to Resp. to SOMF in Support of PMSJ (Dkt No. 37-1) ("Reply-SOMF") ¶ 9. Handguns and semiautomatic centerfire rifles are indisputably protected because they are in common use for lawful purposes and are not "dangerous and unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring); *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008); *id.* at 628-29 (the handgun is "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense); *Staples v. United States*, 511 U.S. 600, 603 (1994) ("[t]he AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon").

While Defendants pressed a narrow conception of the right, claiming it was "limited to a home-bound right of self-defense," Def. Opp. to PMSJ at 2—which *Bruen* squarely rejected, 142 S.Ct. at 2134—they did not and could not dispute that the OGM law also targets firearms *acquisition* activity protected under the Second Amendment. "[T]he Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017). And the "core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Id.* at 677 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011)); *id.* 678 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("'[t]he right to keep arms, necessarily involves *the right to purchase them*, to keep them in a state of efficiency

for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair'''); *accord Renna v. Becerra*, 535 F.Supp.3d 931, 940 (S.D. Cal. 2021).

Significantly too, Plaintiffs introduced voluminous materials and an expert declaration concerning the history of firearms regulations, contending that "[t]he undisputed evidence shows the absence of any historical precedent for OGM laws during the founding era and throughout American history until 1975," Pltf. Opp. to Def. MSJ at 4, and that this sealed the fate of the law as unconstitutional under *Heller's* "true test," PMSJ at 9. Defendants never disputed this evidence or what it established. Instead, they basically *conceded* that Plaintiffs were correct about the infancy of OGM laws in the history of this Nation but shrugged it off as immaterial under their view of the controlling legal standards. *See* Def. MSJ Reply Brf. at 2 ("Plaintiffs appear to argue that strict scrutiny is appropriate because purchasing multiple firearms within a thirty-day period was lawful at the 'time of founding' and the first OGM law was not enacted until 1975. See Pltfs' Opp'n at 4-5. But strict scrutiny does not apply just because an OGM law may not have existed at the 'time of founding.'").

Defendants' strategy was to argue that the OGM law passed constitutional muster *notwithstanding* the foregoing facts because the California legislature had made a policy judgment that OGM laws "make it *harder* for criminals" to obtain multiple firearm within "a short period of time," "*can* help reduce the use of firearms in crimes," and thus "make[] people safer," Def. MSJ at 16 (italics added), and the Court must defer to that judgment so long as the evidence "'fairly support[s]'" it, Def. MSJ Reply at 3 (quoting *Pena v. Lindley*, 898 F.3d 969, 982 (9th Cir. 2018)). The only "evidence" Defendants proffered in support of their strategy here were various studies and a couple of expert reports concerning the supposed efficacy of the OGM laws in the small handful of states on the east coast that have enacted them—again, no earlier than 1975.

Plaintiffs contended that Defendants' legal standards were way off because the only truly relevant evidence was the historical record showing the absence of any precedent for such restraints on firearm rights throughout relevant American history

and thus neither the existence nor the purported efficacy of distinctly *modern* OGM laws mattered at all. Pltf. Opp. to Def. MSJ at 4-5. Moreover, Plaintiffs argued, even assuming these laws mattered, they didn't support the facts that Defendants sought to establish because Defendants had failed to show the other OGM laws were materially similar to California's OGM law—in their prohibitions, their exceptions, or the general firearm regulatory schemes of which they are part—and, even so, the studies and expert reports did not reliably show these laws were effective in achieving the legislative policies that California claims to be pursuing here. Pltf. Opp. to Def. MSJ at 12-24.

This was of no moment to Defendants, who claimed that any such disputes or doubts about the credibility or value of this evidence must be resolved in their favor because "'[i]t is the legislature's job, not [the courts'], to weigh [that] evidence and make policy judgments,'" Def. Opp. to PMSJ at 5 (quoting *Kachalsky v. Cnty. Of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012)), given the paramount need to "'accord substantial deference to the predictive judgments of the [legislature],'" *id.* at 5 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)); Def. MSJ Reply at 6-7 (sweeping aside any concerns about the validity of this evidence as simply amounting to "conflicting evidence" on matters that the legislature is entitled to decide).

Plaintiff argued that even if this evidence did show that California's OGM law advances its "plain vanilla public safety purposes," the State's claimed interests were "far too generic and far too broad to pass constitutional muster even under the most lenient of the potentially applicable standards of 'intermediate' scrutiny." PMSJ Reply at 6. This was particularly true given the undisputed fact that the State actively enforces a vast network of statutes, regulations, policies, and law enforcement mechanisms designed to target the same claimed interests behind the OGM law. Reply-SOMF ¶¶ 32-35. Indeed, the record showed that any risks associated with multiple-firearm purchases exist only in relation to multiple purchases made on the same day or within no more than five days—which the ATF already actively monitors—and there is no evidence that a period greater than five days but less than 30 days would not be just as

effective. PMSJ, Ex. 14 at 190. Defendants even admitted there was no evidence "to show that a five-day or a seven-day or a ten-day is not alone as effective as a 30-day" limitation in meeting the claimed goals of the OGM law. Reply-SOMF ¶ 69.

Yet, to Defendants, all this made no difference because "[i]ntermediate scrutiny does not require such precision." Def. Opp. to PMSJ 7. In fact, Defendants claimed, these numerous overlapping regulations were "*irrelevant*" because the government "'must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.'" *Id.* at 6 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)). They argued that *Plaintiffs* had to prove the rest of the scheme was "just as effective as OGM laws in reducing illegal firearms trafficking," to carry *their burden* of demonstrating that the law was *not* constitutional. *Id.* at 7.

