Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE NGUYEN, et al, <br><br> Plaintiffs, <br><br> vs. <br><br> ROB BONTA, Attorney General of California, et al, <br><br> Defendants. | Case No. 3:20-cv-02470-WQH-MDD <br><br> PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF CONCERNING CROSS-MOTIONS FOR SUMMARY JUDGMENT <br><br> Judge: Hon. William Q. Hayes <br> Courtroom: 14B |

**Table of Contents**

I.    Introduction………………………………………………………………………..1
II.   The Second Amendment Plainly Covers the Conduct at Issue……………...1
III.  Defendants Cannot Claim Any "Presumptively Lawful" Status Here……..4
IV.   Defendants Could Not Carry Their Burden Even If They Tried……………8
V.    Conclusion…………………………………………………………………………10

**Table of Authorities**

*Cases*

*Andrews v. State*, 50 Tenn. 165 (1871)……………………………………………...4
*Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010)……………………..3
*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………………………*passim*
*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021)………………………...2
*Ezell v. City of Chicago*, 651 F.3d 684 (9th Cir. 2011)……………………………..2, 4
*Fouts v. Bonta*, 561 F.Supp.3d 941 (S.D. Cal. 2021)…………………………………..6
*Frein v. Penn. State Police*, 47 F.4th 247 (3d Cir. 2022)………………………...2, 7, 8
*Illinois Association of Firearm Retailers v. City of Chicago*, 961 F. Supp.2d 928 (N.D. Ill. 2014)…………………………………………………………………………………..2
*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)…………..2
*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)…………………………………………..7
*Luis v. United States*, 136 S.Ct. 1083 (2016)…………………………………………..2
*Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018)…………………………………...6, 7
*McDonald v. City of Chicago*, 561 U.S. 742 (2010)…………………………………..1
*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003)……………………………………….4
*Minneapolis Star & Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575 (1983)…………………………………………………………………..3
*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)……………………………………10
*Moran v. State of Wash.*, 147 F.3d 839 (9th Cir. 1998)………………………………..3

# Table of Authorities

*Cases*

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
142 S.Ct. 2111, 2126 (2022)……………………………………………………..*passim*
*Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730 (2017)…………………...4
*Renna v. Becerra*, 535 F.Supp.3d 931 (S.D. Cal. 2021)………………………………..7
*Roman Catholic Diocese of Brooklyn v. Cuomo*, ___ U.S. ___, 141 S. Ct. 63 (2020)….8
*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)……………...1, 2, 3, 4, 5
*Thunder Studios v. Kazal*, 13 F.4th 736 (9th Cir. 2021)………………………………..3
*Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016)………...6
*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)………………………………...6
*United States v. Hill*, 2022 WL 4361917 (S.D. Cal. 2022)……………….…………2, 6, 7
*U.S. v. Quiroz*, __ F.Supp.3d__, 2022 WL 4352482 (W.D. Texas 2022)…………..3, 7
*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010)……………………………...7
*Yukutake v. Conners*, 554 F.Supp.3d 1074 (D. Hawaii 2021)………………………5, 6

*United States Constitution*

First Amendment………………………………………………………………………3, 8
Second Amendment……………………………………………………………..*passim*

*Statutes*

18 U.S.C § 922……………………………………………………………………….3, 7

*Other Resources*

Joseph G.S. Greenlee, The Historical Justification For Prohibiting Dangerous Persons From Possessing Arms, 20 WYO. L. REV. 249 (2020)……………………………….7
https://www.merriam-webster.com/dictionary/cover……......................................3

## I. Introduction

The proper disposition of these cross-motions is now clear: Defendants have not only failed to carry their burden to demonstrate the OGM law is in any way consistent with this Nation's historical tradition of firearm regulation, but they have actively *refused* to do so despite being granted *another* chance with this briefing. Having elected to abandon their obligation in favor of a tortured constitutional analysis disingenuously shifting the burden on Plaintiffs, they should be precluded from introducing any evidence on this issue now, and the Court should enter judgment in Plaintiffs' favor.

## II. The Second Amendment Plainly Covers the Conduct at Issue

Again, the test is a simple one: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022). Then, the government must "justify its regulation" of the conduct. *Id.* To carry this burden, it is not enough to "simply posit that the regulation promotes an important interest." *Id.* "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Supreme Court's opinions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) held that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen* at 2126. And *Bruen* held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. These cases also all make clear that "'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Id.* 2132 (quoting *Heller* at 582).

