1   ROB BONTA
    Attorney General of California
2   ANTHONY R. HAKL
    Supervising Deputy Attorney General
3   JERRY T. YEN
    Deputy Attorney General
4   State Bar No. 247988
      1300 I Street, Suite 125
5     P.O. Box 944255
      Sacramento, CA 94244-2550
6     Telephone:  (916) 210-7836
      Fax:  (916) 324-8835
7     E-mail:  Jerry.Yen@doj.ca.gov
    *Attorneys for Rob Bonta, in his official*
8   *capacity as California Attorney General, and*
    *Allison Mendoza, in her official capacity as*
9   *Director of the Department of Justice Bureau*
    *of Firearms*
10
                  IN THE UNITED STATES DISTRICT COURT
11
                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA
12

13

14

15  | **MICHELLE NGUYEN, et al.,** | Case No. 3:20-cv-02470-WQH-MMP |
16  |                              |                                |

**MICHELLE NGUYEN, et al.,**

                                        Plaintiffs,

              v.

**ROB BONTA, in his official capacity
as Attorney General of California, et
al.,**

                                        Defendants.

Case No. 3:20-cv-02470-WQH-MMP

**DECLARATION OF JERRY T.
YEN IN SUPPORT OF
DEFENDANTS' *DAUBERT*
MOTION TO PRECLUDE
TESTIMONY OF GEORGE A.
MOCSARY**

Date:         To be set by the Court
Judge:        Hon. William Q. Hayes
Courtroom:    14B
Action Filed: Dec. 18, 2020

                    **DECLARATION OF JERRY T. YEN**

      I, Jerry T. Yen, declare:

      1.   I am a Deputy Attorney General for the Office of the Attorney General

for the State of California, attorney of record for Defendants in this action.

2.   I am competent to testify to the matters set forth in this declaration, and if called to do so, I would and could so testify.  I make this declaration in support of Defendants' *Daubert* Motion to Preclude Testimony of George A. Mocsary.

3.   On November 19, 2021, Plaintiffs served Defendants with the Declaration of George A. Mocsary.  A true and correct copy of the Declaration of George A. Mocsary, which includes his curriculum vitae as an exhibit, is attached as **Exhibit A**.

4.   On January 17, 2022, Defendants deposed Plaintiffs' expert, George A. Mocsary.  A true and correct copy of relevant excerpts of the Reporter's Transcript of the Deposition of George A. Mocsary is attached as **Exhibit B**.

5.   A true and correct copy of Maryland Gun Violence Act of 1996, ch. 561, 1996 Md. Acts 3139, 3159 (codified as Md. Code Ann., Art. 27, § 442A) and Md. Code Ann., Art. 27, § 442A (1996) are attached as **Exhibit C**.  These documents are public records of the State of Maryland that were accessed on or about March 8, 2022, from HeinOnline (https://home.heinonline.org/).

6.   A true and correct copy of New York City Admin. Code § 10-302.1(b) is attached as **Exhibit D**.  This document is a public record of New York City, New York that was accessed on or about March 8, 2022, from Westlaw (http://www.westlaw.com/).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 15, 2023.

*/s/ Jerry T. Yen*
JERRY T. YEN
Deputy Attorney General

**EXHIBITS**

**TABLE OF CONTENTS**

| Exhibit | Description | Pages |
|---------|-------------|-------|
| Exhibit A | Declaration of George A. Mocsary | 00001-00019 |
| Exhibit B | Deposition Transcript of George A. Mocsary (Excerpts) | 00020-00049 |
| Exhibit C | Maryland Gun Violence Act of 1996, ch. 561, 1996 Md. Acts 3139, 3159 (codified as Md. Code Ann., Art. 27, § 442A) and Md. Code Ann., Art. 27, § 442A (1996) | 00050-00061 |
| Exhibit D | New York City Admin. Code § 10-302.1(b) | 00062-00066 |

Declaration of Jerry T. Yen ISO Defendants' *Daubert* Motion (3:20-cv-02470)

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, an individual; DOMINIC BOGUSKI, an individual; JAY MEDINA, an individual; FRANK COLLETTI, an individual; JOHN PHILLIPS, an individual; PWGG, L.P., a California Limited Partnership; DARIN PRINCE, an individual; NORTH COUNTY SHOOTING CENTER, INC., a California Corporation; FIREARMS POLICY COALITION, INC.; SAN DIEGO COUNTY GUN OWNERS PAC; and SECOND AMENDMENT FOUNDATION,** | Case No. 3:20-cv-02470-WQH-MDD<br><br>**DECLARATION OF GEORGE A. MOCSARY** |
| Plaintiffs, | |
| **v.** | |
| **ROB BONTA, in his official capacity as Attorney General of California; and LUIS LOPEZ, in his official capacity as Director of the Department of Justice Bureau of Firearms,** | |
| Defendants. | |

**DECLARATION OF GEORGE A. MOCSARY**

I, George A. Mocsary, declare as follows:

     1.    I am not a party to the above-captioned action, I am over the age of 18, I have personal knowledge of the facts stated herein, and I am competent to testify as to the matters stated and the opinions rendered below.

     2.    I graduated from the Cooper Union School of Engineering with a bachelor's degree in engineering in 1995. I earned a master's degree in business administration from the University of Rochester in 1997. And I received my Juris

Doctor degree in 2009 from Fordham Law School, where I graduated first in my class and summa cum laude. I served as Notes and Articles Editor of the Fordham Law Review and was the recipient of the Fordham Law Alumni Association Medal in Constitutional Law.

3.      I am currently a Professor of Law at the University of Wyoming College of Law. I previously taught at the Southern Illinois University School of Law as an Associate Professor and at the University of Connecticut School of Law as a Visiting Assistant Professor.

4.      Prior to entering academia, I practiced corporate and bankruptcy law at Cravath, Swaine and Moore in New York. And before that, I clerked for the Honorable Harris L Hartz of the U.S. Court of Appeals for the Tenth Circuit.

5.      I co-authored the first law school textbook on the Second Amendment, entitled *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3d ed. 2021) (with Nicholas J. Johnson, David B. Kopel, E. Gregory Wallace, and Donald Kilmer).

6.      I have also published several scholarly research articles on the right to keep and bear arms, which have been published in the Connecticut Law Review, Duke Law Journal Online, Fordham Law Review, George Mason Law Review, and other journals.

7.      My scholarship has been cited by the Supreme Court of the United States in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court of Illinois, and in several opinions by the U.S. Courts of Appeals.

8.      I taught a course on the Second Amendment at Southern Illinois University School of Law, and will likely teach it again at the University of Wyoming College of Law.

9.      Within the last four years, I have testified as an expert in the following matters: *Miller v. Becerra*, U.S.D.C. Case No. 3:19-cv-01537-BEN-JLB.

1

10.     I provide consultation and research services for Plaintiff Firearms Policy Coalition pursuant to a general retainer agreement under which I am compensated quarterly with a flat fee. The instant matter falls under that agreement and thus I am not receiving any separate or additional compensation for my work in this case.

11.     Attached hereto as **Exhibit 1** is a true and correct copy of my Curriculum Vitae. It describes my education, employment background, career experience, and publications.

12.     My opinions expressed here are formed in light of my scholarship and study of the Second Amendment.

<u>The Second Amendment</u>

13.     The text of the Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  The text neither qualifies the right of ordinary law-abiding citizens to acquire firearms based on their history of prior purchases or acquisitions nor distinguishes between methods or quantities of acquisition.

14.     "*Heller* makes it clear that ["the Second Amendment right to keep and bear arms"] is 'deeply rooted in this Nation's history and tradition.'"[1]

15.     In determining whether the District of Columbia's handgun ban was constitutional, *Heller* looked to eighteenth- and nineteenth-century arms law for guidance.[2]

16.     Because "[f]ew laws in the history of our Nation have come close to the severe restriction" as that of the District's handgun ban, that law had to fall.[3]

17.     *Heller* resolved "*what* types of weapons" the Second Amendment

---

[1] *McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010).

[2] *District of Columbia* v. *Heller,* 554 U. S. 570, 600–03, 605–19, 632–34 (2008).

[3] *Id.* at 629; *see id.* at 632–34 (adding that even a few less restrictive laws than the one at issue were not enough to save the District's extreme one); *McDonald*, 561 U.S. at 786.

2

protects.[4] The right protects arms that are "typically possessed by law-abiding citizens for lawful purposes"[5] because, historically, "the sorts of weapons protected were those 'in common use at the time.'"[6]

18.    Specifically, *Heller* held "that the [District of Columbia's] ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[7] It therefore struck both the District of Columbia's handgun ban and the District's requirement that long guns be unloaded and disassembled or trigger locked.

<u>History and Tradition</u>

19.    The colonists in the first English settlements in America were granted the right to import the items necessary to build arms, without reference to quantity. In 1606, King James I granted Virginia the right to import from Great Britain "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise."[8] The 1620 Charter of New England guaranteed colonists the right "to take, load, carry, and transport in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there."[9]

---

[4] *Heller*, 554 U.S. at 624 (emphasis in original).

[5] *Id.* at 625.

[6] *Id.* at 627 (quoting *Miller*, 307 U.S. at 179).

[7] *Id.* at 635.

[8] 7 Federal and State Constitutions: Colonial Charters and Other Organic Laws of the States, Territories and Colonies Now or Heretofore Forming the United States of America 3787–88 (Francis Thorpe ed., 1909).

[9] 3 *id.* at 1834–35.

Exhibit A
Page 00005

20.   Ordinary Americans could transact in firearms without restriction as to quantity, for personal use or otherwise. As Thomas Jefferson wrote in 1793, "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."[10]

21.   In 1796, Ira Allen traveled to France and purchased from the French Directory (the revolutionary government there) 20,000 muskets and 24 field pieces for Vermont's militia. The arms were seized by the British while shipped to America. Suspected of planning a revolt against the British in Canada, Allen was prosecuted in Britain's Court of Admiralty. At trial, Allen explained that in Vermont, "Government have nothing to fear from its Militia . . . Arms and military stores are free merchandise, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government."[11] The arms were restored to Mr. Allen.[12]

22.   I could find no laws in the founding era limiting the quantity or frequency with which an American might acquire arms. To the contrary, as Ira Allen explained, it appears that the policy of the time embraced private collections of arms.

<u>Jurisdictional Analysis</u>

23.   The first in American law forcing the spacing of gun purchases over time was South Carolina's 1975 law restricting handgun sales to one per person per month. The law was repealed in 2004.[13]

24.   In 1993, Virginia passed a one-handgun-per month law, which was

---

[10] Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904).

[11] Ira Allen, PARTICULARS OF THE CAPTURE OF THE OLIVE BRANCH, LADEN WITH A CARGO OF ARMS 403 (1798).

[12] *Id.*

[13] *See* 2004 S.C. Acts 242.

4

repealed in 2012.[14] The law, with many exemptions, re-appeared in 2020.[15]

25.    In 1999, California limited handgun purchases to one in a 30-day period, extending that limitation to semiautomatic centerfire rifles in 2019.[16]

26.    Maryland saw a one-handgun-per-month law appear in 2003, with fairly limited exceptions.[17]

27.    In 2008, New Jersey passed Senate Bill 1774, restricting handgun purchases to one-per-month.[18]

28.    Following the 2008 *Heller* decision, the District of Columbia effectively limited pistols to one-per-month with a law prohibiting the registration of more than one pistol per registrant "during any 30-day period."[19] The law was struck down as unconstitutional in 2015.[20]

## CONCLUSIONS

29.    My research leads me to the following conclusions:

30.    The otherwise-legal purchase of protected arms has been unregulated as to the quantity of firearms that may be purchased within a given timeframe for practically all of American history.

31.    There is an American tradition of transacting in and collecting protected firearms, free of quantity-over-time restrictions.

32.    Transacting in protected firearms free of quantity-over-time restrictions remains a lawful Second Amendment activity in a large majority of jurisdictions across

---

[14] Virginia's Legislative Information System, *SB 323 Handguns; eliminates prohibition on purchasing more than one in a 30-day period*, https://lis.virginia.gov/cgi-bin/legp604.exe?121+sum+SB323&121+sum+SB323.

[15] VA. CODE ANN. § 308.2:2(R).

[16] CAL. PENAL CODE § 27535.

[17] MD. CODE ANN., Pub. Safety § 5-128.

[18] N.J.S.2C:58-2(a)(7), N.J.S.2C:58-23(i).

[19] D.C. Code. § 7-2502.03(e).

[20] *Heller v. Dist. of Columbia*, 801 F.3d 264 (D.C. Cir. 2015).

5

1    the United States.

2        I declare under penalty of perjury that the foregoing is true and correct to the

3    best of my knowledge. Executed within the United States on November 19, 2021.

