ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JERRY T. YEN
Deputy Attorney General
State Bar No. 247988
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
  Fax: (916) 324-8835
  E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Rob Bonta, in his official
capacity as California Attorney General, and
Allison Mendoza, in her official capacity as
Director of the Department of Justice Bureau
of Firearms*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,** | Case No. 3:20-cv-02470-WQH-MMP |
| Plaintiffs, | |
| v. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **ROB BONTA, in his official capacity as Attorney General of California; and ALLISON MENDOZA[1], in her official capacity as Director of the Department of Justice Bureau of Firearms,** | Date: To be set by the Court<br>Judge: Hon. William Q. Hayes<br>Courtroom: 14B<br>Action Filed: Dec. 18, 2020 |
| Defendants. | |

---

[1] Allison Mendoza is hereby substituted for former Bureau of Firearms Director Luis Lopez. *See* Fed. R. Civ. P. 25(d).

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on a date to be set before the Honorable William Q. Hayes (Dkt No. 57), Defendants California Attorney General Rob Bonta and Director Allison Mendoza (collectively, Defendants) will and hereby do move under Rule 56 of the Federal Rules of Civil Procedure for an order granting summary judgment in favor of Defendants.  This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Defendants' statement of undisputed facts, the declarations and evidence filed concurrently herewith, all pleadings and papers on file in this action, and such other matters as may properly come before the Court.

Defendants seeks summary judgment on the grounds that California laws limiting the purchase of handguns and semiautomatic centerfire rifles are constitutional because (1) they do not violate Plaintiffs' Second Amendment right to keep and bear arms, (2) they are presumptively lawful regulations on the commercial sale of firearms, and (3) they are consistent with the Nation's historical tradition of firearm regulation.

1   Dated:  September 15, 2023             Respectfully submitted,

2                                     ROB BONTA
                                     Attorney General of California

3                                     ANTHONY R. HAKL
                                     Supervising Deputy Attorney General

4

5                                   */s/ Jerry T. Yen*

6                                   JERRY T. YEN
                                     Deputy Attorney General

7                                   *Attorneys for Rob Bonta, in his official capacity as California Attorney*

8                                 *General, and Allison Mendoza, in her official capacity as Director of the*

9                                 *Department of Justice Bureau of Firearms*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

                                                                            **Page**

Introduction..............................................................................................1

Background..............................................................................................1

    I.     California's OGM Law ....................................................1

    II.    Studies Show that OGM Laws Prevent Illegal Firearms
          Trafficking..................................................................... 3

    III.   Studies Show that Firearms Acquired as Part of a Multiple Sale
          Were More Likely to Be Used in Crimes ............................. 4

    IV.   Procedural History ......................................................... 5

Legal Standard .........................................................................................6

Argument ................................................................................................6

    I.     Plaintiffs Cannot Show that the Text of the Second Amendment
          Covers Their Proposed Conduct ............................................ 7

    II.    California's OGM Law Is A Presumptively Lawful Regulation
          on the Commercial Sale of Firearms .................................... 9

    III.   California's OGM Law Is Consistent with the Nation's History
          of Firearm Regulation ...................................................... 11

          A.    This Case Requires a "More Nuanced" Analogical
                 Approach............................................................. 11

                1.    Firearms Were Not Widely Owned or Purchased
                     During the Founding and Reconstruction Eras ............. 12

                2.    The OGM Law Addresses the Unprecedented
                     Problem of Firearms Trafficking and Straw
                     Purchases .......................................................... 13

          B.    The Government Has Historically Enjoyed Broad
                 Authority To Regulate the Commercial Sale of Products,
                 Including Firearms, to Promote Public Safety ........................ 14

                1.    Gunpowder Regulations Are Analogous to the
                     OGM Law........................................................... 15

                2.    Sales Restrictions During the Founding and
                     Reconstruction Eras are Analogous to California's
                     OGM Law........................................................... 18

                  3.    Taxing and Licensing Regulations During the
                     Founding and Reconstruction Eras are Analogous
                     to California's OGM Law ........................................ 20

Conclusion .............................................................................................23

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

Anderson v. Liberty Lobby, Inc.
  477 U.S. 242 (1986) ................................................................................. 6

5

6

Bauer v. Becerra
  858 F.3d 1216 (9th Cir. 2017) ................................................................. 9

7

8

Celotex Corp. v. Catrett
  477 U.S. 317 (1986) ................................................................................. 6

9

10

District of Columbia v. Heller
  554 U.S. 570 (2008) ................................................................... 7, 8, 9, 10

11

12

Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives
  5 F.4th 407 (4th Cir. 2021), vacated on other grounds, 14 F.4th 322
  (4th Cir. 2021) ....................................................................................... 10

13

14

Huddleston v. United States
  415 U.S. 814 (1974) ............................................................................... 13

15

16

Jackson v. City & Cty. of San Francisco
  746 F.3d 953 (9th Cir. 2014) ................................................................... 9

17

18

Jones v. Bonta
  34 F.4th 704 (9th Cir. 2022), vacated and remanded on rehearing,
  47 F.4th 1124 (9th Cir. 2022) .................................................................. 9

19

20

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.
  475 U.S. 574 (1986) ................................................................................. 6

21

22

McDonald v. City of Chicago
  561 U.S. 742 (2010) ........................................................................ 7, 8, 9

23

24

New York State Club Ass'n, Inc. v. City of New York
  487 U.S. 1 (1988) ..................................................................................... 8

25

26

New York State Rifle & Pistol Ass'n, Inc. v. Bruen
  142 S. Ct. 2111 (2022) ...................................................................passim

27

28

1
2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3
4

*Pena v. Lindley*
   898 F.3d 969 (9th Cir. 2018) .............................................................. 10

5
6

*T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*
   809 F.2d 626 (9th Cir. 1987) ................................................................ 6

7
8

*Teixeira v. Cnty. of Alameda*
   873 F.3d 670 (9th Cir. 2017) ................................................ 7, 8, 19, 23

9

*United States v. Alaniz*
   69 F.4th 1124 (9th Cir. 2023) ....................................................... 7, 13

10
11

*United States v. Holton*
   639 F. Supp. 3d 704 (N.D. Tex. 2022) ............................................... 23

12
13

*United States v. Tribunella*
   749 F.2d 104 (2d Cir. 1984) ................................................................ 2

14

**STATUTES**

15
16

United States Code, Title 18
   § 921 (1968) ...................................................................................... 13

