ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JERRY T. YEN
Deputy Attorney General
State Bar No. 247988
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
  Fax: (916) 324-8835
  E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Rob Bonta, in his official
capacity as California Attorney General, and
Allison Mendoza, in her official capacity as
Director of the Department of Justice Bureau
of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,** | Case No. 3:20-cv-02470-WQH-MMP |
| Plaintiffs, | **DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; EXHIBITS 3-7** |
| **v.** | |
| **ROB BONTA, in his official capacity as Attorney General of California, et al.,** | Date: To be set by the Court |
| | Judge: Hon. William Q. Hayes |
| | Courtroom: 14B |
| Defendants. | Action Filed: Dec. 18, 2020 |

### DECLARATION OF JERRY T. YEN

I, Jerry T. Yen, declare:

1.   I am a Deputy Attorney General for the Office of the Attorney General for the State of California, attorney of record for Defendants in this action.

1

2.   I am competent to testify to the matters set forth in this declaration, and if called to do so, I would and could so testify.  I make this declaration in support of Defendants' Motion for Summary Judgment.

3.   A true and correct copy of Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996) is attached as **Exhibit 3**[1].

4.   A true and correct copy of Virginia State Crime Commission, *Study of Virginia's Law on Handgun Purchase Limits*, House Document No. 28 (1996) is attached as **Exhibit 4**.

5.   A true and correct copy of Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749 (2005) is attached as **Exhibit 5**.

6.   A true and correct copy of Anthony A. Braga, *Long-Term Trends in the Sources of Boston Crime Guns*, 3 RSF: The Russell Sage Found. J. Soc. Sci. 76 (2017) is attached as **Exhibit 6**.

7.   A true and correct copy of Mona A. Wright, et al., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances that Suggest Gun Trafficking*, 87 J. Urban Health 352 (2010) is attached as **Exhibit 7**.

8.   On November 19, 2021, Defendants served Plaintiffs with the Expert Report of Joseph L. Bisbee.  A true and correct copy of the Expert Report of Joseph L. Bisbee (without exhibits) is attached as **Exhibit 8**.

9.   On May 19, 2023, Defendants served Plaintiffs with the Expert Report of Kevin M. Sweeney.  A true and correct copy of the Expert Report of Kevin M. Sweeney is attached as **Exhibit 9.**

---

[1] The documents submitted in this declaration are a subset of the documents submitted in support of Defendants' Motion for Summary Judgment.  To keep the numbering of the exhibits consistent, Defendants begin with Exhibit 3 in this declaration.

2

10. On May 19, 2023, Defendants served Plaintiffs with the Expert Report of Jennifer M. McCutchen. A true and correct copy of the Expert Report of Jennifer M. McCutchen is attached as **Exhibit 10.**

11. On May 19, 2023, Defendants served Plaintiffs with the Expert Report of Brennan Rivas. A true and correct copy of the Expert Report of Brennan Rivas is attached as **Exhibit 11.**

12. A true and correct copy of Plaintiff Dominic Boguski's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission is attached as **Exhibit 12**.

13. A true and correct copy of Plaintiff Frank Colletti's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission is attached as **Exhibit 13**.

14. A true and correct copy of Plaintiff Jay Medina's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission is attached as **Exhibit 14**.

15. A true and correct copy of Plaintiff Michelle Nguyen's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission is attached as **Exhibit 15**.

16. A true and correct copy of excerpts from William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* (University of North Carolina Press 1996) is attached as **Exhibit 16**.

17. A true and correct copy of Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2022) is attached as **Exhibit 17**.

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

2  foregoing is true and correct.

3    Executed on September 15, 2023.

4

5                                              /s/ Jerry T. Yen

6                                    JERRY T. YEN
                                     Deputy Attorney General

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Jerry T. Yen ISO Defendants' MSJ (3:20-cv-02470)

1

**EXHIBITS**

2

**TABLE OF CONTENTS**

3

| Exhibit | Description | Pages |
|---------|-------------|-------|
| Exhibit 3 | Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996) | 00001-00004 |
| Exhibit 4 | Virginia State Crime Commission, *Study of Virginia's Law on Handgun Purchase Limits*, House Document No. 28 (1996) | 00005-00073 |
| Exhibit 5 | Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749 (2005) | 00074-00104 |
| Exhibit 6 | Anthony A. Braga, *Long-Term Trends in the Sources of Boston Crime Guns*, 3 RSF: The Russell Sage Found. J. Soc. Sci. 76 (2017) | 00105-00125 |
| Exhibit 7 | Mona A. Wright, et al., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances that Suggest Gun Trafficking*, 87 J. Urban Health 352 (2010) | 00126-00139 |
| Exhibit 8 | Expert Report and Declaration of Joseph L. Bisbee (with relevant exhibits) | 00140-00157 |
| Exhibit 9 | Expert Report and Declaration of Kevin M. Sweeney | 00158-00179 |
| Exhibit 10 | Expert Report and Declaration of Jennifer M. McCutchen | 00180-00210 |
| Exhibit 11 | Expert Report and Declaration of Brennan Rivas | 00211-00242 |
| Exhibit 12 | Plaintiff Dominic Boguski's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00243-00252 |

5

| Exhibit | Description | Pages |
|---|---|---|
| Exhibit 13 | Plaintiff Frank Colletti's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00253-00262 |
| Exhibit 14 | Plaintiff Jay Medina's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00263-00272 |
| Exhibit 15 | Plaintiff Michelle Nguyen's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00273-00282 |
| Exhibit 16 | Excerpts from William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* (University of North Carolina Press 1996) | 00283-00305 |
| Exhibit 17 | Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2022) | 00306-00332 |

# Exhibit 3

Exhibit 3
Page 00001

# Brief Reports

# Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms

Douglas S. Weil, ScD; Rebecca C. Knox, MPH, MSW

**Objective.**—To determine the effect of limiting handgun purchases to 1 per month on the illegal movement of firearms across state lines.

**Design.**—Data from the Bureau of Alcohol, Tobacco, and Firearms firearms trace database were obtained for traces requested for firearms recovered in connection with criminal investigations. The analysis incorporates data on date and location of purchase for 14 606 firearms purchased prior to (September 1989 through June 1993) and after (July 1993 through March 1995) enactment of a Virginia law limiting handgun purchases to 1 per month.

**Main Outcome Measures.**—Odds of tracing a firearm acquired prior to implementation of the law to Virginia vs another state in the Southeast compared with the odds for firearms acquired after the law took effect.

**Results.**—For firearms recovered anywhere in the United States, 3201 (27%) of 11 876 acquired prior to the implementation of the law and 519 (19%) of 2730 purchased after the law was enacted were traced to Virginia (odds ratio [OR], 0.64; 95% confidence interval [CI], 0.58-0.71). For traces initiated in the northeast corridor (New York, New Jersey, Connecticut, Rhode Island, and Massachusetts), 1103 (34.8%) of 3169 of the firearms acquired before the 1-gun-a-month law took effect and 142 (15.5%) of 919 firearms purchased after implementation were traced to Virginia (OR, 0.34; CI, 0.28-0.41).

**Conclusion.**—Gun control policies involving licensing, registration, and restricting the number of purchases represent efforts to limit the supply of guns available in the illegal market. This study provides evidence that restricting handgun purchases to 1 per month is an effective means of disrupting the illegal interstate transfer of firearms.

*(JAMA. 1996;275:1759-1761)*

IN JULY 1993, a Virginia law limiting handgun purchases by an individual to 1 gun in a 30-day period took effect.[1] Prior to the 1-gun-a-month law, individuals were able to purchase an unlimited number of handguns from licensed dealers. The law was passed in response to Virginia's growing reputation as a principal supplier of guns to the illegal market in the northeastern United States.[2] The Bureau of Alcohol, Tobacco, and Firearms (ATF) reported that 41% of a sample of guns seized in New York City in 1991 were traced to Virginia gun dealers.[3] Virginia also has been a primary out-of-state source of recovered crime guns traced in Washington, DC,[4] and Boston, Mass.[5]

Virginia is not the only out-of-state source of firearms illegally trafficked along the eastern seaboard. The ATF has identified the illegal movement of firearms from states in the Southeast to states

north along interstate highway I-95 (sometimes referred to as the "Iron Pipeline"[5]), as 1 of 3 principal gun-trafficking routes in the country (oral communication, Joe Vince, July 18, 1995). The ATF also reported that Virginia, Florida, and Georgia accounted for 65% of all successfully traced firearms used in crimes in New York City.[3] In a separate report, investigators found that 25% of successfully traced firearms recovered in Baltimore, Md, were originally purchased in the southeastern United States.[6]

Interstate gun trafficking occurs, in part, because of the disparity in state laws governing gun sales. As a result, the illegal market price of firearms in localities with restrictive gun laws is significantly greater than the retail price for the same types of guns purchased in states in which laws are less stringent.[7] The ability to buy many guns at a retail price to be sold elsewhere at a higher illegal market price suggests that the purchase of multiple firearms in a single transaction is an important aspect of the profit motive that supports the illegal gun mar-

ket. The objective behind passage of the 1-gun-a-month law in Virginia was to undermine the economic incentive created by the disparities in gun laws among the states. This study assesses the effect of Virginia's 1-gun-a-month law on gun-trafficking patterns across state lines.

## Methods

The data used in the analysis come from the firearms trace database compiled by ATF and were obtained by the Center to Prevent Handgun Violence through the Freedom of Information Act. Law enforcement agencies can request that ATF trace a gun that has been recovered in connection with a criminal investigation. The ATF staff at the National Tracing Center contact the manufacturer of the firearm to identify the wholesaler or retail dealer who received the gun. Staff at the National Tracing Center then contact each consecutive dealer who acquired the firearm until the gun is either traced to the most recent owner or until the gun can be traced no further. There is no requirement that records of gun transfers be maintained by nongun dealers who sell a firearm. Consequently, the tracing process often ends with the first retail sale of the gun.

As part of the tracing process, information is collected on several variables, including the location of the gun dealer or dealers who handled the gun (by state and region); when the gun was purchased; when and where the trace was initiated; and the manufacturer, model, and caliber of the firearm being traced. The firearms trace database contained records pertaining to approximately 295 000 firearms (September 1989 through March 1995). Since 1990, the number of traces conducted each year has more than doubled, and in 1994 was approximately 85 000.

The principal analysis was to estimate the odds ratio (OR) for tracing a firearm to any gun dealer in Virginia relative to gun dealers in the other southeastern states, for guns purchased prior to the effective date of Virginia's 1-gun-a-month law (September 1989 through June 1993) compared with guns purchased after the law was implemented (July 1993 through March 1995). The Southeast region was

From the Center to Prevent Handgun Violence, Washington, DC.

Reprints: Douglas S. Weil, ScD, Center to Prevent Handgun Violence, 1225 I St NW, Suite 1100, Washington, DC 20005.

Exhibit 3
Page 00002

Estimated Odds Ratios That a Firearm Purchased After Implementation of the Virginia 1-Gun-a-Month Law Would Be Traced to a Virginia Gun Dealer Relative to a Gun Dealer in Another Southeastern State Compared With Firearms Purchased Prior to the Law*

| Firearms Recovered In | Guns Traced to Dealer In | Guns Purchased Prior to Law, No. (%) | Guns Purchased After Law Implemented, No. (%) | Odds Ratio (95% Confidence Interval) |
|---|---|---|---|---|
| All states (n=14 606) | Virginia | 3201 (27.0) | 519 (19.0) | 0.64 (0.58-0.71) |
| | Southeast | 8675 (73.0) | 2211 (81.0) | |
| Northeast (n=4088) | Virginia | 1103 (34.8) | 142 (15.5) | 0.34 (0.28-0.41) |
| | Southeast | 2066 (65.2) | 777 (84.5) | |
| New Jersey (n=729) | Virginia | 154 (28.7) | 34 (17.7) | 0.53 (0.35-0.80) |
| | Southeast | 537 (71.3) | 192 (82.3) | |
| New York (n=2991) | Virginia | 888 (38.2) | 102 (15.3) | 0.29 (0.23-0.36) |
| | Southeast | 2324 (61.8) | 667 (84.7) | |
| Connecticut (n=53) | Virginia | 15 (34.1) | 3 (33.3) | 0.96 (0.21-4.39) |
| | Southeast | 44 (65.9) | 9 (66.7) | |
| Rhode Island (n=14) | Virginia | 1 (7.1) | NA | NA |
| | Southeast | 14 (92.9) | NA | |
| Massachusetts (n=301) | Virginia | 45 (18.0) | 3 (5.9) | 0.28 (0.08-0.94) |
| | Southeast | 250 (82.0) | 51 (94.1) | |

*Southeast includes the following states: North Carolina, South Carolina, Mississippi, Georgia, Florida, Tennessee, and Alabama. NA indicates not applicable. Period prior to law is September 1989 through June 1993; period after law is July 1993 through March 1995.

identified as the comparison group for Virginia because the region has long been identified as a principal source of out-of-state firearms for the eastern seaboard. As defined by ATF, the Southeast region includes Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, and Tennessee. The origin of a gun that had been transferred from a dealer in 1 state to a dealer in a second state was considered to be the last dealer's location.

The ATF no longer traces firearms manufactured prior to 1985 without being specifically requested to do so. Results are reported in this analysis only for guns purchased since January 1985. However, the results of a sensitivity analysis incorporating data for all firearms for which date of purchase information were available were essentially unchanged from the principal analysis. In another sensitivity analysis conducted excluding guns purchased more than 1 full year after the Virginia law took effect to rule out the influence of seasonal variation, the results were not significantly different from those of the principal analysis.

Date of purchase information was not available for all guns in the firearms trace dataset. Of the 9217 traced firearms acquired in the Southeast region and recovered in the Northeast, the date of purchase was known in 4088 cases (42%). A proxy variable for the date of purchase (the date the trace was initiated) was created so that the analysis could be replicated using the firearms for which the date of purchase was unknown under the assumption that all guns traced prior to implementation of the law would have been purchased before the law took effect, and that guns traced after the law was implemented could have been ac-

quired before or after implementation. The results of this analysis were consistent with the principal results of the study.

Odds ratios were estimated for firearm traces initiated (1) anywhere in the United States; (2) in the northeast corridor (New Jersey, New York, Connecticut, Rhode Island, and Massachusetts); and (3) for each of these Northeast states individually. For each estimate, the hypothesis being tested remained the same: the odds of a gun purchased after enactment of Virginia's 1-gun-a-month law being traced to any Virginia gun dealer relative to a gun dealer in another part of the Southeast were significantly lower than for guns purchased prior to enactment of the law.

## Results

The date a gun was purchased and the date the trace request was made were available for 55 856 (19%) of the guns in the ATF database. Of these guns, 17 082 (30.6%) were traced to dealers located in the Southeast region; 14 606 guns were acquired after 1989.

A total of 3201 (27%) of 11 876 guns purchased prior to passage of the 1-gun-a-month law, which were traced to gun dealers in the Southeast, were acquired from Virginia gun dealers. A total of 519 (19%) of 2730 guns purchased after the law went into effect and similarly traced to dealers in the Southeast were acquired in Virginia. The likelihood that a traced gun recovered anywhere in the nation was acquired in Virginia relative to another southeastern state, for firearms purchased after the 1-gun-a-month law took effect compared with guns purchased prior to enactment of the law, was reduced 36% (OR, 0.64; 95% confidence interval [CI], 0.58-0.71) (Table).

The magnitude of the association between when and where a gun was acquired was greater when the analysis focused on gun traces initiated in the northeast corridor (New Jersey, New York, Connecticut, Rhode Island, or Massachusetts). For gun traces originating in the Northeast, the likelihood that a gun would be traced to Virginia relative to gun dealers elsewhere in the Southeast for guns purchased after the 1-gun-a-month law took effect when compared with guns purchased prior to the law's effective date was reduced 66% (OR, 0.34; 95% CI, 0.28-0.41).

Associations were apparent for gun traces initiated in individual states. For instance, among the guns from the Southeast recovered in New York, 888 (38%) of 3212 guns purchased prior to implementation of the Virginia law were traced to Virginia gun dealers compared with 102 (15%) of 869 guns from the Southeast purchased after the law took effect (OR, 0.29; 95% CI, 0.23-0.36).

## Comment

There is little published research on the effectiveness of gun laws. Most studies have focused on the association between gun laws and rates of injury or violence. With little dissent,[8] these studies are generally supportive of the thesis that well-tailored gun laws can have a beneficial impact on gun violence, whereas laws that increase access to firearms may have the opposite effect.[9-12] For example, restrictive licensing of handguns in Washington, DC, was associated with a "prompt decline in homicides and suicides by firearms in the District of Columbia."[13] Conversely, in a study of 5 large urban areas, easing restrictions on carrying concealed weapons was associated with an increase in gun-related homicide and was not offset by a decrease in homicides committed by other means.[14]

In 1993, 1.1 million violent crimes were committed with handguns.[15] Approximately 30% to 43% of criminals identified the illegal market as the source of their last handgun.[16,17] The illegal market exists for several reasons: would-be criminals may be unable to buy handguns because prior criminal records disqualify them from legal purchases, the gun laws in their states prevent them from obtaining a handgun quickly and easily, and would-be criminals do not want to make legal purchases because the handgun eventually can be traced back to them.

Local and state legislative bodies have created a variety of weak and strong laws regulating handgun sales across the country. In some jurisdictions purchasers may need a permit to possess a handgun[18,19] or may be required to wait several days before the firearm transfer is authorized.[20]

Exhibit 3
Page 00003

Interstate Transfer of Firearms—Weil & Knox

In other jurisdictions, there are no restrictions on the sale of handguns beyond the few imposed by federal law. Consequently, jurisdictions with weaker gun retail laws may attract gun traffickers who buy handguns in these jurisdictions and transport their purchases illegally to areas with stronger regulation. The guns can then be sold illegally to ineligible buyers (eg, felons or minors) or to people who want guns that cannot be traced to them.

In an ATF study on gun trafficking in Southern California where a 15-day waiting period applies, 179 (30.5%) of 587 guns recovered in crimes in that region, which could be traced to a gun dealer, came from outside California.[21] Almost a third (58 [32.4%] of 179) of these out-of-state guns were sold initially by dealers in Nevada, Arizona, and Texas, states in which the most exacting rules concerning handgun sales are the minimum restrictions set forth in federal law.[21] The experience in New York City is similar. The ATF reports that 66% of a sample of all guns recovered in crime in New York City in 1991 and traced by ATF were originally obtained in Virginia, Florida, Ohio, and Texas, all of which have relatively weaker gun laws compared with New York City.[3]

The ability to purchase large numbers of firearms that have a street value that is much higher than their commercial price enables gun traffickers to make large profits and keep costs to a minimum. The ATF field division for Southern California recently reviewed more than 5700 instances of multiple gun sales. Almost 18% (1026 [17.9%] of 5743) of these multiple sales involved individual purchases of 3 or more guns.[21(pp16-17)] Theoretically, prohibiting multiple purchase transactions should be an effective policy means to disrupt established gun-trafficking patterns while ultimately reducing the supply of firearms in the illegal market.

The results of our study provide evidence that restricting purchases of handguns to 1 per month is an effective way to disrupt the illegal movement of guns across state lines. The analysis of the firearms trace database shows a strong, consistent pattern in which guns originally obtained in the Southeast are significantly less likely to be recovered as part of a criminal investigation and traced to Virginia if they were purchased after the Virginia law went into effect.

While evidence generated from this study is consistent with the theory behind a prohibition on multiple gun sale transactions, a change in the laws governing gun purchases that makes more permissive the laws in the comparison states (eg, Florida or Georgia) after July 1993 could provide an alternative explanation for the findings. We surveyed state laws looking for changes in limits on multiple sales, gun bans, background checks and waiting periods required for the purchase of a gun, regulation of secondary sales, license to purchase requirements, and registration of sales. Laws governing private gun ownership in the southeastern region revealed no relevant changes, although Georgia adopted an instant check system and preempted local gun laws effective January 1996.

Our study has several limitations. First, additional research is needed to clarify what, if any, displacement effects were created by the Virginia law (eg, to what extent gun traffickers shift their activities to the next most attractive state for acquiring firearms). Second, with the ATF data we used, it was not possible to determine the effect of the Virginia law on gun violence rates. Third, all types of firearms are included in our analysis, even though the Virginia law only restricts the purchase of handguns. The prohibition on multiple handgun purchases could have an incidental effect on illegal trafficking of long guns (eg, rifles) as gun traffickers either stop or limit their operations in Virginia or shift from trafficking in handguns to long guns. If there is no incidental impact on trafficking of long guns, their inclusion in the analysis would bias the results toward the null hypothesis.

Fourth, because ATF does not trace all firearms recovered by law enforcement as part of a criminal investigation, firearms included in the firearms trace database may not be representative of all recovered guns. However, the origin and date of purchase of a gun (the 2 key variables in our study) are not known by the requesting agency until a trace is completed, making it unlikely that the sample of guns traced will differ significantly from the larger pool of recovered guns with respect to these 2 variables.

Finally, other unidentified factors associated with when and where a gun was acquired and the likelihood that a gun trace would be requested (eg, a decision to stop or start tracing 1 type of firearm that can only be acquired in Virginia) may have been present at the time the law took effect. Such factors could lead to results that are inappropriately attributed to implementation of the law. However, the observation of a consistent set of results in several different regions decreases the possibility that such an unidentified confounding factor is responsible for the outcome of our analysis.

## Conclusion

Most gun control policies currently advocated in the United States (eg, licensing, registration, and 1-gun-a-month) could be described as efforts to limit the supply of guns available in the illegal market. However, once such laws are enacted, it is important to demonstrate that they are effective. This study provides evidence that limiting the purchase of handguns to no more than 1 per month per person is an effective means of disrupting the illegal interstate transfer of firearms.

This work was supported in part by the Overbrook Foundation, New York, NY, and the Educational Foundation of America, Westport, Conn.

We thank David Hemenway, PhD, and Eric Rimm, ScD, of the Harvard School of Public Health for their assistance with the development of this article. We also thank Mark Polston, JD,Rick Bielke, Richard Aborn, JD, Dennis Henigan, JD, Bob Walker, JD, Diana Weil, ScM, and James Willmuth for their comments.

### References

1. Va Code Ann. §18.2-308.2:2(Q) (Michie 1994).
2. Larson E. *Lethal Passage: How the Travels of a Single Handgun Expose the Roots of America's Gun Crisis.* New York, NY: Crown Publishers Inc; 1994:104.
3. Bureau of Alcohol, Tobacco, and Firearms, Project Lead. Memorandum to special agent in charge, NYPD: firearms/homicide statistics. June 16, 1992:1.
4. Edds M. The pipeline to the streets of New York. *Virginia-Pilot.* January 3, 1993:A9.
5. Montgomery B. Guns bought in Georgia arm northern criminals. *Atlanta Constitution.* October 11, 1993: A1, A4.
6. Bureau of Alcohol, Tobacco, and Firearms and the Baltimore Police Dept. *1994 Baltimore Trace Study.* Baltimore, Md: Bureau of Alcohol, Tobacco, and Firearms; 1994:Appendix X.
7. Freedman A. Fire power: behind the cheap guns flooding the cities is a California family. *Wall Street Journal.* February 28, 1992:A1, A6.
8. Centerwall BS. Homicide and the prevalence of handguns. *Am J Epidemiol.* 1991;134:1245-1260.
9. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assault, and homicide: a tale of two cities. *N Engl J Med.* 1988;319:1256-1262.
10. Sloan JH, Rivara FP, Reay DT, Ferris JA, Kellermann AL. Firearm regulations and rates of suicide. *N Engl J Med.* 1990;342:369-373.
11. Killias M. International correlations between gun ownership and rates of homicide and suicide. *Can Med Assoc J.* 1993;148:1721-1725.
12. Houser HB, Invited commentary: common wisdom and plain truth. *Am J Epidemiol.* 1991;134:1261-1263.
13. Loftin C, McDowall D, Wiersema B, Coffey MS. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N Engl J Med.* 1991;325:1615-1620.
14. McDowall D, Loftin C, Wiersema B. Easing concealed firearm laws: effects on homicide in three states. *J Criminal Law Criminol.* Fall 1995;86:198-206.
15. Zawitz M. *Firearms, Crime, and Criminal Justice: Guns Used in Crime: Bureau of Justice Statistics: Selected Findings.* Washington, DC: US Dept of Justice, Bureau of Justice Statistics; July 1995:1.
16. Sheley JF, Wright JD. *Gun Acquisition and Possession in Selected Juvenile Samples.* Washington, DC: National Institute of Justice and Office of Juvenile Justice and Delinquency Prevention; December 1993:6. Research in Brief.
17. Beck A, Gilliard P, Greenfeld L, et al. *Survey of State Prison Inmates, 1991.* Washington, DC: National Institute of Justice, Bureau of Justice Statistics; March 1993:19.
18. New York Penal Law. §265.01, 265.20(f)(3) (McKinney 1989).
19. New York City, NY Code. §10-131.
20. Cal Penal Code. §12071(b)(3)(A) (West 1992).
21. Bureau of Alcohol, Tobacco, and Firearms. *Sources of Crime Guns in Southern California.* Los Angeles, Calif: Bureau of Alcohol, Tobacco, and Firearms; April 1995:21-22.

Interstate Transfer of Firearms—Weil & Knox   **1761**

Exhibit 3
Page 00004

# Exhibit 4

Exhibit 4
Page 00005

REPORT OF THE VIRGINIA STATE CRIME
COMMISSION

# STUDY OF VIRGINIA'S LAW ON HANDGUN PURCHASE LIMITS

TO THE GOVERNOR AND
THE GENERAL ASSEMBLY OF VIRGINIA



# HOUSE DOCUMENT NO. 28

COMMONWEALTH OF VIRGINIA
RICHMOND
1996

Exhibit 4
Page 00006

Exhibit 4
Page 00007



# COMMONWEALTH of VIRGINIA

Frederick L. Russell
Executive Director

**VIRGINIA STATE CRIME COMMISSION**

General Assembly Building

(804) 225-4534
(804) 786-7872 Fax

November 14, 1995

TO:   The Honorable George Allen, Governor of Virginia
and Members of the General Assembly:

During the 1995 Session of the General Assembly, the House Courts of Justice Committee directed the Virginia State Crime Commission to study the one-gun-a-month law, and carried over House Bill 2427 to allow the Crime Commission to submit its findings and recommendations to the Governor and the 1996 session of the General Assembly.

In fulfilling this directive, a study was conducted by the Virginia State Crime Commission in 1995. I have the honor of submitting herewith the study report.

Respectfully submitted,

Elmo G. Cross, Jr.
Chairman

EGC/dgs

Exhibit 4
Page 00009

MEMBERS OF THE VIRGINIA STATE CRIME COMMISSION 1995

## From the Senate of Virginia:

Elmo G. Cross, Jr., Chairman
Janet D. Howell
Edgar S. Robb

## From The House of Delegates:

James F. Almand
Robert B. Ball, Sr.
Jean W. Cunningham
Howard E. Copeland
Raymond R. Guest, Jr.
Clifton A. Woodrum, Vice Chairman

## Appointments by the Governor:

Robert C. Bobb
Robert F. Horan, Jr.
Rev. George F. Ricketts, Sr.

## Attorney General:

James S. Gilmore, III

Exhibit 4
Page 00010

**Law Enforcement Subcommittee**

**Crime Commission Members**

The Honorable Robert F. Horan, Chairman
Delegate James F. Almand
Delegate Howard E. Copeland
Delegate Jean W. Cunningham
Delegate Raymond R. Guest
Senator Janet D. Howell
Rev. George F. Ricketts, Sr.
Senator Edgar S. Robb
Senator Elmo G. Cross, Jr., ex officio

**Staff**
Dana G. Schrad, Staff Attorney

Frederick L. Russell, Executive Director
Sylvia Coggins, Executive Assistant

This project was supported by Grant #96-A7885AD95, awarded by the Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice. The Assistant Attorney General, Office of Justice Programs, coordinates the activities of the following program offices and bureaus: Bureau of Justice Assistance, Bureau of Justice Statistics, National Institute of Justice, Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime. Points of view or opinions contained within this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice.

Exhibit 4
Page 00011

# Study Of Virginia's Law On Handgun Purchase Limits

## TABLE OF CONTENTS

I.    Authority for Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Members Appointed to Serve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Report of Department of State Police . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Report of Center to Prevent Handgun Violence . . . . . . . . . . . . . . . . 5

      C.    Position of National Rifle Association . . . . . . . . . . . . . . . . . . . . . . . . 6

      D.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.    Findings and Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.   Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VII.  Acknowledgements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Appendix A - Letter from House Courts of Justice Committee . . . . . . . . . . . . . A-1

Appendix B - Virginia and South Carolina statutes . . . . . . . . . . . . . . . . . . . . . . . B-1

Appendix C - State Police Report on Multiple Handgun Purchases . . . . . . . . . . C-1

Appendix D - Report from Center to Prevent Handgun Violence . . . . . . . . . . . D-1

Appendix E - Presentation by NRA Lobbyist Paul Blackman . . . . . . . . . . . . . . . E-1

Exhibit 4
Page 00012

Exhibit 4
Page 00013

## Study Of Virginia's Law On Handgun Purchase Limits

### I. Authority for Study

During the 1995 General Assembly session, Delegate Clinton Miller of Woodstock introduced House Bill 2427, a measure to repeal Code of Virginia § 18.2-308.2:2 Subsection Q. The bill as proposed would have eliminated restrictions imposed in 1993 on multiple handgun sales in Virginia, the legislation often referred to as the "one-gun-a-month" bill. House Bill 2427 came before the House Courts of Justice and the Committee forwarded the bill to the Crime Commission for study. The Commission has been requested to study the impact of the one-gun-a-month law in Virginia, and report to the House Courts of Justice Subcommittee prior to the 1996 Session of the General Assembly. (See Appendix A.)

Code of Virginia § 9-125 establishes and directs the Virginia State Crime Commission "to study, report, and make recommendations on all areas of public safety and protection." Code of Virginia § 9-127 provides that "the Commission shall have the duty and power to make such studies and gather information in order to accomplish its purpose, as set forth in Code § 9-125, and to formulate its recommendations to the Governor and the General Assembly." Code of Virginia § 9-134 authorizes the Commission to "conduct private and public hearings, and to designate a member of the Commission to preside over such hearings." The Virginia State Crime Commission, in fulfilling its legislative mandate, undertook the study of Virginia's law on handgun purchase limits.

### II. Members Appointed to Serve

At the April 27, 1995 meeting of the Crime Commission, Chairman Elmo G. Cross, Jr., selected Robert F. Horan, Jr., to serve as Chairman of the Law Enforcement Subcommittee, which was directed to conduct the study of Virginia's one-gun-a-month law. The following members of the Crime Commission were selected to serve on the subcommittee:

The Honorable Robert F. Horan, Fairfax, Chairman
Delegate James F. Almand, Arlington
Delegate Howard E. Copeland, Norfolk
Delegate Jean W. Cunningham, Richmond
Delegate Raymond R. Guest, Front Royal
Senator Janet D. Howell, Reston
Rev. George F. Ricketts, Sr., Hallieford
Senator Edgar S. Robb, Charlottesville
Senator Elmo G. Cross, Jr., Mechanicsville, ex officio

1

Exhibit 4
Page 00014

## III.    Executive Summary

During the 1995 session of the Virginia General Assembly, Delegate Clinton Miller of Woodstock introduced House Bill 2427 to repeal Code of Virginia § 18.2-308.2:2, the one handgun-a-month purchase limit law passed in 1993.  The House Courts of Justice Committee voted to refer the bill to the Virginia State Crime Commission for study.  At the April 27, 1995 meeting of the Crime Commission, Chairman Elmo G. Cross, Jr., selected Robert F. Horan, Jr., to serve as Chairman of the Law Enforcement Subcommittee, which was directed to conduct the study of Virginia's one-gun-a-month law.

At the May 23, 1995 meeting of the subcommittee, Staff Attorney Dana Schrad presented an overview of the study requested by letter from the House Courts of Justice Committee.  The Department of State Police was asked to update its statistical report on multiple handgun purchases and present it to the subcommittee at the August meeting.

On August 29, 1995, the subcommittee heard presentations by staff, the Department of State Police, the Center to Prevent Handgun Violence, and the National Rifle Association on behalf of the Virginia Firearm Dealers Association. Copies of those presentations are appended to this report.    Following the presentations, Delegate Copeland made a motion that Code of Virginia § 18.2-308.2:2 not be amended or repealed.  The motion was seconded by Delegate Almand.  The subcommittee voted 6-2 in favor of the motion.

At the October 3, 1995 meeting, the subcommittee reviewed and adopted the draft report developed by staff.  Delegate Guest and Senator Robb requested that their votes against the motion not to repeal or amend Code of Virginia § 18.2-308.2:2 be reflected in the report.  At the request of staff, the subcommittee voted to approve the publication of the report as a House document, pending final Commission approval.  On November 14, 1995, the Commission adopted the study recommendation and approved the report for publication as a House document.

## IV.    Background

House Bill 1592, patroned by Delegate James F. Almand of Arlington, amended Code of Virginia § 18.2-308.2:2 to create the one-gun-a-month purchase limit law.  It was passed by the 1993 Virginia General Assembly and signed into law by Governor L. Douglas Wilder.  (See Appendix B.)  The statute prohibits the purchase of more than one handgun per month unless the buyer applies for approval of a multiple handgun purchase.  This exception was created to allow multiple handgun purchases only if the buyer has passed successfully the enhanced background check, and if the multiple purchase is for a lawful business use, lawful

2

Exhibit 4
Page 00015

personal use, a collector series, for a bulk purchase from estate sales or for a similar purpose. The legislation was recommended by the 1993 Governor's Commission on Violent Crime in an effort to curtail the use of Virginia as a source state for gun trafficking.

A companion bill also patroned by Delegate Almand, House Bill 1602, required more detailed reporting by firearms dealers to the State Police when multiple gun purchases are made. The amendments to <u>Code of Virginia</u> § 18.2-308.2:2 and to § 54.1-4201 allow the State Police to collect and maintain information about multiple gun purchases that aids in the detection of "strawman" purchases and gun trafficking schemes. ("Strawman" purchases are weapon purchases made by a qualified purchaser, usually for profit, on behalf of someone who would otherwise be prohibited by law from purchasing a weapon.)

During the 1995 session of the Virginia General Assembly, Delegate Clinton Miller introduced House Bill 2427, a proposal to eliminate the restrictions imposed in 1993 on multiple handgun sales in Virginia. Delegate Miller contended that the handgun purchase limit law had not reduced gun trafficking as it had intended, and thus should be repealed. The House Courts of Justice Subcommittee carried the bill over, and requested a report from the Crime Commission prior to the 1996 Session of the General Assembly on the handgun purchase limit law.

The letter specifically requests that the Crime Commission study the effect of limiting multiple handgun purchases and directs the Commission to:

> 1. compile various statistical records documenting the statute's effect; and
> 2. examine the effectiveness of similar statutes in other states.

Only one other state, South Carolina, has a statute that limits the number of guns a purchaser may buy in one month. (See Appendix B.) The South Carolina statute has been in effect since 1976. According to BATF, prior to the passage of the one-gun-a-month law, South Carolina was a leading source state for guns traced to New York City, accounting for 39% of guns recovered in criminal investigations. Following the implementation of the law, South Carolina virtually dropped off of the statistical list of source states for firearms trafficked to the northeast.

