1  ROB BONTA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  JERRY T. YEN
   Deputy Attorney General
4  State Bar No. 247988
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-7836
     Fax: (916) 324-8835
7    E-mail: Jerry.Yen@doj.ca.gov
   *Attorneys for Rob Bonta, in his official*
8  *capacity as California Attorney General, and*
   *Allison Mendoza, in her official capacity as*
9  *Director of the Department of Justice Bureau*
   *of Firearms*
10
             IN THE UNITED STATES DISTRICT COURT
11
          FOR THE SOUTHERN DISTRICT OF CALIFORNIA
12

13

14

15  **MICHELLE NGUYEN, et al.,**          Case No. 3:20-cv-02470-WQH-MMP

16                         Plaintiffs,   **EXHIBITS 8-11 TO THE**
                                         **DECLARATION OF JERRY T.**
17          **v.**                       **YEN IN SUPPORT OF**
                                         **DEFENDANTS' MOTION FOR**
18                                       **SUMMARY JUDGMENT**
    **ROB BONTA, in his official capacity**
19  **as Attorney General of California, et**  Date:        To be set by the Court
    **al.,**                             Judge:       Hon. William Q. Hayes
20                                       Courtroom:   14B
                           Defendants.   Action Filed: Dec. 18, 2020
21

22

23

24

25

26

27

28

                                   1
─────────────────────────────────────────────────────

**EXHIBITS**

**TABLE OF CONTENTS**

| Exhibit | Description | Pages |
|---|---|---|
| Exhibit 3 | Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996) | 00001-00004 |
| Exhibit 4 | Virginia State Crime Commission, *Study of Virginia's Law on Handgun Purchase Limits*, House Document No. 28 (1996) | 00005-00073 |
| Exhibit 5 | Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749 (2005) | 00074-00104 |
| Exhibit 6 | Anthony A. Braga, *Long-Term Trends in the Sources of Boston Crime Guns*, 3 RSF: The Russell Sage Found. J. Soc. Sci. 76 (2017) | 00105-00125 |
| Exhibit 7 | Mona A. Wright, et al., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances that Suggest Gun Trafficking*, 87 J. Urban Health 352 (2010) | 00126-00139 |
| Exhibit 8 | Expert Report and Declaration of Joseph L. Bisbee (with relevant exhibits) | 00140-00157 |
| Exhibit 9 | Expert Report and Declaration of Kevin M. Sweeney | 00158-00179 |
| Exhibit 10 | Expert Report and Declaration of Jennifer M. McCutchen | 00180-00210 |
| Exhibit 11 | Expert Report and Declaration of Brennan Rivas | 00211-00242 |
| Exhibit 12 | Plaintiff Dominic Boguski's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00243-00252 |

2

| Exhibit | Description | Pages |
|---|---|---|
| Exhibit 13 | Plaintiff Frank Colletti's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00253-00262 |
| Exhibit 14 | Plaintiff Jay Medina's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00263-00272 |
| Exhibit 15 | Plaintiff Michelle Nguyen's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00273-00282 |
| Exhibit 16 | Excerpts from William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* (University of North Carolina Press 1996) | 00283-00305 |
| Exhibit 17 | Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2022) | 00306-00332 |

3

# Exhibit 8

Exhibit 8
Page 00140

1    ROB BONTA, State Bar No. 202668
     Acting Attorney General of California
2    ANTHONY R. HAKL, State Bar No. 197335
     Supervising Deputy Attorney General
3    JERRY T. YEN, State Bar No. 247988
     Deputy Attorney General
4      1300 I Street, Suite 125
      P.O. Box 944255
5      Sacramento, CA 94244-2550
      Telephone:  (916) 210-7836
6      Fax:  (916) 324-8835
      E-mail:  Jerry.Yen@doj.ca.gov
7    *Attorneys for Defendants Rob Bonta, in his*
     *official capacity as California Attorney*
8    *General, and Luis Lopez, in his official*
     *capacity as Director of the Department of*
9    *Justice Bureau of Firearms*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,**<br><br>               Plaintiffs,<br><br>     **v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California, et al.,**<br><br>           Defendants. | Case No. 3:20-cv-02470-WQH-MDD<br><br>**EXPERT REPORT AND DECLARATION OF JOSEPH L. BISBEE** |

1

**EXPERT REPORT AND DECLARATION OF
JOSEPH L. BISBEE**

**INTRODUCTION AND QUALIFICATIONS**

1.      I have been retained by the Attorney General's Office for the State of California to provide my opinion on whether California law (Cal. Penal Code § 27535) limiting individuals from purchasing more than one handgun or semiautomatic centerfire rifle every thirty days can help reduce illegal firearms trafficking and subsequent illegal activity.  It is my understanding that this law does not preclude individuals from acquiring firearms, but merely limits the number they can purchase within a specified time period.  This law also does not limit the overall number of firearms an individual can possess.

2.      I am the principal officer of Armed With Knowledge (AWK), a business aimed at education and outreach in regards to firearms issues.  AWK focuses on several areas including public education, policy development, strategies to reduce firearms-related violent crime, and expert consulting.

3.      Prior to creating AWK, I was a special agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for more than 25 years.  During my career as an ATF special agent, I focused on firearms trafficking investigations, analyzing how criminals acquire firearms, training other law enforcement officers on firearms investigations, assessing and recommending "best practices" to law enforcement agencies on issues involving illegal firearms, and other issues related to the illegal acquisition and disposition of firearms both domestically and internationally. Exhibit 1 provides an overview of my ATF career.

4.      As a special agent for the ATF, I have been involved in hundreds of investigations into illegal firearms trafficking and have been the case agent on numerous investigations involving organized groups illegally acquiring and disposing of firearms.  These investigations have involved thousands of firearms.

2

The majority of these cases involved the interstate and intrastate movement of firearms, but I have also been involved in the investigation of international firearms trafficking.

5.      While I was at ATF, I testified as an expert witness in U.S. District Court and Superior Court (Washington, D.C.).  I have testified to the identification of firearms, as well as the movement of firearms across state lines.  As seen in *U.S. v. Thomas Bing*, D.D.C., Case No. 01cr00270–05, I am one of very few individuals that have been recognized as an expert in firearms trafficking in federal criminal court.

6.      I have also served as an expert in *LaManno v. WalMart*, Circuit Court of Jackson County, Missouri, Case Number 1616-CV08764, and in *City of Kansas City, Missouri v. Jimenez Arms*, Circuit Court of Jackson County, Missouri, Case Number 2016-CV00829.  I was deposed in both cases.

7.      In preparing this report, I have relied on my general knowledge, training, experience, and expertise.  In addition, I have reviewed in whole or in part the materials cited in my report below.

8.      I am being compensated for my time in this matter at my normal billing rate, currently $150 per hour ($250 per hour for depositions and trial testimony.) This compensation is not contingent upon the nature of my findings or on the outcome of this litigation.

### IMPACT OF LIMITING FIREARMS PURCHASES ON FIREARMS TRAFFICKING AND CRIME

9.      The Gun Control Act of 1968, which was later amended by the Brady Handgun Violence Prevention Act in 1993, sets forth specific requirements for the purchase and sale of firearms.  While ATF has been tasked with enforcing the Gun Control Act since its passage, based on my experience, ATF did not begin a uniform, agency-wide effort to identify and investigate firearms trafficking

1    organizations until the mid-1980s.  Around that time, ATF developed a program to

2    more effectively trace firearms and track multiple firearm sales.

3        10.    Early in my career as an ATF special agent, I learned the significance

4    of monitoring "multiple sale" information, and that multiple sales were a key

5    firearms trafficking indicator that could be used to help identify individuals

6    involved in illegal firearms trafficking.  At the ATF, "multiple sale," also called a

7    "multiple purchase," generally refers to the sale of more than one handgun to an

8    individual by a licensed retail gun dealer within five consecutive business days.

9    This definition has evolved for certain States to now include some long guns.  A

10   "multiple sale" triggers a notification be sent to ATF.  The presence of this indicator

11   alone provides important data regarding potential firearms trafficking.  Indeed, the

12   fact that ATF, which is tasked with reducing the criminal misuse of firearms,

13   requires notification of multiple purchases by an individual reinforces the

14   connection between multiple purchases and illegal firearms activity.

15       11.    As I progressed in my career and worked on complex conspiracy

16   firearms trafficking investigations involving a number of individuals, I continued

17   to utilize multiple sales information to identify criminal organizations.  I also found

18   that many criminals prefer firearms that are "new in the box", and thus traffickers

19   benefited from being able to purchase multiple firearms from licensed dealers in a

20   short period of time.  The ability to deal in volume is also important to traffickers

21   in order to maximize their profits.  In other words, the more firearms that can be

22   acquired in a short period of time, the more money traffickers can make.

23       12.    I have personally created training programs and trained well over one

24   thousand law enforcement officers on firearms trafficking investigations.  These

25   training programs cover all aspects of investigations, from pre-planning to

26   investigative analysis to investigative tactics.  A large component of the training

27   programs involve identifying suspected trafficking operations.  All of my firearms

28   trafficking training programs instruct investigators to utilize multiple sales as a way

4

1  to identify firearms trafficking operations and/or further firearms trafficking
2  investigations.

3  *Firearms Acquired in Multiple Sales Have Been Used in Crimes*

4      13.    During my time investigating illegal firearms trafficking, I frequently
5  saw that firearms recovered in crimes originated from a multiple sale.  These crime
6  gun recoveries were "traced" in order to determine their first retail purchaser.
7  Firearms tracing is the systematic tracking of the history of a gun from manufacturer
8  through the wholesale and retail distribution chain and ultimately to a retail
9  purchaser.  ATF is the only agency capable of performing crime gun traces on a
10  national level.  Crime gun recoveries traced back to a multiple sale are particularly
11  worrisome due to the likelihood that all the firearms purchased as part of that
12  multiple sale have been sold to, or otherwise acquired, by other criminals.

13      14.    The *U.S. v. Bing* case, where I was recognized as an expert, is a good
14  example of the interplay between the sale of firearms in a short period of time to an
15  individual and illegal firearms trafficking.  This case involved a group of
16  individuals acquiring multiple firearms from gun dealers in the State of Georgia.
17  By having the ability to make multiple purchases, the group was able to illegally
18  traffic at least 35 firearms from Georgia to other states, as well as Washington,
19  D.C., for criminal use.

20      15.    While receiving reports of multiple sales can provide investigative
21  leads, the fact remains that illegally trafficked firearms associated with a multiple
22  sale have already been obtained by criminals before law enforcement can step in
23  and recover those guns.  Rarely, if ever, do all firearms associated with illegal
24  trafficking get recovered before at least some are used in a crime.

25      16.    One example is an investigation I conducted into Reginald Edwards.
26  Mr. Edwards lived in Ocala, Florida, and made multiple purchases of firearms for
27  criminals in Washington, D.C.  I initiated this case after one of Mr. Edwards'
28  firearms was used in a drive-by shooting that injured a child.  During my

5

investigation, none of the roughly ten firearms purchased by Mr. Edwards were recovered prior to being involved in a crime.  Mr. Edwards was convicted on federal firearms trafficking charges in the Middle District of Florida.[1]

17.    Another example is an investigation I conducted into Rasi Robinson.  Mr. Robinson had previously been convicted of a firearms offense in Washington, D.C., but told police he "would get more guns once that case was over."[2]  Mr. Robinson moved to Columbus, Ohio, and kept that promise.    Mr. Robinson recruited a number of straw purchasers and began illegally supplying firearms to criminals in Washington, D.C.  In total, I was able to identify 21 firearms associated with Mr. Robinson's criminal enterprise.  On a number of occasions, Mr. Robinson instructed the straw purchasers to buy multiple firearms at one time.  The difficulty in coordinating straw purchasers often leads traffickers to engage in multiple sales.  The firearms involved in this case were recovered in a number of crimes including illegal firearms possession, drug offenses, and a homicide committed by Mr. Robinson himself.

*Criminals Use Multiple Sales to Engage in Firearms Trafficking*

18.    Of particular note, during my time assigned to a Firearms Trafficking Group in Washington, D.C., Virginia had a "one handgun per month" law.  This meant that under most circumstances unlicensed individuals could only purchase one handgun within a 30-day period.  During this time, I was recognized in a *Washingtonian* magazine article as the "top federal gun-hunter in D.C." and was quoted saying "(t)he one-gun-a-month law in Virginia has affected people's ability to bring a quantity of guns into the District."[3]

---

[1] *U.S. v Edwards*, M.D. Fla., Case No. 5:01cr00009.

[2] Theodore Decker, "Ohio gun-sale laws easily circumvented," *The Columbus Dispatch*, May 30, 2011, https://www.dispatch.com/article/20110530/news/305309835 (last visited Oct. 15, 2021), Exh. 2.

[3] Harry Jaffe, "DC Gun Rights: Do You Want This Next To Your Bed?",

19.    This *Washingtonian* magazine article also highlighted a firearms trafficking investigation that circumvented Virginia's one handgun per month law. Garfield Headlam was enlisted in the Navy and stationed in Norfolk, Virginia. However, Mr. Headlam had ties to a criminal gang operating in Washington, D.C. Mr. Headlam recruited numerous straw purchasers to buy him one handgun per month that he subsequently provided to criminals in Washington, D.C. Having to recruit more straw purchasers increases the likelihood that one of those straw purchasers gets caught and leads law enforcement to the trafficker. This is what happened in the Headlam case.

20.    The Headlam investigation uncovered 57 illegally acquired firearms. As the case agent, I was leading surveillance of Mr. Headlam in Virginia and witnessed him purchase one handgun and one semi-automatic rifle, destined for Washington, D.C. Virginia's law at the time only prevented the multiple purchase of handguns, not rifles, within a 30-day period, which allowed him to purchase both types of firearms in a single transaction. Mr. Headlam was eventually convicted of firearms trafficking.

21.    While serving his prison sentence, Mr. Headlam was interviewed by *The Virginian-Pilot*.[4] In that interview, Mr. Headlam admitted that Virginia's one-gun-a-month law hampered his ability to traffic firearms because it required him to recruit a number of straw purchasers. As stated by Mr. Headlam, "I'm proof the law works." In fact, when I interviewed Mr. Headlam after his arrest, he told me that he wanted to be a big-time trafficker, but the Virginia restriction on multiple

---

*Washingtonian*, March 1, 2008, https://www.washingtonian.com/2008/03/01/dc-gun-rights-do-you-want-this-next-to-your-bed/, Exh. 3.

[4] Joanne Kimberlin, "As street values rise, gun thieves get bolder," *The Virginian-Pilot*, March 4, 2008, https://www.pilotonline.com/government/nation/article_e9f0e3d2-5bc4-5a0d-90dd-a1e3cd6c2b51.html, Exh. 4.

1  sales made it hard for him to acquire large quantities of firearms in a short period
2  of time.

3      22.    I have reviewed numerous publications and reports that support the
4  fact that multiple purchases are a strong firearms trafficking indicator.  For
5  example, one article concluded that multiple sales "appear to account for roughly a
6  quarter of guns used in crime and a number of studies provide indirect indications
7  that guns sold in these transactions are more likely to be trafficked and used in
8  crime."[5]  Another article found that "restricting purchases of handguns to 1 per
9  month [was] an effective way to disrupt the illegal movement of guns across state
10  lines."[6]  Finally, according to a United States Government Accountability Office
11  Report, "ATF has identified multiple sales or purchases of firearms by a
12  nonlicensee as a 'significant indicator' of firearms trafficking."[7]

13      23.    I have also reviewed the analysis evaluating the effectiveness of
14  Virginia's one gun per month law in reducing the number of illegal firearms sourced
15  from the state.  According to one report, "Virginia's one-gun-a-month statute…has
16  had its intended effect of reducing Virginia's status as a source state for gun
17  trafficking."[8]

18
19
20  [5] Christopher S. Koper, "Crime Gun Risk Factors: Buyer, Seller, Firearm,
21  and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun
Use," *Journal of Quantitative Criminology* (2014) 30:285-315, 290, Exh. 5.

22  [6] Douglas Weil and Rebecca Knox, "Effects of Limiting Handgun Purchases
23  on Interstate Transfer of Firearms," *The Journal of the American Medical Association*, June 12, 1996, 275:1759-1761, 1761, Exh. 6.

24  [7] United States Government Accountability Office Report, Firearms
25  Trafficking, "U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning
26  and Coordination Challenges," June 2009, https://www.gao.gov/assets/gao-09-709.pdf.

27  [8] Virginia State Crime Commission, "Study of Virginia's Law on Handgun
28  Purchase Limits," House Document No. 28, 1996, Exh. 7.

24.     My understanding is that the California law limiting handgun and semiautomatic centerfire rifle purchases to one every thirty days contains a number of exemptions.   For example, some of those exemptions permit law enforcement agencies, peace officer, licensed collectors, security companies, and the entertainment industry to purchase more than one handgun or semiautomatic centerfire rifle within a thirty-day period.  In my experience, many of these exempt entities have rarely, if ever, been involved in the criminal misuse of firearms purchased as part of a multiple sale.

## CONCLUSIONS

25.     In my opinion, the California law limiting the purchase of handguns and semiautomatic centerfire rifles to one every thirty days helps reduce the incidence of illegal firearms trafficking.  My training and experience leave no doubt that firearms traffickers utilize multiple sales to procure quantities of firearms for illegal use.  Limiting the ability of criminals to acquire multiple firearms in a short period of time reduces the profit motive and decreases the chances of illegal trafficking.

26.     In addition, my investigations into illegal firearms trafficking has shown that firearms initially acquired through multiple sales have been used in crimes.   Therefore, it is my opinion that limiting purchases of handguns and semiautomatic centerfire rifles to one every thirty days can also help reduce the use of firearms in crimes.

9

Exhibit 8
Page 00149

1       I declare under penalty of perjury that the foregoing is true and correct, and

2   if called as a witness would testify competently to them.

3

4       Executed on November 18, 2021, at Seattle, Washington.

5

6   Joseph L. Bisbee

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert Report and Declaration of Joseph Bisbee (3:20-cv-02470-WQH-MDD)

Exhibit 8
Page 00150

# EXHIBIT 1

Exhibit 8
Page 00151

QUALIFICATIONS OF JOSEPH L. BISBEE

1) I was employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) between September 1989 and March 2015.  During this time I held the positions of special agent, project officer, assistant country attaché, and group supervisor.

2) Between September 1989 and April 1995, I was assigned to the Youngstown, Ohio Field Office.  The majority of my investigations related to firearms violations, including the identification and investigation of firearms traffickers operating between Ohio and such market areas as Detroit, Michigan; Philadelphia, Pennsylvania; and others.

3) In April 1995, I was promoted to the Firearms Enforcement Branch, Bureau Headquarters (BHQ) as a project officer. During this time, I was an active participant in the development and implementation of firearms related investigative programs within ATF.  I also met with high ranking Bureau and Treasury representatives regarding monitored cases and conducted training sessions on firearms trafficking related issues.  In 1998, BHQ asked me to lead the ATF/US Customs, Country Assessment for Barbados in relation to their capabilities in addressing firearms related violent crime as well as investigations of illegal firearms.

4) Between November 1997 and February 2001, I was assigned to ATF's Washington Group II Field Office.  This office is devoted to the investigation of firearms trafficking violations.  During this period, I conducted numerous domestic illegal firearms trafficking investigations and because of my expertise in this area, was selected by BHQ to be the case agent on a sensitive investigation involving the attempted assassination of the Police Commissioner of Japan.

5) Between February 2001 and January 2004, I was assigned to the US Consulate in Vancouver, B.C., Canada, as ATF's Assistant Country Attaché.  In this position I was tasked with coordinating international firearms trafficking investigations as well as providing training to Canadian law enforcement on firearms related matters.  In 2002, BHQ assigned me to be the US representative to the Trafficking in Small Arms Working Group in relation to the G-8 Summit in Alberta, Canada.

