ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JERRY T. YEN
Deputy Attorney General
State Bar No. 247988
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7836
  Fax:  (916) 324-8835
  E-mail:  Jerry.Yen@doj.ca.gov
*Attorneys for Rob Bonta, in his official
capacity as California Attorney General, and
Allison Mendoza, in her official capacity as
Director of the Department of Justice Bureau
of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,** | Case No. 3:20-cv-02470-WQH-MMP |
| Plaintiffs, | **EXHIBITS 12-17 TO THE DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of California, et al.,** | Date:          To be set by the Court |
| Defendants. | Judge:        Hon. William Q. Hayes |
| | Courtroom:  14B |
| | Action Filed:  Dec. 18, 2020 |

1

**EXHIBITS**

**TABLE OF CONTENTS**

| Exhibit | Description | Pages |
|---|---|---|
| Exhibit 3 | Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996) | 00001-00004 |
| Exhibit 4 | Virginia State Crime Commission, *Study of Virginia's Law on Handgun Purchase Limits*, House Document No. 28 (1996) | 00005-00073 |
| Exhibit 5 | Christopher S. Koper, *Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement*, 4 Criminology & Pub. Pol'y 749 (2005) | 00074-00104 |
| Exhibit 6 | Anthony A. Braga, *Long-Term Trends in the Sources of Boston Crime Guns*, 3 RSF: The Russell Sage Found. J. Soc. Sci. 76 (2017) | 00105-00125 |
| Exhibit 7 | Mona A. Wright, et al., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances that Suggest Gun Trafficking*, 87 J. Urban Health 352 (2010) | 00126-00139 |
| Exhibit 8 | Expert Report and Declaration of Joseph L. Bisbee (with relevant exhibits) | 00140-00157 |
| Exhibit 9 | Expert Report and Declaration of Kevin M. Sweeney | 00158-00179 |
| Exhibit 10 | Expert Report and Declaration of Jennifer M. McCutchen | 00180-00210 |
| Exhibit 11 | Expert Report and Declaration of Brennan Rivas | 00211-00242 |
| Exhibit 12 | Plaintiff Dominic Boguski's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00243-00252 |

| Exhibit | Description | Pages |
|---------|-------------|-------|
| Exhibit 13 | Plaintiff Frank Colletti's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00253-00262 |
| Exhibit 14 | Plaintiff Jay Medina's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00263-00272 |
| Exhibit 15 | Plaintiff Michelle Nguyen's Amended Responses to Defendant Rob Bonta's First Set of Requests for Admission | 00273-00282 |
| Exhibit 16 | Excerpts from William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* (University of North Carolina Press 1996) | 00283-00305 |
| Exhibit 17 | Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2022) | 00306-00332 |

Declaration of Jerry T. Yen ISO Defendants' MSJ (3:20-cv-02470)

# Exhibit 12

Exhibit 12
Page 00243

Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**MICHELLE NGUYEN**, et al.,

    Plaintiffs,

    vs.

**ROB BONTA**, Attorney General of California, et al.,

    Defendants.

Case No. 3:20-cv-02470-WQH-WVG

Hon. J. William Q. Hayes

**PLAINTIFF BOGUSKI'S AMENDED RESPONSES TO DEFENDANT ROB BONTA'S FIRST SET OF REQUESTS FOR ADMISSION**

**Complaint Filed: December 18, 2020**

*PLAINTIFF BOGUSKI' AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-CV-02470-WQH-WVG)

Exhibit 12
Page 00244

PROPOUNDING PARTY: Defendant Rob Bonta

RESPONDING PARTY: Plaintiff Boguski

SET NUMBER: One

**AMENDED RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION**

Pursuant to Federal Rules of Civil Procedure, rule 36, Plaintiff Boguski responds to the following requests for admission from Defendant Bonta.

**Request for Admission No. 1:**

Admit that YOU own at least one operable FIREARM that is suitable for self-defense, including defense of hearth and home.

**Response:**

**Objection. The phrase "suitable for self-defense" is vague, ambiguous, and calls for a legal conclusion depending on the undefined meaning ascribed to it. The request invades Plaintiff Boguski's privacy rights. Further, the interrogatory is overbroad and harassing insofar as it seeks information relating to the ownership of constitutionally protected property. It also seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff owns any firearm has no bearing on the on the legal issue in dispute—namely, whether the prohibitions under the challenged laws that prevent ordinary law-abiding Californians from purchasing or acquiring more than one handgun or semiautomatic centerfire rifle within a 30-day period**

1

violate the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution.

Without waiving any of these objections, Plaintiff Boguski responds as follows: Plaintiff Boguski admits that he owns at least one operable firearm that he uses for lawful purposes including self-defense.

**Request for Admission No. 2:**

Admit that YOU are able to purchase an operable FIREARM that is suitable for self-defense, including defense of hearth and home.

**Response:**

Objection. The phrase "suitable for self-defense" is vague, ambiguous, and calls for a legal conclusion depending on the undefined meaning ascribed to it. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff owns any firearm has no bearing on the on the legal issue in dispute—namely, whether the prohibitions under the challenged laws that prevent ordinary law-abiding Californians from purchasing or acquiring more than one handgun or semiautomatic centerfire rifle within a 30-day period violate the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution.

2

**Without waiving any of these objections, Plaintiff Boguski responds as follows: Plaintiff Boguski admits he is able to purchase an operable firearm, subject to the prohibitions of the laws being challenged in this action which restrict the number and frequency of such purchases for law-abiding citizens like him.**

<u>**Request for Admission No. 3:**</u>

Admit that YOU are able to obtain more than one handgun within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

<u>**Response:**</u>

**Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.**

3

*PLAINTIFF BOGUSKI'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 12

Page 00247

Without waiving any of these objections, Plaintiff Boguski responds as follows: He would be able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) a private party seller or transferor of a handgun exists; (2) the handgun to be sold or transferred is lawful to own and possess, is in an operable condition, and is reliable for self-defense and other lawful purposes; (3) the private party seller or transferor is ready, willing, and able to sell or transfer the handgun to Plaintiff Boguski; (4) Plaintiff Boguski is simultaneously ready, willing, and able to purchase or receive the handgun; and (5) the sale or transfer can be and is completed within the same 30-day period. Plaintiff Boguski can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Boguski continues to deny that his ability to do so has any bearing on the issues in dispute.

4

*PLAINTIFF BOGUSKI'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 12

Page 00248

**Request for Admission No. 4:**

Admit that YOU are able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

**Response:**

**Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.**

**Without waiving any of these objections, Plaintiff Boguski responds as follows: He would be able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) a private party seller or transferor of a semiautomatic**

5

*Plaintiff Boguski's Amended Responses to Defendant Bonta's First Set of Requests for admission*
(Case No. 3:20-cv-02470-WQH-WVG)

Exhibit 12

Page 00249

centerfire rifle exists; (2) the semiautomatic centerfire rifle to be sold or transferred is lawful to own and possess, is in an operable condition, and is reliable for self-defense and other lawful purposes; (3) the private party seller or transferor is ready, willing, and able to sell or transfer the semiautomatic centerfire rifle to Plaintiff Boguski; (4) Plaintiff Boguski is simultaneously ready, willing, and able to purchase or receive the semiautomatic centerfire rifle; and (5) the sale or transfer can be and is completed within the same 30-day period. Plaintiff Boguski can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Boguski continues to deny that his ability to do so has any bearing on the issues in dispute.

**Request for Admission No. 5:**

Admit that YOU are able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

6

**Response:**

Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.

Without waiving any of these objections, Plaintiff Boguski responds as follows: He would be able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) there exists a private party seller or transferor of both a handgun and a semiautomatic centerfire rifle; (2) both the handgun and the semiautomatic centerfire rifle to be sold or transferred are lawful to own and possess, are in an operable condition, and are reliable for self-defense and other lawful purposes; (3) the private party seller or transferor of the handgun is

7

ready, willing, and able to sell or transfer the handgun to Plaintiff Boguski; (4) the private party seller or transferor of the semiautomatic centerfire rifle is ready, willing, and able to sell or transfer the rifle to Plaintiff Boguski; (5) Plaintiff Boguski is simultaneously ready, willing, and able to purchase or receive both the handgun and the semiautomatic centerfire rifle; and (6) the sale or transfer of both firearms can be and is completed within the same 30-day period. Plaintiff Boguski can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Boguski continues to deny that his ability to do so has any bearing on the issues in dispute.

November 1, 2021                    Respectfully Submitted,

                                    */s/ Raymond M. DiGuiseppe*
                                    Raymond M. DiGuiseppe
                                    The DiGuiseppe Law Firm, P.C.
                                    4320 Southport-Supply Road, Suite 300
                                    Southport, NC 28461
                                    Tel.: 910-713-8804
                                    Email: law.rmd@gmail.com
                                    *Attorney for Plaintiffs*

8

*PLAINTIFF BOGUSKI'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 12
Page 00252

# Exhibit 13

Exhibit 13
Page 00253

a

Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN**, et al.,<br><br>    Plaintiffs,<br><br>    vs.<br><br>**ROB BONTA**, Attorney General of California, et al.,<br><br>    Defendants. | Case No. 3:20-cv-02470-WQH-WVG<br><br>Hon. J. William Q. Hayes<br><br>**PLAINTIFF COLLETTI'S AMENDED RESPONSES TO DEFENDANT ROB BONTA'S FIRST SET OF REQUESTS FOR ADMISSION**<br><br>**Complaint Filed: December 18, 2020** |

*PLAINTIFF COLLETTI'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-CV-02470-WQH-WVG)

Exhibit 13
Page 00254

PROPOUNDING PARTY: Defendant Rob Bonta

RESPONDING PARTY: Plaintiff Colletti

SET NUMBER: One

## AMENDED RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Federal Rules of Civil Procedure, rule 36, Plaintiff Colletti responds to the following requests for admission from Defendant Bonta.

**Request for Admission No. 1:**

Admit that YOU own at least one operable FIREARM that is suitable for self-defense, including defense of hearth and home.

**Response:**

**Objection. The phrase "suitable for self-defense" is vague, ambiguous, and calls for a legal conclusion depending on the undefined meaning ascribed to it. The request invades Plaintiff Colletti's privacy rights. Further, the interrogatory is overbroad and harassing insofar as it seeks information relating to the ownership of constitutionally protected property. It also seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff owns any firearm has no bearing on the on the legal issue in dispute—namely, whether the prohibitions under the challenged laws that prevent ordinary law-abiding Californians from purchasing or acquiring more than one handgun or semiautomatic centerfire rifle within a 30-day period**

1

*PLAINTIFF COLLETTI'S AMENDED TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 13
Page 00255

violate the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution.

Without waiving any of these objections, Plaintiff Colletti responds as follows: Plaintiff Colletti admits that he owns at least one operable firearm that he uses for lawful purposes including self-defense.

**Request for Admission No. 2:**

Admit that YOU are able to purchase an operable FIREARM that is suitable for self-defense, including defense of hearth and home.

**Response:**

Objection. The phrase "suitable for self-defense" is vague, ambiguous, and calls for a legal conclusion depending on the undefined meaning ascribed to it. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff owns any firearm has no bearing on the on the legal issue in dispute—namely, whether the prohibitions under the challenged laws that prevent ordinary law-abiding Californians from purchasing or acquiring more than one handgun or semiautomatic centerfire rifle within a 30-day period violate the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution.

2

**Without waiving any of these objections, Plaintiff Colletti responds as follows: Plaintiff Colletti admits he is able to purchase an operable firearm, subject to the prohibitions of the laws being challenged in this action which restrict the number and frequency of such purchases for law-abiding citizens like him.**

**Request for Admission No. 3:**

Admit that YOU are able to obtain more than one handgun within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

**Response:**

**Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.**

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Without waiving any of these objections, Plaintiff Colletti responds as follows: He would be able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) a private party seller or transferor of a handgun exists; (2) the handgun to be sold or transferred is lawful to own and possess, is in an operable condition, and is reliable for self-defense and other lawful purposes; (3) the private party seller or transferor is ready, willing, and able to sell or transfer the handgun to Plaintiff Colletti; (4) Plaintiff Colletti is simultaneously ready, willing, and able to purchase or receive the handgun; and (5) the sale or transfer can be and is completed within the same 30-day period. Plaintiff Colletti can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Colletti continues to deny that his ability to do so has any bearing on the issues in dispute.**

4

*PLAINTIFF COLLETTI'S AMENDED TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 13

Page 00258

**Request for Admission No. 4:**

Admit that YOU are able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

**Response:**

**Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.**

**Without waiving any of these objections, Plaintiff Colletti responds as follows: He would be able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) a private party seller or transferor of a semiautomatic**

5

centerfire rifle exists; (2) the semiautomatic centerfire rifle to be sold or transferred is lawful to own and possess, is in an operable condition, and is reliable for self-defense and other lawful purposes; (3) the private party seller or transferor is ready, willing, and able to sell or transfer the semiautomatic centerfire rifle to Plaintiff Colletti; (4) Plaintiff Colletti is simultaneously ready, willing, and able to purchase or receive the semiautomatic centerfire rifle; and (5) the sale or transfer can be and is completed within the same 30-day period. Plaintiff Colletti can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Colletti continues to deny that his ability to do so has any bearing on the issues in dispute.

**Request for Admission No. 5:**

Admit that YOU are able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

**Response:**

Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.

Without waiving any of these objections, Plaintiff Colletti responds as follows: He would be able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) there exists a private party seller or transferor of both a handgun and a semiautomatic centerfire rifle; (2) both the handgun and the semiautomatic centerfire rifle to be sold or transferred are lawful to own and possess, are in an operable condition, and are reliable for self-defense and other lawful purposes; (3) the private party seller or transferor of the handgun is

7

ready, willing, and able to sell or transfer the handgun to Plaintiff Colletti; **(4)** the private party seller or transferor of the semiautomatic centerfire rifle is ready, willing, and able to sell or transfer the rifle to Plaintiff Colletti; **(5)** Plaintiff Colletti is simultaneously ready, willing, and able to purchase or receive both the handgun and the semiautomatic centerfire rifle; and **(6)** the sale or transfer of both firearms can be and is completed within the same 30-day period. Plaintiff Colletti can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Colletti continues to deny that his ability to do so has any bearing on the issues in dispute.

November 1, 2021                    Respectfully Submitted,

*/s/ Raymond M. DiGuiseppe*
Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com
*Attorney for Plaintiffs*

8

*PLAINTIFF COLLETTI'S AMENDED TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 18
Page 00262

# Exhibit 14

Exhibit 14
Page 00263

Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN**, et al., | Case No. 3:20-cv-02470-WQH-WVG |
| Plaintiffs, | Hon. J. William Q. Hayes |
| vs. | |
| **ROB BONTA**, Attorney General of California, et al., | **PLAINTIFF MEDINA'S AMENDED RESPONSES TO DEFENDANT ROB BONTA'S FIRST SET OF REQUESTS FOR ADMISSION** |
| Defendants. | **Complaint Filed: December 18, 2020** |

*PLAINTIFF MEDINA'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-CV-02470-WQH-WVG)

Exhibit 14
Page 00264

PROPOUNDING PARTY: Defendant Rob Bonta

RESPONDING PARTY: Plaintiff Medina

SET NUMBER: One

## AMENDED RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Federal Rules of Civil Procedure, rule 36, Plaintiff Medina responds to the following requests for admissions from Defendant Bonta.

