Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE NGUYEN, et al., | Case No. 3:20-cv-02470-WQH-MMP |
| Plaintiffs, | PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| ROB BONTA, Attorney General of California, et al., | Date: To be set by the Court |
| Defendants. | Judge: Hon. William Q. Hayes |
| | Courtroom: 14B |

**Table of Contents**

**I.**   **Introduction**………………………………………………………………...1

**II.**   **The *Bruen* Standards**…………………………………………………….2

**III.**   **Textual Analysis** …………………………………………………………3

   **A.**   **The OGM Law's Clear Infringement of the Second Amendment's Plain Text Renders It Presumptively Unconstitutional.** ……………..4

   **B.**   **Defendants Cannot Claim Any "Presumptively Lawful" Status.** …...7

**IV.**   **Historical Analysis** ………………………………………………………9

   **A.**   **The General Parameters of the Historical Test**……………………...10

   **B.**   **Important Guiding Principles** ………………………………………..12

**C.**   **Nothing in the Relevant History Could Support the Existence of a Relevantly Similar Analogue that Would Justify California's OGM Law.** 14

   **1.**   **General Traditions During the Relevant Historical Period** ………15

   **2.**   **Militia Laws** ………………………………………………………..17

   **3.**   **The Freedoms This Society Enjoyed Foreclose Any Possibility that the OGM Law is Part of this Nation's History of Firearm Regulation.** ……………………………………………………………18

**Table of Authorities**

*Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………………………………2

*Andrews v. State*, 50 Tenn. 165 (1871)………………………………………………...5

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)………………………………………6

*Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010)……………………..5

*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………………………passim

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021)………………………..5

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)……………………………4, 5

*Fouts v. Bonta*, 561 F. Supp. 3d 941 (S.D. Cal. 2021)……………………………....8

## Table of Authorities (continued)

*Cases*

*Frein v. Penn. State Police*, 47 F.4th 247 (3d Cir. 2022)……………………………….5

*Gamble v. United States*, __ U.S. __, 139 S. Ct. 1960 (2019)……………………10, 11

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)………………..2, 12

*Illinois Association of Firearm Retailers v. City of Chicago*…………………………..5

961 F.Supp.2d 928 (N.D. Ill. 2014)

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)…………..4

*Khan v. State Oil Co.*, 93 F.3d 1358 (7th Cir. 1996)……………………………………11

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961)…………………………………..3

*Luis v. United States*, 136 S. Ct. 1083 (2016)…………………………………………..4

*Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018)………………………………………8

*Marshall v. Sawyer*, 365 F.2d 105 (9th Cir. 1966)………………………………9, 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)…………………………..1, 11, 12

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003)………………………………………6

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)……………………………………..9

*Moran v. State of Wash.*, 147 F.3d 839 (9th Cir. 1998)……………………………2, 5

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)………….passim

*Staples v. United States*, 511 U.S. 600 (1994)…………………………………………7

*State Oil Co. v. Khan*, 522 U.S. 3 (1997)……………………………………………..11

*Teixeira v. Cty. of Alameda*, 873 F.3d 670 (9th Cir. 2017)……………………….4, 5, 7

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023)………………………………………..6, 9

*Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016)……….8

*United States v. Bello*, 194 F.3d 18 (1st Cir. 1999)……………………………………9

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)………………………………8

*Thunder Studios v. Kazal*, 13 F.4th 736 (9th Cir. 2021)………………………………6

*Yukutake v. Conners*, 554 F. Supp. 3d 1074 (D. Hawaii 2021)……………………7, 8

**Table of Authorities** (continued)

*Statutes*

Cal. Pen. Code § 27535……………………………………………………………..6


*United States Constitution*

Second Amendment………………………………………………………….*passim*

Fourth Amendment………………………………………………………..10


*Rules*

Fed. R. Evid. 201……………………………………………………………9


*Publications*

C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741 (1993)………………12

*Cramer, Clayton E., Colonial Firearms Regulation* (2016) https://ssrn.com/abstract=2759961; http://dx.doi.org/10.2139/ssrn.2759961…………17

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015)…………………………………………………………..3, 7

Davis, *The Requirement of a Trial-Type Hearing*, 70 Harv. L. Rev. 193 (1956)………9

James Lindgren and Justin L. Heather, *Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777 (2002)……………………………………………………16

Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, William & Mary Bill of Rights Journal (2022-2023)………………………………………..16

Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and Not 1868* (Oct. 1, 2022)……………………………………………10

*Military Obligation: The American Tradition*, vol. 2 (Arthur Vollmer ed., 1947)……17

## <u>Table of Authorities</u> (continued)

***Publications***

Nicholas J. Johnson, *et al.*, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3d ed. 2021)……………………………………………………15, 17

