# Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion for Summary Judgment

## Exhibit 5
### *The Right to Bear Arms in the First State Bills of Rights*

# THE RIGHT TO BEAR ARMS IN THE FIRST STATE BILLS OF RIGHTS: PENNSYLVANIA, NORTH CAROLINA, VERMONT, AND MASSACHUSETTS

Stephen P. Halbrook*

Of all federal Bill of Rights provisions, the second amendment "right of the people to keep and bear arms" is perhaps the most controversial and least understood. As the bicentennial of the United States Constitution approaches, the intent of the founding fathers as to the meaning of the second amendment and other provisions will be widely discussed in the public forum. Yet the key to understanding the federal Bill of Rights may lie in the state bills of rights which preceded it.

An insight into the intent of the framers of the first state bills of rights is significant in its own right, now that the state courts are rediscovering their own bills of rights.[1] Knowing the intent of the framers as to a particular freedom guaranteed under state constitutional law would shed light on whether that state's courts have appropriately interpreted such freedoms.[2] The intent of the framers of the first state bills of rights may also assist in interpreting identical or similar provisions of states admitted into the Union in later periods.[3] The need, recognized in all American jurisdictions,

---

* J.D., Georgetown University (1978); Ph. D., Florida State University (1972); Author of That Every Man Be Armed: The Evolution of A Constitutional Right (University of New Mexico Press 1984); Attorney at Law, Fairfax, VA.

1. *See, e.g.*, Linde, *First Things First: Rediscovering the States' Bill of Rights*, 9 U. BALT. L. REV. 379 (1980).

2. The highest courts of most states have rendered decisions where they follow or purport to follow the intent of the framers of the constitutional provisions. "It is never to be forgotten that, in the construction of the language of the Constitution . . . we are to place ourselves as nearly as possible in the condition of the men who framed the instrument." Ex Parte Baine, 121 U.S. 1, 12 (1887). *See, e.g.*, Patsy v. Florida Board of Regents, 457 U.S. 496 (1982) (a 42 U.S.C. § 1983 action for declaratory or injunctive relief or damages in which petitioner alleged that her employer had denied her employment opportunities solely on the basis of her race and sex. The question of the framers' intent arose when the Court was deciding whether or not petitioner had exhausted all available state administrative remedies, and in the Court's review of fourteenth amendment and Civil Rights Act cases); Payton v. New York, 445 U.S. 573 (1979) (case in which appeals were brought challenging the constitutionality of New York statutes authorizing police officers to enter a private residence without a warrant and without force, if such was necessary to make a routine felony arrest. The Court looked to common law and the framers' intent when considering the constitutionality of the arrest warrant).

3. On the borrowing of state constitutional provisions during westward expansion, *see*

to analyze both the explicit language of a constitutional guarantee and its original understanding was explained by the Pennsylvania Supreme Court as follows: "A constitution is not to receive a technical or strained construction, but rather the words should be interpreted in their popular, natural and ordinary meaning. We should also consider the circumstances attending its formation and the construction probably placed upon it by the people."[4] Moreover, one can assume that most American jurisdictions recognize, at least in theory, that constitutionally guaranteed rights are fundamental rights since most states have adopted the formulation of the United States Supreme Court that "fundamental rights" are those which are "explicitly or implicitly guaranteed by the Constitution."[5] Certainly the four states emphasized in this article have purported to follow that rule.[6]

The Massachusetts Supreme Judicial Court opined in *O'Neal* I,[7] one of a series of death penalty cases, that "[a]lthough there is no precise standard for determining what rights are fundamental, we are guided by what is 'explicitly or implicitly guaranteed by the Constitution.' "[8] While that court conceded that the framers of the Massachusetts Declaration of Rights did not consider the death penalty for rape-murder to be cruel and unusual punishment, it held that penalty unconstitutional due to the explicit guarantee of the right to "life."[9] It appears inconsistent that the court, while holding the right to life overridingly fundamental in the case of a rapist-murderer, held the right of the ordinary citizen to protect

---

Williams, *State Constitutional Law Processes*, 24 WILLIAM & MARY L. REV. 169, 174 n.14 (1983). For instance, the right-to-bear-arms guarantee of Pennsylvania and Vermont was copied by Ohio in 1802 and by Indiana in 1816. *See*, Barnhart, *Sources of Indiana's First Constitution*, 49 IND. MAG. OF HISTORY 55, 62-63 (1943). Indiana's provision was in turn copied by Oregon in 1857. THE OREGON CONST. AND PROCEEDINGS AND DEBATE OF THE CONSTITUTIONAL CONVENTION OF 1857 at 101-02, 302, 469 (Salem, Ore. 1926).

4. Commonwealth v. Harmon, 469 Pa. 490, 366 A.2d 895, 897 (1976) (citing Commonwealth ex rel Tate v. Bell, 145 Pa. 374, 22 A. 641 (1891)). The court recalled the language of Moers v. City of Reading: "The Constitution is entitled, like other instruments, to a construction, as nearly as may be, in accordance with the intent of its makers." *Harmon*, 469 Pa. at __, 366 A.2d at 899, n.10, citing *Moers*, 21 Pa. 188, 200 (1853).

5. San Antonio Independent Sch. Dist. v. Rodriguez, 411 U.S. 1, 33-34 (1973) (citing Eisenstadt v. Baird, 405 U.S. 438 (1972)).

6. *See* In re Barcomb, 132 Vt. 225, 315 A.2d 476 (1974); Duggins v. N.C. State Bd. of C.P.A. Examiners, 294 N.C. 120, 240 S.E.2d 406 (1978); Snider v. Thornburgh, 496 Pa. 159, 436 A.2d 593 (1981); Commonwealth v. O'Neal, 367 Mass. 440, 327 N.E.2d 662 (1975).

7. *O'Neal*, 367 Mass. at 440, 327 N.E.2d at 662.

8. *Id.* at 449, 327 N.E.2d at 668 (citing *San Antonio*, 411 U.S. at 33-34).

9. *Id. Accord* Commonwealth v. O'Neal [*O'Neal* II], 369 Mass. 242, 339 N.E.2d 676 (1975).

life by bearing arms to prevent rape and murder to be nonexistent.[10]

More recently, the Illinois Supreme Court held that possession of handguns in the home may be banned.[11] The Illinois court made such a ruling despite previous rulings recognizing explicitly guaranteed constitutional rights to be fundamental,[12] and despite the explicit constitutional right of individuals to keep arms (including handguns). This 3-2 decision is the first such opinion in American history.

The highest courts of Massachusetts and Illinois have, in essence, held that all explicitly guaranteed rights are fundamental except for the right to keep and bear arms. These decisions are contrary to the general rule, and no logic buttresses the carving out of this exception.

Before the federal Bill of Rights was adopted, explicit right-to-bear-arms guarantees appeared in the declarations of rights of Pennsylvania,[13] North Carolina,[14] Vermont,[15] and Massachusetts.[16] The Virginia Declaration of Rights of 1776 heralded the virtues of "a well regulated Militia, composed of the body of the People, trained to Arms,"[17] and three other states adopted similar provisions.[18] The first constitutions of four states included no bills of rights,[19] and two states adopted no written constitutions until the nineteenth century.[20]

---

10. *See infra* notes 24-29 and accompanying text.

11. Kalodimos v. Village of Morton Grove, 103 Ill.2d 483, 470 N.E.2d 266 (1984). "Not every right secured by the State or Federal constitutions is fundamental . . . ." *Id.* at __, 470 N.E.2d at 277. (Here, the court was construing the Illinois Constitution, article I, section 22, which provides: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed.").

12. " 'Fundamental interests . . .' are rooted in explicit or implicit constitutional guarantees." People v. Kaeding, 98 Ill.2d 237, __, 456 N.E.2d 11, 16 (1983). "[T]he key to discovery if a right is fundamental 'lies in assessing whether there is a right [that is] explicitly or implicitly guaranteed by the Constitution.' " In re Roger B., 84 Ill.2d 323, __, 418 N.E.2d 751, 753 (1981).

13. PA. DEC. OF RIGHTS art. XXI (1776, 1791).

14. N.C. DEC. OF RIGHTS art. XXV (1776).

15. VT. DEC. OF RIGHTS art. XXXIX (1777).

16. MASS. DEC. OF RIGHTS art. XVII (1780).

17. VA. DEC. OF RIGHTS art. XIII (1776).

18. DEL. DEC. OF RIGHTS art. XVIII (1776); MD. DEC. OF RIGHTS art. XXV (1776); N.H. BILL OF RIGHTS art. XXIV (1784).

19. *See* constitutions of N.J. (1776), S.C. (1776, 1778), Ga. (1777), and N.Y. (1777).

20. These two did guarantee the right to bear arms. CONN. CONST., art. I, § 17 (1818); R.I. CONST., art. I, § 22 (1842).

The purpose of this analysis is to investigate the intent of the
framers, and to facilitate original understanding by the public, of
the four bills of rights which explicitly guaranteed the right to bear
arms before the adoption of the federal second amendment. The
understanding of that right in the other states is important as well
in construing the second amendment, but is beyond the scope of
this study.[21]

The courts of Pennsylvania, North Carolina, Vermont, and
Massachusetts have interpreted their right-to-bear-arms guaran-
tees in different ways. Pertinent opinions will be analyzed together
before the historical origins of the four bills of rights are treated
individually. The extent to which these decisions were decided ap-
propriately or not will then become evident.

## I. JUDICIAL PRECEDENTS

When Pennsylvania adopted the first right-to-bear-arms guar-
antee in the newly independent states in 1776, it did not do so in a
vacuum. That it was an established right under common law or
natural law seems to be suggested by *Commonwealth v. Ray*,[22]
which declared void a Philadelphia ordinance prohibiting the unli-
censed carrying of a firearm on public property. The Pennsylvania
Superior Court invalidated the city ordinance on the following
grounds:

> The right of citizens of Pennsylvania to bear arms in de-
> fense of themselves; their property and the State predates
> any Constitution of the Commonwealth, and has been embod-
> ied in every Constitution we have had and is in Article I, § 1,
> and Article I, § 21 of the present Constitution of Pennsylva-
> nia as follows:
>
> > "*Article I, Section 1.* All men are born equally
> > free and independent, and have certain inherent and
> > indefeasible rights, among which are those of en-
> > joying and defending life and liberty, of acquiring,
> > possessing and protecting property and reputation,
> > and of pursuing their own happiness.

---

21. An analysis of that understanding in each of the other states has been or is cur-
rently being prepared by this author.
22. Commonwealth v. Ray, 218 Pa. Super. 72, 272 A.2d 275 (1970), *vacated on other
grounds* 448 Pa. 307, 292 A.2d 410 (1972).

> *Article I, Section 21*. The right of the citizens to
> bear arms in defense of themselves and the State
> shall not be questioned."[23]

The city ordinance at issue in *Ray* prohibited the unlicensed
carrying of firearms in public places during an emergency unless
"actively engaged in" defense of life or property.[24] The lower court
had declared the requirement of a license to carry firearms void
because it "did not contain as an exception to the right of a citizen
to bear arms in defense of himself or his property."[25] The Superior
Court, reversing in part, found that "[the] right [to bear arms] is a
constitutional one and cannot be diminished by any act of the Leg-
islature. If it was included it would be mere surplusage, for it is
presumed that all acts of the Legislature are subject to the clear
mandate of the Constitution . . . ."[26]

The same Philadelphia ordinance regulated the purchase of
firearms, and this was also attacked in federal court on second
amendment grounds.[27] The district court dismissed,[28] and the
Third Circuit affirmed.[29] Appellant argued "that by the Second
Amendment to the United States Constitution he is entitled to
bear arms."[30] The court, however, said that "[a]ppellant is com-
pletely wrong about that . . . . It must be remembered that the

---

23. *Id.* at ___, 272 A.2d at 278-79 (the trial court judge based his decision on the federal
constitution, ruling that the city ordinance was in violation of the second amendment). Af-
ter nearly a century from the adoption of Pennsylvania's right-to-bear-arms provision, the
courts were split on whether some local prohibitions on carrying concealed firearms were
constitutional. In the constitutional convention of 1873, it was unsuccessfully proposed that
citizens have a right to bear arms "openly." A proponent noted that "when that question
was brought before one of the courts of Philadelphia, one of the judges declared that a
person . . . who had a pistol concealed on his person had a constitutional right to carry that
pistol concealed . . . ." DEBATES OF THE CONVENTION TO AMEND THE CONSTITUTION OF PENN-
SYLVANIA at 258 (Harrisburg 1873). An opponent who "believe[d] in the right of self-defense
of the weak against the strong" could not understand "why the Constitution should prohibit
a man from carrying weapons to defend himself unless he carries them openly, why you
should require him to sling a revolver over his shoulder." *Id.* at 259.

Although the above proposed amendment was defeated 54-23 (*id.* at 261), two years
later the Pennsylvania Supreme Court, in a very brief opinion, upheld a prohibition on car-
rying concealed weapons. Wright v. Commonwealth, 77 Pa. 470 (1875).

24. *Ray*, 218 Pa. Super. at ___, 272 A.2d at 278.

25. *Id.* at ___, 272 A.2d at 279.

26. *Id.*

27. Eckert v. City of Philadelphia, 477 F.2d 610 (3d Cir. 1973), *cert. denied* 414 U.S.
839 (1973).

28. Eckert v. City of Philadelphia, 329 F. Supp. 845 (E.D. Pa. 1973).

29. *Eckert*, 477 F.2d 610.

30. *Id.*

right to keep and bear arms is not a right given by the United States Constitution."[31] While construing the federal guarantee narrowly, the court concluded that the ordinance was void under state law in view of the decision in *Commonwealth v. Ray*.[32]

Vermont copied its right-to-bear-arms guarantee in the Declaration of Rights of 1777 from Pennsylvania. Since its legislature has rarely enacted laws infringing on the right to bear arms, the guarantee has been infrequently construed by the courts.

Without mentioning the arms provision, the Vermont Supreme Court, in 1876, set aside a manslaughter verdict because the defendant "had the right to go prepared with a loaded pistol, to defend himself against any assault . . . ; [and] if he only intended to use such weapon in such emergency in defending his own life, or himself against the infliction of great bodily harm, the carrying of such weapon for such a purpose, would not be unlawful."[33] This language was favorably mentioned in *State v. Rosenthal*[34] in light of Vermont's constitutional provision "that the people have a right to bear arms for the defense of themselves and the State . . . ."[35]

In *Rosenthal*, the court declared void a local ordinance which prohibited the carrying of a pistol without a permit.[36] The court pointed out that under state law, "a person not a member of a school, may carry a dangerous or deadly weapon, openly or concealed, unless he does it with the intent or avowed purpose of injuring another . . . ."[37] The ordinance's prohibition on carrying a pistol was declared void upon the following reasoning: "By the or-

---

31. *Id.* The district court made a similar statement, but added in more detail that "the only function of the Second Amendment is to prevent the federal government, and the federal government *only*, from infringing that right . . . . [T]he plaintiff has no absolute right to be free of state or municipal regulation concerning the keeping and bearing of arms . . . ." *Eckert*, 329 F. Supp. at 845-46.

32. *Eckert*, 329 F. Supp. at 846.

33. State v. Carlton, 48 Vt. 636 (1876).

34. 75 Vt. 295, 298, 55 A. 610, 611 (1903).

35. *Id.* at 297, 55 A. at 610 (quoting Vt. Const., art. 16, cl. 1).

36. *Rosenthal*, 75 Vt. 295, 55 A. 610.

37. *Id.* at 298, 55 A. at 610-11. Vermont law remains unique in avoiding the open/concealed or licensed/unlicensed carry dichotomies, and gets straight to the issue of wrongful purpose. This policy represents the English common law and can be traced to Roman law. In the words of Cicero: "Indeed even the wisdom of the law itself, by a sort of tacit implication, permits self-defense, because it does not actually forbid men to kill; what it does, instead, is to forbid the bearing of a weapon with the intention to kill." Cicero, Selected Political Speeches 222 (M. Grant transl. 1969). This passage was well known to James Otis and John Adams. 1 J. Adams, Legal Papers 160 n. 16 (1965).

dinance in question, no person can carry such weapon concealed on his person within the city of Rutland in any circumstances, nor for any purpose, without the permission of the mayor or chief of police in writing. Therein neither the intent nor purpose of carrying them enters into the essential elements of the offense."[38] The court went on to note the anomaly that the ordinance would not be violated where a licensed person carried a weapon to injure another.[39]

A prohibition against carrying a loaded rifle or shotgun in a vehicle on a public highway without a license was tested in *State v. Duranleau*.[40] The statute, which was passed as part of the fish and game law, was upheld under the following reasoning:

> The statute does not literally prohibit the "bearing" of any arms, but only requires that, when rifles and shotguns are carried in mechanically propelled vehicles on public highways, that they be unloaded. This restriction . . . admittedly somewhat conditions the unrestrained carrying and operation of firearms. But the language of the constitutional provision does not suggest that the right to bear arms is unlimited and undefinable. To require that two particular kinds of weapons, at certain specific places and under limited circumstances, be carried unloaded rather than loaded, it is not such an infringement on the constitutional right to bear arms as to make the statute invalid.[41]

While the state courts in Pennsylvania and Vermont have liberally construed their right "to bear arms for the defense of themselves and the State," Massachusetts courts have narrowly interpreted the constitutional provision of that state that "the people have a right to keep and bear arms for the common defense." In the *Opinion of The Justices of 1859*,[42] the Massachusetts Supreme Judicial Court discussed as separate and distinct the state power to organize a militia and the independent but related right of the citizen to have arms: "The Constitution of Massachusetts was

---

38. *Rosenthal*, 75 Vt. at 298-99, 55 A. at 611.

39. *Id.* at 298, 55 A. at 611.

40. 128 Vt. 206, 260 A.2d 383 (1969).

