# Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion for Summary Judgment

## Exhibit 6
### *Firearms Law and the Second Amendment*

CHAPTER 3

# THE COLONIES

The movement toward independence dates from the very foundation of the colonies.
*George Louis Beer, British Colonial Policy, 1754-1765, at 161 (1907)*

This Chapter examines the role of arms in the development of a distinctive American identity, and how independence became inevitable as the British immigrants became Americans. Part A discusses colonial charters, which contained the first written guarantees of arms rights in the English-speaking world. Part B covers arms laws in the colonies—who was required to own or carry arms, and who was forbidden to do so. Like the charters, many colonial statutes made a sharp break from English law. Part C studies the relationships of Indians with the European colonial powers and with the American colonists; Indians could be powerful allies or formidable adversaries. European-Americans' copying of Indians changed the arms cultures of the colonists into something new. Part D examines the political and moral understanding of personal and collective self-defense in the colonial period, especially in the years leading up to the American Revolution. Part E surveys the unique arms culture that grew in America, including the prevalence of arms among the colonists; the types of arms the colonists owned and how the circumstances in the New World shaped those choices; and how the American colonial militias differed from the English model. Long before the official rupture with Great Britain, the colonists had become a new people—American and not British.

## A.   ARMS RIGHTS IN COLONIAL CHARTERS

The first English settlers in North America founded the Virginia colony in 1607.[1] When they crossed the Atlantic, they brought with them perpetual guarantees of their arms rights. On April 10, 1606, King James I granted a charter to the Virginia Company to create two colonies. The charter set forth the reciprocal rights and responsibilities of the colonists and the king. For example, the colonies were allowed to coin money—something that local governments in England had no right to do. 7 Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3783, 3786 (Francis Newton Thorpe ed., 1909).

---

1.  Not counting the short-lived colony at Roanoke Island, North Carolina, in 1585.

The king, binding his "Heirs and Successors," gave "full Power and Authority" to the leaders of the Virginia Company and "so many of our subjects as shall willingly accompany them," for all of them to bring:

> sufficient Shipping, and Furniture[2] of Armour, Weapons, Ordinance, Powder, Victual, and other things necessary for the said Plantations and for their Use and Defence there: Provided always, that none of the said Persons be such, as shall hereafter be specially restrained by Us, our Heirs or Successors.

*Id.* The English crown perpetually guaranteed to allow the Virginia Company's leaders and "their Associates . . . by their Deputies, Ministers, and Factors,"[3] to import goods from England, Ireland, and other royal dominions. In particular, "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel,[4] Food, Defence or otherwise." For the first seven years, there would be no taxes on these Virginia-bound exports. *Id.* at 3787-88. Although the English who lived in England had no written guarantee of arms rights until the 1689 English Bill of Rights (*see* Ch. 2.H.4), the Virginians had their guarantees from the start: to bring arms for their use and defense, and to import arms for "defence or otherwise"—such as hunting.

The colonies had the right "from time to time, and at all times forever hereafter, for their several Defences," to "encounter, expulse, repel and resist, as well by Sea as by Land, by all Ways and Means whatsoever," any persons who should attempt to inhabit the colonies without permission, or anyone who attempted "the Hurt, Detriment, or Annoyance of the said several Colonies or Plantations." *Id.* at 3787. The colonial governments' right of self-defense against invaders or criminals would in practice need to be exercised through the collective action of the colonists, there being no British army anywhere near. The above rights were reiterated in Virginia's second charter, in 1609.

The 1606 Virginia Charter had planned for a Northern Colony and a Southern Colony, with identical rights. The Southern Colony established itself at Jamestown, today part of the Commonwealth of Virginia. The Northern Colony finally got going in 1620; the settlers were given letters patent by the holders of the 1606 charter rights for the north, thus ensuring that New Englanders had the 1606 rights. These rights were restated in the 1620 Charter of New England: it shall be lawful for "our loving Subjects, or any other Strangers who become our loving Subjects," to "att all and every time and times hereafter, out of our Realmes or Dominions whatsoever, to take, load, carry, and transports in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there." 3 *id.* at 1834-35.

---

2. ["Furniture" can mean fighting equipment; it can also mean furnishing.—Eds.]

3. [Commercial agents.—Eds.]

4. [As used here, equipment for fighting, including defensive clothing. The sentence can be read narrowly, in the sense of arms and armor, and also more broadly, to include other necessities, such as ordinary clothing.—Eds.]

The New England Charter repeated the guarantee of no customs duties, "inwards or outwards" for the aforesaid goods for seven years. Also repeated was the exception to the right: persons who now or in the future were "by special Name restrained" by the king or his successors. *Id.* at 1835.

Likewise reiterated was the collective defense right, under the direction of the government of New England: to "for their severall Defence and Safety, encounter, expulse, repel, and resist by Force of Arms, as well as by Sea as by Land, and all Ways and Means whatsoever," all persons who attempted to inhabit New England without the government's permission. *Id.* at 1835-36. Also affirmed was the right to resist any persons who attempted the "Destruction, Invasion, Detriment, or Annoyance of said Collony and Plantation." *Id.* at 1836.

To induce settlement of Virginia and New England, the king further guaranteed that the settlers and their descendants would forever have all the rights of Englishmen. All of the king's subjects who dwelled in the colonies, "and every of their children" born there, "shall have and enjoy all Liberties, Franchises and Immunities within any of our other Dominions, to all Intents and Purposes, as if they had been abiding and born, within this our Realm of *England*, or any other of our said Dominions."[5]

Based on the boundaries of the territories in the Virginia and New England charters, the 1606 Virginia Charter is one of the founding legal documents of all 13 original states, plus West Virginia and Kentucky (both formerly part of Virginia) and Maine (formerly part of Massachusetts). The 1620 New England Charter is one of the founding legal documents of the New England states (except Vermont), plus New York, New Jersey, and Pennsylvania. 1 *id.* at iv-xiii. Guarantees of the rights of Englishmen were common in other American colonial charters.[6] So when English rights were restated in the 1689 English Bill of Rights (Ch. 2.H.4), those rights—including the right to "arms for their defence"—applied to Americans, too.

The American colonists' political association with the king ended when the king stopped adhering to the above principles. In October 1774, King George III embargoed the shipment of firearms or gunpowder to the American colonies, and ordered the royal governors to begin confiscating arms and ammunition there. Coercive disarmament set off the American Revolution, when confiscation was met with armed resistance at Lexington and Concord, on April 19, 1775.[7] Ch. 4.

The rights that grew in American soil would not be identical to their English ancestors. In the early nineteenth century—two centuries after the Virginia charter, and four decades after American independence—English journalist William Cobbett would contrast life in England and America. Recall that the game laws of

---

5.  7 *id.* at 3788 (Virginia, 1606); 3 *id.* at 1839 (New England, 1620) (slight differences in phrasing and spelling).

6.  *See* 1 *id.* at 533 (Connecticut); 2 *id.* at 773 (Georgia); 3 *id.* at 1681 (Maryland); 3 *id.* at 1857 (Massachusetts Bay); 5 *id.* at 2747 (Carolina, later divided into North and South Carolina); 6 *id.* at 3220 (Rhode Island).

7.  At the time of the Revolution, Americans invoked the legal rights of Englishmen, including the right to arms in the 1689 English Declaration of Right (Ch. 2.H.4). They did not invoke the arms commerce rights of the 1606 and 1620 charters. During the seventeenth century, those original charters had been replaced by other charters, as described in this Chapter.

England were used to keep commoners from hunting, and, sometimes, from having firearms at all. Ch. 2. But in America, wrote Cobbett, "As to game-laws, there are none, except those which appoint the times for killing. People go where they like, and, as to wild animals, shoot what they like." Hunting was "the sport which is the most general favourite." William Cobbett, Cobbett's America 200 (J.E. Morpugo ed., 1985). As described below, Americans believed that they all had the right to hunt, and they mocked the hunting restrictions in England. *See* Ch. 2.H.6 (James Madison and other Americans who said that the right to arms in England was too narrow).

Further, according to Cobbett, "there is no sort of resemblance between the American and the English militia. These militia in America receive no pay, no clothing, no arms, from the government. Every man goes out in his own ordinary array, and carries his own arms and accoutrements. Ninety-nine times out of a hundred, he finds his own powder and ball. In short, it was a body of the people, voluntarily assembled, and acknowledging no superior not of their own electing."[8]

The frugal U.S. federal government having only a small standing army, and the American people being so well armed, the federal "government could not stand a week, if it were hated by the people," Cobbett wrote. *Id.* at 212. Although Cobbett's language about one week and 99 percent were probably not meant to be read as mathematically exact, they show the broad contrast between the English and American arms cultures.

The changes in American political and legal philosophy after 1606 can be seen by contrasting two of Virginia's seals. According to King James's first charter for Virginia, the seal of the Virginia colonies would contain the king's coat of arms on one side, and the king's portrait on the reverse. On the left of the royal coat was a rampant lion wearing a crown; on the right, a rampant unicorn. The words for the Virginia seals would be (in Latin) "Royal seal of Great Britain, France,[9] and Ireland."[10]

In 1776, the independent Commonwealth of Virginia created a new seal, and put the same design on its state flag. Virginia's 1776 seal and flag also had arms, but of a different sort. At the bottom of the seal and flag is the prostrate body of a man, representing tyranny. A crown has fallen from his head. He holds a broken chain in one hand, and a scourge in the other. Above him, with one foot placed on his chest, is Virtus, the Roman goddess of bravery and military strength. She holds a spear in one hand, and a sheathed sword in the other. The orientation of the weapons indicates that her triumph is complete, and peace has been restored. The motto is *Sic semper tyrannis* ("Thus always to tyrants").[11]

8. *Id.* at 145-46 (first published in Cobbett's newspaper, *Political Register*, in 1814).

9. [The English kings by 1606 had lost all their territories in mainland France, but still had some of the Channel Islands, and continued their pretensions to sovereignty over some of the mainland, much of which they had ruled in previous centuries. The lion symbolized England and the unicorn Scotland.—EDS.]

10. 7 Federal and State Constitutions Colonial Charters at 3785.

11. Va. Code. § 1-500. The seal was designed by a four-member legislative committee. The motto came from one of the members, George Wythe. He was the first American law professor, at William & Mary. Among his students were two future Presidents (Thomas Jefferson and James Monroe), two future Supreme Court Justices (John Marshall and Bushrod Washington), and the future Virginia judge, law professor, and author of the leading legal treatise of the Early Republic, St. George Tucker (Ch. 5.F.2).

## B.    FIREARMS CONTROL IN THE COLONIES

The typical colonial American arms-control law required all or most of the citizenry to own arms, sometimes to carry arms, and to ensure that their dependents were armed and trained. Providing guns to suspect groups — Indians, slaves, the politically disloyal, and, sometimes, free Blacks — was often restricted or forbidden. A few states imposed safety laws against shooting firearms in crowded public places.

### 1.    Early Arms Mandates

#### a.    Colonial Statutes Mandating Arms Possession

Militiamen in America were required to have their own arms, and so were many people not in the militia. People in charge of dependents, such as children or servants, were responsible for supplying their dependents with arms. This section describes the arms possession mandates, whereas the militia histories of the colonies are described in Section E.3. In the readings below, colonial period arms words that are not well-known today — such as bastard musket, goose shot, worm, or fusee — are briefly defined in footnotes or parentheticals. For an annotated glossary of colonial arms-related words, see David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*. 43 S. Ill. U.L.J. 495, 510-26 (2019).

The readings below do not attempt to cite all of the militia and other arms mandates of every colony. For comprehensive cites of the hundreds of the colonial and early state statutes on militia and other arms mandates, from the first English settlements though 1800, see *id*. at 533-89.

#### (i)    Massachusetts Bay

In 1628, a group of Puritans established the Massachusetts Bay Colony. They received a royal charter in 1629. That same year, King Charles I prorogued Parliament and intensified persecution of the Puritans, thereby triggering the Great Migration to New England. On March 22, 1631, the Massachusetts Bay Colony adopted a law mandating that all adult males be armed.[12] 1 Records of the

---

12.  3 *id*. at 84. For dates in this Chapter, readers should be aware that in the English-speaking countries, the calendar changed from Old Style (Julian) to New Style (Gregorian) in 1752. Under the Old Style, the New Year began on March 25 (the traditional date of the Annunciation to the Virgin Mary), not January 1. So the people of Massachusetts considered the above March 22 date to be 1630, not 1631. We have generally rendered dates in New Style. Researchers using Western European date citations between 1582 (when France adopted the New Style calendar) and 1752 should be aware that the days between January 1 and March 24 may be assigned to a different year, depending on the country. The shift can also move the calendar date as far forward as 11 days; for example, July 1 Old Style can become July 12 New Style. The shift occurs because New Style fixed the incorrect number of leap year days in Old Style. New Style omits leap years every 100 years, except for every 400th year. So, under New Style, there was no leap year day in 1800 or 1900, but there was one in 2000.

Governor and Company of the Massachusetts Bay in New England 84 (Nathaniel B. Shurtleff ed. 1853) [hereinafter Mass. Bay Recs.]. Massachusetts's arms mandates were not limited to the militia. A 1645 order of the General Court (the governing body) declared that "all inhabitants" must "have armes in their howses fitt for service, with pouder, bullets, match, as other souldiers."[13]

The law also established "trained bands," who trained more frequently than the general militia. The trained bands were required to have "ether full musket boare, or basterd musket at the least, & that none should be under three foote 9 inches."[14]

The Massachusetts Bay Colony had a strict law on children and guns, requiring that boys and girls age ten and older be trained in weapons use. The 1645 statute provided that "all youth within this jurisdiction, from ten yeares ould to the age of sixsteen yeares, shalbe instructed, by some one of the officers of the band, or some other experienced souldier . . . upon the usuall training dayes, in the exercise of armes, as small guns, halfe pikes,[15] bowes & arrows." However, children were not required to so exercise "against their parents minds." 2 *id.* at 99.

### (ii)   Plymouth

Nearby, another English colony had already been established. The Plymouth Colony comprised what is today southeastern Massachusetts, including Cape Cod. Its first English settlers had arrived in 1620—by accident; they had been aiming for the mouth of the Hudson River. The Pilgrims were Brownists, a Calvinist sect that separated itself from the Church of England.

Initially, the Pilgrims had fled to Holland. However, they wanted to establish a refuge for their brethren still in England, and they realized that Holland would not work. Making a living there was grueling, and aged people prematurely. The Pilgrims also wanted to maintain their Englishness rather than become assimilated Dutch, so they set sail on the *Mayflower* and ended up at Plymouth. Their Mayflower Compact provided their foundational structure of government.

The Puritans of neighboring Massachusetts Bay were not Brownist Separatists. The Puritans considered themselves part of the Church of England. From 1641-60, the Puritans back in England did manage to take over the Church of England, but

---

13. "Match" in the colonial context means slow-burning hemp cord, which is attached to a matchlock firearm; when the trigger is pressed, the burning end of the cord is lowered and used to ignite the powder in the pan (from which the flame travels through the adjacent touch hole and ignites the main powder charge). What we today call "matches"—paper or wood sticks with ignitable tips—did not become common consumer items until the nineteenth century.

14. 2 *id.* at 134 (enacted 1645), 222 (enacted 1647). The bastard musket was shorter and lighter than a standard musket.

15. [A pike is a spear with a thrusting or cutting weapon at one end. A half-pike is a shorter version. In the early decades, sometimes up to a third of the men in a town's militiamen were pikemen. King Philip's War, in 1675-76, demonstrated pikes were not very useful in sylvan warfare, so Massachusetts ordered pikemen to get themselves muskets. Martin W. Anderson, New England Colonial Militia and its English Heritage: 1620-1675, at 65 (M.A. thesis in Military Arts & Science, U. of Iowa, 1979).—Eds.]

that ended with the Restoration of King Charles II in 1660. *See* Ch. 2.H. Thereafter, the American Puritans became more like the Brownists, considering themselves a denomination separate from the Church of England. As a separate sect, they would become known as Congregationalists, meaning that each congregation governed itself, and was not subject to hierarchical control.

Plymouth Colony was overshadowed by the larger Massachusetts Bay Colony. Culturally, there were only minor differences between the colonies. In 1692, Plymouth would be forced to choose between assimilation to Massachusetts or New York. The former was the easy choice.

During the decades when Plymouth was separate, its arms laws were similar to Massachusetts Bay, as were those of all the New England colonies. Plymouth's first written arms mandate came in 1632. "[E]very freeman or other inhabitant must provide for himselfe and each under him able to beare arms a musket and other serviceable peece with bandeleroes and other apurtanances," plus two pounds of powder and ten pounds of bullets. The Compact with the Charter and Laws of the Colony of New Plymouth 31 (William Brigham ed., 1836) (enacted 1632) [hereinafter Plymouth Laws].[16]

Male indentured servants who had completed their period of service, and other male singles, could not set up their own households unless they possessed the requisite arms and ammunition. If they did not, they had to work for someone who would buy the arms and ammunition for them. *Id.* at 35 (enacted 1635); *id.* at 71-72 (enacted 1642) (during emergencies, military commanders can fine persons who lack required arms; gunsmiths must speedily repair arms, and must accept corn for their services, at reasonable rates).

### (iii)   Maryland

In 1639, Maryland required "that every housekeeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes one Serviceable fixed gunne of bastard muskett boare." Also

---

16.  *See also id.* at 44-45 (enacted 1636) (repeating requirement, including for "each man servant"); *id.* at 74 (enacted 1643) (service guns should be matchlocks, snaphaunces, or flintlocks, not longer than four and a half feet, and of a bore at least the size of a caliver or a bastard musket—that is, the smaller bores for long guns); *id.* at 285-16 (enacted 1671) (comprehensive recodification; militia is "every man from the age sixteen and upwards" and each shall have the requisite arms; smiths must repair arms, for the same rates they charge for other work); *id.* at 184 (enacted 1676) (matchlocks no longer sufficient; the arm must be a flintlock or a snaphaunce); *id.* at 192 (enacted 1681) (adding requirement for a sword or cutlass).

The snaphaunce or snaphance was an early version of the flintlock, an improvement over the wheellock. "The true snaphaunce, rarely used in New England" differs from the "true" flintlock in how the cover of the firing pan is connected to the rest of the gun lock. American sources often do not use the different terms with precision. Patrick A. Malone, The Skulking Way of War: Technology and Tactics among the New England Indians 34 (1991). In this Chapter, we generally ignore the distinction between the snaphaunce and the "true" flintlock.

required was one pound of gunpowder, four pounds of pistol or musket shot, "match for matchlocks" or "flints for firelocks." 1 Archives of Maryland 77 (enacted 1639) (William Hand Browne ed., 1885). A "firelock" is a wheellock or a flintlock, although in American usage it almost always means a flintlock. *See* Ch. 2.I (describing wheellocks and flintlocks). Nearly four centuries after the enactment of Maryland's 1639 statute, the phrase "his her or their" has modern resonance. As it shows, Maryland wanted the whole population armed, not just one sex.

The colony also wanted to encourage immigration, and to ensure that the immigrants could take care of themselves. A 1641 statute thus stated that any person wishing to acquire title to Maryland land must bring "Armes and Ammunition as are intended & required by the Conditions above said to be provided & carried into the said Province of Maryland for every man betweene the ages of sixteene & fifty years w[hi]ch shalbe transported thether." The arms minimum was "one musket or bastard musket with a snaphance lock," ten pounds of gunpowder, 40 pounds of "Lead, Bullets, Pistoll, and Goose shot."[17]

The 1639 mandate that householders and children and servants have guns with bastard musket bore size was relaxed in 1642 to allow any type of firearm: "That all housekeepers provide fixed gunn and Sufficient powder and Shott for each person able to bear arms." 3 *id.* at 103. The legal minimum quantities of ammunition were raised in 1658: "[E]very householder provide himselfe speedily with Armes & Ammunition according to a former Act of Assembly viz 2 [pounds] of powder and 5 of shott & one good Gun well fixed for every man able to bear Armes in his house." *Id.* at 345.

Maryland imposed additional arms mandates on militiamen. A 1715 statutory compilation includes the requirement that every militiaman "appear and bring with him one good serviceable Gun, fixed, with Six Charges of Powder." Militia cavalrymen were to "find themselves with Swords, Carbines, Pistols, Holsters and Ammunition."[18]

### (iv)   Connecticut

When Connecticut was founded in 1636, its government ordered that "every souldier" should have "in his own howse in a readiness" two pounds of gunpowder and 20 lead bullets. 1 Public Records of the Colony of Connecticut 3 (J. Hammond Trumbull ed., 1850) (law of June 7, 1636) [hereinafter Pub. Recs. of Conn.]. A more detailed law in 1637 ordered "that all persons shall beare Armes that are above the age sixteene yeeres." Commissioners and church officers were exempt. "[E]very military man" had to have "continually in his house" half a pound of powder and two pounds of bullets. Towns were required to have specified reserves of gunpowder and lead bullets. *Id.* at 15-16.

Central stores of bullets and gunpowder were important in case of extended fighting. The colonists' personal supplies of ammunition might run out. During

---

17.  *Id.* at 100-01. Goose shot is large pellets. Today it is used in shotguns, and it was usable in handguns or long guns, including long guns made primarily for bird hunting (fowling pieces).

18.  The Laws of the Province of Maryland 115 (Evan Jones ed., 1718).

wartime, roads might be captured by the enemy, so a town might not be able to bring in more gunpowder and lead from outside.

In 1650, the colony ordered "[t]hat all persons that are above the age of six-teene yeares, except magistrates and church officers, shall beare arms . . . ; and every male person within this jurisdiction, above the said age, shall have in continu-all readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band."[19]

New Haven, a separate colony until 1662, required males aged 16-60 to have "a good serviceable gun . . . to be kept in a constant fitness in all Respects for service." Also required were a "a good sword," bandoleers, a powder horn, worm, scourer, priming wire, shot bag, charger, "and whatsoever else is necessary for such service."[20] The ammunition minimum was at least "a pound of good powder" plus "four pounds of pistol bullets" or 24 long gun bullets, and matches for a matchlock or flints for a flintlock.[21]

### (v)   New Hampshire

New Hampshire's first militia act was passed in 1687. It demanded "that no person whatsoever above Sixteene yeares of age remaine unlisted." Equipment was "a well fixed musket" with a barrel at least three feet. The caliber was large: "the bore for a bullett of twelve to the pound."[22] Also necessary were bandoliers and a cartridge box, plus bullets and powder. Officers had the option of allowing their men to have "a good pike and sword" instead of the musket. 1 Laws of New Hamp-shire: Province Period 221 (Albert Stillman Batchellor ed., 1904). The next act, in 1692, changed the militia from all "persons" over 16 to all males over 16. *Id.* at 537.

In 1718, an upper age limit was introduced for the first time, age 60. The arms mandate applied not just to males, but also to every "Housholder," such as an unmarried woman who lived on her own, or a man who had a house, but was 60 years or older. The new law required gun cleaning tools ("a Worm and Priming Wire"), as well as "a good Sword or Cutlash [Cutlass]." 2 *id.* at 285 (1913).

The New Hampshire statute reflected a common American practice. Whenever a small town was attacked, everybody who was able would fight as needed, including

---

19.  *Id.* at 542-43; Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut 72-73 (Silas Andrus ed., 1822). The statute was not refer-ring to Dick Clark's *American Bandstand*, a popular television program (1957-87). Rather, it meant the clerk of the trained band. While the "trained band" could mean a subset of the militia that received extra training, American usage sometimes called the entire militia the "band" or the "trainband."

20.  The worm was a device for cleaning the barrel and for extracting an unfired bullet from a firearm. The priming wire was for cleaning the touch hole — the small hole where the fire from the priming pan connected with the main powder charge. A charger is a bulb-shaped flask for carrying gunpowder, attached to metal components that release a premea-sured quantity of powder.

21.  New-Haven's Settling in New-England and Some Lawes for Government 60-61 (1656).

22.  The bore size was about .73 inches, the same as for a modern 12 gauge shotgun. In a 12 gauge, 12 balls of ammunition weigh one pound.

women, children, and the elderly. Steven C. Eames, Rustic Warriors: Warfare and the Provincial Soldiers on the New England Frontier, 1689-1748, at 28-29 (2011).

### (vi)   Rhode Island

Created as a refuge for religious nonconformists in 1636, Rhode Island was granted a charter by Parliament in 1644. It was the only place at the time in the Western world with complete freedom of religion. The colony required "that every Inhabitant of the Island above sixteen or under sixty years of age, shall always be provided with a Musket, one pound of powder, twenty bullets, and two fadom [2 fathom is 12 feet] of Match, with sword, rest, bandoleers all completely furnished." As for persons who were defective in arms, the town councils were empowered to cause them "to be supplied in an equal way according to Estate and strength." *Acts and Orders of 1647, in* Colonial Origins of the American Constitution: A Documentary History 183-84 (Donald S. Lutz ed., 1998) [hereinafter Colonial Origins].

### (vii)   New York

New Netherland was founded by the Dutch West India Company. At its height, New Netherland stretched from Fort Orange (Albany) down to Delaware, with a trading zone along Long Island and southern New England. The company promised prospective settlers that the company would defend them at its own expense. Even after the promise became obviously untenable, and militias were created, New Netherland's scattered settlements lacked a strong sense of community for which to fight and were too weak even if they had been willing. When the British navy showed up in 1664, Dutch Governor Peter Stuyvesant received little support from the inhabitants, and so he had to surrender without firing a shot. Merrill Jensen, *Introduction* to 9 English Historical Documents: American Colonial Documents to 1776, at 29 (David C. Douglas gen. ed., Merrill Jensen ed., 1955) [hereinafter Am. Col. Docs.]. British King Charles II gave the colony to his brother James Stuart, the Duke of York; so the city of New Amsterdam became the city of New York, and the colony of New Netherland became New York.

The form of government in New York was the most autocratic in the colonies. Back in England, the Duke of York and his brother the King favored gun control. *See* Ch. 2.H.3. But that was not practical for New York. In 1671 and 1676 New York's Royal Governor issued militia laws requiring that towns and individuals each have their own arms supply. All males sixteen to sixty had to have a firearm and the appropriate accessories and ammunition. If they were freeholders (landowners, rather than tenants), they had to supply the equipment "at their own." If they were "sons or Servants," their "Parents and Masters" were responsible for providing the arms. Any "good Serviceable Gun" plus "a good sword" approved by the local militia officer would suffice. The gun had "to be kept in Constant fitness for present Service." 1 The Colonial Laws of New York from the Year 1664 to the Revolution 49-50 (1894). A 1684 statute ordered that persons exempt by law from militia training (e.g., certain occupations) still had to keep the same arms. *Id.* at 161. The militia starting age was lowered to 15 in 1691 and raised back to 16 in 1702. *Id.* at 231, 500. The maximum age was lowered to 50 in 1775.[23]

23.   5 Colonial Laws of New York From the Year 1664 to the Revolution 732 (1894).

### (viii)   New Jersey

New Jersey was once part of New Netherland. Shortly after English conquest, it was separated from New York. Like some other colonies, New Jersey enticed immigrants by offering land grants. The lords proprietors—the high English aristocrats who had been granted title to New Jersey—in 1664 offered land to any freeman who came "arm'd with a good musket"—plus 10 pounds of gunpowder, 20 pounds of bullets, match, bandoleros, and 6 months of food. For the second year of English settlement, the schedule was 90 acres of land to plant, for "every free man and free woman" who brought the requisite arms and supplies. *The Concession & Agreement of the Lords Proprietors of the Province of New Caesarea, or New Jersey, to & with all and every the Adventurers & all such as shall settle or plant there* (1664), *in* The Grants, Concessions & Original Constitutions of the Province of New Jersey 20–23 (1881).

From 1674 to 1702, East Jersey—the part closest to New York City—was a separate colony from West Jersey. After reunion in 1702, New Jersey enacted an arms mandate for militiamen. All men 16 to 50 were in the militia, and each one "shall be sufficiently armed with one good sufficient Musquet or Fusee well fixed, a Sword or Bagonet [bayonet], a Cartouch [cartridge] box or Powder-horn, a pound of Powder, and twelve sizeable Bullets." Militiamen "shall appear in the Field, so armed, twice every year." There were exemptions for ministers, doctors, schoolmasters, legislators, slaves, and "Civil Officers of the Government."[24] Legislative exemptions were controversial because legislators would not bear the burdens of warfare that they might vote to initiate.

As in other colonies, the equipment requirements grew over time. The 1781 militia statute required "a good Musket" plus bayonet, and allowed a rifle plus tomahawk as an alternative. Everyone needed a cartridge box, 23 rounds, six flints, knapsack, canteen, worm, and priming wire. 1780 N.J. Laws 42-43. The worm and priming wire were cleaning tools. The sharpened flints were held in the jaws of a flintlock gun's operating mechanism—what we today call the *action*, and what was once called the *lock*. When the flintlock gun's trigger is pulled, the flint is brought forward to strike steel, and the shower of sparks ignites the gunpowder in the priming pan. Eventually, a flint wears down from friction, so replacements are necessary.

