# Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion for Summary Judgment

## Exhibit 7
### *The Right to Train: A Pillar of the Second Amendment*

## William & Mary Bill of Rights Journal

Volume *31 (2022-2023)*
Issue 1

Article 3

10-2022

# The Right to Train: A Pillar of the Second Amendment

Joseph G.S. Greenlee

Follow this and additional works at: https://scholarship.law.wm.edu/wmborj

 Part of the Second Amendment Commons

Repository Citation

Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill Rts. J. 93 (2022), https://scholarship.law.wm.edu/wmborj/vol31/iss1/3

Copyright c 2022 by the authors. This article is brought to you by the William & Mary Law School Scholarship Repository.
https://scholarship.law.wm.edu/wmborj

# THE RIGHT TO TRAIN: A PILLAR OF
# THE SECOND AMENDMENT

### Joseph G.S. Greenlee[*]

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
I.   ENGLISH HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
    *A.   Devotion to Arms in Ancient England* . . . . . . . . . . . . . . . . . . . . . . . . . . 96
    *B.   Dependence on a Trained Populace for Domestic Order and National
       Security* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
    *C.   Legal Commentaries on the Right to Train* . . . . . . . . . . . . . . . . . . . . 102
    *D.   Shooting Competitions as Practice and Entertainment* . . . . . . . . . . . 103
    *E.   The Understanding of the English Right at the Time of the Second
       Amendment's Ratification* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
II.  COLONIAL AMERICA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
    *A.   The Importance of Marksmanship for Food and Survival* . . . . . . . . . 107
    *B.   Shooting Competitions as Practice and Entertainment* . . . . . . . . . . . 109
    *C.   Community Defense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
III. REVOLUTIONARY AMERICA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
    *A.   Pre-War Focus on Arms Proficiency* . . . . . . . . . . . . . . . . . . . . . . . . . 114
    *B.   Effect of Arms Training in the Revolutionary War* . . . . . . . . . . . . . . 117
IV.  RATIFICATION OF THE UNITED STATES CONSTITUTION . . . . . . . . . . . . . . 124
    *A.   State Constitutions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
    *B.   Debates over the Ratification of the Constitution* . . . . . . . . . . . . . . . 126
    *C.   Ratifying the Second Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
    *D.   Post-Ratification Interpretations of the Second Amendment* . . . . . . . 131
V.   RESTRICTIONS ON SHOOTING DURING THE COLONIAL AND FOUNDING
    ERAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
    *A.   Wartime Measures to Conserve Gunpowder* . . . . . . . . . . . . . . . . . . . 134
    *B.   Time and Place Limitations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
VI.  MODERN COURT DECISIONS ON THE RIGHT TO TRAIN . . . . . . . . . . . . . . 138
    *A.   The Supreme Court* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
       1.   *District of Columbia v. Heller* . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
       2.   *Luis v. United States* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
       3.   *New York State Rifle & Pistol Association v. City of New York* . . . 140
    *B.   Federal Circuit Courts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143
       1.   *Ezell v. City of Chicago* (*Ezell I*) . . . . . . . . . . . . . . . . . . . . . . . . . 143

   * Policy Advisor for Legal Affairs, Heartland Institute; Director of Constitutional Studies, FPC Action Foundation; http://josephgreenlee.org. The author thanks David Kopel and George Mocsary for their valuable insights and helpful suggestions.

        2.  *Ezell v. City of Chicago* (*Ezell II*) . . . . . . . . . . . . . . . . . . . . . . . . 144
        3.  *Drummond v. Robinson Township*  . . . . . . . . . . . . . . . . . . . . . . . 145
CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

INTRODUCTION

Since the Supreme Court confirmed that the Second Amendment protects "the individual right to possess and carry weapons" in *District of Columbia v. Heller*, lower courts have been grappling with whether there is also a right to train with those weapons.[1] Courts have considered whether training is a protected activity, whether it is a "core" right, and whether its protection is limited to gaining the minimum competency needed for self-defense.[2]

The federal circuit courts are divided over these questions. The Seventh Circuit struck down a ban on shooting ranges within the city of Chicago because training restrictions are "close[] to implicating the core of the Second Amendment right."[3] After Chicago revised its ban to allow shooting ranges in 2.2 percent of the city, the Seventh Circuit invalidated that regulation as well, along with a provision barring anyone under eighteen from entering a shooting range.[4] The Third Circuit, holding that a ban on center-fire rifle training likely violates the Second Amendment, stated that a training restriction burdens the Amendment's core if it has the effect of depriving people of the "skills commonly used for lawful purposes like self-defense in their homes," but suggested that such restrictions are rare.[5] The Second Circuit held that a law prohibiting New York City residents from taking handguns outside of the city—which contained only seven total ranges for its eight million residents—for training or shooting competitions "does not approach the core area of protection."[6] After the Supreme Court granted certiorari, however, the City of New York opted to amend its law and moot the case rather than defend it before a less agreeable court.[7]

No court yet has explored the legal history of the right to train, nor has any article. This Article presents the first in-depth historical exploration of the right. It reveals that America's Founders viewed the right to train as a pillar of the Second Amendment: it supports every aspect of the right, including self-defense, community defense, militia rights, and the prevention of tyranny. Moreover, the activity of training itself was cherished by the Founders. This history reveals that training is central to the right and deserving of robust Second Amendment protection.

---

[1]  554 U.S. 570, 592 (2008).

[2]  *Id.* at 630.

[3]  Ezell v. City of Chi., 651 F.3d 684, 708 (7th Cir. 2011) (*Ezell I*).

[4]  Ezell v. City of Chi., 846 F.3d 888, 890 (7th Cir. 2017) (*Ezell II*).

[5]  Drummond v. Robinson Twp., 9 F.4th 217, 229–30 (3d Cir. 2021).

[6]  N.Y. State Rifle & Pistol Ass'n v. City of New York, 883 F.3d 45, 62 (2d Cir. 2018).

[7]  N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct 1525, 1526 (2020).

Part I of this Article looks at English history. It explores the millennium leading up to America's founding in which England—through the hue and cry, posse comitatus, and militia—relied on an armed and trained populace for domestic tranquility and national security.

Part II analyzes the colonial era, in which arms proficiency was necessary for food, sport, and survival. Accurate shooting was required for everything, from procuring meat to conquest to self-defense and community defense. Further, because there was such an emphasis on marksmanship, shooting matches became a popular diversion. As a result of the colonists' habitual use of firearms, they became the most skillful shooters in the world.

During the Revolutionary War, discussed in Part III, the Americans' lifelong familiarity with arms provided them with a tremendous advantage over the British. Their superior marksmanship inspired confidence among the Patriots, terrified the British, and greatly contributed to their success on the battlefield. It is reasonable to suggest that the Americans would not have won their independence had the typical colonist not been accustomed to using arms all their lives.

The lessons of the Revolutionary War were fresh in the minds of the Founders when they ratified the Constitution and the Bill of Rights. Part IV delves into the debates during the ratification processes and finds that while the Federalists and Antifederalists disagreed over the need for a declaration of rights, everyone agreed that an armed and trained populace was necessary to prevent tyranny. Indeed, the Second Amendment's text expressly highlights the relationship between a trained society and a free state.

Part V reviews the restrictions on the right to train that existed in the colonial and founding eras. The few laws that restricted recreational shooting were either wartime measures enacted to conserve gunpowder or limitations on shooting at particular times and places. These laws were not intended to limit training, and some included exceptions to allow it.

Part VI analyzes modern cases. While courts generally recognize that there must be some sort of right to train, no court has explored the historical support for the right or the challenged restrictions.

This Article concludes by emphasizing that training is a pillar of the right to keep and bear arms because it is required to develop the skills necessary to effectively exercise the other protected rights, such as self-defense, hunting, and militia service. Given the historical foundation of the right to train, courts should ensure that it is robustly protected by the Second Amendment, as the Founders intended.

## I. ENGLISH HISTORY

In forming their government, Americans sought to both preserve cherished English liberties and expand them. As the Supreme Court explained, the Second

Amendment "codified a right 'inherited from our English ancestors.'"[8] This is not to say that the American arms right is limited to the scope of the English arms right.[9] Rather, Americans were contemptuous of the limitations on the English right.[10] They secured a broader and more robust right, which encompassed their own arms tradition informed by their own experiences.[11] Yet even the relatively limited English right protected the right to train with arms.

*A. Devotion to Arms in Ancient England*

The English encouraged training throughout most of their history, starting in the earliest recorded times. The definitive English historian of the eighteenth century, David Hume, wrote of Britain's first inhabitants in his monumental *History of England*.[12] Hume explained that their devotion to arms secured their liberty: "The Britons were divided into many small nations or tribes; and being a military people, whose sole property was their arms and their cattle, it was impossible, after, they had acquired a relish of liberty, for their princes or chieftains to establish any despotic authority over them."[13] "Their governments," Hume added, "though monarchical, were free."[14]

---

8   District of Columbia v. Heller, 554 U.S. 570, 599 (2008) (quoting Robertson v. Baldwin, 165 U.S. 275, 281 (1897)).

9   *See* Bridges v. California, 314 U.S. 252, 264 (1941) ("[T]o assume that English common law in this [First Amendment] field became ours is to deny the generally accepted historical belief that one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.") (quotation omitted); *id.* (quoting VI THE WRITINGS OF JAMES MADISON, 1790–1802, at 387 (Gaillard Hunt ed., 1906) ("Madison . . . wrote that 'the state of the press . . . under the common law, cannot . . . be the standard of its freedom in the United States.'").

10   When James Madison introduced the Second Amendment in Congress, his notes show that he condemned the limited scope of the "English Decln. of Rts" including that it protected only "arms to Protestts" (Protestants). James Madison, Notes for Speech in Congress Supporting Amendments, June 8, 1789, *in* THE ORIGIN OF THE SECOND AMENDMENT: A DOCUMENTARY HISTORY OF THE BILL OF RIGHTS, 1787–1792, at 645 (David Young ed., 2d ed. 2001); *see also* THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 270 (1880) [hereinafter COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW] (The Second Amendment "was adopted with some modification and enlargement from the English Bill of Rights").

11   *See* Poe v. Ullman, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting) (Justice John M. Harlan analyzing the "liberty of the individual" in America by looking to "what history teaches are the traditions from which it developed as well as the traditions from which it broke").

12   1 DAVID HUME, THE HISTORY OF ENGLAND FROM THE INVASION OF JULIUS CÆSAR TO THE REVOLUTION IN 1688, at 3 (1775).

13   *Id.*

14   *Id.*

Their devotion to arms paid off when Julius Caesar invaded Britain in 55 BC and the "common people" successfully repelled the Roman invasion.[15] When Caesar launched another campaign the following year, the British resisted the conquest for nearly a century, until largely being subdued in AD 43.[16]

Once the British were under Roman control, the Romans established a Field of Mars in London, where the "Romans train'd up and exercised their Young Souldiers, and likewise the Youth of the Neighbouring Britains, in the skill and exercise of Arms, that they might be more expert in the use of them upon all emergent Occasions."[17] The purpose was to ensure that "if any sudden Tumults or Insurrections should happen in the City," the British "were then ready and at hand to suppress them."[18]

Over time, however, the British developed too great a dependency on the Romans. When Rome began neglecting Britain to focus on its own teetering empire, Britain lacked the capability to defend itself.[19] It was not long before Britain learned the consequences of an unarmed and untrained populace, as it was repeatedly invaded by enemies and left pleading for Rome's assistance.[20] Tired of coming to Britain's aid, the Romans around 448 AD "informed the Britains that they must no longer look to them for succour, exhorted them to arm in their own defence, and urged, that as they were now their masters, it became them to protect by their valour that independence which their antient lords had conferred upon them."[21]

## B. Dependence on a Trained Populace for Domestic Order and National Security

Having reaped the benefits of a trained populace and suffered the consequences of an untrained populace, English laws soon began requiring arms possession and competency.[22] Jurist Nathaniel Bacon (Francis Bacon's half-brother) wrote in the seventeenth century about the rights of Englishmen under the ancient laws of England.[23] Bacon noted that historically the "strength" of the nation was "the

---

[15]  *See* JULIUS CAESAR, THE CONQUEST OF GAUL 100 (S.A. Handford ed., 1951) (1982 reprint).

[16]  HUME, *supra* note 12, at 6. Some tribes "maintained an obstinate resistance," but most were defeated by Publius Ostorius Scapula in AD 51, and the rest were conquered by Gnaeus Julius Agricola in the early 80s. *Id.* at 6–8.

[17]  John Bagford, A Letter to the Publisher, *in* 1 JOHN LELAND, ANTIQUARII DE REBUS BRITANNICIS COLLECTANEA LXI (1715). Leland (1503–1552) has been called the "father of [England's] local history and bibliography." Archibald L. Clarke, *John Leland and King Henry VIII*, *in* 2 THE LIBRARY 145 (J.Y.W. MacAlister & Alfred W. Pollard eds., 3d. ser., 1911).

[18]  Bagford, *supra* note 17, at LXI.

[19]  HUME, *supra* note 12, at 9.

[20]  *Id.* at 10.

[21]  *Id.* at 11.

[22]  *See generally* HUME, *supra* note 12.

[23]  William Pitt the Elder called Bacon's work "without exception, the best and most instructive book we have on matters of that kind." Letter from William Pitt to Thomas Pitt,

Freemen . . . bound to keep Arms for the preservation of the Kingdom, their Lords, and their own persons," who were "strict in their Discipline"—i.e., training—with arms.[24]

Part of what freemen were "bound" to do was join the "hue and cry" to pursue and apprehend criminals.[25] *The Mirrour of Justices* noted that historically in England, "[i]t was [o]rdained; [t]hat every one of the age of fourteene yeares and above should be ready to kill mortall offenders in their notorious sinnes, or to follow them from [t]owne to [t]owne with [h]ue and [c]ry."[26] It must have been expected that everyone over thirteen would be trained to arms because they could not otherwise "be ready to kill mortall offenders."[27] Indeed, the entire community of people over thirteen years old chasing criminals with deadly weapons and "ready to kill" would often be more dangerous than allowing criminals to flee, unless the community were disciplined in arms.[28]

A related and likewise ancient law-enforcement scheme that required an armed and competent populace was the posse comitatus. When sheriffs needed assistance catching criminals, suppressing riots, or enforcing civil process, they had the authority to summon armed members of the community for help.[29] "The attack of a castle or place of arms must require disciplined troops," Granville Sharp explained at the time of America's founding, "therefore it was certainly necessary that 'every man' so bound by the common law to assist" in the posse comitatus "should be trained in arms."[30]

---

May 4, 1754, *in* LETTERS WRITTEN BY THE LATE EARL OF CHATHAM TO HIS NEPHEW THOMAS PITT, ESQ. (AFTERWARDS LORD CAMELFORD) 38–39 (3d ed. 1804).

[24] NATHANIEL BACON, THE CONTINUATION OF AN HISTORICALL DISCOURSE OF THE GOVERNMENT OF ENGLAND, UNTILL THE END OF THE REGIME OF QUEENE ELIZABETH 40 (1651).

[25]       There is yet another species of arrest, wherein both officers and private
          men are concerned, and that is upon an *hue* and *cry* raised upon a felony
          committed. An hue (from *huer*, to shout) and cry, *hutesium et clamor*,
          is the old common law process of pursuing, with horn and with voice,
          all felons, and such as have dangerously wounded another. It is also
          mentioned by statute Westm. 1. 3 Edw. I. c. 9. and 4 Edw. I. *de officio
          coronatoris*. But the principal statute, relative to this matter, is that of
          Winchester, 13 Edw. I. c. 1 & 4. which directs, that from thenceforth
          every country shall be so well kept, that, immediately upon robberies
          and felonies committed, fresh suit shall be made from town to town,
          and from county to county. . . .

4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1769), *reprinted in* CLASSICS OF ENGLISH LEGAL HISTORY IN THE MODERN ERA 293 (David S. Berkowitz & Samuel E. Thorne eds., 1978).

[26] ANDREW HORNE, THE MIRROUR OF JUSTICES 10 (W. H. trans., 1646). *See also* Nicholas Tindal, in an opinion as the Chief Justice of Common Pleas, called *The Mirrour of Justices* "a book of great authority." 133 ENG. REP. (11 COMMON PLEAS) 94 (1913).

[27] HORNE, *supra* note 26, at 10.

[28] *Id.*

[29] *See* BLACKSTONE, *supra* note 25, at 146.

[30] GRANVILLE SHARP, TRACTS, CONCERNING THE ANCIENT AND ONLY TRUE MEANS OF

When King Alfred established England's militia during his reign from 871–899, he created an even greater need for the people to be expert in arms.[31] The militia required armed members of the community to defend the country against invasions and insurrections.[32] It "was founded on the idea that all the freemen were to be armed, trained, and ready to fight to defend their local and national communities."[33]

Through the hue and cry, posse comitatus, and militia, England's domestic order and natural security historically depended on a significant portion of the population being proficient in arms. It was therefore common throughout England's history to train the people with arms, starting from their youth.

