1  ROB BONTA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  JERRY T. YEN
   Deputy Attorney General
4  State Bar No. 247988
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone: (916) 210-7836
    Fax: (916) 324-8835
7   E-mail: Jerry.Yen@doj.ca.gov
   *Attorneys for Rob Bonta, in his official*
8  *capacity as California Attorney General, and*
   *Allison Mendoza, in her official capacity as*
9  *Director of the Department of Justice Bureau*
   *of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,** | Case No. 3:20-cv-02470-WQH-MMP |
| Plaintiffs, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| **ROB BONTA, in his official capacity as Attorney General of California; and ALLISON MENDOZA, in her official capacity as Director of the Department of Justice Bureau of Firearms,** | Date: To be set by the Court<br>Judge: Hon. William Q. Hayes<br>Courtroom: 14B<br>Action Filed: Dec. 18, 2020 |
| Defendants. | |

**TABLE OF CONTENTS**

Page

Introduction ............................................................................................................... 1

Argument .................................................................................................................. 1

    I.    California's OGM Law Does Not Implicate The "Plain Text" Of The Second Amendment ........................................................................... 1

    II.   California's OGM Law Is A Presumptively Lawful Regulation .......... 3

    III.  Plaintiffs Incorrectly Interpret And Conduct The *Bruen* Analysis ....... 5

        A.    There Is No Basis For Plaintiffs' Proposed Restrictions On Historical Evidence ............................................................... 5

        B.    California's OGM Law Is Consistent With The Nation's History Of Firearm Regulation ..................................................... 7

Conclusion ............................................................................................................. 11

# TABLE OF AUTHORITIES

**Page**

**CASES**

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ............................................................................................*passim*

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011) .......................................................................................3, 7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
    142 S. Ct. 2111 (2022) ........................................................................................*passim*

*Nordyke v. King*
    681 F.3d 1041 (9th Cir. 2012) .........................................................................................4

*Pena v. Lindley*
    898 F.3d 969 (9th Cir. 2018) .......................................................................................3, 4

*Teixeira v. Cnty. of Alameda*
    873 F.3d 670 (9th Cir. 2017) ...........................................................................................4

**STATUTES**

California Penal Code
    § 27535 ............................................................................................................................1
    § 27540(g) ........................................................................................................................1

**OTHER AUTHORITIES**

James Lindgren & Justin L. Heather, *Counting Guns in Early America*,
    43 Wm. & Mary L. Rev. 1777, 1780 (2002) ..................................................................8

Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth-
    and Eighteenth-Century England and America in* The Second
    Amendment on Trial: Critical Essays on *District of Columbia v.
    Heller* (Saul Cornell & Nathan Kozuskanich, eds., University of
    Massachusetts Press, 2013) .............................................................................................8

Paul G. E. Clements, *The Consumer Culture of the Middle Atlantic,
    1760-1820*, 52 Wm. & Mary Quarterly 591 (2005) ..........................................................8

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 Wm. & Mary Quarterly 223 (2002) ............................................. 8, 9

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 502 (2004) ................................................................................................................ 10

William G. Merkel, Forum: Comment, *Mandatory Gun Ownership, the Militia Census of 1806, and Background Assumptions concerning the Early American Right to Arms: A Cautious Response to Robert Churchill*, 25 Law & Hist. Rev. 187, 189-90 (2007) ........................................................................................................................ 9

# INTRODUCTION

California's limit on the purchase of handguns and semiautomatic centerfire rifles from licensed firearms dealers to one every thirty days (also known as the One-Gun-per-Month or OGM law[1]) does not prevent the Individual Plaintiffs[2] from keeping or bearing arms. Plaintiffs have not presented any material facts to the contrary. Accordingly, the Individual Plaintiffs' desire to purchase more than one handgun or semiautomatic centerfire rifle within a thirty-day period is not covered by the "plain text" of the Second Amendment.

Further, under the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), California's OGM law regulates the commercial sale of firearms and is thus a "presumptively lawful regulatory measure." *Id.* at 626. Plaintiffs fail to rebut that presumption. But to the extent the Court concludes that the Second Amendment does not cover California's OGM law and that it is not a presumptively lawful condition on the sale of firearms, Defendants' summary judgment motion (Dkt. No. 59) demonstrates that the law is consistent with the Nation's historical tradition of firearm regulation.

Accordingly, the Court should deny Plaintiffs' Renewed Motion for Summary Judgment (Dkt. No. 60) and grant Defendant's motion for summary judgment.