So, as things stood in their prior briefing, Plaintiffs were arguing that it was Defendants' burden to prove the constitutionality of the OGM law based on the meaning of the right to keep and bear arms during the Founding Era, and Defendants were arguing that they need only point to evidence of the purported efficacy of modern day OGM laws and, if that evidence "fairly" supports the legislative goals, Plaintiffs must show those goals could be achieved just as effectively without the law.

### III.   *Bruen*

Then along came *Bruen*, which eliminated the "two-step" test that had become a fixture in many federal circuits since *Heller*. Further, it ended the "interest-balancing" that enabled governments to supplant their policy judgments for that of "the people" who "adopted" the Second Amendment, 142 S.Ct. at 2136, and then claim "substantial deference" when challenged in court, just as Defendants have done here. As *Bruen* explained, "*Heller's* methodology centered on constitutional text and history." *Id.* 2127-28. While "step one" of this two-step framework—under which "the government may justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood'" is "broadly consistent with *Heller*," *id.* at 2126, 2127 (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir.

2019)), the "means-end scrutiny" process of "step two"—judicial balancing of the relative importance of the government's claimed interest against the burdens imposed against the Second Amendment right—is just plain wrong, *id.*

"Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127. This is a single inquiry focused "on text and history." *Id.* at 2128. Specifically, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961)). What "demands our unqualified deference" is the balance "struck by the traditions of the American people"—not "the determinations of legislatures," *id.* at 2131, or "the evolving product of federal judges," *id.* at 2132 n. 7. Importantly then, in no event may a court "engage in independent means-end scrutiny under the guise of an analogical inquiry," because the proper reasoning "requires judges to apply faithfully the balance struck by the founding generation to modern circumstances." *Id.*

The burden rests squarely and unrelentingly on the government's shoulders throughout this inquiry. *See Bruen*, 142 S.Ct. at 2130 (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000) (explaining that "[t]his Second Amendment standard accords with how we protect other constitutional rights," like in the First Amendment context where "the Government bears the burden of proving the constitutionality of its actions" when it restricts protected speech); *id.* at 2135 ("the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation"); *id.* at 2150

1   ("we are not obliged to sift the historical materials for evidence to sustain New York's
2   statute," because "[t]hat is respondents' burden" in seeking to uphold it).

3   **A.     The Analysis Required Under *Bruen***

4       The true test begins with "a 'textual analysis' focused on the 'normal and
5   ordinary' meaning of the Second Amendment's language." *Bruen*, 142 S.Ct. at 2127
6   (quoting *Heller*, 554 U.S. at 576-77). This compelled the conclusion in *Bruen* that the
7   Second Amendment "presumptively guarantees" "a right to 'bear' arms in public for
8   self-defense," since "[n]othing in the Second Amendment's text draws a home/public
9   distinction with respect to the right to keep and bear arms." *Id.* at 2124-25.

10      To justify a regulation as "consistent with the Second Amendment's text and
11  historical understanding," the government must demonstrate by "analogical reasoning"
12  the existence of "a proper analogue." *Bruen*, 42 S.Ct. 2131-32. The analogue must be
13  "'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein, On Analogical Reasoning, 106
14  Harv. L. Rev. 741, 773 (1993)). It "may be analogous enough to pass constitutional
15  muster" even if it's not "a historical *twin*" or a "dead ringer" for the modern regulation,
16  but it must be "well-established and representative." *Id.* at 2133. *Bruen* did not
17  "provide an exhaustive survey of the features that render regulations relevantly similar"
18  here, but "*Heller* and *McDonald* point toward at least two metrics: how and why the
19  regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132.
20  "[W]hether modern and historical regulations impose a comparable burden on the right
21  of armed self-defense and whether that burden is comparably justified are '*central*'
22  considerations when engaging in an analogical inquiry," because "individual self-
23  defense is 'the *central component*' of the Second Amendment right." *Id.* at 2133
24  (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)).

25      As for what constitutes the relevant historical period, the high court explained,
26  "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*,
27  142 S.Ct. at 2136. Foremost, "'[c]onstitutional rights are enshrined with the scope they
28  were understood to have when the people adopted them.'" *Id.* at 2137 (quoting *Heller*,

554 U.S. at 634-35). While "[s]trictly speaking," the States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, and not the Second, adopted in 1791, "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* Indeed, as noted, the standard established in *Bruen* "requires judges to apply faithfully the balance struck *by the founding generation* to modern circumstances." *Id.* at 2132 n. 7 (italics added). While "there is an ongoing scholarly debate" over whether the understanding of the Second Amendment in 1791 or 1868 should be considered primary, that issue need not be resolved when "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" the rights at stake. *Id.* at 2138.

What is more, while *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the Court's repeated holdings (a) that 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*, __ U.S. __, 139 S. Ct. 1960, 1976 (2019), and (b) that incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765. *See, e.g.*, *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (lower courts must follow Supreme Court holdings even with "wobbly, moth-eaten foundation" until overruled by the Supreme court), *vacated by State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but making clear that the "Court of Appeals was correct in applying [*stare decisis*] . . . for it is this Court's prerogative alone to overrule one of its precedents").