And, well before *Bruen*, the federal courts, including the Ninth Circuit, recognized that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Constitutional rights "implicitly protect

those closely related acts necessary to their exercise." *Luis v. United States*, 136 S.Ct. 1083, 1097 (2016) (Thomas, J., concurring). Thus, the right to keep and bear arms "'implies a corresponding right to obtain the bullets necessary to use them,'" *id.* (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)), as well as the ability to engage in "the training and practice that make it effective," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011). And, even more fundamentally, the Second Amendment necessarily must secure the right to *acquire* constitutionally protected arms in the first instance: "The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." *Teixeira* at 677; *accord Illinois Association of Firearm Retailers v. City of Chicago*, 961 F. Supp.2d 928, 930 (N.D. Ill. 2014) ("This right must also include the right to *acquire* a firearm."); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (the right 'implies a corresponding right to acquire and maintain proficiency' with common weapons") (quoting *Ezell* at 704). This is also why "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms" *today*, *Bruen*, 142 S.Ct. at 2132, why the definition of "arms" "covers modern instruments that facilitate armed self-defense," *id.*, and why the "right to keep and bear arms" covers "'the right to possess and carry weapons in case of confrontation,'" *id.* at 2134 (quoting *Heller*, 554 U.S. at 2134), even though it does not *expressly* say so.

In fact, as the Third Circuit just recently recognized in *Frein v. Penn. State Police*, 47 F.4th 247 (3d Cir. Aug. 30, 2022), the right to "keep… Arms" by itself makes clear that "aside from a few exceptions, the government may not prevent citizens from buying and owning guns." *Id.* at 254. "Likewise, the Second Amendment prevents the government from *hindering* citizens' ability to 'keep' their guns." *Id.* (italics added). Defendants nevertheless distort the settled precedents and *Bruen* by parsing the text of the Second Amendment for an *express* statement that the scope *specifically* includes a right to "purchas[e] more than one handgun or one semiautomatic centerfire rifle from a licensed firearms dealer within a thirty-day period," not just the right to

*acquire* firearms. DSB at 7. The United States government recently tried a similar ploy in *U.S. v. Quiroz*, __ F.Supp.3d__, 2022 WL 4352482 at *3 (W.D. Texas 2022) (appealed filed September 21, 2022), in arguing that the prohibition under 18 U.S.C § 922(n)—barring anyone under a felony indictment from "receiv[ing]" firearm or ammunition shipped or transported in commerce—fell outside the scope of the Second Amendment's protection because the text doesn't *expressly* include "buying a gun *while under felony indictment*." *Id.* at * 3. But, as the court emphasized, *Bruen's* test "requires only that 'the Second Amendment's plain text cover the conduct.'" *Id.* "And the prohibited conduct under § 922(n) is 'receipt' of a firearm—nothing more," which *is* covered. Thus, the government could not avoid its burden to *prove* that the regulation was "consistent with the Nation's historical tradition of firearm regulation." *Id.* at *4.

Similarly, Defendants cannot demand that the Second Amendment *expressly* declare a right to purchase multiple arms within a 30-day period. When it comes to the First Amendment right of "free speech," to which the Supreme Court has "repeatedly compared the right to keep and bear arms," *Bruen*, 142 S.Ct. at 2130, we would never require as a condition to protection that the First Amendment *expressly* enumerate each of the numerous forms of speech or each of the numerous forms of media and platforms through which people commonly exercise their expressive rights. *See Minneapolis Star & Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 592-93 (1983) (holding that a tax on paper and ink used by newspapers violated the First Amendment). Generally, to "cover" means "to have sufficient scope to include or take into account" or "to afford protection or security to." https://www.merriam-webster.com/dictionary/cover. Thus, the First Amendment's text has been interpreted to *cover* numerous forms and means of expression not literally spelled out in the text. *See Thunder Studios v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021) ("emails and tweets"); *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 393 (2010) ("core political speech"); *Moran v. State of Wash.*, 147 F.3d 839, 848 (9th Cir. 1998) (speech "related to a matter of public concern"); *Teixeira*, 873 F.3d at 688-69 (expression of views

"through the distribution of written material"); *Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730, 1735 (2017) (the "exchange of views" in "cyberspace" and "the vast democratic forums of the Internet"). So it is with the Second Amendment and the many sticks within the bundle of rights necessarily implicit and ancillary to the express right to "keep and bear arms." The scope of this protection *plainly* covers the conduct at issue, which is simply the right to *lawfully acquire constitutionally protected arms*.