4

5                        /s/ George A. Mocsary

6                        George A. Mocsary

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

# EXHIBITS

| **Exhibit** | **Description** |
| --- | --- |
| 1 | George A. Mocsary's Curriculum Vitae |

*DECLARATION OF GEORGE A. MOCSARY*

# George A. Mocsary

1000 East University Avenue, Dept. 3035 | Laramie, WY 82071
(505) 847-6570 | gmocsary@uwyo.edu

## ACADEMIC EXPERIENCE

**UNIVERSITY OF WYOMING COLLEGE OF LAW**                                                   **Laramie, WY**
*Professor of Law*                                                                                  **7/19 – PRESENT**
*Director*, Business Law Practicum.

Courses:
- Business Organizations
- Securities Regulation
- Entrepreneurship and Business Law Practicum
- Corporations
- Contracts II
- Agency and Partnership
- Law and Economics Seminar

**SOUTHERN ILLINOIS UNIVERSITY SCHOOL OF LAW**                                      **Carbondale, IL**
*Associate Professor*                                                                               **7/18 – 5/19**
*Assistant Professor*                                                                               **7/13 – 6/18**
*Director*, Faculty Development.
*Director*, Business Boot Camp.
*Director*, Law and Economics Program.
*Director*, Gene and Katy Simonds Lectureship in Democracy.
- Recipient of the SIU Law Outstanding Scholar Award (April 13, 2017).

Courses:
- Business Organizations
- Contracts I and II
- Judicial Externship
- Corporations
- Accounting for Lawyers
- Firearms Law and the Second Amendment
- Agency and Partnership
- Business Boot Camp

**UNIVERSITY OF CONNECTICUT SCHOOL OF LAW**                                         **Hartford, CT**
*Visiting Assistant Professor*                                                                     **8/11 – 7/13**
Courses:  Business Organizations, Legal Accounting.

## TEACHING & RESEARCH INTERESTS

### TEACHING INTERESTS

- Business Organizations
- Securities Regulation
- Blockchain Law
- International Business Transactions
- Corporations
- Contracts
- Insurance Law
- Law and Economics
- Unincorporated Business Entities
- Corporate Finance
- Accounting for Lawyers
- Firearms Law

### RESEARCH INTERESTS

- Firearms law.
- Economic analysis of law.
- Organizational theory.
- The intersection of financial regulation and financial-economic agency theory.
- Corporate law, including corporate governance, corporate purpose, and securities regulation.
- Contract law.

## PUBLICATIONS

### LAW JOURNAL ARTICLES

- *Expressive Trading, Hypermateriality, and Insider Trading*, 22 TRANSACTIONS: TENN. J. BUS. L. (forthcoming 2021) (with John P. Anderson & Jeremy L. Kidd).  (link)

- *Social Media, Securities Markets, and the Phenomenon of Expressive Trading*, 25 LEWIS & CLARK L. REV. (forthcoming 2021) (with John P. Anderson & Jeremy L. Kidd).  (link)

- *A Brief History of Public Carry in Wyoming*, 21 WYO. L. REV. 341 (2021) (with Debora A. Person).  (link)

- *Errors of Omission: Words Missing from the Ninth Circuit's* Young v. State of Hawaii, 2021 U. ILL. L. REV. ONLINE 172 (with David B. Kopel).  (link)

- *Public Perceptions of Insider Trading*, 51 SETON HALL L. REV. 1035 (2021) (with John P. Anderson & Jeremy L. Kidd). (link)

- *A Close Reading of an Excellent Distant Reading of* Heller *in the Courts*, 68 DUKE L.J. ONLINE 41 (2018).  (link)

- *Insuring the Unthinkable*, NEW APPLEMAN ON INS.: CURRENT CRITICAL ISSUES IN INS. L. 1 (Spring 2018) (lead article). (link)

- *Freedom of Corporate Purpose*, 2016 BYU L. REV. 1319 (2017) (lead article).  (link)

- *Guns, Bird Feathers, and Overcriminalization:  Why Courts Should Take the Second Amendment Seriously*, 14 GEO. J. L. & PUB. POL'Y 17 (2016) (with Robert J. Cottrol).  (link)
  - Cited in *Kolbe v. Hogan*, 849 F.3d 114, 154 (4th Cir. 2017) (Traxler, J., dissenting).

- *Insuring Against Guns?*, 46 CONN. L. REV. 1209 (2014) (lead symposium article).  (link)

- *The Embedded Firm: Corporate Governance, Labor, and Finance Capitalism—Commentary*, 3 ACCT., ECON. & L. 123 (2014) (peer reviewed essay on incentive issues in corporate governance as they relate to corporate purpose, based on participation in a symposium discussion panel on THE EMBEDDED FIRM:  CORPORATE GOVERNANCE, LABOR, AND FINANCE CAPITALISM (Cynthia A. Williams & Peer Zumbansen eds., 2011)).  (link)

- *Statistically Insignificant Deaths:  Disclosing Drug Harms to Investors (and Patients) Under SEC Rule 10b-5*, 82 GEO. WASH. L. REV. 111 (2013).  (link)

- *"This Right Is Not Allowed by Governments That Are Afraid of the People":  The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823 (2010) (with Clayton E. Cramer & Nicholas J. Johnson) (link).
  - Cited in *McDonald v. Chicago*, 561 U.S. 742, 773 n.21, 776 n.25, 780 (2010).
  - Cited in *Ezell v. City of Chicago*, 651 F.3d 684, 702 n.11 (7th Cir. 2011).

- Note, *Explaining Away the Obvious:  The Infeasibility of Characterizing the Second Amendment as a Nonindividual Right*, 76 FORDHAM L. REV. 2113 (2008).  (link)

**BOOKS AND SUPPLEMENTS**

- FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2021) (with Nicholas J. Johnson, David B. Kopel, E. Gregory Wallace & Donald Kilmer).

- CONTRACTS: CASES AND THEORY OF CONTRACTUAL OBLIGATION (3d ed. 2021) (with Carter G. Bishop & Daniel D. Barnhizer).

- FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY online chs. 12-16 (2020) (with Nicholas J. Johnson, David B. Kopel & E. Gregory Wallace). (link)

- FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2d ed. 2017) (with Nicholas J. Johnson, David B. Kopel & Michael P. O'Shea).
  - Cited in Illinois v. Chairez, 2018 IL 121417, at 7 n.3 (Ill. Feb. 1, 2018).

- 2015 SUPPLEMENT FOR FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2015) (with Nicholas J. Johnson, David B. Kopel & Michael P. O'Shea).

- FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY online chs. 12-15 (2014) (with Nicholas J. Johnson, David B. Kopel & Michael P. O'Shea). (link)

- FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2012) (with Nicholas J. Johnson, David B. Kopel & Michael P. O'Shea) (first casebook on firearms law).
  - Cited in *Drake v. Filko*, 724 F.3d 426, 441 n.3, 441 n.5, 442 (3d Cir. 2013) (Hardiman, J., dissenting).
  - Cited in *Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

**OTHER ARTICLES**

- *An Economic Climate Change?*, L. & LIBERTY (Nov. 8, 2021), http://lawliberty.org/eco-disclosures (with John P. Anderson).

- *Surprising Support for the Right to Bear Arms*, REASON (Nov. 3, 2021), https://reason.com/volokh/2021/11/03/surprising-support-for-the-right-to-bear-arms (with David Kopel).

- *Insider Trading as a Response to Social Media Driven Trading*, THE FINREG BLOG (July 1, 2021), https://sites.law.duke.edu/thefinregblog/2021/07/01/insider-trading-as-a-response-to-social-media-driven-trading (with John P. Anderson & Jeremy L. Kidd).

- State of Vermont v. Misch, FEDERALIST SOC'Y STATE CT. DOCKET WATCH (May 10, 2021), https://fedsoc.org/commentary/publications/state-court-docket-watch-state-of-vermont-v-misch.

- *Who Decides?*, LIVING CITY, Aug./Sept. 2020, at 22.

- *Imposing the DNR*, L. & LIBERTY (June 8, 2020), http://lawliberty.org/imposing-the-dnr.

- *Competition for the First Amendment—Teaching Firearms Law and the Second Amendment*, SECOND THOUGHTS (Jul. 8, 2019), https://sites.law.duke.edu/secondthoughts/2019/07/08/competition-for-the-first-amendment-teaching-firearms-law-and-the-second-amendment.

- *States have a constitutional duty to recognize gun rights nationwide*, THE HILL (Dec. 27, 2017), http://thehill.com/opinion/international/366599-states-have-a-constitutional-duty-to-recognize-gun-rights-nationwide (with Rafael Mangual).

- *Defying the Supreme Court in* Kolbe v. Hogan, L. & LIBERTY (Dec. 20, 2017), http://www.libertylawsite.org/defying-the-supreme-court-in-kolbe-v-hogan.

- *Are There Guns in Mayberry?*, L. & LIBERTY (Oct. 17, 2016), http://www.libertylawsite.org/book-review/are-there-guns-in-mayberry (reviewing JENNIFER CARLSON, CITIZEN-PROTECTORS:  THE EVERYDAY POLITICS OF GUNS IN AN AGE OF DECLINE (2015)).

- *Incentive Engineering*, L. & LIBERTY (July 27, 2015), http://www.libertylawsite.org/book-review/incentive-engineering (reviewing ROBERT D. COOTER & ARIAL PORAT, GETTING INCENTIVES RIGHT:  IMPROVING TORTS, CONTRACTS, AND RESTITUTION (2014)).

- *Shareholder Wealth Maximization:  A Response to Cynthia Williams*, L. & LIBERTY (Feb. 20, 2014), http://www.libertylawsite.org/forum/shareholder-wealth-maximization-a-response-to-cynthia-williams.

- *Why the Corporation Is Not Merely a Nexus of Contracts:  A Response to Alexei Marcoux,* L. & LIBERTY (Dec. 20, 2013), http://www.libertylawsite.org/forum/why-the-corporation-is-not-merely-a-nexus-of-contracts.

- *The Future of Shareholder Wealth Maximization*, L. & LIBERTY (Dec. 2, 2013), http://www.libertylawsite.org/forum/the-future-of-shareholder-wealth-maximization.

- *Monopoly of Violence,* CLAREMONT REV. OF BOOKS, Summer 2010, at 46 (reviewing ROBERT H. CHURCHILL, TO SHAKE THEIR GUNS IN THE TYRANT'S FACE (2008)).  (link)

SELECTED LEGAL BRIEFS

- Brief for Professors of Second Amendment Law et al. as Amici Curiae Supporting Petitioner, New York State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. July 13, 2021).

- Brief for Professors of Second Amendment Law et al. as Amici Curiae Supporting Appellant, Young v. Hawaii, 992 F.3d 765 (9th Cir. 2021) (No. 12-17808).
  o Cited in *Young v. Hawaii*, 992 F.3d 765, 796 (9th Cir. 2021).

- Brief for Firearms Policy Coalition et al. as Amici Curiae Supporting Petitioner, Caniglia v. Storm, 141 S. Ct. 1596 (2021).

- Brief for Firearms Policy Coalition et al. as Amici Curiae Supporting Appellant, Aposhian v. Barr, 973 F.3d 1151 (10th Cir. 2020) (No. 19-4036).

- Brief for Processors of Second Amendment Law et al. as Amici Curiae Supporting Plaintiffs, Ass'n of New Jersey Rifle and Pistol Clubs v. Attorney General New Jersey, 974 F.3d 237 (3d Cir. 2020) (No. 19-3142).
  o Cited in *Ass'n of New Jersey Rifle and Pistol Clubs v. Attorney General New Jersey*, 974 F.3d 237, 255, 257 n.8, 258 (3d Cir. 2020) (Matey, J., dissenting).

- Brief for States Attorneys Steward J. Umholtz and Brandon J. Zanotti et al. as Amici Curiae Supporting Appellee Vivian Claudine Brown, People v. Brown, 164 N.E.3d 1187 (Ill. 2020) (No. 124100). (link)

## PRESENTATIONS AND WORKSHOPS

- *Decentralized Autonomous Organizations*, Testimony Before the State of Wyoming Legislature's Select Committee on Blockchain, Financial Technology and Digital Innovation Technology (Sept. 22, 2021).

- *Recreational Marijuana and the Constitution*, Constitution Day Presentation to High School Seniors in Fountain-Fort Carson, Colorado, School District 8 (Sept. 17, 2021).

- *The Second Amendment as Tyranny Control in the Age of COVID-19?*, Address to the Federalist Society's New Mexico Lawyers Chapter (Sept. 10, 2021).

- *Guns and Moral Panic: Sound Bite Overcriminalization and Judicial Acquiescence*, Address to the Federalist Society's Tallahassee Lawyers Chapter (Aug. 2, 2021).