17

1837 Ga., ch. 90 ................................................................................... 19

18
19

1838 Fla., ch. 24 .................................................................................. 21

20

1838 Tenn., ch. 137 ............................................................................. 19

21

1879 Tenn., ch. 96 ............................................................................... 19

22

1881 Ark., ch. 96 ................................................................................. 20

23

1763 Pa. Laws 319 ............................................................................... 20

24
25
26

Acts of Assembly, Mar. 1675-76, 2 William Waller Hening, *The
   Statutes at Large: Being a Collection of All the Laws of Virginia,
   from the First Session of the Legislature, in the Year 1619* (1823) ... 19

27

An Act Entitled "Revenue," 1856-1857 N.C. Sess. Laws 34 ................ 22

28

Defendants' Motion for Summary Judgment (3:20-cv-02470)

1
2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3
4

An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gunpowder, Ordinances of Kensington (1774).................................................................................................17

5
6
7

An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder Within the Town of Boston, 1783 Mass. Acts 218 .................................................................................................16

8
9
10

An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.)...................................................................................................16

11
12

An Act To Amend An Act Entitled "An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State," 1893 S.C. Acts 426 ...........................................21

13
14
15

An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same, 1866 Ga. Law 27 .......................22

16
17

An Act to Incorporate and Establish the City of Dubuque, 1845 Iowa Laws 119..............................................................................................16

18
19
20

An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof, 1784 N.Y. Laws 627 ..............16

21

An Act to Prevent the Sale of Pistols, 1879 Tenn. Pub. Acts 135-36 ....................21

22
23

An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93.................................................................16

24
25

An Act to Suppress the Use of Bowie Knives, 1837 Ala. Laws 7 ..........................22

26

An Act To Tax Guns And Pistols in The County Of Washington, 1867 Miss. Laws 327.....................................................................................22

27
28

iv

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

**Page**

An Ordinance to Provide for Licensing Vendors of Gunpowder and
    Other Explosive Substances and to Regulate the Storing, Keeping
    and Conveying of all Dangerous and Explosive Materials and
    Substances within the City of La Crosse, and in relation to the
    Storage and Sale of Lime Therein, Ordinances of La Crosse (1888) ............... 17

California Penal Code
    § 17140 ................................................................................................... 2
    § 27535 ............................................................................................... 1, 2
    § 27535(a) .............................................................................................. 2
    § 27535(b) .............................................................................................. 3
    § 27535(b)(7) ......................................................................................... 3
    § 27535(b)(8) .................................................................................... 3, 10
    § 27540(g) ....................................................................................... 2, 10

California Statutes
    2019, Chapter 737, § 5 ......................................................................... 3
    2022, Chapter 76, §§ 18-21 ................................................................... 2

Concerning the Manufacture, Storage, Transportation, and Sale of
    Powder, Nitro-glycerine, etc., Ordinances of the City of Hoboken
    (1901) .................................................................................................. 17

The New York City Consolidation Act, Ordinances of the City of New
    York (1890) ......................................................................................... 17

The Revised Code of Alabama (1867) ......................................................... 22

The Revised Statutes of South Carolina, Containing the Code of Civil
    Procedure, and the Criminal Statutes (1890) ....................................... 21

**CONSTITUTIONAL PROVISIONS**

Texas Constitution
    Article I, § 13 (1869) ........................................................................... 15

United States Constitution
    Amendment II ....................................................................................... 7

v

# TABLE OF AUTHORITIES
### (continued)

Page

**COURT RULES**

Federal Rules of Civil Procedure
  Rule 56(a) ................................................................................................ 6
  Rule 56(d) ............................................................................................... 6

**OTHER AUTHORITIES**

Allen Rostron, *High-Powered Controversy: Gun Control, Terrorism, and the Fight Over .50 Caliber Rifles*, 73 U. Cin. L. Rev. 1415 (2005) ..................................................................................................... 2

Assemb. B. 202, March 16, 1999 Assembly Committee on Public Safety Hearing, 1999-2000 Reg. Sess. (Cal. 1999) ..................................... 2

California Code of Regulations, Title 11
  § 5471(ff) ................................................................................................ 2
  § 5471(hh) ............................................................................................... 2
  § 5471(j) .................................................................................................. 2

Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30 (2023) ....................................................... 18

S.B. 61, June 25, 2019 Assembly Committee on Public Safety Hearing, 2019-2020 Reg. Sess. (Cal. 2019) ......................................... 3

Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2022) ................. 15

William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809 (2019) ................................................... 18

William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* (University of North Carolina Press 1996) ........................................................................................... 14, 15

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Over twenty years ago, California limited the civilian purchase of handguns from licensed firearms dealers to one purchase every thirty days in an effort to curtail the illegal gun market and make it more difficult for criminals to acquire firearms.  Cal. Penal Code § 27535.[2]  This limitation is typically referred to as a one-gun-a-month, or OGM, law.  As rifles became more prevalent, California's OGM law was expanded to the purchase of semiautomatic centerfire rifles in 2021.

Plaintiffs now bring this action claiming that the OGM law violates the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment.  The Court having granted Defendants' earlier summary judgment motion as to Plaintiffs' equal protection claim, the only remaining claim is the Second Amendment claim.  And that claim fails as a matter of law.  Under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), (1) the OGM law does not violate Plaintiffs' Second Amendment right to keep and bear arms, (2) it is a presumptively lawful regulation of the commercial sale of firearms, and (3) it is consistent with the Nation's historical tradition of firearm regulation.  Thus, the Court should grant Defendants' motion for summary judgment.

**BACKGROUND**

**I.    CALIFORNIA'S OGM LAW**

California Penal Code section 27535 currently states that "[a] person shall not make an application to purchase more than one handgun or semiautomatic centerfire rifle[3] within the same 30-day period.  This subdivision does not authorize

---

[2] All subsequent statutory references are to the California Penal Code, unless otherwise noted.

[3] Generally speaking, a "semiautomatic" firearm is one "the operating mode

a person to make an application to purchase both a handgun and semiautomatic centerfire rifle within the same 30-day period." § 27535(a). Similarly, a dealer is prohibited from delivering a handgun or semiautomatic centerfire rifle if the purchaser has "made another application to purchase either a handgun or semiautomatic rifle" within the preceding 30-day period. § 27540(g).[4]

The purpose of California's OGM law is "to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself. Such a transfer is referred to as a 'straw transaction.'" Defendants' Statement of Undisputed Facts (DSUF) No. 5; Defendants' Notice of Legislative Facts (NLF), Exh. 1 (Assemb. B. 202, March 16, 1999 Assembly Committee on Public Safety Hearing, 1999-2000 Reg. Sess. (Cal. 1999)) at 3. Without a limit on the number of handguns that may be purchased, it is easier for "straw purchasers to acquire guns for another person or for street dealers to acquire guns legitimately." DSUF No. 6; NLF, Exh. 1. Thus, the Legislature

of which uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of the trigger." § 17140 (defining semiautomatic pistol). With respect to the "centerfire" and "rimfire" distinction, in centerfire ammunition, the primer that ignites the gunpowder and causes the cartridge to fire is located in the center of the base of the cartridge. In rimfire ammunition, the primer is located inside a soft outer rim around the edge at the base of the cartridge. Centerfire firearms are generally more powerful because centerfire cartridges are stronger and can withstand higher pressures than rimfire cartridges. *See generally United States v. Tribunella*, 749 F.2d 104, 107 (2d Cir. 1984) (describing centerfire weapons); Allen Rostron, *High-Powered Controversy: Gun Control, Terrorism, and the Fight Over .50 Caliber Rifles*, 73 U. Cin. L. Rev. 1415, 1469 n.12 (2005) (explaining rimfire and centerfire design); *see also* Cal. Code Regs. tit. 11, § 5471(j), (ff), (hh) (defining "centerfire," "rimfire," and "semiautomatic").