According to Bureau of Alcohol, Tobacco and Firearms (BATF) data provided by the Department of State Police, in 1973 BATF traced 20% of the handguns found at New York City crime scenes back to South Carolina. More recently this figure had grown to 39%. By 1992, BATF trace data showed that this figure had dropped to 3 percent. Additional BATF data indicates that handgun theft trends in Virginia and South Carolina between 1972 and 1991 were similar despite the fact that only South Carolina had a handgun purchase limit law at the time. Some critics of the

3

Exhibit 4
Page 00016

legislation in Virginia had contended that a law that would limit the number of handguns a person could purchase would lead to an increased number of handgun thefts.

South Carolina's handgun purchase limit statute, according to South Carolina Senator Joe Wilson, has not resulted in a large number of complaints from South Carolina citizens. According to the Virginia Department of State Police, only six percent of all 1990-91 handgun sales in Virginia were multiple gun purchases. However, nearly 75 percent of multiple handgun purchases in Virginia prior to the passage of the handgun purchase limit law were for semi-automatic weapons, the weapon of choice among gun traffickers, according to the State Police, due to their high illegal market value.

According to the Virginia Department of State Police, Delaware and North Carolina are two East Coast states that have not reported a large number of guns purchased in Virginia appearing in their states connected with criminal activity. Georgia, however, reportedly has seen an increase in multiple gun purchases since the passage of the Virginia limit law, and has become a source state for guns in the southeast.

## A.   Report of Department of State Police

In 1995, the Department of State Police published Senate Document No. 28, entitled "Consent Forms Received by the Department of State Police for the Firearms Transaction Program." From July 1, 1993 through December 31, 1994, the Department of State Police received 620 applications for the multiple purchase of handguns. Of these, 555 requests were approved, so only 9.8% of the requests were denied. 58% of the requests were for the purchase of collector series; 38% were for lawful personal use; 3% were for lawful business use; and 1% were for bulk purchases. The Department of State Police was asked to update this report with data through June, 1995.

On July 26, 1995, the Department of State Police provided the Crime Commission with a statistical report on gun trafficking and multiple handgun purchases in Virginia. (See Appendix C.) The report updates the data in Senate Document No. 28 through June 30, 1995. The Department of State Police also requested data from the federal Bureau of Alcohol, Tobacco and Firearms to determine Virginia's present status as a source state for weapons. The report was presented to the Law Enforcement Subcommittee at its August 29, 1995 meeting.

The Department of State Police reports that it received 830 multiple handgun purchase applications between July 1, 1993, when the law went into effect, through June 30, 1995. The majority of the multiple handgun purchase applications were for collector series (60%), followed by lawful personal use (35%), lawful business use

4

Exhibit 4
Page 00017

(4%) and bulk purchases (1%.)

Of these 830 applications, 67 were denied, which amounts to 8% of the total applications. Denial of a request to purchase multiple handguns can be for a variety of reasons, including a felony record or pending felony charges, substance abuse or mental health problems, dishonorable military discharge or illegal alien status. Fifty-one percent of the multiple handgun purchase denials within the two-year period were because an unacceptable reason was stated as the basis for the application. The application was withdrawn in 39% of the cases. In 10% of the cases, the applicant either did not need to file an application, or had a felony conviction that would prohibit the gun purchase.

The Department of State Police notes that the handgun purchase limit law applies only to purchase of guns from licensed gun dealers. Guns purchases that are made through trade magazines, classified ads and private sales are not affected by the handgun purchase limit law. Additionally, it should be noted that guns purchased legally in Virginia still are illegally transported into the District of Columbia or other states in the course of criminal activity and weapons trade.

According to the federal Bureau of Alcohol, Tobacco and Firearms, Virginia has fallen to 8th in the list of states identified as source states for firearms trafficking since the passage of the one-gun-a-month law. Additionally, Virginia no longer is the main source state for firearms trafficking to New York City since the one-gun-a-month law was passed. However, Virginia counties immediately adjacent to Washington, D. C., continue to be a main source (29.6%) for the flow of firearms into the nation's capitol, with Maryland a close second at 26.9%.

## B.    Report of Center to Prevent Handgun Violence

Coincidental to the Commission's study, the Center to Prevent Handgun Violence conducted its own study of Virginia's one-gun-a-month law, and presented the results to the Law Enforcement Subcommittee on August 29, 1995. (See Appendix D.) Using the BATF firearms trace database, the Center analyzed information about 17,082 guns traced to the southeastern United States. Dr. Douglas Weil compared BATF tracing data collected prior to the passage of the law with similar tracing data collected after the law's enactment. The Center contends that the one-gun-a-month law is having its intended impact on reducing the odds that Virginia would be the source state for guns recovered in criminal investigations outside of Virginia. Specifically the data shows that, for guns purchased in Virginia that were recovered in criminal investigations:

- Anywhere in the United States (including Virginia), the odds were reduced by 36%;
- In the Northeast Corridor (NJ, NY, CT, RI, MA), the odds were reduced

Exhibit 4
Page 00018

by 66%;
- In New York, the odds were reduced by 71%;
- In New Jersey, the odds were reduced by 57%;
- In Massachusetts, the odds were reduced by 72%.

According to the Center, the BATF data shows that 35% of all guns seized in criminal investigations in the Northeast, and purchased prior to July, 1993, could be traced back to Virginia. After the one-gun-a-month law took effect, that 35% dropped to 16%, a 54% reduction in the number of Virginia guns recovered in criminal investigations in the Northeast. The Center does state that the Virginia law does not necessarily reduce the number of guns used in criminal activity, but that gun purchasers who are criminally involved probably had to look elsewhere to buy weapons.

The Center concludes that there is "persuasive evidence that restricting handgun purchases to one per month per individual is an effective means of disrupting the illegal interstate transfer of firearms." The Center's report recommends that the U. S. Congress consider enacting a federal law similar to the Virginia one-gun-a-month law.

## C.   Position of National Rifle Association

The Virginia Firearm Dealers Association was requested by Crime Commission staff to prepare a response to the study conducted by the Center to Prevent Handgun Violence. At the August 29, 1995, meeting of the subcommittee, Dr. Paul Blackman, lobbyist and researcher for the National Rifle Association, testified at the request of Mr. Thomas Evans, who represents the Virginia Firearm Dealers Association. (See Appendix E.)

Mr. Blackman's remarks challenged the statistical relevance of the BATF tracing data, stating that it was not a representative, random sample of the types of guns used in crime. He contended that, because BATF can target selected areas for tracing guns, instead of comprehensively tracing all guns used in crime, the data relied upon for the Center's report presents a skewed view. Dr. Blackman asserts that BATF has "switched its focus" off of Virginia since the adoption of the one-gun-a-month purchase law, resulting in a decline in guns traced to Virginia gun dealers. Additionally, he asserts that there was no "effort made to determine whether guns traced -- whether used in crime or not -- involved sales of more than one handgun a month." Dr. Blackman believes this is important because a reduction in misuse of guns purchased in Virginia could be attributed to other recent changes in Virginia law, such as the "buyer-identification and background-check laws." According to Dr. Blackman, "it would appear that all Virginia has succeeded in accomplishing is to make the process of multiple handgun purchases more onerous for serious collectors and possibly more expensive for the state." Dr. Blackman did not present

6

Exhibit 4
Page 00019

any documentation of statistical data to support his comments.

### D.   Conclusion

The Virginia Department of State Police report confirmed that only 8% of applications for multiple handgun purchases have been denied. It can be concluded that law-abiding gun purchasers in Virginia are not unduly burdened by Virginia's one-gun-a-month law. The BATF has dropped Virginia from first to eighth on its list of East Coast source states for guns used in criminal activity. The state of Georgia now is considered the top-ranked southeastern source state for gun trafficking. The Center's report concludes that Virginia's law has disrupted the so-called "Iron Pipeline" of weapons used in criminal activity flowing from the southeast along the Interstate 95 corridor to northeastern states. A key concern for Virginia law enforcement agencies is that illegal gun trade leaving Virginia can be a mechanism for bringing illegal drugs into the state, as weapons often are exchanged for drugs instead of money.

After hearing the presentations by the State Police, Center to Prevent Handgun Violence, and the National Rifle Association, Delegate Howard Copeland motioned that the Law Enforcement Subcommittee recommend no amendments to Code of Virginia § 18.2-308.2:2 Subsection Q, the one-gun-a-month law. Delegate Almand seconded the motion, and the subcommittee voted 6 to 2 in favor of recommending that the one-gun-a-month law not be amended or repealed. Delegate Guest and Senator Robb voted against the motion.

### V.   Findings and Recommendation

Finding:     Virginia's one-gun-a-month statute, Code of Virginia § 18.2-308.2:2 Subsection Q, has had its intended effect of reducing Virginia's status as a source state for gun trafficking. The imposition of the law does not appear to create an onerous burden for law-abiding gun purchasers who apply for a multiple handgun purchase waiver.

Recommendation:     Code of Virginia § 18.2-308.2:2 Subsection Q, the Virginia one-gun-a-month purchase limit law, should not be amended or repealed.

Exhibit 4
Page 00020

## VI.   Resources

Virginia Acts of Assembly, 1993.

"Governor's Commission on Violent Crime in Virginia: Final Report." Office of the Governor of Virginia, prepared by the Department of Criminal Justice Services, January, 1994.

"Gun law said to slow illegal trade. " Richmond Times-Dispatch, August 3, 1995.

"Shot Down: A Consensus on Gun Control." Kates, D. B., Jr., National Review, March 6, 1995, p. 49.

"Handgun Highway: Illegal Gunrunners Target Virginia." D'Orso, M., Commonwealth, December, 1981, p. 16.

"Guns and Violent Crime." Report by Criminal Justice Research Center, Commonwealth of Virginia, January, 1994.

"Firearms, Violence and Public Policy." Zimring, F., Scientific American, November, 1991, p. 48.

8

Exhibit 4
Page 00021

## VII.   Acknowledgements

The members extend special thanks to the following agencies and individuals for their cooperation and valuable assistance to this study effort:

Delegate Clinton Miller, Woodstock

National Criminal Justice Reference Service
National Institute of Justice, Department of Justice

Captain Lewis Vass, Records Management
Virginia Department of State Police

Mr. Brian Chodrow, Planning and Research
Virginia Department of State Police

Mr. Douglas S. Weil, Sc.D.
The Center to Prevent Handgun Violence

Mr. Thomas Evans
Virginia Firearm Dealers Association

Mr. Paul H. Blackman, Ph.D.
NRA Institute for Legislative Action

Mr. Jay Cochran, Executive Director
Virginia Association of Chiefs of Police

Mr. John Jones, Executive Director
Virginia Sheriffs Association

9

Exhibit 4
Page 00022

Exhibit 4
Page 00023

**Appendix A**

Exhibit 4
Page 00024

Exhibit 4
Page 00025

COMMONWEALTH OF VIRGINIA

É. M. MILLER, JR.
DIRECTOR



GENERAL ASSEMBLY BUILDING
910 CAPITOL STREET, 2ND FLOOR
RICHMOND, VIRGINIA 23219

(804) 786-3591
FAX (804) 371-0169

## DIVISION OF LEGISLATIVE SERVICES

### MEMORANDUM

**TO**:      Dana Schrad, Crime Commission

**FROM:**    Oscar R. Brinson

**DATE:**    February 28, 1995

**RE:**      HB 2427 (Patron, Delegate Miller) - One handgun per month purchase limitation

      For your records, this will confirm that Jim Almand, Chairman of the House Committee for Courts of Justice, has created an ad hoc Committee study of the above bill and has requested that the Crime Commission assist in the conduct of this study by compiling various statistical records pertaining to the effect of Virginia's handgun purchase limitation law set forth in subsection Q of § 18.2-308.2:2.   This compilation should also encompass the effectiveness of similar statutes in other states.  The ad hoc Committee will need this information in time for consideration prior to the 1996 Session.

      Please feel free to contact me should you need additional information..

ORB/cgl

cc:    The Honorable James F. Almand
       The Honorable Clinton Miller

E:\DLSDATA\BUSJURIS\CORRESP\ORB\SCHRAD28.DOC

Exhibit 4
Page 00026

Exhibit 4
Page 00027

**Appendix B**

Exhibit 4
Page 00028

Exhibit 4
Page 00029

Virginia one-gun-a-month law

**§ 18.2-308.2:2. Criminal history record information check required for the transfer of certain firearms; firearm safety information to be provided.** — A. Any person purchasing from a dealer a firearm as herein defined shall consent in writing, on a form to be provided by the Department of State Police, to have the dealer obtain criminal history record information. Such form shall include only, in addition to the information required by subdivision B 1, the identical information required to be included on the firearms transaction record required by regulations administered by the Bureau of Alcohol, Tobacco and Firearms of the U.S. Department of the Treasury, except that the copies of such forms mailed or delivered to the Department of State Police shall not include any information related to the firearm purchased or transferred.

B. 1. No dealer shall sell, rent, trade or transfer from his inventory any such firearm to any other person who is a resident of Virginia until he has (i) obtained written consent as specified in subsection A, and provided the Department of State Police with the name, birth date, gender, race, and social security and/or any other identification number and the number of firearms by category intended to be sold, rented, traded or transferred and (ii) requested and received criminal history record information by a telephone call to the State Police. To establish personal identification and residence in Virginia for purposes of this section, a dealer must require any prospective purchaser to present one photo-identification form issued by a governmental agency of the Commonwealth or by the United States Department of Defense, and other documentation of residence. Except where the photo-identification was issued by the United States Department of Defense, the other documentation of residence shall show an address identical to that shown on the photo-identification form, such as evidence of currently paid personal property tax or real estate tax, or a current (i) lease, (ii) utility or telephone bill, (iii) voter registration card, (iv) bank check, (v) passport, (vi) automobile registration, or (vii) hunting or fishing license; other current identification allowed as evidence of residency by Part 178.124 of Title 27 of the Code of Federal Regulations and ATF Ruling 79-7; or other documentation of residence determined to be acceptable by the Department of Criminal Justice Services, that corroborates that the prospective purchaser currently resides in Virginia. Where the photo-identification was issued by the Department of Defense, permanent orders may be used as documentation of residence. Additionally, when the photo-identification presented to a dealer by the prospective purchaser is a driver's license or other photo-identification issued by the Department of Motor Vehicles, and such identification form contains a date of issue, the dealer shall not, except for a renewed driver's license or other photo-identification issued by the Department of Motor Vehicles, sell or otherwise transfer a firearm to the prospective purchaser until thirty days after the date of issue of an original or duplicate driver's license unless the prospective purchaser also presents a copy of his Virginia Department of Motor Vehicles driver's record showing that the original date of issue of the driver's license was more than thirty days prior to the attempted purchase.

In addition, no dealer shall sell, rent, trade or transfer from his inventory any assault firearm to any person who is not a citizen of the United States or who is not a person lawfully admitted for permanent residence. To establish citizenship or lawful admission for a permanent residence for purposes of purchasing an assault firearm, a dealer shall require a prospective purchaser to present a certified birth certificate or a certificate of birth abroad issued by the United States State Department, a certificate of citizenship or a certificate of naturalization issued by the Immigration and Naturalization Service, an unexpired U.S. passport, a United States citizen identification card, a current voter registration card, a current selective service registration card, or an immigrant visa or other documentation of status as a person lawfully admitted for permanent residence issued by the Immigration and Naturalization Service.

Upon receipt of the request for a criminal history record information check, the State Police shall (i) review its criminal history record information to determine if the buyer or transferee is prohibited from possessing or transporting a firearm by state or federal law, (ii) inform the dealer if its record indicates that the buyer or transferee is so prohibited, and (iii) provide the dealer with a unique reference number for that inquiry.

Exhibit 4
Page 00030

2. The State Police shall provide its response to the requesting dealer during the dealer's call, or by return call without delay. If the criminal history record information check indicates the prospective purchaser or transferee has a criminal record or has been acquitted by reason of insanity and committed to the custody of the Commissioner of Mental Health, Mental Retardation and Substance Abuse Services, the State Police shall have until the end of the dealer's next business day to advise the dealer if its records indicate the buyer or transferee is prohibited from possessing or transporting a firearm by state or federal law. If not so advised by the end of the dealer's next business day, a dealer who has fulfilled the requirements of subdivision B 1 of this subsection may immediately complete the sale or transfer and shall not be deemed in violation of this section with respect to such sale or transfer. In case of electronic failure or other circumstances beyond the control of the State Police, the dealer shall be advised immediately of the reason for such delay and be given an estimate of the length of such delay. After such notification, the State Police shall, as soon as possible but in no event later than the end of the dealer's next business day, inform the requesting dealer if its records indicate the buyer or transferee is prohibited from possessing or transporting a firearm by state or federal law. A dealer who fulfills the requirements of subdivision B 1 of this subsection and is told by the State Police that a response will not be available by the end of the dealer's next business day may immediately complete the sale or transfer and shall not be deemed in violation of this section with respect to such sale or transfer.

3. Except as required by subsection D of § 9-192, the State Police shall not maintain records longer than thirty days, except for multiple handgun transactions for which records shall be maintained for twelve months, from any dealer's request for a criminal history record information check pertaining to a buyer or transferee who is not found to be prohibited from possessing and transporting a firearm under state or federal law. However, the log on requests made may be maintained for a period of twelve months, and such log shall consist of the name of the purchaser, the dealer identification number, the unique approval number and the transaction date.

4. On the last day of the week following the sale or transfer of any firearm, the dealer shall mail or deliver the written consent form required by subsection A to the Department of State Police. The State Police shall immediately initiate a search of all available criminal history record information to determine if the purchaser is prohibited from possessing or transporting a firearm under state or federal law. If the search discloses information indicating that the buyer or transferee is so prohibited from possessing or transporting a firearm, the State Police shall inform the chief law-enforcement officer in the jurisdiction where the sale or transfer occurred and the dealer without delay.

5. Notwithstanding any other provisions of this section, rifles and shotguns may be purchased by persons who are citizens of the United States or persons lawfully admitted for permanent residence but residents of other states under the terms of subsections A and B upon furnishing the dealer with proof of citizenship or status as a person lawfully admitted for permanent residence and one photo-identification form issued by a governmental agency of the person's state of residence and one other form of identification determined to be acceptable by the Department of Criminal Justice Services.

C. No dealer shall sell, rent, trade or transfer from his inventory any firearm, other than a rifle or a shotgun, to any person who is not a resident of Virginia unless he has first obtained from the Department of State Police a report indicating that a search of all available criminal history record information has not disclosed that the person is prohibited from possessing or transporting a firearm under state or federal law. The dealer shall obtain the required report by mailing or delivering the written consent form required under subsection A to the State Police within twenty-four hours of its execution. If the dealer has complied with the provisions of this subsection and has not received the required report from the State Police within ten days from the date the written consent form was mailed to the Department of State Police, he shall not be deemed in violation of this section for thereafter completing the sale or transfer.

D. Nothing herein shall prevent a resident of this Commonwealth, at his option, from buying, renting or receiving a firearm from a dealer by obtaining a criminal history record information check through the dealer as provided in subsection C.

E. If any buyer or transferee is denied the right to purchase a firearm under this section, he may exercise his right of access to and review and correction of criminal history record information under § 9-192 or institute a civil action as provided in § 9-194, provided any such action is initiated within thirty days of such denial.

B–2

Exhibit 4
Page 00031

F. Any dealer who willfully and intentionally requests, obtains, or seeks to obtain criminal history record information under false pretenses, or who willfully and intentionally disseminates or seeks to disseminate criminal history record information except as authorized in this section shall be guilty of a Class 2 misdemeanor.

G. For purposes of this section:

*"Antique firearm"* means any firearm, including those with a matchlock, flintlock, percussion cap, or similar type of ignition system, manufactured in or before 1898 and any replica of such a firearm if such replica (i) is not designed or redesigned for using rimfire or conventional center-fire fixed ammunition or (ii) uses rimfire or conventional center-fire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

*"Assault firearm"* means any semi-automatic center-fire rifle or pistol which expels a projectile by action of an explosion and is equipped at the time of the offense with a magazine which will hold more than twenty rounds of ammunition or designed by the manufacturer to accommodate a silencer or equipped with a folding stock.

*"Dealer"* means any person licensed as a dealer pursuant to 18 U.S.C. § 921 et seq.

*"Firearm"* means any handgun, shotgun, or rifle which expels a projectile by action of an explosion.

*"Handgun"* means any pistol or revolver or other firearm originally designed, made and intended to fire a projectile by means of an explosion from one or more barrels when held in one hand.

*"Lawfully admitted for permanent residence"* means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.

H. The Department of Criminal Justice Services shall promulgate regulations to ensure the identity, confidentiality and security of all records and data provided by the Department of State Police pursuant to this section.

I. The provisions of this section shall not apply to (i) transactions between persons who are licensed as firearms importers or collectors, manufacturers or dealers pursuant to 18 U.S.C. § 921 et seq., (ii) purchases by or sales to any law-enforcement officer or agent of the United States, the Commonwealth or any local government, (iii) antique firearms or (iv) transactions in any county, city or town that has a local ordinance adopted prior to January 1, 1987, governing the purchase, possession, transfer, ownership, conveyance or transportation of firearms which is more stringent than this section.

J. All licensed firearms dealers shall collect a fee of two dollars for every transaction for which a criminal history record information check is required pursuant to this section, except that a fee of five dollars shall be collected for every transaction involving an out-of-state resident. Such fee shall be transmitted to the Department of State Police by the last day of the month following the sale for deposit in a special fund for use by the State Police to offset the cost of conducting criminal history record information checks under the provisions of this section.

K. Any person willfully and intentionally making a materially false statement on the consent form required in subsection B or C shall be guilty of a Class 5 felony.

L. Except as provided in § 18.2-308.2:1, any dealer who willfully and intentionally sells, rents, trades or transfers a firearm in violation of this section shall be guilty of a Class 6 felony.

M. Any person who purchases a firearm with the intent to (i) resell or otherwise provide such firearm to any person who he knows or has reason to believe is ineligible to purchase or otherwise receive from a dealer a firearm for whatever reason or (ii) transport such firearm out of the Commonwealth to be resold or otherwise provided to another person who the transferor knows is ineligible to purchase or otherwise receive a firearm, shall be guilty of a Class 5 felony. However, if the violation of this subsection involves such a transfer of more than one firearm, the person shall be sentenced to a mandatory minimum term of imprisonment of five years, which shall not be suspended in whole or in part nor shall the person be eligible for parole during that period.

N. Any person who is ineligible to purchase or otherwise receive or possess a firearm in the Commonwealth who solicits, employs or assists any person in violating subsection M shall be guilty of a Class 5 felony and shall be sentenced to a mandatory minimum term of imprisonment of five years, which shall not be suspended in whole or in part nor shall the person be eligible for parole during that period.

O. All driver's licenses issued on or after July 1, 1994, shall carry a letter designation indicating whether the driver's license is an original, duplicate or renewed driver's license.

Exhibit 4
Page 00032

P. The Department of Education, in conjunction with the Department of Game and Inland Fisheries, shall develop a standard informational form and posted notice to be furnished to each licensed firearms dealer in the Commonwealth at no cost to the dealer. The form and notice shall provide basic information of the laws governing the purchase, possession and use of firearms by juveniles and adults.

Copies of the form shall be made available by the dealer whenever a firearm is purchased.

Every firearms dealer shall conspicuously post the written notice which shall be at least eight and one-half inches by eleven inches in size and printed in boldface type of a minimum size of ten points. A licensed firearms dealer shall not be liable for damages for injuries resulting from the discharge of a firearm purchased from the dealer if, at the time of the purchase, the dealer failed to provide the form or failed to post the written notice.

Q. Except as provided in subdivisions 1, 2 and 3 of this subsection, it shall be unlawful for any person who is not a licensed firearms dealer to purchase more than one handgun within any thirty-day period. A violation of this subsection shall be punishable as a Class 1 misdemeanor.

1. Purchases in excess of one handgun within a thirty-day period may be made upon completion of an enhanced background check, as described herein, by special application to the Department of State Police listing the number and type of handguns to be purchased and transferred for lawful business or personal use, in a collector series, for collections, as a bulk purchase from estate sales and for similar purposes. Such applications shall be signed under oath by the applicant on forms provided by the Department of State Police, shall state the purpose for the purchase above the limit, and shall require satisfactory proof of residency and identity. Such application shall be in addition to the firearms sales report required by the Bureau of Alcohol, Tobacco and Firearms (ATF). The Superintendent of State Police shall promulgate regulations, pursuant to the Administrative Process Act (§ 9-6.14:1 et seq.), for the implementation of an application process for purchases of handguns above the limit.

Upon being satisfied that these requirements have been met, the Department of State Police shall forthwith issue to the applicant a nontransferable certificate which shall be valid for seven days from the date of issue. The certificate shall be surrendered to the dealer by the prospective purchaser prior to the consummation of such sale and shall be kept on file at the dealer's place of business for inspection as provided in § 54.1-4201 for a period of not less than two years. Upon request of any local law-enforcement agency, and pursuant to its regulations, the Department of State Police may certify such local law-enforcement agency to serve as its agent to receive applications and, upon authorization by the Department of State Police, issue certificates forthwith pursuant to this subsection. Applications and certificates issued under this subsection shall be maintained as records as provided in subdivision 3 of subsection B. The Department of State Police shall make available to local law-enforcement agencies all records concerning certificates issued pursuant to this subsection and all records provided for in subdivision 3 of subsection B.

2. The provisions of this subsection shall not apply to:

a. A law-enforcement agency;

b. An agency duly authorized to perform law-enforcement duties;

c. State and local correctional facilities;

d. A private security company licensed to do business within the Commonwealth;

e. The purchase of antique firearms as herein defined; or

f. A person whose handgun is stolen or irretrievably lost who deems it essential that such handgun be replaced immediately. Such person may purchase another handgun, even if the person has previously purchased a handgun within a thirty-day period, provided (i) the person provides the firearms dealer with a copy of the official police report or a summary thereof, on forms provided by the Department of State Police, from the law-enforcement agency that took the report of the lost or stolen handgun; (ii) the official police report or summary thereof contains the name and address of the handgun owner, the description of the handgun, the location of the loss or theft, the date of the loss or theft, and the date the loss or theft was reported to the law-enforcement agency; and (iii) the date of the loss or theft as reflected on the official police report or summary thereof occurred within thirty days of the person's attempt to replace the handgun. The firearms dealer shall attach a copy of the official police report or summary thereof to the original copy of the Virginia firearms transaction report completed for the transaction and retain it for the period prescribed by the Department of State Police.

Exhibit 4
Page 00033

3. For the purposes of this subsection, *"purchase"* shall not include the exchange or replacement of a handgun by a seller for a handgun purchased from such seller by the same person seeking the exchange or replacement within the thirty-day period immediately preceding the date of exchange or replacement. (1989, c. 745; 1990, cc. 594, 692; 1991, cc. 515, 525, 716; 1992, cc. 637, 872; 1993, cc. 451, 461, 486, 493, 674; 1994, c. 624.)

**Effective date.** — This section is effective Nov. 1, 1989.

**The 1990 amendments.** — The 1990 amendment by c. 594 substituted "Department of State Police" for "Treasurer of the Commonwealth" in subsection J.

The 1990 amendment by c. 692, in subdivision B 2, inserted "or has been acquitted by reason of insanity and committed to the custody of the Commissioner of Mental Health, Mental Retardation and Substance Abuse Services" in the second sentence, and substituted "subdivision B 1" for "subsection B 1" in the third and last sentences.

**The 1991 amendments.** — The 1991 amendment by c. 515 added the second sentence in subdivision B 1.

The 1991 amendment by c. 525, effective March 23, 1991, added subsection M.

The 1991 amendment by c. 716, in subsection G, substituted "firearm" for "handgun or pistol" throughout the paragraph defining "Antique firearm," rewrote the paragraph defining "Firearm" and substituted "firearms" for "hand guns or pistols" in clause (iii) of subsection I.

**The 1992 amendments.** — The 1992 amendment by c. 637 substituted "On the last day of the week" for "Within twenty-four hours" in the first sentence of subdivision B 4, and substituted "by the last day of the month" for "on the twentieth day of the month" in the second sentence of subsection J.

The 1992 amendment by c. 872, in subsection B, in subdivision 1, deleted the former second sentence relating to sufficient identification of any prospective purchaser of a firearm through use of a photo-identification form and added the present second sentence, and added subdivision 5; inserted "other than a rifle or a shotgun" in the first sentence of subsection C; and deleted "pistol" following "handgun" in the paragraph defining "Firearm" in subsection G.

**The 1993 amendments.** — The 1993 amendment by c. 451 inserted "or" preceding the clause (vii) designation in the second sentence of subdivision B 1; and added subsection N.

The 1993 amendments by cc. 461 and 493 are identical, and added the second sentence in subsection A; in subsection B, inserted "the number of firearms by category intended to be sold, rented, traded or transferred and" in the first sentence of subdivision 1, and in subdivision 3, inserted "except for multiple handgun transactions for which records shall be maintained for twelve months" in the first sentence, and added the language beginning "and such log shall consist" in the second sentence; inserted "the" preceding "Commonwealth" near the middle of subsection I; and substituted "Class 6 felony" for "Class 1 misdemeanor" at the end of subsection L.

The 1993 amendment by c. 486 added the paragraph defining "Handgun" in subsection G; inserted "the" preceding "Commonwealth" near the middle of subsection I; and added subsection O.

The 1993 amendment by c. 674 added the second paragraph to subdivision B 1, in subdivision B 5, inserted "citizens of the United States or persons lawfully admitted for permanent residence but," and inserted "proof of citizenship or status as a person lawfully admitted for permanent residence and"; in subsection G, added the paragraph defining "Assault firearm" and added the paragraph defining "Lawfully admitted for permanent residence".

**The 1994 amendment,** in subdivision B 1, divided the former second sentence into the present second and third sentences; in the present second sentence, inserted "or by the United States Department of Defense" and deleted "and of which must" following "documentation of residence"; in the present third sentence, added "Except where the photo-identification was issued by the United States Department of Defense, the other documentation of residence shall" to the the beginning of the sentence and added the next-to-last and the last sentences; in subsection M, in clause (i), inserted "he knows or has reason to believe"; in clause (ii), substituted "another person" for "an ineligible person," and inserted "who the transferor knows is ineligible to purchase or otherwise receive a firearm"; and added the last sentence; added present subsections N and O; and redesignated former subsections N and O, as present subsections P and Q.

Exhibit 4
Page 00034

South Carolina one-gun-a-month law

### § 23-31-140. Completion and contents of application prior to purchase of pistol; further restrictions on purchase.

(A) Prior to the purchase of a pistol, the purchaser shall complete an application in triplicate in the presence of the dealer. The application to be furnished by the division must contain the applicant's (1) name; (2) residence and business address; (3) date and place of birth; (4) social security number; (5) South Carolina driver's license number or South Carolina Department of Highways and Public Transportation identification card number; (6) physical description; (7) fingerprint card and photograph of applicant if applicant does not have items (4) and (5); (8) a signed sworn statement by the applicant that he is not within any classification set forth in item (a), (b), (c), or (d) of Section 16-23-30, and that he has not purchased a pistol within the previous thirty days; (9) the signatures of applicant and the dealer; (10) and such other personal identifying information as may be required by the division.

(B) No person is allowed to purchase a pistol from a dealer unless he has fully completed the application.

(C) No person is allowed to purchase more than one pistol on each application and no person is allowed to purchase more than one pistol during each thirty-day period.

(D) The provisions of subsection (C) do not apply to (1) a law enforcement agency provided that the conditions of subsection (E) are met, (2) an agency duly authorized to perform law enforcement duties, (3) county and municipal penal facilities and the State Department of Corrections, (4) a private security company licensed to do business within this State, or (5) a person whose pistol is stolen or irretrievably lost and who feels that it is essential that he immediately purchase a pistol may obtain a special permit which will enable him to purchase a pistol upon his sworn affidavit to the chief of police, or his designated agent, of the municipality in which the applicant resides or if the applicant resides outside the corporate limits of a municipality, to the sheriff, or his designated agent, of the county in which the applicant resides. This affidavit must cite the facts and reasons why the applicant cannot wait for a thirty-day period to purchase a pistol. This special permit must contain such information as required by the division and must be on a form furnished by the division. The issuing officer shall retain a copy of the permit and forward a copy to the Division. The application must be signed by the dealer effecting the sale and must contain such information as may be required by the division.

(E) A law enforcement agency or a private security company licensed under the provisions of Title 40, Chapter 17, may purchase more than one pistol during a thirty-day period as long as the following conditions are met:

    (1) the pistols purchased are for use in this State;

    (2) ownership of the pistols is retained by the law enforcement agency or licensed security company;

    (3) multiple purchases under this provision must be made on a special application form to be provided by the division;

Exhibit 4
Page 00035

(4) the multiple purchase form is signed by the chief of the law enforcement agency or the chief executive officer of the licensed private security company, whose name appears on the company license;

(5) the number of pistols purchased may not exceed the number of security guards registered under the provisions of Title 40, Chapter 17, and employed in this State;

(6) a letter of authorization, in triplicate, signed by the agency director, company representative, or their designees, certifying the purchaser to be a representative of the agency or company with delegated authority to purchase pistols for the agency or company. The letter of authorization must contain such information as may be required by the division.

(F) No person is allowed to purchase a pistol from a dealer unless he is a resident of this State. For the purpose of this article, the possession of a valid South Carolina driver's license or Department of Highways and Public Transportation identification card constitutes proof of residency.

(G) Upon proper completion of the application the dealer shall submit the original application to the division, retain a copy for his records, and give a copy to the applicant upon his purchase of a pistol. The application to be submitted to the division must be accompanied by a firearm transaction record properly completed by the purchaser and the dealer.

For purposes of this section, the purchase of a pistol does not include the redeeming of a pistol by its owner after it has been pledged to secure a loan.

**HISTORY: 1975 (59) 582; 1988 Act No. 492, § 3.**

**Cross references—**
As to various offenses connected with pistols, see §§ 16–23–10 et seq.
As to issuance of Pistol Collector's License, which entitles holder to purchase pistols for his collection notwithstanding the provisions of this section, see § 23–31–195.

**ALR and L Ed Annotations—**
Validity, construction, and application of 18 USCS § 922(a)(6), making it unlawful to knowingly make any false or fictitious oral or written statement in connection with the acquisition or attempted acquisition of any firearm or ammunition. 43 ALR Fed 338.

### ATTORNEY GENERAL'S OPINIONS

Proof of residency required for the purchase of a pistol may be established by any reasonable evidence showing that the person actually lives in South Carolina. 1975–76 Op Atty Gen, No 4316, p 136.

Exhibit 4
Page 00036

Exhibit 4
Page 00037

**Appendix C**

Exhibit 4
Page 00038

Exhibit 4
Page 00039

# CONSENT FORMS RECEIVED BY THE

# DEPARTMENT OF STATE POLICE

# FOR THE FIREARMS TRANSACTION PROGRAM

## *UPDATE FOR THE STATE CRIME COMMISSION*

JULY 1995

Department of State Police

M. Wayne Huggins
Superintendent

Exhibit 4
Page 00040

# Table of Contents

| | |
|---|---|
| Table of Contents | 2 |
| Executive Summary | 3 |
| Introduction | 4 |
| History | 4 |
| Findings | 5 |
| Conclusion | 7 |
| Attachment 1 | 8 |

Exhibit 4
Page 00041

## Executive Summary

This report is being submitted per a letter study from the House Courts of Justice Committee to study the impact of § 18.2-308.2:2 (Q) of the *Code of Virginia* on gun trafficking and multiple handgun purchases. The update was requested by the State Crime Commission.