6) Between January 2004 and September 2012, I returned to ATF's Washington Group II Field Office and again focused on illegal firearms trafficking investigations.  I have been the case agent on numerous investigations in which hundreds of firearms have been identified as illegally moving between source States such as Ohio, West Virginia, Kentucky, North Carolina, and others; and market areas including the Washington, D.C. metropolitan region.  As a result of my experience in the firearms trafficking arena, the March 2008 issue of the Washingtonian Magazine profiled me as "the top federal gun-hunter in DC".  Also, in 2010, BHQ asked that I be the ATF investigative representative for the El Salvador Country Assessment.  I utilized information gathered from meetings with numerous law enforcement, military, and government leaders to recommend ways El Salvador can improve its efforts in addressing firearms crime.

7) In September 2012, I was promoted to the Seattle Field Division as the Group Supervisor for the ATF Violent Gang Task Force.  This Group focuses on armed violent criminals and criminal

Exhibit 8
Page 00152

organizations utilizing firearms illegally. Many of the investigations I oversaw involved the illegal trafficking of firearms to criminal street gangs and Mexican Drug Trafficking Organizations in which Washington was the source State.

8) I have received instruction in both general and specific courses in pursuing firearms trafficking investigations. This training includes study at the Federal Law Enforcement Training Center with successful completion of Criminal Investigator School and New Agent Training, which dealt with ATF specific instruction. I also attended and successfully completed ATF Firearms Interstate Nexus School and Advanced Interstate Nexus School, which provided specific instruction on determining the origin and movement of firearms and ammunition.

9) I have been an instructor on firearms related investigative activity to local law enforcement officers in the State of Ohio; the International Law Enforcement Academies in Budapest, Hungary and Gaborone, Botswana; the Vancouver, B.C., Police Department; the Royal Canadian Mounted Police; and many others, as well as providing instruction at ATF's International Firearms Trafficking Conferences. I was asked to prepare and present a case study on one of my firearms trafficking investigations to the FBI's National Academy for State and Local Law Enforcement. I have also provided firearms trafficking training to new agents at ATF's National Academy in Glynco, Georgia.

10) I have previously testified as an expert witness in the areas of determining the origin and movement of firearms, illicit prices of illegally trafficked firearms, firearm trafficking indicators, and other issues related to illegal firearms trafficking.

11) I am currently the Principal Officer for Armed with Knowledge, a business dedicated to educating the public on firearms issues and providing assistance on policy development and investigations to government, law enforcement and related organizations.

Exhibit 8
Page 00153

**EXHIBIT 2**

Exhibit 8
Page 00154

# The Columbus Dispatch

## Ohio gun-sale laws easily circumvented

Posted May 30, 2011 at 12:01 AM
Updated May 30, 2011 at 9:59 AM

When Rasi Robinson was arrested with a gun in 1999, he told Washington, D.C., police he probably would get more guns once that case was over.

When Rasi Robinson was arrested with a gun in 1999, he told Washington, D.C., police he probably would get more guns once that case was over.

He kept his word. Robinson is now serving time for gun trafficking and manslaughter.

Officials say his case illustrates how easily gun laws can be circumvented and how guns bought at a central Ohio store can be used in crimes both near and far.

Robinson, now 33, called D.C. home, but he moved to Columbus around 2002 and started dealing drugs. He also used "straw buyers" to purchase guns here that he would then sell in D.C.

Wayne L. Dixie Jr., assistant special agent in charge of the Columbus field division of the Bureau of Alcohol, Tobacco, Firearms and Explosives, explained how it's done.

"An individual who has a criminal history who legally can't purchase firearms, he or she then goes and gets a number of individuals who have clean criminal histories or no criminal history at all and has them straw purchase firearms," Dixie said. "I've had cases myself where, for example, they paid a college student 25 bucks."

By November 2004, Robinson had recruited at least four women to buy guns for him. Two were drug customers. Two others were romantically involved with him.

Exhibit 8
Page 00155

"It's pretty common for a male with a strong personality to use women to get what they want," said ATF agent Joseph L. Bisbee. "It works the same with firearms trafficking."

Together, the women bought at least 16 guns.

Bisbee, who is based in D.C., said he got onto the Robinson case when a gun seized in the district was traced back to a woman who had bought it at Vance's Shooters Supplies on Cleveland Avenue in Clinton Township.

Bisbee talked to the woman and people around her and tracked down the other straw buyers. He learned that the man for whom they had bought guns was known as "Dre" and sold drugs from a Columbus apartment complex off Dresden Street. He also learned Dre might have killed someone.

Columbus homicide detectives told the ATF that Dre likely was Robinson, a suspect in the Nov. 20, 2004, slaying of 18-year-old Sharif Sharif.

All four women eventually pleaded guilty. Based largely on their testimony, Robinson was indicted on gun charges in September 2006. He fled to Kentucky but was arrested there in late 2007.

With Robinson locked up, Bisbee teamed up with Columbus cold-case detective Dana Farbacher to close the homicide by speaking to once-skittish witnesses.

A break came when a gun pulled on a police officer in D.C. was found to be the same gun that had killed Sharif.

It also had been bought by one of Robinson's straw purchasers, though she told police she had purchased it for herself. She reported it stolen in July 2004 and remembered only later that Robinson had had access to her place when it disappeared, police said.

Farbacher said Sharif was killed because he sold drugs on turf that Robinson considered his.

Robinson was sentenced to 41 months in federal prison for gun trafficking. He now is serving 10 years in state prison for the death of Sharif.

Exhibit 8
Page 00156

Of the 16 firearms linked to his ring, police have found only three. The rest, agents say, might still be on the streets.

tdecker@dispatch.com

Exhibit 8
Page 00157

# Exhibit 9

Exhibit 9
Page 00158

Rob Bonta
Attorney General of California
Anthony R. Hakl
Supervising Deputy Attorney General
Jerry T. Yen, State Bar No. 247988
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
  Fax: (916) 324-8835
  E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his
official capacity as California Attorney
General, and Allison Mendoza, in her official
capacity as Director of the Department of
Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,** | |
| Plaintiffs, | |
| **v.** | Case No. 3:20-cv-02470-WQH-BGS |
| **ROB BONTA, in his official capacity as Attorney General of California, et al.,** | **EXPERT REPORT AND DECLARATION OF KEVIN M. SWEENEY** |
| Defendants. | |

1

**EXPERT REPORT AND DECLARATION OF**
**KEVIN M. SWEENEY**


**INTRODUCTION AND QUALIFICATIONS**

1.　　I am a Professor of History *emeritus* at Amherst College.  From 1989 to 2016, I taught history and American Studies at Amherst.  I regularly offered courses on colonial American history, the era of the American Revolution, and early American material culture, which focused on studying the production and use of home furnishings and other artifacts in common use dating from the 1600s, 1700s, and early 1800s.  During these years, in my own research on material culture, I made use of colonial-era probate inventories to study such topics as home furnishings in an effort to discover what types of possession were commonly found in households, to measure changes in standards of living, and to gain insights into domestic architecture.[1]  I also examined critically and wrote about the strengths and weaknesses of these sources, their usefulness and pitfalls.[2]  For decades, historians who are aware of these records' usefulness and their limitations have used estate inventories to study agricultural changes in England, wealth and social structures in England and its colonies, the institution of slavery in colonial American and the lives of slaves, and household possessions in America, England, and France.[3]

---

[1] Kevin M. Sweeney, "Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800 in *Material Life in America, 1600-1860,* Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-290.

[2] Kevin M. Sweeney, "Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987*, Peter Benes, editor (Boston: Boston University Press, 1989), 32-40.

[3] For some notable examples which also contain informed observations on the use of probate inventories, their biases, and how to deal with the biases, see James Horn, *Adapting to a New World: English Society in the Seventeenth-Century*

2

2.      My current research on seventeenth- and eighteenth-century firearms and militias utilizes similar types of methodologies, documentary sources, and period artifacts.  As part of my on-going project, I have given papers at the annual meetings of the American Historical Association and the Organization of American Historians, at conferences on firearms and society at Stanford and Wesleyan Universities, and elsewhere, and published two essays, *Firearms Militias, and the Second Amendment*, *in* THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON DISTRICT OF COLUMBIA V. HELLER (Saul A. Cornell and Nathan Kozuskanich eds., 2013), 310-382, and *Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019), 54-71.  A third essay is forthcoming on **"**Revolutionary State Militias in the Backcountry and Along the Frontiers," and I am currently working on a fourth essay, as well as working on a book-length manuscript entitled "Guns and Governments: Creating and Arming Militias in England and America, circa 1300 to 1815."  My curriculum vitae, detailing my education, experience, and publications, is attached to this declaration as **Exhibit A**.

3.      I have filed declarations as an expert witness in the following cases: *Hanson v. District of Columbia*, Case No. 1:22-cv-02256-RC (D.D.C.); *Delaware State Sportsmen's Assoc., Inc. v. Delaware Dept. of Safety and Homeland Security*,

*Chesapeake* (Chapel Hill: University of North Carolina Press, 1994); Gloria L. Main, *Tobacco Colony: Life in Early Maryland, 1650-1720* (Princeton: Princeton University Press, 1982), esp. 49, 171-174, 282-286; Philip D. Morgan, *Slave Counterpoint: Black Culture in the Eighteenth-Century Chesapeake & Lowcountry* (Chapel Hill: University of North Carolina Press, 1998); Carole Shammas, *The Pre-Industrial Consumer in England and America* (Oxford: Oxford University Press, 1990), esp. 19-20; Lorna Weatherill, *Consumer Behaviour & Material Culture in Britain 1660-1760*, 2nd ed. (London: Routledge, 1996), esp. 201-207.

3

Case No. 1:22-cv-00951-RGA (D. Del.); *Oregon Firearms Federation Inc. v. Brown,* Case No. 2:22-cv-01815-IM (D. Or.); *Rupp v. Bonta,* Case No. 8:17-cv-00746-JDE (C.D. Cal.); *Wiese v. Bonta*, Case No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Sullivan v. Ferguson,* Case No. 3:22-cv-05403-DGE (W.D. Wash.).

4.      I have been retained by the California Attorney General's Office to provide an expert opinion on the ownership of firearms and the firearms market in eighteenth-century America.  I make this declaration on the basis of my training, professional expertise, and research.  For my work in this case, I am being compensated at a rate of $100 per hour.

## PRODUCTION OF FIREARMS AND THEIR DISTRIBUTION IN EIGHTEENTH-CENTURY AMERICA

5.      A lack of suitable documentary sources makes it difficult to recover and analyze patterns in firearm sales in late eighteenth-century America.  Few gunsmiths' account books survive and, as will be seen below, those that do survive fail to provide much information on the sale of new firearms.  Storekeepers' account books do not offer much help either.  It is only by looking elsewhere to gain an understanding of the production, marketing, and ownership of eighteenth-century firearms that one can obtain some insight into the sale and purchase of firearms in America during this era.

6.      In the eighteenth century, producing a muzzle-loading musket or rifle took a great deal of time and demanded a varied skill set.  The work began with forging, boring, and finishing a barrel.[4]  This process required two men with blacksmithing skills and would have taken several days.  Making the lock mechanism that fired the weapon was the most demanding job and required an

---

[4] The most informative account of the making of a muzzle-loading firearm is *The Gunsmith of Williamsburg* (Colonial Williamsburg Productions, 1969).  Since 2009, it has been available as a DVD and it can also be found on-line at https://www.youtube.com/watch?v=X_O1-chxAdk.

4

ability to work with both iron and steel.  Woodworking skills were needed to rough out and finish a gun's walnut, maple, or cherry stock.  Brass parts for the lock plate, trigger guard, butt plate, thimbles (for holding the ramrod), and other mountings had to be cast, filed, and polished.  The barrel and lock had to be fitted into and attached to the stock along with the mountings.  Building an entire musket from scratch would have taken a gunsmith an entire week and possibly as long as a month for a finely made and elaborately decorated long rifle.[5]  Working with a couple of assistants, a colonial gunsmith might have been able to make two to possibly three muskets a week if some of the more intricate parts such as the lock mechanism were obtained from other sources.[6]

7.    Estimates of the number of gunsmiths working in the American colonies on the eve of the Revolution range from 350 to 3,000.[7]  The exact number is actually beside the point for understanding the production and sale of firearms during the period.  Most guns sold in late eighteenth-century America came from England, and American gun makers typically made repairs instead of producing new firearms.[8]  A rare surviving account book of an inland gunsmith, John Partridge Bull of Deerfield, Massachusetts indicates that he made only three

---

[5] Robert F. Smith, *Manufacturing Independence: Industrial Innovation in the American Revolution* (Yardley, PA: Westholme, 2016), 12; *The Gunsmith of Williamsburg,* at 56 minutes, 29-30 seconds.

[6] Smith*, Manufacturing Independence*, 10, 12.

[7] Smith, *Manufacturing Independence*, 34, 222.  Smith's estimate was apparently calculated from entries in Arcadi Gluckman and L. D. Satterbee, *American Gunmakers* (Harrisburg, PA: Stackpole Publishing, 1953).  The undocumented claim of 2,500 to 3,000 guns is found in George D. Moller, *American Military Shoulder Arms* (1993; Albuquerque: University of New Mexico Press, 2011), Vol. 1, 107.  Moller's estimate appears to me to be too high.

[8] Ed Crews, "The Gunsmith's Shop" in *Colonial Williamsburg Journal* (Autumn 2000). <Accessed on line at https://research.colonialwilliamsurg.org/ foundation/journal/Autumn00/guns on 5/1/2023>

new guns over a period of 20 years from 1768 to 1788, while performing 452 repairs on existing firearms.[9]  The account book of James Anderson, another late eighteenth-century gunsmith working in Williamsburg, Virginia, also lists only gun repairs.[10]  Anderson does not appear to have made any new guns before the American Revolution.[11]  When it came to the gunsmithing business, skilled craftsmen such as Anderson and Bull may have had more in common with a twentieth-century TV repairman than they did with gun manufacturers like Samuel Colt or Oliver Winchester.

8.     English records and American newspapers provide some insight into the volume and character of the trans-Atlantic importation of firearms both before and after the American Revolution.  At the time, most English firearms were fabricated by large-scale putting-out systems that obtained barrels from one set of suppliers, got gunlocks from other sources, and assembled the parts at yet another site where the firearms also would have been stocked by woodworkers.  During the mid-eighteenth-century, gun manufacturing in Birmingham, England involved "at least thirty different 'sub-trades' or manual manufacturing processes."[12]  In particular, this is how firearms were made for the British army and for the export trade to Africa and England's colonies.  Division of labor and economies of scale enabled English gunmakers to outproduce and undersell competitors.

9.     During the years from 1756 to 1763, at least 36,592 muskets and

---

[9] Susan McGowan, "Agreeable to his Genius: John Partridge Bull (1731-1813)," Deerfield, Massachusetts (M.A. thesis, Trinity College, 1988), 5, 39-40, 74-75.

[10] Harold B. Gill, Jr., *The Gunsmith of Colonial Virginia* (Williamsburg, VA: The Colonial Williamsburg Foundation, 1974), 22-27, 64-68.

[11] *Id.*, 23.

[12] David Williams, *The Birmingham Gun Trade* (Stroud, Gloucestershire, Eng.: The History Press, 2009), 21.

other long arms were imported into the thirteen American colonies from England for civilian customers.[13]   Another 18,900 inexpensive, smooth-bore "trading guns" were imported  to exchange with Native Americans who supplied colonial traders with furs or deerskins. [14]  Most of the pistols purchased by Americans were not produced in the colonies, and 4,400 pairs of pistols were imported during this eight-year period.[15]  Advertisements indicate that urban gunsmiths in the colonies sold imported firearms and made use of imported gunlocks and barrels.[16]  The domestic production of long rifles was one niche market where colonial gunsmiths did dominate production.[17]  Newspaper advertisements indicate that after the War for Independence, American merchants and gunsmiths resumed the importation of English firearms.[18]

10.     These figures suggest that the number of newly made firearms available for sale during the later eighteenth century would have been modest in comparison to the size of the growing population of the thirteen American

---

[13] De Witt Bailey*, Small Arms of the British Forces in America 1664-1815*, (Woonsocket, RI: Andrew Mowbray, 2009), 237.

[14] De Witt Bailey, "The Wilson Gunmakers to Empire, 1730-1832" in *American Society of Arms Collectors Bulletin* No. 85, 19.

[15] Bailey, *Small Arms of British Forces*, 215; Jeff Kinard*, Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 46

[16] Edward Annely, *New York Gazette*, 7/25/1748; John Dodd, *South Carolina Gazette,* 2/25/1764; Nathan and Joseph Cranch, *Massachusetts Spy*, 5/21/1772; Joseph Coolidge, *Boston Gazette,* 10/19/1772.

[17] Crews, "The Gunsmith's Shop".

[18] Lawson and Price, *South Carolina Weekly Gazette*, 9/6/1783; Edward Pole, *Freeman's Journal* [Philadelphia] 12/3/1783; S & S Salisbury*, Continental Journal* [Boston], 2/29/84; Stewart, Hayes, and Company, *South Carolina Gazette,* 8/10/84; Frederick Cockle, *Independent Journal* [New York City] 10/16/1784; Robert Barnhill, *Independent Gazetteer* [Philadelphia], 10/30/84.

7

colonies, which is estimated to have been 2.5 million in 1775 [19]  Almost one-fifth of these inhabitants were enslaved Africans and African-Americans, though as discussed below some slaves did have access to firearms.  The number of free white males over the age of 16 in 1775 was somewhere between 400,000 and 500,000, suggesting that 13,000 to 20,000 free white males turned 16 each year and, in most colonies, theoretically became subject to militia duty.[20]  Assuming that on average 8,000 or even 10,000 firearms were being imported annually suggests that the number of available firearms was not keeping pace with population growth, with a presumably increasing demand, and with the need to replace old firearms.  (The British army operated on the assumption that its robust Brown Bess musket, which was designed to survive hard usage by soldiers in the field, had to be replaced after 8 to 10 years of service.[21])

---

[19] Evarts B. Greene and Virginia D. Harrington, *American Population before the Federal Census of 1790* (New York: Columbia University Press, 1932), 6-7.

[20]  Computations as follows: 2,000,000 divided by 5 (which is sometimes used to calculate the proportion of males of militia age in a period population) produces an estimate of 400,000 free white males over the age of 16.  Alternatively, 2,000,000 divided by 2 for 1,000,000 free white males divided by 2 produces an estimate of 500,000 free white males over 16, which I think is a more accurate formula to determine the number of males over 16 in the later 1700s.  The number of males aged 16 to 20 is estimated as being one-fifth of all males over 16 – though I have found one-sixth is more accurate – results in an estimate of 66,666 to 100,000 free white males aged 16 to 20.  All of which produces an estimate of 13,333 to 20,000 free white males reaching the age of 16 annually.

[21]  J. A. Holding, *Fit for Service: The Training of the British Army 1715-1795* (New York: Oxford University Press, 1981), 140.

**Table 1: Categorization of Eighteenth-century Male Probate Inventories by the Number of Firearms Listed in Each Inventory**

| Category | Number of Inventories | Percentage of Total Inventories | Number of Firearms | Number of Pistols* | Number of Old Firearms* | Number of Parts or Broken Firearms* |
|---|---|---|---|---|---|---|
| **Inventories with 0 Firearms** | 1,627 | 53.7% | 0.0 | 0.0 | 0.0 | 0.0 |
| **Inventories with 1 Firearm** | 837 | 27.6% | 837 | 8 (1.0%) | 206 (24.6%) | 23 (2.7%) |
| **Inventories with 2 Firearms** | 292 | 9.6% | 584 | 70 (12.0%) | 95 (16.3%) | 25 (4.3%) |
| **Inventories with 3 Firearms** | 136 | 4.5% | 408 | 119 (29.2%) | 70 (17.2%) | 11 (2.7%) |
| **Inventories with 4 Firearms** | 67 | 2.2% | 268 | 99 (36.9%) | 18 (6.7%) | 9 (3.3%) |
| **Inventories with 5 Firearms** | 28 | 0.9% | 140 | 40 (28.6%) | 28 (20.0%) | 10 (7.1%) |
| **Inventories with 6 to 9 Firearms** | 32 | 1.1% | 213 | 57 (26.8%) | 45 (21.1%) | 5 (2.3%) |
| **Inventories with 10 or more Firearms** | 10 | 0.3% | 185 | 49 (26.5%) | 77 (41.6%) | 1 (0.5%) |
| **Totals** | 3,029 | 99.9% | 2,635 | 442 (16.8%) | 539 (20.5%) | 84 (3.2%) |

**NOTE:** * The percentages in these columns are percentages of each type or condition of firearms expressed as a percentage of the total number of firearms in each category found in the "Number of Firearms" column.  Sources:  The sources for the probate inventories used in this table can are listed in Kevin M. Sweeney, "Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Press, 2019), 70-71.