**Request for Admission No. 1:**

Admit that YOU own at least one operable FIREARM that is suitable for self-defense, including defense of hearth and home.

**Response:**

**Objection. The phrase "suitable for self-defense" is vague, ambiguous, and calls for a legal conclusion depending on the undefined meaning ascribed to it. The request invades Plaintiff Medina's privacy rights. Further, the interrogatory is overbroad and harassing insofar as it seeks information relating to the ownership of constitutionally protected property. It also seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff owns any firearm has no bearing on the on the legal issue in dispute—namely, whether the prohibitions under the challenged laws that prevent ordinary law-abiding Californians from purchasing or acquiring more than one handgun or semiautomatic centerfire rifle within a 30-day period**

1

*PLAINTIFF MEDINA'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 14

Page 00265

violate the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution.

Without waiving any of these objections, Plaintiff Medina responds as follows: Plaintiff Medina admits that he owns at least one operable firearm that he uses for lawful purposes including self-defense.

**Request for Admission No. 2:**

Admit that YOU are able to purchase an operable FIREARM that is suitable for self-defense, including defense of hearth and home.

**Response:**

Objection. The phrase "suitable for self-defense" is vague, ambiguous, and calls for a legal conclusion depending on the undefined meaning ascribed to it. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff owns any firearm has no bearing on the on the legal issue in dispute—namely, whether the prohibitions under the challenged laws that prevent ordinary law-abiding Californians from purchasing or acquiring more than one handgun or semiautomatic centerfire rifle within a 30-day period violate the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution.

2

*PLAINTIFF MEDINA'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-CV-02470-WQH-WVG)

Exhibit 14

Page 00266

**Without waiving any of these objections, Plaintiff Medina responds as follows: Plaintiff Medina admits he is able to purchase an operable firearm, subject to the prohibitions of the laws being challenged in this action which restrict the number and frequency of such purchases for law-abiding citizens like him.**

<u>Request for Admission No. 3:</u>

Admit that YOU are able to obtain more than one handgun within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

<u>Response:</u>

**Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.**

3

Without waiving any of these objections, Plaintiff Medina responds as follows: He would be able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) a private party seller or transferor of a handgun exists; (2) the handgun to be sold or transferred is lawful to own and possess, is in an operable condition, and is reliable for self-defense and other lawful purposes; (3) the private party seller or transferor is ready, willing, and able to sell or transfer the handgun to Plaintiff Medina; (4) Plaintiff Medina is simultaneously ready, willing, and able to purchase or receive the handgun; and (5) the sale or transfer can be and is completed within the same 30-day period. Plaintiff Medina can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Medina continues to deny that his ability to do so has any bearing on the issues in dispute.

4

*PLAINTIFF MEDINA'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 14

Page 00268

**Request for Admission No. 4:**

Admit that YOU are able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

**Response:**

**Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.**

**Without waiving any of these objections, Plaintiff Medina responds as follows: He would be able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) a private party seller or transferor of a semiautomatic**

5

centerfire rifle exists; (2) the semiautomatic centerfire rifle to be sold or transferred is lawful to own and possess, is in an operable condition, and is reliable for self-defense and other lawful purposes; (3) the private party seller or transferor is ready, willing, and able to sell or transfer the semiautomatic centerfire rifle to Plaintiff Medina; (4) Plaintiff Medina is simultaneously ready, willing, and able to purchase or receive the semiautomatic centerfire rifle; and (5) the sale or transfer can be and is completed within the same 30-day period. Plaintiff Medina can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Medina continues to deny that his ability to do so has any bearing on the issues in dispute.

**Request for Admission No. 5:**

Admit that YOU are able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

*PLAINTIFF MEDINA'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 14

Page 00270

**Response:**

Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.

Without waiving any of these objections, Plaintiff Medina responds as follows: He would be able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) there exists a private party seller or transferor of both a handgun and a semiautomatic centerfire rifle; (2) both the handgun and the semiautomatic centerfire rifle to be sold or transferred are lawful to own and possess, are in an operable condition, and are reliable for self-defense and other lawful purposes; (3) the private party seller or transferor of the handgun is

7

ready, willing, and able to sell or transfer the handgun to Plaintiff Medina; (4) the private party seller or transferor of the semiautomatic centerfire rifle is ready, willing, and able to sell or transfer the rifle to Plaintiff Medina; (5) Plaintiff Medina is simultaneously ready, willing, and able to purchase or receive both the handgun and the semiautomatic centerfire rifle; and (6) the sale or transfer of both firearms can be and is completed within the same 30-day period. Plaintiff Medina can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding his ability to engage in such activity inherently a matter of speculation. Thus, he can only respond to this request by saying that he admits he is able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Medina continues to deny that his ability to do so has any bearing on the issues in dispute.

November 1, 2021                    Respectfully Submitted,

                                   */s/ Raymond M. DiGuiseppe*
                                   Raymond M. DiGuiseppe
                                   The DiGuiseppe Law Firm, P.C.
                                   4320 Southport-Supply Road, Suite 300
                                   Southport, NC 28461
                                   Tel.: 910-713-8804
                                   Email: law.rmd@gmail.com
                                   *Attorney for Plaintiffs*

8

*PLAINTIFF MEDINA'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 14
Page 00272

# Exhibit 15

Exhibit 15
Page 00273

Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**MICHELLE NGUYEN**, et al.,

    Plaintiffs,

    vs.

**ROB BONTA**, Attorney General of
California, et al.,

    Defendants.

Case No. 3:20-cv-02470-WQH-WVG

Hon. J. William Q. Hayes

**PLAINTIFF NGUYEN'S
AMENDED RESPONSES TO
DEFENDANT ROB BONTA'S
FIRST SET OF REQUESTS FOR
ADMISSION**

**Complaint Filed: December 18, 2020**

PROPOUNDING PARTY: Defendant Rob Bonta

RESPONDING PARTY: Plaintiff Nguyen

SET NUMBER: One

## AMENDED RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Federal Rules of Civil Procedure, rule 36, Plaintiff Nguyen responds to the following requests for admission from Defendant Bonta.

**Request for Admission No. 1:**

Admit that YOU own at least one operable FIREARM that is suitable for self-defense, including defense of hearth and home.

**Response:**

**Objection. The phrase "suitable for self-defense" is vague, ambiguous, and calls for a legal conclusion depending on the undefined meaning ascribed to it. The interrogatory invades Plaintiff Nguyen's privacy rights. Further, the interrogatory is overbroad and harassing insofar as it seeks information relating to the ownership of constitutionally protected property. It also seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff owns any firearm has no bearing on the on the legal issue in dispute—namely, whether the prohibitions under the challenged laws that prevent ordinary law-abiding Californians from purchasing or acquiring more than one handgun or semiautomatic centerfire rifle within a 30-day period**

1

1  violate the fundamental rights that ordinary law-abiding citizens are guaranteed

2  under the Second Amendment to the United States Constitution.

3

4      Without waiving any of these objections, Plaintiff Nguyen responds as

5  follows: Plaintiff Nguyen denies that she owns any firearms.

6  **Request for Admission No. 2:**

7

8      Admit that YOU are able to purchase an operable FIREARM that is suitable

9  for self-defense, including defense of hearth and home.

10 **Response:**

11

12     Objection. The phrase "suitable for self-defense" is vague, ambiguous, and

13 calls for a legal conclusion depending on the undefined meaning ascribed to it.

14 The request seeks information not relevant or reasonably calculated to lead to

15 admissible evidence because whether any Plaintiff owns any firearm has no

16

17 bearing on the on the legal issue in dispute—namely, whether the prohibitions

18 under the challenged laws that prevent ordinary law-abiding Californians from

19

20 purchasing or acquiring more than one handgun or semiautomatic centerfire

21 rifle within a 30-day period violate the fundamental rights that ordinary law-

22 abiding citizens are guaranteed under the Second Amendment to the United

23

24 States Constitution.

25     Without waiving any of these objections, Plaintiff Nguyen responds as

26 follows: Plaintiff Nguyen admits she is able to purchase an operable firearm,

27

28

2

1    subject to the prohibitions of the laws being challenged in this action which

2    restrict the number and frequency of such purchases for law-abiding citizens

3

4    like her.

5    **Request for Admission No. 3:**

6

7        Admit that YOU are able to obtain more than one handgun within a 30-day

8    period through a private-party sale OR transfer under California Penal Code section

9    27535(b)(8).

10

11   **Response:**

12       **Objection. The request seeks information not relevant or reasonably**

13   **calculated to lead to admissible evidence because whether any Plaintiff is able to**

14

15   **obtain more than one handgun within a 30-day period through a private-party**

16   **sale or transfer under California Penal Code section 27535(b)(8) has no bearing**

17   **on whether the challenged laws' prohibition against the purchase from a**

18

19   **licensed dealer in a single transaction within a 30-day period of two or more**

20   **handguns and/or semiautomatic centerfire rifles violates the fundamental rights**

21   **that ordinary law-abiding citizens are guaranteed under the Second Amendment**

22

23   **to the United States Constitution. Further, the request calls for speculation.**

24       **Without waiving any of these objections, Plaintiff Nguyen responds as**

25   **follows: She would be able to obtain more than one handgun within a 30-day**

26   **period through a private-party sale or transfer under California Penal Code**

27

28

---

3

*PLAINTIFF NGUYEN'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 15

Page 00277

section 27535(b)(8) only if and to the extent that all the following facts are true: (1) a private party seller or transferor of a handgun exists; (2) the handgun to be sold or transferred is lawful to own and possess, is in an operable condition, and is reliable for self-defense and other lawful purposes; (3) the private party seller or transferor is ready, willing, and able to sell or transfer the handgun to Plaintiff Nguyen; (4) Plaintiff Nguyen is simultaneously ready, willing, and able to purchase or receive the handgun; and (5) the sale or transfer can be and is completed within the same 30-day period. Plaintiff Nguyen can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding her ability to engage in such activity inherently a matter of speculation. Thus, she can only respond to this request by saying that she admits she is able to obtain more than one handgun within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Nguyen continues to deny that her ability to do so has any bearing on the issues in dispute.

**Request for Admission No. 4:**

Admit that YOU are able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale OR transfer under California Penal Code section 27535(b)(8).

4

*PLAINTIFF NGUYEN'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 15

Page 00278

**Response:**

Objection. The request seeks information not relevant or reasonably calculated to lead to admissible evidence because whether any Plaintiff is able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.

Without waiving any of these objections, Plaintiff Nguyen responds as follows: She would be able to obtain more than one semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) a private party seller or transferor of a semiautomatic centerfire rifle exists; (2) the semiautomatic centerfire rifle to be sold or transferred is lawful to own and possess, is in an operable condition, and is reliable for self-defense and other lawful purposes; (3) the private party seller or transferor is ready, willing, and able to sell or transfer the semiautomatic

5

1   **centerfire rifle to Plaintiff Nguyen; (4) Plaintiff Nguyen is simultaneously ready,**

2

3   **willing, and able to purchase or receive the semiautomatic centerfire rifle; and**

4   **(5) the sale or transfer can be and is completed within the same 30-day period.**

5   **Plaintiff Nguyen can only speculate as to the existence of any of these facts at**

6

7   **any given point in time, thereby rendering any admission regarding her ability**

8   **to engage in such activity inherently a matter of speculation. Thus, she can only**

9   **respond to this request by saying that she admits she is able to obtain more than**

10

11   **one semiautomatic centerfire rifle within a 30-day period through a private-**

12   **party sale or transfer under California Penal Code section 27535(b)(8) *assuming***

13   **all these contingencies to be true. Plaintiff Nguyen continues to deny that her**

14

15   **ability to do so has any bearing on the issues in dispute.**

16   **Request for Admission No. 5:**

17       Admit that YOU are able to obtain both a handgun and a semiautomatic

18
      centerfire rifle within a 30-day period through a private-party sale OR transfer under
19

20   California Penal Code section 27535(b)(8).

21   **Response:**

22
         **Objection. The request seeks information not relevant or reasonably**
23

24   **calculated to lead to admissible evidence because whether any Plaintiff is able to**

25   **obtain both a handgun and a semiautomatic centerfire rifle within a 30-day**

26

27   **period through a private-party sale or transfer under California Penal Code**

28

6

*PLAINTIFF NGUYEN'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 15

Page 00280

section 27535(b)(8) has no bearing on whether the challenged laws' prohibition against the purchase from a licensed dealer in a single transaction within a 30-day period of two or more handguns and/or semiautomatic centerfire rifles violates the fundamental rights that ordinary law-abiding citizens are guaranteed under the Second Amendment to the United States Constitution. Further, the request calls for speculation.

Without waiving any of these objections, Plaintiff Nguyen responds as follows: She would be able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) only if and to the extent that all the following facts are true: (1) there exists a private party seller or transferor of both a handgun and a semiautomatic centerfire rifle; (2) both the handgun and the semiautomatic centerfire rifle to be sold or transferred are lawful to own and possess, are in an operable condition, and are reliable for self-defense and other lawful purposes; (3) the private party seller or transferor of the handgun is ready, willing, and able to sell or transfer the handgun to Plaintiff Nguyen; (4) the private party seller or transferor of the semiautomatic centerfire rifle is ready, willing, and able to sell or transfer the rifle to Plaintiff Nguyen; (5) Plaintiff Nguyen is simultaneously ready, willing, and able to purchase or receive both the handgun and the semiautomatic centerfire rifle; and (6) the sale

or transfer of both firearms can be and is completed within the same 30-day period. Plaintiff Nguyen can only speculate as to the existence of any of these facts at any given point in time, thereby rendering any admission regarding her ability to engage in such activity inherently a matter of speculation. Thus, she can only respond to this request by saying that she admits she is able to obtain both a handgun and a semiautomatic centerfire rifle within a 30-day period through a private-party sale or transfer under California Penal Code section 27535(b)(8) *assuming* all these contingencies to be true. Plaintiff Nguyen continues to deny that her ability to do so has any bearing on the issues in dispute.

November 1, 2021                    Respectfully Submitted,

                                    */s/ Raymond M. DiGuiseppe*
                                    Raymond M. DiGuiseppe
                                    The DiGuiseppe Law Firm, P.C.
                                    4320 Southport-Supply Road, Suite 300
                                    Southport, NC 28461
                                    Tel.: 910-713-8804
                                    Email: law.rmd@gmail.com
                                    *Attorney for Plaintiffs*

8

*PLAINTIFF NGUYEN'S AMENDED RESPONSES TO DEFENDANT BONTA'S FIRST SET OF REQUESTS FOR ADMISSION*
(CASE NO. 3:20-cv-02470-WQH-WVG)

Exhibit 15
Page 00282

# Exhibit 16

Exhibit 16
Page 00283

WILLIAM J. NOVAK

# The People's Welfare

Law and Regulation in Nineteenth-Century America

The University of North Carolina Press

Chapel Hill and London



Exhibit 16
Page 00284

© 1996 The University of North Carolina Press

All rights reserved

Manufactured in the United States of America

The paper in this book meets the guidelines for permanence
and durability of the Committee on Production Guidelines
for Book Longevity of the Council on Library Resources.