*NSSF Announces Over 24 Million MSRs in Circulation*, The Firearm Indus. Trade Ass'n (July 20, 2022)…………………………………………………………………….7

S. Halbrook, *The Right to Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont, and Massachusetts*, VERM. L. REV. (1985)…………...15, 16

## I.      Introduction

The parties' renewed cross-motions for summary judgment follow this Court's order on the initial cross-motions, which found that "the existing evidence presented by the parties establishes that OGM [one-gun-per-month] laws were first enacted in the 1970s," but this evidence "does not foreclose the possibility that Defendants may be able to carry their burden of demonstrating a historical consistency through analogical reasoning." (Dkt. No. 49 ("Order") at 7-8. Thus, the Court concluded that "additional expert discovery concerning whether the OGM law is consistent with the Nation's historical tradition of firearm regulation" was warranted. *Id.* at 8. The Court denied the cross-motions as to the Second Amendment claim, reopened the discovery, and ordered further briefing with renewed motions for summary judgment. *Id.* at 11.[1]

Plaintiffs maintain that the existing record of legislative and other judicially noticeable facts already demonstrates beyond any reasonable dispute that the conduct at issue, which California's OGM law criminalizes, is protected under the Second Amendment, and Defendants cannot "carry their burden of demonstrating a historical consistency through analogical reasoning." Dkt. No. at 7-8. No amount of additional discovery, expert opinions, or other investigation could produce any "relevantly similar" analogues as required for the OGM law to be "consistent with the Nation's historical tradition of firearm regulation" under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2126, 2132 (2022) ("*Bruen*"). The historical record speaks for itself in showing without a doubt that no other regulation from the relevant period shares with the OGM law either of the "two metrics" that "are '*central*' considerations," *id.* at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010))—i.e., "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2133.

---

[1]      The Court granted Defendants' motion for summary judgment as to the Equal Protection claim, leaving only the Second Amendment claim at issue. Order at 8-11.

As Plaintiffs have already explained, the fate of the OGM law was sealed under *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller*"), even under the "means-end scrutiny" standards squarely rejected in *Bruen* as insufficiently protective. Now, with such artificial barriers out of the way, the path to judgment in Plaintiffs' favor is even clearer. It is indeed Defendants' burden to marshal evidence of any historical analogues that could possibly justify the restraints imposed by the OGM law. Plaintiffs stand ready to respond to any such attempts at establishing purported analogues. Yet, one need only look to the indisputable evidence of what the free citizenry was *permitted to do without restriction* during the relevant period to see that nothing like the firearm restrictions of the OGM law were in existence, or even would have been countenanced, and thus Defendants have no chance proving the OGM law is part of this Nation's *tradition* of firearm regulation. Simply put, "there is no genuine dispute as to any material fact and [Plaintiffs are] entitled to judgment as a matter of law" on their Second Amendment claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.   The *Bruen* Standards

"The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. So applied, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. Then, the government must "justify its regulation" of the conduct. *Id.* It cannot "simply posit that the regulation promotes an important interest." *Id.* "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Importantly, in no event may a court "engage in independent means-end scrutiny under the guise of an analogical inquiry," because the proper reasoning "requires judges to apply faithfully the balance struck by the founding generation to modern circumstances." *Bruen*, 142 S. Ct. at 2132 n. 7. "The Second Amendment 'is the very *product* of an interest balancing by the people[.]" *Id.* at 2131. It is this balance

"that demands our unqualified deference," *id.*, and not "the determinations of legislatures" or "the evolving product of federal judges," *id.* at 2132 n. 7.

Thus, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and only if the government "affirmatively prove[s]" the regulation at issue "is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct at 2126-27 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

## III.   Textual Analysis

The parties previously stipulated that, but for Defendants' enforcement of the OGM law, Plaintiffs would engage in a specified course of conduct. R-SOUMF Nos. 1, 5.[2] Specifically, each Individual Plaintiff—none of whom is disqualified by federal or state law from owning or possessing firearms—"desires and intends to purchase two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more handguns and semiautomatic centerfire rifles, in a single transaction within a 30-day period from a licensed dealer," and each would do so but for the OGM law that Defendants enforce. R-SOUMF Nos. 1, 3, 5. The parties further stipulated that the Institutional Plaintiffs "bring this action on behalf their members and supporters similarly situated to Individual Plaintiffs," that Plaintiffs Prince and Phillips are listed as firearms dealers on the California Department of Justice's Centralized List of Firearms Dealers for Retailer Plaintiffs, and that the Retailer Plaintiffs are federally licensed as Federal Firearms Licensees who are prevented from selling these arms in the same frequency and number prohibited by the OGM law. R-SOUMF Nos. 4, 6-8; *see also* Dkt. No. 37-1 (Reply to Defendants' Response to SOUMF in support of Plaintiffs' initial motion for summary judgment) ("Reply-SOUMF 1"), Nos. 1-8.