41. *Id.* at 210, 260 A.2d at 386. The statute was clearly aimed at unsportsmanlike "hunters" who chased game from vehicles. Violation meant a fine of only $25-$50 and, much worse, loss of the right to hunt, fish, or trap for one year; "the principal mischief toward which it is directed . . . relate primarily to the activities of those who are, or purport to be, hunting." *Id.*

42. Opinion of the Justices, 80 Mass. (14 Gray) 614 (1859).

adopted and went into operation in 1780. It recognized the militia as an essential department of the constitution of its government . . . . It also, in the Declaration of Rights, distinctly declared the right of the people to bear arms."[43]

About fifty years later, an Irish-American was convicted for parading with an unauthorized body of men with inoperable Springfield rifles. Relying on precedents from other courts which intended to stamp out similar instances of working class demonstrations, the Supreme Judicial Court of Massachusetts held: "The right to keep and bear arms for the common defense does not include the right to associate together as a military organization, or to drill and parade with arms in cities and towns, unless authorized so to do by law."[44]

In 1976, Massachusetts' highest court judicially abrogated the right of individuals to bear arms in defense of themselves.[45] This was done with virtually no analysis of the provision at issue, article 17, which provides: "The people have a right to keep and bear arms for the common defense."[46] The court stated, in summary fashion, that "[t]he meaning of such provisions is to be gathered from their history which is reasonably well known and need not be reviewed here in detail."[47] In addition, the court went on to support its opinion by quoting two law review articles which contain no significant analysis of the Massachusetts provision.[48]

Without quoting a single original source, the court went on to say that "the declared right to keep and bear arms is that of the people, the aggregate of citizens . . . . Provisions like art. 17 were not directed to guaranteeing individual ownership or possession of weapons."[49] In the court's opinion, the militia is now the National

---

43. *Id.* at 615. After quoting the federal second amendment, the court added: "This, like similar provisions in our own Declaration of Rights, declares a great general right, leaving it for other more specific constitutional provision or to legislation to provide for the preservation and practical security of such right, and for influencing and governing the judgment and conscience of all legislators and magistrates, who are thus required to recognize and respect such rights." *Id.* at 620.

44. Commonwealth v. Murphy, 166 Mass. 171, 44 N.E. 138 (1896).

45. Commonwealth v. Davis, 369 Mass. 886, 343 N.E.2d 847 (1976).

46. *Id.*

47. *Id.* at 887, 343 N.E.2d at 848.

48. *Id.* The law review articles cited were: Feller & Gotting, *The Second Amendment: A Second Look*, 61 N.W. U. L. REV. 46 (1966); and Levin, *The Right to Bear Arms: The Development of the American Experience*, 48 CHI-KENT L. REV. 148 (1971).

49. *Id.* at 887, 343 N.E.2d at 848-49.

Guard, and therefore the constitutional right to "keep" arms no longer exists because the Guard is equipped by public funds.[50] In support of its holding, the court declared that "[t]here is nothing to suggest that, even in early times, due regulation of possession of carrying of firearms, short of some sweeping prohibition, would have been thought to be an improper curtailment of individual liberty . . . ."[51] Such a declaration seems inconsistent with actual history, considering that even concealed weapons were not prohibited at common law, and gun control laws were unknown to Founding Fathers, most of whom believed in the *code duello*.[52]

The *Davis* opinion paved the way for the Bartley-Fox Act, under which a person without a license who carries a firearm either on his person or in a vehicle receives a mandatory one year prison sentence.[53] The "firearm," which need not be loaded, may be a pistol, rifle, shotgun, or even an air rifle or BB gun. Possession of a shotgun with a barrel of less than eighteen inches may result in life imprisonment.[54] For the foregoing reasons, it appears that the arms guarantee in the Massachusetts Declaration of Rights is practically meaningless at this time.

The arms guarantee in the original Declaration of Rights of North Carolina was somewhat similar to that of Massachusetts in that it recognized "that the people have a right to bear arms, for the defense of the State . . . ."[55] The 1843 case of *State v. Huntley*[56] held:

> The bill of rights in this State secures to every man, indeed, the right to "bear arms for the defense of the State." While it

---

50. *Id.* at 888, 343 N.E.2d at 849.

51. *Id.*

52. Luckily, duelling was not included as a constitutional right. However, the short barrel shotgun for which defendant's conviction was upheld in *Davis* is clearly the descendant of the blunderbuss, one of the "arms" seized by the British in Boston which led to the provision in the Declaration of Rights. *See* R. FROTHINGHAM, HISTORY OF THE SIEGE OF BOSTON 95 (6th ed. 1903). As the court conceded, the language of the United States Supreme Court in United States v. Miller, 307 U.S. 174, 178 (1939), that a short-barrel shotgun would be protected by the second amendment if it was a militia arm, could imply "that Congress could not regulate weapons having military uses . . . . The inference is quite unacceptable . . . ." *Davis*, 369 Mass. at 891 n. 9, 343 N.E.2d at 850 n. 9. While this is not the first time that a state court rejected the authority of the United States Supreme Court, at least the *Miller* court cited a few original historical sources.

53. MASS. ANN. LAWS ch. 269, § 10(a) (Michie/Law. Co-op. 1980).

54. *Id.* § 10(c).

55. N.C. DEC. OF RIGHTS art. XVII (1776).

56. 25 N.C. 284 (1843).

> secures to him a *right* of which he cannot be deprived, it
> holds forth the *duty* in execution of which that right is to be
> exercised . . . .
>
> . . . .
>
> . . . [T]he carrying of a gun, *per se*, constitutes no offense.
> For any lawful purpose—either of business or amuse-
> ment—the citizen is at perfect liberty to carry his gun.[57]

In 1868, the North Carolina arms guarantee was amended to
read exactly as the federal second amendment, and shortly thereaf-
ter it was reamended to add that "nothing herein contained shall
justify the practice of carrying concealed weapons . . . ." The
North Carolina Supreme Court, however, opined that the "right to
keep and bear arms" protected the open wearing of the arms.[58]
That court also reaffirmed the *Huntley* rule that "[a] man may
carry a gun for any lawful purpose of business or amusement
. . . ."[59]

In *State v. Kerner*,[60] the North Carolina Supreme Court once
again addressed the right to keep and bear arms. The court de-
scribed this right as "a sacred right based upon the experience of
the ages in order that the people may be accustomed to bear arms
and ready to use them for the protection of their liberties or their
country when occasion serves."[61] In its decision upholding the right
of workers to carry pistols openly for self-defense against armed
agents of "great corporations,"[62] the court reasoned: "Had not the
common people, the rank and file, those who 'bore the burden of
the battle' during our great Revolution, been accustomed to the
use of arms, the victories for liberty would not have been won and
American independency would have been an impossibility."[63]

In *State v. Dawson*,[64] the court interpreted the North Carolina
arms guarantee as both a collective and an individual right. Al-
though the court asserted that the National Guard had supplanted
the militia of the body of citizens who privately armed themselves,
the court acknowledged that:

---

57. *Id.* at 286-87.
58. State v. Speller, 86 N.C. (11 Keenan) 697, 700 (1882).
59. State v. Roten, 86 N.C. (11 Keenan) 701, 704 (1882).
60. 181 N.C. 574, 107 S.E. 222 (1921).
61. *Kerner*, 181 N.C. 574, ___, 107 S.E. 222, 223 (1921).
62. *Id.* at 578, 107 S.E. at 225.
63. *Id.* at 577, 107 S.E. at 224.
64. 272 N.C. 644, 159 S.E.2d 1 (1968).

> While the purpose of the constitutional guaranty of the right
> to bear arms was to secure a well regulated militia and not an
> individual's right to have a weapon in order to exercise his
> common-law right of self-defense, this latter right was as-
> sumed . . . . North Carolina decisions have interpreted our
> Constitution as guaranteeing the right to bear arms to the
> people in a collective sense—similar to the concept of a mili-
> tia—and also to individuals.[65]

Justice Lake, in a thoughtful concurring and dissenting opin-
ion, pointed out: "It was the very fact that the right to bear arms
had been infringed in England, and that this is a step frequently
taken by a despotic government, which caused the adoption of the
provision in the North Carolina Declaration of Rights of 1776 and
the insertion in the Federal Bill of Rights of the Second
Amendment."[66]

The above judicial opinions from Pennsylvania, Vermont,
Massachusetts, and North Carolina construed their respective
arms guarantees based on the language of the guarantee itself, and
considering "secondary" sources, such as judicial precedents and
(in the Massachusetts *Davis* case) law review articles. While sev-
eral of these cases refer to the period of the American Revolution
when the arms provisions were adopted, none actually cite original
sources concerning the intent of the framers or the people during
that period. Moreover, none of the secondary sources cited refers
to any original source related to the framing of the state constitu-
tional guarantees.

The following analysis brings together for the first time the
thoughts of the framers of the four states in adopting arms guaran-
tees prior to the ratification of the federal Bill of Rights. This anal-
ysis is timely, in that gun control remains a highly controversial

---

65. *Id.* at __, 159 S.E.2d at 9.
66. *Id.* at __, 159 S.E.2d at 14. Justice Lake added that the second amendment origi-
nally limited only the federal government, but that the federal Bill of Rights was made
applicable to the states through the fourteenth amendment. *Id.* at __, 159 S.E.2d at 15.
Indeed, State v. Newsom, 27 N.C. 250 (1844) upheld a ban on the carrying of firearms by
free blacks because they were not citizens, and that in the second amendment "the States
are neither mentioned nor referred to. It is, therefore, only restrictive of the powers of the
Federal Government." *Newsom*, 27 N.C. at 251. *See also* State v. Dobbins, 277 N.C. 484, 178
S.E.2d 449 (1971), which stands for the proposition that "the Second Amendment to the
Constitution of the United States, if it reaches state action at all, reaches it by way of the
Due Process Clause of the Fourteenth Amendment . . . ."). *Dobbins*, 277 N.C. at __, 178
S.E.2d at 462.

issue in American society. State bills of rights were designed to limit deprivations of specified rights. The following analysis traces the drafting and adoption of the original four bills of rights' guarantees, including the right to keep and bear arms, as well as the common understanding of those guarantees by the people.

## II. PENNSYLVANIA

### A. *The Declaration of Rights of 1776*

The constitutional convention of Pennsylvania, over which Benjamin Franklin presided, met from July 15 through September 28, 1776, a longer period than most state conventions.[67] The Virginia Declaration of Rights had been published in Philadelphia just over a month before the convention began.[68] From the beginning, a majority in the convention were Associators, members of armed associations.[69] Initially, eleven persons were appointed to the declaration of rights committee.[70]

The Declaration of Independence was approved during the July 25th session, and at the same session Colonel Timothy Matlack and James Cannon were appointed to the committee responsible for writing an essay for a frame of government.[71] Symbolic of the times, the following newspaper advertisement began to appear regularly: "WANTED immediately, a quantity of good HORSE PISTOLS AND CARBINES, for which ready money, and a liberal price, will be given . . . . Has a quantity of Muskets . . . to sell."[72]

The authors of the Declaration of Rights, adopted some three weeks later, were apparently Judge George Bryan, Colonel Matlack, and James Cannon. Alexander Graydon later recalled that the Pennsylvania Constitution "was understood to have been principally the work of Mr. George Bryan, in conjunction with Mr. Ca-

---

67. "Unlike the framers of the Constitutions of New Hampshire and South Carolina, and New Jersey, who considered their work as temporary, the men of Pennsylvania desired to make a document of greater permanence." J. SELSAM, THE PENNSYLVANIA CONSTITUTION OF 1776, 175-76 (1936). It is noteworthy that the hastily drawn constitutions mentioned above contained no bills of rights.
68. Pennsylvania Gazette (Philadelphia), June 12, 1776, at 2.
69. J. SELSAM, *supra* note 67, at 148.
70. THE PROCEEDINGS RELATIVE TO CALLING THE CONVENTIONS OF 1776 AND 1790 48 (Harrisburg 1825).
71. *Id.* at 49.
72. Pennsylvania Evening Post (Philadelphia), July 23, 1776, at 366.

non, a schoolmaster . . . ."[73] John Adams wrote that the Pennsylvania "Bill of Rights is taken almost verbatim from that of Virginia, which was made and published two or three months before that of Philadelphia was begun. It was by Mr. Mason, as that of Pennsylvania was by Timothy Matlack, James Cannon and Thomas Young and Thomas Paine."[74]

Of the Declaration framers, George Bryan, later a Justice of the Pennsylvania Supreme Court, was the most influential member of the convention.[75] Professor James Cannon of the College of Philadelphia contributed the major part of the phraseology of the document.[76] Cannon, along with Dr. Thomas Young and Thomas Paine, were leaders of the radical Whig Society.[77] Dr. Young, a member of the Continental Congress, would later persuade the Vermont convention to adopt the Pennsylvania Declaration of Rights as a model.[78] Thomas Paine, whose *Common Sense* appeared in early 1776, was already influencing affairs in Pennsylvania and throughout the colonies.[79]

According to the contemporary account of Graydon, Judge Bryan's policy was "to identify himself with the people, in opposition to those who were termed the *well born* . . . ."[80] Cannon had a "scholastic predilection for the antique in liberty . . . ."[81] Matlack, an Associator, when once asked by a Quaker why he wore a sword, replied: "That is to defend my property and my liberty."[82] It was inevitable that these framers would seek guarantees of the people's liberty to have arms.

As adopted by Pennsylvania, the Declaration of Rights included the following provision:

> That the people have a right to bear arms for the defense of themselves, and the state; and as standing armies in the

---

73. A. GRAYDON, MEMOIRS OF HIS OWN TIME 287 (Philadelphia 1846).

74. J. ADAMS, DIARY AND AUTOBIOGRAPHY 391 (Cambridge, Mass., 1961) (diary entry, June 23, 1779).

75. B. KONKLE, GEORGE BRYAN AND THE CONSTITUTION OF PENNSYLVANIA 119 (Philadelphia 1922). Bryan would author the Act of March 1, 1780, abolishing slavery in Pennsylvania. *Id.* at 195.

76. *Id.* at 121.

77. *Id.* at 117 n.1.

78. *Id.*

79. *See infra* part B.

80. A. GRAYDON, *supra* note 73, at 287.

81. *Id.* at 288.

82. J. SELSAM, *supra* note 67, at 207 n.6.

> time of peace, are dangerous to liberty, they ought not to be
> kept up; and that the military should be kept under strict
> subordination to, and governed by the civil power.[83]

This provision is significant in several respects. Pennsylvania was
the first state to adopt the explicit language that "the people have
a right to bear arms," and thus its use of that term would have
been known to those who adopted similar language in the bills of
rights in other states and, later, the United States. The Declara-
tion of Rights clearly extends to all of the people the right to carry
arms for self-defense and for defense of the state. The term "bear
arms," although included in the same sentence in which standing
armies are rejected, has no exclusive militia nexus. While the fram-
ers intended in the declaration of a right to bear arms, to preserve
the more controversial right to defend the state against the estab-
lished (Crown) government, they did not neglect to include the un-
disputed right to bear arms for self-defense.

No dispute with the declaration of the right to bear arms to
defend self and state appears to have been raised in the convention
or later in the press. While some parts of the declaration were
highly controversial, a search of newspapers from the time the dec-
laration was first published on August 20[84] reveals not a single ob-
jection. Freedom of religion certainly did not appear to be consid-
ered as fundamental as the right to bear arms. For example, when
Benjamin Franklin revised certain wording of the Declaration of
Rights, he suggested no change in the right to bear arms clause; yet
he unsuccessfully opposed the profession of faith required for As-
semblymen.[85] Newspaper attacks on the religious guarantees and
other matters were extreme and persistent,[86] but the right to bear
arms was not once questioned.

The perceived significance of the bill of rights, including the
right to bear arms, was amplified in newspaper commentary. One
writer saw the Declaration as "equal to any thing of the kind now
extant in the various governments that we know in the world,"[87]
and added that "[t]he Magna Carta or Great Charter of Britain,

---

83. PA. DEC. OF RIGHTS art. XIII; PROCEEDINGS, *supra* note 70, at 56.

84. Pennsylvania Evening Post, Aug. 20, 1776, at 413; Pennsylvania Gazette, Aug. 21,
1776, at 2-3.

85. 22 B. FRANKLIN, PAPERS 514 n.2-3 (1982).

86. *E.g.*, Pennsylvania Evening Post, Sept. 26, 28, Oct. 8, 10, 15, 17, 19, 22, 24, 1776;
Pennsylvania Gazette, Oct. 23, Nov. 13, 20, 1776.

87. Pennsylvania Evening Post, Oct. 24, 1776, at 531, col. 1.

and the Bill of Rights exhibited at the Revolution, are not touched, nor allowed to be touched, by their Parliaments, and we at this time blame them, and bear arms against them, because they have deprived us, and still attempt to deprive us, of the privileges of that Constitution."[88] "Casa" wrote "To the Freemen of Pennsylvania":

> The Bill of Rights should always include the natural rights of every freeman, and the essential principles of free government . . . . This bill should be UNALTERABLE. The least violation of any part of it, whether by legislature—the courts of law—or the people, should always be punished as high treason against the state.[89]

While the right to bear arms went unquestioned, clauses in the Pennsylvania Constitution concerning the militia and hunting were criticized. One of the initial sections of the constitution provided: "The freemen of this commonwealth and their sons shall be trained and armed for its defense, under such regulations, restrictions and exceptions as the general assembly shall by law direct . . . ."[90] The only attack on this provision was actually no more than a satire which pictured the constitution as confusing and disorganized. Entitled "A Dialogue," its comment on the militia clause was more sarcasm than substance:

> In section the *fifth*—the freemen shall be *trained and armed* for their defense, and the militia shall elect their officers, & c. Oh, how I am transported at the velocity of the mental operations of these geniuses! They ought not to be compared to any thing but *leaden* bullets flying from the muzzles of rifles, hot, heavy, rapid, and yet twisting to their marks.[91]

Another section of the constitution provided: "The inhabitants of this state shall have liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands not enclosed . . . ."[92] While the militia and the right to hunt were certainly subjected to criticism, the most comprehensive attacks on the new constitution were devoted to issues such as the Christian religion

---

88. *Id.* at col. 2.
89. *Id.*, Oct. 31, 1776, at 546.
90. PA. CONST. art. II, § 5; PROCEEDINGS, *supra* note 70, at 57.
91. Pennsylvania Evening Post, Oct. 10, 1776, at 503.
92. PA. CONST. art. I, § 43; PROCEEDINGS, *supra* note 70, at 64.

not being treated "with proper respect."[93] A minor objection was "that several regulations improper to be taken notice of therein, are mentioned in the said Constitution . . . . Fishing, fowling, and hunting."[94]

Much more was at stake than the right to hunt, as was evidenced in the Pennsylvania Evening Post's "Remarks on the Resolves."[95] Under English law, game belongs to the King, who grants rights to lords of manors. From this privilege stemmed deprivation of the right to keep and carry guns:

> In order to prevent poachers, as they are called, from invading this aristocratical prerogative, the possession of *hunting dogs, snares, nets,* and *other* engines by unprivileged persons, has been forbidden, and, under pretence of the last words, *guns* have been seized. And though this was not legal, as guns are not engines appropriated to kill game, yet if a witness can be found to attest before a Justice that a gun has been thus used, the penalty is five pounds, or three months imprisonment fall on the accused . . . . Thus penal laws, and trials without juries, are multiplied on a trivial subject, and the freeholders of moderate estates deprived of a natural right. Nor is this all; the body of the people kept from the use of guns are utterly ignorant of the arms of modern war, and the kingdom effectually disarmed, except of the standing force . . . . Is any thing like this desired in Pennsylvania?[96]

Although modelled on the Virginia Declaration of Rights, the Pennsylvania Declaration made significant improvements. The rights of assembly and petition, and an unprecedented recognition of religious liberty, were included only in the latter.[97] Although Virginia recognized the right of "the Body of the People, [to be] trained to Arms,"[98] Pennsylvania more explicitly provided: "That the people have a right to bear arms for the defense of themselves,

---

93. *Resolution,* Pennsylvania Evening Post, Oct. 22, 1776, at 526-27.