### (ix)   Virginia

Long before Virginia expressly required people to possess arms, it assumed that they already did. For example, a 1619 statute mandated arms carrying, as did numerous follow-up statutes extending the places where arms must be carried. *See*

---

24.  The Laws and Acts of the General Assembly of Her Majesties Province of Nova Caesarea or New-Jersey 12-13 (1709) (enacted 1703). Fusee, fuse, fuze, fuzee, fusil are often synonyms for a flintlock musket. More precisely, "a light, smoothbore shoulder arm of smaller size and caliber than the regular infantry weapon." George C. Neumann, Battle Weapons of the American Revolution 19 (2011).

"Jersey" is an anglicization of the Latin word "Caesar." New Jersey's first English royal governor came from the island of Jersey in the English Channel; Jersey is under the British crown, but it is not governed by the British parliament, and even today retains some independent self-government.

Section 2.B.1.b(i). The surviving records of the 1639 Assembly are lost, but a manuscript in the possession of Thomas Jefferson summarized the year's enactments, including "ALL persons except negroes to be provided with arms and ammunition or be fined at pleasure of the Governor and Council." William Waller Hening, 1 The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 226 (1823). Based on the summary, it is possible but not certain that the bill's text covered women as well as men.

Ownership was again required in 1656. Every man able to bear arms had to have "a fixt gunn" plus two pounds of powder and eight pounds of shot. Delinquents would be fined 50 pounds of tobacco, to be sold by the county courts and used to provide "a common stock of ammunition for the county." *Id.* at 525.

A 1684 revision required both a bladed arm and a firearm. Free Virginians had to "provide and furnish themselves with a sword, musquet and other furniture fitt for a soldier." 3 *id.* at 13. To promote settlement of the frontier, 500-acre land grants were offered starting in 1701, provided that the grantee keep "upon the said land one christian man between sixteen and sixty years of age perfect of limb, able and fitt for service." Such men should be "continually provided with a well fixt musquett or fuzee, a good pistoll, sharp simeter [scimitar sword], tomahauk," and ammunition. *Id.* at 205-07.

A 1705 statute ordered every foot soldier to acquire "a firelock, muskett, or fusee well fixed." *Id.* at 338. In 1748, all militiamen were required to have "arms and ammunition." 6 *id.* at 116. Militiamen who did not have enough money to provide their own arms would be given arms "out of his majesty's magazine." *Id.* at 116-18.[25] Cavalry officers had to buy themselves "holsters and pistols well fixed." *Id.* at 537 (1755). A requirement that persons exempted from militia service—such as college professors—must possess militia-type arms was added in 1762. 7 *id.* at 534, 537. During the American Revolution, a statute put William & Mary professors into active service in the Norfolk militia. 9 *id.* at 313.

### (x)   North Carolina

The Carolina colony was given a charter in 1663. In 1712, South Carolina was split off from North Carolina because the North and South developed differently from the start.

To encourage settlement, the eight original Carolina proprietors offered prospective immigrants a strong legislature, religious freedom, and generous land grants. The requirements were similar to New Jersey's land grant program. Immigrants had to bring six months of provisions, so they could take care of themselves while they settled. Every man had to have "a good musket full bore, 10 pounds powder and 20 pounds of bullet." A free woman immigrant could instead have an armed servant. Bonus lands were granted to every additional person in an immigrant group who was "above the age of fourteen years" and had "a good firelock or matchlock."[26]

---

25. *Magazine* can mean a central storage place for arms, or it can mean the part of a gun where reserve ammunition is held.

26. *See A Brief Description of the Province of Carolina* (London 1666) (pamphlet by proprietors encouraging immigration), *reprinted in* Am. Col. Docs at 120; America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance 210-11 (Jon L. Wakelyn ed. 2006) (Concessions and Agreements, Jan. 11, 1664).

North Carolina's 1715 militia law encompassed all freemen between 16 and 60. The militiamen were obligated to appear at militia musters "with a good Gun well-fixed Sword & at least Six Charges of Powder & Ball." Under a 1746 statute, militiamen had to "be well provided with a Gun, fit for Service, . . . and at least Twelve Charges of Powder and Ball, or Swan Shot,[27] and Six spare Flints." The 1746 statute also brought indentured servants into the militia.[28]

In the colonies, free servants were almost always in the militia. The American policy contrasted with the English select militia under the Stuarts in the seventeenth century. There, the militia technically included all able-bodied males, but militia training was reserved for people who owned their own land, freeholders. If a servant showed up for English militia training, the servant was probably a substitute sent by his land-owning master. *See* Ch. 2.H.

The colonial norm was also to include indentured servants, who were not legally free, and who were bound to service for a term of years. Whether a servant was free or indentured, the servant's master was often legally responsible for providing the servant with arms. Four colonies—North Carolina, Virginia, Delaware, and Maryland—for part of their histories excluded indentured servants from the militia. Indentured servants were mainly European immigrants who had signed an indenture contract in exchange for sea fare to America. Some were convicted criminals who had been offered the choice of execution in England or transportation to America. Others were Indians, Irish, or Africans who had been captured and sold. Captives who were held for life rather than for a term of years, and whose children were likewise held for life, were euphemistically called "servants for life."

The North Carolina militia included free Blacks.[29] "[F]ree Negroes served in the militia of North Carolina with no apparent discrimination against them."[30] For more on Blacks and arms in the colonial period, see Section B.2.b. For more on Indians, including the enslavement of Indians by Indians and by European-Americans, see Part C.

### (xi)   Delaware

Sweden had established Fort Cristina (near present-day Wilmington) and two other settlements, starting in 1638. It covered the northern part of Delaware Bay (part of the future State of Delaware), plus the area around the southern Delaware River, which divides New Jersey from Pennsylvania. The Swedes relied on militia for defense. Leon de Valinger, Jr., Colonial Military Organization in Delaware 1638-1776, at 7-21 (1938). New Sweden fell to Dutch New Netherland in 1655. Then in 1664, the English seized New Netherland from the Dutch.

---

27.  [Large shotgun pellets.—Eds.]

28.  *Laws of North Carolina–1715*, ch. 25, *in* 2 The Earliest Printed Laws of North Carolina, 1669-1751, at 29-31 (John D. Cushing ed., 1977).

29.  A Collection of all the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use 215-16 (1751).

30.  John Hope Franklin, The Free Negro in North Carolina, 1790-1860, at 101-02 (1995).

After 1664, Delaware was initially governed as part of greater New York, the successor to New Netherland. A 1671 law required "every Person that can beare Arms from 16 to 60 years of Age" to have "Powder & Bullett fitt for Service, and their mutual Defence." Militiamen who could not afford their own would be given arms from the colonial magazine. *Id.* at 22-23.

When Pennsylvania was created as a separate colony in 1681, Delaware was included in the grant. Pennsylvania proprietor William Penn allowed the "Three Lower Counties" (modern Delaware) their own assembly, but they shared a governor with Pennsylvania. Delaware's Swedish, Finnish, and English settlers were not predominantly Quakers, unlike the majority of the early settlers of Pennsylvania, so Delaware did not hesitate to embody militias when necessary. However, as in South Carolina, Delaware's legislature was chary of putting the power of the sword in the hands of the governor, so colonial militia laws were enacted on a temporary basis during periods of necessity.

In the War of Jenkins' Ear (1739-42), Great Britain fought Spain and France.[31] Due to the foreign threat, Delaware modernized its arms mandate: "every *Freeholder* and taxable Person" shall have "One well fixed Musket or Firelock, one Cartouch-Box, with Twelve Charges of Gun-Powder and Ball therein, and Three good Flints, to be approved of by the Commanding Officer of the respective Company to which he belongs, and shall be obliged to keep such Arms and Ammunition by him, during the Continuance of this Act." The militia law would sunset after three years or the end of the War of Jenkins' Ear, whichever came first. Laws of the Government of New-Castle, Kent and Sussex Upon Delaware 171 (1741).

Every "Freeholder and taxable Person" had to own specified arms. A freeholder owned land outright, and could be male or female, of any color. A "taxable person" was someone subject to a capitation tax, often but not always for the established church. In some states, White females were exempted. Although many people had to be armed, the Delaware militia comprised males 18 to 50. Masters of indentured servants had to make their servants enlist. Like other colonies, Delaware exempted certain occupations from routine militia service, but still ordered them to be armed and ready to serve in an emergency.[32]

Delaware Quakers, who by the mid-eighteenth century were mostly but not entirely pacifists, did not have to own guns, serve in the militia, or perform the nightly watch duties required in some towns. To obtain the exemption, Quakers (formally, members of the Society of Friends) had to pay a fee of two shillings six pence each day on which they would ordinarily be required to serve in the militia or watch.[33] The fee was deposited in the Poor Fund, to respect Quaker scruples

---

31.  The war was precipitated in part by the Spanish cutting off the ear of the captain of a British smuggling ship. Jenkins brought his severed ear to Parliament.

32.  "[A]ll Justices of the Peace, Physicians, Lawyers, and Millers, and Persons incapable through Infirmities of Sickness or Lameness, shall be exempted and excused from appearing to muster, except in Case of an Alarm [an attack on the locality]: They being nevertheless obliged, by this Act, to provide and keep by them Arms and Ammunition as aforesaid, as well as others. And if an Alarm happen, then all those, who by this Act are obliged to keep Arms as aforesaid . . . shall join the General Militia." *Id.* at 176-77.

33.  A "pound" was literally the weight of 240 pence. A shilling was one-twentieth of a pound, or 12 pence.

about being taxed for specific military purposes. *Id.* at 176. Ministers were exempt from all arms-related rules and did not have to pay a fee. *Id.* at 177.

King George's War (1744-48) was known in Europe as the War of the Austrian Succession, again pitting Britain against Spain and France. Delaware enacted no new militia law, but instead sent voluntary companies of "associators" to join the fighting near Albany, New York. De Valinger at 37-42.

A new militia law was passed for the French and Indian War (1754-63). It was essentially the same as the 1741 law, except that Quakers did not have to pay a fee for their exemption. *Id.* at 43-52. On the eve of the American Revolution, new and permanent militia laws were enacted in 1774-75. *Id.* at 52. During the Revolution, a law punished people who bought from militiamen the arms or accoutrements that militiamen were supposed to always keep. If the illicit buyer were a man 18 to 50, the punishment could include six months' service in the militia. 1778 Del. Acts Mar. Adjourned Sess. 1-3.

#### (xii)   Pennsylvania

Early eastern Pennsylvania was part of New Sweden/New Netherland/New York and was covered by New York's 1676 militia law. Section B.1.a(vii). Even beforehand, some towns had formed their own militia.[34] Pennsylvania was created as a separate colony in 1681 by the Quaker William Penn, in settlement of the enormous debts that the Duke of York (the future King James II) owed Penn's father. "Pennsylvania" means "Penn's woods." The Pennsylvania colony was long unique, never mandating that anyone be armed, nor establishing a colonial militia. After Quakers lost political control of the colony in 1755-56, there were intense political conflicts over the creation of a militia.[35] There were always volunteer militias, and some local governments did raise local militias, but not until 1776 was a state-wide militia obligation created, pursuant to the new Pennsylvania Constitution. Pa. Const. of 1776, § 5. *See* Ch. 4.D.4. Further reading: Samuel J. Newland, The Pennsylvania Militia: The Early Years, 1669-1792 (1997); C. Hale Sipe, The Indian Wars of Pennsylvania (1931).

#### (xiii)   Overview

The standard age for militia duty in the colonial period was 16 to 60. By 1800, several state militia statutes had been altered to 18 to 45.[36] The changes conformed state militia composition to match the ages in the federal First Militia Act of 1792 (Ch. 5.F.1). Over the years, some states or colonies had set an upper age as low as 45 or 50, and some had no upper limit.

---

34.  *See* René Chartrand, Colonial American Troops 1610-1774 (3), at 9 (2003).

35.  *See* , *e.g.*, 1 Pennsylvania Archives, 4th ser., 706-08 (George Edward Reed ed., 1900-02); 2 *id.* at 441, 548, 555; Samuel J. Newland, The Pennsylvania Militia: The Early Years, 1669-1792 (1997); Kopel & Greenlee at 560-64; Chartrand, Colonial American Troops (3), at 9-12.

36.  That is, a person's militia obligation ended on his forty-fifth birthday.

Although the most common lower bound was 16, statutes ranged from 15 to 18. The only colony that excluded 18- to 20-year-olds from the militia was Virginia, from 1738 to 1757. For young people who still lived with their parents, statutes usually required the parents to ensure that their children had the requisite arms. The same was true for servants.

No colony or state restricted arms possession by males who were too young or too old for the militia, nor by females. Some colonies or states put older males, males not physically fit for militia service, or the occupationally exempted on the alarm list. They would not train or march off with the militia, but they were required to have militia equipment and defend their community if it were attacked.

No state authorized female service in the militia, but several—Massachusetts, Maryland, Virginia, Delaware, New Hampshire, Vermont, and Connecticut—at least sometimes required females to have the same arms as militiamen. Like males who were militia-exempt because of age or occupation, armed females were part of their communities' emergency defense.

From early days to 1800, arms mandates grew in detail. The later ones almost always mandated an edged weapon, such as a bayonet or sword. They usually mandated certain quantities of gunpowder and bullets, plus accessories for carrying and loading, for casting lead bullets, and for gun cleaning and repair. Pole arms, such as pikes, lances, or spontoons, were sometimes required. Militiamen on horseback might have to have a saddle, holsters to attach to the saddle, and other tack. Kopel & Greenlee at 510-89.

While the above statutory survey has concentrated on specific arms mandates and the militia, Americans had additional duties to bear arms and use force in community service. The duties were based on English common law, and sometimes expressed in a colony's statutes. The arms that individuals would bring to these duties would be whatever arms they kept at home.

The first of the duties was to join the "hue and cry" to pursue fleeing criminals. The hue and cry could be raised by a victim or by a government official such as a sheriff, constable, or justice of the peace. By common law, all able-bodied men from 15 or 16 to 60 were obliged. Pursuing citizens were allowed to use deadly force if necessary to prevent escape.

Second, there was "watch and ward"—guard duty for towns and villages. "Ward" was the daytime activity, and "watch" the nighttime activity. The patrols would be arranged by a government official.

Third, was the *posse comitatus*—the power of the sheriff, coroner, magistrate, or other officials to summon all able-bodied males to assist in keeping the peace. Posse service could include a few men helping a sheriff serve a writ or could include many men helping a sheriff suppress a riot. Ch. 2.C. For the posse, the traditional minimum age was 15 or 16. Some commentators said the upper age limit was 70, whereas others said there was no limit. Shortly before being appointed to the U.S. Supreme Court by President Washington, James Wilson stated in 1790 that "No man above fifteen and under seventy years of age, ecclesiastical or temporal, is exempted from this service."[37]

---

37.  James Wilson, *Lectures on Law*, in 2 Collected Works of James Wilson 1017 (Kermit L. Hall & Mark David Hall Eds., 2007)  (Ch. VII, "The Subject Continued. Of Sheriffs and Coroners").

On the above duties, the laws of England and the American colonies were all solidly established. Yet America and England were very different in practice. Only in America did governments promote armed women, land grants for armed settlers, and a general militia rather than a select militia. Only in America was the right to arms guaranteed by written law right from the start (Part A).

The American colonies diverged from England in another way. In England, the duty to bear arms only arose in special situations. Militia duty might be a couple days a month or several months in a row, but it would be the exception to ordinary life. Keeping watch and ward would be according to a schedule. A typical day would not involve following the hue and cry, nor serving in a *posse comitatus*. In England, arms carrying in everyday situations had been regulated in varying degrees, but never required. Some American colonial laws did so require, as the next section describes.

### b.  Colonial Statutes Mandating Routine Arms Carrying

Eight colonies required arms carrying in routine circumstances, such as farming, church, public assemblies, or journeys.

#### (i)  Virginia

The first session of the first legislative assembly in America mandated gun carrying. The Virginia House of Burgesses in 1619 required that "all suche as beare armes shall bring their pieces, swords, pouder and shotte" to church on Sundays.[38] To the same effect was 1632's "All men that are fittinge to beare arms, shall bring their pieces to the church." 1 Hening at 198.

Four years later came a traveler's mandate: "That no man go or send abroad without a sufficient partie will armed." *Id.* at 127. The next year, for farmers: "That men not go to worke in the ground without their arms (and a centinell upon them)." And "That the commander of every plantation take care that there be sufficient of powder and amunition within the plantation under his command and their pieces fixt and their arms compleate." *Id.* The church, travel, and farming mandates were reiterated in 1632. *Id.* at 173.

In 1665, the Assembly worried that "the careless Manner" of people "going unarmed to Churches, Courts, and other public Meetings, may probably, in Time, incite the *Indians*, to make some desperate Attempt upon them." Accordingly, the legislature requested that the governor tell militia officers "to take care and prevent the same."[39]

After Bacon's Rebellion (Section E.3.f), the legislature in 1676 declared that although "liberty is granted to all persons to carry their armes wheresoever they goe," a group of more than five would be considered riotous. 2 Hening, at 381.

---

38.  *Proceedings of the Virginia Assembly, 1619, in* Lyon Gardiner Tyler, Narratives of Early Virginia, 1606-25, at 273 (1907).

39.  Virginia Laws 1661-1676, at 37 (1676). Available in the Sessions Laws library of Hein Online, as are many of the books containing colonial laws.

### (ii)   Connecticut

Connecticut, too, mandated carrying of firearms to church. "To prevent or withstand such sudden assaults as may be made by Indeans upon the Sabboth or lecture dayes, It is Ordered, that one person in every several howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, with powder and shott to e[a]ch meeting."[40] The New Haven Colony, which was separate until 1662, passed its carry mandate in 1644.[41]

### (iii)   Massachusetts Bay

A short-lived 1637 Massachusetts law mandated carry at all public assemblies, not just church services: All persons over 18, except for magistrates and church elders, must "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets." 1 Mass. Bay Recs. at 190. It was repealed the next year. 2 *id.* at 38. Then in 1643, the highest ranking militia officer of each town was ordered to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting." 2 *id.* at 38 (1853); 1 *id.* at 190.

Like Virginia, Massachusetts wanted travelers armed. Beginning in 1631, Massachusetts ordered persons traveling to the adjacent Plymouth Colony not to go "without some armes, though 2 or 3 togeathr." 1 *id.* at 85. The mandate was expanded in 1636 so that "no person shall travel above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12 *d.* for every default."[42]

### (iv)   Plymouth

Militiamen had to bring guns to church on Sundays, from April 1 through November 30. One-quarter of them had to bring powder and bullets for after-church practice that might be required. Plymouth Laws at 102 (enacted 1656); *id.* at 115 (enacted 1658) (changing April 1 to March 1). During King Philip's War (1675-76, Part C.3), the requirement was made year-round, and everyone had to bring at least six rounds of ammunition. *Id.* at 176 (enacted 1675).

### (v)   Rhode Island

In 1639, Rhode Island directed that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 Records of the Colony of Rhode Island and Providence Plantations, in New England 94 (John Russell Bartlett ed., 1856). Portsmouth, Rhode Island, enacted a similar law in 1643. *Id.* at 79.

---

40.  1 Pub. Recs. of Conn. at 95-96 (enacted 1643).

41.  Records of the Colony and Plantation of New Haven, From 1638 to 1649, at 131-32 (Charles J. Hoadly ed., 1857).

42.  1 *id.* at 190. The *d.* is the abbreviation for pence (short for the Latin *denarius*, a predecessor to the penny).

### (vi)   Maryland

In 1642, Maryland mandated arms carrying for church meetings and travel: "Noe man able to bear arms to goe to church or Chappell . . . without fixed gunn and 1 Charge at least of powder and Shott." Further, "Noe man able to bear arms to goe . . . any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott." 3 Archives of Maryland at 103.

### (vii)   South Carolina

In South Carolina, "every white male inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who . . . is . . . liable to bear arms in the militia of this Province" who shall "go and resort to any church or any other public place of divine worship" had to "carry with him a gun or a pair of horse-pistols[43] . . . with at least six charges of gun-powder and ball." Church officials had to report persons who failed to bring arms to church, and were authorized to require parishioners to display their arms. The carry mandate did not apply in Charlestown, where instead the entire watch and ward (Ch. 2.C) was supposed to be on duty on Sundays. The stated purpose of the law was "for the better security of this Province against the insurrections and other wicked attempts of Negroes and other Slaves."[44] The "other Slaves" were enslaved Indians, discussed in Part C.4.

### (viii)   Georgia

A 1770 Georgia law mostly followed the South Carolina model. Everyone "liable to bear arms in the militia" had to carry one long gun or two handguns to church. The guns could not be left outside; everyone had to "take the said gun or pistols with him to the pew or seat." The "inhabitants of the sea port towns" could instead carry any "side arms"—swords, knives, handguns, or other arms worn on the side. 19 (pt. 1) The Colonial Records of the State of Georgia 137-40 (Allen D. Candler ed., 1904) [hereinafter Georgia Recs.].

### c.   Freedom Dues for Indentured Servants

Some Americans were free servants. They would work for whomever they pleased, on terms agreeable to both parties. A free servant could leave employment at any time, although they were often employed on one-year contracts and would not be paid if they left before the end of the year.

Many other Americans were at first indentured servants. Because they could not afford to pay for passage to America, they signed contracts by which they would receive a free voyage, and when they arrived, the sailing company would sell a contract for the person to be a servant for a term of years. Additionally, persons who were captured in warfare—such as Indians, Africans, or Irish—might be sold as indentured servants; the latter two of course would have to be transported across

---

43.  [Large handguns, typically worn in saddle bags. Note the eighteenth-century usage of "gun," which at the time meant a long gun, and not a handgun.—EDS.]

44.  David J. McCord, 7 Statutes at Large of South Carolina 417-19 (1840) (enacted 1740, re-enacted 1743).

the Atlantic before sale. Or a convicted criminal in the United Kingdom might be offered the choice between execution at home or transportation to America as an indentured servant.

Legally, indentured servants were unfree. The master could employ their labor himself, or could sell or rent them to someone else. The key legal difference between an indentured servant and a slave was that an indenture was for a term of years, often seven or ten. In contrast, a slave often had no prospect for emancipation. Some Indian tribes did release slaves after years of service, and sometimes adopted them into the tribe. *See, e.g.* Ch. 6.A.8.c (Seminole Indians). Slaves were usually allowed to earn money on their own time, such as by working as a craftsman. They sometimes earned enough to buy their own freedom, and some laws required that a master emancipate a slave who offered a certain sum. Some owners emancipated slaves freely, such as in the master's last will and testament. Legal restrictions on emancipation would become much stricter in Southern states during the nineteenth century.

As described above, colonies often obliged heads of households to ensure that their servants and children were armed. In addition, the colonies generally required that when an indentured servant or apprentice finished his or her term of labor, the master provide some goods, known as "freedom dues," so that the person could begin independent life.[45] Some colonies specified that firearms were part of freedom dues.

For example, Maryland required masters to give discharged male servants, "One Gun of Twenty Shillings Price, not above Four Foot by the barrel, nor less than Three and a Half; which said Gun shall, by the Master or Mistress, in the Presence of the next Justice of the Peace, be delivered to such Free-man, under the Penalty of Five Hundred Pounds of Tobacco on such Master or Mistress omitting so to do. . . ." 22 Archives of Maryland 548 (William Hand Browne ed., 1902) (enacted 1699). A 1704 amendment fined a former servant who sold his gun within the ensuing 12 months. 26 *id.* at 256 (William Hand Browne ed., 1906).

In North Carolina, a 1715 statute told the master to discharge his or her obligation by giving the freed servant three barrels of Indian corn and two suits of clothes, or one suit of clothes and "a good well-fixed Gun, if he be a Manservant." The Earliest Printed Laws of North Carolina, 1669-1751, at 63 (John D. Cushing ed., 1977). A 1741 statute revised the freedom dues and ended the arms mandate. *Id.* at 165.

Virginia's freedom dues for males included "one well fixed musket or fuzee, of the value of twenty shillings, at least."[46] By custom, in sparsely settled South Carolina, freedom dues were 50 acres of land and a firelock musket.[47]

As described *supra*, in Massachusetts Bay and Plymouth colonies, a former servant could not set up his own household until he had his own firearm. The laws likely encouraged that freedom dues in those colonies include a firearm.

---

45.  *See* Farley Grubb, *The Statutory Regulation of Colonial Servitude: An Incomplete-Contract Approach*, 37 Explorations in Econ. Hist. 69 (2000).

46.  3 The Statutes at Large of Virginia 451 (1836) (enacted 1705).

47.  Theodore Harry Jabbs, The South Carolina Colonial Militia 1663-1733, at 137-38 (Ph.D. thesis in History, U. of N.C. Chapel Hill, 1973).

## NOTES & QUESTIONS

1.  What might be some reasons why the American colonies were more insistent than England that many people own or carry arms? Why did American colonial legislatures but not the British Parliament require some women to be armed?

2.  Rights and duties can be synergistic. How might the laws described above have helped make Americans think that they had a right to carry weapons?

3.  Current federal law prohibits minors from possessing handguns, with some exceptions. Chs. 9.C.3.k, 13.C. Some states also restrict possession of handguns or all firearms by persons under certain ages. Why do you think that the colonies typically mandated armament and training by males 16 or older? Why did Massachusetts require training for children of both sexes over age 10? Why are laws different today? Further reading: David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U.L.J. 495 (2019); David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. Ill. U.L.J. 119 (2018).

## 2.   Early Firearms Control and Prohibition

### a.   Safety Regulations

Some colonial laws prohibited unsafe behavior with guns, including making noise at the wrong time. Besides being weapons, firearms were the leading tool for rapid communication. For example, on the night of April 18, 1775, Paul Revere and William Dawes rode though Massachusetts towns to warn that the British were coming. The alarm was spread from farm to farm, town to town, far beyond the sound of the riders' voices, by the firing of guns. Gunfire was the standard method of raising an alarm. Inappropriate gunfire could raise a false alarm.

Thus, in 1656 Virginia banned shooting "any guns at drinkeing (marriages and funerals onely excepted)." While guns supposed to be the alarm of an Indian attack, "no certainty can be had in respect of the frequent shooting of gunns in drinking. . . ." 1 Hening at 401-02. Preventing miscommunication might have motivated a 1642 Maryland law that "No man to discharge 3 guns within the space of hour . . . except to give or answer alarm." 3 Archives of Maryland at 103. Likewise, Plymouth forbade nighttime gunfire, except for shooting wolves "or for the finding of some man lost." Plymouth Laws at 56 (1636).

In England, setting up guns triggered by tripwires was a common anti-poaching tactic. Plymouth outlawed setting guns except in enclosures and required a warning to the neighbors. *Id.* at 163 (enacted 1670).

In 1713-14, the Massachusetts assembly determined that "by the indiscreet firing of guns laden with shot and ball within the town and harbour of Boston, the lives and limbs of many persons have been lost, and others have been in great danger, as well as other damage has been sustained." Accordingly, the legislature outlawed shooting any "gun or pistol" in Boston, "the islands thereto belonging excepted." The Act expired by its own terms in three years and had an exception of

militia training under the supervision of an officer, and any other target shooting authorized by a militia, but there was no explicit exception for self-defense.[48]

In Pennsylvania, colonial legislation, which remained after independence, fined anyone who "shall fire any gun or other fire arms . . . within the city of Philadelphia." Likewise, it was illegal to "wantonly, and without reasonable occasion, discharge and fire off any hand-gun, pistol or other firearms" in inhabited areas on New Year's Eve. Violators were fined. An Abridgment of the Laws of Pennsylvania, 1700-1811, at 173-74 (John Purdon ed., 1811). Pennsylvania also punished anyone who "shall presume to carry any gun, or hunt" on the land of others without permission, or who "shall presume to fire a gun on or near any of the king's highways." *Id.* at 208.

### b.  Gun Restrictions on Blacks

#### (i)  Virginia

In 1680, Virginia forbade "any negroe or other slave [i.e., an enslaved Indian] to carry or arme himselfe with any club, staffe, gunn, sword or any other weapon of defence or offence." 2 Hening at 481. In early Virginia, free Blacks and Indians were part of the militia, later excluded, and reincluded in 1723. Black or Indian militiamen, as well as Blacks or Indians who lived in their own house, could have one gun. 4 *id.* at 131. Blacks and Indians who were "not house-keepers, nor listed in the militia" were prohibited arms. On the frontier, all Blacks and Indians could possess arms if granted a license. After 1738, free people of color were still required to serve in the militia, but they "shall appear without arms." 5 *id.* at 17. During the American Revolution, military necessity pressed Virginia to allow free Blacks in the state's military.[49]

#### (ii)  Maryland

Maryland adopted a licensing law that became typical in slave states during the nineteenth century. "[N]o negro or other slave, within this province, shall be permitted to carry any gun or any other offensive Weapon, from off their master's Land, without licence from their said Master."[50]

#### (iii)  Delaware

Blacks were excluded from the Delaware militia in 1741 because of the discovery that year of a slave plot to burn New York City. De Valinger at 36-37.

#### (iv)  Rhode Island

Free Blacks were part of the militia pursuant to a 1667 statute. But after 1708, they were only allowed to serve in unarmed roles, such as musicians or laborers. René Chartrand, Colonial American Troops 1610-1774 (1), at 23 (2002).

---

48.  3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 305-06 (1878).

49.  L.P. Jackson, *Virginia Negro Soldiers and Seamen in the American Revolution*, 27 J. Negro Hist. 247 (1942).

50.  1 The Laws of Maryland 117-18 (Virgil Maxcy ed., 1811) (enacted 1715).