With arms proficiency being so vital to the nation's security, it is no wonder that England has an extensive tradition of training mandates. Such mandates existed since at least 1363, when King Edward III sent letters to London sheriffs mandating "that every citizen, at leisure times and holidays, use in their recreations Bows and Arrows, or Pellets, or Bolts, . . . and learn the art of shooting."[34] A similar 1368 proclamation ensured that "every one of the said city, strong in body . . . learn and exercise the art of shooting."[35] Londoners who opted to "apply themselves to the throwing of stones, wood, iron, hand-ball, foot-ball, bandy-ball, cambuck or cock-fighting" instead of shooting faced imprisonment.[36]

Edward's successor, King Richard II, similarly mandated shooting while forbidding less-worthy hobbies. A 1388 law required that "Servants and Labourers shall have Bows and Arrows, and use the same the Sundays and Holydays, and leave all playing at Tennis or Football, and other Games called Coits, Dice, Casting of Stone, and other such importune Games."[37] Mindless games apparently continued to distract the population over the next couple decades, so the 1388 law was restated

---

NATIONAL DEFENCE, BY A FREE MILITIA 23 (3d ed. 1782) (quoting EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWES OF ENGLAND 193 (1642) ("every man is bound by the Common Law to assist not only the Sherife in his Office for the execution of the Kings Writs (which are the commandments of the King) according to Law; but also his Baily, that hath the Sheriffes Warrant in that behalfe, hath the same authority.")); *see also* WILLIAM JONES, AN INQUIRY INTO THE LEGAL MODE OF SUPPRESSING RIOTS WITH A CONSTITUTIONAL PLAN OF FUTURE DEFENCE 19 (2d ed. 1782) (stressing that "all persons, who constitute the power of a county" must be "bound to be competently skilled in the use of [the musket and bayonet]").

[31] David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 761, 771 (2015).

[32] *Id.*

[33] *Id.*

[34] WALTER MICHAEL MOSELEY, AN ESSAY ON ARCHERY: DESCRIBING THE PRACTICE OF THAT ART, IN ALL AGES AND NATIONS 294 (1792). "Bolts were the Arrows used for Cross-bows." *Id.*

[35] 1 JOHN ENTICK, A NEW AND ACCURATE SURVEY OF LONDON, WESTMINSTER, SOUTHWARK, AND PLACES ADJACENT 261 (1766).

[36] *Id.*

[37] 12 Ric. II ch. 6 (1388) (brackets omitted).

in 1409 with the assurance that the said statute will "be firmly holden and kept."[38] The 1409 act punished "every such Labourer or Servant that doth contrary to the same Statute" with "Imprisonment by Six Days."[39] And if the law was not enforced, the local official responsible for enforcement was fined.[40]

Nearly a century later, a 1477 law under King Edward IV provided that "no Person should use any unlawful Games, as Dice, Coits, Tennis, and such like Games, but that every Person strong and able of Body should use his Bow."[41] This law must have been effective, because in 1511, *An Act Concerning Shooting in Long Bowes* recognized the increasing number of "good Archers" due to the regular "exercise of the Subgiettes" in the "shotyng in long bowes."[42] It credited the improvement in archery for having successfully "defended this Realme" against "the cruell malice and daunger" of England's enemies.[43] But it also lamented a recent decline in "[a]rcherie and shotyng in longbowes" due to the increasing popularity of other games and hobbies.[44] The act, therefore, required that every able-bodied subject under 60 years old "use and exercise shotyng in longbowes" and keep "a bowe and arrowes" at home, ready for defensive use at all times.[45] Additionally, fathers were required to provide their sons, and masters were required to provide their servants, with archery equipment and training.[46] By applying to nearly everyone under sixty, this law was significantly broader than the fourteenth-century laws that applied only to laborers and servants.[47]

---

[38]  11 Hen. IV ch. 3–6 (1409).
[39]  *Id.*
[40]  *Id.*
[41]  17 Edw. IV ch. 3 (1477).
[42]  3 Hen. VIII ch. 3 (1511).
[43]  *Id.*
[44]  *Id.*
[45]  *Id.*
[46]  *Id.*
[47]  [L]ocal records suggest that towns took seriously the need to make provision for their inhabitants to practise archery. Lydd in Kent can be found making butts periodically from the 1420s to the 1480s, and by the last decades of the fifteenth century Coventry, New Romney, Plymouth, Rye and Walberswick were all doing the same. The fuller records of the mid sixteenth century sometimes present a more detailed picture. At Bristol half a dozen men or more worked for the best part of a week or even longer to construct butts in the town marsh most years between 1540 and 1557. . . . At Ludlow a team half the size worked for two or three days to construct butts behind the castle most years between 1538 and 1570. . . . Between the 1530s and the 1560s Barnstaple, Dover, Exeter, Eye, Faversham, Leicester, Lyme Regis, Poole, Reading, Southampton, Warwick, Winchester, Windsor, Worcester and no doubt many other towns made similar efforts to keep their butts in good repair.

Steven Gunn, *Archery Practice in Early Tudor England*, 209 PAST & PRESENT 53, 55 (2010).

A similar law, enacted three years later, required all able-bodied subjects to always keep bows and arrows ready at home, practice with them regularly, and if responsible for a young male, to equip and train them.[48] This act stated that it would apply in perpetuity.[49] Additionally, several proclamations issued under Henry VIII during this time ordered local officials to ensure that people were engaging in archery rather than the forbidden games that took attention away from it.[50]

Likely resulting from the growing popularity of firearms in the sixteenth century, a firearms training law was passed along with a longbow training law in 1541.[51] The longbow training law again lamented that "Several new devised Games" had caused "the Decay of Archery," and required that "every man" under sixty "use and exercise shooting in long-bows," while keeping a bow "continually in his house" to "use himself in shooting."[52] Everyone had to "exercise themselves with long-bows . . . in holy days and other times convenient."[53] Also similar to previous laws, the "fathers, governors and rulers of such as be of tender age" were required to "teach and bring them up in the knowledge of the same shooting" and provide them with arms to practice with.[54] The firearms training law allowed "all Gentlemen, Yeomen, and Servingmen," as well as "all the Inhabitants of Citties, Coroughes and Markett

---

Some towns made the effort to build ditches or rails around the butts, while others hired painters to decorate them. *Id.* at 57.

[48]   6 Hen. VIII ch. 2 (1514).

[49]   *Id.*

[50]   1 TUDOR ROYAL PROCLAMATIONS, nos. 108, 121, 138, 163, 183 (Paul L. Hughes & James F. Larkin eds., 1964–69).

[51]   The popularity of handguns and crossbows had long been blamed for taking away from longbow practice. For example, Henry VIII's 1528 proclamation blamed "the newfangles and wanton pleasure that men now have in using of crossbows and handguns" for the declining interest in longbows. *Id.* at no. 121. As a result, some laws restricted the possession and use of crossbows and handguns for certain classes in part to encourage longbow proficiency. *See, e.g.*, 19 Hen. VII, ch. 4 (1503) (limiting crossbows); 3 Hen. VIII ch. 13 (1511) (limiting crossbows); 6 Hen. VIII ch. 13 (1514) (limiting crossbows); 25 Hen. VIII ch. 17 (1533) (limiting crossbows and handguns). Handguns grew in popularity anyway, as the 1541 law reflects. *See* 6 Hen. VIII ch. 13 (1514).

[52]   33 Hen. VIII ch. 9 (1541), *in* 5 THE STATUTES AT LARGE, FROM THE THIRTY-SECOND YEAR OF KING HENRY VIII. TO THE SEVENTH YEAR OF KING EDWARD VI. INCLUSIVE 81 (Danby Pickering ed., 1763).

[53]   *Id.* at 82.

[54]   *Id.* at 81. For examples of enforcement of the longbow training law, see Gunn, *supra* note 47, at 58–59 (finding evidence of 176 individuals in Ludlow being charged for failing to train from 1542–1576 and 72 individuals being charged in Fordwich between 1553–1569); LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 55 (2016) (finding that 59 individuals in Essex were charged from 1573–1574; that Peterborough residents were fined for failing to train while Peterborough constables were fined for failing to enforce the training requirement; and that "leaders in Buckinghamshire, Derbyshire, Essex, Oxfordshire, Warwickshire, and Wiltshire were cooperative and took steps to comply" with the training requirement).

Townes" to "shote with any handgune Demyhake or hagbutt at anye butt or bank of Earth onlye in place convenient for the same."[55]

In addition, there was regular militia training. As of 1581, depending on where one lived throughout the realm, the populace was summoned for arms training in times of peace anywhere from one to sixteen times per year.[56] The following decade, Queen Elizabeth commanded that her subjects be armed and ready to defend the country in an address to both Houses of Parliament: "You that be lieutenants and gentlemen of command in your counties, I require you to take care that the people be well armed, and in readiness upon all occasions."[57] The emphasis on training continued under Charles II, as a 1662 law required that the militia train up to four times per year (for up to two days at a time) in addition to one general muster per year (which lasted up to four days).[58]

It was not until the late seventeenth century that England established a standing army, and not until the nineteenth century that England established a professional police force.[59] Throughout the overwhelming majority of its history, the country relied on its armed populace for domestic order and national security.

## C. Legal Commentaries on the Right to Train

Influential legal commentators long recognized the importance of England's trained populace. Sir John Fortescue, the Chief Justice of the King's Bench, wrote two influential treatises around 1470.[60] In *The Difference Between an Absolute and a Limited Monarchy*, Fortescue contrasted the unarmed and untrained French with the armed and proficient English. The French peasants were "not able to fight, nor to defende the realme; nor thai haue wepen, nor money to bie thaim wepen."[61] In England, on the other hand, where the people were expert in arms, the country could better defend itself.[62] In *De Laudibus Legum Angliæ*, Fortescue advocated for a trained populace and, to that end, starting training at a young age. "[W]hat is or can

---

[55]   33 Hen. VIII ch. 6 (1541).

[56]   2 WILLIAM LAMBARD, EIRENARCHA OR OF THE OFFICE OF THE JUSTICES OF PEACE, IN TWO BOOKES 479 (1581) (reprinted by The Lawbook Exchange, Ltd. in 2003).

[57]   A Speech Made by Queen Elizabeth in Parliament Concerning the Spanish Invasion (1593), *in* 1 THE HARLEIAN MISCELLANY: A COLLECTION OF SCARCE, CURIOUS, AND ENTERTAINING PAMPHLETS AND TRACTS, AS WELL IN MANUSCRIPT AS IN PRINT 437 (1808).

[58]   14 Car. II ch. 3 (1662).

[59]   JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 2 (1994).

[60]   WALTER RALEIGH, THE HISTORIE OF THE WORLD, IN FIVE BOOKES 247 (1614) (Sir Walter Raleigh called Fortescue "that notable Bulwarke of our Lawes").

[61]   JOHN FORTESCUE, THE GOVERNANCE OF ENGLAND: THE DIFFERENCE BETWEEN AN ABSOLUTE AND A LIMITED MONARCHY 114 (Charles Plummer ed., rev. ed. 1885).

[62]   *Id.*

be of greater Use to a Minor," he questioned, "than to be trained up in Military Discipline, whilst he is yet a Minor"?[63] "Indeed," Fortescue asserted, "it will be of no small Advantage to the Kingdom, that the Inhabitants be expert in Arms."[64] John Selden—"England's first legal historian"[65]—added notes to the edition he edited and published in 1616. Demonstrating that arms training remained common practice during the century-and-a-half after Fortescue wrote *De Laudibus Legum Angliæ*, Selden stated that "[t]he Custom of the Nation has been to train up the Freeholders to Discipline."[66]

### D. Shooting Competitions as Practice and Entertainment

Frequent practice and the demand for marksmanship inevitably led to the popularity of shooting competitions. By the thirteenth century, shooting matches "were an integral part of the social scene in Europe and elsewhere."[67] By the end of the fifteenth century, archery practice had become so common that "all the gardens" in London were converted into "a plaine field, for Archers to shoot in."[68] When population growth in Islington, Hoxton, and Shoreditch led to the closure of areas traditionally used for training in 1514, "a furious contest" erupted, "amounting . . . to an insurrection," "in which the citizens practising archery, tenacious of what they had long enjoyed as a right, assembled and destroyed all the fences" obstructing their old training grounds.[69] The archers who removed the barriers and restored the training grounds numbered in the thousands.[70]

The typical shooting practice was a social activity, with practices often involving over a dozen participants and sometimes even more spectators.[71] Shooting competitions could be major events. As Steven Gunn explained:

> The duty to practise archery for the sake of king and kingdom was often lightened by the excitement of competition, as at Canterbury, Chester, Great Dunmow and Shrewsbury, at the

---

[63]   JOHN FORTESCUE, DE LAUDIBUS LEGUM ANGLIÆ 100 (John Selden ed., 2d ed. 1741).

[64]   *Id.* at 100–01.

[65]   Martha A. Ziskind, *John Selden: Criticism and Affirmation of the Common Law Tradition*, 19 AM. J. LEGAL HIST. 22, 22 (1975).

[66]   FORTESCUE, *supra* note 63, at 101.

[67]   M.L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492–1792, at 28 (1980).

[68]   RICHARD BAKER, CHRONICLE OF THE KINGS OF ENGLAND FROM THE TIME OF THE ROMANS GOVERMENT UNTO THE RAIGNE OF OUR SOVERAIGNE LORD KING CHARLES 159 (1643).

[69]   ANTHONY HIGHMORE, THE HISTORY OF THE HONOURABLE ARTILLERY COMPANY OF THE CITY OF LONDON, FROM ITS EARLIEST ANNALS TO THE PEACE OF 1802, at 40 (1804).

[70]   William Hunt, *Civic Chivalry and the English Civil War*, *in* THE TRANSMISSION OF CULTURE IN EARLY MODERN EUROPE 204, 215 (Anthony Grafton & Ann Blair eds., 1990).

[71]   Gunn,  note 47, at 56, 61.

> Whit Monday games at Burrough on the Hill in Leicestershire
> and the wrestling and shooting contests with graded prizes linked
> to Bartholomew Fair in London.[72]

Gunn also identified shooting matches held between communities: "The Scotts of nearby Scot's Hall and their men came to shoot at New Romney in 1506–7, Lord Powis and his men came to shoot at Shrewsbury in 1522–3, and Yorkshire gentlemen held a shooting match at York in 1555."[73]

Archers of the era were highly skilled. "[M]any of them are recorded as shooting at twelve-score pricks or even thirteen-score pricks, targets set 240 or 260 paces away, comparable to the 250–300 yards reckoned as extreme bow range in the Hundred Years War."[74] Firearms became common in shooting competitions in the fifteenth century, and gunners were also skilled.[75] A 1487 match hosted in Germany was held at a distance of 200 meters (nearly 219 yards), an impressive range for the rudimentary firearms of the time.[76]

In 1537, King Henry VIII incorporated by royal charter the Honourable Artillery Company.[77] The Company originated around 1087 "as a society of armed citizens for the protection of the goods of merchants."[78] Henry VIII granted the royal charter "to promote regular practice in shooting the longbow, crossbow, and the handgun."[79] The plan was successful, as interest in marksmanship increased and men vied for acceptance into the Company.

By the seventeenth century, however, enthusiasm for the Company waned— perhaps because London was facing no threat of invasion or because those most passionate about arms training were serving in Ireland.[80] Consequently, in 1610, inspired by ruined European cities that neglected training during peacetime, a group of private citizens revived the weekly training sessions at the Company's Artillery Garden.[81] The effort to reinvigorate training was effective. Writing about 1638 in 1804, Anthony Highmore noted that becoming "great proficients in the use and exercise of arms" was "esteemed the most laudable exercise of diversion in use

---

[72] *Id.* at 64.

[73] *Id.*

[74] *Id.* at 68.

[75] BROWN, note 67, at 28. Firearm competitions were typically held separate from archery competitions due to the superiority of firearms, and rifle competitions were typically held separate from competitions for smoothbore firearms based on the superiority of rifles. *Id.*

[76] *Id.* Historian Lois Schwoerer notes that while "gorgeous guns" were sometimes used as a "status symbol," those "used in hunting, target shooting, and for protection were usually simple and unadorned." SCHWOERER, *supra* note 54, at 7.

[77] Hunt, *supra* note 70, at 214.

[78] RALPH NEVILL, BRITISH MILITARY PRINTS xxxiv (1909).

[79] SCHWOERER, *supra* note 54, at 97.

[80] Hunt, *supra* note 70, at 216.