# ARGUMENT

## I. CALIFORNIA'S OGM LAW DOES NOT IMPLICATE THE "PLAIN TEXT" OF THE SECOND AMENDMENT

The "proposed course of conduct" at issue in this case—purchasing more than one handgun or one semiautomatic centerfire rifle from a licensed firearms dealer

---

[1] California's OGM law primarily refers to California Penal Code sections 27535 and 27540(g).

[2] Individual Plaintiffs are Michelle Nguyen, Dominic Boguski, Jay Medina, and Frank Colletti.

within a thirty-day period—is not covered by the "plain text" of the Second Amendment.[3] As explained in Defendants' summary judgment motion, limiting the purchase of handguns and semiautomatic centerfire rifles to one every thirty days does not interfere with the Individual Plaintiffs' ability to "keep" or "bear" arms for self-defense. Defs.' Mem. of P. & A. (Defs.' MSJ), Dkt. No. 59, at 7-9. And the Individuals Plaintiffs admit that the OGM law allows them to own and obtain firearms for self-defense. *See* Defs.' Statement of Undisputed Facts (DSUF), Dkt. No. 59-1, Nos. 17 and 18; DX-12[4], DX-13, DX-14, and DX-15 (Individual Plaintiffs' Responses to Requests for Admission). The OGM law only limits purchases of certain firearms from licensed firearms dealers and does not impact other types of transactions (e.g., private-party sales). It also does not place any limit on the number of firearms that the Individual Plaintiffs can "keep" or their ability to "bear" arms. Plaintiffs do not present any arguments or material facts to the contrary.

Instead, Plaintiffs simply jump to the conclusion that the text of the Second Amendment protects a right to purchase firearms without any limitation on frequency or quantity. Pls.' MSJ at 4. They offer no support for such a conclusion

---

[3] Plaintiffs claim that Defendants admitted that the OGM law implicates the Second Amendment in the last round of summary judgment briefing. Pls.' Mem. of P. & A. in Supp. of Renewed Mot. for Summ. J. (Pls.' MSJ), Dkt. No. 60-1, at 4. However, any such admission was made solely for purposes of that pre-*Bruen* round of summary judgment briefing and in the context of the means-end scrutiny no longer applicable to Second Amendment claims. *See* Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (pre-*Bruen*), Dkt. No. 33-1, at 3-4; Defs.' Summ. J. Mot. (pre-*Bruen*), Dkt. No. 29, at 11 (stating that "[f]or purposes of this motion only, the Attorney General assumes . . . that California's OGM law implicates the Second Amendment").

[4] "DX" followed by the exhibit number are citations to Defendants' exhibits accompanying the Declaration of Jerry T. Yen in support of Defendants' Motion for Summary Judgment (Dkt. No. 59) or the Declaration of Jerry T. Yen in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

or any discussion of how California's OGM law prevents the Individual Plaintiffs from keeping or bearing arms for self-defense. Thus, Plaintiffs fail to meet their threshold burden under *Bruen* and the analysis ends. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129-30 (2022) (courts must first determine that "the Second Amendment's plain text covers an individual's conduct."). There is no Second Amendment violation.

## II. CALIFORNIA'S OGM LAW IS A PRESUMPTIVELY LAWFUL REGULATION

There is also no dispute that, under *Heller*, laws imposing a condition or qualification on the commercial sale of firearms are presumptively lawful. 554 U.S. at 626-27, 627 n.26. And the Supreme Court's decision in *Bruen* emphasized that *Heller* remains good law. *See Bruen*, 142 S. Ct. at 2122 (noting that its holding is "consistent with *Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010)]"); *id.* at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* . . . ."); *id.* at 2162 (Kavanaugh, J., concurring) (emphasizing that the *Bruen* decision does not disturb *Heller*'s discussion of "presumptively lawful" prohibitions).

The presumption of lawfulness can be overcome where the law is unreasonable or amounts to an effective ban on gun purchases by law-abiding citizens. *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 1007-08, 1009 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) (providing examples of unreasonable conditions on the commercial sale of firearms, such as a restriction that firearms sales may only take place between 11 p.m. and midnight on Tuesdays or placing a $1,000,000 tax on purchase of firearms). That is not the case here. The OGM law does not effectively ban gun purchases or limit the total number of arms that a person may keep. The law simply limits the number of handguns and semiautomatic centerfire rifles that can be purchased from a licensed firearms dealer within a thirty-day period. Accordingly, California's OGM law is a "presumptively lawful regulatory measure." *Heller*, 554 U.S. at 626.