As for periods of time other than those surrounding the Founding or Reconstruction, some may bear a degree of secondary significance while others may have little to no bearing. English common law prevailing at the time the Constitution "was framed and adopted" may have some relevance, *Bruen*, 142 S.Ct. at 2138, but

anything that "long predates" 1791 or 1868 is generally suspect because it may not accurately "illuminate the scope of the right," *id.* at 2136. The period "immediately after its ratification through the end of the 19th century" can be a "critical tool of constitutional interpretation," but "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* The main purpose of consulting such evidence is to *confirm* the public understanding of the right to keep and bear arms at the time Second Amendment was adopted. *Id.* at 2137 (quoting *Gamble*, 139 S.Ct. at 1975–76 (2019) (the mid-to-late 19th century evidence considered in *Heller* "was 'treated as mere confirmation of what the Court thought had already been established'"); *Heller*, 554 U.S. at 600-01 ("Our interpretation is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment").

Standing alone, evidence from the mid-to-late 19th century "do[es] not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S.Ct. at 2137. Similarly, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." Laws from this period that "conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'" *Id.* at 2154 (quoting *Heller*, 554 U.S. at 614); *id.* at 2163 (Barrett, J., concurring) ("today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights"). Nor does "20th-century historical evidence" that "contradicts earlier evidence" "provide insight into the meaning of the Second Amendment." *Id.* at 2153, n. 28. The same goes for any other "later history" that "contradicts what the text says," because "'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

1    **B.    Essential Guiding Principles**

2        Several essential guiding principles emerge from the *Bruen* court's application

3    of this framework in striking down New York's carry license scheme.

4        ***First***, regardless of the historical period from which it may hail, any firearms

5    regulation that conflicts with the Supreme Court's interpretation of the Second

6    Amendment right in *Heller* and its progeny cannot serve as a historical "analogue."

7    Thus, the *Bruen* court disregarded a statute from the year 1541 that "impeded not only

8    public carry, but further made it unlawful for those without sufficient means to 'kepe

9    in his or their houses' any 'handgun,'" because "[o]f course, this kind of limitation is

10   inconsistent with *Heller's* historical analysis regarding the Second Amendment's

11   meaning at the founding and thereafter." *Bruen*, 142 S.Ct. at 2140, n. 10. And, because

12   it conflicted with *Heller*, such a restriction necessarily "was not incorporated into the

13   Second Amendment's scope." *Id.* Similarly, state laws from the late 19th century that

14   broadly prohibited the public carrying of handguns without qualification bore no

15   weight in the analysis despite having been upheld by courts of the day, because those

16   courts had "operated under a fundamental misunderstanding of the right to bear arms,

17   as expressed in *Heller*." *Id.* at 2155; *id.* (citing as "clearly erroneous" a 1905 Kansas

18   decision that upheld such a law based on the rationale that the Second Amendment

19   only protects a *civic* right to bear arms as a member of a militia group).

20       ***Second***, any conflicts in the evidence as to whether the Second Amendment does

21   or does not protect the targeted arms or conduct should be resolved in favor of the

22   protective interpretation. Thus, in *Bruen*, when the dissent complained that one case

23   only "arguably" supported finding protection for the public carry rights targeted by

24   certain restrictions in the 1600s and 1700s, the majority's reminded that "respondents

25   here shoulder the burden" of proving the regulation was "consistent with the Second

26   Amendment's text and historical scope" and admonished that "[t]o the extent there are

27   multiple plausible interpretations of [the case], we will favor the one that is more

28   consistent with the Second Amendment's command." *Bruen*, 142 S.Ct. at 2141, n. 11.

*Third*, even if a historical regulation may otherwise be "relevantly similar" for all intents and purposes, it cannot justify the challenged regulation when it was an "outlier" or an exception to the tradition prevailing within the vast majority of jurisdictions at the time. *Bruen*, 142 S.Ct. at 2142 ("we doubt that three colonial regulations could suffice to show a tradition of public-carry regulation"); *id.* at 2144 ("we cannot put meaningful weight on this solitary statute"); 2147, n. 22 (rejecting as of "insubstantial" value an 1860 "extreme restriction" that was "an outlier statute enacted by a territorial government nearly 70 years after the ratification of the Bill of Rights" whose "constitutionality was never tested in court"); *id.* at 2153 (rejecting broad carry prohibitions in Texas from the 1870s as "outliers" "endorsed by no other court during this period"); *id.* ("we will not give disproportionate weight to a single state statute and a pair of state-court decisions"); *id.* 2154 ("the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry"); *id.* at 2155 (quoting *Heller*, 554 U.S. at 632) (rejecting "a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence"); *id.* at 2155 (rejecting 1890 prohibitions in three cities of Kansas that represented only 6.5% of the state's overall population).

*Fourth*, when a historical regulation that conflicted with the prevailing tradition was never subjected to judicial scrutiny, it is of inherently suspect value. *Bruen*, 142 S.Ct. at 2131 ("if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality"); *id.* at 2155 ("because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality"); *id.* at 2147 (rejecting a post-ratification "outlier" statute whose "constitutionality was never tested in court").

### IV.    The OGM Law Flatly Fails Under the *Bruen* Framework

No longer able to claim that this Court must "accord substantial deference" to the legislature as it "experiment[s] with" the fundamental rights of law-abiding people, Def. Opp. to PMSJ 5, 7, Defendants must finally face the music and carry the burden they've had all along: to *prove* this regulation "is consistent with the Nation's historical tradition of firearm regulation" using historically *relevant* evidence. *Bruen*, 142 S.Ct. at 2126. They cannot do so, for the same essential reasons that New York could not justify its "special need" condition for public carry licenses at issue in *Bruen*.