Such conduct—including the *commercial* acquisition of arms—has long been recognized as *covered* by the Second Amendment's text. *Teixeria*, 873 F.3d at 687 ("firearms commerce plays an essential role today in the realization of the individual right to possess firearms recognized in *Heller*"); *id.* at 677 (quoting *Ezell*, 651 F.3d at 704 (the "core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms"); *id.* at 678 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871) (italics added) ("'[t]he right to keep arms, necessarily involves *the right to purchase them*, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair'"). Certainly, nothing about *Bruen*—which generally raised the bar to ensure *greater* protection for rights too often left to languish under all-too-lenient forms of "interest-balancing"—"effectively overruled" or is "clearly irreconcilable with" any of these circuit court precedents recognizing this scope of protection. *Miller v. Gammie*, 335 F.3d 889, 890, 893 (9th Cir. 2003) (explaining that lower courts are otherwise bound to follow Ninth Circuit precedent). The plain text "covers" the conduct at issue, meaning Defendants must *justify* it with the required historical showing.

### III. Defendants Cannot Claim Any "Presumptively Lawful" Status Here

Yet, Defendants invoke another burden-avoidance artifice to argue that *Plaintiffs* must marshal evidence to rebut the "presumptively lawful" nature of the OGM law. DSB at 9-11. This argument rests on the thin reed that the OGM law is entirely *exempt* from the scope of the Second Amendment because it can be viewed in the abstract as "imposing conditions and qualifications on the commercial sale of arms" within the

meaning of the "longstanding prohibitions" on which the Supreme Court's jurisprudence has not "cast doubt." *Id.* at 9 (citing *Heller*, 554 U.S. at 626-27, & n. 26; *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring). And Defendants make the reed even thinner by shaving off the "longstanding" requirement: they claim that the Court's inclusion of laws against "the possession of firearms by felons and the mentally ill" within this category means there needn't be any founding-era analogue for OGM laws either because the modern-day statutes restricting the rights of such individuals "were not enacted until the 1960s." DSB at 9, n. 7. Then, they couple this argument with the notion that the OGM law imposes only a "de minimis" burden on the Second Amendment right, which Plaintiffs cannot rebut because there's no limitation on the total number of firearms they can purchase, only how often they can purchase them, and they can acquire firearms through other means like private sales. DSB at 11.

Notably, even though the case authority on this point is exactly the same as it was pre-*Bruen*, this is the first time Defendants have actually made such an argument.[1] Defendants' late game play here falls just as flat now as it would have before *Bruen*.

"The Ninth Circuit has held the phrase 'conditions and qualifications on the commercial sale of arms' 'sufficiently opaque' to prohibit reliance on it alone, instead opting to conduct a 'full textual and historical review' of the scope of the Second Amendment." *Yukutake v. Conners*, 554 F.Supp.3d 1074, 1082 (D. Hawaii 2021) (quoting *Teixeira*, 873 F.3d at 683). And even *early* 20th century regulations do not suffice to claim "presumptively lawful" status—much less the handful of *late* 20th century laws on which Defendants rely in claiming this status here. Rather, the government must show the law is "sufficiently similar to historical regulations to demonstrate that the law's restrictions accord with historical understanding of the

---

[1] Defendants only *hinted at* this as a possibility, footnoting assertions like the OGM law "could be considered" or is "arguably" a "presumptively lawful" condition on commercial sales, with no claim that it *is*. DMSJ 11, n. 10 (Dkt. No. 29); Def. Opp. to PMSJ 1-2, n. 1 (Dkt. No. 33); Def. Reply to Ptlf. Opp. to DMSJ 1 (Dkt. No. 36).

scope of the Second Amendment right." *Yukutake* at 1087; *see id.* at 1082 ("a handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a 'longstanding' historical tradition of 'presumptively lawful' firearm prohibitions"); *Mance v. Sessions*, 896 F.3d 699, 713-14 (5th Cir. 2018) (rejecting the government's reliance on laws from 15 states enacted between 1909 and 1939 as demonstrating "presumptively lawful" status for the challenged regulation, because it offered no evidence the regulation had "a founding-era analogue or was historically understood to be within the ambit of the permissible regulation of commercial sales of firearms at the time the Bill of Rights was ratified").