- Discussant at the Southeastern Association of Law Schools 2021 Annual Meeting Discussion Group:  Insider Trading and Markets (Aug. 1, 2021).

- Organizer, Moderator, and Participant at the University of Wyoming College of Law, Firearms Research Center's Firearms Law Works-in-Progress Workshop (July 22-23, 2021).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Introduction to the Economics of Information, Advertising, Privacy, and Data Security (May 19-23, 2021).

- *COVID-19 and the Constitution*, CLE Presentation to the Wyoming State Bar (Sept. 15, 2020).

- *Administrative Browbeating of Insurers*, Presentation at the 2021 Public Choice Society Conference, Occupational licensing and Insurance Panel (Mar. 12, 2021).

- *The Second Amendment as Tyranny Control in the Age of COVID-19?*, Address to the Federalist Society's Long Island Lawyers Chapter (Jan. 6, 2021).

- *Decentralized Autonomous Organizations*, Testimony Before the State of Wyoming Legislature's Select Committee on Blockchain, Financial Technology and Digital Innovation Technology (Dec. 16, 2020).

- *Public Benefit Corporations*, Testimony Before the State of Wyoming Legislature's Select Committee on Blockchain, Financial Technology and Digital Innovation Technology (Nov. 2, 2020).

- *What does the public really think about insider trading?*, Presentation at Mississippi College School of Law (Apr. 6, 2020).

- Organizer, Moderator, and Participant at the Introduction to Law and Economics through the Work of Elinor Ostrom Discussion Colloquium presented by the Institute for Humane Studies (Jan. 24-25, 2020).

- Instructor, Udmurt Law Student Project (Dec. 11, 2019) (presented an overview of U.S. contract law via videoconference to Russian law students at Udmurt State University in Izhevsk, Russia).

- Speaker, Courthouse Steps Preview:  *New York State Rifle & Pistol Association Inc. v. City of New York, New York*, Federalist Society Criminal Law & Procedure and Civil Rights Practice Group Teleforum (Nov. 22, 2019), https://fedsoc.org/events/courthouse-steps-preview-new-york-state-rifle-pistol-association-inc-v-city-of-new-york-new-york.

- *Guns and Moral Panic: Sound Bite Overcriminalization and Judicial Underenforcement of the Second Amendment in New York, New Jersey, and Connecticut*, Address to the Federalist Society's New York City Young Lawyers Chapter (Nov. 7, 2019).

- Debater at the University of Utah S.J. Quinney College of Law's 36th Annual Jefferson B. Fordham Debate: *Be it resolved that the Second Amendment right to keep and bear arms should be limited to the home.* (Sept. 5, 2019).

- Commenter at the Duke University School of Law, Center for Firearms Law's Firearms Law Works-in-Progress Workshop (Aug. 2, 2019).

- Discussant at the Southeastern Association of Law Schools 2019 Annual Meeting Discussion Group:  Insider Trading Stories:  Todd Newman & Anthony Chiasson (Aug. 1, 2019).

- Reviewer at the Southeastern Association of Law Schools 2019 Annual Meeting Prospective Law Teachers CV Review Session (Jul. 30, 2019).

- *Perceiving and Measuring Judicial Defiance of* Heller, CLE Presentation at the 22nd Annual National Firearms Law Seminar (Apr. 26, 2019).

- *Guns & Moral Panic: Sound-Byte Overcriminalization and Judicial Underenforcement of the Second Amendment*, Address to the Federalist Society's Long Island Lawyers Chapter (Apr. 17, 2019).

- Discussant at the Duke University School of Law, Center for Firearms Law and Center for Law, Ethics, and National Security's, The Second Amendment and the Prevention of Tyranny Panel (Feb. 28, 2019).

- Guest Speaker at the Duke University School of Law, Second Amendment: History, Theory, and Practice Class (Feb. 28, 2019).

- Participant at the Revisiting Corporate Social Responsibility Colloquium presented by the Federalist Society and the Liberty Fund (Jan. 25-26, 2019).

- Presentation at the Hastings Constitutional Law Quarterly and Giffords Law Center Symposium:  *Heller* at 10, A "Second-Class Right"? The Second Amendment & Other Constitutional Rights Panel (Jan. 18, 2019).

- Presentation at the AALS 2019 Annual Meeting, Open-Source Panel:  Judicial Supremacy (Jan. 5, 2019).

- *Administrative Browbeating*, Presentation at the Federalist Society 2019 Faculty Conference (Jan. 4, 2019).

- Instructor, Udmurt Law Student Project (Oct. 23, 2018) (presented an overview of U.S. contract law via videoconference to Russian law students at Udmurt State University in Izhevsk, Russia).

- Discussant at the Southeastern Association of Law Schools 2018 Annual Meeting Discussion Group:  The Role of Corporate Personhood in *Masterpiece Cakeshop* (Aug. 11, 2018).

- Discussant at the Southeastern Association of Law Schools 2018 Annual Meeting Discussion Group:  *United States v. Martoma* and the Future of Insider Trading Law (Aug. 9, 2017).

- Commenter at the Southeastern Association of Law Schools 2018 Annual Meeting Prospective Law Teachers Mock Interview Workshop (Aug. 7, 2018).

- *Insider Trading, Demonization of the Financial Sector, and Judicial Complacency*, Presentation at the 2018 National Business Law Scholars Conference (June 21, 2018).

- Presentation at the Campbell Law Review Symposium:  *Heller* After Ten Years, *Heller* and Public Carry

Restrictions Panel (Feb. 2, 2018).

- *Insider Trading, Demonization of the Financial Sector, and Judicial Complacency*, Presentation at the Federalist Society 2018 Faculty Conference (Jan. 4, 2018).

- Moderator at the Federalist Society 2018 Faculty Conference, Works in Progress Panel (Jan. 5, 2018).

- *Freedom of Corporate Purpose*, Presentation at Mercer University School of Law (Nov. 9, 2017) (invited to participate in speaker series).

- *Insider Trading, Demonization of the Financial Sector, and Judicial Complacency*, Presentation at the Central States Law Schools Association 2017 Annual Meeting (Oct. 7, 2017).

- *Guns, Bird Feathers, and Overcriminalization: Why Courts Should Take the Second Amendment Seriously*, Constitution Day Address at John A. Logan College (Sept. 18, 2017).

- Reviewer at the Southeastern Association of Law Schools 2017 Annual Meeting Prospective Law Teachers CV Review Session (Aug. 2, 2017).

- Discussant at the Southeastern Association of Law Schools 2017 Annual Meeting Discussion Group: Three Felonies a Day?: Is There a Problem of White-Collar Overcriminalization? (Aug. 1, 2017).

- *Guns, Bird Feathers, and Overcriminalization: Why Courts Should take the Second Amendment Seriously*, Keynote Address at the Federalist Society's Lawyer Division's Chicago Chapter's Fourth Annual Otis McDonald Memorial Second Amendment Lecture (May 6, 2017).

- Moderator at the Federalist Society 2017 Faculty Conference, Works in Progress Panel (Jan. 5, 2017).

- Commentator at the George Mason University School of Law, Law and Economics Center's Research Roundtable on Solving the Public Pension Crisis (Sept. 29-30, 2016) (invited to review and comment on nine scholarly papers accepted for publication).

- *Freedom of Corporate Purpose*, Presentation at the Southeastern Association of Law Schools 2016 Annual Meeting (Aug. 6, 2016).

- Commenter at the Southeastern Association of Law Schools 2016 Annual Meeting Prospective Law Teachers Mock Job Talk Workshop (Aug. 5, 2016).

- Commenter at the Southeastern Association of Law Schools 2016 Annual Meeting Prospective Law Teachers Mock Interview Workshop (Aug. 4, 2016).

- *Freedom of Corporate Purpose*, Presentation at the University of Iowa College of Law Faculty Workshop (Feb. 4, 2016).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop on the Contractual Theory of the Corporation (Jan. 20-22, 2016).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop for Law Professors on the Economics of the Rule of Law (Dec. 11-14, 2015).

- *Freedom of Corporate Purpose*, Presentation at the University of Chicago Law School Legal Scholarship Workshop (Nov. 23, 2015).

- Author Participant and Organizer at the Theory of the Firm Colloquium presented by the Federalist Society and the John Templeton Foundation (Nov. 6-7, 2015) (featured readings included George A. Mocsary, *Freedom of Corporate Purpose*, 2016 BYU L. REV. 1319 (2017) and George A. Mocsary, *Why the Corporation Is Not Merely a Nexus of Contracts: A Response to Alexei Marcoux*, LIBR. L. & LIBERTY (Dec. 20, 2013), http://www.libertylawsite.org/liberty-forum/why-the-corporation-is-not-merely-a-nexus-of-contracts).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop for Law Professors on the Economics of Public Pension Reform (Sept 17-20, 2015).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop for Law Professors on Austrian Law and Economics (Oct. 2-3, 2014).

- Guest Presenter and Workshop Participant at the George Mason University School of Law, Law and Economics Center's Economics Institute for Law Professors (June 15-26, 2014) (taught a segment on game theory in corporate law).

- Workshop Participant at the George Mason University School of Law, Law and Economics Center's Workshop for Law Professors on Risk, Injury, Liability, and Insurance (Jan. 30 - Feb. 1, 2014).

- Presentation at the AALS 2014 Annual Meeting, Criminal Justice Panel: The Problematics of Possessory Offenses (Jan. 5, 2014) (discussing the potential for liability insurance mandates to lead to status criminality).

- *Insuring Against Guns?*, Presentation at the University of Chicago Law School Legal Scholarship Workshop (Nov. 25, 2015).

- *Insuring Against Guns?*, Presentation at the Connecticut Law Review Symposium: Up in Arms: The Second Amendment in the Modern Republic, Tragedy and Gun Control: The Legislative Response Panel (Nov. 15, 2013).

- Moderator at the Connecticut Law Review Symposium: Up in Arms: The Second Amendment in the Modern Republic, Litigating the Affirmed Right to Arms Panel (Nov. 15, 2013).

- *The Second Amendment as Tyranny Control*, Presentation at the Indiana Tech Law School Symposium: On the Question of Regulating Guns (Nov. 8, 2013).

- *Insuring Against Guns?*, Presentation at the Indiana Tech Law School Faculty Workshop (Nov. 7, 2013).

- Discussant at the Society for the Advancement of Socio-Economics 2012 Annual Meeting, Authors meet Critics Panel (June 29, 2012) (discussing THE EMBEDDED FIRM: CORPORATE GOVERNANCE, LABOR, AND FINANCE CAPITALISM (Cynthia A. Williams & Peer Zumbansen eds., 2011)).

## EDUCATION

**FORDHAM UNIVERSITY SCHOOL OF LAW**                                                              **New York, NY**
Juris Doctor, *Summa Cum Laude*.                                                                       **MAY 2009**
<u>G.P.A.</u>: 3.9 (First in a class of 468).
- Notes & Articles Editor, Fordham Law Review.

**UNIVERSITY OF ROCHESTER, SIMON GRADUATE SCHOOL OF BUSINESS**                    Rochester, NY
Master of Business Administration, Competitive and Organizational Strategy.                    MARCH 1997
- Specialized in the application of financial-economic agency theory to business situations.
- Dean's list; 70% merit scholarship; selected to mentor first-year students.

**THE COOPER UNION SCHOOL OF ENGINEERING**                    New York, NY
Bachelor of Engineering, Civil Engineering.                    MAY 1995
- Dean's list; Full scholarship.

## LEGAL EXPERIENCE

**CRAVATH, SWAINE & MOORE**                    New York, NY
*Associate*, Bankruptcy & Restructuring                    12/10 – 8/11
*Summer Associate*, Bankruptcy & Restructuring and Litigation                    SUMMER 2008
- Represented a major derivatives creditor in Lehman Brothers' bankruptcy and handled other bankruptcy matters.
- Worked on restructuring transactions involving major American corporations.
- Assisted other Corporate Department groups with bankruptcy and restructuring matters.

**HON. HARRIS L. HARTZ, U.S. COURT OF APPEALS FOR THE TENTH CIRCUIT**                    Albuquerque, NM
*Law Clerk*                    8/09 – 7/10

**HON. JOSE L. LINARES, U.S. DISTRICT COURT, DISTRICT OF NEW JERSEY**                    Newark, NJ
*Judicial Intern*                    SUMMER 2007

**HON. NOVALYN L. WINFIELD, U.S. BANKRUPTCY COURT, DISTRICT OF NEW JERSEY**                    Newark, NJ
*Judicial Intern*                    SUMMER 2007

## BUSINESS EXPERIENCE

**GRENFELL CONSULTING**                    New York, NY
*Owner/Management Consultant*                    9/01 – 2/07
Clients included:

**Pictet & Cie.,** e-Business Group                    Geneva, Switzerland
Pictet & Cie. is one of the oldest private banks in Switzerland.
- Created a strategy for the wireless delivery of financial information that adhered to Swiss banking-secrecy laws.