[4] California Penal Code sections 27535 and 27540, subdivision (g) are collectively referred to as "California's OGM law." Beginning on January 1, 2024, California's OGM law will limit purchases of any firearm to one purchase every thirty days. Cal. Stats. 2022, ch. 76 (Assemb. B. 1621), §§ 18-21.

found that the law would "curtail the illegal gun market, disarm criminals, and save lives." *Id.*

In 2019, California expanded its OGM law to include semiautomatic centerfire rifles, and the expansion went into effect on July 1, 2021.  DSUF No. 2; Cal. Stats. 2019, ch. 737 (S.B. 61), § 5 (amending § 27535).  In doing so, the Legislature noted that "[m]ore and more shootings [were] occurring with long guns."  DSUF No 7; NLF, Exh. 2 (S.B. 61, June 25, 2019 Assembly Committee on Public Safety Hearing, 2019-2020 Reg. Sess. (Cal. 2019)) at 3.  And, in support of this expansion, at least one local board of supervisors noted that it would "support[] legislation that reduces the likelihood of accidental or intentional homicides and, in particular, mass homicides."  DSUF No. 8; NLF, Exh. 2 at 4.

There are some limited exceptions to California's OGM law.  For example, private party transactions conducted through a licensed dealer and transactions conducted through a law enforcement agency are exempt from the OGM requirement.  DSUF No. 4; § 27535(b)(7), (8).  The Legislature provided these exemptions because they are "salutary" and "encourage a person who may be involved lawfully in multi-gun exchanges to go to a licensed dealer, or to the local sheriff, in order to facilitate the exchange."  DSUF No. 9; NLF, Exh. 1 at 4.  Peace officers, licensed private security businesses, and licensed gun collectors are also exempt from the OGM law, among others.  DSUF No. 3; § 27535(b).

## II. Studies Show that OGM Laws Prevent Illegal Firearms Trafficking

Several research studies have found that, after a state implemented an OGM law, there was a reduction in the number of crime guns traced back to that state.  These studies conclude that OGM laws reduce illegal firearms trafficking:

- A 1996 study published in the *Journal of the American Medical Association* found "that restricting purchases of handguns to 1 per month [was] an

effective way to disrupt the illegal movement of guns across state lines." DSUF No. 10; DX-3[5] (Weil & Knox 1996) at 1761.

- In 1996, the Virginia State Crime Commission published the results of its study on Virginia's OGM law and found that the law "had its intended effect of reducing Virginia's status as a source state for gun trafficking." DSUF No. 11; DX-4 at 7. The Commission also noted that "prior to passage of the one-gun-a-month law, South Carolina was a leading source state for guns [trafficked] to New York City, accounting for 39% of guns recovered in criminal investigations. Following implementation of the law, South Carolina virtually dropped off of the statistical list of source states for firearms trafficked to the northeast." DSUF No. 12; DX-4 at 3.

- A 2005 study in *Criminology and Public Policy* looked into crime gun data for handguns sold in Maryland before and after the passage of Maryland's OGM law. DX-5 (Koper 2005). "This research [] supports the efficacy of OGM laws as a method for disrupting gun trafficking." DSUF No. 13; DX-5 at 770. The author also concluded that "[a]n OGM law should disrupt straw purchasing operations, thereby reducing the flow of guns from the primary market into criminal channels." *Id.*

- A 2017 study of firearms recovered by the Boston Police Department confirmed the findings of Weil and Knox's 1996 study and stated "that restricting handgun purchases to one per month may change where criminals get their guns." DSUF No. 15; DX-6 (Braga 2017) at 90.

**III. STUDIES SHOW THAT FIREARMS ACQUIRED AS PART OF A MULTIPLE SALE WERE MORE LIKELY TO BE USED IN CRIMES**

Studies have also concluded that multiple guns purchased by the same person were more likely to be used in a crime:

- The 2005 study in *Criminology and Public Policy* concluded that "[g]uns sold in multiple sales accounted for about one quarter of crime guns and, more importantly, were at elevated risk for criminal use." DSUF No. 14; DX-5 at 769.

---

[5] "DX" followed by the exhibit number are citations to Defendants' exhibits accompanying the Declaration of Jerry T. Yen in support of Defendants' Motion for Summary Judgment.

- Another study analyzed data for handguns purchased in California in 1996, before California's OGM law was passed. DX-7 (Wright 2010). In that study, the researchers found that "[h]andguns purchased by individuals who bought multiple similar guns were 58% more likely to be used in crime than were handguns purchased by individuals who purchased only one handgun in 1996." DSUF No. 16; DX-7 at 362.

## IV. PROCEDURAL HISTORY

On December 18, 2020, Plaintiffs filed a complaint challenging the constitutionality of California's OGM law. ECF No. 1 (Complaint). Plaintiffs comprise four individuals (Michelle Nguyen, Dominic Boguski, Jay Medina, and Frank Colletti (collectively, "Individual Plaintiffs")); two firearm retailers (PWGG, L.P. and North County Shooting Center, Inc.) and their respective owners (John Phillips and Darin Prince) (collectively, "Retailer Plaintiffs")); and three nonprofit entities focused on Second Amendment rights (Firearms Policy Coalition, San Diego County Gun Owners PAC, and Second Amendment Foundation (collectively, "Institutional Plaintiffs")). *Id*. ¶¶ 7-17. The Individual Plaintiffs desire to purchase two or more handguns and semiautomatic rifles in a single transaction within a thirty-day period. DSUF No. 19; Complaint ¶¶ 73-77. The Retailer Plaintiffs allege that they are prevented from selling two or more handguns or semiautomatic rifles in a single transaction within a thirty-day period to individuals. Complaint ¶¶ 87-88. The Institutional Plaintiffs claim to have an interest in defending the Second Amendment rights of their members. *See id*. ¶ 104.