Since the amendment of § 18.2-308.2:2 prohibiting the purchase of more than one handgun within a thirty-day period became effective July 1, 1993, the Department of State Police has received a total of 830 Multiple Handgun Purchase applications for the period ending June 30, 1995. As stated in the *Code*, purchases in excess of one handgun within a thirty-day period may be made upon the completion of an enhanced background check by special application to the Department of State Police. Upon satisfactory completion of the enhanced background check, a certificate shall be issued authorizing the purchase of multiple handguns for lawful business use, lawful personal use, collector series, and bulk purchase from estate sales and for similar purposes.

During the period July 1, 1993, through June 30, 1995, 830 applications for multiple handgun purchases were received and processed. Of the 830 applications received, 67 or 8 percent were denied. It appears, the amendments to § 18.2-308.2:2 have not significantly affected the number of consent forms received or the number of multiple handgun purchases within the Commonwealth.

Exhibit 4
Page 00042

## I.    Introduction

This report is being submitted in accordance with a letter study requested by the General Assembly (House Courts of Justice Committee), directing the State Crime Commission to study the impact of § 18.2-308.2:2 (Q) of the *Code of Virginia* on gun trafficking and multiple handgun purchases. The study includes the period of July 1, 1993, through June 30, 1995.

The 1993 Session of the General Assembly added language to § 18.2-308.2:2 providing for the maintenance of records relating to multiple handgun purchases. This change inserted language that allowed records concerning multiple handgun purchases to be maintained for twelve (12) months. Previously, the *Code* section only allowed the maintenance of firearms transaction records for thirty (30) days.

Information for this report was obtained from the Department of State Police - Firearms Transaction Center. The Firearms Transaction Center is the sole repository for all of the Department's information concerning firearms and related information.

## II.    History

In 1992, Virginia was cited by the Bureau of Alcohol, Tobacco and Firearms as a major source state for the flow of illegal weapons for the east coast, particularly New York City, New York, and Washington, DC. This was based on the trace information supplied by the National Tracing Center to the New York Field Division's Project LEAD. In reaction to these findings, the General Assembly of Virginia passed laws limiting the number of firearms that an individual can purchase in a 30 day period. The intent of these laws was to reduce the number of firearms recovered in crimes and traced to purchasers in Virginia.

Exhibit 4
Page 00043

## III.   Findings

The State Police Firearms Transaction Center (FTC) is responsible for processing firearms transaction requests for the Commonwealth of Virginia.  This program was implemented on November 1, 1989, and has served as a model for other states wishing to implement similar programs.  Interest in this program has heightened due to the passage of the Brady Handgun Violence Prevention Act, the "Brady Act," by the federal government.  The Brady Act requires up to a five (5) day waiting period prior to the transfer of handguns except in those states having an instant criminal history record check program.  States having such programs are exempt from the five (5) day waiting period. Virginia is such, an exempted state.

From the period July 1, 1993, through June 30, 1995, the FTC processed 436,547 transactions.  These transactions included all calls for record checks as provided in § 18.2-308.2:2 of the *Code of Virginia.*  Of these, 3,588 or .82 percent were declined or the purchasers were advised of a nonapproval.  Additionally, 292 wanted persons were identified as they attempted to purchase firearms during this period.   Reasons for nonapproval of a firearm purchase are contained in Article 7 of Title 18.2 of the *Code of Virginia* and include: the purchaser being a nonresident of Virginia; having a felony criminal record; having been acquitted by reason of insanity and committed to the Commissioner of Mental Health, Mental Retardation and Substance Abuse Services; having been adjudicated legally incompetent or mentally incapacitated; being a person who was involuntarily committed; being a person subject to protective orders, pursuant to § 16.1-253.1, 16.1-253.4, or § 16.1-279; or not being a citizen of the United States.

Since the implementation of the thirty-day prohibition on multiple handgun purchases in 1993, purchasers are required, under  § 18.2-308.2:2(Q), to apply for a Multiple Handgun Purchase Certificate which authorizes the purchase of more than one handgun in a thirty-day period.  To receive a certificate, the purpose must either be for lawful business use, lawful personal use, inclusion in a collector series, a bulk purchase from an estate sale, or for similar purposes.

The application process is managed by the Department of State Police through regulations implemented specifically for this process [*See* 10:1 VA.R. 80-84, October 4, 1993].  Through these regulations, local law enforcement agencies can act as an agent for the State Police and provide the services for multiple handgun purchases.  When this service was opened to local agencies, sixteen agencies applied for this service, but only one agency performs the service with any frequency.  The application process is merely an enhancement to the program already in place.  The process requires satisfactory proof of residency and identity, and is in addition to the firearms sales report required by the Bureau of Alcohol, Tobacco and Firearms (ATF).  Additionally, the State Police contacts local law enforcement agencies for charges or offenses not reported to the Central Criminal Records Exchange (CCRE).

Exhibit 4
Page 00044

Since this law came into effect on July 1, 1993, the Department of State Police has received a total of 830 applications for the purchase of multiple handguns through June 30, 1995. A breakdown of applications, by purpose, is shown in the following table:

**Applications Received**
**July 1, 1993 to June 30, 1995**

| | |
|---|---|
| Collector Series | 498 (60%) |
| Lawful Personal Use | 294 (35%) |
| Lawful Business Use | 30 (4%) |
| Bulk Purchase | 8 (1%) |
| **Total** | **830 (100%)** |

From these applications, 763 certificates were issued. The following table illustrates the categories by total number and percentage:

**Certificates Issued**
**July 1, 1993 to June 30, 1995**

| | |
|---|---|
| Collector Series | 464 (61%) |
| Lawful Personal Use | 268 (35%) |
| Lawful Business Use | 26 (3.4%) |
| Bulk Purchase | 5 (.6%) |
| **Total** | **763 (100%)** |

A complete summary of Multiple Handgun Purchases from July 1, 1993 through June 30, 1995, may be found in Attachment 1. There appears to be a downward trend in the number of applications received, as well as a decrease in the number of denials.

Applications for Multiple Handgun Purchases can be denied for the following reasons: having a pending felony charge, a felony conviction, a wanted record, being a controlled substance user, being mentally defective, having been committed or placed in a mental institution, having been dishonorably discharged, being an illegal alien and those who have renounced U.S. Citizenship. These categories apply to both buyers and recipients of handguns. In addition, records are maintained for categories such as: when an application is not necessary, when the application is withdrawn, and unacceptable reason for firearms purchase. There were 67 denials during this period.

The totals and percentages for the above categories are shown in the following table:

C– 6

Exhibit 4
Page 00045

**Multiple Handgun Purchase Denials**
**July 1, 1993 to June 30, 1995**

| | |
|---|---|
| Unacceptable Reason | 34 (51%) |
| Application Withdrawn | 26 (39%) |
| Application Not Necessary | 6 (9%) |
| Felony Conviction | 1 (1%) |
| **Total** | **67 (100%)** |

**Illegitimate Multiple Handgun Purchases**

It should be noted that this law has the intent of limiting handgun purchases, but is only applicable to licensed gun dealers. There are numerous firearms that are being transferred on a daily basis, either through the local newspaper or through mediums like the "Trading Post". Additionally, the law does not pertain to firearms that are privately sold and distributed by individuals.

It may take years for this law to have the desired effect that was sought when the law was passed. Due to the proliferation of weapons that are already available on the private market, criminals will continue to have access to weapons and be capable of making multiple purchases without the benefit of a background check.

**Recent Source State Statistics**

The most recent information indicates that Virginia continues to be a source state for the flow of firearms into Washington, D.C. In 1994, 266 or 29.6 percent of the firearms traced to the dealer were from Virginia. Maryland was second with 241 or 26.9 percent. This would be expected due to the proximity of both jurisdictions. The leading source counties within Virginia were immediately adjacent to Washington, D.C.

The information from New York reveals that Virginia ranks third as a source state (New York and Florida were number one and two, respectively). However, these numbers are deceiving as Virginia "runs" traces on all weapons. Source State Statistics are compiled from traces submitted from the target city.

Exhibit 4
Page 00046

## IV. Conclusion

Since the implementation of the multiple handgun purchase process, only 8 percent of the total number of applications received have been denied.  This figure only pertains to those weapons which are subject to the law.  Numerous weapons are being sold everyday by private individuals who are not subject to the law.

Additionally, according to the Bureau of Alcohol, Tobacco and Firearms, Virginia has ceased to be the source state for firearms trafficking to New York City since the passage of this law.

Exhibit 4
Page 00047

**Appendix D**

Exhibit 4
Page 00048

# Evaluating the Impact of Virginia's One-Gun-A-Month Law

Douglas S. Weil, Sc.D.
Rebecca Knox, M.P.H., M.S.W.

The Center to Prevent Handgun Violence
August 2, 1995

Exhibit 4
Page 00049

**Executive Summary**

**Introduction**

In response to a growing reputation as a principal supplier of firearms to the illegal market -- particularly in the Northeastern United States -- Virginia enacted a law (which was implemented July 1993) restricting handgun purchases to one per month per individual. The purpose of this study was to determine whether limiting handgun purchases to one per month is an effective way to disrupt the illegal movement of firearms across state lines.

**Hypothesis**

The hypothesis tested was that the odds of tracing a gun, originally acquired in the Southeast region of the United States, to a Virginia gun dealer, if it was recovered in a criminal investigation outside of the region, would be substantially lower for guns purchased after Virginia's one-gun-a-month law took effect, than for guns purchased prior to implementation of the law.

**Methods**

The principal analytic method used in this analysis was to estimate the odds ratio for tracing a firearm to a gun dealer in Virginia relative to a gun dealer in the other Southeastern states (as defined by the Bureau of Alcohol, Tobacco and Firearms (BATF)), for guns purchased prior to Virginia's one-gun-a-month law's effective date compared to guns purchased after the law was enacted. The data, including information about 17,082 guns traced to the Southeast, come from the firearms trace database compiled by the BATF.

**Results**

The hypothesis was substantiated by the data. The odds of tracing a gun, originally acquired in the Southeast region, to a Virginia gun dealer, and not to a gun dealer in another Southeastern state, were substantially lower for firearms purchased after Virginia's one-gun-a-month law took effect, than for firearms purchased prior to implementation of the law.

Specifically, for guns recovered:

*     Anywhere in the United States (including Virginia), the odds were reduced by 36%;

*     In the Northeast Corridor (NJ, NY, CT, RI, MA), the odds were reduced by 66%;

*     In New York, the odds were reduced by 71%;

*     In New Jersey, the odds were reduced by 57%;

*     In Massachusetts, the odds were reduced by 72%.

Exhibit 4
Page 00050

## Conclusion

Most gun control policies currently advocated in the United States (e.g., licensing, registration and one-gun-a-month) could be described as efforts to limit the supply of guns available in the illegal market. This study provides persuasive evidence that restricting handgun purchases to one per month per individual is an effective means of disrupting the illegal interstate transfer of firearms. Based on the results of this study, Congress should consider enacting a federal version of the Virginia law.

## Introduction

In July 1993, a Virginia law limiting handgun purchases by an individual to one gun in a thirty day period took effect.[1] Prior to the one-gun-a-month law, individuals were able to purchase an unlimited number of handguns from licensed dealers.

The law was passed in response to Virginia's growing reputation as a principal supplier of guns to the illegal market in the Northeastern United States.[2] Statistics from the Bureau of Alcohol, Tobacco, and Firearms (BATF) provided evidence of the magnitude of gun trafficking from Virginia. The BATF reported that 41% of a sample of guns seized in New York City in 1991 were traced to Virginia gun dealers.[3] Virginia has long been a primary out-of-state source of recovered crime guns traced in Washington, D.C.[4] and Boston.[5]

Virginia is not the only out-of-state source of firearms illegally trafficked along the Eastern Seaboard. In fact, the BATF has identified the illegal movement of firearms from states in the Southeast northward to states along Interstate 95 (sometimes referred to as the "Iron Pipeline"[6]), as one of three principal gun trafficking routes in the country.[7] The same BATF report that identified Virginia as the principal out-of-state source of guns used in crime in New York City noted that a high percentage of recovered guns also came from Florida and Georgia. Together, the three states accounted for 65% of all successfully traced firearms in New York City. Investigators also found that 25% of successfully traced firearms recovered in Baltimore were originally purchased in the Southeastern United States.[8]

Interstate gun trafficking occurs, in part, because of the disparity in state laws governing gun sales. As a result, the "street price" of firearms in localities with restrictive gun laws is significantly greater than the retail price for the same guns purchased in states where laws are less stringent. For example, low quality, easily concealable guns like the Raven Arms MP-25, the Davis P-38 and the Bryco Arms J-22 which retail for less than $100 can net street prices between $300 and $600.[9] The ability to buy many guns at a retail price to be sold elsewhere at a higher street price suggests that the purchase of multiple firearms in a single transaction is an integral part of the profit motive which supports the illegal market.

The objective behind Virginia's passage of the one-gun-a-month law was to undermine the economic incentive created by the disparities in gun laws among the states -- an objective supported by historical evidence. In 1975, South Carolina limited purchases of firearms to one gun in a thirty day period. Prior to enactment of the law, South Carolina was a primary out-of-state source of guns used in crime in New York City. After the passage of the law, South Carolina was no longer a primary source of guns for New York City.[10]

Exhibit 4
Page 00052

**Purpose of the Study**

The objective of this study was to assess the effect of Virginia's one-gun-a-month law on gun trafficking patterns, particularly along the "Iron Pipeline."

**Data**

The data[11] used in the analysis come from the firearms trace database compiled by the Bureau of Alcohol, Tobacco and Firearms (BATF). Law enforcement agencies can request that the BATF trace a gun which has been recovered in connection with a criminal investigation. BATF staff at the National Tracing Center (NTC) contact the manufacturer of the firearm to identify which wholesaler or retail dealer received the gun. NTC staff then contact each consecutive dealer who acquired the firearm until the gun is either traced to the most recent owner or, until the gun can be traced no further. There is no requirement that records of gun transfers be maintained by non-gun dealers who sell a firearm. Consequently, the tracing process often ends with the first retail sale of the gun.

As part of the tracing process, information is collected on several variables including the location of the gun dealer or dealers who have handled the gun (by state and region); when the gun was purchased; when and where the trace was initiated; and, the manufacturer, model and caliber of the firearm being traced.

The firearms trace database contained in excess of a half million records pertaining to approximately 295,000 firearms (9/89 through 3/95). The database contains more records than firearms because two or more traces can be of the same gun, as part of the same criminal investigation. Multiple traces of a particular gun is an indication that the weapon was transferred from federally licensed firearms dealer to another dealer before it was sold to a non-licensed individual. Since 1990, the number of traces conducted each year has more than doubled to approximately 85,000 in 1994.

**Methods**

The principal analytic method used in the study was to estimate the odds ratio for tracing a firearm to a gun dealer in Virginia relative to a dealer in the other Southeastern states (as defined by the BATF), for guns purchased prior to Virginia's one-gun-a-month law's effective date compared to guns purchased after the law was enacted.

In other words, the data were classified by two criteria: (1) where the gun was purchased (from a gun dealer in Virginia or from a dealer in another state in the Southeast region of the country), and (2) when a traced firearm was purchased (before or after implementation of the Virginia law). The odds ratio was calculated by comparing the odds of a gun being traced to a gun dealer

Exhibit 4
Page 00053

in the state of Virginia relative to a dealer in another part of the region, for guns purchased prior to the law's implementation and for guns purchased after the law took effect.

The Southeast region was identified as the comparison group for Virginia because the region has long been identified as a principal source of out-of-state firearms for the Eastern Seaboard.[7] In addition to Virginia, the Southeast region includes North and South Carolina, Georgia, Florida, Alabama, Mississippi and Tennessee. Only guns traced to a dealer in the Southeast region were incorporated into the analysis.

The BATF no longer traces firearms manufactured prior to 1985 without being specifically requested to do so. Results are reported in this analysis only for guns purchased since January 1985. However, a sensitivity analysis was conducted incorporating data for all firearms for which date of purchase information was available. The results of the analysis were essentially unchanged by the sensitivity analysis; the conclusions would not change.

The period studied for which there is data after implementation of the law was 20 months long. Consequently, the possibility that seasonal variation in gun trafficking patterns could have effected the results of the analysis was studied. A sensitivity analysis was conducted excluding guns purchased more than one full year after the Virginia law took effect. The results of the sensitivity analysis were not significantly different from those of the principal analysis; the conclusions would not change.

Date of purchase information was not available for all guns in the firearms trace data set. The distribution of guns traced to the Southeast region (to gun dealers in Virginia relative to the rest of the region) is similar for the subset of data for which date of purchase information was available (24%), and the subset for which date of purchase information was not available (21%).

The Virginia law pertains to acquisition of handguns by individuals who are not federally licensed firearms dealers. Therefore, the origin of a gun which had been transferred from a dealer in one state to a dealer in a second state was considered to be the last dealer's location. In other words, if a firearm was transferred by a dealer in Georgia to a dealer in Virginia, who then sold the gun to an individual who was not a licensed dealer, the gun would be considered a Virginia gun.

Odds ratios were estimated for traces initiated: (1) anywhere in the United States; (2) the Northeast corridor taken as a whole (New Jersey, New York, Connecticut, Rhode Island and Massachusetts); and, (3) for each of the Northeast states individually considered. For each iteration, the hypothesis being tested remained the same, and was that:

> the odds of a gun, purchased after enactment of Virginia's one-gun-a-month law, being traced to a Virginia gun dealer relative to a gun dealer in another part of the Southeast, were significantly lower than for guns purchased prior to enactment of the law.

D–6

Exhibit 4
Page 00054

A significant reduction in the odds would provide evidence that the Virginia law effectively helped to reduce gun trafficking from the state.

**Results**

The date a gun was purchased and the date the trace request was made was available for 55,856 (19%) of the guns in the database. Of these guns, 17,082 (30.6%) were traced to a dealer located in the Southeast region. Approximately one in four guns (24%) traced to the Southeast were traced to a Virginia gun dealer.

Cross-tabulations indicate that there is an association between when a firearm was acquired (before or after the Virginia law went into effect) and where it was obtained (either from a Virginia gun dealer or a gun dealer in another state located in the Southeast). Twenty-seven percent of all guns purchased prior to passage of the one-gun-a-month law (including guns recovered in Virginia), which were traced to a gun dealer in the Southeast, were acquired from a Virginia gun dealer. Only 19% of guns purchased after the law went into effect and similarly traced to a dealer in the Southeast were acquired in Virginia (Appendices i-vii). In other words, there was a 36% reduction in the likelihood that a traced gun from anywhere in the nation was acquired in Virginia relative to another Southeastern state, for firearms purchased after the one-gun-a-month law took effect compared to guns purchased prior to enactment of the law (Odds Ratio=0.64; p<0.0001)
(Table 1).

The magnitude of the association between when a gun was purchased and where it was acquired was greater when the analysis focused on gun traces initiated in the Northeast corridor of the United States (New Jersey, New York, Connecticut, Rhode Island or Massachusetts). For gun traces originating in the Northeast, there was a 66% reduction in the likelihood that a gun would be traced to Virginia relative to a gun dealer elsewhere in the Southeast for guns purchased after the one-gun-a-month law took effect when compared to guns purchased prior to law's effective date (OR=0.34;p<0.0001).

Even stronger associations were identified for gun traces initiated in individual states -- specifically for traces of guns recovered in New York and Massachusetts. Among the guns from the Southeast recovered in New York, 38% purchased prior to implementation of the Virginia law were traced to Virginia gun dealers compared to 15% of guns from the Southeast which were purchased after the law took effect (OR=0.29;p<0.0001). In Massachusetts, the percentages were 18 and 6 (OR=0.28;p<0.032). In other words, implementation of the law was associated with a 71% reduction in New York and a 72% reduction in Massachusetts in the likelihood that a traced gun originally purchased in the Southeast would be traced to a Virginia gun dealer as opposed to a dealer in another Southeastern state.

Exhibit 4
Page 00055

Table 1:    Estimated odds ratio that a firearm, purchased after implementation of the Virginia one-gun-a-month law, would be traced to a Virginia gun dealer relative to a gun dealer in another state in the southeastern region of the country compared to firearms purchased prior to the law.

| Firearms recovered in: | Guns Traced to Dealer In . | Guns Purchased Prior to Law (%) | Guns Purchased After Law Implemented (%) | Odds Ratio (95% CI) | | p-value |
|---|---|---|---|---|---|---|
| All states (n=14606)* | | | | | | |
| | VA | 27.0 | 19.0 | 0.64 | (0.58-0.71) | <0.0001 |
| | SE-VA** | 73.0 | 81.0 | | | |
| Northeast Corridor (NJ, NY, CT, RI, MA) (n=4088) | | | | | | |
| | VA | 34.8 | 15.5 | 0.34 | (0.28-0.41) | <0.0001 |
| | SE-VA | 65.2 | 84.5 | | | |
| NJ (n=729) | | | | | | |
| | VA | 28.7 | 17.7 | 0.53 | (0.35-0.80) | =0.003 |
| | SE-VA | 71.3 | 82.3 | | | |
| NY (n=2991) | | | | | | |
| | VA | 38.2 | 15.3 | 0.29 | (0.23-0.36) | <0.0001 |
| | SE-VA | 61.8 | 84.7 | | | |
| CT (n=53) | | | | | | |
| | VA | 34.1 | 33.3 | 0.96 | (0.21-4.39) | =0.97 |
| | SE-VA | 65.9 | 66.7 | | | |
| RI (n=14) | | | | | | |
| | VA | 7.1 | na | na | na | na |
| | SE-VA | 92.9 | na | | | |
| MA (n=301) | | | | | | |
| | VA | 18.0 | 5.9 | 0.28 | (0.08-0.94) | =0.032 |
| | SE-VA | 82.0 | 94.1 | | | |

*n=number of guns traced to the Southeast
**SE-VA=all states of the Southeast except Virginia

## Comment

In 1993, 1.1 million violent crimes were committed with handguns.[12]  Studies show that anywhere from 30% to 43% of criminals identified the illegal market as the source of their last handgun.[13]  The illegal market exists for several reasons: would-be criminals may be unable to buy handguns because prior criminal records disqualify them from over-the-counter purchases, or the gun laws in their states prevent them from obtaining a handgun quickly and easily.  In addition, would-be criminals do not want to make over-the-counter purchases because the handgun eventually can be traced back to them.

Local and state legislative bodies have created a patchwork of weak and strong laws regulating handgun sales across the country.  In some jurisdictions purchasers may need a permit to possess

Exhibit 4
Page 00056

a handgun,[14] or may be required to wait before the transfer is allowed to go forward.[15]  In other jurisdictions, however, there are no restrictions on the sale of handguns beyond the few imposed by federal law.[16]  Consequently, the jurisdictions with "weaker" gun retail laws attract gun traffickers who buy firearms in these jurisdictions and transport their purchases illegally to areas with "stronger" regulation.  The guns are then sold illegally on the street to ineligible buyers (e.g., felons or minors), or to people who want guns that cannot be traced back to them.

The BATF recently completed a study on gun trafficking in southern California where a 15-day waiting period applies.  The study found that more than 30% of the guns recovered in crime in that region which could be traced back to a gun dealer came from outside California.[17]  Almost a third of these out-of-state guns were sold initially by dealers in Nevada, Arizona, and Texas, where the most exacting rules concerning handgun sales are the minimum restrictions set forth in federal law.[18]  The experience in New York City is the same.  For example, the BATF reports that 66% of all the guns recovered in crime in that city in 1991 and traced by the Bureau were originally obtained in Virginia, Florida, Ohio and Texas -- states with "weak" gun laws compared to New York.[19]

The ability to purchase large numbers of firearms, which have a much higher street value than their commercial price, enables gun traffickers to make enormous profits and keep their "business" costs to a minimum.  For example, convicted gun runner Edward Daily "hired" several straw purchasers to buy approximately 150 handguns in Virginia and North Carolina. Daily traded the handguns in New York City for cash and drugs and reaped profits of $300 per gun on smaller caliber handguns and $600 per gun for more powerful assault pistols like the TEC-9 and MAC-11.[20]

In March 1991, Owen Francis, a Bronx, New York resident, drove to Virginia and, without having to show proof of residency, obtained a Virginia driver's license.  Within a short time, Francis had purchased five Davis Saturday Night Specials -- the most common handgun traced to crime between 1990-1991, according to the BATF[21] -- and returned to New York and sold the guns.  Francis was arrested a few weeks later when he returned to Virginia to buy four more Davis handguns.[22]

High-volume multiple sales are common.  The BATF field division for southern California recently reviewed over 5,700 instances of multiple sales.  Almost 18% of these multiple sales involved individual purchases of three or more guns.[23]  Theoretically, prohibiting multiple purchase transactions should be an effective policy means to disrupt established gun trafficking patterns while ultimately reducing the supply of firearms available in the illegal market.  The effects of the Virginia one-gun-a-month law seem to support the theory.

The results of this study provide strong evidence that restricting purchases of handguns to one per month is an effective way to disrupt the illegal movement of guns across state lines.  The analysis of the firearms trace database shows a strong, consistent pattern in which guns originally obtained in the Southeast are less likely to be recovered as part of a criminal investigation and

traced back to Virginia if they were purchased after the Virginia law went into effect. There was a 65% reduction in the likelihood that a gun traced back to the Southeast would be traced to Virginia for guns recovered in the Northeast Corridor; a 70% reduction for guns recovered in either New York or Massachusetts; and, a 35% reduction for guns recovered anywhere in the United States.

While evidence generated from this study is strong, a change in the laws governing gun purchases in the other southeastern states (e.g., Florida or Georgia) which makes the laws in those states more permissive after July 1993 could provide an alternative explanation for the findings. A review of laws related to private gun ownership in the southeastern region revealed no relevant changes, though Georgia will move to an instant check system and preempt local gun laws effective January 1996.[24]

While there are many strengths of this analysis, there are some limitations. First, additional research is needed to clarify what, if any displacement effects were created by the Virginia law (i.e., to what extent, if any, do gun traffickers successfully shift their activities to the next most attractive state for acquiring firearms). Second, all types of firearms are included in the analysis even though the Virginia law only restricts the purchase of handguns. This potentially results in an underestimate of the effect of the law. Third, the BATF does not trace all firearms recovered as part of a criminal investigation, and, for the firearms traced, some information (e.g., date of purchase) is not always available. Though it is unlikely that there is a systematic bias in the origin of guns from the Southeast which are recovered outside of the region, or with respect to which guns from the Southeast are traced (a gun's origin and date of purchase are not known prior to the trace), such a bias could alter the results leading to an over- or under-estimation of the association between passage of the Virginia law and the relative likelihood of Virginia guns turning up in the tracing data.

**Conclusion**

Most gun control policies currently being advocated in the United States (e.g., licensing, registration, and one-gun-a-month) could, most fairly, be described as efforts to limit the supply of guns available in the illegal market. In other words, these are policies crafted to keep guns from proscribed individuals. Once enacted, however, it is important to demonstrate that they are effective. This study, which looks at the impact of Virginia's one-gun-a-month law, provides persuasive evidence that a prohibition on the acquisition of more than one handgun per month by an individual is an effective means of disrupting the illegal interstate transfer of firearms. Based on the results of this study, Congress should consider enacting a federal version of the Virginia law.

Exhibit 4
Page 00058

## Acknowledgments

This work was supported in part by the Overbrook Foundation and the Educational Foundation of America.

We thank David Hemenway, Ph.D. and Eric Rimm, Sc.D. of the Harvard School of Public Health for their assistance with the development of this report. We also thank Mark Polston, Rick Bielke, Richard Aborn, Dennis Henigan, Bob Walker, Diana Weil and James Willmuth for their comments.

Exhibit 4
Page 00059

## References

1. Code of Virginia, Section 18.2-308.2:2(Q). Often referred to as "one-gun-a-month."

2. Larson, Erik, Lethal Passage: How the Travels of a Single Handgun Expose the Roots of America's Gun Crisis, Crown Publishers, Inc., New York, 1994, p. 104.

3. BATF memo, "Firearm/Homicide Statistics," June 16, 1992.

4. Edds, Margaret, "The Pipeline to the Streets of New York," Virginian-Pilot, January 3, 1993: A9.

5. Montgomery, Bill, "Guns Bought in Georgia Arm Northern Criminals," Atlanta Constitution, October 11, 1993: A1, A4.

6. Id.

7. Personal communication with Joe Vince of the Bureau of Alcohol, Tobacco, and Firearms, July 18, 1995.

8. BATF and the Baltimore Police Department, 1994 Baltimore Trace Study, 1994: Appendix X.

9. Freedman, Alix, Wall Street Journal, February 28, 1992: A1, A6.

10. BATF memo, "Firearm/Homicide Statistics," June 16, 1992.

11. Obtained by the Center to Prevent Handgun Violence through the Freedom of Information Act.

12. United States Department of Justice, Bureau of Justice Statistics, Guns Used in Crime, July 1995.

13. Sheley, Joseph F and Wright, James D, "Gun Acquisition and Possession in Selected Juvenile Samples," National Institute of Justice and Office of Juvenile Justice and Delinquency Prevention, December 1993: 6; Beck, Alan, "Survey of State Prison Inmates, 1991," National Institute of Justice, Bureau of Justice Statistics, March 1993: 19.

14. N.Y. Penal Law Section 265.01, 265.20(f)(3) (no handgun purchases without previously receiving a license to possess a handgun). New York City law grants great discretion to the police commissioner in determining whether to issue a license to possess. N.Y.C. Admin. Code Section 10-131.

15. Cal. Penal Code, Section 12071(b)(3)(A) (15 day waiting period for delivery of firearm).

Exhibit 4
Page 00060

16. For example, Georgia law places no additional restrictions on the sale of handguns beyond those established by federal law.  In fact, as of January 1996, Georgia will prohibit local jurisdictions from regulating handguns sales.

17. Bureau of Alcohol, Tobacco and Firearms, Sources of Crime Guns in Southern California, 1995: 21-22.

18. Id.

19. BATF memo, "Firearms/Homicide Statistics," June 16, 1992.  See also Edds, Margaret, "The Pipeline to the Streets of New York," Virginian-Pilot, January 3, 1993 at A9 (describing Project Lead data).

20. Federal Firearms Licensing: Hearing Before the Subcomm. on Crime and Criminal Justice of the Committee on the Judiciary House of Representatives, 103rd Cong., 1st Sess., 8-10 (June 17, 1993) (hereinafter "House Hearing").

21. Freedman, Alix, "Fire Power: Behind the Cheap Guns Flooding the Cities is a California Family," Wall Street Journal, Feb. 28, 1992: A1, A6.

22. Thomas, Pierre, "Virginia Driver's License Is Loophole for Guns", Washington Post, January 20, 1992: A1.

23. BATF, Sources of Crime Guns in Southern California, 1995: 16-17.

24. Laws reviewed included one-gun-a-month, bans on weapons, background checks, waiting periods, regulation of private sales, license to purchase, and registration of sales.

Exhibit 4
Page 00061

# Distribution of Guns Traced to the Southeast by Date of Purchase

**Guns Recovered in All States:**



Virginia Gun
Dealers
**27%**

**73%**
Other Southeastern
Gun Dealers

**Guns Purchased Prior to July 1993**



Virginia Gun
Dealers
**19%**

**Guns Purchased After July 1993**

**81%**
Other Southeastern
Gun Dealers

Number of Firearms Traced = 14,606

i

Exhibit 4
Page 00062

## Distribution of Guns Traced to the Southeast by Date of Purchase

Guns Recovered in the Northeast Corridor (NJ, NY, CT, RI, & MA):



Virginia Gun
Dealers
**35%**

| Guns Purchased Prior to July 1993 |

**65%**
Other Southeastern
Gun Dealers



Virginia Gun
Dealers
**16%**

| Guns Purchased After July 1993 |

**84%**
Other Southeastern
Gun Dealers

| Number of Firearms Traced = 4,088 |

ii

Exhibit 4
Page 00063

# Distribution of Guns Traced to the Southeast by Date of Purchase

Guns Recovered in New Jersey:



Virginia Gun
Dealers
**29%**

**71%**
Other Southeastern
Gun Dealers

Guns Purchased Prior to July 1993



Virginia Gun
Dealers
**18%**

**82%**
Other Southeastern
Gun Dealers

Guns Purchased After July 1993

Number of Firearms Traced = 729

iii

Exhibit 4
Page 00064

# Distribution of Guns Traced to the Southeast by Date of Purchase

Guns Recovered in New York:



Virginia Gun
Dealers
**38%**

**62%**
Other Southeastern
Gun Dealers

Guns Purchased Prior to July 1993



Virginia Gun
Dealers
**15%**

**85%**
Other Southeastern
Gun Dealers

Guns Purchased After July 1993

Number of Firearms Traced = 2,991

iv

Exhibit 4
Page 00065

# Distribution of Guns Traced to the Southeast by Date of Purchase

**Guns Recovered in Connecticut:**



Virginia Gun
Dealers
**34%**

66%
Other Southeastern
Gun Dealers

| Guns Purchased Prior to July 1993 |



Virginia Gun
Dealers
**33%**

67%
Other Southeastern
Gun Dealers

| Guns Purchased After July 1993 |

| Number of Firearms Traced = 53 |

v

Exhibit 4
Page 00066

## Distribution of Guns Traced to the Southeast by Date of Purchase

Guns Recovered in Rhode Island:



Virginia Gun
Dealers
7%

93%
Other Southeastern
Gun Dealers

| Guns Purchased Prior to July 1993 |

| Guns Purchased After July 1993

Insufficient Data for Analysis |

| Number of Firearms Traced = 14 |

vi

Exhibit 4
Page 00067

## Distribution of Guns Traced to the Southeast by Date of Purchase

**Guns Recovered in Massachusetts:**



Virginia Gun
Dealers
**18%**

82%
Other Southeastern
Gun Dealers

> Guns Purchased Prior to July 1993



Virginia Gun
Dealers
**6%**

94%
Other Southeastern
Gun Dealers

> Guns Purchased After July 1993

> Number of Firearms Traced = 301

vii

Exhibit 4
Page 00068

**Appendix E**

Exhibit 4
Page 00069

Exhibit 4
Page 00070

Dr. Paul Blackman took his bachelor's degree in political science from the University of California at Riverside, his master's from Johns Hopkins University, and his Ph.D. in Government from the University of Virginia.

He taught American government and constitutional law at the University of North Dakota and the University of Maryland, and did consulting work for the American Political Research Corporation and Media Research, Inc., in the 1970s, with particular emphasis on election and voter-registration laws and their reform, and analyzing public-opinion surveys.

For the past 17 years, he has served as the Research Coordinator of the National Rifle Association's Institute for Legislative Action, with research emphasis on criminological and public-health studies of firearms and violence.

Exhibit 4
Page 00071

Remarks by
Paul H. Blackman, Ph.D.,
NRA Institute for Legislative Action
to the
Virginia State Crime Commission
regarding
Handgun Control, Inc.(Center to Prevent Handgun Violence)'s
Report on Virginia's One-Handgun-Per-Month Law
August 29, 1995

When Virginia first considered "one handgun per month" legislation, data were presented detailing how many firearms traced from New York City or the District of Columbia led to Virginia.  At the time, we mentioned that such data were worthless, since tracing data have consistently been found by objective scholars, such as the Library of Congress's Congressional Research Service -- and even those with an anti-gun bias, such as Frank Zimring -- to be worthless as a means of studying anything.  For two decades criminologists have known that nothing can be learned by any analysis of Bureau of Alcohol, Tobacco & Firearms (BATF) tracing data.  It doesn't matter whether the analysis is simplistic or sophisticated; the data source is too flawed to admit of any meaningful analyses.