9

11.     Eighteenth-century Americans' dependence on their existing stock of firearms was one reason why American gunsmiths had to devote so much of their time to repairing firearms instead of fabricating new ones.  Table 1 categorizes into groups the probate inventories 3,029 male decedents according to the number of firearms listed in their inventories.  These probate inventories suggest that while the ownership of firearms was widespread, it does not appear to have been universal, and in particular, evidence of the ownership of more than one firearm was found in only 18.6% of the inventories.

12.     Evidence from probate inventories and contemporary descriptions also indicate that a significant proportion of the era's firearms was seen as being "old".  In some instances, such as the "old & sorry smooth bore gun" owned by Marylander John Downey who died in 1773, the characterization of "old" may be due primarily to the firearm's condition.  Other firearms still in use in the late eighteenth century were in fact very old.  For example, while not referred to as "old," the "Queen Ann's gun" owned by Reverend Ebenezer Prince, who died on Long Island, New York in 1784, was probably been made in England sometime between 1712 and 1720.[22]  A contemporary's account of a Revolutionary era militia muster also describes "an old soldier [who] carried a heavy Queen's arm [i.e. circa 1712-1720 English musket] with which he had done service at the conquest of Canada twenty years previous [i.e. 1760], while by his side walked a stripling boy with a Spanish fusee not half its weight or calibre, which his grandfather may have taken at the Havana [circa. 1741], while not a few had old French pieces, that dated back to the reduction of Louisburg [in 1745]."[23]  At the

---

[22]   Estate of Ebenezer Prince, 1784, New York [State] Court of Probates, 1779-1786, Vol. 1, 250-264, film J2301-04, New York State Archives, Albany, NY.

[23]   Quoted in David Hackett Fischer, *Paul Revere's Ride* (New York: Oxford University Press, 1994), 161.

10

battle of Lexington in April of 1775, 18-year-old Solomon Brown carried a musket with a barrel from a French Model 1728 rampart musket, a lock from a Model 1754 French infantry musket, and a stock made of American cherry.[24] Other long-serving American muskets and fowlers from this period sometimes contained an even more international amalgamation of parts and evidence of repairs.[25]

13.    The reused elements from other firearms in Solomon Brown's musket and the gun parts listed in probate inventories played a critical role in keeping eighteenth-century Americans armed.  Some probate inventories contained broken weapons far beyond repair or reuse such as "the remains of a gun" found in the 1796 probate inventory of Gideon Wheelock of Hartwick, Massachusetts.[26]  However, the gun barrels listed in probate inventories could have had life left in them and were therefore worth saving because fabricating a barrel was the most time-consuming part of producing a new firearm from scratch.  In Williamsburg, Virginia during the early days of the American Revolution, William Geddy, a gunsmith and brass founder, removed old doglock firing mechanisms from seventeenth-century firearms and reused their barrels.[27] Most of Geddy's work in 1775 and 1776 appears to have involved making new parts to repair old guns, instead of making new firearms from scratch.[28]

---

[24]  Bill Ahearn, *Muskets of the Revolution and Other Colonial Wars* (Lincoln. RI: Andrew Mowbray, 2005), 120-123.

[25]  *Id.*, 104-112, 124-131.

[26]  Estate of Gideon Wheelock, 1796, Worcester County [Massachusetts] Probate Records, Vol., 27, 137, Massachusetts Archives, Boston, Mass.

[27]  Ivor Noël Hume, *James Geddy and Sons Colonial Craftsmen*, Colonial Williamsburg Archaeological Series No. 5 (Williamsburg, VA: Colonial Williamsburg Foundation, 1970), 18-19.

[28]  *Id.*, 17-22.

14.     As a general rule, those individuals who left probated estates containing more than one firearm were those who could afford to do so.  This included the inventories of merchants, traders, and shopkeepers who were involved in selling firearms.[29]  Most strikingly – but not surprisingly – this group also included a disproportionate number of Southern plantation owners.  All ten of the individuals whose probate inventories contained 10 firearms or more were South Carolinians who owned an average 95 slaves.  Of the 32 probate inventories with 6 to 9 firearms, 22 (68.8%) were Southerners who owned plantations and slaves.  In the categories of probate inventories listing 5 guns, 4 guns, and 3 guns, 146 (63.2%) of the 231 decedents were Southern slaveowners.  In all of these groups that owned 3 or more firearms, a significant and atypical number of the firearms were pistols.  The 273 probate inventories that listed 3 or more firearms accounted for only 19.5% of 1,402 inventories listing firearms, but they contained 82.4% of the pistols found in this entire group of probate inventories.

15.     The presence of pistols and of a larger than average number of long arms in the inventories of plantation owners was more than just an expression of their wealth.  These firearms were directly related to controlling the source of their wealth: slave labor.  The movements and activities of slaves outside of their home plantations were policed by mounted and armed patrols of white

---

[29] For example, see Estate of Thomas Brown, 1747, Vol. M-M 162-169, South Carolina Inventories of Estates, Vol. MM, 1746-1748 at https://www.fold3.com/publication/700/south-carolina-estate-inventories-and-bills-of-sale-1732-1872; Estate of William Molineaux, 1774, Jones, *American Colonial Wealth*, Vol. 2, 958-963; Estate of Philip Hart, 1797, Charleston County [South Carolina] Inventories,  Vol. C, 1793-1800, 242-244, microfilm, Historic Deerfield Library, Deerfield, Mass.

militiamen.[30]  Pistols, which could be used more easily on horseback, were particularly useful firearms while participating in slave patrols.  In fact, a 1734 South Carolina law required every person serving on a slave patrol to "provide himself and always keep, a good horse, one pistol, and a carbine or other gun, a cutlass [and] a cartridge box with at least 12 cartridges in it."[31]

16.     The role of long arms in controlling slaves was, as a rule, more subtle.  Some of a plantation's firearms would have been intended for use by slaves.  There was in fact a special category of inexpensive smooth-bore firearms known as plantation guns.[32]  Masters would allow trusted slaves to use firearms to hunt birds and small game.  In Maryland and South Carolina, the system was actually regularized by a law requiring masters to issue licenses or "tickets" to slaves carrying firearms.[33]  Hunting and birding gave some slaves an opportunity to augment their limited and often monotonous diets.[34]  Archaeologists' discovery

---

[30] On colonial slave patrols see Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (Cambridge: Harvard University Press, 2001), 6-40, 93-98, 154-162.

[31] *Statutes at Large of South Carolina*, Thomas Cooper, ed., (Columbia, SC: A. S. Johnston, 1838), Vol. 3, 395.

[32] Estate of Archibald McNeill, 1774, Estate of Peter Manigault, 1774, and Estate of Eljjah Postele, 1774, in Alice Hanson Jones, ed., *American Colonial Wealth: Documents and Methods*, 3 volumes (New York: Arno Press, 1977), Vol. 3, 1539-1542, 1543-1557, 1576-1582.

[33] *Archives of Maryland*, William Hand Brown, ed., Vol. 1-ongoing (Baltimore: Maryland Historical Society, 1883-1972), Vol. 75, 268; *Statutes at Large of South Carolina*, David J. McCord, ed., (Columbia, SC: A. S. Johnston, 1840), Vol. 7, 404-405.

[34] Patricia Samford, "Archaeology of African-American Slavery and Material Culture" Vol. 53, No. 1 *William and Mary Quarterly* (January 1996), 95-9; Philip D. Morgan, *Slave Counterpoint: Black Culture in the Eighteenth-Century Chesapeake and Lowcountry* (Chapel Hill, NC: published for the Omohundro Institute of Early American History and Culture by the University of North Carolina Press, 1998), 139-140.

of flints, shot, and even some gun parts on the sites of former slave quarters indicates that this practice was widespread.[35]

17.     No other large category of gun owners had a similarly compelling need for possessing more than one or perhaps two firearms.  The 1744 probate inventory of gunsmith James Geddy of Williamsburg, Virginia contained 2 pairs of pistols (which were mostly likely to have been imported) and that of gunsmith Daniel Dalton of Charleston, South Carolina listed 14 "old guns" when he died in 1784.[36]  Some individuals who owned a rifle also had a second smooth-bore gun better suited to birding or vermin control.[37]  In any case, the presence of old "guns" in larger than average groups of firearms suggests that these lots did not result from the frequent purchase of new guns, or in the case of gunsmith Daniel Dalton, did not result from producing new firearms instead of repairing old firearms.

---

[35]  Samford, "Archaeology of African-American Slavery and Material Culture," 96; Philip D. Morgan and Andrew Jackson O'Shaughnessy, "Arming Slaves in the American Revolution" in Christopher Leslie Brown and Philip D. Morgan, eds, *Arming Slaves: From Classical Times to the Modern Age* (New Haven: Yale University Press, 2006), 185.

[36] Estate of James Geddy, 1744, York County [Virginia] Deeds, Orders, and Wills, Vol. 19, 321-322, typed transcription, Department of Historic Research, Colonial Williamsburg Foundation, Williamsburg, VA; Estate of Daniel Dalton, 1784, Charleston County [South Carolina] Inventories, Vol. A, 1783-1787, 200, microfilm, Historic Deerfield Library, Deerfield, Mass.

[37] For example, Estate of Abner Drake, 1746, Augusta County [Virginia] Will Book no. 1, 1746-1753, 29-30, Virginia State Library, Richmond; Estate of William Gabel, 1774, Jones, *American Colonial Wealth*, Vol. 1, 79-80; Estate of Peter Strol, 1774, Jones, *American Colonial Wealth*, Vol 1, 96-97; Estate of John Moss, 1774, Lunenburg County [Virginia] Will Book no. 2, 1770-1778, 389-392, Virginia State Library, Richmond; Estate of Peter Cousins, 1775, Lunenburg County [Virginia] Will Book no 2, 1770-1778, 406-410, Virginia State Library, Richmond.

## SUMMARY

18.    To summarize, the evidence gathered from documentary sources such as probate inventories and from surviving firearms suggests that America's gun culture in the late eighteenth-century was based on the need to make do rather than buying new.  In addition, most gun owners had only one firearm for militia duty, shooting vermin, and possibly hunting.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently to them.

Executed on May 19, 2023, at Greenfield, Massachusetts.

_Kevin M. Sweeney_

Kevin M. Sweeney

15

# EXHIBIT A

Exhibit 9
Page 00174

## Curriculum Vitae: Kevin M. Sweeney

Home Address:  9 Orchard Street,
                         Greenfield, MA  01301
Home Phone:     (413) 774-5027
E-mail:             kmsweeney@amherst.edu

**Education:**   Ph.D. in History    1986, Yale University.
                    B.A.   in History    1972, Williams College.

**Employment:**

2000-2016    Professor of History and American Studies, Amherst College.
1993-2000    Associate Professor of History and American Studies, Amherst College.
1989-1993    Assistant Professor of History and American Studies, Amherst College.
1986-1989    Director of Academic Programs, Historic Deerfield, Deerfield, Mass.
1985-1986    Assistant Professor, Winterthur Museum, Winterthur, Delaware.
1980-1984    Administrator-Curator, Webb-Deane-Stevens Museum, Wethersfield, Conn.
1978-1980    History Instructor, Westover School, Middlebury, Conn.

**Other Academic Appointments:**

2007           Visiting Faculty, American Studies Seminar, American Antiquarian Society, Worcester,
                   Mass.
1987-1989    Assistant Professor of American Studies at Smith College under the Five
                   College Program.
1985-1986    Adjunct Assistant Professor, Early American Culture, University of
                   Delaware.
1982-1984    Visiting Lecturer in American Studies, Trinity College, Hartford, Conn..
1981           Adjunct, Art History Department, University of Hartford.

**Declarations Filed as an Expert Witness**

2022           *Hanson v. District of Columbia*, Case No. 1:22-cv-02256-RC.
2023           *Delaware State Sportsmen's Assoc., Inc. v. Delaware Dept. of Safety and Homeland
                   Security*, United States District Court. District of Delaware, Case No. 1:22-cv-00951-RGA.
2023           *Oregon Firearms Federation Inc. et al v. Tina Kotek et. al. and Oregon Alliance for Gun
                   Safety,* United States District Court, District of Oregon, Pendleton Division, Case No.
                   2:22-cv-01815-IM.
2023           *Rupp v. Bonta,* United States District Court for the Central District of California Western
                   Division, Case No. 8:17-cv-00746-JDE

Exhibit 9
Page 00175

**Academic Honors and Prizes:**

2003   Book Prize, New England Historical Association.
2003   Award of Merit, American Association for State and Local History.
1995   Harold L. Peterson Award, Eastern National Parks & Monuments Association.
1986   Jamestown Prize of the Institute of Early American History and Culture,
         Williamsburg, VA.
1986   Frederick W. Beinecke Prize in History, Yale University.
1973   Mary Cady Tew Prize in History, Yale University.
1972   William Bradford Turner Prize in American History, Williams College.
1971   Phi Beta Kappa, Williams College.

**Publications:**

   **Books**

With Evan Haefeli, co-editors, *Captive Histories: English, French and Native Narratives
   of the 1704 Deerfield Raid* (Amherst, Mass.: University of Massachusetts Press, 2006).

With Evan Haefeli, *Captors and Captives: The 1704 French and Indian Raid on
   Deerfield* (Amherst, Mass.: University of Massachusetts Press, 2003). Awarded 2003 Book Prize, New
   England Historical Association and 2003 Award of Merit, American Association for State and Local
   History.

   **Articles/Book Chapters/Catalogue Essays**

"Revolutionary State Militias in the Backcountry and Along the Frontiers," *The American Revolution on
   the Frontier*, edited by Seanegan Sculley, Sons of the American Revolution 2022 Conference
   Proceedings, (publication forthcoming).

"Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in
   Jennifer Tucker, Barton C. Hacker, and Margaret Vining, editors *A Right to Bear Arms? The Contested
   Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian
   Scholarly Press, 2019), 54-71.

"Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, editors*, The
   Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of
   Massachusetts Press, forthcoming August 2013), 310-382.

 "Mary Rowlandson: Taken by Indians," *American Heritage* 58:5 (Fall 2008): 23-25.

"Early American Religious Traditions: Native Visions and Christian Providence," *OAH Magazine of
   History* (January 2008):8-13.

With Jessica Neuwirth, Robert Paynter, Braden Paynter and Abbott Lowell Cummings, "Abbott Lowell
   Cummings and the Preservation of New England," *The Public Historian* 29:4 (Fall 2007):57-81.

With Evan Haefeli, "*The Redeemed Captive* as Recurrent Political Text*" The New England*

Exhibit 9
Page 00176

*Quarterly* (September 2004):341-367.

"The 1704 French and Indian Raid on Deerfield" *New England Ancestors* 5:1 (Winter 2004): 23-26.

"Regions and the Study of Material Culture: Explorations along the Connecticut River" for *American Furniture*, Luke Beckerdite, editor (Milwaukee, Wis.: Chipstone Foundation/ the University Press of New England, 1995), 145-166.

With Evan Haefeli, "Revisiting *The Redeemed Captive*: New Perspectives on the 1704 Attack on Deerfield" *William and Mary Quarterly* 3rd ser. 52:1(January 1995):3-46. Awarded the 1995 Harold L. Peterson Award, Eastern National Parks & Monument Association, and the 1995 Essay Prize, Society of Colonial Wars.

With Evan Haefeli, "Wattanummon's World: Personal and Tribal Identity in the Algonquian Diaspora, c. 1660-1712" in William Cowan, ed., *Papers of the Twenty Fifth Algonquian Conference* (Ottawa, 1994), 212-224.

"High Style Vernacular: Lifestyles of the Colonial Elite " in *Of Consuming Interests: The Style of Life in Eighteenth-Century America*, edited by Ronald Hoffman, Cary Carson, and Peter J. Albert (Charlottesville: University of Virginia Press, 1994),1-58.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1995.

"Meetinghouses, Town Houses, and Churches: Changing Perceptions of Sacred and Secular Space in Southern New England, 1725-1850" *Winterthur Portfolio* 28:1 (Winter 1994):59-93.

"Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987,* Peter Benes, ed. (Boston: Boston University Press, 1989), 32-40.

"Gentlemen Farmers and Inland Merchants: The Williams Family and Commercial Agriculture in Pre-Revolutionary Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1986*, Peter Benes, ed. (Boston University Press, 1988), 60-73.

"Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800," *Connecticut Antiquarian* 36:2 (1984): 10-39. Revised and reprinted in *Material Life in America, 1600-1860*, Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-290.

"From Wilderness to Arcadian Vale: Material Life in the Connecticut River Valley, 1635 to 1760" and "Gravestones" in *The Great River: Art and Society of The Connecticut Valley, 1635-1820* (Wadsworth Atheneum, Hartford, CT., 1985), 17-27, 485-523.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1985.

"Where the Bay Meets the River: Gravestones and Stonecutters in the River Towns of Western Massachusetts, 1690-1810," *Markers III*, David Watters, ed. (Association for Gravestone Studies, 1985),1-46.

"Mansion People: Class, Kinship and Architecture in Western Massachusetts in the Mid-18th Century," *Winterthur Portfolio* (Winter 1984):231-255.

Exhibit 9
Page 00177

"Furniture and furniture making in mid-eighteenth-century Wethersfield, Connecticut" *Antiques* 125:5 (May 1984), 1156-1163.


"River Gods in the Making: The Williams Family in Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1981*, Peter Benes, ed. (Boston University Press, 1982), pp. 101-116. Reprinted in a *Place Called Paradise: 1654-2004*, edited by Kerry Buckley (Amherst, Mass.: University of Massachusetts Press, 2004), 76-90.


**Exhibitions:**

2007-2008    Consultant, "Shays's Rebellion," N. E. H. Funded Web-Exhibition, Springfield Technical Community College and Pocumtuck Valley Memorial Association.

2003-2005    Consultant and Contributor, "The Many Stories of 1704," N.E.H. Funded Web-exhibition, Pocumtuck Valley Memorial Association. 2005 Museums and Webs Award Winner; 2005 Award of Merit, American Association for State and Local History; 2007 Merlot History Classics Award and others.

1984-1985    Consultant and Contributor, "The Great River: Art and Society of the Connecticut Valley, -1820" Catalogue awarded Charles F. Montgomery Prize for 1985 by the Decorative Arts Society; Award of Merit from the American Association for State and Local History, 1986; Honorable Mention, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1986.

1982    Consultant and Contributor, "Two Towns: Concord and Wethersfield - A Comparative Exhibition of Regional Culture, 1635-1850," 1982. N. E. H. Funded Exhibition.


**Films/Videos:**

2012    Contributor, *Cherry Cottage, The Story of an American House*, Dave Simonds, Williamstown, Mass.

2009    Contributor, *The Forgotten War: The Battle for the North Country,* Mountain Lake Public Television, Plattsburg, NY.

2005    Contributor, *Captive: The Story of Esther,* VisionTV and Aboriginal Peoples Television Network, Canada.

2003    Contributor, *New England's Great River: Discovering the Connecticut,* Vermont Public Television, Burlington, VT


**Memberships in Professional and Scholarly Societies:**

American Historical Association.