Library of Congress Cataloging-in-Publication Data

Novak, William J., 1961–

The people's welfare : law and regulation in nineteenth-
century America / by William J. Novak.

p.  cm.—(Studies in legal history)

Includes bibliographical references and index.

ISBN 0-8078-2292-2 (cloth : alk. paper)

ISBN 0-8078-4611-2 (pbk. : alk. paper)

1. Law—United States—-History.   I. Title.   II. Series.

KF366.N68   1996

349.73′09′034—dc20                    95-51850

[347.3009034]                              CIP

00  99  98  97  96   5  4  3  2  1

Exhibit 16
Page 00285

# CONTENTS

Preface  ix

— INTRODUCTION —

Governance, Police, and American Liberal Mythology

1

— CHAPTER ONE —

The Common Law Vision of a Well-Regulated Society

19

— CHAPTER TWO —

Public Safety: Fire and the Relative Right of Property

51

— CHAPTER THREE —

Public Economy: The Well-Ordered Market

83

— CHAPTER FOUR —

Public Ways: The Legal Construction of Public Space

115

— CHAPTER FIVE —

Public Morality: Disorderly Houses and Demon Rum

149

— CHAPTER SIX —

Public Health: Quarantine, Noxious Trades, and Medical Police

191

— CONCLUSION —

The Invention of American Constitutional Law

235

Notes  249    Select Bibliography  345    Index  375

Exhibit 16
Page 00286

themselves reveal little about the actual implementation or enforcement of regulation. A small cottage industry has grown up in legal history exploring the gaps between law on the statute books and law in action. A convincing challenge to pervasive myths of lax law enforcement in nineteenth-century America (whether in safety, criminal, market, or morals law) requires a deeper investigation of prosecution, litigation, and local governance.[46] Second, the legislative record is also weak on underlying rationale. Fire regulations were often the product of imitation, at times passed hastily after a particular disaster. Issues of governmental power, constitutionality, precedent, the historical roots of authority, and the like were often assumed rather than made explicit. The New York Assembly, for example, established a fire company in Schenectady with the cursory observation that the need for this legislation was "too obvious to require particular detail."[47] As with the question of implementation, it is necessary to turn elsewhere for a closer examination of the underlying assumptions of early nineteenth-century fire regulation.

American courts were constant and crucial players in nineteenth-century governance and regulation. The cases they heard offer direct evidence of the actual operation and enforcement of fire laws. Moreover, the requirement that appellate courts justify and explicate the legal and constitutional context of their decisions in written opinions provides a more comprehensive picture of the legal-philosophical framework of nineteenth-century public safety regulation. Indeed, two of the central doctrines behind fire laws were the products of courts, not legislatures. The law of nuisance and the law of overruling necessity were two powerful legal technologies that governed public safety issues such as the prohibition of hazardous materials, the regulation of buildings and land use, and the conduct of public officials in actual fires.

## Nuisance: Gunpowder and Wooden Buildings

The common law of nuisance was one of the most important public legal doctrines of nineteenth-century regulatory governance. Its object was securing social order according to the maxim of the well-regulated society: *sic utere tuo ut alienum non laedas* (use your own so as not to injure another). Nathan Dane suggested the potential within this "very important and extensive branch of the law," when he observed, "Strictly whatever annoys or damages another is a nuisance." Horace Wood elaborated that nuisances were "that class of wrongs that arise from the unreasonable, unwarrantable or unlawful use by a person of his own property . . . or personal conduct, working an obstruction of or injury to a right of another or of the public."[48]

60                    — THE PEOPLE'S WELFARE —

Exhibit 16
Page 00287

Case 3:22-cv-01616-MCR-HTF Document 33-1 Filed 03/13/23 PageID 5709 Page 49 of 93

Since Blackstone, it has been common to think of nuisance in two categories, private and public. A private nuisance consisted of a trespass- or tort-like invasion of one individual's rights by a neighbor. The classic cases involved either a physical intrusion like the construction of a house so as to overhang adjoining property, or the less corporeal maintenance of a hogsty or drainage system so as to flood a neighbor's hereditament with noxious smells or water. Public nuisances consisted of similarly troublesome behavior or uses of property, but so as to injure the whole community rather than a single individual. Livery stables, slaughterhouses, disorderly inns, bawdy houses, and malarial ponds were all considered public nuisances at common law.[49] Private nuisances were civil offenses; public nuisances made up a category of crimes and misdemeanors. Taken together, the law of private and public nuisance greeted damaging and asocial uses of private property and individual liberty with an impressive array of legal remedies: civil suit, damages, equitable injunction, private destruction, criminal indictment, fine, and summary abatement.

Two historical misconceptions, however, have hindered an accurate appraisal of the role of nuisance in nineteenth-century public policymaking. First is the tendency to see nuisance in modern terms as a "trifling inconvenience" and nuisance law as an archaic technology for addressing the somewhat irritating land-use habits of a not-so-good neighbor. This perspective deems nuisance law's individuated, ex post facto, court-centered mode of resolving petty conflicts as the very antithesis of the preventive legislative measures required of modern regulatory states.[50] Second, the provocative work of historians Joel Brenner and Morton Horwitz has overemphasized the instrumental transformation of *private* nuisance law on behalf of commerce at the expense of the continued regulatory significance of *public* nuisance law. Nuisance law was not simply a site for creative, capital-friendly judges to relax antidevelopmental standards of private liability.[51]

On the contrary, nineteenth-century jurists were quite explicit about both the overarching significance and the public power of the law of nuisance.[52] Horace Wood's formulation of private nuisance encompassed almost the whole of modern tort law. Joel Bishop attributed a significant chunk of nineteenth-century criminal law (from barratry to sepulture) to public nuisance precepts. And James Kent foreshadowed Ernst Freund's notion of nuisance as the common law of the police power, suggesting that the governmental power to "interdict such uses of property as would create nuisances" was the font of general law-making authority.[53] Nuisance law, far from being ineffective or emasculated by a market-minded judiciary, remained a powerful juris-

Exhibit 16
Page 00288

prudential reference point for nineteenth-century discussions of private and public power.

Nineteenth-century nuisance law was neither trivial nor timid. Along with every unneighborly hogsty or spite fence abated as a nuisance came dozens of ships, hospitals, steam engines, furnaces, dairies, sewers, slaughterhouses, stables, pumping stations, foundries, manufactories, and saloons. Almost every major innovation in transportation and industry at one time or other came within the purview of nuisance law: mills, dams, railroads, smokestacks, and public works. Declaring an activity or establishment a nuisance in the nineteenth century unleashed the full power and authority of the state. Perhaps under no other circumstances (short of martial law) could private property and liberty be so quickly and completely restrained or destroyed.

In sum, nuisance law was not primarily a matter of technical, private law at all. The *sic utere tuo* rationale of nuisance was a public ordering principle of "every civilized community." Sidney and Beatrice Webb pointed out that the heart of nuisance was an all-embracing notion of social obligation, wherein any breach of one's irreducibly public duties to society and to others was deemed an actionable nuisance. The redress of nuisance thus came to include nearly "every conceivable neglect or offence"—a good part of the "framework of law in which the ordinary citizen found himself."[54] *Sic utere tuo*, Horace Wood argued, was but "the legal application of the gospel rule of doing unto others as we would that they should do unto us." Indeed, nuisance law encapsulated the ultimate statement of the relative right of private property in a well-regulated society: "Every person yields a portion of his right of absolute dominion and use of property, in recognition of, and obedience to, the rights of others . . . for the mutual protection and benefit of every member of society." These public principles of nuisance law formed the jurisprudential framework for the regulation of such diverse subjects as noxious trades, adulterated food, obscenity, contagious diseases, theaters, and monopolies.[55] They also decidedly shaped the response of the nineteenth-century American polity to the public safety threat posed by two enormous fire hazards: gunpowder and wooden buildings.

The policing of the manufacture, storage, and sale of gunpowder marked an important episode in the development of the early American regulatory state. Though trade regulations had deep roots in the colonial era, gunpowder was one of several emerging industrial manufactures that met extensive governmental restraints after the Revolution. Powder mills, like the extensive textile manufactories of the Boston Associates, symbolized the dramatic take-off of the early American economy.[56] Gunpowder was grist for early American

62                    — THE PEOPLE'S WELFARE —

Exhibit 16
Page 00289

Case 3:20-cv-02470-WQH-MMP Document 59-2 Filed 09/15/23 PageID.5760 Page 51 of 93

capitalism. In addition to its obvious importance for public defense, frontier security, and hunting, gunpowder was increasingly in demand for a host of developmental projects in a labor-scarce economy, including mining, canal building, and road building.[57] Before the Revolution, American gunpowder supply was dependent on a handful of mills, scattered household production, and imports.[58] Five years after hostilities with Britain, Pennsylvania had 21 powder mills producing 625 tons of powder annually. The 1810 United States census listed 200 mills scattered among sixteen states, the most promising being the Du Pont works on the Brandywine River in Delaware.[59] Gunpowder production fast became a central component of early American commerce, industry, and trade. And it just as quickly encountered the force of early American governance in the guise of the law of public nuisance.

Gunpowder's tendency to explode, with dramatic consequences for nearby surroundings, made it particularly susceptible to nuisance law's admonition that one should use property so as not to injure another. As early as 1700, Lord Holt made it clear that "though gunpowder be a necessary thing, and for the defence of the kingdom, yet if it be kept in such a place as it is dangerous to the inhabitants or passengers, it will be a nuisance."[60] The manufacture and storage of gunpowder joined an array of economic activities including brewhouses, glasshouses, limekilns, dyehouses, smelting houses, tan pits, chandler's shops, and swine-sties subject to common law nuisance restrictions on behalf of the people's health and safety.[61]

Early American legislative and municipal enactments regulating gunpowder were extensive, but control over antisocial uses of private property in the early republic did not depend on codification. The regulation of gunpowder through the common law of public nuisance in lieu of statute remained an integral part of the American fight against fires throughout the nineteenth century—this, despite a somewhat inauspicious start. In *People v. Sands* (1806), C. & L. Sands were indicted for maintaining a public nuisance. They were accused of keeping fifty barrels of gunpowder in a Brooklyn house "near the dwellinghouses of divers good citizens of the state, and also, near a certain public street . . . to the great damage, danger, and common nuisance of all the good citizens."[62] Statute law explicitly regulated dangerous caches of powder in New York City, but Brooklyn had no similar written requirement.[63] Though the trial court declared the powderhouse to be a public nuisance, the New York Supreme Court reversed.

None of the justices in *Sands* denied that a gunpowder storehouse could be a common nuisance. Indeed, they all agreed with Lord Holt that if kept in such a place "as it is dangerous" to the public, it would certainly be indictable.

Exhibit 16
Page 00290

But they refused to accept the district attorney's contention that fifty barrels of gunpowder stored near a dwelling house was a public nuisance per se, as a matter of law. They wanted the circumstances of the nuisance—time, place, manner, and/or evidence of negligence or lack of due care—spelled out in the indictment for a jury's inspection and determination.[64] Indeed, in an outrageous example of judicial notice, Justice Livingston offered that he knew the house in question, identified it as a "powder-house," and personally deemed it "safe." From his own observation, Livingston described the structure as a "brick building, constructed for the storing of powder, and secured by conductors, and every other usual guard against accident." He concluded, "A safer mode of keeping this article than in a building thus constructed, cannot well be devised. . . . The danger of a magazine's exploding, when properly built and secured is remote indeed."[65] In other words, this was truly a decision about a particular powderhouse rather than a general policy insulating dealers of gunpowder from the regulatory impact of nuisance. In addition to agreeing with Lord Holt's general condemnation of dangerous powderhouses, Livingston advocated legislative interference if the common law should ultimately prove an insufficient safeguard.[66]

Still the justices' refusal in *Sands* to acknowledge a powderhouse in a populated area as ipso facto a common nuisance was significant. If it predominated in American case law, the regulation of gunpowder (in lieu of statute or ordinance) would necessitate a case-by-case judicial evaluation of the peculiar circumstances surrounding each alleged nuisance. Such solicitousness for idiosyncratic facts could severely inhibit public nuisance law's usefulness as a general regulatory instrument.[67] A negligence requirement could disable it altogether.

That was not to be the case, however. Perhaps because the Brooklyn powderhouse at issue in *Sands* exploded six months later (no doubt to Livingston's surprise), future courts were much more willing to find gunpowder stored in populous areas common nuisances as a matter of law.[68] In *Myers v. Malcolm* (1844), after 600 pounds of gunpowder exploded killing and wounding several people, the New York Supreme Court ruled that the keeping of a large quantity of gunpowder in a wooden building near other buildings was indeed a public nuisance.[69] Ending some confusion after *Sands*, Chief Justice Nelson made it clear that negligence was not a part of public nuisance determinations.[70] Tennessee's Supreme Court went even further in *Cheatham v. Shearon* (1851), holding that a powder magazine in a populous part of Nashville was a nuisance per se as a matter of law.[71] Directly challenging the decision in *Sands*, Justice Green ruled that no matter what the circumstances and no matter how

Exhibit 16
Page 00291

Case 3:20-cv-02470-WQH-MSB   Document 52-5   Filed 08/26/21   PageID.1782   Page 53 of 93

solidly constructed, a large storehouse of gunpowder in the heart of a populous city was in and of itself a public nuisance.[72] Green's argument closely followed the main outlines of the well-regulated society. Citing Blackstone, Green defined common nuisances as "offenses against the public order and economical regimen of the state." Invoking the *sic utere tuo* rationale of nuisance, he suggested that there were "few things one could do that would annoy the community more than the deposit of a large quantity of gunpowder in the midst of a populous city." Concluding with public safety and *salus populi*, Green asked, "Can it be possible that the law shall protect us from the annoyance of a pig-sty, or a slaughterhouse, and yet that it affords no protection from a danger that might be a constant annoyance, and which may, and sometimes does, result in a great destruction of life and property?"[73] He answered and decided, of course, "No."

Although few courts were as explicit as Justice Green in deeming powderhouses nuisances per se, they continued to abate and in some cases enjoin them with reference to little else than the presence of nearby dwellings.[74] In 1873, the Pennsylvania Supreme Court afforded the extraordinary relief of an equity injunction against a partially constructed powderhouse in a "suburban village" of Sharpsburg.[75] Here, the facts deemed so crucial in *Sands* were unavailable—the powderhouse had not yet been built.