---

[2]   "R-SOUMF" refers to Plaintiffs' Statement of Undisputed Material Facts in Support of Plaintiffs' Renewed Motion for Summary Judgment filed contemporaneously herewith. "SOUMF 1" refers to the initial motion.

**A.** **The OGM Law's Clear Infringement of the Second Amendment's Plain Text Renders It Presumptively Unconstitutional.**

The textual analysis "focus[es] on the 'normal and ordinary' meaning of the Second Amendment's language." *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576-77). This analysis compelled the conclusion in *Bruen* that the Second Amendment "presumptively guarantees" "a right to 'bear' arms in public for self-defense," since "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 2124-25. It similarly compelled the conclusion in *Heller* that the Second Amendment protects the right to possess handguns in the home. *Heller* at 635.

In the last round of briefing, Defendants "admit[ted] that California's OGM law implicates the Second Amendment." Reply-SOUMF 1, No. 9. That remains just as true today. The text of the Second Amendment plainly declares that "the right of the people to keep and bear Arms, shall not be infringed." *Arms* in the plural can only be read one way—the right is *not* subject to any limitation on the frequency or quantity of protected arms that a law-abiding person may purchase or otherwise acquire for lawful purposes.

Well before *Bruen*, the courts recognized that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Constitutional protections also "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring). Thus, the right to keep and bear arms "'implies a corresponding right to obtain the bullets necessary to use them,'" *id.* (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)), as well as the ability to engage in "the training and practice that make it effective," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Even more fundamentally, the Second Amendment necessarily secures the right to *acquire* constitutionally protected arms in the first instance: "The core Second Amendment right to keep and bear arms for self-defense

wouldn't mean much without the ability to acquire arms." *Teixeira* at 677; *accord Illinois Association of Firearm Retailers v. City of Chicago*, 961 F.Supp.2d 928, 930 (N.D. Ill. 2014) ("This right must also include the right to *acquire* a firearm."); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he right 'implies a corresponding right to acquire and maintain proficiency' with common weapons.") (quoting *Ezell*, 651 F.3d at 704).

Thus, it is evident that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms" today, *Bruen*, 142 S. Ct. at 2132, that the definition of "arms" "covers modern instruments that facilitate armed self-defense," *id.*, and that the "right to keep and bear arms" covers "'the right to possess and carry weapons in case of confrontation,'" *id.* at 2134 (quoting *Heller*, 554 U.S. at 2134), even though it does not *expressly* say so. "'The right to keep arms, necessarily involves *the right to purchase them*, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.'" *Teixeira*, 873 F.3d at 678 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)) (emphasis added). Thus, "firearms commerce plays an essential role today in the realization of the individual right to possess firearms recognized in *Heller*." *Id.* at 677; *Frein v. Penn. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) ("[A]side from a few exceptions, the government may not prevent citizens from buying and owning guns."). One cannot demand the Second Amendment *expressly* declare a right to purchase multiple arms within a 30-day period any more than one could demand that the right of "free speech"—which the Supreme Court has "repeatedly compared the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2130—spell out all the forms of speech it protects. *See, e.g.*, *Thunder Studios v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021) ("emails and tweets"); *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 393 (2010) ("core political speech"); *Moran v. State of Wash.*, 147 F.3d 839, 848 (9th Cir. 1998) (speech "related to a matter of public concern").

Certainly, nothing about *Bruen* "effectively overruled" or is "clearly irreconcilable with" any of these circuit court precedents recognizing the breadth of protection afforded by the Second Amendment's express protection of the individual right to "keep and bear arms." *Miller v. Gammie*, 335 F.3d 889, 890, 893 (9th Cir. 2003) (explaining that lower courts are otherwise bound to follow Ninth Circuit precedent). *Bruen* militates in favor of *greater* protection for these rights increasingly left to languish under all-too-lenient forms of "interest-balancing," by reiterating that "[i]n keeping with *Heller*," "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. The plain meaning of the Second Amendment encompasses the individual right to lawfully acquire constitutionally protected arms, and Defendants must *justify* the OGM law with the required historical showing.