94. *Id.* at 527, col. 1. The resolution was also published in Pennsylvania Gazette, Oct. 23, 1776, at 2-3.

95. Pennsylvania Evening Post, Nov. 5, 1776, at 554, cols. 1-2.

96. *Id.*

97. J. SELSAM, *supra* note 67, at 178-79. "Besides Pennsylvania only Delaware and Rhode Island acknowledged the equality of all Protestant sects, and only Pennsylvania and Delaware extended equality to Catholics." *Id.* at 181.

98. "That a well regulated Militia, composed of the Body of the People, trained to Arms, is the proper, natural, and safe Defense of a free State . . . ." VA. DEC. OF RIGHTS, XIII.

and the state . . . ."[99] As the chief authority on the first Pennsylvania constitution concluded, "the *Declaration of Rights* was the true expression of the ideals of the American Colonists, and the guarantees contained therein were the product of long and severe experience."[100]

## B.  *The Influence of Thomas Paine*

John Adams' assertion that Thomas Paine participated in making the Pennsylvania Declaration of Rights[101] was not literally correct in that Paine was not in Philadelphia when the convention met. However, he did influence the delegates to some extent, and his comments on the Declaration after its adoption further clarify the sentiments of the time. Paine's writings are particularly relevant on the perceived meaning of the right to bear arms.

A protest against gun seizures under English game laws which imposed property qualification was part of a poem Paine wrote in 1775 for *Pennsylvania Magazine.* Based on a true story about three judges who hung a farmer's dog, the poem included the following:

> Each knew by instinct when and where A farmer caught or killed a hare; Could tell if any man had got One hundred pounds per ann. or not; Or what was greater, could divine If it was only ninety-nine. For when the hundred wanted one, They took away the owner's gun.[102]

When *Common Sense* was published in Philadelphia in early 1776, "taking up arms"[103] was pictured by Paine as both necessary and realistic: "Our small arms [are] equal to any in the world . . . . Saltpeter and gunpowder we are every day producing."[104]

---

99. PA. DEC. OF RIGHTS art. XIII. George Mason, author of the Virginia Declaration, recognized this improvement in 1788 when he drafted proposals for a Bill of Rights to the United States Constitution which included: "That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural, and safe defense of a free state . . . ." 3 J. ELLIOT, DEBATES IN THE SEVERAL STATE CONVENTIONS 659 (1836).

100. J. SELSAM, *supra* note 67, at 182-83.

101. J. ADAMS, *supra* note 74.

102. *Farmer Short's Dog Porter*, Pennsylvania Magazine, July 1775, in 2 T. PAINE, COMPLETE WRITINGS 1785 (P. Foner ed. 1969). Paine would applaud the abolition of the game laws in France in *The Rights of Man* (1791). 1 *id.* at 281.

103. 2 T. PAINE, *supra* note 102, at 45.

104. *Id.* at 35.

The pro-Tory position taken by some Quakers was based on a double standard, "[a]s if all sin was reduced to, and comprehended in, *the act of bearing arms*, and that by the *people only*." Not condemning the invading soldiers was illogical, *"for they likewise bear* ARMS."[105]

In July 1776, the same month the Pennsylvania constitutional convention began its deliberations, Paine justified having and using arms defensively in the *Pennsylvania Magazine* as follows:

> The supposed quietude of a good man allures the ruffian; while on the other hand, arms like laws discourage and keep the invader and the plunderer in awe, and preserve order in the world as well as property. The balance of power is the scale of peace. The same balance would be preserved were all the world destitute of arms, for all would be alike; but since some *will not*, others *dare not* lay them aside . . . . Horrid mischief would ensue were one half the world deprived of the use of them . . . the weak will become a prey to the strong.[106]

Throughout 1777, in the *American Crisis*, Paine optimistically predicted that "a country furnished with arms and ammunition as America now is, with three millions of inhabitants," would not be conquered.[107] He expressed abhorrence at General Gates' letter to the administration: "That though their idea of his disarming certain counties was a right one, yet it required him to be master of the country, in order to enable him to execute it."[108]

Paine consistently defended the Pennsylvania Declaration of Rights and Constitution of 1776.[109] He held that "a Bill of Rights should be a plain positive declaration of the rights *themselves* . . . it should *retain much natural rights* as are either consistent with, or absolutely necessary toward our happiness in a state of civil government."[110] In 1786, Paine wrote:

---

105. Appendix to Common Sense (3rd ed. Feb. 1776), *in* 2 T. PAINE, *supra* note 102, at 57.

106. *Thoughts on Defensive War*, Pennsylvania Magazine, July 1776, *in* 2 T. PAINE, *supra* note 102, at 53.

107. 1 T. PAINE, *supra* note 102, at 95.

108. *Id.* at 85. A frequently repeated British order noted by Paine provided: "all inhabitants who shall be found with arms, not having an officer with them, shall be immediately taken and hung up." *Id.* at 65.

109. *To the People*, Pennsylvania Packet, Mar. 18, 1777, *in* 2 T. PAINE, *supra* note 102, at 269.

110. *Critical Remarks*, Pennsylvania Journal, May 21, 1777, *in* 2 T. PAINE, *supra* note 102, at 274.

> By this mutual compact, the citizens of a republic put it
> out of their power, that is, they renounce, as detestable, the
> power of exercising, at any future time any species of despot-
> ism over each other . . . .
>
> In this pledge and compact lies the foundation of the re-
> public . . . .
>
> This pledge and compact is contained in the declaration
> of rights prefixed to the constitution (of Pennsylvania).[111]

The language, but not the substance, of the Declaration was
changed by the Pennsylvania constitutional convention which met
in 1789-90.[112] Alexandere Graydon recalled that "during the sitting
of the Convention, the direful revolution in France was in progress,
and its proceedings sometimes appealed to, as guides for our con-
duct."[113] In the *Rights of Man* (1791), which appeared while the
federal Bill of Rights was still being debated, Paine described the
situation just before the storming of the Bastille as follows:

> The event was to be freedom or slavery. On one side, an army
> of nearly thirty thousand men; on the other, an unarmed
> body of citizens: for the citizens of Paris, on whom the Na-
> tional Assembly must then immediately depend, were as un-
> armed and as undisciplined as the citizens of London are now
> . . . .
>
> Arms they had none, nor scarcely any who knew the use
> of them . . . .
>
> . . . The night was spent in providing themselves with
> every sort of weapon they could make or procure: Guns,
> swords . . . clubs, etc.[114]

Whatever influence the French Revolution had on the Pennsylva-
nia convention, Paine was dissatisfied with the Constitution of
1790. "The Constitution of 1776 was conformable to the Declara-
tion of Independence and the Declaration of Rights, which the pre-
sent Constitution is not; for it makes artificial distinctions among
men in the right of suffrage . . . ."[115] Yet Paine never criticized

---

111. *Dissertation on Government* (Philadelphia 1786), *in* 2 T. PAINE, *supra* note 102, at
373-74.

112. *See infra* part D.

113. A. GRAYDON, *supra* note 73, at 357.

114. 1 T. PAINE, *supra* note 102, at 262-63.

115. *Constitutional Reform* (Philadelphia 1805), *in* 2 T. PAINE, *supra* note 102, at 1001.
"The Constitution formed by the Convention of 1776 . . . had many good points in it which

the Declaration of Rights of 1790, which accorded formal protection to the same rights, including arms, as the Declaration of 1776.

### C. *The Lack of Legislative Infringement*

The same provincial conference which called for the constitutional convention also resolved that a militia be raised, and "that each Private procure his own Musket or Rifle . . . ."[116] Similarly, the first General Assembly to meet after the constitution was adopted declared that "it is the indispensable duty of the Freemen of this Common-Wealth, to be at all times prepared to resist the hostile attempts of its enemies . . . ."[117] In later years, the Pennsylvania legislature prohibited "any male person, capable of bearing arms in the militia" from travelling about as a pedlar.[118] Another militia act declared that: "A well regulated militia is the only safe and constitutional method of defending a free state, as the necessity of keeping up a standing army, especially in times of peace, is thereby superceded."[119]

The Pennsylvania Constitution established a Council of Censors to meet every seven years to determine whether the Constitution had been preserved inviolate. The Council's report for 1784 found several violations of the Bill of Rights, including unjust seizures of property, illegal searches, and lack of jury trial.[120] No violation of the right to bear arms was suggested, and, in fact, very little legislation existed on the subject of firearms.

One piece of legislation that pre-dated the Revolution imposed a fine on "any person or persons, of what sex, age, degree, or quality soever, [who] shall fire any gun or other fire arms . . . within the city of Philadelphia . . . ."[121] In addition, any persons who "wontonly, and without reasonable occasion, discharge and fire off

---

were overthrown by the Convention of 1790, under the pretense of making the Constitution conformable to that of the United States . . . ." *Id.* at 993.

116. Proceedings of Provincial Conference of Committee of Pennsylvania (June 25, 1776), *in* 6 P. Force, American Archives 965.

117. Act of Mar. 17, 1777, *in* Acts of the General Assembly of the Commonwealth of Pennsylvania, Enacted into Laws, Since the Declaration of Independence on the Fourth Day of July, A.D. 1776 at 22.

118. Act of Nov. 26, 1779, *in* Acts of the General Assembly of the Commonwealth of Pennsylvania (1775-1781) 249 (Philadelphia 1782).

119. Act of Mar. 20, 1780, *in* Acts of the General Assembly, *supra* note 118, at 347.

120. Proceedings, *supra* note 70, at 87.

121. Act of Aug. 26, 1721, *in* An Abridgement of the Laws of Pennsylvania, 1700-1811 at 173 (Philadelphia 1811).

any hand-gun, pistol or other firearms" in inhabited areas on New Years night were subject to fine.[122] Finally, a hunting regulation punished any person who "shall presume to carry any gun, or hunt" on the land of others without permission, or who "shall presume to fire a gun on or near any of the king's highways . . . ."[123]

In 1779, the General Assembly passed a disarming act which was aimed primarily at Tories. It declared that "it is very improper and dangerous that persons disaffected to the liberty and independence of this state should possess or have in their own keeping, or elsewhere, any fire arms . . . ."[124] The act empowered militia lieutenants

> to disarm any person or persons who shall not have taken any oath or affirmation of allegiance to this or any other state, and against whom information on oath shall be given before any justice of the peace, that such person is suspected to be disaffected to the independence of this state; and shall take from every such person any cannon, mortar, or other piece of ordinance, or any blunderbuss, wall piece, musket, fusee, carbine, or pistols or any other firearms, or any hand gun . . . out of any building, house or place belonging to such persons.[125]

Aside from anti-Tory legislation, no legislation was passed in Pennsylvania from the time of the Revolution for decades afterward which even remotely infringed on the right to bear arms.[126] While the Council of Censors was abolished by the Constitution of 1790, bearing arms remained a constitutional right that was preserved inviolate.

## D. *The Declaration of Rights of 1790*

The Pennsylvania Declaration of Rights of 1790 was a result of the constitutional convention which met during the period November 24, 1789 through September 2, 1790. That convention unanimously resolved that the Declaration of 1776 "requires alterations and amendments, in such manner as that the rights of the people, reserved and excepted out of the general powers of government,

---

122. Act of Dec. 24, 1774, *in* An Abridgement of the Laws, *supra* note 121 at 174.
123. Act of April 9, 1760, *in* An Abridgement of the Laws, *supra* note 121, at 208.
124. Act of April 2, 1779, *in* Acts of the General Assembly, *supra* note 118, at 193.
125. *Id.*
126. *See* An Abridgement of the Laws, *supra* note 121.

*Vermont Law Review* [Vol. 10:255]

may be more accurately defined and secured . . . ."[127] A committee of nine was elected to draft proposed changes.[128]

A number of the delegates had participated in the convention which ratified the United States Constitution in 1787. Some of the leading characters[129] included such people as James Wilson, who, in support of the federal constitution, had argued that "however wide and various the firearms of power may appear, they may all be traced to one source, the people."[130] Also included were John Smilie and William Findlay, both signers of the Dissent of Minority, which urged an amendment "that the people have a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them . . . ."[131]

The delegates in the Pennsylvania convention of 1789-90 were acutely aware of the progress of the proposed federal constitutional amendments, which Pennsylvania would not ratify until March 10, 1790, and which became valid only in late 1791. The delegates considered a provision similar to what became the second amendment as originally drafted by James Madison: "The right of the people to keep and bear arms shall not be infringed . . . but no person religiously scrupulous of bearing arms shall be compelled to render military service in person."[132] In the Pennsylvania proceedings, the

---

127. PROCEEDINGS, *supra* note 70, at 152.

128. *Id.* at 153-54. Members included Findley, Hand, Miller, Wilson, Irvine, Lewis, James Ross, Smith, and Addison.

129. A. GRAYDON, *supra* note 73, at 351-56.

130. DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 336 (M. Jensen ed. 1976).

131. *Id.* at 623-24, 639. In debate, Smilie had warned that "the people in general may be disarmed." *Id.* at 509. The Dissent of Minority provision bore clear marks of the 1776 Pennsylvania Declaration and Constitution on the rights to bear arms and to hunt. In fact, dissident leaders Smilie and Findley were vigorous followers of Justice George Bryan, leader of the Pennsylvania constitutional convention of 1776. B. KONKLE, *supra* note 75, at 258. On Justice Bryan's role in framing the Pennsylvania Declaration of Rights, *see supra* notes 73-80 and accompanying text. Justice Bryan played a key role in agitating for amendments to the proposed federal constitution, his son George authored the influential anti-federalist *Centinel* series which demanded a federal Bill of Rights. B. KONKLE, *supra* note 75, at 309-38.

In reply to the Dissent of Minority, Tench Coxe wrote:
"Their swords, and every other terrible implement of a soldier, are *the birth-right of an American.* What clause in the state or federal constitution hath *given away* that important right." A Pennsylvanian, *To the Citizens of the United States,* Pennsylvania Gazette, Feb. 20, 1788, *in* 2 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 130, at 1778-80 (mfm. supp.).

132. 1 ANNALS OF CONG. 434 (1789). The proposed amendments were published in the

delegates exhibited their own understanding of the second amendment's language.

In its first report, the committee charged with recommending amendments proposed the following provisions:

> XIX. That the right of the citizens to bear arms in defense of themselves and the state, and to assemble peaceably together, and apply in a decent manner, to those invested with the powers of government, for redress of grievances or other proper purposes, shall not be questioned.
>
> XX. That those who conscientiously scruple to bear arms shall not be compelled to do so, but shall pay an equivalent for personal service.[133]

This language clarifies the wide protection guaranteed by the clauses in bills of rights at that time, as well as the severability of the clauses. Being bound by the conjunction "and" in no manner suggested that arms bearing, assembly, and petition were constitutionally protected only when provided simultaneously. Under the proposal, these activities would be protected when carried out either separately or together.

This proposal was widely published throughout the country, including in states which had not yet ratified the federal Bill of Rights.[134] There is no evidence that anyone thought the militia clause of what became the second amendment limited the right to bear arms clause any more than Pennsylvania's assembly clause limited its arms clause. The general perception was that both the federal and Pennsylvania guarantees protected the bearing of arms by members of the general public for self and common defense.

Further committee action placed the assembly clause in the nineteenth section, and the arms clause in the twentieth. Minutes of the committee of the whole reflect the following:

> The twentieth section of the said bill of rights being under consideration, it was moved by Mr. Pickering, seconded

---

Federal Gazette (Philadelphia), June 16, 1789, at 2, col. 2. Two days later it was explained that "the people are confirmed by the next article in their right to keep and bear their private arms." A Pennsylvanian, *Remarks on the First Part of the Amendments to the Federal Constitution*, *id.*, June 18, 1789, at 2, col. 1.

133. PROCEEDINGS, *supra* note 70, at 163 (Dec. 23, 1789).

134. *See, e.g.*, Providence Gazette & Country Journal, Jan. 30, 1790, at 1. Rhode Island ratified the Bill of Rights on June 7, 1790.

by Mr. McKean, to amend the same so as to read as follows, viz.