### (v)  Georgia

The last of the original 13 colonies, Georgia was founded in 1733 by James Oglethorpe as a place where debtors could make a new start, instead of being sent to debtors' prison in England. Oglethorpe intended for the colony to have no slaves, but that plan did not work out. A 1755 statute, revised in 1768, forbade slave possession or carrying of "Fire Arms or any Offensive Weapon whatsoever," unless the slave had written permission from his or her master, mistress, or overseer to hunt. Slaves could also carry guns without written permission when accompanied by a White of at least 16 years old, or when hunting destructive birds on their master's plantation during daytime. However, no slaves could have arms between sunset Saturday and sunrise Monday.[51] Slavery existed in all 13 colonies before the Revolution. In the colonial period, the most common approach was for slaves' arms to be left to the discretion of the master. Some saw no problem with slaves having a gun for hunting. Most of the above colonial statutes added formality, by requiring a written permission, presumably to facilitate enforcement against unauthorized carrying. Virginia overrode discretion by categorically forbidding slave armament. As will be described in Chapter 6.E, in the nineteenth century, slavery laws grew more restrictive, with categorical bans.

### (vi)  Slave Patrols

The Georgia statute limiting arms carrying by slaves also created slave patrols, with the duty of "Searching and examining any Negroe house for Offensive Weapons Fire Arms and Ammunition." The Georgia statute was modeled on South Carolina law. Sally E. Hadden, Slave Patrols: Law and Violence in Virginia and the Carolinas 24 (2001). The South Carolina patrols were separate from the militia for many years, then integrated after 1740. Section E.3.g.

Practices in Southern colonies varied.[52] Virginia's slave patrols were created by statute in 1727 and revised in 1738. The statute arose from the general laxity of Virginia slave owners in enforcing legal restrictions on slaves. While the slave patrols were part of the Virginia militia, they tended to operate only on holidays, when large numbers of slaves would gather. Id. at 29-32.

Slave patrols were created in North Carolina in 1753, also because of the unreliability of private enforcement of the slave laws. The North Carolina patrols were separate from the militia and run by the county courts. In North Carolina, participation in the slave patrol garnered an exemption from militia duty. Id. at 32-40.

As the name indicated, the main function of slave patrols was to search for slaves who were off their masters' property without written permission. The patrols also searched slave quarters for illegal arms. The North Carolina patroller's oath was to be a "searcher for guns, swords, and other weapons among the slaves in my district." Id. at 78. Some slave owners greatly resented patrollers entering their land

---

51.  19 (part 1) Georgia Recs. at 76-78 (1755), 117-18 (1768).

52.  The border between Pennsylvania, Maryland, and Delaware is known as the Mason-Dixon Line. Over time, all the states north of the line except Delaware abolished slavery, and none of the states to the south did so. Climatologically, the conditions for slave labor were more favorable south of the Mason-Dixon Line.

or whipping their slaves without permission. *Id.* at 130-31. All of the slave patrols long post-dated general law enforcement entities, such as sheriffs, justices of the peace, town constables, and so on, all of which had very deep roots in English.

For Pennsylvania and all colonies to the north and east, there was no slave patrol system. In New England, slaves were a tiny part of the population. The more common use of the militia was to suppress riots by Whites, which the militia did well, except when it refused because it agreed with the rioters' grievances. *See* John Shy, Toward Lexington: The Role of the British Army in the Coming of the American Revolution 40 (1965).

### (vii)   Changes during Wartime

Military needs often led to formal changes in laws, or relaxed enforcement. For example, during the French and Indian War (1754-63), even slaves were sometimes armed and enrolled in colonial militias.[53]

The greatest military crisis was the Revolution. Initially, free Blacks were allowed to enlist in the Continental Army, but they were later removed under Southern pressure. In the third year of the war, manpower demands became overwhelming. Free Blacks were included in the Continental Army and almost all state militias and state armies. So, too, were slaves. Typically, the master would receive compensation from the state, and the slave would receive freedom at the end of the war. The two states that resisted were South Carolina and Georgia. Benjamin Quarles, The Negro in the American Revolution 62-67 (1961). Alexander Hamilton unsuccessfully attempted to change their minds, writing, "the plan is to give them their freedom with their muskets."[54]

Meanwhile, the British offered freedom to any slave who would run away and serve the British army. To avoid causing problems for Loyalist slave owners, the British did not attempt to incite slave insurrection. They did aim to cripple the rebel economy by depriving it of labor. Slaves viewed the matter pragmatically, and chose whichever course was available to freedom. As a result, the number of Blacks who joined with the British was far larger than the number who fought the British. Quarles at 111-81.

The devastation to the slave economy in South Carolina and Georgia was immense. When the Constitutional Convention met in 1787, almost all the state delegations favored an immediate prohibition on slave imports—a measure the Continental Congress had promoted since 1775. Indeed, wartime conditions, plus the British naval embargo against all trade by rebelling America, had amounted to a de facto ban on slave imports. But at the Constitutional Convention, South Carolina and Georgia vehemently insisted that they needed time to recover the slave populations that they had lost during the war. Without a delay in the import ban, they would refuse to join the Constitution. Accordingly, congressional power

---

53.  *See* Benjamin Quarles, *The Colonial Militia and Negro Manpower*, 45 Miss. Valley Hist. Rev. 643 (1959).

54.  Letter from Alexander Hamilton to John Jay (Mar. 14, 1779) (letter intended to be shared in S.C.), *in* 2 Papers of Alexander Hamilton: 1779-1781, at 17-18 (Harold C. Syrett ed., 1961); Walter Millis, Arms and Men: A Study in American Military History 28 (1956).

to prohibit slave imports was not allowed to operate until 1808. U.S. Const., art. I, § 9, cl. 1.[55]

### c.   Sporadic Disarmament of Dissidents

The American colonies never experienced the pervasive attempts to disarm almost all the free population that took place in England during the seventeenth century under the Stuart kings. *See* Ch. 2.H. There were occasions when religious or political dissidents, or persons suspected of disloyalty, were disarmed.

In the 1630s in Massachusetts Bay, Anne Hutchinson criticized the Puritan government for its legalistic interpretation of the Bible. She expounded the antinomian principle that the Old Testament was no longer binding law. In 1637, Hutchinson and some of her supporters were tried and then banished. Seventy-seven of them were disarmed.[56]

The Massachusetts government had expected that Hutchinson and her supporters would sail back to England. Instead, they moved to Rhode Island, which had been founded in 1636 by the Baptist Roger Williams (also banished from Massachusetts) upon the principles of separation of church and state and of complete religious liberty.

Following Bacon's Rebellion (Section E.3.f), a 1676 Virginia statute affirmed "that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." 2 Hening at 403. The wording implied that it was illegal to sell arms or ammunition to disloyal persons.

In 1754, a global war began between the United Kingdom and France. Known in America as the French and Indian War, it pitted Protestant versus Catholic. In 1756, Maryland removed Catholics from the state militia, and as a setoff, doubled their real estate taxes. 52 Archives of Maryland 450 (J. Hall Pleasants ed., 1935) (exempting from militia service "Papists, the Persons commonly called Neutralls, Servants, and Slaves"), 598 (forbidding military enlistment of any "Roman Catholic or Deserter, knowing them to be such"). Marylanders who refused to swear loyalty to King George III also were forbidden to possess arms or ammunition. *Id.* at 451-52. Further, "all Arms Gunpowder and Ammunition of what kind soever any Papist or reputed Papist within this Province hath or shall have in his House or Houses" were to be confiscated. *Id.* at 454.

---

55.  In the compromise struck at the Convention, the Deep South abandoned its proposal that a congressional supermajority be required for laws regulating commerce. In exchange, the other States agreed to the 1808 rule and also agreed to prohibit all taxation of exports. *See* Peter A. Dorsey, Common Bondage: Slavery as Metaphor in Revolutionary America 204 (2009). It is interesting to imagine what might have happened if the converse compromise had been struck; slave imports would have been immediately prohibited, and there would be many fewer federal criminal statutes—including the federal Gun Control Act of 1968—enacted on the basis of the Commerce Clause.

56.  *See* Bradley Chapin, Criminal Justice in Colonial America, 1606-1660, at 103-04 (1983); Edward Johnson, Johnson's Wonder-Working Providence: 1628-1651, at 175 (J. Franklin Jameson ed., 1959) (listing numbers of persons disarmed in each town); 1 Mass. Bay Recs. 211-12 (disarming orders).

The policy in next-door Virginia, where the Catholic population was much smaller, was milder. Catholics were required to take a loyalty oath. Only if they refused would their arms be taken. 7 Hening at 35 (enacted 1756).

The Canadian island province of Nova Scotia was under British rule, but the population was mostly French. During the war, the British insisted that the Nova Scotians swear allegiance to King George. Some of these Acadians, as the Nova Scotia French called themselves, instead moved to French Louisiana. Many who refused the oath were deported to other British colonies. Some were sent to Georgia as indentured servants; there they were restricted from possessing firearms. A 1756 Georgia law forbade an indentured Acadian "to have or use any fire Arms or other Offensive Weapons otherwise than in his Masters Plantation or immediately under his Inspection. . . ." 18 Georgia Recs. at 190-91.

On the eve of the French and Indian War, New Jersey's Royal Governor Belcher ordered the confiscation of arms from Moravians — a sect of pacifist immigrants from Germany. They owned firearms for hunting but would not use them for fighting. Although Belcher called them "Snakes in the Grass and Enemies to King George," they might simply have been the handiest targets for confiscation, since the Crown government of New Jersey had no firearms of its own.[57]

## NOTES & QUESTIONS

1.  How common should a particular restriction or practice be to be considered to demonstrate a traditional consensus that the restriction does or does not violate the right to arms?

3.  *East Jersey*. "Offensive" arms carrying to create "terror" was outlawed in some colonies by statute, and in others by common law. *See* Chs. 2.F, 6.B.5. Peaceable carry of any arm was lawful everywhere in America until East Jersey in 1686. Then, a statute outlawed *concealed* carry: no person "shall presume privately to wear any Pocket Pistol, Skeines, Stilladoes [stilettos], Daggers or Dirks, or other unusual or unlawful Weapons."

Another provision limited open carry of some arms by frontiersmen: "no Planter shall Ride or go Armed with Sword, Pistol, or Dagger," except when in government service, or "Strangers, Travelling upon their lawful Occasions through this Province, behaving themselves peaceably."[58] A "planter" was "One of those who settled new and uncultivated territory."[59] Thus, frontiersmen could openly carry long guns, but not handguns. People in towns could openly carry anything.

In 1688 the gun-confiscating King James II of England was removed by the Glorious Revolution. The new monarchs William and Mary in 1689 expressly affirmed the English constitutional right to arms. Ch. 2.H. Whatever the prior East

57.  *See* 8 Archives of the State of New Jersey, 1st ser., Part II, 158-61 (1885) (letters dated Nov. 10, 1775).

58.  The Grants, Concessions, and Original Constitutions of the Province of New-Jersey 289-90 (1758). A skein (or skain, skeyn, scjan, skean) was a double-edged dagger, associated with Ireland and Scotland. George Cameron Stone, A Glossary of the Construction, Decoration and Use of Arms and Armor in All Countries and in All Times 566-67 (1999); Logan Thompson, Daggers and Bayonets: A History 48-51 (1998).

59.  Richard M. Lederer, Jr., Colonial American English 175 (1985).

Jersey statute had said, the new attitude seemed to be that a free person could carry any firearm, including a pistol, anywhere. According to a 1694 East Jersey statute, enslaved persons could "carry any gun or pistol or take any dog with him or them into the woods, or plantations" only if companied by their owner or by a White man acting on the owner's instructions. East N.J. Laws ch. 2 (1694). If slaves could be authorized to carry pistols in woods and plantations, then necessarily free people could carry pistols there, too.

After East Jersey and West Jersey were merged into New Jersey in 1702, there is no known subsequent evidence to suggest that the old East Jersey carry law remained in force. New Jersey first required a permit for concealed carry in 1905. 2 Compiled Stats. of N.J. 1759 (1911). A permit for open carry was required in 1966. N.J. Stat. Ann. § 2A:151–41 (1966).

4. **CQ:** Racial conflict is present from the beginning of the story of guns in America. *See* Nicholas Johnson, Negroes and the Gun: The Black Tradition of Arms (2014). As we will see in subsequent chapters, disarmament of Blacks, both slave and free, has been a frequent issue in American firearms policy. Starting in the early twentieth century, concerns about immigrants also became important in gun control. *See* Chs. 6-9.

5. **Further reading**: For colonial arms laws and practice, see Clayton E. Cramer, Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie (2009). For colonial and subsequent prohibitions on persons considered dangerous, see Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms* , 20 Wyo. L. Rev. 249 (2020).

## C.   INDIANS: TRADE AND RESISTANCE

The history of the right to bear arms in America has mostly left the Indians off-stage, except to briefly note that people on the frontiers needed arms for defense against Indians. The narrow view is misleading. The American gun culture of today, like the gun culture of America in 1776, is in significant part a product of Indian arms culture. At the beginning, the English had the guns, and the Indians had the culture. The encounter of the two helped produce America's unique gun culture, and, indeed, the Americans' understanding of themselves as a distinct people, no longer English.

Chapter 2 examined English arms law and culture. Both influenced the American colonies, especially at the beginning, but less so as time progressed. By the time the Second Amendment was being proposed, England had become, to Americans, a negative example of too much government control and too little individual skill at arms. Ch. 2.H.6. Perhaps nothing was so important in changing the American mind than what the Americans were forced to learn from Indians.

American Indians are sometimes portrayed as hapless victims of the European immigrants. The truth is more complicated, and firearms are at the center. Whereas the Aztecs of Mexico and the Incas of Peru were swiftly toppled, firearms were the sine qua non for why American Indian natives who started with Stone Age technology were able to resist European-American expansion for nearly three centuries.

There were hundreds of Indian tribes. The smallest might number several dozen, the largest over 10,000. For example, the five tribes of the Iroquois Confederacy, discussed below, comprised about 16,000. Michael Johnson, Tribes of the Iroquois Confederacy 4 (2003).

In the New World, like in the Old World, how much land any group controlled depended on its military ability to conquer and defend.[60] Groups made alliances that lasted as long as both parties considered them beneficial, gained or lost land depending on the outcome of warfare, moved hundreds of miles to new areas when they chose, and took over new areas when they could.

Every incipient colony quickly found Indian allies, usually the ones who happened to live nearest to wherever the colonists had arrived. Trade relations developed immediately. The colonists offered cloth (the largest trade item, based on total value), metal tools (including edged weapons), beads, and other goods. While Indians could do without cloth or beads if they had to, they insisted that trade include firearms, gunpowder, ammunition, and, ideally, gunsmithing services. The most important good offered by the Indians was peltry (animal skins). Deerskins were important; they are why one dollar is called "a buck." Beaver skins were especially valuable, later supplanted by buffalo robes, starting around 1830. *See* David B. Silverman, Thundersticks: Firearms and Violent Transformation of Native America 15 (2016).

Soon much of the Indian economy was globalized. Back in the Old World, consumers appreciated the warmth of their new beaver hats. Demand was so great that the beaver near the American Eastern Seaboard were hunted to near extinction.[61] So the colonies' Indian allies developed trade networks deep into the American interior. Some of the American colonists, like the French *coureurs de bois* (lit., runners of the woods), conducted their own interior trade, trying to make Indian friends as they went and to stay out of the way of the Indian enemies of their Indian friends. The traders were predecessors of America's nineteenth-century *mountain men.* Ch. 6.A.8.a. All were known for their hardy independence; as intermediaries between two cultures, some married Indian wives. In global networks of commerce, such as the Great Huron Trade Circle, the beaver that ended up on a man's head in Lyon, France, might have been caught by a Winnebago in southeast Wisconsin, traded to a Huron near Lake Erie, then bought by a *coureur*, sold to a trading ship in a Canadian port, then passed through other hands on its way from a French port to inland Lyon. The Winnebago, the Frenchman with the new hat, and the middlemen all benefited from the exchanges. Everyone was better off, except the beaver.

For the Indians, firearms were mandatory in trade. *See, e.g.,* Patrick A. Malone, The Skulking Way of War: Technology and Tactics among the New England Indians

---

60. [O]ne occupied a hunting ground precisely as long as one could hold it by force of arms. Indeed, the very migration of the "South Plains" tribes to the South Plains had occurred because a powerfully expanding Sioux Nation had physically driven them from their old territories, and when they arrived on the South Plains and found them already occupied by Apache Indians, the latter had to be vanquished and driven into the deserts of the Southwest.

James L. Haley, The Buffalo War: The History of the Red River Indian Uprising of 1874, at 2 (1976).

61.  For example, by 1640 the Iroquois had wiped out almost all the beaver in their Iroquoia homeland, comprising most of upstate New York. Johnson, Tribes, at 8.

(1991); J. Frederick Fausz, *Fighting "Fire" with Firearms: The Anglo-Powhatan Arms Race in Early Virginia*, 3 American Indian Culture & Res. J. 33 (1979). Trade, from the Indian viewpoint, was not an impersonal market exchange. It was a manifestation of enduring friendship and brotherhood. A colonist who would not supply arms was no friend; if he sold arms to an enemy tribe, he was an enemy. A strong trading relationship was supposed to include gunsmithing services, free or at low cost, plus ample and continuing sales of gunpowder and bullets.[62] Trade and friendship also included reciprocal gift giving, and Indians often expected the gifts to be firearms or ammunition. At times, the quantities of gifts demanded and received made some European-American colonies into de facto tributaries of their Indian friends.

Why were firearms so important to the Indians? They were helpful for hunting medium-size game or larger. One bullet or one arrow could each kill a deer. But the bullet was much more likely to bring down the animal immediately; a deer fatally wounded by an arrow might run for a long distance and never be found. In warfare, firearms conferred a huge advantage. Indian armor, such as animal skins, might blunt or mitigate an arrow, but not a bullet. A bullet was more likely to immediately stop an adversary, and more likely to produce a fatality, including by infection of a deep wound. Silverman at 28-29. The single-shot guns of the time were far slower to reload than a bow, so a well-equipped warrior carried both.

Wars had existed in America before firearms were introduced, but firearms would affect who won the new wars. The tribes who had guns—the tribes who had the best trade relations with the European-American colonists—routed their less-armed enemies. Well-armed tribes became ascendant powers in America, sometimes far stronger than their colonial neighbors. Necessarily, the tribes in the interior endeavored to get firearms for themselves, through middlemen if necessary.

Fortunately for them, there were a lot of willing sellers. There were five European colonial powers near the eastern shore, and the several colonies of New England each pursued their own agendas. If one colony wouldn't sell, another one would, and everyone knew it. Besides, even if a given colonial government outlawed the Indian arms trade, many colonists would still sell arms. For some vendors, the profitable arms trade was a temptation. For the colonists on the frontiers, where they were far outnumbered by Indians, not selling arms meant not being considered a friend by the Indians, and the absence of friendship was a deadly peril.

Over the long run, one might say that the Indians got the better side of the gun trade with the European-Americans. "To the extent that Indians held back this [Old World immigrant] tide, it was in no small part because of, not despite of, their adoption of firearms. . . ." Silverman at 18. From the early sixteenth century to the late nineteenth century, firearms improved dramatically: muzzleloaders replaced by breechloaders; matchlocks replaced by flintlocks, then by percussion ignition, then modern primer ignition; round balls replaced by conical bullets; single-shot guns replaced by revolvers and lever-action long guns; constant improvements in gunpowder quality. Every step of the way, as soon as a new technology became affordable to the American middle class, it would also be found widely in Indian

---

62.  Or lead ingots—Indians could cast their own lead bullets from molds, as the European-Americans had taught them.

hands. Indians were discerning and demanding consumers of firearms and ammunition. *Id.* at 27. As described below, the Indians' adversaries were almost never able to cut off their arms supplies. And as also described below, in any given fight, the Indians were often the most proficient firearms users.

The rest of this Part examines firearms in the interactions between Indians and the European-Americans. Section 1 looks at relations of the European colonial governments. Section 2 summarizes the contacts with the American colonies. Section 3 is a case study of the greatest Indian war of the colonial period, King Philip's War (1675-76). The deadliest war ever fought on New England soil displayed patterns that would be repeated in America for the next two centuries. Section 4 describes Indian slavery, the massive Indian slave trade that developed in the Carolinas, and the wars that resulted.

## 1.   European Relations with Indians

### a.   New Spain: No Guns for You, Except Sometimes

In 1501, only nine years after the first voyage to the New World by Spain's navigator Christopher Columbus, King Ferdinand and Queen Isabella banned the sale of guns to Indians. Still, Indians in Florida and the Southwest stole guns from the Spanish or bought them from trading networks linked to the French.

The enslaved Pueblo Indians of New Mexico acquired and hoarded guns one at a time and revolted in 1680. Pueblo attacks killed hundreds of Spanish immigrants and pushed Spanish settlement out of Santa Fe, all the way back to El Paso.[63] The Pueblo revolt resulted in the capture of many horses and began an expansion of a "horse frontier" that would eventually spread throughout the West. Silverman at 227-28. The new availability of horses would have profound consequences for Plains Indian prosperity and warfare, as will be described in Chapter 6.A.8.a. By 1692, the Spanish had regained their position in New Mexico, partly because they stopped trying to suppress Pueblo religion, and because many Pueblo decided they could not live without the partial protection that the Spanish provided from the Apache, Comanche, and Navajo. *Pueblo, in* 2 The Gale Encyclopedia of Native American Tribes 250 (Sharon Malinowski et al. eds. 1998); *Santa Ana Pueblo* in *id.* at 285.

The problem for the Spanish policy was that arms could often be obtained from other colonial powers, and the Indians would ally accordingly. For example, starting in the 1750s, Comanche raiders, using guns supplied by the French in exchange for Comanche horses, forced Spain to abandon north Texas. They bottled up eastward expansion of Spanish New Mexico and raided there often. Carl P. Russell, Guns on the Early Frontiers 26-34 (1957). In violation of orders from Mexico City, the Spanish governors of the province of Texas began making gifts of arms to the Comanche in an effort to appease them. Silverman at 234-35.

The Louisiana Territory, which France would sell to the United States in 1803, was a Spanish colony from 1762 to 1800. The Spanish colonial government, based

---

63.   *See* The Pueblo Indian Revolt of 1696 (J. Manual Espinosa ed., 1988).

in New Orleans, was separate from the Spanish colonial governments of Mexico/ Texas and Florida. In the interests of good Indian relations, and to cause trouble for the English or Americans east of the Mississippi River, Spanish Louisiana allowed French and other itinerant traders to sell arms to Indians. *Id.* at 144-45, 234.

Initially, Spanish Florida mostly adhered to the policy of not providing arms to Indians, with disastrous consequences for Florida Indians in the late seventeenth century. Section C.4. Depending on the circumstances, Spanish Florida eventually did allow some arms for Indians, particularly for use against American settlers in Georgia and Alabama. Russell at 38-39.

### b.   Russia: No Guns, Just Forced Labor

The standard European model for economic relations with indigenous Americans was trade, with the Indians most desirous of firearms and the Europeans of peltry. Russia, which began sending fur harvesting expeditions into Alaska in the eighteenth century, had a different model, previously developed in its relations with Siberian tribes. In Alaska, Russian expeditions kidnapped the women and children of Aleut villages and demanded ransom in the form of quantities of peltry. Then, to avoid future kidnappings, the village wound have to pay the Russians an annual tribute in peltry. Finally, all Aleut men would be required to labor a certain number of days for the Russians. Silverman at 158.

### c.   New Sweden and the Delaware Indians: Progenitors of the American Backwoods Frontiersmen

Swedish traders began arriving in the New World in 1610. New Sweden was established in 1638, comprising areas around the lower Delaware River and its valley (which separates Pennsylvania from New Jersey). New Sweden included portions of the future states of Delaware, New Jersey, and Pennsylvania. Like the Delaware River, the nearby Susquehanna River allowed traders to venture far into the interior. New Sweden traded guns with Indians freely. They even sold cannons to the Susquehanna (a/k/a Susequehannock).

Many of New Sweden's settlers were Finnish, for at the time Finland was ruled by the Swedish Empire. The particular settlers chosen for America, the Savo-Karelians, were Finns who had moved to the dense forests of western Sweden. They were the only early European immigrant group with substantial preadaptation for American conditions. They already knew how to survive in a wooded frontier, and they already had experience trading with indigenous groups, namely the Lapps of upper Scandinavia. They hunted enthusiastically with flintlock rifles and shotguns and knew how to make and repair guns in their own forges. *See* Terry G. Jordan & Matti E. Kaups, The American Backwoods Frontier: An Ethical and Ecological Interpretation 222-24 (1988). To the annoyance of Queen Christina of Sweden, they often violated Sweden's game laws, including in the royal forests. *Id.* at 213. Their log cabins and fences were made to be constructed by people who were skilled with axes but did not have access to a good supply of nails; the entire lifestyle was suited for families ready to live independently. *Id.* at 251.

The settlers of New Sweden were mostly left to their own devices, and they quickly learned from the nearby Delaware Indians.[64] "On no other part of the colonial American frontier was such rapid and comprehensive acceptance of Indian expertise in hunting and gathering achieved. . . ." Jordan & Knaup at 232. Together, the Savo-Karelian Finns and the Delaware created the model for American backwoods pioneers. The Finns sent trading parties deep into the interior, selling firearms as they went. The Finns were the first of the American *long hunters*—men who would spend days, weeks, months, or longer in the interior, hunting and trading, and eventually returning with valuable peltry. Besides bringing back game, the hunting expeditions scouted new areas for future settlement. *Id.* at 217-18, 251.[65]

The Fenno-Delaware model for pioneer settlement provided for highly efficient use of labor for types of agriculture, animal husbandry (particularly, free range hogs), and hunting that collectively were resilient against misfortune. In an ever-repeated cycle, as local settlements grew, the pioneers would pick up and move even deeper into the interior, opening new frontiers. It was New Sweden, with cooperation from the Delaware, that built the enduring system of American pioneering into the backwoods.

In 1655, New Sweden was captured and annexed by New Netherland. The Dutch encouraged more Swedes to emigrate, as they "are conversant, and understand better than any other nation, . . . hunting and fowling."[66] After the English took New Netherland/New Sweden in 1664, they, too, recognized the unique backwoods talents of the Finns. Jordan & Knaup at 150.

64.  The common English names of many Indian tribes were bestowed by other tribes or by European-Americans. For example, the tribe known as the "Delaware" called itself "Lenape." For simplicity, this textbook uses common names. The Delaware River and Bay (and later, the colony) were named in honor of the first governor of the Virginia Company, Lord De La War (a/k/a Sir Thomas West).

The historical chapters of this textbook use the word "Americans" in contrast to "Indians." The usage would not be accurate in modern times, since in 1923 American citizenship was granted to all Indians, whereas before only some had been citizens. *See* Indian Citizenship Act, 43 Stat. 253 (1924). Whether citizens or not, Indians always lived in America, and thus were Americans. The term "Indians" is less cumbersome than "Native Americans" or "American Indians," especially in light of how much this textbook discusses them. Given that many Indians today prefer the word "Indian," we do, too.

We use "Americans" as a contrast to "Indians" in the historical chapters because any other phrasing is awkward or inaccurate; for example, "Anglos" or "White" are inappropriate, because the non-Indians in the American colonies or the United States were never all English or all White. We do use "European-Americans" at times to refer to the early European immigrants, whose identities were still conceived as partially European, and not yet entirely American.

65.  "The essential characteristics of the Midland American colonization system can be simply restated: steel ax, rifle, log construction, hog, worm fence [zig-zag with interlocking rails and crossed poles], scattered settlement, mobility, and shifting cultivation." *Id.* at 248.

66.  2 John R. Brodhead, Documents Relative to the Colonial History of the State of New-York Procured in Holland, England, and France 65 (1858).

Starting in the eighteenth century, the Scotch-Irish began emigrating to America, many of them to what had once been New Sweden.[67] Like other immigrants, such as the Germans, they had few, if any, of the above preadaptations, but they learned the Fenno-Delaware model and quickly headed to the frontiers. They moved up the rivers, deeper into the woods, eventually crossed the Appalachian Mountains, and then pioneered further west through the Ohio River Valley, southwest into future Tennessee and Kentucky, and across the Mississippi.

The culture of the American backwoods became mainly Scotch-Irish and Germanic — as with fiddles, musical yodeling, and the word "Bubba" (from German *bube*, boy). Like all immigrant identities, Scotch-Irish and Germanic identities were eventually weakened by intermarriage, and became contributors to the broader American identity. All the while, the Savo-Karelian-Delaware model of the means of pioneering — including the rifles and long hunting — remained, as it was perfect for American conditions. *Id.* at 233-35, 237, 252.

As this Chapter will describe, the American gun culture — and attitudes toward gun laws — that had become nationwide by 1775 grew syncretically from the British (who brought the guns) and the Indians (who brought the skills). To the mix were added the specific contributions of the Finns and the Delaware. American gun culture is not and never was merely English arms culture. It was something brand new; although the Fenno-Indian influence might not be much remembered, it was part of the core.

For further reading on Americans of the backwoods, *see, e.g.*, Mark A. Baker, Sons of a Trackless Forest: The Cumberland Long Hunters of the Eighteenth Century, M.S. Thesis in English, Utah State University (1992).