[81] *Id.* at 213.

amongst the citizens of London."[82] Shooting was pursued with similar zeal in the eighteenth century, when "visit[ing] shooting galleries in London as well as other places for target practice" was all the "rage."[83]

Notably, recreational shooting was an activity in which everyone could participate, including children. In the 1540s, shooting games held in Essex included a bracket for "lads."[84] In his poem *The Artillery Garden*, Thomas Dekker refers to a "muster made by children," in which "Every boy-man in his infantery, [is] Shewing like Mars in his minority."[85] Similarly, Benjamin Johnson hoped in a seventeenth-century poem that "our great men would let their Sonnes Come to their Schooles" so instructors could "show' hem the use of Guns."[86]

Roger Ascham argued that "euerye bodye shoulde learne to shote when they be yonge," because men can only learn to shoot well if "they learne it perfitelye when they be boyes."[87] In his very influential *The Scholemaster* published in 1570, Ascham advised boys to learn to shoot firearms and bows in childhood. "[T]o plaie at all weapones" and "to shote faire in bow, or surelie in gon" were "verie necessarie" skills "for a Courtlie Gentleman."[88] Similarly, John Milton's 1644 treatise *Of Education* advocated for students to practice daily with their arms.[89] Some schools included arms training in their curriculums. For example, at the Lincoln Grammar School in the 1620s, "an old low-country souldier was entertain'd to traine them [the students] in arms, and they all bought themselves weapons, and instead of childish sports, when they were not at their bookes, [they] were exercis'd in all their military postures, and in assaults and defences."[90] Likewise, the free grammar school at Chipping Campden in Gloucestershire "legitimated firearms in the minds of young boys" by "[i]ncluding guns in their educational program" by 1639.[91] A 1615 augmented edition of John Stow's *Annals of London* noted that "the young Schollers, and other youthes, from the age of nine or ten yeares unto seaventeene" voluntarily "practised all points of warre, which they had seene their elders teach, having made them pikes

---

[82] HIGHMORE, *supra* note 69, at 64.

[83] SCHWOERER, *supra* note 54, at 113. Schwoerer adds that throughout the centuries, the popularity of guns for marksmanship and other civilian activities "helped to maintain a market for firearms and employment in the gun industry in peacetime." *Id.* at 26.

[84] Gunn, *supra* note 47, at 61.

[85] Hunt, *supra* note 70, at 219 (quoting THOMAS DEKKER, THE ARTILLERY GARDEN).

[86] 2 THE WORKES OF BENJAMIN JOHNSON 215 (1640).

[87] ROGER ASCHAM, TOXOPHILUS 36 (Edward Arber ed., 1868) (1545). Ascham added that "shotinge of all pastymes is moost fitte to be vsed in childhode: bycause it is an imitation of moost ernest thinges to be done in manhode." *Id.*

[88] ROGER ASCHAM, THE SCHOLEMASTER 64 (1571). "The record of reprints of Roger Acham's *The Scholemaster*—four between 1571 and 1589, and another one in 1711—shows its popularity." SCHWOERER, *supra* note 54, at 147.

[89] JOHN MILTON, OF EDUCATION 6–7 (1644).

[90] LUCY HUTCHINSON, MEMOIRS OF THE LIFE OF COLONEL HUTCHINSON 32 (7th ed. 1848).

[91] SCHWOERER, *supra* note 54, at 147; *see also* Hunt, *supra* note 70, at 220.

and pieces fit for their weake handling."[92] Meanwhile, a 1622 sermon commended the Artillery Garden and Military Yard companies for training London's "valiant men" as well as "youths, nay very children in feats of arms."[93]

When seventeenth-century kings visited places, the local men would often train to impress them.[94] Sometimes, to the kings' delight, the children would also join.[95] Sir John Oglander wrote that when King James I visited the Isle of Wight in 1607, "hee wase mutch taken with seeing the littel [boys] skirmishe, whoe he loved to see betor and willynglior then menn."[96] Sir Oglander observed that the "[b]oys were drilled in martial exercises in other places as well as in the Island, and their performances pleased Charles I as much as they did his father [James]."[97] Indeed, King Charles I was "gratified by witnessing the proficiency of 'certain boys' in the use of arms" on the Island in 1627, and even granted their request for gunpowder "in the hope that the youths of other places would be stirred up to do the same."[98]

### E. The Understanding of the English Right at the Time of the Second Amendment's Ratification

In interpreting the United States Constitution, the analytical baseline for English history is how America's Founders understood it. What mattered most in *Heller*, for example, is that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects."[99]

At the time of America's founding, training was revered as both a right and a duty in England. It had long been held as essential to self-preservation. Highmore articulated the view held by generations of his countrymen when he said that "the laws of nature [and] of sound policy require every active citizen to be exercised, and expert in arms of defence and peace for mutual protection."[100] "The ancient power of the country," he added, "is established upon th[e] security" of a trained citizenry.[101] Indeed, England had depended on an armed and trained populace for domestic tranquility and national security for over a millennium. England's 1541 training requirements were still in effect.[102] Shooting competitions were a favorite pursuit. And to many—especially the Americans who just battled Britain in a long

---

[92]  JOHN STOW, ANNALES, OR A GENERALL CHRONICLE OF ENGLAND 936 (Edmund Howes ed., 1615).

[93]  Hunt, *supra* note 70, at 219.

[94]  JOHN OGLANDER, THE OGLANDER MEMOIRS 121 (W.H. Long ed., 1888).

[95]  *Id.*

[96]  *Id.*

[97]  *Id.* at 121 n.2.

[98]  *Id.*

[99]  District of Columbia v. Heller, 554 U.S. 570, 593 (2008).

[100]  HIGHMORE, *supra* note 69, at 4.

[101]  *Id.*

[102]  SHARP, *supra* note 30, at 16.

and grueling war—Britain's large standing army created an even greater need for a trained populace. As Granville Sharp put it:

> If it be alledged that there can be no occasion, in these modern times, to arm and train the inhabitants of England, because there is an ample military force, or *standing army*, to preserve the peace; yet let it be remembered, that, the greater and more powerful *the standing army is*, so much more necessary is it that there *should be a proper balance to that power*, to prevent any ill effects from it: though there is one bad effect, which *the balance* (howsoever perfect and excellent) cannot prevent.[103]

In sum, as Sharp declared at the time of America's founding, "the laws of England always required the people to be armed, and not only to be *armed*, but to be *expert in arms*."[104]

## II. COLONIAL AMERICA

### A. The Importance of Marksmanship for Food and Survival

In colonial America, arms proficiency was required for survival. Guns were needed for food, self-defense, community defense, and conquest. Poor shooting, therefore, had deadly consequences.[105] It could result in starvation, invasion, insurrection, or defeat in battle.

Great emphasis was placed on proficiency from the earliest colonial days. "Nowhere else was the cult of accuracy so rigorously worshipped as in colonial America."[106] The colonists practiced shooting regularly, and since they depended on one another for security, they passed laws to ensure that the community as a whole was competent with arms.[107]

In 1629, so the community "may bee the better able to resist both forraigne enemies & the natives," the governor of Massachusetts Bay asked that the people "bee exercised in the use of armes."[108] In 1645, the colony ensured that its youth

---

[103] *Id.* at 26.

[104] *Id.* at 18.

[105] "Everywhere the gun was more abundant than the tool. It furnished daily food; it maintained its owner's claims to the possession of his homestead among the aboriginal owners of the soil; it helped to win the mother country's wars for possession of the country as a whole." 1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 1 (1910).

[106] ALEXANDER ROSE, AMERICAN RIFLE: A BIOGRAPHY 18–19 (2008).

[107] *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–89 (2019).

[108] 1 RECORDS OF MASSACHUSETTS, 1628–1641, at 392 (Nathaniel B. Shurtleff ed., 1853).

knew how to shoot, too. Determining that "the training up of youth to the art and practice of arms will be of great use in the country in divers respects," it ordered "that all youth within this jurisdiction, from ten years old to the age of sixteen years, shall be instructed . . . in the exercise of arms," including "small guns, half-pikes, bows and arrows, &c."[109] Starting in 1656, Plymouth Colony required its militiamen to bear arms to church on Sundays "with powder and bullett to improve if occation shall require"—i.e., practice shooting after church when necessary.[110]

The most common laws ensuring arms proficiency were militia laws.[111] The American colonies enacted hundreds of militia laws that required virtually all able-bodied males (most often defined as those aged sixteen to sixty) to keep arms for service in the militia.[112] Virtually all such laws required those militiamen to train with said arms.[113] In a 1744 speech, for example, New Jersey's governor proclaimed that "the Militia, in this Country . . . [is] the whole Body of the People from Sixteen Years of Age to Fifty. It is fit that all these People should be trained and taught the Use of Arms, and it is chiefly for this that the Militia Act is intended."[114] Since the colonies were entirely dependent on a trained militia for their defense, and because the militia consisted of the body of the people, the colonies depended on the people being trained in arms.[115] Militia laws were therefore intended to ensure that the populace possessed arms and could use them effectively.

Most colonists did not need mandates to maintain arms proficiency. As Robert Beverley wrote of Virginians in 1705, "most people there are skilful in the use of fire-arms, being all their lives accustomed to shoot in the woods."[116] It was this habitual practice of using guns in their daily lives, "together with a little exercising," that Beverley thought "would soon make the militia useful."[117]

Joseph Doddridge's writings reveal that little changed throughout the eighteenth century. Writing of the typical Virginian and Pennsylvanian during the 1760s, 70s,

---

[109] THE CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY 734 (1814).

[110] WILLIAM BRIGHAM, THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 102 (1836).

[111] The Supreme Court has noted the American militia system's roots in King Alfred's inventions. See United States v. Miller, 307 U.S. 174, 179 (1939) ("Blackstone's Commentaries, Vol. 2, Ch. 13, p. 409 points out 'that king Alfred first settled a national militia in this kingdom' and traces the subsequent development and use of such forces.").

[112] See Kopel & Greenlee, supra note 107, at 533–89 (covering the 13 original states and colonies, Vermont, and Plymouth Colony).

[113] Id.

[114] 6 DOCUMENTS RELATING TO THE COLONIAL HISTORY OF THE STATE OF NEW JERSEY, 1738–1747, at 187 (William A. Whitehead ed., 1882).

[115] The New Jersey Council described the militia as "the only Means in [the people's] Power of preserving themselves, their Wives, their Children, and their Fortunes." Id. at 227.

[116] ROBERT BEVERLEY, THE HISTORY AND PRESENT STATE OF VIRGINIA 217 (J.W. Randolph ed., 1855).

[117] Id.

and 80s, Doddridge noted that "[a] well grown boy, at the age of twelve or thirteen years, was furnished with a small rifle and shot pouch."[118] It was not government mandates but recreational shooting that developed expertise: "Hunting squirrels, turkeys, and raccoons soon made him expert in the use of his gun."[119]

## B. Shooting Competitions as Practice and Entertainment

Discussing the adults, Doddridge noted that shooting contests, as in England, were popular in America: "Shooting at marks was a common diversion among the men, when their stock of ammunition would allow it."[120] He explained their technique and tendency to shoot at long ranges:

> Their shooting was from a rest, and at a great distance as the length and weight of the barrel of the gun would throw a ball on a horizontal level. Such was their regard to accuracy, in these sportive trials of their rifles, and of their own skill in the use of them, that they often put moss, or some other soft substance, on the log or stump from which they shot, for fear of having the bullet thrown from the mark, by the spring of the barrel. When the rifle was held to the side of a tree for a rest, it was pressed against it as lightly as possible, for the same reason.[121]

---

[118] JOSEPH DODDRIDGE, NOTES ON THE SETTLEMENT AND INDIAN WARS OF THE WESTERN PARTS OF VIRGINIA AND PENNSYLVANIA FROM 1763 TO 1783, INCLUSIVE, TOGETHER WITH A REVIEW OF THE STATE OF SOCIETY AND MANNERS OF THE FIRST SETTLERS OF THE WESTERN COUNTRY 123 (John S. Ritenour & Wm. T. Lindsey eds., 1912).

[119] Id.; see also ROSE, supra note 106, at 19 ("In Europe hunting with guns was a pursuit reserved for the nobility, but in America, where gun ownership on the frontier was more common if not universal, even children were introduced to firearms from an early age.").

[120] DODDRIDGE, supra note 118, at 124.

[121] Id. Alexander Rose likewise explained the unique care that Americans put into each shot:
> Only American riflemen refused to "guess" how much powder to use for their personalized weapon. When they purchased a new rifle, they would rest its muzzle on the snow or on a bleached cloth and fire it. If it spat out unburned residue, they gradually reduced the powder load until none stained the white background. Then they would fashion a powder flask or charger that would dispense exactly the right amount down the barrel. For "tricky" shots, they would rely on long experience and a skilled eye to calculate whether to use extra or skim a little off. For longer ranges, where the ball would be buffeted by the wind and retarded by air resistance, they would add more powder for higher muzzle velocity and a flatter ballistic arc; to increase accuracy by reducing recoil at shorter distances, they would use less.

ROSE, supra note 106, at 19 (footnote omitted); see also id. ("Some riflemen even purchased

Shooting competitions were an activity in which nearly anyone could partici-
pate. The matches offered an ideal opportunity to hone some of the most important
skills for colonial life, while providing colonists with a source of amusement—
especially in rural communities where entertainment was limited.[122] Good marksmen
were praised and admired.

Future president John Adams was especially fond of shooting. "I spent my time
as idle Children do," Adams wrote in his autobiography, "and above all in shooting,
to which Diversion I was addicted to a degree of Ardor which I know not that I ever
felt for any other Business, Study or Amusement."[123] When he "was about nine or
ten years old" he "learn'd the use of the gun and became strong enough to lift it."
"I used to take it to school and leave it in the entry," he explained, "and the moment
it was over went into the field to kill crows and squirrels."[124]

His son, John Quincy Adams, who also became president, valued firearms train-
ing as well. In retirement, he wrote about a recent encounter that reminded him of
his early childhood, in which he performed musket drills for militiamen:

> Cary asked me if I remembered a company of militia who, about
> the time of the battle of Lexington in 1775, came down from
> Bridgewater, and passed the night at my father's house and barn,
> at the foot of Penn's Hill, and in the midst of whom my father
> placed me, then a boy between seven and eight years, and I went
> through the manual exercise of the musket by word of command
> from one of them. I told him I remembered it distinctly as if it
> had been last week. He said he was one of the company.[125]

Before his own presidency (which began in 1825), President James Madison
sent John Quincy Adams to St. Petersburg to serve as Minister to Russia from 1809
to 1814.[126] Adams left his brother Thomas instructions for watching his children in
his absence. Prominent among these was a request that Thomas train the children—
George (age 9), John (age 7), and Charles (age 3)—with firearms:

---

a long, narrow brass or iron tube about half an inch in diameter that could be screwed into
the top of the barrel to function as a rudimentary 'telescopic' sight. (The accessory lacked
a magnifying glass but certainly aided concentration)").

[122] *See* NICHOLAS JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT:
REGULATION, RIGHTS AND POLICY 239 (3d ed. 2021) ("Long-distance shooting contests were
major events in rural communities.").

[123] 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257 (Lyman H. Butterfield ed., 1961).

[124] *Id.* at 258 n.6.

[125] 7 MEMOIRS OF JOHN QUINCY ADAMS: COMPRISING PORTIONS OF HIS DIARY FROM 1795
TO 1848, at 325 (Charles Francis Adams ed., 1875).

[126] 3 WRITINGS OF JOHN QUINCY ADAMS, 1801–1810, at 321 n.1 (Worthington Chauncey
Ford ed., 1914).

> One of the things which I wish to have them taught . . . is the use and management of firearms. . . . The accidents which happen among children arose more frequently from their ignorance, than the misuse of weapons which they know to be dangerous. . . . I beg you occasionally from this time to take George out with you in your shooting excursions, teach him gradually the use of the musket, its construction, and the necessity of prudence in handling it; let him also learn the use of pistols, and exercise him at firing at a mark.[127]

Thomas Jefferson, who succeeded John Adams as president after defeating him in the election of 1800, was also enthusiastic about recreational shooting in the colonial days. By the age of fourteen, Jefferson's father had taught him "to sit his horse, fire his gun, boldly stem the Rivanna when the swollen river was 'Rolling red from brae to brae,' and press his way with unflagging foot through the rocky summits of the contiguous hills in pursuit of deer and wild turkeys."[128] As a young man, Jefferson enjoyed shooting competitions, sometimes placing wagers on his skill. For example, in 1768, he recorded that he "Won shooting 1/6" (one sixpence), and the following year that he "Lost shooting" "2/6."[129]

Jefferson maintained his enthusiasm for firearms training throughout his life. In 1785 he wrote to his nephew about the best form of exercise:

> As to the species of exercise, I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprise, and independence to the mind. Games played with the ball, and others of that nature, are too violent for the body, and stamp no character on the mind. Let your gun therefore be the constant companion of your walks.[130]

Over three decades later, Jefferson gifted his favorite pistols to James Madison's adoptive son, John Payne Todd, "in the hope they will afford you [Todd] sport in your daily rides."[131] Jefferson took the opportunity to boast that he "never missed a squirrel [at] thirty. yards with them."[132] Even in his final years, Jefferson still declared

---

[127]   *Id.* at 497.

[128]   1 HENRY S. RANDALL, THE LIFE OF THOMAS JEFFERSON 15 (1865).

[129]   1 JEFFERSON'S MEMORANDUM BOOKS, ACCOUNTS, WITH LEGAL RECORDS AND MISCELLANY, 1767–1826, at 81, 150 (James A. Bear, Jr. & Lucia C. Stanton eds., 1997).

[130]   THOMAS JEFFERSON, WRITINGS 816 (Merrill D. Peterson ed., 1984).

[131]   Letter from Thomas Jefferson to John Payne Todd (Aug. 15, 1816), *in* 10 THE PAPERS OF THOMAS JEFFERSON: RETIREMENT SERIES 321 (J. Jefferson Looney ed., 2013). Jefferson believed the pistols would "suit" Todd because he was "a sportsman." *Id.* at 320.