Plaintiffs argue that a regulation on the commercial sale of firearms still requires a full historical review under Ninth Circuit precedent. Pls.' MSJ at 7-8. That is an overstatement. The Ninth Circuit has relied on the presumption to uphold commercial sale regulations. *See Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc). Admittedly, some courts have avoided defining the contours of the commercial sales category and proceeded to analyze the challenged laws under the appropriate level of scrutiny. *See Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018); *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 683 (9th Cir. 2017) (en banc) (stating that "*Heller*'s assurance that laws imposing conditions and qualifications on the commercial sale of firearms are presumptively lawful makes us skeptical of Teixeira's claim that retail establishments can assert an independent, freestanding right to sell firearms under the Second Amendment," and then proceeding to conduct a textual and historical review). However, the plaintiffs in those cases argued that the challenged laws targeted certain firearms or locations. *See Pena*, 898 F.3d at 974 n.4 (arguing the challenged law prevented plaintiffs from obtaining certain firearms in common use); *Teixeira*, 873 F.3d at 681 (claiming the challenged law made it virtually impossible to open a new gun store in unincorporated Alameda County). In this case, there is no evidence or even allegations that the OGM law imposes similar restrictions. To the contrary, Plaintiffs admit that the OGM law does not impact the Individual Plaintiffs' ability to own and obtain firearms for self-defense. *See* DSUF Nos. 17 and 18; DX-12, DX-13, DX-14, and DX-15 (Individual Plaintiffs' Responses to Requests for Admission). Thus, *Heller*'s assurance that "conditions and qualifications on the commercial sale of arms" are "presumptively lawful" is applicable here. 554 U.S. at 626-27, 627 n.26. And Plaintiffs fail to rebut that presumption.

### III. PLAINTIFFS INCORRECTLY INTERPRET AND CONDUCT THE *BRUEN* ANALYSIS

If the Court concludes that California's OGM law burdens conduct covered by the plain text of the Second Amendment and that it is not a presumptively lawful regulation on the commercial sale of firearms, only then must it address the historical analysis discussed in *Bruen*. In this case, that analysis would involve a "more nuanced approach" in determining whether the OGM law is "relevantly similar" to a "well-established and representative historical analogue." *Bruen*, 142 S. Ct. at 2131-33. And Defendants' summary judgment motion has provided ample evidence that the OGM law is analogous to numerous historical regulations and consistent with the Nation's historical tradition of firearm regulation. Defs.' MSJ at 15-23.

#### A. There Is No Basis For Plaintiffs' Proposed Restrictions On Historical Evidence

The Supreme Court provided some guidance for the historical analogue analysis. For example, it identified "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense" for determining if a modern regulation is "relevantly similar" to a historical law. *Bruen*, 142 S. Ct. at 2133. However, Plaintiffs appear to restrict what type of evidence may be used in the historical analysis and how that evidence should be analyzed. Pls.' MSJ at 12-14. There is no basis for this. Plaintiffs simply cherry-pick statements from *Bruen* to reach their "guiding principles" on how to view historical evidence.

For example, Plaintiffs claim that "conflicts in the evidence . . . should be resolved in favor of [a] protective interpretation." Pls.' MSJ at 13. Plaintiffs do not explain what is meant by "protective interpretation." Their phrasing suggests a position that the required historical analysis involves some sort of default resolution in favor of one side or the other in the event of conflicting evidence. Yet Plaintiffs cite no authority supporting that position. Moreover, *Bruen* does not speak in terms

5

of "protective interpretation." It explains that depending on the nature of the challenged regulation, the analysis may require "nuanced judgments about which evidence to consult and how to interpret it." *Bruen*, 142 S. Ct. at 2130 (quoting *McDonald*, 561 U.S. at 803-04 (Scalia, J., concurring)).

Plaintiffs also appear to claim that the government cannot justify a regulation with historical regulations that were not enacted by a majority of jurisdictions at the time or never subjected to judicial scrutiny. Pls.' MSJ at 13-14. The statements from *Bruen* cited by Plaintiffs in connection with that claim do not support such restrictions on the use of historical evidence. The Supreme Court made those statements as part of its analysis of the entire historical record in a particular case, and ultimately discounted some historical evidence that was contradicted by the "overwhelming weight of other evidence." *Bruen*, 142 S. Ct. at 2153 (citing *Heller*, 554 U.S. at 632). In addition, the Supreme Court's statements regarding the lack of judicial scrutiny focused on "temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption." *Id*. at 2155. The Supreme Court never suggested that historical regulations must have been subjected to a court challenge for them to qualify as valid evidence.