Beginning with the text, like in *Bruen*, nothing in the language of the Second Amendment's guarantee supports the prohibition at issue. It plainly declares that "the right of the people to keep and bear Arms, shall not be infringed." Indeed, by referencing *Arms* in the plural, the text can only support the opposition conclusion— that the right is *not* subject to any limitation on the frequency or quantity of protected arms that a law-abiding person may purchase or otherwise acquire for lawful purposes.

In fact, like the small bandwagon of jurisdictions New York joined in pursuing its "may-issue" carry licensing scheme, California joins a just handful of jurisdictions with its OGM law. *See Bruen*, 142 S. Ct. at 2123-24 ("only six States and the District of Columbia have 'may issue' licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria"). Not only is the group even smaller—only four states (South Carolina, Virginia, Maryland, New Jersey) and the District of Columbia, have ever enacted such laws, and only those in Virginia, Maryland, and New Jersey are still in force[2]—but the

---

[2]    South Carolina enacted an OGM law in 1975, but repealed it in 2004. Reply SOMF ¶13. Virginia enacted one in 1993, repealed it in 2020, and reenacted another one in 2020. *Id.* ¶14. Maryland enacted an OGM law no earlier than 1996. *Id.* ¶15. New Jersey enacted an OGM law no earlier than 2009. *Id.* ¶16. The District of Columbia enacted a pistol registration requirement in 2008 (after *Heller*) that effectively limited residents to one pistol per month, although that was struck down as unconstitutional in 2015. *Id.* ¶17. California's OGM law was enacted as to handguns in 2000 and extended to semiautomatic centerfire rifles effective July 1, 2021.

OGM law is even more restrictive: while New York's *discretionary* licensing scheme included *some* relief valve for those applicants who *could* meet the onerous "special need" condition, there's no discretion at all under the OGM law; the 30-day purchase and sale prohibitions imposed against ordinary law-abiding Californians are *absolute*. *And*, California's OGM law is the *most* restrictive of the group—targeting handgun *and* long guns (and soon, all firearm "precursor" parts too). Reply SOMF ¶40.

The historical record is worse too. As with the New York law, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" the rights at stake under the OGM law. *Bruen*, 142 S.Ct. at 2138. And the "may-issue" schemes like New York's ultimately could not pass constitutional muster because "apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Bruen*, 142 S.Ct. at 2138. Here, apart from a handful of *late 20th century and early 21st century* jurisdictions enacting OGM laws, the historical record does not show any tradition of broadly prohibiting law-abiding citizens from commercially purchasing more than one handgun, semiautomatic rifle, or combination of the same within any 30-day period. Tellingly, the record shows there was no tradition *at all* of imposing *any* frequency-over-time purchase restrictions, for *any* type of firearm.

## A. The Existing Historical Record in This Case

Again, Defendants have already conceded that no prohibitions against "purchasing multiple firearms within a thirty-day period" existed during the Founding era, Def. MSJ Reply at 2, with the modern day OGM laws being the first in time, as already established by the undisputed evidence that Plaintiffs previously provided, *See* Reply SOMF ¶¶ 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23. Nor have Defendants credibly disputed or produced anything to counter the evidence already showing that it

was common during the Founding era for ordinary people to purchase and sell multiple firearms in single or frequent transactions, and to even establish a personal "arsenal" of firearms," R-SOMF ¶¶ 24-28, and that "[t]here is an American tradition of transacting in and collecting protected firearms, free of quantity-over-time restrictions," PMSJ, Ex. 2 (Dec. of George Mocsary) at ¶ 31.

As Plaintiffs previously highlighted as well, the historical evidence that Defendants themselves previously submitted only *bolsters* these points. The Halbrook publication (Def. Ex. 7 to Depo. of George Mocsary) recounts that during the Founding era, "[t]here was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." Reply SOMF ¶20 (PMSJ Ex. 4 at p. 318). Instead, "it appears that having arms was manifestly an attribute of free citizenship" during this period. Reply SOMF ¶22 (PMSJ Ex. 4 at pp. 285-86). Consistent with these attributes of citizenship, free citizens commonly possessed and used multiple firearms at any given time. Reply SOMF ¶26 (PMSJ Ex. 4 at pp. 291-92) ("Vermont's founding fathers" "carried a gun and a brace [a pair] of pistols on their persons as a common practice."); Reply SOMF ¶27 (PMSJ Ex. 4 at p. 295) ("Pistols in the pocket and an arsenal at home were options available to every free citizen").

## B.   Additional Compelling Historical Evidence

Given *Bruen's* affirmation that evidence of the Nation's tradition of firearms regulations is the key to determining the constitutionality of modern regulations, Plaintiffs have conducted an even more in-depth investigation of the historical record. This additional research only further confirms what the previously undisputed evidence already established and only further confirms that the OGM law cannot be sustained.[3]

---

[3]   Again, neither Plaintiffs nor the Court is "obliged to sift the historical materials for evidence to sustain [California's] statute," because the burden rests entirely with Defendants. *Bruen*, 142 S.Ct. at 2150. Plaintiffs supply this additional evidence simply to further facilitate proper adjudication and resolution. They reserve the right to rebut

Plaintiffs' research was objectively conducted and focused on the available data regarding the nature and scope of firearms regulations during the relevant time periods. Thus, it even includes publications from authors and groups who have compiled relevant data while advocating for "gun control."[4] But the history speaks for itself.