Indeed, "treat[ing] *Heller's* listing of 'presumptively lawful regulatory measures,' for all practical purposes, as a kind of 'safe harbor,'" as some courts have done, "'approximates rational-basis review, which has been rejected by *Heller*.'" *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 686 (6th Cir. 2016) (quoting *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010)). Thus, *Heller* clearly "did not invite courts onto an analytical off-ramp to avoid constitutional analysis" or insulate firearms regulations from constitutional scrutiny. *Id.* at 686-87. Even if a firearms regulation could be considered "longstanding" in this sense, "[w]hy should a longstanding regulation be kept permanently beyond the reach of constitutional review?" *See Fouts v. Bonta*, 561 F.Supp.3d 941, 948 (S.D. Cal. 2021); *Fonts v. Bonta*, 2022 WL 4477732 (9th Cir. Sept. 22, 2022) (vacated and remanded for further proceedings consistent with *Bruen*). "A presumptively lawful firearm restriction may, upon further analysis, actually be at odds with the Second Amendment." *Id.* An invalid restriction may have eluded any viable challenge in the past simply because the Second Amendment wasn't recognized as securing an *individual* right until the *Heller* decision in 2008, which was necessary to confer Article III standing. *Id.* at 948-49.

Moreover, any presumptively lawful status that might be established for "the possession of firearms by felons and the mentally ill" could not help Defendants here. *Those* laws do find truly historical roots: "'Felons are often, and historically have been,

explicitly prohibited from militia duty."' *United States v. Hill*, 2022 WL 4361917, *2 (S.D. Cal. 2022) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010)); *see also* Joseph G.S. Greenlee, The Historical Justification For Prohibiting Dangerous Persons From Possessing Arms, 20 WYO. L. REV. 249 (2020). Indeed, "'founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety.'" *Hill* at *3 (quoting *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting); *Mance*, 896 F.3d at 714 ("there are indications that in the founding era, it was generally thought that felons and the mentally ill should and could be prohibited from bearing arms"); *see also Quiroz*, 2022 WL 4352482 at *13 ("the Court's historical survey finds little evidence that § 922(n)—which prohibits those under felony indictment from obtaining a firearm—aligns with this Nation's historical tradition," highlighting that each regulation must be individually justified).

What's more, for any presumption of lawfulness that *might* arise, Defendants concede that "a plaintiff may rebut a presumptively lawful regulation on the commercial sales of firearms 'by showing that the regulation [has] more than a de minimis effect upon his [Second Amendment] right.'" DSB 10 (quoting *Renna v. Becerra*, 535 F.Supp.3d 931, 940 (S.D. Cal. 2021)). Their only argument around this is to claim that "Plaintiffs cannot and have not rebutted the (false) presumption" of lawfulness because the other options for firearms acquisition that the State has *not* foreclosed (yet) render the impact of the OGM law "de minimis." DSB at 11.

It has never been the case that the government can defend a restriction on the exercise of constitutional rights by pointing to the existence of *other* channels through which the same rights might alternatively be exercised. Rather, it is the government's burden to *justify* cutting off the channel it has foreclosed. *Bruen*, 142 S.Ct. 2130 (the Court has long enforced the general rule that "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions"); *see also Frein*, 47 F.4th at 256 (rejecting the government's argument that "seizures do not burden Second Amendment rights as long as citizens can 'retain[ ] or acquir[e] other

firearms"'); *id.* ("We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere.").

"With other constitutional rights, we scrutinize not only total bans but also lesser restrictions and burdens." *Frein*, 47 F.4th at 254. "Even if the government has not entirely prevented citizens from speaking or worshipping, its burdens on speech and worship may violate the First Amendment." *Id.* "Thus, we may be skeptical of public-health rules that cap how many people may physically attend church, even if the rules do not ban them from worshipping." *Id.* (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, ___ U.S. ___, 141 S. Ct. 63, 68 (2020)). We may, and should, be similarly skeptical of this OGM law, even if it does not *entirely* ban firearm acquisitions. Indeed, it does impose a 30-day *purchase ban* against law-abiding citizens. Even *assuming* a purchase ban of *some* length is constitutionally permissible and even considering *their own* policy judgments in support of the OGM law, Defendants have not even attempted to justify a 30-day ban *at all*. Rather, they have conceded that there is no evidence "to show that a five-day or a seven-day or a ten-day is not alone as effective as a 30-day" limitation in meeting the claimed justifications behind California's OGM law. SOMF ¶69. In no event can Defendants claim "presumptively lawful" status for this law and any presumption that could possibly arise evaporates in the face of this reality.