**Blister, LLC**                    New York, NY
- Advised creative advertising business in its startup phase, helping to grow its revenues from $36,000 in its first year to over $800,000 in its second.

**Office of the Mayor, City of New York**                    New York, NY
- Oversaw projects for a $9 billion capital program.
- Taught training classes to City employees and vendors on the City's financial systems and business processes.

**JPMorgan Chase & Co.**                    New York, NY
- Analyzed the businesses of banks acquired via merger to identify synergies and areas for system integration.

**CLICKTHINGS**                    New York, NY
*Manager, Professional Services*                    5/00 – 1/01
ClickThings developed information-distribution technology for the business-services market.
- Created plans for entering new markets via reseller partnerships by analyzing clients' and competitors' strategies.

**AMERICAN MANAGEMENT SYSTEMS**                                          **New York, NY**
*Senior Business Analyst*                                                **6/97 – 5/00**
- Led a team of consultants in creating a business model that integrated budgeting, procurement, and accounting activities, enabling the City of New York to match forecasts with expenditures for the first time in its history.

**CREDIT SUISSE FIRST BOSTON**                                          **New York, NY**
*Change Management Coordinator*, Fixed Income Division                   **9/94 – 1/97**
(Worked half-time while classes were in session, full-time during winter, spring, and summer recesses.)

## OTHER

**BAR ADMISSIONS:** Wyoming, New York, U.S. Supreme Court, U.S. Court of Appeals for the Ninth Circuit, U.S. Court of Appeals for the Tenth Circuit.

**COMMUNITY SERVICE:** Provided **Carbondale New School** with *pro bono* advisory work on contract-related matters; presented two *pro bono* **seminars on end-of-life matters** open to and attended by members of the public.

**LANGUAGES:** Fluent in conversational **Hungarian**, basic understanding of **French**.

# Exhibit B

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4

5    MICHELLE NGUYEN, et al.,

6              Plaintiffs,

7       vs.                          Case No.
                                     3:20-cv-02470-WQH-
8    ROB BONTA, in his official      MDD
     capacity as Attorney
9    General of California, et
     al.,

10

11              Defendants.
     _____

12

13

14      REMOTE DEPOSITION OF PROFESSOR GEORGE A. MOCSARY

15              Monday, January 17, 2022

16

17

18

19

20   Reported by:
     Layli Phillips
21   RPR, CRR, CSR No. 14402

22   Job No. 10093565

23

24

25

Exhibit B
Page 00021

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4

 5     MICHELLE NGUYEN, et al.,

 6               Plaintiffs,

 7        vs.                          Case No.
                                       3:20-cv-02470-WQH-
 8     ROB BONTA, in his official      MDD
       capacity as Attorney
 9     General of California, et
       al.,
10
                 Defendants.
11     _____

12

13

14

15          Remote Deposition of PROFESSOR GEORGE A.

16   MOCSARY, taken on behalf of Defendants, beginning at

17   9:58 a.m. and ending at 12:30 p.m., on Monday,

18   January 17, 2022, appearing remotely via Zoom before

19   Layli Phillips, RPR, CRR, Certified Shorthand Reporter

20   No. 14402.

21

22

23

24

25
```

**Professor George A. Mocsary**

```
1   REMOTE APPEARANCES:

2

    For the Plaintiffs:
3        THE DIGUISEPPE LAW FIRM, P.C.
         BY:  RAYMOND M. DIGUISEPPE, ESQ.
4        4320 Southport-Supply Road, Suite 300
         Southport, North Carolina 28461
5        910.713.8804
         law.rmd@gmail.com
6

7

    For the Defendants Rob Bonta, in his official capacity
8   as California Attorney General, and Luis Lopez, in his
    official capacity as Director of the Department of
9   Justice Bureau of Firearms:
         OFFICE OF THE ATTORNEY GENERAL OF CA - SACRAMENTO
10       BY:  JERRY T. YEN, ESQ.
         1300 I Street, Suite 125
11       Sacramento, California 94244
         916.324.4785
12       jerry.yen@doj.ca.gov