Plaintiffs claim that California's OGM law violates the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment. *Id*. at ¶¶ 94-143 (Counts I and II). The Complaint seeks declaratory and injunctive relief. *Id*. at 42-43 (Prayer for Relief).

In April 2022, the parties filed cross-motions for summary judgment. ECF Nos. 23, 29. In September 2022, pursuant to the Court's order, the parties filed

1  supplemental briefing on the effect of the Supreme Court's decision in *Bruen*.  ECF

2  Nos. 43, 44.  In January 2023, the Court denied Plaintiffs' summary judgment

3  motion, granted Defendants' summary judgment motion as to the equal protection

4  claim, but otherwise denied the motion.  ECF No. 49.  The Court ordered that the

5  parties could engage in additional expert discovery and file renewed motions for

6  summary judgment.  *Id.*

7  ## LEGAL STANDARD

8  A court must grant summary judgment in favor of a moving party that shows

9  "there is no genuine dispute as to any material fact and the movant is entitled to

10  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is entitled

11  to judgment as a matter of law when the nonmoving party fails to make a sufficient

12  showing on an essential element of a claim in the case on which the nonmoving

13  party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

14  There is no genuine issue of fact for trial where the record, taken as a whole, could

15  not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

16  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

17  present specific, significant probative evidence, not simply "some metaphysical

18  doubt"); *see also* Fed. R. Civ. P. 56(d).  Conversely, a genuine dispute over a

19  material fact exists if there is sufficient evidence supporting the claimed factual

20  dispute, requiring a judge or jury to resolve the differing versions of the truth.

21  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253, (1986); *T.W. Elec. Serv. Inc. v.*

22  *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

23  ## ARGUMENT

24  In *Bruen*, the Supreme Court announced a new standard for adjudicating

25  Second Amendment claims, one "centered on constitutional text and history."  142

26  S. Ct. at 2128-29.  Under this text-and-history approach, courts must first determine

27  that "the Second Amendment's plain text covers an individual's conduct."  *Id.* at

28  2129-30.  If it does, "[t]he government must then justify its regulation by

6

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130; *see United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (explaining *Bruen*'s "two-part test").

Under the text-and-history standard, the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. It does not prevent states from adopting a "'variety' of gun regulations," *id.* at 2162 (Kavanaugh, J., concurring), and "experiment[ing] with reasonable firearms regulations" to address threats to the public, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion). As discussed below, California's OGM law is consistent with the Second Amendment's text and history.

## I.    PLAINTIFFS CANNOT SHOW THAT THE TEXT OF THE SECOND AMENDMENT COVERS THEIR PROPOSED CONDUCT

As a threshold matter, Plaintiffs fail to meet their burden to show that each of the "textual elements" of the Second Amendment's operative clause—which provides a right of the "People" to "keep" and "bear" "Arms," U.S. Const. amend. II—covers the proposed course of conduct. *Bruen*, 142 S. Ct. at 2134 (citation omitted). The right to "keep arms" refers to possessing arms, and the right to "bear arms" refers to carrying arms "for a particular purpose—confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 583-584 (2008). The Court in *Bruen* also emphasized that "self-defense is 'the *central component* of the [Second Amendment] right itself." 142 S. Ct. at 2135 (citations omitted). Although the ability to acquire firearms is necessary to keep and bear arms for self-defense, it is not an unconditional right. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017). And the imposition of conditions, such as waiting for completion of a background check or licensing requirements, does not impede an individual's right to "keep" or "bear" arms once those conditions have been satisfied.

Here, California's OGM law does not prevent the Individual Plaintiffs or other "people"[6] from "keep[ing]" or "bear[ing]" "Arms." The law merely limits individuals to the purchase of one handgun or semiautomatic centerfire rifle every thirty days directly from licensed firearm dealers. It does not prevent anyone from acquiring firearms for self-defense, keeping them for those purposes, and bearing the firearms for confrontation. Indeed, the Individuals Plaintiffs even admit that the OGM law still allows them to own and obtain firearms for self-defense. *See* DSUF Nos. 17-18; DX-12, DX-13, DX-14, and DX-15 (Individual Plaintiffs' Responses to Requests for Admission). They also admit that they could obtain more than one firearm within a thirty-day period through other types of transactions (e.g., private party sale). *Id*. Thus, the proposed course of conduct—purchasing more than one handgun or one semiautomatic centerfire rifle from a licensed firearms dealer within a thirty-day period—does not impact an individual's ability to "keep" or "bear" arms and does not fall within the scope of the Second Amendment.

This conclusion that Plaintiffs' challenge fails as a textual matter is consistent with the Supreme Court's Second Amendment precedents. *Heller* and *McDonald* invalidated unusually "severe" restrictions that "totally ban[ned] handgun possession in the home." *Heller*, 554 U.S. at 628-629; *see also McDonald*, 561 U.S. at 750-751. Those laws "amount[ed] to a destruction of the Second Amendment right" to "keep" firearms for "the core lawful purpose of self-defense"

---

[6] Defendants have no reason to dispute that the Individual Plaintiffs are part of "the People." However, the Retailer Plaintiffs do not have a freestanding right to sell firearms under the Second Amendment. *See Teixeira*, 873 F.3d at 686-87. Any Second Amendment right to sell a firearm in this case would be connected to the Individual Plaintiffs' right to "keep" and "bear" arms. *See id*. The Institutional Plaintiffs allegedly have an interest in protecting the Second Amendment rights of their members, which include the Individual Plaintiffs. Complaint ¶¶ 7-10, 104. Thus, the Institutional Plaintiffs appear to be invoking the doctrine of associational standing and their interest in this case is coextensive with the Individual Plaintiffs' Second Amendment right. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988).

by "law-abiding, responsible citizens." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014) (quoting *Heller*, 554 U.S. at 629, 635). Similarly, the "proper cause" requirement challenged in *Bruen* made it "virtually impossible for most New Yorkers" "to carry a gun outside the home for self-defense," 142 S. Ct. at 2156 (Alito, J., concurring), and therefore effectively "nullif[ied] half of the Second Amendment's operative protections"—*i.e.*, the right to "bear" arms, *id.* at 2135. In contrast to the laws challenged in *Heller*, *McDonald*, and *Bruen*, which effectively operated as a restraint on the ability of most law-abiding citizens to "keep" firearms for self-defense or to "bear" "arms" outside the home, California's OGM law places no limit on the number of firearms that the Individual Plaintiffs can "keep" nor does not it place any limit on their ability to "bear" arms. *Cf. Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (a $19 fee on firearms transfers does not "ha[ve] any impact on the plaintiffs' actual ability to obtain and possess a firearm"); *see also Jones v. Bonta*, 34 F.4th 704, 718 (9th Cir. 2022) (requiring that young adults ages 18-20 secure a hunting license before they can acquire some firearms from dealers "does not impose a significant burden on the Second Amendment right to keep and bear arms"), *vacated and remanded on rehearing* by 47 F.4th 1124 (9th Cir. 2022) (mem.) (vacating district court decision for further proceedings consistent with *Bruen*).