To spur legislative action, when the legislation was being considered, those worthless data were supplemented for the state legislature by Batman comic strips, making the Virginia General Assembly one of the few, possibly the only, legislative body in world history, to enact legislation because told to by a children's comic-strip character, in this case by one dedicated to the promotion and exploitation of violence.

The Congressional Research Service years ago noted that traces were never intended to provide statistical information on the types of guns used in crime, or the sources of crime guns.  Tracing was not supposed to be a statistical tool for analyzing crime, but a law-enforcement tool to assist officers investigating specific crimes.  Traces involve neither effort to find out about all guns involved in any or all crimes, nor random sampling, or anything else which would allow useful statistical analyses.

There are two fundamental reasons for the worthlessness of the data:

First, only a tiny percentage of guns actually used in crime are traced. For example, during a period when about 1,000 gun-related murders were committed in New York City, only two guns were traced to Virginia as a result of homicide investigations.  And those guns were not necessarily used to commit the crimes, but might have been found at the scene, or even on the body of the victim.  In recent years, about one million gun-related crimes have occurred annually, and less than one percent of those crimes has resulted in a firearm being traced. The gun traces are not representative of firearms involved in crime and are certainly not randomly selected.

Second, only a fraction of guns traced were used in crime.  The vast majority of the gun traces involve possessory offenses, not misuse offenses. Generally, less than one tenth of traced guns are traced as a result of the investigation of a violent crime -- and even then, the firearm wasn't necessarily used to commit the crime, or belonged to the suspected criminal.

And a majority of traces are not instituted by local police, whether investigating serious crimes or possessory offenses, but by BATF.  Thus, BATF essentially determines the nature of guns traced by deciding which dealers or suspected gun-runners to target -- or by deciding which sorts of firearms to target.  When BATF focuses on possible misdeeds by Virginia dealers, or by gun traffickers using Virginia dealers, then when BATF completes its investigation, a lopsided portion of traced guns will come to Virginia -- that's where the investigation began and that's where it automatically will end.

E-2

Exhibit 4
Page 00072

After Virginia adopted one-handgun-per-month, BATF decided to switch and to start investigating guns from dealers in other states. Of course there was a diminution in guns traced to Virginia dealers and an increase of those traced to dealers to whose transfers BATF had switched its focus. We don't know if gun-runners slowed in their use of Virginia or merely, as they testified they would do, used more persons for once-a-month straw-man sales. While in past years, "multiple sales" forms might have alerted BATF to potential gun-running schemes, the Virginia one-handgun-a-month law added Virginia to South Carolina as the only two states where any such potential law-enforcement tool would be undermined.

Before the one-handgun-per-month law was adopted, BATF focused its investigations of gun traffickers on those who were using gun dealers in Virginia, as opposed to those in Ohio, West Virginia, Georgia, or Delaware. Since then, it's switched its focus. The obvious result is a decline in guns traced to Virginia gun dealers. Neither prior to the legislation, nor now, was any effort made systematically to look at the guns actually used in crime anywhere.

Neither prior to the legislation nor now was any effort made to determine whether guns traced -- whether used in crime or not -- involved sales of more than one handgun per month. This is important, since, over the past 15 years, Virginia has adopted at least three other laws designed to curb dealer transfers of handguns to prohibited persons, laws adopted with the cooperation of the National Rifle Association. It would thus be important to determine whether any diminution in Virginia gun misuse in other states should be credited that those buyer-identification and background-check laws or to the numerical curb on handgun transfers. For that matter, I have no doubt that, in other contexts, Handgun Control, Inc., will take these same sorts of data and claim they prove the Brady Act is working, even if the effective part is the NRA-backed instant background check initiated here in Virginia.

The possible involvement of multiply-purchased handguns is also significant since data indicate that there has been no appreciable change in the number of multiple handgun sales in the state. It would appear that all Virginia has succeeded in accomplishing is to make the process of multiple handgun purchases more onerous for serious collectors and possibly more expensive for the state.

In short, the simplistic studies before enactment of the one-handgun-per-month law, and this more sophisticated post-law study, are equally worthless since the data on which they are based are incapable of revealing anything about the nature of crime guns or their source, and, even using those generally worthless data, no effort was made to determine whether "one handgun per month" was an issue for the firearms traced to Virginia or elsewhere.

As an interesting side note on Virginia's role in eastern corridor interstate sales, I have noted no legislative efforts to curb the use of Virginia as a source of cigarettes to persons seeking to evade the Northeast's high tobacco taxes. To the extent the state may wish to humor the public-health researchers involved in both firearms and tobacco misuse, by helping curtail interstate evasion of tough laws, Virginia might wish to consider limiting the number of cartons of cigarettes a given individual, particular one without a Virginia driver's license, may lawfully be sold by any particular store.

Thank you.

Exhibit 4
Page 00073

# Exhibit 5

Exhibit 5
Page 00074

# PURCHASE OF MULTIPLE FIREARMS AS A RISK FACTOR FOR CRIMINAL GUN USE: IMPLICATIONS FOR GUN POLICY AND ENFORCEMENT

CHRISTOPHER S. KOPER*
University of Pennsylvania

*Research Summary:*

*The simultaneous or rapid purchase of multiple guns, which is referred to as a multiple sale, is a potential indicator of gun trafficking. This study examines the role of multiple sales in supplying criminals, using longitudinal analysis of the sale and subsequent police recovery of guns sold in Maryland during the early to mid-1990s. Guns sold in multiple sales accounted for 25% of guns later recovered and had an elevated risk of recovery outside of Maryland, particularly in neighboring Washington, D.C., where handguns are banned.*

*Policy Implications:*

*Federal regulations requiring gun dealers to report multiple sales are prudent, and law enforcement should emphasize these sales in gun trafficking investigations. A 1996 Maryland law restricting handgun buyers to one purchase per month may have produced modest reductions in the flow of guns to criminals in Maryland and particularly in Washington, D.C.*

KEYWORDS: Guns, Gun Control, One-Gun-A-Month, Crime Prevention

## INTRODUCTION

Despite the recent drop in gun violence, criminal misuse of firearms continues to be one of America's most serious crime problems. In 2003, there were roughly 11,000 murders with firearms (calculated from Federal

---

* The Smith Richardson Foundation and the Jerry Lee Center of Criminology, University of Pennsylvania, provided funding for this research. Data acquisition was also supported by Grant 97-IJ-CX-0053 from the National Institute of Justice (U.S. Department of Justice) to Northeastern University. The author thanks the Maryland State Police (especially Lieutenant Jack Simpson) and Glenn Pierce for assistance with data acquisition and David Huffer for data management support. The author also thanks Jeff Roth, Charles Wellford, and anonymous reviewers of *Criminology & Public Policy* for helpful comments on earlier versions of this paper. The views expressed are those of the author and should not be attributed to the trustees of the University of Pennsylvania, the Smith Richardson Foundation, or any other aforementioned persons and organizations.

VOLUME 4        NUMBER 4        2005        PP 749–778

Exhibit 5
Page 00075

750                              KOPER

Bureau of Investigation, 2004:19) and another 367,000 nonfatal violent crimes with guns (Catalano, 2004:10). By some estimates, the total costs of gun violence in the United States, including medical, criminal justice, and other government and private costs, could be as high as $80 billion per year (Cook and Ludwig, 2000).

Furthermore, the recent downturn in gun crime does not seem to have been driven in any large way by a reduction in the availability of guns to offenders. Although the number of gun homicides plummeted by 41% from 1993 to 1999, for example, the percentage of homicides committed with guns declined by a modest 6%, from 69.6% to 65.2% (Federal Bureau of Investigation, 1994; 2000). Similarly, the percentage of robberies committed with guns declined by only 6% (from 42.4% to 39.9%) in police statistics and 14% (from 25.1% to 21.5%) in victimization surveys during this same period (Federal Bureau of Investigation, 1994, 2000; Maguire and Pastore, 1995:236, 2001:198). Hence, reducing the availability of guns to criminals remains an important policy concern.

The simultaneous or rapid purchase of multiple guns by one individual, which is commonly referred to as a multiple sale, provides an obvious means by which illegal gun traffickers, working alone or with other buyers, can accumulate a many firearms in a short period for sale in illegal markets. Accordingly, federal regulations require licensed gun dealers to notify the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) whenever they sell multiple handguns to any one individual within five consecutive business days (ATF, 1995a:59), thereby enabling authorities to monitor these sales for illegal trafficking. In addition, a few states, including South Carolina, Virginia, Maryland, and California, have responded to this problem by enacting one-gun-a-month (OGM) laws that restrict handgun buyers (and sometimes buyers of other designated weapons) to one purchase every 30 days (ATF, 1998, 2003; Vernick and Hepburn, 2003). However, there has been very little research examining the link between multiple sales and gun crime. This study investigates that link using data on gun sales in the state of Maryland and subsequent recoveries of those guns by police.

## GUN MARKETS, MULTIPLE SALES, AND GUN TRAFFICKING

### GUN MARKETS AND CRIMINAL GUN ACQUISITION

Firearms are distributed in markets commonly referred to as primary and secondary markets (Cook et al., 1995). Primary markets include transactions by federally licensed gun dealers. Licensed dealers are required to follow federal and state background check procedures to verify the eligibility of purchasers, observe any legally required waiting period before

Exhibit 5
Page 00076

making transfers, maintain records of gun acquisitions and dispositions, and report multiple sales and losses due to theft to federal authorities.

Secondary markets encompass secondhand gun transactions made by nonlicensed individuals.[1] Secondary market participants are prohibited from knowingly transferring guns to ineligible purchasers (e.g., convicted felons and drug abusers). However, secondary transfers are not subject to federal record-keeping and background check requirements, thus making the secondary market largely unregulated and, consequently, a better source of guns for criminal users.[2] In the secondary market, ineligible buyers may obtain guns (through collusion or misrepresentation) from a variety of legitimate and illegitimate gun owners: relatives, friends, and other associates; fences and other street dealers; drug dealers and addicts; and persons selling through classified ads or at gun shows (e.g., see Beck et al., 1993; Harlow, 2001; Sheley and Wright, 1993; Wright and Rossi, 1986). Of course, ineligible purchasers may also steal guns; approximately 600,000 guns are stolen each year from private owners, dealers, and common carriers (ATF, 2000a:27–28; Cook and Ludwig, 1996:29–30).

Although secondary market transactions and theft seem to be the predominate sources for the supply of firearms to criminals, illicit diversion from the primary market is also an important channel (e.g., see Braga et al., 2002).[3] This diversion occurs in several ways (besides theft). Some prohibited buyers obtain guns directly from dealers by using false identification. There are also corrupt retailers who engage in illegal sales, either by selling directly to prohibited users or by colluding with unlicensed street dealers (e.g., see ATF, 2000b; Wachtel, 1998).

Another mechanism—and one that is central to this study—involves the activities of "straw purchasers," lawfully eligible gun buyers who purchase guns for illegal users and traffickers or to make illicit sales themselves. Straw purchasers include small-scale actors who make one-time or occasional purchases as well as rings of buyers who traffic large numbers of firearms through systematic, repetitive operations. The full extent of straw purchasing cannot be determined from available data,[4] but it seems to be a

---

1. Persons who make only occasional sales of firearms from their personal collection are not required to obtain a federal firearms license (ATF, 2000a:11).

2. Some states require that secondary market participants conduct transactions through licensed dealers or law enforcement authorities (Vernick and Hepburn, 2003). Even in these states, however, it is not clear how well these laws are enforced.

3. Of course, some people who commit crimes with firearms are legally eligible buyers at the time they acquire their guns. Nationally, about 11% of crime guns are recovered from their original purchasers (ATF, 2000c:8).

4. In a recent national survey of prison inmates, 14% of gun offenders reported that they obtained the gun used in their conviction offense from a retail outlet, 40% indicated that a family member or friend was the source, 39% cited a "street" or "illegal" source (including theft, drug dealers, and fences), and 7% reported using "other"

Exhibit 5
Page 00077

fairly common supply mechanism for criminals and juveniles. A survey of
juveniles incarcerated in four states, for instance, revealed that one third
had asked someone, most commonly a family member or friend, to buy a
gun for them at a retail outlet at some point in the past (Sheley and
Wright, 1993:6). Another rough indicator is the share of crime guns that
are new but that have changed hands at least once. To illustrate, approxi-
mately one quarter of guns confiscated by police are less than three years
old, and most of these are recovered from persons other than the original
buyers (Cook and Braga, 2001:294–295), all of which implies that many of
these guns were diverted from the primary market via straw purchasing
and other means.

Straw purchasers move several thousand guns into criminal channels
each year based on just those cases known to federal authorities. Nearly
half of federal gun trafficking investigations from July 1996 to December
1998 involved straw purchasers who had diverted an average of 37 guns
per case and a total of nearly 26,000 guns (ATF, 2000b:12–13). Case stud-
ies also suggest that larger, repetitive straw purchasing operations, which
are particularly relevant to this discussion (see below), divert a considera-
ble number of guns to the street markets from which roughly 25% to 40%
of offenders obtain firearms and to the interstate flow of guns into areas
with strict gun laws and lower levels of gun ownership (ATF, 2000b; Ken-
nedy et al., 1996:174; Wachtel, 1998; but see Kleck, 1999 for a skeptical
view on the importance of large-scale trafficking operations to the criminal
gun supply).[5, 6]

## MULTIPLE SALES AND THE CRIMINAL GUN SUPPLY

Multiple sales facilitate large-scale gun trafficking by straw purchasers,
which is why federal authorities monitor them and a few states prohibit
them.[7] However, there has been very little direct investigation of the role

sources (Harlow, 2001:6). Such data tell us nothing, however, about the role of small- or
large-scale straw purchasers as direct or indirect sources for these offenders. Many
acquisitions from dealers and from family and friends may have involved straw
purchases. And as noted below, some guns obtained through street sources may have
been originally supplied through straw purchasing.

5. The estimate that 25% to 40% of offenders obtain guns from street sources is
based on surveys of adult and juvenile gun offenders showing the percentages that
acquire firearms directly from fences, drug dealers, "street" sources, or the "black mar-
ket" (e.g., see Beck et al., 1993:19; Harlow, 2001:6; Sheley and Wright, 1993:6; Wright
and Rossi, 1986:183).

6. For extensive reviews of gun markets, see Braga et al. (2002), Cook et al.
(1995), Kleck (1999), Koper and Reuter (1996), National Research Council
(2005:72–101), and Pierce et al. (2003).

7. Analysis of multiple sales reports prompted 13% of ATF's gun trafficking
investigations during the late 1990s (ATF, 2000b:8–9).

Exhibit 5
Page 00078

of multiple sales in supplying criminal offenders. Two key questions with implications for the use of multiple sales as a trafficking indicator and for the efficacy of OGM laws are whether guns purchased in multiple sales are more likely than other guns to be used in crime and whether they provide a substantial share of crime guns. Multiple sales are probably fairly common, considering that three quarters of gun owners possess more than one gun (Cook and Ludwig, 1996:15).[8] Yet many who purchase guns in multiple sales are likely to be low-risk buyers (e.g., gun collectors), so the risk that guns sold in multiple sales are used in crime is likely to vary across different groups of buyers.

An ATF study that linked multiple sales directly to crime guns found that multiple sales accounted for 22% of a subsample of handguns recovered by police in 32 cities (ATF, 2000c:40). Moreover, handguns linked to multiple sales were over twice as common (51%) among handguns with an obliterated serial number, an obvious flag for potential trafficking. Nonetheless, the study was based on only the 5% of recovered handguns (and 4% of all recovered guns) successfully traced to a retail sale that occurred within the prior year,[9] and the link between multiple sales and obliterated serial numbers was not as strong in a later sample (ATF, 2002a:52).[10] And because the study examined only guns used in crime, it provides no basis for comparing the risks that handguns sold in single and multiple sales are used in crime. Information on multiple sales and crime from other sources is fragmentary but suggestive of a link.[11]

---

8. On a related note, Californians who purchased more than one handgun during 1999 (before the state's OGM law) accounted for about half of all handgun sales in the state that year (Violence Prevention Research Program, 2002:62).

9. The full study was based on 49,832 handguns (and 64,637 total guns) reported to the ATF by the 32 cities during 1999 (p. 11). The multiple sales analysis was based on 2,378 successfully traced handguns that were sold at retail for the first time in 1999 and recovered that same year (p. 40).

10. In the later study (based on data from 2000), multiple sales accounted for 20% of all recovered handguns and 27% of recovered handguns with an obliterated serial number. This multiple sale analysis was also based on a small subset of guns both sold and recovered within a one-year period.

11. For example, ATF inspections of Chicago-area gun retailers during the 1970s showed that half of multiple sales involved some form of federal violation in contrast to only 1% of randomly selected transactions (Zimring, 1975:192). A study of guns recovered from persons under the age of 25 in California during 1998 and 1999 revealed that about half of the guns linked to purchasers associated with more than one recovered gun were purchased in multiple sales (Wintemute et al., 2004). Firearms linked to these purchasers accounted for only 6% of crime guns with identified purchasers, but they moved into criminal channels more quickly; the median time from retail sale to recovery was just over two years for these guns but was almost six-and-a-half years for the full sample. Finally, a recent national study found that guns sold by dealers making higher numbers of multiple sales are recovered by police more quickly than guns sold by dealers making fewer multiple sales (Pierce et al., 2003, 2004). The study did not

Exhibit 5
Page 00079

There are also a few studies of OGM laws that provide insight into whether and how prohibition of multiple sales disrupts the criminal gun supply. In sum, there are indications these laws affect the interstate flow of guns, particularly that from states with lenient gun controls to those with more restrictive gun laws (Weil and Knox, 1996), but there is scant evidence they actually reduce gun crime (Coggeshall, 2001; Lott and Whitley, 2001; Webster et al., 2002). This implies that systematic straw purchasing via multiple sales plays a small-to-modest role in supplying illegal gun markets and one that is readily substitutable from other sources. However, various subtleties in these studies cloud interpretation of the findings. A few general points are that the studies lacked data on multiple sales (thus making it difficult to judge the scope of multiple sales trafficking in each jurisdiction) and did not systematically examine the full range of the laws' possible intrastate and interstate effects on both gun trafficking and gun crime.[12]

---

reveal whether guns sold in multiple sales were more likely to be used in crime or whether they moved into criminal channels more quickly, but some findings suggested that multiple sales were correlated weakly to moderately with other gun trafficking indicators.

12. In brief, one study of Virginia's 1993 OGM law suggests that it substantially reduced the flow of guns from Virginia to other states, particularly Northeastern states with stringent gun controls, but the study did not examine whether the law reduced gun crime in Virginia or elsewhere (Weil and Knox, 1996). Another study of crime and gun laws in Virginia reported that the state's OGM law had no impact on homicides in Virginia during its first year (Coggeshall, 2001).

In Maryland, gun homicides declined significantly in the two years after implementation of that state's OGM law in 1996 (Webster et al., 2002). Attribution of this trend to the OGM law is problematic, however, because the law was passed simultaneously with other state gun control measures, most notably new restrictions on secondhand gun transfers. Further, non-firearm homicides dropped after the law by more than did firearm homicides. The reduction in non-gun homicides was not statistically significant, but it implies that factors other than the OGM law may have caused the decline in gun homicides. Impacts elsewhere were not examined.

Finally, a state-level study of gun laws and crime from 1977 to 1998 reported that OGM laws failed on average to reduce homicides (and may have increased them) in OGM states and in their neighboring states (Lott and Whitley, 2001; also see Lott, 2003:164–168). (The study also examined other violent crimes, but I have focused on homicides because most homicides are committed with firearms.) This study included South Carolina, which has had an OGM law since 1975 (Vernick and Hepburn, 2003). (The other OGM laws in effect for portions of the study period were those in Virginia and Maryland.) However, South Carolina did not conduct background checks on gun buyers until required by federal law in 1994, which raises questions about enforcement of its OGM law before that time. (A system for background checks and maintenance of sales records for at least 30 days is a prerequisite for effective administration of an OGM law if policy makers wish to prevent these sales rather than react to them after

Exhibit 5
Page 00080

To provide a more direct assessment of the role of multiple sales in sup-
plying crime guns, this study presents longitudinal analyses of the sale and
subsequent criminal use of guns sold in single and multiple sales in the
state of Maryland over several years. I examine the contribution of multi-
ple sales to the criminal gun supply from Maryland and test the predictive
validity of multiple sales as a crime gun indicator. I then consider the
implications of the findings for the investigation of gun trafficking and the
efficacy of OGM laws.

## STUDY SETTING

The state of Maryland had a population of approximately 4.8 million in
1990, which grew to nearly 5.3 million by 2000. Maryland is one of the
most densely populated states in the nation, with 87% of its population
residing in the metropolitan area of Baltimore, the state's largest city
(which has over 650,000 residents), and the suburbs of Washington, D.C., a
city of more than 570,000 persons that borders the state (see Figure 1).

## FIGURE 1. AVERAGE VIOLENT CRIME RATES (PER 10,000 PERSONS) IN MARYLAND COUNTIES AND THE DISTRICT OF COLUMBIA, 1995–1999



the fact. Otherwise, gun dealers have no way of knowing whether a given buyer has
made purchases from other dealers within the past 30 days.)

Also, the analysis of interstate effects in this study did not include an assessment of
gun trafficking patterns to determine which neighboring or non-neighboring states were
most likely to have been affected (the estimate was based on the weighted average
across the three OGM states and their neighbors). Trafficking from Virginia into Wash-
ington, D.C., for example, was probably more problematic than trafficking from Vir-
ginia into its other neighbors (North Carolina, West Virginia, Tennessee, and
Kentucky). And as mentioned, some research implies that Virginia's OGM law may
have affected gun crime in non-neighboring states in the Northeast (Weil and Knox,
1996).

Exhibit 5
Page 00081

Despite relatively stringent gun controls (see discussion below), Maryland had comparatively high rates of violence throughout the 1990s. Maryland's crime rate is driven largely by crime in Baltimore, which had the third highest murder rate among the nation's largest cities in 1998 (Maguire and Pastore, 2000:288) and, unlike many other big cities, experienced little decline in its homicide rate during the 1990s. Guns are plentiful in Baltimore, where police seize in the neighborhood of 4,000 a year (ATF, 1999a, 2000d, 2002b). Other large, high-crime jurisdictions in the state include Baltimore County, a suburban county surrounding Baltimore city, and Prince George's County, a suburban county bordering Washington, D.C. (see Figure 1). From 1995 to 1999, three quarters of the violent crimes in Maryland occurred in Baltimore city, Baltimore County, or Prince George's County.

Maryland's proximity to Washington, D.C. (hereafter, D.C.) also has implications for gun markets in the state. Despite having a handgun ban in place since the mid-1970s, D.C. has high levels of gun violence. During the 1990s, police in D.C. recovered 2,000 to 3,000 guns annually (ATF, 1999a, 2000e; Wilber, 2004), and the city's murder rate ranked first or near the top among the nation's largest cities (e.g., see Maguire and Pastore, 1995:320, 2000:288, 2001:301). D.C.'s stringent gun controls, high levels of violence, and proximity make it a likely destination for gun trafficking out of Maryland, from which it gets 20% to 30% of its crime guns (ATF, 1997, 1999a, 2000e, 2002c).

Maryland has licensed handgun dealers and required background checks and a seven-day waiting period for handgun buyers since the 1960s (Vernick and Hepburn, 2003), all of which gave rise to the gun sales database described below. The state also instituted background checks for sales of military-style assault weapons (as defined by state law) in 1989, followed by a later state ban on assault pistols. Since 1990, moreover, the state has prohibited sales of many, although not all, of the inexpensive, low-quality, and easily concealable handgun models commonly referred to as "Saturday night specials" (SNS). Finally, in October 1996, Maryland implemented OGM restrictions for handgun purchases, among other gun control measures.

Although this study focuses on sales made before Maryland's OGM law (see below), the restrictions existing before 1996 may have discouraged large-scale, repetitive gun trafficking in the state even before the OGM law. This could bias the results conservatively, lessening the difference in criminal use between guns sold in single and multiple sales. Accordingly, generalization of the results to other areas must be done cautiously, an issue to which I return later.

Exhibit 5
Page 00082

## DATA AND MEASURES

### MARYLAND GUN SALES DATA

The Maryland State Police (MSP) maintain a registry of all handgun sales by gun dealers in the state. This analysis is based on records of 180,246 sales made in Maryland from 1990 through September 1996, before the imposition of Maryland's OGM law.[13] For each sale, the following data were extracted: characteristics of the firearm (e.g., type, manufacturer, model, serial number); the buyer's identification, demographics, and residence; the dealer's identification; and the date of the sale.

In the analysis below, the term *multiple sale* refers to the purchase of two or more handguns by the same person from any dealer(s) within a 30-day period.[14] By this criterion, 27% of the handguns sold during the study period were purchased in a multiple sale (see Table 1). This definition is consistent with the logic of OGM laws, and it captures the activities of purchasers who may have spread multiple buys over several dealers and/or days to avoid federal reporting requirements. Nonetheless, 82% of the guns purchased in multiple sales as defined herein also met the federal definition of a multiple sale (i.e., the purchase of more than one handgun from the same dealer within five business days[15]), in almost all cases involving same-day, same-dealer purchases.

### CRIME GUN DATA

To determine if and when handguns sold in Maryland were subsequently recovered by police, the Maryland sales records were linked to a national database on approximately one million guns recovered by law enforcement agencies and reported to the ATF for investigative tracing from 1990 through March 2000. A gun trace is an investigation that tracks the sales history of a gun from its manufacture through its first point of retail sale by a licensed dealer. Upon request, the ATF traces guns seized

---

13. The database contains records of 199,300 sales for this period. However, 9% of the records were omitted from the analysis due to insufficient information about the firearms (particularly gun make and serial number, which, as described below, were necessary for determining which guns were later used in crime). Less than 1% of the records were excluded for other miscellaneous problems.

A small percentage of guns in the analysis (less than 4%) are assault rifles (state law requires registration of all assault weapon sales) or voluntarily registered rifles and shotguns. (Ambiguities or inconsistencies in the coding of weapon types made it difficult to differentiate these guns from certain types of handguns.)

14. More specifically, a purchase was counted as a multiple sale if the buyer made any other purchases on the same day, during the prior 30 days, or during the subsequent 30 days.

15. This was approximated based on purchases from the same dealer within any five consecutive calendar days.

Exhibit 5
Page 00083

## TABLE 1. POLICE RECOVERIES OF GUNS SOLD IN MARYLAND BY TYPE OF SALE (N = 180,246 GUNS SOLD IN MARYLAND, 1990–SEPTEMBER 1996)

|                                     | Single Sale | Multiple Sale |
|-------------------------------------|-------------|---------------|
| Sales                               |             |               |
| Number sold                         | 130,885     | 49,361        |
| As a percentage of all sales        | 72.6%       | 27.4%         |
| Recoveries*                         |             |               |
| Number recovered                    | 4,851       | 1,612         |
| Percentage recovered                | 3.7%        | 3.3%          |
| As a percentage of all recoveries   | 75.1%       | 24.9%         |

* Based on recoveries anywhere in the nation as of March 2000.

by law enforcement as a service to federal, state, and local authorities. To initiate a trace, law enforcement agencies must provide the ATF with detailed information about the firearm, such as make, model, serial number, and caliber.[16]

Although the ATF tracing data provide the only available national sample of guns used in crime and otherwise possessed or carried by criminal and high-risk groups, they have limitations for research purposes (e.g., see Cook and Braga, 2001; Kleck, 1999; National Research Council, 2005:37–40). Guns reported to the ATF for tracing represent a nonrandom subset of guns used in crime. For one thing, law enforcement agencies do not seize all guns used in crime, although the guns that they do recover are generally considered to be a reasonable sample of crime guns (Brill, 1977; Cook and Braga, 2001). Moreover, gun tracing is voluntary; hence, some law enforcement agencies trace all recovered guns as a matter of policy, whereas others trace guns only when needed for specific investigations, if at all. These patterns have not been studied systematically but undoubtedly vary widely based on a range of organizational and contextual factors, thus introducing additional bias of an unknown degree into the sample of traced guns.[17]

---

16. Note that the Maryland data, rather than the ATF trace results, were used to determine if and when the crime guns were sold in Maryland. The ATF trace results identify the first retail dealer that sold the gun, who may differ from the Maryland dealer who most recently sold the gun. Also, the ATF tracing results are sometimes incomplete due to factors like the failure of dealers to submit their sales records to the ATF when they go out of business (e.g., see ATF, 1999a).

17. Factors influencing tracing practices might include, for instance, the types of firearms confiscated (e.g., see Kleck, 1997:112,141), the availability of state or local gun registration data, knowledge of the ATF's tracing capabilities and procedures, the types of investigations being conducted, participation in federal/state/local law enforcement task forces, and the stringency of state and local gun laws.

Exhibit 5
Page 00084

As of the mid-1990s, it seemed that law enforcement agencies requested traces for about one quarter of gun homicides but only 1% of gun robberies and gun assaults known to police (calculated from ATF, 1995b and Federal Bureau of Investigation, 1995:13,18,26,29,31,32). However, gun tracing became increasingly common during the 1990s due to a renewed federal emphasis on gun trafficking investigations and dealer regulation, improvements in the tracing process, and ATF promotional efforts and special initiatives that greatly increased tracing among state and local police agencies (ATF, 2000a:19–21; Cook and Braga, 2001). The ATF received approximately 200,000 trace requests in 1999 (ATF 2000a:25), up from 83,359 in 1994 and only 37,181 in 1990 (ATF, 1995b). As part of the ATF's Youth Crime Gun Interdiction Initiative (YCGII), 17 major cities have been requesting traces on all confiscated firearms since at least 1996 (ATF, 1997). By 2000 (the end of this study period), the effort had been expanded to 50 cities and metropolitan areas, most of which had successfully implemented comprehensive tracing (see http://www.atf.gov/firearms/ycgii/2000/index.htm). Furthermore, six states (including Maryland) were instituting or had successfully achieved comprehensive statewide tracing by the end of the 1990s (ATF, 2000c:51).

Although these developments have arguably made tracing data more representative of crime guns in general and enhanced their utility for policy research (e.g., see Cook and Braga, 2001; Pierce et al., 2003, 2004). the variation in gun tracing across places and over time may bias analyses based on national tracing data. Therefore, separate analyses were conducted based on recoveries in Baltimore and D.C. . The police departments in these cities have been tracing guns comprehensively since 1994 (both departments have been participating in the ATF's YCGII since its inception), providing complete data on guns recovered in these jurisdictions for a significant portion of the study period. Hence, the Baltimore and D.C. analyses will show whether trafficking indicators developed from national tracing data can be validated using more representative samples of crime guns (for a similar approach, see Pierce et al., 2003, 2004).

Furthermore, they will provide insights into the workings of local gun markets, which provide a large if not predominant share of the criminal supply in most places. Nationally, about half of traced guns are recovered within 25 miles of where they were purchased (ATF, 2002a:43–44); currently, this figure is 63% for Baltimore (ATF, 2002b:17) and 44% for D.C. (ATF, 2002c:17).[18]

---

18. Crime guns from out-of-state and distant locations are more common in jurisdictions with more restrictive gun controls (such as New York, Massachusetts, and Washington, D.C.), which is likely due in part to higher levels of interstate gun trafficking in such jurisdictions.

Exhibit 5
Page 00085

760                                     KOPER

Finally, contrasts of the Baltimore and D.C. results will yield insights into differences between interstate and intrastate gun markets. Due to the restrictions on the legal supply of handguns in D.C., it seems likely that trafficking guns from Maryland into D.C. is more profitable than trafficking guns within Maryland. Therefore, we can hypothesize that multiple sales were more strongly related to gun use in D.C. than in Baltimore.

## ANALYSIS AND RESULTS

### ANALYSES WITH NATIONAL CRIME GUN DATA

Linking the Maryland and ATF databases on gun make, serial number, and caliber indicated that 3.6% of the guns sold in Maryland from 1990 through September 1996 (6,463 of 180,246) had been recovered by law enforcement and reported to the ATF as of March 2000. Table 1 reveals that 25% of the guns recovered by police were sold in multiple sales. However, the percentage of multiple sales recovered (3.3%) was somewhat smaller than that for single sales (3.7%), which suggests that guns sold in multiple sales had a lower risk of being used in crime.

To examine the issue more rigorously, survival analysis techniques (Allison, 1995) were used to analyze the time from the sale of a handgun in Maryland until its recovery by police or the end of the study period, whichever came first.[19] Follow-up time varied from 1 to 3,733 days (i.e., up to approximately 10 years) across the population.

MULTIPLE SALES AND THE RISK OF CRIMINAL USE: LIFE TABLE RESULTS

Table 2 presents results from a life table analysis comparing the probabilities that handguns sold in single and multiple sales were recovered within various follow-up periods. For example, estimates in the bottom row of Table 2 suggest that 4% to 5% of guns were recovered within ten years of sale, regardless of transaction type.[20] Note, however, that

---

19.   In the latter case, an observation is censored, meaning that we know only that the gun was not recovered in the time that elapsed between its sale and the end of the study period. Survival analysis techniques were developed specifically for the analysis of censored data.

Also note that the MSP database includes dealers' sales of used guns. Therefore, in contrast to other ATF tracing studies that have calculated time from sale to recovery (commonly referred to as "time to crime") based on a gun's first retail sale, this study uses a more refined calculation of time to recovery based on a gun's most recent sale in Maryland (it is possible, however, that some crime guns passed through the hands of dealers in other states after being sold in Maryland but before being recovered).

20.   In the life table method, the analyst groups the event times into intervals of a chosen length—in this application, one year—and calculates $S_t$, which is the probability that the case "survived" (i.e., did not experience the event of interest) to the start of

Exhibit 5
Page 00086

these are minimum estimates because police do not trace all recovered guns.

## TABLE 2. CUMULATIVE PROBABILITY THAT GUNS SOLD IN MARYLAND WERE RECOVERED BY POLICE AND REPORTED TO THE ATF BY FOLLOW-UP TIME AND TYPE OF SALE (LIFE TABLE ESTIMATES, N = 180,246 GUNS SOLD IN MARYLAND, 1990–SEPTEMBER 1996)

| Follow-Up Time | Single Sale | Multiple Sale | Relative (%) Difference (Multiple Relative to Single Sales) |
|---|---|---|---|
| 1 year | 0.0084 | 0.0094 | +12% |
| 2 years | 0.0152 | 0.0158 | +4% |
| 3 years | 0.0209 | 0.0203 | –3% |
| 4 years | 0.0264 | 0.0254 | –4% |
| 5 years | 0.0312 | 0.0286 | –8% |
| 6 years | 0.0352 | 0.0317 | –10% |
| 7 years | 0.0389 | 0.0348 | –11% |
| 8 years | 0.0418 | 0.0377 | –10% |
| 9 years | 0.0449 | 0.0397 | –12% |
| 10 years | 0.0469 | 0.0407 | –13% |

NOTE: Based on recoveries anywhere in the nation as of March 2000. Differences significant at $p < 0.01$.