Exhibit 9
Page 00178

Colonial Society of Massachusetts.
Massachusetts Historical Society.
Organization of American Historians.
Society of Military Historians

**Other Professional Activities**

| | |
|---|---|
| 2008-2010 | Chair, History Department, Amherst College. |
| 2005-2007 | Chair, American Studies Department, Amherst College. |
| 2003-2004 | Consultant, "Remembering 1704: Context and Commemoration of the Deerfield Raid" Pocumtuck Valley Memorial Association and Historic Deerfield, Inc. |
| 1997-2001 | Consultant, "Turns of the Centuries" Project, Pocumtuck Valley Memorial Association. |
| 1997-1999 | Chair, History Department, Amherst College. |
| 1997-1998 | Consultant, Exhibition entitled "Performing Arts: The Refinement of Rural New England," Historic Deerfield., Inc. |
| 1996-1998 | Member, Advisory Committee for the Dickinson Homestead, Amherst College. |
| 1994-1995 | Chair, Committee on Priorities and Resources, Amherst College. |
| 1993-1995 | Chair, American Studies Department, Amherst College |
| 1992 | Consultant, "Forty Acres: A Reinterpretation Initiative," Porter-Phelps-Huntington Foundation, Hadley, Mass. |
| 1991 | Consultant, "Furniture-making in Central New England, 1790-1850," Old Sturbridge Village. |
| 1991-1994 | Member, Five College Standing Committee on American Indian Studies. |
| 1986-1989 | Member, Five College American Studies Steering Committee. |
| 1981-1986 | Member, Advisory Committee for Historic Deerfield. |

4/28/2023

Exhibit 9
Page 00179

# Exhibit 10

Exhibit 10
Page 00180

1    ROB BONTA
     Attorney General of California
2    ANTHONY R. HAKL
     Supervising Deputy Attorney General
3    JERRY T. YEN, State Bar No. 247988
     Deputy Attorney General
4      1300 I Street, Suite 125
       P.O. Box 944255
5      Sacramento, CA 94244-2550
       Telephone:  (916) 210-7836
6      Fax:  (916) 324-8835
       E-mail:  Jerry.Yen@doj.ca.gov
7    *Attorneys for Defendants Rob Bonta, in his*
     *official capacity as California Attorney*
8    *General, and Allison Mendoza, in her official*
     *capacity as Director of the Department of*
9    *Justice Bureau of Firearms*

10

11                 IN THE UNITED STATES DISTRICT COURT

12              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16   **MICHELLE NGUYEN, et al.,**

17                              Plaintiffs,

18          **v.**                      Case No. 3:20-cv-02470-WQH-BGS

19   **ROB BONTA, in his official capacity**   **EXPERT REPORT AND**
     **as Attorney General of California, et**  **DECLARATION OF JENNIFER M.**
20   **al.,**                          **MCCUTCHEN**

21                              Defendants.

22

23

24

25

26

27

28

                                   1

# EXPERT REPORT AND DECLARATION OF
# JENNIFER M. MCCUTCHEN

## INTRODUCTION AND QUALIFICATIONS

1.      I am an Assistant Professor of History at the University of St. Thomas in St. Paul, Minnesota.  I assumed this position on September 1, 2022.  From September 1, 2019, to August 31, 2022, I was an Assistant Professor of History at the University of Southern Maine.  I regularly offer courses in the colonial and Early Republic eras of United States History, the history of the American Revolution, and Native American History.

2.      I have a Ph.D. in History from Texas Christian University, awarded in 2019.  My expertise includes the history of trade, exchange, and diplomacy between Native peoples and Europeans in the eighteenth century, with a specific focus on gunpowder and firearms.  I have several publications in this field including peer-reviewed articles in the academic journals *Terrae Incognitae* and *Studies in Eighteenth-Century Culture*.  I also have a forthcoming, peer-reviewed article in *Ethnohistory* which will be published in July 2023.  I am currently completing an 80,000-word book manuscript, based on my dissertation research, which uses the gunpowder trade as a lens to explore diplomacy between members of the Creek Confederacy and British / American officials during the second half of the eighteenth century.  The manuscript proposal is currently under review with the University of Oklahoma Press.  My current curriculum vitae is attached as **Exhibit A** to this declaration.

3.      I have been retained by the California Attorney General's Office to provide an expert opinion regarding laws pertaining to gun ownership and the trade and sale of firearms in the late colonial and founding / Early Republic United States.  I am being compensated at a rate of $200 per hour.

**PROFESSIONAL OPINIONS**

4.     I have been asked to provide my opinion on the history of firearms ownership and laws related to the sale and trade of guns during the late colonial and founding / Early Republic eras of the United States.  For the purposes of this declaration, I use "guns" or "firearms" interchangeably, though I designate the differences regarding rifles, muskets, long arms, and trade guns.

5.      Below, I make three basic points.  First, during the late colonial and founding / Early Republic eras, the majority of individuals in North America did not own more than one gun.  For both economic and logistical reasons, individuals that owned a gun sought to repair their existing gun rather than purchase a new one.  Second, the cost of a firearm during this time period prevented the average person from purchasing more than one firearm per month. Third, from the colonial through the founding and Early Republic eras, individual colonies (later states) enacted numerous laws prohibiting the private sale or trade of guns, and accompanying accessories, like gunpowder, gunflints, and bullets, to Native Americans.  This was largely due to public safety risks associated with trading guns to Native Americans.  Colonial and United States officials were of the view that control over the trade of guns and firearms to Indigenous peoples could both offer protection to whites and push Native Americans into relationships of economic dependence upon the United States.  Laws restricting the trade of goods like guns and gunpowder to Native peoples during the founding and Early Republic eras were not unique, and are part of a larger, longstanding tradition of regulating firearms to protect public safety.

**GUNS AND GUN OWNERSHIP IN THE LATE COLONIAL AND FOUNDING ERAS**

6.      During the late colonial and Early Republic eras, most individuals in North America did not own multiple guns.  Because guns were expensive and existing guns were reusable and repairable, colonists preferred constant and

3

reliable access to gunsmiths, as well as the tools that rendered firearms operational: gunpowder and gunflints.  A well-maintained gun retained its value and effectiveness over time, allowing it to be passed down generationally.  For example, evidence from late eighteenth-century probate inventories describe many guns as "old," indicating that people in the Early Republic continued to arm themselves with guns either maintained or inherited from the colonial era. Archaeological findings corroborate that most Native American men used a single gun over the course of their lives, as modern-day archaeologists "rarely" find Native American trade guns in-tact.[1]  Guns found in-tact indicate that their owners prioritized and/or could afford maintenance, which allowed them to be handed down through generations.[2]

      7.     Gunsmiths were essential in the colonial and founding eras, a time when mass-produced firearms were not manufactured on the continent.[3]  During the seventeenth century, British parliament passed a series of acts called the Navigation Acts, which imposed restrictions on colonial manufacturing and trade. The Navigation Acts declared that British colonies could only export their commodities (which consisted of raw materials such as sugar, tobacco, and rice) to England, and prohibited colonists from purchasing commodities from other nations.  The Navigation Acts also prevented the development of a colonial manufacturing industry, rendering colonial inhabitants dependent on England for

---

[1] A more detailed description of Native American trade guns can be found in the next section below.

[2] O. Ned Eddins, "Trade Guns," *Peach State Archaeological Society*, accessed May 15, 2023, http://www.peachstatearchaeologicalsociety.org/index.php/23-fur-trade-goods.

[3] Given the trade and manufacturing restrictions imposed by the Navigation Acts, many colonial gunsmiths not only repaired guns, but created self-built firearms, though these were not as accurate or user-friendly as their professionally-created counterparts.

finished goods, like firearms.[4]

8.      In addition, from the late colonial period through the early nineteenth century, access to a gunsmith for a set length of time was often included in colonial treaty negotiations with Native nations.  As early as 1730, the Upper Creek Native Americans asked Georgia traders for "free repair of firearms" as part of a "fair and substantial basis for trade."[5]  In 1747, the Oneida Indian tribe successfully pressured the Pennsylvania Colony to erect a gunsmithery and provide a gunsmith at Shamokin, a town northwest of present-day Harrisburg. Frontier traders frequently employed gunsmiths to service Native guns at nearby outposts.[6]  A 1757 letter from the commander at Fort Prince George, a Cherokee-serving outpost in rural South Carolina, included a request for gunsmithing tools, such as "a small screw plate to mend gun locks."[7]  But the importance of guns to Native life also necessitated that Indigenous men become experts at repairing guns themselves.  According to Indian trader James Adair, eighteenth-century Cherokee men could "fresh stock their guns, only with a small hatchet and knife, and straighten the barrels, so as to shoot with proper direction.  They likewise alter, and fix, all of the springs of the [gun] lock with others of the sort they may

---

[4] For an expert overview of the Navigation Acts and the economic theory of mercantilism, see Joyce Oldham Appleby, *Economic Thought and Ideology in Seventeenth-Century England* (Princeton, NJ: Princeton University Press, 1978).

[5] William Brandon, narr., *The American Heritage Book of American Indians*, ed. Alvin M. Josephy, Jr. (Rockville, MD: American heritage Publishing Co., 1961), 217.

[6] M.L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1492 -1792* (Washington D.C.: Smithsonian University Press, 1980), 283.

[7]  William L. McDowell, Jr., ed., *Documents Relating to Indian Affairs, 1754 - 1765 (South Carolina)* (Columbia, SC: South Carolina Department of Archives and History, 1970), 44.

have out of use."[8]  Archeological evidence also supports that the ability of Indians to repair firearms was not limited to those living close to Europeans.  An examination of Indigenous villages at Malta bend, Missouri "uncovered files, screwdrivers, hand vises, and other gunsmith tools along with various gun parts, showing villagers were repairing guns as early as 1750."[9]

9.     For reasons related to economics and accessibility, people across North America chose to maintain their existing guns rather than purchase new ones.  According to historian Solomon K. Smith, every British colony in North America had at least one gunsmith when established, and most had at least ten gunsmiths at the end of its first twenty-five years.[10]  The numbers outlined in Smith's table below reflect a dramatic escalation of gunsmithing services in accordance with the colonies' rapid population growth, which saw Euro-American settlement expand from 260,000 people in 1700 to 2,150,000 people in 1770.[11]

---

[8] James Adair, *The History of the American Indians* (London, UK: E. and C. Dilly, 1775), 432, https://archive.org/details/historyofamerica00adairich/page/n3.

[9]  Solomon K. Smith, "Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America," 15, *Fortyninthparalleljournal.com*, accessed May 15, 2023, https://fortyninthparalleljournal.files.wordpress.com/2014/10/solomonsmithautumn2014.pdf.

[10] *Id.*

[11] *Id.* at 16; "The Colonies: 1690-1715," *National Humanities Center: Toolbox Library: Primary Resources in American History and Literature*, accessed May 15, 2023, https://nationalhumanitiescenter.org/pds/becomingamer/growth/text1/text1read.htm#:~:text=From%20260%2C000%20settlers%20in%201700,25%20years%20in%20the%201700s.

GUNSMITHS IN THE THIRTEEN BRITISH COLONIES OF NORTH AMERICA, 1600-1800

| COLONY | 1600-1650 | 1651-1699 | 1700-1725 | 1726-1750 | 1751-1774 | 1775-1783 | 1784-1800 |
|---|---|---|---|---|---|---|---|
| CONNECTICUT | 2 | 3 | 4 | 13 | 53 | 136 | 46 |
| DELAWARE | - | - | - | - | 4 | 8 | 9 |
| GEORGIA | - | - | 4 | 21 | 20 | 14 | 6 |
| MARYLAND | 8 | 11 | 3 | 20 | 49 | 265 | 142 |
| MASSACHUSETTS | 25 | 40 | 21 | 35 | 90 | 126 | 64 |
| NEW HAMPSHIRE | - | - | 3 | 6 | 9 | 16 | 20 |
| NEW JERSEY | - | 1 | 6 | 16 | 33 | 41 | 21 |
| NEW YORK | 12 | 21 | 5 | 21 | 94 | 138 | 82 |
| NORTH CAROLINA | - | - | - | 14 | 58 | 149 | 108 |
| PENNSYLVANIA | 3 | 13 | 8 | 29 | 139 | 336 | 285 |
| RHODE ISLAND | 14 | 19 | 1 | 11 | 47 | 88 | 40 |
| SOUTH CAROLINA | - | 13 | 17 | 49 | 63 | 59 | 35 |
| VIRGINIA | 5 | 17 | 20 | 48 | 144 | 197 | 153 |
| TOTALS | 69 | 138 | 92 | 283 | 803 | 1573 | 1011 |

Sources: These estimates are heavily indebted to the extensive lists of gun makers compiled by gun collectors to identify the manufacturers of weapons in their collections. Some of the most valuable lists of arms makers include, but are not limited to Dwight Demeritt's *Maine Made Guns and their makers* (1973), William O. Achtermier's *Rhodes Island Arms Makers and Gunsmiths, 1643-1883* (1980), and James B. Whisker's *Arms Makers of Colonial America* (1992). To arrive at the estimates listed in the table, I made a list of arms makers from the published sources, then verified the names on the list and added new individuals through intensive examination of manuscript sources found in the various the archives and public and state papers of the thirteen colonies, tax records, revolutionary war pensions, deeds, wills and estate papers. In some cases, I utilised individual printed versions when available for the archives and papers of the thirteen colonies, like *American Archives*, Peter Force, ed. (Washington, DC: U.S. Government Printing Office, 1837-1853). I also relied on advertisements found in newspapers from the period for the various colonies. Regardless of how an individual arms maker was identified, no individual was included in the table unless there were two separate documents showing evidence that identified the individual as a gunsmith.

Yet, the number of guns imported to the colonies during this period steadily averaged between 8,000 and 10,000 per year.[12]

     10.    Smith's findings also indicate that most urban areas in British North America and, later, the United States, had at least one gunsmith regardless of size:[13]

---

[12] Brown, *Firearms in Colonial America,* 242.

[13] Smith, "Firearms Manufacturing," 17.

7

GUNSMITH LOCATED IN MAJOR CITIES AND/OR CAPITOLS

| | 1600-1650 | 1651-1699 | 1700-1725 | 1726-1750 | 1751-1774 | 1775-1783 | 1784-1800 |
|---|---|---|---|---|---|---|---|
| Albany, NY | - | - | - | 1 | 8 | 12 | 7 |
| Annapolis, MD | - | - | 1 | 4 | 5 | 19 | 5 |
| Baltimore, MD | - | - | - | - | 8 | 63 | 10 |
| Boston, MA | 3 | 8 | 8 | 10 | 14 | 10 | 4 |
| Charleston, SC | - | 3 | 1 | 3 | 11 | 32 | 12 |
| Charlotte, NC | - | - | - | 6 | 6 | 16 | 10 |
| Concord, NH | - | - | 1 | 2 | 2 | 2 | 1 |
| Frederica, GA | - | - | - | 2 | 2 | - | - |
| Fredericktown, MD | - | - | - | 2 | 9 | 50 | 29 |
| Hagerstown, MD | - | - | - | 3 | 8 | 28 | 43 |
| Halifax, NC | - | - | - | - | 8 | 12 | 7 |
| Hartford, CT | 1 | 1 | - | 1 | 3 | 3 | 2 |
| Manhattan, NY | 2 | 3 | 1 | 2 | 31 | 27 | 31 |
| New Haven, CT | 1 | 2 | 1 | 2 | 2 | 9 | 1 |
| Newport, RI | 2 | 3 | 1 | 2 | 1 | 1 | - |
| Philadelphia, PA | 3 | 13 | 2 | 4 | 27 | 135 | 55 |
| Providence, RI | - | - | - | 1 | 11 | 15 | 7 |
| Salem, MA | 4 | 5 | 2 | 1 | 1 | - | - |
| Salisbury, CT | - | - | - | - | 6 | 20 | 9 |
| Salisbury, NC | - | - | - | 5 | 15 | 15 | 20 |
| Savannah, GA | - | - | 1 | 3 | 4 | 8 | 3 |
| Williamsburg, VA | - | - | 1 | 7 | 11 | 10 | 8 |
| Williamsport, MD | - | - | - | 3 | 7 | 16 | 13 |

Sources: Dwight Demeritt's *Maine Made Guns and their makers* (1973), William O. Achtermier's *Rhodes Island Arms Makers and Gunsmiths, 1643-1883* (1980), and James B. Whisker's *Arms Makers of Colonial America* (1992).; *American Archives*, Peter Force, ed. (Washington, DC: U.S. Government Printing Office, 1837-1853).

11.    Both tables reflect a significant uptick in gunsmiths during the American Revolution, followed by a notable decline.[14]  The increase between the years 1775 and 1783 is the result of official requests for both domestic arms production during the Revolutionary War and the need to repair existing guns. The reduction in gunsmiths over the first sixteen years of the Early Republic era (defined as the period from 1780 to 1830) reveals that civilian demand for new firearms, or the restoration of existing firearms, did not maintain wartime levels despite militia requirements and the westward expansion of Euro-Americans beyond the Appalachian Mountains into Indian territory.  This indicates that (1) it was not uncommon for a white, male citizen of the United States to own one gun

---

[14] *Id*. at 16-17.

8

in the Early Republic era, and (2) individuals did not see the ownership of multiple firearms, or even professional repair services for their existing firearms, as necessary for their safety and protection.

### TYPES AND COSTS OF GUNS IN THE LATE COLONIAL AND FOUNDING ERAS

12.     The Revolutionary War produced widespread financial instability, causing rapid economic inflation and debt among United States citizens.  Because of this financial crisis, American merchants returned to importing British firearms which could be sold to American consumers at a cheaper price than domestically produced ones.  The majority of guns in the late colonial and Early Republic United States were single shot muzzle loading firearms (long arms), broadly defined as any gun designed to be held with two hands and braced against the shoulder, and typically having a barrel of sixteen inches or longer.  The average cost of a smoothbore long arm between the years 1740 and 1800 was one pound, or 20 shillings.[15]  Muzzle-loading single shot long arms could also include rifles, though these were more expensive.  The cost of a rifle in the late colonial and Early Republic eras averaged anywhere from two to three pounds.[16]  Thus, while the average price of a single shot, smoothbore muzzle-loading firearm would have been relatively affordable for an unskilled day laborer, a rifle, which was more accurate and better for personal safety and self-defense, would have only been accessible to wealthier members of society.[17]

---

[15] Declaration of Kevin M. Sweeney, *Hanson v. District of Columbia*, No. 1:22-cv-02256-RC (D.D.C. Nov. 23, 2022), ECF No. 17-15, at ¶ 12.

[16] *Id*. at ¶ 13.

[17] A day laborer's wage usually varied between one and a half and two shillings.  See *Sixteenth Annual Report of the Bureau of Statistics of Labor* (Boston, MA: Massachusetts Bureau of Statistics of Labor, 1885), 206, accessed May 15, 2023, https://archives.lib.state.ma.us/handle/2452/757021.  Some years separate

13.     Other firearms were Indian "trade guns," sometimes called "trade fusils," a lightweight smoothbore flintlock musket better suited to hunting than warfare.  Produced in Birmingham, England, trade guns had shorter barrels and shorter calibers than other muskets and shoulder arms, making them easier to handle and more economical, as they required less lead and gunpowder to fire a shot.[18]  The Indian trade gun underwent several aesthetic changes after 1730 to distinguish it from other firearms in the North American market.  From the mid-eighteenth through the early nineteenth centuries, Indian trade guns were characterized by a brass side plate shaped like a serpent.  Many eighteenth-century trade guns also bore the initials of the Birmingham-based gunsmith, known as proof marks.

14.     A trade gun was among the most expensive items carried by the traders.  By the second half of the eighteenth century, the average price of a trade gun ranged from fourteen to sixteen pounds of dressed leather.[19]  Small game hunters of Pennsylvania backcountry, Ohio Valley, and Great Lakes regions would need twenty beaver pelts for a trade gun.

15.     It would not have been economically feasible for the average person to purchase more than one firearm per month in the late colonial and/or Early Republic periods.  This is evidenced by the above analysis of eighteenth-century

laborers' wages into the categories of "high," "medium," and "low."

[18] The barrel of a "trade gun" averaged 30 to 48 inches in length and an average bore size of under .62 caliber.  Some weighed as little as 5.5 pounds. Brown, *Firearms in Colonial America*, 283.

[19] This was among the southeastern deer hunting tribes of the Southeast. "John Stuart's Journal of His Proceedings with the Indians and Traders at Augusta in Georgia," 1767, Document 177, Thomas Gage Papers, William L. Clements Library, University of Michigan, Ann Arbor, MI; Kathryn Holland Braund, *Deerskins and Duffels: The Creek Indian Trade with Anglo America, 1685-1815* (Lincoln, NE: University of Nebraska Press, 1993), 128.

10

gun prices in relation to both the average unskilled laborer's daily wage and rate of exchange for deerskins.  This is further supported by the number of gunsmiths in comparison to white population numbers during the late colonial, revolutionary, and founding eras.