The public calculation was not always easy. After all, powderhouses were a "great convenience to the public, and of advantage to the commerce of [a] city."[76] But ultimately, public safety trumped commerce as it trumped the relative property rights of powderhouse owners. Whereas Justice Livingston could argue in *Sands* that "the danger of a magazine's exploding . . . is remote indeed," later justices had to deal with the fact that they were exploding all the time.[77] Once the threat to public safety became apparent, *People v. Sands* was a dead letter.[78]

Early American nuisance restrictions on gunpowder aptly reflected the pull and power of the common law vision of a well-regulated society. Even without legislative action, uses of property and modes of production that endangered the people's welfare were subjected to restraints and penalties. As Lemuel Shaw pointed out, a gunpowder nuisance prosecution involved not only the punishment of the offender, but "the seizure and confiscation of the property, by the removal, sale, or destruction of the noxious articles."[79] Nuisance law was a powerful and punitive technology of public action. The well-regulated society was not insensitive to the claims of commerce and property; it was merely adamant about the superior rights of the public. Property rights were protected, but relatively, not absolutely. Under the common law of nuisance

Exhibit 16
Page 00292

one did not have a right to accumulate gunpowder in one's tenement. On the contrary, neighboring property owners (and the community as a whole) had a right to be protected from just such dangerous accumulations—*sic utere tuo ut alienum non laedas*.

State statutes and municipal ordinances regulating gunpowder essentially codified the underlying principles of the common law of nuisance.[80] These written laws themselves were rarely challenged in the early nineteenth century and were never struck down by an appellate court. In 1843 the New York Supreme Court upheld the constitutionality of New York City's gunpowder restrictions with the simple observation, "The statute is a mere police regulation—an act to prevent a nuisance to the city."[81] In the *License Cases* (1847), U.S. Supreme Court Justice McLean was unequivocal about written prohibitions on gunpowder: "Now this is an article of commerce, . . . yet, to guard against a contingent injury, a city may prohibit its introduction." McLean defended such regulatory power as "essential to [the] self-preservation" of "every organized community" upon that "acknowledged principle" of ordered society: "Individuals in the enjoyment of their own rights must be careful not to injure the rights of others."[82]

Gunpowder regulation, then, was an easy case. As Roger Taney anticipated in his argument in *Brown v. Maryland*, no one would defend a private right to sell or store gunpowder in the heart of early American cities. Restrictions on gunpowder were so well rooted in the common law of nuisance and the vision of a well-regulated society that they spawned little controversy and required little elaboration. Perhaps because the regulation of wooden buildings entailed a more distinct departure from common law norms, judges handled this kind of fire regulation with fuller discussions of the implications of nuisance, police, regulation, and the people's safety.

On the whole, legal prohibitions on wooden buildings in early American cities closely followed the evolution of gunpowder restrictions. Both were security and safety measures, passed to protect the public from the dangers of fire; and both relied heavily on the common law of nuisance for remedies as well as underlying rationale. But bans on wooden buildings involved a somewhat different species of public regulation. Unlike gunpowder, there was nothing inherently dangerous or hazardous about a wooden structure. In and of itself it was largely benign vis-à-vis adjoining property owners and the community at large. Unlike traditional public nuisances (slaughterhouses, pigsties, tanneries), no physical characteristics made a wooden building particularly noxious, offensive, or threatening to the surrounding public. It became a nuisance solely because the legislature or municipality drew an

66          — THE PEOPLE'S WELFARE —

Exhibit 16
Page 00293

arbitrary line (analogous to the wharf line in *Commonwealth v. Alger*) known as a "fire limit" around a community declaring otherwise innocent conduct within that boundary "offensive" as a matter of law.

Fire limits, then, were hardly a timid or primitive form of public regulation. They were prospective and preventative (rather than merely remedial), and they operated on behavior not inherently evil or pernicious. They represented a distinct effort to prevent urban development from becoming simply a function of a free market of private decision-makers to the detriment of public safety. Fire limits involved the kind of foresight, public planning, and mandated social ordering that many claim is an exclusive product of the twentieth century.[83] Indeed, in the fire-limit ordinances of the early nineteenth century we see a form of urban land-use regulation different only in degree from the comprehensive zoning ordinances of the Progressive Era.

One of the first American discussions of the legal and constitutional legitimacy of fire limits occurred in 1799. Philip Urbin Duquet was indicted for maintaining a "common and most dangerous nuisance"—a wooden house erected contrary to a 1796 Philadelphia ordinance prohibiting wooden structures (houses, shops, warehouses, stores, or stables) on pain of $500 fine.[84] Jared Ingersoll argued the case for the Commonwealth in *Respublica v. Duquet*. Citing English Chief Justice Lord Holt, Ingersoll defended Philadelphia as a "great community that have a legislative power intrusted to them for their better government" to "make laws to *bind the property* of those that live within."[85] He rooted Philadelphia's overarching regulatory power in its incorporation statute authorizing it to make laws "as shall be necessary or convenient for the government and welfare" of the city. And he invoked a 1795 state act explicitly empowering Philadelphia to establish fire limits.[86] "We have no unfavorable precedents against us," Ingersoll declared, noting similar fire and safety regulations in New York City and Charleston.[87]

In a very short opinion, Chief Justice Shippen simply cited the two state statutes and matter-of-factly upheld the constitutionality of the fire-limit ordinance. The only question in this case was whether legislative authority was properly delegated to the municipal corporation. Neither the judge nor the defendant's attorneys thought to question the legislature's ultimate authority to restrict and restrain private property by banning the use of wood in buildings. As was suggested in the very statute creating the "Corporation of the City of Philadelphia," the intention of civil government was to "provide for the order, safety and happiness of the people."[88] The power of government to "bind" property in pursuit of these larger ends—to protect against fire—hardly was contestable.

Exhibit 16
Page 00294

*Respublica v. Duquet* quickly emerged as the leading American case on the constitutionality of municipal fire limits.[89] But the court's spartan opinion did not really offer a compelling explanation for the legal legitimacy of fire ordinances. We can only infer that public power to regulate private property to protect against fire was so apparent and assumed by the Pennsylvania court that close scrutiny was unnecessary. Thirty-six years after *Duquet* in *Wadleigh v. Gilman*, the Maine Supreme Court fleshed out some of the common assumptions left implicit by Chief Justice Shippen.[90]

Like Philadelphia, New York, Boston, and Charleston, Bangor, Maine, had a fire-limit ordinance in the early nineteenth century prohibiting new wooden buildings (existing buildings were exempt). The penalty for violation of the ordinance was $50. When Wadleigh moved a preexisting wooden building from one part of Bangor to another, it was deemed new construction and, in a twist reflective of the swiftness and power of nuisance law, was summarily demolished by the street commissioner and city marshal. Wadleigh brought an action of trespass against the municipal officers for breaking and entering his close. The defendants justified their action as merely the enforcement of Bangor's fire regulation. In a short but comprehensive opinion, Chief Justice Weston exonerated the municipal officials.[91]

*Wadleigh* is notable for several reasons. First, it illustrates the extent to which some communities were willing to go to enforce their police regulations. At issue in *Wadleigh* was a quite common, but striking, nineteenth-century remedy for antisocial uses of private property—the physical destruction and removal of offensive structures. As we shall see in later chapters, demolition was used throughout this period to deal with noxious milldams, disorderly houses, saloons, hospitals and infectious buildings, as well as the accoutrements of the illegal liquor trade.[92] In *Wadleigh*, the plaintiff's wooden building was torn down by public officials despite the fact that the municipal ordinance only authorized a $50 fine. Chief Justice Weston had no trouble amplifying the public remedy. "Is this all they can do?" he questioned, "After exacting the penalty, must [the city] submit to the continuance of a mass of combustible matter, erected in defiance of their ordinance, in the heart of the city?" He found otherwise: "If it was lawful for them to forbid the erection, we hold it lawful for them to cause it to be removed."[93] Such incidents of the actual *destruction* of private property without compensation (in the interests of public safety, morals, health, and welfare) indicate just how different nineteenth-century common law assumptions about public regulation could be from twentieth-century constitutional hairsplitting over what constitutes a

Exhibit 16
Page 00295

CHAPTER THREE

# Public Economy:
# The Well-Ordered Market

So the markets are regulated.—Thomas M. Cooley

Public safety was a first-order concern of the well-regulated society to which all private rights and interests were subordinated. An examination of fire regulations thus goes far toward demystifying American private property. Property rights in the early nineteenth century were social, relative, and historical, not individual, absolute, and natural. A second aspect of American liberal mythology that stands in need of disenchantment concerns that mysterious and value-laden sociohistorical force known as "the market." Polity and economy have a very special relationship. But despite being at the center of American historical research for over a century, basic assumptions about the American state and the market have remained surprisingly static. First, state regulation and market economics are seen as diametrical opposites. Regulation is a contrived and public interference in a field of invisible economic relations otherwise natural and private.[1] Second, American economic regulation is understood as a relatively recent invention. As Thomas McCraw argued in 1975 (perhaps with the Massachusetts Board of Railroad Commissioners in mind), "regulation is barely a century old."[2]

This chapter takes aim at both of these assumptions. Through a historical reconstruction of nineteenth-century notions of *public* economy and the *well-ordered* market, it establishes the predominance in theory and practice of an approach to economic life in early America antithetical to the classical separation of market and state. The cases, statutes, and ordinances analyzed here

— 83 —

Exhibit 16
Page 00296

suggest that early Americans understood the economy as simply another part of their well-regulated society, intertwined with public safety, morals, health, and welfare and subject to the same kinds of legal controls. Far from viewing the state and the economy as adversarial, public economy was part of a world-view slow to separate public and private, government and society. It understood commerce, trade, and economics, like health and morals, as fundamentally public in nature, created, shaped, and regulated by the polity via public law.

This chapter also demonstrates the deep roots of economic regulation in America. In contrast to historical depictions of the period from 1776 to 1860 as an era of Americanization, transformation, and modernization heralding the ascendancy of liberal constitutionalism and free-market economics, it documents the pervasiveness of a commitment to a regulated economy in a well-ordered society. Indeed, the deluge of restrictions on economic life passed by state and local authorities in this period suggests that "regulation" might supplant "the market" as a better metaphor for the age. Regulations were not quaint residues of a feudal regime doomed to obsolescence. Rather public economy and the well-regulated society functioned as central, compelling philosophies in early American public law—philosophies busily put into practice through a host of particular rules and prosecutions solicitous of public goods over individual interests.

The market did not burst on the American stage circa 1776 of its own natural self-volition. It was a human, historical, and political creation. Postrevolutionary America was indeed the site of an economic transformation. But it owed more to the visible laws of police than the natural laws of economics. This was a revolution that had more to do with the conspicuous invention of political economy than the invisible hand of the free market.

## Market Revolution or Legal-Political Economy?

The first hurdle blocking a reconstruction of the notion of public economy in nineteenth-century America is a twentieth-century perspective that separates public and private and understands economy as an autonomous and natural force in history. One of its most persistent historical themes is the notion of antebellum America as a site for the pivotal transition from colonial mercantilism to laissez-faire capitalism. The publication of Adam Smith's *Wealth of Nations* (1776), the story goes, "inaugurated an economic revolution by emphasizing laissez-faire and individualism in place of the mercantilist emphasis on government intervention and statism."[3] Building on accounts of the ascen-

Exhibit 16
Page 00297

dancy of a self-regulating market in England, histories of early American eco-nomic development continue to rely on a rather narrow and apolitical render-ing of the great capitalist transformation. Capitalism is defined as a state of affairs where "most property is privately owned," "economic decisions are de-termined in a relatively unfettered market," and "profit is the goal." A free market, private property, and self-interested profit maximization set the con-ditions for an "age of boundlessness" and unprecedented economic growth.[4]

Recently social historians have taken to the phrase "market revolution" to characterize the impact of antebellum industrial and agricultural change on ordinary Americans. They too emphasize the invisible force of "new markets" in land, labor, and produce that eroded artisan handicrafts and subsistence farming, creating a sea change in human relations and American history. As in the case of capitalist transformation, these market changes transcended legal, governmental, or other forms of public action.[5] In both the theses of "market revolution" and "capitalist transformation," the public and political dimen-sions of change are subordinated (if not made invisible) to the more primary relationships of society and economy. Law and the state appear as separate, ex-ternal spheres whose ramifications can be captured in a simple, binary assess-ment of whether they were "in" or "out" of the economy. There is no room in such interpretations for a common law tradition in which state, economy, and society were mutually interwoven in an overarching practice of well-regulated governance.

As one might expect, political and legal histories of the nineteenth century do stress the governmental and institutional contexts of market and capitalist change. Indeed, political history since Oscar and Mary Handlin's *Common-wealth*[6] and legal history since Willard Hurst's *Law and the Conditions of Free-dom*[7] have exploded the "myth of laissez-faire" and demonstrated the myriad ways that law and active state governments furnished the necessary *conditions* for early American economic development, from the state promotion of canals and railroads to the transformation of the laws of property and con-tract. Without downplaying this extraordinarily important insight, however, the commonwealth studies and the new legal histories nonetheless remain predominantly instrumentalist in orientation. The state had an important *role* in early American capitalism, and the law was a crucial *tool* of economic de-velopment. But polity and economy, public and private remained separate spheres. The needs of capitalism was still the dominant engine of change in nineteenth-century America. At bottom, the state and the law in these legal-political studies were mere public mechanisms for the advancement of eco-nomic individualism and an ultimately private, self-regulating market. As

Exhibit 16
Page 00298

Arthur Miller observed in a commonly accepted depiction of nineteenth-century law and economy: "The basic emphasis of government . . . may be summed up in the hypothesis that the legal system was used to encourage and protect business enterprise."[8]

In contrast, I would like to rehabilitate a different conception of the relationship between polity and economy that predominated in nineteenth-century America. Law and state were not simply instrumentalities of a fundamentally economic transformation. Rather, they were the central creators of the notion of economy as a special sphere of social activity, a sphere distinctly cognizable as an object of governance. In the early nineteenth century as a product of state policy and legal change, the economy emerged from the shadows of colonial household management into the public sphere as an object of police and statecraft. The basic relations of the American economy were subsequently formed and transformed as a result of the overt policies of government and law *not* the invisible laws of supply and demand. Indeed, one of the most important attributes of this antebellum debut of economics as a distinctly public practice was its accompaniment by extensive police regulation.[9]

First and foremost, the economy was seen in antebellum America as a site for the exercise of public power, that is, for the execution of the ubiquitous rules and restrictions of the well-regulated society. The discourses of governance, police, and political economy grew up together. Vattel captured this confluence when he described as the principal object of government "the business of providing for all the wants of the people, and producing a *happy plenty* of all the necessaries of life, with its conveniences and innocent and laudable enjoyments." In a well-regulated society, the happiness of the nation and the welfare of the people depended upon the public management of economy and market. It was a duty (as well as reason) of state to encourage labor and industry, to provide sufficient working men, to prevent the emigration of useful laborers, to encourage cultivation (e.g., by the establishment of public granaries), to cultivate home trade, to promote public communication and transportation, and to enact and enforce regulations for preventing scarcity.[10] Charles Goodrich, who labeled political economy "only another term for jurisprudence," was quite explicit about this interconnection of police and economy: "The regulation of internal trade is a matter of public concernment, and is regulated by state authority."[11] Regulation was an inseparable and indispensable part of the early American notion of "public economy."