There can also be no reasonable dispute that the arms targeted by the OGM law under California Penal Code section § 27535(a)-(b)—handguns and semiautomatic centerfire rifles—are constitutionally protected arms.[3] As *Heller* made clear, "the Second Amendment extends, prima facie, to *all instruments* that constitute bearable arms," *Heller*, 554 U.S. at 582, and no such protected instruments can be banned unless they are both "dangerous *and* unusual," *id.* at 627 (emphasis added). Handguns and semiautomatic centerfire rifles are indisputably in common use for lawful purposes and not "dangerous and unusual."[4] *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring); *Heller*, 554 U.S. at 625; *id.* at 628-29 (the handgun is "the

---

[3]    Absent judicial intervention, in just a few months, the OGM law will extend the same purchase prohibitions to all arms falling within an expanded definition of "firearm," so as to include "completed frames or receivers" and all other "firearm precursor parts," effective January 1, 2024, under recent Assembly Bill No. 1621.

[4]    Indeed, even if Defendants sought to raise a question about the nature of the targeted arms as purportedly "dangerous and unusual," they would have to prove any such nature as part of their burden of proof on the historical prong. *Teter v. Lopez*, 76 F.4th 938, 948-49 (9th Cir. 2023) (quoting *Heller*, 554 U.S. at 637) ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons,'" and thus whether a weapon is "'dangerous and unusual' is a contention as to which [the State] bears the burden of proof in the second prong of the *Bruen* analysis").

quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense); *Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."); *see also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015); https://davekopel.org/2A/LawRev/2015/History-of-firearms-magazines-and-magazine-prohibition.pdf (Ex. 2) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."); *NSSF Announces Over 24 Million MSRs in Circulation*, The Firearm Indus. Trade Ass'n (July 20, 2022), https://bit.ly/3QBXiyv. (Ex. 3).

This should be the end of the analysis here, because *Heller* and *Bruen* have already established the relevant contours of the historical regulation that the Court must examine, and under these contours the arms targeted by the OGM law cannot be subjected to the law's 30-day ban on purchases and sales by law-abiding citizens.

**B.    Defendants Cannot Claim Any "Presumptively Lawful" Status.**

Defendants may again attempt to avoid the consequences of a proper textual analysis by continuing to claim the OGM law is a presumptively lawful condition on the commercial sale of arms. *See* Order at 8 n.5 (noting that Defendants assert in the alternative that they are entitled to summary judgment "because the OGM law is "presumptively lawful as a regulation on the commercial sale of firearms").

"The Ninth Circuit has held the phrase 'conditions and qualifications on the commercial sale of arms' 'sufficiently opaque' to prohibit reliance on it alone, instead opting to conduct a 'full textual and historical review' of the scope of the Second Amendment." *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1082 (D. Hawaii 2021) (quoting *Teixeira*, 873 F.3d at 683). And even *early* 20th century regulations do not suffice to claim "presumptively lawful" status—much less the handful of *late* 20th century laws on which Defendants have relied in claiming this status here. Rather, the government must show the law is "sufficiently similar to historical regulations to

demonstrate that the law's restrictions accord with historical understanding of the scope of the Second Amendment right." *Yukutake*, 554 F. Supp. 3d at 1087; *see id.* at 1082 ("[A] handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a 'longstanding' historical tradition of 'presumptively lawful' firearm prohibitions."); *Mance v. Sessions*, 896 F.3d 699, 713-14 (5th Cir. 2018) (rejecting the government's claim of "presumptively lawful" status because it offered no evidence the challenged regulation had "a founding-era analogue or was historically understood to be within the ambit of the permissible regulation of commercial sales of firearms at the time the Bill of Rights was ratified").

Indeed, "treat[ing] *Heller's* listing of 'presumptively lawful regulatory measures,' for all practical purposes, as a kind of 'safe harbor,'" as some courts have done, "'approximates rational-basis review, which has been rejected by *Heller*.'" *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 686 (6th Cir. 2016) (quoting *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010)). Thus, *Heller* "did not invite courts onto an analytical off-ramp to avoid constitutional analysis" or insulate firearms regulations from constitutional scrutiny. *Id.* at 686-87. Even if a regulation could be considered "longstanding" in this sense, "[w]hy should a longstanding regulation be kept permanently beyond the reach of constitutional review?" *See Fouts v. Bonta*, 561 F. Supp. 3d 941, 948 (S.D. Cal. 2021); *Fonts v. Bonta*, 2022 WL 4477732 (9th Cir. Sept. 22, 2022) (vacated and remanded for further proceedings consistent with *Bruen*). "A presumptively lawful firearm restriction may, upon further analysis, actually be at odds with the Second Amendment." *Id.* An invalid restriction may have previously eluded a viable challenge simply because the Second Amendment wasn't recognized as securing an *individual* right until *Heller* in 2008. *Id.* at 948-49.