That the right of the citizens to bear arms in defense of themselves and the state shall not be questioned; but those who conscientiously scruple to bear arms shall not be compellable to do so, but shall pay an equivalent for personal service. Which was carried in the affirmative, and the said section, as amended, adopted.[135]

Colonel Timothy Pickering and Chief Justice Thomas McKean,[136] both of whom had served in Pennsylvania's federal convention, followed Madison's example by combining a right to bear arms guarantee with a conscientious objector exception.[137] This demonstrates that inclusion of a prohibition on compelling the religiously scrupulous from bearing arms in no way detracted from the individual character of the right to bear arms for defense of self and state. While the conscientious objector clause was deleted from what became the second amendment, the fact that it was considered did not imply that the right to bear arms belonged only to militias. The same kind of clause was also considered in the Pennsylvania convention as a qualification of the right to bear arms "in defense of *themselves* and the state."[138]

In addition to the arms guarantee, the committee of the whole agreed to a provision that "the freemen of this commonwealth shall be armed and disciplined for its defense . . . ."[139] The convention rejected a proposal to change "shall" to "may,"[140] apparently because the right to bear arms was already provided for elsewhere.

Meanwhile, unsuccessful attempts were made to delete or alter the conscientious objector clause. A memorial from the Quakers protested that the "article materially affects our religious liberties, which proposes that those who conscientiously scruple to bear arms shall pay an equivalent for personal service; such an equivalent it is well known we cannot, consistent with our principles, voluntarily pay . . . ."[141] The convention still refused to

---

135. PROCEEDINGS, *supra* note 70, at 380 (Feb. 4, 1790).
136. On their role at the state convention, *see* A. GRAYDON, *supra* note 73, at 355-56.
137. *See, supra* note 132 and accompanying text.
138. PROCEEDINGS, *supra* note 70, at 380 (Feb. 4, 1790) (emphasis added).
139. *Id.* at 173, 175 (Feb. 5, 1790).
140. *Id.* at 258 (Aug. 17, 1790).
141. *Id.* at 225, 263.

reconsider.[142]

In the final version, the controversial clause, while not deleted, was moved to a more logical place. As adopted, the Pennsylvania Declaration of Rights provision simply stated: "That the right of the citizens to bear arms in defense of themselves and the state shall not be questioned."[143] The militia clause, in the body of the constitution read: "The freemen of this commonwealth shall be armed and disciplined for its defense: Those who conscientiously scruple to bear arms, shall not be compelled to do so, but shall pay an equivalent for personal service."[144]

### III.   NORTH CAROLINA

#### A.   *"The Right of Every English Subject to Be Prepared with Weapons For His Defense."*

In 1771, a young lawyer named James Iredell wrote a letter to his mother which included the following lines:

> Be not afraid of the Pistols you have sent me. They may be necessary Implements of self Defense, tho' I dare say I shall never have Occasion to use them. All Mobbing is at an end, here, and we are once more at Peace. It is a Satisfaction to have the means of Security at hand if we are in no danger, as I never expect to be. Confide in my prudence and self regard for a proper use of them, and you need have no Apprehension. They are extremely neat, and I thank you, Madam, for, the trouble you had about them.[145]

James Iredell would go on to become a Justice of the United States Supreme Court.

In the years between the time of the above letter and when he became a Justice, Iredell played a prominent role in North Carolina constitutional development in general and in the adoption of the United States Constitution in particular. Iredell's letter captures the general sentiments of his generation at that time, espousing support for the right to bear arms.

Royalists became increasingly fearful of what they described

---

142. *Id.* at 274 (Aug. 23, 1790).
143. PA. DEC. OF RIGHTS, art. XXI, *in* PROCEEDINGS, *supra* note 70, (Sept. 2, 1790).
144. PA. CONST. art. VI, § 2, *in* PROCEEDINGS, *supra* note 70, at 302.
145. 1 THE PAPERS OF JAMES IREDELL 79 (D. Higginbotham ed. 1976).

as the "inhabitants in arms" who protested the stamp tax.[146] In 1774, North Carolina's future first governor, Richard Caswell, urged his neighbors that "it is indispensably necessary for [you] to arm and form into a company or companies of independents."[147] Willie Jones, the distinguished radical leader, led the Halifax Committee of Safety, which provided arms to the people.[148] Caswell and Jones would play leading roles in North Carolina constitutional development.

Lexington sparked the seizure of public arms and arms smuggling by the colonists. Governor Martin proclaimed against those "endeavouring to engage the People to subscribe papers obliging themselves to be prepared with Arms, to array themselves in companies, and to submit to the illegal and usurped authorities of Committees."[149] "The Inhabitants of this County on the Sea Coast," he wrote in mid-1775, "are . . . arming men, electing officers and so forth. In this little town [Newburn] they are now actually endeavouring to form what they call independent Companies under my nose . . . ."[150]

In a widely published message to the committees of safety, Richard Caswell, William Hooper, and Joseph Hewes, North Carolina's members of the Continental Congress, stated:

> It is the Right of every *English* Subject to be prepared with Weapons for his Defense. We conjure you . . . to form yourselves into a Militia . . . .
>
> Carefully preserve the small quantity of Gunpowder which you have amongst you, it will be the last Resource when every other Means of Safety fails you; Great-Britain has cut you off from further supplies. We enjoin you . . . as you would wish to live and die free, that you would reserve what ammunition you have as a sacred Deposit . . . .
>
> We cannot conclude without urging again to you the necessity of arming and instructing yourselves, to be in Readiness to defend yourselves against any Violence that may be exerted against your Persons and Properties.[151]

---

146. 1 R. CONNER, HISTORY OF NORTH CAROLINA 324 (1919).
147. *Id.* at 421.
148. *Id.* at 354-55.
149. *Id.* at 360.
150. *Id.* at 362.
151. Hooper, Hewes, and Caswell, *To the Committees of the Several Towns and Counties of the Province of North Carolina*, North Carolina Gazette (Newburn), July 7, 1775, at

The above address provoked Governor Martin to issue his "Fiery Proclamation," which deplored a

> publication in the said *Cape Fear Mercury* of the 14th of last month [July], addressed "To the Committees of North Carolina appointed for the purpose of carrying into execution the Resolves of the Continental Congress" bearing date at Philadelphia June 19th, 1775 signed William Hooper, Joseph Hewes, Richard Caswell, the preposterous enormity of which cannot be adequately described and abhor'd . . . . [I]t proceeds upon these false and infamous assertions and forgeries to excite the people of North Carolina to usurp the prerogative of the Crown by forming a Militia and appointing officers thereto and finally to take up arms against the King and His Government . . . .[152]

Governor Martin warned that all "persons who hath or have presumed to array the Militia and to assemble men in Arms within this Province without my Commission or Authority have invaded His Majesty's just and Royal Prerogative and violated the Laws of their Country to which they will be answerable for the same."[153]The governor's threats failed to deter the North Carolinians. Considering their individual right to have weapons for defense as a starting point, they then asserted their right to associate in militia companies independent of the government. From the latter, they went on and claimed a right to use those arms against despotic government. A typical committee of safety resolution of the time referred to "the painful necessity of having recourse to Arms for the preservation of those rights and Liberties which the principles of our Constitution and the Laws of God, Nature, and Nations

---

2, col. 3. Those who asserted a right to have arms did so fully conscious of its perils. The same newspaper issue reports "a Demoniac being left in a Room, in which were 18 loaded Muskets," who shot three men, "upon which the People present, without further Ceremony, shot him dead." *Id.* at 3, col. 1.

A week later, the Gazette published the Address and Declaration of the Provincial Congress of South Carolina, which stated, "solely for the Preservation and in Defense of our Lives, Liberties, and Properties we have been impelled to associate, and to take up Arms. Our taking up Arms in the Result of dire Necessity, and in compliance with the first Law of Nature." *Id.*, July 14, 1775, at 1, col. 1.

The address by Hooper, Hewes, and Caswell was also published in the Cape Fear Mercury, July 14, 1775, *see infra* note 8, and is *reprinted in* 10 COLONIAL RECORDS OF NORTH CAROLINA 22-23 (W. Saunders ed. 1890).

152. Proclamation of Aug. 15, 1775, in 10 COLONIAL RECORDS OF NORTH CAROLINA, *supra* note 151, at 144-145.

153. *Id.* at 150.

have made it our duty to defend."[154]The right of the English subject to have weapons became a duty in 1776. The Provincial Congress of North Carolina resolved "that each Militia Soldier shall be furnished with a good Gun, Bayonet, Cartouch Box, Shot Bay and Powder Horn, a Cutlass or Tomahawk; and where any person shall appear to the Field Officers not possessed of sufficient Property to afford such Arms and Accoutrements, the same shall be provided at Public Expense . . . ."[155]

In light of the sentiments of the people of North Carolina during the early period of constitutional development, and the fact that North Carolina's members of the Continental Congress supported the right of individuals to bear arms, it would have been unlikely that any declaration of rights adopted during that period would not recognize a right to bear arms.

### B. *The Declaration of Rights of 1776*

The delegates at the North Carolina constitutional convention, which met in November and December, 1776, had been instructed by their constituents to adopt a declaration of rights. For example, the inhabitants of Mecklenburg instructed "that you shall endeavor that the form of Government shall set forth a bill of rights containing the rights of the people and of individuals which shall never be infringed in any future time by the law-making power or other derived powers in the State."[156] The delegates were urged to acknowledge certain maxims, including that "the principal supreme power is possessed by the people at large, the derived and inferior power by the servants which they employ."[157]

The North Carolina delegates looked to Virginia and Pennsylvania as guides for their own declaration of rights. Virginia rested a free state on "the body of the people, trained to arms,"[158] while Pennsylvania declared "that the people have a right to bear arms for the defense of themselves, and the state . . . ."[159] The commit-

---

154. *Committee of Safety Proceedings*, Tryon County, August 14, 1775, *in* COLONIAL RECORDS OF NORTH CAROLINA, *supra* note 151, at 162.

155. *Journal of Proceedings of the Provincial Congress of North Carolina* 32 (May 4, 1776).

156. Instructions to the Delegates, adopted Nov. 1, 1776, in 10 COLONIAL RECORDS OF NORTH CAROLINA, *supra* note 151, at 870a.

157. *Id.* at 870b.

158. VA. DEC. OF RIGHTS art. XIII (1776).

159. PA. DEC. OF RIGHTS art. XIII (1776).

tee appointed to frame a Bill of Rights and Constitution included Richard Caswell, who was appointed president, and Joseph Hewes,[160] both of whom had asserted "the Right of every *English* Subject to be prepared with Weapons for his Defense."[161]

Just one month after its appointment, the committee had a proposal for a Bill of Rights. It was debated, paragraph by paragraph, for three days, and then adopted.[162] From the debates, it appears that Willie Jones was its draftsman, and Richard Caswell its inspiration.[163] Little, if any, debate appears to have been raised by the proposal to protect the right to bear arms.[164]

As adopted, the Declaration of Rights furnished the following interconnected guarantees:

I. That all political power is vested in, and derived from, the People only.

XVII. That the People have a Right to bear Arms for the Defense of the State; and as standing Armies in Time of Peace are dangerous to Liberty, they ought not to be kept up . . . .

XVIII. That the People have a Right to assemble together . . . .[165]

Having assembled in arms against the royal army since the days of the Regulators, these propositions were unquestionable to

---

160. Convention Journal, Nov. 13-14, 1776, in 10 COLONIAL RECORDS OF NORTH CARO-LINA, *supra* note 151, at 918-19. The committee included "Willie Jones, Thomas Person, and Griffith Rutherford, radical leaders; Allen Jones, Thomas Jones, Samuel Ashe, and Archi-bald Maclaine, conservative leaders; Richard Caswell and Cornelius Harnett, who may be classed as moderates." 1 R. CONNOR, *supra* note 146, at 412.

161. *Supra* note 151 and accompanying text.

162. The committee was appointed on Nov. 13, reported the bill of rights on Dec. 12, and passed it on Dec. 17, 1776. 1 R. CONNOR, *supra* note 146, at 413. The debate took place on Dec. 14, 16, and 17, 1776. J. SEAWELL JONES, A DEFENSE OF THE REVOLUTIONARY HISTORY OF NORTH CAROLINA 286 (Raleigh 1834).

163. PROCEEDINGS AND DEBATES OF THE CONVENTION OF NORTH CAROLINA [1835] 318 (Raleigh 1836) (Louis D. Wilson).

*See, e.g.,* J. JONES, *supra* note 162, at 287: "Thus were the Bill of Rights and the Consti-tution of the State formed. They are said to have come from the pen of Thomas Jones, aided and assisted by Willie Jones. I find in one Governor Johnston's letters, that he alludes to it as Jones's Constitution, and the reader will observe that Thomas Jones was throughout the organ of the Committee."

164. N.C. PROCEEDINGS, *supra* note 163.

165. *Journal of Proceedings of the Provincial Congress of North Carolina* 3-4 (Dec. 18, 1776).

North Carolinians now engaged in armed revolt. The North Carolina arms guarantee, as adopted, updated what Caswell and Hewes had referred to as "the right of every *English* Subject to be prepared with Weapons for His Defense."[166] While the right to bear arms for self-defense and other uses was encompassed in this provision, the arms guarantee expanded that right by explicitly recognizing the right to bear arms "for the Defense of the State." Implicit in this provision was the right to bear arms against the long established forces of a legally constituted royal government.

Jones' campaign for a federal Bill of Rights twelve years later indicated that he was in accord with Caswell in supporting the right to keep and bear arms as an individual right.[167] The phrase "for the Defense of the State," included in the arms guarantee, was intended as an expansion, not a limitation, of the traditional right to use and carry arms.[168]

The North Carolina Declaration was meant to guard against state infringement on *individual* rights. However, the arms guarantee contained therein could not have been intended to allow the state to abolish its own militia force, an act in which it could have no interest. Indeed, the militia is not even mentioned in the provision. The framers intended to guarantee individual rights when they used the term "the People," in both the right to bear arms and assembly provisions. By contrast, when they intended to guarantee a collective right, they did so explicitly: "The Property of the Soil in a free Government being one of the essential Rights of the collective Body of the People, it is necessary . . . that the Limits of the State should be ascertained with Precision . . . ."[169]

## C. *The Fundamental Right to Bear Arms*

The statutes in force in North Carolina during the last quarter of the eighteenth century reflect the recognition of the right to have arms. An enactment of 1787 declared "that all Freemen and indentured Servants within this State, from 15 to 50 years of age,

---

166. *See supra* note 151.

167. *See infra* notes 188-193 and accompanying text.

168. "A man may carry a gun for any lawful purpose of business or amusement . . . ." State v. Huntley, 25 N.C. 418, 422-23 (1843). This was apparently the only construction by North Carolina's high court on the subject.

169. N.C. Dec. of Rights art. XXV, *in Journal of Proceedings supra* note 165. The provision went on to describe the state boundaries, and to provide that titles of individuals holding under previous laws would remain valid.

shall compose the militia thereof . . . ."[170] Privates furnished their
own muskets and rifles, while horsemen had pistols.[171] No man
could go or ride armed to the terror of the people,[172] but each was
required to pursue felons and follow the hue and cry.[173] While
these statutes may be construed as state regulation of the right to
bear arms, such regulation occurred only after an individual had
violated a statute enacted for the safety of all citizens.

A statute passed during the royalist period imposed a property
qualification for hunting deer, violation of which included forfei-
ture of the gun.[174] After independence, hunting legislation included
only deer seasons and prohibition of hunting in the woods with a
gun at night by fire light.[175] For the first half century after inde-
pendence, there were no laws at all which prohibited possession of
guns and pistols by freemen in North Carolina.[176]

There were, however, disarming laws which were aimed at
slaves. A mid-eighteenth century enactment provided that "no
slave shall go armed with Gun, Sword, Club, or other Weapon,"
unless he had a certificate to carry a gun, issued on the owner's
permission for him to hunt.[177] In the same period, after the master
gave bond, a certificate could be granted "allowing any Slave to
carry a Gun and hunt in the Woods."[178] The justice of the peace
was to appoint a "Searcher for Guns, Swords, and other Weapons"
among slaves.[179]

In sum, under the constitution and laws of North Carolina, the
right to keep and carry arms went virtually unquestioned. Such
right was questioned only under one of two circumstances: either
the individual had violated a state statute, or the rights of slaves
were involved. Therefore, it appears that having arms was mani-

---

170. JAMES IREDELL, STATUTES OF THE STATE OF NORTH CAROLINA 591 (Edenton 1791).
171. *Id.* at 592.
172. A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE
STATE OF NORTH CAROLINA 60, 95 (Newbern 1792). *See* State v. Huntley, 25 N.C. 418, 422-23
(1843): "The offense of riding or going armed with unusual and dangerous weapons to the
terror of the people, is an offense at common law and is indictable in this state. A man may
carry a gun for any lawful purpose of business or amusement . . . . It is the wicked purpose,
and the mischievous result, which essentially constitute the crime."
173. A COLLECTION OF THE STATUTES, *supra* note 172, at 6, 398.
174. Act of 1768 *in* J. IREDELL, *supra* note 170, at 242.
175. Act of 1784, *in* J. IREDELL, *supra* note 170, at 587-88.
176. *See* H. POTTER, LAWS OF THE STATE OF NORTH CAROLINA (Raleigh 1821).
177. Act of 1741, *in* J. IREDELL, *supra* note 170, at 93.
178. Act of 1753, *in* J. IREDELL, *supra* note 170, at 152-53.
179. *Id.*

festly an attribute of free citizenship.

In 1786, people in the western part of North Carolina, an area which later became Tennessee, declared themselves independent. Calling their state "Franklin," these pioneers adopted a Declaration of Rights modeled on that of North Carolina, including the following provision: "That the People have a Right to bear Arms for the Defense of the State . . . ."[180] The people of Franklin complained of many injustices committed by the state of North Carolina, but complaints of violations of their freedoms guaranteed in the state bill of rights were not alleged.

Willie Jones, the draftsman of North Carolina's Declaration of Rights of 1776, became the architect of a Bill of Rights to the United States Constitution, which was proposed in 1787. The resulting federal Bill of Rights, urged by Jones and the anti-federalist majority in North Carolina's constitutional convention which he led,[181] further clarified their understanding of the right to bear arms as a fundamental, individual right.