### d.   New Netherland: Reluctant Arsenal of the Northeast

Dutch settlers in New Netherland came from one of history's greatest trading empires. New Netherland claimed lands from Cape Cod (far southeastern Massachusetts) to the south side of the Delaware Bay. Charles McLean Andrews, Colonial Self-Government: 1652-1689, at 95 (1905). Although the English colonies became dominant in southern New England, the Dutch trading there and on Long Island provided Indians there with alternative supplies of arms. Silverman at 96-98. The strongest Dutch zones of control were from Delaware to Manhattan Island, and then up the Hudson River. Under the auspices of the Dutch West India Company, New Netherlanders had emigrated to America for commerce, not religion. Soon, New Amsterdam become a polyglot city of people from many nations, mostly devoted to making money. New Amsterdam is now called New York City, and is still polyglot and commerce-minded.

The nation that had dispatched the West India Company, the Dutch Republic, was an industrial powerhouse, and led the world in gun manufacture — partly by necessity because of the Republic's 1569-1648 war of independence against Spain.

---

67.  The Scots-Irish were Scots who had been encouraged by the English government to settle in Northern Ireland, as a means of preventing the frequent uprising of the Irish against English rule. A new word was coined for the Scotch-Irish farms in Ireland: *plantations*.

Dutch guns were high quality and affordable. Many would end up in the New World.[68]

New Netherland's settlements extended northward up the Hudson River Valley, with Albany (at the time, Fort Orange) being the furthest outpost. Soon, the Dutch met the Mohawk, easternmost of five nations of the Iroquois Confederation. The other Iroquois nations were, from east to west, the Oneida, Onondaga, Cayuga, and Seneca. As a confederation, the Iroquois often made common cause, but not always. At times, different Iroquois nations might fight on each side of a war.

In the 1630s, the Iroquois informed the Dutch that if they did not supply arms, the Iroquois would take their beavers to New England, and buy guns there. Then the Dutch would no longer be friends with the Iroquois, who were in a good position to wipe out the isolated Dutch outposts along the upper Hudson River. Silverman at 32. In short, "No guns, no peace." The Dutch opted for peace and trade with the Iroquois.[69]

In 1643 the Director-General of New Netherland (the company's chief executive in the colony) aggressively blundered his way into starting Kieft's War (1643-45) against the Wappinger, a non-Iroquois tribe in the eastern Hudson River Valley, south of the Catskill Mountains. Other tribes in the lower Hudson area joined, on each side. New Amsterdam was nearly wiped out; the defensive wall built during the war would later become the namesake of Wall Street.

Kieft was replaced by the West India Company, which ordered an end to private firearms sales to Indians. Only the Director-General could sell guns to Indians, and he should so with "a sparing hand." As applied, the Director-General confiscated illegal guns from fur traders, and then sold the same guns to Indians for personal profit. The example from the top led to much law evasion and corruption, including by fur traders who would be ruined if they couldn't offer guns. Francis Jennings, The Ambiguous Iroquois Empire: The Covenant Chain Confederation of Indian Tribes with English Colonies 84 (1984); Silverman at 33. To control the black market, the New Netherland government attempted to license gun traders in 1650.

In 1656, the government decreed that settlers themselves could possess only matchlock guns. Flintlocks, which were newer, more reliable, and easier to fire, were banned. A death penalty for selling guns to the Indians was enacted, but gun trading with the Indians continued. Russell at 10-13.

By the early 1660s, the Dutch had given up on prohibition, and were manufacturing muskets specifically for the Iroquois market. Compared to guns for sale in Europe, the Dutch trade guns were shorter and lighter, and thus better for use in forests or for carrying long distances.[70]

---

68.  H. Ph. Vogel, *The Republic as an Arms Exporter 1600-1650, in* The Arsenal of the World: The Dutch Arms Trade in the Seventeenth Century 13-21 (Jan Peit Puype & Macro van der Hoeven, eds., B.J. Martens, G. de Vries & Jan Peit Puype trans., 1996) (Dutch edition 1993).

69.  To entice settlers, the West India Company had promised to take care of military defense. Even so, in 1640 a militia law was established, with units arranged by trade guilds. The militia usually did not do much other than night watch. It did join European Dutch regulars in conquering New Sweden in 1655. Chartrand (1) at 41.

70.  Silverman at 28.

Because the Iroquois Confederation had the upper hand in its relationship with New Netherland, they were able to turn Fort Orange into a monopoly armory. They prevented other tribes from trading there, and thereby made themselves the essential middlemen for the largest armory in a wide region. Other tribes that wanted to sell peltry or buy firearms had to go through the Iroquois.[71] Because the Iroquois became better armed than other regional tribes, they were able to raid and conquer far and wide. Their aggression peaked in the Beaver Wars of 1648-57. For example, the Iroquois Seneca (south of Lake Erie) conquered the north side of the Lake, driving the Huron out of their homeland. As nearby tribes eventually reached arms parity, the Iroquois ranged further for new targets. They first attacked the Illinois Confederacy in 1655. In 1680 they wiped out the Espeminkia tribe. They were finally repulsed from Illinois in 1684. Silverman at 23-47; *Huron in* 1 Encyclopedia of Native American Tribes at 63; *Illinois in id.* at 69-70.

In 1664, several British warships showed up in the harbor of New Amsterdam, loaded with soldiers. Unpopular and autocratic Director-General Peter Stuyvesant ordered the New Netherlands militia to defend the city, but the militia was not much interested in doing so. Conquered almost effortlessly by Great Britain, New Netherland became the British royal colony of New York.

### e.   The United Kingdom and the Iroquois Confederation: A Powerful Alliance

In 1622 King James I ordered New England merchants to stop selling the Indians arms.[72] The ban was repeated by King Charles I in 1630.[73] From the colonists' point of view, however, the King of England was very far away, and the Indians very close. Colonies and colonists traded with Indians according to their own perceived interests.

By the time the British took New Netherland in 1664, the British government had begun making arms supply to Indians part of its diplomacy. When Fort Orange was renamed Albany, the Dutch traders stayed.

The King of England and the Iroquois Confederation became formal allies in 1677. The alliance extended to what the Iroquois called the Great Covenant Chain, which embraced tribes who were willing or not-so-willing "little brothers" of the Iroquois. According to a French nobleman writing from Canada in 1685, among the Indian nations, the Iroquois "are the most powerful by reason of the facility they possess of procuring arms from the English." The Iroquois made "large purchases . . . at a low rate [cost]." Laramie at 66. As New York and French Canada competed for Iroquois favor, they each hired gunsmiths to live among the Iroquois. Silverman at 51.

With both France and Great Britain as supplicants, the Iroquois did not want to ruin the relationships by attacking tribes allied with either one. Nor could they

---

71.   *See* Michael G. Laramie, King William's War: The First Contest for North America, 1689-1697, at 1-31 (2017). Specifically, to go through the Mohawk, who controlled the easternmost area of the Iroquois Empire.

72.   1 Stuart Royal Proclamations: Royal Proclamations of King James I 1603-1625, at 555 (James F. Larkin & Paul I. Hughes Eds., 1973).

73.   2 Stuart Royal Proclamations: Royal Proclamations of King Charles I, 1625-1645, at 304 (James F. Larkin ed., 1983) (also forbidding teaching Indians "to make or amend" firearms).

attack tribes that had achieved arms parity. Nor the tribes who had already fled from the Iroquois, sometimes crossing the Mississippi. The remaining available targets were to the south and far west. Silverman at 50. With the encouragement of the New York government, the Mohawks in 1676 joined King Philip's War, to support New England in its battle for survival with the Wampanoag. The second front opened by the Mohawks was decisive, and the Wampanoag were soon defeated. *See* Section C.3.

For most of the seventeenth century, Great Britain and France did not war against each other in North America. Then, between 1689 and 1763, there were four North American wars between the two, as theaters of global wars. Most of the Iroquois nations fought on the side of British North America, against New France and her own Indian allies.

The strategic wisdom of British arms supply to Indians was demonstrated by a brief experiment with a different policy. After winning the French and Indian War in 1763, Great Britain was financially exhausted. To cut expenses, the new Governor General of the formerly French territories—Canada plus America between the Appalachians and the Mississippi—refused to adopt the French policy of making generous annual presents of guns and powder to tribal leaders. The French-allied tribes of the Great Lakes region were perfectly willing to become new friends with the British. But the haughtiness of Governor-General Jeffrey Amherst made it clear that he regarded Indians as subjects, not brothers.[74] The result was Pontiac's War, waged from Pennsylvania to Wisconsin by 22 tribes, the largest Indian war alliance heretofore seen. The war begun in 1763 ended in 1764 when Amherst was replaced by the more diplomatic Thomas Gage, and the arms gifts began coming. The gifts were costly, but much less so than warfare. *Id.* at 121-54.

When the American Revolution came, most of the tribes that had fought in Pontiac's War allied with the British. *Id.* at 153. So did four of the now-six Iroquois nations, devastating parts of upstate New York.[75] Similarly, the Abenaki of Upper New England fought on each side. In all theaters of the Revolution where Indians were present, some allied with the British and some with the Americans. The same would be true when the British and Americans clashed again in the War of 1812.

For decades after American independence, British Canada provided arms to Britain's Indian friends in the United States, which the Indians put to effective use against Americans. Fur traders bearing arms from Canada ranged far and wide in the West. Silverman at 153.

### f.   The French and Their Many Friends

The French enjoyed several advantages in their arms trade and Indian relations. First, they manufactured the best gunpowder in the world. Discerning Indian

74.  Amherst was later involved in another gun policy controversy. When the people of London in 1780 patrolled their neighborhoods after the Gordon Riots of 1789, Amherst objected and issued orders demanding the guns be surrendered; his actions led to some stern criticism in Parliament. Ch. 2.J.3.

75.  Most Tuscarora and Oneida sided with the Americans. Johnson at 7. The Tuscarora had become the sixth nation of the Iroquois Confederacy in 1722, as relatives of the Oneida tribe. They had moved to North Carolina centuries before, then moved back after losing the Tuscarora War. *See* Section C.4.

buyers demanded French powder. The colonists of New France did not annoy the native population the way that the English colonists did—for there were far fewer of them. By 1740, the population of the English colonies had grown to 1.4 million, thanks to immigration, high fecundity, and low rates of infant and child mortality.[76] The French colonies were poorer and much lower in population. Unlike the Anglo-American colonists, the French were not putting pressure on the Indians for more land.

Rather, the French concentrated on commerce, not extensive settlement. Their empire of commerce started at the mouth of the St. Lawrence River in Canada, then upriver to the Great Lakes, and on to the rivers on the west slope of the Allegheny Mountains. From a base in New Orleans, another series of forts and trading posts stretched north, including along the Mississippi River. The immense arc of French forts and Indian friends bottled up the Anglo-Americans to the east. Indeed, the French construction of forts in the Ohio River Valley was what provoked the French and Indian War.

At first, the French had been willing to provide arms, but in a limited way. A gun was the reward for the many Indians who converted to Christianity. But the French soon had to loosen the policy, to save some of their allies, particularly the Algonquian Indians in the Great Lakes region. (Algonquian is a language group including many different tribes.) The Iroquois fighting the Algonquian had plentiful arms, and the Algonquian needed many more firearms to be able to hold on.

The biggest impediment to France's Indian arms trade was the high price of the arms. Patrick A. Malone, The Skulking Way of War: Technology and Tactics among the New England Indians 46 (1991). In general, French goods were higher priced, and often lower quality, than British trade goods, because the French economy was much less free than the British one.[77] Because the French could not compete with the English or Dutch in quantities of commercial arms, the French instead developed and maintained their Indian friendships by making gifts of firearms to leading men of a tribe or band. (A band is a subdivision of a tribe.)

On the whole, the French program worked. Most of their allies stuck with them throughout the Anglo-French wars of the eighteenth century. In the East, the French converted the Abenaki in northern New England into allies who thwarted northward English colonial expansion. In the South, arms supplies from New Orleans and its network of forts to the north also won many friends. Much further north, the Ojibwa and Dakota both had relationships with the French, but the Ojibwa were in the better trading position, received more firearms, and were able to force the Dakota out of northern Minnesota in the mid-eighteenth century. *Ojibwa* in Encyclopedia of Native American Tribes at 188-89; *Dakota, in* 3 *id.* at 242.

Although the French government lost all of its North American lands in 1763, French traders continued to operate long thereafter. In New Orleans, they sold their pelts and bought more guns and other trade goods for their next

---

76.  *See , e.g.,* Silverman at 103 (Seventeenth-century New England "women tended to marry young and bore, on average, eight children, most of whom reached adulthood and survived to old age").

77.  *See* William R. Nester, The French and Indian War and the Conquest of New France (2014).

expeditions. The Spanish governors of the Louisiana territory tolerated the trade.[78] *See* Section C.1.a.

### 2.   *The American Colonies: Futile Gun Controls*

In addition to the material in this Part C, American relations with Indians are also described in Part E.3 regarding colonial militias and armies.

American colonial legislatures often attempted to prevent some or all Indians from acquiring guns.[79] But they could not stop Indians from buying directly from the French, Dutch, or Swedish colonies, or from middlemen tribes. Moreover, the price that Indians would pay for the colonists' guns was so high that suppressing the arms trade was impossible. Virginia went to both extremes in attempting to cope with the situation. The House of Burgesses in 1619 declared that giving Indians any arms, "offensive or defensive," was treason and would be punished by hanging. Colonial Records of Virginia 25-26 (1874). The penalty was mitigated in 1658, to forfeiture of one's "whole estate." Further, anyone who discovered an Indian in possession of gun, powder, or shot could confiscate it. 1 Hening at 441.

The next year, the legislature repealed the ban, "it is manifest that the neighboring plantations both of English and [foreigners] do plentifully furnish the Indians with guns, powder & shot, and do thereby draw from us the trade of beaver to our great loss and their profit, and besides the Indians being furnished with as much of both guns and ammunition as they are able to purchase, It is enacted, That every man may freely trade for guns, powder and shot: It derogating nothing from our safety and adding much to our advantage." *Id.* at 525.

Later, after the Dutch lost New Netherland, Virginia attempted to resume its restrictive policy. In 1676, the frustrated legislature observed that "the traders with Indians by their avirice have so armed the Indians with powder, shot and guns, that they have been thereby emboldened." So the legislature again provided capital punishment for violations. Further, any Virginian found "within any Indian town or three miles without the English plantations" and carrying more than one gun or

---

78.  France conveyed Louisiana to Spain in the 1762 Treaty of Fontainebleau. Spain secretly retroceded Louisiana to France in 1800 in the Third Treaty of San Ildefonso. In 1803 France sold the Louisiana Territory to the United States. Treaty Between the United States of America and the French Republic, Fr.-U.S., Apr. 30, 1803, 8 Stat. 200.

79.  *See* , *e.g.*, 1 Archives of Maryland at 71 (enacted 1639) (felony "to sell give or deliver to any Indian or to any other declared or professed enemie of the Province any gunne pistol powder or shott without the knowledge or lycence of the Leiutenant Generall"); 3 *id.* at 103 (enacted 1642) (statute against selling arms to Indians, with potential capital punishment); *id.* at 250 (enacted 1649) ("noe Inhabitant of this Province shall deliver any Gunne or Gunnes or Ammunicon or other kind of martiall Armes, to any Indian borne of Indian Parentage"); de Valinger at 23 (enacted 1671) (Delaware ban on selling ammunition to Indians). Maryland's 1642 capital punishment statute was enacted the year that the Maryland colony declared war on the Susquehannock, which in a sense was a formal recognition of what was already going on. Sporadic fighting lasted over a decade. *Susquehannock*, in 1 Encyclopedia of American Indian Tribes 301.

more than "ten charges of powder and shot for his necessary use" was presumed to be illegally trading with the Indians. 2 *id.* at 336-37.

The situation was especially complex in southern New England. By 1670, the population was about three-quarters European-American and one-quarter Indian. For decades the various tribes had been adept in their political relations with the various colonies, playing one colony against the other. Given the growing power and numbers of the English, many Indians had sworn allegiance to the English king, and some of them had cooperated with English efforts to get them to settle in towns and convert to Christianity in at least a partial sense, becoming *praying Indians.*

A 1644 Plymouth statute barred the repairing of Indian arms. Plymouth Laws at 76. Gun sales to Indians were only allowed to those who worked for the colonists. To facilitate firearms sales, some Plymouth settlers would hire (or pretend to hire) Indians as servants for a month. The government cracked down in 1651, prohibiting the furnishing of arms to Indians except those who had served for "divers years and who are in good measure civilized and approved of by the Governor and his assistants." *Id.* at 94; Malone at 48. Indians were also forbidden to shoot at night, except in cases of necessity, lest it raise a false alarm. Plymouth Laws at 100. Plymouth repealed its ban on selling gunpowder and shot to Indians in 1665. Plymouth Laws at 148. The ban was revived in 1667 and repealed again in 1669. *Id.* at 152, 158. An even stronger ban was enacted in 1671, against any direct or indirect furnishing of arms or ammunition. The penalty was 20 times the value of what had been furnished. Further, Indians who "manifestly appear to be unfaithful and treacherous to us" shall forfeit their arms. *Id.* at 288. This was 1674. *Id.* at 171. Then a 1675 law forbade lending guns to Indians. *Id.* at 175. The Plymouth Colony's attempt to disarm the neighboring Wampanoag Indians precipitated King Philip's War in 1675-76. Section C.3. Finally, a 1682 enactment prohibited colonists from buying guns, tools, or clothes from Indians. *Id.* at 200.

Massachusetts Bay went through similar changes, although not as frequently as Plymouth did. Whenever Massachusetts Bay allowed arms sales to Indians, Plymouth had to follow, as the availability of arms in Massachusetts made prohibition in Plymouth impossible.

In 1642 Massachusetts Bay outlawed the sale to Indians of guns, gunpowder, shot, lead, or shot molds, and also outlawed White repair of Indian guns.[80] A few years later, Massachusetts Bay enrolled Indians in the militia. 3 *id.* at 268 (1652) ("Indians inhabiting with or servants to the English"). Then in 1656, they were excluded from the militia. *Id.* at 397.

Massachusetts licensed fur traders to sell guns and ammunition to Indians "not in hostility with us or any of the English in New England. . . ." 4 *id.* at 365 (1668).

Connecticut outlawed gun sales to Indians the same year Massachusetts did. 1 Pub. Recs. of Conn at 79-80 (1642). This was followed by various additional laws

---

80.  1 Mass. Bay. Recs. at 196. The ban was repeated in a 1647 statutory recodification. *Laws and Liberties of Massachusetts, in* Colonial Origins at 120.

to attempt to make the prohibition effective.[81] If Indians carried arms into town, the arms could be seized. *Id.* at 351 (1660). This was modified to allow the friendly Tunxis Indians to "have free liberty to carry their guns, through the English towns, provided they are not above 10 men in company." *Id.* at 375 (1661).

Free-thinking Rhode Island always approved of sales to and repairs for friendly Indians. Its arms trade law limited only "the Indians that are or may prove offensive to this Colonie, or any member thereof."[82] The colony of Rhode Island and Providence Plantations maintained a strong friendship with the Narragansett Indians. The Narragansett warred with the nearby Wampanoag and Pequot and lived amicably with the Rhode Islanders. Rhode Island founder Roger Williams was a very devout Puritan; central to his Christian faith was freedom of conscience — "soul liberty" — for everyone, Indians included.

The other colonies in southern New England did not like Rhode Island's religious heterodoxy, and they formed the New England Confederation in part to gang up on Rhode Island. Section E.5.a. Rhode Island and the Narragansett relied on each other, and were strong enough to deter major offensive action from the other colonies — until King Philip's War in 1675-76. Section C.3. Both Rhode Island and the Narragansett initially tried to stay neutral in the war, but it was reported that some Narragansett were considering entreaties to join other tribes fighting the other colonists; it was certain that the Narragansett refused to turn over Indian combatants who had taken refuge with them. Thus, in the Great Swamp Fight of December 1675, Connecticut forces, joined by the Pequot Indians, attacked and captured a Narragansett fort. The battle provoked the Narragansett into joining the war, and they attacked all New Englanders, including their former Rhode Island friends. Defeat in King Philip's War finished the Narragansett as a significant military power.[83]

As the frontier moved westward, concern in the original colonies about armed Indians declined. For example, by 1763, after the Anglo-American victory in the French and Indian War, Maryland felt safe enough to allow limited sales — no more than one pound of gunpowder and six pounds of lead to an Indian man within a six-month period. Sales to Indian women and children were not allowed.[84]

### 3.   *The Wampanoag and King Philip's War*

By legal and illegal means, the Indians of southern New England were well-armed, and they were also the most proficient firearms users on the continent. The combination nearly spelled the end of New England in 1675. The first Indian war in New England had been the Pequot War of 1636-37, in the coastal regions of Rhode Island and Connecticut. Whereas the colonists were well-armed and were joined in the war by the Mohegan Indians and Narragansett Indians, the poorly

---

81.  *Id.* at 113-14, 138, 145-46, 197-98 (banning the sale of guns outside of Connecticut; forbidding foreign merchants from doing business in Connecticut, in retaliation for Dutch and French gun sales to hostile Indians).
82.  *Acts and Orders of 1647*, in Colonial Origins at 184.
83.  *See* James A. Warren, God, War and Providence (2018).
84.  58 Archives of Maryland 420 (J. Hall Pleasants ed., 1941).

armed Pequot had no support from other tribes. The situation would be very different in the next New England war.

Soon after the Pilgrims had disembarked from the *Mayflower* in 1620, they had formed an alliance with the Wampanoag, led by their sachem Massasoit. He found the English to be useful allies against other tribes, and the Wampanoag helped save the Pilgrims from some of their early ineptitude regarding life in America.

By the 1640s, Plymouth Governor William Bradford became alarmed that the Wampanoag had molds to make bullets or shot in different sizes. During the seventeenth and eighteenth centuries, gun owners usually made their own bullets by pouring molten lead into molds. The Indians could do so as well as anyone else. Likewise, noted Bradford, they had "screw-plates to make screwpins," so they could replace broken screws on guns. They could also "mend and new stock their pieces [firearms]. . . as in most things as an Englishman." Malone at 70. They made gunflints and resharpened them as needed. *Id.* Their blacksmiths had worked for Plymouth gunsmiths and learned how to repair firearms. *Id.* at 71. The Indians could not manufacture gunpowder, and so had to obtain it by licit or illicit trade or by plunder.

As described in Section C.2, Plymouth in the 1640s began restricting arms for Indians, grew stricter, alternated between allowing and forbidding sales in the late 1660s, and then grew more strongly prohibitive starting in 1671. Massasoit's son Metacomet had become sachem in 1662. Two years previously, he had asked a Plymouth court to change his name to Philip. The colonists called him King Philip, an appellation he himself sometimes used. Relations with Plymouth were fraying, however. In 1671, Plymouth confiscated much of the Wampanoag arms and ammunition, and forced the Wampanoag to say that they were subject to English law. The Wampanoag reaction to the confiscation of arms and sovereignty by Plymouth was similar to how Americans would react to similar confiscation by King George a century later: If confiscation is happening, one's only chance is to fight now rather than later. For Indians of the seventeenth, eighteenth, and nineteenth centuries, any attempted shut-off of the arms supply was a *casus belli*.

Conversely, the New Englanders looked at the Wampanoag the same way the British would look at the Americans. Because both sides in the conflict had previously agreed to live under a common government, resistance was considered treason.[85]

In June 1675, Plymouth hanged three Wampanoag who had been convicted of the murder of John Sassamon, an Indian who had been a mediator between the Wampanoag and Plymouth. Sassamon had told Plymouth that the Wampanoag were preparing for war. The executions led to Metacomet's decision to initiate King Philip's War two weeks later.

Although the Wampanoag had planned only for a war against Plymouth, the colonies of Massachusetts Bay and Connecticut joined with Plymouth, pursuant to the terms of the New England Confederation. Section E.5.a. Rhode Island, which was not part of the Confederation, tried to stay neutral, but eventually it could not escape the fighting. Section C.2. Throughout southern New England, many Whites and non-Wampanoag Indians remained neutral, yet most were drawn in. Lasting only 14 months, King Philip's War was the largest war of the seventeenth century

85.   *See* James D. Drake, King Philip's War: Civil War in New England 1675-1676 (1999).

on the western Atlantic seaboard. Per capita, it was the bloodiest Indian war before or since.

Indians were the superior marksmen. They had always been expert bowmen. The English had once been outstanding archers, but archery had decayed long before the English migrations to America. Ch. 2.G. & H. The Indians' diet of flesh came by hunting and fishing. The New Englanders chased and gamed less, with much protein coming from cattle and seafood. Practice makes perfect, and many Indians practiced hunting daily, becoming expert at hitting moving targets. Compared to New Englanders, the Indians acted more rapidly to adopt flintlocks as their standard arm, due to its great superiority in "snap shooting"—taking a quick shot without precise aim.

Indians were also more mobile. Whereas the English lived in farms near towns, the Indian wigwams could be set up and taken down rapidly. The New England Indians were not nomads, but they did move often, to follow the game. When they wished to make themselves invisible to the English, they did so, concealed deep in the country, sometimes breaking into smaller groups. During the first half of the war, many of the colonial forces who were supposed to engage in offensive operations were reluctant conscripts, scraped from the lowest ranks of the towns. These forces proved incapable of taking the war to the Indians. *See* Section E.3.a.

King Philip's forces held the initiative. The Massachusetts government proposed abandoning much of the colony and retreating behind natural barriers and long wooden palisades. The idea was rejected, in part because the people had good reason to doubt that the government could build the wall.

The tide turned when New England brought friendly Indians into combat, especially in mobile units that operated well in the "howling wilderness." Besides facing an Anglo-Indian alliance on the east, King Philip's forces were then beset by hostiles from the west: Mohawks allied with the English government of New York. King Philip could not win a two-front war. The Mohawks made sure that the Wampanoag could not acquire any arms from Albany, and they interdicted the French arms pipeline that came from Canada via the Abenaki Indians of northern New England. Many Wampanoag chose to surrender to the New Englanders and their New England Indian allies, because capitulation to the Mohawks was certain doom. Some refugees fled north. Many of the captured Indians were sold into Caribbean slavery.

While the English had attracted a large number of Indians to their side, the Wampanoag attracted no English to theirs. The broader coalition won because its elite forces incorporated diverse knowledge: Anglo-Indian beat Indian-only. *See* Patrick A. Malone, The Skulking Way of War: Technology and Tactics among the New England Indians (1991); James D. Drake, King Philip's War: Civil War in New England 1675-1676 (1999); Kyle E. Zelner, A Rabble in Arms: Massachusetts Towns and Militiaman During King Philip's War (2009).

### 4.   The Carolinas: The Disastrous Indian Slave Trade

This section describes how the Indian slave trade in the Carolinas grew to terrible size in the latter decades of the seventeenth century and led to war in the next century.

Indian slavery was a common condition. Tribes varied as to how and how much slavery was practiced. At the high end, about 25 percent of the population of the Indian nations of the Pacific Northwest was enslaved. Silverman at 157, 165-66. "Indian war parties usually killed their adult male opponents but marked able-bodied women for forcible adoption or slavery." *Id.* at 11.

Instead of being enslaved or sold, some captives, including children, were either forcibly adopted or enslaved for a while, and then adopted. A woman might become a fifth wife of a leading warrior; as the most subordinate wife, she would perform the most grueling and unpleasant labor. She would be expected to bear children to replenish the tribe. As the years passed, many captives did assimilate into the tribe of their captors. Thus did the size and the fighting power of a tribe increase. The seven-year-old Apache boy who was captured by the Comanche could be found a decade later among the Comanches attacking an Apache village, participating in the killing and capture of his old blood relatives. Over generations, whichever side could gain numerical ascendency — by killing the most men and assimilating the most children and child-bearing women — would win. Thus did the Comanche take the eastern Colorado plains from the Apache in the eighteenth century. Andrés Reséndez, The Other Slavery: The Uncovered Story of Indian Enslavement in America (2016); Silverman 54-55.[86]

The proprietary colony of Carolina was created in 1663 by England's King Charles II, granting to eight of his supporters the lands of today's South Carolina and North Carolina. The original colony of Carolina was divided into North and South in 1712. Even before 1663, migrants from Virginia had begun settling eastern North Carolina.

South Carolina was settled later, by English coming from the island of Barbados, a sugar colony reliant on slave labor. South Carolina had something North Carolina didn't: a deep-water port. Charleston harbor become a gateway to global commerce, and especially to Barbados and other British Caribbean Islands, the British West Indies.

Like other mainland colonies, Carolina traded arms to friendly Indians, who used the arms to attack other tribes. As in the English and French colonies to the north, and in Spanish Florida and Mexico, Indians captured in war were sometimes sold into slavery. In the north, the market for slaves was limited, because a small farmer could afford few if any. The same was true for the middle class in towns. And even a wealthy person can only use so many personal attendants. It was large-scale agriculture where the demand would lay — as with tobacco in Virginia and Maryland, then in the nineteenth century, in the cotton fields to the southwest.

South Carolina made many Indian alliances, including with the most powerful nearby tribe, the Yamasee. The Yamasee had once lived in northern Florida and southern Georgia. When the Spanish in 1687 tried to capture some Yamasee to sell them into slavery in the West Indies, the Yamasee fought back, and then moved to South Carolina, where they became friends with the British colonists there. *Yamasee in* 3 Encyclopedia of Native American Tribes 499. In South Carolina, they put themselves on the other side of the slave trade.