[132]   *Id.* at 321.

himself "a great friend to the manly and healthy exercises of the gun," and suggested that "every American who wishes to protect his farm from the ravages of quadrupeds & his country from those of biped invaders . . . ought to be" a "gun-man."[133]

Adams and Jefferson are especially notable because of their extraordinary roles in America's founding, but their enthusiasm for shooting was ordinary among the colonists.

The freedom to shoot was even used to entice indentured servants to come to America. George Alsop boasted from Maryland in 1666 that "every Servant has a Gun, Powder and Shot allowed him, to sport him withall on all Holidays and leasurable times, if he be capable of using it, or willing to learn."[134] This, Alsop hoped, would appeal to Englanders who did not enjoy as much liberty as Americans to sport with arms.

Although shooting matches were a common "entertainment form," firearms historian M.L. Brown noted that "[t]he popular shooting match" was also "practical from the standpoint of practice."[135] For the colonies, like the English, depended on a trained populace to maintain domestic order via the posse comitatus and maintain a defense against invasions and insurrections via the militia.[136]

## C. Community Defense

In colonial America, as in England, the hue and cry and posse comitatus helped to keep the peace domestically, and the militia provided security from foreign foes—all of which consisted of ordinary members of the community who were skillful with arms.

The only colony in America without a long tradition of raising and maintaining a militia was Pennsylvania, which, due to its large and influential Quaker population, only began mandating militia service during the French and Indian War in 1755.[137] Yet when French and Spanish privateers terrorized the Delaware River and Atlantic coast in 1747 during King George's War, armed and trained Pennsylvanians stepped forward to defend the colony. Benjamin Franklin published a pamphlet calling for the people of Pennsylvania to create a voluntary organization.[138] In the pamphlet, *Plain Truth*, Franklin argued that

---

[133]  Letter from Thomas Jefferson to Peter Minor (Jul. 20, 1822), *in* 18 THE PAPERS OF THOMAS JEFFERSON: RETIREMENT SERIES 565 (J. Jefferson Looney ed., 2013).

[134]  GEORGE ALSOP, A CHARACTER OF THE PROVINCE OF MARYLAND 59 (Newton D. Mereness ed., 1902) (1666).

[135]  BROWN, *supra* note 67, at 127.

[136]  Kopel, *supra* note 31, at 792–94.

[137]  Kopel & Greenlee, *supra* note 107, at 559–64. Most, but not all, Quakers were pacifists. *See, e.g.*, DAVID B. KOPEL, THE MORALITY OF SELF-DEFENSE AND MILITARY ACTION: THE JUDEO-CHRISTIAN TRADITION 384–89 (2017) (describing diverse Quaker views on self-defense and defense of others, before and during the American Revolution).

[138]  *See Plain Truth: Or, Serious Considerations On the Present State of the City of Philadelphia, and Province of Pennsylvania*, *in* 3 THE PAPERS OF BENJAMIN FRANKLIN (Leonard W. Labaree & Whitfield J. Bell, Jr eds., 1961).

> If this now flourishing City, and greatly improving Colony, is destroy'd and ruin'd, it will not be for want of Numbers of Inhabitants able to bear Arms in its Defence. 'Tis computed that we have at least (exclusive of the Quakers) 60,000 Fighting Men, acquainted with Fire-Arms, many of them Hunters and Marksmen, hardy and bold.[139]

Franklin believed that these fighting men, hunters, and marksmen just needed "Order, Discipline, and a few Cannon."[140]

*Plain Truth*, Franklin wrote later in life, "had a sudden and surprising Effect."[141] A second edition was published, as was a German translation of it, and it spread throughout the colonies. Soon, over ten thousand volunteers signed up, trained regularly, and provided security to the colony.[142]

> Militia laws were clearly not responsible for the people of Pennsylvania having and knowing how to use arms. It was the common possession and usage of arms for numerous everyday purposes such as hunting and target shooting that resulted in the population being familiar with arms and in a position to defend themselves and the Colony.[143]

Another group of colonists who were free from required training but voluntarily maintained firearms competency were students at Harvard College.[144] "[N]o sooner was the College started [in 1636] than the students began to waive their rights and volunteer to train" with the militia.[145] When the college later forbade the students to train with the militia, the students decided to train themselves. They petitioned in 1759 "for Liberty to exercise Themselves in the use of the Fire-Lock," which the faculty granted them permission to do "in the Play-Place" (the site of Memorial Hall), provided that "they behave themselves orderly in their Exercise, & Particularly [t]hat [t]hey explode not any of their Fire-Locks in the College Yard, or Elsewhere (Except Vollies in the Field of Exercise.)"[146] By 1766, this training "was influencing college life considerably."[147]

---

[139] *Id.* at 202.

[140] *Id.*

[141] *Id.* at 278.

[142] DAVID E. YOUNG, THE FOUNDERS' VIEW OF THE RIGHT TO BEAR ARMS 18 (2007).

[143] *Id.* at 16–17.

[144] Among the college's first laws was a 1642 provision requiring a "license of the Overseers of the Colledge" to participate in the "Artillery or traine-Band." Samuel F. Batchelder, *"The Students in Arms"—Old Style*, 29 THE HARV. GRADUATES' MAG. 549, 552 (1921).

[145] *Id.* (quotation marks omitted).

[146] *Id.* at 556–57.

[147] *Id.* 557 n.1.

Nearly "[e]veryone" in colonial America "was expected to be a master of precision shooting—not just for prestige, but for dinner."[148] Thus, even those exempted from mandatory training often made time to train themselves. Indeed, due to their constant dependence on firearms for food and protection, and their habitual use of firearms for sport and entertainment, "[t]he Colonists in America were the greatest weapon-using people of that epoch in the world"[149]—a fact the British would soon learn firsthand.

## III. Revolutionary America

### A. Pre-War Focus on Arms Proficiency

As tensions rose between Britain and its North American colonies, Americans' emphasis on marksmanship intensified. They had always relied on accuracy for their most essential needs, but it was now becoming increasingly clear that ordinary Americans—farmers, merchants, shopkeepers, etc.—would have to confront the world's strongest military.

Understanding that their independence would largely depend on their ability to outshoot professional British soldiers, Americans soon equated firearms competence with freedom. Thus, Reverend Simeon Howard, in his famous 1773 sermon in Boston, expressed the need for a free people to be trained in arms:

> A people who would stand fast in their liberty, should furnish themselves with weapons proper for their defence, and learn the use of them . . . . However numerous they may be, if they are unskilled in arms, their number will tend little more to their security, than that of a flock of sheep does to preserve them from the depredations of the wolf: accordingly it is looked upon as a point of wisdom, in every state, to be furnished with this skill, though it is not to be obtained without great labor and expence.[150]

Influential Boston patriot Josiah Quincy echoed this sentiment, asserting that "[t]he supreme power is ever possessed by those who have arms in their hands, and are disciplined to the use of them."[151] Accordingly, the Provincial Congress of

---

[148]  Johnson et al., *supra* note 122, at 239.

[149]  Sawyer, *supra* note 105, at 1.

[150]  A Sermon Preached to the Ancient and Honorable Artillery-Company, in Boston, New England, June 7th, 1773, at 25–26 (1773).

[151]  Josiah Quincy, Jr., Observations on the Act of Parliament Commonly Called the Boston Port-Bill: With Thoughts on Civil Society and Standing Armies (1774), *in* Memoir of the Life of Josiah Quincy, Junior, of Massachusetts: 1774–1775, at 347 (2d ed. 1874).

Massachusetts in 1775 advocated for "all the inhabitants of this colony, to be diligently attentive to learning the use of arms."[152]

As noted above, the inhabitants had long done so. The *Boston Gazette* reported that "[b]esides the regular trained militia in New-England, all the planters sons and servants are taught to use the fowling piece from their youth, and generally fire balls with great exactness at fowl or beast."[153] This phenomenon was confirmed by an Englishman visiting New England in 1774, who noted that "in the cities you scarcely find a Lad of 12 years that does not go a Gunning."[154] In other colonies it was no different. For instance, a Virginia gentleman described American arms culture to his Scottish friend by explaining that "[w]e are all in arms, exercising and training old and young to the use of the gun."[155] Benjamin Franklin reported that "I found at my arrival all America from one End of the 12 united Provinces to the other, busily employed in learning the Use of Arms."[156]

The Americans were confident their firearms expertise would give them a significant edge over their British adversaries. Although they generally had less experience as soldiers and many had never seen war, they had been using firearms their entire lives. John Zubly, a Savannah minister, warned the British that "in the strong sense of liberty, and the use of firearms almost from the cradle, the Americans have vastly the advantage over men of their rank almost everywhere else."[157] He added that American children were "shouldering the resemblance of a gun before they are well able to walk."[158] The eccentric Major General Charles Lee—Washington's second-in-command—also believed that the Americans' lifelong familiarity and expertise with arms would allow them to prevail over the British. Lee found "reason to doubt" that the British troops "composed of the refuse of an exhausted nation . . . should be able to conquer 200,000 active, vigorous yeomanry, fired with the noble ardour . . . all armed, all expert in the use of arms, almost from their cradles."[159]

---

152. N.H. GAZETTE, Jan. 27, 1775, at 1.

153. BOS. GAZETTE, Dec. 5, 1774, at 4.

154. DAVID HARSANYI, FIRST FREEDOM: A RIDE THROUGH AMERICA'S ENDURING HISTORY WITH THE GUN 47 (2018).

155. Peter Force, *The King's Message to Parliament, of March 7, 1774, to the Declaration of Independence by the United States*, *in* 3 AMERICAN ARCHIVES: A DOCUMENTARY HISTORY OF THE ENGLISH COLONIES IN NORTH AMERICA 621 (4th Ser., Peter Force ed., 1840) [hereinafter 3 AMERICAN ARCHIVES].

156. Letter from Benjamin Franklin to Jonathan Shipley (July 7, 1775), *in* 1 LETTERS OF DELEGATES TO CONGRESS, 1774–1789, at 604 (Paul H. Smith ed., 1976).

157. MOSES COIT TYLER, THE LITERARY HISTORY OF THE AMERICAN REVOLUTION, 1763–1776, at 484 (1898).

158. *Id.* at 485.

159. *To the People of America* (Feb. 3, 1775) *in* MEMOIRS OF THE LIFE OF THE LATE CHARLES LEE, ESQ. 142 (1792). Lee was notoriously odd. In an intercepted letter that eventually found its way to Lee, John Adams wrote, "[Lee] is a queer creature, but you must love his dogs if you love him, and forgive a thousand whims for the sake of the soldier and the

In fact, Americans' constant use of firearms did make them remarkable marksmen. One example was provided by John Andrews, an aid to British General Thomas Gage, who recounted an incident in which Redcoats were unsuccessfully trying to shoot at a target on the Boston Common. When an American mocked them, a British officer dared the American to do better. The American repeatedly hit the target, and "[t]he officers as well as the soldiers *star'd,* and tho't the Devil was in the man. *Why,* says the countryman, I'll tell you *naow.* I have got a *boy* at home that will toss up an apple and shoot out all the seeds as its coming down."[160] A clearly exaggerated report from London warned that American militiamen "all have and can use arms . . . in so particular a manner, as to be capable of shooting a Pimple off a man's nose without hurting him."[161]

James Madison was more realistic in boasting about Virginia's marksmen, as well as his own marksmanship:

> The strength of this Colony will lie chiefly in the rifle-men of the Upland Counties, of whom we shall have great numbers. You would be astonished at the perfection this art is brought to. The most inexpert hands rec[k]on it an indifferent shot to miss the bigness of a man's face at the distance of 100 Yards. I am far from being among the best & should not often miss it on a fair trial at that distance. If we come into an engagement, I make no doubt but the officers of the enemy will fall at the distance before they get within 150 or 200 Yards. Indeed I believe we have men that would very often hit such a mark 250 Yds. Our greatest apprehensions proceed from the scarcity of powder but a little will go a great way with such as use rifles.[162]

scholar." Letter from John Adams to James Warren (July 24, 1775), *in* 2 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 412 (Charles Francis Adams ed., 1850). To his credit, Lee took no apparent offense, writing to Adams:

> As you may possibly harbor some suspicions that a certain passage in your intercepted letters (may) have made some disagreeable impressions on my mind I think it necessary to assure you that it is quite the reverse. Until the bulk of mankind is much alter'd, I consider the reputation of being whimsical and eccentric rather as a panegyric than sarcasm, and my love of dogs passes with me as a still higher complement.

Letter from Charles Lee to John Adams (Oct. 5, 1775), *in* 2 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 414 (Charles Francis Adams ed., 1850).

[160]  LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON, 1772–1776, at 59 (Winthrop Sargent ed., 1866).

[161]  BOS. EVENING POST, Nov. 21, 1768, at 2, col. 3.

[162]  Letter from James Madison to William Bradford (June 19, 1775), *in* 1 THE PAPERS OF JAMES MADISON 153 (William T. Hutchinson et al. eds., 1962).

Madison was correct. Virginia had a tremendous number of sharpshooters. So many, in fact, that when General Washington sought five hundred riflemen, a competition had to be held because far more applied.[163] They were such skilled shots, however, that they destroyed the target before most had an opportunity:

> The commanding Officer . . . took a board of a foot squar and with Chalk drew the shape of a moderate nose in the center and nailed it up to a tree at 150 yd distance and those who came nighest the mark with a single ball was to go. But by the first 40 or 50 that fired the nose was all blown out of the board, and by the time his Comp. was up the board shared the same fate.[164]

Washington, as could be expected, selected his riflemen carefully. And he believed that those who were accustomed to using arms in their daily lives were the most desirable. Thus, Washington wrote, "great care should be observed in choosing active marksmen. The manifest inferiority of inactive persons, unused to arms, in this kind of service, (although equal in numbers,) to men who have practised hunting, is inconceivable. The chance against them is more than two to one."[165]

A Pennsylvanian wrote of another impressive company of roughly a thousand riflemen.[166] "They are, at listing, rejected, unless they can hit a playing-card, without a rest, at one hundred and twenty yards distance," he said.[167] Like many Americans, he believed their training and skill gave them the advantage over the British. "Almost every sensible man, in all the colonies, is trained, and ready to supply any loss," he asserted, whereas "[t]he regulars have . . . never appeared equal to our troops, man for man."[168]

### B. Effect of Arms Training in the Revolutionary War

The Revolutionary War began on April 19, 1775, when the British set out to seize American munitions at Concord, Massachusetts and the Americans resisted with arms, leading to "the shot heard round the world" and the Battles of Lexington and Concord.[169] The Americans' success surprised many and proved the colonists

---

[163]  Diary of John Harrower, 1773–1776, *in* 6 THE AMERICAN HISTORICAL REVIEW 100 (1900).

[164]  *Id.* The *Virginia Gazette* mockingly warned "General Gage, take care of *your* nose." 1 DIARY OF THE AMERICAN REVOLUTION: FROM NEWSPAPERS AND ORIGINAL DOCUMENTS 111 (Frank Moore ed., 1863).

[165]  2 THE WRITINGS OF GEORGE WASHINGTON 140 (Jared Sparks ed., 1883).

[166]  1 LETTERS OF DELEGATES TO CONGRESS, 1774–1789, *supra* note 156, at 609.

[167]  *Id.*

[168]  *Id.*

[169]  *Lexington and Concord: The Shot Heard 'Round the World*, AM. BATTLEFIELD TR.,

could indeed stand up to the powerful British military. Despite being comparatively undisciplined, the Massachusetts farmers, historian Richard Frothingham, Jr. explained, were more effective than the experienced troops due to the farmers' lifelong use of arms:

> [T]his ill-appointed army was not entirely unprepared for an encounter. Some of its officers, and not a few of the privates, had served in the French wars,—an invaluable military school for the colonies; a martial spirit had been excited in the frequent trainings of the minute-men, while the habitual use of the fowling-piece made these raw militia superior to veteran troops in aiming the musket.[170]

After the Battles of Lexington and Concord, Americans prepared for war. As earlier writings demonstrated, Americans' firearms proficiency was the pride of the nation, and their extraordinary skill was frequently used to boost morale among the patriots and intimidate the enemy.

The Continental Congress highlighted the Americans' shooting skills to warn King George III that they would make for a formidable foe.[171] The Congress cautioned that "[M]en trained to Arms from their infancy, and animated by the love of liberty, will afford neither a cheap or easy conquest."[172]

Bearing out this warning, Americans' success in the Revolutionary War was widely attributed to their familiarity and training with arms. Discussing the 1775 Battle of Bunker Hill in 1789, David Ramsay, a South Carolina legislator and delegate to the Continental Congress, explained that,

> None of the provincials in this engagement were riflemen, but they were all good marksmen. The whole of their previous military knowledge had been derived from hunting, and the ordinary amusements of sportsmen. The dexterity which by long habit they had acquired in hitting beasts, birds, and marks [i.e., targets], was fatally applied to the destruction of British officers.[173]

Ramsay determined that Americans had an advantage because "the inhabitants had been, from their early years . . . taught the use of arms."[174] "Europeans," by contrast,

---

https://www.battlefields.org/learn/articles/lexington-and-concord-shot-heard-round-world https://perma.cc/G47C-X8VE (last visited Oct. 18, 2022).