Ultimately, when conducting the historical analysis, it is a judgment about whether the evidence demonstrates that a regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. In *Bruen* and *Heller*, the historical analogies were "relatively simple," but cases "implicating unprecedented societal concerns . . . may require a more nuanced approach." *Id*. at 2132. And in such a case, the government can support a challenged regulation if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors, and the modern and historical laws are "comparably justified." *Id.*

### B. California's OGM Law Is Consistent With The Nation's History Of Firearm Regulation

During the founding era,[5] multiple firearms were not purchased in a single transaction nor were firearms commonly owned. However, Plaintiffs take the opposite position and claim that multiple firearms were frequently offered for sale and purchased in a single transaction. Pls.' MSJ at 15-16. Plaintiffs rely on an article quoting advertisements from dealers seeking to acquire and sell pistols. *Id.* (citing Pls.' Exh. 5, Dkt. No. 60-9, Stephen Halbrook, *The Right to Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont, and Massachusetts* (*Right to Bear Arms*), 10 Vt. L. Rev. 255, 266, 304 (1985)). Their reliance is misplaced. Those advertisements do not indicate that private individuals wanted to or actually purchased multiple firearms in a single transaction. In fact, most people during the founding and Reconstruction eras could not even afford to purchase more than one gun at a time. DX-10 (McCutchen Expert Report) ¶ 15; DX-11 (Rivas Expert Report) ¶¶ 8, 25, 29.

Plaintiffs also appear to argue that the OGM law is inconsistent with the tradition of firearms ownership based on the erroneous claim that it was common to own multiple firearms during the founding era. Pls.' MSJ at 16-18. Plaintiff make this erroneous claim by relying on a single law review article and regulations requiring militia members to possess firearms. *Id.* With respect to the law review

---

[5] Plaintiffs' arguments appear to focus on the founding era. However, Reconstruction-era regulations also bear particular importance because, as noted in *Bruen*, the Second Amendment was made applicable to the states not in 1791, but in 1868, with the ratification of the Fourteenth Amendment. 142 S. Ct. at 2138; *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.").

article, the conclusion that there was a "high percentage of gun ownership" was "chiefly" based on probate data from 1774.[6] Pls.' Ex. 8, Dkt. No. 60-12 (James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777, 1780 (2002)). This limited data is insufficient to support such a broad conclusion. On the other hand, Prof. Sweeney's probate analysis is based on more expansive data from the 1780s and 1790s, reflects probate inventories closer to when the Second Amendment was ratified, and shows that the majority of individuals owned either one gun or no gun at all. *See* DX-9 (Sweeney Expert Report) ¶¶ 11, 18, tbl. 1 (citing Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*, in A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment 70-71 (Jennifer Tucker et al. eds., Smithsonian Press 2019)). Moreover, most sources suggest that firearms ownership in the late eighteenth century was in the range of 45% to 55%. *See* DX-21 (Paul G. E. Clements, *The Consumer Culture of the Middle Atlantic, 1760-1820*, 52 Wm. & Mary Quarterly 591, 622-624, tbls. VII, XVII, XVIII, and XIX (2005)); Pls.' Ex. 8 (*Counting Guns in Early America*) at 1800; DX-20 (Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 Wm. & Mary Quarterly 223, 228 (2002)); DX-22 (Kevin M. Sweeney, *Firearms, Militias and the Second Amendment*, in The Second Amendment on Trial: Critical Essays on *District of Columbia v. Heller* 324-325, 340-341, 346-347, 354-355, tbls. 4, 7, 8, and 9 (Saul Cornell & Nathan Kozuskanich, eds., University of Massachusetts Press, 2013)).

---

[6] To a lesser extent, it appears that the authors also relied on probate records from 1679-1726, before the Second Amendment was ratified. Pls.' Ex. 8 at 1780. The authors further reference the Gunston Hall database. *Id*. However, that collection of estates were "far from a random sample" and the selection of those estates "was purposely weighted in favor of estates with food service items, particularly forks." *Id*. at 1811-12.