## 1. General Traditions

First, this further study of the annals affirms that the general American tradition throughout the Nation's history was to not only permit but encourage—indeed *require* for most of the history—ready access to the acquisition of firearms for all free citizens without any frequency-of-purchase-over-time or quantity restrictions.

"The first English settlers in North America founded the Virginia colony in 1607. When they crossed the Atlantic, they brought with them perpetual guarantees of their arms rights." *Firearms Law and the Second Amendment: Regulation, Rights, and Policy*, Third Edition, 2021, Nicholas J. Johnson, David B. Kopel, George A. Mocsary, E. Gregory Wallace, Donald E. Kilmer, Chapter 3, Excerpt, available at https://www.aspenpublishing.com/Johnson-SecondAmendment3 (Ex. 2) at 173. "Guarantees of the rights of Englishmen were common in other American colonial

---

any evidence Defendants may produce in support of their summary judgment motion since, from an evidentiary perspective, they are *the movant* under the *Bruen* framework.

[4] Some of the publications were authored by Saul Cornell, who strongly advocated against any finding of an individual right to keep and bear arms before *Heller* was decided, Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) (Ex. 1 to Plaintiffs' MSJ) at p. 597 (arguing that any such conception of the right was "phantasmagorical" and "far-fetched"), and who has since heavily criticized the Supreme Court for ultimately interpreting the right as individual in nature, Saul Cornell, *The Police Power and the Authority to Regulate Firearms in Early America*, Brennan Center for Justice (2021), at p. 2, https://www.brennancenter.org/our-work/research-reports/police-power-and-authority-regulate-firearms-early-america (arguing *Heller* "distorts the texts it seeks to illuminate"); *Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*, https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/ (characterizing the *Bruen* majority opinion as based on "fiction, fantasy, and mythology").

charters." *Id.* at 175. "So when English rights were restated in the 1689 English Bill of Rights …, those rights—including the right to 'arms for their defence'—applied to Americans, too." *Id.* "No colony or state restricted arms possession by males who were too young or too old for the militia, nor by females." *Id.* at 188. In 1688, after "the gun-confiscating King James II of England was removed by the Glorious Revolution," "[t]he new monarchs William and Mary in 1689 expressly affirmed the English constitutional right to arms," after which "the new attitude seemed to be that a free person could carry any firearm, including a pistol, anywhere." *Id.* at 198-99.

"An examination of the Colonial statutes reveals that … almost all colonies required white adult men to possess firearms and ammunition." *Cramer, Clayton E., Colonial Firearms Regulation* (2016), online at https://ssrn.com/abstract=2759961 or http://dx.doi.org/10.2139/ssrn.2759961, (Ex. 3) at 1. "If Colonial governments evinced any distrust of the free population concerning guns, it was a fear that not enough freemen would own and carry guns." *Id.* Thus, "Colonies that did not explicitly require firearms ownership passed laws requiring the carrying of guns under circumstances that implied nearly universal ownership." *Id.* at 1-2. "None of the Colonial laws in any way limited the possession of firearms by the white non-Catholic population; quite the opposite." *Id.* at 2, 6. "For the vast majority of people, who were considered loyal members of the community, gun ownership was not only allowed, it was an obligation." *Id.* at 17. In fact, several Colonies required their militiamen to be equipped and to keep with them at all times a "case of good *pistols*"—i.e., *multiple* firearms. *Military Obligation: The American Tradition*, vol. 2 (Arthur Vollmer ed., 1947) (Ex. 4), at 21, 45, 52, 139, 145, 151, 311 (cataloguing laws mandating such requirements in Massachusetts (1693), New Hampshire (1718), Connecticut (1754), Virginia (1755), North Carolina (1756), New Jersey (1777), and New York (1782)).

Consistent with these traditions and practices, gun ownership was prolific throughout early American history. Generally, "there were high numbers of guns in early America." *James Lindgren and Justin L. Heather, Counting Guns in Early*

*America*, 43 Wm. & Mary L. Rev. 1777 (2002), https://scholarship.law.wm.edu/wmlr/vol43/iss5/2 (Ex. 5) at 1835. "[I]n the late seventeenth and early eighteenth centuries, guns were next in importance after beds, cooking utensils, and pewter-and ahead of chairs and books." *Id.* at 1837. They were "more common than chairs or hoes in a poor agricultural county" and "as common as plows" with "eighteenth century mid-Atlantic farmers." *Id.* "Thus, everywhere and in every time period from 1637 through 1810," there were "high percentages of gun ownership"—50 to 79% of males within the free citizenry. *Id.* at 1838.

To state the obvious: any regulation prohibiting anyone within the free citizenry from purchasing or otherwise acquiring no more than one of *any* type of firearm—much less the most popular and ubiquitous types—within *any* given period of time—much less within an entire month—would be fundamentally *inconsistent* with this tradition of *ensuring and promoting* ready access to firearms without any limitations on either quantity or frequency of purchase. As borne out in the record, the traditional *regulations* of the time that did place restrictions on the possession, use, ownership, or purchase of firearms are surely no "historical analogue" to the OGM law.

All the traditional firearms regulations fell into the same set general of categories: prohibitions and disarmaments based on a failure or refusal to pledge sufficient loyalty or allegiance to the government or simply to force subjugation; laws regulating the militia; prohibitions and disarmaments based on race or ethnicity; age-based restraints; gunpowder storage conditions; public carry restrictions; hunting regulations; regulations on the discharge of firearms; and restrictions on sales designed to enforce the restrictions in the foregoing categories or a handful of blanket firearms prohibitions entirely inconsistent with this Nation's tradition.

### 2.    Loyalty Oath and Allegiance Conditions

While still under British control, citizens who refused "to swear loyalty" to the King were forbidden to possess or use of firearms or ammunition, *Firearms Law and the Second Amendment* (Ex. 2) at 197, and others "suspected of disloyalty" were also

disarmed, *id.* The Crown further ordered general confiscations of the citizenry's arms in an effort to subjugate the populace. *Id.* at 175. These actions, effected by force when met with resistance, are what set off the American Revolution. *Id.*; *How the British Gun Control Program Precipitated the American Revolution*, Charleston L. Rev., Vol. 6, No. 2, David B. Kopel (2012) (Ex. 6) at 285. The British sought to "take[] away" the "Arms of all the People" to prevent any "rebellions" against them. *Id.* at 324. This old world order was "anathema to the Second Amendment" and "what Americans fought a war to ensure could never happen again in America." *Id.*

Laws "which attempt to disarm people who have proven themselves to be a particular threat to public safety" are one thing, but "laws which aim to disarm the public at large are precisely what turned a political argument into the American Revolution." *How the British Gun Control Program Precipitated the American Revolution* (Ex. 6) at 327. All such prohibitions and disarmaments are clearly untenable under *Heller*—not to mention the Fourth Amendment's guarantees against unreasonable search and seizure—and thus necessarily were not "incorporated into the Second Amendment's scope." *Bruen*, 142 S.Ct. at 2140, n. 10.

And, no such regulations could bear any "analogical" relation to the purchase prohibitions of the OGM law imposed against California's law-abiding citizens today.

### 3. Militia Laws

The general aim of the militia regulations was to ensure *compliance* with *mandates* of firearm ownership, possession, and use by all members of the free citizenry. *Firearms Law and the Second Amendment* (Ex. 2) at 177-188 (cataloguing laws mandating such firearms ownership, possession, and use throughout the Colonial and Founding eras, which included the "community service" duties to join the "hue and cry" in pursuing fleeing criminals, "watch and ward" for the general safety of towns and villages, and partake in the *posse comitatus* as called upon to assist with "keeping the peace"). These regulations enabled the government to "keep track of who had firearms"—at least for persons in the militia—and required the free citizens "to

report for a muster," *A Well Regulated Right* (Ex. 1) at 505, but it is clear that they were designed to ensure compliance with the general duties because the failure to do so called for "stiff penalties," *id.*, *Colonial Firearms Regulation* (Ex. 3) at 6 (citing Colonial statutes establishing "fines for failure to appear with guns at church or militia musters" as was generally required). And, anyway, regulations designed to *ensure* the free citizenry *was armed* clearly can't serve as any sort of analogue justifying the purchase prohibitions of the OGM law.

### 4. Race and Ethnicity Based Prohibitions

Broad firearm prohibitions were imposed against Blacks, Indians, "foreigners," and other immigrants throughout the Colonial and Founding eras. *Firearms Law and the Second Amendment* (Ex. 2) at 194 (e.g., "[N]o negro or other slave, within this province, shall be permitted to carry any gun or any other offensive Weapon, from off their master's Land, without licence from their said Master."); *id.* at 216 ("Most colonies, North Carolina included, saw nothing wrong with enslaving an Indian taken captive in a justified Indian war."); *Colonial Firearms Regulation* (Ex. 3) at 17 (Indians and Blacks were "not trusted" to be "loyal" citizens); Spitzer, Robert, J. *Gun Law History in the United States* (2017) (Ex. 7) at 72 ("Early gun laws aimed at preventing felons, foreigners, or others deemed dangerous from owning firearms focused on Native Americans"); *id.* ("By the early 1900s, as anti-immigrant sentiment spread, many states enacted laws aimed at keeping guns from non-citizens…").

The racism and prejudice that spurred these prohibitions and the many other laws oppressing the basic human rights of these individuals—long since deemed antithetical to the Constitution and surely not "incorporated into the Second Amendment's scope," *Bruen*, 142 S.Ct. at 2140 n. 10—certainly cannot represent a legitimate American "tradition" for any purposes under the *Bruen* framework.

### 5. Age-Based Restrictions

Age-based restrictions arose in some states in the late 1800s and early 1900s. *Gun Law History in the United States* (Ex. 7) at 76. As a general matter, firearm rights

prohibitions based on age are constitutionally suspect when applied to young adults 18 to 20 years old, *see Hirschfeld v. BATFE*, 5 F.4th 407, 421 (4th Cir. 2021), *vacated on mootness grounds*, 14 F.4th 322, 328 (4th Cir. 2021) ("Our nation's most cherished constitutional rights vest no later than 18. And the Second Amendment's right to keep and bear arms is no different."). In any event, any such regulations based solely on a person's *age* can bear no "relevant similarity" to the purchase prohibitions of the OGM law which are based on the frequency of otherwise lawful purchases of firearms.

### 6. Gunpowder Storage

Many laws regulated the storage and transport of gun powder in the 18th century, *A Well Regulated Right* (Ex. 1) at 506, given the inherent risks posed by the use of "loose gun powder" in early firearms, *Gun Law History in the United States* (Ex. 7) at 74. But again, such regulations are in no way analogous to the very different purchase prohibitions imposed by the OGM law.

### 7. Hunting Regulations

Hunting regulations during the 17th and 18th centuries established hunting seasons, licensing schemes, and protections for particular wildlife, mainly aimed at those who hunted certain game "on private lands or in preserves" or who employed dangerous methods of hunting, like setting fires to draw out and trap their prey. *Gun Law History in the United States* (Ex. 7) at 73-74; *Colonial Firearms Regulation* (Ex. 3) at 17. This is nothing on the order of the purchase prohibitions at issue here.

### 8. Firearm Discharge

Laws regulating the discharge of firearms were on the books of some states during the Colonial and Founding Eras, but mainly to prohibit indiscriminate shooting that posed unnecessary risks or that could spark unnecessary alarm to the public. *Firearms Law and the Second Amendment* (Ex. 1) at 193 ("firearms were the leading tool for rapid communication" to warn of approaching dangers, so "[i]nappropriate gunfire could raise a false alarm"); *id.* at 194 (citing a Pennsylvania law that prohibited shooting "wantonly, and without reasonable occasion"); *Gun Law History in the*

1   *United States* (Ex. 7) at 63 (states "criminalize[d] the threatening use" of firearms). By

2   stark contrast, the OGM law targets *law-abiding* citizens to prohibit them from

3   exercising the very distinct right of *lawfully acquiring* a firearm for *lawful* purposes.

### 9.   Public Carry Restrictions

5   The *Bruen* opinion exhaustively describes the history of regulations on the

public carrying of firearms, illustrating why no historical analogue exists that would

justify the sort of "special need" condition of New York's "may-issue" licensing

scheme and that law-abiding citizens cannot be subject to such a restriction. Indeed,

the *valid* historical regulations were only aimed at "bearing arms to terrorize the

people," *Bruen*, 142 S.Ct. at 2143, and blanket prohibitions on carrying or bearing

firearms without any requirement of criminal or wrongful intent were unconstitutional,

*id.* at 2140, n. 10; *id.* at 2141, 2145, 2146, 2148, 2148-49 (rejecting New York's

attempt to analogize to carry restrictions that only applied to those who carried with an

evil, violent, or other nefarious purpose, and did not prohibit public carry *per se*).

15   Not only does California's OGM law blanketly impose purchase prohibitions

against *law-abiding* citizens never shown to pose any danger to the public, but again,

they are more severe than "*may*-issue" licensing schemes like New York's because the

OGM prohibitions are absolute with no room for any discretionary relief.

### 10.   Sales Regulations

20   As for any regulations on the sale or purchase of firearms during the relevant

period, these were also limited to laws that cannot justify the prohibitions of the OGM

law. They fall into two categories: a handful of late 18th to early 19th century laws

prohibiting the sale of "dangerous" weapons; and a handful of late 19th century laws

flatly banning the sale or exchange of firearms. The prohibitions against "dangerous"

weapons were tied up with *blanket* bans on the use, possession, and concealed carry of

"dangerous" weapons, which were ultimately aimed at "the complete prohibition of

this class of weapon." *A Well Regulated Right* (Ex. 1) at 505, 513-14. They had little

to no exceptions for self-defense and they defined "dangerous weapon" to include any

"pistol." *Id.* at 513-515. As *Bruen* just reaffirmed, all arms in "'common use' for self-defense today," which indisputably include *handguns*, are protected under the Second Amendment—and such common arms cannot be both dangerous *and* unusual. So, any historical regulations designed to ban such arms as "dangerous" can "provide no justification" for imposing prohibitions against arms "unquestionably in common use today," *Bruen*, 142 S.Ct. at 2143, and such practices in a mere handful of states cannot establish any "American tradition" anyway, *id.* at 2156.[5]

As for "categorical bans that criminalized the sale or exchange of firearms," again, only "[a] handful of laws" did so, and all were enacted *after* ratification of the Fourteenth Amendment in 1868. *Gun Law History in the United States* (Ex. 7) at 62 (citing such laws enacted in five states between 1869 and 1901). A handful of laws enacted late in the game *totally banning* any sale or exchange of firearms is clearly beyond the constitutional pale. *Teixeira*, 873 F.3d at 693 (Tallman, J., concurring and dissenting in part) ("All would agree that a complete ban on the sale of firearms and ammunition would be unconstitutional."); *Bruen*, 142 S.Ct. at 2163 (Barrett, J., concurring) (quoting *Espinoza v. Montana Dept. of Revenue*, 591 U.S. ___, 140 S.Ct. 2246, 2258–59 (2020) ("a practice that 'arose in the second half of the 19th century ... cannot by itself establish an early American tradition'").[6]

---

[5]    Spitzer cites a handful of other laws "restricting or barring certain dangerous or unusual weapons," which included "pistols." *Gun Law History in the United States* (Ex. 7) at 67. Not only are these laws *against* the recognized the traditions of this Nation's firearm regulations, as shown, but they were all enacted in the early-to-mid-*20th* century, *id.*, rendering of them no significance. *See Bruen*, 142 S.Ct. 2163.

[6]    Spitzer references another small group of state laws that "regulated, *barred*, or licensed firearm sales," but goes on to describe them as simply requiring licenses for gun dealers, permits and/or registration for purchasers, and prohibiting the "public display" of firearms for sale, without any indication that any of them *barred* commercial sales in any way. *Gun Law History in the United States*, Ex. 7 at 75 (italics added). In any event, all these laws (which amount only eight in total) came far too late in time, as they span between 1902 and 1925. *See Bruen*, 142 S.Ct. 2163.

Once again then, nothing in this category of historical regulations in any way supports the purchase prohibitions that California imposes against law-abiding citizens under the OGM law. There is certainly no "well-established and representative" *tradition* of prohibiting such individuals from purchasing more than one firearm—of *any* type, much less of the *most popular* types—within 30 days. Nothing in the record reveals "a comparable burden on the right of armed self-defense" at any time during the relevant history. *Id.* at 2132. Rather, the entire body of such evidence weighs *heavily against* the existence of any tradition of frequency-of-purchase-over-time or purchase quantity limitations, since the prevailing norms and practices throughout all pertinent time periods actively permitted, promoted, and often *required* ready access to firearms without any restrictions on the frequency or quantity of purchases.

## C. Defendants Cannot Avoid the Inevitable by Claiming the OGM Law Enjoys Any Sort of "Longstanding" or "Presumptively Lawful" Status

For the same essential reasons, Defendants cannot hope to claim that the OGM law constitutes a "longstanding" "presumptively lawful" regulatory measure so as to somehow place the law beyond the reach of the Second Amendment's protection. Notably, the New York law *struck down* in *Bruen* had been on the books since 1905, *Bruen*, 142 S.Ct. at 2122—which is far more "longstanding" than any of the OGM laws out there, particularly California's, which wasn't enacted until the year 2000. And the New York law was clearly not treated as "*presumptively* lawful"—if it were, the burden would have been *reversed*, with the challengers bearing the burden to show the law was unconstitutional in order to overcome the presumption. Instead, *Bruen* emphatically compelled New York to justify its regulation of the protected conduct. That was surely *because* the law stood against the established traditions of this Nation.

So it is here with the purchase prohibitions of the OGM law. It is no answer to simply say the prohibitions constitute "conditions and qualifications on the commercial sale of arms." *See Heller*, 554 U.S. at 626-27. Indeed, "the Supreme Court in *Heller* could not have meant that anything that *could* be *characterized* as a condition and

qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny." *Pena*, 898 F.3d at 1007 (Bybee, J., concurring and dissenting). "Take, for example, a law saying that a condition for the commercial sale of firearms is that sales may take place only between 11 p.m. and midnight, on Tuesdays. Or a law imposing a $1,000,000 point-of-sale tax on the purchase of firearms for self-defense." *Id.* at 1007-08. "Even though these restrictions can be characterized as 'conditions and qualifications on the commercial sale of arms,' we would have to find such restrictions inconsistent with the 'scope of the Second Amendment.'" *Id.* at 1008. "After *Heller*, it seems clear that challenges to these laws would easily overcome any presumption of lawfulness." *Id.* The "scope of the Second Amendment" undoubtedly includes the arms and conduct targeted by the OGM law—again, that is *undisputed* in this case—and, as all the relevant evidence shows, its prohibitions are "inconsistent" with the protections of the Amendment as clearly reflected throughout the history of this Nation's laws, customs, and practices designed to *maximize* access to arms for law-abiding people without any frequency or quantity limitations.

In no event may the OGM law be shrouded with a presumption of lawfulness to subvert the *Bruen* framework, which is specifically designed to ferret out modern-day gun laws divorced from the regulations within the scope of the Second Amendment. Even *assuming* Defendants could claim such a presumption, it is sharply rebutted for all the same reasons that the law fails under *Bruen*. *See Pena*, 898 F.3d at 1006 (Bybee, J., concurring and dissenting) (quoting *Heller,* 670 F.3d at 1253 ("A plaintiff may rebut the presumption of validity by showing that the regulation at issue has 'more than a de minimis effect upon his right.'").

## V.    Plaintiffs are Entitled to Judgment on the Equal Protection Claim Too

Not much else need be said about the equal protection claim, except that the OGM law's abject failure under the *Bruen* framework underscores that it indeed "impermissibly interferes with the exercise of a fundamental right," subjecting it to strict scrutiny. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976).

Defendants haven't even attempted to claim the law would survive such scrutiny. They just seek refuge under the "rational basis" standard—the lowest conceivably applicable form of scrutiny—for their special exemption classifications. It bears emphasis that the only argument Defendants have made in support of jettisoning strict scrutiny for rational basis is that the "Individual Plaintiffs are not similarly situated to a group exempt from California's OGM law." DMSJ at 20. But their own justification for these exemption classifications—that "many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale," Def. MSJ, Ex. 19 ¶ 24—defeats this argument, because it's undisputed that the Individual Plaintiffs are *law-abiding* citizens, who therefore *similarly* have not "been involved in the criminal misuse of firearms purchased as part of a multiple sale."

And the same self-defeating argument sinks the whole case for Defendants on this clam: because countless *non*-exempted individuals and groups "rarely, if ever," have been involved in such criminal misconduct, the classifications the State has drawn here are so "arbitrary or irrational" as to defeat the law even under "rational basis" scrutiny. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 446 (1985). Defendants' own defense of the law shows there is no demonstrated "relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Therefore, summary judgment for Plaintiffs must follow here too.

## VI.   Conclusion

For these reasons, Plaintiffs respectfully request this Court grant their motion for summary judgment and deny Defendants' cross-motion for summary judgment.

Dated:  September 16, 2022                    The DiGuiseppe Law Firm, P.C.


By   /s/ *Raymond M. DiGuiseppe*
Raymond M. DiGuiseppe
Attorneys for Plaintiffs