## IV. Defendants Could Not Carry Their Burden Even If They Tried

Defendants go on to say, "[i]f the Court were to conclude that the text of the Second Amendment covers the OGM law and that the law is not a presumptively lawful condition on commercial sale, California would still be able to defend its law by showing that it is 'consistent with the Nation's historical tradition of firearm regulation.' *Bruen*, 142 S. Ct. at 2130." DSB at 12. However, "this would require additional expert discovery directed at *Bruen*'s text-and-history standard as well as supplemental briefing discussing the results of that discovery." *Id.* And, Defendants lament, this "can be a challenging and time-consuming process." *Id.* at 14. In other

words, Defendants have not produced *any* evidence at all over the three-month period since the Court issued its order for the parties to provide supplemental briefing *and* any additional evidence they may wish to be considered as pertinent. Instead, Defendants merely suggest they *could* possibly develop "a historical record" but only with a *further* order from this Court directing them to take such action. But they can't have their cake and eat it too—*refusing* to "perform the historical analysis called for by *Bruen*" and then expecting the Court to find in their favor by granting their motion or holding the matter open for some indefinite period of time while Defendants *then* do their work.

Again, Plaintiffs have *no* burden to produce evidence *negating* the existence of a "relevantly similar" regulation, i.e., a "well-established and representative historical *analogue*" for the OGM law. *Bruen*, 142 S.Ct. at 2132-33. Nevertheless, even before *Bruen*, they developed voluminous evidence showing the absence of any relevantly similar historical analogue to the OGM law and, in connection with this supplemental briefing, they have supplied even more materials illustrating that Defendants could not carry this burden to affirmatively justify the OGM law even if they tried. As Defendants themselves have conceded, the first OGM law was not enacted until 1975. DMSJ-Reply 2; *see* R-SOMF ¶¶ 10, 11, 13-23. Such regulations are distinctly of the modern age, well beyond the relevant historical period, the scope of which the Supreme Court has "generally assumed" is pegged to the time period of the Bill of Rights' adoption in 1791. *Bruen* at 2137. Even historical evidence from the late 19th and 20th centuries is of little to no relevance when it contradicts either the plain text of the Second Amendment or any earlier evidence, *id.* at 2135, n. 28, 2137—to say nothing of the *21st* century, when the sort of regulations at issue here first surfaced.

Moreover, *Bruen* made clear that regardless of its provenance along the historical timeline, even if a regulation may otherwise be "relevantly similar" for all intents and purposes, it cannot justify the challenged regulation when it is an "outlier" or an exception to the contemporaneously prevailing traditions, *see Bruen*, 142 S.Ct. at 2142, 2144, 2147, n. 22, 2153, 2154, 2155 (disregarding regulations from various

periods based on their "outlier" status in contravening the prevailing traditions), like OGM laws, which find counterparts in only a miniscule number of states.

### V. Conclusion

At bottom, this case presents an entirely legal question: Has the State demonstrated that the challenged OGM regulation is consistent with this Nation's historical tradition of firearm regulation? The answer, of course, is no. And to confirm that answer, the Court need only consult "legislative facts," "which is to say facts that bear on the justification for legislation, as distinct from" adjudicative facts, which are facts "concerning the conduct of parties in a particular case." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). "Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the [challenged] gun law." *Id*. And *Bruen* itself rebuts Defendants' claims about the purported need for extensive discovery or expert evidence, because it was decided entirely on judicially noticeable (legislative) facts on a *motion-to-dismiss* record. So too was *Heller*. Indeed, Defendants have elected to pursue a litigation strategy of delay, obfuscation, and burden-shifting *because* they cannot provide a historical record to justify their OGM law under *Bruen*. Such historical evidence simply does not exist, and no amount of discovery or expert testimony can change that fact.[2]

This Court has before it all relevant evidence needed to decide the case. Based on the Second Amendment's text and history, Plaintiffs must prevail.

Dated: October 10, 2022                 The DiGuiseppe Law Firm, P.C.
                                        By */s/ Raymond M. DiGuiseppe*
                                        Raymond M. DiGuiseppe

---

[2] To any extent that Defendants are afforded further opportunities to introduce additional evidence or arguments in efforts to carry the burden they have so far failed to carry, Plaintiffs must be afforded the opportunity to rebut them.