13

14
    ALSO PRESENT: Chris Landrum, Aptus monitor
15

16

17

18

19

20

21

22

23

24

25
```

**Professor George A. Mocsary**

```
 1                    I N D E X

 2

 3  WITNESS                                  EXAMINATION

 4  PROFESSOR GEORGE MOCSARY

 5       By Mr. Yen                                    6

 6

 7

 8

 9                   E X H I B I T S

10  Defendants'                                    PAGE

11    Exhibit 1     CV                                9

12    Exhibit 2     Table of Contents From the      15

13                  Second Edition of Casebook

14    Exhibit 3     Expert Report                    35

15    Exhibit 4     Portion of Quote From Thomas     57

16                  Jefferson to the British Prime

17                  Minister

18    Exhibit 5     Source of Ira Allen Quote        62

19    Exhibit 6     Notice of Videoconference        75

20                  Deposition

21    Exhibit 7     "The Right to Bear Arms in the   78

22                  First State Bills of Rights:

23                  Pennsylvania, North Carolina,

24                  Vermont, and Massachusetts," By

25                  Stephen P. Halbrook
```

**www.aptusCR.com**

```
 1                   P R O C E E D I N G S
 2                        9:58 a.m.
 3                        --oOo--
 4          THE REPORTER:  Good morning.  My name is Layli
 5   Phillips.  I am a California Certified Shorthand
 6   Reporter, CSR number 14402.
 7          Please note it is imperative that everyone
 8   speak clearly and one at a time.  Overlapping speakers
 9   are not discernible over the phone and cannot be
10   reported.
11          Beginning with the noticing party, will counsel
12   please introduce themselves, state whom they represent,
13   and stipulate to the swearing in of the witness
14   remotely.
15          MR. YEN:  My name is Jerry Yen from the
16   California Attorney General's Office on behalf of the
17   defendants, and I so stipulate to the swearing in of the
18   witness.
19          MR. DIGUISEPPE:  Good morning.  This is Raymond
20   DiGuiseppe on behalf of the plaintiffs, and I will also
21   stipulate.
22          (Witness sworn.)
23          THE REPORTER:  Please proceed.
24   //
25   //
```

1          PROFESSOR GEORGE MOCSARY

2          the deponent herein, called as a witness, after

3    having been first remotely duly sworn, was examined and

4    testified as follows:

5                              EXAMINATION

6    BY MR. YEN:

7          Q. Professor, could you state your full name for

8    the record.

9          A. George A. Mocsary.

10         Q. Where are you located today?

11         A. I'm -- excuse me.  I'm in Laramie, Wyoming.

12         Q. Have you been deposed before?

13         A. I have not.

14         Q. Are you generally aware of the deposition

15    format?

16         A. Roughly, roughly.

17         Q. Well, I'm going to just kind of just go over

18    just some general guidelines and just instructions so

19    that we can try to make this go as smoothly as possible

20    today.

21          You understand that the deposition is a -- in a

22    question-and-answer format?

23         A. Yep, I do.

24         Q. And that everything that you and I say will be

25    taken down by the court reporter?

1        A. I understand.

2        Q. Because the court reporter's taking everything

3    down, it's important that you and I try not to speak

4    over each other.  I would ask that you wait for me to

5    finish my question, and I will also do my best to wait

6    for you to finish your answer.  Is that okay?

7        A. It is, yep.

8        Q. As part of the question-and-answer format,

9    because the court reporter is taking everything down, it

10   will also help for us speak slowly, especially if we're

11   reading something.  It just gives the court reporter an

12   opportunity to take everything down.  Okay?

13       A. Okay.

14       Q. Also.  We need to have verbal answers.  It's

15   just very helpful to the court reporter to also to be

16   able to have a verbal "yes," verbal "no" instead of

17   noddings or -- nods or gestures.  Okay?

18       A. Okay.

19       Q. I'll also ask you to -- if there's a question

20   that you do not understand that you ask me for

21   clarification.  If you don't ask me for clarification,

22   I'll -- I'll assume that you understood my question.

23   Okay?

24       A. Okay.

25       Q. Periodically, your counsel may object to a

1   question.  Unless he specifically instructs you not to

2   answer, I'm still entitled to an answer; do you

3   understand that?

4        A. I do.

5        Q. Typically, I like to take breaks every hour or

6   90 minutes or so, but if you need a break before then or

7   if you just need a break for whatever reason, will you

8   please let me know?

9        A. I will.  I will.

10       Q. Do you understand that you are under oath

11  today?

12       A. I do.

13       Q. Do you understand that you are required to

14  answer my questions truthfully?

15       A. I do.

16       Q. Do you understand that your testimony here is

17  given the same effect as if you were giving it in a

18  court of law?

19       A. I do.

20       Q. Is there any reason why you cannot give

21  truthful and accurate testimony today?

22       A. There isn't.

23       Q. I would like to first turn to your educational

24  background.  I understand that you've submitted a CV in

25  this case; is that correct?

1  agency, and partnerships.  Yep, that's correct.  That's

2  correct.

3      **Q. You said that one of your research interests**

4  **was firearms law.  What do you mean by firearms law?**

5      A. Anything related to the law of firearms, so

6  Second Amendment constitutional law, statutory law,

7  history of the -- of firearms law and regulation.

8      **Q. Anything else?**

9      A. I think that's it.

10      **Q. When you refer to firearms, what**

11  **specifically -- what firearms are you referring to?**

12      A. All firearms.

13      **Q. So that would include handguns, rifles?**

14      A. Correct.

15      **Q. Would that also include anything like bombs or**

16  **cannons or anything like that?**

17      A. It comes up as a -- sometimes in conversation,

18  you know, people would ask -- ask.  When, for example,

19  the National Firearms Act comes up, there's a category

20  under the act called destructive devices, which covers

21  things like that, things like you just said.

22      So in that context, sometimes it might come up,

23  but that's -- kind of on an everyday basis, not so much.

24      **Q. So generally related to handheld firearms?**

25      A. Typically, typically.  As an academic,

1   subject -- subjects come up all the time, and, you know,

2   they come up in conversation or they are sort of

3   relevant.  They sort of come up when -- when discussing

4   a certain topic or I don't know what.

5         But typically, yes, handheld arms are what's --

6   what's included in that.

7         **Q. Are there any particular aspects of firearms**

8   **law that you focus on?**

9         A. Well, as the author of a casebook on the topic,

10  I have to look at all of the areas.  I wouldn't say I

11  have a particular focus.

12        **Q. I believe in your -- in your expert report, you**

13  **say that --**

14        A. I'm -- I lost you for a moment.  I'm sorry.

15        **Q. It's okay.**

16        **I believe in your expert report, you said that**

17  **you would likely be teaching firearms law at the**

18  **University of Wyoming; is that correct?**

19        A. Yes.

20        **Q. What did you mean, likely to teach it?**

21        A. So typically, a professor will teach four

22  courses.  And three of those courses are ones for which

23  there's, for lack of a better word, a curricular need or

24  a bar course or something like that.  And then the

25  fourth course is a course that the professor picks based

 1   on his or her interests.

 2          So ordinarily, even now, I would be teaching a

 3   firearms law class, probably using my casebook, but we

 4   have a shortage of business law professors, so until we

 5   get another business law professor, I'm stuck

 6   teaching -- instead of teaching that one class that I

 7   get to pick, I'm teaching an extra business law class.

 8       **Q. In order to teach a particular class, do you**

 9   **have to submit any proposals or any kind of -- to get --**

10   **anything to get approval to teach that particular class?**

11       A. Well, I don't know because I -- I haven't done

12   it yet, so I couldn't tell you.  I was essentially told

13   what classes I need to teach.

14       **Q. You did teach firearms law earlier in your**

15   **career, correct?**

16       A. Correct.

17       **Q. Where was that?**

18       A. At Southern Illinois University.

19       **Q. How many years did you teach firearms law at**

20   **Southern Illinois University?**

21       A. I believe four years.

22       **Q. So in total, you've taught firearms -- strike**

23   **that.**

24          **So in total, you've taught a firearms law class**

25   **for four years; is that correct?**

1      A. Yes.

2      **Q. And then starting from 1975 to today -- I'm**

3   **also going to round up a little bit -- but that's about**

4   **50 years, right?**

5      A. Yeah, yeah.

6      **Q. Okay.  So if -- so, let's say, roughly**

7   **250 years of American history, 50 years were -- have the**

8   **OGM law.  If I have my math correct, that's about**

9   **20 percent; is that right?**

10      A. Yeah, yeah.  On a strictly if we're looking

11   only at a timeline, yes.  But -- well, carry -- I'll let

12   you.

13      **Q. So let's -- I want to focus on the -- on --**

14   **well, let me -- let me ask this first:  In Paragraph 31,**

15   **you mentioned "American tradition"; do you see that?**

16      A. Yeah, yeah.

17      **Q. What American tradition are you referring to**

18   **there?**

19      A. So -- so if you, you know, sort of consider the

20   American tradition of -- of the right to bear arms to --

21   to go past, perhaps, the start of the nation or at one

22   and to be reflected in practices around the colonial and

23   founding eras, there's a -- there's no history or no

24   tradition, I should say, of restricting or imposing

25   quantity over time.

1          Can we say OGM to include quantity over time as

2   well, not just -- not just to limit us to a month?

3   Would that be okay?

4          **Q. Yes.   I think that makes it easier for**

5   **everyone.**

6          A. Okay.   Let's do that.

7          So there -- during that time frame, the start

8   of the nation and before and what people were doing at

9   the time, there's no history of restricting firearms

10  purchases in an OGM manner.

11         **Q. So I want to focus on Paragraphs 30 and 31,**

12  **your conclusions in Paragraphs 30 and 31.**

13         A. Okay.

14         **Q. What research did you do to reach those**

15  **conclusions?**

16         A. I looked at historical sources, primarily

17  books, that described the -- that dealt with various

18  aspects of the founding era, books about the founders,

19  books about that time in general -- excuse me -- to see

20  if there was -- if I could uncover or discover any

21  mention of OGM restrictions.

22         **Q. Did you do anything else?**

23         A. Not that I recall at the moment.

24         I should say -- that's not correct -- I also

25  asked around.   I also asked others if they could think

1    of anything like that, and nobody could.

2        Q. When you mentioned "historical sources," did

3    you mainly look at books?

4        A. Yeah, primarily, primarily.  Now, sometimes --

5    and digitized books on things like Google Books, but

6    sometimes on other -- other sources as well, so I think

7    Liberty Fund, for example, Liberty Fund website had some

8    old books.

9            Sometimes they were, you know, statute books,

10   so you might not think of a statute as -- as being a

11   book, but, you know, the statute would be in the book.

12           So I think -- I think everything I looked at

13   ultimately was in a book somewhere or -- or an

14   electronic version of a book or a book that's on a

15   website that's, you know, not actually a PDF of the

16   bound volume or anything like that but -- but the

17   contents of the book being online.

18       Q. How did you locate these books to review?

19       A. Yeah.  So some of them I had, just over -- I

20   had collected over the year.  They are in the public

21   domain, so I had collected them over the years and kept

22   them in my collection.

23           There's one great one about organic documents

24   of the -- organic documents of the states by -- it's by

25   Jim Thorpe.  He was the editor.  It's cited in here

1   somewhere.  I won't look for it, but -- so many of them,

2   I had.

3        Others I would occasionally, when I have time,

4   I'll just -- just look for these things online and in

5   Google Books, or if I find them, a new source that I

6   hadn't seen yet cited in a brief, for example, or a law

7   review article, I'll go look for it, and I'll download

8   it and try and save it.

9        **Q. When you say you looked online, did you do a**

10   **Google search?**

11        A. Oh, so typically in Google Books is where I'll

12   search for things.

13        There are also some good sources out there that

14   list -- that contain in them listings of books about --

15   Liberty Fund, the Liberty Fund website has -- I think

16   it's called the Online Library of Law and Liberty maybe.

17   It just has lists of old books, and sometimes I'll check

18   those books as well.

19        I have some books in my office, but typically,

20   when I search for something like this, I'll -- I'll look

21   for it -- I'll find an electronic copy just so I can be

22   thorough and make sure I find -- I have a better chance

23   of finding whatever I'm searching for, word searches and

24   such.

25        **Q. Approximately how many books did you review as**

1  part of your expert report?

2       A. That's a good question.

3          So I -- I looked -- I probably considered

4  searching through 50 books, a hundred books.  I'm not --

5  it's hard to say, you know, when you see a listing of

6  them online; I'm not sure.

7          And then I searched through maybe -- maybe 10,

8  20 of them, something like that.

9       **Q. When you say 10 or 20, did you actually read**

10  **the books, or did you skim through it looking for what**

11  **you were looking for?**

12      A. Skimmed through them looking for what I'm

13  looking for, yeah.

14         And, for example, in one case, I saw a source

15  listed.  So in one -- in one case, for example, the --

16  the -- the -- when the crown granted the colonists the

17  right to import and export arms, which I mention in

18  here, I knew about that one.  I knew that one existed,

19  so I -- in fact, it's mentioned in the casebook, and so

20  I just transported that one over.

21      **Q. You also mentioned earlier that you asked**

22  **others; is that correct?**

23      A. Yes.

24      **Q. Who did you ask?**

25      A. Joseph Greenlee who -- with whom I work quite a

1   bit and who has good historical knowledge.

2          And I believe I asked David Kopel as well,

3   though I don't recall a specific interaction with him.

4   I don't recall kind of discussing with him.  I might

5   have messaged him and not heard back, or maybe he

6   messaged and said he didn't know about anything,

7   something like that.

8          **Q. And Mr. Greenlee is the attorney for Firearms**

9   **Policy Coalition; is that correct?**

10         A. Correct.

11         **Q. About how much time did you spend researching**

12  **these books and talking to others?**

13         A. That's a good question.  I could look, but I'm

14  not sure now.  I'm going to guess 10 to 15 hours.  I'm

15  sort of -- that's an educated guess, let's say.

16         **Q. Well, less than the 20 hours that you typically**

17  **spend in a quarter for the Firearms Policy Coalition**

18  **agreement; is that right?**

19         A. I think so.  That's what it feels like.  That's

20  about how I was trying to figure out the -- roughly what

21  the number was.

22         **Q. Are you aware of a -- the Brigham Young**

23  **University American history database?**

24         A. Is that the same as the -- I don't think so,

25  but maybe if you described it in more detail.

1    Q. It's apparently Brigham Young University has a

2  website that includes a collection of historical

3  documents from the founding colonial era of American

4  history.  Are you aware of that?

5    A. I am not.

6    Q. Are you aware of the Duke Center for Firearms

7  Law database?

8    A. I am.

9    Q. Did you do any research in the Duke Center for

10  Firearms database for your expert report?

11    A. I did not, did not.

12    Q. Why not?

13    A. I'm familiar with that database.  And I've --

14  I've looked in there quite a bit before.  I know the

15  folks that run that center quite well.

16        Their database contains what we might think of

17  as typical gun laws like carry restrictions.  It

18  contains some of the peace bomb laws, and in my -- I've

19  spent quite a bit of time in there on other occasions,

20  and I've never seen anything in this vein in that

21  database, so it just didn't -- I didn't think it was

22  worth my time to look at that one.

23    Q. In Paragraph 12 of your report --

24    A. Okay.

25    Q. -- which is on Page 2 or actually Page 3 of the

1   PDF, you state:

2          "My opinions expressed here are formed in

3          light of my scholarship and study of the Second

4          Amendment."

5          Do you see that?

6       A. I do.

7       Q. When you -- what do you mean when you refer to

8   "scholarship and study of the Second Amendment"?

9       A. So I look at Second Amendment and firearms law

10  issues for a living, let's say, or for part of my living

11  as a -- as a professor, so those -- so that that work

12  gives me a familiarity -- excuse me, familiarity with

13  what I can expect to be out there and where I can expect

14  to find them and so on.

15         So my -- the opinions that I express in that

16  report are based on what I knew and some additional

17  research that I did and just to check various places to

18  see if there's anything I might have missed here or

19  there or what have you about, you know, OGM laws.

20      Q. How long have you been looking into Second

21  Amendment and firearms laws?

22      A. That's a good question.  The topic began to

23  interest me in high school, actually.  And my first, if

24  you will, legal -- kind of in-depth legal foray into the

25  topic, I would say, was in -- started in 2007 when I was

1    Q. How does that quote support the earlier

2    statement that ordinary Americans could transact

3    firearms without restrictions as to quantity?

4        A. So Thomas Jefferson here is saying to the --

5    the British ambassador to the U.S. that, look, our

6    people can just buy and sell firearms as they wish.

7    They can -- they can do what they want with them.  We

8    don't restrict -- there are no restrictions on that in

9    this country.

10        If -- I think the -- his statement there, if

11   there were some kind of OGM -- OGM restriction, then

12   Jefferson wouldn't have made this sort of a broad

13   statement, right, that there always -- they have always

14   been free to make, vend, and export firearms.  To me,

15   that statement suggested that there aren't restrictions

16   on how they can make, sell, and, you know -- I'm sorry,

17   make, vend, and export firearms.

18    Q. Do you know what context Thomas Jefferson was

19   making this statement?

20        A. I don't recall.  I don't recall.  But the -- I

21   do recall looking at the context, as I -- as I have to,

22   you know, as a scholar and researcher, to make sure that

23   the -- the context fits with the statement, and I

24   remember deciding that it did.

25    Q. I'm going to mark as Exhibit 4 -- I'm going to

 1  upload it now.

 2          (Whereupon Deposition Exhibit No. 4 was marked

 3            for identification.)

 4      A. Okay.

 5      Q. This is --

 6      A. I'm having a little -- no.  I'm good.  I'm

 7  good.

 8      Q. This is the portion of -- of the quote from

 9  Thomas Jefferson to the British prime minister.  It's

10  part of a larger document that we received as part of

11  your expert report.

12      A. Mm-hmm.

13      Q. And you'll see that there are 456 pages, if

14  you -- if you look at the bottom right-hand corner; do

15  you see that?

16      A. Yeah, yeah.

17      Q. Okay.  So this -- this Exhibit 4 includes the

18  first few pages of what we received and then jumps to

19  the letter from Jefferson to the British prime minister

20  on Page 16 of the PDF, which is Page 273 of the -- of

21  the document; do you see that?

22      A. I do.  I do.

23      Q. If you look at the last paragraph, starting

24  with, "The purchase of arms"; do you see that?

25      A. Yep, yep.

1    Q. That sentence reads:

2            "The purchase of arms and military

3        accoutrements by an agent of the French

4        government, in this country, with an intent to

5        export them to France, is the subject of

6        another of the memorials."

7        Do you see that?

8    A. Mm-hmm, mm-hmm.  I do.  Sorry.

9    Q. And then there's another sentence after this,

10   and then the third sentence is your quote, correct?

11   A. Correct.

12   Q. Does that indicate to you that Thomas Jefferson

13   was making that quote in the context of a French agent

14   wanting to purchase arms for export to France?

15   A. Yes.  It was from individuals who just were --

16   have always been free to make as many arms as they -- as

17   they want.

18        So he's -- the way I read this was that

19   Americans -- citizens have the ability to make and have

20   as many arms as they want and sell them for export or --

21   or what have you, actually somewhat reminiscent of the

22   quote from the -- about the colonists.

23        So it's the capability to make and vend, et

24   cetera, as much as they want that enables this -- excuse

25   me, that enables this sale to the French or to whoever.

1    Q. So the focus is more on the manufacturing of

2  arms as opposed to the purchase of arms; is that right?

3    A. So the manufacturing and the sale of arms, I

4  think, so the manufacturing, sale, and export.  So if

5  there's a sale, then there's a -- presumably a purchase

6  on the other end.

7    Q. But, again, this was in the context of a sale

8  to a foreign government; is that right?

9    A. Mm-hmm, yes.

10    Q. Going on to back to your expert report,

11  Paragraph 21.

12    A. Bear with me a moment here.

13      Okay.  I'm there.

14    Q. Paragraph 21 talks about an individual named

15  Ira Allen; is that right?

16    A. Yes.

17    Q. Who is Ira Allen?

18    A. He's one of the -- he's sort of considered one

19  of the founders of -- of Vermont with Ethan Allen.

20      Vermont has this interesting history about how

21  it was claimed by New York on -- on one -- New York on

22  one side and New Hampshire on the other, and Ira Allen

23  and his brother Ethan Allen were sort of part of this

24  movement that wanted to make Vermont first independent,

25  but there's the sense that they always intended to join

1  the United States, but they wanted to do it on their own

2  and not -- not as part of another state.

3      Q. Do you know if Ira Allen was a member of the

4  Vermont militia?

5      A. I don't know whether he was officially a member

6  of the militia or -- or how official the militia itself

7  was, but he was part of that group that was sort of for

8  Vermont's independence and then joining of the United

9  States as an independent state.

10      Q. In Paragraph 21, you describe Ira Allen

11  purchasing items from the French, which include 20,000

12  muskets and 24 field pieces; do you see that?

13      A. I do.

14      Q. What is field pieces?

15      A. Artillery, basically.  I believe cannons, but

16  more broadly, you know, artillery, let's say.

17      Q. So -- so you mean like cannonballs or --

18      A. No.  I think -- so, like, cannon, I think,

19  the -- the -- not the balls necessarily but the thing

20  that shoots the cannonballs.

21      Q. Okay.  And you say that those were being

22  purchased for Vermont's militia, right?

23      A. Correct.

24      Q. They were not being purchased for the ordinary

25  citizen, right?

1    But he's describing a situation where

2  individual members of the population, if they decided to

3  have it, could have whatever arms they want, including

4  cannon.

5    And so to me, that's -- that was the relevant

6  part of the sentence.  But hopefully I've at least given

7  you the context for the -- the ellipsis part there,

8  what -- the whole talk about not fearing the government

9  and government isn't worried about it was this very

10  American thing compared to what was happening in Europe

11  and, presumably, what the English were worried about

12  in -- in Canada.

13  **Q. I just want to be clear that the portion in the**

14  **ellipsis includes language about protecting the**

15  **government from foreign invasion, correct?**

16  A. Yes, yes, to protect a government they have an

17  interest in supporting against foreign invasion.

18  **Q. And then in your report, you say that the arms**

19  **were restored to Mr. Allen; do you see that?**

20  A. I remember it.  I'm making my way there now.

21    Yes.

22  **Q. And then I'm just trying to find, you cite the**

23  **same page in the Ira Allen Exhibit 5, and I just wanted**

24  **to try to find where it says in Exhibit 5 that the arms**

25  **were restored to him.  And maybe I just missed it.  I**

1   don't know.

2       A. Yeah.  I don't see it.  Let me read from the

3   beginning to be sure.  We may have to provide that to

4   you.

5           Yeah.  You're correct.  I don't see that there,

6   either.  I have to find where -- what made me believe

7   that that was the case.  I imagine it's on a later page

8   or something, but --

9       Q. Okay.  But you -- at some point, you -- you

10  read that they were restored to Ira Allen, correct?

11      A. Correct.  I believe so, anyway.  I hope so now

12  at this point.

13      Q. Do you know what happened -- ultimately

14  happened to the muskets and the field pieces?

15      A. After they were restored to him, you mean?

16      Q. Yes.

17      A. I do not.  I do not.

18      Q. So you don't know if they were actually

19  distributed to the militia or not?

20      A. Correct.

21      Q. Do you know if anyone received more than one

22  musket from Mr. Allen?

23      A. I do not.  I do know that Mr. Allen received

24  more than one musket.

25      Q. So out of those 20,000 muskets, you -- you know

1   that he kept more than one of those for himself?

2       A. Oh, well, I don't know how many he kept, but I

3   know that at some point, he got 20,000 muskets.

4       Q. Which were intended to be distributed to the

5   Vermont militia, correct?

6       A. Correct.

7       Q. In Paragraph 22, you say that:

8           "I could find no laws in the founding era

9           limiting the quantity or frequency with which

10          an American might acquire arms."

11      When you refer to arms, you are referring to

12  something more than just firearms; is that right?

13      A. So I was thinking of firearms, but it's -- it

14  certainly can be broader than that, so I -- you know,

15  swords or I don't know what would -- it's a true

16  statement even when applied to other kinds of arms as

17  well, yes.

18      Q. But earlier, we -- we had discussed that --

19  that in the context of your report, you were really

20  focused on the -- on firearms, so you used arms and

21  firearms interchangeably in your report, correct?

22      A. Correct, correct.

23      Q. And then in the last sentence in Paragraph 22,

24  you say:

25          "It appears that the policy of the time

 1          embraced private collection of arms."

 2          Do you see that?

 3      A. I do.

 4      Q. When you say "policy," what policy are you

 5 referring to?

 6      A. So that's the -- the -- the part of that quote

 7 there where it says:

 8          "Arms and stores are -- military stores are

 9          free merchandise, so that any who have property

10          and choose to sport with it, may turn their

11          gardens into parks of artillery, their houses

12          into arsenals," blah, blah, blah.

13      So just the sense that the government's

14 position wasn't one of disarming people or restricting

15 arms purchases, but that if somebody wanted to, then he

16 or she could purchase firearms, you know, as desired for

17 kind of common, customary uses.

18      Q. So when you say "policy," you're not talking

19 about any kind of formal written policy, correct?

20      A. Correct.

21      Q. And then you also say -- you refer to "private

22 collections of arms."  What do you mean by that?

23      A. So it talks about how if people want -- wanted

24 to turn their houses into arsenals, they could.  And so

25 they -- there were no restrictions on -- on collecting

Professor George A. Mocsary

1              I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3              That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand,

8    which was thereafter transcribed by me; that the

9    foregoing is a true record of the testimony given.

10             Further, that if the foregoing pertains to

11   the original transcript of a deposition in a federal

12   case, before completion of the proceedings, review of

13   the transcript [ ] was [X] was not requested.

14             I further certify I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney or party to this action.

17             IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20

21   Dated:  January 17, 2022

22

23

24   _____

     Layli Phillips

25   RPR, CRR, CSR No. 14402

# Exhibit C

Exhibit C
Page 00050

# LAWS

## OF THE

# STATE OF MARYLAND

## ENACTED

At the Session of the General Assembly Begun and Held in the
City of Annapolis on the Tenth Day of January, 1996
and Ending on the Eighth Day of April, 1996

———

# VOLUME V

———

Exhibit C
Page 00051

The Computer Services Division
of the Department of Legislative Reference,
General Assembly of Maryland,
prepared this document.

For further information concerning this document contact:

Library and Information Services
Department of Legislative Reference
90 State Circle
Annapolis, Maryland 21401

Baltimore area (410-841-3810) Washington area (301-858-3810)
Other areas (1-800-492-7122)
TTY(410-841-3814) (301-858-3814)

The Department of Legislative Reference does not discriminate on the basis of race, color, national origin, sex, religion, or disability in the admission or access to its programs or activities. The Department's Information Officer has been designated to coordinate compliance with the nondiscrimination requirements contained in Section 35.107 of the Department of Justice Regulations. Requests for assistance should be directed to the Information Officer at the Library and Information Services Division of the Department of Legislative Reference.

Exhibit C
Page 00052

(1)    the station contains an enclosed work area where the service of motor vehicles is offered to customers regardless of whether motor fuel is bought; and

(2)    the services offered include a battery charge, lubrication, oil change, tire repair, and replacement of accessories such as fan belts, radiator hoses, or wiper blades.

(b)    Notwithstanding subsection (a) of this section, the Comptroller may issue a certificate of registration to a retail service station dealer who markets motor fuel through:

(1)    a retail service station that, before it is altered, enlarged, or structurally modified, lacks an enclosed work area; or

(2)    a retail service station that is altered, enlarged, or structurally modified if:

(i)    the appropriate county, municipal, or special zoning board or planning commission rules in favor of conversion to a gasoline-only outlet after considering the need of the public for this type of service in the locality; and

(ii)    the owner and retail service station dealer agree to the conversion OF THE RETAIL SERVICE STATION TO A GASOLINE-ONLY OUTLET *ELIMINATION OF AN ENCLOSED WORK AREA*.

SECTION 2. AND BE IT FURTHER ENACTED, That this Act shall take effect October *June* 1, 1996.

Approved May 14, 1996.

---

## CHAPTER 561

### (Senate Bill 215)

AN ACT concerning

### Maryland Gun Violence Act of 1996

FOR the purpose of prohibiting the purchase of more than a certain number of regulated firearms during a certain period; establishing certain exceptions; establishing a procedure for making multiple purchases; prohibiting a dealer from selling or transferring a regulated firearm under certain circumstances; prohibiting a dealer or person from selling, renting, transferring, possessing, receiving, or purchasing a firearm or any high-capacity magazine in violation of federal, State, or local law; prohibiting a person from participating in a straw purchase of a regulated firearm; providing certain exceptions; requiring certain private sales, purchases, and transfers of regulated firearms to comply with certain requirements; providing for a certain fee; requiring a valid Maryland driver's license or photographic identification card with approved firearms purchase designation for the purchase or receipt of a regulated firearm; establishing requirements and procedures for the issuance and renewal of a firearms purchase approval designation; providing for the

Exhibit C
Page 00053

~~revocation of a firearms purchase approval designation under certain circumstances;~~
~~providing for a hearing process;~~ adding certain exceptions to the prohibition against
carrying or possessing certain weapons on certain school property; prohibiting a
person from disarming a law enforcement officer under certain circumstances;
making certain penalties applicable to the discharge of a firearm from a motor
vehicle; providing that a person who possesses a firearm during and in relation to a
drug trafficking offense under certain circumstances is guilty of a separate felony
and subject to certain penalties; clarifying that a person is guilty of a separate
misdemeanor if the person uses a certain firearm in the commission of certain
crimes whether the firearm is operable or inoperable; authorizing the court to order
a certain respondent to surrender a firearm for a certain period under certain
circumstances; requiring a law enforcement officer who responds to a domestic
violence scene to remove a firearm from certain premises under certain
circumstances; requiring a law enforcement officer to provide certain information to
the owner of a firearm and to provide for the safe storage of the firearm;
authorizing the use of a facsimile machine to forward a certain application to the
Department of State Police; revising, reorganizing, and clarifying certain laws
pertaining to the sale, rental, or transfer of certain regulated firearms by certain
individuals; providing that certain sales, transfers, and possessions of firearms
prohibited under federal law are prohibited under State law; altering a certain
notice provision on a certain application; ~~altering certain fees;~~ defining certain
terms; altering certain definitions; providing certain penalties; providing for a
certain statute of limitations for the prosecution of certain misdemeanors created by
this Act; making stylistic and technical changes; and generally relating to ~~gun~~
~~violence~~ guns and weapons.

BY repealing
  Article 27 – Crimes and Punishments
  Section 406, 441, ~~and~~ 448, and 481E
  Annotated Code of Maryland
  (1992 Replacement Volume and 1995 Supplement)

BY adding to
  Article 27 – Crimes and Punishments
  Section 36A–1 to be under the new subheading "Disarming a Law Enforcement
    Officer"; and 441, 441A, 442A, ~~442B,~~ 445A, 445B, 448, and 449 to be under
    the amended subheading "Regulated Firearms"
  Annotated Code of Maryland
  (1992 Replacement Volume and 1995 Supplement)

BY repealing and reenacting, with amendments,
  Article 27 – Crimes and Punishments
  Section 36A, 36B(d), 120, 281A, 442, 443, 443A, 445, and 446
  Annotated Code of Maryland
  (1992 Replacement Volume and 1995 Supplement)

BY repealing and reenacting, with amendments,

Exhibit C
Page 00054

Article – Family Law
Section 4–506
Annotated Code of Maryland
(1991 Replacement Volume and 1995 Supplement)

BY adding to

Article – Family Law
Section 4–511
Annotated Code of Maryland
(1991 Replacement Volume and 1995 Supplement)

BY adding to

Article – Courts and Judicial Proceedings
Section 5–106(s)
Annotated Code of Maryland
(1995 Replacement Volume and 1995 Supplement)

BY repealing and reenacting, with amendments,

Article 27 – Crimes and Punishments
Section 12A–2
Annotated Code of Maryland
(1992 Replacement Volume and 1995 Supplement)
(As enacted by Chapter ____ (S.B. 618/H.B. 749) of the Acts of the General
Assembly of 1996)

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That Section(s) 481E of Article 27 – Crimes and Punishments of the Annotated Code of Maryland be repealed.

~~SECTION 1. BE IT~~ SECTION 2. AND BE IT FURTHER ENACTED ~~BY THE GENERAL ASSEMBLY OF MARYLAND~~, That the Laws of Maryland read as follows:

### Article 27 – Crimes and Punishments

36A.

(a)   No person, unless otherwise excepted in this section, shall carry or possess any rifle, gun, knife, or deadly weapon of any kind on any public school property in this State.

(b)   Nothing in this section shall be construed to apply to [law]:

(1)   LAW enforcement officers in the regular course of their duty[, or to any persons];

(2)   PERSONS hired by the boards of education in the counties and Baltimore City specifically for the purpose of guarding public school property[, or to persons];

– 3141 –

Exhibit C
Page 00055

PARRIS N. GLENDENING, Governor                    Ch. 561

~~MARYLAND DRIVER'S LICENSE OR PHOTOGRAPHIC IDENTIFICATION CARD TO THE SECRETARY WITHIN 45 DAYS AFTER THE RECEIPT OF THE NOTICE OF THE REVOCATION.~~

~~(II) (1) A PERSON WHOSE APPLICATION FOR A FIREARMS PURCHASE APPROVAL DESIGNATION OR RENEWAL OF A FIREARMS PURCHASE APPROVAL DESIGNATION IS DISAPPROVED OR WHOSE FIREARMS PURCHASE APPROVAL DESIGNATION HAS BEEN REVOKED MAY SUBMIT A WRITTEN REQUEST TO THE SECRETARY FOR A HEARING WITHIN 30 DAYS FROM THE DATE THE WRITTEN NOTICE OF THE DENIAL OR REVOCATION WAS FORWARDED TO THE AGGRIEVED PERSON.~~

~~(2) A HEARING SHALL BE GRANTED BY THE SECRETARY WITHIN 15 DAYS OF THE REQUEST.~~

~~(3) THE HEARING AND ANY SUBSEQUENT PROCEEDINGS OF JUDICIAL REVIEW, IF ANY, SHALL BE CONDUCTED IN ACCORDANCE WITH THE PROVISIONS OF THE ADMINISTRATIVE PROCEDURE ACT.~~

~~(4) THE HEARING SHALL BE HELD IN THE COUNTY OF THE LEGAL RESIDENCE OF THE AGGRIEVED PERSON.~~

~~442B.~~ 442A.

(A) (1) EXCEPT AS PROVIDED IN THIS SUBSECTION, A PERSON MAY NOT PURCHASE MORE THAN ONE REGULATED FIREARM IN A 30-DAY PERIOD.

(2) THE PROVISIONS OF THIS SUBSECTION DO NOT APPLY TO:

(I) A LAW ENFORCEMENT AGENCY;

(II) AN AGENCY DULY AUTHORIZED TO PERFORM LAW ENFORCEMENT DUTIES;

(III) STATE OR LOCAL CORRECTIONAL FACILITIES;

(IV) A PRIVATE SECURITY COMPANY LICENSED TO DO BUSINESS WITHIN THE STATE;

(V) THE PURCHASE OF ANTIQUE FIREARMS AS DEFINED IN § 441 OF THIS ARTICLE;

(VI) PURCHASES BY A LICENSED FIREARMS DEALER;

(VII) THE EXCHANGE OR REPLACEMENT OF A REGULATED FIREARM BY A SELLER FOR A REGULATED FIREARM PURCHASED FROM THE SELLER BY THE SAME PERSON SEEKING THE EXCHANGE OR REPLACEMENT WITHIN THE 30-DAY PERIOD IMMEDIATELY PRECEDING THE DATE OF EXCHANGE OR REPLACEMENT; OR

(VIII) A PERSON WHOSE REGULATED FIREARM IS STOLEN OR IRRETRIEVABLY LOST AND WHO CONSIDERS IT ESSENTIAL THAT THE REGULATED FIREARM BE REPLACED IMMEDIATELY, IF:

– 3159 –

Exhibit C
Page 00056

Ch. 561                         1996 LAWS OF MARYLAND

                  1.     THE PERSON PROVIDES THE LICENSED REGULATED FIREARMS DEALER WITH A COPY OF THE OFFICIAL POLICE REPORT OR AN OFFICIAL SUMMARY OF THE REPORT <u>A COPY OF WHICH SHALL BE ATTACHED TO THE APPLICATION TO PURCHASE OR TRANSFER A REGULATED FIREARM</u>;

                  2.     THE OFFICIAL POLICE REPORT OR OFFICIAL SUMMARY OF THE REPORT CONTAINS THE NAME AND ADDRESS OF THE REGULATED FIREARM OWNER, A DESCRIPTION OF THE REGULATED FIREARM, THE LOCATION OF THE LOSS OR THEFT, THE DATE OF THE LOSS OR THEFT, AND THE DATE WHICH THE LOSS OR THEFT WAS REPORTED TO THE LAW ENFORCEMENT AGENCY; AND

                  3.     THE DATE OF THE LOSS OR THEFT AS REFLECTED ON THE OFFICIAL POLICE REPORT OR OFFICIAL SUMMARY OF THE REPORT OCCURRED WITHIN 30 DAYS OF THE PERSON'S ATTEMPT TO REPLACE THE REGULATED FIREARM.

        ~~(3)   FOLLOWING THE SALE OF A REGULATED FIREARM TO A PERSON WHOSE REGULATED FIREARM WAS EITHER STOLEN OR IRRETRIEVABLY LOST, A LICENSED REGULATED FIREARMS DEALER SHALL ATTACH A COPY OF THE OFFICIAL POLICE REPORT OR OFFICIAL SUMMARY OF THE REPORT TO THE APPLICATION TO PURCHASE A REGULATED FIREARM AS REQUIRED IN THIS SUBHEADING AND FORWARD BOTH DOCUMENTS TO THE SECRETARY.~~

    (B)   (1)   <u>UPON APPLICATION FOR A MULTIPLE PURCHASE TO AND APPROVAL BY THE SECRETARY,</u> PURCHASES IN EXCESS OF ONE REGULATED FIREARM <u>IN A 30-DAY PERIOD</u> MAY BE MADE ~~UPON COMPLETION OF AN APPLICATION FOR MULTIPLE PURCHASES OF REGULATED FIREARMS CONTAINING THE FOLLOWING INFORMATION:~~

        ~~(I)   A LIST OF THE REGULATED FIREARMS TO BE PURCHASED AND TRANSFERRED FOR LAWFUL BUSINESS OR PERSONAL USE;~~

        (II)  ~~WHETHER~~ <u>UNDER THE FOLLOWING CIRCUMSTANCES:</u>

        <u>(I)</u>   THE PURCHASE OF THE REGULATED FIREARMS IS FOR A PRIVATE COLLECTION OR IS A COLLECTOR SERIES;

        ~~(III)~~ <u>(II)</u>  ~~WHETHER~~ THE PURCHASE OF THE REGULATED FIREARMS IS A BULK PURCHASE FROM AN ESTATE SALE; ~~OR~~

        <u>(III)   THE PURCHASE OF NOT MORE THAN TWO REGULATED FIREARMS IS A MULTIPLE PURCHASE FOR THE PURPOSE OF TAKING ADVANTAGE OF A REGULATED FIREARMS DEALER'S DISCOUNTED PRICE AVAILABLE ONLY FOR A MULTIPLE PURCHASE, PROVIDED THAT THE PURCHASER IS PROHIBITED FROM PURCHASING A REGULATED FIREARM THE FOLLOWING 30-DAY PERIOD UNLESS APPROVED FOR A MULTIPLE PURCHASE UNDER ITEM (I) OR (II) OF THIS PARAGRAPH; OR</u>

        (IV)  OTHER SIMILAR PURPOSES.

    (2)   THE APPLICATION SHALL:

– 3160 –

Exhibit C
Page 00057

(I)   CONTAIN A LIST OF THE REGULATED FIREARMS TO BE PURCHASED OR TRANSFERRED;

(I) (II)   STATE THE PURPOSE OF THE PURCHASE IN EXCESS OF ONE ~~GUN~~ REGULATED FIREARM IN A 30-DAY PERIOD;

(II) (III)   BE WITNESSED BY A REGULATED FIREARMS DEALER OR DESIGNATED LAW ENFORCEMENT AGENCY ~~THAT THE APPLICANT DISPLAYED A MARYLAND DRIVER'S LICENSE WITH APPROVED FIREARMS PURCHASE DESIGNATION OR A PHOTOGRAPHIC IDENTIFICATION CARD WITH APPROVED FIREARMS PURCHASE DESIGNATION~~; AND

(III) (IV)   BE SIGNED UNDER THE PENALTY OF PERJURY BY THE APPLICANT.

(C)   THE APPLICATION FOR A MULTIPLE PURCHASE OF REGULATED FIREARMS SHALL BE ATTACHED TO A COMPLETED APPLICATION TO PURCHASE A REGULATED FIREARM AND FORWARDED TO THE SECRETARY BY A LICENSED REGULATED FIREARMS DEALER OR DESIGNATED LAW ENFORCEMENT AGENCY.

(D)   UPON RECEIPT OF THE APPLICATION TO PURCHASE A REGULATED FIREARM AND THE APPLICATION FOR A MULTIPLE PURCHASE, THE SECRETARY SHALL COMPLETE A BACKGROUND INVESTIGATION AS DEFINED IN § 442 OF THIS SUBTITLE.

(E)   A DEALER OR PERSON MAY NOT SELL, RENT, OR TRANSFER ANY REGULATED FIREARMS TO ~~AN APPLICANT~~ A PERSON WHOSE APPLICATION HAS BEEN PLACED ON HOLD BECAUSE OF AN OPEN DISPOSITION OF CRIMINAL PROCEEDINGS AGAINST THE APPLICANT OR DISAPPROVED, UNLESS THE HOLD OR DISAPPROVAL HAS BEEN SUBSEQUENTLY WITHDRAWN BY THE SECRETARY OR OVERRULED BY ACTIONS OF THE COURTS.

443.

(a)   No person shall engage in the business of selling, RENTING, OR TRANSFERRING [pistols or revolvers] REGULATED FIREARMS unless he lawfully possesses and conspicuously displays at his place of business, in addition to any other license required by law, a [pistol and revolver] REGULATED FIREARMS dealer's license issued by the Secretary. [of the State Police or the Secretary's duly authorized agent or agents.] Such license shall identify the licensee and the location of the licensee's place of business. One such license shall be required for each place of business where [pistols or revolvers] REGULATED FIREARMS are sold.

(b)   (1)   The license required by subsection (a) above shall expire on the 30th day of June of each year.

(2)   The initial fee for the license shall be [$50] $150, and the annual renewal shall be [$25] $75, payable to the Comptroller of the State of Maryland.

(3)   The license shall not be transferable nor shall any refund or proration of the annual fee therefor be allowed. Provided, however, that before any licensee changes his or her place of business, the licensee shall so inform the Secretary [of the State Police

– 3161 –

Exhibit C
Page 00058

## 1996 Md. Ann. Code art. 27, § 442A

1996 Maryland Code Archive

*ANNOTATED CODE OF MARYLAND > ARTICLE 27. CRIMES AND PUNISHMENTS > I CRIMES AND PUNISHMENTS > REGULATED FIREARMS*

## § 442A. Purchase of firearms in a 30-day period

**(a)  Purchase limited to one regulated firearm; exceptions. --**

**(1)**  Except as provided in this subsection, a person may not purchase more than one regulated firearm in a 30-day period.

**(2)**  The provisions of this subsection do not apply to:

**(i)**  A law enforcement agency;

**(ii)**  An agency duly authorized to perform law enforcement duties;

**(iii)**  State or local correctional facilities;

**(iv)**  A private security company licensed to do business within the State;

**(v)**  The purchase of antique firearms as defined in § 441 of this *article*;

**(vi)**  Purchases by a licensed firearms dealer;

**(vii)**  The exchange or replacement of a regulated firearm by a seller for a regulated firearm purchased from the seller by the same person seeking the exchange or replacement within the 30-day period immediately preceding the date of exchange or replacement; or

**(viii)**  A person whose regulated firearm is stolen or irretrievably lost and who considers it essential that the regulated firearm be replaced immediately, if:

**1.**  The person provides the licensed regulated firearms dealer with a copy of the official police report or an official summary of the report a copy of which shall be attached to the application to purchase or transfer a regulated firearm;

**2.**  The official police report or official summary of the report contains the name and address of the regulated firearm owner, a description of the regulated firearm, the

Exhibit C
Page 00059

1996 Md. Ann. Code art. 27, § 442A

location of the loss or theft, the date of the loss or theft, and the date which the loss or theft was reported to the law enforcement agency; and

**3.** The date of the loss or theft as reflected on the official police report or official summary of the report occurred within 30 days of the person's attempt to replace the regulated firearm.

**(b) Purchase of more than one regulated firearm. --**

**(1)** Upon application for a multiple purchase to and approval by the Secretary, purchases in excess of one regulated firearm in a 30-day period may be made under the following circumstances:

**(i)** The purchase of the regulated firearms is for a private collection or is a collector series;

**(ii)** The purchase of the regulated firearms is a bulk purchase from an estate sale;

**(iii)** The purchase of not more than two regulated firearms is a multiple purchase for the purpose of taking advantage of a regulated firearms dealer's discounted price available only for a multiple purchase, provided that the purchaser is prohibited from purchasing a regulated firearm the following 30-day period unless approved for a multiple purchase under item (i) or (ii) of this paragraph; or

**(iv)** Other similar purposes.

**(2)** The application shall:

**(i)** Contain a list of the regulated firearms to be purchased or transferred;

**(ii)** State the purpose of the purchase in excess of one regulated firearm in a 30-day period;

**(iii)** Be witnessed by a regulated firearms dealer or designated law enforcement agency; and

**(iv)** Be signed under the penalty of perjury by the applicant.

**(c) Application for purchase of more than one regulated firearm. --** The application for a multiple purchase of regulated firearms shall be attached to a completed application to purchase a regulated firearm and forwarded to the Secretary by a licensed regulated firearms dealer or designated law enforcement agency.

Exhibit C
Page 00060

1996 Md. Ann. Code art. 27, § 442A

**(d)  Background investigation. --**  Upon receipt of the application to purchase a regulated firearm and the application for a multiple purchase, the Secretary shall complete a background investigation as defined in § 442 of this subtitle.

**(e)  Sale to disapproved applicant prohibited. --**  A dealer or person may not sell, rent, or transfer any regulated firearms to a person whose application has been placed on hold because of an open disposition of criminal proceedings against the applicant or disapproved, unless the hold or disapproval has been subsequently withdrawn by the Secretary or overruled by actions of the courts.

## History

1996, ch. 561, § 2; ch. 562, § 2.

ANNOTATED CODE OF MARYLAND

Copyright © 2022 by Michie, a division of Reed Elsevier Inc. and Reed Elsevier Properties Inc. All rights reserved.

End of Document

# Exhibit D

New York City, N.Y., Code § 10-302.1
NEW YORK CITY CHARTER, CODE, AMENDMENTS & RULES
NEW YORK CITY ADMINISTRATIVE CODE
TITLE 10. PUBLIC SAFETY
CHAPTER 3. FIREARMS.

The New York City Code is current with files received through January 31, 2022.

§ 10-302.1. Preventing the diversion of firearms, rifles and shotguns to criminals.

 a. No dealer in firearms and no dealer in rifles and shotguns shall: (i) sell or otherwise dispose of more than one firearm or more than one rifle or shotgun to any individual as part of the same sales transaction; or (ii) sell or otherwise dispose of a rifle or shotgun to any individual if the dealer knows or should know that such individual has purchased a rifle or shotgun within the prior ninety days, or (iii) sell or otherwise dispose of a firearm to any individual if the dealer knows or should know that such individual has purchased a firearm within the prior ninety days.

 b. No person shall acquire a firearm if such person has acquired a firearm within the previous ninety days. No person shall acquire a rifle or shotgun if such person has acquired a rifle or shotgun within the previous ninety days. For purposes of this subdivision when a firearm, rifle or shotgun is acquired by a corporation, partnership, or other entity, it shall be considered to have been acquired by each natural person who is an officer, director or other principal of such entity, unless the firearm, rifle or shotgun is acquired on behalf of such entity by a person who is licensed by the commissioner as gun custodian or special gun custodian, or acquired on behalf of an organization possessing an organization registration certificate, as those terms are used in title thirty-eight of the rules of the city of New York.

 c. Before disposing of any firearm, rifle or shotgun to a person licensed by the commissioner to possess firearms, rifles or shotguns, any dealer in firearms, dealer in rifles and shotguns or other person shall contact the police department to ensure compliance with the requirements of this section.

 d. Any dealer in firearms, dealer in rifles and shotguns or other person who disposes of any firearm, rifle or shotgun to a person licensed by an authority other than the commissioner to possess firearms, rifles or shotguns shall make reasonable efforts to contact such licensing authority and to ascertain the most recent date of acquisition by such licensee of a firearm, in the case of disposition of a firearm, or of a rifle or shotgun, in the case of disposition of a rifle or shotgun.

 e. Any dealer in firearms or dealer in rifles or shotguns who disposes of any firearm, rifle or shotgun shall, before or at the time of disposing of such firearm, rifle or shotgun, record, in the record book required to be kept by subdivision n of section 10-302, the efforts made by such dealer to ensure compliance with the requirements of this section, any exception or exemption set forth in this section that such dealer reasonably believes would authorize the disposal of such firearm, rifle or shotgun, and the grounds for such dealer's belief that such exception or exemption applies.

 f. Exceptions. The provisions of this section shall not apply to the sale of firearms, rifles or shotguns to (i) a police officer, as such term is defined in section 1.20 of the criminal procedure law, (ii) a federal law enforcement officer, as such term is defined in section 2.15 of the criminal procedure law, (iii) a public agency in furtherance of official business, (iv) persons in the military service of the state of New York, when duly authorized by regulations issued by the adjutant general to possess such weapons, (v) persons in the military or other service of the United States, in pursuit of official duty or when duly authorized by federal law, regulation or order to possess such weapons, (vi) persons employed in fulfilling defense contracts with the government of the United States or agencies thereof when possession of such weapons is necessary for manufacture, transport, installation and testing under the requirements of such contract, (vii) peace officers as defined in section 2.10 of the criminal procedure law, provided that such peace officers are authorized pursuant to law or regulation of the state or city of New York to possess a firearm, rifle or shotgun within the city of New York without a license or permit therefor, and are authorized by their employer to possess such firearm, rifle or shotgun, (viii) persons licensed as dealers, manufacturers or importers of firearms pursuant to chapter 44 of title 18 of the United States Code, (ix) any motion picture, television or video production company or entertainment or theatrical company whose production involves the use of firearms, rifles or shotguns, provided that such

weapons shall be properly registered and a special theatrical permit shall have been issued for such weapons pursuant to rules established by the commissioner, (x) with respect to the sale of firearms only, persons licensed by the commissioner as gun custodians or special gun custodians, as those terms are used in title thirty-eight of the rules of the city of New York, and (xi) with respect to the sale of rifles and shotguns only, organizations possessing an organization registration certificate, as that term is used in title thirty-eight of the rules of the city of New York.

g. Exempt transactions. The requirements of this section shall not apply to: (i) any transaction in which a person acquires a firearm, rifle or shotgun by operation of law, or because of the death of another person for whom such person is an executor or administrator of an estate or a trustee of a trust created in a will, provided that within fifteen days such person surrenders such firearm, rifle or shotgun to the commissioner until it can be reacquired without violation of this section or other applicable law. If a firearm, rifle or shotgun is surrendered pursuant to this subdivision but no written request to reacquire it is received by the commissioner within two years of such surrender, the commissioner shall dispose of such firearm in accordance with the provisions of section 400.05 of the penal law;

(ii) the exchange of a firearm, rifle or shotgun by a dealer in firearms or a dealer in rifles and shotguns for another firearm, rifle or shotgun previously purchased from such dealer by the person requesting such exchange, provided that such exchange takes place within thirty days of such request;

(iii) the acquisition or disposal of an antique firearm, rifle or shotgun which is incapable of being fired or discharged or which does not fire fixed ammunition, or a firearm, rifle or shotgun manufactured prior to eighteen hundred ninety-four or whose design was patented and whose commercial manufacture commenced prior to eighteen hundred ninety-four and whose manufacture continued after such year without any substantial alteration in design or function, and for which cartridge ammunition is not commercially available and is possessed as a curiosity or ornament or for its historical significance and value;

(iv) the acquisition or disposal of a firearm at an indoor or outdoor pistol range when such acquisition or disposal begins a period of possession or use of the firearm that is authorized by paragraphs 7-a, 7-b, or 7-e of subdivision a of section 265.20 of the penal law;

(v) the sale of a firearm by a dealer in firearms to a person whose firearm is stolen or irretrievably lost, provided that: (1) such person has complied with any legal requirement to report the loss or theft, including but not limited to the applicable provisions of title thirty-eight of the rules of the city of New York and section 400.10 of the penal law;

(2) such person provides to such dealer a copy of a police report of the loss or theft or of any report made pursuant to the applicable provisions of title thirty-eight of the rules of the city of New York and section 400.10 of the penal law, which copy the dealer shall attach to the record book required to be kept by subdivision n of section 10-302;

(3) the copy provided pursuant to subparagraph two of this paragraph contains the name and address of the regulated firearm owner, a description of the regulated firearm, the location of the loss or theft, if known, the date of the loss or theft, if known, and the date when the loss or theft was reported to the law enforcement agency; and

(4) such person's attempt to replace the regulated firearm occurs within thirty days of the loss or theft of such firearm, if known, or, if such date is not known, within thirty days of the date when the loss or theft was reported to the law enforcement agency, as reflected by the information recorded on the police report; and

(vi) any other transaction authorized in advance in writing by the commis-sioner.

h. Penalties. (i) In addition to the penalties specified in section 10-310, any act or omission that constitutes or would constitute a violation of this section or of rules and regulations issued by the commissioner pursuant thereto shall be grounds for the revocation of a license to deal in firearms, deal in rifles and shotguns, possess firearms, or possess a rifle or shotgun.

(ii) Any firearm disposed of or acquired in violation of this section shall be a nuisance subject to surrender and forfeiture in accordance with the procedures specified in section 400.05 of the penal law.

i. The commissioner may make and promulgate such rules and regulations as are necessary to carry out the provisions of this section. Such rules and regulations may address, but need not be limited to:

(i) procedures for implementation of this section by the commissioner;

(ii) establishment of a database of firearm, rifle and shotgun purchases for the purpose of enforcing the requirements of this chapter; and

(iii) the specification of reasonable efforts required to comply with subdivision d of this section.

HISTORICAL NOTE

Section amended L.L. 31/2006 § 3, eff. Nov. 24, 2006. [See Note 2]

Section added L.L. 9/2005 § 2, eff. July 17, 2005 with special provisions.

[See Note 1]


NOTE

  1. Provisions of L.L. 9/2005:

  Section 1. Declaration of legislative findings and intent. Although many illegal guns are obtained outside of New York state, existing city laws governing gun sellers should be strengthened to prevent the diversion of guns to the illegal marketplace. The Council finds that it is imperative that additional protections be implemented to ensure that New York city continues to lead the way in preventing gun violence.

  ............

  § 3. This local law shall take effect 180 days after its enactment; provided that the police commissioner is immediately authorized to adopt, amend and promulgate such rules as may be necessary to effectuate the purpose of this local law.

  2. Provisions of L.L. 31/2006:

  Section 1. Declaration of legislative findings and intent. In local law number 9 for the year 2005, the Council addressed the problem of the diversion of rifles and shotguns to the illegal gun marketplace. The Council finds that the provisions of this local law must be strengthened and extended to address the problem of the proliferation of illegal handguns.

  The illegal possession of handguns--by felons, juveniles, drug addicts, people subject to restraining orders for domestic violence, and others not legally entitled to possess handguns--is a deadly and ongoing threat to the people of New York City. The city, state, and federal government maintain extensive statutes and licensing schemes to prevent such people from acquiring handguns. Nonetheless, networks of illegal gun traffickers supply handguns at a large profit to people who should not have them.

  Approximately twenty percent of the city's robberies and the majority of its murders involve guns. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) traced 8,437 guns used in crime in New York City from August 1997 to July 1998. Of those guns, 278 were used in homicides and 618 were used by juveniles.

  Although traffickers can obtain guns in many ways, they are often able to simply buy them from federally licensed retailers. Rather than buy guns in their own names, illegal traffickers usually rely on "straw purchases," i.e., having someone else purchase guns on their behalf. One ATF study concluded that more than half of the guns identified in urban trafficking investigations that involved juveniles had been trafficked by straw purchasers or straw purchasing rings.

  ATF has found that purchases of multiple handguns at the same time are a strong indicator of straw purchases and, therefore, of illegal handgun trafficking. A loophole in existing federal and New York state law allows a purchaser, once approved, to buy as many guns at a time as he or she likes. Having a straw purchaser buy more than one handgun at a time allows traffickers to work quickly, efficiently, and without involving more criminal confederates than necessary.

  Due to the importance in illegal gun sales of multiple purchases by straw purchasers, limiting or prohibiting multiple sales by licensed dealers inhibits gun crime and illegal gun trafficking. After South Carolina and Virginia enacted one-handgun-per-month laws, their significance as suppliers of crime guns to Northeastern states diminished sharply. In the year after Maryland passed a similar law, it experienced a fourteen percent drop in homicides. Moreover, the number of crime guns seized in the adjacent District of Columbia that had first been bought at retail in Maryland dropped from twenty to zero.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

In order to fight illegal handgun trafficking and therefore the supply of handguns to people who, under existing law, should not have handguns, the city must limit multiple and closely consecutive purchases of handguns. Doing so will not only save lives, but will also reinforce the city's position as a national leader against gun crime.

............

§ 6. Severability. If any provision of this local law is for any reason found to be invalid, in whole or in part, by any court of competent jurisdiction, such finding shall not affect the validity of all remaining provisions of this local law, which shall continue in full force and effect.

§ 7. This local law shall take effect 120 days following its enactment into law [Nov. 24, 2006], provided that, prior to such effective date, the police commissioner shall promulgate such rules and take such other actions as are necessary to its timely implementation.

Copyright © 2022 by New York Legal Publishing

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.