At bottom, California's OGM law does not prevent law-abiding citizens from keeping or bearing arms of any sort. Accordingly, under *Bruen*, the burden does not shift to the government to support the regulations with a historical analysis and Plaintiffs' Second Amendment challenge fails at the threshold stage of the inquiry.

## II. CALIFORNIA'S OGM LAW IS A PRESUMPTIVELY LAWFUL REGULATION ON THE COMMERCIAL SALE OF FIREARMS

Plaintiffs' challenge also fails because the OGM law merely imposes a "condition[] and qualification[] on the commercial sale of arms," which makes the law among those "presumptively lawful regulatory measures" that governments

may adopt consistent with the Second Amendment.  *Heller*, 554 U.S. at 626-627, 627 n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting this part of *Heller* stating that "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples]").  Although the contours of the commercial conditions category have not yet been conclusively defined, *see Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018), the Fourth Circuit noted that "a law's substance, not its form, determines whether it qualifies as a condition on commercial sales."  *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 416 (4th Cir. 2021) (citation omitted), *vacated on other grounds*, 14 F.4th 322 (4th Cir. 2021).  In other words, a commercial regulation is considered a "condition on commercial sales" if it does not operate as a functional prohibition or total ban on buying a gun.  *See id*. Indeed, presumptively lawful restrictions on commercial sales generally "go to *where* and *when* such [] sales can take place" as opposed to "*what* can be sold." *Pena*, 898 F.3d at 1009 (Bybee, J., concurring in part and dissenting in part).

Here, California's OGM law is not a total ban on purchasing a firearm or a ban on any particular type of firearm.  Instead, it regulates *when* licensed firearms dealers may sell a handgun or semiautomatic centerfire rifle to someone who previously purchased one from a licensed dealer.  Cal. Penal Code § 27540(g).  And, as noted earlier, the OGM law does not apply to private party transactions. Cal. Penal Code § 27535(b)(8).  Thus, far from a total ban, California's OGM law merely places a "presumptively lawful" condition on the commercial sale of firearms.

As for the Individual Plaintiffs, they all but admit that the OGM law does not infringe on their ability to acquire firearms for self-defense.  *See* DSUF Nos. 17-18; DX-12, DX-13, DX-14, and DX-15 (Individual Plaintiffs' Responses to Requests for Admission).  In fact, they are able to purchase and keep as many firearms as

they wish.  Once they have purchased a handgun or semiautomatic centerfire rifle from a licensed firearms dealer, they only have to wait thirty days to purchase another one.  They can also purchase additional firearms from a private party at any time.  Accordingly, California's OGM law is a presumptively lawful condition on the commercial sale of firearms.

## III.   CALIFORNIA'S OGM LAW IS CONSISTENT WITH THE NATION'S HISTORY OF FIREARM REGULATION

Even if Plaintiffs could demonstrate that California's OGM law burdens conduct covered by the plain text of the Second Amendment and could not be considered a presumptively lawful condition on the commercial sale of firearms, the law is consistent with the Nation's historical tradition of firearm regulation under *Bruen*.  Properly contextualized, the OGM law is analogous to numerous historical regulations that were passed to promote public safety around the time that the Second and Fourteenth Amendments were ratified.

### A.   This Case Requires a "More Nuanced" Analogical Approach

As a preliminary matter, a "more nuanced" approach is required when comparing the OGM law to historical laws.  *Bruen*, 142 S. Ct. at 2131-32.  When a challenged law addresses either "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" is needed because "[t]he regulatory challenges" of today would not be "the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  *Id*. at 2132.  Governments generally regulate problems as they arise, and thus prior generations cannot be expected to address concerns that were not prevalent at the time.

Here, unlike the "fairly straightforward" historical analysis in *Bruen* that required the government to identify a "distinctly similar historical regulation," *id*. at 2131, a more nuanced analogical approach is required because, during the founding and Reconstruction Eras, most gun owners did not purchase more than one gun at a

time, firearms were not generally available for bulk purchases, and firearms trafficking was not as much of a concern as it is today.

### 1.   Firearms Were Not Widely Owned or Purchased During the Founding and Reconstruction Eras

During the eighteenth century, producing a firearm required a significant amount of time, resources, and expertise, and as a consequence, the number of firearms available for purchase was very limited.  DX-9 (Sweeney Expert Rept.) ¶¶ 6, 10.  In fact, most gunsmiths spent their time repairing firearms instead of making new ones.  *Id.* ¶¶ 11, 13, 17, 18; DX-10 (McCutchen Expert Rept.) ¶ 9.  In addition to the limited availability of new firearms, the cost of a firearm generally prevented people from purchasing more than one firearm at a time.  McCutchen Expert Rept. ¶ 15.  This is confirmed by contemporaneous probate records showing that a majority of individuals owned either one gun or no gun at all.  Sweeney Expert Rept. ¶ 11, tbl. 1.  And the minority of those estates with more than one firearm were largely Southern plantation owners who used multiple firearms to control their source of wealth (rather than to engage in self-defense).  *Id.* ¶¶ 14-15.  Thus, most gun owners in the eighteenth century only had one firearm and many individuals did not even own a firearm.  *Id.* ¶ 18.

Moving to the time the Fourteenth Amendment was ratified, manufacturing advances resulted in guns becoming more widely available and lowered the cost of some firearms.  DX-11 (Rivas Expert Rept.) ¶ 25.  However, many Americans still could not afford to purchase more than one gun at a time.  *See id.* ¶¶ 8, 25, 29.  Moreover, the Reconstruction-era firearms distribution network limited the availability of firearms.  Retailers only had a limited number of firearms available to sell at any given time and people needed to place orders for new firearms well in advance and then wait for their order to arrive.  *Id.* ¶¶ 26-27.  Considering these practical limitations, Americans during this time generally did not acquire guns in bulk.  *Id.* ¶¶ 8, 29.

In sum, governments during the founding and Reconstruction eras did not have to confront the ability to purchase a large number of firearms at a given time or any of the dangers associated with bulk purchases.

### 2.   The OGM Law Addresses the Unprecedented Problem of Firearms Trafficking and Straw Purchases

California's OGM law also addresses societal concerns that did not exist during the founding or Reconstruction eras to the same extent that they exist today: firearms trafficking and straw purchases. *See, e.g., Alaniz*, 69 F.4th at 1129-30 (explaining that the use of firearms in illegal drug trafficking "is a largely modern crime" requiring a "more nuanced approach" despite the existence of other smuggling crimes in the founding era). In 1968, Congress "determined that the ease in which firearms could be obtained contributed significantly to the prevalence of lawlessness and violent crime in the United States." *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (citation omitted). In an effort to keep criminals and other prohibited persons (e.g., drug users, juveniles, dangerously mentally ill) from obtaining guns, Congress passed the Gun Control Act of 1968, 18 U.S.C. § 921 (1968). *See Huddleston*, 415 U.S. at 824, 827. The Act created federally licensed dealers, required firearms to be channeled through the licensed dealers, and set forth other requirements for the sale and purchase of firearms. *See* 18 U.S.C. § 921 (1968); *see also Huddleston*, 415 U.S. at 824-25.

Despite these requirements, firearms were still being obtained by individuals who could not lawfully purchase or possess them. Law enforcement agencies gradually developed tools to investigate firearms trafficking organizations. *See* DX-8 (Bisbee Expert Rept.) ¶ 9. One tool is to monitor sales of multiple firearms because purchases of more than one firearm is a key indicator of firearms trafficking and straw purchases. *Id.* ¶¶ 10-11. As such, California took steps to curtail the incidence of firearms trafficking and straw purchases by passing the

13

OGM law under its authority to protect the public and regulate the commercial sale of firearms.

**B.   The Government Has Historically Enjoyed Broad Authority To Regulate the Commercial Sale of Products, Including Firearms, to Promote Public Safety**

The tradition of regulating the commercial sale of products, including firearms and ammunition, stems from the government's authority to preserve the peace and welfare of the community pursuant to its police powers. "[D]espite historical depictions of free trade, 'laggard' regulation, and the opening of American society, the early nineteenth century was home to a deluge of formal economic regulations and vigorous defenses of the power of the state over trade and commerce." DX-16, William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* 87 (University of North Carolina Press 1996); *see also id.* at 85 (contrasting the "'myth of laissez-faire'" with "the myriad ways that law and active state governments furnished the necessary conditions for early American economic development"). Thus, "early Americans understood the economy as simply another part of their well-regulated society, intertwined with public safety, morals, health, and welfare and subject to the same kinds of legal controls." *Id.* at 84.

Consistent with these principles, "[n]early all state legislatures in the early nineteenth century passed laws directing 'trades to be conducted, and wares and goods to be fabricated, and put up for market in a certain manner.'" *Id.* at 88 (citing Nathan Dane, *A General Abridgment and Digest of American Law* vol. VI 749 (Cummings, Hillard & Co. 1823)). For example, between 1780 and 1835, the Massachusetts legislature passed regulations that closely specified and controlled the way numerous products were manufactured and sold, including gunpowder and firearms. *Id.* (listing a total of 49 regulated products, from boards and shingles to beef and pork). Maryland, South Carolina, Michigan, and Ohio enacted similar legal schemes. *Id.* Aside from such product and inspection laws, nineteenth-century legislators also used licensing "to regulate and control a host of economic

14

activities, trades, callings, and professions . . . for the public good and the people's welfare." *Id.* at 90.  In 1827, Maryland enacted a series of statutes requiring a "license to trade," and Tennessee, Missouri, Pennsylvania, and California passed similar statutes in the midcentury "requiring the licensing of merchants, retailers, and wholesalers." *Id.* at 90-91.  And in 1868, Alabama required licenses for over thirty occupations and businesses, including for "dealers in firearms." *Id.* at 91 (citing *Alabama Acts of the General Assembly* 329-35 (1868)).

Moreover, it was well understood that state and local governments possessed the inherent police power to regulate the firearms and ammunition market to address public safety.  *See* McCutchen Expert Rept. ¶¶ 27-28; Rivas Expert Rept. ¶ 23.  In fact, state constitutions adopted during the Reconstruction era employed expansive language providing that the right to keep and bear arms was subject to state regulation.  *See* DX-17, Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65, 75-77 (2022).  For example, the Texas Constitution of 1869 stated "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, *under such regulations as the Legislature may prescribe*."  Tex. Const. art. I, § 13 (1869) (emphasis added).

### 1.    Gunpowder Regulations Are Analogous to the OGM Law

In accordance with technological and social norms and the prevailing needs of the day, gunpowder—which was inherently dangerous (especially in urban areas with wooden infrastructure), but also required for the use of firearms and made widely available by a rapidly growing industry—was highly regulated in early America.  *See generally* Novak, *supra*, at 60-67; *see also* Rivas Expert Rept. ¶ 13 (noting that local ordinances often regulated where and how black powder could be stored).  States enacted laws regulating gun powder, such as:

- An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder Within the Town of Boston, 1783 Mass. Acts 218, *available at* https://firearmslaw.duke.edu/laws/1783-mass-acts-218-an-act-in-addition-to-the-several-acts-already-made-for-the-prudent-storage-of-gun-powder-within-the-town-of-boston-ch-13/ (Massachussets' law prohibiting the storage of any firearm loaded with gunpowder in Boston); and

- An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof, 1784 N.Y. Laws 627, ch. 28, *available at* https://firearmslaw.duke.edu/laws/1784-n-y-laws-627-an-act-to-prevent-the-danger-arising-from-the-pernicious-practice-of-lodging-gun-powder-in-dwelling-houses-stores-or-other-places-within-certain-parts-of-the-city-of-new-york-or/ (New York State's requirements for gunpowder storage in New York City).

States also enacted laws delegating to cities the authority to regulate gunpowder, including:

- An Act to Incorporate and Establish the City of Dubuque, 1845 Iowa Laws 119, chap 123, § 12, *available at* https://firearmslaw.duke.edu/laws/1845-iowa-laws-119-an-act-to-incorporate-and-establish-the-city-of-dubuque-chap-123-%c2%a7-12/ (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city");

- An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20, *available at* https://firearmslaw.duke.edu/laws/1836-conn-acts-105-an-act-incorporating-the-cities-of-hartford-new-haven-new-london-norwich-and-middletown-chap-1-%c2%a7-20/ (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder); and

- An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8,  pt. 4, *available at* https://firearmslaw.duke.edu/laws/1847-ind-acts-93-an-act-to-reduce-the-law-incorporating-the-city-of-madison-and-the-several-acts-amendatory-thereto-into-one-act-and-to-amend-the-same-chap-61-%c2%a7-8-pt-4/ (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").

As a result, cities regularly enacted laws regulating gunpowder, including prohibitions of *where* and *how much* gunpowder may be stored, transported, and made available for sale:

- An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gunpowder, Ordinances of Kensington (1774), §§ 2, 5, *available at* https://firearmslaw.duke.edu/laws/a-digest-of-the-acts-of-assembly-and-the-ordinances-of-the-commissioners-and-inhabitants-of-the-kensington-district-of-the-northern-liberties-for-the-government-of-that-district-page-45-47-image-4/ (restricting the storage and transportation of gunpowder within two miles of the City of Philadelphia to no more thirty pounds);

- Concerning the Manufacture, Storage, Transportation, and Sale of Powder, Nitro-glycerine, etc., Ordinances of the City of Hoboken (1901), Ch. 22, §§ 246-247, *available at* https://firearmslaw.duke.edu/laws/concerning-the-manufacture-storage-transportation-and-sale-of-powder-nitro-glycerine-etc-ch-22-%c2%a7%c2%a7-246-247-in-ordinances-of-the-city-of-hoboken-from-the-incorporation-of-the-city-to/ (limiting the amount of gunpowder available for sale);

- An Ordinance to Provide for Licensing Vendors of Gunpowder and Other Explosive Substances and to Regulate the Storing, Keeping and Conveying of all Dangerous and Explosive Materials and Substances within the City of La Crosse, and in relation to the Storage and Sale of Lime Therein, Ordinances of La Crosse (1888), § 3, *available at* https://firearmslaw.duke.edu/laws/charter-and-ordinances-of-the-city-of-la-crosse-with-the-rules-of-the-common-council-page-239-242-image-242-245-1888-available-at-the-making-of-modern-law-primary-sources/ (limiting the amount of gunpowder kept for sale in the city); and

- The New York City Consolidation Act, Ordinances of the City of New York (1890), § 455, *available at* https://firearmslaw.duke.edu/laws/mark-ash-the-new-york-city-consolidation-act-as-in-force-in-1891-with-notes-indicating-the-statutory-sources-references-to-judicial-decisions-and-all-laws-relating-to-new-york-city-passed-since/ (limiting the quantity of gunpowder being stored or sold within city limits).

Ultimately, the gunpowder regulations placed limits on the ownership and storage of gunpowder, even for use in armed self-defense, but did not completely

prevent people from purchasing gunpowder.  Likewise, although the OGM law places limits on the number of firearms that can be purchased within a certain period of time, it does not prevent individuals from purchasing firearms for lawful self-defense.  The gunpowder regulations from the founding and Reconstruction eras therefore "impose[d] a comparable burden on the right of armed self-defense" that is also "comparably justified" to the OGM requirement.  *Bruen*, 142 S. Ct. at 2133.  In addition, regulations limiting where and how much gunpowder could be stored or made available for sale served to promote public safety.  Similarly, as discussed earlier, by limiting the number of firearms that can be purchased in a thirty-day period, the OGM protects the public from the dangers of straw purchases and firearms trafficking.  Accordingly, historical restrictions on the storage and sale of gunpowder are relevantly similar to California's OGM law.

## 2. Sales Restrictions During the Founding and Reconstruction Eras are Analogous to California's OGM Law

During the colonial and founding era, colonists perceived Native Americans as a threat to public safety due to hostilities between colonists and Native peoples, and passed laws regulating the trade and sale of firearms to them.[7]  McCutchen Expert

---

[7] These historical restrictions were enacted before ratification of the Fourteenth Amendment's Equal Protection Clause.  Defendants in no way condone laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but refer to such laws because they are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees.  *See Bruen*, 142 S. Ct. at 2150-51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).  Historical analogues can confirm enduring traditions of firearm regulation even if Defendants disapprove of their particular application in the past.  *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past doctrine, not to that doctrine's role in past society."); *see also* Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30, 37 (2023) ("Without a full picture of past laws—the prosaic and prejudiced alike— courts risk impermissibly narrowing the range of legislative options the ratifiers

Rept. ¶¶ 17-22; *see also Teixeira*, 873 F.3d at 685 (discussing firearm sale restrictions in response to the threat posed by Native tribes).  Examples of such laws include:

- A Virginia law prohibiting colonists traveling to any Native town or more than three miles of an English plantation from carrying more than one gun and ten charges of powder in an effort to prevent the sale of guns and ammunition to Native peoples.  *Teixeira*, 873 F.3d at 685 (citing Acts of Assembly, Mar. 1675–76, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 336–37 (1823)); *see also* McCutchen Expert Rept. ¶ 17;

- A Connecticut law prohibited colonists from lending guns and ammunition to Native Americans.  McCutchen Expert Rept. ¶ 18 (citing 1723 Connecticut Acts 292);

- A Maryland law limited the amount of gunpowder that could be sold to Native Americans.  *Id*. ¶ 20 (citing Clayton E. Cramer, "Colonial Firearm Regulation," *SSRN Electronic Journal*, April 2016, at 11); and

- An early federal law placed limits on trading guns with Native Americans. *Id*. ¶ 25 (citing the 1796 Act for Establishing Trading Houses with the Indian Tribes).

Moving to the Reconstruction era, governments enacted restrictions on the sale of deadly weapons to address the increase in violence and public safety problems associated with the use of those weapons.  Rivas Expert Rept. ¶ 14.  For example, in order to protect citizens from the prevalent use of deadly weapons, Georgia and Tennessee passed statutes making it unlawful to sell certain kinds of knives, pistols, and swords.  *Id*. ¶ 16 (citing 1837 Ga., ch. 90; 1838 Tenn., ch. 137; 1879 Tenn., ch. 96).  In other examples, Vermont, New York, Kentucky, Florida, Illinois, Massachusetts, North Dakota, and Oklahoma prohibited the sale of slung shots and metal knuckles.  *Id*. ¶ 18 (citations omitted).  And Arkansas prohibited

---

understood to be consistent with the right to keep and bear arms.").

the sale of pistols, knives, swords, spears, metal knuckles and razors.  *Id*. ¶ 20 (citing 1881 Ark., ch. 96).  These laws were generally upheld as a proper exercise of police powers by the legislature.  *Id*. ¶¶ 19, 20.

The restrictions on the sale of firearms and other weapons enacted pursuant to the police powers of the legislatures during the founding and Reconstruction eras placed limits on the ability of individuals to purchase or sell firearms to address the perceived risks to public safety.  And, in some cases, they banned the sale of entire categories of weapons.  Such restrictions actually imposed a greater burden on the right to bear arms for lawful self-defense than the OGM law (which only places a limit of how many firearms may be purchased directly from a licensed dealer within a thirty-day period).  Nevertheless, the founding and Reconstruction era restrictions on the sale of firearms and other weapons are relevantly similar to California's OGM law because those restrictions and the OGM law were enacted to address public safety risks—in particular, the OGM law was passed to address the public safety risks associated with straw purchases and illegal firearms trafficking.  Therefore, the founding and Reconstruction era laws restricting the sale of firearms and other deadly weapons are analogous to the OGM law.

### 3. Taxing and Licensing Regulations During the Founding and Reconstruction Eras are Analogous to California's OGM Law

Governments also addressed the perceived threats to public safety through taxing and licensing laws in order to limit the availability of firearms.  In the eighteenth century, to regulate trade with Native Americans and limit (but not eliminate) their access to firearms, some local authorities required a license to trade with them.  *See* McCutchen Expert Rept. ¶ 18 (citing 1763 Pa. Laws 319).  Though colonial officials were concerned with arming potentially hostile Native groups, these perceived public-safety risks were balanced against financial interests in the firearms trade.  *Id*.  After the American Revolution, the new United States also decided to regulate trade with Native Americans by copying local-level laws and

20

requiring a license to trade with them. *Id*. ¶ 24 (citing Indian Trade and Intercourse Act (1790)).

During the nineteenth century, states continued to pass laws requiring a license to sell firearms. *See* Rivas Expert Rept. ¶ 19.  For example:

- An Act to Prevent the Sale of Pistols, 1879 Tenn. Pub. Acts 135-36, ch. 96, § 1, *available at* https://firearmslaw.duke.edu/laws/1879-tenn-pub-acts-135-36-an-act-to-prevent-the-sale-of-pistols-chap-96-%c2%a7-1/ (prohibiting the sale of pistols without a license);

- An Act To Amend An Act Entitled "An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State," 1893 S.C. Acts 426, § 2, *available at* https://firearmslaw.duke.edu/laws/1893-s-c-acts-426-an-act-to-amend-an-act-entitled-an-act-to-provide-for-a-license-for-the-sale-of-pistols-or-pistol-cartridges-within-the-limits-of-this-state-%c2%a7-2/ (authorizing counties to issue licenses to sell pistols); and

- The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes (1890), ch. 28, § 490, *available at* https://firearmslaw.duke.edu/laws/john-e-breazeale-the-revised-statutes-of-south-carolina-containing-the-code-of-civil-procedure-and-the-criminal-statutes-also-the-constitutions-of-the-united-states-and-of-the-state-and-the-rule/ (requiring a license to sell or offer to sell pistols and rifles).

In addition to licenses, states began placing taxes on the sale of firearms and other deadly weapons for the purpose of protecting the public from the use of those weapons by increasing the costs of those weapons and thus reducing their availability.  *See* Rivas Expert Rept. ¶ 15 (citing 1838 Fla., ch. 24 and explaining that the Florida legislature used a tax on certain weapons to accomplish their public safety goal of reducing the number of those weapons being carried in public spaces); *see also id*. ¶ 19 (noting that Thomas Cooley, an influential legal scholar of the time, wrote that a tax "has not for its object the raising of revenue, but looks rather to the regulation of relative rights, privileges and duties . . . [to] the

discouragement of pernicious employments." *Id*. ¶ 19 (citation omitted).  Examples of these taxes include:

- An Act to Suppress the Use of Bowie Knives, 1837 Ala. Laws 7, § 2, *available at* https://firearmslaw.duke.edu/laws/1837-ala-acts-7-an-act-to-suppress-the-use-of-bowie-knives-%C2%A7-2/ (imposing a $100 tax on each Bowie knife sold in the state);

- An Act Entitled "Revenue," 1856-1857 N.C. Sess. Laws 34, ch. 34, § 23, pt. 4, *available at* https://firearmslaw.duke.edu/laws/1856-1857-n-c-sess-laws-34-pub-laws-an-act-entitled-revenue-ch-34-%c2%a7-23-pt-4/ (taxing pistols);

- An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same, 1866 Ga. Law 27, § 3, *available at* https://firearmslaw.duke.edu/laws/1866-ga-laws-27-28-an-act-to-authorize-the-justices-of-the-inferior-courts-of-camden-glynn-and-effingham-counties-to-levy-a-special-tax-for-county-purposes-and-to-regulate-the-same-%c2%a7%c2%a7-3/ (taxing each gun, pistol, musket, or rifle over the number of three owned on a plantation);

- An Act To Tax Guns And Pistols in The County Of Washington, 1867 Miss. Laws 327, § 1, *available at* https://firearmslaw.duke.edu/laws/1867-miss-laws-327-28-an-act-to-tax-guns-and-pistols-in-the-county-of-washington-ch-249-%c2%a7-1/ (taxing each gun or pistol owned in the county); and

- The Revised Code of Alabama (1867), Page 169, *available at* https://firearmslaw.duke.edu/laws/the-revised-code-of-alabama-page-169-image-185-1867-available-at-the-making-of-modern-law-primary-sources/ (taxing all pistols and revolvers in the possession of private individuals).

Licensing and taxing laws during the founding and Reconstruction eras served to limit the availability and ownership of firearms in order to protect the public while minimally burdening the right to armed self-defense.  These laws are analogous to California's OGM law which limits the availability of firearms for straw purchases and firearms trafficking and, in turn, protects the public from the dangers associated with those criminal activities.

As shown above, state and local governments fully exercised their powers to enact commercial firearms regulations based on the needs at the time to protect the public. *See United States v. Holton*, 639 F. Supp. 3d 704, 711-12 (N.D. Tex. 2022) (relying in part on "commercial firearms regulations" dating back to colonial times to reject Second Amendment challenge, and favorably citing the historical discussion of such regulations in *Teixeira*, 873 F.3d at 685). As the court observed in *Holton*, several commercial regulations of this era, including regulations controlling the firearms trade and taxes on firearms, were enacted "to address the illegal trading and trafficking of arms and ammunition." *Holton*, 639 F. Supp. 3d at 711. These historical analogues have comparable justifications to California's OGM Law —"(1) controlling [] the sale of firearms and (2) ensuring dangerous individuals d[o] not obtain firearms." *Id.* And the OGM law similarly regulates firearms-related commercial activity to promote public safety—and in doing so, it is no more burdensome than the analogous regulations discussed above from the founding and Reconstruction eras. Accordingly, California's OGM law is consistent with the Nation's historical tradition of firearm regulation and does not violate the Second Amendment.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment.

Dated:  September 15, 2023                    Respectfully submitted,

ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General


*/s/ Jerry T. Yen*

JERRY T. YEN
Deputy Attorney General
*Attorneys for Rob Bonta, in his*
*official capacity as California*
*Attorney General, and Allison*
*Mendoza, in her official capacity as*
*Director of the Department of Justice*
*Bureau of Firearms*

Defendants' Motion for Summary Judgment (3:20-cv-02470)