The results suggest that handguns sold in multiple sales were roughly 4% to 12% more likely to be used in crime than other guns during the first two years after sale, but the pattern reversed thereafter. By year ten, guns sold in multiple sales were 13% less likely to have been used in crime than other guns.

---

interval t. For each interval, the value of $S_t$ is based on the probabilities of events occurring in prior intervals. For example, the probability of surviving to the third interval or beyond would be the product of $(1 - q_1)(1 - q_2)$, where $q_1$ and $q_2$ represent the probabilities of events occurring during intervals 1 and 2, respectively. For a given interval, the probability of an event (conditional on survival to the start of the interval) is denoted as $q = d / (n - m/2)$, where d equals the number of events occurring during the interval, n refers to the sample at risk at the start of the interval (i.e., the number of cases that have not experienced an event or been censored by the start of the interval), and m is the number of cases censored during the interval (Teachman, 1983:270). For further discussion of the life table method, see Allison (1995) and Teachman (1983).

The values presented in Table 2 are based on $1 - S_t$. For example, the probability that a handgun sold in a single sale survived (i.e., was not recovered by police) to the start of year 2 was 0.9916. Conversely, the probability that the gun was recovered by the start of year 2 was $1 - 0.9916$, or 0.0084, which is presented in Table 2 as the probability that the gun was recovered within 1 year.

Exhibit 5
Page 00087

ADJUSTING FOR BUYER CHARACTERISTICS AND OTHER FACTORS:
MULTIVARIATE RESULTS

The life table results provide mixed support at best for the hypothesized link between multiple sales and gun trafficking. However, preliminary analysis also revealed that multiple sales were associated with other factors, such as buyer demographics, that could have confounded the relationship between multiple sales and criminal gun use. For example, older gun buyers and white gun buyers were more likely to purchase guns in multiple sales, but the guns they purchased were less likely to be used in crime.

To control for such factors, we next examine a series of multivariate accelerated failure time (AFT) models that test the effect of multiple sales on the time until a gun's recovery by police.[21] As shown in Table 3, the models control for the age (and age-squared), race (categorized as white, black, and other/unknown), and sex of the buyer. Year of sale is included

---

21. AFT models take the form, $\log T = a + b_1 x_1 + b_2 x_2 + \ldots + b_n x_n + ce$, where T is the survival time (in this case, the time until a gun was recovered or the observation period ended), a is an intercept term, $b_1$ through $b_n$ are coefficients representing the effects of covariates $x_1$ through $x_n$, and ce is an error term whose distribution varies for different types of AFT models (Allison, 1995:61–110). The distribution of the error term is related to assumptions about the unobserved rate at which events occur, also called the hazard rate. Common AFT models, also known as parametric survival models, include the exponential model, which assumes a hazard rate that is constant over time; the Weibull model, which assumes a hazard rate that increases or decreases monotonically; the log-normal model, which assumes a hazard that rises to a peak and then declines over time; and the gamma model, which, in its generalized form, allows the hazard rate to take on a wide variety of shapes. Several of these models are nested within others; in which case, their fits can be formally tested against one another using a log-likelihood ratio test. The AFT models discussed in this article were estimated assuming various distributions for the hazard rate. Those presented in the text are the ones that produced the best fit as measured by the log-likelihood statistic. However, assumptions about the hazard rate had little effect on inferences regarding multiple sales.

It is also possible to estimate semiparametric models (commonly known as Cox proportional hazard models) that do not require assumptions about the underlying hazard rate. Nonetheless, I employed parametric AFT models because statistical software for estimating these models can accommodate left censoring, which is present in these data. Left censoring refers to instances in which it is known that an event occurred before time t, but the exact timing of the event is unknown. In this application, some recovered guns have a known tracing date but an unknown recovery date (in these cases, the tracing date is an upper limit on the gun's survival time). In the national analysis, approximately one third of the gun recoveries are left censored cases. This is much less problematic, however, for the analyses of recoveries in Baltimore and D.C. .; only 9.8% of the Baltimore recoveries and 11.8% of the D.C. recoveries are left censored cases. Alternative analyses that substituted tracing dates for missing recovery dates (thus

Exhibit 5
Page 00088

to control for changes over time in both crime rates and gun tracing practices.[22] Finally, indicators for the buyer's county of residence (not shown in Table 3) account for time-stable differences in crime rates and proximity to high crime areas between Maryland's 24 counties.

Adjusting for these factors reveals that handguns sold in multiple sales had survival times 22% shorter than those of other handguns (Table 3, Model A), which is to say that handguns sold in multiple sales were more likely to be used in crime.[23] Model B (Table 3) replaces the multiple sale dichotomy with variables for the number of guns purchased and that number squared.[24] This shows that each additional gun purchased shortened time to recovery by approximately 11%, but the effect leveled off at about 16 guns.[25]

Turning to the other covariates, handguns purchased by young buyers,[26] males, and nonwhites were more likely to be used in crime, as were those purchased during 1995 or 1996 (this finding likely reflects greater utilization of gun tracing during 1995 and 1996, particularly by police in Baltimore and D.C., where most of the crime guns were recovered). Although not shown in Table 3, the buyer's county of residence also affected the likelihood that guns were used in crime. Most notably, handguns purchased by buyers in Baltimore city, Baltimore County, and Prince George's County had an elevated risk of being used in crime.

---

ignoring left censoring) yielded substantive findings virtually identical to those presented in the text for both the national and the local tests.

Another advantage to parametric models is that they enable one to draw inferences about the shape of the hazard rate, which has implications for theory and policy. Although I do not highlight the issue in this article, the hazard of gun recovery was highest in the early years after a gun's sale, thus providing empirical confirmation of the "new guns" hypothesis (Zimring, 1976), which states that criminals make disproportionate use of newer firearms, and yielding further insight into the role of primary market diversion in supplying criminals.

22.   The year indicators also control for random censoring, which occurs when observations are censored for reasons not under the investigator's control (Allison, 1995:12). In this application, the observations have a fixed end date but random entry dates. Consequently, guns sold during the earlier years have longer potential follow-up periods.

23.   The effect size is calculated by exponentiating the coefficient for multiple sales, subtracting one, and multiplying by 100.

24.   Note that this count captures purchases made simultaneously as well those made during both the prior 30 days and the subsequent 30 days.

25.   This plateau point is calculated as $b1/(-2 * b2)$, where $b1$ is the coefficient for the number of guns and $b2$ is the coefficient for the number of guns squared.

26.   The coefficients for age and age-squared indicate that time to recovery increased with age up until age 59, at which point the effect leveled off.

Exhibit 5
Page 00089

KOPER

## TABLE 3. MULTIPLE SALES AND CRIME GUN RECOVERIES: ACCELERATED FAILURE TIME MODELS OF TIME FROM SALE IN MARYLAND TO RECOVERY BY POLICE (N = 180,246 GUNS SOLD 1990–SEPTEMBER 1996)

|  | Model A | | Model B | |
|---|---|---|---|---|
|  | Estimate | Chi-square | Estimate | Chi-square |
| Multiple sale (Y/N) | −0.255 | 21.07*** | — | — |
| Number of guns | — | — | −0.112 | 21.38*** |
| Number of guns (squared) | — | — | 0.003 | 13.85*** |
| Age | 0.246 | 472.09*** | 0.244 | 466.00*** |
| Age (squared) | −0.002 | 270.40*** | −0.002 | 264.31*** |
| Male | 0.421 | 35.92*** | 0.420 | 35.70*** |
| White | 1.083 | 48.07*** | 1.077 | 47.54*** |
| Black | −2.022 | 163.74*** | −2.025 | 164.14*** |
| Sale in 1990 | 0.822 | 60.74*** | 0.822 | 60.65*** |
| Sale in 1991 | 0.304 | 9.33*** | 0.308 | 9.55*** |
| Sale in 1992 | 0.271 | 7.95*** | 0.271 | 7.94*** |
| Sale in 1993 | 0.261 | 7.47*** | 0.255 | 7.12*** |
| Sale in 1994 | 0.178 | 3.63* | 0.178 | 3.63* |
| Sale in 1995 | −0.086 | 0.78 | −0.085 | 0.77 |
| Intercept | 8.934 | 358.27*** | 9.057 | 366.62*** |
| Hazard distribution | Gamma | | Gamma | |
| Log likelihood | −30,073.62 | | −30,072.56 | |
| Right censored cases | 173,783 | | 173,783 | |
| Left censored cases | 2,272 | | 2,272 | |

NOTE: Based on recoveries anywhere in the nation as of March 2000. Race effects interpreted relative to "other" and year effects relative to 1996. Coefficients for buyer's county of residence not shown.
*$p \leq 0.10$; ***$p \leq 0.01$.

## ANALYSES WITH LOCAL CRIME GUN DATA

The national results suggest that multiple sales are a risk factor for criminal gun use. As noted, however, results with national tracing data could be biased by variation in tracing practices between law enforcement agencies and over time. If, for example, police departments without comprehensive tracing policies are more likely to trace guns they suspect are linked to gun trafficking, then the preceding results may overstate the risk that guns sold in multiple sales are used in crime. In the next sections, therefore, we examine whether handguns sold in multiple sales were more likely to be used in crime in Baltimore and D.C. . Because police in these cities began comprehensive gun tracing in 1994, the models below are based on 82,811 guns sold from 1994 through September 1996, with follow-

Exhibit 5
Page 00090

up periods extending from 1994 through March 2000.[27] Approximately
3.4% of the guns sold during that period were recovered and traced as of
March 2000, with Baltimore and D.C. recoveries accounting for 51% and
17% of the traces, respectively. Based on life table estimates (not shown),
the probability of recovery in Baltimore within five years was 1.9% for
single sales and 1.5% for multiple sales. (I focus on recoveries within five
years because most of the guns had less than six years of potential follow-
up time.) The corresponding probabilities for recoveries in D.C. were
0.6% and 0.5%, respectively. However, because the national analysis
revealed confounding influences from buyer demographics and other fac-
tors, I concentrate on multivariate results in the sections below.

MULTIPLE SALES AND CRIME GUNS IN BALTIMORE: MULTIVARIATE
RESULTS

Table 4 presents results from competing risks AFT models predicting
recoveries in Baltimore.[28] As in the national analysis, the Baltimore mod-
els control for buyer demographics, year of sale, and buyer jurisdiction.
But due to the smaller sample size for this analysis, the latter was mea-
sured with an abbreviated set of four indicators representing Baltimore
city, Baltimore County (which surrounds Baltimore city), other counties in
the Baltimore metropolitan area, and counties in the D.C. metropolitan
area (guns purchased elsewhere are treated as the reference group).[29]

Whether measuring multiple sales as a dichotomy or as the number of
guns purchased, handguns sold in multiple sales were no more likely to be
recovered by police in Baltimore than were other firearms (Table 4, Mod-
els A and B). This may indicate that the multiple sale effect found in the
national analysis is an artifact of biases in national tracing data. On the
other hand, it could also imply that trafficking through multiple sales was
not particularly important to the illicit gun market within Maryland due to
the availability of various other supply channels (e.g., single-sale straw
purchases, secondhand sales, thefts).

---

27.  A supplemental analysis linking only the 1994-September 1996 sales to the
national crime gun data also yielded a significant multiple sales effect.

28.  In competing risks models, event types other than the one of interest are
treated as censored cases. Here, recoveries in Baltimore are the events of interest, and
those elsewhere are modeled as censored cases. In the D.C. models described below,
recoveries in D.C. are the events of interest.

29.  Gun sales in several counties resulted in very few or no recoveries in Baltimore
or D.C., thus necessitating a recode of the geographic variables. Note also that the race
variable was collapsed into a white/nonwhite dichotomy.

Exhibit 5
Page 00091

## TABLE 4. MULTIPLE SALES AND CRIME GUN RECOVERIES: ACCELERATED FAILURE TIME COMPETING RISKS MODELS OF TIME FROM SALE IN MARYLAND TO RECOVERY IN BALTIMORE (N = 82,811 GUNS SOLD 1994–SEPTEMBER 1996)

| | Model A | | Model B | |
|---|---|---|---|---|
| | Estimate | Chi-square | Estimate | Chi-square |
| Multiple sale (Y/N) | –0.010 | 0.01 | — | — |
| Number of guns | — | — | –0.041 | 0.44 |
| Number of guns (squared) | — | — | 0.008 | 1.81 |
| Age | 0.173 | 99.14*** | 0.177 | 100.51*** |
| Age (squared) | –0.002 | 53.27*** | –0.002 | 54.18*** |
| Male | 0.359 | 11.04*** | 0.402 | 12.31*** |
| Nonwhite | –2.285 | 457.71*** | –2.298 | 495.89*** |
| Sale in 1994 | 0.069 | 0.50 | 0.037 | 0.14 |
| Sale in 1995 | –0.145 | 2.03 | –0.169 | 2.57 |
| Baltimore City resident | –4.218 | 176.04*** | –4.077 | 205.57*** |
| Baltimore County resident | –3.165 | 105.80*** | –2.915 | 110.85*** |
| Other Baltimore MSA resident | –1.893 | 37.47*** | –1.731 | 39.44*** |
| Washington, D.C. MSA resident | 1.244 | 12.17*** | 1.185 | 14.27*** |
| Intercept | 11.818 | 623.04*** | 11.882 | 651.39*** |
| Hazard distribution | Weibull | | Gamma | |
| Log-likelihood | –7,059.44 | | –7,044.91 | |
| Right censored cases | 81,386 | | 81,386 | |
| Left censored cases | 139 | | 139 | |

NOTE: Based on recoveries as of March 2000. Year effects interpreted relative to 1996 and geographic effects relative to rural (non-MSA) areas.
*** $p \leq 0.01$.

MULTIPLE SALES AND CRIME GUNS IN WASHINGTON, D.C.:
MULTIVARIATE RESULTS

To shed light on these ambiguities, Table 5 presents competing risks models predicting recoveries in Washington, D.C., a likely destination for interstate gun trafficking out of Maryland. The D.C. models have the same covariates as the Baltimore models, with the exception that the jurisdiction variables have been changed to reflect the geography of the D.C. area. Separate geographic indicators are included for Prince George's and Montgomery counties, the two counties that share a border with D.C., whereas two additional indicators represent all other counties in the D.C. and Baltimore metropolitan areas, respectively.

In general, handguns were recovered in D.C. 31% more quickly if they were sold in multiple sales (Table 5, Model A), an effect larger than that in the national analysis. Time to recovery (or as it is often called, time to crime) accelerated by about 12% for each additional gun purchased in a

Exhibit 5
Page 00092

MULTIPLE SALES & GUN CRIME          767

## TABLE 5. MULTIPLE SALES AND CRIME GUN RECOVERIES: ACCELERATED FAILURE TIME COMPETING RISKS MODELS OF TIME FROM SALE IN MARYLAND TO RECOVERY IN WASHINGTON, D.C. (N = 82,811 GUNS SOLD 1994–SEPTEMBER 1996)

| | Model A | | Model B | |
|---|---|---|---|---|
| | Estimate | Chi-square | Estimate | Chi-square |
| Multiple sale (Y/N) | −0.366 | 5.10** | — | — |
| Number of guns | — | — | −0.128 | 7.33*** |
| Number of guns (squared) | — | — | 0.002 | 1.99 |
| Age | 0.247 | 30.03*** | 0.230 | 24.84*** |
| Age (squared) | −0.002 | 10.59*** | −0.002 | 7.69*** |
| Male | 0.050 | 0.05 | 0.104 | 0.20 |
| Nonwhite | −2.874 | 144.97*** | −2.808 | 140.12*** |
| Sale in 1994 | 0.033 | 0.03 | 0.116 | 0.36 |
| Sale in 1995 | −0.033 | 0.03 | −0.014 | 0.00 |
| Prince George's County resident | −4.539 | 43.16*** | −4.494 | 42.48*** |
| Montgomery County resident | −2.676 | 14.86*** | −2.690 | 15.08*** |
| Other D.C. MSA resident | −2.161 | 8.38*** | −2.103 | 7.97*** |
| Baltimore MSA resident | −0.223 | 0.11 | −0.229 | 0.11 |
| Intercept | 13.431 | 151.06*** | 150.65 | 150.65*** |
| Hazard distribution | Weibull | | Weibull | |
| Log likelihood | −2.700.43 | | −2.692.78 | |
| Right censored cases | 82.344 | | 82.344 | |
| Left censored cases | 55 | | 55 | |

NOTE: Based on recoveries as of March 2000. Year effects interpreted relative to 1996 and geographic effects relative to rural (non-MSA) areas.
**p ≤ 0.05; *** p ≤ 0.01.

multiple sale (Table 5, Model B). These results confirm that the purchase of handguns in a multiple sale in Maryland was a risk factor for criminal gun use, but they suggest the effect was primarily due to interstate rather than intrastate trafficking.

*Predicted Probabilities of Recovery in Washington, D.C.* To further illustrate the link between multiple sales in Maryland and gun crime in D.C., I used the results of Model A in Table 5 to generate predicted probabilities of recovery in D.C. by transaction type (single, multiple) and years of follow-up for guns purchased by selected types of buyers. Table 6 displays predictions for a fairly typical Maryland gun buyer in the D.C. metropolitan area (based on modal characteristics of buyers during the 1994–September 1996 period). Guns purchased by these buyers had roughly a 0.2% to 0.3% chance of being recovered in D.C. within five years. Although these probabilities are quite small, they also reveal that guns sold in multiple sales were 24% to 29% more likely to have been used in crime at each year of follow-up.

Exhibit 5
Page 00093

KOPER

## TABLE 6. CUMULATIVE PROBABILITY THAT GUNS PURCHASED IN MARYLAND BY "TYPICAL" GUN BUYERS WERE RECOVERED IN WASHINGTON, D.C., BY FOLLOW-UP TIME AND TYPE OF SALE

| Follow-Up Time | Single Sale | Multiple Sale | Relative (%) Difference (Multiple Sales Relative to Single Sales) |
|---|---|---|---|
| 1 year | 0.0007 | 0.0009 | +29% |
| 2 years | 0.0012 | 0.0015 | +25% |
| 3 years | 0.0015 | 0.0019 | +27% |
| 4 years | 0.0018 | 0.0023 | +28% |
| 5 years | 0.0021 | 0.0026 | +24% |

NOTE: Typical gun buyer = 35-year old, white male residing in Montgomery County who bought in 1994. Predictions were generated from the results of Model A in Table 5.

## TABLE 7. CUMULATIVE PROBABILITY THAT GUNS PURCHASED IN MARYLAND BY "HIGH-RISK" GUN BUYERS WERE RECOVERED IN WASHINGTON, D.C., BY FOLLOW-UP TIME AND TYPE OF SALE

| Follow Up Time | Single Sale | Multiple Sale | Relative (%) Difference (Multiple Sales Relative to Single Sales) |
|---|---|---|---|
| 1 year | 0.0550 | 0.0690 | +25% |
| 2 years | 0.0843 | 0.1053 | +25% |
| 3 years | 0.1079 | 0.1343 | +24% |
| 4 years | 0.1281 | 0.1591 | +24% |
| 5 years | 0.1463 | 0.1811 | +24% |

NOTE: High-risk buyer = 21-year-old, nonwhite male residing in Prince George's County who bought in 1995. Predictions were generated from the results of Model A in Table 5.

Table 7 presents predictions for guns purchased by selected high-risk buyers (i.e., buyers whose demographic characteristics and area of residence put their guns at high relative risk of being used in crime in D.C. according to the results of Model A in Table 5). Recovery probabilities were much higher for these guns, illustrating the effects of buyer demographics and residence. Handguns purchased by these buyers in single sales had a nearly 15% chance of being recovered in D.C. within 5 years. This figure rose to about 18% for handguns purchased in multiple sales, an increase of 24%.[30]

---

30.   This is a very elementary illustration of how transaction type affected the likelihood of recovery. More dramatic effects might be uncovered by considering possible interactions between transaction type and buyer characteristics and incorporating other

Exhibit 5
Page 00094

MULTIPLE SALES & GUN CRIME               769

## DISCUSSION AND CONCLUSIONS

### GENERAL FINDINGS AND CAVEATS

This study of the sale and subsequent criminal use of handguns sold in
Maryland during the early and mid-1990s supports the suspected link
between multiple sales and gun trafficking. Guns sold in multiple sales
accounted for about one quarter of crime guns and, more importantly,
were at elevated risk for criminal use. The latter finding was primarily an
interstate phenomenon; guns sold in multiple sales in Maryland before the
state's OGM law were roughly 25% more likely than those sold in single
sales to be recovered by police in the neighboring jurisdiction of Washing-
ton, D.C., where gun controls are very restrictive, but no more likely to be
recovered in Baltimore, which is Maryland's primary urban center. Hence,
multiple sales in Maryland were a risk factor for interstate but not intra-
state gun trafficking. These results are consistent with the view of some
analysts that the criminal gun supply is more dependent on larger, ongoing
trafficking operations in jurisdictions with stricter gun controls (e.g., Braga
et al., 2002).

This study is based on multiple sales as reported by primary market (i.e.,
retail) gun dealers. It cannot address multiple sales in the secondary mar-
ket or covert multiple sales made by corrupt dealers in the primary mar-
ket.[31] Furthermore, the study is based on crime guns that could be
matched to sales records based on make and serial number. If guns sold in
multiple sales are more likely to have obliterated serial numbers, as sug-
gested by some research (ATF, 2000c:40), then these results may under-
state the risk that these guns are diverted to criminal channels. (Other
limitations to the data were discussed earlier.)

We must also be cautious about generalizing these findings to other
states. Gun control measures in Maryland, particularly its waiting period
on handgun sales and ban on many SNS firearms, may have discouraged
repetitive trafficking from retail sources even before the state's OGM
law.[32] On the other hand, it is not particularly difficult to buy a gun from a
dealer in Maryland—one need only pass a background check and wait a
week—and the state's proximity to a major city with a handgun ban (D.C.)

---

factors like the number and types of guns sold. I discuss some of these issues briefly in
the next section.

   31.  I have focused on multiple sales in the primary market because they are regu-
lated more closely and because my data correspond to primary market sales. However,
secondary market multiple sales at gun shows and elsewhere also undoubtedly contrib-
ute to the gun trafficking problem (ATF, 1999b, 2000b).

   32.  The low prices of SNS guns and the ease with which they can be concealed
seem to make them particularly attractive to criminals and juvenile possessors (e.g., see
Kennedy et al., 1996; Wintemute, 1994; Wintemute et al., 1998).

Exhibit 5
Page 00095

770                                    KOPER

may have provided an incentive for trafficking. In other jurisdictions, multiple sales could prove to be a stronger risk factor for intrastate gun trafficking and possibly a stronger or weaker one for interstate trafficking.

## IMPLICATIONS FOR GUN ENFORCEMENT AND POLICY

Notwithstanding these caveats, the study supports the validity of multiple sales as a gun trafficking indicator. This suggests that federal reporting requirements for multiple sales are prudent, and that investigators should continue to emphasize these sales in gun trafficking investigations.[33] Information on multiples sales should be particularly useful to interjurisdictional (federal–state–local) task forces examining the supply sources of local illicit gun markets.

Trafficking indicators based on multiple sales can also be refined in various ways. As reported, for instance, the number of guns sold in a multiple sale influences the likelihood that those guns will be used in crime. In addition, a supplemental analysis of D.C. recoveries (not shown) revealed that the association between multiple sales and recovery by police was stronger for the few SNS-type models still sold in Maryland. Therefore, more precise trafficking indicators could likely be developed based on the number and type(s) of guns sold in a multiple sale.[34]

This research also supports the efficacy of OGM laws as a method for disrupting gun trafficking, particularly trafficking across state lines (also see Virginia State Crime Commission, 1996; Weil and Knox, 1996). Beyond this, the study facilitates some tentative speculation about the effects of Maryland's OGM law on the illegal gun supply and gun violence inside and outside the state.

An OGM law should disrupt straw purchasing operations, thereby reducing the flow of guns from the primary market into criminal channels.[35] According to economic reasoning (e.g., see Cook and Leitzel, 1996), this should raise prices in the secondary market. Besides disrupting gun trafficking, the law might also reduce primary market sales more generally among persons who buy without criminal intent but who are more likely to resell guns in the secondary market.[36] This is more speculative

---

33.   Even if multiple sales are not at elevated risk for criminal use in a given jurisdiction, it may still be cost effective for law enforcement to emphasize these sales in gun trafficking investigations, provided that multiple sales are not at a significantly lower risk of criminal use.

34.   A sale involving ten SNS-type handguns, for instance, is likely to be a higher risk transaction than one involving two expensive handguns.

35.   To illustrate, OGM laws should force traffickers to lower their business volume, recruit more straw purchasers, or find guns from other sources, all of which may entail greater expenses and/or risks.

36.   This may not be an explicit objective of legislators passing such laws (Virginia's

Exhibit 5
Page 00096

MULTIPLE SALES & GUN CRIME          771

but, if true, could aggravate shortages of guns available through theft or sale on the secondary market, exerting even more upward pressure on street prices. In principle, this combination of restricted supplies and higher prices should reduce criminal gun acquisitions and gun crime.

Whether, when, and by how much these forces reduce gun crime will depend on how readily prohibited buyers can substitute other sources for those affected by the law (e.g., see National Research Council, 2005:72–101).[37] For example, increases in single straw purchases and the use of fake identification to buy guns from dealers might offset some of the law's impact on the diversion of guns from the primary market. Another key factor is the share of the secondary market that is supplied through multiple sales, which will determine the magnitude of the supply shift in that market. These factors are likely to vary across jurisdictions depending on other gun laws and levels of gun ownership.

Having said this, we can place reasonable upper limits on the net effects of the Maryland OGM law within the state and in D.C. by noting that guns sold in multiple sales in Maryland accounted for approximately 14% of Baltimore's crime guns and 7% of D.C.'s before the law.[38] The data in this study are not sufficient to determine what share of these multiple sale crime guns were provided through trafficking rather than through a process of gradual diffusion, but we can reasonably infer that this share was higher in D.C. . We can also speculate that substitution of other supply sources is more difficult in D.C. due to its handgun ban and greater reliance on systematic trafficking. It is conceivable, therefore, that the net effect of the law on illegal gun acquisition has been greater in D.C. than in Maryland. Nonetheless, a disruption in this modest segment of D.C.'s gun market may have been overcome by more diversions of single retail sales from Maryland, trafficking from other states, thefts, and other sources.[39]

Additional information on the effects of the Maryland OGM law is

---

OGM law, for example, was clearly inspired by concerns about interstate gun trafficking—see Virginia State Crime Commission, 1996), but it is a potential byproduct that must be considered.

37.   If an OGM law applies only to handguns, one must also consider the possibility that some offenders will substitute long guns.

38.   Guns sold in Maryland accounted for roughly 57% of Baltimore's crime guns around the time of the law (ATF, 1997), and the data analyzed here show that 25% of this Maryland supply came from multiple sales. We can thus infer that 57% x 25% = 14% of Baltimore's crime guns originated from multiple sales in Maryland. In D.C., 25% of crime guns came from Maryland (ATF, 1997), and 28% of those guns were linked to multiple sales. These figures imply that multiple sales in Maryland provided roughly 7% of D.C.'s crime guns.

39.   Another consideration, however, is that the combination of OGM restrictions in Maryland and Virginia has likely produced a larger cumulative impact on the D.C. gun supply. In general, we can probably expect the effects of OGM restrictions to rise

Exhibit 5
Page 00097

772                                    KOPER

sparse. Handgun sales in Maryland dropped over 20% in the year after the state's OGM law, and gun homicides fell 10% to 11% in the two years after the law (on the latter point, see Webster et al., 2002). These changes may have been due at least in part to a general decline in handgun sales and crime in the state, as well as to the effects of other gun control measures that were passed simultaneously with the OGM law (including restrictions on secondhand sales of handguns and a state provision explicitly banning straw purchases).[40] There has been no longer term study of the issue, but the percentage of guns recovered by police in Baltimore and D.C. that were originally sold in Maryland had not declined (or, in the case of D.C., had not declined in a consistent manner) as of 2000 (ATF, 1997, 1999a, 2000d, 2000e, 2002b, 2002c).[41]

Developing a more complete understanding of the impacts of this and other OGM laws will require further study of gun tracing data and crime rates, of course, but should also ideally include investigation of intermediate effects on the price and quantity of guns available through various intrastate and interstate channels. Studies of gun trafficking investigations, interviews with convicted gun traffickers and other gun offenders, and ethnographic research on illegal gun acquisition might help achieve the latter.

To conclude, this study has examined one suspected risk factor for criminal gun use, in the process testing a key assumption underlying one form of gun control. This research complements other recent efforts to develop improved indicators of gun trafficking (Pierce et al., 2003, 2004; Wintemute, 2000). But unlike prior studies of crime guns, this study used longitudinal analysis of the sale and subsequent criminal use of representative samples of handguns sold at retail, thus permitting a more refined assessment of the risks that guns purchased in different types of transactions and by different types of buyers are used in crime. Further research along these lines could also be applied to the study of other suspected risk factors—i.e., characteristics of firearms, sellers, buyers, and sales transactions that may influence the likelihood that guns sold in retail (or secondhand) transactions are subsequently used in crime. For example, what are the characteristics of gun dealers whose sales are at highest relative risk of

---

with the number of states adhering to them because this limits displacement of trafficking operations. On a related note, federal OGM legislation has been proposed (Jacobs, 2002) but does not seem likely to be passed anytime in the near future.

40.   Handgun sales declined 26% from 1994 to 1995, 6% from 1995 to 1996, 21% from 1996 to 1997, and 7% from 1997 to 1998 (analyses not shown). Also see the discussion of research on Maryland's OGM law in footnote 12.

41.   Such figures should be interpreted very cautiously because the share of guns traced to a source state can vary substantially from year to year as a result of improvements in tracing, changes in tracing procedures (particularly recent changes pertaining to the tracing of older firearms), and other factors.

Exhibit 5
Page 00098

MULTIPLE SALES & GUN CRIME                 773

resulting in crime gun recoveries? Are these high-risk dealers also the
ones who are linked to the highest numbers of crime guns? Also, are some
types of firearms—differentiated on characteristics such as price, size, cali-
ber, firing mechanism, ammunition capacity, and age—more likely to be
trafficked to criminals? And how do multiple sales operate in tandem with
these factors and others (such as community characteristics) to influence
the risk that guns are used in crime?[42] Such research could be used to
improve the effectiveness and fairness of law enforcement and regulatory
efforts to identify networks diverting guns into criminal channels and to
inform debates on the efficacy of various gun control policies such as
OGM laws, regulation of gun dealers, gun bans, and others.

## REFERENCES

Allison, Paul D.
    1995     Survival Analysis Using the SAS System: A Practical Guide. Cary, N.C.:
          SAS Institute, Inc.

Beck, Allen, Darrell Gilliard, Lawrence Greenfeld, Caroline Harlow, Thomas Hester,
    Louis Jankowski, Tracy Snell, James Stephan, and Danielle Morton
    1993     Survey of State Prison Inmates, 1991. Washington, D.C.: Bureau of Justice
          Statistics, U.S. Department of Justice. NCJ-136949.

Braga, Anthony, A., Philip J. Cook, David M. Kennedy, and Mark H. Moore
    2002     The Illegal Supply of Firearms. In Michael Tonry (ed.), Crime and Justice:
          A Review of Research. Vol. 29. Chicago, Ill.: The University of Chicago.

Brill, Steven
    1977     Firearm Abuse: A Research and Policy Report. Washington, D.C.: Police
          Foundation.

Bureau of Alcohol, Tobacco, and Firearms
    1995a    Federal Firearms Regulations Reference Guide. Washington, D.C.: U.S.
          Department of the Treasury.
    1995b    The National Tracing Center 1994 Yearend Report. Washington, D.C.:
          U.S. Department of the Treasury.
    1997     Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets
          in 17 Communities. Washington, D.C.: U.S. Department of the Treasury.
    1998     State Laws and Published Ordinances—Firearms. 21st ed. Washington,
          D.C.: U.S. Department of the Treasury.
    1999a    Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets
          in 27 Communities. Washington, D.C.: U.S. Department of the Treasury.
    1999b    Gun Shows: Brady Checks and Crime Gun Traces. Washington, D.C.:
          U.S. Department of the Treasury.
    2000a    Commerce in Firearms in the United States. Washington, D.C.: U.S.
          Department of the Treasury.
    2000b    Following the Gun: Enforcing Federal Firearms Laws Against Firearms
          Traffickers. Washington, D.C.: U.S. Department of the Treasury.

---

42. To the author's knowledge, however, only a few states maintain the types of
gun sales and registration records necessary to conduct this type of research.

Exhibit 5
Page 00099

774                                    KOPER

| | |
|---|---|
| 2000c | Crime Gun Trace Reports (1999): National Report. Washington, D.C.: U.S. Department of the Treasury. |
| 2000d | Crime Gun Trace Reports (1999): Baltimore. Washington, D.C.: U.S. Department of the Treasury. |
| 2000e | Crime Gun Trace Reports (1999): Washington, D.C. Washington, D.C.: U.S. Department of the Treasury. |
| 2002a | Crime Gun Trace Reports (2000): National Report. Washington, D.C.: U.S. Department of the Treasury. |
| 2002b | Crime Gun Trace Reports (2000): Baltimore. Washington, D.C.: U.S. Department of the Treasury. |
| 2002c | Crime Gun Trace Reports (2000): Washington, D.C. Washington, D.C.: U.S. Department of the Treasury. |
| 2003 | State Laws and Published Ordinances—Firearms. 24th ed. Washington, D.C.: U.S. Department of the Treasury. |

Catalano, Shannan M.
| | |
|---|---|
| 2004 | Criminal Victimization, 2003. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice. NCJ-205455. |

Coggeshall, Mark B.
| | |
|---|---|
| 2001 | Keeping Guns Out of the Wrong Hands: Effects of Gun Control on Homicide in Virginia. Master's Thesis. College Park, Md.: Department of Criminology and Criminal Justice, University of Maryland. |

Cook, Philip J. and Anthony A. Braga
| | |
|---|---|
| 2001 | Comprehensive firearms tracing: Strategic and investigative uses of new data on firearms markets. Arizona Law Review 43:277–309. |

Cook, Philip J. and James A. Leitzel
| | |
|---|---|
| 1996 | "Perversity, futility, and jeopardy": An economic analysis of the attack on gun control. Law and Contemporary Problems 59:91–118. |

Cook, Philip J. and Jens Ludwig
| | |
|---|---|
| 1996 | Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use. Washington, D.C.: Police Foundation. |
| 2000 | Gun Violence: The Real Costs. New York: Oxford University Press. |

Cook, Philip J., Stephanie Molliconi, and Thomas B. Cole
| | |
|---|---|
| 1995 | Regulating gun markets. The Journal of Criminal Law and Criminology 86:59–92. |

Federal Bureau of Investigation
| | |
|---|---|
| 1994 | Crime in the United States 1993. Washington, D.C.: U.S. Department of Justice. |
| 1995 | Crime in the United States 1994. Washington, D.C.: U.S. Department of Justice. |
| 2000 | Crime in the United States 1999. Washington, D.C.: U.S. Department of Justice. |
| 2004 | Crime in the United States 2003. Washington, D.C.: U.S. Department of Justice. |

Harlow, Caroline W.
| | |
|---|---|
| 2001 | Firearm Use by Offenders. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice. NCJ-189369, revised Feb. 4, 2002. |

Jacobs, James B.
| | |
|---|---|
| 2002 | Can Gun Control Work? New York: Oxford University Press. |

Exhibit 5
Page 00100

## MULTIPLE SALES & GUN CRIME                       775

Kleck, Gary
    1997    Targeting Guns: Firearms and Their Control. New York: Aldine de
            Gruyter.
    1999    BATF gun trace data and the role of organized gun trafficking in
            supplying guns to criminals. Saint Louis University Public Law Review
            18:23–45.

Kennedy, David M., Anne M. Piehl, and Anthony A. Braga
    1996    Youth violence in Boston: Gun Markets, Serious youth offenders, and a
            use-reduction strategy. Law and Contemporary Problems 59:147–196.

Koper, Christopher S. and Peter Reuter
    1996    Suppressing illegal gun markets: Lessons from drug enforcement. Law
            and Contemporary Problems 59:119–146.

Lott, John R., Jr.
    2003    The Bias Against Guns: Why Almost Everything You've Heard About
            Gun Control is Wrong. Washington, D.C.: Regnery Publishing.

Lott, John R., Jr. and John E. Whitley
    2001    Safe-storage gun laws: Accidental deaths, suicides, and crime. Journal of
            Law and Economics 64:659–689.

Maguire, Kathleen and Ann L. Pastore (eds.)
    1995    Sourcebook of Criminal Justice Statistics—1994. Washington, D.C.:
            Bureau of Justice Statistics, U.S. Department of Justice.
    2000    Sourcebook of Criminal Justice Statistics—1999. Washington, D.C.:
            Bureau of Justice Statistics, U.S. Department of Justice.
    2001    Sourcebook of Criminal Justice Statistics—2000. Washington, D.C.:
            Bureau of Justice Statistics, U.S. Department of Justice.

National Research Council (Charles F. Wellford, John V. Pepper, and Carol V.
Petrie, eds.)
    2005    Firearms and Violence: A Critical Review. Washington, D.C.: The
            National Academies Press.

Pierce, Glenn L., Anthony A. Braga, Raymond R. Hyatt, Jr., and Christopher S.
Koper
    2004    Characteristics and dynamics of illegal firearms markets: Implications for
            a supply-side enforcement strategy. Justice Quarterly 21:391–422.

Pierce, Glenn L.. Anthony A. Braga, Christopher Koper, Jack McDevitt, David
Carlson, Jeffrey Roth, Alan Saiz, Raymond Hyatt, and Roberta E. Griffith
    2003    The Characteristics and Dynamics of Crime Gun Markets: Implications
            for Supply-Side Focused Enforcement Strategies. Final Report to the
            National Institute of Justice. Boston: College of Criminal Justice,
            Northeastern University.

Sheley, Joseph F. and James D. Wright
    1993    Gun Acquisition and Possession in Selected Juvenile Samples. Washing-
            ton, D.C.: National Institute of Justice and Office of Juvenile Justice and
            Delinquency Prevention, U.S. Department of Justice. NCJ-145326.

Teachman, Jay D.
    1983    Analyzing social processes: Life tables and proportional hazards models.
            Social Science Research 12:263–301.

Exhibit 5
Page 00101

776                                KOPER

Vernick, Jon S. and Lisa M. Hepburn
   2003      State and federal gun laws: Trends for 1970-99. In Jens Ludwig and Philip
            J. Cook (eds.), Evaluating Gun Policy: Effects on Crime and Violence.
            Washington, D.C.: Brookings Institution Press.

Violence Prevention Research Program
   2002      Handgun Commerce in California, 1999. Sacramento: University of
            California, Davis.

Virginia State Crime Commission
   1996      Study of Virginia's Law on Handgun Purchase Limits. Richmond:
            Commonwealth of Virginia. House Document 28.

Wachtel, Julius
   1998      Sources of crime guns in Los Angeles, California. Policing: An Interna-
            tional Journal of Police Strategies and Management 21:220–239.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn
   2002      Effects of Maryland's law banning "Saturday night special" handguns on
            homicides. American Journal of Epidemiology 155:406–412.

Weil, Douglas S. and Rebecca C. Knox
   1996      Effects of limiting handgun purchases on interstate transfer of firearms.
            JAMA 275:1759–1761.

Wilber, Del Q.
   2004      D.C. police sweeping the street for guns. The Washington Post (July
            4):C6.

Wintemute, Garen J.
   1994      Ring of Fire: The Handgun Makers of Southern California. Sacramento:
            Violence Prevention Research Program, University of California, Davis.
   2000      Relationship between illegal use of handguns and handgun sales volume.
            JAMA 284:566–567.

Wintemute, Garen J., Carrie A. Parham, Mona A. Wright, James J. Beaumont, and
Christiana M. Drake
   1998      Weapons of choice: Previous criminal history, later criminal activity, and
            firearm preference among legally authorized young adult purchasers of
            handguns. The Journal of Trauma: Injury, Infection, and Critical Care
            44:155–160.

Wintemute, Garen J., Michael P. Romero, Mona A. Wright, and Kevin M. Grassel
   2004      The life cycle of crime guns: A description based on guns recovered from
            young people in California. Annals of Emergency Medicine 43:733–742.

Wright, James D. and Peter H. Rossi
   1986      Armed and Considered Dangerous: A Survey of Felons and Their
            Firearms. New York: Aldine de Gruyter.

Zimring, Franklin E.
   1975      Firearms and federal law: The Gun Control Act of 1968. Journal of Legal
            Studies 4:133–198.
   1976      Street crime and new guns: Some implications for firearms control.
            Journal of Criminal Justice 4:95–107.

Exhibit 5
Page 00102

## MULTIPLE SALES & GUN CRIME 777

Christopher S. Koper is a Senior Research Associate with the Jerry Lee Center of Criminology and a scholar-in-residence with the Firearm and Injury Center at Penn. He holds a Ph.D. in criminology and criminal justice from the University of Maryland and has worked for the Urban Institute, the Crime Control Institute, the University of Maryland, the Police Foundation, and the National Institute of Justice. Dr. Koper has written articles and reports on a variety of topics, including firearms, policing, white collar crime, and research methods. He recently completed a study of the federal assault weapons ban for the U.S. Department of Justice and is currently studying gun markets, police interventions to reduce gun violence, and juvenile crime trends.

Exhibit 5
Page 00103

778                              KOPER

Exhibit 5
Page 00104

# Exhibit 6

Exhibit 6
Page 00105

# Long-Term Trends in the Sources of Boston Crime Guns

ANTHONY A. BRAGA



*Analyses of firearm trace data, most collected over relatively brief periods, suggest that a noteworthy share of guns used in crime were recently diverted from legal commerce. This article analyzes a longitudinal database on firearm recoveries by the Boston Police Department between 1981 and 2015 and successfully traced handguns between 1991 and 2015. The percentage of high-capacity semiautomatic pistols among recovered handguns increased dramatically in the 1980s and 1990s. A persistent share of traced handguns were imported from licensed dealers in southern states and an increasing share first purchased at licensed dealers in New Hampshire and Maine. These analyses suggest that market disruption strategies may reduce illegal diversions of new handguns from licensed dealers and the passage of one-handgun-a-month laws may influence where criminals get their guns.*

**Keywords:** firearms, gun trafficking, gun control, gun laws, firearm tracing

The question of whether the illegal supply of guns to criminals and juveniles can be disrupted has been vigorously debated in policy circles and in the literature on firearms and violence (see, for example, Cook, Braga, and Moore 2011; Kleck and Wang 2009). Estimates suggest that only about one of every six firearms used in crime was legally obtained (Reiss and Roth 1993). To the extent that criminals and juveniles in particular jurisdictions are supplied with guns through systematic gun trafficking, focused regulatory and investigative resources may be useful in disrupting the illegal supply of firearms to criminals (Braga et al. 2002). Unlike other contraband, the illegal supply of guns does not begin with illegal smuggling or in clandestine factories. Virtually every crime gun in the United States starts out in the legal market. This suggests a problem with illegal gun acquisition from regulated and

**Anthony A. Braga** is Distinguished Professor of Criminology and Criminal Justice and director of the School of Criminology and Criminal Justice at Northeastern University, a fellow of the American Society of Criminology, a fellow and past president of the Academy of Experimental Criminology, and the 2014 recipient of its Joan McCord Award.

© 2017 Russell Sage Foundation. Braga, Anthony A. 2017. "Long-Term Trends in the Sources of Boston Crime Guns." *RSF: The Russell Sage Foundation Journal of the Social Sciences* 3(5): 76–95. DOI: 10.7758/RSF.2017 .3.5.04. This research was supported by funds provided by the Rappaport Institute for Greater Boston, Everytown for Gun Safety, and the Fund for a Safer Future. I would like to thank Boston mayor Martin Walsh, Boston police commissioner William Evans, superintendent Paul Fitzgerald, sergeant detective Catherine Doherty, Desiree Dusseault, Richard Laird, Ted Alcorn, and James Sullivan for their valuable assistance in the completion of this research. Points of view in this document are those of the author and do not necessarily represent the official position of the City of Boston or the Boston Police Department. Direct correspondence to: Dr. Anthony A. Braga at a.braga@northeastern.edu, School of Criminology and Criminal Justice, Northeastern University, 360 Huntington Ave., Boston, MA 02115.

Exhibit 6
Page 00106

unregulated legal sources and a corresponding need to intervene in these markets to make obtaining firearms for criminal use more expensive, inconvenient, or legally risky.

Effective supply-side efforts could help increase the price of guns sold to prohibited persons and increase the effective price of acquiring guns—the time and hassle required to make a connection to buy guns (see Moore 1973, 1976). The benefit of this approach would be an increased incentive for criminals and juveniles to economize on gun possession and use. As guns become more scarce and valuable, they will be slower to buy and quicker to sell. Thus, prohibited persons would have guns for shorter periods over the course of their criminal careers (Kennedy 1994). Unfortunately, direct evidence is scant that successful regulatory and enforcement actions against supply lines of guns to criminals and juveniles will actually reduce availability and hence gun use in crime (Wellford, Pepper, and Petrie 2005). Further research on the structure of illegal gun markets and experimentation with market disruption tactics is sorely needed.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is charged with regulating firearms commerce and enforcing federal firearms law. Historically, with the support of local, state, and federal law enforcement partners, ATF has pursued cases against armed career criminals and firearms traffickers (2000, 2002). The strategic analysis of firearms trace data to identify gun traffickers is a key component of ATF's efforts to address the illegal supply of guns. ATF encourages state and local agencies to engage comprehensive firearms tracing under which all firearms recovered by the police are submitted for tracing to determine where they were first sold and by whom they were first purchased. The resulting database of trace results is the raw material for improved intelligence on the channels through which criminals acquire guns (Cook and Braga 2001).

The use of firearms trace data to describe the sources of crime guns and to evaluate the impact of policy interventions on criminal access to and use of guns remains controversial. For instance, critics suggest that these data may be limited by police decisions on which recovered guns to submit for tracing (Bea and Burton 1992; Kleck and Wang 2009). However, comprehensive tracing of all firearm recoveries reduces some of the bias in trace data introduced by police decision making. Jurisdictions that submit all confiscated guns for tracing can be confident that the resulting database of trace requests is representative of a well-defined "population" of guns recovered by police during a particular period and a reasonable "sample" of guns used in crime (Cook and Braga 2001). Trace data have been used to describe the structure of illegal gun markets serving criminals (Kennedy, Piehl, and Braga 1996a; Braga et al. 2012) and in a number of policy evaluations (such as Weil and Knox 1996; Koper and Roth 2001; Braga and Pierce 2005).

This article presents a descriptive analysis of a unique longitudinal database on firearm recoveries by the Boston Police Department (BPD) between 1981 and 2015 and successfully traced recovered handguns between 1991 and 2015. These data are used to describe long-term trends in the types of firearms recovered, examine changes in the characteristics of first retail sales of traced handguns, and assess the influence of several policy interventions on the age and sources states of traced handguns over time in Boston. The following section briefly reviews the empirical evidence on the illegal supply of guns to criminals.

## EMPIRICAL EVIDENCE ON ILLEGAL GUN MARKETS

Much of the empirical evidence on the illegal supply of guns comes from analyses of ATF firearm trace data and firearms trafficking investigations that indicate some percentage of the guns used in crime were recently diverted from legal firearms commerce (ATF 2000, 2002; Braga et al. 2012; Cook and Braga 2001; Pierce et al. 2004). Several findings are of particular note. First is that new guns are recovered disproportionately in crime (Cook and Braga 2001; Pierce et al. 2004; Zimring 1976). Another is that some licensed firearm retailers are disproportionately frequent sources of crime guns and are linked to more guns traced by ATF than would be expected from their overall volume of gun sales (on reasons for these patterns, see Wintemute, Cook, and Wright 2005). Sepa-

Exhibit 6
Page 00107

rately, under test conditions, significant proportions of licensed retailers and private party gun sellers will knowingly participate in illegal gun sales (Sorenson and Vittes 2003; Wintemute 2010). In addition, on average, about one-third of guns used in crime in any community are acquired in that community, another third from elsewhere in the same state, and a third from other states (ATF 2002; Cook and Braga 2001). Last are the long-standing interstate trafficking routes for crime guns, typically from states with weaker gun regulations to those with stronger ones. The best known of these is the so-called Iron Pipeline—from the Southeast to the Middle Atlantic and New England (Cook and Braga 2001; Pierce et al. 2004).

Analyses of ATF firearm trafficking investigation data reveal that illegal gun traffickers exploit an incredibly leaky legal firearms commerce system. For instance, a 2000 report examining 1,530 gun trafficking investigations made by ATF between July 1, 1996, and December 31, 1998, found that more than eighty-four thousand firearms were diverted legal to illegal commerce (ATF 2000). The report identified the primary gun trafficking pathways as scofflaw and negligent firearms dealers, straw-man legal purchasers who provide guns to criminals, and illegal diversions through secondary market sources such as gun shows, flea markets, and want ads. The analysis also revealed the organized theft of firearms from licensed dealers, common carriers, and residences as illegal diversion pathways. Moreover, ATF found that 61 percent of the cases involved the diversion of twenty or fewer firearms, and concluded that most but not all gun trafficking investigations involve a relatively small number of firearms (2000). The two largest cases involved the illegal diversion of some eleven thousand and ten thousand firearms, respectively.

Recent analyses of data drawn from the 2004 Survey of Inmates in State Correctional Facilities, the 2004 Survey of Inmates in Federal Correctional Facilities, and the 2002 Survey of Inmates in Local Jails suggest that very few illegal gun users directly acquire their guns through theft. Philip Cook, Susan Parker, and Harold Pollock find that only 4 percent of male respondents age eighteen to forty in the first two years of their prison term who admitted in the survey interview that they had a gun at the time of crime reported directly stealing their most recent crime gun. These authors further document that 10 percent of recently incarcerated state prison inmates who carried a gun indicated that they purchased that gun from a licensed dealer, such as a gun store or pawnbroker (2015). Most of the transactions—roughly 70 percent—were with social connections (friends and family) or with street sources (fences, drug dealers, illicit gun brokers, and gangs). These sources may well include traffickers who are buying from retail outlets and selling to prohibited persons.

Despite multiple illegal sources of firearms for criminals, ethnographic research suggests that illegal gun markets may not work very well in particular urban environments. Some evidence indicates considerable frictions in the underground market for guns in Chicago (Cook et al. 2007). These frictions were due primarily to the underground gun market being both illegal and thin—that is, the number of buyers, sellers, and total transactions was small, and relevant information on reliable sources of guns were scarce. The same research further reveals that Chicago street gangs helped overcome these market frictions, but economic interests caused gang leaders to limit supply primarily to gang members, and even then transactions were usually loans or rentals with strings attached. Thin underground gun markets may be particularly vulnerable to focused gun market disruption strategies.

A growing body of evaluation evidence suggests that enforcement and regulatory interventions focused on retail sales practices can generate subsequent reductions in new guns recovered in crime. In Detroit and Chicago, the number of guns recovered within a year of first retail sale from someone other than the original purchaser was sharply reduced after undercover police stings and lawsuits targeted scofflaw retail dealers (Webster et al. 2006). In Milwaukee, the number of guns recovered within a year of first retail sale from someone other than the original purchaser significantly decreased after voluntary changes in the sales practices of a gun dealer that received negative

Exhibit 6
Page 00108

publicity for leading the United States in selling the most guns recovered by police in crime (Webster, Vernick, and Bulzacchelli 2006). In Chicago, an analysis of recovered crime handguns found that the 1994 implementation of the Brady Handgun Violence Prevention Act was associated with a marked decrease in crime handguns imported from states required to institute the provisions of the act (Cook and Braga 2001). The Brady Act mandated licensed dealers to conduct a criminal background check on all handgun buyers and required a one-week waiting period before transferring the gun to a criminal. The Cook and Braga (2001) analysis suggests that the Brady Act made interstate gunrunning from lax-control states less profitable by making it more difficult for traffickers to buy handguns from licensed dealers in those states.

The case for a supply-side approach to gun violence is generally supported by the empirical evidence on illegal gun market dynamics. However, rigorous research is sorely needed to determine whether supply-side interventions can actually affect the availability of guns to criminals. As the National Research Council's Committee to Improve Research Information and Data on Firearms concludes, "it is simply not known whether it is actually possible to shut down illegal pipelines of guns to criminals nor the costs of doing so" (Wellford, Pepper, and Petrie 2005, 8). Experimental evidence also needs to be developed to determine whether interventions designed to limit illegal transfers of firearms can indeed reduce gun violence.

## GUNS AND SERIOUS GUN VIOLENCE IN BOSTON

Massachusetts is well known for having some of the strongest gun laws in the United States. In 2013, the Brady Campaign to Prevent Gun Violence ranked Massachusetts gun laws as the sixth strongest in the fifty states.[1] Importantly, Massachusetts regulates all secondhand gun transactions by requiring records of ownership

transfers, thefts, and losses to be reported to the state (Braga and Hureau 2015). Massachusetts has also been noted as having very low prevalence of gun ownership relative to other U.S. states (Azrael, Cook, and Miller 2004). Survey research suggests that only 12.8 percent of Massachusetts households reported owning a gun (Okoro et al. 2005), versus 31 percent nationwide (Smith and Son 2015). A 2010 Harvard School of Public Health representative survey of Boston residents estimates that only 3.7 percent of respondents report that someone in their household owns a handgun (see Braga and Cook 2016).

Like many cities in the United States, Boston suffered a dramatic increase in gun violence in the late 1980s and early 1990s (Kennedy, Piehl, and Braga 1996a). Preceded by the arrival of crack cocaine in 1986, this epidemic, measured as a gun homicide problem, started in 1988 and was contained mostly within Boston's young black male population residing in a few disadvantaged neighborhoods (Braga 2003). Gangs and criminally active youth were at the core of the situation (Kennedy, Braga, and Piehl 1997). Boston experienced a sudden downturn in related violence in the mid- to late 1990s; however, the change was associated with the implementation of a strategic gang violence reduction initiative (Braga et al. 2001).

Gun violence surged again in Boston during the mid-2000s. Research conducted during this period once more revealed that it could be characterized as being driven by gang conflicts and highly concentrated among a small number of high-risk places and high-risk people. Roughly 5 percent of Boston's street block faces and intersections generated about 74 percent of fatal and nonfatal shooting incidents between 1980 and 2008 (Braga, Papachristos, and Hureau 2010). These hot spots were located in and proximate to gang turf and drug market areas and occupied small geographies within disadvantaged neighborhoods. In 2006, only 1 percent of Boston's population between the ages of fourteen and twenty-four were mem-

1. See "2013 State Scorecard," http://www.bradycampaign.org/2013-state-scorecard (accessed July 5, 2017). The Brady Campaign ranked all fifty states based on thirty policy approaches to regulating guns and ammunition, such as: background checks on gun sales; reporting lost or stolen firearms; and prohibiting dangerous people from purchasing weapons.

Exhibit 6
Page 00109

bers of street gangs involved in gun violence; at the same time, gang-related disputes generated more than two-thirds of gun homicides, and gang members were involved as offenders, victims, or both in nearly 70 percent of nonfatal shootings (Braga, Hureau, and Winship 2008). In a recent study of one disadvantaged Boston community, roughly 85 percent of all gunshot victims were in a single co-offending network representing less than 5 percent of the community's population (Papachristos, Braga, and Hureau 2012). Once again, a deterrence-based gang violence reduction strategy was credited with reducing serious gun violence in Boston during the late 2000s (Braga, Apel, and Welsh 2013; Braga, Hureau, and Papachristos 2014).

Most people arrested for illegal gun possession in Boston are not otherwise law-abiding individuals. In 2014, the BPD arrested 485 people for illegal gun possession and 228 for violent gun offenses. Eighty percent of the adult arrestees were found to have criminal records, and judging by criminal-history data, illegal gun possessors were as involved in crime as those who were arrested for gun violence—murder, robbery, and assault (Braga and Cook 2016). These data suggest that Boston has an ongoing problem with criminal access to firearms.

### SOURCES OF CRIME GUNS

The Boston Gun Project was a problem-oriented policing initiative expressly aimed at reducing homicide victimization among youths in Boston in the mid-1990s (Kennedy, Braga, and Piehl 1996a). It represented an innovative partnership between researchers and practitioners to assess the city's youth homicide problem and implement an intervention designed to have a substantial near-term impact on the problem. Project research shows that the problem of youth homicide was concentrated among a few chronically offending

gang-involved youth (Kennedy, Braga, and Piehl 1996a). The same research also shows that firearms associated with youth, especially with gang youth, tended to be semiautomatic pistols, often quite new and apparently only recently diverted from retail. Many of these guns were first sold at retail in Massachusetts or smuggled into Boston from out of state. The project began in early 1995 and implemented what is now known as the Operation Ceasefire intervention beginning on May 15, 1996. The intervention had two main elements: the "pulling levers" focused deterrence strategy to prevent gang violence and a direct law enforcement attack on illicit firearms traffickers supplying youth with guns.[2]

Boston Gun Project research initially focused on understanding and addressing the local illicit firearms market serving youth age twenty-one and younger. Youth gun acquisition was largely driven by fear, self-protection, and status concerns arising from a high-risk street environment dominated by violent gangs, drugs, and guns (Kennedy, Piehl, and Braga 1996a). Interviews with youth probationers in Boston reveal that guns were fairly easy to acquire either by buying them illegally or by borrowing them from friends and associates (Kennedy, Piehl, and Braga 1996a). For style reasons and to avoid being caught with an older gun that may have already been used in a violent crime, youth probationers expressed a strong preference for "new in the box" semiautomatic pistols.

To unravel the nature of the illegal gun market, the Boston Gun Project research team analyzed ATF firearms trace data for 1,550 firearms recovered from youth age twenty-one and younger in Boston between January 1991 and May 1995 (Kennedy, Piehl, and Braga 1996a). Some 82 percent of the recovered firearms were handguns and more than half were semiautomatic pistols. Recovered semiautomatic pistols were concentrated among a few calibers, such

2. Focused deterrence strategies honor core deterrence ideas, such as increasing risks faced by offenders, while finding new and creative ways of deploying traditional and nontraditional law enforcement tools. According to a 2001 National Institute of Justice evaluation, the intervention was associated with a 63 percent reduction in Boston youth homicide and similar large reductions in nonfatal serious gun violence (Braga et al. 2001). A more recent systematic review and meta-analysis of focused deterrence programs indicates that these initiatives generate statistically significant reductions in crime (Braga and Weisburd 2012).

Exhibit 6
Page 00110

as 9mm, .380, and .25. Roughly 52 percent of the firearms were successfully traced to their first retail sale. Almost 20 percent were not traced because the serial numbers had been obliterated. An analysis of the source states of traceable guns revealed that Boston had problems with diversions from both local and out-of-state federal firearms licensees (FFLs). Despite strict state controls on firearms commerce, 34 percent of traceable guns were first sold at retail in Massachusetts. Nearly 32 percent were first sold at retail in loose-control southern states, most notably along the I-95 Iron Pipeline—Florida, Georgia, Virginia, North Carolina, and South Carolina.

The time between a firearm's first sale at retail and subsequent recovery in crime is popularly known as time-to-crime (Pierce et al. 2004). Law enforcement investigators consider that a fast time-to-crime, defined by ATF as three years or less, suggests that a firearm may have been recently illegally diverted from retail outlets (ATF 2002): 35 percent of traceable Boston youth guns were fast time-to-crime guns. For all traceable new firearms, the first retail purchaser was a different person than the youth from whom the gun was recovered, suggesting a recent illegal diversion from legitimate firearms commerce.

Based on this analysis, the Operation Ceasefire gun market disruption strategy was appropriately focused on the illegal diversion of new handguns from retail outlets in Massachusetts, southern states along Interstate 95, and elsewhere (Braga and Pierce 2005). The key elements of the strategy were sevenfold:

Expanded focus of local, state, and federal authorities to include *intrastate* firearms trafficking in Massachusetts in addition to interstate trafficking.

Focused enforcement attention on traffickers of the makes and calibers of handguns most used by gang members.

Focused enforcement attention on traffickers of handguns that had short time-to-crime intervals and, thus, were most likely to have been trafficked. The ATF Boston Field Division implemented an in-house tracking system that flagged handguns

whose traces revealed a short time-to-crime interval.

Focused enforcement attention on traffickers of handguns used by the city's most violent gangs.

Attempts to restore obliterated serial numbers of confiscated handguns and subsequently investigate trafficking based on these restorations.

Support for these enforcement priorities through strategic analyses of data generated by the Boston Police Department and ATF's comprehensive tracing of crime guns and by developing leads from the systematic debriefing of gang-affiliated arrestees and those involved in violent crime.

Deliberate communication of successful investigations and prosecutions of gun traffickers to deter others from diverting firearms from retail sources to criminals and youth in Boston.

Half of the ATF gun trafficking investigations launched as part of this strategy focused on firearms illegally diverted from FFLs by straw purchasers. An impact evaluation in 2005 found that the gun market disruption strategy significantly reduced the illegal supply of new handguns to Boston criminals (Braga and Pierce 2005). However, the evaluation also suggests that gun traffickers may have substituted older handguns purchased through secondary market transactions to avoid enforcement attention.

As mentioned, the Boston gun market disruption strategy was implemented in conjunction with a powerful deterrence-based strategy to reduce gang violence. The National Institute of Justice–sponsored evaluators credited the Operation Ceasefire deterrence strategy with the sudden, large impact on youth homicide and gun violence (Braga et al. 2001). Their assessment that the principal impact was a demand-side, deterrence-based effect rather than a supply-side effect was based on two observations. First, it seemed implausible that supply-side efforts were responsible for the abrupt reductions in gun-related violence over the summer of 1996. Boston trafficking cases

Exhibit 6
Page 00111

followed that reduction, rather than anticipated it. Second, antitrafficking efforts in Boston did nothing to reduce the existing stockpile of illegally acquired and possessed firearms in Boston. Those guns held by gang members in Boston in May of 1996 were, for the most part, still held by them several months later when the violence reached its new, lower equilibrium. The immediate change was not in the extent of gun ownership but in gun use. Although it was unlikely that market disruption strategy had a meaningful short-term impact on serious gun violence, the available evidence suggests that the intervention had a meaningful longer-term impact on the illegal supply to Boston of newer handguns (Braga and Pierce 2005).

Boston has been the site of an ongoing series of research inquiries into the illegal supply of guns to criminals. Like others, Boston-based studies have generally analyzed the sources of illegal guns during specific periods, such as the early 1990s or late 2000s, rather than long-term trends. This article presents a descriptive analysis of a unique longitudinal data set on gun recoveries in Boston to uncover developmental trends in illegal gun market characteristics and dynamics that would be missed in existing cross-sectional data analyses. These data are also used to assess the impacts of two well-known policy interventions, one-gun-a-month laws and gun buy-back programs, on the characteristics of Boston crime guns.

## DATA

This article uses detailed BPD firearm recovery data to examine long-term gun trends in Boston. The Ballistics Unit keeps records on the basic characteristics of all firearms recovered by BPD officers (type, manufacturer, model, and caliber-gauge). Prior to 1991, these data were maintained in carefully organized paper record files. Paper records on N=8,753 firearms recovered between 1981 and 1990 were entered into a computerized database for a previously completed research study (see Braga 2003). The data were acquired and supplemented with gun recovery data maintained by the BPD in their comprehensive firearms trace database.

The Gun Control Act of 1968 (GCA) established a set of requirements that allows any given firearm to be traced from its manufacture or import to its first sale by a retail dealer (Zimring 1975; Cook and Braga 2001). The GCA mandates that each new firearm, whether manufactured in the United States or abroad, be marked with a serial number. In addition, the GCA requires all FFLs, including manufacturers, importers, distributors, and retail dealers, to maintain records of all firearms transactions. Firearms traces can be unsuccessful for a variety of reasons. ATF trace data can provide policy-relevant insights on illegal gun market dynamics when conclusions are based on careful analyses that are coupled with clear acknowledgments of data limitations (Cook and Braga 2001; Wellford, Pepper, and Petrie 2005).

The BPD has been comprehensively submitting all recovered firearms to ATF for tracing since 1991 (Kennedy, Piehl, and Braga 1996a; Braga and Pierce 2005). Between 1991 and 2015, the BPD recovered 15,888 firearms in illegal gun possession offenses (62.3 percent), public places (28.8 percent), violent crimes (6.3 percent), and drug offenses or other crimes (2.6 percent) that were subsequently submitted to ATF for tracing. This research analyzes trace data for the N=12,909 handguns recovered by the BPD during this period (81.3 percent of 15,888). Long guns, such as rifles and shotguns, were not included in the analyses. Handguns are the majority of crime guns recovered by the BPD. Some 58.3 percent (7,521 of 12,909) recovered between 1991 and 2015 were successfully traced to the first retail purchaser. Traces were not successful for pre-1968 manufacture (16.3 percent), obliterated serial numbers (13.7 percent), and data entry issues on the trace form (8.2 percent) or in dealer records (3.5 percent).

## TRENDS IN FIREARM RECOVERIES, 1981–2015

Figure 1 presents yearly trends in the total number of firearms and the total number of handguns the BPD recovered between 1981 and 2015. Nearly 78 percent of the total (24,641) were handguns (19,157). The number of recovered guns peaked in 1990 with 1,153 recoveries, and dropped to a low of 319 in 1999. The yearly number of handguns recovered closely followed the total number of firearms recovered. Figure 1 also shows that the share of recovered firearms that were handguns narrowed after 1996. Be-

Exhibit 6
Page 00112

**Figure 1.** Guns Recovered by Boston Police Department



*Source:* Author's calculations.

**Figure 2.** Handgun Recoveries and Homicides in Boston



*Source:* Author's calculations.

tween 1981 and 1996, almost 73 percent were handguns. Between 1997 and 2015, slightly more than 84 percent were.

Figure 2 presents the yearly numbers of handgun recoveries and of gun homicides in Boston between 1981 and 2015. Because the numbers of handgun recoveries were much greater, those of gun homicides were multi-

Exhibit 6
Page 00113

**Table 1.** Types and Calibers of Recovered Handguns in Boston

| Period | N | Percentages | | | | |
|---|---|---|---|---|---|---|
| | | Semi-automatic | .22, .25, .32 | .38, .357 | .380, 9mm | .40, .44, .45 |
| 1981–1985 | 3134 | 34.6 | 44.9 | 38.6 | 7.5 | 4.3 |
| 1986–1990 | 3114 | 41.6 | 44.2 | 33.2 | 14.0 | 5.1 |
| 1991–1995 | 3449 | 60.9 | 38.3 | 23.3 | 30.2 | 4.8 |
| 1996–2000 | 2008 | 74.2 | 38.9 | 23.9 | 27.5 | 6.8 |
| 2001–2005 | 2905 | 75.7 | 29.2 | 20.9 | 29.7 | 12.9 |
| 2006–2010 | 2195 | 65.7 | 26.4 | 20.6 | 33.4 | 18.0 |
| 2011–2015 | 2,352 | 66.6 | 26.7 | 20.7 | 31.7 | 19.9 |

*Source:* Author's calculations.

plied by ten so that both trends could be represented on the same graph. Although yearly trends diverge in particular years, such as 1992 and 2003, gun homicides and handgun recoveries both show sudden increases between the late 1980s and early 1990s, steep declines between the middle and late 1990s, and more modest increases in the early to middle 2000s. The two trends have a Pearson's cross-temporal correlation coefficient $r=0.574$ ($p<.01$), suggesting a strong positive association between yearly number of handgun recoveries and yearly number of gun homicides.

Changes over time in the types and calibers of recovered handguns are summarized in table 1. Between 1981 and 1985, higher-capacity semiautomatic pistols represented "only" 34.6 percent of all handguns recovered. During this period, the vast majority of recovered handguns were revolvers (63.5 percent) and only a small share were derringers (1.6 percent). The proportion of semiautomatic pistols among recovered handguns increased dramatically over the course of the late 1980s, 1990s, and 2000s, reaching a peak of 75.7 percent between 2001 and 2005. The share of semiautomatic pistols then decreased moderately to roughly 65 percent between 2006 and 2015.

Consistent with the shift toward greater shares of semiautomatic pistols, the calibers of recovered handguns also changed over time. Between 1981 and 1985, medium-powered .380 and 9mm handguns represented only 7.5 percent of all handguns recovered. The share quadrupled to 30.2 percent between 1991 and 1995 and remained steadily more than 25 percent

through 2015. In contrast, the share of .38 and .357 handguns declined from 38.6 percent between 1981 and 1985 to 20.7 percent between 2011 and 2015. Recoveries also shifted from lower-powered to high-powered handguns over the study period. Between 1981 and 1985, lower-powered .22, .25, and .32 handguns accounted for almost 45 percent of all recoveries; higher-powered .40, .44, and .45 handguns represented only 4.3 percent. By 2011 through 2015, .22, .25, and .32 handguns represented only 26.7 percent of recoveries; nearly 20 percent were .40, .44, and .45 handguns.

## TRENDS IN KEY TRAFFICKING INDICATORS FOR TRACED HANDGUNS, 1991–2015

### Obliterated Serial Numbers

The recovery of a firearm with an obliterated serial number is viewed as a strong indicator that a trafficker was involved in the illegal diversion of the firearm from legal commerce (ATF 2000, 2002; Cook and Braga 2001; Kennedy, Piehl, and Braga 1996a). Because defacing the serial number on a firearm is itself a crime (see 18 U.S.C. § 922(k)), obliterated numbers establish that a criminal possessed the gun at some time and is strong evidence that some past possessor wanted to obstruct tracing and prevent the firearm from being linked to a past transfer. Gun traffickers are likely to want to impede tracing so that they cannot be linked with their criminal associates, such as straw purchasers or a corrupt licensed dealer. Obliterated serial numbers were found on a modest

Exhibit 6
Page 00114

**Figure 3.** Handguns and Obliterated Serial Number Handguns



*Source:* Author's calculations.

share of handguns recovered by the BPD over time. Between 1991 and 2015, the trend in the yearly share of handguns recovered with obliterated serial numbers was stable, between roughly 10 percent and 17 percent per year (see figure 3). For the entire 1991 to 2015 period, 13.7 percent (1,763 of 12,909) had obliterated serial numbers.

BPD Crime Lab specialists, however, can sometimes restore obliterated serial numbers, and traces of guns can then proceed. Between 1995 and 2003, the BPD and ATF Boston Field Division made a concerted effort to restore and trace 910 firearms recovered with obliterated serial numbers as part of a special initiative to focus their enforcement efforts on the guns that seemed most likely to be trafficked (Braga and Pierce 2005). During this period, roughly 45 percent had their serial numbers successfully restored and subsequently traced to a first retail purchaser. These guns were a blend of new and secondhand firearms predominantly purchased from out-of-state licensed dealers. Because as many as one in six recovered handguns have obliterated serial numbers in any given year, restoring defaced numbers seems

to be high-value activity to generate investigative leads on gun traffickers diverting firearms from both primary and secondary market sources.

### Age of Traced Handguns

As described, a traced firearm with a short time-to-crime is generally regarded as an indicator that the weapon may have been recently diverted from an FFL. Figure 3 presents the annual percentage of traced Boston handguns with a time-to-crime of three years or less between first retail sale and BPD recovery. Between 1991 and 1996, the share increased from 31.6 percent to 53.8 percent. The Operation Ceasefire gun trafficking strategy was associated with a large post-1997 reduction in the percentage of handguns recovered with fast time-to-crime (Braga and Pierce 2005). As figure 3 suggests, the annual percentage of fast time-to-crime handguns dropped sharply in 1997 and 1998. Between 1999 and 2011, the trend was relatively stable and only 18.4 percent of all traced handguns (638 of 3,475) had a fast time-to-crime. The rate remained above 25 percent between 2012 and 2015.

Exhibit 6
Page 00115

The Anthony Braga and Glenn Pierce evaluation used multivariate regression analyses to estimate the effects of the Operation Ceasefire intervention on new handguns recovered in crime between January 1991 and December 2003 (2005). To distinguish intervention effects from measurable rival causal factors, the final model controlled for existing linear and non-linear trends, seasonal variation, Boston violent crime trends, handgun recovery numbers, trace result variations, and the February 1994 implementation of the Brady Handgun Violence Prevention Act. The analysis was supplemented by a postintervention-only comparison of Boston trends in new handgun recoveries to new handgun recovery trends in fourteen Youth Crime Gun Interdiction Initiative (YC-GII) cities. YCGII cities participated in an ATF program that required local police departments to trace all recovered crime guns. The trends in the comparison group suggested that the Boston trend was unique.

In their review of the Boston evaluation, Gary Kleck and Sung-Yung Wang speculate that the reported decline in the share of new recovered crime handguns was not due to the effects of the intervention but instead driven by a decline in Boston's burglary rate during the same period (2009). To support this assertion, the authors report a strong positive correlation between the percentage of crime guns with a time-to-crime of three years or less and Boston's burglary rate as reported in the Uniform Crime Reports between 1996 and 2003 ($r$=0.89). The Braga and Pierce analysis did not control for trends in Boston's burglary rate (2005).

To investigate whether burglary explained the decrease in new handguns recovered by the BPD over time, a covariate was added to the original Braga and Pierce model to account for Boston's monthly burglary rate for the full evaluation time period of January 1991 through December 2003. Following the Braga and Pierce model development strategy, the effects of Operation Ceasefire on the recovery of new handguns in Boston was estimated using ordinary least squares linear regression models. The impact on the percentage of recovered handguns that were new in Boston was measured at a one-year lag (dummy variable capturing the effect post–June 1, 1997). The dependent variable

is, once again, the monthly percentage of traced recovered handguns that were recovered within three or fewer years of the first retail sale.

Table 2 presents the original results and those of the revised model that included the Boston burglary rate. A quick comparison of the regression coefficients between the two models reveals no substantive changes when the Boston burglary rate covariate is included. Controlling for other covariates, the burglary rate is not significantly associated with the percentage of new recovered handguns, which suggests that the causal relationship between burglary and new recovered handguns is spurious when other factors are considered. Table 2 also reveals that the lagged effects of the intervention on the percentage of recovered handguns that were new remained robust to the addition of the burglary rate covariate to the model. Holding the other predictor variables constant, the intervention was associated with a statistically significant 22.3 percent reduction in the mean monthly percentage of all recovered handguns that were new. This revised analysis suggests that the Operation Ceasefire strategy did affect the prevalence of new handguns recovered in Boston crime.

### Source States of Traced Handguns

Figure 4 presents yearly trends in share of traced recovered handguns from selected source states between 1991 and 2015. Consistent with prior research, FFLs in Massachusetts consistently generated the largest share of Boston's recovered handguns relative to those from other states (see Kennedy, Piehl, and Braga 1996a; Braga and Hureau 2015). Between 1991 and 2007, the yearly proportion of traced handguns first purchased at Massachusetts FFLs generally varied between about 30 percent and almost 42 percent. In 2008, the share originating from Massachusetts FFLs dropped to 20.4 percent, followed by a steady increase over the next several years. In 2013, 46 percent of the traced handguns were first purchased at the Massachusetts FFLs. This one-year spike was mostly driven by a small number of seizures of multiple firearms from individuals who were once legal purchasers but became illegal pos-

Exhibit 6
Page 00116

**Table 2.** OLS Regressions, Effects of Operation Ceasefire

| Variable | Percentage of New Handguns | | | | |
| --- | --- | --- | --- | --- | --- |
| | New Handguns | | | Controlling for Boston Burglary Rate | |
| | B (SE) | | t | B (SE) | | t |
| Ceasefire (one-year lag) | −.227 | (.040) | −5.65*** | −.223 | (.045) | −4.954*** |
| Burglary rate | — | | — | .00003 | (.000) | .218 |
| Trend | .001 | (.002) | .285 | .001 | (.003) | .355 |
| Trend² | −.000006 | (.000) | −.281 | −.000008 | (.000) | −.627 |
| N violent gun crimes | .000 | (.000) | 1.00 | .000 | (.001) | .859 |
| N handguns received | −.002 | (.001) | −2.29* | −.002 | (.001) | −2.29* |
| Percent handguns with no age | .182 | (.094) | 1.93 | .184 | (.095) | 1.93 |
| Brady Law enacted | .106 | (.048) | 2.27* | .108 | (.049) | 2.23* |
| Intercept | .253 | (.135) | 1.88 | .254 | (.133) | 1.91 |
| N | 156 | | | 156 | | |
| R² | .599 | | | .599 | | |
| F-test | 11.346*** | | | 10.676*** | | |
| Durbin-Watson test | 1.74 | | | 1.77 | | |

*Source:* Author's compilation based on Braga and Pierce 2005.
*Note:* Month dummy variables included in both regression models but not shown here.
*$p < .05$; **$p < .01$; ***$p < .001$

**Figure 4.** Source States of Traced Handguns in Boston



*Source:* Author's calculations.

Exhibit 6
Page 00117

sessors after a felony conviction or domestic assault incident.

A recent study examined whether Massachusetts state-level private gun transfer data could be used to understand how in-state secondary market transactions may influence the supply of handguns to Boston criminals (Braga and Hureau 2015). Using trace data on Boston recoveries between 2007 and 2013, traced Boston crime handguns first sold at Massachusetts license dealers were matched to state second-hand gun transfer data. Many crime handguns with records of secondary market transactions in Massachusetts moved rapidly from private transfer to police recovery, suggesting an in-state problem with illegal transfers to high-risk and prohibited persons. Unfortunately, important transaction data on the in-state sources of nearly 63 percent of recovered handguns were not readily available to law enforcement agencies. Braga and David Hureau conclude that a highly problematic gap between having strong gun laws in place and actually enforcing their provisions exists in Massachusetts (2015). This lack of enforcement seems to contribute to the relatively large number of crime guns directly or indirectly originating from Massachusetts FFLs over time.[3]

Traced handguns recovered in Boston tended to be imported from FFLs in two distinct geographic regions of states with less restrictive gun control laws: either nearby New Hampshire and Maine, or the Iron Pipeline states of Virginia, North Carolina, South Carolina, Georgia, and Florida. Between 1991 and 2004, about 23 percent of traced handguns were imported from FFLs in those five southern states and only 7.5 percent from the two northern ones. Between 2005 and 2015, the share of traced handguns imported from FFLs in the southern states increased slightly to 26.3 percent. However, during this same period, the share of traced handguns imported from FFLs in New Hampshire and Maine more than doubled, to 17.7 percent. ATF and BPD investiga-

tors suggest that drug trafficking supply lines from Boston into southern New Hampshire and Maine have intensified as high property values in the Boston area have caused a population shift to less expensive, out-of-state properties within commuting distance of the city; Boston gang members and other criminals increasingly export illegal drugs into New Hampshire and Maine, and import illegal guns from these loose gun control states (see, for example, Bever 2014).

To some observers, a crime gun with an out-of-state origin is not necessarily an indicator that a gun runner illegally moved the gun across state lines. Other explanations for this movement are possible, such as an owner legally moving to another state and having the firearm stolen from their new residence (Kleck and Wang 2009). Massachusetts state law requires all gun owners, including those who move into the state with their firearms, to report firearm losses and thefts to local and state police department. When recovered Boston crime guns are submitted to the BPD Ballistics Unit for processing, firearm examiners run the manufacturers and serial numbers through the National Crime Information Center (NCIC) stolen gun database and record whether the recovered crime gun was reported stolen.

To further examine out-of-state origin as an indicator of illegal gun diversions, NCIC data collected by the BPD Ballistics Unit on N=1,479 handguns recovered by the BPD between 2007 and 2014 and subsequently traced to FFLs located outside Massachusetts were analyzed. Despite a state law requiring such reporting, not a single recovered handgun traced to FFLs outside Massachusetts was reported to NCIC as stolen. It is possible that law-abiding gun owners might be reluctant to report stolen guns to authorities or lacked enough information on stolen guns to file an accurate report. These problems, however, would affect recently transplanted residents and long-term residents alike. For comparative purposes, stolen gun re-

3. In comparison, only 12 percent of traceable firearms recovered by the New York City Police Department (NYPD) between 2010 and 2015 were first purchased at an FFL in New York State (trace data provided as part of an ongoing research partnership with NYPD to examine the sources of New York City crime guns). New York State has strong gun laws that are similar to Massachusetts gun laws. See the 2013 Brady Campaign scorecard (http://www.bradycampaign.org/2013-state-scorecard, accessed July 3, 2017).

Exhibit 6
Page 00118

cords were analyzed for 2007 to 2014 handguns traced to a Massachusetts FFL and not found to be recovered in the hands of the first retail purchaser. BPD Ballistic Unit records indicated that 10.8 percent (62 of 572) had been reported stolen to NCIC before recovery by BPD officers. If theft of guns from recently transplanted residents was a persistent problem, a similar stolen gun reporting rate would be expected. The "guns stolen from new residents" explanation for the interstate movement of crime guns therefore does not seem to apply to traced Boston crime guns imported from other states. Philip Cook and his colleagues come to a similar conclusion in their analysis of the sources of Chicago crime guns (2015).

## USING LONGITUDINAL TRACE DATA IN POLICY EVALUATION

### Effects of Limiting Handgun Purchases on Interstate Gun Trafficking

During the early 1990s, the Commonwealth of Virginia earned a reputation as a key source state for firearms illegally trafficked to cities in the northeastern United States (Larson 1994). In July 1993, Virginia enacted a law limiting individual handgun purchases to one per thirty-day period. The intention of the law was to limit the ability of illegal gun traffickers to make multiple purchases of handguns in a single transaction, thereby undermining the economic incentive generated by diverting multiple handguns from Virginia FFLs. Douglas Weil and Rebecca Knox used ATF trace data to examine the locations of crime gun purchases before (September 1989 through June 1993) and after (July 1993 through March 1995) the enactment of Virginia's one-handgun-per-month law (1996). Their analyses reveal noteworthy reductions, after passage of the bill, in the share of guns traced to Virginia FFLs for firearms traced from anywhere in the United States and for firearms traced from northeast corridor states.

The findings of the Weil and Knox evaluation are limited by the uncertain quality of the available ATF firearms trace information (1996). As the authors openly report, that used in their study was not collected in a comprehensive manner. It represented only the recovered crime guns that law enforcement agencies in study locations decided to submit to ATF for tracing. The trends and patterns documented by their analyses were therefore biased to an unknown degree. As described earlier, the BPD has been comprehensively tracing all recovered firearms since January 1, 1991. These comprehensive data allow a clearer assessment of the impact of the July 1993 law limiting handgun purchases to one per month on the movement of handguns from retail purchases at Virginia FFLs to recovery by the BPD.

In this partial replication of the Weil and Knox analysis, the sources of traced handguns recovered in Boston were compared for eighteen-month periods before (January 1991 through June 1993) and after (July 1993 through December 1995) implementation of the law. Between January 1991 and December 1995, 55.1 percent of handguns (1,893 of 3,438) recovered by the BPD were successfully traced by ATF to the first retail purchaser. Purchase dates were examined to determine whether Boston-recovered handguns were purchased at Virginia and other FFLs in I-95 southern states before or after the law was implemented. Virginia's one-handgun-per-month law was repealed in March 2012. To determine whether the repeal of the law affected interstate transfers of Boston crime guns, the sources of traced handguns recovered in Boston were compared for twenty-six months before (January 2010 through February 2012) and forty-six months after (March 2012 through December 2015). Between January 2010 and December 2015, 62.3 percent of handguns (1,764 of 2,830) recovered by the BPD were successfully traced by ATF to the first retail purchaser.

Table 3 presents the estimated odds ratios that a Boston-recovered handgun was purchased from a Virginia FFL relative to an FFL in another I-95 southern state for the implementation and repeal of Virginia's one-handgun-a-month law. Before the law was implemented, 20.1 percent of recovered handguns originating from an I-95 southern state were first purchased at a Virginia FFL; after the implementation, only 7.8 percent were. The likelihood that a Boston handgun would be traced to a Virginia FFL relative to licensed dealers elsewhere in I-95 southern states decreased by

Exhibit 6
Page 00119

**Table 3.** Estimated Odds Ratios, Recovered Handgun Purchases

| Traced to I-95 | Before Law | | After Law | | Odds Ratio (95% CI) |
|---|---|---|---|---|---|
| | N | Percentage | N | Percentage | |
| **After July 1993 law implementation comparison, January 1, 1991–December 31, 1995** | | | | | |
| Southern state FFL | 403 | 100.0 | 128 | 100.0 | 0.337 |
| Virginia FFL | 81 | 20.1 | 10 | 7.8 | (0.169–0.671) |
| Other FFL | 322 | 79.9 | 118 | 92.2 | $Chi^2 = 10.33$ |
| | | | | | $p = .0013$ |
| **After March 2012 law repeal comparison, January 1, 2010–December 31, 2015** | | | | | |
| Southern state FFL | 251 | 100.0 | 65 | 100.0 | 1.878 |
| Virginia FFL | 27 | 10.8 | 12 | 18.5 | (0.893–3.943) |
| Other FFL | 224 | 89.2 | 53 | 81.5 | $Chi^2 = 2.83$ |
| | | | | | $p = .0925$ |

*Source:* Author's calculations.

66.3 percent after the one-gun-a-month law took effect (OR=0.337, *p*<.01). Fifteen years later, before the law was repealed, 10.8 percent of recovered handguns originating from an I-95 southern state were first purchased at a Virginia FFL; after repeal, the figure was 18.5 percent. Although not statistically significant at the *p*<.05 level, the likelihood that a Boston handgun would be traced to a Virginia FFL relative to licenses dealers elsewhere in I-95 southern states increased by 87.8 percent after the law was repealed (OR=1.878, *p*<.10). These results are congruent with the findings of Weil and Knox's 1996 study and suggest that restricting handgun purchases to one per month may change where criminals get their guns.

### Influence of Buy-Back Programs on Characteristics of Recovered Guns

Gun buy-backs involve a government or private group paying individuals to turn in guns they possess. Participants turning in guns are paid via cash disbursements, gift cards, or other compensation. To encourage participation by criminals, these programs do not require participants to identify themselves and do not maintain any records of the individuals who turned firearms in. The recovered guns are then destroyed. Despite empirical evidence that suggests gun buy-backs do not reduce vio-

lence, municipalities continue to implement these programs (Wellford, Pepper, and Petrie 2005; but see Leigh and Neill 2010). At least three problems are associated with the violence reduction theory underlying gun buybacks: the guns turned in are the least likely to be used in criminal activities; because replacement guns are easy to acquire, the decline of guns on the street may be smaller than the number of guns that are turned in; and the likelihood that any particular turned-in gun will be used in crime is very low (Wellford, Pepper, and Petrie 2005).

Gun buy-back program implementers have responded to the empirical evidence by developing strategies to increase the likelihood that high-risk guns are turned in by high-risk individuals (Braga and Wintemute 2013). These strategies have included targeted advertising to young people in urban neighborhoods affected by high levels of gun violence and graded incentives to encourage the recovery of handguns and assault weapons. In response to community concerns over periodic outbreaks of serious gun violence, the City of Boston implemented gun buy-back programs three times: in 1993–1994, 2006, and 2014–2015. The characteristics of guns recovered during each period are presented in table 4.

In 1993 and 1994, a nonprofit crime preven-

Exhibit 6
Page 00120

**Table 4.** Characteristics of Firearms Recovered from Buybacks

|  | 1993–1994 | 2006 | 2014–2015 |
|---|---|---|---|
| N firearms | 1,556 | 1,019 | 430 |
| Percent handgun | 56.1 | 85.7 | 89.1 |
| Percent semiautomatic pistol | 17.1 | 34.7 | 40.5 |
| Percent .380, 9mm, .40, .45 | 1.9 | 26.1 | 11.4 |
| Percent obliterated | 4.3 | 4.1 | 3.9 |
| **Percent traced to first retail purchaser** | 11.1 | 33.9 | 44.2 |
| Percent three years or less from first retail sale | 4.1 | 9.2 | 5.3 |
| Percent first sold at retail in I-95 states | 15.7 | 18.8 | 13.7 |

*Source:* Author's calculations.

tion agency conducted buy-backs with the BPD and the Suffolk County district attorney, offering $50 per gun and recovering 2,158 guns (see Kennedy, Piehl, and Braga 1996b). BPD and ATF attempted to trace the chain of ownership from manufacturer to first retail purchaser of 1,566 (72.6 percent) of these: all 1,288 from 1993 but only the first 278 (31.9 percent) of 870 from 1994. BPD and ATF stopped comprehensive tracing efforts after finding that many were not traceable. Only 11 percent (173) were successfully traced to the first retail purchaser. BPD noted that licensed gun dealers from the suburbs used the event to clear their inventories of secondhand firearms that were worth less than the $50 incentive.

In 2006, then Boston mayor Thomas M. Menino, BPD, and numerous faith-based and community organizations launched the Aim for Peace gun buy-back program (see Braga and Wintemute 2013). It included four new programmatic elements designed to increase the number of handguns brought in from neighborhoods suffering from high levels of violence:

Target gift cards for $200 were given for each handgun. Rifles and shotguns were accepted, but no incentives were provided.

Individuals who turned in firearms had to prove that they were Boston residents before receiving a gift card. The names of participants were not associated with any recovered guns or recorded in any way.

As in 1993–1994, BPD district stations served as gun drop-off locations. However, recog-

nizing that some residents may not be comfortable walking into a police station with a gun, BPD also set up drop-off operations at eight community locations, such as churches and nonprofit organization offices, in neighborhoods with high rates of gun violence.

A sophisticated communications campaign sought to engage Boston's youth via a podcast, more than thirty billboards in strategic locations frequented by city youth, and saturation advertising on city buses, subway cars, train stations, and bus stops.

The program operated from June 12 through July 14 and recovered 1,019 firearms; BPD attempted to trace all of them.

Beginning in March 2014 and continuing throughout 2015, mayor Martin J. Walsh and the BPD implemented the Your Piece for Peace program, which included some of the design features of the 2006 buy-back. Once again, the BPD provided a $200 Visa gift card for each turned-in handgun and, though long guns were accepted, no incentives were provided. Individuals were also required to prove they were Boston residents before they received a gift card. Although the launch of the program was publicized in the local media, it did not have the strategic advertising initiatives of its 2006 predecessor. The 2014–2015 buy-back did not have community-based drop-off locations and walk-in gun exchanges were limited to BPD district stations. Community members could, however, call the BPD and make arrangements for an officer to pick up firearms from their

Exhibit 6
Page 00121

residences. Although the program operated for an extended twenty-two months (and continued through 2016), the program yielded only 430 firearms. The BPD submitted all the buy-back guns to ATF for tracing.

Relative to the 1993–1994 program, the 2006 buy-back yielded more handguns, especially higher-powered semiautomatic pistols (table 4).[4] The 1993–1994 buy-back recovered more older long guns than newer handguns associated with the youth gun violence epidemic of the period (Kennedy, Piehl, and Braga 1996b). Although similar numbers of guns from the 1993–1994 and 2006 buy-backs had obliterated serial numbers, a much higher number from the 2006 program were successfully traced by ATF (Braga and Wintemute 2013). Relative to 1993–1994, the 2006 firearms were more likely to have been purchased within three years of their first retail sale and more likely to have originated from dealers along the Iron Pipeline. The 2014–2015 buy-back yielded fewer guns but did secure more handguns and semiautomatic pistols than its predecessors. ATF was also able to successfully trace 44.2 percent of the 2014–2015 guns, notably more than the earlier programs.

The features of the 2014–2015 program may have unintentionally diminished the overall number of recovered handguns and reduced the share of higher-powered semiautomatic pistols taken off Boston streets relative to the 2006 program. Traceable firearms were also less likely to have included newer guns that were first sold at retail outlets in the I-95 southern states. As described elsewhere in this article, increasing the number of recovered guns with these indicators provides law enforcement agencies with additional opportunities to identify and apprehend gun traffickers. Unfortunately, the 2014–2015 buy-back recovered fewer high-risk handguns than its immediate predecessor. Gun criminals in disadvantaged neighborhoods may have not been aware of the opportunity to turn in their guns given the lack of strategic advertising in the later program. Among those who were aware, some may have been dissuaded by the prospects of walking into a police station with a gun or calling the police to schedule a gun pick-up.

These analyses suggest that program design may matter when attempting to encourage high-risk individuals to turn in their guns. However, the first two programs did not reduce levels of gun violence in Boston after implementation (Kennedy, Piehl, and Braga 1996b; Braga and Wintemute 2013). Over the course of the 2014–2015 program, the number of fatal and nonfatal shooting victims increased by 14 percent from 214 in 2014 to 244 in 2015. These findings suggest that, even with program design modification that improved the kinds of guns turned in, buy-back programs are not an effective market intervention to reduce gun violence.

## CONCLUSION

The longitudinal analyses of Boston firearm recovery and trace data shed some policy-relevant insight on evolving illegal gun market dynamics serving criminals in one jurisdiction. First, they suggest that handguns recovered by the BPD became increasingly deadly over time. Beginning in the 1990s, higher-capacity semiautomatic pistols capable of shooting larger numbers of bullets replaced revolvers as the most frequently recovered type of handgun in Boston. Equally concerning, the share of smaller caliber handguns among BPD recoveries diminished over the 2000s as the prominence of larger caliber handguns increased. This transition from revolvers to semiautomatic pistols recovered by law enforcement agencies mirrors national trends in handgun production in the United States between the 1980s and 1990s (Wintemute 2006). Given the increased killing power of handguns in the civilian firearms stock, it is imperative to block

4. As Braga and Wintemute note, the available data suggest that improvements in the guns recovered were driven by changes in buy-back design features rather than secular changes in the underlying distribution of crime guns during the intervening years (2013). In 1993 and 1994, the BPD submitted 1,637 recovered crime guns to ATF for tracing: 75.8 percent were handguns and 48.4 percent were traceable. In 2006, the BPD submitted 554 recovered crime guns to ATF for tracing: 89.5 percent were handguns and 53.9 percent were traceable. The 2006 guns more closely resembled the stock of crime guns.

Exhibit 6
Page 00122

access by criminals, juveniles, and other high-risk individuals.

Like many other U.S. cities, the bulk of Boston's serious gun violence problem is generated by a relatively small number of criminally active gang members (Braga 2003; Braga, Hureau, and Winship 2008; see also, for example, Papachristos and Wildeman 2014; Papachristos et al. 2015). Boston gun criminals seem to be supplied by illegal diversions of handguns from both out-of-state and in-state FFLs. The age of recovered handguns, as measured as the time between the first retail sale and confiscation by the BPD, has also increased, suggesting a problem with the illegal diversion of older firearms from secondary market sources.

Massachusetts gun laws should provide state and local law enforcement agencies with the necessary tools to regulate secondary transfers of firearms within the state. Unfortunately, as Braga and Hureau suggest, little enforcement and regulatory attention seems to be paid to the problem of suspicious transfer patterns in Massachusetts (2015). Long-term trends document a noteworthy share of traced handguns originating from FFLs in I-95 southern states and an increasing share from those in nearby New Hampshire and Maine. The lack of paperwork on secondary market transfers in these lax gun control states, however, makes launching investigations into interstate gun trafficking operations of older firearms very difficult.

Strategic enforcement programs focused on the illegal diversion of new firearms from primary markets may reduce the availability of new guns to criminals (Webster et al. 2006; Webster, Vernick, and Bulzacchelli 2006). The analyses presented here strengthened the case that the anti–gun trafficking component of Boston's Operation Ceasefire strategy did indeed reduce the prevalence of new handguns recovered by the BPD. What is more, this study suggests that the presence of state one-gun-per-month laws do influence where criminals acquire guns. Unfortunately, whether these market-based interventions reduced the overall availability of guns to criminals and whether supply-side interventions have a measureable impact on gun violence remain unclear. Modifying the programmatic features of buy-back

programs in Boston seemed to increase the share of recovered semiautomatic pistols that could be traced to their retail origins. However, the implementation of gun buy-back programs in Boston was not associated with any gun violence reductions.

Rational debate on gun policy requires detailed information on crime guns. ATF currently produces modest summaries of the characteristics of crime gun traces for the fifty states, the District of Columbia, U.S. territories, Canada, Mexico, and the Caribbean (www.atf.gov/statistics/index.html). Unlike the national and city-level trace reports generated by the now-defunct Youth Crime Gun Interdiction Initiative (ATF 2002), ATF's current state-level crime gun summaries do not involve external academics and do not provide more rigorous and detailed analyses of crime gun sources, trends, and patterns. ATF should return to publishing these more detailed annual crime gun trace reports overseen by external academics. The Boston illegal gun market research summarized and extended here highlights the policy-relevant findings that can be generated through ongoing academic analyses of ATF trace data and local police data.

## REFERENCES

Azrael, Deborah, Philip J. Cook, and Matthew Miller. 2004. "State and Local Prevalence of Firearms Ownership: Measurement, Structure, and Trends." *Journal of Quantitative Criminology* 20(1): 43–62.

Bea, Keith, and Michael J. Burton. 1992. "'Assault Weapons': Military-Style Semi-Automatic Firearms Facts and Issues." *CRS* Report no. 92–434. Washington, D.C.: Government Printing Office.

Bever, Fred. 2014. "When Mass. Criminals Want a Gun, They Often Head North," WBUR News, February 24. Accessed July 3, 2017. http://www.wbur.org/2014/02/24/gun-trafficking-into-massachusetts.

Braga, Anthony A. 2003. "Serious Youth Gun Offenders and the Epidemic of Youth Violence in Boston." *Journal of Quantitative Criminology* 19(1): 33–54.

Braga, Anthony A., Robert Apel, and Brandon C. Welsh. 2013. "The Spillover Effects of Focused Deterrence on Gang Violence." *Evaluation Review* 37(3–4): 314–42.

Exhibit 6
Page 00123

Braga, Anthony A., and Philip J. Cook. 2016. "The Criminal Records of Gun Offenders." *Georgetown Journal of Law and Public Policy* 15(1): 1–16.

Braga, Anthony A., Philip J. Cook, David M. Kennedy, and Mark H. Moore. 2002. "The Illegal Supply of Firearms." In *Crime and Justice: A Review of Research*, vol. 29, edited by Michael Tonry. Chicago: University of Chicago Press.

Braga, Anthony A., and David M. Hureau. 2015. "Strong Gun Laws Are Not Enough: The Need for Improved Enforcement of Secondhand Gun Transfer Laws in Massachusetts." *Preventive Medicine* 79 (October): 37–42.

Braga, Anthony A., David M. Hureau, and Andrew V. Papachristos. 2014. "Deterring Gang-Involved Gun Violence: Measuring the Impact of Boston's Operation Ceasefire on Street Gang Behavior." *Journal of Quantitative Criminology* 30(1): 113–39.

Braga, Anthony A., David M. Hureau, and Christopher Winship. 2008. "Losing Faith? Police, Black Churches, and the Resurgence of Youth Violence in Boston." *Ohio State Journal of Criminal Law* 6(1): 141–72.

Braga, Anthony A., David Kennedy, E. Waring, and Anne M. Piehl. 2001. "Problem-Oriented Policing, Deterrence, and Youth Violence: An Evaluation of Boston's Operation Ceasefire." *Journal of Research in Crime and Delinquency* 38(3): 195–225.

Braga, Anthony A., Andrew V. Papachristos, and David M. Hureau. 2010. "The Concentration and Stability of Gun Violence at Micro Places in Boston, 1980–2008." *Journal of Quantitative Criminology* 26(1): 33–53.

Braga, Anthony A., and Glenn L. Pierce. 2005. "Disrupting Illegal Firearms Markets in Boston: The Effects of Operation Ceasefire on the Supply of New Handguns to Criminals." *Criminology and Public Policy* 4(4): 717–48.

Braga, Anthony A., and David L. Weisburd. 2012. "The Effects of Focused Deterrence Strategies on Crime: A Systematic Review and Meta-Analysis of the Empirical Evidence." *Journal of Research in Crime and Delinquency* 49(3): 323–58.

Braga, Anthony A., and Garen J. Wintemute. 2013. "Improving the Potential Effectiveness of Gun Buyback Programs." *American Journal of Preventive Medicine* 45(5): 668–71.

Braga, Anthony A., Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway. 2012. "Interpreting the Empirical Evidence on Illegal Gun Market Dynamics." *Journal of Urban Health* 89(5): 779–93.

Bureau of Alcohol, Tobacco and Firearms (ATF). 2000. *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*. Washington, D.C.: Bureau of Alcohol, Tobacco and Firearms.

——. 2002. *Crime Gun Trace Analysis (2000): National Report*. Washington, D.C.: Bureau of Alcohol, Tobacco and Firearms.

Cook, Philip J., and Anthony A. Braga. 2001. "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets." *Arizona Law Review* 43: 277–309.

Cook, Philip J., Anthony A. Braga, and Mark H. Moore. 2011. "Gun Control." In *Crime and Public Policy*, rev. ed., edited by James Q. Wilson and Joan Petersilia. New York: Oxford University Press.

Cook, Philip J., Richard J. Harris, Jens Ludwig, and Harold A. Pollock. 2015. "Some Sources of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Traffickers." *Journal of Criminal Law and Criminology* 104(4): 717–59.

Cook, Philip J., Jens Ludwig, Sudhir Venkatesh, and Anthony A. Braga. 2007. "Underground Gun Markets." *Economic Journal* 117(524): 558–88.

Cook, Philip J., Susan T. Parker, and Harold A. Pollack. 2015. "Sources of Guns to Dangerous People: What We Learn by Asking Them." *Preventive Medicine* 79(1): 28–36.

Kennedy, David M. 1994. "Can We Keep Guns Away from Kids?" *American Prospect* 18(1): 74–80.

Kennedy, David M., Anthony A. Braga, and Anne M. Piehl. 1997. "The (Un)Known Universe: Mapping Gangs and Gang Violence in Boston." In *Crime Mapping and Crime Prevention*, *Crime Prevention Studies*, vol. 8, edited by David Weisburd and J. McEwen. Monsey, N.Y.: Criminal Justice Press.

Kennedy, David M., Anne M. Piehl, and Andrew A. Braga. 1996a. "Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy." *Law and Contemporary Problems* 59(1): 147–96.

——. 1996b. "Gun Buy-Backs: Where Do We Stand and Where Do We Go?" In *Under Fire: Gun Buy-Backs, Exchanges, and Amnesty Programs*, edited by Martha R. Plotkin. Washington, D.C.: Police Executive Research Forum.

Kleck, Gary, and Shun-Yung Kevin Wang. 2009. "The Myth of Big-Time Gun Trafficking and the

Exhibit 6
Page 00124

Overinterpretation of Gun Trace Data." *UCLA Law Review* 56: 1233–94.

Koper, Christopher S., and Jeffrey A. Roth. 2001. "The Impact of the 1994 Federal Assault Weapons Ban on Gun Markets: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation." *Journal of Quantitative Criminology* 17(1): 239–66.

Larson, Erik. 1994. *Lethal Passage: The Story of a Gun*. New York: Crown Publishers.

Leigh, Andrew, and Christine Neill. 2010. "Do Gun Buybacks Save Lives? Evidence from Panel Data." *American Law and Economics Review* 12(2): 462–508.

Moore, Mark H. 1973. "Achieving Discrimination in the Effective Price of Heroin." *American Economic Review* 63(2): 193–206.

———. 1976. *Buy and Bust: The Effective Regulation of an Illicit Market in Heroin*. Lexington, Mass.: Heath.

Okoro, Catherine A., David E. Nelson, James A. Mercy, Lina S. Balluz, Alex E. Crosby, and Ali H. Mokdad. 2005. "Prevalence of Household Firearms and Firearms Storage Practices in 50 States and the District of Columbia." *Pediatrics* 116(3): e370–76.

Papachristos, Andrew V., Anthony A. Braga, and David M. Hureau. 2012. "Social Networks and the Risk of Gunshot Injury." *Journal of Urban Health* 89: 992–1003.

Papachristos, Andrew V., Anthony A. Braga, Eric Piza, and Leigh S. Grossman. 2015. "The Company You Keep? The Spillover Effects of Gang Membership on Individual Gunshot Victimization in a Co-Offending Network." *Criminology* 53(4): 624–49.

Papachristos, Andrew V., and Christopher Wildeman. 2014. "Network Exposure and Homicide Victimization in an African American Community." *American Journal of Public Health* 104(1): 143–50.

Pierce, Glenn L., Anthony A. Braga, Raymond R. Hyatt, and Christopher S. Koper. 2004. "The Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy." *Justice Quarterly* 21(2): 391–422.

Reiss, Albert J., and Jeffrey A. Roth, eds. 1993. *Understanding and Preventing Violence*, vol. 1. Washington, D.C.: National Academies Press.

Smith, Tom W., and Jackson Son. 2015. "General Social Survey Final Report: Trends in Gun Ownership in the United States, 1972–2014." Chicago: National Opinion Research Center at University of Chicago.

Sorenson, Susan B., and Katherine A. Vittes. 2003. "Buying a Handgun for Someone Else: Firearm Retailer Willingness to Sell." *Injury Prevention* 9(2): 147–50.

Webster, Daniel W., Jon S. Vernick, and Maria T. Bulzacchelli. 2006. "Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals." *Journal of Urban Health* 83(5): 778–87.

Webster, Daniel W., April M. Zeoli, Maria T. Bulzacchelli, and Jon S. Vernick. 2006. "Effects of Police Stings of Gun Dealers on the Supply of New Guns to Criminals." *Injury Prevention* 12(4): 225–30.

Weil, Douglas S., and Rebecca C. Knox. 1996. "Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms." *Journal of the American Medical Association* 275(22): 1759–61.

Wellford, Charles F., John V. Pepper, and Carol V. Petrie, eds. 2005. *Firearms and Violence: A Critical Review*. Committee to Improve Research and Information on Firearms. Washington, D.C.: National Academies Press.

Wintemute, Garen J. 2010. "Guns and Gun Violence." In *The Crime Drop in America*, rev. ed., edited by Alfred Blumstein and Joel Wallman. New York: Cambridge University Press.

Wintemute, Garen J., Philip J. Cook, and Mona A. Wright. 2005. "Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes." *Injury Prevention* 11(6): 357–63.

Zimring, Franklin E. 1975. "Firearms and Federal Law: The Gun Control Act of 1968." *Journal of Legal Studies* 4(1): 133–98.

———. 1976. "Street Crime and New Guns: Some Implications for Firearms Control." *Journal of Criminal Justice* 4(1): 95–107.

Exhibit 6
Page 00125

# Exhibit 7

Exhibit 7
Page 00126

Journal of Urban Health: Bulletin of the New York Academy of Medicine, Vol. 87, No. 3
doi:10.1007/s11524-010-9437-5
© 2010 The Author(s). This article is published with open access at Springerlink.com

# Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime under Circumstances That Suggest Gun Trafficking

Mona A. Wright, Garen J. Wintemute, and Daniel W. Webster

**ABSTRACT**   *While many handguns are used in crime each year in the USA, most are not. We conducted this study to identify factors present at the time of a handgun's most recent retail sale that were associated with its subsequent use in crime under circumstances suggesting that the handgun had been trafficked—purchased with the intent of diverting it to criminal use. Handguns acquired in multiple-gun purchases were of particular interest. Using data for 180,321 handguns purchased from federally licensed retailers in California in 1996, we studied attributes of the handguns, the retailers selling them, the purchasers, and the sales transactions. Our outcome measure was a handgun's recovery by a police agency, followed by a gun ownership trace, conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives, that determined (a) that the recovery had occurred within 3 years of the handgun's most recent purchase from a licensed retailer and (b) that the person who possessed the gun when it was recovered by police was not its most recent purchaser. Altogether, 722 handguns were recovered and had trace results that met the additional criteria. Handguns acquired in multiple-gun, same-day transactions were more likely to be traced than were single-purchase handguns (odds ratio [OR] 1.33, 95% confidence intervals [CI] 1.08 to 1.63). This was not the case for multiple-purchase handguns defined more broadly as multiple handguns purchased by one individual over any 30-day period as used in "one-gun-a-month" laws. Bivariate regressions indicated increased risk of a handgun being traced when it sold new for $150 or less (OR 4.28, 95% CI 3.59 to 5.11) or had been purchased by a woman (OR 2.02, 95% CI 1.62 to 2.52). Handguns sold by retailers who also had a relatively high proportion (≥2%) of purchases denied because the prospective purchasers were prohibited from owning firearms were more likely to be traced than were those sold by other retailers (OR 4.09, 95% CI 3.39 to 4.94). These findings persisted in multivariate analyses. Our findings suggest specific strategies for intervention to prevent gun violence.*

**KEYWORDS**   *Crime, Violence, Firearms*

## INTRODUCTION

Approximately 280 million firearms are now in civilian hands in the USA.[1] Most firearms are not used in crime. Yet an estimated 315,000 violent crimes

Wright and Wintemute are with the UC Davis Medical Center, Sacramento, CA, USA; Webster is with the Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, USA.

Correspondence: Mona A. Wright, MPH, UC Davis Medical Center, Sacramento, CA, USA. (E-mail: mawright@ucdavis.edu)

Exhibit 7
Page 00127

involving guns, including 10,886 homicides, were committed in the USA in 2008.[2,3]

Few large-scale studies have been done of potential risk factors for firearms being used in crime. One risk factor is well known; handguns are overrepresented among crime guns, particularly in urban areas. Previous studies further suggest that specific gun type, cost, and concealability are associated with a handgun's risk of involvement in crime, as are purchaser age and sex, and several attributes of the licensed retailer who sells the handgun.[4–7]

Interventions to prevent gun violence by reducing the supply of guns to dangerous people often focus on *gun trafficking*, the rapid and intentional diversion of guns from legal to illegal commerce. The median interval between a gun's retail sale and its recovery in crime in the USA is 5.7 years, but trafficked guns are often used in crime within a few years of purchase, by someone other than the original retail purchaser.[4,8–10] Several lines of evidence suggest that guns used in crime are often bought in multiple-gun transactions,[6,8–10] but the evidence is mixed.[5] A Maryland study found that these multiple-sale handguns were at increased risk of recovery by law enforcement agencies in that state for the first 2 years following purchase, but not thereafter.[6] This increase in risk persisted for at least 5 years for handguns sold in Maryland but recovered by police in nearby Washington, DC, which had banned the purchase of handguns.

Using detailed data for handguns sold in 1996 by federally licensed retailers in California, we examine attributes of the handguns, retailers, purchasers, and sales transactions to identify those that affect the likelihood a handgun will be recovered by a law enforcement agency and subjected to gun ownership tracing by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). These traces, done at the request of law enforcement agencies, are a widely used surrogate measure for a gun's use in crime.[5,6,10,11] To focus the results on handguns that may have been trafficked, we specify further that the trace must have occurred within 3 years of the handgun's most recent retail sale and that, at the time of its recovery by a law enforcement agency, the handgun must have been in the possession of someone other than the person identified by the trace as the gun's buyer in 1996.

Our objective is to identify risk factors for use in crime among handguns sold by federally licensed firearms dealers that are amenable to law enforcement or public policy interventions. Given the prior evidence, we were particularly interested in handguns acquired in multiple-gun purchases. We apply two definitions of this term: (1) multiple-gun, same-day transactions and (2) purchases of multiple handguns, one at a time, by the same individual in transactions spread over up to 30 days—a definition used in "one-gun-a-month" laws. Simultaneously, we determine the importance in this large population of risk factors identified in previous studies.

## METHODS

### Datasets

Data on study handguns and their sellers, purchasers, and sales transactions were obtained from the Dealer's Record of Sale (DROS) file for 1996, provided by the California Department of Justice (CDOJ). Files for later years were used to identify any subsequent sales (see below). All gun tracing records for 1996 through 1999, regardless of the location of the requesting law enforcement agency, were made available by ATF. With few exceptions, guns for which traces are requested have

Exhibit 7
Page 00128

been recovered in a criminal context.[12] ATF attempts to reconstruct the chain of ownership of the gun from its manufacture to its first retail sale; records for completed traces include information on both the seller and buyer in that transaction.

### Forming the Study Population and Identifying Outcome Events

We identified all handguns sold in 1996 from the DROS file, using data from the most recent sale for guns that were sold more than once that year. We then searched DROS records for 1997–1999 to identify subsequent sales of handguns sold in 1996, using manufacturer, serial number, handgun type, and caliber as linking variables. Handguns resold during this follow-up period were omitted from analysis since attributes of the buyer, the transaction, and the retailer would change with the subsequent sale.

Handgun characteristics were then used to link sales records to tracing data. An exact replication of manufacturer, serial number, handgun type, and caliber constituted a successful match. If the handgun matched on manufacturer, serial number, and either caliber or type (but not both), a manual comparison of the records was done, using additional handgun information such as model and barrel length, to determine whether a true match existed.

Our outcome measure was a handgun's recovery by a police agency, followed by a gun ownership trace, conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives, that determined (a) that the recovery had occurred within 3 years of the handgun's most recent purchase from a licensed retailer and (b) that the person who possessed the handgun when it was recovered by police was not its most recent purchaser. We omitted from analysis those handguns that were not recovered by law enforcement but had been purchased by an individual who had bought at least one traced handgun due to the increased likelihood that an untraced gun purchased by such an individual may also have been used in crime but not recovered by police.

### Explanatory Variables

In accordance with the law in several states, we defined a multiple purchase as the purchase of more than one handgun from one or more licensed retailers by an individual within any 30-day period. We identified each handgun as being purchased singly or as part of a multiple sale by linking DROS records using the buyer's last name, first four letters of the first name, date of birth, date of sale, and a unique weapon number assigned by CDOJ. Among multiple-purchase handguns, we identified the subset bought in same-day, multiple-gun transactions. Over the course of 1996, an individual buyer could have bought guns in both single and multiple purchases.

We grouped handguns by type as semi-automatic pistols, revolvers, or derringers and single-shot guns, and categorized caliber as small (.22, .25, .32), medium (.38, .380, 9 mm), or large (.357, .40, .44, .45, .50, 10 mm). Barrel length was defined as short (≤3 in.) or long (>3 in.). We classified handguns as inexpensive if their retail price as a new gun was ≤$150, based on manufacturer. There were eight gun manufacturers that sold only handguns with retail prices of $150 or less in 1996 (Bryco Arms, Davis Industries, Hi-Point Firearms, Jennings Firearms, Lorcin Engineering, Phoenix Arms, Raven Arms, and Sundance Industries). All handguns from these manufacturers were classified as inexpensive. To our knowledge, no other major manufacturers produced handguns in this price range.

Retailer type—dealer, pawnbroker, or importer/manufacturer—was obtained from the DROS data. Retailers were categorized by their total number of handgun

Exhibit 7
Page 00129

sales during 1996 (1–249, 250–999, ≥1,000) and the percentage of purchase applications that were denied because the prospective purchasers were prohibited from possessing firearms (<1%, 1% to <2%, ≥2%).[5,13] The highest category for the percentage of handgun purchase applications denied is higher than the national average.[14] Most denials stem from previous criminal convictions,[15–17] and a high denial percentage might therefore reflect a clientele at increased risk for committing crimes.[3,8,13] Finally, retailers were grouped according to their proximity to a Youth Crime Gun Initiative (YCGI) city (within 25 mi or farther away). YCGI is an ATF initiative to comprehensively trace all crime guns; participating cities agree to trace all guns recovered from criminal suspects and crime scenes.[4]

Handgun purchaser attributes included gender; age; and an occupation, such as law enforcement officer or firearms instructor, which exempted the purchaser from completing a California Basic Firearms Safety Course. (Proof of completion was otherwise mandatory.)

We hypothesized that gun traffickers who sell many guns illegally might be inclined to purchase multiple handguns of the same make, model, and caliber. To capture the number of handguns purchased in 1996 and purchases of essentially identical types of handguns by individual purchasers, we created a variable to describe the number and uniformity of the handguns bought. All handguns purchased by a single individual were compared on manufacturer, handgun type, and caliber classification. Guns had to match on all three variables to be considered alike. We then determined if all, some, or none of each individual's purchased handguns were alike, and all handguns purchased by that individual were assigned to that category.

### Statistical Analysis

We performed separate analyses for all handguns (single- and multiple-purchase) and for multiple-purchase handguns only. Unadjusted odds ratios and their 95% confidence intervals were calculated for each explanatory variable. We then performed a sequence of logistic regression models, adding groups of variables in stages to those already in the model to estimate adjusted odds ratios for a handgun being recovered and traced. The first stage included only the purchase timing variable (single purchase, same-day multiple purchase, or 30-day multiple purchase) and handgun attribute variables. The second stage added retailer variables, and the third stage added purchaser variables. All analysis was done using PC SAS version 8.[18]

This study was approved by the Institutional Review Board of the University of California, Davis.

### RESULTS

The DROS file identified 209,485 handgun sales in California in 1996 by licensed retailers (Figure 1). After exclusions (see figure legend), data for 180,321 handguns (86.1% of all handguns sold in 1996) were available for analysis. Of these handguns, 135,192 (75.0%) were bought singly and 45,129 (25.0%) were part of multiple-handgun purchases. Of the multiple-purchase handguns, nearly half (45.7%) were part of same-day purchases. Among all guns, 722 (0.4%) were traced by ATF following recovery of the gun by the police from someone other than the retail purchaser within three years of the purchase.

Exhibit 7
Page 00130



**FIGURE 1.** Study subject flow chart. Prior to assigning purchase timing (single or multiple), we excluded sale records that were not for handguns, that were duplicate or invalid entries, or were missing key variables. Following purchase timing assignment, we excluded sales to other retailers, earlier sales of guns sold more than once in 1996, and all guns resold within 3 years after purchase. We identified 182,814 handguns; 136,185 (74.5%) acquired in single purchases and 46,629 (25.5%) in multiple purchases. Among the multiple purchase handguns, nearly half (21,686 guns, 46.5%) were bought on the same day with others. Among handguns not recovered by a law enforcement agency, we excluded those which had been purchased by a buyer who had also purchased a traced gun. We also excluded ATF traced handguns where the possessor of the weapon at the time of the trace was the purchaser of the gun. Our final sample was 180,321 handguns (86.1% of all handgun sales in 1996).

In a bivariate analysis for all handguns (Table 1), multiple-purchase handguns bought on the same day with others were more likely to be traced than were single-purchase handguns (odds ratio [OR] 1.33, 95% confidence interval [CI] 1.08 to 1.63). Conversely, handguns purchased by the same individual within 30 days of

Exhibit 7
Page 00131

**TABLE 1   Tracing within 3 years of purchase, following recovery by law enforcement from a person other than the gun's purchaser, for handguns purchased legally in California in 1996**

| Explanatory variable | Traced $N=722$ | Not traced $N=179,599$ | OR[a] | 95% CI[b] | $p$ value |
|---|---|---|---|---|---|
| **Related to purchase** | | | | | |
| Timing | | | | | |
| Same-day multiple | 111 (0.5) | 20,492 (99.5) | 1.33 | 1.08–1.63 | <0.0001 |
| 30-day multiple | 62 (0.3) | 24,464 (99.8) | 0.62 | 0.48–0.81 | <0.0001 |
| Single purchase | 549 (0.4) | 134,643 (99.6) | 1.00 | (Referent) | – |
| **Related to handgun** | | | | | |
| Type | | | | | |
| Derringer and single shot | 47 (0.4) | 11,114 (99.6) | 1.36 | 0.98–1.88 | 0.3900 |
| Semi-automatic pistol | 511 (0.4) | 115,828 (99.6) | 1.42 | 1.19–1.69 | 0.0381 |
| Revolver | 164 (0.3) | 52,648 (99.7) | 1.00 | (Referent) | – |
| Caliber | | | | | |
| Small (.22, .25, .32) | 105 (0.3) | 32,741 (99.7) | 1.11 | 0.87–1.40 | 0.0587 |
| Medium (.38, .380, 9) | 421 (0.5) | 79,229 (99.5) | 1.83 | 1.55–2.17 | <0.0001 |
| Large (.357, .40, .44, .45, .50, 10) | 196 (0.3) | 67,593 (99.7) | 1.00 | (Referent) | – |
| Barrel length | | | | | |
| Short (≤3 in.) | 278 (0.6) | 49,515 (99.4) | 1.65 | 1.42–1.92 | <0.0001 |
| Long (>3 in.) | 439 (0.3) | 129,000 (99.7) | 1.00 | (Referent) | – |
| Price | | | | | |
| ≤$150 | 159 (1.4) | 11,115 (98.6) | 4.28 | 3.59–5.11 | <0.0001 |
| >$150 | 563 (0.3) | 168,484 (99.7) | 1.00 | (Referent) | – |
| **Related to retailer** | | | | | |
| License type | | | | | |
| Importer or manufacturer | 46 (0.7) | 6,227 (99.3) | 2.01 | 1.49–2.71 | 0.0152 |
| Pawnbroker | 80 (0.7) | 11,707 (99.3) | 1.86 | 1.47–2.35 | 0.0468 |
| Dealer | 595 (0.4) | 161,638 (99.6) | 1.00 | (Referent) | – |
| Within 25 mi of YCGI[c] city | | | | | |
| Yes | 500 (0.5) | 93,725 (99.5) | 2.06 | 1.76–2.42 | <0.0001 |
| No | 222 (0.3) | 85,874 (99.7) | 1.00 | (Referent) | – |
| Number of gun sales in 1996 | | | | | |
| ≥1,000 | 302 (0.5) | 59,241 (99.5) | 1.86 | 1.54–2.26 | <0.0001 |
| 250–999 | 263 (0.4) | 63,000 (99.6) | 1.53 | 1.25–1.86 | 0.1597 |
| 1–249 | 157 (0.3) | 57,358 (99.7) | 1.00 | (Referent) | – |
| Denials, % of sales+denials | | | | | |
| ≥2% | 167 (1.1) | 15,556 (98.9) | 4.09 | 3.39–4.94 | <0.0001 |
| 1 to <2% | 244 (0.5) | 45,625 (99.5) | 2.04 | 1.72–2.41 | 0.9295 |
| <1% | 311 (0.3) | 118,418 (99.7) | 1.00 | (Referent) | – |
| **Related to purchaser** | | | | | |
| Gender | | | | | |
| Female | 89 (0.8) | 11,698 (99.2) | 2.02 | 1.62–2.52 | <0.0001 |
| Male | 633 (0.4) | 167,844 (99.6) | 1.00 | (Referent) | |
| Age, years | | | | | |
| 21–24 | 186 (1.0) | 18,136 (99.0) | 4.86 | 3.97–5.95 | <0.0001 |
| 25–29 | 140 (0.6) | 23,429 (99.4) | 2.83 | 2.28–3.52 | 0.0043 |
| 30–39 | 202 (0.4) | 46,035 (99.6) | 2.08 | 1.71–2.53 | 0.0889 |
| 40+ | 194 (0.2) | 91,969 (99.8) | 1.00 | (Referent) | – |
| Safety course exemption | | | | | |
| Law enforcement | 36 (0.2) | 17,632 (99.8) | 0.49 | 0.35–0.69 | <0.0001 |

Exhibit 7
Page 00132

WRIGHT ET AL.

**TABLE 1**   *(Continued)*

| | Number (%) of guns | | | | |
| | Traced *N* = 722 | Not traced *N* = 179,599 | OR[a] | 95% CI[b] | *p* value |
|---|---|---|---|---|---|
| Professional | 55 (0.5) | 10,656 (99.5) | 1.24 | 0.94–1.63 | 0.0004 |
| None | 631 (0.4) | 151,311 (99.6) | 1.00 | (Referent) | – |
| Number and uniformity of all handguns purchased in 1996 | | | | | |
| >1 handgun: all alike | 42 (0.7) | 6,152 (99.3) | 1.58 | 1.15–2.18 | 0.0002 |
| >1 handgun: some alike | 41 (0.4) | 11,652 (99.7) | 0.82 | 0.60–1.13 | 0.1072 |
| >1 handgun: none alike | 196 (0.3) | 59,014 (99.7) | 0.77 | 0.65–0.91 | 0.0008 |
| Purchased only 1 handgun | 443 (0.4) | 102,779 (99.6) | 1.00 | (Referent) | – |

Missing data—handgun type: 9 not traced; caliber: 36 not traced; barrel length: 5 traced, 1,084 not traced; retailer license type: 1 traced, 27 not traced; gender: 57 not traced; age: 30 not traced; number and uniformity of guns purchased: 2 not traced

[a]Odds ratio
[b]Confidence interval
[c]Youth Crime Gun Initiative

another handgun purchase, but not on the same day, were less likely to be traced (OR = 0.62, 95% CI 0.48 to 0.81). Pistols, handguns of medium caliber, and those with short barrels were more likely than other handguns to be traced. Handguns selling new for $150 or less were four times as likely to be traced as were more expensive handguns (OR 4.28, 95% CI 3.59 to 5.11).

Handguns sold by a pawnbroker or importer/manufacturer were twice as likely to be traced as handguns sold by gun dealers. Handguns sold by retailers with denial percentages of 2% or greater were four times as likely to be traced as were handguns sold by retailers with denial percentages of 1% or less (OR 4.09, 95% CI 3.39 to 4.94). Handguns sold by dealers with high sales volume and handguns sold by dealers in close proximity to a city that participated in the YCGI gun tracing program had higher risk of being traced than other handguns. Handguns purchased by females were twice as likely to be traced as were those purchased by males (OR 2.02, 95% CI 1.62 to 2.52), and risk that a handgun would be traced decreased as the age of the purchaser increased. Handguns purchased by individuals who bought more than one gun during the year, and whose purchased handguns were all alike, were more likely to be traced than were handguns purchased by single-gun purchasers (OR 1.58, 95% CI 1.15 to 2.18).

A sequence of logistic regression models for all handguns, with related variables added in stages, is shown in Table 2. Across all models, a handgun's having been purchased on the same day with others, a low selling price, the retailer variables mentioned above, the gender and age of the buyer, and uniformity among all handguns purchased by the buyer were associated with an increase in risk for being traced. We tested for interactions between purchase timing and selected variables (price, gender, number and uniformity of purchases, denial percentage of retailer, number of retailer gun sales); none were identified.

Findings for multiple-purchase handguns only were similar (results not shown; available on request). Handguns that were part of same-day multiple purchases were twice as likely to be traced as were those from purchases spread over 30 days (OR 2.1, 95% CI 1.57 to 2.92).

Exhibit 7
Page 00133

**TABLE 2  Multivariate regression results for all handguns**

| Variable | Handgun variables | | | Handgun and retailer variables | | | Handgun, retailer, and purchaser variables | | |
|---|---|---|---|---|---|---|---|---|---|
| | OR[a] | 95% CI[b] | p value | OR | 95% CI | p value | OR | 95% CI | p value |
| **Related to purchase** | | | | | | | | | |
| Timing | | | | | | | | | |
| Same-day multiple | 1.29 | 1.03–1.56 | 0.0247 | 1.22 | 0.99–1.50 | 0.0587 | 1.29 | 0.97–1.71 | 0.0840 |
| 30-day multiple | 0.70 | 0.54–0.91 | 0.0076 | 0.72 | 0.55–0.93 | 0.0125 | 0.83 | 0.61–1.15 | 0.2610 |
| Single purchase | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Related to handgun** | | | | | | | | | |
| Type | | | | | | | | | |
| Derringer and single shot | 0.87 | 0.62–1.22 | 0.4106 | 0.92 | 0.65–1.29 | 0.6174 | 0.87 | 0.62–1.23 | 0.4238 |
| Semi-automatic pistol | 1.11 | 0.91–1.35 | 0.3097 | 1.08 | 0.88–1.31 | 0.4728 | 0.95 | 0.78–1.16 | 0.6162 |
| Revolver | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| Caliber | | | | | | | | | |
| Small | 0.59 | 0.45–0.77 | 0.0001 | 0.56 | 0.43–0.74 | <0.0001 | 0.62 | 0.47–0.82 | 0.0007 |
| Medium | 1.39 | 1.16–1.67 | 0.0005 | 1.28 | 1.06–1.54 | 0.0106 | 1.25 | 1.04–1.51 | 0.0187 |
| Large | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| Barrel length | | | | | | | | | |
| ≤3 in. | 1.29 | 1.08–1.54 | 0.0048 | 1.25 | 1.05–1.49 | 0.0134 | 1.30 | 1.09–1.56 | 0.0042 |
| >3 in. | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| Price | | | | | | | | | |
| ≤$150 | 4.25 | 3.44–5.26 | <0.0001 | 3.64 | 2.92–4.54 | <0.0001 | 3.12 | 2.50–3.90 | <0.0001 |
| >$150 | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Related to retailer** | | | | | | | | | |
| License type | | | | | | | | | |
| Importer or manufacturer | | | | 1.99 | 1.46–2.71 | <0.0001 | 2.01 | 1.47–2.73 | <0.0001 |
| Pawnbroker | | | | 1.56 | 1.20–2.02 | 0.0009 | 1.49 | 1.14–1.93 | 0.0032 |
| Gun dealer | | | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| Within 25 mi of YCGI[c] city | | | | | | | | | |
| Yes | | | | 1.70 | 1.43–2.03 | <0.0001 | 1.69 | 1.41–2.01 | <0.0001 |

Exhibit 7
Page 00134

WRIGHT ET AL.

| | OR[a] | CI[b] | p | OR[a] | CI[b] | p |
|---|---|---|---|---|---|---|
| No | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Number of gun sales in 1996** | | | | | | |
| 1,000+ | 1.79 | 1.43–2.24 | <0.0001 | 1.62 | 1.29–2.03 | <0.0001 |
| 250–999 | 1.69 | 1.37–2.08 | <0.0001 | 1.57 | 1.27–1.94 | <0.0001 |
| 1–249 | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Denials, % of sales + denials** | | | | | | |
| ≥2% | 3.05 | 2.48–3.76 | <0.0001 | 2.71 | 2.20–3.34 | <0.0001 |
| 1 to <2% | 1.59 | 1.34–1.89 | <0.0001 | 1.50 | 1.26–1.79 | <0.0001 |
| <1% | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Related to purchaser** | | | | | | |
| **Gender** | | | | | | |
| Female | | | | 1.50 | 1.19–1.90 | 0.0005 |
| Male | | | | 1.00 | (Referent) | |
| **Age, years** | | | | | | |
| 21–24 | | | | 4.01 | 3.25–4.94 | <0.0001 |
| 25–29 | | | | 2.49 | 1.99–3.11 | <0.0001 |
| 30–39 | | | | 1.92 | 1.57–2.35 | <0.0001 |
| 40+ | | | | 1.00 | (Referent) | |
| **Safety course exemption** | | | | | | |
| Law enforcement | | | | 0.53 | 0.38–0.76 | 0.0004 |
| Professional | | | | 1.32 | 1.00–1.74 | 0.0541 |
| None | | | | 1.00 | (Referent) | |
| **Number and uniformity of all handguns purchased in 1996** | | | | | | |
| >1 handgun: all like this gun | | | | 1.54 | 1.06–2.26 | 0.0250 |
| >1 handgun: some like this gun | | | | 1.03 | 0.69–1.52 | 0.8958 |
| >1 handgun: none like this gun | | | | 0.91 | 0.73–1.14 | 0.4104 |
| Purchased only 1 handgun | | | | 1.00 | (Referent) | |

Groups of variables were added to the model in stages: (1) related to handgun; (2) related to retailer; (3) related to purchaser. Purchase timing was included throughout.

[a] Odds ratio

[b] Confidence interval

[c] Youth Crime Gun Initiative

Exhibit 7
Page 00135

The effect of applying several risk factors serially is shown in Figure 2. Only 0.4% of all handguns in the study were traced under the conditions that met our definition of an outcome event. Among the 1,783 handguns that were purchased on the same day as others, and from a retailer with an increased percentage of denials (Level 2 in Figure 2), 25 (1.4%) were recovered by police and traced to a purchaser different from the possessor—a risk ratio of 3.5.

## DISCUSSION

For handguns sold by licensed dealers in California in 1996, several specific factors predicted a greater likelihood that a handgun would be later recovered by police within three years of its sale and that the gun's purchaser and its possessor at the time of its recovery would not be the same person. Multiple-purchase handguns bought on the same day with others were at greater risk of being traced than were single-purchase handguns. This was not true for multiple purchase handguns bought over a period of up to 30 days. Gun traffickers may purchase several guns at once, on the same day, to maximize operational efficiency.



**FIGURE 2.** Effect of applying several risk factors serially. *LEVEL 1* same-day multiple purchase; *LEVEL 2* same-day multiple purchase and retailer with denials ≥2% of all prospective purchases; *LEVEL 3* same-day multiple purchase, increased denials, and purchaser age <30; *LEVEL 4* same-day multiple purchase, increased denials, purchaser age <30, and price of gun ≤\$150.

Exhibit 7
Page 00136

Handguns purchased by individuals who bought multiple similar guns were 58% more likely to be used in crime than were handguns purchased by individuals who purchased only one handgun in 1996. This is a substantial difference. A case from our data illustrates the point: One purchaser bought 100 handguns in three transactions (two same-day multiple purchases and one single purchase). All handguns were Lorcin 9 mm pistols, costing $150 or less when purchased new. Nine of these handguns were traced by ATF within three years following purchase; another 10 appeared in a separate California database of guns recovered and held as evidence.

Koper[6] identified an increase in risk of tracing for multiple-purchase handguns, irrespective of the timing of the multiple purchase, in the first two years following purchase. Our study considered additional factors relating to the retailer and the purchaser, and one year of sales data with a three-year follow-up. These variations may explain the differences between the two studies. Webster and colleagues have recently shown that one-gun-a-month statutes are not associated with less intrastate gun trafficking.[19] Studies in other jurisdictions would be useful in identifying subsets of multiple-purchase handgun transactions that are disproportionately associated with guns that are later used in crime.

Several of the factors we associated with handguns' risk for being traced have been identified previously. These include a low selling price,[20,21] a female purchaser,[5] a younger buyer,[4,5] and a high percentage of denied sales and sales volume for the retailer.[5,13]

Others of our findings have not previously been reported. Risk for being traced was nearly twice as great for handguns sold by retailers licensed as manufacturers and importers as for those sold by gun dealers. We conducted a post hoc analysis of trace completion rates by retailer type to investigate the possibility that some traced handguns were linked to these firms only because the retailer actually selling the gun had not been identified. Completion rates were the same for traces for all three categories of retailers. Some of those licensed as manufacturers or importers have been the subject of site visits conducted by one of the authors for another study,[13] and all of these were functioning as retail sellers. This remains a subject for further investigation.

Our findings are subject to several limitations. We used a handgun's appearance in ATF's trace records, a proxy for use in crime, as our measure of outcome. To help focus our findings on activities associated with gun trafficking, we defined outcome events restrictively as traces occurring within three years of purchase and involving purchasers and possessors who were different people. ATF estimates the median time from sales to trace is nearly twice as long,[4] and our results should not be generalized to the larger population of recovered crime guns. Studies of that larger population have yielded similar results, however.[3,10]

Handgun sales records did not include the selling price or distinguish new from used guns. Our classification of guns as to cost was necessarily based on their selling price as new guns. We were not able to identify handguns that were sold used at much less than their original price, resulting in misclassification of some inexpensive guns as expensive.

The handguns in this study were purchased nearly 13 years ago. However, recent tracing data are not available, and it is unlikely that gun markets have changed substantially since that time. Four states—California, Maryland, Virginia, and New Jersey—now restrict handgun purchases to no more than one within a 30-day period. The remaining states do not limit the number of guns that can be purchased at one time; our findings likely reflect the current situation in those states.

Exhibit 7
Page 00137

Legitimate gun collectors may also buy many guns over the course of a year, and California's handgun sales records do not differentiate these purchasers from others. Our uniformity variable was devised in part in the belief that collectors would be less likely than purchasers for gun trafficking operations to buy many essentially identical handguns at once, but this belief has never been empirically tested. The mixed results that we and Koper have obtained may be due in part to an inability to distinguish multiple purchases by legitimate collectors from other multiple purchases.

Our findings provide some specific directions for future intervention and research. Handguns that are bought on the same day with others, are inexpensive, are purchased by young people or women, are acquired in purchases that involve multiple identical guns, or are sold by retailers whose clienteles include a disproportionate number of persons with significant criminal histories appear to be more likely than others to be used in crime. Law enforcement agencies and policymakers may wish to take such patterns into account in designing future monitoring and intervention programs and violence prevention policies. For example, some local and state law enforcement agencies have units that combat illegal gun sales and rely upon the same type of data used in this study—archives of handgun sales records and ATF traces of crime guns. ATF requires licensed retailers to report the sale of multiple handguns to the same individual within five business days, and these reports are already used to develop leads for gun trafficking investigations. Our findings should help these units to consider which of the thousands of crime gun traces to follow up with an investigation of possible trafficking.

Our findings are relevant to potential legislative initiatives as well. A ban on the sale of low-quality (and therefore inexpensive), highly concealable handguns, for example, has been associated with a decrease in firearm homicides.[21] In addition, a large gun dealer's voluntary decision to discontinue sales of these low-quality handguns led to a dramatic reduction in the rate at which guns sold by that dealer were diverted to the criminal market.[22] Future research efforts should examine further the relationship between multiple-gun purchases, particularly guns bought on the same day, and risk for use in crime, and should seek data directly from persons involved in illegal gun commerce.

## ACKNOWLEDGEMENTS

This journal article was supported by grants from The California Wellness Foundation (#20000130, #2007-151), The Eli & Edythe L. Broad Foundation, The Joyce Foundation, The David and Lucille Packard Foundation (#99-8827, #2001-17381), and the Richard and Rhoda Goldman Fund.

**OPEN ACCESS**  This article is distributed under the terms of the Creative Commons Attribution Noncommercial License which permits any noncommercial use, distribution, and reproduction in any medium, provided the original author(s) and source are credited.

## REFERENCES

1. Hepburn LM, Miller M, Azrael D, Hemenway D. The US gun stock: results from the 2004 national firearms survey. *Inj Prev.* 2007;13:15-19.
2. Rand MR. *Criminal Victimization, 2008*. Washington DC: Bureau of Justice Statistics; 2009. NCJ 227777.

Exhibit 7
Page 00138

WRIGHT ET AL.

3. Crime in the United States 2008. Washington DC: Federal Bureau of Investigation; 2009. Available in http://www.fbi.gov/ucr/cius2008/index.html.

4. Bureau of Alcohol, Tobacco and Firearms. *Crime Gun Trace Reports (2000)—National Report*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2002.

5. Wintemute GJ, Cook PJ, Wright MA. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Inj Prev.* 2005;11:357-363.

6. Koper CS. Purchase of multiple firearms as a risk factor for criminal gun use: implications for gun policy and enforcement. *Criminol Public Policy.* 2005;4:749-778.

7. Bureau of Alcohol, Tobacco and Firearms. *Operation snapshot: an analysis of the retail regulated firearms industry.* Washington DC: Bureau of Alcohol, Tobacco and Firearms; 2000.

8. Bureau of Alcohol, Tobacco and Firearms. *Following the gun: enforcing federal laws against firearms traffickers*. Washington DC: Bureau of Alcohol, Tobacco and Firearms; 2000.

9. Braga AA, Cook PJ, Kennedy DM, Moore MH. The illegal supply of firearms. In: Tonry M, ed. *Crime and justice: a review of research*. Chicago, IL: The University of Chicago Press; 2002:319-352.

10. Pierce GL, Braga AA, Hyatt RRJ, Koper CS. Characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. *Justice Q.* 2004;21:391-422.

11. Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings on gun dealers on the supply of new guns to criminals. *Inj Prev.* 2006;12:225-230.

12. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Rev.* 2001;43:277-309.

13. Wintemute GJ. Disproportionate sales of crime guns among licensed handgun retailers in the United States: a case control study. *Inj Prev.* 2009;15:291-299.

14. Bureau of Justice Statistics. *Background Checks for Firearm Transfers, 2008—Statistical Tables*. Washington DC: Bureau of Justice Statistics; 2009. NCJ 227471.

15. Violence Prevention Research Program. *Handgun commerce in California, 2000*. Sacramento, CA: Violence Prevention Research Program; 2004.

16. Wright MA, Wintemute GJ, Claire BE. People and guns involved in denied and completed handgun purchases. *Inj Prev.* 2005;11:247-250.

17. Bowling M, Lauver G, Hickman M, Adams DB. *Background checks for firearm transfers, 2003*. Washington, DC: Bureau of Justice Statistics; 2004. NCJ 210117.

18. SAS Institute. *SAS system for Windows, version 9.1*. Cary, NC: SAS Institute; 2003.

19. Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *J Urban Health*. 2009;86:525-537.

20. Wintemute GJ. *Ring of fire: the handgun makers of Southern California*. Sacramento, CA: Violence Prevention Research Program; 1994.

21. Webster D, Vernick J, Hepburn L. Effects of Maryland's law banning "Saturday night special" handguns on homicides. *Am J Epidemiol.* 2002;55:406-412.

22. Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices of the supply of guns to criminals. *J Urban Health*. 2006;83:778-787.

Exhibit 7
Page 00139