## LAWS AND POLICIES PROHIBITING THE SALE OF GUNS TO NATIVE AMERICANS IN THE LATE COLONIAL AND FOUNDING ERAS

16.     The Jamestown settlers introduced guns to the Powhatan confederacy shortly after their arrival in North America in May 1607.[20]  Firearms became widely accessible to Native peoples a few decades later when Dutch traders from Long Island and the Connecticut River Valley introduced the flintlock musket to Indigenous communities in the region.  Native groups like the Iroquois and the Pequot used these weapons to displace and subjugate nearby Indigenous rivals, launching what historian David Silverman calls an Indian arms race.[21]  They also employed these weapons to challenge English colonial expansion demonstrated in two violent conflicts: the Pequot War (1636 – 1637) and King Philip's War (1675 – 1676).  In times of war, Euro-American officials often prohibited the trade of gunpowder and firearms to Native peoples.  During the French and Indian War in 1761, British General Jeffrey Amherst set forth a decree prohibiting representatives authorized to interact with Indian tribes on behalf of the colonies (Indian agents) from trading or gifting gunpowder and firearms to Native men, declaring both the dangers of this practice and the high financial cost to the British government.[22]

---

[20] John Smith, *The Generall Historie of Virginia, New England, and the Summer Isles* (Glasgow: James MacLehose and Sons, 1907), 1: 158 -159.

[21] David J. Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America* (Cambridge, MA: Harvard University Press, 2016), 23.

[22] Colin Calloway, *Pen, Ink, and Witchcraft: Treaties and Treaty Making in American Indian History* (New York, NY: Oxford University Press, 2013), 22.

11

17.     Laws banning the trade and sale of firearms to Native peoples are present in the historical record as early as 1631.  Through most of the colonial period, individual colonies formulated their own laws and policies regarding trade between colonists and Native peoples.  Yet, laws regarding the trade of guns and firearms to Native Americans were largely analogous across colonies and geographic regions.  A Virginia law passed in 1731 broadly prohibited "all trade with the Savages" both public and private.[23]  A 1633 Virginia law stated that any person selling "guns, powder, shot, or any arms or ammunition unto any Indian or Indians within this territory" would face imprisonment.[24]  A January 1639 Virginia act reduced the punishment for general trading with the Indians, but stipulated that the trade of arms and ammunition would remain a felony.[25]  Punishment for trading guns to the Natives expanded in 1642 to include the forfeiture of one's estate.[26]  New Netherland passed a law in 1645 prohibiting all persons from trading "any munitions of war with the Indians," and forbade their importation to the colony without explicit permission. Punishment, the act stipulated, could include death.[27]  A 1649 Maryland law banned its inhabitants

[23] "1631 Va. Acts 173," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1631-va-acts-173-acts-of-february-24th-1631-act-xlvi/.

[24] "1633 Va. Acts 219," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1633-va-acts-219/.

[25] *Statutes at Large: Collection of Virginia Laws from 1619*, archive.org, 226; https://archive.org/details/statutesatlargeb01virg/page/226/mode/2up. See also: "1639 Va. Acts 224," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1639-va-acts-224-acts-of-january-6th-1639-act-xvii/.

[26] "1642 Va. Acts 255," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1642-va-acts-255-acts-of-march-2nd-1642-act-xxiii/.

[27] A 1656 New Netherland law also prohibited the admission of armed Indians into cities, villages, and houses.  "1656 N.Y. Laws 235," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1656-ny-laws-235/.  See also:

12

from selling or exchanging guns, ammunition, or "any other kind of martiall Armes" to Native peoples.[28]  In 1676 the Plymouth colony also enacted a law against trading or selling arms and ammunition to Indians, a practice "very poisonous and destructive to the English." Like New Netherland's law, anyone convicted of selling, bartering, or trading guns and ammunition to Native Americans could be put to death.[29]  A Virginia law, also enacted in 1676, made it a capital offense to sell guns or ammunition to the Indians, and declared that any colonist found within any Indian town or three miles without the English plantations with more than one gun and ten charges of powder and shot for his necessary use would be considered guilty of selling to the Indians, and punished accordingly.[30]

18.    These types of laws carry through to the eighteenth century, though they begin to explicitly state that only private trade is punishable by law; government-sponsored trade, regulated through a license from a specific colony, is acceptable.  A 1723 Connecticut law prohibited all persons within the colony from lending guns, ammunition, or associated goods to Native Americans.[31]  A

---

"1645 N.Y. Laws 47," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1645-n-y-laws-47-by-the-director-and-council-of-new-netherland-further-prohibiting-the-sale-of-firearms-etc-to-indians/.

[28] Clayton E. Cramer, "Colonial Firearm Regulation," *SSRN Electronic Journal*, April 2016, 11, accessed May 15, 2023, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[29] "1675 Records of the Colony of New Plymouth," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/records-of-the-colony-of-new-plymouth-in-new-england-page-173-image-179-1856-available-at-the-making-of-modern-law-primary-sources/.

[30] Cramer, "Colonial Firearms Regulation," 11.

[31] "1723 Connecticut Acts 292," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1723-conn-acts-292-an-act-for-preventing-lending-guns-ammunition-etc-to-the-indians/.

13

1763 Pennsylvania law explicitly banned unlicensed private citizens from exchanging guns, gunpowder, shot, bullets, lead, or other warlike stores to Native peoples. Offenders were subject to "pay the sum of five hundred pounds . . . and shall be whipped with thirty-nine lashes on his bare back, well laid on, and be committed to the common goal [jail] of the county, there to remain twelve months without bail or mainprise."[32]

19.     Economic factors drove this slight, but significant, legal shift. In lieu of stable cash crops, many colonies relied upon deerskins, pelts, and Native hunters to sustain their eighteenth-century colonial economies, and the demands of the pelt and deerskin trades necessitated Indigenous access to guns. Colonial officials were aware that arming potentially hostile Native Americans posed a significant public safety issue, yet the eighteenth-century Native firearms trade was a financially lucrative enterprise. To balance these concerns with economic demands, late colonial-era trade restrictions came to specify that rifles could not be traded to Native peoples. While Native men preferred rifles for their long-range accuracy, these firearms produced larger holes in deerskins, potentially devaluing them. Rifles were more dangerous to Indigenous enemies, posing a greater threat to colonial populations. Thus, colonists enacted laws and regulations to ensure that all weapons traded to Native Americans were inferior to those owned by whites.

20.     Control over guns, gunpowder, and ammunition encouraged the colonial pelt and deerskin trades while simultaneously securing Native American dependence. The centrality of firearms to Native life, along with the Indians' inability to make them, led colonial and later, American, officials to view these commodities as tools through which they could attempt to control Indigenous

---

[32] "1763 Pa. Laws 319," Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1763-pa-laws-319-an-act-to-prohibit-the-selling-of-guns-gunpowder-or-other-warlike-stores-to-the-indians/.

populations and force them to adhere to imperial interests.  Yet, the largest threat to this system came from private citizens and traders who attempted to trade with Natives outside the structures of governmental oversight.  It is no surprise, therefore, that Britain's thirteen North American colonies (later states) enacted numerous laws to control the actions of private citizens and keep them from trading guns to Native peoples.  A Maryland law from 1763, for example, focused specifically on the trade of gunpowder and ammunition, prohibiting "any Person or Persons within this Province to Sell or give any Indian Woman or Child any Gun Powder Shot or lead Whatsoever[,] nor to any Indian Man within this Province more than the Quantitys of one Pound of Gun Powder and six Pounds of Shot or lead at any one Time . . . ."[33]

21.     A 1756 report from Indian agent Daniel Pepper illuminates British colonial concerns regarding Indigenous access to rifles.  Pepper reported that the Cherokee and Upper Creeks were "getting into the Method of using Riffle Guns instead of Traders [trade guns] . . . as they can kill point blank at 200 yards distance.  This, in my humble opinion, puts them too much upon an equality with us in case of a breach . . . ."  As for legal ramifications, Pepper noted "the People who sell them to the Indians are generally poor, their Gun being the greatest part of their estate, a fine would be of little or no effect.  Imprisonment or something of corporal punishment would creat[e] a greater Dread."[34]  A 1764 draft trade regulation corroborates Pepper's concerns:

> "Rifled Barreled Guns should certainly be prohibited; the Shawanese and Delawares, with many of their neighbours are become very fond of them [rifles], and use them with such dexterity, that they are capable of doing infinite damage, and as they are made in some of the frontier Towns, where the Indians will procure them at any Price . . . all white persons should be

[33] Cramer, "Colonial Firearm Regulation," 11.

[34] McDowell, *Documents Relating to Indian Affairs,* 256.

15

1   restricted on a very severe penalty from selling them to any Indians."[35]

2       22.   The examples above indicate that laws prohibiting the sale of

3   firearms to Native peoples took on many forms in the late colonial period,

4   depending largely upon local and/or economic needs.  Allowing each colony to

5   establish its own laws supported local-level authority, but a lack of unified

6   directive over trade limited imperial control in an empire whose identity was

7   deeply intertwined with commerce.  This became a major concern after the French

8   and Indian War when the British increasingly sought to control the actions of their

9   colonial populations.  The Plan of 1764 imposed new trade regulations aimed at

10  demonstrating the empire's socio-economic and political dominance over North

11  America's colonial and Native populations.  New policies provided the British

12  Board of Trade executive authority to establish universal protocols for commerce

13  with the Natives.  Individual colonies, who for over a century had determined

14  trade laws with nearby Native peoples, were now expected to follow imperial

15  laws and regulations.

16      23.   Colonial officials quickly realized that a lack of local-level authority

17  over Native trade laws created space for large numbers of corrupt, illegal traders

18  to cross into Indian territory to conduct unauthorized exchange.  In February

19  1768, Indian Commissary Roderick McIntosh complained that the Upper Creek

20  towns were swarmed with traders, whom he regarded as "notorious villains" for

21  trading guns and gunpowder to Native men at prices below the established

22  exchange rate.[36]  Thus, despite Britain's efforts to standardize Indian trade

23  policies, the colonies' inability to make and enforce trade laws led to a significant

24  
25      [35] Angela R. Riley, "Indians and Guns," *The Georgetown Law Journal* (2012), 100: 1690.

26      [36] Roderick McIntosh, "McIntosh to Stuart," February 8, 1768, Document
27  104, Thomas Gage Papers, William L. Clements Library, The University of Michigan, Ann Arbor, MI.

28  

16

1   uptick in illegal arms trading and, subsequently, Native violence.  The British

2   Board of Trade's decision to return the management of the Indian trade to the

3   colonial governments in late 1768 marked a return to policies that embraced local-

4   level lawmaking to better control the actions of both traders and Native peoples.[37]

5       24.     While the end of the American Revolution brought independence to

6   Britain's former North American colonies, the new United States inherited the

7   Crown's unresolved questions about relationships with Native peoples.  To

8   answer these questions, United States policymakers looked to colonial-era laws

9   regulating the trade of firearms to Indians.  With Indigenous diplomacy now

10  under the jurisdiction of the federal government, Congress reworked existing

11  local-level laws for national use.  The resulting Indian Trade and Intercourse Act

12  (1790) established that private individuals needed a license to conduct trade with

13  Native peoples and were required to renew their license every two years.  Sections

14  of the Indian Trade and Intercourse Act heavily emulated earlier, colonial-level

15  firearms regulations.  The 1796 "Act for Establishing Trading Houses with the

16  Indian Tribes," however, authorized the president to establish designated facilities

17  – known as "factories" – for the "purpose of carrying on a liberal trade with the

18  several Indian nations," and appoint agents to run them.  By providing goods to

19  Native peoples at-cost, these trading houses aimed to push out any illegal or

20  foreign competition while asserting control over the quality and quantity of goods

21  Native peoples acquired.  But Indian factories were not intended to be profit-

22  seeking ventures; they existed to impose federal control over the 150,000 Native

23  peoples living between the Appalachian Mountains and the Mississippi River.

24  More affordable than warfare, historian David Nichols describes the Indian

25

26  _____

[37] Richard White, *The Roots of Dependency: Subsistence, Environment, and
Social Change among the Choctaws, Pawnees, and Navajos* (Lincoln, NE:
University of Nebraska Press, 1988), 72.

27

28

factory system as "conquest on the cheap," riddled with abuse and misconduct on the part of factory agents.[38]

25.    Notably, section seven of the 1796 "Act for Establishing Trading Houses" addresses firearms and associated goods. But instead of placing a restriction upon private traders, it specifically prohibits agents from "purchas[ing], or receiv[ing] of any Indian, in the way of trade or barter, a gun or other article commonly used in hunting," imposing a one-hundred-dollar penalty for each offense. This indicates that the success of factory system depended upon the sale of cheaply made goods to Native peoples, inferior to those made for white American populations. By prohibiting factory agents from purchasing firearms from Native people, U.S. officials sought to curb the sale of firearms outside the purview of the federal government. Because it was not uncommon for Native peoples to access better-quality firearms from Spanish Florida or British Canada, factory agents could acquire these weapons and re-sell them to bolster their income. Such actions would challenge U.S. efforts to control Native peoples through inferior goods and undermine their efforts to navigate the long-standing contradiction of providing firearms, gunpowder, and ammunition to potentially dangerous outsiders.

**CONCLUSIONS**

26.    During the late colonial and founding / Early Republic eras, the majority of individuals in North America did not own more than one gun. Individuals would typically have their existing gun repaired instead of purchasing

---

[38] David Andrew Nichols, *Engines of Diplomacy: Indian Trading Factories and the Negotiation of Empire* (Chapel Hill: University of North Carolina Press, 2016), 1. Nichols writes that in 1821, Senator Thomas Hart Benton of Missouri accused the factors of "abuse and misconduct" characterizing the merchandise from Indian factories as "the rubbish of Georgetown retail stores." Benton argued the system had achieved none of its goals and branded it "worse than useless." The federal government disbanded the Factory system in the same year.

a new one.  In addition, the cost of a firearm during this time period prevented the average person from purchasing more than one firearm per month.

27.    Laws regarding access to guns and firearms by Native Americans changed slightly in shape and form as Britain's former colonies became the United States, and Native affairs became a concern of the federal government. But the evidence outlined above indicates that despite such changes, the sale, trade, and exchange of guns and firearms to Native people and others deemed dangerous to the state posed a significant public safety threat, warranting legal restrictions on both the local and federal levels.  However, there was a difference between the highly regulated, permitted trade with Native peoples (for purposes such as hunting), and the prohibited trade of the more dangerous rifles and weapons for public safety.  Ultimately, laws restricting the trade of goods like guns and gunpowder to Native peoples during the founding and Early Republic eras emerged from similar laws in the colonial period and are part of an established legal tradition that regulates sale of firearms to protect public safety.

28.    This brief account of laws restricting the private sale and exchange of guns and accompanying goods to Native peoples demonstrates that colonial governments, state governments, and the federal government understood the public safety risks associated with trading firearms to Native Americans.  In other words, laws restricting the trade of firearms to Native peoples and other potentially dangerous individuals during the founding and Early Republic eras were rooted in public safety concerns.

1         I declare under penalty of perjury that the foregoing is true and correct, and

2    if called as a witness would testify competently to them.

3

4         Executed on May 19, 2023, at St. Paul, Minnesota.

5

6                                *Jennifer M. McCutchen*

7                                Jennifer M. McCutchen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

# EXHIBIT A

Exhibit 10
Page 00201

# JENNIFER MONROE McCUTCHEN

JRC 432 ⬥ 2115 Summit Ave ⬥ St. Paul, MN 55105 ⬥ j.mccutchen@stthomas.edu

## EDUCATION

Ph.D., History (United States to 1877), Texas Christian University, Fort Worth, Texas, August 2019.

> **Doctoral Dissertation:** *Gunpowder and the Creek-British Struggle for Power in the Southeast, 1763-1776.*

> **Dissertation Committee:** Alan Gallay (chair), Steven C. Hahn, Susan Ramirez, Alex Hidalgo.

M.A., History, Texas Christian University, Fort Worth, Texas, May 2014.

B.A., History (with honors), John Carroll University, University Heights, Ohio, May 2012.

## PROFESSIONAL EXPERIENCE

**University of St. Thomas**
Assistant Professor of History                                            August 2022 - Present

**University of Southern Maine**
Assistant Professor of History
Coordinator – History Undergraduate Internship Program     September 2019 - August 2022

**Minnesota State University, Mankato**
Adjunct Professor of History                                           August 2018 - May 2019

**Texas Christian University**
Graduate Assistant                                                        August 2012 - May 2017

## ACADEMIC RESEARCH AREAS and FIELDS OF STUDY

Native American History, Ethnohistory, United States History to 1877, Atlantic World, Colonial and Revolutionary America, Gender and Women's History.

## PEER-REVIEWED PUBLICATIONS

*Journal Articles*
"Gunpowder and Creek Diplomacy in the Pre-Revolutionary Native South." *Studies in Eighteenth-Century Culture* Vol. 52, pp. 163-174 (March 2023).

"'More Advantageous to be With Spaniards': Gunpowder and Creek-Spanish Encounters in Cuba, 1763-1783." *Terrae Incognitae: The Journal for the Society of the History of Discoveries and Exploration* 52:3, pp. 1-16 (December 2020).

"'They Will Know in the End that We are Men': Gunpowder and Gendered Discourse in Creek-British Diplomacy, 1763 – 1776." *Ethnohistory* Vol. 70:3 (Accepted, forthcoming July 2023).

<u>WORKS CURRENTLY UNDER PEER-REVIEW</u>

*Book Chapter*
"'Playing the Old Game of Double': Creek and Spanish Conceptualizations of Sovereignty in the Post-Revolutionary Gulf Region." (Co-Authored with Chad McCutchen, Ph.D.) Submitted to the edited volume *Claiming Land, Claiming Water: Borders and the People Who Crossed Them in the Early Modern Atlantic.* Rachel Herrmann and Jessica Choppin Roney, eds.

<u>WORKS IN PROGRESS</u>

*Book Manuscript*
*Gunpowder Diplomacy: Commodities, Culture, and Power in the Eighteenth-Century Creek Confederacy.* (Proposal under peer-review with the University of Oklahoma Press, February 2023).

*Edited Collection*
*Gender in the Native South: A Reinterpretation of Women, Men, and Two-Spirit Peoples Before 1850.* Co-Edited with Jamie Myers-Mize.

*Chapter Contribution*
"Horns, Beads, and Brass Tacks:  A Gendered Investigation of Gunpowder Accessories in the Post-Revolutionary Native South." For submission to the edited volume *Women and Gender in the Native South Before 1850.* Jamie Myers-Mize and Jennifer Monroe McCutchen, eds.

<u>OTHER PUBLICATIONS</u>

*Online Journal*
"What a Historical Analysis of Gunpowder can Teach us About Gun Culture in the United States." *The Panorama: The Digital Extension of the Journal of the Early Republic.* (Accepted, forthcoming April 2023).

*Book Reviews*
Samantha Seeley, *Race, Removal and the Right to Remain: Migration and the Making of the United States.* Chapel Hill: University of North Carolina Press, with the Omohundro Institute of Early American History and Culture, 2021. *American Nineteenth Century History* (2022).

Richard W. Edwards, *Indigenous Life Around the Great Lakes: War, Climate, and Culture.* South Bend: University of Notre Dame Press, 2020. *H-War* (September 2021).

Claudio Saunt, *Unworthy Republic: The Dispossession of Native Americans and the Road to Indian Territory.* New York: W.W. Norton and Company, 2020. *H-AmIndian* (February 2021).

Strother E. Roberts, *Colonial Ecology, Atlantic Economy: Transforming Nature in Early New England.* Philadelphia: University of Pennsylvania Press, 2019. *American Indian Quarterly,* 44:4 (Fall 2020).

Mikaëla M. Adams, *Who Belongs? Race, Resources, and Tribal Citizenship in the Native South.* New York: Oxford University Press, 2016. *H-Atlantic.* (April 2020).

*Reference Works and Encyclopedia Entries*
"The Life of Mary Musgrove." *Women Who Changed The World: Their Lives, Challenges, and Accomplishments Through History,* ed. Candice Goucher. Santa Barbara, CA: ABC-CLIO Publications (February 2022).

"Hunting (American Indian)." *World of Antebellum America: A Daily Life Encyclopedia,* ed. Alexandra Kindell. Santa Barbara, CA: ABC-CLIO Publications (2018).

"Gender Relations (American Indian)." *World of Antebellum America: A Daily Life Encyclopedia,* ed. Alexandra Kindell. Santa Barbara, CA: ABC-CLIO Publications (2018).

"The French and Indian War." *The Digital Encyclopedia of George Washington,* ed. Joseph F. Stoltz III. Mount Vernon, VA: The Fred W. Smith National Library for the Study of George Washington and George Washington's Mount Vernon Association (2017).

"The Proclamation Line of 1763." *The Digital Encyclopedia of George Washington,* ed. Joseph F. Stoltz III. Mount Vernon, VA: The Fred W. Smith National Library for the Study of George Washington and George Washington's Mount Vernon Association (2017).

<u>FELLOWSHIPS, GRANTS, and AWARDS</u>

*Fellowships (External)*
The William L. Clements Library at the University of Michigan, Howard H. Peckham Short-Term Research Fellowship on Revolutionary America (2020-2021 academic year).

The David Library of the American Revolution, Residential Research Fellowship (2018-2019 academic year).

*Fellowships (Internal)*
Osher Map Library and Smith Center for Cartographic Education at the University of Southern Maine, Teaching With Maps Faculty Fellowship (2019-2020 academic year; 2021-2022 academic year).

Texas Christian University Department of History, Departmental Dissertation Fellowship (2017-2018 academic year).

*Grants (External)*
Samuel and Marion Merrill Graduate Student Grant, The Organization of American Historians (2019).

American Society for Ethnohistory Graduate Student Grant (2017 and 2016).

Culturally Relevant Pedagogy Curriculum Development Grant. The Minnesota Historical Society and the Inquiry in the Upper Midwest Grant Program (2018).

Federal Pell Grant (2008-2012).

*Grants (Internal)*
Faculty Research Grant, University of St. Thomas (2023-2024 academic year)

Open Educational Resources Curriculum Development Mini Grant, University of Southern Maine (2020).

Adjunct Faculty Improvement Grant, College of Social and Behavioral Sciences, Minnesota State University, Mankato (2019).

Game-Based Learning Professional Development Mini Grant, The Center for Excellence in Teaching and Learning, Minnesota State University, Mankato (2019).

Boller-Worcester Graduate Student Travel and Research Grant, Texas Christian University (2019, 2018, 2017, 2016, 2015, and 2013).

Graduate Student Senate Travel and Research Grant, Texas Christian University (2017 and 2015).

*Awards*
Provost's Recognition of Doctoral Candidate Research, "Gunpowder Diplomacy: Trade, Alliance Formation, and Creek Indian Policymaking in the Atlantic World." Selected by Dr. Bonnie Melhart, Associate Provost for Research and Dean of Graduate Studies and University Programs, Texas Christian University (November 2017).

Best Paper of the Fifth Annual Texas Tech University History Graduate Student Conference, "Speaking With Two Tongues: Navigating Native American Power and Colonial Alliances in the Revolutionary Atlantic World, 1775-1776." Awarded by the Department of History and the History Graduate Student Organization, Texas Tech University (February 2016).

<u>TEACHING EXPERIENCE</u>

<u>University of St. Thomas</u>
Early America in a Global Perspective (HIST 113)
Revolutionary America (HIST 353)
Native American History (HIST 292)

<u>University of Southern Maine</u>
United States History to 1800 (HTY 121)
United States History to 1877 (HTY 131)
Native American History, 1450 - 2000 (HTY 143/HON 103)
Indigenous Peoples in the Atlantic World (HTY 144)
History Internship (HTY 300)
Colonial and Revolutionary America (HTY 350)
Gender in Native North America, 1450-1850 (HTY 353/WGS 355)
From Jefferson to Jackson (HTY 354)

<u>Minnesota State University, Mankato</u>
United States History Since 1877 (HIST 191)

<u>Texas Christian University</u>
United States History Since 1877 (HIST 10613)

<u>Concurrent Enrollment and Secondary Education Experience</u>
University of Southern Maine, History Graduate Certificate Development Committee (September 2019 – May 2022).

Online History Content Grader, United States History from 1492 to 1865 and United States History from 1865 to the Present. OnRamps Dual-Enrollment Program, The University of Texas at Austin (September 2018 - May 2019).

"We the People" Educational Outreach Program, program coordinator and classroom instructor, Cleveland and East Cleveland Public School Systems. Grades 11 and 12, Shaw High School (2010-2012).

"Project Citizen" Government and Citizenship Educational Program, program coordinator and classroom instructor, Cleveland and East Cleveland Public School Systems. Grades 7 and 8, Heritage Middle School (2011-2012).

<u>SCHOLARLY CONFERENCE PRESENTATIONS</u>

"Horns, Beads, and Brass Tacks:  A Gendered Investigation of Gunpowder Accessories in the Post-Revolutionary Native South." Native American and Indigenous Studies Association Conference, Toronto, Canada (May 2023).

"Native Peoples, American Colonialism, and the U.S. Constitution: A Roundtable Discussion." Native American and Indigenous Studies Association Conference, Toronto, Canada (May 2023).

"Sovereignty, Commodities, and Indigenous Autonomy in the Revolutionary Native South." Consortium on the Revolutionary Era Annual Meeting, Ft. Worth, Texas (February 2023).

"'Almost like two distinct people': Creek Women and Men as Economic Policymakers in the Colonial Native South." The Northern Great Plains History Conference, Fargo, North Dakota (September 2022).

"Mapping Commodity Encounters: Ethnohistory in the Undergraduate Classroom" The Northern Great Plains History Conference, Fargo, North Dakota (September 2022).

"Gunpowder Diplomacy: Commodities and Power in the Eighteenth-Century Native South." The American Society for Ethnohistory Annual Conference, Lawrence, Kansas (September 2022).

"To Enjoy the Advantages of a Neutrality": Gunpowder and the Creek Play-Off Strategy in the American Revolution, 1774-1776." The Society for Historians of the Early American Republic Annual Conference, New Orleans, Louisiana (July 2022).

"Beads, Baldrics, and Bandolier Bags: The Impact of European Commodities on Clothing and Culture in the Eighteenth and Nineteenth-Century Native South." The American Society for Ethnohistory Annual Conference, via Zoom (November 2021).

"Exploring Native Women's Roles in the Late Eighteenth and Early Nineteenth-Century Gunpowder Trade." New England Historical Association Fall Conference, via Zoom (October 2021).

"Creeks, Guns, and Citizenship in the Early American Republic." The Society for Historians of the Early American Republic Annual Conference, via Zoom (Organizer) (July 2021).

"Rethinking Commodities, Culture, and Power in the Eighteenth-Century Creek Confederacy." The Southeastern American Society for Eighteenth-Century Studies Annual Conference, via Zoom (February 2021).

"Gendered Commodities and Projections of Masculinity in Creek-British Diplomacy, 1763 - 1776." The Allen Morris Forum on the Native South. Hosted by the Florida State University Department of History, via Zoom (October 2020).

"Gunpowder and the Gendering of British Indian Policy in the Southeast." New England Historical Association Fall Conference, via Zoom (October 2020).

"They Will Know in the End That We Are Men." Gunpowder, Power, and Masculinity in the Creek Confederacy, 1763-1776." The American Society for Ethnohistory Annual Conference, State College, Pennsylvania (September 2019).

"'Deprive Them of Ammunition and They Will Become Easy Prey': Commodities, Southeastern Indian Policy, and Creek-British Power Dynamics Following the Seven Years' War." The Organization of American Historians Annual Meeting, Philadelphia, Pennsylvania (Organizer) (April 2019).

"'For They Have Their Politicks Like Other Men': Gendered Aspects of the Gunpowder Trade in the Spanish Borderlands, 1763-1773." New and Emerging Studies of the Spanish Colonial Borderlands Workshop, The Huntington Library, San Marino, California (March 2019).

"Gunpowder and Its Impact on Creek-British Diplomacy in the Revolutionary Southeast, 1763-1783." The Southern Historical Association Annual Meeting, Birmingham, Alabama (November 2018).

"Competing Narratives of North American Native History in World History Textbooks." The Northern Great Plains History Conference, Mankato, Minnesota (September 2018).

"Gendered Neutrality: Rethinking Social Relations and Cross-Cultural Politics in the Eighteenth-Century Creek Confederacy." The American Society for Ethnohistory Annual Conference, Winnipeg, Manitoba (October 2017).

"A Tool of Negotiation and Persuasion: Gunpowder as a Source of Power Among Male Creeks in the Eighteenth-Century Southeast." Gulf South History and Humanities Conference, Pensacola, Florida (October 2017).

"Seeking Supplementary Trade Relationships: Gunpowder and its Influence on Native Diplomacy." The Rocky Mountain Council for Latin American Studies Annual Conference, Salt Lake City, Utah (April 2017).

"The Expansion of Creek Influence in the Atlantic World: The Gunpowder Trade in the Revolutionary Era." American Society for Ethnohistory Annual Conference, Nashville, Tennessee (November 2016).

"Lowlands of Colonial Conflict: Indians, Spaniards, Colonists, and the Florida-Georgia Borderlands, 1700-1763." North Central Texas Phi Alpha Theta Conference, Texas Wesleyan University, Ft. Worth, Texas (April 2016).

"Speaking With Two Tongues: Navigating Native American Power and Colonial Alliances in the Revolutionary Atlantic World, 1775-1776." Texas Tech University History Graduate Student Organization Annual Conference, Texas Tech University, Lubbock, Texas (February 2016).

"Corporeal Conversions: Gender, Catholicism, and the Amerindian Christian Experience." The Rocky Mountain Council for Latin American Studies Annual Conference, Tucson, Arizona (Organizer) (April 2015).

<u>INVITED PUBLIC TALKS</u>

Guest, "Historians on Housewives" Podcast. Recorded November 19, 2022.

"'My Son's Behavior Has Covered Me With Shame': Gunpowder's Impact on Generational Notions of Masculinity in the Creek Confederacy." Fall History Symposium, University of Maine, Orono, Maine, via Zoom (September 2021).

"Rethinking Wabanaki History in Maine and New England." History Lecture Series, Biddeford Historical Society, Biddeford, Maine, via Zoom (October 2020.)

"Indians of the Southeastern United States." Senior Citizens Lunch and Learn Program, Lake Crystal Area Recreation Center, Lake Crystal, Minnesota (February 2018).

"Kinship, Alliance, and Violence Among Indian Tribes in the Texas and New Mexico Borderlands." History Guest Lecture Series, Tarrant County Community College, Ft. Worth, Texas (April 2014).

## SCHOLARLY CONFERENCE PANEL PARTICIPATION AS A CHAIR OR COMMENTATOR

Commentator, *South Carolina: Right-Sized for Revolution,* Consortium on the Revolutionary Era Annual Meeting, Ft. Worth, Texas (February 2023).

Chair, *Teaching Early America in Turbulent Times,* The Southeastern American Society for Eighteenth-Century Studies Annual Conference, via Zoom (February 2021).

Chair and Commentator, *Pop Culture in American History.* New England Historical Association Fall Conference, via Zoom (October 2020).

Commentator, *Topics in Native American History: From Canada to the Southwest.* The American Society for Ethnohistory Annual Conference, Oaxaca, Mexico (October 2018).

Chair, *Ongoing Problems in Teaching World History.* The Northern Great Plains History Conference, Mankato, Minnesota (September 2018).

## SERVICE to the COMMUNITY, PROFESSION, and INSTITUTION

### *Community*
Guest Speaker in Angela Jill Cooley's "History in Black and White" course, Minnesota State University, Mankato (January 2022).

Judge, Maine History Day, Regional Contest, via Zoom (2022, 2021, and 2020).

Judge, Maine History Day, State Contest, via Zoom (2020).

Guest speaker in Todd Little-Siebold's Wabanaki History Research Seminar, College of the Atlantic, Bar Harbor, Maine, via Zoom (April 2020).

Judge, Minnesota History Day, South Central Region. Minnesota State University, Mankato (2019 and 2018).

### *Profession*
Women's History Interest Group Representative, Northern Great Plains History Conference Executive Council (April 2023 – Present).

Member (elected position), Executive Council, H-Net: Humanities and Social Sciences Online (January 2023 - Present).

Senior Editor, H-AmIndian. H-Net: Humanities and Social Sciences Online (August 2022 - Present).

Network Editor, H-AmIndian. H-Net: Humanities and Social Sciences Online (May 2021 – August 2022).

Reviewer, Oxford Bibliographies (2022).

United States History Subject Matter Expert and Content Reviewer, MindTap Digital Learning Tool, Cengage Learning (July 2020 – March 2021).

### *Institution*
Co-leader, "Tools of Engagement" Lunch and Learn Seminar. STELAR University of St. Thomas (January 2023).

Faculty Representative, The Gloria S. Duclos Convocation Committee, University of Southern Maine (October 2020 – May 2022).

Member, "Decolonizing USM" (a committee to develop a Native American Studies minor and a more inclusive campus environment for Native students) (October 2020 – May 2022).

Member, Social Justice Minor Development Committee, University of Southern Maine (September 2020 – May 2022).

History Department Faculty Liaison, Teacher Education Pathways Program, University of Southern Maine (September 2020 – May 2022).

Member, Women and Gender Studies Faculty Council – University of Southern Maine (November 2019 – May 2022).

## SELECTED PROFESSIONAL DEVELOPMENT

Queering St. Thomas Faculty Learning Community (2022-2023 Academic Year).

Institute for Constitutional Studies Summer Seminar: Native Peoples, American Colonialism, and the U.S. Constitution. Sponsored by the NYU - Yale American Indian Sovereignty Project, New Haven, Connecticut (June 2022).

Supporting Students in Distress. Counseling Services, University of Southern Maine (November 2021).

Supporting the Success of Remote Learners. Center for Technology Enhanced Learning, University of Southern Maine (July 2020).

Advising Students on the Autism Spectrum. The Center for Collaboration and Development, University of Southern Maine (November 2019).

Writing Across the Curriculum Writing Fellows Program. Minnesota State University, Mankato (August - December 2018).

Game Based Learning Professional Development Program. Minnesota State University, Mankato (August - December 2018).

Culturally Relevant Pedagogy Curriculum Development Program. The Minnesota Historical Society and the Inquiry in the Upper Midwest Grant Program, Beloit College (August 2018).

Certificate in Teaching Fully Online for Faculty and Graduate Students. Koehler Center for Teaching Excellence, Texas Christian University (April 2017).

## INSTITUTIONAL RESEARCH and PUBLIC HISTORY EXPERIENCE

The Office of Institutional Research at Texas Christian University. Internship in Special Collections (2014).

The Cleveland Memory Project, in affiliation with Cleveland State University. Internship in Digital History, Preservation, and Public History (2011-2012).

The South Euclid Historical Society, South Euclid, Ohio. Researcher and presenter for the History of South Euclid Community Symposium (2011).

The Western Reserve Historical Society, Cleveland, Ohio. Internship in Research Studies, Public History, and Museum Programming (2011).

PROFESSIONAL AFFILIATIONS and MEMBERSHIPS

Native American and Indigenous Studies Association
The Society for Historians of the Early American Republic
The Organization of American Historians
The Southern Historical Association
The American Society for Ethnohistory
The Southern Association for Women Historians

# Exhibit 11

Exhibit 11
Page 00211

1 ROB BONTA
  Attorney General of California
2 ANTHONY R. HAKL
  Supervising Deputy Attorney General
3 JERRY T. YEN, State Bar No. 247988
  Deputy Attorney General
4  1300 I Street, Suite 125
  P.O. Box 944255
5  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
6  Fax: (916) 324-8835
  E-mail: Jerry.Yen@doj.ca.gov
7 *Attorneys for Defendants Rob Bonta, in his*
 *official capacity as California Attorney*
8 *General, and Allison Mendoza, in her official*
 *capacity as Director of the Department of*
9 *Justice Bureau of Firearms*

10

11    IN THE UNITED STATES DISTRICT COURT

12    FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16 **MICHELLE NGUYEN, et al.,**

17       Plaintiffs,

18  **v.**       Case No. 3:20-cv-02470-WQH-BGS

19 **ROB BONTA, in his official capacity**  **EXPERT REPORT AND**
 **as Attorney General of California, et** **DECLARATION OF BRENNAN**
20 **al.,**       **RIVAS**

21     Defendants.

22

23

24

25

26

27

28

          1

**EXPERT REPORT AND DECLARATION OF**
**BRENNAN RIVAS**


**INTRODUCTION AND QUALIFICATIONS**

1.      I am a Historian and independent scholar.  During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library.  From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University.  From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU).  My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

2.      My expertise includes historical weapon regulations in the United States.  I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.  I am currently completing a book manuscript based upon my dissertation research.  A copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

3.      I have provided expert witness declarations in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, No. 7:21-cv-5334-NSR (S.D.N.Y.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wash.); *Siegel v. Platkin*, New Jersey, No. 22-cv-7463-RMB-AMD (D.N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Oregon*

2

1   *Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.); *NSSF v.*

2   *Jennings*, No. 22-cv-01499-RGA (D. Del.); *Jones v. Bonta*, No. 3:19-cv-01226-L-

3   AHG (S.D. Cal.).

4       4.   I have been asked by the California Attorney General's Office to

5   render an opinion on the history of the firearms market and restrictions on the

6   sales of firearms in the nineteenth century.  I am being compensated by the

7   California Attorney General's office at a rate of $130/hour for research and

8   consultation, $150/hour for writing and editing materials, and $200/hour for

9   deposition and testimony.

10   **METHODOLOGY**

11       5.   Historians draw on primary sources while also evaluating them in

12   light of relevant peer-reviewed scholarship.  For example, published works on a

13   given time period or subject help historians interpret news articles, laws,

14   testimony, personal letters, and other primary sources.  Rather than consider such

15   sources in a vacuum, divorced from their context, historians are trained to

16   contextualize them in order to better understand the subject at hand.

17       6.   For this report, I relied upon knowledge and research that I have

18   collected over my years working on the history of gun and weapon regulation in

19   the United States.  I have supplemented that with additional research into the

20   history of firearm sales and distribution during the nineteenth and early twentieth

21   centuries.  I have read or consulted many books about the development of

22   firearms and other weapons from the early modern period to the mid-twentieth

23   century.  In addition to online repositories like Westlaw, Hein Online, Hathi Trust,

24   Chronicling America, and the Duke Repository of Historical Gun Laws, I have

25   made use of digital collections housing government documents and rare

26   newspapers.

27   **SUMMARY OF OPINIONS**

28       7.   Sales restrictions are an integral part of the American tradition of

3

regulating weapons.  They are historical, and developed in scope as population growth and administrative capacity to enforce them increased across the nineteenth century.  Sales prohibitions and prohibitive occupation taxes against deadly weapons date at least as far back as the 1830s, when rates of violence were on the rise in much of the country.  State and municipal laws also regulated the sale of weapons to minors, required firearm dealers to register sales, and assessed occupation taxes.  There is a long history of placing regulatory requirements upon dealers in firearms.

8.     The structure of the firearm sales and distribution market in the nineteenth century made bulk gun purchases fairly difficult.  The high cost of new firearms (particularly well-made rifles and shotguns) meant that most cash-poor and credit-poor Americans would have struggled to purchase more than one at a time.  The hardware and general store proprietorships from which most consumers would have purchased firearms did not have the capital, credit, or capacity to stock large numbers of firearms or a wide variety of them—certainly not in the way that large sporting goods stores, gun shops, or gun shows do today.  Even dedicated gun stores sold other hardware or sporting goods beyond firearms and would have relied upon traveling salesmen called *drummers* to place and fill orders for firearms that were not kept in stock.

9.     Armed extralegal assemblies were a real threat during the nineteenth century, as were black markets in stolen goods.  It is likely that bulk firearm purchases by an individual (rather than a representative of a police, militia, or other legally authorized organization) would have been interpreted as an attempt to raise a private army or engage in illegal sales in firearms.  Nineteenth-century Americans were concerned about firearms being sold into the wrong hands.

**REGULATING WEAPONS IN THE NINETEENTH CENTURY**

10.     In order to make sense of the types of weapon regulations enacted between 1800 and 1900—including sales restrictions—it is crucial to have an

4

1    understanding of the socio-political context of the time.  Nineteenth-century

2    Americans did not debate, pass, and enforce weapon laws in a vacuum any more

3    than we do today—just as for us, their views on how and to what degree they

4    should regulate weapons were formed in response to the violence and loss of life

5    they saw around them.

6         11.    An important regulatory distinction in the nineteenth century was that

7    between *deadly weapons* on one hand and *militia arms* on the other.  Concealable

8    weapons associated with interpersonal violence and crime tended to be grouped

9    together and labeled *deadly weapons*.  They ran the gamut from sword canes to

10   pocket pistols and included various kinds of large knives as well as makeshift

11   weapons such as the "slung shot," which (unlike today's slingshots) consisted of

12   was "a shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a

13   weapon."[1]  Many nineteenth-century regulations, including some sales

14   restrictions, confined themselves to these concealable deadly weapons.

15        12.    The weapons conducive to hunting, militia service, and communal

16   policing fell into a different category.  In the nineteenth century, shotguns,

17   muskets, rifles, the cavalryman's large horse pistol, and sabres were considered

18   militia arms.  Men used these firearms for militia service and for the occasions

19   when they were required to participate in local policing efforts through the *posse*

20   *comitatus*; they would have much more frequently used such weapons for

21   hunting—be it killing predatory animals, driving birds away from their crops, or

22   hunting for meat.  Rifles, muskets, and shotguns were not as likely to be used in

23   the commission of crimes, especially crimes of passion that resulted in murder or

24   manslaughter, when compared to bare hands, blunt instruments, or concealable

25

26   _____

27        [1] This is the definition of the nineteenth-century American phrase from the
     *Oxford English Dictionary*.

28

weapons.[2]

13.      Even though these arms and their owners received certain protections during the nineteenth century, they were not wholly unregulated.  Sometimes militia firearms were stored in local armories, essentially confining them to uses that involved public service.[3]  Local ordinances often regulated where and how the black powder needed to use flintlock firearms could be stored[4], which would have had consequences for the availability and use of such weapons for private, everyday purposes.  Some statutes and ordinances carved out certain spaces where no arms were allowed—not even the rifles, muskets, and shotguns typically exempted as militia arms.  For instance, a law from Texas prohibited all deadly weapons, including "fire-arms, wither known as a six shooter, gun or pistol of any kind" at a host of events ranging from churches to polling places "or other social gathering composed of ladies and gentlemen."[5]  Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to it[6], and Vermont prohibited all weapons inside schools.[7]  Other laws prohibited all weapons within

---

[2] Guns were used in less than half of the murders of unrelated adults, and less than ten percent of marital murders during the seventeenth and eighteenth centuries. See Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 115.

[3] For example, see 1859 Conn. Acts 62, "An Act In Addition To And In Alteration Of 'An Act For Forming And Conducting The Military Force'," ch. 82, § 7.

[4] For example, 1801 Mass. Acts, ch. 20, 507, "An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same."

[5] 1870 Tex. Gen. Laws 63, ch. 46 § 1.

[6] *Revised Statutes of the State of Missouri* (1879), ch.24 § 1274; 1890 Okla. Stat. 495–96.

[7] *Laws of Vermont*, Special Session (1891), No. 85 § 2.  "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly

6

the general vicinity of polling places, churches, and parks.[8]

## SALES RESTRICTIONS

14.     Newspapers and commentary from the nineteenth century are filled with denunciations of carrying deadly weapons, concealing deadly weapons, and the unnecessary loss of life that resulted from both.  One commentator writing in 1838 remarked that "This practice [carrying deadly weapons], which was once only known to a few, very few Americans, has now become so common that

---

weapon shall, upon conviction thereof, be fined not exceeding twenty dollars."  It is worth noting that disarmament laws and policies had been in effect at both public and private colleges long before this time.  For example, *see* The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810); University of Virginia Board of Visitors Minutes, 6–7 (October 4–5, 1824); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838).  This is not an exhaustive list.

[8] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (no carry concealed or unconcealed of "any gun, pistol, bowie knife or other dangerous weapon" within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317–1318 (no carry concealed or unconcealed of "any gun, pistol, bowie knife, or other dangerous weapon" within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (no carry of "any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon" by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 § 1 (no carry of "any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon" by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace § 21 (criminalizing "any gun, pistol, bowie-knife, dagger, or other dangerous weapon" in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry "any gun, pistol, revolver, or other firearm" into public parks).

7

almost every man, and often boys, are seen using them as a common pocket knife."[9]  He went on to lament that "Men under the influence of violent passion, with these instruments of death in hand, instantly perpetrate the most horrid deeds of which they are capable, and bring sudden ruin, shame, and disgrace upon themselves for ever."[10]  Another writer in 1844 stated that "The practice of carrying deadly weapons about the person, apart from its illegality, is morally wrong, highly dangerous, and deeply reprehensible."[11]  An article in the *Washington Post* declared in 1887 that:

> One conspicuous vice which ought in the interest of peace and justice to be suppressed is the habit of carrying deadly weapons. The fact of having a revolver handy makes a man dangerous, for it frequently encourages him to such impudence of speech and demeanor as results in violence. Most of the shooting affrays that disgrace this country spring from the vicious custom of going armed so as to be "ready for an emergency".[12]

The legislative response in nineteenth-century America to the public safety problems posed by deadly weapons typically involved laws prohibiting them in certain public spaces.  The examples of Florida Territory, Georgia, and Tennessee (below), however, show that as early as the 1830s, sales restrictions were also acceptable strategies for protecting the public by reducing the presence of deadly weapons.

15.  An early sales restriction took effect in Florida Territory in 1838, and placed a steep annual tax of $200 upon anyone who chose "to vend dirks, pocket

---

[9] B. T. Kavanaugh, "Moral Reform—Deadly Weapons," *Western Christian Advocate* (Cincinnati, Ohio), January 12, 1838.

[10] *Id.*

[11] "Deadly Weapons," *Sun* (Baltimore, Maryland), September 28, 1844, 2.

[12] "Carrying Deadly Weapons," *Washington Post* (Washington, D.C.), January 20, 1887, 2.

8

pistols, sword canes, or bowie knives."[13]  In 2023 dollars, this amounts to approximately $6,300 per year in order to legally sell pistols or large knives.[14] The hefty tax in an overwhelmingly rural territory would have incentivized firearm and weapon dealers to confine their trade to that of shotguns, muskets, rifles, and other protected arms rather than knives and pistols.  The tax was part of an effort by Florida's territorial lawmakers to reduce the number of weapons being carried in public spaces.  When laws[15] did not do enough to curtail the practice, the legislature turned to the 1838 tax as a second strategy for accomplishing their public safety goal.[16]

16.     Around the same time, Georgia and Tennessee also enacted sales restrictions for deadly weapons.[17]  Georgia passed a statute to "guard and protect [] citizens . . . against the unwarrantable and too prevalent use of deadly weapons" through a sales restriction, making it unlawful "for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence."[18]  The statute further stated that "pistols, dirks, sword canes,

---

[13] 1838 Fla., ch. 24.

[14] The occupation tax amounts to $6,382.73.  *See* https://www.in2013dollars.com/us/inflation/1838?amount=200.

[15] 1835 Florida ch. 860, "An Act to prevent any person in this Territory from carrying arms secretly," 318.

[16] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly."  *See supra*, n. 13.

[17] Tenn. 1838 ch. 137; Ga. 1837 ch. 90; https://dlg.usg.edu/record/dlg_zlgl_16741934#text.

[18] Ga. 1837 ch. 90; https://dlg.usg.edu/record/dlg_zlgl_16741934#text.

spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols."[19]   The following year (1838), Tennessee lawmakers did much the same by prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick."[20]

17.    These sales restrictions were not challenged in the antebellum era the way that public carry laws sometimes were.[21]   Florida's and Tennessee's sales restrictions do not appear to have been challenged in appellate courts.  The public carry portion of the Georgia statute was challenged in 1844, when a man named Hawkins Nunn appealed his conviction.  Nunn had been seen carrying a pistol (not an exempted horseman's pistol) openly in his hand, and a grand jury issued a presentment against him.  The Georgia Supreme Court ultimately struck down the portions of the law in question that prohibited keeping and openly carrying certain kinds of weapons and criticized the poor construction of the statute.  But the decision in the case did not actually address the constitutionality of the sales restriction.[22]   The *Nunn* decision, far from a full-throated defense of limitless gun

---

[19] *Id.*

[20] Tenn. 1838 ch. 137.

[21] Some southern appellate courts weighed the constitutionality of public carry laws in light of their view of the Second Amendment and particularly in light of their state analogues.  The regional understanding that emerged was that legislatures could prohibit the concealed carrying of deadly weapons, but not the open carrying of them.  This understanding coexisted with a general disdain for the habitual carrying of weapons in public spaces, and was likely a way of protecting the open carrying of deadly weapons at times of emergency rather than carte blanche to carry openly at all times.  Eric Ruben and Saul A. Cornell, "Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," *Yale Law Journal Forum* (Summer 2015), 121–35.

[22] *Nunn v. State*, 1 Ga. 243 (1846).

rights, in fact reiterated states' authority to prohibit the concealed carrying of deadly weapons in the name of public safety and set no precedent regarding weapon-specific sales bans.

18.     In the years and decades following the *Nunn* decision, more jurisdictions prohibited the sale of certain deadly weapons.  In 1849, Vermont banned the sale or manufacture of slung shots, and New York followed suit.[23]  In 1855, the Kentucky legislature enacted a law that prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefor,"—essentially banning the sale of deadly weapons altogether.[24]  Prohibitions against the sale and manufacture of slung shots and metal knuckles spread in the post-Civil War period with Florida, Illinois, Massachusetts, North Dakota, and Oklahoma Territory all embracing sales restrictions as a regulatory method.[25]

---

[23] 1849 Vermont ch. 36, 26 § 1; Hiram Denio, et al., *Revised Statutes of the State of New York* (Albany: Gould, Banks, & Co., 1852), Part IV, Title 6, "Misdemeanors," 880 § 52.  The code section cites 1849 New York ch. 278.

[24] Kentucky 1855 ch. 636, 96 § 1.  The term "colts" referred to Colt brand or imitation revolvers, which were the most readily available repeating handgun at that time.

[25] *Florida, 1st Session* (1868), "Laws of Florida," ch. 7, "Of Offenses against the Public Peace," 95 § 11.  The law was reiterated in the subsequent penal code revision.  *See* Allen H. Bush, *Digest of the Statute Law of Florida of General and Public Character, in Force up to the First Day of January, 1872* (Tallahassee: C. H. Walton, 1872), ch. 49, 253 § 12; 1893 Fla. 4124. Sec 1; *Illinois, 32nd General Assembly, 1st Session* (1881), "Criminal Code–Deadly Weapons: Regulates Traffic and Prevents Sale to Minors," 73 § 1; *Public Statutes of the Commonwealth of Massachusetts, Enacted November 19, 1881, to Take Effect February 1, 1882* (Boston: Wright & Potter, 1886), ch. 206, "Offenses against the Public Peace," 1164 § 11 (This appears to be a reiteration of a previously existing law in Massachusetts; citation is G. S. 164 § 11); *Oklahoma, 1st Regular Session*, (1890), ch. 25, "Crimes and Punishment," Art. 38, "Of Crimes against the Public Health and Safety," 475–76 § 18; *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative*

11

19.     By the 1870s, Tennessee had long prohibited the sale of bowie knives and Arkansas toothpicks,[26] but in 1879 lawmakers strengthened their sales restriction by placing pistols within its purview.[27]  The statute in question criminalized the sale of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol."[28]  When a Tennessee merchant named Burgoyne challenged the law, the state supreme court decided that it was well within the police powers of the legislature to "put down the pernicious habit of

_Assembly_ (1883), ch. 38, "Of Crimes against the Public Health and Safety," 684, § 455–56; _Revised Codes of the State of North Dakota_ (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311.

[26] 1837-1838 Tennessee ch. 132, "An Act to suppress the sale and use of Bowie Knives and Arkansas Toothpicks in this State," 200-201 (_supra_, n. 17 and n. 20).  There was a brief period in which the law was not enforced during the Civil War.  Tennessee was the first Confederate state to be reconquered and begin the process of political reconstruction (in 1863), so it is likely that this wartime hiatus of enforcement lasted less than two years.  Tenn. 1862 ch. 23.

[27] Between 1871 and 1879, Tennessee lawmakers made substantial changes to their state weapons policy, of which the 1879 sales restriction forms only a part.  An 1870 statute prohibited "publicly or privately" carrying "a dirk, sword cane, Spanish stiletto, belt or pocket pistol or revolver."  When the state supreme court struck the measure down as unconstitutional for prohibiting the open carrying of militia arms known as "repeaters" (referring to army-sized revolvers), lawmakers quickly added an exception for army/navy pistols carried "openly in his hands."  In 1879, lawmakers prohibited the sale of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistols."  See 1870 Tenn. 13, p. 28-29; 1871 Tenn. 90, p. 81-82; _Andrews v. State_, 50 Tenn. 165 (1871); 1879 Tenn. 96 p. 135-136.

[28] Tenn. 1879 ch. 96. (Sec. 1: "That it shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; _Provided_, that this Act shall not be enforced against any person now having license to sell such articles until the expiration of such present license,").  The associated fine was $25 to $100 and imprisonment at the court's discretion.

12

going armed"[29] by declining to issue licenses to firearm dealers.  When the justices considered whether the law deprived Burgoyne of his property rights, they determined that the state's allowance for licensed dealers to dispose of their stock prior to the expiration of their licenses was sufficient protection.  In explaining that the harm posed by the pistol trade justified the sales restriction, the court quoted Thomas Cooley, one of the more influential legal scholars of the time. Cooley wrote that sometimes a tax "has not for its object the raising of revenue, but looks rather to the regulation of relative rights, privileges and duties, as between individuals, to the conservation of order in the political society, to the encouragement of industry, and the discouragement of pernicious employments."[30]  The legislation was "being made in the exercise of that authority which is inherent in every sovereignty, to make all such rules and regulations as are needful to secure and preserve the public order, and to protect each individual in the enjoyment of his own rights and privileges by requiring the observance of rules of order, fairness and good neighborhood, by all around him."[31]  The Tennessee justices summed up the concept by saying that "the private interests of the few must yield to the welfare of the many and good order in society."[32]

20.     Arkansas lawmakers followed the pattern set by their peers in Tennessee by enacting a statute in 1881 that updated the public carry law and included a similar sales restriction.[33]  Not only did it prohibit carrying pistols, knives, swords, spears, metal knuckles, and razors, but also provided that anyone

---

[29] *State v. Burgoyne*, 75 Tenn. 173 (1881).

[30] Thomas M. Cooley, *A Treatise on the Law of Taxation: Including the Law of Local Assessments* (Chicago: Callaghan, 1876), 396.  See https://archive.org/details/atreatiseonlawt01coolgoog/page/896/mode/1up.

[31] *Id.*

[32] *State v. Burgoyne*, 75 Tenn. 173 (1881).

[33] Ark. 1881 ch. 96.

13

"who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to *any person*" said weapons also faced prosecution.[34]  When the law was challenged, appellate judges upheld it as a constitutional exercise of police power:

> It is difficult to assign bounds to the police power of the State.  It extends to the protection of the lives, health, comfort and quite of all persons and the protection of all property within the State.  The law was enacted as a measure of precaution for the prevention of crimes and calamities.  It is leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person.[35]

21.     Sales restrictions also took the form of minimum age requirements. Americans often found it concerning that underage persons, particularly boys, could acquire deadly weapons from local dealers.  In response, state legislatures began setting minimum age requirements for the purchase of certain weapons and holding dealers accountable to exercise some discretion in conducting sales to those who were or appeared to be underage.[36]  Between the Civil War and the turn of the twentieth century, more than a dozen states assessed fines and other

---

[34] *Id.*, see especially §2-3.  It is worth noting that the Arkansas policy was almost identical to that of Tennessee in that the public carrying of deadly weapons was strictly illegal with the exception of army/navy pistols carried "uncovered" and in the hand.

[35] *Dabbs v. State*, 39 Ark. 353 (1882).

[36] For example, see *Holt County Sentinel* (Oregon, Missouri), February 27, 1880, 1 (Discussion of the "wretched practice of carrying concealed weapons…among boys," which included a call for greater stringency in enforcing the law against selling them to minors.); and "A Correction," *Wheeling Register* (Wheeling, West Virginia), November 12, 1891, 6 (A gunsmith charged with "selling weapons to minors" argues that the guns in question had been stolen, and that "they do not sell pistols to boys."). See also "The Law in Regard to Deadly Weapons," *The Sun* (Baltimore, Maryland), July 12, 1883, 4; and "Small Boys and Deadly Weapons," *Chicago Daily Tribune* (Chicago, Illinois), December 31, 1880, 11.

14

penalties upon dealers who provided weapons to underage buyers.[37]  Unlawful sales, gifts, or transfers of deadly weapons to minors were misdemeanors punishable by a fine (most of them ranging from $25 to $200).  Some jurisdictions provided for jail time in lieu of or in addition to the fine.  Missouri's statute applied to various deadly weapons as well as "any kind of fire arms."[38]  Ohio also restricted the sale of all guns to those under the minimum age requirement.[39]

22.    Some jurisdictions also required firearm dealers to register and track their sales as a way to reduce gun crime.[40]  Beginning in 1881, Illinois required

_____

[37] Alab. 1856 ch. 26 p. 17; Tenn. 1856 ch. 81 p. 92 § 2; Ind. 1875 ch. 40 p. 59; Geo. 1876 ch. 128 p. 112; Miss. 1878 ch. 46 p. 175; Ohio 1880 S.B. 80 p. 79; Penn. 1881 ch. 124 p. 111; Dela. 1881 ch. 548 p. 716; Flor. 1881 ch. 3285 p. 87; Ill. 1881 "Criminal Code" § 2 p. 73; Mary. 1882 ch. 424 p. 656; W. V. 1882 ch. 135 § 7 p. 421; Kan. 1883 ch. 105 p. 159; MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,'"; Wisc. 1883 ch. 329 p. 290; Iowa 1884 ch. 78 p. 86; Okla. 1890 ch. 25 art. 47 § 3 p. 496; Lou. 1890 ch. 46 p. 39; Va. 1890 ch. 152 p. 118; Wyo. 1890 ch. 73 § 97 p. 140; N. C. 1893 ch. 514 p. 468; Tex. 1897 ch. 154 p. 221.

[38] MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,'" ("If any person . . .shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon [any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon], without the consent of the parent or guardian of such minor . . . .").

[39] Ohio 1880 S.B. 80 p. 79 ("…any air gun, musket, rifle-gun, shot-gun, revolver, pistol, or other fire-arm, of any kind or description whatever, or ammunition for the same . . . .").

[40] For example, see "Ned Brace Discusses Proposed Plans and Needed Reforms for Birmingham," *Age-Herald* (Birmingham, Alabama), October 7, 1900, 20 (Describing various measures that would reduce "murder and shooting scrapes" in the city, including "a law requiring every dealer in pistols to keep a correct and sworn register of every weapon he sells and to whom," said register to "be open at all times to police inspection."); and "Sale of Pistols: How the New Law is Observed," *Chicago Daily Tribune* (Chicago, Illinois), July 7, 1881, 8 (Stating that the purpose of a sales registry requirement was "presumably to enable the police

1   every dealer to keep a register of all sales of deadly weapons—which included

2   "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like

3   character, capable of being secreted upon the person."  The law went so far as to

4   specify the form of the register and require the serial number of the weapon.[41]

5   The District of Columbia had a similar registration requirement, which was

6   approved by the United States Congress in 1892.  Among other things, the law

7   required all dealers in deadly weapons to be properly licensed, and to "keep a

8   written register of the name and residence of every purchaser, barterer, hirer,

9   borrower, or donee of any such weapon."[42]

10      23.     Even though nineteenth-century regulations often confined

11   themselves to deadly weapons (especially pocket pistols), not all did so.

12   Furthermore, as automatic rifles and shotguns began to pose risks to public safety,

13   states responded by exercising their police power to regulate their sale and

14   possession.  These technological changes, which caused major societal concern

15   about criminal activity and public safety, facilitated parallel developments in

16   firearm regulation by encouraging states, municipalities, and ultimately the

17   federal government to enact licensing, registration, and taxation systems—all of

18   which placed some burdens upon firearm dealers for the sake of the common

19   _____

20   authorities to control the sale of revolvers particularly, and to give them a [clue] to

21   the purchaser in the event of the weapon being found when a murderer escaped.").

22   [41] *Illinois, 32nd General Assembly, 1st Session* (1881), "Criminal Code–
    Deadly Weapons: Regulates Traffic and Prevents Sale to Minors," 73–74 § 2–3

23   (*supra*, n. 25).  There was some critique of the law as insufficiently effective, at
    least in part due to the fact that dealers were not required to verify the identity of

24   the buyer and some deadly weapons were not manufactured with serial numbers.

25   See "Sale of Pistols," *Chicago Daily Tribune* (Chicago, Illinois), July 7, 1881, 8.

26   [42] "To Punish the Carrying or Selling of Deadly or Dangerous Weapons
    within the District of Columbia, and for other Purposes," ch.159, 52 Congress,

27   Public Law 52-159, 27 Stat. 116 (1892), 117 § 5.

28

good.[43]  The tradition of regulating dealers, which reached back to the nineteenth century, was not controversial.[44]  From the nineteenth century well into the twentieth, the American people, their legislatures, and their judges believed that sales regulations upon firearms were permissible strategies to protect the public from gun violence.[45]

**FIREARM SALES & DISTRIBUTION IN THE NINETEENTH CENTURY**

24.     Restricting the number of firearms that could be purchased at one time was not a necessary form of weapon regulation during the nineteenth century.  Manufacturing and distribution networks for finished goods in the United States did not allow for the kinds of bulk purchases that are possible today.  A review of the firearms industry's organization (which was a subset of the hardware distribution system) in light of American business history shows that large purchases of firearms by individuals were unlikely in the nineteenth century, and therefore did not generate a regulatory response from American lawmakers.

25.     Much like today, nineteenth-century goods could be cheap and poorly manufactured or expensive and well-made.  Even though low-cost pistols were becoming ever more widely available in the post-Civil War period, high quality products from reputable brands (like Colt's Patent Fire Arms Company or the Winchester Repeating Arms Company) tended to be significantly more expensive—particularly larger firearms like rifles and shotguns.  Many guns cost upwards of fifty dollars; a fifty-dollar firearm in 1875 would cost approximately

---

[43] Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (New York: W. W. Norton & Company, 2011), 202-203 (discussing the National Firearms Act of 1934 as a response to rampant criminal use of automatic firearms).

[44] Such regulations generated fewer challenges than public carry laws.  See *State v. Burgoyne*, 75 Tenn. 173 (1881); *Dabbs v. State*, 39 Ark. 353 (1882).

[45] See *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

17

1   $1,100.00 today.[46]  These high prices, particularly in conjunction with the relative

2   cash- and credit-poverty of many Americans, means that the acquisition of

3   numerous firearms was fairly cost-prohibitive.  Moreover, the post-Civil War

4   decades were a time of significant technological development and innovation for

5   firearms.  Many gun purchases resulted from preexisting gun owners buying new

6   breech-loading guns to replace their old muzzle-loaders, or new centerfire models

7   to replace older rimfire ones.  A similar transition was occurring with revolvers,

8   with owners of cap-and-ball pistols likely to spend money on replacement

9   firearms with newer features.[47]

10      26.     For most of the nineteenth century, firearms were sold to the general

11   public in hardware stores, general stores, or pawn shops.[48]  Store owners provided

[46] The exact amount is $1,157.87. See https://www.in2013dollars.com/us/ inflation/1870?amount=50.  See also "The Gun Trade in America," *Turf, Field & Farm* (March 19, 1875), 186 ("One noticeable feature of the repair trade is that only the cheaper guns come in for treatment; nearly all the repairs being required on guns whose original cost was less than $50, from which fact we infer that it is cheaper, in the long run, to buy the higher priced and consequently higher grades of guns.").

[47] *Id*. ("The muzzle-loaders have all been very materially reduced in price, as they are going out of use as the breech-loader becomes better known.  To such an extent is this the case that this firm have ceased importing fine muzzle-loaders.").

[48] On the role of wholesalers in the American firearms trade of the nineteenth century, see Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016), 169-171.  On the challenges of running a retail business in the West, see Greg Gordon, "The Shopkeeper's Frontier," *Montana: The Magazine of Western History* 69, no. 4 (Winter 2019), 37-55.  See also "Address of W. L. Sanford," *American Artisan and Hardware Record* (Chicago, Illinois), January 20, 1908, 22 (A section titled "Local Jobber Needs Support," provides a list of forty items, "the sales of which amount to millions in our territory [Arkansas and Texas]."  Of those items, eleven were firearms and ammunition: Ammunition, Remington Guns, Remington Rifles, Stevens Guns, Stevens Rifles, Winchester Guns, Winchester Rifles, Savage Rifles, Colts Revolvers, Automatic Revolvers, and Remington Revolvers).  The use of the word "guns" in juxtaposition to "rifles" indicates that the author meant shotguns.

18

1  a vast array of goods, ranging from nails, flour, farm implements, and lumber to

2  guns and ammunition and everything in between.  These stores were small

3  operations compared to the large department stores that emerged in the early

4  twentieth century and have since morphed into the "box stores" of today.

5  Photographs of storekeepers often show a large room with nearly every square

6  foot of space devoted to storing or showing available products.[49]  Due to their

7  limited space and the cost of doing business, individual retailers kept relatively

8  small inventories on hand, especially for goods that were not the necessities (like

9  flour) that local customers needed on a recurring basis.  When orders for more

10  specialized goods arrived—such as perhaps a new and expensive firearm—

11  retailers contacted traveling salesmen called *drummers*.  A drummer typically

12  represented a wholesaler (sometimes called *jobbers*), who in turn specialized in a

13  type of goods, like hardware, textiles, or groceries.  An individual retailer might

14  have relationships with several drummers, each of whom provided advice about

15  stocking and selling their goods.  A hardware drummer operating in Missouri

16  during the latter 1800s estimated that the turnaround time for fulfilling retailers'

---

There were dedicated gun stores in the nineteenth century, though not in every town the way that a general store or hardware store would be.  Gun stores also carried other sporting goods or hardware products.  For example, see *Daily Los Angeles Herald* (Los Angeles, California), November 30, 1878, 2 ("Ladies' scissors and pen knives at Sutherland's gun store, 75 main street."); *Fort Worth Daily Gazette* (Fort Worth, Texas), August 23, 1889, 8 ("An elegant new line of fishing tackle at Anderson's gun store." "Get one of those fine fishing rods and reels at Anderson's gun store.").  On the kinds of goods stocked by general store proprietors, see Gerald Carson, *The Old Country Store* (New York: Oxford University Press, 1954), 191-214.

[49] For examples of some photographs, see:
https://texashistory.unt.edu/ark:/67531/metapth398/m1/1/?q=store /
https://texashistory.unt.edu/ark:/67531/metapth191228/m1/1/?q=store /
https://texashistory.unt.edu/ark:/67531/metapth202776/m1/1/?q=store /
https://texashistory.unt.edu/ark:/67531/metapth16112/m1/1/?q=store

19

orders took about a week.[50]

27.     During the post-Civil War period, high-end manufacturers like Colt and Winchester produced catalogs for the jobbers and retailers who distributed and sold their products.  These catalogs showcased the entire lineup of firearms, ammunition, and related accessories with descriptions, prices, and sometimes even customer reviews.[51]  Newly released products might be featured in the front of the catalog.  They also advertised in the growing number of interest-specific magazines.[52]  Hunting was a common recreational activity, and publications like *Field and Stream* and *Shooting and Fishing* provided hunters with information about their pastime as well as the firearms and ammunition that were required for it.  Some customers undoubtedly entered a retail hardware store (or pawn shop) and made a firearm purchase based on what was readily available and what could be had for the lowest price; but the advertising methods of major firearm companies indicates that they shaped consumer tastes to some extent by showing detailed images and descriptions of firearms that might not be available at the neighborhood hardware store or even at the nearest city's gun shop.[53]  Instead,

---

[50] On drummers and their relationships to retail proprietors, see Walter A. Friedman, *Birth of a Salesman: The Transformation of Selling in America* (Cambridge: Harvard University Press, 2004), 56-87; on hardware drummers, see especially 72-79.  See also Carson, *The Old Country Store*, 131-158.

[51] Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[52] See, for example, reprints of pages from Colt catalogs of the 1880s, and a reprint of an advertisement in *Shooting and Fishing*, available in Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver, and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 408-417.  On the innovative advertising and marketing strategies employed by Colt and Winchester during the late nineteenth century, see Haag, *The Gunning of America*, 250-255.

[53] For example, an advertisement for a Colt rifle originally published in

1   someone wanting to buy a new Winchester or Colt might have to go to a store,

2   place an order, and wait a week or more while the retailer contacted his drummer,

3   who then sent an order to the hardware wholesaler, who fetched it from the

4   warehouse and shipped it directly to the retailer.[54]  This process likely would have

5   been the same even for less well-known brands simply because retailers did not

6   have the space or capital to store goods that they could not rely on to sell.[55]  As

7   with other products, hardware and general retailers probably kept a few of the

8   best-selling, reasonably priced models on hand, and might stock up in advance of

9   hunting season in the fall.[56]  The rest they would have fulfilled through the

10

11   _Shooting and Fishing_ informs potential customers that "Detailed descriptions of
      any of the above Arms [versions of "Colt's New Lightning Magazine Rifles"] will
12    be furnished on application to the wholesale trade.").  Reprinted in Haven and
13    Belden, _History of the Colt Revolver_, 414.

14         [54] See Friedman, _Birth of a Salesman_, 72-79.

15         [55] Newspaper coverage of major firearm-specific wholesalers B. Kittredge &
      Co. and Schuyler, Hartley, Graham & Co. indicate how unusual it was for
16    Americans of that time to be in a space filled with firearms.  In 1875, _Turf, Field_
      _and Farm_ ran a full page special report on the firearms trade that was based upon
17    the journalist's visit to the Kittredge distribution warehouse in Cincinnati, Ohio.
      The author, who visited the firm's warehouse, related that "I will endeavor to tell
18    you some of the sights I saw there, though I am sure that any one of those who read
      my imperfect description of this wonderful establishment, would, if permitted to
19    visit it in all its various departments and see with his own eyes that which I saw,
      exclaim with the Oriental queen, 'The half had not been told me!'."  See "The Gun
20    Trade in America," _Turf, Field, and Farm_ (Cincinnati, Ohio) March 19, 1875, 186.
      In 1867, a visitor to the Schuyler, Hartley, Graham & Co. warehouse in Manhattan
21    described it as an "emporium," and that "we know of few places in the city that
      would prove more attractive to the sportsman that this establishment."  The writer
22    went on to say that the selection of firearms available there was such that "here he
      can settle for himself as far as mere inspection without actual trial can do so, the
23    relative merits" of various firearms.  See "Guns, Rifles, Pistols, and Military
      Equipments," _Turf, Field, and Farm_ (Cincinnati, Ohio), October 19, 1867, 248.
24
25         [56] Friedman, _Birth of a Salesman_, 73.
26
27
28

network of drummers and jobbers.

28.    Drummers and small-time retailers eventually lost market share to catalog companies and were further hurt by manufacturers beginning to sell directly to affiliated retailers rather than going through the wholesaler middlemen. This shift coincided with the rise of retail chain stores and department stores in the early twentieth century.  Manufacturers hired their own sales personnel and developed relationships with large-scale retail enterprises that could afford to purchase and store more products than the independent shopkeeper.[57]

29.    The overall structure of the American hardware and firearm industries reduced the likelihood that individual consumers would be able to afford or acquire guns in bulk.  And even though there were not statutory obstacles preventing a person from buying multiple guns at one time, it is unlikely that nineteenth-century Americans viewed large firearm purchases by an individual as harmless.  Numerous states prohibited armed assemblies in public. The text repeated in several jurisdictions stated: "It shall not be lawful for any body of men whatever, other-than the regular organized volunteer militia of this State, and the troops of the United States, to associate themselves together as a military company or organization, or to drill or parade with arms in any city, or town, of this State, without the license of the Governor thereof, which license may

---

[57] On the rise of catalog companies, mail-order retail, and name-brand products, see Friedman, *Birth of a Salesman*, 86-91; Boris Emmet and John E. Jeuck, *Catalogues and Counters: A History of Sears, Roebuck, and Company* (Chicago: University of Chicago Press, 1950), 14-20.  In the early twentieth century, American hardware dealers discussed these changes, asking whether the jobber was still needed in the hardware trade.  For example, see "Must the Hardware Jobber Go?" *Hardware Dealers' Magazine* (New York, New York), July 1, 1901, 57; "Jobbers Who Sell Consumers," *Hardware Dealers' Magazine* (New York, New York), September 1, 1902, 431; "Meeting Catalogue House Competition," *American Artisan and Hardware Report* (Chicago, Illinois), February 11, 1905, 43.

22

at any time be revoked."[58]  These statutes aimed to prevent private armies or riotous gatherings from taking the law into their own hands.  Across the nineteenth century, Americans witnessed, debated, and sometimes participated in extralegal armed assemblies through filibustering campaigns, vigilante conflicts, local/regional "wars" between rival political groups, racist terror organizations, and urban gangs.  These conflicts were not mere abstractions to the people involved, who feared that their homes and communities could be destroyed by armed mobs.

---

[58] Myra Bradwell, *All the Laws of the State of Illinois Passed by the General Assembly, Convened January 8th, 1879. Adjourned sine die May 31st, 1879. With Head Notes and References to the Revised Statutes of 1877* (Chicago, IL: Chicago Legal News Company, 1879), 156-157, Article XI General Provisions, § 5 Other Organizations Prohibited.  See also *Laws Passed at the Second Session of the General Assembly of the State of Colorado, Convened at Denver, on the First Day of January, A, D. 1879* (Denver, CO: Daily Times Printing House and Book Manufactory, 1879), 138-139, Article VIII, § 23 Unlawful Armed Assemblage; *Acts Resolves Passed by The General Court at Massachusetts, in the Year 1866 Together with the Constitution, the Messages of the Governor, List of the Civil Government, Changes of Names of Persons, Etc. Etc. Etc.* (Boston: Wright & Potter, State Printers, No. 4 Spring Lane, 1866), 219, Ch. 219, An Act Concerning the Militia §184, Approved 8 May, 1866; William E. Miller, *Revised and Annotated Code of Iowa, Containing All the Statutes of the State of Iowa of a General Nature in Force July 4, 1880, Being the Code of 1873 as Amended by Statutes Passed by the Fifteenth, Sixteenth, Seventeenth and Eighteenth General Assemblies, and All the General and Permanent Statutes of those Sessions Suitably Arranged...Authorized and Made Legal Evidence by Chap. 196, Laws of 1800,* vol. 1 (Des Moines, IA: Mills & Company, 1880), 265, Title 8, Ch. 1, § 36 Unlawful for Other than Regularly Organized Militia to Organize. Undated; *Acts and Resolutions of the General Assembly of the State of Georgia: 1884-85* (Atlanta, GA: James P. Harrison, & Co., 1885), 85. Title 7, Military, No. 355, § 17 Permission to Drill for Troops Other than Volunteer Forces, etc. Approved October 13, 1885; Acts and Resolves Passed by the Forty-Fourth Legislature of the State of Maine (Augusta, ME: Stevens & Sayward, 1865), 83, Ch. 307, An Act Concerning the Militia, §171, Approved 23 Feb. 1865.  Laws of this nature were upheld in *Presser v. Illinois*, 116 U.S. 252 (1886).

23

30.     A private citizen buying firearms in bulk could have easily been interpreted as an attempt to outfit an armed assembly or prop up an unregulated, secondary market.  Such secondary markets were associated with criminal activity such as burglary and theft.[59]  A detective active during the post-Civil War period explained the connection, saying that "pawnbrokers encourage robbers, for if there were no shops the temptation to steal would not be so great."[60]  As a result, the pawnshop business was regulated.  For instance, Texas laws required pawnbrokers to post a bond, submit to licensing laws, register all sales, and provided a criminal penalty for failure to comply.[61]  New Orleans, Louisiana exercised its police powers through an ordinance in the 1890s that regulated second-hand stores as a way of tracking down stolen goods.[62]  This points to the view of late-nineteenth century Americans that pawn shops, second-hand stores, and other retail venues that participated in secondary markets were often used to

---

[59] Theft and resale of goods was a serious concern in the nineteenth century. Legislation from 1862 pertaining to the Washington, D. C. police force included specific requirements for how to handle "property or money taken on suspicion of having been feloniously obtained, or of being the proceeds of crime . . . ."  The police standards included instructions for "all property and money taken from pawnbrokers as the proceeds of crime," showing that the connection between pawn shops and illegal sales was already well-established.  See Pub. L. No. 37-181, 12 Stat. 478 (1862), ch. 181.

[60] "Men Who Never Sleep," *Arkansaw Traveler* (Little Rock, Arkansas), June 1, 1889, 10.

[61] For definitions and regulations for pawnbrokers, see *1879 Revised Civil Statutes of the State of Texas*, Title 70: Pawnbrokers, 499-500, § 3494-3510.  See also *1879 Penal Code of the State of Texas*, Title 11: Offenses Against Public Policy, ch. 8 "Miscellaneous Offenses," 52, § 386 ("If any pawnbroker or person doing any business as such shall receive any article in pledge, or sell the same without complying with the laws regulating pawnbrokerage in this state, he shall be punished by fine not less than twenty-five nor more than one hundred dollars.").

[62] The ordinance was eventually nullified because the city did not have authority to enact it.  *State v. Itzcovitch*, 49 La. Ann. 366 (1897).

24

further criminal activity.

## CONCLUSION

31.    In the nineteenth century, weapon sales were regulated in a number of ways.  Some weapons were illegal to sell altogether, and numerous states set minimum age requirements for purchases.  Yet other jurisdictions levied occupation taxes or required transactions to be registered.  All of these laws were intended to reduce gun crime in the United States, and each placed burdens upon dealers in firearms and other weapons, penalizing them criminally for infractions. When sales restrictions were challenged in court, they were typically affirmed as an appropriate exercise of police power to protect the public.  The absence of restrictions on the number of firearms that could be purchased arises more from structural differences in the gun-making and -distribution industries than from a nineteenth-century aversion to such a policy.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently to them.

Executed on May 19, 2023, at Fort Worth, Texas.

*Brennan Rivas*

Brennan Rivas

26

# EXHIBIT A

Exhibit 11
Page 00238

# Brennan Gardner Rivas
## Curriculum Vitae · May 2023

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
　　University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
　　2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
　　Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
　　the Lone Star State, 1836-1930"
　　Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
　　Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
　　1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
　　on the Place of Guns in American Law and Society* (New York: Oxford University Press,
　　forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
　　(May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
　　Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the
　　Journal of the Early Republic*, forthcoming, 2023.
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
　　Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
　　Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
　　*Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History

Exhibit 11
Page 00239

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
  ~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures
"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)
"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
  ~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"
"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
  ~ Public lecture featuring special insights for genealogical researchers
"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
  ~ Research presentation focusing on interpretation of county court records
"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
  ~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
  ~ Awarded by the Newberry Library to scholars using its collection to research topics in American history
Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
  ~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books
The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
  ~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students
Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
  ~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West

2

Exhibit 11
Page 00240

Status: Research and writing in progress

## University Teaching Experience
*Instructor of Record*
Lecturer in American History, Texas Christian University                    2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University                    2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks
"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service
Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020

Exhibit 11
Page 00241

~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016

~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015

~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.

*Jones v. Bonta*, California, 3:19-cv-01226-L-AHG, S.D. Cal.

## Professional Memberships

Society for Historians of the Gilded Age and Progressive Era

Texas State Historical Association

Southern Historical Association

American Historical Association

## Languages

Spanish (Proficient)

Latin (Proficient)

4

Exhibit 11
Page 00242