In unpacking this understanding of public economy, it is important to remember that the word "economy" meant something different in the eighteenth and nineteenth centuries. The Latin *oeconomia* had Greek roots and

Exhibit 16
Page 00299

meant "the management of a household." The notion of management or control was inherent in the word, as was its connection to family matters. By the eighteenth century, under the influence of police and cameralist thinking, the word was broadened to include any society ordered after the manner of a family or, similarly, the general administration of the concerns of a community with a view to orderly conduct and productiveness.[12] That was, of course, exactly William Blackstone's meaning when he referred 'to "Offenses against Public Police or Oeconomy" in his *Commentaries*.[13] Blackstone used the words "public police" and "oeconomy" interchangeably to represent "the due regulation and domestic order of the kingdom."[14]

The nineteenth-century American notion of public economy resonated with the eighteenth-century English "moral economy" implied by Blackstone but more critically described by E. P. Thompson (the historian along with Marx and Weber who best illuminated the legal and political construction of market capitalism). But there was a crucial difference. Thompson argued that English law and legislation quickly capitulated to the overwhelming "intellectual victories" of the "new political economy" of Adam Smith. Thus, enforcement of the precepts of the old moral economy fell to the ultimately futile "extralegal" activities of the English crowd.[15] In contrast, American public economy remained firmly rooted in law and legislation until after the Civil War.[16]

Indeed, despite historical depictions of free trade, "laggard" regulation, and the opening of American society,[17] the early nineteenth century was home to a deluge of formal economic regulations and vigorous defenses of the power of the state over trade and commerce. Regulations of public trade and the *jus publicum* of commerce, like those governing public justice and public peace, were crucial building blocks of the well-regulated society and antebellum public policy. The commerce clause of the United States Constitution, empowering Congress to "regulate commerce," was only the nation's most visible economic police law.[18] In 1823, Nathan Dane (who established the first law chair at Harvard University) outlined a series of economic offenses against "public polity and good order of the government."[19] He enumerated a variety of common law and statutory regulations of "public trade," violations of which "no well-governed state can suffer to exist unpunished." Among these were: cheating, deceits, and frauds; the operation of an inn, tavern, or licensed house without a license; offensive trades; the sale of unwholesome provisions; peddlers and hawkers; forestalling, engrossing monopolies, and regrating; luxury; usury; and illegal weights and measures.[20] Though Dane's list was short, the broad policy concerns represented by each offense stretched across

Exhibit 16
Page 00300

the spectrum of the antebellum economy and included thousands of particular state economic regulations.

The broad, political understanding of economy as the object of police and regulation dominated thinking about exchange, trade, and commerce well into the nineteenth century. Rather than moving to the whims of an invisible, self-regulating law of supply and demand, early Americans perceived the economy as inseparable from the basic institutions and public concerns of their daily lives. As such, it was held to the same rigorous controls and legal standards that governed all aspects of life. Indeed, ultimately the early American economy is only interpretable through the mass of economic rules, controls, customs, and regulations passed by state and local governments to protect and pursue *salus populi*, the people's welfare.

## Product Laws

Under "cheating, deceit, and fraud in trade," Nathan Dane discussed a host of state and common law regulations meant to ensure fair trade and "fair dealing." Nearly all state legislatures in the early nineteenth century passed laws directing "trades to be conducted, and wares and goods to be fabricated, and put up for market in a certain manner."[21] Between 1780 and 1835, the Massachusetts legislature passed regulations that closely specified and controlled the way the following products were manufactured and sold: boards, shingles, clapboards, hoops, and staves (1783); flaxseed, barreled fish, and dried fish (1784); tobacco and onions (1785); pot and pearl ashes (1791); firewood, bark, and coal (1796); beef and pork (1799); boots, half-boots, shoes, pumps, sandals, slippers, and galoshes (1799); butter (1799); bread (1800); nails (1800); chocolate (1803); hops (1806); lime (1806); smoked alewives and herrings (1807); gunpowder (1809); pickled fish (1810); Indian and rye meal (1813); firearms (1814); salt and grain (1817); paper (1818); spruce and pine timber (1822); hay (1825); ale, beer, and cider (1829); sole leather (1831); oils (1833); and beef cattle (1833).[22] Surveys of the statute books of Maryland, South Carolina, Michigan, and Ohio reveal similar stories.[23]

But a mere list of restricted products (even if it contains the staples of the antebellum economy) does not capture how deeply embedded public regulation was in the American economy. That is more apparent in the far-reaching detail of the statutes. A Maryland law regulating the sale, inspection, and export of pickled or salted fish was typical.[24] It employed most of the antebellum strategies for regulating the sale of food products (short of outright price-fixing): strict controls on packaging, weights and measures, and quality and

Exhibit 16
Page 00301

merchantability; branding; inspection and certification; restrictions on exportation; oaths; and, of course, penalties (fines and seizure).

Maryland borrowed liberally from a Massachusetts statute which in turn was based on English Parliamentary Acts dating from the seventeenth century. The Maryland act demanded rigorous packaging standards:

> [A]ll barrels . . . shall be made of sound well seasoned oak, ash or chestnut staves, of rift timber, not less than half an inch thick, with heading of either of the said kinds of wood, not less than five-eighths of an inch thick, and sound and well seasoned, the said heading to be well planed or shaved, the barrels, half barrels and tierces, to be well hooped, with at least three hoops on each bilge, and three hoops on each chine, all of which shall be good hoops of sufficient substance; the barrel staves to be twenty-eight inches in length, and the heads to be seventeen inches between the chines, and to contain not less than twenty-nine or more than thirty-one gallons; and the barrels, half barrels and tierces, shall be made in a good workman-like manner, so as to hold pickle, the tierces to hold not less than forty-five gallons, and the half barrels not less than fifteen gallons.[25]

Owners or importers of any fish in Baltimore were required to arrange for an inspection within forty-eight hours. The state inspector was charged with ensuring that the fish were "well struck with salt or pickle . . . and preserved sweet and free from rust, taint or damage." Those "of a good and fat quality, with sweet pickle in the barrels, and sufficient salt to preserve them" were branded "No. 1." Others were branded "No. 2" or condemned. Fish of a very superior quality were further branded with the owner's name and the word "prime."[26] No fish could be exported from Maryland without certification of inspection and an oath by the ship's master that all fish on board had been properly inspected.[27] Further restrictions were placed on the landing of fish at the public wharf and the storage of more than forty-eight barrels in a warehouse. Penalties were imposed for violating any part of the act or for tampering with stamps or brands.

Similar regulations accompanied the sale and exportation of almost all important commodities. Before being sold, wood had to be measured (conforming to precise dimensions); inspected for sap, shakes, wormholes, rots, knots, splits, and seasonedness; certified; and cut, split, landed, stored, and carted according to the dictates of statute.[28] Legislatures empowered a small army of inspectors, measurers, surveyors, viewers, cullers, weighers, provers, and gaugers, as well as mayors, aldermen, justices of the peace, and private citizens,

Exhibit 16
Page 00302

to protect the public against the evils of unregulated commerce and trade.[29] The fear was fraud and deceit—the same motivation for laws regulating weights and measures and outlawing cheating.[30] But there was also a ubiquitous concern for quality, merchantability, and fair dealing.[31] In a public economy, the buying and selling of goods was intimately bound up with community identity and social order. Nothing so important could be left to the invisible laws of a marketplace or the private law stricture that a buyer should beware.

Demands for a moral and well-regulated economy did not die with the American Revolution or a subsequent economic one.[32] As late as 1841, the Supreme Court of Alabama unequivocally upheld the assize of bread, suggesting that "whatever doubts have been thrown over the question by the theories of political economists, it would seem that experience has shown that this great end [the urban bread supply] is better secured by licensing a sufficient number of bakers and by an assize of bread, than by leaving it to the voluntary acts of individuals." In *Turner v. Maryland* (1882), the U.S. Supreme Court reviewed state product and inspection laws dating from the late eighteenth century and found them decidedly constitutional.[33]

## Licensing

Licensing, another item in Nathan Dane's analysis of public trade, was just as far-reaching and important to the public economy as inspection and product laws. Nineteenth-century legislators used licensing to regulate and control a host of economic activities, trades, callings, and professions. The goals of particular license laws were mixed and sometimes confused, including prohibition, regulation, administration, and revenue. But the overall justification for licensing was the same as the police power generally—the public good and the people's welfare.[34]

To get at the public significance of licensing in the nineteenth century, it is necessary to suspend our twentieth-century conception of licensing as little more than routine public registration. As Thomas Cooley pointed out in 1876, the license (like an early act of incorporation) was understood as a special "privilege granted by the state."[35] Licensing was an exertion of the public prerogative granting permission to do that which was otherwise illegal or against public policy.[36]

So what were some of the activities that were considered special privileges in the early nineteenth century—illegal without public sanction? In some states, one was the basic economic act of *selling for profit.* Beginning in 1827,

Exhibit 16
Page 00303

Case 3:25-cv-00478-HSH-AMF Document 54-1 Filed 09/19/22 Page 1 of 1 Page 65 of 93

Maryland put together a series of statutes that established a "license to trade." An act of the legislature made it unlawful for anyone (other than the grower, maker, or manufacturer of goods) to set up any shop or stand "for the purpose of selling by wholesale or retail, or bartering any dry goods, groceries, spirituous or fermented liquor, imported dried fruit, glass, crockery, hardware, drugs or medicines, paints, printed books, stationery, saddlery, gold, silver or plated ware, jewelry, toys, wearing apparel, salted provisions, grain, meal, flour, timber, tobacco, cotton, leather, hides, lime, wrought or cast iron, copper or tin, or any other kind of goods, wares or merchandise, foreign or domestic, without first obtaining a license."[37] By 1832, it was illegal in Maryland to "expose for sale, or sell, any goods, wares or merchandise, with a view to profit in the way of trade" unless one first obtained a state "license to trade."[38] Tennessee, Missouri, Pennsylvania, and California all passed similar statutes around midcentury requiring the licensing of merchants, retailers, and wholesalers. In *French v. Baker* (1856), the Tennessee Supreme Court joined other state courts in holding that the occupation of merchant was a *privilege* sanctioned by government and not a natural right of individuals.[39] That most basic of economic activities—the selling of goods in a shop—was understood as flowing from the state, which retained the right and duty to control, regulate, and tax it for the common good.

But merchants and retailers were not the only economic actors subject to licensing restrictions. By 1868 Alabama required a license for over thirty occupations and businesses, including public race tracks, lottery ticket dealers, gift enterprises, liquor dealers, distillers, brewers, dealers in tobacco or cigars, livery stable keepers, keepers of stud horses, horse and mule dealers, brokers, pawnbrokers, real-estate agents, insurance agents, dentists, physicians and surgeons, lawyers, druggists, commission merchants, peddlers, bowling alleys, billiard tables, gaming tables, theaters, dealers in firearms, auctioneers, and newspapers. The Alabama Supreme Court upheld this statute (and the indictment of a lawyer for practicing without a license) with the observation, "The right to regulate the property and the avocations of its citizens by the State is sovereign."[40] By 1881, a Tennessee legislature declared more than fifty such occupations "privileges" requiring a license.[41]

General licensing statutes were significant in establishing the power of the state over nineteenth-century businesses and occupations. But even more important were statutes that used the license as the first step in a more comprehensive regulatory strategy. This was the case with many antebellum businesses, but especially in the licensing and regulation of three central economic operations: inns and taverns, auctioneers, and public carriers.

Exhibit 16
Page 00304

Inn and tavern owners were not only licensed but were treated as virtual public officials. Drawing on its own colonial laws and English precedents dating from William III, Massachusetts passed an act for the regulation of "licensed houses" in 1786.[42] It held that no person could be a common victualler, innholder, taverner, or seller of strong liquors by retail without a license. To obtain such a license, tavern owners had first to obtain a certificate from the selectmen of their town recommending them as "persons of sober life and conversation, suitably qualified and provided for the exercise of such an employment." They then had to take an oath bearing allegiance and faith to the commonwealth and post a recognizance of twenty pounds that they would "keep and maintain good order and rule, and shall suffer no disorders nor unlawful games to be used . . . and shall not break any of the laws for the regulation of such houses." Such regulations included requirements for suitable provisions and lodging for all strangers and travelers; pasturing and stable room, hay and provender for horses and cattle; a conspicuous sign; a duty to provide for all travelers; a prohibition on gaming implements, dancing or reveling, excessive drinking, and service to minors or servants. In addition, selectmen posted the names of common drunkards and idlers in all inns and taverns, prohibiting service to such individuals. Tithingmen were appointed to inspect all licensed houses and inform on all disorders or violations of the statute. Substantial fines and forfeiture of a license were the penalties for violating these regulations. Tavern owning was neither a right nor a private economic activity; it was understood as a public responsibility. American statutes echoed English Justice Coleridge's suggestion that "innkeepers are a sort of public servant."[43] Justices of the peace were charged with issuing no more licenses than "necessary for the public good."[44] In South Carolina and Maryland, county courts set prices and rates for food, drink, lodging, and horse care at licensed inns and taverns.[45]

Auctioneers were as much economic officers of the state as tavern keepers. The auction (or vendue) was an ancient institution still integral to nineteenth-century economic exchange. Auctions were strictly regulated public events. The auctioneer was usually appointed by the governor, and the number in any city limited by law.[46] He was required to post bond or recognizance to cover all duties, satisfy any claims against him, and guarantee good and honest public behavior (in Baltimore $30,000 in 1827). License fees could amount to more than $750. Accounts were to be rendered to public officials and duties paid on all items sold every three to six months. Auctioneers were required to take oaths attesting to the accuracy of the accounts. Auctions were restricted to certain times and places, and their commissions were fixed by state law.

Exhibit 16
Page 00305

# Exhibit 17

Exhibit 17
Page 00306

# UC Davis Law Review Online

| VOL. 55 | | SEPTEMBER 2021 |



## SYMPOSIUM ESSAY

# The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America

*Saul Cornell*[*]

Under the framework developed in *District of Columbia v. Heller* and refined in *McDonald v. City of Chicago* the outcome of firearms litigation often hinges on demonstrating that there is a clear historical genealogy or analogue to modern gun laws. If a regulation is grounded in history it provides a strong foundation for upholding the challenged statutes and ordinances.[1] The Ninth Circuit took note of this fact when it highlighted the need for a detailed examination of the history of state statutes and local ordinances in *Young v. Hawaii*, describing this material as "the best evidence we have of the American understanding

---

[*] Copyright © 2021 Saul Cornell. Paul and Diane Guenther Chair in American History, Fordham University.
[1] District of Columbia v. Heller, 554 U.S. 570, 591, 595 (2008); McDonald v. City of Chicago, 561 U.S. 742, 767-68 (2010).

65

Exhibit 17
Page 00307

of the interface between the right to keep and bear arms and the police power."[2]

Discussions of Founding era history and the English roots of Anglo-American gun regulation have dominated much of the existing scholarship and jurisprudence.[3] The role of Reconstruction-era law has figured less prominently in these debates, but this period is vital to understanding the history, text, and tradition model that *Heller* demands.[4] Indeed, in *McDonald v. City of Chicago*, Justice Alito refined and elaborated *Heller*'s history, text, and tradition model for evaluating the constitutionality of gun regulation.[5] Extending the focus of analysis

---

[2]   Young v. Hawaii, 992 F.3d 765, 824 (9th Cir. 2021).

[3]   Although there is widespread agreement that history, text, and tradition are important to *Heller*'s framework, there is less agreement about whether this approach precludes other standard modes of constitutional analysis entirely. *See* JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER* 100-17 (2018).

[4]   On the expansion of regulation during Reconstruction, see PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY (2018); Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1068-69 (2010).

[5]   *See McDonald*, 561 U.S. at 767-68. For Justice Kavanaugh's view on the model, see *Heller v. District of Columbia* (Heller II), 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). For Justice Gorsuch's view, see *Peruta v. California*, 137 S. Ct. 1995, 1998 (2017) (Mem.) (Thomas, J., joined by Gorsuch, J., dissenting from denial of certiorari) (noting positively that a Ninth Circuit panel decision "pointed to a wealth of cases and secondary sources from England, the founding era, the antebellum period, and Reconstruction"). On the likely increasing relevance of history given the recent Court appointees, see *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., dissenting) (per curiam) (arguing that the fact that the City "point[ed] to no evidence of laws in force around the time of adoption of the Second Amendment that prevented gun owners from practicing outside city limits" was "sufficient to show that the New York City ordinance [was] unconstitutional") and Joseph S. Hartunian, *Gun Safety in the Age of Kavanaugh*, 117 MICH. L. REV. ONLINE 104, 115-16 (2019). Chief Justice Roberts also gestured toward a historical approach in the *Heller* oral argument: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well." Transcript of Oral Argument at 77, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290). For Justice Barrett's view, see *Kanter v. Barr*, 919 F.3d 437, 451-52 (7th Cir. 2019) (Barrett, J., dissenting) ("There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people — for example, violent felons — who fall entirely outside the Second Amendment's scope. . . Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. . . . These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that

Exhibit 17
Page 00308

beyond the Founding era, Alito took note of developments in American law up to and including Reconstruction. Building on *McDonald*'s analysis, the Seventh Circuit decision in *Ezell v. City of Chicago* explained the relevance of Reconstruction-era practices to *Heller*'s historical framework: "*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified."[6]

Despite these judicial pointers, scholarship on the history of firearms regulation during Reconstruction has lagged far behind studies of early American gun regulation.[7] This essay collects and analyzes evidence about Reconstruction-era firearms regulation and summarizes these findings.[8] Reconstruction ushered in one of the most intense periods of gun regulation in American history. The Republicans who framed and enacted the Fourteenth Amendment were eager to protect the Second Amendment rights of recently freed persons, including an individual right of self-defense. But Republicans were equally committed to enacting strong racially neutral gun regulations, aimed at reducing interpersonal violence and preserving the peace, a task vital to the success of Reconstruction.[9] Scores of new regulations were enacted and one of the main goals of these laws was to limit the public carry of weapons. These laws were not driven by racial animus, as some gun rights advocates have erroneously claimed, but sought to protect vulnerable populations in the South, including former slaves and Republicans eager to further the aims of Reconstruction.[10]

One area of regulation that has not received sufficient attention is municipal ordinances. During the Reconstruction Era, localities enacted some of the most sweeping laws in American history and pioneered new

---

same body of evidence to identify the scope of the legislature's power to take it away. In my view, the latter is the better way to approach the problem.").

   [6]  Ezell v. City of Chicago, 651 F.3d 684, 702 (7th Cir. 2011).

   [7]  *See supra* note 4.

   [8]  *See infra* Tables 1, 2.

   [9]  It is vital to distinguish between the racially motivated Black codes enacted by Confederate sympathizers and the racially neutral laws enacted by Republicans to protect free persons and Republicans from terrorist violence. See Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 611, 621-22 (2006).

   [10]  For the most recent example of the gun control is racist canard, see Justin Aimonetti & Christian Talley, Essay, *Race, Ramos, and the Second Amendment Standard of Review*, 107 VA. L. REV. ONLINE 193, 194 (2021).

Exhibit 17
Page 00309

approaches to gun regulation.[11] The most important and influential type of these new ordinances were good cause permit schemes. Indeed, by the end of Reconstruction, these discretionary good cause permitting schemes had not only proliferated in number but were in the process of becoming the dominant model of gun regulation in America. In states such as California, more than half the population lived under such schemes by the end of the nineteenth century.[12] Similarly, four of the nation's largest cities at the dawn of the new century, including New York, St. Louis, Buffalo and San Francisco, also embraced this form of gun regulation.[13]

Justice Alito's important insights in *McDonald* have not received enough attention in recent Second Amendment scholarship and jurisprudence. The changes in the language of state constitutional texts between the Founding era and the era of Reconstruction merits closer scrutiny.[14] Understanding this transformation requires analyzing the changing fears driving American constitutional thinking about the right to bear arms. For Reconstruction-era lawyers and judges schooled in common law modes of legal analysis, one of the most important interpretive tools was the mischief rule — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and remediate.[15] By the era of

---

[11]  For an important exception to this lack of attention to local laws, see generally Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82 (2013) (comparing urban and rural firearm municipal ordinances).

[12]  *See infra* Table 3 and related text.

[13]  An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, § 209, 1891 N.Y. Laws 129, 176-77 (Mar. 27, 1891); *Prohibiting the Carrying of Concealed Deadly Weapons, Sept. 17, 1880, in* GENERAL ORDERS OF THE BOARD OF SUPERVISORS PROVIDING REGULATIONS FOR THE GOVERNMENT OF THE CITY AND COUNTY OF SAN FRANCISCO 7-8 (1884); EVERETT W. PATTISON, THE REVISED ORDINANCE OF THE CITY OF ST. LOUIS, TOGETHER WITH THE CONSTITUTION OF THE UNITED STATES, AND OF THE STATE OF MISSOURI, THE CHARTER OF THE CITY; AND A DIGEST OF THE ACTS OF THE GENERAL ASSEMBLY, RELATING TO THE CITY 491-92 (1871); ELLIOTT F. SHEPARD & EBENEZER B. SHAFER, ORDINANCES OF THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, IN FORCE JANUARY 1, 1881, at 214-15 (1881). For population data, see *Table 13. Population of the 100 Largest Urban Places: 1900*, U.S. BUREAU OF THE CENSUS (June 15, 1998), https://www2.census.gov/library/working-papers/1998/demo/pop-twps0027/tab13.txt [https://perma.cc/TQ2K-3PMP].

[14]  *See* McDonald v. City of Chicago, 561 U.S. 742, 767-68 (2010).

[15]  The interpretation and application of the mischief rule raises a host of jurisprudential issues. *See* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 967 (2021). To reconstruct the original meaning of the law at the time of the Fourteenth Amendment, one must reconstruct how the rule was understood in the eighteenth century and in the era of Reconstruction. The mischief rule was articulated in Heydon's

Exhibit 17
Page 00310

Reconstruction, gun violence had emerged as a serious problem in American life and legislators responded to this development by enacting scores of new laws.

Founding era fears about the federal government's threat to state militias, Alito noted, had largely abated by the time of the Civil War. One of the most important consequences of this shift was the adoption of state arms bearing provisions that were more self-consciously individualistic.[16] What has not drawn much scholarly or judicial notice, though, is the profound change in the structure and language that accompanied the rise of a more individualistic formulation of the right to bear arms after the Civil War.

The inclusion of more individualistic language was only part of the change in the language of these texts. States also included provisions expressly affirming the right to regulate arms. In fact, state after state cast aside the eighteenth century's dominant formulation of arms-bearing, dropping references to the dangers of standing armies and the necessity of civilian control of the military. In place of these ancient fears of tyrannical Stuart monarchs and standing armies, a new fear permeated these texts: gun violence. To borrow a key concept from the common law: a new mischief had emerged, one that required a different remedy. The constitutional danger nineteenth century America faced, one that intensified after the Civil War, was not "lobster-back" redcoats facing off against minutemen, but interpersonal gun violence and the collective terrorist violence perpetuated by groups such as the Ku Klux Klan.[17] In response to these new threats to the peace and safety of the republic, a novel formulation of the right to bear arms emerged in state constitutional law — a new model that forged an indissoluble bond between the right to regulate arms and the right to bear arms.[18]

Powered by this new constitutional framework, uniting arms bearing and regulation into a single principle, states and localities took up the challenge of framing policies that both protected the right to bear arms

---

Case [1584] 76 Eng. Rep. 637, and elaborated on in 1 William Blackstone, Commentaries on the Laws of England 61 (1765). For the rule in post-Civil War constitutional thought, see Joel Prentiss Bishop, Commentaries on the Written Laws and Their Interpretation 206 (1882).

[16]  Actually, a more self-consciously individualistic language to describe the right to bear arms, one expressly tied to self-defense, emerged during the Jacksonian era — much earlier than Alito credits. *See* Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 142-4 (2006).

[17]  *See* Randolph Roth, American Homicide 350-54 (2009); Eric Foner, The Second Founding: How the Civil War and Reconstruction Remade the Constitution 116-17 (2019).

[18]  *See infra* notes 37–40.

Exhibit 17
Page 00311

and the public's right to enjoy the peace by enacting dozens of new laws regulating nearly every aspect of the right to keep and bear arms.[19] Laws regulating the sale of arms; prohibitions on possessing arms in churches, schools, and polling places; bans on concealed carry; general bans on public carry; and new discretionary permit schemes that limited the right of armed travel to situations in which citizens had a good cause to fear attack were among the most important laws adopted during this period.[20]

## I.   RECONSTRUCTION AND THE RIGHT TO BEAR ARMS

Although scholars have long recognized that Reconstruction, the period after the Civil War, ushered in profound changes in American law, the impacts of those changes on gun regulation and conceptions of the right to bear arms have not been subjected to rigorous historical analysis.[21] The Civil War had a profound impact on gun violence in America. The trauma of the war and the enormous increase in the production of guns necessary to supply two opposing armies intensified the problem posed by firearms violence and gave a new impetus to regulation.[22] A false historical narrative has warped much of the modern debate over the meaning of the right to keep and bear arms in the era of Fourteenth Amendment. According to this erroneous account, Reconstruction-era Republicans opposed gun regulation because it was inherently racist and aimed at disarming Blacks.[23] Confederate

---

[19]   *See* Cornell & Florence, *supra* note 4, at 1069.

[20]   *See infra* note 36.

[21]   For discussions of the continuing problems with legal scholarship on the right to bear arms and its penchant for anachronistic claims, see generally Saul Cornell, "Half Cocked": The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment, 106 J. CRIM. L. & CRIMINOLOGY 203 (2016) and Martin S. Flaherty, *Can The Quill Be Mightier Than the Uzi?: History "Lite," "Law Office," and Worse Meets the Second Amendment*, 37 CARDOZO L. REV. 663 (2015).

[22]   *See* ROTH, *supra* note 17.

[23]   Several authors, including prominent gun rights activists, have argued that gun control was part of a racist agenda to strip freed persons of color of their rights, an erroneous conclusion that conflates the Black Codes with the Republican-enacted racially neutral gun regulations aimed at demilitarizing the South and pacifying the public sphere so African Americans could vote and organize to protect their rights. For a discussion of the vital importance of this distinction to evaluating Reconstruction-era laws, see discussion *infra* note 50. For a sampling of ideologically slanted scholarship on this topic, see generally STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876 (1998); Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity — The Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307, 1310, 1318 (1995) (The authors ignore laws

Exhibit 17
Page 00312

sympathizers in the Reconstruction South did attempt to use gun regulations in a racially targeted fashion, as part of the infamous Black Codes, hoping to facilitate the return of white rule. Although eager to dismantle these racist laws disarming Blacks, Republicans also used government power proactively to rebuild the militia system and pass a range of racially neutral gun control measures aimed at promoting public safety.[24] Rather than oppose an expansion of gun regulation, Reconstruction-era Republicans (including those responsible for framing and ratifying the Fourteenth Amendment) aimed to use racially neutral gun laws, including those designed to demilitarize the public sphere, to restore order and empower freed people to participate in civic life, most importantly elections.[25] Republicans were committed to a vision of government that would protect the rights of recently freed slaves and promote the ideal of a well-regulated society.[26]

Nothing better illustrates the linkage between gun regulation, the right to bear arms and the protection of free persons than General Daniel Sickles' General Orders.[27] In General Order No. 1 Sickles declared that "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent."[28] It is worth noting that

---

enacted by legislatures dominated by Republicans aimed at protecting Blacks in the Reconstruction South.); Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17, 18 (1995).

[24]  *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. F. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

[25]  *See* WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA 51-53 (1996).

[26]  *See generally* RONALD M. LABBÉ & JONATHAN LURIE, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (2003) (discussing the origins of the Fourteenth Amendment).

[27]  For a gun rights reading of Order No. 1 that ignores its strong support for racially neutral limits on public carry, see Clayton E. Cramer, Nicholas J. Johnson & George A. Mocsary, *This Right Is Not Allowed by Governments that are Afraid of the People: The Public Meaning of the Second Amendment when the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823, 854, 857 (2010). General Order No. 7 is not mentioned at all. For a similar one-sided reading of the evidence, see Cottrol & Diamond, *supra* note 23.

[28]  1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION: POLITICAL, MILITARY, SOCIAL, RELIGIOUS, EDUCATIONAL & INDUSTRIAL 1865 TO THE PRESENT TIME 207-208, 211 (1906) (reprinting General Order No. 1 and General Order No. 7).

Exhibit 17
Page 00313

General No. 1 not only affirmed a right to bear arms, but reasserted the right to regulate arms, including bans on concealed carry and limits on the ability to travel armed on private property. Moreover, gun rights advocates ignore General Order No. 7 issued by Sickles several months later. Addressing the problem of promiscuous public carry, a practice that led to the disruption of civil society, Sickles issued another order prohibiting "[o]rganizations of white or colored persons bearing arms, or in-tend[ing] to be armed."[29] Order No. 7 prohibited drilling, parading, and patrolling with arms, limiting public carry to those enrolled in the military forces of the United States.[30] Sickles followed up with General Order No.10, a measure that banned all public carry and made concealed carry "an aggravation of the offense."[31]

Other laws aimed at limiting arms in polling places, schools, and other important public venues where people gathered were also enacted by Reconstruction era governments.[32] During the colonial period, some legislatures passed laws requiring settlers to bring arms to church, but during Reconstruction laws were passed banning firearms in churches, schools, and other public places in which people gathered in significant numbers.[33] The aim of these laws was to preserve the peace and enable civil society to function in the South. These were not restrictions on guns in sensitive places but were an effort to eliminate guns from public places essential for civic life to flourish. For example, one law from Texas prohibited guns in multiple public venues:

> If any person shall go into any church or religious assembly, any school-room or other place where persons are assembled for

---

[29]  *See* Miller, *supra* note 24, at 241.

[30]  EDWARD MCPHERSON, THE POLITICAL HISTORY OF THE UNITED STATES OF AMERICA DURING THE PERIOD OF RECONSTRUCTION, (FROM APRIL 15, 1865, TO JULY 15, 1870) 204 (1875) https://quod.lib.umich.edu/m/moa/abz4761.0001.001/216?xc=1&g=moagrp&q1=General+Sickles&view=image&size=100 [https://perma.cc/M53U-STLW].

[31]  *Id.*

[32]  *See, e.g.,* 1890 Okla. Laws 495, art. 47, sec. 7 ("It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, or for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.").

[33]  For a good illustration of the colonial policy, see AN ACT FOR THE BETTER SECURITY OF THE INHABITANTS BY OBLIGING THE MALE WHITE PERSONS TO CARRY FIRE ARMS TO PLACES OF PUBLIC WORSHIP (1770), *reprinted in* GEORGIA COLONIAL LAWS 471 (1932). For a good example of the restrictive approach taken during Reconstruction, see REVISED STATUTES OF THE STATE OF MISSOURI 224 (John A. Hockaday ed., 1879).

Exhibit 17
Page 00314

educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentleman, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk, or butcher-knife, or fire-arms, whether known as a six shooter, gun, or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same: *Provided*, That nothing contained in this section shall apply to locations subject to Indian depredations: *And provided further*, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.[34]

Many of the new constitutions adopted after the Civil War in Southern states, and the newly admitted Western states, reflected this approach to firearms regulation, entrenching it in the same provisions affirming the right to bear arms.[35] In keeping with the vision of law embodied in these new constitutional provisions, Republicans enacted dozens of new laws to reduce gun violence and promote public safety.[36]

The first state constitutions enacted after the American Revolution typically separated the right of the people to regulate their internal police from specific statements about the right to bear arms. Comparing the language of the Revolutionary era Pennsylvania Constitution 1776 and 1868 Texas Constitution side by side is instructive.[37] The Founding era formulation of the right to bear arms was distinct from the right of the people to regulate their internal police. The Reconstruction era formulation not only omits references to the dangers of standing armies and the need for civilian control of the military but merges the right to

---

[34] AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS (1871), *reprinted in* 2 A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1862 TO 1872, at 1322 (George Washington Paschal ed., Washington D.C., 1873).

[35] *See infra* Table 1.

[36] *See* Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113-17 (2016); Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SW. HIST. Q. 284, 294 (2020).

[37] PA. CONST. of 1776 amends. III, XIII; TEX. CONST. of 1868, art. I, § 13.

Exhibit 17
Page 00315

regulate arms and the right to bear them into a single constitutional principle.[38] The Reconstruction-era constitutional solution cast aside the eighteenth-century language that was steeped in fears of standing armies and substituted in its place new language affirming the state's police power authority to regulate arms, particularly in public.

| Pennsylvania Constitution (1776) | Texas Constitution (1868) |
|---|---|
| "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."<br><br>"That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power."[39] | "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe.[40] |

The constitutional danger Americans faced during and after Reconstruction was unregulated firearms, particularly the danger posed by public carry. The debates in the Texas constitutional convention illustrate the centrality of this concern. The proliferation of weapons and the absence of regulation was a palpable fear in the convention that drafted the Texas Constitution — so much so that the convention passed a resolution prohibiting weapons in the convention hall.[41] One delegate reminded the convention's members that the constitutional

---

[38]   *See, e.g.*, UTAH CONST. of 1896, art. I, § 6.

[39]   PA. CONST. of 1776 amends. III, XIII.

[40]   TEX. CONST. of 1868, art. I, § 13. For similarly expansive constitutional provisions enacted after the Civil War, see *infra* Table 1.

[41]   1 CONSTITUTIONAL CONVENTION, JOURNAL OF THE RECONSTRUCTION CONVENTION, WHICH MET AT AUSTIN, TEXAS, JUNE 1, 1868 (Austin, TX, Tracy, Siemering & Co. 1870) at 248 [hereinafter RECONSTRUCTION CONVENTION] ("The convention do order that no person shall hereafter be allowed in this hall, who carries belted on his person, revolvers or other offensive weapons.").

Exhibit 17
Page 00316

right to bear arms ought not be confused with the pernicious practice of habitually arming.[42] The right, he cautioned, ought not "be construed as giving any countenance to the evil practice of carrying private or concealed weapons about the person."[43]

Table One. Post-Civil War State Constitutional Arms Bearing Provisions about Regulation

| Date | State | Provision |
|------|-------|-----------|
| 1868 | Georgia | GA. CONST. of 1868, art. I, § 14: [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |
| 1868 | W. Texas | W. TEX. CONST. of 1868, Art. I, § 13: Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe. |
| 1869 | Texas | TEX. CONST. of 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. |
| 1870 | Tennessee | TENN. CONST. of 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common defense. But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. |

---

[42] Modern gun rights advocates have erroneously argued that antebellum law established a constitutional right of permissive open carry. In fact, the cases cited for this proposition, including those cited by *Heller*, do not support such an expansive and unregulated right; rather, they support a notion of purposive carry, not permissive carry. On this confusion, see Saul A. Cornell, *The Police Power and the Authority to Regulate Firearms in Early America*, BRENNAN CTR. FOR JUST., June 2021, at 1, 8, https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/VG35-5FBX].

[43] RECONSTRUCTION CONVENTION, *supra* note 41, at 152.

Exhibit 17
Page 00317

| 1875 | Missouri | MO. CONST. of 1875, art. II, § 17: That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. |
| 1875 | North Carolina | N.C. CONST. of 1875, art. I, § 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. |
| 1876 | Colorado | COLO. CONST. of 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. |
| 1876 | Texas | TEX. CONST. of 1876, art. I, § 23: Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime. |
| 1877 | Georgia | GA. CONST. of 1877, art. I, § 22: The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne. |

Exhibit 17
Page 00318

| 1879 | Louisiana | LA. CONST. of 1879, art. III: A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. |
|------|-----------|-----------------------------------------------------------------|
| 1885 | Florida | FLA. CONST. of 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. |
| 1889 | Idaho | IDAHO CONST. of 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law. |
| 1889 | Montana | MONT. CONST. of 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. |
| 1890 | Mississippi | MISS. CONST. of 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. |
| 1891 | Kentucky | KY. CONST. of 1891, § 1(7): The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. |
| 1896 | Utah | UTAH CONST. of 1896, art. I, § 6: The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. |

Exhibit 17
Page 00319

The new focus on regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights.[44] The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters in Ohio that after the adoption of this Amendment, states would continue to bear the primary responsibility for "local administration and personal security."[45] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact whatever reasonable measures were necessary to promote public safety and secure the common good.[46]

The formulation of the right to bear arms adopted in post-Civil War state constitutions drew on antebellum jurisprudence and constitutional theory's robust view of state police power, including the right to regulate firearms. These post-war constitutional texts explicitly recognized broad legislative authority to regulate the right to bear arms. It would be difficult to understate the significance of this change: across the nation, state legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms, especially public carry. Indeed, the number of laws enacted skyrocketed, as did the number of states passing such laws. [47] States fulfilled their role as laboratories of democracy by implementing a range of regulations aimed at curbing the problem of gun violence: limiting the sale of firearms, taxing particular types of weapons perceived to pose threats to public safety, imposing limits on the access of minors to weapons, and restricting the public places one might carry arms.[48] Texas banned "[a]ny person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing."[49] The law aimed to preserve the peace and prevent the

---

[44]   *See* Cornell & Florence, *supra* note 4, at 1056-58.

[45]   *Id.* at 1058 (quoting John Bingham's Sept. 2, 1867, speech to the voters of Ohio).

[46]   For a discussion of how the courts wrestled with the meaning of the Fourteenth Amendment, see WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 148-51 (1998).

[47]   See *infra* Tables 2 & 3 for examples. On the expansion of regulation after the Civil War, see Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 59-61 (2017).

[48]   *Id.*

[49]   An Act to Regulate the Keeping and Bearing of Deadly Weapons, Apr. 12, 1871, *reprinted in* 2 A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND

Exhibit 17
Page 00320

intimidation of free persons, the exact opposite of the claims of gun rights advocates who have insisted that gun control during Reconstruction was tainted by an insidious racist agenda.[50]

In the post-war period the number of laws limiting public carry increased dramatically , a trend that continued into the first decades of the twentieth century. There was broad agreement among courts and constitutional commentators that laws banning concealed weapons posed no constitutional issues. Some states went further and enacted more sweeping limits on open carry.[51] Rather than oppose limits on public carry, the dominant paradigm for firearms regulation in the era of the Fourteenth Amendment supported robust regulation of public carry, provided the laws were racially neutral and contained appropriate exceptions for specified good cause needs for self-defense.[52]

II.   STATE REGULATION OF PUBLIC CARRY IN THE ERA OF THE FOURTEENTH AMENDMENT: A BRIEF OVERVIEW

Table 2. Examples of State Firearms Laws Passed Between 1865 and 1900 Impacting Public Carry

| State | Year | Category | Source | Statutory Text |
|---|---|---|---|---|
| Texas | 1866 | Carry on the lands of others | Act of Nov. 6, 1866, ch. 92, § 1, 1866 Tex. Gen. Laws 90. | That it shall not be lawful for any person or persons to carry fire-arms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty, and any person or persons so offending shall be fined . . . or imprison[ed] . . . or both . . . . |

THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322 (George Washington Paschal, ed., Washington, D.C., 1873).

[50]  Gun rights advocates have simply ignored the most recent scholarship on gun control and race relations during Reconstruction, including the rich new literature on gun regulation, enforcement, and Reconstruction in Texas. For more, see the discussion in Frassetto, *supra* note 36, at 102-04, and Rivas, *supra* note 36, at 287.

[51]  For a good illustrations of state concealed carry statutes, see Act of Mar. 22, 1871, ch. 1888, § 1-2, 5, 1871 Ky. Acts 89, 89-90; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231, 231-32.

[52]  For an illustrative set of examples, see Table 2.

Exhibit 17
Page 00321

| Indiana | 1875 | Brandishing | Act of Mar. 13, 1875, ch. 17, § 1, 1875 Ind. Acts 62. | [I]f any person shall draw or threaten to use any pistol, dirk, knife, slung-shot, or any other deadly or dangerous weapon upon any other person, he shall be deemed guilty of a misdemeanor . . . Provided, That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law. |
|---------|------|-------------|----------|-------------|
| Mississippi | 1878 | Prohibitions on Persons Deemed Irresponsible | Act of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175, 176. | [A]ny student of any university, college or school, who shall carry concealed, in whole or in part, any [pistol or other concealable deadly weapon], or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor . . . . |
| Missouri | 1879 | Sensitive Places (courts, church, schools, colleges) | Act of Apr. 30, 1879, § 1, 1879 Mo. Laws 90, 90. | Hereafter it shall be unlawful for any person in this State, except he be a sheriff or other officer, in the discharge of official duty, to discharge or fire off any gun, pistol or fire-arms of any description in the immediate vicinity of any court house, church or building used for school or college purposes. |

Exhibit 17
Page 00322

| | | | | |
|---|---|---|---|---|
| Arkansas | 1881 | Prohibitions on Pistols, (exception for military weapons) | Act of Apr. 1, 1881, no. 96, § 3, 1881 Ark. Acts 191, 192. | Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person any person [sic] . . . any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor. |
| Nevada | 1881 | Penalty for carry while intoxicated | Act of Jan. 28, 1881, ch. 7, § 1, 1881 Nev. Stat. 19, 19-20. | Any person in this State, whether under the influence of liquor or otherwise, who shall, except in necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theater, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor. . . . |
| Vermont | 1884 | Prohibitions on Certain Types of Weapons (spring loaded traps) | Act of Nov. 25, 1884, no. 76, § 1, 1884 Vt. Pub. Acts 74, 74-75. | A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined . . . and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. |
| Maryland | 1890 | Sensitive Times (Sabbath) | Act of Apr. 3, 1890, ch. 273, § 1, 1890 Md. Laws 297, 297. | No person whatsoever shall hunt with dog or gun on the Lord's day, commonly called "Sunday," nor shall profane the Lord's day by gunning, hunting, fowling, or by shooting or exploding any gun, pistol or firearm of any kind, or by any other unlawful recreation or pastime. . . . |

Exhibit 17
Page 00323

| Florida | 1899 | Sensitive Places (Trains) | Act of May 29, 1899, ch. 4701, § 1, 1899 Fla. Laws 93, 93. | That it shall be unlawful for any person to discharge any gun, pistol, or other fire-arm, except in self defense, while on any passenger train in this State; or to recklessly handle any fire-arm or other weapon in the presence of any other person or persons on any train carrying passengers in this State. |
|---------|------|---------------------------|------------------------------------------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Indiana | 1875 | Sell, barter, or give a pistol to a minor | Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 | That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. |

Federal territories enacted a variety of limits on armed travel in public, which suggests that the new, more robust vision for regulation was not limited to state and municipal law. [53] New Mexico adopted a broad prohibition on public carry: "[I]t shall be unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory . . . ."[54] This provision was not unique. Idaho adopted a similar law, prohibiting "any person . . . to carry, exhibit or flourish any . . . pistol, gun or other

---

[53] Territories had considerable latitude to enact laws consistent with their police power authority, but unlike states or localities, they were obligated to abide by the Second Amendment, even prior to the adoption of the Fourteenth Amendment. On the limits imposed by the Constitution on governments created in the territories, see JOSEPH STORY, 3 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1319 (1833) ("What shall be the form of government established in the territories depends exclusively upon the discretion of congress. Having a right to erect a territorial government, they may confer on it such powers, legislative, judicial, and executive, as they may deem best. They may confer upon it general legislative powers, subject only to the laws and constitution of the United States.") Thus, territorial laws would have had to be consistent with Second Amendment irrespective of any interpretation of the Fourteenth Amendment and the issue of incorporation.

[54] Act of Jan. 29, 1869, ch. 32, § 1-2, 1869 N.M. Laws 72, 72-73.

Exhibit 17
Page 00324

deadly weapons, within the limits or confines of any city, town or village or in any public assembly of Idaho Territory."[55]

The broad latitude legislatures and municipalities exercised over firearms regulation was widely acknowledged by the major constitutional commentators of the period as well. John Norton Pomeroy, one of the era's most distinguished constitutional authorities, observed that the right to keep and bear arms posed no barrier to government authority to regulate or limit persons from "carry[ing] dangerous or concealed weapons."[56] Pomeroy's observation is borne out by the legislation on public carry presented below in Table 3.[57]

III.   LOCAL REGULATION AND THE RISE OF PERMIT SCHEMES IN THE ERA OF THE FOURTEENTH AMENDMENT

Gun regulation in the era of the Fourteenth Amendment was not limited to state-level interventions; there was also an enormous growth in the number of local ordinances. Developments at the local level have drawn relatively little scholarly or judicial notice but this was one of the areas in which government was most active.[58] A local ordinance adopted by Huntsville, Missouri offers a glimpse of the sweeping scope of such regulations.[59] It contained multiple provisions, including:

- A ban on concealed carry in public;
- A ban on public carry in public places where people assembled for religious, "educational, literary, or social purposes";
- A ban on carry in courthouses;
- A ban on carry into a "public assemblage of persons met for any lawful purpose" except militia-related activities;

---

[55]  Act of Feb. 4, 1889, § 1, 1888 Idaho Laws 23, 23; *see also* Act of Jan. 11, 1865, § 1, 1864 Mont. Laws 355 (preventing the carrying of concealed deadly weapons in the cities and towns of the territory); Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Sess. Laws 352. ("That hereafter it shall be unlawful for any resident of any city, town or village, or for any one not a resident of any city, town or village, in said Territory, but a sojourner therein, to bear upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village.").

[56]  JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152-53 (1868).

[57]  *See infra* Table 3.

[58]  The most notable exception to this lack of attention to the importance of local regulation in American firearms law is Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82 (2013).

[59]  Huntsville, Mo., Rev. Ordinance in Relation to Carrying Deadly Weapons (July 17, 1894).

Exhibit 17
Page 00325

- A ban on open public carry and public display of a weapon in a rude or threatening manner;
- A ban on carry while intoxicated;
- An exception for travelers passing through town.

Finally, the ordinance also included an affirmative defense exception for good cause, i.e., a specific threat to "home, person or property."[60]

The most common types of local regulations were bans on concealed carry. Evanston, Illinois's ordinance was typical: "It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot."[61] Residents in the ten most populous cities in America at the end of the nineteenth century all lived under some form of restrictive public carry regime: permit schemes, complete bans on concealed carry, or some type of total ban with a specified threat and self-defense exception.[62] In some parts of the country a majority of the population were living under a model of gun regulation that limited public carry. The case of California is instructive in this regard since most of its inhabitants were subject to one of these types of limits on public carry.[63] Table 3 lists the municipalities in the state that enacted permit laws after the Civil War.

Table 3. Municipalities with Permit Schemes in Post-Civil War California[64]

| Location | Year Permit ordinance enacted | Population in 1900 |
|---|---|---|
| Sacramento | 1876 | 17,897 |
| Napa | 1880 | 16,451 |
| San Francisco | 1880 | 342,782 |
| Santa Barbara | 1881 | 18,934 |

---

[60]  *Id.*

[61]  Evanston, Ill., Rev. Ordinances, ch. 29, § 531 (1893).

[62]  Copies of these ordinances may be found in the appendix to Brief for Patrick J. Charles as Amicus Curiae Supporting Neither Party app. at 2-11, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. docketed Dec. 23, 2020) 2021 WL 3145961. Population statistics may be found in Campbell Gibson, *Population of the 100 Largest Cities and Other Urban Places in the United States: 1790 to 1990*, (U.S. Census Bureau, Working Paper No. POP-WP027.

[63]  *See* sources cited *supra* note 62.

[64]  *Id.*

Exhibit 17
Page 00326

| Alameda | 1882 | 180,197 |
|---------|------|---------|
| St. Helena | 1884 | 1,582 |
| Fresno | 1885 | 37,862 |
| Lompoc | 1888 | 972 |
| Marysville | 1889 | 3,497 |
| Oakland | 1890 | 66,960 |
| Monterey | 1892 | 19,380 |

Within a decade of the end of Reconstruction about half the population of the state of California was living under good cause discretionary permit schemes such as those listed in Table Three. The list of municipalities adopting such regulations included tiny towns such as Lompoc, and the state's largest city, San Francisco.[65] Gun violence in California in this period was a complex problem, but the range of municipalities adopting good cause permit schemes, large heterogenous urban areas and smaller towns, suggest that these policies enjoyed broad popular support and were understood at the time to be consistent with California's constitution.[66]

Good cause permitting schemes were not the only type of restrictions adopted to deal with the problem of gun violence in post-Civil War California. Other localities, most notably Los Angeles and San Jose, adopted more restrictive laws limiting the ability to carry arms in public. The law enacted by Los Angeles was sweeping in scope, prohibiting public carry "concealed or otherwise."

> [N]o persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby

---

[65] Brief for Patrick J. Charles as Amicus Curiae Supporting Neither Party app., *supra* note 62, at 2-11.

[66] On the problem of gun violence in California during this period, see CLARE V. MCKENNA, RACE AND HOMICIDE IN NINETEENTH-CENTURY CALIFORNIA 11-12, 103 (2007). Race was certainly an important factor in many places in California, but the range of communities enacting limits on public carry of some kind, permit laws, bans on concealed weapons, or broader bans, militates against imputing nefarious racial motives to all the legislation enacted to reduce gun violence. Moreover, racial minorities were often the victims of homicides and assaults in these communities and had a vested interest in reducing the levels of gun violence.

Exhibit 17
Page 00327

made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.[67]

If one adds together the population figures for the jurisdictions in California with either a good cause permit scheme in place or a more restrictive ban on public carry, such as the one in place in Los Angeles, the numbers demonstrate that the majority of Californians were living under a legal regime that curtailed the right to travel armed in public within populace areas. In short, the example of California offers strong evidence that some type of limit on armed travel in populated areas had become an accepted feature of American law by the end of the nineteenth century. Indeed, limits on the public carry of dangerous weapons are one of the most enduring features of American law, operating continuously in some form from the colonial era through Reconstruction and up until the rise of modern gun control laws in the twentieth century.[68]

The early history of good cause permit schemes has not figured prominently in post-*Heller* scholarship and jurisprudence because local ordinances have been difficult to identify and collect. But, starting with Reconstruction good cause permit ordinances emerged as the ascendent model in firearms regulation. By the end of the nineteenth century this approach to firearms regulation had become the dominant paradigm in America and had largely supplanted the common law inspired surety-based models of enforcing the peace that predominated before the Civil War.[69] The older surety model reflected the realities of life in early

---

[67]  William M. Caswell, *Ordinances of the City of Los Angeles, § 36, in* REVISED CHARTER AND COMPILED ORDINANCES AND RESOLUTIONS OF THE CITY OF LOS ANGELES 85 (1878).

[68]  An Act for the Punishing of Criminal Offenders, 1694 Mass. Laws 12, no. 6 ("Further it is Enacted by the authority aforesaid, That every Justice of the Peace in the County where the Offence is committed , may cause to be staid and arrested all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere."). On New York's 1911 Sullivan law, see BLOCHER & MILLER, *supra* note 3, at 42.

[69]  This community-based model of policing originated in England and continued in America until the rise of modern police forces in the nineteenth century. Any justice of the peace could detain, disarm, and if necessary, bind an individual to the peace by imposing a surety, a peace bond. Under the common law in America the conservation of the peace remained central to the legal system. As conservators of the peace, justices

Exhibit 17
Page 00328

modern England and colonial America. This approach to preserving the peace was well-suited to a pre-industrial society in which members of the local gentry elite could count on the mechanisms of deference and a web of patron-client relationships to help them maintain social order.[70] As America modernized, urbanized, and became a more diverse and highly mobile society over the course of the nineteenth century, these traditional mechanisms of law enforcement, including sureties, were slowly replaced by a criminal justice system that did not rely on informal mechanisms to maintain order. In a society in which the bonds of community had weakened, binding an individual to the peace was no longer an effective means to preserve social order.[71] Professional police forces, courts, and administrative agencies were better suited to maintaining order and peace in the new urban world of nineteenth-century America where people living in close proximity were less likely to be knit together in the bonds of community.[72] Thus, by end of the nineteenth century, permit schemes that took advantage of these new institutions and the tools provided by professional police forces had largely replaced the traditional common law mechanisms of sureties, or

---

of the peace, sheriffs, and constables maintained their broad common law authority. Additionally, any member of the community who felt threatened could have a justice of the peace impose a surety, a peace or good behavior bond, as a measure to conserve the peace. On sureties in England, see STEVE HINDLE, THE STATE AND SOCIAL CHANGE IN EARLY MODERN ENGLAND, 1550-1640, at 100 (2000). For an informative study of the transfer of English criminal justice to the colonies, see generally, Alfred L. Brophy, *"For the Preservation of the King's Peace and Justice": Community and English Law in Sussex County, Pennsylvania, 1682–1696*, 40 AM. J. LEGAL HIST. 167 (1996). Gun rights advocates have erroneously argued that peace bonds required an individual to come forward to start this process, but this claim ignores the role of the justice of the peace as conservators of the peace. *See* David B. Kopel and George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's* Young v. Hawaii, U. ILL. L. REV. ONLINE 172, 184 (2021). This error has been repeated by other gun rights advocates. *See also* Robert Leider, *Constitutional Liquidation, Surety Laws, and the Right to Bear Arms* 13 (March 2021) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm? abstract_id=3697761 [https://perma.cc/RV6P-RS88]. Leider's flawed analysis of gun regulation rests on anachronistic interpretations of the historical evidence and ignores the relevant scholarship in the history of criminal law, the result is a presentist and distorted account of the enforcement of prohibitions on armed travel in pre-Civil War Massachusetts. For a general account of the history of criminal law in this period, see ELIZABETH DALE, CRIMINAL JUSTICE IN THE UNITED STATES, 1789-1939 (2011). On the norms governing antebellum Massachusetts, see Mary E. Vogel, *The Social Origins of Plea Bargaining: Conflict and the Law in the Process of State Formation, 1830-1860* 33 L. & SOC'Y REV. 161, 163 (1999).

70   *See* McPherson, *supra* note 30.

71   *See* ERIC H. MONKKONEN, AMERICA BECOMES URBAN: THE DEVELOPMENT OF U.S. CITIES & TOWNS, 1780-1980, at 98-108 (1988).

72   *Id.*

Exhibit 17
Page 00329

peace bonds, as the dominant method for dealing with the dangers posed by gun violence.[73]

### IV.   LIMITS ON ARMED TRAVEL IN PUBLIC DURING THE ERA OF THE FOURTEENTH AMENDMENT: HISTORY, TEXT, AND TRADITION AND THE GOOD CAUSE PERMIT MODEL

A comprehensive and scholarly review of the nation's laws on public carry published in the last decade of the nineteenth century noted that bans on concealed weapons and more general prohibitions on armed carry were permissible, provided they included a good cause exception for specified threats.[74] John Forrest Dillon's overview of American firearms law and the constitutional right to keep and bear arms endorsed this view. Drawing on recent cases, including *Andrews v. State*, he concluded, "[E]very good citizen is bound to yield his preference as to the means [of self-defense] to be used, to the demands of the public good."[75] Dillon acknowledged that the police power was not without limit in this area. Contrary to the claims of modern gun rights advocates, Dillon did not believe that there was a fundamental right to carry arms in public openly. Nor did he believe that the right to bear arms trumped state and municipal police power authority to regulate such behavior, taking it entirely out of the hand of the people's representatives. He did, however, recognize that American law acknowledged the continuing validity of affirmative defenses for necessity in cases of specified threats and reasonable self-defense.[76] Dillon concluded that as far as the right to carry went, states might regulate this practice and prohibit it entirely as long as the common law self-defense exception was recognized. "Every state," Dillon wrote, "has power to regulate the bearing of arms in such manner as it may see fit, or to restrain it altogether."[77] In those cases in which a state sought the more stringent form of regulation, Dillon argued that the common law would offer those who needed to travel armed an affirmative defense. Dillon's survey of American law was not the only commentary to come to this conclusion. Another comprehensive overview of American law published in the last decade of the nineteenth century reached the same judgment. The survey of American law and public carry was published

---

[73]   *See supra* notes 17–19 and accompanying text.

[74]   *See* John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defense*, 1 CENT. L.J. 295, 296 (1874).

[75]   Andrews v. State, 50 Tenn. 165, 188 (1871).

[76]   Dillon, *supra* note 74, at 296.

[77]   *Id.*

Exhibit 17
Page 00330

in *The American and English Encyclopedia of Law*, an influential and popular legal reference work that became a fixture on bookshelves in law offices across the nation. It noted that "[t]he statutes of some of the States have made it an offence to carry weapons concealed about the body, while others prohibit the simple carrying of weapons, whether they are concealed or not. Such statutes have been held not to conflict with the constitutional right of the people of the United States to keep and bear arms."[78]

Although there has been considerable discussion of the implications of *Heller's* understanding of the right to keep and bear arms, *McDonald's* focus on constitutional change, especially the changes wrought by Reconstruction, have not received nearly as much attention. Yet, *McDonald* makes Reconstruction's history vital to understanding the scope of permissible regulation today.[79] Read together these two landmark decisions make clear that when state and local regulation are at issue it is the era of the Fourteenth Amendment that is the most important time-period for understanding what is presumptively lawful under *Heller's* framework. Until now, this crucial period of firearms regulation has been largely neglected by post-*Heller* scholarship. This history is critical to fashioning a post-*Heller* firearms jurisprudence consistent with *McDonald*. Then, as now, states and localities function as America's laboratories of democracy, experimenting with different forms of regulation. This function is hardwired into our federal system. Unfortunately, this rich and diverse part of our legal history has been largely invisible in post-*Heller* scholarship and jurisprudence. Scholars and courts need to reckon with this history more fully before evaluating the constitutionality of gun laws. Rather than acting as a high-water mark for gun rights, Reconstruction ushered in a period of expansive regulation. Courts, legislators, and commentators during this period recognized that the robust power to regulate firearms, particularly in public, was not only constitutional, but essential to preserve ordered liberty. The key innovation in this period, a development that became the dominant model of firearms regulation in America, good cause permit schemes continue to function as an important part of efforts to address the problem of gun violence. These ordinances were first enacted by municipalities but were soon emulated by states. In short, this model is deeply rooted in history, text, and tradition. As such, these

---

78  3 THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 408 (John Houston Merrill ed., 1887). This influential reference work was considered to be an essential part of a basic reference library for lawyers. *See American and English Encyclopedia of Law, Vol. 29*, 42 CENT. L.J. 397, 400 (1896) (book review).

79  *See* sources cited *supra* note 5.

Exhibit 17
Page 00331

90          *UC Davis Law Review Online*          [Vol. 55:65

laws are indisputably presumptively lawful under *Heller's* framework. Modern judges attempting to construct a post-*Heller* firearms jurisprudence that is sensitive to history, text, and tradition need to recognize that discretionary good cause permit schemes are firmly rooted in America's long history of gun regulation. If originalist judges wish to remain true to *Heller's* model such laws are undeniably constitutional.

Exhibit 17
Page 00332