The OGM law cannot be considered presumptively lawful under any such theory. It is instead presumptively *unconstitutional*, based on the clear language of the Second Amendment. Thus, Defendants bear the burden of proving that the OGM law should be allowed to stand *despite* its clear textual infringement of the rights at stake.

## IV.    Historical Analysis

Again, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Confirming the answer to this question involves consulting "legislative facts," "which is to say facts that bear on the justification for legislation, as distinct from" adjudicative facts, which are facts "concerning the conduct of parties in a particular case." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). "Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the [challenged] gun law." *Id*. The Ninth Circuit itself just reiterated that "the historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process,' such as 'the formulation of a legal principle or ruling by a judge or court'—rather than adjudicative facts, which 'are simply the facts of the particular case.'" *Teter*, 76 F.4th at 946-47 (quoting Fed. R. Evid. 201, advis. comm. note (1972 proposed rules)). "'Adjudicative facts are facts about the parties and their activities, businesses, and properties, usually answering the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case.'" *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966) (quoting Davis, *The Requirement of a Trial-Type Hearing*, 70 HARV. L. REV. 193, 199 (1956)). "'Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law, policy, and discretion.'" *Id.*; *accord United States v. Bello*, 194 F.3d 18, 23 (1st Cir. 1999) ("Whether a fact is adjudicative or legislative depends not on the nature of the fact— e.g., who owns the land—but rather on the use made of it (*i.e.*, whether it is a fact germane to what happened in the case or a fact useful in formulating common law policy or interpreting a statute) . . . .").

As further detailed below, the legislative facts here foreclose the possibility of finding that the OGM law is consistent with the Nation's history of firearm regulation.

**A.      The General Parameters of the Historical Test**

As this Court already noted, the record reflects that "OGM laws were first enacted in the 1970s." Order at 7. To justify a regulation as "consistent with the Second Amendment's text and historical understanding," the government must demonstrate by "analogical reasoning" the existence of "a proper analogue." *Bruen*, 142 S. Ct. at 2131-32. Nothing from the 1970s, or any time within the 20th century, will suffice. As the high court has explained, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. Foremost, "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Id.* at 2137 (quoting *Heller*, 554 U.S. at 634-35). While "[s]trictly speaking," the States are explicitly "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* Again, the standard established in *Bruen* "requires judges to apply faithfully the balance struck *by the founding generation* to modern circumstances" in deciding Second Amendment claims. *Id.* at 2132 n.7 (emphasis added); *see also* Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and Not 1868* (Oct. 1, 2022), available at https://bit.ly/3CMSKjw (Ex. 4).

While "there is an ongoing scholarly debate" over whether the understanding of the Second Amendment in 1791 or 1868 should be considered primary, that issue need not be resolved when "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" the rights at stake. *Bruen*, 142 S. Ct. at 2138. What is more, while *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the Court's repeated holdings that (1) 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*,

139 S. Ct. at 1976, and (2) that incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765. *See, e.g.*, *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (lower courts must follow Supreme Court holdings even with "wobbly, moth-eaten foundation" until overruled by the Supreme court), *vacated by State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but making clear that the "Court of Appeals was correct in applying [*stare decisis*] . . . for it is this Court's prerogative alone to overrule one of its precedents").

As for periods of time other than those surrounding the Founding Era, some may bear a degree of secondary significance while others may have little to no bearing. English common law prevailing at the time the Constitution "was framed and adopted" may have some relevance, *Bruen*, 142 S. Ct. at 2138, but anything that "long predates" 1791 or 1868 is generally suspect because it may not accurately "illuminate the scope of the right," *id.* at 2136. The period "immediately after its ratification through the end of the 19th century" can be a "critical tool of constitutional interpretation," but "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* The main purpose of consulting such evidence is to *confirm* the public understanding of the right to keep and bear arms at the time Second Amendment was adopted. *Id.* at 2137 (quoting *Gamble*, 139 S. Ct. at 1975–76 (2019) (the mid-to-late 19th century evidence considered in *Heller* "was 'treated as mere confirmation of what the Court thought had already been established'"); *Heller*, 554 U.S. at 600-01 ("Our interpretation is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment.").

Standing alone, evidence from the mid-to-late 19th century "do[es] not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S. Ct. at 2137. Similarly, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* Laws from this period that "conflict with the Nation's earlier approach to firearm regulation, are most

unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'" *Id.* at 2154 (quoting *Heller*, 554 U.S. at 614); *id.* at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."). Nor does "20th-century historical evidence" that "contradicts earlier evidence" "provide insight into the meaning of the Second Amendment." *Id.* at 2153 n.28. The same goes for any other "later history" that "contradicts what the text says," because "'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

Substantively, for regulations *within* the relevant time period, the analogue must be "'relevantly similar.'" *Bruen*, 142 S. Ct. at 2132 (quoting C. Sunstein, On Analogical Reasoning, 106 HARV. L. REV. 741, 773 (1993)). It "may be analogous enough to pass constitutional muster" even if it's not "a historical *twin*" or a "dead ringer" for the modern regulation, but it must be "well-established and representative." *Id.* at 2133. *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar" here, but "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense [the "how"] and whether that burden is comparably justified [the "why"] are '*central*' considerations when engaging in an analogical inquiry," because "individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767).

**B.   Important Guiding Principles**

*Bruen* provides important guiding principles for determining whether a regulation meets the necessary standards of a "relevantly similar" analogue.

***First***, regardless of the historical period from which it may hail, any firearms regulation that conflicts with the Supreme Court's interpretation of the Second Amendment in *Heller* and its progeny cannot serve as a historical "analogue." Thus, the *Bruen* Court disregarded a statute from the year 1541 that "impeded not only public carry, but further made it unlawful for those without sufficient means to 'kepe in his or their houses' any 'handgun,'" because "[o]f course, this kind of limitation is inconsistent with *Heller's* historical analysis regarding the Second Amendment's meaning at the founding and thereafter." *Bruen*, 142 S. Ct. at 2140 n.10. And, because it conflicted with the breadth of the Second Amendment's protection elucidated by *Heller*, such a restriction necessarily "was not incorporated into the Second Amendment's scope." *Id.* Similarly, state laws from the late 19th century that broadly prohibited the public carrying of handguns without qualification bore no weight in the analysis despite having been upheld by courts of the day, because those courts had "operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*." *Id.* at 2155; *id.* (citing as "clearly erroneous" a 1905 Kansas decision that upheld such a law based on the rationale that the Second Amendment only protects a *civic* right to bear arms as a member of a militia group).

***Second***, any conflicts in the evidence as to whether the Second Amendment does or does not protect the targeted arms or conduct should be resolved in favor of the protective interpretation. In *Bruen*, when the dissent complained that one case only "arguably" supported finding protection for the public carry rights targeted by certain restrictions in the 1600s and 1700s, the majority reminded that "respondents here shoulder the burden" of proving the regulation was "consistent with the Second Amendment's text and historical scope" and admonished that "[t]o the extent there are multiple plausible interpretations of [the case], we will favor the one that is more consistent with the Second Amendment's command." *Bruen*, 142 S. Ct. at 2141 n.11.

***Third***, even if a historical regulation may otherwise be "relevantly similar" for all intents and purposes, it cannot justify the challenged regulation when it was an

"outlier" or an exception to the tradition prevailing within the vast majority of jurisdictions at the time. *Bruen*, 142 S. Ct. at 2142 ("we doubt that three colonial regulations could suffice to show a tradition of public-carry regulation."); *id.* at 2153 (rejecting broad carry prohibitions in Texas from the 1870s as "outliers" "endorsed by no other court during this period"); *id.* ("[W]e will not give disproportionate weight to a single state statute and a pair of state-court decisions."); *id.* at 2154 ("[T]he bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry."); *id.* at 2155 (quoting *Heller*, 554 U.S. at 632) (rejecting "a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence"); *id.* at 2155.

  ***Fourth***, when a historical regulation that conflicted with the prevailing tradition was never subjected to judicial scrutiny, it is of inherently suspect value. *Bruen*, 142 S. Ct. at 2131 ("if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality").

## C. Nothing in the Relevant History Could Support the Existence of a Relevantly Similar Analogue that Would Justify California's OGM Law.

  As with the New York law at issue in *Bruen*, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" the rights at stake under the OGM law. *Bruen*, 142 S. Ct. at 2138. And the "may-issue" schemes, such as New York's, ultimately could not pass constitutional muster because "apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Bruen*, 142 S. Ct. at 2138. Here, apart from a handful of *late 20th century and early 21st century* jurisdictions enacting OGM laws—which themselves don't amount to

even a *modern* tradition—nothing in the historical record could support the existence of any tradition broadly prohibiting law-abiding citizens from commercially purchasing more than one handgun, semiautomatic rifle, or combination of the same within any 30-day period. Tellingly, the record shows that the traditions prevailing during the relevant historical period not only did not include anything remotely like the OGM law but operated to affirmatively *preclude* the possibility that the Founding generation would have even countenanced *any* frequency-over-time purchase restrictions for *any* type of firearm.

### 1.    General Traditions During the Relevant Historical Period

Scholars who have gathered the relevant legislative facts—the "general facts which help the tribunal decide questions of law, policy, and discretion" concerning the constitutionality of a law, *Marshall*, 365 F.2d at 111—have observed based on their collection and study of the prevailing firearm regulations that, during the Founding era, "[t]here was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." Stephen Halbrook, *The Right to Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont, and Massachusetts*, VERM. L. REV. at 318 (1985), available at https://www.stephenhalbrook.com/law_review_articles/state-bills.pdf ("*Right to Bear*") (Ex. 5); R-SOUMF No. 10. "No colony or state restricted arms possession by males who were too young or too old for the militia, nor by females." Nicholas J. Johnson, *et al.*, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* at 188 (3d ed. 2021), https://www.aspenpublishing.com/Johnson-SecondAmendment3 (Ex. 6) ("*Firearms Law*"); R-SOUMF No. 11. Consistent with a largely unregulated right to keep and bear arms, people in the colonial states commonly offered for sale and sought for purchase multiple firearms in single transactions. R-SOUMF No. 12. "Symbolic of the times, the following newspaper advertisement began to appear regularly: 'WANTED immediately, a quantity of good HORSE PISTOLS

AND CARBINES, for which ready money, and a liberal price, will be given . . . Has a quantity of Muskets. . . to sell.'" *Right to Bear* at 266 (quoting Pennsylvania Evening Post (Philadelphia), July 23, 1776, at 366). Another example of "the unquestioned freedom to have arms" during the Founding era was a sales advertisement for "100 Pair Horsemens Pistols." *Id.* at 304 (citing the Independent Chronicle, June 29, 1780, at 4, col. 3).

Consistent with the same general tradition, the free citizenry commonly owned, possessed, and carried on their person more than one firearm. R-SOUMF No. 13. "Vermont's founding fathers" "carried a gun and a brace [a pair] of pistols on their persons as a common practice." *Right to Bear* at 291-92.[5] "Pistols in the pocket and an arsenal at home were options available to every free citizen." *Id.* at 295. "'Arms and military stores are free merchandise, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government.'" Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, William & Mary Bill of Rights Journal at 132 (2022-2023), https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=2024&context=wmborj (Ex. 7) (quoting Ira Allen, *Particulars of the Capture of the Olive Branch, Laden with a Cargo of Arms 403* (London 1798)). "[I]n the late seventeenth and early eighteenth centuries, guns were next in importance after beds, cooking utensils, and pewter-and ahead of chairs and books." James Lindgren and Justin L. Heather*, Counting Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1837 (2002) (Ex. 8). They were "more common than chairs or hoes in a poor agricultural county" and "as common as plows" with "eighteenth century mid-Atlantic farmers." *Id.* "Thus, everywhere and in every time period from 1637 through 1810," there were "high percentages of gun ownership." *Id.*

---

[5]    A "brace of pistols" is a pair. *See* https://www.merriam-webster.com/dictionary/brace ("brace" means "one of two" or a "pair").

### 2. Militia Laws

Consistent with the general lack of regulation on the ability of the free citizenry to acquire firearms—either generally or specifically based on the number or frequency of acquisitions—not only were they generally not restricted by quantity or frequency over time regulations, but the colonies almost universally *required* firearm ownership. R-SOUMF No. 14. "An examination of the Colonial statutes reveals that … almost all colonies required white adult men to possess firearms and ammunition." *Cramer, Clayton E., Colonial Firearms Regulation* (2016) at 1, https://ssrn.com/abstract=2759961 or http://dx.doi.org/10.2139/ssrn.2759961 (Ex. 9) ("Firearms Regulation"). "None of the Colonial laws in any way limited the possession of firearms by the white non-Catholic population; quite the opposite." *Id.* at 2, 6. Thus, "[c]olonies that did not explicitly require firearms ownership passed laws requiring the carrying of guns under circumstances that implied nearly universal ownership." *Id.* at 1-2. This was the genesis of militia regulations. The general aim was to ensure compliance with mandates of firearm ownership, possession, and use by all members of the free citizenry. *Firearms Law* (Ex. 6) at 177-188 (cataloguing numerous laws mandating ownership, possession, and use throughout the Colonial and Founding eras, which included the "community service" duties to join the "hue and cry" in pursuing fleeing criminals, "watch and ward" for the general safety of towns and villages, and partake in the *posse comitatus* as called upon to assist with "keeping the peace").

Several Colonies required their militiamen to be equipped and to keep with them at all times a "case of good *pistols*"—i.e., *multiple* firearms. R-SOUMF No. 17. *Military Obligation: The American Tradition*, vol. 2 (Arthur Vollmer ed., 1947) (Ex. 10) (cataloguing laws mandating such requirements in Massachusetts (1693), New Hampshire (1718), Connecticut (1754), Virginia (1755), North Carolina (1756), New Jersey (1777), and New York (1782)); *see also* Duke Center for Firearms Law, Repository of Historical Gun Laws (cataloguing laws enacted between 1631 and 1791 mandating constant readiness with one or more firearms: Virginia

(https://firearmslaw.duke.edu/laws/1631-va-acts-173-acts-of-february-24th-1631-acts-xlvii-xlviii-li/), Massachusetts (https://firearmslaw.duke.edu/laws/1693-mass-acts-48-an-act-for-regulating-of-the-militia-ch-3-%c2%a7%c2%a7-1-5/), Georgia (https://firearmslaw.duke.edu/laws/an-act-for-the-better-security-of-the-inhabitants-by-obliging-the-male-white-persons-to-carry-fire-arms-to-places-of-public-worship-1770-reprinted-in-1775-1770-georgia-colonial-laws-471-1932/), New Jersey (https://firearmslaw.duke.edu/laws/1778-n-j-laws-45-2d-general-assembly-an-act-for-the-regulating-training-and-arraying-of-the-militia-ch-21-%c2%a7-11/), Vermont (https://firearmslaw.duke.edu/laws/1779-vt-acts-and-for-encouragement-of-military-skill-for-the-better-defense-of-this-state/), and Ohio ().

> **3.** **The Freedoms This Society Enjoyed Foreclose Any Possibility that the OGM Law is Part of this Nation's History of Firearm Regulation.**

In a society that not only permitted the free citizenry to acquire arms in any quantity or frequency they wished, that actually encouraged amassing personal "arsenals," and even *mandated* the acquisition and possession of firearms—often *multiple* arms—the restrictions of the OGM law had no place at all. Nowhere within it could one conjure up a "well-established and representative" *tradition* of prohibiting any of the free citizenry from purchasing more than one firearm—of *any* type, much less of the *most popular* types—within 30 days. Thus, nothing in the record reveals "a comparable burden on the right of armed self-defense" at any time during the relevant history, as Defendants must show in order to save this law. *Bruen*, 142 S. Ct. at 2132.

The reality is, regulations like the OGM law are distinctly of the modern age, well beyond the relevant historical period of the Bill of Rights' adoption in 1791. *Bruen*, 142 S. Ct. at 2137. And even if there were later evidence that Defendants could claim as purportedly analogous, it would be of little to no relevance, because it would contradict the language text of the Second Amendment showing textual coverage, as well as the earlier laws showing the *general* traditions of this Nation placed no restraints on the frequency or number of firearm acquisitions. *Id.* at 2135 n.28, 2137.

Not only is there no historical tradition backing up the OGM law, but there is not even a *modern* tradition of such regulation. In fact, like the small bandwagon of jurisdictions that New York joined in pursuing its "may-issue" carry licensing scheme, California joins a just handful of jurisdictions with its OGM law. *See Bruen*, 142 S. Ct. at 2123-24 ("only six States and the District of Columbia have 'may issue' licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria"). The group is even smaller here— only four states (South Carolina, Virginia, Maryland, New Jersey) and the District of Columbia, have ever enacted such laws, and only those in Virginia, Maryland, and New Jersey are still in force, as the others have been repealed, R-SOUMF Nos. 18-19—and the OGM law is even more restrictive: while New York's *discretionary* licensing scheme included *some* relief valve for those who *could* meet the onerous "special need" condition, there's no discretion at all under the OGM law; the 30-day purchase and sale prohibitions imposed against ordinary law-abiding Californians are *absolute*. And, California's OGM law is the *most* restrictive of the group—targeting handgun *and* long guns (soon, all firearm "precursor" parts too). R-SOUMF No. 9.

Of course, it's the relevant historical period that matters most—all of which was long before anything like the OGM law ever came to life—and the pages of the relevant history are entirely blank when it comes to firearm restrictions of this kind. The universal liberties of the free citizenry during this time period stand in direct and total opposition to the notion that the OGM law finds any part in this Nation's history of firearm regulation. For too long now, California has been allowed to enforce these historically unprecedented and entirely unsupported restrictions. Now that *Bruen* has put the burden squarely on the State's shoulders to *prove* a relevantly similar analogue in order to justify any continued enforcement of this law, the OGM law must fall.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.    Conclusion

For these reasons, Plaintiffs respectfully request this Court grant their motion for summary judgment and deny Defendants' cross-motion for summary judgment.

Dated:  September 15, 2023                    The DiGuiseppe Law Firm, P.C.


By  /s/ *Raymond M. DiGuiseppe*
Raymond M. DiGuiseppe
Attorneys for Plaintiffs