The anti-federalist position at the North Carolina constitutional convention was well stated by William Lenoir, who warned of the powers of Congress: "They can disarm the militia. If they were armed, they would be a resource against great oppressions . . . . If the laws of the Union were oppressive, they could carry them into effect if the people were possessed of proper means of defense."[182] Inexplicably, these remarks would be referred to in 1942 as authority (without quoting them) for the claim that the second amendment guarantees a collective, state right to maintain a militia, but not an individual right to keep and bear arms.[183] On the contrary, Lenoir clearly equated all of the people with the militia, thereby asserting every individual's right to have the means of defense.

Recently, North Carolina's Declaration of Rights of 1776 has been cited for the proposition that most early state bills of rights only guaranteed a state militia, not an individual right to bear arms.[184] Yet the theoretician behind this Declaration was Richard

180. 22 STATE RECORDS OF NORTH CAROLINA 663 (W. Clark ed. 1907).
181. 2 R. CONNER, *supra* note 146, at 33.
182. 4 J. ELLIOT, DEBATES IN THE SEVERAL STATE CONVENTIONS 203 (1838).
183. Tot v. United States, 131 F.2d 261, 266 n.14 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463 (1943).
184. Comment, *Banning Handguns: Quilici v. Village of Morton Grove and the Second*

Caswell,[185] who upheld the right of every person "to be prepared with Weapons for his Defense."[186] Furthermore, the Declaration's draftsman was Willie Jones.[187] Jones concurred in changing North Carolina's provision, "that the People have a Right to bear Arms for the Defense of the State,"[188] to the proposed federal provision, "that the people have a right to keep and bear arms . . . ."[189]

Convention records show that Willie Jones sought "to introduce a resolution which he had in his hand, and which he was then willing to read if gentlemen thought proper, stipulating for certain amendments to be made previous to the adoption by this state."[190] Jones persuasively argued that the Constitution should not be adopted until a Bill of Rights was certain.[191] Over objections by federalists, the convention passed a Declaration of Rights which included: "That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state . . . ."[192]

The first proposition above, clearly independent of, but supported by, the second proposition, declared that there was, indeed, an individual right to keep and bear arms. The state right to maintain a militia was the subject of a separate proposed amendment: "That each state respectively shall have the power to provide for organizing, arming, and disciplining its own militia, whensoever Congress shall omit or neglect to provide for the same . . . ."[193]

North Carolina refused to adopt the United States Constitution until the adoption of a Bill of Rights appeared imminent.[194] The people of North Carolina considered their right to keep and bear arms as a fundamental, individual right guaranteed by both their state and federal constitutions.

---

*Amendment*, 60 WASH. U.L.Q. 1087, 1095 n. 30 (1982) ("North Carolina limits the right [to bear arms] to 'defense of the state' . . . .").

185. *See supra* note 163 and accompanying text.
186. *See supra* note 151 and accompanying text.
187. *See supra* note 163 and accompanying text.
188. *See supra* note 165 and accompanying text.
189. *See infra* note 192 and accompanying text.
190. 4 J. ELLIOT, *supra* note 182, at 216.
191. *Id.* at 226. *See also* 2 R. CONNER, *supra* note 146, at 42-43.
192. 4 J. ELLIOT, *supra* note 182, at 244. This is identical to the Virginia provision. 3 *id.* at 659.
193. 4 *id.* at 245. This, too, is identical with the Virginia proposal. 3 *id.* at 660.
194. 1 *id.* at 333.

## IV. VERMONT

### A. *Pistols for Their Defense: The Green Mountain Boys*

Keeping and bearing arms was not only an abstract right, but also a constant practice of Vermont's founding fathers. Led by Ethan and Ira Allen, the Green Mountain Boys sought independence first from New York, and later from Great Britain. In his detailed accounts of their exploits, Ira Allen vividly described the role of firearms in the hands of the people for purposes of defending the person and the incipient state.[195]

In his autobiography, Ira Allen chronicled a series of incidents initiated in 1772 when New York Governor Tryon, assisted by British troops, sought to dispossess Vermont's settlers of their lands.[196] In one of the first confrontations, Ira Allen and two friends were accosted by a group of Yorkers with Indian allies. "Capt. Baker had a cutlass, I. Vanornam a gun and I a case of pistols. These were all the arms we had; nevertheless, we determined to defend the ground."[197] The Green Mountain Boys were able to force the surrender of the larger group. Allen told the captured leader that he would have shot him if necessary to prevent "being a prisoner and tryed by the Supreme Court of New York by the acts of outlawry & c." Allen then demonstrated his marksmanship by shooting a small mark some distance away.[198]

Firearms were regularly carried for hunting game (such as deer and bear) and survival as well as for self-defense. On a typical outing, Allen recalled taking "six days provisions . . . a small pocket pistol, little horn of powder, and a hatchet of a small size . . . ."[199] The Allens sought to survey, purchase, and develop wilderness land, which conflicted with the plans of New York's governor and land jobbers. Before setting out to purchase land near the New York border, "Col. Ethan Allen, Capt. Remember Baker and myself armed with holsters and pistols, a good case of pistols each in our pockets, with each a good [sword] hanger . . . ."[200] Lodging with a Quaker during that journey, Ira Allen recalled:

---

195. *See generally* Ira Allen, *Autobiography* (1799), *in* J. WILBUR, IRA ALLEN: FOUNDER OF VERMONT, 1751-1814 (1928).

196. *Id.*

197. *Id.* at 17.

198. *Id.*

199. *Id.* at 31.

200. *Id.* at 39.

We took our pistols out of our holsters and carried them in with us. He looked at the pistols saying "What doth thee do with those things?" He was answered "Nothing amongst our friends," but we were Green Mountain Boys, and meant to protect our persons and property, and that of our friends on the New Hampshire Grants against the unjust claims of the land jobbers & c. of New York.[201]

Allen recorded similar events for the year 1773.

Exercise of the right to bear arms on the eve of the Revolution is further described in Ira Allen's *History of Vermont*.[202] In 1773, Ethan Allen and Eli Roberts unexpectedly met a dozen soldiers in a tavern. The soldiers knew that the New York governor had offered a reward for Allen's capture. "Thus situated, Allen called for liquor, and made merry with the serjeants, who observed that he and Roberts had each a gun and a case of pistols."[203] Thus deterred, the soldiers were outwitted later in the evening when Allen and Roberts pretended to go to bed without their guns, which the tavern owner slipped back to them, making good their escape.[204]

In early 1774, Col. Ethan Allen and Lt. Ira Allen learned of a Yorker plot to capture them, take them to the Poughkeepsie jail, and collect the reward. "The Colonel and Lieutenant armed, however for their defense, but they were not disturbed."[205] New York then passed an act, described by Ira Allen as "the most mandatory and despotic of anything which ever appeared in the British colonies," sentencing to death Green Mountain Boys who refused to surrender.[206] In response, Vermont town committees resolved that "our inhabitants hold themselves in readiness, at a minute's warning, to aid and defend such friends of ours, who, for their merit and attachment to the great and general cause, are falsely denominated rioters . . . ."[207]

While the Vermonters' friction with New York escalated, a broader conflict broke out when the armed colonists fought British troops at Lexington and Concord in April 1775. Only a few days

---

201. *Id.* at 40.
202. IRA ALLEN, NATURAL AND POLITICAL HISTORY OF THE STATE OF VERMONT (London 1798).
203. *Id.* at 43-44.
204. *Id.*
205. *Id.* at 49.
206. *Id.*
207. *Id.* at 50.

later, Ethan Allen led the Green Mountain Boys to capture Fort
Ticonderoga. Ira Allen described this feat of armed citizens as fol-
lows: "Thus, in a few days, at the commencement of hostilities be-
tween the British and the Americans, two hundred undisciplined
men, with small arms, without a single bayonet, made themselves
masters of the garrisons of Ticonderoga, Crown Point, and St.
Johns . . . *to the honour of the Green Mountain Boys*. It is to be
remembered, that this was the first offensive part taken against
Great Britain in the American revolution."[208]

### B.   *The Declaration of Rights of 1777*

During the year 1776, conventions and committee meetings
were held in Vermont to address primarily two issues: which means
of resistance should be used against the British, and the need to
secure land titles against New York claims. Vermonters petitioned
the Continental Congress, arguing that they had the same right of
independence from New York as America had from Britain.[209]

At a convention meeting in September 1776, Ira Allen and six
others formed a committee which had the task of establishing
objectives for Vermont.[210] The proposed objectives included the
following: "To regulate the Militia; To furnish troops according to
our ability, for the defense of the Liberties of the United States of
America."[211] The convention resolved "that each non-commis-
sioned officer and soldier immediately furnish himself with a good
gun with a Bayonet, sword or tomahawk . . . ."[212] According to
Allen's biographer, it was not uncommon that at conventions such
as this Ira Allen and his friends "were assigned to all important
committees and generally constituted a majority. No paper was
drawn that Ira Allen did not have opportunity to review. Indeed,
for ten years few if any state papers of Vermont were issued that
he did not prepare or assist in preparing."[213]

In January 1777, representatives of the towns of Vermont de-
finitively decided that Vermont should be a free and independent
state. It was established at the convention that the rights of all

---

208. *Id.* at 60.
209. *Id.* at 73-78.
210. J. WILBUR, *supra* note 195, at 85.
211. *Id.*
212. *Id.* at 87.
213. *Id.*

Vermont inhabitants "shall be considered to be such privileges and immunities to the free citizens and denizens, as are, or, at any time hereafter, may be allowed, to any such inhabitants of any of the free and independent states of America: And that such privileges and immunities shall be regulated in a bill of rights, and by a form of government, to be established at the next adjourned session of this convention."[214]

The constitutional convention which met July 2 through 8, 1777, had several models to choose from, but was predisposed toward that of Pennsylvania.[215] For several months, an address "To the Inhabitants of Vermont" by Dr. Thomas Young of Philadelphia had circulated, urging the Pennsylvania Constitution "as a model, which, with a very little alteration, will, in my opinion, come as near perfection as anything yet concocted by mankind."[216] Young, a friend of Ethan Allen, belonged to the Whig Society which also included James Cannon and Thomas Paine.[217] All three of these men had influenced the writing of the Pennsylvania Declaration of Rights.[218]

Among the provisions included in the Declaration of Rights adopted by the Vermont convention, which was taken verbatim from that of Pennsylvania, was the following: "That the people have a right to bear arms for the defense of themselves and the State; and, as standing armies, in the time of peace, are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power."[219] In a related provision, Vermont copied Pennsylvania in declaring "that the inhabitants of this State, shall have liberty to hunt and fowl, in seasonable times, on the lands they hold, and on other lands [not enclosed] . . . ."[220]

The above language clarifies what Vermont's founding fathers considered to be the fundamental character of the right to carry arms. To "bear arms" meant to possess guns, pistols, and swords

---

214. VERMONT STATE PAPERS 70 (Middlebury 1823).

215. DANIEL CHIPMAN, A MEMOIR OF THOMAS CHITTENDEN, THE FIRST GOVERNOR OF VERMONT 27 (Middlebury 1849).

216. REV. PLING H. WHITE, *Address on the Windsor Convention*, 1 COLLECTIONS.

217. B. KONKLE, GEORGE BRYAN AND THE CONSTITUTION OF PENNSYLVANIA 117 n.1 (Philadelphia 1922).

218. *Id.*

219. VT. CONST. art. I, § 15 (1777); PA. DEC. OF RIGHTS art. XIII (1776).

220. VT. CONST. art. XXXIX (1777); PA. CONST. art. I, § 43 (1776).

for defense of self and state or for hunting. Indeed, the framers of this provision carried a gun and a brace of pistols on their persons as a common practice. The phrase "for the defence of themselves" precludes any interpretation that "bear arms" was meant solely for the use of the militia, or that concern with standing armies or subordination of the military somehow limited the individual character of the right. Recognition of bearing arms to defend the state was more radical, since it justified action by armed private citizens to defend an incipient state from the constituted authorities of both New York and Great Britain.

Vermont's first constitution was framed in just six days, but it was not finally ratified until the convention reconvened on Christmas Eve of 1777. Ira Allen travelled over a hundred miles through winter snows to attend, and then retraced his steps after the convention appointed him to have the constitution printed and distributed so that elections could be held.[221]

Vermont adopted new constitutions twice more in the next two decades, but the right-to-arms provisions of the Declaration of Rights remained unaltered. The right to "bear arms" as an individual right for defense of self and state remained protected in the constitution of 1787.[222] That constitution became binding just before the federal constitutional convention met, and therefore prior to the next constitution, which was framed in 1793 and adopted in 1796.[223]

Vermont reenacted right-to-bear-arms provisions just before and just after the proposal and ratification of the federal second amendment. Further, Vermont was admitted by Congress into the Union on February 18, 1791, and thereby ratified the federal Bill of Rights before Virginia's ratification at that year's end made it binding. Vermonters could have only understood the second amendment "right of the people to keep and bear arms," as being "for the defence of themselves and the State," as their own state declaration of rights provided.

C. *Houses Into Arsenals: The Voyage of the Olive Branch*

Vermont, like Pennsylvania, had a Council of Censors which

---

221. J. WILBUR, *supra* note 195, at 11-12.
222. VT. CONST. art. I, § 18 (1787).
223. VT. CONST. art. I, § 16 (1796).

met periodically to determine whether violations of the constitution had occurred. Vermont's Council, also like Pennsylvania's, made no mention of alleged infringement on the right to bear arms.[224] Indeed, a review of the laws passed in the years 1779-1786 reveals that the only law on the books concerning firearms mandated, rather than restricted, arms.[225] The 1779 Act for Forming and Regulating the Militia required that all males between the ages of sixteen and fifty "shall bear arms, and duly attend all musters," and that "every listed soldier and other householder, shall always be provided with, and have in constant readiness, a well fixed firelock . . . or other good fire-arms . . . ."[226] The militia act of 1787 reiterated that every male shall "provide himself, at his own expense, with a good musket or firelock,"[227] and that horsemen "shall always be provided with . . . holsters with bear-skin caps, a case of good pistols, a sword or cutlass . . . ."[228]

Due to a lack of literature on the subject, what Vermonters understood as the fundamental right to keep and bear arms must be gleaned from the founders' personal accounts, the Declaration of Rights provision itself, and the above militia laws. Boundary disputes with New York and the Green Mountain state's claim to legitimacy are the subjects which dominate Vermont's political literature from the 1770's through the next two decades. Commentaries on matters such as the Declaration of Rights are virtually nonexistent, perhaps in part because the rights enumerated were taken for granted. Fortunately, Ira Allen, early Vermont's most prolific political writer, was involved in and recorded a series of events at the end of the century which further exemplify the perceived nature of the personal right to bear arms.

In 1796, as a Major-General of the Vermont militia, Ira Allen travelled to Europe for the purposes of selling his lands and purchasing large quantities of arms for distribution to militiamen. In Paris, he contracted with the French Directory to purchase 20,000 muskets and 24 field pieces. The arms were transported across the Atlantic on a ship called the *Olive Branch*. While en

224. *See Proceedings of the First and Second Councils of Censors, in* VERMONT STATE PAPERS, *supra* note 214.
225. *The Laws from the Year 1779 to 1786, Inclusive, in* VERMONT STATE PAPERS, *supra* note 214, at 307.
226. *Id.*
227. Statutes of the State of Vermont, Passed February and March 1789, 97 (1789).
228. *Id.* at 95-96.

route to New York, the *Olive Branch* was seized by the British as a war prize, France and England being at war. Allen was accused in the Court of Admiralty of seeking to instigate a Jacobin revolt against the British in Canada.[229]

Allen published numerous documents from the *Olive Branch* litigation, some of which exposit the people's militia system and the right to distribute, acquire, and possess arms in America. Allen declared that his purpose had been "to purchase arms in Europe for the use of the Vermont Militia, as a sufficient number of muskets for that purpose could not be procured in the United States. By the laws of Vermont, every male, from the age of sixteen to forty-five, is obliged to bear arms at their own expense . . . ."[230]

The prosecutor accused Allen of acquiring far more arms than necessary for the militia. Allen replied: "As each Militia man pays for his own musket, the deponent is convinced that he could have disposed to advantage of a much greater number than that by him contracted for . . . ."[231] Besides 30,000 men "able to bear arms" in Vermont alone, "each militiamen belonging to the said [United] States is bound to find his own musket or firelocks . . . and that by the laws of the States aforesaid . . . individuals are permitted to buy arms, and convey them into the said States . . . ."[232]

While conceding that a gunsmith who trades in arms may legitimately have a large quantity in his house, the prosecution disputed the right of an individual to possess arms for 20,000 men.[233] Creation of an independent army was said to be inconsistent with modern government.[234] Allen's counsel countered, by declaring that in America "individuals are allowed to purchase arms, that the Militia of each individual State are bound to find their own arms."[235] More precisely, "the law of America does require that such individual provide himself with arms."[236]

Private citizens are entitled to acquire and keep unlimited quantities of arms, counsel for Allen continued, because an armed

---

229. Ira Allen, Particulars of the Capture of the Olive Branch, Laden with a Cargo of Arms (London 1798).
230. *Id.* at 6.
231. *Id.* at 141-42.
232. *Id.* at 146.
233. *Id.* at 245.
234. *Id.* at 246.
235. *Id.* at 281.
236. *Id.*

populace is the sure foundation of a free state. "Government have nothing to fear from its Militia . . . . Arms and military stores are free merchandise, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government."[237]

The arms, which were restored to Allen in accordance with a Court order, were eventually sold through distributors in New York who then went bankrupt, leaving Allen without any of the proceeds.[238] Curiously, the end result was that the arms were indeed distributed to the American public, as Allen had planned.[239]

The legacy of Ira Allen, founding father of Vermont, symbolizes the understanding of the right to keep and bear arms in the early republic. This legacy included his constant exercise of this right by carrying pistols for self-protection, his participation in the adoption of the Declaration of Rights which explicitly recognized this right, and his purchase and eventual distribution of 20,000 muskets to the populace. Pistols in the pocket and an arsenal at home were options available to every free citizen of the Green Mountain State.

## V. MASSACHUSETTS

### A. *The Common Law Exposited*

The rights to keep and use arms to defend the home, and to carry and defend oneself with arms when outside the home, were extensively discussed in the Massachusetts courts on the eve of the revolution. These expostulations, which frequently arose in connection with conflicts between the colonists and the British, were set forth by the leading trial lawyers at the time, including James Otis, Josiah Quincy, and John Adams.[240] Not coincidentally, these figures were to play the leading roles in mobilizing American sentiment in favor of independence. The courtroom dramas in which these figures acted are preserved in the papers of John Adams, who generalized their scripts in the Massachusetts Declaration of Rights of 1780.[241]

---

237. *Id.* at 403.
238. *Id.*
239. *See* IRA ALLEN, THE OLIVE BRANCH (Philadelphia 1805).
240. 2 J. ADAMS, LEGAL PAPERS 106 (L. Wroth and H. Zobel eds. 1965).
241. *Id.*

The arguments of James Otis against writs of assistance before the Superior Court significantly influenced colonial opposition against British regulation,[242] and resulted in bills of rights rejecting general warrants and unreasonable searches and seizures.[243] As of 1761, general standing warrants entitled holders to enter any house by day and search for smuggled goods.[244] In the famous *Petition of Lechmere* case of 1761 Otis argued: "This Writ is against the fundamental Principles of Law. The Privilege of House. A Man, who is quiet, is as secure in his House, as a Prince in his Castle . . . ."[245]

According to Otis, there was only a single legislative precedent for general warrants: "No more than one instance can be found of it in all our law books, and that was in the zenith of arbitrary power, viz. In the reign of Car. II when Starchamber powers were pushed in the extremity . . . ."[246] It is significant that in 1662, in the reign of Charles II, the following interconnected acts were passed: a customs measure which allowed a "writ of assistance" to search and seize contraband;[247] a militia act providing for general warrants to search for arms;[248] and an act which allowed such warrants to search for unlicensed printed matter.[249] It is noteworthy that the colonists' revolt against the application of similar measures against themselves eventually resulted in the first, second, and fourth amendments.

Not all of the cases recorded by Adams were major political events, but nonetheless they reveal the status of the right to have arms at that time. In a 1765 custody dispute that got out of hand, an old widow fired at nighttime attackers who stormed her house. She was found not guilty of criminal assault for firing her gun at the intruders based on the following reasoning: "Officer must demand a peaceable Entry. Night Time not the Proper Time . . . . Threats before Hand . . . . Widow is wounded in the House of her fri[en]ds. The Report Defamation [sic] of keeping a Gun . . . . Re-

---

242. *Id.* at 116-17. Otis incorporated these arguments in his influential Rights of the British Colonies (1764). *Id.* at 118-19.

243. Mass. Dec. of Rights § 14; U.S. Const. amend. IV.

244. J. Adams, *supra* note 240, at 108.

245. *Id.* at 125.

246. *Id.* at 143.

247. 13 & 14 Car. 2, ch. 11, § 5(2) (1662).

248. *Id.*, ch. 3, § 14.

249. *Id.*, ch. 33, §§ 15, 19. These acts are discussed in J. Adams, *supra* note 240, at 108-09.

sisting the sham appearance of Authority is laudable. Fire the Gun."[250]

According to Adams, the 1769 case of *Rex v. Corbet* was very politically charged, involving asserted self-defense by American seamen armed with a fish gig, musket, hatchet, and harpoon against British impressment agents with musket, pistols, and cutlasses. Arguing justifiable homicide, Otis and Adams defended Corbet for gigging the British impressment officer who fired on the Americans.[251] Impressment being illegal,

> our next Enquiry must be what the Rules of the civil Law are, relative to Homicide in Cases of Self Defense. Self Preservation is first Law of Nature. Self Love is the strongest Principle in our Breasts, and Self Preservation [*the most important Duty*] not only our unalienable Right but our clearest Duty, by the Law of Nature. This Right and Duty, are both confirmed by the municipal Laws of every civilized Society.[252]

The impressers being trespassers and rioters, and the deceased having first fired a pistol in the face of Corbet, the latter "had an undoubted Right, not merely to make a push at Lt. Panton, but to have darted a Harpoon, a dagger thro the Heart of every Man in the whole gang."[253]

> The Killing of Lt. Panton was justifiable Homicide. Homicide se defendendo.

> I. Hawkins [PLEAS OF THE CROWN] 71. § [14], middle. "the killing of dangerous Rioters, by any private Persons, who cannot otherwise suppress them, or defend themselves from Them, inasmuch as *every private Person seems to be authorized by the Law to arm himself* for the Purposes aforesaid."[254]

---

250. 1 J. Adams, *supra* note 240, at 100-01.

251. Adams argued: "For if impresses are always illegal, and Lt. Panton acted as an Impress Officer, Michael Corbitt and his Associates had a right to resist him, and if they could not otherwise preserve their Liberty, take away his Life . . . . Nay I think that Impresses may be allowed to be legal, and yet Corbitt might have a Right to resist." 2 *id.* at 322.

252. *Id.* at 326. The argument continues: "2 Domat. [*Civil Law*] 638, § 6. 'He who is attacked by *Robbers*, or by *other Persons*, that are *armed in such a manner*, as to put him in *Danger of his Life*, in case he does not defend himself, may kill the Robber or the aggressor . . . ." *Id.*

253. *Id.* at 331.

254. *Id.* (emphasis added). *See id.* at 283 (same citation). In Rex v. Richardson, Josiah Quincy cited the same section from Hawkins about the right of "every private person . . . to

It befell John Adams and Josiah Quincy to defend British soldiers in the Boston Massacre trials of 1770, and the former began his argument with the famous words: "I am for the prisoners at the bar, and shall apologize for it only in the words of the Marquis *Beccaria*: 'If I can but be the instrument of preserving one life, his blessings and tears of transport, shall be a sufficient consolation to me, for the contempt of all mankind.' "[255] Interestingly, both prosecution and defense attorneys stipulated that the Bostonians had the right to arm themselves for self defense. The issue was whether the inhabitants or the soldiers were the aggressors.[256]

Samuel Quincy's argument for the Crown assumed the right of the populace to carry arms in public places when endangered by soldiers. When the soldiers sallied out "with clubs, cutlasses, and other weapons of death; this occasioned a general alarm; every man therefore had a right, and very prudent it was to endeavor to defend himself if attacked; this accounts for the reason of Dr. *Young* or any one inhabitant of the town having a sword that evening . . . ."[257]

John Adams quoted Hawkin's statement in *Pleas of the Crown* that "every private person seems to be authorized by the Law to arm himself" to verify that soldiers and inhabitants alike could be armed. Adams argued that the soldiers, many of whom were the subject of the townspeoples' contempt, had a right of "Self Defense, the primary Canon of the Law of Nature." Adams conceded, on the authority of Hawkins, that the populace had an equivalent right: "Here every private person is authorized to arm

---

arm himself," asserted that "a Man's house is his Castle and he may defend it," and generally expounded the law of justifiable homicide in self defense. *Id.* at 412-15, 421-23.

255. 3 *id.* at 242. Josiah Quincy also relied on Beccaria in the massacre trials. *Id.* at 231-32. It is noteworthy that Beccaria considered the carrying of arms, a right asserted by both prosecution and defense in these trials, to be conducive to preserving the lives of potential victims of assault. BECCARIA, ON CRIMES AND PUNISHMENTS 87-88 (H. Paolucci trans. 1963). Locke and Sidney, other defenders of the right of armed self-defense, were relied on by Quincy and Adams. J. ADAMS, *supra* note 240, at 240, 270.

256. J. ADAMS, *supra* note 240, at 149. Paine argued for the Crown that due to the abusive conduct of the soldiers, "the most peaceable among us had [*thought*] found it necessary to arm themselves with heavy Walking Sticks or Weapons of Defense when they went abroad." *Id.* at 274. Samuel Adams argued in the press that one of the slain "was leaning upon his stick when he fell, which certainly was not a *threatening* posture: It may be supposed that he had as good right, *by the law of the land*, to carry a stick for his own and his neighbor's defence, in a time of danger, as the Soldier who shot him had, to be arm'd with musquet and ball, for the defence of himself and his friend the Centinel . . . ." 2 J. ADAMS, WORKS 119 (1906).

257. J. ADAMS, *supra* note 240, at 84.

himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defense, not for offense, that distinction is material and must be attended to."[258]

It is significant that the court's charge to the jury also asserted the right and duty of private persons to have arms: "It is the duty of all persons (except women, decrepid persons, and infants under fifteen) to aid and assist the peace officers to suppress riots, & c. when called upon to do it. They may take with them such weapons as are necessary to enable them effectually to do it . . . ."[259]

Adams' reprinted legal papers contain two other cases on the right to have arms. In a 1771 assault case defended by Otis, Quincy, and Adams, Otis relied on the phrase "Orat. pro Milone beginning."[260] The editor of Adams' papers notes:

> When in 52 B.C. Titus Annius Milo stood trial for Clodius' murder, Cicero defended him . . . . The passage [in *Pro T. Annio Milone Oratio*] cited by Otis seems to be: "When arms speak, the laws are silent; they bid none to await their word . . . . And yet most wisely, and, in a way, tacitly, the law authorizes self-defense . . . . The man who had employed a weapon in self-defense was not held to have carried that weapon with a view to homicide."[261]

Similarly, in a 1773-74 case, Adams wrote: "An Englishmans dwelling House is his Castle . . . . [E]very Member of Society has entered into a solemn Covenant with every other that he shall enjoy in his own dwelling House as compleat a security, safety and Peace and Tranquility as if it was . . . defended with a Garrison and Artillery."[262]

The right to be armed for self-defense was vindicated by Adams and his contemporaries not only in the courts, but also in the press. As early as 1763, Adams wrote: "Resistance to sudden violence, for the preservation not only of my person, my limbs and life, but of my property, is an indisputable right of nature which I have never surrendered to the public by the compact of society,

---

258. *Id.* at 248. Extensive citations to English commentaries and cases on justifiable and excusable homicide are presented *id.* at 48, 83-84, 236-58, and 285-88.
259. *Id.* at 285.
260. 1 *id.* at 160.
261. *Id.* at n.16.
262. *Id.* at 137.

and which, perhaps, I could not surrender if I would. Nor is there anything in the common law of England . . . inconsistent with that right."[263] It is believed that John Adams or Josiah Quincy may have provided legal information for "A Journal of the Times," one of the most widely circulated newspaper serials in the pre-Revolutionary colonies.[264] Issues in 1769 referred to "the British subjects, to whom the *privilege* of possessing arms is expressly recognized by the Bill of Rights,"[265] and stated: "It is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defense; and as Mr. Blackstone observes, it is to be made use of when the sanctions of society and law are found insufficient to retain the violence of oppression."[266]

By the time of 1774-1775, General Gage was seizing muskets, pistols, and blunderbusses from the citizens of Boston and, when possible, in the provinces.[267] In past courtroom dramas, John Adams had defended the right of individuals to protect themselves with arms in the home against intruders and in the streets against soldiers. Now he anonymously defended in the papers the right of these same individuals to smuggle arms into the country for protection against the established government.[268] In one such column, Adams implored his readers: "Is it to be supposed, then, that the whole British navy could prevent the importation of arms and ammunition into America, if she should have occasion for them to defend herself against the hellish warfare that is here supposed?"[269] Adams also vindicated the right to band together into militias to oppose the royal militia. " 'The new-fangled militia,' as the specious Massachusettensis [a Tory writer] calls it, is such a militia as he never saw. They are commanded through the province, not by men who procured their commissions from a governor as a reward

---

263. Boston Gazette, Sept. 5, 1763, *reprinted in* 3 J. ADAMS, WORKS 438 (1851).

264. BOSTON UNDER MILITARY RULE ix (O. Dickerson compl. 1936).

265. Boston Evening Post, Apr. 3, 1769, at 1-2, *reprinted in* BOSTON UNDER MILITARY RULE, *supra* note 264, at 61.

266. New York Journal Supplement, Apr. 27, 1769, at 1, *reprinted in* BOSTON UNDER MILITARY RULE, *supra* note 264, at 79. The only other reference to the English Bill of Rights in this series stated: "The quartering troops upon British Americans, in time of peace, is quite repugnant to the Bill of Rights . . . ." *Id.* at 74.

267. *See, e.g.*, Virginia Gazette (Williamsburg), July 2, 1774, at 1, col. 3 (seizure of small arms on Boston Neck); R. FROTHINGHAM, HISTORY OF THE SIEGE OF BOSTON 95 (6th ed. 1903) ("No arms nor ammunition is allowed to pass."); J. GALVIN, THE MINUTE MAN 55, 102 (1967).

268. *See Novanglus* (1774), *in* 4 J. ADAMS, WORKS *supra* note 263, at 40.

269. *Id.*

for making themselves pimps to his tools . . . but by gentlemen, whose estates, abilities, and benevolence have rendered them the delight of the soldiers . . . ."[270]

It is clear that the personal right to keep arms in the home, to carry them in public, and to use them in either place for self-defense was deemed fundamental by Adams and his contemporaries. This individual right of armed self-defense was to be incorporated by Adams in the Massachusetts Declaration of Rights of 1780, and by Madison in the second and ninth amendments of the United States Constitution a decade later.

## B.  *The Declaration of Rights of 1780*

Following the rejection of a constitution which included no bill of rights by the populace in 1778, a convention was held the following year to frame a more acceptable constitution. The sub-committee charged with drafting the constitution included James Bowdoin, Samuel Adams, and John Adams.[271] While John Adams alone drafted the constitution and declaration of rights, presumably the three discussed the general concept. They probably compared other state bills of rights, some of which explicitly recognized the right to "bear" arms but none of which used the term "keep" arms. In earlier correspondence, Samuel Adams had mentioned "that we may all be soon under the necessity of keeping *Shooting Irons*."[272] Given his background of defending in the courts the right to keep arms in the home, John Adams would have needed no prompting to add "to keep and" to the phrase "bear arms." He also added "for the common defense" after these words, presumably because it was the right to bear arms for the common defense that the British had attempted to thwart when they had seized arms from both individuals and town arsenals.

As proposed by Adams, the arms guarantee read: "The people have a right to keep and bear arms for the common defense. And as, in time of peace standing armies are dangerous to liberty, they ought not to be maintained without the consent of the legislature; and the military power shall always be held in an exact subordination to the civil authority, and be governed by it."[273] While no pro-

---

270. *Id.* at 41.
271. 4 J. ADAMS, WORKS *supra* note 263, at 215-16.
272. S. Adams to Stephen Collins, Jan. 31, 1775, 3 S. ADAMS, WRITINGS 172 (1907).
273. *Compare* MASS. DEC. OF RIGHTS art. XVII (1780) with JOURNAL OF THE CONVENTION

vision caused as much controversy in Puritan Massachusetts as the freedom of religion guarantee, questions were also raised concerning the arms guarantee. "The Convention went into the consideration of the 18th article, (the subject military power), and after considerable debate, and expunging the word 'standing' before the word 'armies,' accepted the same . . . ."[274] It could be that some of the controversy may have revolved around "the common defense" as a possible restriction on the right to keep and bear arms. If so, proponents of the clause probably argued that the term was expansive and was meant to preclude any construction that arms could be used only for individual self-defense, a well recognized right, but not for common defense against despotism, a "right" the British government was resisting with its military might. Indeed, both private and general defense had already been recognized in article I of the Declaration, which included among the unalienable rights "defending their lives and liberties . . . and protecting property . . . ."[275] In light of the fact that the Massachusetts Constitution was the first in which the right not only to "bear," but also to "keep" arms was explicitly recognized, and considering John Adams' prior vindication of armed defense of person and home, it is clear that "the common defense" was not intended to limit the right to bear arms.[276]

---

FOR FRAMING A CONSTITUTION OF GOVERNMENT FOR THE STATE OF MASSACHUSETTS BAY (1779-1780) 41 (1832).

274. *Journal, supra* note 273, at 41. *See, e.g.*, 2 J. ADAMS, DIARY AND AUTOBIOGRAPHY 401 (1961). No records of debates were kept, although in the convention of 1820-1821 some members remembered the speeches of Samuel and John Adams in 1779. *See, e.g.*, JOURNAL OF DEBATES TO REVISE THE CONSTITUTION OF MASSACHUSETTS 430, 435 (1853).

275. MASS. DEC. OF RIGHTS art. I (1780).

276. The second sentence of art. XVII, concerning the danger of armies to liberty in time of peace and the subordination of military to civil authority, was commented on by ABBÉ DE MABLY, REMARKS CONCERNING THE GOVERNMENT AND THE LAWS OF THE UNITED STATES OF AMERICA: IN FOUR LETTERS, ADDRESSED TO MR. ADAMS 162-64 (1785) as follows:

> This law clearly and excellently points out, but does not prevent, the danger. Wherefore has it referred only to the times of peace? Is it because, during a state of war, armies are less disposed to remain under a subjection to the civil power . . . . The end of this law is vague and mutilated. The question is not that the army ought to continue in subordination to the civil power; for, such a truth is trivial; and it behoves the legislator to employ all possible means and measures, in order that this subordination, being once established, may exist, secure from every derangement . . . . These points neglected, the times will reproduce a Sylla, a Marius, a Caesar, a Cromwell, or a Valstein.

To this, Adams responded: "Abbé de Mably, though *right* in point of argument, *appears* to have set out upon a *wrong* principle. Surely, to declare that the military power shall *always* be holden in *exact subordination* to the civil authority and *governed* by it, is a provision equally and pointedly allusive to times of war and peace." After quoting pro-mili-

Even so, due to their having felt the impact of British disarm-
ing measures more than the other colonies, at least two towns ob-
jected to the clause as too narrow. The town of Northhampton
resolved:

> We also judge that the people's right to keep and bear
> arms, declared in the seventeenth article of the same declara-
> tion is not expressed with that ample and manly openness
> and latitude which the importance of the right merits; and
> therefore propose that it should run in this or some like man-
> ner, to wit, The people have a right to keep and bear arms as
> well for their own as the common defense. Which mode of
> expression we are of opinion would harmonize much better
> with the first article than the form of expression used in the
> said seventeenth article.[277]

Similarly, the town of Williamsburg proposed the following
alteration:

> Upon reading the 17th Article in the Bill of Rights.
> Voted that these words their Own be inserted which makes it
> read thus; that the people have a right to keep and to bear
> Arms for their Own and the Common defense.
>
> Voted Nemine Contradic.
> Our reasons gentlemen for making this Addition Are these.
> 1st that we esteem it an essential privilege to keep Arms in
> Our houses for Our Own Defense and while we Continue hon-
> est and Lawful subjects of Government we Ought Never to be
> deprived of them.
> Reas. 2 That the legislature in some future period may Con-
> fine all the fire Arms to some publick Magazine and thereby
> deprive the people of the benefit of the use of them.[278]

The Northhampton resolution would have made the provision

---

tia and anti-army provisions from other state constitutions, Adams concluded: "Even a
smaller quantity of plain and sterling sense would have proved sufficient to overthrow the
paradox in question." *Id.* at 162-63. Perhaps Mably provided the best response to the issue
when he wrote a few pages later: "You must expect that your people, of whom the laws have
so clearly established the sovereignty, may prove difficult to manage, because they will per-
ceive of their power. Armed in the defence of their country, they will become jealous of their
dignity . . . ." *Id.* at 166.

277. THE POPULAR SOURCES OF POLITICAL AUTHORITY: DOCUMENTS ON THE MASSACHU-
SETTS CONSTITUTION OF 1780 574 (O. & M. Handlin eds. 1966).

278. *Id.* at 624. *See id.* at 856 (the only other question raised about article XVII out of
all the towns).

more explicit by having the arms provision specifically recognize what was taken for granted, that arms could be kept and borne for individual self-defense. John Adams, draftsman of the Declaration, apparently deemed this unnecessary in view of the recognition accorded this right when articles I and XVII were read together and in view of common law. The fear expressed in the Williamsburg resolution about not being able to keep firearms in the home should they be relegated to a public magazine was unfounded in that the Massachusetts Declaration guaranteed the right "to keep," and not just to "bear" arms. Thus, the people would "keep" their firearms in the home, or "bear" them abroad, both for "the common defense" and for "defending their lives and liberties . . . and protecting property . . . ."[279]

Unlike the private right to have arms and most of the other rights mentioned in the Declaration, freedom of religion as guaranteed in article III was probably the most hotly debated proposal. In Massachusetts, free religion was clearly considered to be much less fundamental than firearms or printing presses. A review of the Boston *Independent Chronicle* for the year 1780 reveals bitter dispute on the religious issue.[280] In comparison, the unquestioned freedom to have arms was exemplified in the following advertisement appearing in that paper just a week before it announced the final adoption of the Massachusetts Constitution:

To be Sold
Jamaica Rum
and
Sugars
And 100 Pair
Horsemen's Pistols, neatly
mounted with Steel. Inquire of the Printer.[281]

Adams' intent in drafting the Declaration of Rights so as to protect the private right to keep and bear arms for both personal and common defense is further evident from his philosophical influences. After the convention ended, Adams sailed to Paris. One of his purchases there was a copy of Beccaria's *Dei delittie delle*

---

279. MASS. DEC. OF RIGHTS arts. I and XVII (1780).

280. The most extensive articles on the convention and the constitution were by William Gordon, in his series "To the Freemen of the Massachusetts Bay." References to Adams and the convention are included in the Independent Chronicle, May 4, 1780.

281. Independent Chronicle, June 29, 1780, at 4, col. 3. On approval of the Constitution, *see id.* July 6, at 4.

*pene*, an edition published in 1780. In his trial work a decade before, Adams had relied on the English translation of 1770.[282] He was fond of quoting Beccaria's adage that if he could save but one life, it would be worth the contempt of mankind.[283] Another of his favorite quotes was: "Every Act of Authority, of one Man over another for which there is not an absolute Necessity, is tyrannical."[284] It cannot be doubted, consistent with these two precepts, that Adams agreed further with Beccaria's concept of "false ideas of utility":

> The laws of this nature, are those which forbid to wear arms, disarming those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparitive importance? Does not the execution of this law deprive the subject of that personal liberty, so dear to mankind and to the wise legislator, and does it not subject the innocent to all the disagreeable circumstances that should only fall on the guilty? It certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder, as it requires less courage to attack armed than unarmed persons.[285]

Besides Beccaria, English philosophers of the preceding century and a half also strongly influenced the views of Adams and his contemporaries in regard to individual rights in general, and the personal right to be armed for defense of self and commonwealth in particular. Specifically, Adams wrote: "I had read Harrington, Sydney, Hobbs, Nedham and Lock, but with very little Application

---

282. Adams' copy of DEI DELITTLE DELLA PENE (Haarlem and Paris 1780) is among his books in the Boston Public Library. 1 J. ADAMS, DIARY AND AUTOBIOGRAPHY *supra* note 274, at 353 n.2, 442 n.23.

283. *See, e.g., id.* at 352. Of Adams' opening statement in the Boston Massacre trial of 1770, his son, John Quincy Adams, later reported "the electrical effect produced upon the jury and upon the immense and excited auditory, by the first sentence with which he opened his defense, which was [a] citation from the then recently published work of Beccaria." 2 J. ADAMS, WORKS 238-39 (1856).

284. 3 J. ADAMS, DIARY AND AUTOBIOGRAPHY *supra* note 274, at 194.

285. This is from one of John Adams' own copies of the work now located at the Boston Public Library Rare Book Collection. BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS 161-62 (London 1775). Adams' Coat of Arms and name appears on the first page, and the title page contains the following handwritten note: "Thomas B. Adams. From his Father. 1800."

to any particular Views: till these Debates in Congress and these
Interrogations in public and private, turned my thoughts to those
Researches, which produced . . . the Constitution of Massachu-
setts . . . ."[286]

It comes as no surprise that each of the five political theorists
cited by Adams as sources of the Massachusetts Constitution up-
held the citizen's right to keep, bear, and use arms. In his *Defense
of the Constitutions of Government of the United States*,[287] Ad-
ams endorsed the words of James Harrington: "The public sword,
without a hand to hold it, is but cold iron. The hand which holds
this sword is the militia of a nation . . . ."[288] "[A] government of
citizens, where the commonwealth is equal, is hardest to be con-
quered [because] . . . . such citizens, being all soldiers, or trained
up to *their* arms, which they use not for the defense of slavery, but
of liberty, [are] . . . the vastest body of a well-disciplined militia,
that is possible in nature . . . ."[289]

For Algernon Sidney, popular government meant that "the
body of the People is the public defense, and every man is armed
and disciplined . . . ."[290] The "summe of the Right of Nature,"
Thomas Hobbes postulated, is "by all means we can, to defend our
selves."[291] This is why, "when taking a journey, [a man] arms him-
self . . . and this when he knows there bee Laws . . . to revenge all
injuries shall bee done him . . . he rides armed . . . ."[292] John
Locke agreed that private persons "have a right to defend them-
selves and recover by force what by unlawful force is taken from
them . . . ."[293] Thus, the people never gave absolute power to the
legislator, for they would not "have disarmed themselves, and
armed him, to make prey of them when he pleases."[294]

---

286. J. ADAMS, DIARY AND AUTOBIOGRAPHY *supra* note 274, at 358-59.
    287. 1 J. ADAMS, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED
STATES OF AMERICA 163 (1787-1788).
    288. *See id.* at 164 ("The public sword, or right of the militia.").
    289. *Id.* at 168 (emphasis added). "The vast bodies of citizens in arms, both elders and
youth," characterized Harrington's true commonwealth. J. HARRINGTON, POLITICAL WORKS
696 (J. Pocock ed. 1977). "Men accustomed to their arms and their liberties will never en-
dure the yoke." *Id.* at 443. Sir Henry Vance the Younger, in an exposition of Harrington's
writings, defined "free Citizen[s]" in part as those who "have deserved to be trusted with
the keeping or bearing Their own Armes in the Publick defence." *Id.* at 109.
    290. A. SIDNEY, DISCOURSES CONCERNING GOVERNMENT 157 (1698).
    291. T. HOBBES, LEVIATHAN 88 (1964).
    292. *Id.* at 85.
    293. J. LOCKE, OF CIVIL GOVERNMENT 174 (1955).
    294. *Id.* at 114-15.

Adams' reference to Marchamont Nedham as a source of the Massachusetts Constitution is particularly significant in that Adams explicitly endorsed Nedham's ideal of an armed citizenry. While Adams refused to countenance the use of arms without popular support to dissolve government, he upheld the right of "arms in the hands of citizens, to be used at individual discretion, . . . in private self-defense, or by partial orders of towns . . . ."[295] In the following quotations from Nedham's *Right Constitution of a Commonwealth*,[296] Adams expresses his agreement with each proposition except the suggestion that the defeated monarchists may be disarmed:

> "That the people be continually trained up in the exercise of arms, and the militia lodged only in the people's hands, or that part of them which are most firm to the interest of liberty, that so the power may rest fully in the disposition of their supreme assemblies." The limitation to "That part most firm to the interest of liberty," was inserted here, no doubt, to reserve the right of disarming all the friends of Charles Stuart, the nobles and bishops. Without stopping to enquire into the justice, policy, or necessity of this, the rule in general is excellent . . . . One consequence was, according to [Nedham], "that nothing could at any time be imposed upon the people but by their consent . . . ." "As Aristotle tells us, in his fourth book of Politics, the Grecian states ever had special care to place the use and exercise of arms in the people, because the commonwealth is theirs who hold the arms: the sword and sovereignty ever walk hand in hand together." This is perfectly just. "Rome, and the territories about it, were trained up perpetually in arms, and the whole commonwealth, by this means, became one formal militia."[297]

In sum, each of the philosophical forebearers of the Massachusetts Declaration of Rights—Harrington, Sidney, Hobbes, Locke, and Nedham—upheld the right of the people at large to have and use arms. While Hobbes rejected any right of armed commoners to revolt against a monarch unless for reasons of self-preservation, the other four were inspirations for such revolts in 1688 and 1776. The use of arms for private self defense was absolutely unques-

---

295. 3 J. ADAMS, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA 471-72 (1787-1788).
296. *Id.*
297. *Id.* at 475.

tioned by all five. It must be concluded that the broad language of the Massachusetts Declaration was intended to embody the right to keep and bear arms for both individual "safety" and "common defense."[298]

## C. *The Perpetual Laws and the United States Constitution*

In the two decades which followed the adoption of the Massachusetts Declaration of Rights in 1780, no laws were passed to prohibit the individual use of firearms for lawful purposes. The use of "any offensive weapon" in a robbery was the first prohibition enacted in that period which specifically mentioned arms.[299] Shay's rebellion in September 1786 led to two arms-related acts. The first of these provided that "if any persons to the number of twelve, or more, being armed with clubs, or other weapons" gather, a justice of the peace or other official was empowered to order them to disperse within an hour.[300] The official could then "require the aid of a sufficient number of persons in arms, if any of the persons assembled as aforesaid shall appear armed . . . ."[301] The second such act declared:

> Whereas in a free government, where *the people have a right to bear arms for the common defense*, and the military power is held in subordination to the civil authority, it is necessary for the safety of the State that *the virtuous citizens thereof should hold themselves in readiness*, and when called upon, should exert their efforts to support the civil government, and oppose the attempts of factious and wicked men who may wish to subvert the laws and Constitution of Their country . . . .[302]

The enactments prompted by Shay's rebellion are significant in several respects. The first act imposed time limits on armed assemblies, but left unquestioned the individual bearing of weapons.

---

298. Mass. Dec. of Rights arts. I and XVII (1780).
299. An Act for the Punishment of Robbery (1785), *in* 1 The Perpetual Laws of the Commonwealth of Massachusetts, From the Establishment of its Constitution in the Year 1780, to the End of the Year 1800. 288 (1801).
300. An Act to Prevent Routs, Riots, and Tumultuous Assemblies (Nov. 8, 1876) *in* 1 Perpetual Laws *supra* note 299, at 346.
301. *Id.*
302. An Act for the More Speedy and Effectual Suppression of Tumults and Insurrections in the Commonwealth (Feb. 20, 1787) *in* 1 Perpetual Laws *supra* note 299, at 366 (emphasis added).

The second is expository of the meaning of the Declaration of
Rights guarantee of "the right of the people to keep and bear arms
for the common defence."[303] This clause means that the citizens
should be prepared to oppose the "wicked," hence the right of all
the good citizens to "keep" arms. Shay's rebellion also prompted,
in May 1787, the convening in Philadelphia of the constitutional
convention.

When the United States Constitution was debated in the Mas-
sachusetts convention, the only statements made on the subject in-
dicate that keeping and bearing arms was viewed in that state as a
right of all the citizens. Fears of standing armies were groundless,
affirmed Theodore Sedwick, who queried, "[I]f raised, whether
they could subdue a nation of freemen, who know how to prize
liberty, and who have arms in their hands?"[304] The understanding
in that convention that no peaceable citizens could rightfully be
disarmed, and of the perception in Massachusetts a year and a half
later that Madison's proposed federal Bill of Rights reflected this
ideal, was to be expressed as follows:

> It may be well remembered, that the following "amend-
> ments" to the new constitution for these United States, were
> introduced to the convention of this commonwealth by its
> present Lieutenant-Governor, that venerable patriot, SA-
> MUEL ADAMS.—It was his misfortune to have been miscon-
> ceived, and the proposition was accordingly withdrawn—lest
> the business of the convention (the session of which was then
> drawing to a period) might be unexpectedly protracted . . . .
> To the honor of this gentleman's penetration, and of this just
> way of thinking on this important subject, every one of the
> intended alterations, but one, have been already reported by
> the committee of the House of Representatives in Congress,
> and most probably will be adopted by the federal legislature.
> In justice therefore to that long tried Republican, and his nu-
> merous friends, you gentlemen, are requested to re-publish
> his intended alterations, in the same paper, that exhibits to
> the public, the amendments which the committee have
> adopted, in order that they may be compared together . . . .
>
> "*And that the said constitution be never construed* to
> authorize Congress to infringe the just liberty of the Press, or
> the rights of Conscience; or *to prevent the people of the*

---

303. MASS. DEC. OF RIGHTS art. XVII (1780).
304. 2 J. ELLIOT, DEBATES IN THE SEVERAL STATE CONVENTIONS 38 (1836).

> *United States who are peaceable citizens, from keeping their*
> *own arms;* or to raise standing armies, unless when necessary
> for the defence of the United States, or of some one of them;
> or to prevent the people from petitioning in a peaceable and
> orderly manner, the federal Legislature, for a redress of griev-
> ances; or to subject the people to unreasonable searches and
> seizures of their persons, papers, or possessions."[305]

The understanding in Massachusetts that what became the
second amendment protected personal rights is further confirmed
by the publication on the front page of the special July 4, 1789
issue of the Boston *Massachusetts Centinel* of Tench Coxe's ex-
planation that to prevent tyranny, "the people are confirmed by
the next article in their right to keep and bear their private
arms."[306] No one disputed this explanation or provided any alter-
native interpretation of the proposed amendment. The Massachu-
setts Declaration of Rights of 1780 was the first such state docu-
ment to refer to the right to "keep" arms, a term now incorporated
in the proposed federal Bill of Rights. The United States Senate
rejected, however, a proposal to add, after "to keep and bear
arms," the words "for the common defense,"[307] which appeared in
the Massachusetts Declaration. While the Senate probably rejected
the latter phrase out of fear that such words would lead to a re-
stricted interpretation of the right to bear arms, the right was not,
as a matter of fact, narrowly construed in Massachusetts.

A review of pertinent statutes enacted through the remainder
of the century further confirms the fact that keeping and bearing
arms was viewed in Massachusetts as a fundamental right and
even a duty. The enrollment of "each and every free able bodied
white male citizen" of ages 18-45 was required by the militia act,[308]
which provided: "Each horseman shall furnish himself with . . . a
pair of pistols,"[309] and each infantryman "shall constantly keep
himself provided with a good musket . . . or with a good rifle
. . . ."[310] By contrast, "each company of artillery shall be provided

---

305. *From the Boston Independent Chronicle*, Philadelphia Independent Gazetteer,
Aug. 20, 1789, at 2, col. 2 (emphasis added).
306. Coxe, *Remarks on the First Part of The Amendments to the Federal Constitu-
tion*, Boston Massachusetts Centinel, July 4, 1789, at 1, col. 2.
307. Sam A. Otis, Senate Journal 1 (Virginia State Library, Executive Communica-
tions, Box 13 Sept. 9, 1789).
308. Militia Act (1793) *in* 2 Perpetual Laws *supra* note 299, at 172-173.
309. *Id.* at 178.
310. *Id.* at 181.

with two good field pieces . . . ."[311] Thus, individuals furnished
themselves with the kinds of "arms" that they could "keep and
bear," i.e., pistols, muskets, and rifles, while the commonwealth
provided heavier armament.

While no one thought of prohibiting the keeping or carrying of
arms for lawful purposes, the legislature reenacted the Statute of
Northhampton[312] so as to incorporate the common law construc-
tion of that ancient law. The enactment provided:

> That every Justice of the Peace . . . may cause to be
> staid and arrested, all affrayers, rioters, disturbers, or break-
> ers of the peace, and such as *ride or go armed offensively, to
> the fear or terror of the good citizens of this Commonwealth,*
> or such others as may utter any menaces or threatening
> speeches, and . . . shall require of the offender to find surities
> for his keeping the Peace, and being of good behavior . . . .[313]

This enactment reflects the interpretation of the ancient statute in
the case of *Rex v. Knight*[314] that going about in public armed with
pistols, absent "*malo animo* [bad purpose]"[315] or a specific intent
"to terrify the King's subjects,"[316] was justifiable in view of the
"general connivance to gentlemen to ride armed for their security
. . . ."[317] The enactment again vindicated a person to "ride or go
armed" defensively, with no intent to cause fear or terror to the
citizens.[318]

### D.  *Their Right to "Keep" Arms: The Letter to John Adams*

In 1823, William H. Sumner published a lengthy letter to John
Adams entitled *The Importance of the Militia to A Free Common-
wealth.*[319] While this was over four decades after the adoption of
the Massachusetts Declaration of Rights, it was endorsed by Ad-

---

311. *Id.* at 178.
312. 2 Edw. III, ch. 3 (1328).
313. Act of Jan. 29, 1795 *in* 2 PERPETUAL LAWS *supra* note 299, at 259.
314. 90 Eng. Rep. 330 (K. B. 1686).
315. *Id.*
316. 87 Eng. Rep. 75, 76 (1686).
317. 90 Eng. Rep. at 330.
318. Indeed, the law required the citizens to participate in suppressing crime. *See* An
Act for Keeping Watches and Wards in Towns (1796) *in* 2 PERPETUAL LAWS *supra* note 299,
at 409. ("[A]ll male persons of the age of eighteen or upwards . . . shall . . . be liable to
watch and ward."). *Id.*
319. W. SUMNER, AN INQUIRY INTO THE IMPORTANCE OF THE MILITIA TO A FREE COMMON-
WEALTH IN A LETTER . . . TO JOHN ADAMS . . . WITH HIS ANSWER 1 (Boston 1823).

ams, the framer of that declaration, and is perhaps the clearest exposition of the concept of a militia to that generation. It is also worthy of scrutiny as representative of the relation between private keeping of arms and a free commonwealth as viewed in Massachusetts.

The militia is, simply put, "essential to the preservation of our civil rights."[320] Begun by the pilgrims who provided their own arms, it alone had provided security for religious freedom.

> The militia is intended for defense only; standing armies for aggression, as well as defense. The history of all ages proves that large armies are dangerous to civil liberty. Militia, however large, never can be, for it is composed of citizens only, armed for the preservation of their own privileges.[321]

This is why the militia principle is that "the people should defend their own homes; not that they should be called away to the defense of others."[322]

According to Sumner, the terrain of the country and the existence of arms in every household made militia operations peculiarly favorable:

> An enemy would be always unwilling to invade such a territory; but notwithstanding, if its population, like that of Europe, chiefly consisted of an unarmed peasantry, and its whole reliance was on its regular army, one pitched battle would decide its fate. But a country of well trained militia-men is not conquered when its army is beaten . . . . Here, every house is a castle, and every man is a soldier. Arms are in every hand . . . .[323]

This statement is particularly revealing as to the understanding of the Declaration of Rights' guarantee to the people to "keep" arms. The home as the castle was protected by its inhabitants' arms from both individual and collective aggression. Arms kept at the home for the common defense were simultaneously readily accessible for defense of life from private intruders. Thus, the centuries old castle doctrine was blended with the armed populace concept to justify having arms "in every hand" for both private and

---

320. *Id.* at 4.
321. *Id.* at 7-8.
322. *Id.* at 16-17.
323. *Id.* at 21.

*The Right to Bear Arms*

common defense.

Not only should the militia be effectively armed, but the states had a constitutional obligation to train them.[324] A military force consisting mostly of young men promotes corruption, while the training in each locality of all age groups and occupations is conducive to preservation of civil liberty.[325] Indeed, Sumner contended that growing urbanization required that all be continuously trained to arms, which required that they keep arms at home:

> By another proposition, all hope of making the militia efficient, as corps, is relinquished; the trainings are to be discontinued; . . . and rifles and powder horns are to be furnished to the citizens, and the whole militia turned into sharp-shooters.

> It is true, that it is better that the arms should be kept by the men themselves, at their own dwellings, than in the public arsenals. They thus learn to take care of them, at least; and as opportunities for hunting and practical shooting offer, they improve as marksmen. But few boys would learn their catechisms, if the books which contained them, were to be found in the public libraries, only; and but few men would be familiar with the use of arms, which were not kept in their own possessions.

> But the plan, if it be viewed in a military light only, will be found to be of partial use, and will operate almost exclusively for the benefit of the foresters, who would thus be supplied with rifles at the public expense. But where the country is settled, the general use of arms is given up; and, as the forests are cleared, drilling becomes necessary as a substitute for that habitual exercise of shooting at game, which has obtained for Americans the reputation of being the best riflemen in the world. If this be not required in the populous parts of the country, the backwoodsmen alone will be able to defend themselves as none others will be accustomed to the use of the arms with which they are to be furnished.[326]

The ideal of a whole people, each member of which exercised in the arms he kept at home, was basic to the founding fathers,

---

324. *Id.* at 31. Sumner refers to U.S. CONST. art. I, § 8 for this proposition.

325. W. SUMNER, *supra* note 319, at 38.

326. *Id.* at 39-40. Sumner indicated that the plan had been supported in the national legislature, and that the debates thereon had affected public opinion on the subject.

who grafted it into the constitutions they adopted. "The founders of our political constitutions anticipated its influence in support of civil government. They acted on the principle, which will stand the test of ages, that 'a militia is the only safe defence of a free state.' "[327] Sumner also recalled "the language of the bill of rights, proposed by the Virginia convention, . . . 'a well regulated militia, composed of the body of the people, trained to arms, [i]s the proper, natural, and safe defence of a free state . . . .' "[328] In sum: "The militia is an institution which unites, in itself, the power effectually to preserve the public peace, the public order, and the public liberty, without endangering either."[329]

In his answer to Sumner's letter, John Adams wrote:

> I thank you for the privilege of hearing read your manuscript dissertation concerning the militia . . . . It is so conformable to all my opinions concerning it from my cradle, that it seemed to be living my life over again . . . .
>
>    . . . The American states have owed their existence to the militia for more than two hundred years. Neither schools, nor colleges, nor town meetings have been more essential to the formation and character of the nation than the militia . . . . Impose its constitution by every prudent means, but never destroy its universality. A select militia will soon become a standing army . . . . Whenever the militia comes to an end, or is despised or neglected, I shall consider this union dissolved, and the liberties of North America lost forever.[330]

## CONCLUSION

As the above demonstrates, the arms guarantees of the four state bills of rights which preceded the federal second amendment were intended to protect the right to keep arms and to bear arms individually for self-defense and in groups for militia purposes. Not one law was on the books at that time which prohibited the keeping or carrying of arms in any manner. The right of the citizen to have personal weapons was deemed fundamental and unques-

---

327. *Id.* at 53. (militia concept supported by "the Adams, Hancock, Washington, Henry, Madison, Monroe, Jay, Hamilton, King, Randolph, Marshall, Pendleton, Rutledge, and a hundred others . . . .") *Id.* at 58.

328. *Id.* at 63.

329. *Id.*

330. *Id.* at 69-70.

tioned, in contrast with free press and religious issues which sparked much controversy and disagreement.

While one would imagine that the gun control debate presently being waged in this country would have generated scholarly research on the intent of the framers of America's first right-to-bear-arms provisions, no other article has, as of yet, contained such an analysis based on original records. Nonetheless, sweeping generalizations have been made about the subject in partisan writings.

One recent law review case comment which explicitly endorses the banning of handguns asserts: "In all the writings on the Revolutionary War and the turbulent times preceding it, there is no evidence showing that the colonists or their revolutionary leaders believed that they had a personal right to carry firearms, nor that the British were violating a personal right to carry firearms."[331] This is a rather hasty conclusion by a law student who relied on secondary sources which failed to substantiate the allegation. The article continues:

> Only four states make any reference in their bills of rights to a right to bear arms. North Carolina limits the right to "defense of the state," while Massachusetts provides the right for "the common defense." Only Pennsylvania and Vermont grant the people the right to bear arms for "themselves and the state."[332]

That "only" four states had arms guarantees is not surprising in that four of the first constitutions (Georgia, South Carolina, New Jersey, and New York) contained no bills of rights, and two other states (Connecticut and Rhode Island) adopted no constitutions or bills of rights at all until the nineteenth century.[333] Moreover, the right to keep and bear arms went unquestioned in each and every one of the independent states.

In another recent article, Professor Lawrence Cress argues that the people's "right to bear arms for the defense of themselves and the state" protected only a duty to do militia service: "Only the citizenry, trained, armed, and organized in the militia, could be depended on to preserve republican liberties for 'themselves' and

---

331. Comment, *Banning Handguns: Quilici v. Village of Morton Grove and the Second Amendment*, 60 Wash. Univ. L.Q. 1087, 1093 (1982). "As a nation, we must attempt to live without handguns." *Id.* at 1112.

332. *Id.* at 1095.

333. R. Rutland, The Birth of the Bill of Rights, 1776-1791 at 49 n.1 (1962).

to ensure the constitutional stability of 'the state.' "[334] He fails to cite any original records to substantiate this proposition.

Regarding the arms guarantee in the Massachusetts Declaration of Rights, Cress states: "By 'the people,' John Adams meant the militia."[335] The implication from this is that today only the members of the National Guard may bear arms. This ignores the fact that Adams explicitly rejected the concept of a select militia and endorsed a general militia of the whole people.[336] Cress does refer to a work by Adams which supports the idea that "the public sword" should be held by the militia,[337] but disregards the fact that in the same work Adams supported the right of "arms in the hands of citizens, to be used at individual discretion, . . . in private self-defense . . . ."[338]

Cress cites no original source to substantiate his conclusion that "for eighteenth-century Americans 'to bear arms' meant militia service" exclusively,[339] or that there are only a few hints "that Americans may have viewed bearing arms as an individual right."[340] Like the Massachusetts Supreme Judicial Court which relied on similar secondary sources which in turn utterly fail to rely on pertinent original records,[341] Cress found no historical support for his interpretation of the first state arms guarantees.

The previous remark that "only" four states had bills of rights with arms guarantees carries with it the implication that the right was not considered fundamental. In fact, the right was unquestioned in every state regardless of whether a specific constitutional provision existed. In Virginia, Jefferson proposed a bill of rights which included the following: "No freeman shall ever be debarred the use of arms."[342] The convention adopted the bill of rights

---

334. L. Cress, *An Armed Community: The Origins and Meaning of the Right to Bear Arms*, 71 J. Am. Hist. 22, 29-30 (June 1984).

335. *Id.* at 30.

336. *See supra* notes 327-330 and accompanying text.

337. L. Cress, *supra* note 334, at 30 and n.18.

338. 3 J. Adams, A Defence of the Constitutions of Government of the United States of America 475 (1787-88).

339. L. Cress, *supra* note 334, at 30.

340. *Id.* at 34.

341. Commonwealth v. Davis, 369 Mass. 886, 343 N.E.2d 847 (1976).

342. 1 Jefferson, Papers 344-45 (Boyd ed. 1951). Jefferson was impressed with Beccaria's argument in support of the utility of carrying arms for self defense, which Jefferson copied in his Commonplace Book 261 (G. Chinard ed. 1926). The quote appears in John Adams' copy of Beccaria, An Essay On Crime and Punishment 161-62 (London 1775).

drafted by George Mason instead, and it recognized "a well regulated Militia, composed of the Body of the People, trained to Arms . . . ."[343] Neither draft contained a free speech guarantee. Proponents of a federal Bill of Rights in the Virginia convention of 1788 were led by Patrick Henry, who held that "the great object is, that every man be armed . . . ."[344]

Maryland and Delaware, the two remaining states to adopt declarations of rights, did not specifically include arms guarantees, but neither did they include a general right of free speech.[345] Yet both recognized a well regulated militia,[346] which was composed of all the freemen, who were self-armed.[347]

South Carolina's Constitution of 1776 included no bill of rights, but there were other indications that the people of South Carolina considered the individual right to bear arms fundamental. For example, South Carolina's preamble to the constitution of 1776 made reference to the fact that in Massachusetts "unarmed people were wantonly robbed and murdered by General Gage's troops."[348] Further, North Carolina's own Chief Justice of the Supreme Court "always had about his person, a dirk and a pair of pocket pistols; for the defense of his life . . . ."[349]

Similarly, the New York Constitution of 1777 contained no bill of rights, but its framers would insist a decade later that the federal Constitution include such provisions as: "That the people have a right to keep and bear arms . . . ."[350] In addition, the members of the constitutional convention in New York "were obliged to go

---

343. Va. Dec. of Rights art. XIII (1776).

344. 3 J. Elliot, *supra* note 182, at 386.

345. *See* Md. Dec. of Rights art. VIII (1776) (free speech guaranteed only in the legislature).

346. Md. Dec. of Rights art. XXV; Del. Dec. of Rights art. XVIII (1776).

347. *See, e.g.*, Proceedings of the Convention of the Province of Maryland 7 (Annapolis 1775); Proceedings of the Convention of the Delaware State 40 (Wilmington 1776).

348. Extracts From the Journals of the Provincial Congress 137-38 (Charles-Town 1776).

349. 1 J. Drayton, Memoirs of the American Revolution 378 (Charleston 1821).

350. 1 J. Elliot, *supra* note 182, at 328. As Robert Yates explained, the omission of a bill of rights in the state constitution in no way empowered the government to infringe on any rights, but this would not excuse lack of a federal Bill of Rights. Sidney [R. Yates], *To the Citizens of the State of New York*, The New York Journal, and Daily Patriotic Register, June 13, 1778, at 2, cols. 1-2. New York federalists countered that armed citizens could overpower a federal military establishment and a Bill of Rights was unnecessary. *E.g.*, The Federalist No. 29, at 184-85 (A. Hamilton) (Arlington House ed. n.d.).

armed, so as to protect themselves from stray marauding parties
. . . ."[351] Rhode Island,[352] which did not adopt a constitution,
much less a bill of rights, until 1842,[353] agreed with New York that
the federal Constitution should contain a provision which guaran-
teed to the people the right to bear arms. Likewise, while New
Hampshire's Constitution of 1783 included no arms guarantee,
that state insisted that a federal Bill of Rights provide that "Con-
gress shall never disarm any citizen, unless such as are or have
been in actual rebellion."[354]

The hastily drafted constitutions of New Jersey of 1776 and
Georgia of 1777 contained no bills of rights,[355] and Connecticut
adopted no constitution or bill of rights until 1818.[356] Like the
other states, however, these three provided for militias composed
of all citizens, who were self-armed. There was not a law on the
books in any of the states which interfered with the keeping or
bearing of arms by free citizens,[357] and this right was understood
and deemed fundamental despite the lack of a state bill of
rights.[358]

The single most dramatic abuse by the British which
prompted the adoption of the state and federal arms guarantees
was the seizures of privately owned arms in Boston. All of the colo-
nies, regardless of whether they later adopted an arms guarantee,
expressed their abhorrence of these seizures which were instigated
by General Gage. According to the Declaration of Causes of Taking
up Arms, when Bostonians were promised that they could leave
town after they deposited their arms with their own magistrates

[t]hey accordingly delivered up their arms; but in open viola-

---

351. T. Roosevelt, Gouverneur Morris 51 (Boston 1898).

352. 1 J. Elliot, *supra* note 182, at 335.

353. R. I. Const. art. I, § 22 (1842) stated: "The right of the people to keep and bear
arms shall not be infringed."

354. 2 B. Schwartz, The Bill of Rights 761 (1971).

355. *See* C. Erdman, The New Jersey Constitution of 1776 32-36 (Princeton 1929);
*see generally* The Constitution of the State of Georgia (Savannah 1777) (includes con-
vention minutes).

356. As adopted, Conn. Const. art. I, § 17 (1818) provided: "Every citizen has a right to
bear arms in defense of himself and the State."

357. *See, e.g.,* State v. Howard, 125 N.J. Super. 39, 308 A.2d 366 (1973). New Jersey's
first prohibition on carrying concealed weapons was not enacted until 1905. *Id.*

358. Nunn v. State, 1 Ga. 243 (1846). "These instruments [state constitutions] confer
no *new rights* on the people which did not belong to them before. When, I would ask, did
any legislative body in the Union have the right to deny to its citizens the privilege of keep-
ing and bearing arms in defense of themselves and their country?" *Id.* at 249.

tion of honour, in defiance of the obligation of treaties, which even savage nations esteemed sacred, the Governour ordered the arms deposited as aforesaid, that they might be preserved for their owners, to be seized by a body of soldiers . . . .[359]

If no individual right to keep and bear arms exists today, the primary barrier against the prohibition and seizure of firearms would be removed. There are some law review writers and even courts who would rewrite history to remove any individual-rights nexus to constitutional arms guarantees, in order to uphold gun bans of various types. Historical facts overwhelmingly demonstrating the intent of the constitutions' framers to protect individual rights are to be consigned to the Orwellian "memory hole." Legal articles and judicial opinions which deny that the right to keep and bear arms is a fundamental, personal right have no historical foundation, but rather are based on bare assertion to reach a preconceived result.

Regarding the four original states with arms guarantees, the above scenario has been followed only in Massachusetts with the judicial abrogation of the arms guarantee and the legislative imposition of a one year mandatory period of incarceration for exercise of a constitutional right. By contrast, in Pennsylvania, Vermont, and North Carolina, the state courts have interpreted the arms guarantees in accord with the intents of the respective framers. The varying decisions reached in these four states are representative of the diverse decisions being reached by the courts of all the other states and even the federal courts.

Clearly, some groups wish that a constitutional right to keep and bear private arms did not exist. Firearms ownership and possession, they contend, have no place in modern society aside from police use. Yet such groups have been unable to amend any consti-

---

359. Passed by the Continental Congress, the Declaration was published throughout the colonies. An example of the colonists' outrage is contained in the Connecticut Courant (Hartford), which published the above Declaration, extensive minutes of the meetings between Gage and Boston Selectmen, and the following poem entitled "Tom Gage's Proclamation":

> That whoseoe'er keeps gun or pistol I'll spoil the motion of his systole; Or, whip his breech, or cut his weason, As has the measure of his Treason: — But every one that will lay down His hanger bright, and musket brown, Shall not be beat, nor bruis'd, nor bang'd, Much less for past offenses, hang'd; But on surrendering his toledo, Go to and fro unhurt as we do; —
>
> Meanwhile let all, and every one Who loves his life, forsake his gun . . . .

Connecticut Courant, July 7, 1775, at 2, col. 1.

tution to repeal an arms guarantee.

As the bicentennial of the federal Constitution approaches, it remains to be seen to what extent the charter of liberty of that document will be preserved as intended. Rights vary in popularity from time to time, and if the currently unpopular right to keep and bear arms will be preserved, it will probably be through reliance on and understanding of the state bills of rights.