---

86.  Like captives of other races, some Whites grew to like their new communities. Even if ransomed or rescued, they might choose to return to their adopted tribes. Whites who did so were known as *white Indians. See generally* Norman Heard, White into Red: A Study of the Assimilation of White Persons Captured by Indians (1973).

"Most colonies, North Carolina included, saw nothing wrong with enslaving an Indian taken captive in a justified Indian war. But South Carolina took the Indian slave trade to extremes." David La Vere, The Tuscarora War: Indians, Settlers, and the Fight for the Carolina Colonies 98 (2013). Slaves and deerskins became Charles Town's major exports. Some of the slaves were sent north, but usually to Barbados, Jamaica, or elsewhere in the British West Indies. *Id.* at 99.

Due to high and sustained demand from the British West Indies, South Carolina's Indian allies could sell slaves at a very high price. One captive had a trade value equal to 200 deerskins. More sales of captives brought more guns in exchange. The slave-capturing tribes thus acquired more power to capture even more slaves.

The Carolina proprietors tried to put a stop to the slave trade, but nobody in the colony, from the governor on down, would cooperate. As the interior tribes were devasted by the slave raids, they sought firearms wherever they could get them—from Virginia, from middlemen, or the French and Spanish. Many tribes were involved in the slave trade, sometimes as victims and sometimes as merchants, depending on the status of the arms races.

When the European powers were at peace, their Indian allies usually refrained from war against each other. Then in 1702-13 came Queen Anne's War (known elsewhere as the War of the Spanish Succession). When Great Britain fought Spain and France, South Carolina's Indian allies could now attack the Indian allies of Spain and France. Silverman at 66-67. The Florida peninsula, where Spain had made little effort to arm its friendly Indians, was greatly depopulated. Slave-hunting expeditions spread further and further west.

Like the Iroquois raids in the Northeast, the slave raiding expeditions in the Southeast finally ended when the interior tribes had acquired enough firearms so that the expeditions became too dangerous. French arms from New Orleans played a role. Moreover, by the eighteenth century, improvements in shipping had made the trans-Atlantic trade for African slaves more economical. "Colonial buyers shifted their preference in slaves from Indians to Africans." *Id.* at 73. African captives were taken the same way as in America: A coastal tribe would raid in the interior, take prisoners, and sell them to merchants in the ports.

The drying up of the Indian slave trade in the Southeast led to new problems for some. Allied Indians had been buying goods on credit from Carolinians. Credit worked fine, as long as the Indians had a reliable income from slave selling. But once the slave supply was reduced, it was clear the Indians were not going to be able to pay their debts, and the Carolinians would use the unpaid debt as a justification to seize the Indians' lands. *Id.*

The major tribe of eastern North Carolina were the Tuscarora. An Iroquoian language group people, they had moved south around 500 A.D. Although they had friendly relations with the early colonists, the situation deteriorated as the population balance shifted to the colonists and the colonists began looking for more farmland further inland. What had once been a relationship between equals was becoming abusive. Incited by a visiting delegation of Seneca (one of the Iroquois Five Nations), about half the Tuscarora started a war against inland settlers in 1711.[87]

---

87.  As of 1711, the Iroquois were legally at peace with the English and the French, and with tribes on all sides except the South. So "Five Nations raiding parties, particularly the Senecas, looked south toward the Indian peoples living in North and South Carolina." La Vere at 56.

It was a good time to attack, as North Carolina was in political turmoil.[88] Initially, North Carolina's militia was weak and not very willing to fight. But they eventually gained the upper hand, thanks in part to their other Indian allies, and to intervention by South Carolina and its Indian allies. The Seneca had promised arms and ammunition shipments twice a year, but they never came.[89] The war was mostly over by 1712. After the war, some of the Tuscarora moved north and in 1722 became the sixth nation of the Iroquois Confederation. Later, other Tuscarora joined them.

To the South, the Yamasee reflected on what had just happened. Having sold the recently captured Tuscarora slaves, the Yamasee had run out of potential captives for the Charles Town market. The South Carolinians had not run out of appetite for slaves, though. "The Yamasees and others realized it was only a matter of time before South Carolina would turn on them. Better to stand together as Indians," and strike before it was too late. La Vere at 179. So they did, on Good Friday, April 15, 1715, along with a dozen other tribes—all of them South Carolina allies, and many of them veterans of the Tuscarora War.

The war was going very well for the Yamasee and allies. Troops to defend South Carolina were dispatched by Virginia, North Carolina, and the Tuscarora who had stayed loyal to North Carolina. The tide turned when South Carolina convinced the Cherokee to change sides. After defeat in 1717, many Yamasee moved to Spanish Florida, and later became part of the Seminole. Ch. 6.A.8.c.

The Cherokee thereafter maintained a strong alliance with England and received many arms from them. In the ensuing decades of the eighteenth century, the British, French, and the newly pragmatic Spanish Florida plied their Indian allies with gifts of arms and resident blacksmiths. As a South Carolina merchant wrote, "the English, French, and Spanish are in some measure become tributary to them." Silverman at 85.

Indian issues will be further discussed in Section E.3, which covers the colonial militias and examines how the colonists learned Indian arms skills. The American synthesis of arms cultures is summarized in Section E.6. Indian arms, laws, and wars after American independence are covered in Chapters 6.A.8, and 7.D. Modern arms law pertaining to Indians and Indian reservations is the subject of online Chapter 17.F.

# D.   PERSONAL AND COLLECTIVE DEFENSE IDEOLOGY IN PRE-REVOLUTIONARY AMERICA

This Part traces pre-Revolution American views about the right to arms and resistance to tyranny. Section 1 examines the Boston Massacre trial, a prosecution of British soldiers who fired at an angry crowd in 1770. Section 2 shows how the

---

88.  In 1711, Queen Anne sent a new governor to North Carolina; not only did the new man replace former Governor Thomas Cary, he tried to have Cary and his allies prosecuted on false charges, owing to political disputes. Cary and forces loyal to him, including Quakers, commenced a rebellion. They held their own against the new governor. But when Royal Marines arrived to assist the new governor, Cary's men were unwilling to commit treason by firing on royal troops. The rebellion dissolved. *Id.* at 13-14, 75.

89.  *Id.* at 58. Perhaps the Seneca desisted because the Yamasee and others had intervened, or perhaps the more pro-English Mohawks and Oneidas convinced the Seneca not to follow through. *Id.* at 197.

Americans viewed their right to arms and the 1689 English Bill of Rights. Section 3 explores the religious and moral background of the Revolution—in particular, why Americans believed that submission to tyranny would cost them their souls, and why they had an absolute moral obligation to use force as a last resort against tyranny. American patriots saw themselves as virtuously armed in the holy cause of liberty. Their ideas of the civic-republican virtue of an armed and free people would later help shape the Second Amendment.

### 1.   The Boston Massacre Trial

The most famous American trial of the eighteenth century was the Boston Massacre prosecution. On the night of March 5, 1770, British Redcoats fired on a threatening crowd that was pelting them with ice. Five members of the crowd were killed. The British government selected noted American attorney Robert Treat Paine to lead the prosecution of the soldiers for murder. John Adams was among the counsel for the defense. Although the facts were disputed, the law was not. Both sides presumed the legal right of soldiers and civilians to defend themselves from violent attacks.

According to Paine, because of the well-known abuses by the Redcoats against the citizens of Boston, "the most peaceable among us had . . . found it necessary to arm themselves with heavy Walking Sticks or Weapons of Defense when they went abroad." Another prosecutor, Samuel Quincy, argued that the soldiers were outside their barracks and armed "with clubs, cutlasses, and other weapons of death; this occasioned a general alarm; every man therefore had a right, and very prudent it was to endeavor to defend himself if attacked; this accounts for the reason of Dr. *Young* or any one inhabitant of the town having a sword that evening." John Adams, 3 Legal Papers of John Adams 149, 274 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965).

Defense counsel John Adams invoked "Self Defence, the primary Canon of the Law of Nature." Citing the treatise of William Hawkins, a leading authority on the common law (Ch. 2.F.4), Adams acknowledged that the Bostonians had a right to be armed for self-defense against the soldiers: "Here every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence, not for offence." *Id.* at 248.

The jury charge explained that citizens were sometimes required to carry arms: "It is the duty of all persons (except women, decrepit persons, and infants under fifteen) to aid and assist the peace officers to suppress riots & c. when called upon to do it. They may take with them such weapons as are necessary to enable them effectually to do it." *Id.* at 285. This was a reference to the duty of able-bodied males to participate in the *posse comitatus. See* Ch. 2.A, 2.C, 6.E.2.

Outside the courtroom, John Adams's cousin Samuel Adams penned an essay on the death of Crispus Attucks, a free Black man who had been killed during the Massacre. Mr. Attucks "was leaning upon his stick when he fell, which certainly was not a threatening posture: It may be supposed that he had as good right, by the law of the land, to carry a stick for his own and his neighbor's defence, in a time of

danger, as the Soldier who shot him had, to be arm'd with musket and ball, for the defence of himself and his friend the Centinel."[90]

The soldier who killed Crispus Attucks was convicted of manslaughter. All the others were acquitted. Bernhard Knollenberg, Growth of the American Revolution: 1766-1775, at 87-88 (rev. ed. 2003). Annual orations on the Massacre Day anniversary continued to promote ill feelings toward the standing army of Redcoats in Boston.

### 2.   *The Colonists' View of the English Right to Arms*

The 1689 English Bill of Rights had affirmed Englishmen's right to arms. *See* Ch. 2.H.4. The American colonists believed they had the same entitlement to "the rights of Englishmen" as persons who lived in England. Their original colonial charters had said so (Part A).

That Americans considered themselves to have the rights of Englishmen did not mean that Americans and the English experienced or understood those rights in identical terms. As Chapter 2 explains, the 1689 English arms right was for "their defence." The right included reservations about a person's "condition" or "degree" that allowed for continuation of game laws that prohibited commoners from hunting. An Englishman's home was his castle, but that did not mean a tenant could shoot a deer on his farm, unless he had his noble landlord's permission. In contrast, game animals in America were a public bounty, not a private possession.[91] The English game laws were never enforced in America. A Plymouth statute formalized what was already the common practice: "That fowling fishing and hunting be free."[92] Massachusetts Bay did the same.[93]

More broadly, the Americans of the 1770s fervently believed in the 1689 Bill of Rights, which had, in colonists' view, "made sacrosanct" rights such as jury trials, free elections, and "the right to bear arms." Americans "in this respect were more British than the British. In the colonies, the people endlessly rehearsed the revolutionary principles of the 1680s, long after the point when in England they had become a tired cliché."[94] Philosophically, "the colonists had drawn more radical

---

90.  2 The Writings of Samuel Adams 119 (Harry Alonzo Cushing ed., 1904).

91.  Lee Kennett & James LaVerne Anderson, The Gun in America: The Origins of a National Dilemma 41 (1975).

92.  Plymouth Laws at 30 (enacted 1631). This does not mean that there were no laws regarding game. A person was liable for any damage caused while hunting. People could stock ponds on their property with fish for their private use, excluding other fishermen. Plymouth Laws at 34 (1635).

93.  Massachusetts Body of Liberties (1641) ("Every inhabitant that is a howse holder shall have free fishing and fowling in any of the great ponds and Bayes, Coves, and Rivers . . . provided that this shall not be extended to give leave to any man to come upon other propertie without there leave."), *in* Colonial Origins at 73; *id* at 125 (1647 recodification and elaboration).

94.  Nick Bunker, An Empire on the Edge: How Britain Came to Fight America 166 (2015).

conclusions than the English from John Locke's doctrines of natural law and the right of revolution."[95]

The most extensive prewar American analysis of the right to arms was a newspaper essay by Samuel Adams. Writing as "E.A.," he began by criticizing the seventeenth-century Stuart monarchs, and then defended the decision of a 1768 Boston town meeting to urge all Bostonians to acquire arms. The town meeting had taken place after the Bostonians found that Redcoats would be garrisoned in Boston because the Bostonians had been resisting the Townshend taxes imposed by Parliament—taxes that Americans believed that Parliament had no right to levy. *See* Ch. 4.A.3.

## Samuel Adams, E.A.

## Boston Gazette, Feb. 27, 1769, at 3

In 1 The Writings of Samuel Adams 317-18 (Harry Alonzo Cushing ed., 1904)

In the days of the Stuarts, it was look'd upon by some men as a high degree of prophaness, for any subject to enquire into what was called the *mysteries* of government: *James* the first thundered his anathema against Dr. *Cowel*, for his daring presumption in treating of—those *mysteries;* and forbad his subjects to read his books, or even to keep them in their houses.[96] In those days *passive obedience, non-resistance*, the *divine hereditary right* of kings, and their being accountable to God *alone*, were doctrines generally taught, believ'd and practiced: But behold the sudden transition of human affairs! In the very next reign the people assum'd the right of *free enquiry*, into the nature and end of government, and the conduct of those who were entrusted with it: *Laud* and *Strafford* were bro't to the block;[97] and after the horrors of a civil war, in which some of the best blood of the nation was spilt as water upon the ground, they finally called to account, arraign'd, adjudg'd, condemn'd and even executed the monarch himself! . . . The two sons of *Charles* the first . . . reigned in their turns; but by copying after their father, their administration of government was *grievous* to their subjects, and *infamous* abroad. *Charles* the second indeed reign'd till he died; but his brother *James* was oblig'd to abdicate the throne, which made room for *William* the third, and his royal consort *Mary*, the daughter of the unfortunate *James*—This was the fate of a race of kings, bigoted to the greatest degree to the doctrines of *slavery* and regardless of the *natural, inherent, divinely hereditary* and *indefeasible* rights of their subjects.—At the revolution, the British Constitution was again restor'd to its original principles, declared in the bill of rights; which was afterwards pass'd into a law, and stands as a bulwark to the natural rights of

---

95.  R.K. Webb, Modern England: From the 18th Century to the Present 87 (2d ed. 1880). *See also* Ch. 2.K.2.

96.  [Apparently a reference to John Cowel's book, The Interpreter (1607), a legal dictionary with extensive analysis of statutory and common law terms.—Eds.]

97.  [Archbishop William Laud was the instrument of King Charles I in attempting to stamp out dissent against the Church of England, and in attempting to move its ritual and theory closer to Catholicism. Thomas Wentworth, Earl of Stafford, was a leading advisor to King Charles I. Stafford was executed in 1641 and Laud in 1645 after Parliament passed bills of attainder against them.—Eds.]

subjects. "To vindicate these rights, says Mr. *Blackstone*, when actually violated or attack'd, the subjects of England are entitled first to the regular administration and *free course of justice* in the courts of law—next to the right of *petitioning the King* and parliament, for redress of grievances—and lastly, to the right of *having and using arms for self-preservation and defence.*"[98] These he calls "auxiliary subordinate rights, which serve principally as *barriers* to protect and maintain inviolate the three great and primary rights of *personal security, personal liberty* and *private property*": And that of *having arms for their defense* he tells us is "a public allowance, under due restrictions, of the *natural right of resistance and self-preservation*, when the sanctions of society and laws are found *insufficient* to restrain the *violence of oppression.*"—How little do those persons attend to the rights of the constitution, if they know anything about them, who find fault with a late vote of this town, calling upon the inhabitants to *provide themselves with arms for their defence* at any time; but more especially, when they had reason to fear, there would be a necessity of the means of self preservation against the *violence of oppression.*

Everyone knows that the exercise of the military power is forever *dangerous* to civil rights. . . . But there are some persons, who would, if possibly they could, per-swade the people *never to make use* of their *constitutional* rights or terrify them from doing it. No wonder that a resolution of this town to *keep arms* for its own defence, should be represented as having at bottom a *secret intention* to oppose the landing of the King's troops: when those very persons, who gave it this colouring, had before represented the peoples petitioning their Sovereign, as proceeding from a *factious* and *rebellious* spirit. . . .

### 3.   Religion, Arms, and Resistance

This section examines some of the reasons why the Bill of Rights amendment about liberty of conscience and religion would be followed by the amendment about arms rights and civic duty.

Many colonial Americans saw gun ownership as a personal right, a civic duty, and a religious obligation, most acutely for militia defense of the religious liberty and self-government of their communities. In the twenty-first century, some scholars argue that because arms bearing in colonial America was a duty, it could not have been a right. Americans in the seventeenth and eighteenth centuries were not so interested in parsing the right/duty distinction. To them, the purported distinction might have seemed like arguing about which blade of the scissors does the cutting.

A few of the American Founders were irreligious. Most notably, Benjamin Franklin and Thomas Jefferson admired the moral philosophy of Jesus, but put little stock in the Bible stories of Christian miracles. Even Jefferson and Franklin, however, agreed that the forcible defense of God-given liberty was an inescapable moral obligation.

The large body of the American people—those who would fill the ranks of the militia, the state armies, and the Continental Army—held conventional reli-gious beliefs, by American standards. Those beliefs were at the core of Americans'

---

98.   [The Blackstone passages that Adams quoted are excerpted in Chapter 2.K.1.—Eds.]

audacity to start a war against the greatest empire in the world; they help explain why personal possession of arms became so important to their identity. It was American religion that provided Americans with the intellectual framework for pressing their disputes with England. Black-robed American clergymen were described as the "black regiment" for their leadership in building popular support for war against England. King George III reportedly denounced the American Revolution as "a Presbyterian rebellion."[99]

When tensions were building in 1774, Pennsylvania Loyalist Joseph Galloway told the British House of Commons that the opponents of British rule were "Congregationalists, Presbyterians, and smugglers." Edward Frank Humphrey, Nationalism and Religion in America: 1774-1789, at 67 (1924). Horace Walpole, a distinguished man of letters, urged his fellow members of the British Parliament, "There is no use crying about it. Cousin American has run off with a Presbyterian parson, and that is the end of it." James G. Leyburn, Scotch-Irish: A Social History 305 (1962). (As the above quotes indicate, "Presbyterian" was a common shorthand for all Protestants who did not adhere to the Church of England. This textbook uses "Presbyterian" only when referring to the denomination of the same name.)

In 1775, the great Anglo-Irish statesman Edmund Burke tried to warn the British Parliament that the Americans could not be subjugated: "[T]he people are Protestants, and of that kind which is the most adverse to all implicit submission of mind and opinion." While the Catholic and Anglican Churches were supported by the government, and were inclined to support the state, the American sects were based on "dissenting interests." They had "sprung up in direct opposition to the ordinary powers of the world, and could justify that opposition only on a strong claim of natural liberty. Their very existence depended on the powerful and unremitted assertion of that claim. All Protestantism, even the most cold and passive, is a sort of dissent. But the religion most prevalent in our northern colonies is a refinement of the principle of resistance: it is the dissidence of dissent, and the protestantism of the Protestant religion."[100]

Spread widely over the American colonies, Presbyterians were in frequent contact with their brethren in other colonies. A young Presbyterian man from North Carolina might be trained for the ministry at the College of New Jersey,[101] and then called to minister to a congregation in New Hampshire. Presbyterians were the first to develop and promote the idea of *American* rights rather than the rights of a particular colony or region. Many Presbyterians were Scots-Irish immigrants who had settled the western regions of the colonies, and who had long-standing resentment about how the English had treated their ancestors in Scotland and Ireland.

Much of the best land belonged to the Anglicans, but the Church of England had no bishop in America. As a result, American Anglican churches were controlled by wealthy landowners who enjoyed independence from British oversight. Rumors

99.  Douglas F. Kelly, The Emergence of Liberty in the Modern World: The Influence of Calvin on Five Governments from the 16th Through 18th Centuries 131 (1992).

100.  Edmund Burke, *Speech on Moving His Resolutions for Conciliation with the Colonies* (Mar. 22, 1775), *in* Edmund Burke: Selected Writings and Speeches 159-60 (Peter J. Stanlis ed., 1963).

101.  Later known as Princeton University.

that the king was preparing to send bishops to America, to administer both the Anglican and other Protestant churches, sent the Americans into an ecumenical rage. John Adams said that no issue was more important in making the American people question the authority of Parliament than the controversy over American bishops. "The objection was not merely to the office of a bishop, even though that was to be dreaded, but to the authority of Parliament, on which it could be founded." John Adams, 10 The Works of John Adams 185 (Charles Frances Adams ed., 1850-56). If Parliament had the authority to appoint a bishop for America, Parliament would also have the authority to "introduce the whole hierarchy, establish tithes, forbid marriages and funerals, establish religions, forbid dissenters, make schism heresy." *Id.*

While Presbyterians and Anglicans were everywhere in the colonies, the Congregationalists were concentrated in New England. They were the descendants of the Puritans who had founded the Massachusetts Bay, Connecticut, and New Haven colonies. By time of the Revolution, Congregationalist church structure was purely democratic and nonhierarchical. The minister was hired by the congregation and could be fired by the congregation. There was no central body that exercised control over an individual church. The Presbyterians also hired their own ministers, but they did have a nationwide church government, composed of an elected group of elders, the Presbyters.

Like the Presbyterians, Congregationalists believed that when God made a covenant with his people, he would maintain the covenant, and protect them. Perry Miller, Nature's Nation 19 (1967). "They conceived the universe to be a great kingdom whose sovereign was God, whose relations with His Son and with men were determined by covenant or compact, 'covenant-constitutions,' which were always conditional and implied strict obedience on each side." Alice M. Baldwin, The New England Clergy and the American Revolution 13 (F. Ungar Pub. Co. 1958) (1928).

The covenant theory was a vigorous example of legal historian Henry Maine's observation: "[T]he movement of progressive societies has hitherto been a movement *from Status to Contract.*" Henry Sumner Maine, Ancient Law: Its Connections with the Early History of Society and Its Relation to Modern Ideas 165 (2d ed. 1871). In the Middle Ages, a person's legal status (serf, knight, lady, etc.) created detailed rules governing almost everything he or she did. Property law was central, and contract law merely an ancillary to conveyance of property.

New England rejected all that. Just as God's relationship with humanity was based on covenants, human relations were based on voluntary contract, compliant with God's natural law. All the New England colonies were created by compacts among the first settlers, starting with the Mayflower Compact. Among the laws of nature that bound God and man was Christ's "law of liberty." Miller at 18. As the apostle Paul had written, "Stand fast therefore in the liberty wherewith Christ hath made us free, and be not entangled again with the yoke of bondage." *Galatians* 5:1. According to historian Alice Baldwin, the view was

> fundamental to any understanding of American constitutional thought. God's government is founded on and limited by law and therefore all human governments must be so founded and limited, if patterned after His. A government, therefore, which exercises its authority unconstitutionally acts illegally. Here is one great source of the American doctrine of government by law.

Baldwin at 19.

In other words, "God ruled over men by a divine constitution. Natural law and Christian rights were legal rights because a part of the law of God. . . . Any act contrary to the constitution was illegal . . . null and void." *Id.* at 168. As God governed people for their own good, so human governors only had legitimate power when they governed the people for their own good. *Id.* at 34-35. Life, liberty, and property—in fact all civil rights—came from God. They were therefore guarded by divine law against any violation by government. *Id.* at 38-39.

Revolutionary sentiment would be grounded in the idea that King George was violating the compact by which God had allowed him the throne. To acquiesce in George's violation of that compact was to defy God. Submission to tyranny was a crime against God. *Id.* at 90 (discussing Andrew Eliot's 1765 election sermon to the North Church[102] in Boston). Ending the king's rule in America would not be seditious or disorderly. Rather, it would constitute the restoration of true civil order, founded on God's contract with his American people. "Resistance to a madman is not a revolution; it is, in obedience to God, an exercise of the police power." Miller at 104.

The foundational sermon for American resistance was delivered on January 30, 1750, by leading Congregationalist minister Jonathan Mayhew. January 30 was the anniversary of the execution of England's absolutist King Charles I whose "martyrdom" was venerated by Anglican ministers propounding the duty of submission to government. Mayhew's sermon argued that blind submission was Satan's idea, not God's. It was the "most famous sermon preached in pre-Revolutionary America."[103] John Adams extolled it as his personal "Catechism" of revolution.[104] According to Adams, "It was read by everybody; celebrated by friends, and abused by enemies." Letter from John Adams to Hezekiah Niles (Feb. 13, 1818), *in* 10 Works of John Adams at 288.


Jonathan Mayhew

A Discourse Concerning Unlimited Submission and Non-Resistance to the Higher Powers: With Some Reflections on the Resistance Made to King Charles I and on the Anniversary of His Death

Jan. 30, 1750

**Rom; xiii. 1, 8.**

1.  *Let every soul be subject unto the higher powers. For there is no power but of God: the powers that be, are ordained of God.*


102.  The North Church is the one from which the signal lanterns were lit on the night of April 18, 1775, to alert Paul Revere and William Dawes that the British were coming by sea. David Hackett Fischer, Paul Revere's Ride (1995).

103.  1 Pamphlets of the American Revolution: 1750-1776, at 204 (Bernard Bailyn ed., 1965).

104.  Letter from John Adams to Thomas Jefferson (July 18, 1818), *in* The Adams-Jefferson Letters: The Complete Correspondence Between Thomas Jefferson and Abigail and John Adams 527 (Lester J. Cappon ed., 1987) (1957).

2. *Whosoever therefore resisteth the power, resisteth the ordinance of God: and they that resist, shall receive to themselves damnation.*

3. *For rulers are not a terror to good works, but to the evil. Wilt thou then not be afraid of the power? Do that which is good, and thou shalt have praise of the same:*

4. *For he is the minister of God to thee for good. But if thou do that which is evil, be afraid; for he beareth not the sword in vain: for he is the minister of God, a revenger to execute wrath upon him that doth evil.*

5. *Wherefore ye must needs be subject, not only for wrath, but also for conscience sake.*

6. *For, for this cause pay you tribute also: for they are God's ministers, attending continually upon this very thing.*

7. *Render therefore to all their dues: tribute to whom tribute is due; custom, to whom custom; fear, to whom fear; honour, to whom honour. . . .*

There is one very important and interesting point which remains to be inquired into; namely, the *extent* of that subjection *to the higher powers*,[105] which is here enjoined as a duty upon all Christians. Some have thought it warrantable and glorious, to disobey the civil powers in certain circumstances; and, in cases of very great and general oppression, when humble remonstrances fail of having any effect; and when the publick welfare cannot be otherwise provided for and secured, to rise unanimously even against the sovereign himself, in order to redress grievances; to vindicate their natural and legal rights: to break the yoke of tyranny, and free themselves and posterity from inglorious servitude and ruin. It is upon this principle that many royal oppressors have been driven from their thrones into banishment; and many slain by the hands of their subjects. . . . And upon this principle was that revolution brought about, which has been so fruitful of happy consequences to *Great-Britain*. But, in opposition to this principle, it has often been asserted, that the scripture in general (and the passage under consideration in particular) makes all resistance to princes a crime, in any case whatever. . . . Now whether we are obliged to yield such an absolute submission to our prince; or whether disobedience and resistance may not be justifiable in some cases, notwithstanding any thing in the passage before us, is an inquiry in which we are all concerned; and this is the inquiry which is the main design of the present discourse. . . .

[I]f we attend to the nature of the argument with which the apostle here inforces the duty of submission to *the higher powers*, we shall find it to be such an one as concludes not in favor of submission to all who bear the *title* of rulers, in common; but only, to those who *actually* perform the duty of rulers, by exercising a reasonable and just authority, for the good of human society. . . . It is obvious, then, in general, that the civil rulers whom the apostle here speaks of, and obedience to whom he presses upon christians as a duty, are *good rulers*, such as are, in the exercise of their office and power, benefactors to society. Such they are described to be, thro'out this passage. Thus it is said, that they are not *a terror to good works, but to the evil;* that they are *God's ministers for good; revengers to execute wrath upon him that doth evil;* and that *they attend continually upon this very thing*. St. Peter gives the same account of rulers: . . . It is manifest that this character and description of rulers, agrees only to such as are rulers in fact, as well as in name: to such as govern well,

105.  [Paul's letter to the Romans called civil rulers "the higher powers" and argued that civil rulers derive their authority from God.—Eds].

and act agreeably to their office. . . . [I]f they are not *ministers for good to society*, but for evil and distress, by violence and oppression; if they execute wrath upon sober, peaceable persons, who do their duty as members of society; and suffer rich and honourable knaves to escape with impunity; if, instead of the good work of advancing the publick welfare, they *attend* only upon the gratification of their own lust and pride and ambition, to the destruction of the public welfare; if this be the case, it is plain that the apostle's argument for submission does not reach them; they are not the same, but different persons from those whom he characterizes; and who must be obeyed according to his reasoning. . . .

. . . It is blasphemy to call tyrants and oppressors, *God's ministers*. They are more properly *the messengers of satan to buffet us*. . . . [S]uch rulers as do not perform the pleasure of God, by doing good; but the pleasure of the devil, by doing evil . . . are not, therefore, *God's ministers*, but the devil's! . . . [W]hat reason is there for submitting to that government, which does by no means answer the design of government? . . . [S]uch persons as (although they bear the title of rulers) use all their power to hurt and injure the public . . . are not *God's ministers*, but *satan's*. . . .

Thus, upon a careful review of the apostle's reasoning in this passage, it appears that his arguments to enforce submission, are of such a nature, as to conclude only in favour of submission to *such rulers as he himself describes;* i.e. such as rule for the good of society, which is the only end of their institution. Common tyrants, and public oppressors, are not intitled to obedience from their subjects, by virtue of any thing here laid down by the inspired apostle. . . .

. . . Suppose God requires a family of children, to obey their father and not to resist him; and inforces his command with this argument; that the superintendence and care and authority of a just and kind parent, will contribute to the happiness of the whole family; so that they ought to obey him for their own sakes more than for his: Suppose this parent at length runs distracted, and attempts, in his mad fit, to cut all his children's throats: Now, in this case, is not the reason before assigned, why these children should obey their parent while he continued of a sound mind, namely, *their common good*, a reason equally conclusive for disobeying and resisting him, since he is become delirious, and attempts their ruin? It makes no alteration in the argument, whether this parent . . . loses his reason[] or . . . retains his understanding. . . .

If we calmly consider the nature of the thing itself, nothing can well be imagined more directly contrary to common sense, than to suppose that *millions* of people should be subjected to the arbitrary, precarious pleasure of *one single man;* (who has *naturally* no superiority over them in point of authority) so that their estates, and every thing that is valuable in life, and even their lives also, shall be absolutely at his disposal, if he happens to be wanton and capricious enough to demand them. . . .

. . . [A] nation thus abused to arise unanimously, and to resist their prince, even to the dethroning him, is not criminal; but a reasonable way of vindicating their liberties and just rights; it is making use of the means, and the only means, which God has put into their power, for mutual and self-defence. And it would be highly criminal in them, not to make use of this means. It would be stupid tameness, and unaccountable folly, for whole nations to suffer *one* unreasonable, ambitious and cruel man, to wanton and riot in their misery. And in such a case it would,

of the two, be more rational to suppose, that they did NOT resist, than that they who did, would *receive to themselves damnation.*

[Mayhew then exhorted his audience to understand that Charles I was a "corrupt" and merciless tyrant with a "lust for power" whom his subjects justifiably beheaded because he "was not, properly speaking, *their king;* but a *lawless tyrant.*"] "The power of this Almighty King . . . is limited by law; not, indeed, by acts of parliament, but by the eternal laws of truth, wisdom and equity; and the everlasting tables of right reason."

———————

From the beginning of English settlement in New England, the relationship between the ministry and the militia was close and symbiotic. New England ministers often gave special sermons and offered prayers on Election Day (when a sermon was preached to the assembly and governor), Artillery Day (when new militia officers were elected), and militia muster days. These sermons often spoke of the duty of Christians to fight for liberty against tyranny.

The following sermon, by Rev. Simeon Howard, is a typical example. The sermon addresses many of the common themes in New England preaching in the years leading to the Revolution. While Mayhew's 1750 sermon had changed how many people thought about resistance to improper government, the Howard sermon expressed what by 1773 had become conventional wisdom. Howard preached on Paul's letter to the Galatians, which exhorted Christians to stand fast in their liberation from the bondage of sin. Howard argued that Christian liberty necessarily included civil and political freedom, because submission to tyranny led to complete moral degeneration. The responsibility of Christian liberty included personal and collective self-defense, as opposed to the servility of being ruled by a standing army.

Simeon Howard

## A Sermon Preached to the Ancient and Honorable Artillery Company in Boston

June 7, 1773

"Stand fast therefore in the liberty wherewith Christ hath made us free." (Galatians V:I). . . .

This liberty has always been accounted one of the greatest natural blessings which mankind can enjoy. Accordingly, the benevolent and impartial Father of the human race, has given to all men a right, and to all naturally an equal right to this blessing. . . .

[T]he liberty which men have is all that natural liberty which [they possess in a state of nature], excepting what they have expressly given up for the good of the whole society; a liberty of pursuing their own happiness, governing their actions, and disposing of their property and persons as they think fit, providing they transgress no law of nature, and keep those restrictions which they have consented to come under. . . .

When a society commits to one or a few a power to govern them, the general practice is to limit this power by certain prescribed rules and restrictions. . . .

There are some natural liberties or rights which no person can divest himself of, without transgressing the law of nature. A man cannot for instance, give up the liberty of private judgement in matters of religion, or convey to others a right to determine of what religion he shall be, and in what way he shall worship God. A grant of this nature would destroy the foundation of all religion in the man who made it, and must therefore be a violation of the law of nature; nor would he be obliged to abide by it, if in consequence of it, he should be required to act contrary to the dictates of his conscience. Or should a man pretend to grant to others a power to order and govern all his actions, that were not of a religious nature, so that in all cases he must act agreeable to their direction; this would be inconsistent with that submission which he owes to the authority of God, and his own conscience. The grant would be in itself void, and he would, notwithstanding, be at liberty to act according to his own conscience, though contrary to the command of those to whom he had made so extravagant a donation. . . .

Now for men to stand fast in their liberty means, in general, resisting the attempts that are made against it, in the best and most effectual manner they can.

When any one's liberty is attacked or threatened, he is first to try gentle methods for his safety; to reason with, and persuade the adversary to desist, if there be opportunity for it; or get out of his way, if he can; and if by such means he can prevent the injury, he is to use no other.

But the experience of all ages has shewn that those, who are so unreasonable as to form designs of injuring others, are seldom to be diverted from their purpose by argument and persuasion alone; Notwithstanding all that can be said to shew the injustice and inhumanity of their attempt, they persist in they have gratified the unruly passion which set them to work. And in this case, what is to be done by the sufferer? Is he to use no other means for his safety, but remonstrance or flight, when these will not secure him? Is he patiently to take the injury and suffer himself to be robbed of his liberty or his life, if the adversary sees fit to take it? Nature certainly forbids this tame submission, and loudly calls to a more vigorous defence. Self-preservation is one of the strongest, and a universal principle of the human mind:

And this principle allows of every thing necessary to self-defence, opposing force to force, and violence to violence. This is so universally allowed that I need not attempt to prove it. . . .

And there are, if I mistake not, several passages in the new testament, which shew, that, it was not the design of this divine institution to take away from mankind the natural right of defending their liberty, even by the sword. . . .[106]

Defending ourselves by force of arms against injurious attacks, is a quite different thing from rendering evil for evil. The latter implies doing hurt to another, because he has done hurt to us; the former implies doing hurt to another, if he is hurt in the conflict only because there is no other way of avoiding the mischief he endeavours to do us: the one proceeds from malice and revenge; the other merely

106.  [*See* online Chapter 21.C.2 for discussion of some of the New Testament passages referenced by Howard.—Eds.]

from self-love, and a just concern for our own happiness, and argues no ill will against any man.

And therefore it is to be observed,

That necessary self-defence, however fatal it may prove to those who unjustly attack us, implies no principle inconsistent with that love to our enemies which Christ enjoins. For, at the same time that we are defending ourselves against their assaults, we may bear good-will towards them, wish them well, and pray God to befriend them: All which we doubtless ought to do in respect of our bitterest enemies.

But it is only defensive war that can be justified in the sight of God. When no injury is offered us, we have no right to molest others.

And christian meekness, patience and forbearance, are duties that ought to be practised both by kingdoms and individuals. . . . If these endeavours are unsuccessful, it then becomes proper, to use more forceable means of resistance.

A people may err by too long neglecting such means, and shamefully suffer the sword to rust in its scabberd, when it ought to be employed in defending their liberty. The most grasping and oppressive power will commonly let its neighbours remain in peace, if they will submit to its unjust demands. And an incautious people may submit to these demands, one after another, till its liberty is irrecoverably gone, before they saw the danger. Injuries small in themselves, may in their consequences be fatal to those who submit to them; especially if they are persisted in. And, with respect to such injuries, we should ever act upon that ancient maxim of prudence; obsta principiis.[107] The first unjust demands of an encroaching power should be firmly withstood, when there appears a disposition to repeat and encrease such demands. And oftentimes it may be both the right and duty of a people to engage in war, rather than give up to the demands of such a power, what they could, without any incoveniency, spare in the way of charity. War, though a great evil, is ever preferable to such concessions, as are likely to be fatal to public liberty. And when such concessions are required and insisted upon, as the conditions of peace, the only consideration to be attended to by the abused state, is . . . "*What king going to make war against another king, sitteth not down first and consulteth whether he be able*, &c." [Luke 14:31].

After a people have been forced into a war for their own security, they ought to set reasonable bounds to their resentment, or they may become as guilty as the first aggressors. They should aim at nothing more than repelling the injury, obtaining reparation for damages sustained, and security against future injuries.[108]

They should endeavor to be united and at peace among themselves. The strength of a society, as well as its honour and happiness, depends much upon its union. Our Saviour's maxim is founded in reason, and has been confirmed by the experience of all ages: "Every kingdom divided against itself is brought to desolation." (Matt. 12:25) When the body politic is divided into parties, and the members

107.  [Resist the first advances. For debate on this principle, see Chapter 2.K. *Cf. Boyd v. United States*, 116 U.S. 616, 635 (1886) ("It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be 'Obsta principiis.'").—Eds.]

108.  [This is a précis of the classical international law of war, which had been created by extrapolation from the principles of personal self-defense. *See* online Ch. 18.C.—Eds.]

make a business of opposing each other, it is in a fair way to ruin. They are not likely to unite in measures of defence against a common enemy, and will therefore lie open to the encroachments of violence and oppression, and become an easy prey to every invader. The tyrants of the earth, sensible of this, have commonly acted upon this maxim, divide et impera:[109] let us first divide the people, whom we mean to enslave, into parties, and we shall then easily bring them under our power.

They should endeavor to maintain among themselves a general disposition to submit to government. Society cannot subsist without government; and there can be no government without laws, and a submission to laws. If a licentious spirit prevails among a people, a general disposition to trample upon laws and despise government, they will probably make but a poor figure in defending themselves against a common enemy; for, in making this defence, there must be leaders and followers, some to command and some to obey: And, other things being equal, the more a disposition to submit to rule and order prevails among a people, the more likely will they be to defend their liberty against foreign invasions. Indeed without any enemy from abroad, the general prevalence of a licentious spirit may as effectually destroy the liberty of a people, as the most despotic government; for civil "liberty is something as really different from that licentiousness which supposeth no government, as from that slavery which supposeth tyranny: it is a freedom restrained by beneficial laws, and living and dying with public happiness." (Bp. Hoadly.)[110] . . . .

That people that would be in a capacity to defend themselves successfully against encroachments, should take care that their internal government be free and easy; allowing all that liberty to every one which is consistent with the necessary restraints of government; laying no burdens upon any, but what are for the good of the whole, and to which the whole society has actually or virtually consented.

A people who would stand fast in their liberty, should furnish themselves with weapons proper for their defence, and learn the use of them.

It is indeed an hard case, that those who are happy in the blessings of providence, and disposed to live peaceably with all men, should be obliged to keep up the idea of blood and slaughter, and expend their time and treasure to acquire the arts and instruments of death. But this is a necessity which the depravity of human nature has laid upon every state. Nor was there ever a people that continued, for any considerable time, in the enjoyment of liberty, who were not in a capacity to defend themselves against invaders, unless they were too poor and inconsiderable to tempt an enemy.

So much depends upon the military art, in the present day, that no people can reasonably expect to defend themselves successfully without it. However numerous they may be, if they are unskilled in arms, their number will tend little more to their security, than that of a flock of sheep does to preserve them from the depredations

---

109.  [Divide and conquer, an ancient Greco-Roman maxim.—Eds.]

110.  [Church of England Bishop Benjamin Hoadly (1676-1761) was an advocate for Whig principles and defender of the Glorious Revolution of 1688. He wrote a famous 1705 sermon from which Mayhew drew heavily. *See* Reed Browning, Political and Constitutional Ideas of the Court Whigs 67-88 (1982); Benjamin Hoadly, A Defence of the Foregoing Sermon 26 (John Hoadly ed., 1773). Both the sermon and the defense thereof argued for the right of individual self-defense, and extrapolated from that a national right of self-defense against a tyrant such as James II.—Eds.]

of the wolf: accordingly it is looked upon as a point of wisdom, in every state, to be furnished with this skill, though it is not to be obtained without great labor and expence.

In some nations the method has been to trust for defence and security to what is called a STANDING ARMY; a number of men paid by the public, to devote themselves wholly to the military profession; while the body of the people followed their peaceable employments, without paying any attention to the art of war.

But this has ever been thought, by the wise and prudent, a precarious defence.

Such armies are, as to the greater part of them, generally composed of men who have no real estate in the dominions which they are to defend; their pay is their living, and the main thing that attaches them to their employers; their manner of life tends to corrupt their morals, and, though they are naturally of the same temper with other men, they seldom continue long in this profession, before they become distinguished by their vices: So that neither their temporal interest, nor their regard to virtue can be supposed to attach them so strongly to the country that employs them, but that there will always be danger of their being tempted by the promise of larger pay to betray their trust, and turn their arms against it. No people therefore, can with safety trust intirely to a standing army, even for defence against foreign enemies.

But without any such enemy, a standing army may be fatal to the happiness and liberty of a community. They generally propagate corruption and vice where they reside, they frequently insult and abuse the unarmed and defenceless people: When there is any difference between rulers and subjects, they will generally be on the side of the former, and ready to assist them in oppressing and enslaving the latter.

For though they are really servants of the people, and paid by them; yet this is not commonly done in their name; but in the name of the supreme magistrate. The KING's BREAD, and the KING'S SERVICE, are familiar expressions among soldiers, and tend to make them consider him as their only master, and prefer his personal interest to that of the people. So that an army may be the means, in the hands of a wicked and oppressive sovereign, of overturning the constitution of a country, and establishing the most intolerable despotism. It would be easy to shew from history, that this measure has been fatal to the liberties of many nations. And indeed, it has seldom been approved by the body of a people.

A safer way, and which has always been esteemed the wisest and best, by impartial men, is to have the power of defence in the body of the people, to have a well-regulated and well-disciplined militia. ("Our trained bands are the trustiest and most proper strength of a free nation." Milton's Eikon.)[111] This is placing the sword in hands that will not be likely to betray their trust, and who will have the strongest motives to act their part well, in defence of their country, whenever they shall be called for. An army composed of men and property, who have been all their days inured to labour, will generally equal the best veteran troops, in point

---

111.  [John Milton, Eikonoklastes (1649) ("The Icon-Breaker"). Commissioned by Parliament, the book argued that reverence for the executed absolutist King Charles I, and for absolute monarchy in general, was a form of idolatry. "Trained bands" were a subset of the English militia that received extra training.—EDS.]

of strength of body and firmness of mind, and when fighting in defence of their religion, their estates, their liberty, and families, will have stronger motives to exert themselves, and may, if they have been properly disciplined, be not much inferior to them in the skill of arms. . . .

Caution however ought to be used in constituting a militia, that it may answer the end for which it is designed, and not be liable to be made an instrument of tyranny and oppression. It should be subject to discipline and order, and somewhere in the state should be lodged a power of calling it forth to action, whenever the safety of the people requires it. But this power should be so limited and restrained, as that it cannot call it unnecessarily, or oblige it to commit violence or oppression upon any of the subjects.

Once more, it is necessary for a people who would preserve their liberty, to maintain the general practice of religion and virtue. This will tend to make them courageous: The truest fortitude is ever to be found where the passions and affections are in subjection to the laws of God. Religion conciliates the favor of God, upon whom success in war essentially depends, and the hope of this favour will naturally inspire a brave and undaunted resolution. Not to mention that the unity, riches, and bodily strength of a people are greatly favoured by virtue. On the other hand; vice naturally makes men timerous, and fills the breast with baseness and cowardise. What is here said is agreable to the observation of that wise King and inspired writer, who tells us, "the wicked flee, when no man pursueth; but the righteous are bold as a lion." (Proverbs 28:1)

Let me now offer a few considerations to shew the obligations men are under to defend that liberty which providence has conferred upon them. This is a trust committed to us by heaven: we are accountable for the use we make of it, and ought therefore, to the best of our power to defend it. . . .

Men are bound to preserve their own lives, as long as they can, consistently with their duty in other respects. Would not he, who should lose his life by neglecting to resist a wild beast, be criminal in the sight of God? And can he be innocent who loses it by neglecting to oppose the violent attacks of wicked men, oftentimes as fierce and cruel as the most savage beast?

. . . Every man is bound both by the law of nature and revelation, to provide in the best manner he can, for the temporal happiness of his family, and he that neglects this, has, according to the declaration of an inspired apostle, denied the faith, and is worse than an infidel. . . . But in what way can a man be more justly chargeable with this neglect, than by suffering himself to be deprived of his life, liberty or property, when he might lawfully have preserved them?

Reason, humanity and religion, all conspire to teach us, that we ought in the best manner we can, to provide for the happiness of posterity. . . . And who that has the bowels of a father, or even the common feelings of humanity, can think without horror, of being the means of subjecting unborn millions to the iron scepter of tyranny? But further: a regard to the happiness of mankind in general, makes it a duty to resist great injuries. . . . It is therefore an act of benevolence to oppose and destroy that power which is employed in injuring others; and as much, when it is that of a tyrant, as of a wild beast.

Once more; from a regard to religion men are obliged to defend their liberty against encroachments, though the attack should not immediately affect religion.

Slavery exposes to many temptations to vice, and by debasing and weakening the mind, destroying its fortitude and magnimity renders it less capable of resisting them, and creates a dependance upon, and subjection to wicked men, highly prejudicial to virtue. Hence it has been often observed, and is confirmed by experience, that the loss of liberty is soon followed by the loss of all virtue and religion. . . .

All that now remains is to offer some reflections, and apply the subject to the present occasion.

Oppressors may indeed for a time, be successful and overcome all opposition, yet it seldom happens that they persevere in their injurious practice, without meeting with such resistance as causes their mischief to return upon their own heads, and their violent dealings to come down upon their own pates: It is an old observation, that few tyrants descend in peace to the grave. . . .

. . . Our greatest security, under God, will be our being in a capacity to defend ourselves. Were we, indeed, sure that Great-Britain would always be both able and willing to protect us in our liberty, which from present appearances, we have little reason to expect, it would be shameful for so numerous a people as this, and a people of so much natural strength and fortitude, to be, thro' inattention to the art of war, incapable of bearing a part in their own defence. . . . Nothing is wanting but our own care and application to make us, with the neighbouring colonies, a formidable people. And religion, honor, patriotism, and even self-love, all unite in demanding from us this application and care. This people, it may be presumed, will never of choice, keep among them a standing army in time of peace:

Virtue, domestic peace, the insulted walls of our State-House, and even the once crimsoned stones of the street, all loudly cry out against this measure. But every well-wisher to the public, should countenance and encourage a military spirit among our militia through the province.

Our political Fathers have it in their power to do much for this end; and we have a right to expect that, out of faithfulness to God and this people, they will not neglect it. . . .

[W]hen gentlemen of fortune, notwithstanding the allurements of pleasure on the one hand, and the fatiguing exercise of a soldier on the other, exert themselves to acquire and promote the military art, they are an honor to their circumstances, and a blessing to the public. . . .

## NOTES & QUESTIONS

1.  What is the dominant theme of the materials in this section? Is it individual self-defense or is it a military, community defense? Are they mutually exclusive?

2.  In the views of Mayhew and Howard, what are the characteristics of a good citizen? Do you see any ways in which the U.S. Constitution attempts to promote good citizenship?

3.  Mayhew and Howard were mainstream in their view that self-defense was a moral duty. The natural rights philosophers—such as Thomas Hobbes, John Locke, William Blackstone, and Montesquieu—who provided the intellectual foundation of the American Revolution saw self-defense as the "fundamental law of nature" from which many other legal principles could be deduced. *See, e.g.*, John Locke, Second Treatise of Government § 16 (C.B. Macpherson ed., 1980) (1690).

Locke argued that a man's life belonged to God. Accordingly, life was inalienable property. A man could not legitimately destroy his life by suicide, or by failure to defend himself, or by submitting to slavery. As a sermon by the famous Presbyterian Rev. Gilbert Tennent put it:

> He that suffers his life to be taken from him by one that hath no Authority for that Purpose, when he might preserve it by Defence, incurs the Guilt of self-murder since God hath enjoined him to seek the continuance of his Life, and Nature Itself teaches every creature to defend itself. . . .[112]

4.  According to Mayhew and Howard, the loss of political freedom creates moral degradation and servile dependence. Therefore, civil liberty is sacred and necessary for proper cultivation of the Christian soul according to God's natural law. Civil liberty being sacred, God will fight on behalf of a nation that fights for its liberty. Patrick Henry's speech forcefully expresses the theory. Ch. 4.A.6. The American ministers pointed to numerous stories in the Old Testament where obeying God's will enabled the Hebrews to triumph militarily over numerically superior forces. Religious self-confidence that God would fight for America made America willing to fight the mighty British Empire. Can you think of instances where similar beliefs have influenced American actions?

5.  *Ancient Israel as America's model.* The America-Israel analogy was very common in New England religious thought. From the earliest days of New England settlement, sermons compared the Americans' situation to the ancient Israelites. At first, the Americans were seen as analogous to Israel in the Wilderness, when the Hebrew tribes wandered the desert for 40 years after escaping from Egyptian slavery.[113] After New England became well settled and the Wilderness analogy was no longer compelling, ministers invoked the governance of ancient Israel, finding good examples (e.g., a militia system) and bad ones (oppressive taxation by monarchs).

When New England sought to draw the other nine colonies into revolution, the dominant theme was the story of the Jewish Republic. As described in the Old Testament books of Joshua, Judges, and Samuel, Israel had governed itself as a tribal confederation for two centuries, but later sinned against God by becoming a centralized monarchy. America needed to throw off monarchy and adopt self-government, which was the only system of government approved by God. Congregationalist minister Peter Whitney's 1776 sermon *American Independence Vindicated*, captured current attitudes when he argued that the 13 "tribes" of Americans had been patient in their suffering under oppression, like the 12 Hebrew tribes under the tyrannical King Rehoboam, until they, like the Hebrews, had no choice but to revolt.

The America-Israel parallel was beloved even by people who did not take all the Bible literally. Shortly after independence was declared, the Continental

112.  Gilbert Tennent, The Late Association for Defence (Dec. 24, 1747) (Philadelphia) *quoted in* Charles Asbury, The Right to Keep and Bear Arms in America: The Origins and Application of the Second Amendment to the Constitution 40 (Ph.D. History thesis, U. of Mich., 1974) (pamphlet for sermon in William Clements Library, U. of Mich.).

113.  *See* , *e.g.*, Marie L. Ahern, The Rhetoric of War: Training Day, the Militia, and the Military Sermon (1989); Miller, Nature's Nation.

Congress created a special committee to design the Great Seal of the United States. Jefferson's proposal was: "The children of Israel in the wilderness, led by a cloud by day and a pillar of fire by night."[114] Benjamin Franklin proposed "Moses standing on the Shore, and extending his Hand over the Sea, thereby causing the same to overwhelm Pharaoh who is sitting in an open Chariot, a Crown on his Head and a Sword in his Hand. Rays from a Pillar of Fire in the Clouds reaching to Moses, to express that he acts by Command of the Deity. Motto, Rebellion to Tyrants is Obedience to God." *Id.*[115] Franklin's proposed U.S. motto had been the motto of John Bradshaw, head of the Parliamentary committee that ordered the execution of King Charles I. (Ch. 2.H.2.a.)

Can you find in the later history of the United States, and in modern times, echoes of America's early self-identification with Israel? Do you share it? Do you think it is a helpful or an unhelpful idea? Further reading: Eric Nelson, The Hebrew Republic: Jewish Sources and the Transformation of European Political Thought (2011) (Study of the ancient Hebrew republic and Jewish scholarship led early modern European political thought to develop three novel principles: republics are the only legitimate government; distribution of property should be egalitarian; religious diversity should be tolerated.)

6.  For more on the black regiment and its role in inciting the Revolution, see, in addition to the sources cited this section, 1-2 Political Sermons of the American Founding Era, 1730-1805 (Ellis Sandoz ed., 2010); Dale S. Kuehne, Massachusetts Congregationalist Political Thought 1760-1790: The Design of Heaven (1996); Harry S. Stout, The New England Soul: Preaching and Religious Culture in Colonial New England (1988); The Pulpit of the American Revolution (John Wingate Thornton ed., 1970) (1860) (reprinting some important sermons); David B. Kopel, The Morality of Self-Defense and Military Action: The Judeo-Christian Tradition (2017).

Important sermons were printed and read widely throughout the colonies. Indeed, by 1776, Congregationalist pamphlets from New England exceeded the number of secular pamphlets from all the other colonies combined by more than four to one. For some examples of leading sermons, in addition to the ones already cited, see John Lathrop, Innocent Blood Crying to God (1771); Eli Forbes, The

114.  Letter from John Adams to Abigail Adams (Aug. 14, 1776), *in* 2 Adams Family Correspondence 96 (L.H. Butterfield ed., 1963). As the Hebrew slaves fled Egypt, "the LORD went before them by day in a pillar of a cloud, to lead them the way; and by night in a pillar of fire, to give them light; to go by day and night." *Exodus* 13:21.

115.  The Hebrews were trapped between the sea and the advancing Egyptian army. "And Moses stretched out his hand over the sea; and the LORD caused the sea to go back by a strong east wind all that night, and made the sea dry land, and the waters were divided. And the children of Israel went into the midst of the sea upon the dry ground: and the waters were a wall unto them on their right hand, and on their left. . . . And the LORD said unto Moses, Stretch out thine hand over the sea, that the waters may come again upon the Egyptians, upon their chariots, and upon their horsemen. And Moses stretched forth his hand over the sea, and the sea returned to his strength when the morning appeared; and the Egyptians fled against it; and the LORD overthrew the Egyptians in the midst of the sea." *Exodus* 14:21-28.

Dignity and Importance of the Military Character Illustrated (1771 Artillery Day); William Gordon, A Discourse Preached December 15th, 1774, Being the Day Recommended by the Provincial Congress; And Afterwards at the Boston Lecture; William Emerson, Sermon on 2 Chronicles 13:12 (Mar. 13, 1775); Samuel Langdon, Government Corrupted by Vice, and Recovered by Righteousness (May 31, 1775).

7.  John Adams described Scottish Whig James Burgh's *Political Disquisitions* as "a book which ought to be in the hands of every American who has learned to read," 4 Works of John Adams at 588. Burgh agreed with the American Revolutionaries about the practical impact of concentrating arms in the hands of standing armies rather than the people:

> The confidence, which a standing *army* gives a minister, puts him upon carrying things with a higher hand, than he would attempt to do, if the people were armed, and the court unarmed, that is, if there were no land-force in the nation, but a militia. Had we at this time no standing army, we should not think of *forcing* money out of the pockets of three millions of our subjects [the Americans]. . . . There is no end to observations on the difference between the measures likely to be pursued by a minister backed by a standing *army*, and those of a court awed by the fear of an *armed people.*

James Burgh, 2 Political Disquisitions 475-76 (1774). The quote appeared, *inter alia*, in the New York Journal, Feb. 9, 1775, at 1. As is discussed in Chapter 4.A, if King George III had not possessed a peacetime standing army to deploy in America, there would have been no Revolution.

8.  Writing in 1789, physician David Ramsay explained that one cause of the Revolution was that "Though there were a variety of sects, they all agreed in the communion of liberty, and all reprobated the courtly doctrines of passive obedience, and non-resistance." David Ramsay, 1 A History of the American Revolution 29 (Lester H. Cohen ed., Liberty Fund, 1990) (1789). Ramsay also identified another cause: "The study of law was common and fashionable." *Id.* According to Ramsay:

> No order of men has, in all ages, been more favourable to liberty, than lawyers. When they are not won over to the service of government, they are formidable adversaries to it. Professionally taught the rights of human nature, they keenly and quickly perceive every attack made upon them. While others judge of bad principles by the actual grievances they occasion, lawyers discover them at a distance, and trace future mischiefs from gilded innovations.

*Id.* Half of the Continental Congress of 1774 were lawyers. "Bred in the habits of public speaking, they made a distinguished figure in the meetings of the people, and were particularly able to explain to them the tendency of the late acts of parliament. Exerting their abilities and influence in the cause of their country, they were rewarded with its confidence." *Id.* at 125. Are Ramsay's observations still accurate today? Why or why not?

## E.   ARMS TECHNOLOGY, TACTICS, AND CULTURE IN THE COLONIES

This Part completes the story of the colonial arms culture from which the American Revolution grew. Section 1 provides data about the prevalence of firearms in colonial America. Section 2 examines the types of arms that the colonists owned, and how their choices reflected the growing divergence between English and American arms cultures. Section 3 surveys the colonial militaries, elucidating similarities and differences among the colonies. Section 4 contrasts American and English militia cultures. Section 5 summarizes the strengths and weaknesses of the colonial militia system. Section 6 observes how American arms culture grew from the encounter of European and Indian arms cultures.

### 1.   How Common Were Firearms in America?

The most sophisticated analysis of gun ownership in colonial America studied probate records and found gun ownership rates of "69% in the South, 50% in New England, and 41% in the Middle colonies." James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777, 1836 (2002). As the authors explained, the numbers are almost certainly a low estimate, as probate records do not account for transfers of goods before death, and they are obviously incomplete. Only 77 percent of probate records included clothing, but this does not mean that 23 percent of Americans walked around naked. Guns were less commonly owned than beds, cooking utensils, and pewter, and more common than chairs or books. *Id.*

Lindgren and Heather conducted their research after the publication of a book claiming that before the Civil War, Americans had neither very many guns nor a robust gun culture. Michael A. Bellesiles, Arming America: The Origins of a National Gun Culture (2000). When the Bellesiles book was exposed as a fraud, the publisher withdrew and pulped it. Bellesiles resigned from Emory University in 2002, and a prize awarded for the book was rescinded.[116]

---

116.  Nearly every page of the book made gross misstatements of fact. Bellesiles claimed that he had examined probate records. But some of the records he said he had studied did not exist, such as those that had burned during the Great San Francisco Earthquake of 1906. Likewise, he made claims about the "wills" of people from Providence, Rhode Island, who died intestate. As for probate and testamentary records that did exist, they showed the opposite of what Bellesiles purported. For scholarship addressing the Bellesiles controversy, see Clayton Cramer, Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie (2009) (by the first scholar to document the Bellesiles fraud); Peter Charles Hoffer, Past Imperfect: Facts, Fictions, Fraud—American History from Bancroft and Parkman to Ambrose, Bellesiles, Ellis, and Goodwin (2007); Clayton E. Cramer, *Why Footnotes Matter: Checking Arming America's Claims*, 1 Plagiary 149 (2006); Jon Wiener, Historians in Trouble: Plagiarism, Fraud and Politics in the Ivory Tower (2005) (arguing that the power of interested constituencies explains the different consequences following discoveries of academic fraud); James Lindgren, *Fall from Grace: Arming America and the Bellesiles Scandal*, 111

## 2.   *American Arms*

To reduce the printed page count and the cost of this textbook, this section is compressed. More detail is available in online Chapter 23.

### a.   Flintlocks

Recall from Chapter 2.I that in seventeenth-century England, the predominant ignition system for firearms was the matchlock, and the shift to flintlocks only began late in the century. Americans made the transition much earlier. The matchlock was inexpensive, and served well enough for European-type battles, in which large masses of infantry shot in each other's general direction. Nobody bothered to take careful aim, because the objective was a volley of fire at the closely packed troops of the enemy.

But Indians did not fight that way. They preferred quick raids and ambushes. Because a matchlock is ignited by a slow-burning cord, it was impractical to keep in a constant state of readiness, to defend against a surprise attack. The burning cord also revealed the location of the matchlock user. Concealment did not matter in European infantry battles, but it was a fatal flaw in America, where fighting often took place in the woods, with both sides hiding behind natural cover. Concealment problems also made the matchlock inferior for hunting, so Americans in the seventeenth century replaced their matchlocks with flintlocks long before the English did. For the same reasons, Indians who were buying arms from the colonists strongly preferred flintlocks to matchlocks. Harold L. Peterson, Arms and Armor in Colonial America 1526-1783, at 18-49 (Dover 2000) (1956). Captain Myles Standish, a former professional soldier who was the military leader of Plymouth Colony, was the first famous New England user of a proto-flintlock (a snaphaunce), in 1620.[117]

### b.   The Pennsylvania-Kentucky Rifle

Common arms in the United Kingdom in the eighteenth century were *smoothbores*. That is, the *bore*, the interior of the barrel, was smooth. Smoothbores are well-suited for bird-hunting. Their accuracy is not very good beyond 50 yards. Today, the most common smoothbores are shotguns.

In a rifle, spiral grooves (*rifling*) are cut in the bore. The grooves make the bullet spin on its horizontal axis, so the bullet's flight is more aerodynamically

---

Yale L.J. 2195 (2002) (at the time, the most-read law review article ever, with over 100,000 downloads); 59 Wm. & Mary Q. 203-40 (2002) (symposium of articles by Ira D. Gruber, Gloria L. Main, Randolph Roth, and Jack Rakove, the first three finding major problems with Bellesiles's scholarship, with Rakove defending Bellesiles). For a more recent book advancing the Bellesiles thesis, see Pamela Haag, The Gunning of America: Business and the Making of American Gun Culture (2016). For a critique of Haag-Bellesiles theory, see Clayton E. Cramer, Lock, Stock, and Barrel: The Origins of American Gun Culture (2018).

117.  Malone at 33. Standish's adventures are told with poetic license in *The Courtship of Miles Standish*, by Henry Wadsworth Longfellow, a descendant of five *Mayflower* Pilgrims, including Priscilla Mullins, whom Standish unsuccessfully courted.

stable. Rifles are superior for long-range shooting. Since the late fifteenth century, rifles had been well established in the mountainous regions of southern Germany and northern Switzerland. M.L. Brown, Firearms in Colonial America: The Impact of History and Technology, 1492-1792, at 28 (1980). Rifled arms were originally created for target shooting and sport. The Finnish immigrants to New Sweden had brought their rifles them in the mid-seventeenth century, but rifles had not caught on in Great Britain, or with the English colonists. Section C.1.c.

Early in the eighteenth century, riflemakers from Germany and Switzerland began settling in Pennsylvania, in the Lancaster area. America was attracting skilled craftsmen immigrants, who could set up their own business and prosper, free of the extensive controls of guilds and government in the homeland. Pennsylvania, with its complete religious freedom, was especially attractive for craftsmen who also sought the free exercise of religion. When George Hanover, a German, became King of Great Britain in 1714 (online Ch. 22.J.1), many German-speaking gunsmiths decided that the time was right to emigrate to America. J.N. George, English Guns and Rifles 144-47 (1947).

Over the century, knowledge of rifle-making was diffused nationally, as apprentices who trained in Pennsylvania moved to Maryland, Virginia, the Carolinas, and other colonies. The demands of the American market led to creation of a new type of rifle, the first distinctively American gun: the Pennsylvania-Kentucky rifle. Pennsylvania was the primary place where it was made, and Kentuckians became the most famous users. John G.W. Dillin, The Kentucky Rifle (1924).[118]

The Pennsylvania-Kentucky rifle was longer than its European ancestor. The longer barrel improved the balance, and helped the user obtain a more accurate sight of the distant target.[119] Whereas European rifles generally had a *caliber* (the interior bore diameter) of .60 to .75 inches, Americans preferred a smaller caliber, usually somewhere between .40 and .46, and sometimes as low as .32. Brown at 267. With the smaller caliber, a person on a hunting expedition that might last for weeks or months could carry a greater quantity of ammunition.

Among America's riflemen, there was "a cult of accuracy." Alexander Rose, American Rifle: A Biography 18-19 (2008). Long-distance shooting contests were major events in rural communities. Everyone was expected to be a master of precision shooting—not just for prestige, but for dinner. The most accurate firearm produced up to 1800—and not surpassed for accuracy until well after that—the Pennsylvania-Kentucky rifle was ideal for hunting mammals and for the irregular tactics of Indian fighting. Indians preferred them for the same reasons. It fit the forest.

118.  Originally, "Kentucky" referred to an area extending from southern Ohio and Indiana all the way to northern Tennessee. Charles Edward Chapel, Guns of the Old West 20-21 (1961).

119.  A common sighting system was a small blade above the top of the muzzle, and a U-shaped notch atop the breech. The user aligned the gun so that the view of the front blade fit inside the U of the back notch. This showed where the barrel was pointed. If the barrel is longer, then so is the *sight radius*—the distance between the front and rear sights. A longer sight radius is more accurate. Brown at 268.

Until the Revolution, rifles were rarely seen in New England, where smooth-bore muskets continued to predominate. New Englanders and others also had many fowling pieces — bird-hunting guns similar to a shotgun. *See* Ch. 2.H. Although fowling pieces are lighter weight than muskets, a musket could be used for bird hunting, and a fowling piece could be used for infantry combat. Brown at 85.

For European-style fighting, rifles had several disadvantages compared to muskets. First, they took more labor to produce, and were consequently more expensive. Second, they took longer to reload, in part because pushing a spherical bullet past the rifling grooves was so difficult. Under optimal conditions with expert use, the maximal rate of rifle fire was about three shots per minute, compared to four or five for the musket. Third, they were too delicate to use with a bayonet. Peterson at 198-203; Lloyd at 234.

A bayonet is a dagger or other straight knife that is attached to the front of a gun. In a typical European battle, fought with linear tactics, the musket-armed infantry on each side would be lined up three-deep in rows. Without bothering to aim at a particular target, the first row would fire a volley at the opposing army. The first row would then step to the rear and begin reloading. The second row would step forward and fire its volley. The three-row cycle made it possible to fire a volley every several seconds.

Eventually, one army would march quickly toward the enemy ranks, absorbing some volleys on the way. Then, the battle would be decided by hand-to-hand combat, not gunfire. The soldiers would stab and slash each other with the bayonets at the end of their muskets. They would also use their muskets as clubs. The rifleman and his more fragile gun were at a disadvantage. All riflemen had a tomahawk, a hatchet, or some other edged weapon. But their opponents who had a bayonet at the end of their muskets had a longer reach.

Accordingly, when Americans had to fight European armies — such as the French from 1744-45 and from 1754-63, or the British from 1775-83 — the musket was the more important arm. The American Revolution was won mainly with muskets, not rifles. During the Revolution, rifles did play a decisive role in the West. There, forces led most notably by Gen. Daniel Morgan defeated the British and their Indian allies, securing American claims to the vast lands between the Appalachian Mountains and the Mississippi River. As discussed in Chapter 6.A.6, the Pennsylvania-Kentucky rifle was the firearm of the 1815 Battle of New Orleans, when Americans led by General Andrew Jackson routed the best forces in the British army. The Pennsylvania-Kentucky rifle would become the first iconic American firearm. To Americans, the Pennsylvania-Kentucky rifle showed that Americans were free because they were excellent marksmen.

Many people needed a firearm that met militia requirements and was also useful for hunting. In America, "civil and military uses of firearms dovetailed as they had not generally done in Europe." Lee Kennett & James LaVerne Anderson, The Gun in America: The Origins of National Dilemma 41 (1975). "Thus the distinction between military and sporting arms is almost lost." Peterson at 179. So Americans developed what collectors call the "semi-military" firearm. It was usually .70 to .75 caliber, and similar to a musket, but with variations that made it better for hunting. *Id.*

As for handguns, they were used for self-defense, and in the militia, army, or navy by officers, cavalry, and sailors. Handguns ranged from large holster pistols to small pocket pistols. *Id.* at 208-11. Depending on size and purpose, handguns were carried in saddle holsters ("horse pistols"), on belts, in trouser pockets, in vests, or "in the big outer pockets of the greatcoat." Charles Winthrop Sawyer, Firearms in American History: 1600 to 1800, at 165 (1910). A variety of multishot pistols from the late eighteenth century have been preserved, holding two to four rounds. *Id.* at 194-98, 215-16.

### c.   Breech Loaders and Repeaters

As in Great Britain during the seventeenth and eighteenth centuries, the very large majority of firearms in America were single-shot muzzleloaders. Firearms that load from the back (*breechloaders*) or that can fire several shots without reloading (*repeaters*) did not become mass-market consumer items until the nineteenth century. Large-scale production of such arms at affordable prices required the prior invention of machine tools, as described in Chapter 6.C.

Nevertheless, breechloaders and repeaters were available in colonial America for persons who could afford them. For example, Boston gunsmith John Cookson in 1756 advertised a repeater in the *Boston Gazette*. "[T]he said gun will fire 9 Times distinctly, as quick, or as slow as you please." Peterson, Arms and Armor at 215. The problem in America, as in England, was that repeating guns require a much closer fitting of the parts than do single-shot guns, so they could only be produced by very skilled gunsmiths who had lots of time. The same was true for breech-loading guns. *Id.* at 217-18. The expense made repeaters and breechloaders unaffordable to most of the population. Affordability would change in nineteenth century with the rise of machine tools. *See* Ch. 6.C.2.

### d.   Edged Weapons

As the arms mandates in Part B demonstrate, edged weapons were pervasive. Besides the bayonet, there were swords, tomahawks, hatchets, and a wide variety of knives. At close quarters, most firearms would be good for one shot. If a person carried a pair of pistols (a *brace*), then he or she could fire two shots. But there would be no time to reload anything more against an adversary who was within arm's reach. Edged weapons were therefore essential to self-defense. *Id.* at 69-101.

### e.   Armor

In Europe in the sixteenth century, the increasing use of firearms had made plate armor obsolete. In the early years of American settlement, when Indians with arrows were the principal opponent, Americans continued to wear armor. For purposes of mobility, leather or quilted jackets became popular; they would not always stop an arrow, but they did mitigate its damage. Once the Indians acquired firearms in large quantities, armor was generally abandoned. By the time of the Revolution, the principal armor was metal headgear. Although it would not necessarily stop a bullet, it offered some protection against edged weapons. As the militia equipment requirements in this Chapter and Chapter 5 show, militiamen often had to provide themselves with some form of armor. *Id.* at 103-51, 307-16.

### f.   Production Issues

Today a gunsmith is typically distinct from a gun manufacturer. The former repairs or customizes firearms and is usually a small businessperson. In England and America during the seventeenth and eighteenth centuries, the gunsmiths were also the manufacturers. Most English gunsmiths belonged to guilds, which imposed price controls on gunsmithing services. There were no such guilds in America. Brown at 87, 150. The effect of supplier-based price controls, a form of oligopoly, is usually a reduction in the supply and an increase in profits to the suppliers.

The United Kingdom's 1750 Iron Act restricted American mines and steel furnaces. Among its provisions were a ban on the use of the tilt hammer, which is necessary to produce the thin iron for knife-making. 23 George II ch. 29 (1750). However, the Act was poorly enforced because some British officials in America had financial interests in the iron and steel business, and others were simply bribed. Had the American colonists not illegally developed an iron industry, the Revolution would have been impossible for lack of arms. Arthur C. Bining, British Regulation of the Colonial Iron Industry (1933); Brown at 241. A shortage of quality iron did reduce the quality of American firearms. *Id.* at 377.[120] Thomas Jefferson's 1774 tract *A Summary View of the Rights of British America* listed the Iron Act as among the abuses inflicted on the Americans.

### 3.   *Colonial Militias and Temporary Armies*

### a.   Massachusetts

According to John Adams, there were "four principal sources" in Massachusetts that "produced the American Revolution." He hoped that all four "will be sacredly preserved as the foundations of the liberty, happiness, and prosperity of the people." The four foundations were: "1. The towns or districts. 2. The congregations. 3. The schools. 4. The militia." As Adams explained, "The militia comprehends the whole people." By law every male 16 to 60 was "enjoined to keep always in his house, and at his own expense, a firelock in good order," plus gunpowder, a powder horn, 24 lead balls, a cartridge box, and a knapsack. Thus, "the whole country [wa]s ready to march for its own defence upon the first signal of alarm."[121]

The Massachusetts Bay Colony was originally a covenanted religious community. Government existed by the consent of those who voluntarily joined the community, accepting its rights and responsibilities, including militia service. Like the rest of New England, the primary form of settlement in Massachusetts was small towns that served as hubs for the nearby small farms, owned in freehold. The township system created a strong nucleus of common interest and affinity and helped make the militia an effective fighting force.

---

120.  In particular, the steel shortage made American springs for the gunlock inferior to the best European guns, so ignition speed (from the time the trigger is pulled until the gun fires) was slower on American guns. Brown at 377.

121.  Letter from John Adams to Abbé de Malby, *in* 5 Works of John Adams at 494-96.

In Massachusetts and elsewhere, the militia was approximately one-fifth of the total population.[122] Contrast the number with England, where as of 1638, the select militia ("trained bands") comprised fewer than 80,000 men out of a national population of 4 or 5 million. *See* Ch. 2.H.1.e.

Nearly from the start, militia officers were elected by the people. Indeed, "the Massachusetts militia franchise was among the broadest, most democratic franchises in the English world." David R. Millar, The Militia, the Army, and Independency in Colonial Massachusetts 80 (Ph.D. diss. in History, Cornell U. 1967). The people voted to "nominate" militia officers, and then those nominations were ratified by the colony's governing body, the General Court.[123] Under pressure from England, militia elections were eliminated in 1668, then restored following the Massachusetts revolution in 1689.[124] The Glorious Revolution in Massachusetts is described in Ch. 4.A.1.

Compared to other colonies, Massachusetts had a large number of occupational exemptions from militia training and service—even professors and students at the local school for training ministers (Harvard College). However, persons with occupational exemptions still had to possess the requisite arms and could be called to serve in emergencies. Millar at 136, 140.

A single man who could not provide the necessary firearm for himself would be hired out as a servant until he earned enough to buy a gun. A family man who could not afford a firearm would be loaned a firearm from the town's magazine; when not in use, the gun was kept in town custody. *Id.* at 138. During 1704-12 (Queen Anne's War, against the French and their Abenaki allies in northern New England), the militia equipment mandate included snowshoes for winter operations. *Id.* at 142.

Immigrants from Scotland were primarily Presbyterian, whereas the Massachusetts English majority was mainly Puritan; although there were never any statutes against Scots possessing arms or serving in the militia, there may have been local discrimination against enrolling them in town militias. Discrimination was forbidden by a 1652 General Court order that all "Scotsmen, Negers, & Indians inhabiting with or servants to the English" should participate in militia training.[125] But in 1656, the law was changed, so that "no Negroes or Indians . . . shal be armed or permitted to trayne." *Id.* at 397.

For local defense, the militia was an effective institution. For operations far from home, the militia could not be used for very long. The economy could not survive if almost the entire White male population 16-60 were gone for months. So

---

122.  Evarts B. Greene & Virginia D. Harrington, American Population before the Federal Census of 1790, at xxiii (1932).

123.  The formal name of the state legislature is still the Massachusetts General Court, now consisting of a Senate and a House of Representatives.

124.  *Id.* at 57, 81; T.H. Breen, *English Origins and New World Development: The Case of the Covenanted Militia in Seventeenth Century Massachusetts*, 3 Past & Present 74, 81-96 (1972).

125.  3 Mass. Bay Recs. at 268. As noted in online Chapter 22.J.1, Scots from the Lowlands tended to be Presbyterians, while those from the Highlands were Catholics. Neither were well-liked by Puritans, who at the time considered themselves to be reformers within the Church of England.

for operations further from home, Massachusetts, like other colonies, created temporary armies. These were not permanent, standing, professional armies, which were anathema. Rather, the state armies were created for a specific campaign, and the service obligation would usually end after several months.

During the first half-century of Massachusetts, the typical mode of raising the army was by conscription. The General Court would create quotas for each town, and the towns would fill up their quotas however they chose. In the early months of King Philip's War (1675-76) (Section C.3), the local committees tended to select unmarried lower class males—those with the fewest attachments to the community. The same had been the policy of Great Britain's Queen Elizabeth I (reigned 1558-1603), whose overseas armies were mainly whomever the town elders wanted to get out of town. The practice continued under the Stuart monarchs. *See* Ch. 2.H.1.e. This was good for town stability, but bad for military effectiveness.

The same system brought Massachusetts close to annihilation. The Indian forces of King Philip (also known as Metacomet) were superior gun users, and more mobile. *See* Section C.3. They could hit a town with a surprise attack, kill everyone they could find, burn the buildings, destroy the food and other resources, and then retreat into the wilderness. In a well-planned attack, the Indian raiders would outnumber the town defenders.

The conscript Massachusetts army performed well enough when it faced the Indians in a stand-up battle, but the Indians could rarely be forced into a battle when they considered conditions disadvantageous. The conscript army was not capable of finding and engaging the Indians when they wanted to stay concealed in the forests.

What saved Massachusetts was augmenting the composition of its army. Massachusetts gave the offensive role to volunteers, not conscripts. The volunteers were motivated by higher pay, by the potential for plunder (which was universally allowed at the time under the laws of war), and by bounties for scalps. Further, Massachusetts stopped disarming friendly Indians and confining them in what amounted to large concentration camps. Instead, Indian allies were allowed into the armed forces.

Two volunteer units proved exceptionally able at finding and engaging King Philip's very mobile military. Benjamin Church's volunteers were 70 percent Indian. Samuel Moseley's rangers were all from the social periphery: apprentices, servants, prisoners, and Indians. Even when the volunteer units could not catch King Philip's forces, they kept up a fast pursuit, so that the camps of King Philip or his allies had to be abandoned quickly. Stores of food, ammunition, gunpowder, and other supplies had to be left behind. The war of attrition gradually deprived the Wampanoag and their allies of supplies and destroyed their morale, leading eventually to surrender.

Church had created a new type of American fighting man: the ranger. He led ranger units in subsequent wars with New France. His most famous successor was Major Robert Rogers, who commanded Rogers's Rangers in the French and Indian War of 1754-63.[126]

126. *See generally* Gary Zaboly, American Colonial Ranger: The Northern Colonies 1724-64 (2004). When the U.S. Army Ranger Association created the Ranger Hall of Fame at Fort Benning, Georgia, Benjamin Church and Robert Rogers were inducted into the first class. Rogers's 28 Rules of Ranging are still distributed to and studied by every new Ranger as part of the Ranger Handbook. The cover of the handbook features a quote from Rogers: "Let the enemy come till he's almost close enough to touch. Then let him have it and jump out and finish him with your hatchet." United States Army, Ranger Handbook, SH 21-76 (2011).

Colonial Massachusetts never repeated its error from the first phase of King Philip's War. Thereafter, military responsibility within the colony was more equally shared. To the extent that armies for extended operations could be raised by paying well for volunteers, they were. *See generally* Kyle E. Zelner, A Rabble in Arms: Massachusetts Towns and Militiaman During King Philip's War (2009) (detailing the conscript system in Essex County).

As the English militia theorists (Ch. 2) had predicted, a genuine people's militia served the people. "A survey of Massachusetts records reveals no instance in which the colony's rulers attempted to employ the militia as a police force, as a tax collector, or as an instrument of social control."[127]

### b.   Connecticut

Connecticut was founded in 1636, and its militia was similar to Massachusetts, although with fewer occupational exemptions. The town-centric militia was sufficient for local defense. Much sooner than Massachusetts, Connecticut appreciated the value of a joint White-Indian military.

In the first phase of the Pequot War of 1636-37, a Massachusetts force with no Indians had fought well on defense but could not catch the Pequots to force them into a decisive battle. Connecticut nervously sat on the sidelines, until the Pequot began attacking Connecticut towns. The Connecticut government accepted the offer of Uncas, sachem of the Mohegans, for a joint offensive. The number of English and Mohegan fighters was about equal, and they were guided by Mohegan scouts. They searched out the Pequots, who had no Indian allies, and defeated them. Connecticut became dependent on its Indian allies and was timid about nonlocal operations without Indian support.

During King Philip's War, the Indians living in Connecticut did not join the fighting. The Connecticut government's forces did fight in Massachusetts and Rhode Island. While the war was going on, the Royal Governor of New York, Edmund Andros, attempted to assert New York's claim to the half of Connecticut west of the Connecticut River. The mobilization of the Connecticut militia convinced him to back down.

Throughout King Philip's War, the English government, which was not favorable to the independent behavior of New England in matters of religion, trade, and politics, did little to aid the colonists. That the colonists fought and survived on their own helped them form a distinctive, non-English identity.

In the last decade of the seventeenth century and the first six decades of the eighteenth, Anglo-French wars in Europe repeatedly led to French and Indian attacks on the American colonies. Buffered from Indian threat by Massachusetts to the north and New York to the northwest, Connecticut would have preferred to leave the fighting to its sister colonies. The British government, however, strongly pressured Connecticut to contribute soldiers, even for offensives in French Canada.

The Connecticut government worked out an informal *modus vivendi* with London. Connecticut would raise a temporary army as needed. Thanks to immigration, the fecundity of the people, and growing prosperity from trade, Connecticut

---

127.  Timothy Breen, *Persistent Localism: English Social Change and the Shaping of New England Institutions*, 32 Wm. & Mary Q. 3d ser. 3, (1975).

could raise armies primarily from well-paid volunteers, supplemented as necessary by conscripts. Blacks and Indians were not part of the militia, but they were allowed to volunteer for the ad hoc armies. Enlistment bonuses were higher for men who brought their own firearm and other equipment.

The temporary armies were not led by militia officers. Instead, their leaders were the men could attract the requisite number of volunteers. To the volunteers, their enlistment contract was for service under the particular leader they chose, and no other man. Traditional military subordination was not the practice. The leaders governed their men more by persuasion than by force.

As for the militia, it was still there for defense within the colony's boundaries. It was instantly available in case of possible French attack on a seaport town, as it had been during the Anglo-Dutch wars of the latter seventeenth century. It helped deter Connecticut Indians from hostile action.

The Connecticut militia was governed democratically, through a well-operating system of checks and balances. The governor was commander of the militia, but he could not act without consent of the General Assembly.[128] The assembly appointed the field grade officers (major and above), whereas the lower officers (captain and below) were elected by the people. Men who could not vote in ordinary political elections (e.g., indentured servants, men who owned no land) could still vote for militia officers. After 1741, even men who were not part of the militia (e.g., those who were 62 years old, or ministers) could vote for officers. Approval from the General Assembly was required for these officers, and this approval was not unreasonably withheld. In a colony where few people were very rich or very poor, men eagerly sought election as a militia officer, one of the few available titles or honors.[129]

In the run-up to the American Revolution, the former leaders of volunteers from the French and Indian War (1754-63) were often the leaders of the Sons of Liberty, the radicals who pushed for active resistance to British government. The election system for militia officers created an officer corps of men who were willing to fight the king, if necessary.

For further reading, see Harold E. Selesky, War and Society in Colonial Connecticut (1990), and Richard H. Marcus, The Militia of Colonial Connecticut, 1639-1775: An Institutional Study (Ph.D. diss. in History, U. of Colo. 1965).

### c.   Plymouth

Before being absorbed by Massachusetts in 1692, Plymouth had a similar system for a permanent universal militia and for temporary armies. In the early years, militia training was six times annually. Plymouth Laws at 68-69 (enacted 1640). When it seemed like there was no danger to the colony, training was reduced to once every three years. *Id.* at 153 (enacted 1668). Townships chose their chief militia officer, who appointed inferior officers, subject to the approval of the General

---

128.  The unicameral Connecticut General Court became the bicameral General Assembly in 1698.

129.  During the period when the New Haven Colony was separate, the people also elected militia officers. New-Haven's Settling in New-England at 61 (enacted 1656).

Court. *Id.* at 84 (1646). For the temporary army, impressment was by town quotas. *Id.* at 215 (enacted 1689), 225 (enacted 1690).

On top of the individual requirement to possess arms (Section B.1.a.ii), towns had to have their own: two flintlocks and two swords per 30 men. *Id.* at 84 (enacted 1646). These would be available as a reserve in case of breakage during war, and to furnish arms to persons who could not afford their own. In addition, towns should also have pikes (long spears used for thrusting). *Id.* at 128 (enacted 1660). There was no mandate for individuals to own pikes.

Like Massachusetts Bay, Plymouth enacted an anti-discrimination law for militia service: "That all such Scots and Irish" in townships "shall beare arms and traine as others." There was an exception for Scots or Irish who were "servants from month to month"—the usual servant contracts being for a year or (for indentured servants) several years. *Id.* at 100 (enacted 1655).

Plymouth was the home of the Wampanoag, and thus the center of King Philip's War. Apparently for conservation of ammunition during war, shooting was forbidden "except at an Indian or Woolfe," subject to a five shilling fine. *Id.* at 176 (enacted 1675).

### d.   New Hampshire and Maine

As will be detailed in Chapter 4.A.2, during 1689-1763, America fought in a series of wars with French Canada and its Indian allies. The warfare was most constant in northern New England—consisting of New Hampshire, Maine (at the time, part of Massachusetts), and the northern and western part of Massachusetts. Steven C. Eames, Rustic Warriors: Warfare and the Provincial Soldiers on the New England Frontier, 1689-1748 (2011).

As Eames explains, the militia statutes are underinclusive and overinclusive in showing who did the fighting. A typical militia statute would encompass males 16-60 and have some occupational exemptions. Yet when a town came under attack, such as from an Indian raid, everyone would fight. Occupational exemptions were ignored. Indeed, women and children fought, too. *Id.* at 28-29. That was one reason some colonies required women to possess the same arms as militiamen. Part B.1.

On the other hand, for operations away from home, it would be economically impractical to send off the entire militia. For expeditions, the militia rolls were the starting point for choosing some (not all) of the militiamen to serve. As elsewhere, volunteers made up the bulk of the forces, with pressed men (conscripts) as the remainder. *Id.* at 142 (conscripts were 10-30 percent).

Administratively, militia musters ensured that men had the necessary arms. Militia training days, which usually ended with a large mock battle, were enjoyed for the spectacle and helped to foster cohesion and morale. However, the practice with linear tactics was not much use for the kind of fighting that northern New Englanders had to do in 1689-1763. Linear tactics were the norm in Europe, where ranks and files of soldiers, facing each other across a field, would perform complex maneuvers in which a unit would turn one way or another, advance, or fall back, all in perfect unison. In the dense woods of Eastern America, linear tactics were irrelevant. Not until the 1759 Anglo-French battle on the Plains of Abraham, outside Quebec City, did North America see a full-scale linear battle. The major battles of

the American Revolution would be fought with linear tactics, and it took a while for George Washington to teach the soldiers of the Continental Army how to use them, with the assistance of Prussian General Friedrich von Steuben.

During the wars with France and Indians, the northern New Englanders had to become proficient at *la petite guerre*— a term originally used for the tactics of the French and their Indian allies. Unlike in European battles, the initiation of combat was usually a surprise to one side. Quickly, the fighters would have to exercise individual judgment—spreading out, taking cover, and choosing their own targets. Unlike in linear tactics, individual marksmanship was essential. The same skills are needed by today's U.S. infantry, and are very different from the unified, unthinking obedience and the mass unaimed fire that were appropriate for linear combat. *Id.* at 177-216.

Northern New England soldiers elected their own officers, choosing the men in whose hands they would trust their lives. The best of these officers were known to be excellent hunters. *Id.* at 183. They led rather than commanded. *Id.* at 170-71. Their men accomplished extraordinary feats, including overland marches of hundreds of miles through the Canadian wilderness. The enlisted men were loyal to their officers, not to a higher command structure, so the northern New England provincial armies really operated as a confederation of small armies. *Id.* at 157.

For defense against Indian raids, forts were constructed, and every town built garrison houses. Typically, the garrison house was an improved public building, such as an ale house, or a large home. During a raid, everyone would take shelter in the garrison. While these defensive structures could mitigate the loss of life during a raid, they could not stop the raids, so the New Englanders learned how to conduct offensive operations in the wilderness. They figured out scouting to find the Indians (or, at the least, the Indians' supply reserves), and how to use small, mobile units to take the war to the Indians.

### e.   Rhode Island

Rhode Island's militia was similar to the general New England model. One difference was that towns elected their militia officers, with no need for approval from the colony's government.[130] This was in keeping with Rhode Island's early federal structure of government, which was more decentralized than its neighbors.

### f.   Virginia

When the settlers of the Virginia Company landed in 1607, they brought a large supply of arms, which quickly needed to use. The first leaders of the colony, the aristocrats from England, shirked their fair share of work, and were inept in military matters. If not for the intervention of Captain John Smith, whom the aristocrats had tried to execute, the colony would have perished. He saved the infant colony by his valor, military skill, and diplomacy.

The first town of the Virginia colonists, Jamestown, happened to be close to the center of power of the Powhatan confederation—a group of tribes that had been brought willingly or unwillingly into alliance with the powerful chief

---

130.  *Acts and Orders of 1647*, in Colonial Origins at 183.

Powhatan. The confederation controlled the area between the Potomac River and the Great Dismal Swamp (on the Virginia/North Carolina border). Initially, the Virginia colony, by necessity, operated as a military organization, with everyone armed from the common store of arms that the colonists had brought with them in 1607, plus subsequent imports. The First Anglo-Powhatan War lasted from 1610 to 1614, and once it was over, the colonists were less amenable to military rule. In 1619, they took the reins of government by establishing the first legislative assembly in North America, the House of Burgesses. Due to peaceable conditions, the paramilitary atmosphere and training had decayed; perhaps a perceived need for continued vigilance is why the House enacted legislation to mandate arms carrying, and to prohibit arms sales to Indians. *See* Sections B.1.b.i, C.2.

Powhatan died in 1618, succeeded by his brother Opechancanough. In 1622, he launched a surprise attack that almost wiped out the Virginians. The Second Anglo-Powhatan War would continue until 1632, with some intermittent truces.

Initially, the Virginians had been armed from the colony's central armory when necessary, but the increasing scope of settlement, and the grave Indian danger, made reliance on an armory impossible. Breaking from the model of England's militia statutes, Virginia householders kept their arms at home. Doing so, of course, was the only way they could comply with the 1619 law about always carrying guns to church. The home possession practice "initiated a troublesome and dangerous American tradition," in the view of one author. William L. Shea, The Virginia Militia in the Seventeenth Century 32 (1983).

The militia was legally established in 1624. In 1634, the government recognized that there were not enough arms to go around. One reason was that masters were supposed to provide arms for their servants, Black or White, free or not. Requests to King Charles I for shipments of arms had gotten nowhere, as he was more interested in spending money on arms to impose his personal dictatorship than on arms for his subjects' protection. *See* Ch. 2.H.1. So in 1640 the Virginia government simply ordered able-bodied freemen to provide arms for themselves and for their White servants. Shea at 53-54.

"Government in early Virginia depended on the tacit consent of the governed, for the governed had the means to resist authority." *Id.* at 55. In 1635, Governor John Harvey, who had been appointed by King Charles I, obstructed the transmission of Virginia's protest against the King's plan to establish a tobacco monopoly, thus depriving Virginia of the Dutch tobacco market. (For Charles's use of monopolies to raise revenue for himself without consent of Parliament, see Ch. 2.H.1.d.) Harvey and his opponents attempted to arrest each other. The issue was settled when an opposition leader gave the signal to 40 musketeers, who surrounded Harvey's house. He was arrested, and the House of Burgesses elected a new governor.[131]

The third, and final, Anglo-Powhatan war began 1644 and ended in 1646 with complete victory by the Virginians. The Powhatan Confederation was reduced to dependency on the Virginians for protection against other tribes. Shea at 58-72. The early militia had made the difference "between survival and annihilation." *Id.* at 136.

131.  J. Mills Thornton, III, *The Thrusting Out of Governor Harvey: A Seventeenth-Century Rebellion*, Va. Mag. of Hist. & Biography (Jan. 1968), at 12.

There being no more Indian threat in the Tidewater region, the need for constant armament was gone. During the 1660s, many militiamen did not comply with the requirement to be armed. The government tried to help by offering free arms repair, but the repair program did not succeed in getting everyone arms, and militia law enforcement was loosened so that only the elite units (the trained bands) had to be armed. *Id.* at 74-75.

The colony had a large population of indentured servants, and there was fear they might revolt. In 1661 the government urged that unreliable servants be excluded from trained bands. Increasingly, they were not even required to fulfill their legal duty to attend basic militia training. *Id.* at 76. During the 1660s and 1670s, Virginia began to move away from indentured servants as a labor force, and to substitute slaves. Hadden at 25.

While the Tidewater, the "first Virginia," had no more Indian danger, the newer inland settlements, the "second Virginia," did. Discontented with the Tidewater regime's lack of protection against an offensive by the Susquehanna Indians, a thousand frontiersman in 1676 participated in Bacon's Rebellion. They went on the offensive against Indians, and also turned their fire on the royal government. The royal government was saved mainly because the rebellion's leader, Nathaniel Bacon, died of dysentery. The British army arrived in time to mop up the remnants of the rebels.

It is notable that royal forces were sent to Virginia but not New England, where the colonists in 1676 were fighting for survival in King Philip's War, against the Indians. Part C.3. While New England had been ignoring old England to the maximum extent feasible, Virginia was a royal profit center, dutifully paying taxes on its tobacco exports.

Bacon's Rebellion reinforced the practice of the Virginia government, dominated by Tidewater aristocrats, of narrowing the militia in fact if not in theory. It is true that a 1684 law reiterated the mandate that freemen purchase and possess their own arms. Shea at 128. But in practice, the Virginia government was like the bad oligarchy described by Sir Walter Raleigh (Ch. 2.H.2.a): exempting the lower classes from arms mandates—supposedly as a favor to them, but in practice to deprive them of political power. The policy was "gradual exclusion from the militia of various segments of the population: most slaves in the 1640s, most servants in the 1650s, and, for all practical purposes, most poorer freemen in the 1680s." *Id.* at 138-39. By the end of the seventeenth century, the "core, the active militia—was nearly as exclusive as the one in England." *Id.* at 139.

Even that militia gradually deteriorated, until a broad, popular militia was established when the American Revolution loomed. *Id* at 137. While the earlier militia had been constricted, arms possession by the free population was not. Governments "attempted to reestablish central magazines and thereby limit the distribution of firearms, but these efforts were not particularly successful." *Id.* at 139.

### g.   South Carolina

South Carolina was in an unusually precarious situation. From its first English settlement in 1670 until the creation of Georgia in the 1730s, South Carolina was the extreme frontier—vulnerable to attack from Spanish Florida, and from Indians to the south and west. For longer than most other colonies, South Carolina

needed to cultivate good relations with Indian allies. The tribes were essential to South Carolina's survival in its wars with other tribes.

Because of the danger, White settlement was slow. A poor economic situation aggravated the problem, until the discovery of rice as a profitable export crop. Meanwhile, plantation owners were bringing in large quantities of Black slaves, to the chagrin of the colony's proprietors, who attempted to discourage Black slave imports through heavy import taxes. The English were already outnumbered by Indians, and by 1708 they were also outnumbered by Blacks. South Carolina needed everyone available for self-defense. Thus, indentured servants and free servants were always part of the militia.

So, too, were slaves, from the first militia laws until the eve of the American Revolution. When possible, South Carolinians tried to put slaves into noncombat roles, such as construction. When necessary, the slaves were armed, as in the Yamasee Indian War of 1715-17, where they constituted over a quarter of the colony's armed forces.[132]

Ordinarily, men were expected to supply their own militia arms. If they did not have a firearm, they had to work as a servant for six months for someone who would buy them a firearm. When slaves or servants were called to militia duty, the master was responsible for arming them. Later, a public program was created to provide them with arms. Needless to say, these arms would be recalled once militia service was completed.

The slave patrol system was created in 1690 and formalized by statute in 1704. At times, the slave patrol was distinct from the militia, with patrol membership earning an exemption from militia service. In 1740, following the Stono Rebellion, the only major slave revolt during the colonial period, the militia and the slave patrol were permanently joined.[133]

As in Delaware (Section B.1.a.xi), South Carolina militia statutes were never enacted on a permanent basis, but instead for a period of years, so that the legislature could have some control over use of the militia. Militia officers were not elected. Although the legislature sometimes attempted to appoint the highest militia officers, the governors almost always controlled the appointments of the top ranks. Gubernatorial appointees would in turn appoint the lower officers.

---

132.  William L. Ramsey, The Yamasee War: A Study of Culture, Economy, and Conflict in the Colonial South (2010); Larry E. Ivers, This Torrent of Indians: War on the Southern Frontier 1715-1728 (2016).

133.  The details of the September 1739 Stono Rebellion are murky, but it appears to have lasted a little over a day and involved about 60 slaves who were working on a road-building crew. It was suppressed by a militia force consisting of about 100 Whites and slaves. *See* Peter Charles Hoffer, Cry Liberty: The Great Stono River Slave Rebellion of 1739 (2012); Stono: Documenting and Interpreting a Southern Slave Revolt (Mark M. Smith ed., 2005). The rebels had recently been brought from the Congo where they (like virtually all slaves imported into America) had been captured by another tribe and then sold to slaving ships. Under the influence of Catholic missionaries in the Congo, the Stono rebels had adopted a faith that syncretized Catholicism with nature religion. There is speculation that the Stono Rebellion—if it was planned and not spontaneous—may have been timed to coincide with a feast of the Virgin Mary. *See* Mark M. Smith, *Remembering Mary, Shaping Revolt: Reconsidering the Stono Rebellion*, 67 J. Southern Hist. 513 (2001).

As in other colonies, the militia was not very good for offensive operations, but it was good enough for defense. It certainly saved the colony during the Yamasee War.[134] Had South Carolina been willing to follow the Continental Congress's urging during the American Revolution to arm slaves in exchange for freedom, the war would have been won sooner, and the state's history might have developed very differently. *See* Section B.2.c.

### 4.   *American versus English Militias*

During the seventeenth century, American militias were almost always on their own. They tended to be active and well-trained when needed for Indian fighting, and less so at other times. While the Indian threat diminished in many areas during the eighteenth century, the danger of European colonial powers increased. Again, the frequency and seriousness of militia musters and training varied with the imminence of the threat. As the possibility of war with Great Britain began to grow after 1765, so did the quantity and quality of militia preparedness.

The first time that American militias had sustained contact with British military officers was during the French and Indian War of 1754-63. Then, British officers often assumed command of militia units. The Americans and the British discovered that they were very different, and that each detested the other's system and its assumptions about social relations. An English officer observed with disapproval that the Americans "have assumed for themselves, what they call rights and privileges, totally unknown in their mother country." Millar at 175.

The principle of the British military, and of other European militaries at the time, was unquestioning obedience and brutal discipline. By European theory, the only way to get men to put their lives in peril by following an order they did not consider sensible was for the privates to be more afraid of their own officers than of the enemy. Americans were not so submissive and disregarded orders they found irrational.

American officers of the militias or state armies refused to inflict the brutal punishments on disobedient soldiers that were characteristic of the British military. Even when an American soldier was convicted of disobedience or disrespect to an American officer, the custom was for the offended officer to ask the court martial to suspend the sentence. Shy at 16. Some of the American militia officers had been elected by the soldiers they commanded and did not want to lose their good will. Even when American officers were appointed, the militias were still "neighbors commanded by neighbors." Marcus at 368. British officers were appalled by friendly social relations between American privates and officers. Fraternizing with the rank-and-file was unthinkable to a British officer. It would be unusual for a British officer even to know a private's first name.

By statute, the British militia comprised almost all able-bodied males. In practice, from Elizabethan times onward, the militia was select. There were periodic musters, at which time Englishmen who had their own militia arms would be

---

134.  Theodore H. Jabs, The South Carolina Colonial Militia, 1663-1733 (Ph.D. diss. in History, U. of N.C. Chapel Hill 1979).

required to so demonstrate. The musters would also be a check to ensure that there were enough town or county government arms to supply all available militiamen. But the active English militia was mostly composed of middle-class men who owned their own small farms or businesses. Servants often showed up when a gentleman sent his servant as a substitute for his own service. The gentlemen were required to arm the substitute, who usually got the gentleman's worst gun. Except for tolerating substitutes, the English militia of the seventeenth and eighteenth centuries did not want active service from the lower classes. *See* Ch. 2.H & 2.J.

The American militias, in contrast, were more inclusive. Tenant farmers, free servants, and indentured servants were usually part of the militia in practice, not just in theory. Whereas the English militia tended to wither in peacetime, the American militia, especially in New England, was often a vital social and community institution, even during times when serious drill was neglected.

Most aggravating, from the British officers' viewpoint, was the desire of northern militiamen, as well as soldiers in the colonies' temporary armies, to elect their own officers. In contrast, the head of the English militia in a given county was the lord lieutenant, who was appointed by the king. The lord lieutenant in turn appointed the deputy lieutenants and other inferior officers of the county militia. Ch. 2.G & H. Officers in Great Britain's standing army were certainly not elected by the privates. British militia officers consisted of the upper classes, and not commoners. In their view, they were born to rule, and the common privates were born to submit.

But in New England, the colonists had chosen their officers right from the start, beginning with the 1621 election of Myles Standish as Captain in Plymouth.[135] Elections made common sense, for "Who better knew the leadership potential and strengths and weaknesses of an individual than his neighbors?"[136] Moreover, in the New England view, men's enlistment in any military force was a covenant. The covenant could be the militia laws of the colony, created by the assembly. Or the covenant could be the terms for enlistment in a temporary army. The officers were "executors in trust" for the community interest. New England was "a society fairly steeped in covenants: marriage covenants binding husbands and wives, church covenants among the members of congregations, the great covenant of salvation between God and his chosen people." Fred Anderson, A People's Army: Massachusetts Soldiers and Society in the Seven Years' War 172 (1984).

The British considered the covenant talk absurd. Subjects were bound to defend the king's dominions, and the king's indivisible sovereignty could not be limited by contracts among his subjects. *Id.* at 173. The British view, in turn, was incomprehensible to the New Englanders, who had no personal experience with the subordination inherent in a standing army or in the "highly stratified social system" of Great Britain. *Id.* at 177-79.

"The longstanding practice of fighting wars against the French without direct aid from the mother country had generated assumptions of autonomy at all levels of New England society that complemented this homegrown contractualism." *Id.*

135.  William Bradford, Of Plymouth Plantation 77 (Harvey Wish ed., 1962).
136.  Martin W. Anderson, New England Colonial Militia and Its English Heritage: 1620-1675, at 41 (M.A. thesis in Military Arts & Science, U. of Iowa, 1979).

at 195. The French and Indian War brought average New Englanders and average British soldiers into close contact with each other for the first time. What the New Englanders learned from the encounter "reinforced their cultural heritage and their sense of themselves as a distinct people." *Id.* When the political crisis with England came a few years later, the French and Indian War veterans knew from their own experience that the principles and practice of a British standing army were contrary to the American way of life. *Id.* at 223.

In 1774-76, as soon as the nascent state governments in the North took control of the militia, one of the first steps was the removal of officers who had been appointed by the royal governors, replacing them with elected officers, sometimes the same person, if the appointee had dutifully resigned his royal commission.[137] In electing officers, the new state militias were drawing on what had sometimes been a colonial practice.

To Americans, election of officers simply applied the principle that all legitimate government was based on consent. Most of America's non-Anglican Protestant denominations (Congregationalists, Presbyterians, Baptists, and others) were used to electing ("calling") their own ministers by free choice of the congregation. So why shouldn't they elect their own military officers? The line of argument could not impress a British officer, for he was very likely a member of the Church of England, whose bishops and ministers were appointed by the national government or the local aristocracy, not elected.

Americans were undisciplined rabble, thought the British officers. To the Americans, British officers were self-important martinets who knew almost nothing about America. They were excellent at European-style warfare, such as when British General Wolfe captured Quebec City in 1759. But the British officer corps was, in the American view, inept at anything outside their ken, especially Indian-fighting in the wilderness.

### 5.    *Strengths and Weaknesses of the Colonial Militias*

#### a.    **Intercolony Cooperation**

Reflecting popular will, colonies were sometimes stingy in sending armed forces to assist other colonies.[138] To be sure, there were times when the colonies were generous in mutual aid. For example, South Carolina, including its Indian allies, sent substantial forces to help North Carolina in the Tuscarora War of 1714-15.[139] North Carolina and Virginia came to the aid of South Carolina in the 1715-17 Yamasee War. Section C.4.

In 1643, the New England Confederation was created by Massachusetts Bay, Plymouth, Connecticut, and New Haven. *See* Plymouth Laws at 308-14

---

137.  David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 Charleston L. Rev. 283, 295 (2012).

138.  *Cf. The Laws and Liberties of Massachusetts* (1647), *in* Colonial Origins at 119 ("Nor shall any man be compelled to go out of this Jurisdiction upon any offensive wars. . . .").

139.  *See* David La Vere, The Tuscarora War: Indians, Settlers, and the Fight for the Carolina Colonies (2013).

(confederation of United Colonies of New-England). The Confederation helped cooperation, including during King Philip's War (1675-76). The New England Confederation had been formed not only for defense, but also with the (never-fulfilled) hope of taking over Rhode Island, which sheltered religious dissenters who were persecuted by the more orthodox colonies. So the New England Confederation was no model for unified militia cooperation of all the colonies.

Leading men sometimes proposed a unified military force of the American colonies. Even William Penn, the Quaker pacifist and proprietor of Pennsylvania, advocated for a central colonial American government with the power to order quotas of fighters from every colony.[140] Nothing came of any of the proposals. The colonies were too diverse, and unwilling to yield their self-government, of which militia control was the *sine qua non*.

Not until the mid-1770s, when it became clear that the British government intended to fully subjugate all the colonies and would use military force to do so, did all 13 colonies accept the wisdom of Benjamin Franklin's 1754 political slogan "Join, or Die." Yet even during the Revolution, militias sometimes resisted out-of-state deployment. A long-term solution was the adoption of the United States Constitution, granting Congress the authority to call forth any state's militia, and to send it where needed within the United States. *See* Ch. 5.A.

### b.   Discipline

Compared to the English militia, discipline in American militias was inferior. On the other hand, public willingness to participate in the American militias was greater, because of its more egalitarian character and because American militias were rarely called out for missions that lacked broad public support. *See, e.g.*, Marcus at 46 (no one ever tried to use the Massachusetts militia to inflict his will on the colony).

### c.   Officer Quality

Americans who were elected as militia officers were often ignorant of military science, and sometimes of basic military hygiene. *Id.* at 368. On the other hand, British militia officers were chosen by social rank, which was no guarantee of military knowledge either. Within the British standing army, a commission was often a long-term career, so prolonged experience did ensure that even tyros would eventually learn the basics of command.

### d.   Training

The frequency and quality of militia training and musters were greatest when danger was near, and lackadaisical at other times. England was usually well-protected from foreign attack by the "wooden walls" of its powerful navy, whereas Americans were often in immediate danger from the Indian nations, New France, and, to a lesser degree, New Spain's Florida colony. Because Americans resorted to their militias more often, their militias were better trained and more capable. *See, e.g., id.* at 362-63 (Massachusetts and Connecticut).

140.   *William Penn's Plan of Union* (1697), *in* Colonial Origins at 390.

### e.   Arms Possession and Proficiency

Because American militia arms were typically bought and possessed by individual militiamen, rather than stored in government armories, American proficiency with militia arms was undoubtedly superior. Many Americans improved their shooting skills by using their militia arms for personal purposes, such as hunting and recreational target shooting.

Further, the central storage system for the British militia of the seventeenth and eighteenth centuries was not effective at maintaining militia arms in good repair, whereas individual ownership in America encouraged Americans to keep their arms in good working order, for personal uses.

A London newspaper scoffed at the British militia: "generally composed of servants, and those not always the same, consequently not well trained, rather such as wink with both eyes at their firing their musquets, and scarce know how to keep them clean, or charge them aright."[141]

But there was also inherent American inefficiency because militia arms were not standardized.[142] In England, the militiamen would be issued, for use only in militia service or training, standard arms from town armories, so every English militia private would have a Brown Bess flintlock musket. Standardization must have made repairs easier for the English field armorers. Similarly, English militia officers could know that all of their troops had firearms with similar capabilities. Moreover, even though everyone's guns—militia and army included—were made one at a time, and so were not really identical, the standardized British firearms were more similar in bore size than were the American guns; therefore, ammunition sharing during combat was more practical. Eames at 127.

Arms proficiency in England was impaired by the game laws, which forbade most of the population to hunt. On top of that were laws that the monarchy in the seventeenth century had created in an attempt to limit ownership or carrying of firearms by some of the free population. America had nothing like the game laws or the class-based gun controls.

The conspicuous exception to the above was the enslaved population in America. Formal statutory restrictions on slave possession of arms had begun in the Southern colonies, and would become more severe in the nineteenth century. Part B.2, Ch. 6.E. Preventing slave armament did not directly harm the militia, since slaves were usually not part of the militia in most places. However, the enslavement of a large share of the population in several colonies deprived those colonies of a great deal of potential defensive manpower. As subsequent centuries would show, slavery was much less efficient than free labor. It retarded the economy and therefore dampened prosperity. The damage indirectly diminished the quantity and

---

141.  Robert Molesworth, *The Principles of a Real Whig*, The Crisis, Sept. 21, 1776 (no. 88), *reprinted in* The Crisis: A British Defense of American Rights 1775-1776, at 726 (Neil York ed., 2016).

142.  As Connecticut Governor Thomas Fitch put it, militia arms, "being all of private property are very various in their sorts and sizes, according to the different occasions and humors of their owners, and according not at all adopted to the business of a campaign." Letter from Thomas Fitch to the Lords of Trade (Mar. 30, 1756), *in* 1 Collection of the Connecticut Historical Society 282, 283 (1860).

quality of arms that the American public could afford to acquire, especially in the states where slavery was significant in the economy.

After describing several of the above problems, Richard Marcus offers a conclusion about the Connecticut militia that can be applied to all the American militias:

> Nonetheless, the economic problems of a new-born colonial society, the fear which existed among colonials concerning service in regular regiments commanded by British officers, and the disinclination of royal authorities to allow the colonies to form their own professional standing regiments created an environment in which militia, with all its strengths and weaknesses, was the only practical answer.[143]

### 6.   A New Culture

By the time the political crisis with Great Britain arose in the 1760s, a new and different arms culture had arisen in America. *See* Sections B.1, C.3, E.1-5. The new culture matched America's political and religious culture of dissent, individualism, natural rights, and the correlative moral duty to resist by force anyone who would subjugate them. *See* Section D.3.

American arms culture was no longer the English arms culture the first settlers of Virginia, Plymouth, and Massachusetts Bay had brought across the Atlantic. Armed Americans had become more like Indians. In warfare, Americans and Indians preferred participatory decision-making rather than the absolute will of a single individual. They adopted the Indian preference for fast-shooting and reliable flintlocks rather than cumbersome and slow matchlocks. As the American colonists followed the lead of the Indians, both the Indians and the colonists were far ahead of old England.

Unlike early English settlers, mid-eighteenth-century Americans were steeped in the cult of accuracy and the impetus for the change had been Indian adversaries and hunting. Most of the first English settlers no longer had their medieval ancestors' expertise with the bow, and they had never been taught to be highly accurate with firearms. Indian bowmen shot with precision and taught themselves to be as precise with firearms. Indians—and then their indirect American proteges—knew how to use cover, shoot while moving, and shoot moving targets. Indians were the origin of the American gun culture's cult of accuracy. In the many Indian wars, Americans were forced to emulate Indian scouting, tracking, marksmanship, wilderness survival, and individual decision-making in the heat of combat. For peacetime, the skills of backwoods pioneering had first been mastered by the Finnish immigrants to New Sweden in the mid-seventeenth century with their Delaware Indian mentors, and then were copied by other immigrants who relentlessly pushed the frontier westward. *See* Section C.1.c.

Ultimately, the American Revolution happened because the colonists were no longer English. They had become a new people with their own special characteristics, including their unique and hybrid arms culture, with Indian, Finnish, and

---

143.  Marcus at 370.

English roots. The Americans were exceptional. In the words of the Great Seal of the United States of America, *Novus ordo seclorum*, or "New order of the ages."

The Latin phrase on the seal evoked the words of the classical Roman poet Virgil: "The great order of the ages is born afresh. return now the pristine rules of old; now a new lineage is sent down from high heaven."[144] The Americans sought a revolution that, like the astronomic revolution of a planet, would return things to their original place: To Anglo-Saxon liberty before the Norman Conquest. To Magna Carta. To the Whiggish principles of England's Glorious Revolution, Petition or Right, and Declaration of Right (Ch. 2.A, 2.D, 2.H). To the Hebrew confederation of the Old Testament. And most of all, to what Rev. Jonathan Mayhew called God's "eternal laws of truth, wisdom and equity; and the everlasting tables of right reason"—namely, inalienable rights bestowed by God, not granted by government. Government the servant, not the master. Government solely by consent and contract. And liberty secured by an armed people stronger than any government (Section D.3).

Two and a half centuries later, Americans wonder how their predecessors could have been so justifiably proud of their self-government yet failed to include Indians and Blacks. The people in any given time only know what has come before. When Europeans started emigrating to the Old World, they found a New World where some things were the same: Slavery was common, and territory was controlled by those who could defend it by force of arms—either alone or in alliances. The rules on both sides of the Atlantic were the same before and after the Virginia Company landed in 1607.

By 1760, the 13 English colonies were well established from central Maine to Georgia. Few had control of the far interior, not even to the headwaters of the rivers that fed the Atlantic. Legally, most Indian tribes were separate nations—the subjects of bilateral treaties, negotiation, and peace or war. Beyond treaty obligations, no nation owed anything to other nations' subjects. Until 1871, U.S. government treaties with Indian nations had to be ratified by two-thirds of the Senate, the same as with treaties with other nations.[145]

Thus, from the perspective of 1760, the contests and alliances involving the diverse American colonies and the diverse Indian nations were the way of the world. On the eastern side of the Atlantic, the English, Scottish, Welsh, French, Spanish, and Dutch fought between and among each other; they took and lost territory based on their armed capabilities. So did most people on the western side of the Atlantic. The arrival of European-Americans added new fighters but did not change the universal rule that what's yours is yours as long as you can keep it.

Like defensive and expansionist warfare, slavery was common on both sides of the Atlantic. The enslavement of Indians by Indians and by European-Americans was discussed in Part C.4 and will be further described in Chapter 6.A.8. The African slave trade was of a similar character. Some African tribes captured members of

---

144.  In the original, *Magnus ab integro saeclorum nascitur ordo. iam redit et Virgo, redeunt Saturnia regna* [literally, Saturn's reign; used here as a metaphor for old customs], *iam nova progenies caelo demittitur alto*. Virgil, 4th Eclogue, lines 6-8 (trans. Robert G. Natelson).

145.  16 Stat. 544, 566 (codified at 25 U.S.C. § 71) ("No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty . . . .").

other tribes and sold them to slave traders for export to the Western Hemisphere. The condemnation of slavery as universally wrong would become a defining principle of the nineteenth century, but that was still a world away.

The American Revolution's *Novus ordo seclorum* did produce a new order in the world, including changes not envisioned when the Revolution began. If "all men are created equal," then slavery is invalid. But in 1760, the ideals of the Declaration of Independence had not been written, Abraham Lincoln had not expounded them, and his grandfather Benjamin Lincoln had no idea that he would become a general in the American Revolution.

The conventional wisdom of the later eighteenth century was that American slavery was on the road to economic extinction. The conventional wisdom would prove incorrect. Instead, slavery would eventually fall to *Novus ordo seculorum* — an unforeseen consequence of the new order in the world.

At the beginning, the American revolutionaries believed they were doing nothing more than restoring the original condition of a properly ordered society. As described in the next Chapter, Americans thought they already had such a society. They became increasingly worried that the British government intended to destroy their self-government and subjugate them. When the British attempted to disarm them by force, all doubt was removed, and Americans went to war.