[170] RICHARD FROTHINGHAM, HISTORY OF THE SIEGE OF BOSTON, AND OF THE BATTLES OF LEXINGTON, CONCORD, AND BUNKER HILL 102–03 (3d ed. 1873).

[171] 1 JOURNALS OF THE AMERICAN CONGRESS FROM 1774–1788, at 106–11 (1823).

[172] *Id.* at 110.

[173] 1 DAVID RAMSAY, THE HISTORY OF THE AMERICAN REVOLUTION 204 (1789).

[174] *Id.* at 191.

"from their being generally unacquainted with fire arms are less easily taught the use of them than Americans, who are from their youth familiar with these instruments of war."[175]

Thomas Jefferson suggested that American casualties were far fewer than British casualties because Americans were better marksmen. Jefferson wrote "[t]his difference [in casualties] is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy."[176] George Washington confirmed Jefferson's assertions: "Our Scouts, and the Enemy's Foraging Parties, have frequent skirmishes; in which they always sustain the greatest loss in killed and Wounded, owing to our Superior skill in Fire arms."[177]

As the war raged on, John Hancock, President of the Continental Congress, praised American riflemen as "the finest Marksmen in the world."[178] Fellow Massachusettsian John Adams expressed similar acclaim, calling them "the most accurate Marksmen in the world."[179] Even greater admiration came from a clergyman in Maryland in a series of letters to the Earl of Dartmouth:

> In this country, my Lord, the boys, as soon as they can discharge a gun, frequently exercise themselves therewith, some a fowling, and others a hunting. The great quantities of game, the many kinds, and the great privileges of killing, make the *Americans* the best marksmen in the world, and thousands support their families principally by the same, particularly riflemen on the frontiers, whose objects are deer and turkies. In marching through woods, one thousand of these riflemen would cut to pieces ten thousand of your best troops. I don't, my Lord, speak at random, or write partially. I have travelled too much among these men to be insensible of their abilities.[180]

---

[175] *Id.* at 195.

[176] 1 THE WORKS OF THOMAS JEFFERSON 208 (H. A. Washington ed., 1884).

[177] 7 THE WRITINGS OF GEORGE WASHINGTON: FROM THE ORIGINAL MANUSCRIPTS 1745–1799, at 198 (John C. Fitzpatrick ed., 1932).

[178] Letter from John Hancock to Joseph Warren (June 18, 1775), *in* 1 LETTERS OF MEMBERS OF THE CONTINENTAL CONGRESS 134 (Edmund C. Burnett ed., 1921).

[179] Letter from John Adams to Abigail Adams (June 11, 1775), 1 ADAMS FAMILY CORRESPONDENCE: DECEMBER 1761–MAY 1776, at 215 (Lyman H. Butterfield ed., 1963).

[180] Peter Force, *The Origin and Progress of the North American Colonies; of the Causes and Accomplishment of the American Revolution; and of the Constitution of Government for the United States, to the Final Ratification Thereof, in* 4 AMERICAN ARCHIVES: A DOCUMENTARY HISTORY OF THE ENGLISH COLONIES IN NORTH AMERICA FROM THE KING'S MESSAGE TO PARLIAMENT, OF MARCH 7, 1774 TO THE DECLARATION OF INDEPENDENCE BY THE UNITED STATES 360 (4th Ser., Peter Force ed., 1843).

In another letter the Minister warned, "O, my Lord! if your Lordship knew but one half what I know of *America,* your Lordship would not persist, but be instantly for peace, or resign."[181]

Another warning, this one from William and Thomas Bradford of Philadelphia, was published in the London Chronicle on August 17, 1775. It warned that "[t]his province has raised 1000 rifle-men, the worst of whom will put a ball into a man's head at a distance of 150 yards or 200 yards, therefore advise your officers who shall here-after come out to America, to settle their affairs in England before their departure."[182]

The expectations for American marksmen were high, and they were eager to show off their skills. In the summer of 1775, General Washington "arranged a spectator review of his riflemen."[183]

> In the presence of the army, drawn up in parallel lines each side of the range and an immense crowd of spectators, in which a number of British spies were welcome visitors, a pole 7 inches in diameter was set up, and a marksman stepped off about 250 spaces. At the place where he stopped a company of riflemen was lined up to show what they could do. The mark was about equal to that a man would present standing sideways, and the range about 200 yards. . . . the riflemen, firing singly or at com-mand, so riddled the pole that it was apparent that no enemy could survive an instant.[184]

"General Howe," the commander-in-chief of the British land forces, "was fully as much impressed as the spectators, and wrote home about the 'terrible guns of the rebels.'"[185]

A letter from Maryland on August 1, 1775, described an impressive display that occurred there.

> [I]n the evening, however, they [the riflemen] were drawn out to show the gentlemen of the Town their dexterity at shooting. A clapboard, with a mark the size of a dollar, was put up; they

---

[181] *Id.* at 361.

[182] *Extract of a Letter from Messrs. Bradford, of Philadelphia, to the Printer of a Public Paper, dated Philadelphia, July 8, 1775*, *in* LETTERS ON THE AMERICAN REVOLUTION, 1774–1776, at 167 (Margaret Wheeler Willard ed., 1925).

[183] SAWYER, *supra* note 105, at 79.

[184] *Id.* at 80; *see also* JOHN G.W. DILLIN, THE KENTUCKY RIFLE 84 (Palladium Press 1998) (1924) ("The *Pennsylvania Gazette* of August 5, 1775, says of the corps: 'A party of these men at a late review on a quick advance, placed their balls in poles of 7 inches diameter, fixed for that purpose, at the distance of 250 yards.' This statement was copied into the *London Chronicle*, August 3–5, and into Almon's *Remembrance* for 1775, 4th ed.").

[185] SAWYER, *supra* note 105, at 80.

> began to fire off-hand, and the bystanders were surprised, few shots being made that were not close to or in the paper. When they had shot for a time in this way, some lay on their backs, some on their breast or side, others ran twenty or thirty steps, and firing, appeared to be equally certain of their mark. With this performance the company were more than satisfied, when a young man took up the board in his hand, not by the end, but by the side, and holding it up, his brother walked to the distance, and very coolly shot into the white; laying down his rifle, he took the board, and holding it as it was held before, the second brother shot as the former had done. By this exercise I was more aston-ished than pleased. But will you believe me, when I tell you, that one of the men took the board, and placing it between his legs, stood with his back to the tree while another drove the centre.[186]

A few days later, the *Virginia Gazette* reported another remarkable display that occurred in Lancaster, Pennsylvania.

> Two brothers in the company took a piece of board five inches broad and seven inches long, with a bit of white paper, about the size of a dollar, nailed in the centre, and while one of them supported this board perpendicularly between his knees, the other, at the distance upwards of sixty yards, and without any kind of rest, shot eight bullets through it successively, and spared a brother's thigh! Another of the company held a barrel stave perpendicularly in his hands with one edge close to his side, while one of his comrades, at the same distance, and in the manner before mentioned, shot several bullets through it, with-out any apprehension of danger on either side. The spectators appearing to be amazed at these feats, were told that there were upwards of fifty persons in the same company who could do the same thing; that there was not one who could not plug nineteen bullets out of twenty, as they termed it, within an inch of the head of a tenpenny nail.[187]

The *Gazette* added that "some of them proposed to stand with apples on their heads, while others at the same distance, undertook to shoot them off; but the people who

---

[186] *Letter from Richard Henry Lee to General Washington August 1, 1775, in* 3 AMERICAN ARCHIVES, *supra* note 155, at 1.

[187] 1 DIARY OF THE AMERICAN REVOLUTION FROM NEWSPAPERS AND ORIGINAL DOCU-MENTS, *supra* note 164, at 122.

saw the other experiments declined to be witnesses of this."[188] It goes without saying that this high degree of skill could be acquired only through extensive training.

It did not take long for the Americans to get their chance to demonstrate their skill in battle. In Boston, the riflemen picked off Howe's men from long distances. One rifleman, "seeing some British on a scow at a distance of fully half a mile, found a good resting place on a hill and bombarded them until he potted the lot."[189] The British soldiers soon discovered that "it was almost certain death to expose their heads within two hundred yards of the riflemen."[190] As the Army surgeon Dr. James Thacher observed,

> These men are remarkable for the accuracy of their aim; striking a mark with great certainty at two hundred yards distance. At a review, a company of them, while on a quick advance, fired their balls into objects of seven inches diameter, at the distance of two hundred and fifty yards. . . . their shot have frequently proved fatal to British officers and soldiers, who expose themselves to view, even at more than double the distance of common musket-shot.[191]

On August 16, 1775, the *Pennsylvania Gazette* reported: "We are also told that the riflemen had in one day killed ten of a reconnoitering party; and it is added likewise, that they have killed three Field officers. A centry was killed at 250 yards distance."[192] The *Pennsylvania Packet* added about the sentry that "only half his head was seen."[193] On the 21st, the *Pennsylvania Gazette* further reported: "Last Wednesday, some rifleman, on Charlestown side, shot an officer of note in the ministerial service . . . and killed three men on board a ship at Charlestown ferry, at the distance of full half a mile."[194]

Those would not be the only stunningly long shots of the war. When an English soldier on the New Jersey side of the Delaware River "mocked" Jacobus Scout, who was on the Pennsylvania side of the river, the Pennsylvanian gunsmith "shot [the] English soldier at 900 yards and killed him."[195] Another example occurred during

---

[188] *Id.*

[189] SAWYER, *supra* note 105, at 81.

[190] W.H. Hunter, *The Pathfinders of Jefferson County, Ohio*, *in* 6 OHIO ARCHEOLOGICAL AND HISTORY PUBLICATIONS 222 n.35 (Fred J. Heer ed., 1900, Supp. 1980).

[191] JAMES THACHER, A MILITARY JOURNAL DURING THE AMERICAN REVOLUTIONARY WAR: FROM 1775 TO 1783, at 38 (1823).

[192] DILLIN, *supra* note 184, at 84.

[193] *Id.*

[194] *Id.* at 85.

[195] HISTORY OF BUCKS COUNTY, PENNSYLVANIA 220 (J.H. Battle ed., 1887); *Tales from the 1769 Vansant/Craven Burying Ground*, THE CRAVEN HALL NEWSLETTER (Craven Hall Historical Society, Warminster, Pa.), Mar. 2021, at 7, https://bit.ly/3CWMLYr [https://perma .cc/A5FE-RAWY]. The inscription on Scout's gravestone noted that "he shot an English soldier at 900 yards and killed him," and "he was an intimate friend of Thomas Paine." *Id.*

the 1778 Siege at Boonesborough: the Shawnees fired into Daniel Boone's fort from hills roughly three hundred yards away[196] and a Shawnee interpreter was said to have been shot at six hundred yards.[197]

Perhaps no long-distance shot was as consequential as Timothy Murphy's during the Battle of Saratoga. The Pennsylvania hunter killed General Simon Fraser from around three hundred yards when the general was rallying his troops during a pivotal point in the battle, which became a turning point in the war.[198] The victory provided the Americans a badly needed morale boost, and it also motivated the French to enter the war in support of the Americans.

Murphy received the order to shoot from Daniel Morgan, in whose rifleman company Murphy served. Morgan, like Washington and other rifle commanders, held a shooting competition for admission into his company.[199] Morgan's shooters were apparently "singularly excellent" because he took twenty-eight more riflemen than the sixty-eight the Congress allowed him.[200] When Morgan assembled the 11th Virginia Regiment, he "found the best shooters in western Virginia by setting up a target depicting a British officer's head (some said it was of King George III) at one hundred yards and requiring his recruits to hit it on their first shot."[201] The Marquis de Lafayette explained that Morgan's riflemen "had been taken, not from different corps, but from parts of the country on the frontiers of the savage tribes, and from amongst men whose mode of life, and skill in firing their long carbines, rendered them particularly useful in that service."[202]

"[T]he best marksman in the British Army,"[203] British Major George Hanger, provided "a proof of [the] most excellent skill of an American rifleman" and challenged "any man [to] shew me an instance of better shooting."[204] He explained that he and others were discretely planning an attack when suddenly an American rifleman killed one of their horses from 300 yards away.[205] As an American captive during the war, Hanger used the opportunity to learn from the Americans about their training and techniques:

> I have often asked American riflemen, what was the most they
> thought they could do with their rifle? They have replied, that

---

[196]  LYMAN COPELAND DRAPER, THE LIFE OF DANIEL BOONE 529 (Ted Franklin Belue ed., 1998).

[197]  Rufus L. Porter, *Porter's Fort*, COLO. SPRINGS GAZETTE TEL., Jan. 2, 1973, at 18.

[198]  SAWYER, *supra* note 105, at 86.

[199]  ROSE, *supra* note 106, at 43.

[200]  *Id.*

[201]  *Id.* at 51.

[202]  *Lafayette "the Friend of America": The First Champion of Revolutionary France, 1757–1834*, *in* 10 UNIVERSITY LIBRARY OF AUTOBIOGRAPHY 295–96 (1918).

[203]  ROSE, *supra* note 106, at 56.

[204]  GEORGE HANGER, COLONEL GEORGE HANGER'S ADVICE TO ALL SPORTSMEN, FARMERS AND GAMEKEEPERS 122 (1814).

[205]  *Id.*

> they thought they were generally sure of splitting a man's head
> at two hundred yards, for so they termed their hitting the head.
> I have also asked several whether they could hit a man at four
> hundred yards,—they have replied certainly, or shoot very near
> him, by only aiming at the top of his head.[206]

Hanger was "certain, that, provided an American rifleman were to get a perfect aim
at 300 yards at me, standing still, he most undoubtedly would hit me."[207] He concluded
that "I never in my life saw . . . men who shot better" than the American riflemen.[208]

Many British soldiers agreed. "In the British camp the riflemen were called . . .
the most fatal widow-and-orphan makers in the world."[209] And it was not just the
riflemen that impressed with their accuracy. One British officer remarked that the
Americans shot well despite low-quality firearms: "These fellows were generally
good marksmen, and many of them used long guns made for Duck-Shooting."[210]

The Americans likely would have lost the war if not for their superior marks-
manship. The odds were overwhelmingly stacked against them. They faced a dangerous
scarcity of firearms, ammunition, food, salt, clothing, medical supplies, and money
for much of the war. They had a smaller fighting force, drawn from a smaller general
population, which was far less experienced in battle. They also had to face paid
Hessian mercenaries, hostile Native Americans, and British loyalists, in addition to
the British military. But they were able to overcome these obstacles with their zeal
for independence and their remarkable skill with arms. They learned firsthand how
valuable lifelong firearms practice could be in resisting a tyrannical government, and
they kept that lesson in mind when forming their own government.

## IV. RATIFICATION OF THE UNITED STATES CONSTITUTION

### A. State Constitutions

In 1787 and 1788, John Adams published his *Defence of the Constitutions of
Government of the United States of America*, a defense of the various state constitu-
tions throughout the United States. Emphasizing the benefits of the militia, Adams
argued that a trained populace could not be tyrannized: "That the people be continu-
ally trained up in the exercise of arms," ensures that "nothing could at any time be

---

[206] *Id.* at 144.
[207] *Id.* at 210.
[208] *Id.* at 122.
[209] Hunter, *supra* note 190, at 222 n.35 (quotations omitted).
[210] FREDERICK MACKENZIE, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON, BEING THE
DIARY OF LIEUTENANT FREDERICK MACKENZIE, ADJUTANT OF THE ROYAL WELCH FUSILIERS,
JANUARY 5–APRIL 30, 1775, at 67 (Allen French ed., 1926).

imposed upon the people but by their consent."[211] That was why "Rome, and the territories about it, were trained up perpetually in arms."[212]

For the same reason, Virginia's 1776 declaration of rights provided that "a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State."[213] Pennsylvania's 1776 constitution was the first adopted after the Declaration of Independence. Its Declaration of Rights stated that "the people have a right to bear arms for the defence of themselves and the state."[214] Its "plan or frame of government" provided that "[t]he freemen of this commonwealth and their sons shall be trained and armed for its defence under such regulations, restrictions, and exceptions as the general assembly shall by law direct."[215] Drawing on Pennsylvania's constitution, Vermont's 1777 constitution ensured that "the people have a right to bear arms for the defence of themselves and the State."[216] Under its "Plan or Frame of Government," it used Pennsylvania's language ensuring that the "[t]he freemen of this Commonwealth, and their sons, shall be trained and armed for its defence."[217] Vermont's 1786 constitution kept the language of the arms provision from its 1777 declaration of rights, but provided more general training language: "The inhabitants of this Commonwealth shall be trained and armed for its defence, under such regulations, restrictions, and exceptions, as the General Assembly shall by law direct."[218] In its 1793 constitution, adopted after the U.S. Constitution and the Bill of Rights, Vermont again kept the 1777 declaration of rights language to protect arms rights,[219] and made another minor change to the training language:

---

[211]   3 JOHN ADAMS, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA 471–72 (1787–88) (quoting MARCHAMONT NEDHAM, THE RIGHT CONSTITUTION OF A COMMONWEALTH 89 (1656)).

[212]   See id. at 472.

[213]   7 THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3814 (Francis Newton Thorpe ed., 1909).

[214]   5 THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3083 (Francis Newton Thorpe ed., 1909).

[215]   Id. at 3084.

[216]   6 THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3741 (Francis Newton Thorpe ed., 1909).

[217]   Id. at 3742.

[218]   Id. at 3758. In the declaration of rights, a comma was added so it read: "the people have a right to bear arms, for the defence of themselves and the State." Id. at 3753. Notably, in writing the 1786 constitution, the convention entertained—and rejected—a proposal to change "a right to bear arms for the defence of themselves and the State" into "a right to bear arms for the defence of the community." VERMONT STATE PAPERS 518 (1823).

[219]   This time, the comma was removed, so it used the exact punctuation of the 1777 guarantee: "the people have a right to bear arms for the defence of themselves and the State." 6 THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC

"The inhabitants of this State shall be trained and armed for its defence, under such regulations, restrictions, and exceptions, as Congress, agreeably to the Constitution of the United States, and the Legislature of this State, shall direct."[220]

## B. Debates over the Ratification of the Constitution

During the debates over the United States Constitution, the assertion that an armed and trained populace was the best defense against a tyrannical government was undisputed.[221] Both Federalists and Antifederalists agreed that a populace trained in arms was an essential bulwark that the new government depended upon.

A Federalist writing in the *Philadelphia Independent Gazetteer* on October 23, 1787, asserted that a tyrannical government "could never prevail over an hundred thousand men armed and disciplined, owners of the country, animated not only with a spirit of liberty, but ardent resentment against base treacherous tyrants."[222]

In Federalist 29, Alexander Hamilton made a similar argument. A standing army was not a serious threat to American liberty, he declared, because "that army can never be formidable to the liberties of the people, while there is a large body of citizens little if at all inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow citizens."[223] To Hamilton, a populace armed and trained was "the best possible security against" an oppressive standing army.[224]

"The Republican," writing in the *Connecticut Courant* on January 7, 1788, explained that because Americans possessed arms and knew how to use them, they were safe from tyrants and foreign invasions.

> It is a capital circumstance in favor of our liberty that the people themselves are the military power of our country. In countries under arbitrary government, the people oppressed and dispirited neither possess arms nor know how to use them. Tyrants never feel secure until they have disarmed the people. They can rely

---

LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3764 (Francis Newton Thorpe ed.,1909).

[220] *Id.* at 3768.

[221] *See* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 121 (1825) ("The first [principle of the Second Amendment] is a declaration that a well regulated militia is necessary to the security of a free state; a proposition from which few will dissent.").

[222] *Essay on Federal Sentiments*, PHILA. INDEP. GAZETTEER, Oct. 23, 1787, *reprinted in* 32 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 435 (John P. Kaminski et al. eds., 2019).

[223] THE FEDERALIST NO. 29 (Alexander Hamilton).

[224] *Id.*

> upon nothing but standing armies of mercenary troops for the
> support of their power. But the people of this country have arms
> in their hands; they are not destitute of military knowledge;
> every citizen is required by law to be a soldier; we are all mar-
> shaled into companies, regiments, and brigades for the defense
> of our country. This is a circumstance which increase the power
> and consequence of the people; and enables them to defend their
> rights and privileges against every invader.[225]

Draft speeches intended to be presented at the Maryland Convention further
reflect the Framers' understanding of the right to keep and bear arms. One such
speech was published in the *Maryland Journal* during July and August of 1788. "It
was not delivered, because it was agreed among the members of the majority [the
Federalists] not to waste time or protract the decision by arguments in favour of the
system."[226] The Federalist's speech explained how a great body of the people, "all
of whom know the use of fire-arms," will prevent the American government from
using its military against its own people:

> Suppose even this improbable circumstance, an army of 10,000
> men embodied for our destruction, before even the alarm shall be
> spread! The vast extent of our territory, the exertions of thirteen
> governments, the diffusion of knowledge and the spirit of liberty
> amongst the citizens of thirteen different states, all of whom
> know the use of fire-arms, would soon prove the folly and mad-
> ness of the undertaking. In such a case, the president and congress
> might, in vain, call upon the militia. In such a case the force of the
> militia would be exerted against the base traitors to their country.[227]

Charles Carroll was a Federalist who prepared a speech expecting to be elected as
a delegate to Maryland's convention—his county, however, elected four Antifederal-
ists instead. According to Carroll, because Americans had arms and the ability to use
them, they were safer from tyranny than Europeans who had neither:

> The situation of our People is also very different from those
> of Europe in general; our citizens have arms in their hands, &

---

[225] *The Republican: To the People*, CONN. COURANT, Jan. 7, 1788, *reprinted in* 3
DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 529–30 (Merrill
Jensen ed., 1978).

[226] *Text of a Federalist Speech Not Delivered in the Maryland Convention*, MD. JOURNAL,
July 25, 29 & August 1, 5, 8, 1788, *reprinted in* 12 DOCUMENTARY HISTORY OF THE RATIFI-
CATION OF THE CONSTITUTION 867 (John P. Kaminski et al. eds., 2015).

[227] *Id.* at 885.

> know the use of them; the common People of Europe are disarmed, & in general would handle a musket as awkwardly as Hadley's quadrant: The passion for hunting, & the pride of the gentry & nobility co-operating with an insidious policy have wrested from the peasantry of Europe those arms which might serve, under favorable auspices, & in critical emergencies to vindicate & maintain their just rights.—By the federal Constitution all orders of nobility are expressly excluded, and there is no probability of the game laws being introduced into any of the States, of course the great body of the People will retain their arms, and I flatter myself the spirit to use them on every proper occasion.[228]

If a trained populace was essential to preventing tyranny, an untrained populace was dangerous to liberty. The influential Antifederalist, "Federal Farmer," warned about the perils of a general population too busy with their private affairs to maintain arms proficiency:

> But, say gentlemen, the general militia are for the most part employed at home in their private concerns, cannot well be called out, or be depended upon; that we must have a select militia . . . . These corps, not much unlike regular troops, will ever produce an inattention to the general militia; and the consequence has ever been, and always must be, that the substantial men, having families and property, will generally be without arms, without knowing the use of them, and defenceless; whereas, to preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them[.][229]

Indeed, as arguably the most influential Antifederalist, George Mason, argued at the Virginia Convention, one method of effectively disarming the people that had historically been used was to allow the militia to fall into disuse.[230] Mason reminded the convention that a former royal governor of Pennsylvania, Sir William Keith, proposed such a plan to the British Parliament "when the resolution for enslaving

---

[228] *Id.* at 837–38.

[229] Federal Farmer, *Letter XVIII*, Jan. 25, 1788, *reprinted in* 20 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1073 (John P. Kaminski et al. eds., 2004). Federal Farmer repeatedly stated that the militia is the general population. *See id.* at 1072 ("militia, when properly formed, are in fact the people themselves"); *id.* ("the militia shall always . . . include, according to the past and general usuage of the states, all men capable of bearing arms"); *id.* at 1073 ("the militia are the people").

[230] 10 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1270–71 (John P. Kaminski et al. eds., 1993).

America was formed in Great-Britain."[231] According to Keith, it was not "good [p]olicy, to accustom all the able men in the Colonies to be well exercised in Arms."[232] It was "more advisable, to keep up a small, regular Force in each Province" so that "in case of a War, or Rebellion, the whole of the regular Troops on the Continent, might without Loss of time be united or distributed at Pleasure."[233] Accordingly, as Mason put it, the British had decided that "to disarm the people . . . was the best and most effectual way to enslave them," and that it was best "not do it openly; but to weaken [the Americans] and let them sink gradually, by totally disusing and neglecting the militia."[234] Mason was convinced that a standing army combined with an untrained populace would surely result in despotism: "When against a regular and disciplined army, yeomanry are the only defence—yeomanry unskilful and un-armed, what chance is there for preserving freedom?"[235] Mason's arguments were consistent with remarks he made during a speech near the start of the Revolutionary War, in which he proclaimed that the people must be "introduce[d] to the use of arms and discipline" to best "act in defence of their invaded liberty."[236]

## C. Ratifying the Second Amendment

The necessity for a trained populace was reflected in proposed declarations of rights, and ultimately, the Second Amendment. Virginia's proposed arms guarantee, which originated with Mason, provided "[t]hat the people have a right to keep and bear arms: that a well regulated militia composed of the body of the people trained to arms, is the proper, natural and safe defence of a free State."[237] The second clause used the same language as Virginia's 1776 declaration of rights, which Mason wrote.[238]

---

[231] *Id.* at 1271.

[232] WILLIAM KEITH, A SHORT DISCOURSE, ON THE PRESENT STATE OF THE COLONIES IN AMERICA, WITH RESPECT TO GREAT BRITAIN (1728), *reprinted in* 6 THE AMERICAN MUSEUM: OR REPOSITORY OF ANCIENT AND MODERN FUGITIVE PIECES, &C. PROSE AND POETICAL 169 (Mathew Carey ed., 1789).

[233] *Id.*

[234] 10 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 230, at 1271.

[235] *Id.*

[236] 1 KATE MASON ROWLAND, THE LIFE OF GEORGE MASON 430 (1892).

[237] 37 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 253 (John P. Kaminski et al. eds., 2020). Virginia's proposed Bill of Rights was nearly identical to the proposals prepared by Mason at the Virginia convention, many of which—including the arms provision—was based on Virginia's 1776 Declaration of Rights that Mason drafted. J. Gordon Hylton, *Virginia and the Ratification of the Bill of Rights 1789–1791*, 25 U. RICH. L. REV. 433, 437, 439 (1991).

[238] 37 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 237, at 113 ("That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State.").

North Carolina proposed the same language as Virginia.[239] New York's proposal was also based on Mason's language, except it substituted "the body of the people trained to arms" with "the body of the People capable of bearing Arms."[240] Additionally, Rhode Island proposed New York's language.[241]

Future vice-president Elbridge Gerry argued that he preferred the "trained to arms" language because it would "furnish a greater certainty" that a competent militia would be maintained.[242] Regardless, the objective of each proposal was to ensure that the populace would be familiar with arms. This objective was also reflected in the final wording of the Second Amendment, which provided that "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."[243] "Well regulated" means trained and disciplined, and the militia includes the body of the people. The body of the people being effective with arms was understood as the best way to protect the state, and the best way to protect the people's liberties from a tyrannical state.

Antifederalist Samuel Nasson emphasized both of these benefits during the constitutional debates. In a speech at the Massachusetts Convention, Nasson praised the people's ability to defend themselves: "What occasion have we for standing armies? We fear no foe—If one should come upon us, we have a militia, which is our bulwark. Let Lexington witness that we have the means of defence among ourselves."[244] The following year, he urged his friend and Federalist congressman George Thatcher to ratify what became the Second Amendment by explaining:

> . . . you know to learn the Use of arms is all that can Save us from a forighn foe that may attempt to subdue us, for if we keep up the Use the-of arms and become well acquainted with them we Shall allway be able to look them in the face that arise up against us.[245]

---

[239]  *Id.* at 266 ("That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural and safe defence of a free State.").

[240]  *Id.* at 257 ("That the People have a right to keep and bear Arms; that a well regulated Militia, including the body of the People *capable of bearing Arms*, is the proper, natural and safe defence of a free State.") (italics in original).

[241]  *Id.* at 273 ("That the people have a right to keep and bear arms; that a well regulated militia, including the body of the people capable of bearing Arms, is the proper, natural and safe defence of a free state.").

[242]  *Id.* at 403.

[243]  U.S. CONST. amend. II.

[244]  6 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1400 (John P. Kaminski et al. eds., 2000).

[245]  Letter from Samuel Nasson to George Thatcher, July 9, 1789, *in* THE COMPLETE BILL OF RIGHTS 296 (Neil H. Cogan ed., 2d. ed. 2015).

*D. Post-Ratification Interpretations of the Second Amendment*

Comments made directly after the Second Amendment was drafted and throughout the following century make clear that firearms training was an important part of the right "to keep and bear arms."[246]

The Bill of Rights was submitted to the states for consideration on September 25, 1789.[247] By the time of President Washington's first address to a joint session of Congress on January 8, 1790, New Jersey, Maryland, and North Carolina had ratified the proposed Amendments.[248] Illustrating that the belief in training was as strong as ever, Washington used his address to remind Americans that "a free people ought not only to be armed, but disciplined."[249] The same point was made during debates in the first Congress. For example, on December 17, 1790—at which point nine of the required eleven states had ratified the Bill of Rights—the House of Representatives discussed the people's ability and willingness to defend themselves.[250] Representative James Jackson declared "that every citizen was not only entitled to carry arms, but also in duty bound to perfect himself in the use of them, and thus be capable of defending his country." To Jackson, one could not credibly contend "that the whole body of the people ought not to be armed, and properly trained."[251]

Vermont's most influential founder was Ira Allen. From 1776 to 1786, "few if any state papers of Vermont were issued that [Ira] did not prepare or assist in preparing."[252] Allen's writings are filled with references to the firearms he carried and used for self-defense, hunting, and target shooting. For example, in 1772 he casually notes a shooting competition between his brother, Ethan Allen, and a "Mr. Peck," when they "lodged at Peck's camp" for an evening,

> Mr. Peck and my brother in the course of the evening had a high banter, and some bets laid for shooting at mark next morning. . . . In the gray of the morning, Mr. Peck and my brother

---

[246] U.S. CONST. amend. II.

[247] *The Bill of Rights: A Transcription*, NAT'L ARCHIVES, https://www.archives.gov/founding-docs/bill-of-rights-transcript [https://perma.cc/W2UZ-RJVA] (last visited Oct. 18, 2022).

[248] *This Day in History| June 21*, HIST. (Nov. 24, 2009), https://www.history.com/this-day-in-history/u-s-constitution-ratified [https://perma.cc/BT5M-J8V5] (last visited Oct. 18, 2022).

[249] 1 JOURNAL OF THE SECOND SESSION OF THE SENATE OF THE UNITED STATES OF AMERICA, BEGUN AND HELD AT THE CITY OF NEW YORK, JANUARY 4TH, 1790; AND IN THE FOURTEENTH YEAR OF THE INDEPENDENCE OF THE SAID STATES 6 (1820).

[250] *James Madison and the Bill of Rights*, BILL RTS. INST., https://billofrightsinstitute.org/essays/james-madison-and-the-bill-of-rights [https://perma.cc/3FLM-NCTN] (last visited Oct. 18, 2022).

[251] 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS: DEBATES IN THE HOUSE OF REPRESENTATIVES: THIRD SESSION, DECEMBER 1790–MARCH 1791, at 95 (1996).

[252] 1 JAMES BENJAMIN WILBUR, IRA ALLEN: FOUNDER OF VERMONT, 1751–1814, at 87 (1928).

> were up and preparing their guns, &c, and soon began to fire.
> Some I heard, and others sleep prevented the notice of. They
> continued their sport till the sun was two hours high.[253]

The activity was so common, it seems, that Ira Allen slept through it.[254] In 1796, Allen traveled to France to purchase 20,000 muskets and twenty-four field pieces for Vermont's militia.[255] While being shipped to America, the arms were seized by the British, who suspected that Allen was planning a revolt against British Canada. While defending himself in Britain's Court of Admiralty, Allen explained that he intended to distribute the arms across Vermont.[256] In doing so, he elucidated his understanding of his right to keep and bear arms in America: "Government have nothing to fear from its Militia. . . . arms and military stores are free merchandize, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government."[257]

In his 1825 "influential treatise," William Rawle, "a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights,"[258] described how the militia's usefulness derived from the people being accustomed to using arms: "In a people permitted and accustomed to bear arms, we have the rudiments of a militia, which properly consists of armed citizens, divided into military bands, and instructed at least in part, in the use of arms for the purposes of war."[259]

As a Supreme Court Justice, Joseph Story published a popular treatise on the Constitution in 1833.[260] Regarding the Second Amendment, Story noted that "[t]he right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic."[261] But Story expressed concern about "a growing indifference" to the right among the people.[262] He worried that the people would neglect their arms and undermine the founders' intent. "There is certainly no small danger, that indifference may lead to disgust, and disgust to contempt; and thus gradually undermine all the protection intended by this clause of our national bill of rights."[263]

---

[253] *Id.* at 28.

[254] *Id.*

[255] STEPHEN P. HALBROOK, A RIGHT TO BEAR ARMS: STATE AND FEDERAL BILL OF RIGHTS AND CONSTITUTIONAL GUARANTEES 38 (1989).

[256] IRA ALLEN, PARTICULARS OF THE CAPTURE OF THE OLIVE BRANCH, LADEN WITH A CARGO OF ARMS 403 (1798).

[257] *Id.* at 403–04.

[258] District of Columbia v. Heller, 554 U.S. 570, 607 (2008).

[259] RAWLE, *supra* note 221, at 140.

[260] *The Idea of the Senate*, U.S. SENATE, https://www.senate.gov/about/origins-foundations /idea-of-the-senate/1833Story.htm [https://perma.cc/7TZY-658R] (last visited Oct. 18, 2022).

[261] 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 746 (1833).

[262] *Id.*

[263] *Id.* at 747.

The "most famous" legal scholar of the nineteenth century was "the judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations."[264] According to Cooley, "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms[.]"[265] Echoing the founders of the previous century, Cooley explained that "[t]he alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms."[266] Thus, as the Supreme Court asserted, "Cooley understood the right not as connected to militia service, but as securing the militia by ensuring a populace familiar with arms."[267]

That same year—which was also the year the Fourteenth Amendment was ratified—John Norton Pomeroy explained that the purpose of the Second Amendment is

> to secure a well-armed militia. . . . But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons. To preserve this privilege, and to secure to the people the ability to oppose themselves in military force against the usurpations of government, as well as against enemies from without, that government is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms. . . . The clause is analogous to the one securing the freedom of speech and of the press. Freedom, not license, is secured; the fair use, not the libellous abuse, is protected.[268]

Benjamin Abbott's post–Fourteenth Amendment treatise echoed these sentiments. First, addressing the public benefit of the right to bear arms, Abbott stressed that "[s]ome general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war."[269] Then, focusing on the right secured by the Second Amendment, Abbott added that "The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe

---

[264]  District of Columbia v. Heller, 554 U.S. 570, 618 (2008).

[265]  COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW, *supra* note 10, at 271.

[266]  THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 350 (1868).

[267]  *Heller*, 554 U.S. at 618.

[268]  JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES 152–53 (1868).

[269]  BENJAMIN VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF LEADING TOPICS IN THE LAW OF THE LAND 333 (1880).

places the use of it, and in due time teaches his sons to do the same, exercises his individual right."[270] Later, Abbott reiterated that "[a]s to guns and pistols, then, the citizen who practises with them is in the exercise of a constitutional right,"[271] because "[o]ne has a general right to practise with firearms."[272]

### V. RESTRICTIONS ON SHOOTING DURING THE COLONIAL AND FOUNDING ERAS

No law prohibited firearms training in seventeenth- or eighteenth-century America, which is significant considering how common shooting was. The restrictions that existed were either wartime measures enacted to conserve gunpowder or limitations on shooting at particular times and places. None were intended to limit the act of training itself. Instead, some included training exceptions.

### A. Wartime Measures to Conserve Gunpowder

Virginia, in 1623, provided that "no commander of any plautation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainment."[273] This law was one of many ensuring that the colonists were always properly armed after an Indian massacre killed 347 of them in 1622.[274] For example, another law passed the same day required that "every dwelling house shall be pallizaded in for defence against the Indians."[275] The powder conservation law was restated in 1631[276] and 1632.[277]

---

[270]   *Id.*

[271]   *Id.* at 334.

[272]   *Id.* at 335.

[273]   1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 127 (William Waller Hening ed., 1823).

[274]      [O]n the 22d of *March*, 1622, a little before noon, at a Time when our men were all at Work abroad in their plantations, dispersd and unarm'd. This Hellish Contrivance was to take Ffect upon all the several Settlements at one and the same instant. . . . The very Morning of the Massacre, they came freely and unarm'd among them, eating with them, and behaving themselves with the same Freedom and Friendship as formerly, till the very Minute they were to put their Plot into Execution. Then they fell to Work all at once everywhere, knocking the *English* unawares on the Head, some with their Hatchets, which they call *Tommahawks*, others with the Hows and Axes of the *English* themselves, shooting at those who escap'd the Reach of their Hands; sparing neither Age nor Sex, but destroying Man, Woman, and Child, according to their cruel Way of leaving none behind to bear Resentment.

BEVERLEY, *supra* note 116, at 40–41.

[275]   1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, *supra* note 273, at 127.

[276]   *Id.* at 173.

[277]   *Id.* at 198.

During King Philip's War, in 1675 Plymouth Colony fined "whosoever shall shoot of any gun on any unnessesarie occation, or att any game whatsoever, except att an Indian or a woolfe . . . till further libertie shalbe given."[278] During King William's War fifteen years later, after French and Indian forces massacred sixty-two colonists in Schenectady, New York, neighboring Albany passed a powder-conservation law. Because "diverse persons dayly wast powder which is of such necessary use for defence of this City and County of Albany," anyone who "burne any powder unlesse to kill provision" was fined "upon of paine of paying for every shot, or discharging of Gun or Pistoll."[279]

*B. Time and Place Limitations*

In 1642, along with forbidding travel, Virginia forbade shooting on the Sabbath, "unles it shall be for the safety of his or their plantations or corne fields or for defence against the Indians."[280] Virginia passed another similar law in 1657.[281] Rhode Island followed in 1679, prohibiting the "[s]hooting out of any gun . . . more then Necessety Requireth" on the Sabbath.[282] Pennsylvania, in 1794, outlawed "any unlawful game, hunting, shooting, sport or diversion" on "the Lord's day, commonly called Sunday."[283]

Most time and place restrictions limited shooting in populated areas.[284] In 1713, Massachusetts made it illegal "to Discharge or Fire off any Gun upon Boston Neck, within Ten Rods of the Road or High-way leading over the same."[285] That same

---

[278] THE BLUE LAWS OF NEW HAVEN COLONY, USUALLY CALLED BLUE LAWS OF CONNECTICUT; QUAKER LAWS OF PLYMOUTH AND MASSACHUSETTS; BLUE LAWS OF NEW YORK, MARYLAND, VIRGINIA, AND SOUTH CAROLINA 50 (An Antiquarian ed., 1838).

[279] 2 THE DOCUMENTARY HISTORY OF THE STATE OF NEW YORK 124 (E. B. O'Callaghan ed., 1849).

[280] 1 LAWS OF VIRGINIA, 1642–1643, ACT XXXV.

[281] 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, *supra* note 273, at 434.

[282] LAWS AND ACTS OF HER MAJESTIES COLONY OF RHODE ISLAND, AND PROVIDENCE PLANTATIONS MADE FROM THE FIRST SETTLEMENT IN 1636 TO 1705, at 31 (1896).

[283] 3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE TWENTIETH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND TEN 178 (1810) ("if any person . . . on the Lord's Day, commonly called Sunday . . . shall use or practice any unlawful game, hunting, shooting, sport or diversion whatsoever . . . every such person, so offending, shall, for every such offense forfeit and pay four dollars. . . .").

[284] *See also* ABBOTT, *supra* note 269, at 333–34 (A person "exercises his individual right" when he "practises in safe places," but that is a "very different habit" than "firing at random with them [guns] upon city sidewalks").

[285] THE CHARTER GRANTED BY THEIR MAJESTIES KING WILLIAM AND QUEEN MARY, TO THE INHABITANTS OF THE PROVINCE OF THE MASSACHUSETTS BAY IN NEW-ENGLAND 227 (1726).

year, Philadelphia forbade "firing a gun without a license" in the city.[286] In 1721, Philadelphia again made it illegal to "fire any gun or other firearms . . . within the city of Philadelphia . . . without the governor's special license for the same."[287] It seems that these licenses were expected to be issued liberally, as an additional statute passed the same day forbade shooting birds in the streets of Philadelphia.[288] Such a law would have been unnecessary if virtually everyone was intended to be prohibited from shooting in the city. In 1731, the town of Newport, Rhode Island forbade shooting in "the Streets or Lanes of any Town . . . or in any Tavern of the same, after Dark, on any Night whatsoever."[289]

A 1746 Massachusetts law provided that "no person or persons, from and after the publication of this act, shall presume to discharge or fire off any cannon laden with shot, from any wharfe or vessel in that part of the harbour of [Boston] which is above the castle."[290] The following section provided that "no personal shall . . . discharge any gun or pistol, charged with shot or ball, in the town of Boston (the islands thereto being excepted), or in any part of the harbour between the castle and said town."[291] Reflecting the value placed on target practice, however, the law clarified that it

---

[286]   2 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 551 (Clarence M. Busch ed., 1896).

[287]   3 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 253 (Clarence M. Busch ed., 1896).

[288]   *Id.* at 256 ("[N]o person whatsoever shall presume to shoot at or kill with a firearm any pigeon, dove, partridge, or other fowl in the open streets of the city of Philadelphia, or in the gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses within the limits of the said city.").

In 1652, the Dutch colony of New Amsterdam prohibited bird hunting in city limits, but did not outlaw other types of shooting:

> Whereas, many guns are daily discharged and fired at Partridges and other game within the jurisdiction of this city *New Amsterdam* and in the vicinity of the Fort, by which firing People or Cattle might perhaps be struck and injured, against which practise complaints have already been made. Therefore the Honorable Director General and Council, in order to prevent accidents, expressly forbid and interdict all persons henceforward firing within the jurisdiction of this city or about the Fort, with any guns at Partridges or other Game that may be chance fly within the city.

LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674, at 138 (E. B. O'Callaghan ed., 1868).

[289]   The CHARTER, GRANTED BY HIS MAJESTY, KING CHARLES II, TO THE GOVERNOR AND COMPANY OF THE ENGLISH COLONY OF RHODE-ISLAND AND PROVIDENCE-PLANTATIONS, IN NEW ENGLAND, IN AMERICA 120 (1744).

[290]   3 THE ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF MASSACHUSETTS BAY 306 (1878).

[291]   *Id.*

> [S]hall not be so construed or understood as to prevent soldiers, in their common-training days, with the leave and by order of the commission officers of the company to which they belong, or other persons, at other times, with the leave of one or more of the field-officers of the regiment in Boston, from firing at a mark or target[t], for the exercise of their skill and judgment, provided it be done at the lower end of the common; nor from firing at a mark, from the several batteries in the town of Boston, with the leave of the captain-general, and nowhere else.[292]

In 1750, Pennsylvania broadened Philadelphia's fire prevention law requiring people to acquire a license to "fire any gun or other fire-arm" in the city by applying it to each "county town, or . . . other town or borough, in this province" that is "built and settled."[293] Another section of the law forbade gambling on shooting matches, and made clear that shooting matches—and thus firearms training in general—were unaffected by either the 1750 licensing law, or, therefore, the 1721 licensing law.[294] Specifically, the 1750 gambling law forbade "any person" to "promote or be concerned in any shooting match for any plate, prize, sum of money or other thing of value whatsoever."[295] The following section of the law forbade the distribution of "strong liquors" to anyone "attending" a shooting match.[296] Shooting matches were apparently common and popular events.

In 1785, New York limited shooting during New Year celebrations by forbidding "any person" to "fire or discharge any gun . . . within a quarter of a mile of any building," on "the eve of the last day of December, and the first and second days of January."[297]

In 1790, Ohio made it unlawful to fire a gun within "one-quarter of a mile from the nearest building."[298] Two years later, Elizabethtown, Maryland made it unlawful

---

[292]   *Id.* This law was revived three times within the following decade. *Id.* at 488, 574, 755.

[293]   5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 108–09 (James T. Mitchell & Henry Flanders eds., 1898).

[294]   *Id.* at 109.

[295]   *Id.*

[296]   *Id.* at 110.

[297]   2 LAWS OF THE STATE OF NEW YORK PASSED AT THE SESSIONS OF THE LEGISLATURE HELD IN THE YEARS 1785, 1786, 1787, AND 1788, INCLUSIVE 152 (1886). A Dutch colony in 1655, New Netherland (which later became part of New York), likewise targeted celebratory shooting, "expressly forbid[ding] from this time forth all firing of Guns, or planting of May poles within this Province of *New Netherland*, on New Years or May days" because "experience hath demonstrated and taught that, besides an unnecessary waste of powder, much Drunkenness and other insolence prevail on New Years and May days, by firing of Guns, planting May poles, and carousing." LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674, *supra* note 288, at 205.

[298]   1 THE STATUTES OF OHIO AND OF THE NORTHWESTERN TERRITORY, ADOPTED OR ENACTED FROM 1788 TO 1833, INCLUSIVE 106 (Salmon P. Chase ed., 1833).

to "fire any gun or pistol in the said town."[299] Notably, the Ohio law included ex-
ceptions for training as part of militia service: "nothing herein contained shall be
construed or extend to prevent the necessary military exercise, evolutions and firings
of, or the discharging of cannon or small arms, by any soldiers or troops. . . ."[300]

In sum, considering what a popular activity shooting was, few regulations through-
out the colonial and founding eras restricted when or where it could occur. The
earlier regulations were wartime measures designed to conserve gunpowder when
powder was scarce and difficult to produce in the colonies. Most regulations were
time and place restrictions, for example Virginia, Pennsylvania, and Rhode Island
forbade shooting on the Sabbath,[301] and New York targeted celebratory shooting.[302]
Shooting was limited in certain populated areas of Pennsylvania, Massachusetts, and
Ohio, as well as in a single town in both Rhode Island and Maryland.[303] No regula-
tion intended to restrict the activity of target shooting itself, and even the relatively
restrictive laws had training exceptions or allowed for shooting with a license. No
pre-1800 law regulated controlled target practice.

## VI. MODERN COURT DECISIONS ON THE RIGHT TO TRAIN

### A. The Supreme Court

#### 1. District of Columbia v. Heller

In *District of Columbia v. Heller*, the Supreme Court provided its "first in-depth
examination of the Second Amendment."[304] *Heller* involved a challenge to a prohi-
bition on handguns, a prohibition on assembled and functional firearms inside the
home, and a prohibition on carrying firearms (even in the home) without a license.[305]

---

[299]  2 THE LAWS OF MARYLAND TO WHICH ARE PREFIXED THE ORIGINAL CHARTER WITH
AN ENGLISH TRANSLATION, THE BILL OF RIGHTS AND CONSTITUTION OF THE STATE ch. LII
(William Kilty ed., 1800). The book is divided by year; the reference here is to chapter 52
of the year 1792.

[300]  *See* 1 THE STATUTES OF OHIO AND OF THE NORTHWESTERN TERRITORY ADOPTED OR
ENACTED FROM 1788 TO 1833, INCLUSIVE, *supra* note 298, at 106.

[301]  *See supra* Section V.B, noting the prohibition of shooting on the Sabbath in these three
states.

[302]  *See* 1 THE STATUTES OF OHIO AND OF THE NORTHWESTERN TERRITORY, ADOPTED OR
ENACTED FROM 1788 TO 1833, INCLUSIVE, *supra* note 298 and accompanying text, noting the
prohibition on celebratory shooting around New Year's Day in New York, as well as similar
prohibitions in the preceding New Netherland colony.

[303]  *See supra* Section V.B, noting that Pennsylvania law forbade shooting within the City
of Philadelphia, Massachusetts law forbade shooting in mainland Boston, Ohio law forbade
shooting near a building, Rhode Island law forbade shooting in the City of Newport, and
Maryland law forbade shooting in the Town of Elizabethtown.

[304]  554 U.S. 570, 635 (2008).

[305]  *Id.* at 574–75.

The *Heller* Court analyzed the Second Amendment's text, using history and tradition to inform its original meaning, and held that the Second Amendment protects "the individual right to possess and carry weapons in case of confrontation."[306] All three prohibitions, therefore, were held to violate the Second Amendment.[307]

The Court noted that "[t]he Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically," the Court explained, "but rather announces a purpose."[308] The "prefatory clause," therefore, "does not limit or expand the scope of the operative clause," but it can "resolve an ambiguity in the operative clause" because "[l]ogic demands that there be a link between the stated purpose and the command."[309]

After analyzing each word and phrase of the operative clause, the Court concluded that "they guarantee the individual right to possess and carry weapons in case of confrontation."[310] Returning to the prefatory clause, to ensure that it fits with the Court's interpretation of the operative clause, the Court found that "[i]t fits perfectly, once one knows the history that the founding generation knew."[311] Specifically, "the way tyrants had eliminated a militia consisting of all the able-bodied men . . . not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents."[312]

A populace allowed to possess and carry arms but forbidden to practice with them would be nearly as useless against a tyrannical government as an unarmed populace.[313] As explained in Section II.B, this was a grave concern among the founding generation. Indeed, *Heller* found "many reasons why the militia was thought to be 'necessary to the security of a free State'": for "repelling invasions and suppressing insurrections," to "render[] large standing armies unnecessary," and because "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny."[314] None of these purposes can be served by an untrained populace. It is thus no surprise that *Heller* found the adjective "well-regulated" in the Second Amendment's text as "impl[ying] nothing more than the imposition of proper discipline and training."[315] An armed *and trained* body of the people, not just an armed body, is necessary. If ensuring a well-trained populace was

---

[306] *Id.* at 592.

[307] *Id.* at 635.

[308] *Id.* at 577.

[309] *Id.* at 577–78.

[310] *Id.* at 592.

[311] *Id.* at 598.

[312] *Id.* The Court added that "This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights." *Id.*

[313] *Id.* at 599 ("[T]he threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution.").

[314] *Id.* at 597–98.

[315] *Id.* at 597. The Court cited Rawle and Virginia's declaration of rights, discussed *supra* notes 213, 221.

the "purpose for which the right was codified," as *Heller* says, then training must be protected by the right.[316]

The Court's conclusion that self-defense and hunting are protected rights further supports the right to train.[317] Neither self-defense nor hunting can reliably be accomplished without adequate training. An incompetent shooter makes for an unethical hunter and an even worse defender of life.[318]

Notably, *Heller* relied on Story, Tucker, Sharp, Jefferson, Abbott, Rawle, Cooley, Sumner, Pomeroy, and the Virginia Declaration of Rights.[319] All of these sources, as discussed above, support the right to train with arms.

### 2. *Luis v. United States*

In *Luis v. United States*, a government freeze on a defendant's untainted assets prevented him from hiring counsel and was therefore held to violate the Sixth Amendment. In a concurring opinion, Justice Thomas explained that "[c]onstitutional rights . . . implicitly protect those closely related acts necessary to their exercise."[320] He provided several examples, including that the right to keep and bear arms implicitly protects the right to train with them because it would otherwise be ineffective: "The right to keep and bear arms, for example, 'implies a corresponding right to obtain the bullets necessary to use them,' and 'to acquire and maintain proficiency in their use,'. . . .Without protection for these closely related rights, the Second Amendment would be toothless."[321]

### 3. *New York State Rifle & Pistol Association v. City of New York*

The plaintiffs in *New York State Rifle & Pistol Association v. City of New York* sued New York City and the New York Police Department–License Division

---

[316] *Id.* at 599.

[317] *Id.* ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting.").

[318] The holding regarding what arms the Second Amendment protects may also be informative. The Court held that "the sorts of weapons protected [a]re those 'in common use at the time.'" *Id.* at 627 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)). Applied to training, this may suggest that the right to train includes practice with common arms and at their effective range.

[319] *Id.* at 593–97, 602, 606–10, 616–19, 626, 641, and 659.

[320] Luis v. United States, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) (first quoting Jackson v. City of San Francisco, 746 F.3d 953 (9th Cir. 2014); then quoting Ezell v. City of Chicago, 651 F.3d 684,704 (7th Cir. 2011)).

[321] *Id.* at 1097 (Thomas, J., concurring) (first quoting Jackson v. City of San Francisco, 746 F.3d 953 (9th Cir. 2014); then quoting Ezell v. City of Chicago, 651 F.3d 684,704 (7th Cir. 2011)).

because their licensing scheme forbade the plaintiffs from transporting handguns to shooting ranges, target competitions, and other target practice outside of New York City.[322] Holders of a "premises license," such as the plaintiffs, could only take their handguns "directly to and from an authorized small arms range/shooting club" located in New York City.[323] When the case was filed, only seven authorized ranges existed in the entire city of over eight million people—or less than one range per million residents.[324]

The Second Circuit applied a two-part test in which it first asks whether the challenged law burdens conduct protected by the Second Amendment as historically understood, and if so, then applies some level of tiered scrutiny—the level of scrutiny depending on the severity of the burden. But in this case, the Court skipped the historical question entirely, announcing that "[w]e need not decide whether" a restriction on training burdens the right, because even if it does, "the Rule passes constitutional muster under intermediate scrutiny."[325]

Having declined to consider the historical understanding of the right, it is unsurprising that the Second Circuit rejected the plaintiffs' arguments that "firearms practice is itself a core Second Amendment right, and that even minimal regulation of firearms training must survive heightened scrutiny."[326] Rather, the Court found heightened scrutiny appropriate only when "regulations amounting to a ban (either explicit or functional) on obtaining firearms training and practice substantially burden the core right to keep and use firearms in self-defense in the home."[327]

As for New York City's restriction, the Court determined that it "does not approach the core area of protection," and could not say for sure that it substantially burdened any Second Amendment rights.[328] Instead, the court applied intermediate scrutiny under a mere assumption that rights were burdened.[329]

The Second Circuit upheld the training restriction under intermediate scrutiny based solely on an affidavit by Andrew Lunetta, the former Commander of the License Division. Lunetta claimed that "taking a licensed handgun to . . . a shooting competition outside the City . . . constitutes a potential threat to public safety" because lawful gun owners "'are just as susceptible as anyone else to stressful

---

[322]   N.Y. State Rifle & Pistol Ass'n v. City of New York, 883 F.3d 45, 52, 54 (2d Cir. 2018). Additionally, one plaintiff sought to transport his handgun from New York City to his second home in upstate New York. *Id.*

[323]   *Id.* at 53.

[324]   *Id.*

[325]   *Id.* at 55 (brackets and quotations omitted).

[326]   *Id.* at 58.

[327]   *Id.* The court reiterated that heightened scrutiny was appropriate for such training bans, not "because live-fire target shooting is *itself* a core Second Amendment right," but because "[p]ossession of firearms without adequate training and skill does nothing to protect, and much to endanger, the gun owner, his or her family, and the general public." *Id.*

[328]   *Id.* at 62.

[329]   *Id.* at 61–62.

situations,' including driving situations that can lead to road rage, 'crowd situations, demonstrations, family disputes,' and other situations 'where it would be better to not have the presence of a firearm.'"[330]

After the Second Circuit upheld the training restriction, the Supreme Court granted certiorari. But then, to avoid the Court's review by mooting the case, the City amended its licensing law to allow the taking of firearms to shooting ranges outside the city.[331]

The City's scheme worked; a majority of the Court ruled the case moot due to the change in the law. Justices Alito, Thomas, and Gorsuch dissented. After disputing the majority's mootness ruling, the dissent addressed the constitutionality of the pre-amendment training restriction. Because "tak[ing] a gun to a range in order to gain and maintain the skill necessary to use it responsibly" is "a necessary concomitant" of self-defense, the dissent explained, "a reasonable opportunity to practice is part of the very right recognized in *Heller*."[332] The fact that the plaintiffs could have trained at out-of-city ranges with someone else's gun was not enough to satisfy that right:

> It is true that a lawful gun owner can sometimes practice at a range using a gun that is owned by and rented at the range. But the same model gun that the person owns may not be available at a range, and in any event each individual gun may have its own characteristics. Once it is recognized that the right at issue is a concomitant of the same right recognized in *Heller*, it became incumbent on the City to justify the restrictions its rule imposes, but the City has not done so. It points to no evidence of laws in force around the time of the adoption of the Second Amendment that prevented gun owners from practicing outside city limits. The City argues that municipalities restricted the places within their jurisdiction where a gun could be fired, and it observes that the Second Amendment surely does not mean that a New York City resident with a premises license can practice in Central Park or Times Square. That is certainly true, but that is not the question. Petitioners do not claim the right to fire weapons in public places *within the City*. Instead, they claim they have a right to practice at ranges and competitions *outside*

---

[330] *Id.* at 63.

[331] N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct. 1525, 1527–28 (2020) (Alito, J., dissenting) ("[O]nce we granted certiorari, both the City and the State of New York sprang into action to prevent us from deciding this case. . . . the City quickly changed its ordinance. And for good measure the State enacted a law making the old New York City ordinance illegal."). The law was also amended to allow licensees to transport firearms to second homes outside of the city. *Id.* at 1526.

[332] *Id.* at 1541–42.

> the City, and neither the City, the courts below, nor any of the
> many *amici* supporting the City have shown that municipalities
> during the founding era prevented gun owners from taking their
> guns outside city limits for practice.[333]

Because "[h]istory provides no support for a restriction of this type," the dissenting Justices would have held the law violative of the Second Amendment.[334]

## B. Federal Circuit Courts

### 1. *Ezell v. City of Chicago* (*Ezell I*)

*Ezell v. City of Chicago* (*Ezell I*) was a challenge to a Chicago ordinance that both required an hour of range training to own a firearm and prohibited any firing ranges within the city.[335] The Seventh Circuit applied the same two-part test applied by the Second Circuit in *New York State Rifle & Pistol Association*.[336] First, the Seventh Circuit determined that range training is a protected activity because "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."[337] Indeed, "the core right [of self-defense] wouldn't mean much without the training and practice that make it effective."[338] In step two, the Court determined that "not quite 'strict scrutiny'" was the appropriate standard because the ordinance was "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense."[339]

Chicago did "not come close to satisfying this standard,"[340] because it relied entirely on "speculation" and failed to present any data or expert opinion.[341] Even if it had, the ordinance would have failed because the risk posed by shooting ranges "can be addressed through sensible zoning and other appropriately tailored regulations" that are substantially less burdensome than a complete prohibition.[342] For example, "straightforward range-design measures that can effectively guard against

---

[333] *Id.* at 1541.

[334] *Id.* at 1544.

[335] 651 F.3d 684, 689–90 (7th Cir. 2011). The ordinance banned "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged." *Id.* at 691 (quoting CHI. MUN. CODE § 8-20-280).

[336] 883 F.3d 45, 45 (2d Cir. 2018).

[337] *Ezell I*, 651 F.3d at 704.

[338] *Id.*

[339] *Id.* at 708.

[340] *Id.* at 709.

[341] *Id.* at 690, 709.

[342] *Id.* at 709.

accidental injury," designated "locations for the loading and unloading of firearms," as well as "limiting the concentration of people and firearms in a range's facilities, the times when firearms can be loaded, and the types of ammunition allowed."[343] And, of course, the irony was not lost on the Court that Chicago considered range training so critical that the city made it a prerequisite to firearm ownership, yet at the same time argued that it had no place within city limits.[344]

## 2. *Ezell v. City of Chicago* (*Ezell II*)

In response to *Ezell I*, Chicago enacted a new ordinance, which was challenged in *Ezell II*. Specifically, the plaintiffs challenged three provisions:

> (1) a zoning restriction allowing gun ranges only as special uses in manufacturing districts; (2) a zoning restriction prohibiting gun ranges within 100 feet of another range or within 500 feet of a residential district, school, place of worship, and multiple other uses; and (3) a provision barring anyone under age 18 from entering a shooting range.[345]

Under the first two provisions, only 2.2% of the city's acreage was even available for locating a shooting range.

Applying the same test it applied in *Ezell I*, the Court reiterated its findings from *Ezell I*:

> [W]e rejected the City's argument that range training is categorically unprotected by the Second Amendment. We held that the core individual right of armed defense—as recognized in *Heller* and incorporated against the states in *McDonald*—includes a corresponding right to acquire and maintain proficiency in firearm use through target practice at a range. We explained that the core right to possess firearms for protection "wouldn't mean much without the training and practice that make it effective." We noted that *Heller* itself supports this understanding. Finally, we held that the City had failed to establish that target practice is wholly unprotected as a matter of history and legal tradition in the founding era or when the Fourteenth Amendment was ratified.[346]

---

[343] *Id.*
[344] *Id.* at 704–05.
[345] *Ezell II*, 846 F.3d 888, 890 (7th Cir. 2017).
[346] *Id.* at 892.

The Court reemphasized that "[r]ange training. . . . lies close to the core of the individual right of armed defense,"[347] and proceeded to apply heightened scrutiny. The range restriction failed scrutiny because the government again failed to provide meaningful evidence and instead relied on speculation.[348]

Regarding the training ban on persons under eighteen, Chicago argued that such persons have no training rights.[349] The Seventh Circuit found otherwise: "There's zero historical evidence that firearm training for this age group is categorically unprotected. At least the City hasn't identified any, and we've found none ourselves."[350] Additionally, the Court found nothing from *Heller* that would justify the ban: "To the contrary, *Heller* itself points in precisely the opposite direction."[351]

Since minors had a right to train at shooting ranges, the Seventh Circuit applied heightened scrutiny to the law prohibiting them from doing so.[352] But the government was "left to rely on generalized assertions about the developmental immaturity of children, the risk of lead poisoning by inhalation or ingestion, and a handful of tort cases involving the negligent supervision of children who were left to their own devices with loaded firearms."[353] Because the government failed to address these concerns with "a more closely tailored age restriction—one that does not completely extinguish the right of older adolescents and teens in Chicago to learn how to shoot in an appropriately supervised setting at a firing range," the law violated the Second Amendment.[354]

### 3. *Drummond v. Robinson Township*

Drummond brought suit after Robinson Township forbade center-fire rifle practice at sportsman's clubs and forbade for-profit entities from operating ranges.[355] Drummond "did not assert that the rim-fire and non-profit rules injure him in his capacity as the operator of a gun range. Instead, he claimed that the rules restrict his

---

[347] *Id.* at 893.

[348] *Id.* at 896.

[349] *Id.*

[350] *Id.*

[351] *Id.* (citing 554 U.S. at 617–18, 128 S. Ct. 2783 ("[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them . . . ; it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." (quoting THOMAS MCINTYRE COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 271 (1868))); *see also id.* at 619, 128 S. Ct. 2783 ("No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right." (quoting BENJAMIN VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880))).

[352] *Ezell II*, 846 F.3d at 897.

[353] *Id.* at 898.

[354] *Id.*

[355] Drummond v. Robinson Twp., 9 F.4th 217, 224 (3d Cir. 2021).

customers' efforts to acquire firearms and maintain proficiency in their use," and thus violate their Second Amendment rights.[356]

The Third Circuit applied the familiar two-part test, first asking whether the burdened activity is protected by the Second Amendment and, if so, then applying heightened scrutiny.

At the first step, the Court phrased the questions as follows:

> For the rim-fire rifle rule, the question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted. For the non-profit ownership rule, similarly, the question is if our ancestors accepted prohibitions on the commercial operation of gun ranges in areas where they were otherwise allowed.[357]

The Court's review found that "neither type of regulation rests on deep historical foundations."[358]

> Start with the rim-fire rifle rule. In exploring the history of what weapons citizens may carry for self-defense, *Heller* excluded "dangerous and unusual weapons" from the Second Amendment's scope but included "arms in common use" within its protection. This "implies a corresponding right to acquire and maintain proficiency" with common weapons. A right to bear those weapons, after all, "wouldn't mean much without the training and practice that make [them] effective."[359]

Finding a lack of historical precedent for Robinson Township's rules, the Court proceeded to apply heightened scrutiny. There, it explained that "[m]ost purchase and practice restrictions merit intermediate rather than strict scrutiny," with the exception being when "limits on buying and training with weapons in public pose a 'functional[] bar' to defense in private."[360] For example, "[i]f a zoning ordinance has the effect of depriving would-be gun owners of the guns and skills commonly used for lawful purposes like self-defense in their homes, strict scrutiny may be warranted."[361] But here, by contrast, "the Township's ordinance preserves avenues for citizens to acquire weapons and maintain proficiency in their use."[362] For

---

[356] *Id.*
[357] *Id.* at 227.
[358] *Id.*
[359] *Id.*
[360] *Id.* at 229.
[361] *Id.* at 229–30.
[362] *Id.* at 230.

instance, it permits non-profit shooting ranges, allows "citizens to train with other forms of ammunition," and allows commercial ranges and center-fire rifle training in two other districts of the township.[363] So intermediate scrutiny was applied.

The government claimed that its center-fire rifle ban advances "public health, safety, and welfare,"[364] but failed to present anything more than a theory to support its claim. Moreover, the government failed to show that "it 'seriously considered' more targeted tools for achieving its ends."[365] "To take two obvious examples, the Township already instructs Sportsman's Clubs to implement noise-reduction techniques and range-safety best practices," and "it cannot forego an entire 'range of alternatives' without developing 'a meaningful record . . . that those options would fail to alleviate the problems meant to be addressed.'"[366] Therefore, the ban failed intermediate scrutiny.

The non-profit rule also failed intermediate scrutiny. The government again failed to present evidence tying the law to its stated interest: "moderat[ing] the intensity of use at Sportsman's Clubs."[367] And the government again failed to consider less burdensome alternatives to the law: "It is not apparent, for instance, why the Township could not achieve its goals by implementing occupancy limits or hours-of-operation restrictions, for nowhere has it demonstrated . . . that it 'reasonably rejected' common regulatory tools in favor of the unusual prohibition on for-profit firing ranges."[368]

CONCLUSION

When America's Founders created the American government, they drew on the lessons and experiences of their English ancestors, the American colonists, and the Revolutionary War. English history taught them that an armed and trained populace was an effective way to maintain domestic order and prevent foreign invasions. The colonial experience taught them the importance of marksmanship for food and survival, including self-defense and community defense. And the Revolutionary War confirmed that an armed and trained populace was the best defense against a tyrannical government. The Founders' statements throughout the ratification of the Constitution and Bill of Rights show that they considered a trained populace indispensable to the free government they were establishing. The Second Amendment states it explicitly: "A well regulated Militia," that is, the body of the people armed and trained, is "necessary to the security of a free State," so "the right of the people

---

[363] *Id.*

[364] *Id.* at 233.

[365] *Id.* at 232 (quoting Bruni v. City of Pittsburgh, 824 F.3d 353, 371 (3d Cir. 2016)).

[366] *Drummond*, 9 F.4th at 232 (quoting *Bruni*, 824 F.3d at 370–71).

[367] *Id.*

[368] *Id.* at 233 (quoting *Bruni*, 824 F.3d at 371).

to keep and bear Arms, shall not be infringed."[369] An express purpose of the Amendment was to safeguard the relationship between a trained society and a free state.

Training was a favorite activity of the Founding generation because it was the best way to improve as marksmen, which is central to every aspect of the right to keep and bear arms. Training develops the skills necessary for effective self-defense and community defense, improves the militia, and deters tyranny. It is thus a pillar of the right, and future courts should treat it as such.

---

[369]  U.S. CONST. amend. II.