8

|     |     |
| --- | --- |
| 1   | Plaintiffs also claim that it was common for individuals to carry more than one |
| 2   | firearm. Pls.' MSJ at 16. They rely on the fact that "Vermont's founding fathers" |
| 3   | carried a "gun and a brace [a pair] of pistols." *Id*. (citing *Right to Bear Arms* at |
| 4   | 291-92). However, they fail to cite any evidence that this was a common practice |
| 5   | by the general public, and an analysis of the probate inventories in Vermont from |
| 6   | the founding era shows that only 40 percent owned guns. DX-20 (*Guns, Gun* |
| 7   | *Culture, and Homicide*) at 228. And even if guns were commonly owned or carried |
| 8   | at the founding, that would not establish a right to purchase an unlimited number of |
| 9   | firearms for an unlimited number of times. |
| 10  | As for the militia laws, they are not relevant to an individual's Second |
| 11  | Amendment right. *See Heller*, 554 U.S. at 605 (explaining that the Second |
| 12  | Amendment "protect[s] an individual right unconnected with militia service"); *see* |
| 13  | *also id*. at 606-09. Even if they were relevant (they are not), those laws were |
| 14  | necessary at the time because the founding era faced a different problem to the one |
| 15  | that the OGM law was passed to address today—i.e., the founding era governments |
| 16  | sought to encourage individuals to obtain guns for military readiness as opposed to |
| 17  | preventing individuals from purchasing guns for other people who cannot legally |
| 18  | purchase guns for themselves. Moreover, many of the militia laws required the |
| 19  | government, as opposed to individuals, to provide a firearm or a "case of good |
| 20  | pistols." *See* Pls.' Ex. 10, Dkt. No. 60-14, at 7 (Massachusetts), 10 (New |
| 21  | Hampshire), 16 (New York), 22 (Virginia). And, even with these militia laws, a |
| 22  | census showed that, in several states, less than half of the militia actually possessed |
| 23  | a firearm. DX-19 (William G. Merkel, Forum: Comment, *Mandatory Gun* |
| 24  | *Ownership, the Militia Census of 1806, and Background Assumptions concerning* |
| 25  | *the Early American Right to Arms: A Cautious Response to Robert Churchill*, 25 |
| 26  | Law & Hist. Rev. 187, 189-90 (2007)). In short, the overwhelming evidence in this |
| 27  | case shows it was atypical during the founding era for a single person to own or |
| 28  | purchase multiple firearms. Thus, California's OGM law conforms to the historical |

realities that existed at the time that the Second Amendment was ratified and does not prevent anyone from keeping and bearing arms.

Even though firearms were not commonly owned, a number of firearms regulations during the founding era were passed to protect the public. Nevertheless, Plaintiffs again take the opposite position and claim that there were no laws "interfere[ing] with the keeping or bearing of arms by free citizens." Plaintiffs' MSJ at 15. This is clearly wrong. There were "a variety of regulations [] on the books when [] the Second Amendment was adopted" and "[i]n the years after the adoption of the Second Amendment, the individual states adopted even more stringent types of regulations." DX-18 (Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 502 (2004)); *see also id*. at 506-13 (listing eighteenth-century gun laws); Pls.' Ex. 9, Dkt. No. 60-13 (Clayton E. Cramer, Colonial Firearm Regulation 16-18 (2016) (listing "restrictions on the use of firearms in the Colonial law")); Defs.' MSJ at 14-23 (listing and discussing regulations on the sale and possession of firearms and gun powder).

Plaintiffs further suggest that the OGM law is not consistent with the Nation's history of firearm regulation because there were no laws during the founding era regulating the "quantity or frequency" of acquiring firearms. Pls.' MSJ at 18-19. This is essentially asking the State to identify a "historical twin," which is not required under *Bruen*. 142 S. Ct. at 2131-33. As discussed in Defendants' summary judgment motion, governments during the founding era did not have to confront the dangers associated with large purchases of firearms, and the OGM law addresses the relatively modern issues of straw purchases and illegal firearms trafficking. Defs.' MSJ at 12-14. Thus, only a "historical analogue" is required under a "more nuanced approach." *Bruen*, 142 S. Ct. at 2131-33. And Defendants have provided a number of relevantly similar laws showing that the OGM law is consistent with the Nation's tradition of firearm regulation. Defs.' MSJ at 14-23.

10
Defendants' Opposition to Plaintiffs' Motion for Summary Judgment (3:20-cv-02470)

# CONCLUSION

For these reasons, and the reasons stated in Defendants' summary judgment motion, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' motion for summary judgment.

Dated:  October 13, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General

*/s/ Jerry T. Yen*

JERRY T. YEN
Deputy Attorney General
*Attorneys for Rob Bonta, in his official capacity as California Attorney General, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms*