ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JERRY T. YEN
Deputy Attorney General
State Bar No. 247988
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
  Fax: (916) 324-8835
  E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Rob Bonta, in his official
capacity as California Attorney General, and
Allison Mendoza, in her official capacity as
Director of the Department of Justice Bureau
of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,** | Case No. 3:20-cv-02470-WQH-MMP |
| Plaintiffs, | **DECLARATION OF JERRY T. YEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; EXHIBITS 18-22** |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of California, and ALLISON MENDOZA, in her official capacity as Director of the Department of Justice Bureau of Firearms,** | Date:          To be set by the Court<br>Judge:        Hon. William Q. Hayes<br>Courtroom:  14B<br>Action Filed:  Dec. 18, 2020 |
| Defendants. | |

## DECLARATION OF JERRY T. YEN

I, Jerry T. Yen, declare:

1.  I am a Deputy Attorney General for the Office of the Attorney General for the State of California, attorney of record for Defendants in this action.

1

2.   I am competent to testify to the matters set forth in this declaration, and if called to do so, I would and could so testify.  I make this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

3.   A true and correct copy of Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) is attached as **Exhibit 18**[1].

4.   A true and correct copy of William G. Merkel, Forum: Comment, *Mandatory Gun Ownership, the Militia Census of 1806, and Background Assumptions concerning the Early American Right to Arms: A Cautious Response to Robert Churchill*, 25 Law & Hist, Rev. 187 (2007) is attached as **Exhibit 19**.

5.   A true and correct copy of Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 Wm. & Mary Quarterly 223 (2002) is attached as **Exhibit 20**.

6.   A true and correct copy of Paul G. E. Clements, *The Consumer Culture of the Middle Atlantic, 1760-1820*, 52 Wm. & Mary Quarterly 591 (2005) is attached as **Exhibit 21**.

7.   A true and correct copy of Kevin M. Sweeney, *Firearms, Militias and the Second Amendment*, *in* The Second Amendment on Trial: Critical Essays on *District of Columbia v. Heller* (Saul Cornell & Nathan Kozuskanich, eds., University of Massachusetts Press, 2013) is attached as **Exhibit 22**.

---

[1] The documents submitted in this declaration are a subset of the documents submitted by Defendants in this round of summary judgment briefing.  To keep the numbering of the exhibits consistent, Defendants begin with Exhibit 18 in this declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 13, 2023.

/s/ Jerry T. Yen
JERRY T. YEN
Deputy Attorney General

Declaration of Jerry T. Yen ISO Defendants' Opp to Plaintiffs' MSJ (3:20-cv-02470)

# EXHIBITS
## TABLE OF CONTENTS

| Exhibit | Description | Pages |
|---------|-------------|-------|
| Exhibit 18 | Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) | 00333-00368 |
| Exhibit 19 | William G. Merkel, Forum: Comment, *Mandatory Gun Ownership, the Militia Census of 1806, and Background Assumptions concerning the Early American Right to Arms: A Cautious Response to Robert Churchill*, 25 Law & Hist, Rev. 187 (2007) | 00369-00379 |
| Exhibit 20 | Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 Wm. & Mary Quarterly 223 (2002) | 00380-00398 |
| Exhibit 21 | Paul G. E. Clements, *The Consumer Culture of the Middle Atlantic, 1760-1820*, 52 Wm. & Mary Quarterly 591 (2005) | 00399-00447 |
| Exhibit 22 | Kevin M. Sweeney, *Firearms, Militias and the Second Amendment*, *in* The Second Amendment on Trial: Critical Essays on *District of Columbia v. Heller* (Saul Cornell & Nathan Kozuskanich, eds., University of Massachusetts Press, 2013) | 00448-00486 |

Declaration of Jerry T. Yen ISO Defendants' Opp to Plaintiffs' MSJ (3:20-cv-02470)

# Exhibit 18

Exhibit 18
Page 00333

**73 Fordham L. Rev. 487**

**Fordham Law Review**
November, 2004

**Symposium: The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives**

**Panel I: Historical Perspectives**

Saul Cornell [a1]   Nathan DeDino [aa1]

Copyright (c) 2004 Fordham Law Review; Saul Cornell; Nathan DeDino

# A WELL REGULATED RIGHT: THE EARLY AMERICAN ORIGINS OF GUN CONTROL

## Introduction

It is impossible to discuss gun policy in contemporary America without stumbling over the question of what the Second Amendment means. [1] Few issues in American constitutional law are as bitterly divisive as the meaning of the right to keep and bear arms. [2] Two opposing historical claims have dominated modern Second Amendment debate. [3] Supporters of more robust gun regulation have generally cast the Amendment as a collective right. [4] According to this **\*488** view, the meaning of the Amendment is shaped by the Preamble affirming the importance of a well regulated militia. [5] Collective rights theorists argue that the Second Amendment makes it possible for the states to preserve their well regulated militias against the threat of disarmament by the federal government. [6] Gun rights advocates have placed greater stress on the latter part of the Amendment, which asserts the right of the people to keep and bear arms. [7] For supporters of this individual rights view, the right to bear arms is comparable to freedom of the press, and the Constitution provides the same level of protection for guns as it does for words. [8] For the most ardent supporters of this view, the Constitution protects the right of individuals to have firearms for self-protection, hunting, or to wage revolution against the government itself. [9]

Many, but certainly not all, advocates of gun rights support the notion that courts ought to interpret the Constitution in terms of the original understanding of the founders. [10] Originalism, however, only accounts for part of the role that history plays in this controversy. Even if one were able to banish originalist arguments from this **\*489** debate, history would continue to influence the way Americans understand this issue. To find evidence of the appeal of history, one needs only to search the topic of the Second Amendment on the Internet. [11]

Popular gun rights rhetoric is also deeply originalist in character. This aspect of popular Second Amendment discourse was captured in an amusing episode of America's favorite dysfunctional family sitcom --The Simpsons. [12] Indeed, the Second Amendment is probably the only topic in American constitutional law to be featured prominently in this venue. In a remarkable exchange between Homer Simpson and his daughter Lisa, the conflict between the individual and collective rights views of the Amendment was bluntly stated in comic terms: [13]

>   Homer: "But I have to have a gun! It's in the Constitution!"


>   Lisa: "Dad! The Second Amendment is just a remnant from revolutionary days. It has no meaning today!"

Homer: "You couldn't be more wrong, Lisa. If I didn't have this gun, the king of England could just walk in here anytime he wants and start shoving you around."[14]   This exchange not only provides one of the most balanced discussions of the Second Amendment in American popular culture, it also underscores the uncanny ability of the Second Amendment to collect and distill popular aspirations and anxieties.

Yet another remarkable example of the importance of history and mythology in this debate is provided by the media attention and public outcry over Michael Bellesiles's controversial and now largely discredited work Arming America.[15]   Although Bellesiles never had much impact on jurisprudence or public policy, his attack on the myth of universal gun ownership prompted unprecedented public scrutiny and outrage on the part of gun rights advocates and scholars.[16]

 **\*490**  Second Amendment scholarship is now clearly at an important crossroads. While most courts continue to interpret the Second Amendment as a collective right, academic scholarship is more divided. Indeed, the notion that one can describe the current academic debate in terms of a simple dichotomy no longer seems tenable.[17]   The current paradigm crisis in Second Amendment scholarship is evidenced in two recent decisions by federal courts that elaborated on two different tri-partite schemes, implicitly abandoning the older dichotomous view that dominated previous jurisprudence and scholarship. In United States v. Emerson, the United States Court of Appeals for the Fifth Circuit, the only federal appeals court to embrace an individual rights view of the Amendment, identified three schools of thought on the Second Amendment: the sophisticated collective rights view, the traditional collective rights view, and the individual rights view.[18]   In Silveira v. Lockyer, the United States Court of Appeals for the Ninth Circuit adopted a different typology, concluding that current scholarship could be divided into the following: the collective rights view, the individual rights view, and the limited individual rights view.[19]   Rather than fitting into a simple dichotomy, it now appears that Second Amendment scholarship is arrayed across a considerable spectrum, from an expansive individual right to a narrow collective right of the states to maintain their militias.

### \*491  I. The Right to Bear Arms as a Civic Right: Forgotten Contexts of the Second Amendment Reconsidered

The most interesting and exciting new developments in the field of Second Amendment scholarship have occurred in the middle of this vast spectrum. A number of scholars have suggested that the time may have arrived to abandon both the individual and collective rights models.[20]   Although this simple dichotomy may have served the interests of modern gun rights and gun control advocates, this model has become an obstacle to framing a more sophisticated and genuinely historical understanding of the evolution of the constitutional right to bear arms. It may well be that history has little to contribute to this debate.[21]   Still, before deciding what relevance, if any, the history might have to the interpretation of the Second Amendment in contemporary constitutional theory, it is important to get the history right.

Rather than give greater weight to only part of the text, recent scholarship strives for a more holistic reading of the Second Amendment.[22]   According to this view, the right protected by the Second Amendment is neither a private right of individuals nor a collective right of the states.[23]   Perhaps the best way to describe these alternative models would be to characterize them as part of a new paradigm which views the Second Amendment as a civic right.[24]   The right to bear arms is one exercised by citizens, not individuals (an important distinction in the Founding Era), who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia.[25]   While issues of federalism and states rights continue to be relevant to understanding the context of the Second Amendment debate, the text fits a civic rights model better than either the individual or collective rights paradigms.

This civic rights model comes the closest to faithfully translating the dominant understanding of the right to bear arms in the Founding Era.[26]   One of the most important eighteenth-century contexts for understanding this right was the powerful legal discourse of civic  **\*492**  obligation. Historians have long recognized that the Second Amendment was strongly connected to the republican ideologies of the Founding Era, particularly the notion of civic virtue.[27]   Other scholars have challenged this claim, arguing that the thought of the founding generation owed more to liberalism than to republicanism.[28]   Historical scholarship has abandoned the notion that American political culture can be understood in terms of any single ideological tradition, and

has embraced a more pluralistic conception of the intellectual world of the founders. [29]  Historical scholarship has come to recognize that in addition to republicanism and liberalism, the founding generation was deeply immersed in a legal tradition derived from English common law jurisprudence. [30]

The constitutionalism of the Founding Era sought to balance rights with obligations. Some obligations were voluntary, while others were mandatory. While American constitutionalism sought to create a set of structures conducive to the emergence of a public sphere of political and legal debate, [31] the state could not compel citizens to speak or publish their views on political or legal matters. While modern constitutional theory has generally focused on the concept of negative liberty, Americans of the Revolutionary Era were equally concerned with promoting a positive conception of liberty. [32] Recast in **493** less abstract terms, the constitutionalism of the founding generation was concerned with rights and obligations. The close connection between rights and obligations was central to the way Sir William Blackstone conceptualized the nature of liberty: "[T]he rights of persons that are commanded to be observed by the municipal law are of two sorts; first, such as are due from every citizen, which are usually called civil duties; and, secondly, such as belong to him, which is the more popular acceptation of rights . . . ." [33] The learned English jurist then went on to note that allegiance and protection were "reciprocally, the rights as well as duties of each other." [34] Citizens had both a right and a duty to arm themselves so that they might participate in a militia. Both of these conceptions of rights were bound together in the idea of well regulated liberty. The goal of constitutional government was to constrain arbitrary power, not to hobble government authority. Civil liberty in this scheme, was "no other than natural liberty so far restrained by human laws (and no farther) as is necessary and expedient for the general advantage of the publick." [35]

As minister John Zubly noted in a sermon preached before the Provincial Congress of Georgia on the eve of the American Revolution, the "well regulated liberty of individuals is the natural offspring of laws, which prudentially regulated the rights of whole communities." [36] Zubly went on to amplify this notion by observing that "all liberty which is not regulated by law is a delusive phantom." [37] Outside of a well regulated society governed by the rule of law, liberty was nothing more than licentiousness and anarchy. [38] This particular conception of liberty was central to the way the founding generation understood the idea of the right to bear arms. [39] Although the Constitution represented a significant break with many aspects of revolutionary theory, Zubly's conception of well regulated liberty endured. [40]

**494** At the end of the federalist era in 1798, James Sullivan, a prominent lawyer in Massachusetts, contrasted the radically different conceptions of liberty that emerged during the French Revolution with the idea of well regulated liberty enshrined by the American Revolution and perfected by the U.S. Constitution. [41] "[L]iberty in its natural extent," he wrote, "has nothing to do with civil society." [42] He went further, declaring "[t]here is in nature the same degree of dissimilarity between natural liberty and those principles of equal security exhibited in a well regulated society as there is between the untouched clay in the earth, and the finer vessels of China." [43] Constitutional government was not premised on the kind of liberty found in the state of nature, but in the idea of well regulated liberty. [44]

If one acknowledges the centrality of the concept of well regulated liberty to the constitutional thought of the founders, one can readily appreciate the irony of supporters of a modern libertarian creed invoking the ideal of the Minuteman. The ideal of liberty at the root of militia was not part of a radical individualist and anti-statist ideology. The Minuteman ideal was a quintessential expression of the idea of civic obligation and well regulated liberty. The essence of this vision of law and politics has been brilliantly captured by David Hackett Fischer in his wonderful study of Paul Revere's world. [45] Although modern Americans are apt to think about constitutionalism in terms of individual rights and collective responsibilities, Fischer reminds us that the Minuteman ideal was one in which collective rights and individual responsibilities predominated. [46] Nothing better typified the nature of this conception of constitutionalism than the militia. Each individual had a responsibility to help secure the collective rights of all by sacrificing some measure of their liberty to participate in a well regulated militia. [47]

## II. To Bear Arms in Defense of Themselves and the State

One can see additional evidence for a distinctly civic republican conception of bearing arms if one examines the Pennsylvania Declaration of Rights in the Pennsylvania Constitution of 1776. While the language of the Pennsylvania Declaration of Rights has often been invoked in modern Second Amendment scholarship, [48] it has seldom **495** been properly contextualized. [49] It

Exhibit 18   3
Page 00336

is a text often cited, but usually misinterpreted, by modern gun rights scholars as positive proof that the right to bear arms in the Founding Era was thought of as an individual right. [50] To understand this text in context, one must resist the tendency to pluck isolated quotes out of context, a practice that has become all too typical in recent Second Amendment scholarship. [51]

The Pennsylvania Declaration of Rights began by affirming the basic Lockean trinity of life, liberty, and property, [52] a theme that had also figured prominently in Blackstone's writings. [53] Section VIII of the Pennsylvania Declaration of Rights modified this statement, presenting an obligation of each citizen to contribute to the protection of others: [54]

> That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore is bound to contribute his proportion towards the expence of that protection, and yield his personal service when necessary, or an equivalent thereto: But no part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives: Nor can any man who is conscientiously scrupulous of bearing arms, be justly compelled thereto, if he will pay such equivalent, nor are the people bound by any laws, but such as they have in like manner assented to, for their common good. [55]

This provision introduced the obligation to bear arms, a term that clearly signified the use of arms for a distinctly public purpose. One **\*496** was obliged to bear arms or contribute in some other comparable manner to the goal of helping society protect each individual. Recognizing that Quakers and several German sects were pacifists, opposed to bearing arms, the Declaration of Rights provided them with an alternative to compulsory military service. [56] Interestingly, this provision of the constitution explicitly exempted the right to bear arms from the prohibition on taking property without compensation. [57] Thus, the state could compel one to serve in the militia, outfit oneself with a weapon, and expend ammunition, while bearing absolutely no legal obligation to compensate citizens for their expenses. [58] In essence, bearing arms was a form of taxation. Rather than stake out a strong claim against government, the original understanding of the right to bear arms gave government a strong claim on the lives and estates of its citizens.

After establishing the obligation to bear arms, Section XIII then stated for the first time in America, a constitutional right of the people to bear arms: [59]

> That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power. [60]

The Pennsylvania Declaration of Rights uttered this principle in the same breath as it attacked standing armies and affirmed civilian control of the military, rather than, for example, articulating this right in the same breath as freedom of religion or the press. The text and structure of the provision both support a civic, military reading of the right to bear arms, not an individual right for personal protection. [61]

**\*497** It is certainly true that the right to bear arms was framed as a "right of the people." [62] Although this term has come to be associated with the notion of individual rights in modern legal thought, in the eighteenth century, the phrase "right of the people" could be used to describe rights held by the people as a collective entity, or as individuals. [63] Thus, the Pennsylvania Declaration of Rights described the right of the people to legislate as a right of the people, a usage that clearly connoted a collective right held by individuals acting in concert for public purposes. [64] This is how Albert Gallatin, a leading Pennsylvanian politician, described the nature of rights affirmed in the Pennsylvania Declaration of Rights in a letter to Judge Alexander Addison. [65] The 1776 constitution, Gallatin observed, wisely included a "declaration of the rights of the people at large or considered as individuals." [66] Gallatin's description of the character of the Pennsylvania Declaration of Rights as either something possessed by individuals or the "people at large" illustrates how different the language of rights was in the Founding Era. [67] The right

Exhibit 18   4
Page 00337

to bear arms was a perfect example of a civic right, a "right[] of the people at large," a right that citizens exercised when they acted together for a distinctly public purpose. [68]

The Pennsylvania Declaration of Rights also framed freedom of speech and the press as a right of the people. [69] Here the term was more individualistic, but still no less public in orientation. Thus, the right to publish on matters of public concern or to assemble for **\*498** redress of grievances would be constitutionally protected. [70] The right to stage a play or assemble to view such an event, however, would not have enjoyed such protection. Indeed, Philadelphia actually prohibited the theater because it posed a threat to public morality. [71]

The Pennsylvania Constitution also declared that the right to bear arms existed as a means for the people to act in "defence of themselves and the state." [72] Modern gun rights scholarship has consistently misread this phrase as stating an individual, private right of self-defense. [73] The Pennsylvania Constitution did not assert a right of each person to bear arms in defense of himself and the state, but rather framed the right in a collective, as opposed to an individualistic, formulation. It is important to recognize that the militia served to protect communities, as well as the state, against internal and external threats. The militia existed to deal with internal dangers such as riot or insurrection, as well as the threat of invasion.

Additional contextual support for the collective reading of this provision is provided by one of the few contemporary commentaries on constitution-making in Pennsylvania authored by a writer who adopted the pen name Demophilus. [74] Although the exact identity of the author is a mystery, he appears to have been part of the constitutional party that drafted the state constitution. [75] Demophilus echoed the ideas expressed by radical Whig theorists who, in choosing to frame the right to bear arms as a means for citizens to protect themselves and the state, simply followed the standard Whig understanding of the role of the militia as a means of defending the people and the state against external and internal enemies. [76] Breaking **\*499** with its own Quaker heritage, the Pennsylvania Constitution defined the militia in the broadest possible terms:

> The freemen of this commonwealth and their sons shall be trained and armed for its defence under such regulations, restrictions, and exceptions as the general assembly shall by law direct, preserving always to the people the right of choosing their colonels and all commissioned officers under that rank, in such manner and as often as by the said laws shall be directed. [77]

Modern gun rights advocates argue that it would have made no sense to protect a right to bear arms while not protecting an individual right of self-defense. While this might not make sense to modern lawyers, it would have made perfect sense to an eighteenth-century lawyer. [78] The right of individual self-defense was well-established under common law, but was legally distinct from the constitutional right to bear arms included in the various state constitutions. [79] The failure to include an explicit protection for such a right was hardly anomalous: many protections under common law were not included in bills of rights during the Founding Era. [80] Americans drafted their constitutional protections for the right to bear arms in response to their fear that government might disarm the militia, not restrict the common law right of self-defense. [81] Indeed, if one scans the vast corpus of writings from the ratification debates, virtually every reference to bearing arms occurs within the context of the debate over the militia. [82] Even if one includes the Revolutionary Era and the federalist era, references to anything that might be construed as a constitutional right of individual self-defense are exceedingly rare, and almost always turn out to be statements from dissenting constitutional texts that expressed the point of view of the losers in the great constitutional struggles of the eighteenth century. Thus, one notes that modern individual rights theorists are particularly fond of references to Jefferson's rejected proposal for the Virginia **\*500** Declaration of Rights, Samuel Adams's rejected proposal made to the Massachusetts Ratification Convention, and the dissent of the Anti-Federalist minority of the Pennsylvania Ratification Convention. [83]

Another anachronism in contemporary Second Amendment scholarship is the tendency to read modern notions of self-defense into the Founding Era. [84] The linkage between firearms and self-defense in the Founding Era and the early Republic was much more tenuous. This makes sense given that firearms only accounted for a small percentage of homicides in the period before the Civil War. [85] Edged weapons and blunt instruments were better suited to individual self-defense in most situations. [86] There can be little doubt that the founders believed that keeping a musket in one's home, something closely tied to the ideal of a

well regulated militia, clearly enjoyed constitutional protection. Weapons with little military value, carried in a civilian context, were treated as another matter entirely. [87] For example, James Madison's proposal for those who violated Virginia's game laws captured the important distinction between civilian and military gun use. In a bill to prevent the killing of deer, Madison proposed that a person who "bear [s] a gun out of his inclosed ground, unless whilst performing military duty" would face penalties of forfeiting their unlawfully killed deer, paying a fine, and being "bound to their good behaviour." [88] The language of this statute provides a remarkable window into the way Madison understood the differences between bearing a gun for personal use and bearing arms for the common defense. Additional evidence that the law treated weapons intended for militia use differently than those used outside of a military context may be found in two New Jersey laws that gave the state broad power to disarm disorderly persons and armed assemblies. [89] The state clearly retained the right to regulate the use of **501 firearms and differentiated between the level of restrictions that might be placed on individuals bearing a gun and those bearing arms.

Some sense of the scope of the concept of self-defense in the Founding Era can be obtained by examining the popular guide books that were consulted by justices of the peace, sheriffs, and constables. [90] Readers of the Conductor Generalis, one of the most popular of these lay guides to the law, would have encountered a detailed explication of the common law crime of affray. [91] Under common law, justices of the peace, sheriffs, and constables were empowered to disarm individuals who rode about armed in terror of the peace. [92] Defining exactly what circumstances constituted the crime of affray was precisely the kind of complex, context-bound judgment that defined common law jurisprudence. [93]

The common law not only constrained when and how one might travel with arms, but it defined the limits of legitimate self-defense quite narrowly. Indeed, the military use of arms required citizens to stand and fight, while the civilian requirement was retreat. [94] In contrast to modern notions of self-defense, [95] the law of justifiable homicide in the eighteenth century required a retreat to the wall before responding with deadly force: flight, not fight, defined the meaning of self-defense in the founding generation. [96]

To properly understand how American law dealt with firearms, one must not only reconstruct the neglected context of the common law, but also recognize the robust character of the state's police power in early America. [97] Pennsylvania's Declaration of Rights affirmed that "[t]he people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." [98] Defining the scope of the individual right to self-defense and the right to own firearms for private use was something that fell within the police powers of the state. It was up to the legislature to create a body of laws dealing with aspects of criminal law, including the law of homicide, which would establish when citizens might use deadly force to protect life, liberty, or property. While one could not eliminate the **502 right of self-defense, the legislature could define the limits of such a right and could enact laws about firearms consistent with the goals of protecting public safety. For instance, states enacted laws about how guns had to be stored, when they could be used for recreational purposes, and when and where citizens could hunt. [99] The right to bear arms and the right to use firearms for personal reasons were clearly separate and distinct under the Pennsylvania Constitution, which dealt with the right to hunt and the right to bear arms in separate provisions. [100]

## III. From Regulation to Prohibition: Weapons Laws in the Early Republic

Although much ink has been expended to try to fit the Second Amendment into our modern categories of debate, relatively little attention has been devoted to analyzing the kinds of laws and regulations regarding firearms that were enacted in the Founding Era and subsequent decades. Nor has much effort been devoted to carefully analyzing the decisions of courts trying to make sense of this complex body of laws. Gun rights advocates have claimed that gun control is a modern invention. [101] In reality, a variety of gun regulations were on the books when individual states adopted their arms-bearing provisions and when the Second Amendment was adopted. In the years after the adoption of the Second Amendment, the individual states adopted even more stringent types of regulations. Most gun regulation in the Founding Era and early Republic occurred **503 at the state level. Of course, one might argue that gun regulation at the state level has little bearing on how we should understand the meaning of the Second Amendment. Until the emergence of modern incorporation theory, however, the dominant view of the Bill of Rights was laid down in Barron v. Baltimore, which held that the Bill of Rights only restrained the federal government, not the individual states. [102] The point of analyzing state gun regulations from the Founding Era and early Republic is not to look for legal precedents that could be applied in a literal fashion; far too much has changed in the nature of federalism in the intervening years to make such a search very probative. Rather, the goal of such an inquiry is to shed light on the historical meaning of the

right to bear arms in the Founding Era and early Republic and to see how the notion of arms bearing fits into the idea of a well regulated society. [103] American constitutional law did not end at the founding and it is important to recognize the profound changes that swept over American law in the decades after the ratification of the Constitution. [104] Analyzing past gun regulation at the state level and the litigation it spawned is therefore vital to understanding the complex history of the right to bear arms.

The philosophical connection between state arms-bearing provisions and the Second Amendment would have seemed obvious to Americans in the Founding Era and the early Republic. Both conceptions of arms bearing were tied to the larger concept of a collective self-defense in a well regulated society governed by law. For an influential lawyer and constitutional commentator such as William Rawle, the connection between state arms-bearing provisions and the Constitution was indisputable. [105] Rawle viewed the right to bear arms as "the corollary" of the Preamble's assertion of the need for a well regulated militia. [106] While Rawle attacked the English game laws for effectively disarming citizens, he argued strongly for the idea **\*504** of regulation and viewed the right to bear arms as inextricably linked to the militia. [107] In contrast to modern gun rights theory, Rawle believed that there could be no right to bear arms without regulation. [108]

Gun rights legal scholars have made a number of remarkable, almost phantasmagorical claims about the meaning of the term "well regulated." Perhaps the most far-fetched of these is the suggestion that well regulated did not mean government-controlled, but only properly disciplined and drilled. [109] In the view of Don Kates and Randy Barnett, it makes no sense to read the Second Amendment "as authorizing regulation of arms." [110] The authors of this curious interpretation of the Second Amendment have constructed a fantasy world where words mean their opposite, and regulation is really anti-regulation. This version of early American history more closely resembles the Bizarro world described in Superman comic books and rendered in hilarious terms in America's best-loved postmodern situation comedy Seinfeld, than it does the constitutional thought of the Founding Era. [111] After reading bizarre claims like this, one can readily understand why historian Jack Rakove has likened the world of Second Amendment scholarship to a scholarly Twilight Zone. [112] Arguments such as those of Kates and Barnett are an example of history extra-lite, to borrow Martin Flaherty's apt characterization of so much legal scholarship produced in an originalist vein. [113] Finding evidence to show that the Bizarro Second Amendment is a fiction **\*505** created by modern gun rights scholarship, and not an accurate representation of early American history, is not difficult. If one simply looks at the gun laws adopted in the Founding Era and early Republic, the evidence for robust regulation is extensive. [114] If American history fit the Bizarro model, then gun regulation after the adoption of the Second Amendment would have virtually disappeared. [115] In reality, the decades after ratification of the Second Amendment saw increased, not decreased, levels of regulation. [116]

A variety of laws regulating firearms were already in place during the Founding Era. Militia regulations were the most common form of laws pertaining to firearms. [117] Such laws could be quite intrusive, allowing government not only to keep track of who had firearms, but requiring them to report for a muster or face stiff penalties. [118] Regulations governing the storage of gun powder were also common. [119] States prohibited the use of firearms on certain occasions and in certain locations. [120] A variety of race-based exclusions disarmed slaves, and in some cases, free blacks. [121] Loyalty oaths also disarmed portions of the population during the Founding Era. [122]

This pattern of regulation shifted dramatically in the decades after the adoption of the Second Amendment. In the years after the War **\*506** of 1812, a number of states enacted laws against the practice of carrying concealed weapons. [123] The first laws were passed in southern states, [124] but midwestern states such as Indiana also passed similar laws. [125] The first round of laws made it a crime to carry such weapons. [126] Later, several states enacted even more stringent laws, banning the sale of concealed weapons. [127]

## A. Eighteenth-Century Gun Laws

Eighteenth-century statutes regulating the use of firearms can be classified as follows: statutes providing for the confiscation of firearms from persons unwilling to take an oath of allegiance to the state, statutes regulating the use of firearms within the context of militia obligations, and statutes regulating the storage of gunpowder. A smaller number of laws also regulated hunting and the discharge of firearms in certain places. These statutes make clear that regulation of firearms is hardly a modern invention.

1. Loyalty Oaths and the Confiscation of Firearms

During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States. [128] To deal with the potential threat coming from armed citizens who remained loyal to Great Britain, states took the obvious precaution of disarming these persons. Thus, the security of the community outweighed any right a person might have to possess a firearm.

In Pennsylvania, if a person "refuse[d] or neglect[ed] to take the oath or affirmation" of allegiance to the state, he was required to deliver up his arms to agents of the state, and he was not permitted to carry any arms about his person or keep any arms or ammunition in his "house or elsewhere." [129] Such a broad provision effectively eliminated the opportunity for someone to violently protest the actions of the Pennsylvania government or defend himself with a firearm. It should be underscored that those refusing to take the oath  **507**  or affirmation were unable to borrow or even use another person's firearms.

In 1776, Massachusetts passed, at the behest of the Continental Congress, an act that disarmed "such Persons as are notoriously disaffected to the Cause of America, or who refuse to associate to defend by Arms the United American Colonies." [130] The Massachusetts law required "every Male Person above sixteen Years of Age" to subscribe to a "test" of allegiance to the "United American Colonies." [131] One who failed to subscribe to this test was "disarmed . . . [of] all such Arms, Ammunition and Warlike Implements, as by the strictest Search can be found in his Possession or belonging to him." [132]

The Massachusetts law is interesting because it exempts Quakers from signing the test of allegiance administered to all other men. [133] To accommodate their religion, Quakers were provided with a different form of declaration. [134] Thus, under the circumstances, the right for a Quaker to practice his religion outweighed the state's interest in its preferred test of allegiance. The right to bear arms, however, did not outweigh the state's interest in maintaining security through disarmament of those considered dangerous to the state. Instead, the state's interest in public safety dominated.

Disarmament was not limited to the arguably extraordinary period of the American Revolution. In 1787, the Massachusetts legislature passed a law setting out the terms for pardons by the governor for persons who had been involved in Shays's rebellion against the state in the previous year. [135] Those who had taken up arms against the state were, with some exceptions, able to seek a pardon from the governor. [136] To obtain the pardon, however, a person needed to take an oath of allegiance to the state and deliver his arms to the state for a  **508**  period of three years. [137] In addition, during the same time period, the person would be unable to serve as a juror, hold government office, or vote "for any officer, civil or military." [138]

The nature of the other disqualifications that went along with disarmament only underscores the civic character of the right to bear arms. Those seeking pardon were not robbed of a right to free speech or free exercise of their religion, rights indisputably associated with individuals. Instead, the penalties deal more with the rights and obligations associated with a citizen's duty to society: participation in government as a political official, participation in the legal process as a juror, participation in the electoral process as a voter, and participation in the militia. [139] The law demonstrates that in a well regulated society, the state could disarm those it deemed likely to disrupt society. These types of statutes raise serious questions about the claim of some modern Second Amendment scholars that the right to bear arms was somehow intended to facilitate an individual right of revolution. [140] Quite the opposite was the case. To enjoy the right to bear arms, one had to renounce such revolutionary aspirations. While one might argue such a case if the Second Amendment had been authored by Daniel Shays and his supporters, such radical voices were noticeably absent in the First Congress that drafted the Bill of Rights. [141]

2. Militia Law in the Eighteenth Century

Some of the most common regulations of firearms in the eighteenth century are the laws regulating a state's militia. [142] The laws defined  **509**  who was part of the militia, who was excused from duty, and what weaponry the citizens were required to procure to meet this obligation. [143]

Exhibit 18   8
Page 00341

In 1778 New York, the militia consisted of "every able bodied male person Indians and slaves excepted residing within [the] State from sixteen years of age to fifty." [144] Massachusetts divided its militia into different groups (e.g., a training band and an alarm list), but generally any "able-bodied Male Person[] . . . from sixteen Years old to fifty" was required to be a member of one group. [145] South Carolina's militia, with certain exceptions, included all men between eighteen and fifty. [146] Those exceptions to militia membership tended to be racially based [147] or contingent upon membership in a certain profession (teachers, politicians, and clergy predominate). [148] Thus, the number of people coming under the militia statutes was considerable.

The state militia statutes had several fairly universal requirements. Members of the militia were required to turn out for regular musters. [149] Militiamen were also required to be armed with certain equipment. In New York, every militia member had to "furnish and provide himself at his own expence with a good musket or fire-lock fit for service[,] a sufficient bayonet with a good belt, a pouch or cartouch box containing not less than sixteen cartridges . . . of powder and ball . . . and two spare flints[,] a blanket and a knapsack." [150] Not only were the militia members required to furnish and provide their arms and ammunition, they were subject to inspections by their leaders. In New York, the colonel or commanding officer called a regimental parade in April and November of each year. [151] Militiamen were required to attend with their equipment--"the arms, ammunition and accoutrements of each man [were] examined, and the **\*510** defaulters . . . noted." [152] Those who failed to attend were fined, and those who attended without the required equipment were also fined. [153] In New York, the names of those absent from the regimental parade were noted and sent to the governor or brigadier-general. [154] In Massachusetts, every six months, the clerk of each company made "an exact List of [each man in the] Company, and of each Man's Equipments." [155] The list was sent on to the commanding officer of the company and the commanding officer of the regiment. [156]

The eighteenth-century militia laws are another example of the lengths to which states could go in order to ensure that their communities were well regulated and safe. Indeed, the excerpts from the above militia laws in force at the end of the eighteenth century shed light on the Second Amendment's language about a "well regulated militia." [157] Militias were certainly well regulated. The state could require a majority of the adult population to muster and offer up their privately held firearms for inspection. In Massachusetts, an "exact" account of each militiaman's firearm and equipment was made, which was then sent on to other officers of the state. [158] The militia laws also underscore how different the eighteenth century was from our own century with regard to civic obligations. Average citizens were required to take part in the defense of their community, using their own property and sacrificing their own time. Finally, militia laws can be seen as another attempt by the state to guarantee the safety of the community. In an era that relied on everyday citizens to provide for community and national defense, the idea of a right to keep and bear arms was a given. To provide the best defense, however, the state also had to ensure that the men were trained and that their equipment was in working order. The eighteenth-century militia laws accomplished these twin goals with regular musters, arms inspections, and penalties for noncompliance.

3. The Safe Storage of Gunpowder

By the close of the eighteenth century, there was already a tradition of statutes regulating the storage and transport of gunpowder. [159] **\*511** These laws were oftentimes enacted to protect the growing population centers, such as Boston, [160] Philadelphia, [161] and New York City. [162] Safe storage laws, however, were not limited to the largest cities. In Pennsylvania, regulations for the storage of gunpowder appeared within the statutes that provided for the initial incorporation of new towns alongside the provisions that created commons and streets and regulated public nuisances. [163]

The statutes provide for the safe storage and transport of gunpowder in a variety of ways. Limits on the amount of gunpowder a person could possess were common and typically in the range of twenty to thirty pounds. [164] Moreover, the amount of powder a person could legally keep was subject to regulation. Many of the statutes specify how the powder a person could legally keep had to be stored. For example, the Pennsylvania statute that established the Town of Carlisle specified that anyone keeping gunpowder "in any house, shop, cellar, store or other place within the said borough" must keep it "in the highest story of the house . . . unless it be at least fifty yards from any dwelling house." [165] In New York, the law required one to separate powder "into four stone jugs or tin cannisters, which shall not contain more than seven pounds each." [166]

Early Americans were permitted to own more gunpowder than they could physically possess. The powder in excess of the legal limit had to be kept, at the owner's expense, in a public magazine. [167] Removal or transport of the powder from the powder house was also subject to safety regulations. In Boston, when gunpowder in excess of the legal limit was transported to the public magazine, it had to be transported "in a waggon or carriage, closely covered with leather or canvas, and without iron on any part thereof, to be first approbated by the Firewards of said town, and marked in capitals, with the words approved powder carriage." [168]  Some port cities also had specific  **\*512**  regulations for what to do with ships arriving with powder on board. New York City required ships to unload gunpowder at a magazine within twenty-four hours of arrival in the harbor and before the ship "hawl[ed] along side of any wharf, pier or key within the city." [169]  Boston subjected any "Gun Powder . . . kept on board any ship or other vessel laying to, or grounded at any wharf within the port of Boston" to confiscation. [170]

The point of these statutes was, as they themselves proclaimed, to protect communities from fire and explosion. As Massachusetts's 1780 gunpowder statute put it, its goal was to "deter[] the Inhabitants thereof from keeping certain Quantities of Powder in Houses and Ware-houses, &c. to the great Inconvenience, Discouragement and Danger of Persons assisting in Time of Fire." [171]  As this characteristic language demonstrates, the statutes were quite explicit in their application not just to shops and stores, but also to private individuals' homes.

The state acting under the authority of its robust police powers retained the right to pass safe storage laws prohibiting citizens from keeping loaded firearms in their homes. A 1783 Massachusetts statute declared that "the depositing of loaded Arms in the Houses of the Town of Boston, is dangerous" and provided for fine and forfeiture for anyone keeping a loaded firearm in "any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store, Shop, or other Building." [172]

Colonial and state legislators clearly thought that it was well within their powers to regulate the storage and transport of gunpowder. In addition, the amount of gunpowder an individual or business could keep in a building was also limited. [173]  The laws were clearly crafted to meet the needs of public safety, but they also provided a check on the creation of a private arsenal. Indeed, gunpowder in excess of the legal limit typically had to be stored in the public magazine, under the authority of the state. The gunpowder storage laws of the eighteenth century thus constituted a significant limit on the right to bear arms.

## B. Nineteenth-Century Gun Laws

In the nineteenth century, laws directly regulating firearms became far more prevalent. In order to combat the dangers stemming from guns and maintain the goal of fostering a well regulated society, states  **\*513**  became increasingly ambitious in the range and scope of the laws they enacted regarding firearms. The laws fall into three categories: laws prohibiting the carrying of concealed weapons, laws prohibiting the sale of such weapons, and laws prohibiting the firing of a gun under certain circumstances. [174]

### 1. The Danger of Concealed Weapons

In the antebellum period, several states had laws banning the carrying of concealed weapons. [175]  Ohio's language is fairly typical: "[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty." [176]  If convicted, one faced the possibility for a first offense of a fine up to two hundred dollars or imprisonment up to a month. [177]

Some of the states with concealed weapons laws did consider self-defense concerns. However, exceptions from the concealed weapons law for self-defense were limited. In Tennessee, the law explicitly exempted any person who was "on a journey to any place out of his county or state." [178]  In Ohio, there was an exception:

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of  **\*514**  carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused. [179]

Exhibit 18   10
Page 00343

This exception is obviously narrow. First, it applied only to those who were carrying a concealed weapon in connection with their employment. Second, the defendant had to prove to the jury that a "prudent man" in the defendant's position would have been justified in carrying a concealed weapon. Thus, while state legislatures could be mindful of self-defense concerns, those concerns did not outweigh the general application of a ban on concealed weapons. The state decided that the dangers arising from concealed weapons were simply greater than the benefits to the populace.

Indeed, Virginia's legislature was so concerned with concealed weapons that the application of the state's ban on the weapons was rather broad. In Virginia, it was against the law for a person to "habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind . . . hidden or concealed from common observation." [180] Under the Virginia law, if a person was tried for "murder or felony" and used a concealed weapon to commit the murder or felony, he could still be charged under the concealed weapon law, even if the jury acquitted him of the murder or felony because of self-defense. [181] A second wave of more restrictive regulations went even further, prohibiting the sale of concealed weapons. An 1837 Georgia law criminalized the sale of concealed weapons, effectively moving toward the complete prohibition of this class of weapon. [182] A similar statute was enacted by Tennessee in 1838. [183] The Supreme Court of Tennessee upheld the law, declaring that "the Legislature intended to abolish these most dangerous weapons entirely from use." [184]

 **\*515** Neither the constitutional right to bear arms nor the common law right of self-defense trumped the right of the state to regulate firearms, including prohibitions on certain types of weapons. In this sense, firearms were subject to a level of prior restraint that would have been unthinkable for the free exercise of religion or freedom of the press.

2. Other Regulations on the Use of Firearms in the Antebellum Period

Apart from laws banning the use or sale of concealed weapons, a variety of other laws in the pre-Civil War Era enacted time, place, and manner restraints on firearms use. [185] Laws restricted where a person could shoot a gun. [186] In 1820, Cleveland prohibited the discharge of firearms by local ordinance. [187] An Ohio statute made it a crime to "shoot or fire a gun at a target within the limits of any recorded town plat in [the] state." [188] This provision is found within the same section of the statute that outlaws playing "bullets along or across any street in any town or village" or "running horses within the limits of any such town or village." [189] In a law amending a statute incorporating the towns of Winchester and Reynoldsburgh, the Tennessee legislature gave the mayor and aldermen of those towns the

> power and authority to make any rules and laws regulating the police . . . and the inhabitants . . . to restrain and punish drinking, gaming, fighting, breaking the sabbath, [and] shooting and carrying guns, and enact penalties and enforce the same, so that they do not conflict or violate the constitution of this State, and are consistent with the laws of this State. [190] An 1821 Tennessee statute prohibited the "shoot[ing] at a mark within the bounds of any town, or within two hundred yards of any  **\*516**  public road of the first or second class within [the] state." [191] In contrast to modern law where many states have pre-empted the right of localities to restrict firearms, local regulation was quite common in pre-Civil War America. [192]

The use of permits or licenses were less common than time, place, and manner restrictions or bans on selected categories of weapons. Such laws were usually used to target groups such as free blacks. Thus, Virginia passed a law in 1806 that required every "free negro or mulatto" to first obtain a license before carrying or keeping "any fire-lock of any kind, any military weapon, or any powder or lead." [193]

These statutes all demonstrate the ample power of the state to regulate and restrict firearm usage and ownership to achieve the goal of creating a well regulated society. A wide range of gun regulations, including safe storage laws; time, place, and manner restrictions; and even prohibitions on certain classes of weapons have deep roots in American history stretching back before the American Revolution and extending forward in time long after the Second Amendment was adopted.

Exhibit 18   11
Page 00344

## IV. Judging the Right to Bear Arms: The Pattern of Antebellum Jurisprudence

The change from regulation to prohibition prompted a wide ranging discussion and re-evaluation of the meaning of the right to bear arms and its connection to the right of self-defense. The first important case of the Jacksonian era, Bliss v. Commonwealth, articulated an expansive individual rights conception of arms bearing, effectively prohibiting any regulation of weapons.[194] The decision was not widely emulated, and proved to be controversial within Kentucky. Indeed, a committee of the Kentucky House excoriated the state's highest court for misconstruing historical origins of the right to bear arms.[195] Outside of Kentucky, the rejection of the Bliss model of arms bearing was equally forceful. In Aymette v. State, a Tennessee court accepted the notion that bearing arms was a military activity, but introduced a distinction between keeping arms and bearing arms.[196] In the view of the Aymette court, bearing arms was subject to more stringent **\*517** regulation than keeping arms.[197] The only types of weapons that the Aymette court believed were entitled to full constitutional protection were those that were suitable for the purposes of supporting a well regulated militia.[198] A more narrowly defined militia-based right was framed in State v. Buzzard.[199] In Buzzard, the right to bear arms was narrowly construed to protect only militia-related activity.[200] Invoking a concept central to Anglo-American jurisprudence since Blackstone, the court wrote that the goal of the Constitution was to protect those rights "essential to the enjoyment of well regulated liberty."[201] To conclude, as had the court in Bliss, that the right to bear arms was not subject to reasonable regulation was to encourage anarchy, not liberty.[202]

The more robust level of regulation associated with the second wave of bans on concealed weapons, including prohibitions on the sale of particular classes of weapons, produced another division among state courts. In a somewhat rambling discussion that took note of these divisions, the Georgia Supreme Court found that time, place, and manner restrictions were constitutional, but general prohibitions were not.[203] The Supreme Court of Tennessee rejected this view and upheld a broad ban on certain classes of weapons.[204] The Tennessee court went on to note that "[t]he Legislature thought the evil great, and, to effectually remove it, made the remedy strong."[205] The more robust Tennessee model of regulation proved to be the more influential one.[206]

## V. Did the Fourteenth Amendment Change Things? The Incorporation Conundrum Revisited

The legacy of the founding is only one of the nodes of historical debate over the meaning of the Second Amendment.[207] A small, but **\*518** growing body of scholarly literature has also developed around the connection between the Fourteenth and Second Amendments. One of the most intellectually provocative claims in the Second Amendment debate is Akhil Amar's suggestion that, as a result of the Fourteenth Amendment, the idea of bearing arms was transformed from a collective right into an individual one.

"[B]etween 1775 and 1866," Amar contends, "the poster boy of arms morphed from the Concord minuteman to the Carolina freedmen."[208] There are a number of problems with this argument. In summarizing Amar's argument, Sanford Levinson correctly notes that Amar identifies close to a dozen Reconstruction Era Republicans in Congress who delivered "odes to arms in speeches in the Thirty-ninth Congress."[209] While it is certainly true that Amar finds some important evidence that such a view was present in Congress, he provides no evidence that this view was widely shared by either the ratifiers of the Fourteenth Amendment or a significant portion of the general public. To document Amar's contention would require a very ambitious examination of the surviving documentary record.[210]

Amar certainly deserves credit for being the first serious constitutional scholar to try to chart the profound changes that transformed the meaning of the right to bear arms in the period after the adoption of the Bill of Rights. There can be little doubt about the emergence of a more individualistic conception of arms bearing over the course of the nineteenth century. While the notion of arms bearing had been closely tied to the well regulated militia in the Founding Era, a considerable amount of slippage had occurred in this concept during this time period.[211] Perhaps the best evidence of this paradigm shift is the remarkable change in the language adopted by a number of state constitutions in the Jacksonian era. While Founding Era constitutions affirmed "the right of the people to bear arms in defense of themselves and the state," a number of states in the Jacksonian era affirmed a right of "each citizen to bear arms in **\*519** defense of himself and the state."[212] If every state had abandoned the older language in favor of the new, Amar would have strong support for his notion that a single monolithic collective understanding of arms bearing in the Founding Era was replaced by an equally hegemonic individualistic ideology during Reconstruction.

Although Amar's model does suggest an important change, he approaches the constitutional thought of the Founding Era and Reconstruction from a model of consensus history that simply does not reflect the complexity of the historical record.

On at least one occasion, Amar has argued that history and constitutional law are distinct and that the legal meaning of arms bearing could well be different than the historical meaning carried by the term.[213] Amar is surely correct in making this important distinction. While the historical question of how far popular and elite attitudes toward arms bearing had shifted in the century between the Revolution and Reconstruction is fascinating, it is not the question with the most probative value. To answer that question, one must grapple with the myriad theories and critiques of constitutional originalism.[214]

Although he eschews the label, Amar's theory of refined incorporation is ultimately an idiosyncratic version of originalism in which the usual emphasis on Madison and the founding has been **\*520** replaced by an equally narrow focus on John Bingham, one of the Framers of the Fourteenth Amendment.[215] To paraphrase Larry Kramer's critique of originalism, we might describe Amar's account as Reconstruction-obsessed, as opposed to founding-obsessed.[216] Yet, even when judged by the standards of originalist theory, Amar's account is not without problems. If any intent or meaning ought to guide constitutional interpretation in an originalist paradigm, it ought to be the ratifiers, not the framers of the Fourteenth Amendment. Even if one adopts the more inexact and historically naïve approach to original meaning favored by scholars such as Randy Barnett, which requires focusing on widely shared public meanings, one is still left with the complicated historical task of weighing the myriad, and in many cases, discordant voices who participated in the framing and ratification of the Fourteenth Amendment. For anyone who has taken the time to read extensively in the sources for this period, the claims that the Fourteenth Amendment or arms bearing had a single monolithic meaning in this era are simply untenable.[217] Even more problematic from the point of view of any originalist theory is the evidence that the leading framers of the Amendment, such as Bingham, sold the Amendment to the American people in radically different terms: as a legal principle that did nothing more than require Americans to follow the golden rule of doing unto others as you would have them do unto you. Fourteenth Amendment originalists who rest incorporation on the historical intent of the framers of the Amendment are effectively engaged in an elaborate legal game of bait-and-switch where the framers' intent is substituted for the meaning associated with the Amendment during ratification. While one can certainly defend incorporation theory on philosophical grounds or in terms of precedent, the historical foundations for this argument are shaky at best.

The different tone and rhetorical strategies employed in Congress and on the stump are evident if one looks at the way John Bingham tried to sell the Fourteenth Amendment to the citizens of Ohio.[218] In his public speeches to his constituents, he adopted a different rhetorical strategy than the one he used in Washington. Rather than play up a constitutional theory steeped in abolitionist rhetoric, he stressed the notion of equality before the law, a much less threatening concept.[219] In one speech, Bingham summarized the meaning of Section 1 as doing no more than "embodying in the Constitution the **\*521** golden rule, learned at the mother's knee, 'to do as we would be done by.'"[220] In a more detailed speech focused exclusively on the meaning of the Fourteenth Amendment, Bingham summarized the meaning of Section 1 in the following manner: "It is a simple, strong, plain declaration that equal laws and equal and exact justice shall hereafter be secured within every State of this Union."[221] He dismissed the charge that the Amendment would destroy the federal system, effectively reducing the individual states and their laws to mere ciphers in a powerful centralized system of government: "It takes from no State any right which hitherto pertained to the several States of the United States."[222] It is impossible to know for certain if Bingham consciously attempted to recast his rhetoric in response to the vicious black baiting tactics used by Democrats to discredit Republicans as supporters of full equality for blacks. While in his own mind, Bingham could in good faith believe that the subtle shifts in emphasis and tone changed nothing in terms of substance, for his listeners, many of whom were not schooled in the same abolitionist ideas and not steeped in the detailed reports of southern atrocities that outraged Republicans in Congress, it is likely that they took a very different message away from his standard stump speech. For the average man on the street listening to one of Bingham's speeches, the argument would have seemed far closer in spirit to the arguments made by those Congressional Republicans who saw the Fourteenth Amendment as doing little more than requiring the states to treat their citizens equally.[223]

What is most striking about the debates over the framing and ratification of the Amendment is how radically different the rhetoric and arguments used by Republicans in Congress were from the way they presented their argument outside the halls of Congress. In Congress, Republicans highlighted the worst excesses of the black codes, which meant playing up the disarmament of freedmen.[224] In the public debate over ratification, Republicans adopted a more conservative strategy, stressing a more abstract and less potentially radical principle of equality.[225] This decision made perfect political sense. Faced with Democratic

Exhibit 18
Page 00346

opponents who played up such emotionally charged issues as Negro suffrage and interracial marriage, it was only natural that Republicans would not dwell excessively on the need to arm blacks.

 **\*522**  Rather than view the impact of the Fourteenth Amendment as transforming the meaning of the Second Amendment in the manner suggested by Amar, a more plausible reading of the evidence would be to argue that the codes selectively disarming blacks were rendered unconstitutional as a result of the Fourteenth Amendment. Borrowing from Amar's vivid imagery, one might describe the impact of the Fourteenth Amendment as facilitating the transformation of the Revolutionary Era's all-white southern militias into the Negro militias of the Reconstruction Era. [226] Amar and other supporters of the individual rights thesis regarding the Fourteenth Amendment have simply ignored the rise of the Negro militias and their importance to the implementation of Reconstruction. Amar's claim that "[r]econstructors obviously had good functional and ideological reasons for downplaying militias" [227] is simply wrong. Congress recognized this fact when it disbanded the rebel-dominated southern militias and then authorized the creation of new militias loyal to the Union. [228] For southern Republicans, the destruction of the old militia, dominated by Confederate sympathizers, and the creation of a new militia loyal to the Union, was a high priority. [229] Even if Amar and others were correct about how Bingham viewed arms bearing, this was not how Republicans in the South viewed the matter. Southern Republicanism not only invested considerable political capital in reconstructing the militia, but they committed enormous financial resources to arming blacks with government-issued weapons. [230] In many places, the inclusion of freedmen into these new militias drove many southern whites to create their own alternative, all-white para-military organizations, effectively turning the new state militias into de facto Negro militias. [231] The story of the Negro militias is therefore key to understanding the contest to define the right to bear arms in the Reconstruction South. Indeed, a remarkable test case for the individual rights thesis may be found in the South Carolina Ku Klux Klan trials. [232] Republicans within the newly created Department of Justice, including U.S. Attorney General Amos Akerman, developed a strategy to apply Second Amendment protections through the Fourteenth Amendment. [233] Although Amar and others cite the South  **\*523**  Carolina Ku Klux Klan trials as proof for their individual rights thesis, [234] the evidence of the trials reveals a radically different story.

Among the many outrages perpetrated by the Klan in South Carolina, the disarmament of members of the Negro militia was particularly galling to Republicans. [235] U.S. Attorney General Amos Akerman and U.S. Attorney Daniel Corbin, the two men responsible for prosecuting these cases, worked closely together and consulted with one another on the best legal strategy to pursue against the Klan. [236] The strategy they formulated was the most systematic effort to theorize the constitutional impact of the Fourteenth Amendment on the Bill of Rights. [237] With Akerman's blessing and guidance, Corbin adopted a strategy to use the Fourteenth Amendment as a vehicle to seek indictments against the Klansmen for violating the Second Amendment rights of blacks in South Carolina. [238] While Congress and the various ratification conventions may have been divided over the issue of incorporation, Akerman and Corbin were not. The two men framed their case around the incorporation issue. [239] While Amar, Levinson, and others have interpreted this choice as evidence that Republicans viewed the right to bear arms as an individual right, [240] the transcript of the trial supports a rather different reading of the evidence. In his opening address, Corbin announced to the court that, "if there is any right that is dear to the citizen, it is the right to keep and bear arms," a protection "secured to the citizen of the United States on the adoption of the amendments to the Constitution." [241] Corbin then noted that some had argued that Barron v. Baltimore [242] had established the precedent that the Bill of Rights was not a restraint on the states. "The fourteenth amendment," Corbin reminded the court, "changes all that theory, and lays the same restriction upon the States that before lay upon the Congress of the United States." [243] Having made a strong argument for using the Fourteenth Amendment to apply the Second Amendment to the states, Corbin then went on to explain the nature of the crime  **\*524**  committed by the Klan--the disarmament of members of the Negro militia.

> Imagine, if you like--but we have not to draw upon the imagination for the facts--a militia company, organized in York County, and a combination and conspiracy to rob the people of their arms, and to prevent them from keeping and bearing arms furnished to them by the State Government. Is not that a conspiracy to defeat the rights of the citizen, secured by the Constitution of the United States, and guaranteed by the fourteenth amendment? [244]

The argument employed by the government in these trials demonstrates that modern supporters of the individual rights view of the Second Amendment have seriously misconstrued the connection between bearing arms and incorporation in the South

Carolina Ku Klux Klan trials. [245] While the action of the federal government in that case supports the incorporation thesis, it does not support the individual rights view. Members of the South Carolina Ku Klux Klan did disarm blacks and the government did try to use the Fourteenth Amendment to prosecute them for violations of the Second Amendment right to bear arms. The guns confiscated, however, were not privately owned, but were issued to South Carolina blacks because they were members of the militia. It is true that the guns were held privately, and not stored in arsenals, but they were unquestionably held as part of citizens' militia obligations. The government did try to incorporate the Second Amendment through the Fourteenth, but as a militia right, not an individual right.

The notion of citizens keeping and bearing arms as part of their obligation to participate in a well regulated militia has had a long history, stretching back to the eighteenth century. Nothing about the Fourteenth Amendment changed that reality. Rather, as William Nelson has argued, the primary impact of the Fourteenth Amendment was to force states to treat all citizens equally. [246] Modern incorporation theory has tended to approach the Fourteenth Amendment somewhat anachronistically, framing the issue in terms relevant to modern law, rather than in those appropriate to the historical debate over incorporation in the Reconstruction era. Modern supporters of incorporation have argued that Republicans sought to overrule Barron v. Baltimore and incorporate the Bill of Rights. [247] Their opponents have argued that Republicans did not wish to undermine traditional notions of federalism and hence could not have intended to effectively nationalize the Bill of Rights. [248] The **\*525** problem with this formulation, as Pamela Brandwein has argued, is that both claims may be true. [249] Republicans may have desired to overrule Barron without fundamentally altering the structure of federalism. [250] If one analyzes the issue at stake in the South Carolina Ku Klux Klan trials, it is possible to see how this was possible. When modern incorporation theory is set aside and the issues are understood in context, a different understanding of the connection of the Fourteenth Amendment to the right to bear arms emerges. Akerman and Corbin's theory of the impact of the Fourteenth Amendment on the right to bear arms advanced two interrelated legal doctrines. [251] It barred states from enacting discriminatory legislation that selectively disarmed blacks. It did not establish a single uniform national definition of what kinds of gun laws individual states might enact. States would be free to enact laws regulating or in some cases prohibiting certain types of weapons as long as those laws were not discriminatory and were grounded in some rational basis. States were also prohibited from enacting laws that prevented blacks from bearing arms in the militia. Overruling Barron v. Baltimore and preserving the existing structure of federalism were not mutually incompatible goals in the minds of Republicans even if these two ideas now seem inconsistent in light of subsequent jurisprudence.

## VI. Translating the Founders' Vision: Toward a Workable Jurisprudence for Firearms

Contrary to the claim of some modern gun rights advocates, robust regulation of firearms is not only compatible with the Second Amendment, it is an essential part of the founders' vision of how guns fit within the framework of well regulated liberty. [252] Nothing in the subsequent history, including the ratification of the Fourteenth Amendment, changed the underlying centrality of the concept of well regulated liberty to American law.

Modern Second Amendment scholarship and recent jurisprudence have devoted considerable energy to debating the individual or collective nature of this right. Hardly any attention has been devoted to elaborating a functional Second Amendment jurisprudence. All of the existing theories of the Second Amendment, including those that **\*526** treat it as an individual right, a collective right, or a civic right, leave open the issue of how courts ought to weigh and evaluate firearms regulation. [253] In this sense, recent Second Amendment jurisprudence has been much less pragmatic than earlier efforts by the courts to sort out the meaning of bearing arms. The struggles of antebellum state judges to make sense of the scope of the right to bear arms and the common law right of self-defense might provide some useful guidelines for modern jurists.

Although mechanistically applying the frameworks developed by these jurists makes little sense, there are a few useful principles to be gleaned from this body of case law. Most jurists recognized a fundamental distinction between guns kept in conjunction with a civic obligation to participate in a well regulated militia, and those kept for purely private purposes. Antebellum jurisprudence also accepted that laws regulating the keeping of militia weapons ought to be subject to a different level of scrutiny than laws regulating the bearing of those weapons. There can be little doubt that if Americans were willing to undertake the burdens of recreating the Founding Era's well regulated militia that the scope of Second Amendment protection for some types of firearms would be considerable. [254] It took a concerted effort on the part of Americans to effectively transform the founders' militia into the modern National Guard; it would take an equally concerted effort to recreate the original militia. [255]

Of course, it is a matter of public policy, not constitutional law, to determine if the time has arrived to restore the founders' militia to its former role in American society. It is also a matter of public policy, not constitutional law, to decide how that militia would be armed and how its arms would be stored. Although gun rights advocates have become somewhat obsessed with proving that the right to bear arms includes private arms for private purposes, there is little in the history, the text, or the structure of the Constitution to support such a view. Only by constructing an alternate history fantasy in which the Second Amendment was authored by Daniel Shays, Samuel Adams, or the dissenting Anti-Federalist minority of Pennsylvania, can such a view be sustained. [256] The absence of any compelling historical evidence to support the individual rights view of the Second Amendment does not mean that government is free to enact any laws it wishes regarding firearms. The concept of well regulated liberty and the common law protections for firearms owners would certainly preclude the nightmare scenario of gun confiscation so often conjured up by gun rights advocates.

 **\*527**  Ironically, rather than conjure up a Bizarro history of the Second Amendment, gun rights advocates would have a much stronger legal theory if they abandoned history entirely and developed a more coherent philosophical defense of their support for an expansive individual right to have firearms for private purposes. While such an exercise would certainly improve the quality of individual rights scholarship on the Second Amendment, there is really no need to invent new legal justifications for protecting the rights of firearms owners. Simply applying a rigorous rational basis review of gun laws would achieve this goal admirably. The notion that we ought to give guns the same protection that the Constitution gives words not only makes little practical sense, it creates yet another false constitutional dichotomy: either we treat guns like words or we give guns no legal protection. Even if one accepted that the Second Amendment protected an individual right, there is no reason to assume that such a right merits strict scrutiny by the courts. [257]

Gun rights advocates have often invoked the specter of domestic disarmament as the inevitable outcome of failing to recognize that the Second Amendment protects an individual right. [258] Although intellectually it is not hard to deconstruct such slippery slope arguments, their emotional resonance in American culture is indisputable. [259] The problem with such slippery slope arguments was first recognized by Federalists, who easily disarmed their Anti-Federalist opponents' hysterical rhetoric by noting that, with such high levels of domestic armament, such a fear was illusory. [260] In a nation with so many guns and such widespread popular support for gun ownership, there is little need to fear domestic disarmament. [261] Quite apart from the problems of enforcement, which would be monumental, it is hard to imagine courts accepting any policy or  **\*528**  regulatory scheme that effectively prohibited all firearms under all circumstances even with the most lax rational basis review. [262] The time has arrived to cast aside both the libertarian and gun prohibitionist rhetoric that drives so much of this debate, and focus our attention on creating a regulatory scheme that promotes public safety and recognizes the many legitimate uses of guns in our society.

## Footnotes

a1     Director of the Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy ("Glenn Institute"); Associate Professor of History, The Ohio State University. Research support for this essay was provided by a grant from the Joyce Foundation. I would like to thank Larry Kramer for useful suggestions and the participants in the Glenn Institute/Fordham University School of Law Symposium panel on the history of the Second Amendment and gun regulation: Carol Berkin, Robert Churchill, David Konig, and James Henretta. Earlier versions of this Article were presented at the Department of Legal Studies, University of Delaware; the Department of History, University of California, Berkeley; and the Center for Law, Policy, and Social Science, The Ohio State University Moritz College of Law.

aa1     A.B., Miami University, 2000; J.D., The Ohio State University Moritz College of Law, 2003; Ph.D. Candidate, Department of Political Science, Ohio State University; Research Associate, Glenn Institute.

1     Franklin E. Zimring, Continuity and Change in the American Gun Debate, in Evaluating Gun Policy: Effects on Crime and Violence 441, 450 (Jens Ludwig & Philip J. Cook eds., 2003).

2     Andrew Jay McClurg, The Rhetoric of Gun Control, 42 Am. U. L. Rev. 53, 57 (1992); Robert Weisberg, Values, Violence, and the Second Amendment: American Character, Constitutionalism, and Crime, 39 Hous. L. Rev. 1, 3 (2002).

3     Generally, the debate has centered around the individual rights versus the collective rights viewpoints. See infra notes 4-9. For an introduction to Second Amendment legal scholarship, see Gun Control and the Constitution: Sources and Explorations on the Second Amendment (Robert J. Cottrol ed., 1994) [hereinafter Gun Control and the Constitution]. For historical writing on the topic, see Whose Right to Bear Arms Did the Second Amendment Protect? (Saul Cornell ed., 2000) [hereinafter Whose Right to Bear Arms].

4     Whose Right to Bear Arms, supra note 3.

5     On the ambiguous role of preambles in constitutional interpretation, see Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637, 644-45 (1989) (discussing the debates arising from different interpretations of the purpose underlying the text). For a critique of the use of preambles in modern Second Amendment scholarship, see Eugene Volokh, The Commonplace Second Amendment, 73 N.Y.U. L. Rev. 793 (1998). Volokh's claims have been challenged as ahistorical by David Konig, who notes that constitutional and legal treatises from the Founding Era did treat proemes and preambles as establishing the correct context for reading a constitutional or legal text. See David Thomas Konig, The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of "the Right of the People to Keep and Bear Arms," 22 Law & Hist. Rev. 119, 154 (2004).

6     Carl T. Bogus, The History and Politics of Second Amendment Scholarship: A Primer, 76 Chi.-Kent L. Rev. 3, 4 (2000); Michael C. Dorf, What Does the Second Amendment Mean Today?, 76 Chi.-Kent L. Rev. 291, 293-94 (2000).

7     On the individual rights view, see Levinson, supra note 5. See also L.A. Powe, Jr., Guns, Words, and Constitutional Interpretation, 38 Wm. & Mary L. Rev. 1311 (1997); Glenn Harlan Reynolds, A Critical Guide to the Second Amendment, 62 Tenn. L. Rev. 461 (1995); cf. William Van Alstyne, The Second Amendment and the Personal Right to Arms, 43 Duke L.J. 1236, 1243, 1254 (1994) (noting that the right to bear arms may be individual, but it is not absolute).

8     See Powe, supra note 7, at 1400-01.

9     See Reynolds, supra note 7, at 469, 480, 504-07.

10     For a discussion of originalism, see Randy E. Barnett, The Original Meaning of the Commerce Clause, 68 U. Chi. L. Rev. 101 (2001) [hereinafter Barnett, The Original Meaning], and Randy E. Barnett, An Originalism for Nonoriginalists, 45 Loy. L. Rev. 611 (1999) [hereinafter Barnett, An Originalism for Nonoriginalists]. Barnett critiques the view of the Second Amendment as militia-centric. See Randy E. Barnett, The Relevance of the Framers' Intent, 19 Harv. J.L. & Pub. Pol'y 403, 410 (1996) [hereinafter Barnett, The Relevance of the Framers' Intent]; see also Randy E. Barnett & Don B. Kates, Under Fire: The New Consensus on the Second Amendment, 45 Emory L.J. 1139 (1996). For critiques of Second Amendment originalism, see Daniel A. Farber, Disarmed By Time: The Second Amendment and the Failure of Originalism, 76 Chi.-Kent L. Rev. 167 (2000), and Jack N. Rakove, The Second Amendment: The Highest Stage of Originalism, 76 Chi.-Kent L. Rev. 103 (2000).

11     Such a search produces a variety of websites. See, e.g., http:// www.gunowners.org; http://www.keepandbeararms.com.

12     The Simpsons: The Cartridge Family (Fox television broadcast, Nov. 2, 1997).

13    Jonah Goldberg, Homer Never Nods: The Importance of The Simpsons, Nat'l Rev., May 1, 2000, at 36, 37. Goldberg believes that the episode dealing with gun rights makes The Simpsons the only sitcom in memory to treat gun control with any fairness. Id.

14    Id.

15    Michael A. Bellesiles, Arming America: The Origins of a National Gun Culture (2000).

16    James Lindgren, Fall from Grace: Arming America and the Bellesiles Scandal, 111 Yale L.J. 2195 (2002); Danny Postel, Did the Shootouts over 'Arming America' Divert Attention from the Real Issues?, Chron. Higher Educ., Feb. 1, 2002, at A12. Although Bellesiles's thesis only had a modest influence on pending cases, John Lott's discredited "more guns, less crime" hypothesis has continued to shape policy. See John J. Donohue III, The Final Bullet in the Body of the More Guns, Less Crime Hypothesis, 2 Criminology & Pub. Pol'y 397, 400 (2003). The charges of scholarly misconduct against Lott have never been investigated. Chris Mooney, Double Barreled Double Standards, MotherJones.com, Oct. 13, 2003, at http:// www.motherjones.com/news/feature/2003/10/we_590_01.html.

17    Stuart Banner, The Second Amendment, So Far, 117 Harv. L. Rev. 898, 903-05 (2004) (reviewing David C. Williams, The Mythic Meanings of the Second Amendment: Taming Political Violence in a Constitutional Republic (2003)).

18    United States v. Emerson, 270 F.3d 203, 218-20 (5th Cir. 2001); see also Parker v. District of Columbia, 311 F. Supp. 2d 103, 109 (D.D.C. 2004) (dismissing challenge against the constitutionality of Washington, D.C.'s handgun ban and rejecting the individual right to bear arms); Seegars v. Ashcroft, 297 F. Supp. 2d 201, 235 (D.D.C. 2004) (upholding the Washington, D.C. handgun ban and rejecting the individual rights theory). Of course, the notion that there is a sophisticated collective rights view and an unsophisticated view is itself a creation of gun rights scholarship. No scholar on the collective rights side of the debate has embraced this type of terminology. The notion appears to have been first suggested by Robert Cottrol. Robert J. Cottrol, Introduction to Gun Control and the Constitution, supra note 3, at xxxv. Ironically, the sophisticated collective rights view actually rests on an extremely simplistic view of history. See Saul Cornell, "Don't Know Much About History": The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657, 661-64 (2002) [hereinafter Cornell, "Don't Know Much About History" ]. For a critique of the notion that there is a sophisticated and unsophisticated collective rights argument, see Banner, supra note 17.

19    Silveira v. Lockyer, 312 F.3d 1052, 1060 (9th Cir. 2002).

20    Saul Cornell, A New Paradigm for the Second Amendment, 22 Law & Hist. Rev. 161 (2004) [hereinafter Cornell, A New Paradigm]; Konig, supra note 5; David Yassky, The Second Amendment: Structure, History, and Constitutional Change, 99 Mich. L. Rev. 588, 613-21 (2000); see H. Richard Uviller & William G. Merkel, The Militia and the Right to Arms, or, How the Second Amendment Fell Silent 147-211 (2002). See generally Richard A. Primus, The American Language of Rights (1999).

21    See Christopher L. Eisgruber, Moral Principle and the Second Amendment, in Guns, Crime, and Punishment in America 140 (Bernard E. Harcourt ed., 2003).

22    Cornell, A New Paradigm, supra note 20; Konig, supra note 5; Yassky, supra note 20.

23    Cornell, A New Paradigm, supra note 20, at 164.

24    See id. at 164-65.

25    See id.

26    See Lawrence Lessig, Fidelity and Constraint, 65 Fordham L. Rev. 1365, 1371-76 (1997) (explaining the idea of translation).

27    Robert E. Shalhope, The Ideological Origins of the Second Amendment, 69 J. Am. Hist. 599 (1982) (finding civic virtue to come from an individual right to bear arms). For a different view, see Lawrence Delbert Cress, An Armed Community: The Origins and Meaning of the Right to Bear Arms, 71 J. Am. Hist. 22 (1984) (presenting a communal viewpoint of civic virtue).

28    Joyce Appleby, Liberalism and Republicanism in the Historical Imagination 140-41 (1992).

29    On the importance of the ideological interpretation and the debate over republicanism and liberalism in early American history, see id. passim; Isaac Kramnick, The "Great National Discussion": The Discourse of Politics in 1787, 45 Wm. & Mary Q. 3 (1988); Daniel T. Rodgers, Republicanism: The Career of a Concept, 79 J. Am. Hist. 11 (1992).

30    See David Lieberman, The Province of Legislation Determined: Legal Theory in Eighteenth-Century Britain (1989) (describing England's legal traditions); John Phillip Reid, Constitutional History of the American Revolution (abr. ed. 1995).

31    Saul Cornell, The Other Founders: Anti-Federalism & the Dissenting Tradition in America, 1788-1828, at 21 (1999); Jürgen Habermas, Between Facts and Norms: Contributions to a Discourse Theory of Law and Democracy 328-87 (William Rehg trans., MIT Press 1996) (1992); Jürgen Habermas, The Structural Transformation of the Public Sphere: An Inquiry into a Category of Bourgeois Society 28 (Thomas Burger trans., MIT Press 1989) (1962); John L. Brooke, Reason and Passion in the Public Sphere: Habermas and the Cultural Historians, 29 J. Interdisc. Hist. 43 (1998); William E. Forbath, Habermas's Constitution: A History, Guide, and Critique, 23 Law & Soc. Inquiry 969 (1998).

32    In his important essay on the Second Amendment, Sanford Levinson invokes Ronald Dworkin's theory of rights as trumps. Levinson, supra note 5, at 657-58; see Ronald Dworkin, Rights as Trumps, in Theories of Rights 153 (Jeremy Waldron ed., Oxford Univ. Press 1984). The distinction between negative and positive liberty has been treated elsewhere. See Isaiah Berlin, Two Concepts of Liberty, in Four Essays on Liberty 118-72 (1969). On liberty in the Anglo-American world of the founders, see John Phillip Reid, The Concept of Liberty in the Age of the American Revolution (1988) and Quentin Skinner, Liberty Before Liberalism (1998). For an effort to construct a modern theory of politics and law around republican conceptions of liberty, see Philip Pettit, Republicanism: A Theory of Freedom and Government (1997).

33    1 William Blackstone, Commentaries *119 (emphasis omitted).

34    Id.

35    Id. at *121; see also Reid, supra note 32.

36    John J. Zubly, The Law of Liberty 26 (Philadelphia 1775).

37    Id.

38 See id.

39 On the importance of the idea of a well regulated society, see William J. Novak, The People's Welfare: Law and Regulation in Nineteenth-Century America (1996). The founding generation's concept of well regulated liberty shares many features with modern legal theory's notion of ordered liberty. See Palko v. Connecticut, 302 U.S. 319, 325 (1937).

40 See Gordon S. Wood, The Creation of the American Republic, 1776-1787 (1993).

41 James Sullivan, An Impartial Review of the Causes and Principles of the French Revolution (Boston, Benjamin Edes 1798).

42 Id. at 44.

43 Id.

44 See id. For a general discussion of natural rights theory, see Philip A. Hamburger, Natural Rights, Natural Law, and American Constitutions, 102 Yale L.J. 907 (1993).

45 See David Hackett Fischer, Paul Revere's Ride, at xvii, 149-64 (1994).

46 See id. at xvii.

47 See id. 149-64.

48 See Saul Cornell, Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory, 16 Const. Comment. 221, 227 & n.25 (1999) [hereinafter Cornell, Commonplace or Anachronism]; Cornell, "Don't Know Much About History," supra note 18, at 670 & n.119.

49 For the historical context of Pennsylvania politics, see Douglas M. Arnold, A Republican Revolution: Ideology and Politics in Pennsylvania, 1776-1790, at 43 (1989), and Robert L. Brunhouse, The Counter-Revolution in Pennsylvania, 1776-1790 (1942).

50 Pa. Const. of 1776, Declaration of Rights, reprinted in 5 The Federal and State Constitutions: Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3082-84 (Francis Newton Thorpe ed., Scholarly Press, Inc. 1977) (1909) [hereinafter 5 The Federal and State Constitutions].

51 I have explored the context from which the Second Amendment emerged elsewhere. See Saul Cornell, Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic, in Beyond the Founders: New Approaches to the Political History of the Early Republic (Jeffrey L. Pasley et al. eds., Nov. 2004) [hereinafter Cornell, Beyond the Myth of Consensus]. For problematic de-contextualized readings of the Pennsylvania Declaration of Rights, see infra note 60.

52     Pa. Const. of 1776, Declaration of Rights, § I, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3082. See generally John Locke, Two Treatises of Government (Peter Laslett ed., Cambridge Univ. Press 1960) (1698).

53     See 1 Blackstone, supra note 33, at *121.

54     Pa. Const. of 1776, Declaration of Rights, § VIII, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083.

55     Id.

56     See id.

57     Id. (allowing one who was "conscientiously scrupulous of bearing arms" to be exempted from bearing arms by paying the "equivalent").

58     See id.

59     Id. § XIII. Earlier state constitutions do not mention this right. See Del. Const. of 1776, available at http:// www.yale.edu/ lawweb/avalon/states/de02.htm (last visited Oct. 8, 2004); N.H. Const. of 1776, available at http://www.yale.edu/ lawweb/avalon/states/nh09.htm (last visited Oct. 8, 2004); N.J. Const. of 1776, available at http:// www.yale.edu/ lawweb/avalon/states/nj15.htm (last visited Oct. 8, 2004); S.C. Const. of 1776, available at http://www.yale.edu/lawweb/ avalon/states/sc01.htm (last visited Oct. 8, 2004).

60     Pa. Const. of 1776, Declaration of Rights, § XIII, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083. For two other individual rights misreadings of this provision, see Stephen P. Halbrook, That Every Man Be Armed: The Evolution of a Constitutional Right 64 (1984); and Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 148 (1994). See also David B. Kopel, The Second Amendment in the Nineteenth Century, 1998 B.Y.U. L. Rev. 1359, 1407.

61     Barnett & Kates, supra note 10. This false historical claim was repeated in a brief prepared by lawyers from the CATO Institute in Parker v. District of Columbia, 311 F. Supp. 2d 103 (D.D.C. 2004). Ironically, the authors of this brief attacked gun control groups for citing the now discredited work of Michael Bellesiles. See Plaintiff's Memorandum of Points and Authorities in Response to Amici at 10-11, 15-16, Parker v. District of Columbia, 311 F. Supp. 2d 103 (D.D.C. 2004) (No. 03-CV-0213), available at http://www.alangura.com/parker/amici/response_to_amici.pdf (last visited Sept. 17, 2004). Sadly, gun rights advocates do not appear to demand the same historical rigor in work that supports their political agenda that they demand of their opponents.

62     U.S. Const. amend. II.

63     See, e.g., United States v. Verdugo-Urquidez, 494 U.S. 259, 265-69 (1990); see also David B. Kopel, The Supreme Court's Thirty-Five Other Gun Cases: What the Supreme Court Has Said About the Second Amendment, 18 St. Louis U. Pub. L. Rev. 99, 128-29 (1999) (arguing that Verdugo-Urquidez demonstrates that "right of the people" cannot mean right of the state).

64     Pa. Const. of 1776, Declaration of Rights, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3082-83.

Exhibit 18   21
Page 00354

65    Letter from Albert Gallatin, to Alexander Addison 2 (Oct. 7, 1789), microformed on Papers of Albert Gallatin, Fiche 1 (New York Univ. & Nat'l Historical Publ'ns Comm'n) [hereinafter Gallatin].

66    Id. These observations were made in the context of proposals to revise the Pennsylvania Constitution. Halbrook mistakenly treats Gallatin's letter discussing the nature of the rights protected in the Pennsylvania Declaration of Rights as describing the Federal Bill of Rights. See Halbrook, supra note 60, at 225 n.169.

67    Gallatin, supra note 65.

68    Id.

69    Pa. Const. of 1776, Declaration of Rights, § XII, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083.

70    Id. §§ XII, XVI, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083-84.

71    On Philadelphia's prohibition of the theater, see Kenneth Silverman, A Cultural History of the American Revolution 66 (1976).

72    Pa. Const. of 1776, Declaration of Rights, § XIII, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083 (emphasis added).

73    For a good illustration of this sort of anachronistic reading of the Pennsylvania Declaration of Rights, see Volokh, supra note 5, at 810-12.

74    Demophilus, The Genuine Principles of the Ancient Saxon, or English Constitution (Philadelphia, Robert Bell 1776).

75    Although a number of scholars have attributed this essay to George Bryan, one of the leading members of the constitutionalist party and a prominent future Anti-Federalist, Bryan's biographer has expressed doubts about this attribution. See Joseph S. Foster, In Pursuit of Equal Liberty: George Bryan and the Revolution in Pennsylvania 80 (1994).

76    Demophilus, supra note 74, at 23. Demophilus wrote,

The best constructed civil government that ever was devised, having but a poor chance for duration, unless it be defended by arms, against external force as well as internal conspiracies of bad men, it will be the next concern of the convention, to put the colony militia on the most respectable footing.

Id. For more on this point, see Don Higginbotham, The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship, 55 Wm. & Mary Q. 39 (1998).

77    Pa. Const. of 1776, § 5, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3084.

78    Nicholas J. Johnson, Beyond the Second Amendment: An Individual Right to Arms Viewed Through the Ninth Amendment, 24 Rutgers L.J. 1 (1992); Don B. Kates, Jr., The Second Amendment and the Ideology of Self-Protection, 9 Const. Comment. 87 (1992) [hereinafter, Kates, The Second Amendment]; Nelson Lund, The Second Amendment, Political Liberty, and the Right to Self-Preservation, 39 Ala. L. Rev. 103 (1987).

79    See 4 Blackstone, supra note 33, at *183-86 (describing common law self-defense in English law); Richard Maxwell Brown, No Duty to Retreat: Violence and Values in American History and Society (1991) (examining the right of self-defense).

80    On state bills of rights in the Founding era, see Donald S. Lutz, A Preface to American Political Theory 49-88 (1992).

81    On this point, see Konig, supra note 5, at 152-53. More generally, see Primus, supra note 20, at 101-05.

82    See, e.g., Don Higginbotham, The Second Amendment in Historical Context, 16 Const. Comment. 263 (1999).

83    Modern supporters of the individual rights view of the Second Amendment are particularly fond of quoting these losing voices and treating them as though they articulated the voice of a majority of Americans. In this sense, individual rights scholarship more closely resembles the popular "what-if histories" that explore how the world might look if the South won the Civil War. For a discussion of Second Amendment scholarship as a form of alternate history science fiction fantasy, see Cornell, A New Paradigm, supra note 20, at 164.

84    See, e.g., Kates, The Second Amendment, supra note 78; Lund, supra note 78.

85    Eric H. Monkkonen, Murder in New York City 32 (2001).

86    See id. at 27.

87    Act of June 10, 1799, ch. DCCCVI, § 2, 1799 N.J. Laws 561, 562 (punishing disorderly persons who were apprehended while carrying offensive weapons such as pistols); Act of Feb. 24, 1797, ch. DCXXXVII, § 1, 1797 N.J. Laws 179, 179 (punishing rioters who were armed with weapons).

88    A Bill for Preservation of Deer (1785), in 2 The Papers of Thomas Jefferson 443-44 (Julian P. Boyd et al. eds., 1950). The bill was presented by Madison to the House, and read twice, but no action was taken. Id. at 444. Virginia had enacted two earlier game laws in 1738 and 1772. Id.

89    § 2, 1799 N.J. Laws at 562; § 1, 1797 N.J. Laws at 179.

90    E.g., The Conductor Generalis: Or the Office, Duty and Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-men, and Overseers of the Poor (New York, Hugh Gaine 1788).

91    Id. at 10-11.

92    Id. at 10-13.

93    Id. This widely reprinted guide went through several editions in the period between the American Revolution and the adoption of the Second Amendment.

94    Brown, supra note 79, at 4-6.

95    Id. at 5.

96    Id. at 4-6.

97    Novak, supra note 39, at 19-50; see Christopher L. Tomlins, Law, Police, and the Pursuit of Happiness in the New American Republic, 4 Stud. Am. Pol. Dev. 3 (1990).

98    Pa. Const. of 1776, Declaration of Rights, § III, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3082.

99    See infra Part III.

100    See Pa. Const. of 1776, § 43, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3091.

101    Joyce Lee Malcolm, Infringement, 2 Common-place, July 2002, at http://www.common-place.org/vol-02/no-04/roundtable/malcolm.shtml. Another ideologically distorted claim has alleged that founders were anti-regulation. See David I. Caplan, Gun Registration, in 1 Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law 257-58 (Gregg Lee Carter ed., 2002). According to Caplan:

At the time of the adoption of the Constitution in 1788, the American people had an absolute, unqualified right to keep ordinary personal firearms and ammunition for defense of home, community, and country. Registration or its equivalent at most was confined to proving that one possessed one rifle or musket for militia purposes; it did not extend to disclosing how many other firearms one possessed, and it did not extend to pistols at all.

Id. at 257. Caplan appears to have not looked at any of the extant gun laws from the period which regulated the possession and use of firearms in a variety of ways. See infra Parts III.A-B. No such right or property claim was absolute in American law in the Founding era. A distorted view of the historical record from the opposing ideological perspective was provided by Michael Bellesiles. Michael A. Bellesiles, Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794, 16 Law & Hist. Rev. 567 (1998). He argued that guns were held in trust by individuals for the government. Each of these views, libertarian and collectivist, distorts the historical record, which fits neither the modern individual rights nor collective rights paradigm.

102    🚩 Barron v. Baltimore, 32 U.S. (7 Pet.) 243, 247 (1833). For the views of Barron contrarians, see Akhil R. Amar, The Bill of Rights: Creation and Reconstruction 145-62 (1998).

103    Gun rights advocates have often cited the language of state constitutional provisions to prove that bearing arms had to be understood as an individual right. See Kopel, supra note 60, at 1413-15; Volokh, supra note 5, at 810-12. According to this view, the right to bear arms could not be a right of the state because its inclusion in a state bill of rights meant it was a claim against the state. Obviously, trying to fit the eighteenth-century right to bear arms into our modern categories is profoundly anachronistic. Bills of rights in the Founding Era included general statements of principle, constitutional obligations, as well as statements of rights. See supra Part II.

104    The changes in the understanding of constitutional law are an important point recently underscored in a thoughtful essay by Sanford Levinson. Sanford Levinson, The Historians' Counterattack: Some Reflections on the Historiography of the Second Amendment, in Guns, Crime, and Punishment in America, supra note 21, at 91.

105    See William Rawle, A View of the Constitution of the United States of America 121 (Philadelphia, H.C. Carey 1825).

Exhibit 18   24
Page 00357

106    Id. at 122.

107    Id. at 122-23.

108    See id. at 121-22. Individual rights theorists often claim Rawle as a spokesmen for their view of the Second Amendment. See, e.g., Kopel, supra note 60, at 1384. Apart from the anachronistic quality of this claim, it seriously distorts Rawle's view of the Second Amendment. Rawle's view fits neither the modern individual rights nor collective rights models, but comes closer to the civic right. See supra Part I.

109    Barnett & Kates, supra note 10, at 1210-14.

110    Id. at 1209. The research for this particular conclusion was drawn primarily from the dictionary, a rather narrow foundation for such a broad historical claim. In his most recent scholarship, Barnett has expanded the scope of his research somewhat. Cf. Barnett, The Original Meaning, supra note 10. The decision to move beyond the dictionary is commendable, but a serious historical examination of this topic would require surveying a much broader range of primary source materials than Barnett has surveyed to this date. Such an inquiry would need to examine newspapers, pamphlets, sermons, broadsides, and books. Only after completing a systematic and comprehensive survey of the surviving documentary and archival record could one speak with the kind of authority necessary to support Barnett's revisionist claims.

111    Seinfeld: The Bizarro Jerry (NBC television broadcast, Oct. 3, 1996); see also Jerry Siegel et al., Superman: Tales of Bizarro World (DC Comics 2000). To describe Bizarro Superman to his friend Elaine, Jerry Seinfeld explains: "Bizarro Superman. Superman's exact opposite who lives in the backwards Bizarro world. Up is down. Down is up. He says 'hello' when he leaves, 'goodbye' when he arrives." Id. at 4.

112    Jack N. Rakove, Confessions of an Ambivalent Originalist, 78 N.Y.U. L. Rev. 1346, 1354 (2003).

113    Martin S. Flaherty, History "Lite" in Modern American Constitutionalism, 95 Colum. L. Rev. 523 (1995).

114    See infra Parts III.A-B.

115    The Bizarro Second Amendment is another type of alternate history, a sub-genre of science fiction in which an author posits a different history where the American Revolution never happened or the South won the Civil War. For a discussion of the prevalence of such histories in Second Amendment scholarship, see Cornell, A New Paradigm, supra note 20. Supporters of the Bizarro Second Amendment oftentimes describe their own view as the Standard Model. See Reynolds, supra note 7, at 463.

116    See infra Parts III.A-B.

117    See infra Part III.A.2.

118    See infra Part III.A.2.

119    E.g., Act of June 26, 1792, ch. X, 1792 Mass. Acts 208 (regarding the transporting and storage of gun powder in Boston); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627 (regarding the storage of gun powder); Act of Dec. 6, 1783, ch. CIV,

1783 Pa. Laws 161, ch. MLIX, 11 Pa. Stat. 209 (concerning the securing of the city of Philadelphia from the danger of gunpowder), available at http:// www.palrb.us/statutesatlarge/17001799/1783/0/act/1059.pdf (last visited Oct. 10, 2004).

120   See, e.g., Act of April 22, 1785, ch. 81, 1785 N.Y. Laws 152; Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78; Act of Jan. 30, 1847, 1846-1847 Va. Acts ch. 79, at 67. The range of colonial regulation of firearms and gun powder is documented. See, e.g., A Collection of all the Laws of the Province of Pennsylvania: Now in Force 13, 39-40, 85, 197-200, 315-17 (1742) (concerning dueling, the storage of gun powder, the carrying of weapons by "Negroes," firing guns in the City of Philadelphia, and hunting).

121   E.g., Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51 (concerning the carrying of weapons by free "Negroes and mulattoes").

122   E.g., Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31 (addressing the disarming of persons who were "disaffected to the Cause of America"); Act of Apr. 1, 1778, ch. LXI, §§ 2, 5, 1777-1778 Pa. Laws 123, 126 (requiring white males over the age of eighteen to take an oath of loyalty or be disarmed).

123   See Kopel, supra note 60, at 1415-19.

124   Id.

125   Id. at 1403.

126   See infra Part III.B.1.

127   See infra notes 182-84 and accompanying text.

128   E.g., Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31; Act of Apr. 1, 1778, ch. LXI, § 5, 1777-1778 Pa. Laws 123, 126.

129   § 5, 1777-1778 Pa. Laws at 126. This provision was contained in a law that also laid out several consequences for those who refused to take the oath or affirmation; for example, lawyers and professors (among others) were not permitted to practice their trades and citizens were unable to "prosecute any suit in equity" or to serve as an "executor or administrator of any person." Id. § 3, at 124; see also Cornell, Commonplace or Anachronism, supra note 48, at 228.

130   ch. VII, 1775-1776 Mass. Acts at 31.

131   Id. The test required, among other things, that the subscribers affirm their belief that the war against Britain was "just and necessary." Id. Additionally, subscribers affirmed that they would not aid or assist the British. Id.

132   Id. at 32.

133   Id. at 35.

134   Notably missing are the requirements that the subscriber believe that the war was a just one and the promise to defend the United American Colonies with arms. Instead, Quakers needed to promise that they would not aid, assist, or pass intelligence to the enemy. Id.

135   Leonard L. Richards, Shays's Rebellion: The American Revolution's Final Battle 38-40 (2002).

136   Act of Feb. 16, 1787, ch. VI, 1787 Mass. Acts 555. The law applied to

any person or persons, who have acted in the capacity of non-commissioned officers or privates, or persons of any other description, who, since the first day of August, seventeen hundred and eighty-six, have been, now are, or hereafter may be in arms against the authority and Government of this Commonwealth, or who have given or may hereafter give them counsel, aid, comfort or support....

Id.

137   Id. at 556.

138   Id. The three-year time period could be shortened for these punishments--but not for the disarmament--provided that the person could "exhibit plenary evidence [to the General Court] of their having returned to their allegiance, and kept the peace, and that they possess an unequivocal attachment to the Government." Id.

139   The disqualifications are also similar in nature to the sorts of privileges taken away regularly from convicted felons today.

140   See infra note 141.

141   Loyalty oaths, disarmament, and the constitutional definition of the crime of treason raise serious questions about the effort to treat the Second Amendment as part of a constitutional right of revolution. See generally Levinson, supra note 5, at 656-57; Reynolds, supra note 7, at 467; David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L.J. 551, 583 (1991). It also calls into question the argument that an individual right of self-defense was somehow absolute and might trump the needs of collective self-defense. The Shaysite reading of the Second Amendment would therefore be consistent with the Bizarro Theory of the Second Amendment. See supra notes 111-15 and accompanying text.

142   E.g., Act of May 8, 1792, 1792 Conn. Pub. Acts 440 (forming the state militia); Act of July 19, 1776, ch. I, 1775-1776 Mass. Acts 15 (regulating the militia of Massachusetts); Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 62 (regulating the militia of New York State); Act of Mar. 20, 1780, ch. CLXVII, 1780 Pa. Laws 347 (regulating the militia of Pennsylvania); Act of Mar. 26, 1784, 1784 S.C. Acts 68 (regulating militia).

143   See supra note 142.

144   ch. 33, 1778 N.Y. Laws at 62.

145   § 1, 1775-1776 Mass. Acts at 15.

146   1784 S.C. Acts at 69.

147   See, e.g., 1778 N.Y. Laws at 62 (providing exclusions for Indians and slaves).

Exhibit 18   27
Page 00360

148    See, e.g., § 1, 1775-1776 Mass. Acts at 15.

149    See, e.g., 1784 S.C. Acts at 68. In South Carolina, for example, the governor could order regimental musters every six months in Charleston and once a year in the rest of the state. Ordinary musters of individual companies could be ordered every two months. Id.

150    1778 N.Y. Laws at 62. As further evidence of how poorly our modern constitutional law can translate to eighteenth-century realities, consider the fact that militia members were required to provide their weapons and ammunition at their own expense. Such a notion hardly seems consistent with our current ideas about what constitutes a taking under the Takings Clause. See, e.g., Phillips v. Wash. Legal Found., 524 U.S. 156, 160 (1998) (finding that interest earned on a lawyer's trust account belonged to the client as private property for purposes of the Takings Clause).

151    1778 N.Y. Laws at 65.

152    Id.

153    Id. at 66. Those too poor to afford to equip themselves properly were usually provided with the weapon and necessary equipment by the state. See, e.g., id. at 63; see also § 7, 1775-1776 Mass. Acts at 18.

154    1778 N.Y. Laws at 65.

155    § 9, 1775-1776 Mass. Acts at 18.

156    Id.

157    U.S. Const. amend. II.

158    § 9, 1775-1776 Mass. Acts at 18.

159    E.g., Act of June 26, 1792, ch. X, 1792 Mass. Acts 208 (addressing the carting and transporting of gunpowder in Boston); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627 (concerning the storage of gunpowder); Act of Dec. 6, 1783, ch. MLIX, 11 Pa. Stat. 209, available at http:// www.palrb.us/statutesatlarge/17001799/1783/0/act/1059.pdf. Laws for the safekeeping of gunpowder, however, continued well into the nineteenth century. E.g., Act of Feb. 24, 1852, ch. CLXIX, 1851-1852 Tenn. Pub. Acts 246.

160    Act of June 19, 1801, ch. XX, 1801 Mass. Acts 507 (relating to storage of gunpowder in Boston); ch. X, 1792 Mass. Acts at 208 (same); Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 218 (same); Act of Oct. 4, 1780, ch. V, 1780 Mass. Acts 326 (relating to a powder house in Boston).

161    Act of Dec. 6, 1783, ch. MLIX, 11 Pa. Stat. 209.

162    Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627.

163 See, e.g., Act of Sept. 12, 1783, ch. LXXVI, § XLII, 1782-1783 Pa. Laws 124, 140 (concerning storage of gunpowder in the Town of Reading); Act of Apr. 13, 1782, ch. XIV, § XLII, 1781-1782 Pa. Laws 25, 41 (concerning storage of gunpowder in the Town of Carlisle).

164 See supra note 159.

165 § XLII, 1781-1782 Pa. Laws at 41.

166 ch. 28, 1784 N.Y. Laws at 627.

167 E.g., Act of June 19, 1801, ch. XX, 1801 Mass. Acts 507; Act of Oct. 4, 1780, ch. V, 1780 Mass. Acts 326.

168 Act of June 26, 1792, ch. X, 1792 Mass. Acts 208.

169 ch. 28, 1784 N.Y. Laws at 628.

170 ch. XX, 1801 Mass. Acts at 507.

171 ch. V, 1780 Mass. Acts at 326.

172 Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 218 (concerning the storage of gunpowder in Boston).

173 Twenty to thirty pounds of gunpowder is certainly not an inconsiderable amount. See supra note 164 and accompanying text. The point is, however, that the state could limit the amount of gunpowder a person could store in his home or shop to an amount that the state deemed safe.

174 Statutes limiting when and where guns could be fired are not a nineteenth-century invention. Pennsylvania in 1774 and New York in 1785 both passed laws that restricted the firing of guns on New Year's Eve and New Year's Day. Act of Apr. 22, 1785, ch. 81, 1785 N.Y. Laws 152; Act of Dec. 24, 1774, ch. DCCV, 1774 Pa. Stat. 410, available at http://www.palrb.us/statutesatlarge/17001799/1774/0/act/0705.pdf. The laws of the nineteenth century go far beyond these restrictions and appear to become more expansive in scope.

175 E.g., Act of Mar. 18, 1859, 1859 Ohio Laws 56 (prohibiting the carrying of concealed weapons); Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15; Act of Feb. 2, 1838, 1838 Va. Acts ch. 101, at 76 (preventing the carrying of concealed weapons).

176 § 1, 1859 Ohio Laws at 56. The language of the Tennessee statute made clear the moral depravity of those who carried concealed weapons. ch. XIII, 1821 Tenn. Pub. Acts at 15. The law states that "each and every person so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols... shall pay a fine." Id. (emphasis added). Clearly, carrying any of these weapons concealed was not something an upstanding and virtuous citizen would do. There might be a right to bear arms, but such a right was tempered by the demands of the well regulated society, and well regulated societies held those carrying concealed weapons in low regard.

177 § 1, 1859 Ohio Laws at 56 (prohibiting the carrying or wearing of concealed weapons).

178    ch. XIII, 1821 Tenn. Pub. Acts at 16. This language is somewhat unclear, however. Presumably, the application to those on a journey outside of their state would protect out-of-staters traveling in Tennessee who were unaware of Tennessee's ban on concealed weapons. The language also seems to carve out a protection for those who were traveling outside of their communities, where they presumably felt less safe.

179    § 1, 1859 Ohio Laws at 56-57.

180    1838 Va. Acts ch. 101 at 76.

181    Id. at 77. Indeed, the law is broader still because it applied to

any such weapon [mentioned in the act], and that the same was hidden or concealed from or kept out of the view of the person against whom it was used, until within the space of one half hour next preceding the commission of the act, or the infliction of the wound, which shall be charged to have caused the death, or constituted the felony....

Id. Thus, the weapon need not have been concealed immediately before it was used for the law to apply under these circumstances.

182    Act of Dec. 25, 1837, 1837 Ga. Laws 90 (protecting citizens of Georgia against the use of deadly weapons).

183    Act of Jan. 27, 1838, ch. CXXXVII, 1837-1838 Tenn. Pub. Acts 200 (banning the sale of Bowie knives and Arkansas tooth picks).

184    Day v. State, 37 Tenn. (5 Sneed) 496, 500 (1857).

185    E.g., Act of Feb. 17, 1831, § 6, 1831 Ohio Laws 161, 162 (preventing certain immoral practices); Act of Dec. 3, 1825, ch. CCXCII, § 4, 1825 Tenn. Priv. Acts 306 (regulating shooting and carrying guns in Reynoldsburgh); Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78-79; Act of Jan. 30, 1847, 1846-1847 Va. Acts ch. 79, at 67; Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51 (restricting Negroes from carrying guns).

186    E.g., § 6, 1831 Ohio Laws at 162.

187    Laws, for the Regulation and Government of the Village of Cleaveland, § 9, in Cleaveland Herald, Aug. 15, 1820, at 1.

188    § 6, 1831 Ohio Laws at 162.

189    Id.

190    ch. CCXCII, 1825 Tenn. Priv. Acts at 307. The language of the statute also tells us that the legislature did not believe that all laws restraining and punishing the shooting and carrying of guns were unconstitutional. The statute's allowance for punishing those who broke the sabbath is also demonstrative of the sort of power the state had in the antebellum period. The well regulated society meant that, while people had the freedom to worship, they also had an obligation to honor the sabbath. Cf. Novak, supra note 39, at 112.

191    Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78-79.

192  Scholars have discussed the trend toward greater centralization and preemption in recent firearms jurisprudence. See, e.g., Jon S. Vernick & Lisa M. Hepburn, State and Federal Gun Laws: Trends for 1970-99, in Evaluating Gun Policy: Effects on Crime and Violence, supra note 1, at 345-67. On the robust tradition of local regulation in earlier periods of American history, see Novak, supra note 39.

193  Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51.

194  Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822).

195  For a discussion of Kentucky's political reaction to the Bliss ruling, see Robert M. Ireland, The Problem of Concealed Weapons in Nineteenth-Century Kentucky, 91 Reg. Ky. Hist. Soc'y 370, 372-74 (1993).

196  Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).

197  Id. at 160.

198  Id. at 158-59.

199  State v. Buzzard, 4 Ark. 18 (1842).

200  Id. at 24-25.

201  Id. at 21; see supra notes 33-35 and accompanying text.

202  Buzzard, 4 Ark. at 21.

203  Nunn v. State, 1 Ga. 243, 249, 251 (1846).

204  Day v. State, 37 Tenn. (5 Sneed) 496, 500 (1857).

205  Id. at 501.

206  See Act of Dec. 25, 1837, 1837 Ga. Laws 90 (protecting citizens of Georgia against the use of deadly weapons); Act of Jan. 27, 1838, ch. CXXXVII, 1837-1838 Tenn. Pub. Acts 200 (banning the sale of Bowie knives and Arkansas tooth picks); Day, 37 Tenn. (5 Sneed) at 496. In Nunn v. State, the Georgia Supreme Court construed the scope of the state's police power more narrowly to apply to the regulation of weapons. Nunn, 1 Ga. at 249. In his important treatise, Joel Prentiss Bishop concluded that the more expansive individual rights view of the Bliss court was the minority view regarding the scope of the state's police powers. Joel Prentiss Bishop, Commentaries on the Law of Statutory Crimes § 793 (2d ed. 1883).

207    Amar, supra note 102; Stephen P. Halbrook, Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876 (1998); Levinson, supra note 5. The most comprehensive account of the Fourteenth Amendment remains William E. Nelson, The Fourteenth Amendment: From Political Principle to Judicial Doctrine (1988). For a critique of Second Amendment scholarship on the Founding Era as a form of consensus history, see Cornell, Beyond the Myth of Consensus, supra note 51.

208    Amar, supra note 102, at 266.

209    Levinson, supra note 104, at 108 (quoting Amar, supra note 102, at 258).

210    Michael Curtis argues that incorporation enjoyed broad popular support. Michael Kent Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights (1986). Other studies of ratification do not support this claim or Amar's morphing Second Amendment. See James E. Bond, The Original Understanding of the Fourteenth Amendment in Illinois, Ohio, and Pennsylvania, 18 Akron L. Rev. 435 (1985) [hereinafter Bond, Original Understanding]; James E. Bond, Ratification of the Fourteenth Amendment in North Carolina, 20 Wake Forest L. Rev. 89 (1984); Lambert Gingras, Congressional Misunderstandings and the Ratifiers' Understanding: The Case of the Fourteenth Amendment, 40 Am. J. Legal Hist. 41 (1996).

211    Amar, supra note 102, at 266.

212    See Kopel, supra note 60, at 1410 n.190 (listing state constitutions' right to bear arms provisions); supra note 72 and accompanying text. For a discussion of this transformation, see Cornell, Beyond the Myth of Consensus, supra note 51; Cornell, "Don't Know Much About History," supra note 18.

213    See Chris Mooney, Showdown, Lingua Franca, Feb. 2000, at 28.

214    The literature challenging originalism is enormous. For a particularly forceful statement, see Mark Tushnet, Interdisciplinary Legal Scholarship: The Case of History-in-Law, 71 Chi.-Kent L. Rev. 909, 914 (1996). A detailed philosophical discussion of originalism may be found in Keith E. Whittington, Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review (1999). Whittington's erudite defense of originalism addresses the theoretical and methodological challenges to this interpretive methodology, but provides little historical guidance on how one should weigh different intents or evaluate the meaning or significance of particular texts. Whittington concedes that discerning intent may be difficult, but he insists it is not impossible. Id. A less satisfactory and more historically naïve defense of originalism may be found in Barnett, The Original Meaning, supra note 10; Barnett, An Originalism for Nonoriginalists, supra note 10. For Barnett's view of the Second Amendment, see Barnett, The Relevance of the Framers' Intent, supra note 10. Historical hostility to the methodology of originalism has had little to do with epistemological problems, and has generally focused on the use of evidence, not the epistemological possibility of reconstructing the past. See also Interpreting the Constitution: The Debate over Original Intent (Jack N. Rakove ed., 1990); Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution (1996). On the notion of standards for originalists, see H. Jefferson Powell, Rules for Originalists, 73 Va. L. Rev. 659 (1987). For a critique of law office history, see Alfred H. Kelly, Clio and the Court: An Illicit Love Affair, 1965 Sup. Ct. Rev. 119. On originalism as a form of forensic history, see John Phillip Reid, Law and History, 27 Loy. L.A. L. Rev. 193 (1993). On the need for legal scholarship to remain current with historical scholarship, see Flaherty, supra note 113.

215    See, e.g., Bret Boyce, Originalism and the Fourteenth Amendment, 33 Wake Forest L. Rev. 909 (1998).

216    Larry Kramer, Fidelity to History--And Through It, 65 Fordham L. Rev. 1627, 1628, 1638 (1997).

217    See supra note 207.

218    Bingham's speech was published in the local newspaper. John A. Bingham, Politics in Ohio (Aug. 8, 1866), in Cincinnati Commercial, Aug. 10, 1866, at 1.

219    Id.

220    Id.

221    John A. Bingham, The Constitutional Amendment (Aug. 24, 1866), in Cincinnati Commercial, Aug. 27, 1866, at 1.

222    Id.

223    See generally Bond, Original Understanding, supra note 210, at 445.

224    For a good sampling of such rhetoric, see Kopel, supra note 60, at 1447-59.

225    See Bond, Original Understanding, supra note 210, at 442-43.

226    Sally E. Hadden, Slave Patrols: Law and Violence in Virginia and the Carolinas 204-05 (2001); see also Carl T. Bogus, The Hidden History of the Second Amendment, 31 U.C. Davis L. Rev. 309, 335-37 (1998) (describing the slave patrols made by an all white militia to control the slave population).

227    Amar, supra note 102, at 259.

228    See Lou Falkner Williams, The Great South Carolina Ku Klux Klan Trials, 1871-1872, at 22-29 (1996).

229    Id.

230    Id.

231    Otis Singletary, Negro Militia and Reconstruction (1957).

232    Williams, supra note 228, at 75-76.

233    Id. at 61-64; Kermit L. Hall, Political Power and Constitutional Legitimacy: The South Carolina Ku Klux Klan Trials, 1871-1872, 33 Emory L.J. 921, 941-42 (1984).

234    Amar, supra note 102, at 210.

235    See Williams, supra note 228, at 27-28.

236    Id. at 61-64. See generally The Case of Robert Hayes Mitchell, Sylvanus Shearer and Others, in Proceedings in the Ku Klux Trials at Columbia, S.C. in the United States Circuit Court 147-48 (Negro Univs. Press 1969) (1872) (transcript of the Ku Klux Trials) [hereinafter Proceedings in the Ku Klux Trials].

237    Williams, supra note 228, at 62-64.

238    Robert J. Kaczorowski, The Nationalization of Civil Rights: Constitutional Theory and Practice in a Racist Society, 1866-1883, at 153 (1987) (noting that Akerman was committed to enforcing the rights of citizens through the Fourteenth Amendment); Robert J. Kaczorowski, The Politics of Judicial Interpretation: The Federal Courts, Department of Justice and Civil Rights, 1866-1876, at 122-29 (1985).

239    Proceedings in the Ku Klux Trials, supra note 236.

240    See supra note 209.

241    Proceedings in the Ku Klux Trials, supra note 236, at 147.

242    32 U.S. (7 Pet.) 243 (1833).

243    Proceedings in the Ku Klux Trials, supra note 236, at 147.

244    Id. at 148.

245    See Amar, supra note 102; Halbrook, supra note 207; Levinson, supra note 5.

246    See generally Nelson, supra note 207, at 11.

247    See Pamela Brandwein, Reconstructing Reconstruction: The Supreme Court and the Production of Historical Truth 56-58 (1999).

248    See id.

249    See id.

250    Id.

251    See Proceedings in the Ku Klux Trials, supra note 236.

252    For problematic efforts to associate guns with modern First Amendment theory's prohibition on prior restraints, see Powe, supra note 7. Another dubious modern claim is that the founders would have not cared about the social cost of the exercise of a right, a dubious claim given the regulatory framework they created to deal with firearms and gun powder. On this anachronistic claim, see Reynolds, supra note 7. In this sense the right to bear arms was certainly not a trump. See supra note 32. When the right is placed in its historical context and viewed as a civic right, this becomes clear.

253    See supra Introduction.

254    Cornell, Beyond the Myth of Consensus, supra note 51.

255    See Uviller & Merkel, supra note 20, at 143.

256    See supra notes 83, 112-16 and accompanying text.

257    For more on this point, see Erwin Chemerinsky, Putting the Gun Control Debate in Social Perspective, 73 Fordham L. Rev. 477, 484 (2004).

258    See Robert J. Cottrol & Raymond T. Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L.J. 309 (1991); Kates, The Second Amendment, supra note 78, at 98.

259    Eugene Volokh, The Mechanisms of the Slippery Slope, 116 Harv. L. Rev. 1026 (2003).

260    Saul Cornell, Introduction to Whose Right to Bear Arms, supra note 3, at 14 (quoting Noah Webster).

261    James Fleming's arguments about the deeply rooted nature of property rights in American society apply with even greater force to gun rights. The deep cultural roots of guns in American history and society render aggressive judicial enforcement of an individual right superfluous. Entrenched social practice and organized political action are the most reliable and effective means for protecting the rights of gun owners and have proven remarkably resilient over time. Given the power of gun rights groups, the limited funding of gun control groups, and their quite modest agenda of moderate regulation, the idea of a slippery slope on this issue is ludicrous. For an elaboration of this argument with regard to property rights, see James E. Fleming, Fidelity, Basic Liberties, and the Specter of Lochner, 41 Wm. & Mary L. Rev. 147 (1999).

262    James B. Jacobs, Can Gun Control Work? (2002).

73 FDMLR 487

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Exhibit 18   35
Page 00368

# Exhibit 19

Exhibit 19
Page 00369

FORUM: COMMENT

# Mandatory Gun Ownership, the Militia Census of 1806, and Background Assumptions concerning the Early American Right to Arms: A Cautious Response to Robert Churchill

## WILLIAM G. MERKEL

In "Gun Ownership in Early America," published in the *William and Mary Quarterly* in 2003,[1] Robert Churchill drew on probate inventories and militia records to make the case that arms ownership was pervasive in late colonial, revolutionary, and early national America. Churchill concluded with the observation that "[i]t is time to ponder what these guns meant to their owners and how that meaning changed over time."[2] In his substantial contribution to this volume of *Law and History Review,*[3] Churchill takes up that challenge himself and advances the claim that widespread arms ownership engendered a sense of possessory entitlement, and that this notion of right informed constitutional sensibilities respecting guns and the Second Amendment. He acknowledges that a civic republican understanding focused on the militia was central to the framers' conception of the right to arms, but urges that another stream of discourse—individualistic, personal, and divorced from militia linked obligations—was present from the beginning. By the early nineteenth century, Churchill argues, this purely private view of the right to arms had become ascendant.

1. Robert H. Churchill, "Gun Ownership in Early America: A Survey of Manuscript Militia Returns," *The William and Mary Quarterly,* 3d ser., 60 (2003): 615.
2. Ibid., 642.
3. Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," *Law and History Review* 25 (2007): 139–75.

William G. Merkel is a professor at Washburn University School of Law.

*Law and History Review* Spring 2007, Vol. 25, No. 1
© 2007 by the Board of Trustees of the University of Illinois

Exhibit 19
Page 00370

Churchill's most intriguing claim is that arms possession (in large measure because of its alleged ubiquity) acquired an aura of immunity against at least some assertions of government power during the period in which the Constitution and Bill of Rights were drafted and ratified. In colonial times, says Churchill, provincial and imperial military authority extended to seizure of guns for purposes of arming militia and ensuring security, but by the 1780s, these statist claims against privately held weapons were abating, never to return. The police power still allowed civil authorities to regulate firearms usage to preserve safety in towns and on public roads, promote public decorum, and protect the population of game, but assertions of governmental power to seize (rather than merely regulate) guns rapidly petered out in the new nation. Perhaps like other royal prerogatives that died a death of desuetude in the Whigish narrative of English history, the abeyance of governmental authority to confiscate arms begat a negative liberty against gun seizure, and this liberty soon took up a prideful place in the orthodox (or at least popular) understanding of constitutional rights. Churchill's argument is interesting, in several respects novel, and in many ways enlightening. But it is by no means clear that he accurately captures all the evidence on which he relies, or that his thesis can fully account for some important evidence that he glosses over or ignores. In fact, vital material Churchill misreads or omits points squarely back to the civic-republican focused reading of the constitutional right to arms he aims to play down or read away.

Consider, for instance, Congressional inquiry into the arming of the militia. On April 2, 1806, Joseph Varnum, then a six-term Republican Congressman from Massachusetts and major general in the Commonwealth's militia, presented a report from the "committee instructed to inquire what measures are necessary to be adopted to complete the arming of the militia of the United States" to the House of Representatives.[4] The report, partly reprinted below, is difficult to reconcile with Churchill's findings concerning gun ownership among militia members in the revolutionary and early national periods, on which his argument that the Second Amendment protected a private as well as a militia-focused right to arms largely depends. Congressman Varnum drew on data familiar to the committee and reprinted in the Militia Census of 1806, a document officially communicated to Congress by the president nine days later on April 11, 1806.[5] The results of that census, and the question of how they square with Churchill's ac-

4. *American State Papers,* 5, *Military Affairs,* 1:198–99. For information on Varnum, see the entry in *American National Biography* 22:278–79 by Edward W. Hanson of the Massachusetts Historical Society.

5. *American State Papers,* 5, *Military Affairs,* 1:199.

Exhibit 19
Page 00371

count, are taken up next. In the report itself, Varnum's committee informed Congress

> [t]hat, by the laws of the United States, each citizen enrolled in the militia is put under obligations to provide himself with a good musket or rifle, and all the other military equipments prescribed by law. From the best estimate which the committee have been able to form, there is upwards of 250,000 fire arms and rifles in the hands of the militia, which have, a few instances excepted, been provided by, and are the property of, the individuals who hold them. It is highly probable, that many more of the militia would have provided themselves with fire arms in the same way, if they had been for sale in those parts of the United States where the deficiencies have happened; but the wars in Europe have had a tendency to prevent the importation of fire arms from thence into the United States, which, together with the limited establishments for the manufacture of that implement in the United States, has rendered it impossible for individuals to procure them.[6]

The committee went on to say that the number of stands of public arms in the arsenals of the various states had not been ascertained, that there were about 120,000 fire arms fit for use and 12,000 in need of repair in the magazines of the United States, and that the committee was of the opinion that further public monies ($62,100 to be exact) should be set aside for manufacture of fire arms in the armories of the United States "to provide for the exigency of war."[7]

The Militia Census listed the total numbers of men enrolled for each state rank by rank and the total numbers of rifles and muskets each state reported. Assuming that privates and noncommissioned officers but not officers were expected to carry long guns as required by the Militia Act of 1792, the percentages of militia members each state reported as armed with rifles or muskets are as follows:[8]

6. Ibid., 199.
7. Ibid., 198–99.
8. These are my rough calculations; I have left out sergeant majors and quartermaster sergeants because of their insignificant numbers and my uncertainty as to whether they were expected to muster with long guns. I have also omitted the reports for the District of Columbia, Mississippi Territory, and Indiana Territory, whose militia were few in number. The Orleans and Louisiana territories did not report. For the raw numbers see *American State Papers*, 5, *Military Affairs*, 1:202–3. For Churchill's important reservations about reading too much into these numbers see Churchill, "Gun Ownership in Early America." Churchill makes the case that the census should not be taken at face value; instead, he maintains, it is important to look at the documents generated at the brigade level on which the census was based. By failing to do so, Churchill cautions that historians will be mislead because the census undercounts by measuring guns brought to muster, not guns held at home. But if this were a serious problem, one would expect Major General Varnum, with thirty years militia experience, to have been aware of it. He reported "upwards of 250,000 firearms and

Exhibit 19
Page 00372

New Hampshire Infantry: 19,100 privates and 1,108 sergeants, 12,500 muskets; or 61.9 percent armed.

Massachusetts Infantry: 53,316 privates and 1,108 sergeants, 46,218 muskets and 397 rifles; or 85.7 percent armed.

Rhode Island Infantry: 4,414 privates and 302 sergeants, 3,052 muskets; or 64.7 percent armed.

Connecticut Infantry: 13,952 privates, 1,144 corporals, 1,293 sergeants, 15,085 muskets; or 92.0 percent armed.

Vermont Infantry: 13,708 privates, 1,011 sergeants, 8,824 muskets; or 59.9 percent armed.

New York Infantry: 63,744 privates, 3,885 sergeants, 39,919 muskets and 1,928 rifles; or 61.9 percent armed.

New Jersey Infantry: 21,742 privates, 1,142 sergeants, 12,423 muskets and 86 rifles; or 54.7 percent armed.

Pennsylvania Infantry and Riflemen: 80,061 privates, 2,881 sergeants, 3,352 riflemen, 20,000 muskets, 3,352 rifles; or 27.1 percent armed.

Delaware, not reporting.

Maryland, not reporting.

Virginia Infantry: 61,962 privates, 3,388 sergeants, 10,490 muskets, 2,734 rifles; or 21.3 percent armed.

North Carolina Infantry: 37,871 privates, 1,774 sergeants, 16,571 muskets, 2,343 rifles; or 47.7 percent armed.

South Carolina Infantry, Riflemen, and Light Infantry: 29,082 privates and rank and file, 245 pioneers, 165 corporals, 1,245 sergeants, 5,916 muskets, 5,731 rifles; or 37.9 percent armed.

Georgia Infantry and Riflemen: 16,650 infantry and rank and file, 835 sergeants, 1,782 muskets, 1,955 rifles; or 21.4 percent armed.

Kentucky Infantry: 29,386 privates, 1,679 sergeants, 3,966 muskets, 15,567 rifles; or 62.9 percent armed.

Tennessee Infantry: 14,285 privates, 308 corporals, 308 sergeants, 4,647 muskets; or 31.2 percent armed.

Ohio Infantry: 8,031 privates, 456 sergeants, 277 muskets, 3,238 rifles; or 41.4 percent armed.

Varnum's report points to the committee's concerns over a national militia less than fully armed and then proposes to rectify this problem by Congressional spending on arms production in federal arsenals for distribution (via the market? state purchase and resale? loan? outright grant?) to unarmed militia members. As the numbers above make clear, the census he and the committee consulted in reaching this decision indicated that

---

rifles in the hands of the militia"; the census lists by my count some 204,200 muskets and 52,900 rifles, suggesting strongly that it provided the basis of Varnum's figures. If Varnum knew of systemic undercounting, he failed to tell Congress, and mislead his colleagues in the process. See *American State Papers,* 5, *Military Affairs,* 1:199.

Exhibit 19
Page 00373

the New England militia was substantially armed and that the middle state militia (except in Pennsylvania, home to large populations of Quakers and other conscientious objectors) was above half armed. But serious problems arose in the South and West (excepting Kentucky), and these problems were nowhere as acute as in Virginia. Churchill, however, argues that that disarmament there was more apparent than real. The census, he claims, counted only state owned arms (and not privately owned arms) in Virginia and several other states. Yet the committee reported that it did not know how many arms were held in the arsenals of the states, and this is very hard to incorporate into Churchill's interpretation of the census, unless his point is that Virginians who had been issued state owned arms kept them at home and brought them to muster where these guns (unlike the guns still in the arsenals) were counted.

Churchill's main thrust on this issue is that most Virginia militia members actually owned their own guns (why would they have so many fewer than their northern compatriots?), but refused to bring them to muster in large measure because of a state history of confiscation. Here again Churchill's thesis stumbles over its own inconsistencies. The claim that Virginians were still influenced by expectations of confiscation in 1806 is not wholly in harmony with Churchill's larger argument that the power to seize atrophied in the 1780s even as a sense of immunity against confiscation took hold in the popular mind.

Varnum's report and the census finding of low armament in Virginia is troubling for the Churchill thesis in at least one other sense as well. If Churchill is right that Virginians had guns but did not bring them to muster, it becomes necessary to explain why a Jeffersonian controlled Congress closely tied to the Virginian president was unaware of this issue. This holds particularly for Major General Varnum himself, given his life-long service with Massachusetts citizen soldiery, his national responsibilities for militia oversight, and his personal relations with the president—he became Jefferson's candidate for Speaker of the House in the next Congress and won appointment when former Speaker John Randolph's faction broke with the administration. If the cause of the Virginia militia's seeming unreadiness was as Churchill supposes, it stands to reason that Jefferson's Virginia connections, including the state's three most recent governors—James Monroe (1799–1802), John Page (1802–1805), and William Cabell (1805–1808), all Jefferson loyalists—would have informed the president, and that Jefferson would have passed to word to Varnum, one of his leading New England lieutenants in the House and chair of the committee responsible for supervising arming of the militia. Churchill's assumption is equally hard to square with then Governor Monroe's behavior six years earlier in 1800, when he was called on to consider the

Exhibit 19
Page 00374

Virginia militia's potential effectiveness as a potential counterweight to a Hamiltonian army unwilling to yield the presidency in the event of a Republican victory in the national elections. Monroe made it a point to order arms from overseas, not to order Virginians to bring their arms out of hiding.[9]

In a cordial email to this reviewer, Churchill has stressed that the assumption of widespread arms ownership that underlies his thesis is the product of his detailed research into a variety of sources, including probate records, and the local militia rolls, which he found formed the basis of state figures included in federal militia censuses. In truth, my disagreements with Churchill have less to do with the prevalence of guns in early national culture (my sense is that the Census of 1806 is about right, his studied retort is that it substantially undercounts) than with the purpose and meaning that Americans attached to their ownership of guns, and the question of how that fed into their thinking (such as there was on this point) about the Second Amendment. And in this respect, Churchill's argument appears based on an oddly ambiguous set of assumptions about statutory compliance. His reasoning relies on two premises. First, Americans complied willingly and broadly with colonial and state level militia-linked requirements to acquire guns. Second, they later followed the federal Militia Act's command that white men of arms-bearing years obtain a musket or a rifle. But he builds on these assumptions to argue that once Americans came into compliance, and became accustomed to a culture of arms bearing, the statutory purposes behind their acquisition of guns were subordinated. Ownership of guns took on an individualistic valence says Churchill, with hostility to gun confiscation reflecting less and less solicitude for the communitarian militia, and more and more a property-focused sense of private immunity. This understanding in turn became imbued with qualities perhaps more readily associated with modern Takings Clause jurisprudence (and its late eighteenth-century precursors), and the sort of "Lockean" rhetoric Locke may not have recognized, than with the anti-army trappings of old Commonwealth Whiggery.

I believe that Churchill reads too much libertarianism and too little republicanism into the problem, and that along the way he smoothes over some important ambiguities that his evidence, fairly read, will not resolve. Once more, the Varnum report is instructive. Varnum suggests that most militia eligible Americans wanted to comply with the Militia Act's requirement of arming themselves, but that many were unable to do so because

9. See William G. Merkel, "To See Oneself as a Target of a Justified Revolution: Thomas Jefferson and Gabriel's Rebellion," *American Nineteenth Century History* 4.1 (2003): 1–31.

Exhibit 19
Page 00375

guns were scarce. Whether Varnum was too charitable respecting the causes of wide-spread non-compliance (lack of guns as opposed to lack of will), the fact remains that, unless Churchill's largely conclusory surmise that many southerners and westerners were hiding their guns is true, nearly half the militia eligible population was non-compliant. Non-compliance was not an uncommon theme in recent American history. Churchill himself claims that non-compliance with the Act of 1792 (failure to appear armed on muster day) actually explains the alleged undercounting of guns in Virginia. Far more famously, the Sugar Act, Stamp Act, Townsend Duties, and Tea Act come to mind as late colonial statutes generating less than optimal compliance, as do the Whiskey Tax and Window Tax from the Federalist period. To be sure, these were imperial or at least national as opposed to provincial or state laws such as those Churchill cites to support his claim for a wide distribution of arms. But other provincial or state laws, including prohibitions against unlicensed preaching and absenting oneself from the established church in a manner not contemplated in the Toleration Act, were notoriously under-enforced or unenforceable as well.[10]

If Americans were as widely out of compliance with late colonial militia-linked mandatory arming laws as their successors were with the U.S. Act of 1792, then serious problems arise at the beginning of Churchill's chronological chain linking the presumption of wide spread gun possession (required by statute) to familiarity to possessory impulses to claims of right to assertions of immunity to constitutionalization. And it is in the earlier period, where Churchill insists the discourse that ripened into rights talk began, that he relies most strongly on unadorned assumptions of statutory compliance, for the evidence from probate inventories and censuses becomes thicker only as the colonial period ends. If late colonial Americans were as non-compliant in regard to gun ownership as they were respecting tax payment and religious establishment, perhaps they were less obsessed with clinging to guns they did not have for individualistic property-focused purposes than they were animated with pro-militia and anti-army rhetoric for civic and republican ends.

Churchill's essay is problematic not simply for evidentiary reasons. His argument builds principally on the theoretical distinction between military authority to seize and police power to regulate guns, but this theoretical distinction may require substantial rethinking. It is premised at least in part on the assumption that measures relying on military authority were extraordinary and rare, while exercises of the police power were quotidian and norm defining. Even if this were true, however, it would in no way

10. See Rhys Isaac, *The Transformation of Virginia: Community, Religion, and Authority, 1740–1790* (Chapel Hill: University of North Carolina Press, 1982).

Exhibit 19
Page 00376

undermine the theory that fears of the standing armies and executive usurpation were central to the Second Amendment, for it was in extraordinary times of crises real or imagined or pre-textual that efforts to disarm the militia and set up a corrupt regime buttressed by the army were most to be expected. Churchill's underlying assumption, however, is in fact not true for the generation that experienced the Revolution and the constitutional crisis. As Alan Taylor among others reminds us, imperial wars between Britain and France were more common than not in the late colonial period, and those wars increasingly focused on the North American theater and increasingly mobilized the North American population. A native born American aged fifty when the new national government convened in 1789 had known more years of war than peace.[11] The great imperial and national political debates of that person's lifetime had focused on war, taxes to fund war, and the dangers of a government capable of enacting and enforcing the tax regime required to finance war or hold together a country sufficiently powerful to avoid war.

If war, or fear of war, or the need to pay for or avoid war was the norm for the founding generation, perhaps this does not so much undermine Churchill's principal claim as suggest that national attitudes were bound to change. Fears of undue assertions of military authority subsided in the decades that followed the revolutionary period, with a clearly civilian-controlled Jeffersonian system of governance firmly in place in the substantially demilitarized nation that became the ante-bellum republic. But this does not get Churchill wholly off the hook. His premises remain problematic for the earlier period in which he roots his analysis, and for colonial times, his terminological distinction between military powers and police powers in some respects is itself anachronistic.

The sharp distinction between military and police powers makes much more sense under the system of federalism and separation of powers adopted in the U.S. Constitution of 1788 than it does for the colonial system of governance. The national Constitution conveyed certain specified powers to the United States Congress (such as the power to raise and support armies), rested the Commander-in-Chief power in the federal presidency, and reserved the bulk of unspecified powers to the states, the latter including the general authority inherent in their quasi sovereign status and partly confirmed in the Tenth Amendment to make general policy respecting health, safety, and morals. Whether the distinction between military and police powers will bear as much weight as Churchill would load on it in colonial times is a more doubtful proposition. The constitutional settlement reached during the Glorious Revolution in England left intact the royal prerogatives that Prince William insisted on keeping to make the Crown

---

11. Alan Taylor, *American Colonies* (New York: Viking, 2001), 420–43.

Exhibit 19
Page 00377

worthwhile, including those related to war and peace and command of the military. In the eighteenth century, however, these devolved in practice to the cabinet and the prime minister. From 1689, military funding was required to flow from Parliament, and the Bill of Rights spoke of allowing protestant subjects such arms as were allowed by law.[12]

On an ad hoc and imperfect basis, each colony's government of provincial assembly, governor, and council mirrored the British system, and during war time (which was, as mentioned above, as normal as not) military relations between colonial and royal government frequently became complicated and confused by the presence of regulars responsible directly to the Crown under whose commanders colonial militia sometimes served. How meaningful it is in this context to attempt to label weapons seizures for purposes of militia arming (often carried out under imperial pressure to get more local troops in the field) exercises of either police or military powers is difficult to say.[13] The authority behind confiscation appears to have been sometimes imperial, sometimes local, sometimes prerogative, sometimes statutory, and sometimes a matter of ad hoc necessity. It is likewise open to question whether the coming of independence marked any conceptual sharpening of the distinctions between police and military powers respecting the issue of guns, so much as it did a general heightening of the popular preference for militia over regulars, and realization by the revolutionary leadership that regulars were as necessary during war as they were dangerous to peace and to republican principles.

Churchill's essay is engaging and thought provoking throughout. His central insight that power to regulate and power to confiscate are not one and the same is of crucial importance, both to understanding the meaning of the American right to arms at its origins, and to understanding the fevered politics that envelop that right in our own times. I have doubts, however, that Churchill's distinction between authority under police and military powers offers a complete and accurate account of changing attitudes towards the militia and the right to arms in the founding and early national periods. In his contribution to this volume, Saul Cornell has pointed to grave problems concerning Churchill's use of evidence from the constitutional period and from the nineteenth century.[14] My own concerns focus

12. See detailed discussion in Lois G. Schwoerer, "To Hold and Bear Arms: The English Perspective," *Chicago-Kent Law Review* 76 (2000): 27, and in H. Richard Uviller and William G. Merkel, *The Militia and the Right to Arms, Or How the Second Amendment Fell Silent* (Durham: North Carolina Press, 2002), 47–56.

13. See, e.g., Michael A. McDonnell, "The Politics of Mobilization in Revolutionary Virginia: Military Culture and Political and Social Relations, 1774–1783" (Oxford University D.Phil. thesis, 1995).

14. Saul Cornell, "Early American Gun Regulation and the Second Amendment: A Closer Look at the Evidence," *Law and History Review* 25 (2007): 197–204.

Exhibit 19
Page 00378

on Churchill's extrapolations from assumptions perhaps too hastily drawn about the meaning of arms ownership to Americans in the late eighteenth and early nineteenth centuries. While Churchill has raised interesting questions and offered intriguing insights, he has also made generalizations that his evidence is not strong enough to support. In the end, I remain convinced that David Konig, Saul Cornell, and my late friend and mentor Richard Uviller and I were correct to stress the civic, militia-focused meaning of the right to arms that dominated discussion at the time of the Second Amendment's framing, and (as Cornell ably shows in this forum) continued to predominate long into the nineteenth century. There were, to be sure, countervailing voices. To ignore them would be false to the historical record and would wrongly deprive many enthusiastic supporters of a broad right to own guns of a sense of provenance to which they attach much meaning. Churchill is right to take those voices seriously. But in the article discussed here, Churchill exaggerates their importance and forges for them a kinship with the mainstream that a careful reading of the record cannot always confirm.

Exhibit 19
Page 00379

# Exhibit 20

Exhibit 20
Page 00380

# Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence

Randolph Roth

MICHAEL A. Bellesiles's *Arming America,* an ambitious and well-written study of the history of gun ownership and gun use in America, has many themes, but none is more important for contemporary public policy than the relationship between guns and interpersonal violence. Bellesiles argues that before the 1850s, relatively few Americans owned guns or knew how to use, repair, or preserve them. As a result, guns contributed little to the homicide rate, which was low everywhere, even in the South and on the frontier, where historians once assumed guns and murder went hand in hand. These patterns changed dramatically, according to Bellesiles, after the Mexican War and especially after the Civil War, when gun ownership became widespread and cultural changes encouraged the use of handguns to command respect and resolve personal and political disputes. The result was an unprecedented wave of gun-related homicides, which has left America to this day with the highest homicide rate of any industrial democracy.

Bellesiles's thesis has been widely embraced by proponents of gun control and condemned by opponents of firearms regulation. Widespread gun ownership is not the only cause, in Bellesiles's opinion, of America's high homicide rate, but it is a crucial factor, so his thesis has landed at the center of a vigorous public debate.[1]

Randolph Roth is a member of the Department of History at Ohio State University and of the Editorial Board of *Historical Methods.* He is completing an interregional study of violent crime and violent death in America from colonial times to 1900, titled "The Puzzle of American Homicide." He would like to thank James Lindgren of Northwestern University, Robert Churchill of Rutgers University, and Saul Cornell of Ohio State University for their help and for sharing their research. The author would also like to thank the Harry Frank Guggenheim Foundation, the National Endowment for the Humanities, and the National Science Foundation (SBR-9808050) for their financial support for the research reported in this essay.

[1] Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York, 2000), 349, notes briefly that "during the twenty years before the Civil War,

*William and Mary Quarterly,* 3d Series, Volume LIX, Number 1, January 2002

Exhibit 20
Page 00381

My concern with *Arming America* is not over its political implications. As a student of homicide, I am persuaded that lowering levels of gun ownership and gun use among groups at high risk of committing homicide, and improving gun storage and safety, might well lower America's homicide rate, even if guns did not cause America's homicide problem in the first place. My concern is that the thesis of *Arming America* is wrong, and wrong in ways that will make it more difficult to persuade the public to back policy measures its author supports.

The first problem is Bellesiles's claim that gun ownership was not widespread in early America. "Most Americans did not own guns and had no interest in buying them" (p. 229), he writes. That claim is not supported by the sources Bellesiles cites, by others he does not cite, or by the data he presents. Indeed, the evidence suggests that roughly half of all households owned at least one working gun, and that is the same level of gun ownership that has prevailed in America during the past fifty years.[2] Bellesiles states, for instance, that of 186 published probate inventories from Providence, Rhode Island, recorded between 1680 and 1730, "all for property-owning adult males," only ninety "mention some form of gun." According to "many inventories," the guns were state-owned rather than personally owned, and "more than half" of all guns were "evaluated as old and of poor quality" (pp. 109–10).[3] Recently, James Lindgren and Justin Lee Heather of Northwestern University re-analyzed the Providence inventories and found a very different pattern

Americans began constructing an image of themselves as a violent people and to act on that self-perception." That image contributed to "a shift toward ever-accelerating passion and violence" in the 1840s and 1850s. Bellesiles does not develop this idea, but it plays a crucial role, as does his claim about rising gun ownership, in his explanation for the surge in homicide among European Americans in the late 1840s and 1850s. (References to *Arming America* are given in parentheses in the text of this article.)

[2] Philip J. Cook and Mark H. Moore, "Guns, Gun Control, and Homicide: A Review of Research and Public Policy," in M. Dwayne Smith and Margaret A. Zahn, eds., *Homicide: A Sourcebook of Social Research* (Thousand Oaks, Calif., 1999), 278–79; Cook and Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use* (Washington, D. C., 1996); Cook and Ludwig, "Guns in America: National Survey on Private Ownership and Use of Firearms," *National Institute of Justice Research in Brief* (May 1997), 1–5, 10–11. Gun ownership has declined in recent years in the United States, from roughly half of all households in the late 1950s to 2/5 in the mid-1990s. Other scholars argue, however, that gun ownership has increased since the 1970s. See Daniel D. Polsby and Don B. Kates, Jr., "American Homicide Exceptionalism," *University of Colorado Law Review,* 69 (1998), 982–88, and John R. Lott, Jr., *More Guns, Less Crime: Understanding Crime and Gun Control Laws,* 2d ed. (Chicago, 2000), 36–40.

[3] The inventories Bellesiles cites are in Horatio Rogers, George Moulton Carpenter, and Edward Field, eds., *The Early Records of the Town of Providence* (Providence, 1892–1915), vols. 6, 7, 16.

Exhibit 20
Page 00382

GUNS, GUN CULTURE, AND HOMICIDE                    225

of gun ownership. They discovered, contrary to what Bellesiles asserts, that 17 of the estates in question were owned by women (only one of whom owned a gun), that several estates owned by men lacked inventories, that only 9 percent of guns were evaluated as old or of poor quality, and that only one inventory contained "one of ye Queens Armes"—a British military musket.[4] According to their count, 63 percent of all inventoried male estates, not 48 percent, had guns, and 90 percent of those guns were listed as operable and privately owned. I have since worked through the inventories myself and found that Lindgren and Heather's counts are accurate. There is no evidence that the estates without inventories were substantially different from those with inventories, but it is important to consider the possibility that they lacked guns.[5] If so, the proportion of male estates with guns (58 percent) and with working, privately owned guns (52 percent) would still have been much higher than Bellesiles allows.[6]

Lindgren and Heather's conclusions from the Providence data are consistent with those of other studies of gun ownership that use probate records. Gloria L. Main's study of 604 estates of married male household heads from six counties in Maryland, 1657–1719, finds that 76 percent

[4] Lindgren and Heather, "Counting Guns in Early America," *William and Mary Law Review* (forthcoming May 2002). Lindgren and Heather note in detail the difficult interpretive decisions they make. They exclude all male estates that lacked inventories or that lacked complete inventories, including one estate that included a working gun. They count two estates with "arms" as having guns, because the arms were valued at a high rate, indicating the presence of guns rather than bladed weapons. They establish strict criteria for what constituted a complete estate, noting that other scholars with different criteria might want to include several more estates among the "inventoried" estates, including the partially inventoried estate with a working gun. And they exclude the estates of nonresident landowners, whose personal property would have been inventoried at their place of residence.

[5] Rogers et al., *Early Records of . . . Providence,* shows that estates without inventories (all but one of which were owned by males) were of several types. One estate lacked an inventory (16:373–74). Two listed only real estate (6:30–31, 31–32), which suggests that the deceased were nonresident landowners. Two estates listed only "household goods" (6:70–71, 7:93), but one of those estates listed two guns in an addendum. Another estate was pilfered before an inventory could be taken (16:361–62), probably by the widow and an accomplice. The balance of the estates in the records were managed for living persons by court-appointed guardians (e.g., 6:27, 7:10, 11, 18–19, 19–20). None of these estates had an inventory or a listed value.

[6] Lindgren and Heather, "Counting Guns in Early America," find that 94 of the 149 male estates with inventories had guns and 1 of the 17 female estates with inventories. The total number of decedents with or without inventories was 184, not 186 as Bellesiles states. Two estates without an inventory were owned by females. One male estate with an incomplete inventory contained a working gun, which raises the total number of guns listed in male estates to 95. Thus, 58% (95/165) of all male estates, whether inventoried or not, listed guns. The proportion of all male and female estates with guns was 52% (96/184).

Exhibit 20
Page 00383

contained "arms." Ownership ranged from 50–58 percent for the poorest fifth of all estates to 93–95 percent for the richest tenth.[7] Main's study does not distinguish between guns and other arms, but if the proportion of armed estates that contained guns was similar to the proportion in Providence, 90 percent of the Maryland estates with arms contained guns. Anna Hawley's study of 221 estates in Surry County, Virginia, 1690–1715, finds that among the poorest 30 percent of property owners, the estates of only 19 percent of nonhouseholders and 32 percent of householders included guns, whereas among the wealthiest 70 percent of property owners, the estates of two-thirds included guns. And Hawley believes that Surry's inventories may have understated the level of gun ownership, especially among the poor, because Virginia law exempted arms and ammunition owned by militiamen from attachment or execution for debt. "Appraisers in Surry County may have selectively omitted the guns of poor men from their inventories so that their heirs could meet their civic responsibility."[8]

Alice Hanson Jones's pioneering study of property ownership on the eve of the American Revolution, which randomly sampled and weighed probate inventories to estimate the wealth of the wealthholding population of the thirteen colonies in 1774, also found high levels of gun ownership.[9] Nearly half of the 919 estates in her sample included guns, even though 30 inventories in her sample were incomplete, and 81 estates were owned by women, 13 of whom owned guns.[10] Lindgren and Heather's re-analysis of Jones's data finds that a weighted average of 50 percent of all wealthholders had guns in 1774: 52 percent of all males and 18 percent of all females. The proportions for males and females are slightly higher if estates with incomplete inventories are excluded: 54 percent and 19 percent. Among the male estates with guns, 87 percent

[7] Main, *Tobacco Colony: Life in Early Maryland, 1650–1720* (Princeton, 1982), 242. Main's study examines the estates of 604 young fathers intensively and weighs her findings to estimate level of gun ownership among 1,863 married heads of household.

[8] Hawley, "The Meaning of Absence: Household Inventories in Surry County, Virginia, 1690–1715," in Peter Benes and Jane Benes, eds., *Early American Probate Inventories* (Boston, 1987), 27–28.

[9] Jones, *Wealth of a Nation to Be: The American Colonies on the Eve of the Revolution* (New York, 1980); Jones, *American Colonial Wealth: Documents and Methods*, 3 vols. (New York, 1977). Jones first sampled counties randomly, and then used all estates in each county, except apparently in two Massachusetts counties where she reduced her sample to about 100 estates by selecting estates randomly. She then weighed each estate according to age and other characteristics so that the sample would reflect the wealthholding population of the 13 colonies as a whole. See ibid., 3:1809–1926, and Jones, "Estimating Wealth of the Living from a Probate Sample," *Journal of Interdisciplinary History*, 13 (1982), 273–300.

[10] Of the male estates in Jones's sample, 813 had complete inventories and 25 did not. Of the female estates, 76 had complete inventories and 5 did not.

Exhibit 20
Page 00384

listed at least one gun that was neither old nor broken. Gun ownership among male wealthholders did not vary dramatically by age, but it did by wealth. Only 32 percent of the poorest fifth of male estates contained guns, but 54 percent of the middle three-fifths and 76 percent of the wealthiest fifth did. Gun ownership among male wealthholders also varied by region, from 41 percent in the Middle Colonies to 50 percent in New England and 69 percent in the South.[11] The rates of gun ownership in Jones's sample are thus consistent with the rates in early Maryland, Surry County, and Providence.

Bellesiles is the only researcher who has produced such low estimates of gun ownership. He concludes from his analysis of the unpublished probate records of forty counties—which includes all of the twenty-five counties in Jones's sample—that only 15 percent to 21 percent of all estates listed firearms in the late colonial and early national period.[12] It is possible that gun ownership had declined precipitously since the early eighteenth century and that Americans were peculiarly well armed in 1774, the date of Jones's sample. There is little evidence, however, as *Arming America* acknowledges, that Americans stockpiled arms in expectation of war with Great Britain or that arms ownership was elevated on the eve of the American Revolution.[13] It is difficult, therefore, to reconcile Jones's findings with those of Bellesiles. The chance, statistically, that Jones's well-designed, properly weighted study is that far wrong, and that the proportion of guns listed in unweighted probated estates, 1765–1790, was 15 percent, rather than 49 percent, is nil.[14] Jones's conclusion speaks for itself: guns and pistols "were found in many homes and were useful for hunting and for protection."[15]

It is impossible to know what went wrong in Bellesiles's study, because he does not discuss his sample size or his sampling technique.

[11] Lindgren and Heather, "Counting Guns in Early America."

[12] See the lists of counties in Jones, *American Colonial Wealth*, 1:55–65, and in Bellesiles, *Arming America*, 445. Bellesiles excludes the few New York estates in Jones's sample.

[13] In the Gunston Hall database (1740–1810) analyzed in Lindgren and Heather, "Counting Guns in Early America," probated estates had significantly fewer guns listed in 1774–1775 than in the surrounding years. It is thus more likely that 1774 was a lower than average year for gun ownership than that it was a higher than average year.

[14] Jones's clustered sample is somewhat less efficient than a pure random sample, so the confidence interval surrounding its estimate of gun ownership would be slightly wider than for a random sample. A random sample of 919 cases would have a 95% confidence interval of +/- 3.2%.

$$48.9\% \ +/- \ 1.96 * \text{square root } [(.5 * (1 - .5)) \ / \ 919]$$
$$48.9\% \ =/- \ 3.2\%$$

Given that 48.9% of the estates in Jone's sample listed guns, Bellesiles's estimate is roughly 10 standard deviations below Jones's estimate.

[15] Jones, *Wealth of a Nation to Be*, 330.

Exhibit 20
Page 00385

**WILLIAM AND MARY QUARTERLY**

Bellesiles may have failed to sample probate records randomly or to sample enough probate records, or he may have counted inaccurately, as he did in his study of Providence. Lindgren and Heather, in a new analysis of the probate records from the counties in Vermont that Bellesiles includes in his study, report that 40 percent of inventoried male estates contained guns, 1773–1790. I checked their Vermont study and found their accounts correct.[16] Bellesiles's low estimates of gun ownership are probably the result of inaccurate counting.[17]

*Arming America* does not rely on probate records alone. Bellesiles recognizes that probate records describe gun ownership among property-owners. He supplements probate records with an analysis of government surveys of the number of guns owned by militia members (p. 446). According to surveys by the federal government, more than two-fifths of all militiamen in 1803, 1810, and 1820 owned firearms—a percentage higher than would have been predicted from probate records alone, con-

---

[16] Probate Court Records, Rutland District Probate Court, vols. 1–2, in Rutland County Probate Court, Rutland, Vt.; Probate Court Records, Bennington District Probate Court, vol. 1, and Probate Court Records, Manchester District Probate Court, vol. 1, both in Bennington County Probate Court, Manchester, Vt.; Probate Court Records, Bradford District Probate Court, vol. A, in Orange County Probate Court, Chelsea, Vt.; Probate Court Records, Marlboro District Probate Court, vol. 1, and Probate Court Records, Westminster District Probate Court, vol. 1, both in Windham County Probate Court, Bellows Falls, Vt.; Probate Court Records, Windsor District Probate Court, vol. 1, in Windsor County Probate Court, North Springfield, Vt.; Probate Court Records, Hartford District Probate Court, vols. 1–2, in Windsor County Probate Court, Woodstock, Vt.. These include all surviving inventories for Vermont, 1773–1790. The Vermont probate records contain complete inventories of 289 male estates, of which 115 list guns. Only 9 of the estates that list guns list only old guns. Excluding estates from Orange County, as Bellesiles does in *Arming America,* the numbers are 274, 110, and 8.

[17] Bellesiles also makes arithmetic mistakes. Some of the percentages in his table of probate inventories listing firearms are mathematically improbable or impossible. He states, for instance, that 14.7% of probate inventories contained guns, 1765–1790. That percentage is slightly higher than his estimate for the frontier (14.2%), but below his estimates for the three other regions studied: the northern urban coast (16.1%), the northern rural coast (14.9%), and the South (18.3%). To pull the national average that far below the averages for the latter three regions, the number of estates that Bellesiles samples from the frontier counties would have to be enormous relative to the number of estates he samples from the other regions. Further mathematical confusion arises because Bellesiles changed his description of his sample between his "The Origins of Gun Culture in the United States, 1760–1865," *Journal of American History,* 83 (1996), 425–55, and *Arming America,* even though his estimates of gun ownership did not change. If, as stated in his 1996 article, Bellesiles includes Jones's data in his sample, 1765–1790, his results are more improbable. To offset the 919 estates in her sample, nearly half of which contain guns, Bellesiles would have had to have found an uninterrupted run of more than 2,000 estates that contained no guns, or more than 5,000 estates that contained 7% guns, to arrive at a national average of 14.7% from 1765–1790.

Exhibit 20
Page 00386

sidering that many militiamen were young men who had little or no taxable property. According to surveys by the state of Massachusetts, the militiamen who turned out for annual musters in 1812 and 1815 had 49,000 and 50,000 guns, respectively, nearly all of which, except for a few town-owned guns, were privately owned. That number, which does not include guns in the hands of nonmilitia members or of militia members who did not turn out for the annual muster, means that active militia members alone had enough guns to arm 53 percent to 56 percent of all households in Massachusetts during the War of 1812. The percentages were lower in 1789, 1795, and 1824, ranging from 31 percent to 36 percent, perhaps because gun ownership was dramatically lower in Massachusetts in those years, but probably because fewer militiamen turned out for musters in peacetime (p. 447).[18]

Bellesiles analyzes surveys of guns owned by militia members in a single-minded way. He divides the number of guns by the number of males ages 16 and older, by the number of white males, and by the total population, which leaves us with the impression that gun ownership was rare. If he had divided the same number of guns by the number of households or by the number of adult white males who were of middling or poor circumstances, we would have been left with the impression that gun ownership was common. His calculations are correct. But as Loren Haskins and Kirk Jeffrey note in *Understanding Quantitative History,*

[18] According to the federal census, the average household size in Massachusetts was 5.7 in 1790 and 5.1 in 1850. See *Returns of the Whole Number of Persons within the Several Districts of the United States* [First Census] (Washington, D. C., 1802), 29, and *The Seventh Census of the United States: 1850* (Washington, D. C., 1853), 53, for the population and the number of families in Massachusetts. I interpolated the average household sizes in 1789, 1795, 1812, 1815, and 1824 from the censuses of 1790 and 1850. Massachusetts included Maine in the militia returns of 1789 and 1795, but the federal census of 1790 did not report the number of families in Maine. It is likely that the average household size of Massachusetts and Maine in 1790 was slightly larger than the average household size of Massachusetts alone, since the average household size of Massachusetts and Maine in 1850 was 5.3, versus 5.1 in Massachusetts alone. I therefore adjusted the average household size upward in 1789 and 1795 by 4% (0.2 / 5.1). I interpolated the population of Massachusetts and Maine in 1789 and 1795, and of Massachusetts alone in 1812, 1815, and 1824, from the decennial federal censuses. For each year, I divided the population by the average household size to estimate the number of households in the state. I then divided the number of privately owned muskets or rifles reported in the returns of guns owned by militia members by the estimated number of households, to estimate the ratio of the number of guns owned by militia members to the number of households.

Bellesiles misreads the Massachusetts returns of guns owned by militia members who appeared at musters as censuses of all privately owned guns in Massachusetts. See Robert H. Churchill, "Gun Ownership in Early America as Reflected in Manuscript Militia Returns," typescript, and Churchill, "Guns and the Politics of History," *Reviews in American History,* 29 (2001), 333–34.

Exhibit 20
Page 00387

"Every statistical table highlights certain patterns in the information but obscures others."[19] It is important to perform not only calculations that show how rare gun ownership might have been, but how common it might have been, if the enumerated guns were owned primarily by poorer, younger men, or used by households rather than individuals.

It is possible to develop good estimates of gun ownership in the American past. Additional sources are available, particularly tax records in states that offered exemptions for militia members who appeared at musters with particular kinds of equipment.[20] It will simply be a matter of using the proper mathematical techniques and of entering the data in databases that can be verified and re-analyzed. Bellesiles's estimates, unfortunately, are biased.

The second problem with Bellesiles's thesis stems from his analysis of the use and significance of firearms in early America. He does an excellent job of discussing "gun cultures": cultures in which guns had an enormous impact on daily life and personal identity. His analyses of Native American hunters and warriors in the eighteenth century and of gentlemen hunters in the early nineteenth century are superb. Bellesiles spends only two pages, however, describing the ways most early Americans used guns. "They were indifferent to owning guns, and they had no apparent interest in learning how to use them" (pp. 103–05, 297). This conflicts with the findings of several researchers of probate records suggesting that guns were as common as chairs or stools and that, once they could afford guns, most men acquired them.[21] Bellesiles is right to say that many American men lacked the training and the equipment to fight wars or to hunt deer, bears, or wolves. There is evidence, however, that low-quality guns, many of them useless for combat or for hunting large game, played important roles in the day-to-day lives of many Americans.

Such guns were used primarily for fowling and vermin control, and most shooters were boys or young men. Militia members got much of their target practice at squirrel hunts, which improved their skills and put ammunition to good use. The *Telegraphe* of Rockbridge County, Virginia, reported in the summer of 1804 that, on Captain Findley's muster day,

his company produced 1783 squirrel scalps. Several squirrels had been killed whose scalps were not produced. We may estimate,

[19] Haskins and Jeffrey, *Understanding Quantitative History* (Cambridge, Mass., 1990), 13.
[20] See, for example, the tax and equipment provisions of Vermont's 1818 militia law. William Slade, *The Laws of Vermont* (Windsor, Vt., 1825), 611–12, 619, 629–30, 641.
[21] Hawley, "Meaning of Absence"; Main, *Tobacco Colony;* Lindgren and Heather, "Counting Guns in Early America."

Exhibit 20
Page 00388

that within the last 3 months, 2000 squirrels have been killed within the bounds of that company. If each company in the county has been successful, there must have been about thirty-five or fourty thousand squirrels killed within the last three months. Now if we estimate, as is commonly done, that each squirrel would destroy one bushel of corn, the saving to the County must be very great indeed.[22]

In 1821, the *Herald* of Rutland, Vermont, reported a

> *Dreadful Slaughter—of the Squirrels!* A corps of sharp shooters, consisting of 40 men and youth, organized into two equal bodies, under Captains Pierpont and Daniels, of this village, on Wednesday last, sallied forth upon the above species of vermin. . . . The result of Wednesday's campaign, in consequence of the unfavorableness of the weather, afforded very little cause of congratulation. On Thursday, however, the attack was renewed with redoubled vigor and the result of both days exceeded the expectations of all. The number of slain brought to head quarters and counted, was 4961! and there was said to be several hundred more, which were not brought forward in season to be counted. Thus, in the short space of 48 hours, was a very numerous and destructive foe nearly annihilated, by a handful of our . . . enterprising sharpshooters.[23]

Participation in such campaigns was widespread, especially if local governments authorized bounties to counter steep rises in the vermin population. In Richmond County, Virginia, in 1749 and 1750, more than 100 men (a seventh of the town's tithable white population) answered the government's call for help. In 1750 alone, they turned in 3,097 crow's heads and squirrel scalps and received a pound of tobacco for each one.[24] Squirrels and crows were not the only casualties in such wars, as Hopkins Rowland of St. Johnsbury, Vermont, found out in 1822. He lost his barn and all its contents after his son shot a squirrel on the roof of the barn and failed to notice that the wadding from his charge had set the roof on fire.[25]

[22] (Lexington) *Virginia Telegraphe, and Rockbridge Courier,* Aug. 3, 1804.
[23] (Montpelier) *Vermont Watchman,* Nov. 27, 1821, copied from the *Rutland [Vermont] Herald.* See also (Bennington) *Vermont Gazette,* Aug. 15, 1791, and *Farmer's Museum* (Walpole, N. H.), Aug. 4, Oct. 6, 1801.
[24] *Richmond County [Virginia] Order Book,* 12:1746–1752, 207–09, 285–86.
[25] *Rutland Herald,* Sept. 16, 1822. See also (Hartford) *Connecticut Courant,* Sept. 26, 1791.

Exhibit 20
Page 00389

Bellesiles is right to think that early Americans were not adept at firing musket balls. They were difficult to use, liable to burst the barrel of a gun if packed with too much powder, and useless against birds, small game, and pests. That does not mean, however, that early Americans were not knowledgeable about firearms. In 1801, friends cautioned Levi Warren, a young militiaman in Swanzey, New Hampshire, against overloading his gun, but he persisted, intent on firing an extraordinarily loud report to honor the commission of several new officers.[26] In 1788, a Mr. Scales of Concord, New Hampshire, rejected the same advice from friends as they prepared to salute another officer, saying, "I will venture it."[27] Both men lost their lives, Warren when his gun burst and Scales when the force of the discharge wheeled him in front of a comrade as the man fired. Everyone present, including the victims, knew that firing a musket ball was a different enterprise from firing shot and that it could produce different effects. Newspaper accounts of gun accidents assumed that readers knew how guns worked, could name their various parts, and could distinguish between proper and improper gun use. Gun dealers, for their part, knew that they had to appeal to farmers, gardeners, and small-game hunters who fired shot as well as to militiamen who had to own military-grade, ball-firing weapons. For instance, when Joseph and William Russell of Providence, Rhode Island, advertised the sale in 1785 of 3,000 "EXCELLENT NEW BRITISH MUSKETS" for three dollars each, they hastened to add that at least 600 were "neat Fowling Pieces."[28]

The best sources for studying the role of firearms in everyday life are accounts of fatal firearms accidents. Such accounts appear in newspapers, diaries, inquests, vital records, and local histories. People lost their lives while repairing, cleaning, or testing firearms or while they or others were hunting, parading, practicing, or simply fooling around with guns. Such accidents were common enough in New Hampshire and Vermont in the late eighteenth and early nineteenth centuries to kill about 5 or 6 persons per million per year.[29] That rate is not directly

---

[26] (Portsmouth) *New Hampshire Gazette,* Oct. 13, 1801.

[27] (New Haven) *Connecticut Journal* , Oct. 29, 1788.

[28] *Boston Gazette,* Mar. 7, 1785. See also *Connecticut Journal,* Mar. 11, 1774.

[29] The counts of fatal firearms accidents (which are preliminary) are from inquests and newspaper articles in the sources cited in Roth, "Child Murder in New England," *Social Science History,* 25 (2001), 126–29. The estimated number of publicly recognized fatal firearms accidents is calculated from the number of accidents found in inquests and newspaper articles, using the matching-list method outlined ibid., 104–05. The population of New Hampshire and Vermont is estimated by the same methods used ibid., 129–36. The matching-list method counts the number of fatal firearms accidents that appeared only in coroners' inquests (I), the number that appeared only in newspapers (N), and the number that appeared in both inquests and newspapers (B). The estimated number of fatal firearms accidents that appeared in neither inquests nor newspapers is: X = (I * N) / B. The standard error of the estimate is derived by the method noted ibid., 104–05.

Exhibit 20
Page 00390

comparable to today's rate, because today's medicine could have saved a number of past firearms victims and because today's firearms are more lethal and easier to discharge unintentionally, despite improvements in safeties and storage. The death rate from firearms accidents in the United States has fallen steadily over the past fifty years, from 14 per million persons per year in 1950 to only 4 today—just below the rate in early Vermont and New Hampshire.[30] If the rates are in any way compa-

TABLE I

ESTIMATES FROM MATCHED LISTS OF THE NUMBER OF SUICIDES, FATAL FIREARMS ACCIDENTS, AND ADULT HOMICIDES IN NEW HAMPSHIRE AND VERMONT

|  | Suicides, 1783–1824 | Fatal Firearms Accidents, 1783–1824 | Adult Homicides, 1775–1793 | Adult Homicides, 1750–1774, 1794–1880 |
|---|---|---|---|---|
| Only in Court Records | 114 | 3 | 4 | 20 |
| Only in Other Sources | 113 | 38 | 9 | 136 |
| In Both Court Records and Other Sources | 30 | 3 | 6 | 253 |
| Number Found | 257 | 44 | 19 | 409 |
| Estimated Number | 686.4 | 82.0 | 25.0 | 419.8 |
| Percentage of Estimated Number Found | 37 | 53 | 76 | 97 |
| Standard Error of Estimated Number | 99.1 | 32.2 | 5.0 | 4.2 |

The estimate appears in Table 1. Note that firearms accidents were more likely to leave a trace in the historical record than suicides, but less likely to leave a trace than adult homicides, even during the Revolution, when documentation was sparse. The lower the estimated portion of fatalities found in surviving records, the less precise the estimate. Thus, the estimate of the number of victims of fatal firearms accidents is less precise than the estimates for adult homicide victims, but more precise than the estimate for suicide victims. There is a 95% chance that the actual number of fatal firearms victims fell between 44 (the number of cases found in the surviving records) and 146 (the estimated number of fatal firearms accidents [82.0] plus roughly twice the standard error [1.99 * 32.2]).

The fatal firearms accident rate per million persons per year is calculated by dividing the estimated number of accidents by the sum of the estimated annual populations of Vermont and New Hampshire, 1783–1824, and multiplying by 1 million. The estimated fatality rate is thus 5.3 per million persons per year, and there is a 95% chance that the rate fell between 2.8 and 9.4 per million persons per year.

By way of comparison, the estimated suicide rate is 4.4 per 100,000 persons per year, and there is a 95% chance that the rate fell between 3.1 and 5.7 per 100,000 persons per year. The suicide rate in Vermont and New Hampshire, 1783–1824, was thus far lower than today's rate.

[30] United States Bureau of the Census, *Statistical Abstract of the United States* (Washington, D. C., 1970–2000).

Exhibit 20
Page 00391

rable, they show that northern New Englanders in the early national period owned guns, used guns, and were by and large careful with them. Whatever the case, the accidental death rate from firearms does not support Bellesiles's claim that gun use was extraordinarily low.

The final problem with *Arming America* is its claim that homicide rates were low everywhere among European Americans before the 1850s—a claim vital to its thesis that low homicide rates and an absence of guns and gun violence went hand in hand. Bellesiles writes that "whites rarely assaulted other whites in the colonies and almost never killed one another," a claim that he repeats for the antebellum period, when he says murder was "rare" (pp. 81, 353). Those claims are false. Homicide was rare among European Americans at some times and in some places, as in New England after King Philip's War or in the Chesapeake during the French and Indian War. But at other times and in other places, homicide was all too common, especially in the seventeenth century, on the frontier, and in the post-Revolutionary South. Furthermore, high homicide rates were sometimes associated with high levels of gun violence and sometimes not. The relationship between guns and homicide is complex.

Bellesiles's errors on homicide are similar to his errors on gun ownership. He cannot appreciate how violent frontier societies were or how violent seventeenth-century European colonies were because he confuses the low number of homicides reported in surviving court records with low homicide rates. Homicide rates depend not only on the number of homicides, but also on the size of the population at risk, which was small in these instances; and the number of homicides cannot be estimated from court records, which missed many homicides, especially in periods when law enforcement was weak.

Homicides that came before the courts must also be counted accurately. Bellesiles states, for instance, that "in forty-six years Plymouth Colony's courts heard five cases of assault, and not a single homicide" (p. 82). The published, well-indexed records he cites, however, actually show that Plymouth's courts heard eleven cases of murder and investigated four additional deaths that may have been murders, not including three trials for multiple murders committed during King Philip's War.[31] Bellesiles

[31] Citing Nathaniel B. Shurtleff et al., eds., *Records of the Colony of New Plymouth in New England,* 10 vols. (Boston, 1855–1861). The records cover 1633–1691, with some gaps. Bellesiles does not state which 46 years he studied, but every contiguous period of 46 years contains homicides. The 11 homicides are in 1:96–97, 2:132-34, 3:70–72, 73, 82, 143, 205, 5:159, 167–68, 264–65, 6:82, 113, 141–42, 153–54, 7:305–07. A probable homicide appears in 2:170–71, and 3 suspicious deaths that may have been homicides in 3:202–03, 217–18, 4:32–33, 5:141. The 3 multiple murders during King Philip's War are in 5:204–06, 209, 224. Three additional murders in Plymouth Colony appear in William Bradford, *Of Plymouth Plantation, 1620–1647,* ed. Samuel Eliot Morison (New York, 1970), 234, 345–46, and in M. Halsey Thomas, ed., *The Diary of Samuel Sewall, 1674–1729* (New York, 1973), 1:153.

Exhibit 20
Page 00392

claims that "in the four years of 1736 to 1739, there were ten murders in Virginia" (p. 82), but his source, Arthur P. Scott, says only that ten white murder suspects were sentenced to death by the Virginia General Court—a fraction of all murder suspects in Virginia in those years, most of whom fled prosecution or were discharged after hearings before coroners' inquests, justices of the peace, or county courts.[32] He states that there were forty-three criminal actions for murder in North Carolina, 1663–1740 (ibid.), but his source, Donna J. Spindel, notes that her data are incomplete because of long, irregular gaps in the colony's higher court records and because "dramatic dips" occurred in the number of criminal prosecutions during periods of "political turmoil."[33] These are not isolated problems: every tally of homicides Bellesiles reports is either misleading or wrong.

The homicide rate for adult European colonists in New England before King Philip's War was as high as the rate in the United States today, 7–9 per 100,000 adults per year. Before the Pequot War, the rate was higher still: roughly 110 per 100,000 adults per year, or 11 to 14 times the rate today. A number of those colonists were murdered by Native Americans, but the homicide rate was still very high if one discounts those murders, as Bellesiles does.[34] Virginia and Maryland were far more homicidal than New England, especially before Bacon's Rebellion, when the institution of indentured servitude took the lives of masters, mistresses, and servants (both children and adults) at a higher rate than slavery did in the eighteenth and nineteenth centuries.[35] North Carolina's

[32] Scott, *Criminal Law in Colonial Virginia* (Chicago, 1930), 318–19, 119 n. 232. Scott examined the surviving issues of the *Virginia Gazette* from Sept. 10, 1736, to Feb. 1, 1740. During that period, according to Scott, the General Court tried twelve people for murder and sentenced ten to death. The General Court tried an additional person for manslaughter and sentenced him to be burnt in the hand. I checked the *Virginia Gazette* and found the same number of cases that Scott did.

[33] Spindel and Stuart W. Thomas, Jr., "Crime and Society in North Carolina, 1663–1740," in Eric H. Monkkonen, ed., *Crime and Justice in American History: The Colonies and Early Republic* (Westport, Conn., 1991), 2:709–10, Spindel, *Crime and Society in North Carolina, 1663–1776* (Baton Rouge, 1989), x–xi, xv–xvii, 147–51. For the period covered by Spindel's full study, 1663–1776, 2/5 of North Carolina's county court records are missing.

[34] Roth, "Homicide in Early Modern England, 1550–1800: The Need for a Quantitative Synthesis," *Crime, History, and Societies,* 5:2 (2001), 55–56. Roughly 3/4 of European American murder victims were killed by Native Americans before the Pequot War and 1/4 between the Pequot War and King Philip's War. See also N.E.H. Hull, *Female Felons: Women and Serious Crime in Colonial Massachusetts* (Urbana, Ill., 1987), 44, 57–59, 61–68.

[35] My preliminary calculations show that the rate at which adult colonists murdered adult colonists in Virginia and Maryland was more than 30 per 100,000 per year from 1607 to 1675. The homicide data will appear at a future date on the website of the Criminal Justice Research Center, Ohio State University <http://www.soc.sbs.ohio-state.edu/cjrc>. See also Philip J. Schwarz, *Twice Condemned: Slaves and the Criminal Laws of Virginia, 1705–1865* (Baton Rouge, 1988), 230–54.

Exhibit 20
Page 00393

incomplete data are sufficient to prove that the colony was more homicidal than twentieth-century America through the 1720s and 1730s.[36] Few of these murders were committed with guns, which complicates Bellesiles's effort to associate high homicide rates with a high proportion of homicides committed with firearms.

There are similar errors in *Arming America* for the Revolutionary period. Bellesiles reports, for instance, that "during Vermont's frontier period, from 1760 to 1790, there were five reported murders (excluding those deaths in the American Revolution), and three of those were politically motivated" (p. 353). He cites as his source the Vermont Superior Court records, but that court did not open until December 1778, and its minutes from September 1782 to August 1791 have been missing since the early twentieth century.[37] In fact, Vermont, together with the rest of New England, had an elevated homicide rate during the American Revolution, and 70 percent of known adult homicides and probable homicides in Vermont, 1760–1790, were committed with guns.[38] New England's adult homicide rate never returned to the high levels of the seventeenth century during the Revolution, and it dropped to its lowest level in history after the Revolution, even though New England's inhabitants were probably better armed than ever before. But in the Georgia-South Carolina backcountry, where the Revolutionary War was a civil war, the homicide rate soared during and after the Revolution, and firearms became a preferred means of ambushing adversaries. In Franklin County, Georgia, 58 percent of the known adult homicides that occurred between 1800 and 1830 were committed with guns.[39] Guns did

[36] Spindel, *Crime and Society in North Carolina*, 57, finds 16 prosecutions of free persons for homicide, 1720–1729, and 21, 1730–1739, in the surviving court records. That number alone yields a homicide rate of 7.7 per 100,000 white persons per year in the 1720s and 6.7 in the 1730s. Population figures are from United States Bureau of the Census, *Historical Statistics of the United States, Colonial Times to 1970* (Washington, D. C., 1975), 2:1168.

[37] Ten bound volumes of "Old Supreme Court Files" have survived, as has one minute book of the Vermont Supreme Court, v. 98 (Dec. 1778 to Sept. 1782). Bellesiles refers to the Vermont Supreme Court records as the Vermont Superior Court records. The records are located in the office of the Clerk of the Superior Court of Rutland County, Vt.

[38] See the homicide rates for Vermont and New Hampshire in Roth, "Child Murder in New England," 108, and for colonial and Revolutionary New England in Roth, "Homicide in Early Modern England, 1550–1800," 55–56. Ten of the 14 adult homicides and probable homicides I have discovered in Vermont, 1760–1790, were committed with firearms. Only 1 of 8 adult homicides in Vermont, 1791–1807, was committed with a firearm, but 10 of 15 were committed with firearms, 1808–1815, during the political upheaval that surrounded the Embargo and the War of 1812. The data on Vermont homicides, 1760–1815, will be made available on the website of the Criminal Justice Research Center, Ohio State University.

[39] Seven of the 12 homicides of adults by adults that I have discovered to date in Franklin County, 1800–1830, were committed with firearms. The case files are

Exhibit 20
Page 00394

not cause the higher murder rates during the Revolution, but guns made homicide rates worse, once political tensions intensified and legal institutions lost legitimacy, as they would again in the South during Reconstruction and in the nation as a whole in the 1850s and 1960s.

Bellesiles makes another significant error when he claims—in opposition to every study completed to date, including those he cites—that the white South had a low homicide rate in the first half of the nineteenth century. Bellesiles argues, for instance, "purely on statistics," that "the least violent state in the country in the thirty years prior to the Civil War was South Carolina," which averaged fewer than five "legally charged" (p. 353) murders a year. The table from Michael Hindus that Bellesiles cites, however, runs from 1800 to 1860. It includes grand jury presentments from only thirteen judicial districts, in a state that had twenty-three judicial districts in 1800 and thirty by 1860. The record of grand jury presentments is complete for only three of the thirteen districts included in the table. And the grand jury presentments contain only a fraction of the murders committed by whites or against whites. That is why Hindus concludes, on the basis of his evidence, that South Carolina was a homicidal place.[40] Jack Kinney Williams, John Hope Franklin, Dickson D. Bruce, Jr., Bertram Wyatt-Brown, Grady McWhiney, and Samuel C. Hyde, Jr., arrived at the same conclusion about the homicidal nature of South Carolina and the South as a whole during the post-Revolutionary period.[41]

---

located in the Franklin County Superior Court papers, Georgia Department of History and Archives. For homicides committed with guns, see *State v. Craddock Low*, 159-1-41, boxes 1, 15, and *Augusta [Georgia] Chronicle*, May 17, 1800; *State v. John Neal*, 159-1-41, box 1, 159-1-59, box 5; *State v. Wilson Strickland*, 159-1-59, boxes 1, 5; *State v. William Willis*, 159-1-41, boxes 2, 20; *State v. Joseph Edwards*, 159-1-41, boxes 3, 16; *State v. William A. Blackburn*, 159-1-59, box 6; and *State v. James Barefield*, 159-1-59, box 3. For homicides not committed with guns, see *State v. Samuel Reed*, 159-1-59, box 6; *State v. John Hutchins*, 159-1-41, boxes 2, 17, 20; *State v. Robert Fullerton*, 159-1-41, box 16; and *State v. Stephen Kirk and Rebecca Kirk*, 159-1-41, boxes 6, 20. For a homicide committed with an unknown weapon, see *State v. John McKee, Augusta Chronicle*, Mar. 22, 1800. On violence and murder in the Georgia-South Carolina backcountry during and after the Revolution, see Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York, 1996), 3–18, and Richard Maxwell Brown, *Strain of Violence: Historical Studies of American Violence and Vigilantism* (New York, 1975), 71–90.

[40] Hindus, *Prison and Plantation: Crime, Justice, and Authority in Massachusetts and South Carolina, 1767–1878* (Chapel Hill, 1980), 59–84.

[41] Williams, *Vogues in Villainy: Crime and Retribution in Antebellum South Carolina* (Charleston, S. C., 1959), and *Dueling in the Old South: Vignettes of Social History* (College Station, Tex., 1980); Franklin, *The Militant South, 1800–1861* (New York, 1964); Bruce, *Violence and Culture in the Antebellum South* (Austin, Tex., 1979); Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York, 1982); McWhiney, *Cracker Culture: Celtic Ways in the Old South* (Tuscaloosa,

Exhibit 20
Page 00395

Why the South became more homicidal after the Revolution, when much of the North became less homicidal, is a question that must be addressed elsewhere. But Bellesiles's failure to appreciate the magnitude of the South's homicide rate has important consequences for his own work: it forces him to ignore evidence that it was in the South that gun violence prompted the first laws against concealed firearms.

Bellesiles writes that before the Civil War, "it was the knife," not the gun, "that aroused outrage" (pp. 308–09) and inspired a movement in the 1820s and 1830s to ban concealed weapons. He cites travelers who witnessed knife fights and laws in Alabama and Tennessee that banned dirk knives. He fails to mention that the laws he cites also banned concealed pistols.[42] He compounds that error by placing the passage of laws against concealed firearms explicitly in the post-Civil War period, in support of his thesis that guns and gun violence were uncommon before the Civil War (p. 434).

Southern citizens and legislators scrambled after the Revolution to find ways to stop the surge in homicidal violence. The grand jurors of Jasper County, Georgia, expressed a frustration common among many southerners when they complained in 1808 that "many men run to and fro carrying guns on the Sabbath Days," and they asked peace officers to do something about it. In 1833, the Jasper County grand jury pointed to "the numerous cases of assassination which have been committed through our community," many committed with pistols as well as knives. And in 1834, they denounced

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting them-

---

1988), 146–70; Hyde, *Pistols and Politics: The Dilemma of Democracy in Louisiana's Florida Parishes, 1810–1899* (Baton Rouge, 1996).

  [42] According to the Alabama law, "Every one, who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be traveling, or setting out on a journey. . . . It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description"; C. C. Clay, *A Digest of the Laws of the State of Alabama* (Tuscaloosa, 1843), 436. According to the Tennessee law of 1821, "Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offense," but "nothing herein contained shall affect any person that may be on a journey to any place out of his county or state"; R. L Caruthers and A.O.P. Nicholson, *A Compilation of the Statutes of Tennessee* (Nashville, 1836), 99–100.

Exhibit 20
Page 00396

selves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[43]

At this date, pistols and other concealed weapons had already contributed to many homicides.[44] Georgia's legislature banned concealed weapons, including pistols, in 1837.[45]

A carefully designed study of murder methods would have shed light on the South's problem, but Bellesiles's table on "Nineteenth-Century Murder Methods" is again misleading (p. 450). The bulk of his data (501 cases) comes from murder pamphlets. Such pamphlets, as Karen Halttunen and Daniel A. Cohen observe, focused on sensational cases, such as child murders, rape murders, robbery murders, and murders of lovers, that were unlike the majority of homicides in motive and method.[46] Bellesiles's remaining data (184 cases ) are drawn from newspapers, which had their own biases in coverage, and his sample of newspaper stories is too small to uncover statistically significant changes in the proportion of murders reported in newspapers that were committed with guns, let alone regional differences, which he does not address.[47]

[43] Jasper County Superior Court Minutes, Grand Jury Presentments, Mar. 1808, Oct. 1833, and Apr. 1834.

[44] In Jasper County in the 1830s, 3 whites were shot dead with pistols and 2 others were stabbed to death with dirk knives. See the case files in the Jasper County Superior Court papers, *State* v. *Augustus L. Glover, Richard V. Gregory, Turner Horton, Samuel McDaniel, and Daniel V. Palmer.*

[45] "An Act to guard and protect the citizens of this State against the unwarrantable and too prevalent use of deadly weapons," Dec. 25, 1837, in William A. Hotchkiss, *A Codification of the Statute Law of Georgia* (Augusta, 1848), 739. The law permitted the concealment of heavy "horseman's pistols," which were carried by long-distance travelers. The act states that "It shall not be lawful for any merchant, or vender of wares or merchandise in this state, or any other person or persons whatsoever, to sell, or offer to sell, or to keep or have about their person or elsewhere, any of the hereinafter described weapons, to wit: bowie, or any other kind of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offense or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known as horsemen's pistols, &c."

[46] Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (Cambridge, Mass., 1998), and Cohen, *Pillars of Salt, Monuments of Grace: New England Crime Literature and the Origins of American Popular Culture, 1674–1860* (New York, 1993).

[47] By dividing 184 cases reported in newspapers by 6 different time periods, Bellesiles must calculate the proportion of reported murders committed with firearms in each period from an average of 30.6 cases. If he drew his sample of cases randomly—and he never says how they were selected—the 95% confidence intervals on his estimates would be in the range of plus or minus 13% to plus or minus 18%. Those intervals are too large to determine if the proportion of reported homicides

Exhibit 20
Page 00397

Bellesiles's data conflict with the conclusions of systematic studies of the proportion of homicides committed with firearms, even those in the North. Roger Lane finds that in Philadelphia, the proportion of homicides committed with guns rose in the mid-nineteenth century and then declined. Eric Monkkonen discovers that in New York City, the proportion was highest in the 1810s. Neither peak in gun use coincided with the peak in homicide rates.[48] Neither Lane nor Monkkonen argues that homicide rates had nothing to do with the availability of guns, but the connection is obviously not a simple one.

Michael Bellesiles poses an excellent question: were Americans always well armed? He has the courage to question fundamental assumptions about the relationship between guns, gun culture, and homicide. But he never tests his thesis against the best available evidence, and it appears that every mistake he makes in his own calculations goes in the same direction, in support of his thesis. Others will have to chart the ups and downs of gun ownership and unravel the complicated relationship between gun use and homicide. But thanks to the controversy *Arming America* has created, we may soon be able to read more detailed histories about the strange career of gun control, about early Americans' use of and attitudes toward firearms, and about the dangers that widespread gun ownership can pose during periods of political upheaval. It is possible that those histories could help Americans move toward a political consensus on guns by giving opponents and proponents of gun control a better understanding of the uses and the dangers of firearms.

---

committed with guns changed over time, even though it is likely that they did. Note also that the number of cases in the table do not add up. Bellesiles reports 735 cases in his table, which is more than the sum of 501 pamphlets and 184 newspaper articles.

[48] Lane, *Violent Death in the City: Suicide, Accident, and Murder in Nineteenth-Century Philadelphia* (Cambridge, Mass., 1979), 62, 60; Monkkonen, *Murder in New York City* (Berkeley, 2001), 39, 16. Lane studies murders that led to criminal indictments. Monkkonen studies all murders reported in inquests, newspapers, court records, and other sources.

Exhibit 20
Page 00398

# Exhibit 21

Exhibit 21
Page 00399

# The Consumer Culture of the Middle Atlantic, 1760–1820

## Paul G. E. Clemens

ATE-nineteenth-century America ushered in the most dramatic consumer revolution in the nation's history, yet it was not the first such fundamental transformation in consumption habits in the Western world. From the late seventeenth through the mid-eighteenth centuries, the mass production of goods—propelled by the spiraling demand of ordinary people for inexpensive, useful, and occasionally exotic household amenities—defined the first consumer revolution. Spread by Atlantic commerce, this revolution affected the New and Old Worlds alike and tapped a global economy. In British North America, the spread of consumer goods was even more revolutionary because it followed a period of austerity associated with the initial establishment of new settlements and farm building.

The first consumer revolution set in motion a long-term process of incremental change in what people used, valued, and accumulated in ordinary goods. For the period from the revolutionary era to about 1820 (less studied than the earlier era), change was a matter of evolution, not revolution, in consumption habits, yet the very ordinariness of products meant that people continued to buy, exchange, and collect goods despite the passionate, periodic outcries that luxury was corrupting early American virtue. Focusing on the rural Middle Atlantic (defined in terms of commercial geography as the region in the Philadelphia and New York City hinterland), examining consumer culture in the 1760s, and then tracing that culture into the early nineteenth century demonstrates that the market, through 1820, never overwhelmed people. Choice remained; distinctive patterns of accumulation existed and persisted within specific regions and among different classes. The great variety of goods, the

Paul G. E. Clemens is a history professor at the New Brunswick campus of Rutgers, The State University of New Jersey. He could not have written this article without a previous collaboration with Lucy Simler, whose work on Chester County informs much of this study. He thanks Cary Carson, Ann Smart Martin, Elisabeth Oliu, Tom Slaughter, Kevin Sweeney, Camilla Townsend, and Lorena Walsh as well as the two anonymous readers for the *William and Mary Quarterly* for their help. Ellen Endslow, Marianne Martin, and Susan Newton supplied invaluable assistance in working with material culture images.

*William and Mary Quarterly,* 3d Series, Volume LXII, Number 4, October 2005

Exhibit 21
Page 00400

global reach of the economy that supplied these goods, the regional variations in what was consumed, and the participation of ordinary householders (but usually not the poor) were each defining features of the evolution of America's first consumer economy.

Scholarship has established several general conclusions about the creation of a consumer society in the early modern Anglo-American world. Changes in household consumption patterns came first to England; there, the greatest changes occurred between the mid-seventeenth and the mid-eighteenth centuries. In England's American colonies, new consumption patterns, paralleling those in the mother country, emerged in the late seventeenth century and drove the economy after the 1720s. In both lands householders acquired a greater variety of goods, especially tableware. They drank new hot drinks, in particular tea and cocoa sweetened with sugar, and smoked tobacco. In England and America, they constructed new rituals around food service and use of space that were as important as the new goods themselves, and they continued to live in fairly rudimentary homes and follow diets that left a substantial part of the population malnourished. Though the acquisition of some goods initially occurred among the gentry and then spread to the middling sort, consumer society was broad based and included much of the landowning and craft population, if not laborers and cottagers, or inmates, as they were more often called in the Middle Atlantic. Most householders acquired new goods—knives and forks, ceramic wares, copper and brass kettles and the like—without increasing the amount they spent on consumer goods. Change, then, was incremental, yet the sum of this process was revolutionary. Building from a foundation of basic subsistence, farms had been erected, fields cleared, and households stocked with a range of consumer goods that ushered their inhabitants into a new world of consumption. In the 1760s and 1770s, political upheaval brought into sharper relief for many Americans, especially true republicans and pious Congregationalists and Presbyterians, the insidious design by which long-gestating consumption habits had gnawed away at traditional ways of life, confused gender hierarchies, and destabilized class conventions. The first consumer revolution slowly altered the way people lived, reshaped how they thought of comfort and necessity, and invested material goods with new meaning (involving utility and status). Just as strikingly, the culmination of the consumer revolution tied Americans into an Atlantic culture of material goods.[1]

[1] The best introduction to the literature on this topic is Cary Carson, Ronald Hoffman, and Peter J. Albert, eds., *Of Consuming Interests: The Style of Life in the Eighteenth Century* (Charlottesville, Va., 1994), see esp. the chaps. by Lois Green Carr and Lorena S. Walsh, T. H. Breen, and Cary Carson. See also John E. Crowley, *The Invention of Comfort: Sensibilities and Design in Early Modern Britain*

Exhibit 21
Page 00401

This process can be traced forward from the 1760s and early 1770s in the Middle Atlantic by focusing on three counties whose probate records are the basis for most of the following analysis: Kent, on the Eastern Shore of Maryland, Chester, in southeastern Pennsylvania, and Fairfield, in southwestern Connecticut. Each was tied commercially to either Philadelphia or New York City and participated in the mid-eighteenth-century wheat boom that brought substantial prosperity to established households. The free, white landed inhabitants of each county had, by the 1760s, already experienced the consumer revolution: most were comfortably a part of a material culture that had been transformed by the Atlantic trading system. In each the Revolution disrupted economic life, and each rebounded fairly quickly from that disruption. At the same time, distinctions among the three counties supply nuance to any discussion of the economy of the Middle Atlantic. In Kent County rich, slave-owning planters increasingly abandoned tobacco planting for wheat farming (a transition that would be completed after the Revolution). In Chester County mixed agriculture, a large cottager population that did much of the seasonal field work, and wide distribution of craft skills among the farming population underwrote the prosperity of the householders. In Fairfield County farmers had long shipped agricultural surpluses in the coastal trade and to the Caribbean. Mixed-grain farming gradually replaced wheat specialization, livestock husbandry accounted for a growing percentage of the export production, and craft industries clustered in several towns and would, in some cases, pave the way to early factory production.[2]

Probate inventories demonstrate that rural households possessed material goods and help supply a brief overview of household consumption

*and Early America* (Baltimore, 2001); T. H. Breen, *The Marketplace of Revolution: How Consumer Politics Shaped American Independence* (Oxford, Eng., 2004).

   [2] On the Middle Atlantic, see Paul G. E. Clemens, "Afterword: Material Culture and the Rural Economy: Burlington County, New Jersey, 1760–1820," in *Land Use in Early New Jersey: A Historical Geography*, ed. Peter O. Wacker and Clemens (Newark, N.J., 1995), 263–96. Among other sources that use probate inventories to study material culture, I have found the following most useful: Jack Michel, "'In a Manner and Fashion Suitable to Their Degree': A Preliminary Investigation of the Material Culture of Early Rural Pennsylvania," *Working Papers from the Regional Economic History Research Center* 5, no. 1 (1981): 1–83; Jackson Turner Main, *Society and Economy in Colonial Connecticut* (Princeton, N.J., 1985); "Forum: Toward a History of the Standard of Living in British North America," *William and Mary Quarterly*, 3d ser., 45, no. 1 (January 1988): 116–70, which includes contributions by Lorena S. Walsh, Lois Green Carr, Jackson Turner Main, and Gloria L. Main; Lois Green Carr and Lorena S. Walsh, "Changing Lifestyles and Consumer Behavior in the Colonial Chesapeake," in Carson, Hoffman, and Albert, *Of Consuming Interests*, 59–166; Edward S. Cooke Jr., *Making Furniture in Preindustrial America: The Social Economy of Newtown and Woodbury, Connecticut* (Baltimore, 1996).

Exhibit 21
Page 00402

patterns in the three counties. Assessing the consumption patterns from 1760 to 1820 shows that changes occurred gradually; consumption in this period was a matter of continuing a commitment that had already been made to a certain degree of comfort and convenience in household amenities. Such a commitment meant that considerations of taste and status could shape consumer choices without much self-conscious reflection. Only in limited ways, and only at the end of this period, would new methods of large-scale production affect what ordinary householders displayed and used in their homes. Another indication of the modest character of the changes wrought by the consumer revolution was the regional distinctiveness that persisted in consumer behavior. If the consumer revolution of the late nineteenth century created a more or less undifferentiated mass culture that cut across class and urban-rural divides, inclusion in the Atlantic economy of the late eighteenth and early nineteenth centuries did not. A concluding analysis of the changing importance of ceramics, porcelain, silver, and pewter among household tableware will reinforce the sense of incremental process and the complexity of change in market behavior.[3]

Consumption here has been measured relative to probable household status of the probated decedents. Probate inventories have been divided into six classifications (each designating their probable household status) by proxies for size (the number of beds and tables) and affluence (tableware). Table I supplies an illustration, from Chester County in the 1790s, of the distribution of these six categories among a representative sample of decedents. The "nonhouseholder" and "probable nonhouseholder, poor" categories include those who had no beds and either no tables and no tableware or were quite poor—all such decedents were probably laborers, cottagers, or older or younger residents living in the households of others. Members of this group are incom-

---

[3] In arguing that scholars can trace an evolution in consumption patterns for semidurable household possessions between the prerevolutionary era and the 1820s, I have excluded from the analysis what were clearly the two other major areas of consumer spending: textiles and foods (esp. alcohol, tea, and spices). On textiles, see Adrienne D. Hood, "The Material World of Cloth: Production and Use in Eighteenth-Century Rural Pennsylvania," *WMQ* 53, no. 1 (January 1996): 43–66; Laurel Thatcher Ulrich, "Wheels, Looms, and the Gender Division of Labor in Eighteenth-Century New England," *WMQ* 55, no. 1 (January 1998): 3–38. Next to cloth and clothing, the most important consumer good was probably alcohol; for an excellent introduction to the topic, see David Hancock, "'A revolution in the trade': Wine Distribution and the Development of the Infrastructure of the Atlantic Market Economy, 1703–1807," in *The Early Modern Atlantic Economy*, ed. John J. McCusker and Kenneth Morgan (Cambridge, 2000), 105–53; John J. McCusker, "The Business of Distilling in the Old World and the New World during the Seventeenth and Eighteenth Centuries: The Rise of a New Enterprise and its Connection with Colonial America," ibid., 186–224.

Exhibit 21
Page 00403

CONSUMER CULTURE OF THE MIDDLE ATLANTIC 581

TABLE I

INVENTORY CLASSIFICATION BY HOUSEHOLD STATUS FOR CHESTER COUNTY, PENNSYLVANIA, 1790S

| | Percentage of inventories (n=72) | Average estate value | Average value of all consumption goods | Index basic consumption goods (max.=12) |
|---|---|---|---|---|
| Nonhouseholder | 4% | 5£ | 4£ | 0.33 |
| Probable non- householder, poor | 3 | 71 | 20 | 2.00 |
| Middling | 44 | 130 | 30 | 2.54 |
| Comfortable | 18 | 194 | 56 | 5.11 |
| Fashionable | 10 | 390 | 104 | 6.13 |
| Other, comfortable | 21 | 86 | 19 | 1.47 |

*Notes:* Nonhouseholder means no bed, table, or tableware; probable nonhouseholder, poor, means no bed, but a table or basic tableware (ceramics, pewter); middling means bed(s), table(s), and basic tableware (ceramics, pewter); comfortable means bed, tables, and tableware, either multiple beds and tables or fashionable (and basic) tableware (silver, china); fashionable means multiple beds and tables and fashionable (and basic) tableware (silver, china); other, comfortable, means bed, but no table or no tableware, otherwise fitting profile of householder. These seventy-two inventories were selected as a sample from the eighty-eight Chester inventories from the 1790s in the larger study. Inventory values are adjusted to Kent County 1790 values. The index of consumption goods counts the number of twelve basic items that might be found in a probate inventory (candlesticks, Dutch ovens, basic earthenware, fine earthenware, bed or table linens, knives and forks, spices or spice containers, books, watches, clocks, pictures, and silverware). This is the average across all inventories, and could take on values from zero to twelve. The index was adopted from one used by Lois Carr, P. M. G. Harris, Russell Menard, and Lorena Walsh but uses a somewhat different selection of goods.

*Source:* Chester County Probate Records, Chester County Archives, West Chester, Pa. See the description of sources for this study in "Probate Inventory Sources" (621).

pletely represented in the inventoried population but often shared indirectly in the consumption economy as they lived in someone else's household. The nonhouseholder category contains considerable ambiguity. Take, for example, Job Baily, whose Chester estate, evaluated in the 1790s, contained no bed, table, or tableware. Baily, actually a small landowner, was listed in the 1790 United States census as a head of household (with two female members). Baily, however, rented out his land, and was noted in the tax records as an inmate.[4]

[4] Job Baily, probate file no. 4188, September 1791, Chester County Archives. Baily was also traced in the 1789 Chester County Tax Ratables, Chester County Archives, West Chester, Pa., and the 1790 United States Census for Pennsylvania; see microfilm copy in the National Archives, Washington, D.C.

Exhibit 21
Page 00404

The next three groups—"middling," "comfortable," and "fashionable"—define ascending rankings in household status. Most of those whose status can be determined were landowners rather than tenants. The final group, "other, comfortable," includes those who did not own the basic goods that most householders did, yet had too much wealth and too many consumer goods to be classified as nonhouseholders. Where it is possible to check their status against other records, most turn out to be retired farmers (living with relatives), widows, or itinerants (seafarers, merchants, or peddlers). Collectively, the three nonhouseholder categories constituted about one-quarter of the sample. In the living population, they accounted for at least half the free, taxable population. These poorer residents (cottagers, laborers, widows, and tenants) were not excluded from consumer culture, but what they shared was meager and defined by their status.

For the householders of the Middle Atlantic, these were good times. From the 1760s to around 1820, average inventoried wealth increased not only in Kent (with its export-led economy and slave-owning estates) but also in Fairfield and Chester counties. Wealth increased as did the value of consumption goods and the average number of selected consumption goods in a typical estate (Table II). The inventories probably underrepresent the prosperity of the landed population. To make the inventories comparable, land values were removed from the Connecticut estates because elsewhere assessors did not include landholdings in their listings. In all three counties, land prices rose (and rose more than other prices) and average holdings remained fairly constant from 1760 to 1820. There was, in consequence, on top of the gains recorded in Table II, an increase in the real wealth of the landed population.[5]

But if the times were good for some householders, economic growth was uneven. In each county the white population increased (as did the free black population) without a corresponding increase in landholding. Those most underrepresented in the probate inventories—the young and the poor—were increasing in number and, most likely, also increas-

[5] The Connecticut probate records include land valuations, which allow distinctions between improved and unimproved land. I have also used land prices from records of land sales in the three counties, however, to preserve comparability. These records do not always distinguish among improved land, unimproved land, and land that includes farm buildings, but they have the advantage of supplying market prices. In developing land price series, I separated out those tracts that probably included the primary dwelling house—thus, the series captures the land values and the value of the primary improvements to a farm. To construct the land price indexes, I used the Chester County Land Records, Chester County Archives, and microfilm from the Genealogical Society of Utah, held by Alexander Library, Rutgers University, New Brunswick, N.J., of the Fairfield Land Deeds, 1750–1823 (14 reels) and Kent County Land Records, 1760–1820 (11 reels).

Exhibit 21
Page 00405

TABLE II

ESTATE WEALTH, WEALTH IN CONSUMPTION GOODS, AND ACCUMULATION
OF CONSUMER GOODS FOR CHESTER COUNTY, PENNSYLVANIA, FAIRFIELD
COUNTY, CONNECTICUT, AND KENT COUNTY, MARYLAND, 1760S, 1790S,
AND 1820S

| | Wealth | Consumption goods | Consumption (% of wealth) | Consumption index |
|---|---|---|---|---|
| **1760s** | | | | |
| Chester | 117.57£ | 33.56£ | 29% | 3.11 |
| Fairfield | 93.22 | 35.63 | 38 | 3.79 |
| Kent | 489.44 | 78.82 | 16 | 5.36 |
| **1790s** | | | | |
| Chester | 146.32 | 37.15 | 25 | 3.08 |
| Fairfield | 108.36 | 39.95 | 37 | 3.90 |
| Kent | 382.51 | 66.14 | 17 | 4.85 |
| **1820s** | | | | |
| Chester | 172.50 | 50.32 | 29 | 4.42 |
| Fairfield | 121.37 | 49.41 | 41 | 5.36 |
| Kent | 557.97 | 92.62 | 17 | 5.85 |

*Notes*: All prices have been converted to Kent County 1790 prices using an index that incorporates cattle, grain, and tableware. For the index, see the appendix to Peter O. Wacker and Paul G. E. Clemens, *Land Use in Early New Jersey: A Historical Geography* (Newark, N.J., 1995), 297–98. For a definition of the consumption index, see Table I notes.

*Source*: See the 253 Chester inventories, 621 Fairfield inventories, and 448 Kent inventories described in "Probate Inventory Sources" (621).

ingly desperate in circumstances. Whatever the gains by 1820, for the generation that came of age in the 1790s, times were less flush. During the 1790s in all three counties, the accumulated consequences of the Revolutionary War and the postwar economic contraction (especially in Kent, where the tobacco trade withered) had clearly delivered an economic blow to the Middle Atlantic. In contrast the 1820 figures represent possessions accumulated before the Panic of 1819 (though evaluated at post-Panic prices).[6]

By the 1760s most of the landholding residents of all three counties already held a number of basic household amenities. For these people the consumer revolution had established a standard of comfort and

[6] As the wealth figures are adjusted by a price index, the 1819 price collapse is not particularly noticeable. Debt rose considerably but financial assets are not included in wealth computations. The wealth index used in this study is described in the appendix to Wacker and Clemens, *Land Use in Early New Jersey*, 297–303.

Exhibit 21
Page 00406

convenience. Most households had looking glasses, candlesticks, books, and guns—a range of goods that connoted taste, utility, elegance, improvement, and security, and goods that were more often inexpensive than ornate and refined. Such goods did not uniformly become more common over time. Rather, their distribution was already widespread and change in consumption patterns from 1760 to 1820 reflected the success (and failure) of marketing strategies as much as anything else.

Though no household amenity necessarily had a primary or singular meaning to its owner, looking glasses and candlesticks are fairly representative of the way the consumer revolution had brought fashion and convenience, respectively, to Middle Atlantic households. A looking glass, today called a mirror, had some practical use, as, for example, in shaving, but even that use was an aspect of self-presentation tied closely to a concern for appearance and fashion. Looking glasses could also be elegant pieces of furniture, thus doubly a reflection of status. There was a regular, albeit modest, importation of glasses—French, German, Dutch, and British—through New York and Philadelphia and by way of Chesapeake storekeepers, with local manufacture becoming increasingly important after the American Revolution. They could be marketed as luxury goods: made for the genteel, large (sometimes four by two feet), with mahogany frames decorated in the latest European fashion, and costing twenty dollars or more. They could also be small and inexpensive—ten by eight inches at a cost of a dollar retail.[7]

In the inventories the average value of a looking glass was about two dollars (fifteen shillings), yet numerous households had looking glasses worth no more than a shilling or two, which is to say, they were more a comfort that could be owned by most, than a luxury. In the 1760s, 1790s, and 1820s, most householders owned looking glasses (Table III). Only among the middling households (and among the poor and those of uncertain householder status) in Chester and Fairfield did less than half the estates include looking glasses and, over time, even these less affluent, less fashionable households acquired them (Figure I).[8]

[7] Prices and descriptions come from Alfred Coxe Prime, comp., *The Arts and Crafts in Philadelphia Maryland and South Carolina, 1721–1800: Gleanings from Newspapers* ([Topsfield, Mass.], 1929), 194–99; Prime, comp., *The Arts and Crafts in Philadelphia Maryland and South Carolina, 1786–1800: Gleanings from Newspapers* ([Topsfield, Mass.], 1932), 209–14. British exports are listed in Great Britain, Public Record Office, Customs 3, import-export ledgers, 1696–1780. I used microfilm copies at the McKeldin Library, University of Maryland, College Park, and from the University of Michigan Library. Though Helen Comstock primarily surveys the more elegant surviving examples of eighteenth-century looking glasses, her work also includes a useful discussion of those who made and sold looking glasses (Comstock, *The Looking Glass in America: 1700–1825* [New York, 1968]). More generally, see Benjamin Goldberg, *The Mirror and Man* (Charlottesville, Va., 1985).

[8] Inventory prices are generally given throughout the text in shillings of the current money of account. In the 1820s appraisers used both dollars and pounds in

Exhibit 21
Page 00407

TABLE III

OWNERSHIP OF LOOKING GLASSES ORGANIZED BY HOUSEHOLD STATUS IN
PERCENTAGES FOR CHESTER, FAIRFIELD, AND KENT COUNTIES, 1760S, 1790S,
AND 1820S

| | Nonhouseholder | Poor | Middling | Comfortable | Fashionable | Other | Average |
|---|---|---|---|---|---|---|---|
| Chester | | | | | | | |
| 1760s | 9% | 25% | 31% | 55% | 89% | 19% | 35% |
| 1790s | — | 25 | 41 | 67 | 100 | 14 | 43 |
| 1820s | — | — | 50 | 80 | 60 | 54 | 62 |
| Fairfield | | | | | | | |
| 1760s | — | — | 48 | 91 | 100 | 29 | 48 |
| 1790s | 5 | 18 | 51 | 78 | 93 | 41 | 58 |
| 1820s | — | 40 | 83 | 86 | 95 | 43 | 75 |
| Kent | | | | | | | |
| 1760s | — | — | 56 | 78 | 93 | 30 | 68 |
| 1790s | 5 | 29 | 58 | 79 | 84 | 37 | 61 |
| 1820s | — | 22 | 70 | 83 | 92 | 37 | 66 |
| Average | | | | | | | |
| Chester | 6 | 20 | 38 | 72 | 81 | 31 | 47 |
| Fairfield | 2 | 15 | 60 | 84 | 95 | 37 | 62 |
| Kent | 2 | 22 | 60 | 80 | 90 | 35 | 65 |

*Note*: Averages are calculated using the number of cases in each category to weight the average.

*Source*: See "Probate Inventory Sources" (621).

Though less expensive, candlesticks were somewhat less widely held than looking glasses yet, like looking glasses, they could be found in most households throughout the period (Table IV). As with looking glasses, Chester lagged behind Kent and Fairfield initially but caught up by the 1820s. In Kent brass candlesticks were more common (and more expensive) than iron ones and by the 1790s brass was the standard; in Fairfield and Chester, appraisers seldom distinguished brass from iron, but a typical pair of candlesticks was worth about half as much as in Kent and, judging from prices, probably made from iron. In only one instance out of several hundred did an inventory include a pair of silver-plated candlesticks.[9]

---

inventories. The official conversion rate was 7.5 shillings to 1 dollar in Chester and Kent; Fairfield counted 6 shillings to 1 dollar. When prices from other sources (newspaper advertisements, account books, or the manufacturing census) are given, the source is specifically noted. Unlike the wealth figures used in the tables, prices have been left in current values; comparisons between counties and over time are quite general.

[9] Price data is best for Kent. Candlesticks averaged 1.20 shillings in the 1760s; 2.87, in the 1790s; 2.55, in the 1820s. Brass candlesticks averaged 1.91 shillings in the

Exhibit 21
Page 00408



FIGURE I

Looking glass, 1760–90, made by John Bachman, Lancaster, Pa. This locally crafted pine and mahogany looking glass was more elaborate than many that were imported and displayed in the households of more modest farmers. Courtesy, Winterthur Museum, gift of Henry Francis du Pont, acc. no. 1955.0052.

Books were also widely held in the 1760s among nonhouseholders as well as the more economically secure (Table V). If the consumer revolution had made inexpensive devotional tracts and Bibles available to most whites, the reading revolution of the late eighteenth and early nineteenth centuries was quantitatively modest (as most people already

1760s; 5.87, in the 1790s; 2.48, in the 1820s (when virtually all candlesticks were brass). Appraised values in Fairfield and Chester were about half those in Kent.

Exhibit 21
Page 00409

TABLE IV

OWNERSHIP OF CANDLESTICKS ORGANIZED BY HOUSEHOLD STATUS IN
PERCENTAGES FOR CHESTER, FAIRFIELD, AND KENT COUNTIES, 1760S, 1790S,
AND 1820S

|  | Nonhouseholder | Poor | Middling | Comfortable | Fashionable | Other | Average |
|---|---|---|---|---|---|---|---|
| Chester |  |  |  |  |  |  |  |
| 1760s | — | 25% | 41% | 36% | 67% | 6% | 30% |
| 1790s | — | — | 21 | 48 | 63 | 5 | 25 |
| 1820s | — | — | 40 | 69 | 80 | 38 | 54 |
| Fairfield |  |  |  |  |  |  |  |
| 1760s | — | 20 | 59 | 85 | 79 | 36 | 52 |
| 1790s | — | 9 | 29 | 59 | 62 | 18 | 38 |
| 1820s | — | 60 | 63 | 81 | 98 | 32 | 68 |
| Kent |  |  |  |  |  |  |  |
| 1760s | — | — | 50 | 67 | 80 | 30 | 59 |
| 1790s | — | — | 54 | 60 | 89 | 21 | 52 |
| 1820s | — | 11 | 61 | 54 | 81 | 26 | 52 |
| Average |  |  |  |  |  |  |  |
| Chester | — | 10 | 32 | 57 | 70 | 19 | 36 |
| Fairfield | — | 23 | 49 | 75 | 82 | 29 | 54 |
| Kent | — | 6 | 54 | 60 | 83 | 25 | 55 |

*Note:* Averages are calculated using the number of cases in each category to weight the average.

*Source:* See "Probate Inventory Sources" (621).

owned some books) yet qualitatively impressive. In the middle decades of the eighteenth century, British publishers greatly increased their export of books to North America. The political storms of the revolutionary era stopped shipments, first during the nonimportation movement of the late 1760s, and then during the war itself, yet colonial publishers rushed endless pamphlets and new newspapers into print and fed the reading appetite of an increasingly politicized populace. After the war American publishers struggled with increasing success to win their own market away from British rivals. Inexpensive reprints (unprotected by copyrights) of European works, subscription libraries, and networks of peddlers all helped bring books to rural inhabitants of the Middle Atlantic, making books something people wanted not only to read but also to possess. The growing popularity of novels and biographies deepened the market; for many, it was no longer enough merely to own a family Bible and a prayer book.[10]

[10] Inventories probably undercount books because family Bibles, which show up in wills, were occasionally given to heirs before an estate was appraised. An

Exhibit 21
Page 00410

TABLE V

OWNERSHIP OF BOOKS ORGANIZED BY HOUSEHOLD STATUS IN PERCENTAGES
FOR CHESTER, FAIRFIELD, AND KENT COUNTIES, 1760S, 1790S, AND 1820S

| | Nonhouseholder | Poor | Middling | Comfortable | Fashionable | Other | Average |
|---|---|---|---|---|---|---|---|
| Chester | | | | | | | |
| 1760s | 55% | —% | 66% | 73% | 67% | 44% | 58% |
| 1790s | 25 | 50 | 52 | 67 | 100 | 36 | 55 |
| 1820s | — | 50 | 80 | 46 | 60 | 50 | 52 |
| Fairfield | | | | | | | |
| 1760s | 32 | 30 | 80 | 97 | 79 | 64 | 71 |
| 1790s | 25 | 45 | 57 | 65 | 86 | 64 | 60 |
| 1820s | 28 | 40 | 57 | 75 | 98 | 43 | 67 |
| Kent | | | | | | | |
| 1760s | 38 | 50 | 67 | 81 | 87 | 60 | 75 |
| 1790s | 26 | 29 | 37 | 64 | 80 | 37 | 55 |
| 1820s | 33 | 33 | 48 | 71 | 85 | 53 | 64 |
| Average | | | | | | | |
| Chester | 41 | 30 | 62 | 57 | 74 | 44 | 55 |
| Fairfield | 28 | 38 | 65 | 76 | 90 | 56 | 66 |
| Kent | 31 | 33 | 53 | 71 | 84 | 48 | 64 |

*Note*: Averages are calculated using the number of cases in each category to weight
the average.
*Source*: See "Probate Inventory Sources" (621).

Scholarship, however, has suggested a more cautious assessment of
this late-eighteenth-century and early-nineteenth-century reading revo-
lution. Imports did not increase more quickly than did the colonial and
early national population, colonial printers and publishers played a sec-
ondary role in the book trade until at least the 1790s, and reading tastes

average of around 75 percent for ownership among the middling, comfortable, and
fashionable seems a good general estimate.
    For estimates of English exports to North America, see James Raven, "Part 3:
The Importation of Books in the Eighteenth Century," in *A History of the Book in
America*, ed. Hugh Amory and David D. Hall, vol. 1, *The Colonial Book in the
Atlantic World* (Cambridge, 2000), 183–98. The British Customs 3 import-export
ledgers confirm that 1768–72 were good years in book importing specifically for
New York, Philadelphia, and the Chesapeake (Virginia and Maryland), though the
nonimportation movement shut the trade down in 1767–68. On the pace of domes-
tic publishing, see Rosalind Remer, *Printers and Men of Capital: Philadelphia Book
Publishers in the New Republic* (Philadelphia, 1996), 15, 30, and for aggressive market-
ing strategies, 125–48. For American reading tastes in the new Republic, see Cathy
N. Davidson, *Revolution and the Word: The Rise of the Novel in America* (New York,
1986), 15–37. Note, in particular, her persuasive discussion of the role of subscription
libraries in the dissemination of fashionable literature (29).

Exhibit 21
Page 00411

remained conventionally religious into the nineteenth century.[11] The probate inventories point toward a gradual, modest transformation. Though ownership of books was clearly widespread, a smaller percentage of the Middle Atlantic population owned books in the 1820s than had in the 1760s, and in both periods, religious books predominated in a typical household: the widespread dissemination of a narrow range of books had already occurred by the 1760s (Tables V–VI).

What signs, then, are there of a qualitative reading revolution after the 1760s? Holdings became larger; libraries of one hundred or more books became more common; histories, geographies, biographies, encyclopedias, and even novels found their way into some collections; and, in Fairfield, library subscriptions began to be listed in probated estates. If the typical householder in the 1760s had had a Bible, testament, prayer book, and devotional work, by the 1820s dictionaries, spelling books, almanacs, and poetry collections had been added. The growing diversity of titles (most of which were still devotional) may indicate increasing piety or intellectual curiosity, yet it also suggests that books were very much commodities whose mere possession was of significance to the owner.

These items—looking glasses, candlesticks, books—to varying degrees signified elegance, sophistication, and taste as well as utility. Each was fairly inexpensive and widely held. Together they reflect how far consumer culture had already spread by the 1760s and how the marketing of fashion—the substitution of brass for iron, the purchase of the latest London publication, or the emergence of a new style of decoration on metal work—could maintain that culture even when there is as much evidence of continuity as of change.

Guns were another widely held consumer amenity in the 1760s and, like books, were found among the poor, young, and transient as well as in the homes of landowners. Change in ownership patterns again suggests the modest, subtle ways the consumer market evolved through 1820 (Table VII). Appraisers placed a value of about twenty shillings on a serviceable gun. Guns were thus worth more than commonly held items such as ordinary looking glasses or candlesticks, yet considerably less than silver watches (a possession with equal claim as a symbol of personal identity). In the 1760s most householders in Kent and Fairfield owned guns, as did many nonhouseholders. By the 1790s the incidence of ownership had decreased, and it dropped even further by the 1820s (sharply in Fairfield, less so in Kent). Taking into consideration the

[11] The crucial cautions come in Elizabeth Carroll Reilly and David D. Hall, "Part 2: Customers and the Market for Books," in Amory and Hall, *History of the Book in America*, 387–99. See also an earlier study, William L. Joyce et al., eds., *Printing and Society in Early America* (Worcester, Mass., 1983).

Exhibit 21
Page 00412

WILLIAM AND MARY QUARTERLY

TABLE VI

BOOKS HELD IN CHESTER, FAIRFIELD, AND KENT ESTATES WITH
PERCENTAGES OF THOSE OF PARTICULAR TYPES, 1760s, 1790s, AND 1820s

|  | Average number of books | Average value | Estates with books | Bibles | Religious | Practical | History | Law |
|---|---|---|---|---|---|---|---|---|
| Chester |  |  |  |  |  |  |  |  |
| 1760s | 5.8 | 32.4s. | 58% | 95% | 47% | 16% | —% | 5% |
| 1790s | 10.2 | 57.8 | 55 | 91 | 44 | 13 | 9 | 9 |
| 1820s | 13.4 | 75.5 | 52 | 93 | 27 | 20 | 6 | 6 |
| Fairfield |  |  |  |  |  |  |  |  |
| 1760s | 4.9 | 13.2 | 71 | 90 | 49 | 16 | 6 | 8 |
| 1790s | 4.5 | 13.2 | 60 | 86 | 57 | 25 | 8 | 5 |
| 1820s | 14.6 | 56.9 | 68 | 92 | 61 | 25 | 12 | 8 |
| Kent |  |  |  |  |  |  |  |  |
| 1760s | 3.7 | 14.3 | 74 | 77 | 54 | 10 | 10 | 16 |
| 1790s | 4.8 | 28.2 | 54 | 76 | 47 | 23 | 20 | 10 |
| 1820s | 10.8 | 102.1 | 63 | 75 | 13 | 8 | 17 | 17 |

*Notes*: The percentages of those with books are broken out into particular type using titles as specified in estates. Categories were defined as follows: Bibles are family Bibles; religious books include hymns, psalms, prayer books, devotional books, sermons, and works of theology; practical books include spelling and arithmetic texts as well as dictionaries; history books include history, geography, biography, and natural science titles; law books include law, medicine, and military volumes. Many estates listed a Bible and "other" (unspecified) books, so the percentages are minimum estimates of inclusion. The number and value of books are based only on estates with books. Values are in current money of account for each county (not deflated).
*Source*: See "Probate Inventory Sources" (621).

description of these guns, however, complicates the pattern. In Kent, with the highest incidence of gun ownership in the 1760s and 1790s, more than half the guns were listed simply as old, broken, or small. In Fairfield guns were seldom designated as old or by type, but evaluators often included separate appraisals of bayonets, powder horns, cartouche boxes, and bullets; in Chester, a gun was merely a gun. In the 1820s however, appraisers noted few guns as old, and in Kent they now took greater care to distinguish the type of gun (musket, shotgun, duck gun, pistol, and the like). Even more strikingly, in the early nineteenth century the most expensive guns, owned in the most fashionable households, were appraised as true luxury items, worth anywhere from fifty to two hundred shillings (as much, that is, as twenty-seven dollars).[12]

[12] The average value placed on a gun in Chester County went from 21 shillings (1760s) to 17 (1790s) to 23 (1820s); for Kent, the equivalent values were 27, 27, and 64 shillings; for Fairfield, 19 shillings (in the 1760s) and 30 (in the 1820s). In the

Exhibit 21
Page 00413

CONSUMER CULTURE OF THE MIDDLE ATLANTIC          591

TABLE VII

OWNERSHIP OF GUNS ORGANIZED BY HOUSEHOLD STATUS IN PERCENTAGES FOR
CHESTER, FAIRFIELD, AND KENT COUNTIES, 1760s, 1790s, AND 1820s

| | Nonhouseholder | Poor | Middling | Comfortable | Fashionable | Other | Average |
|---|---|---|---|---|---|---|---|
| Chester | | | | | | | |
| 1760s | 18% | 25% | 48% | 36% | 56% | 19% | 36% |
| 1790s | — | — | 34 | 38 | 50 | 18 | 30 |
| 1820s | — | — | 10 | 26 | 70 | 19 | 26 |
| Fairfield | | | | | | | |
| 1760s | 27 | 30 | 55 | 79 | 86 | 46 | 56 |
| 1790s | 30 | 18 | 31 | 44 | 59 | 23 | 37 |
| 1820s | 17 | 20 | 20 | 29 | 37 | 21 | 27 |
| Kent | | | | | | | |
| 1760s | 13 | — | 64 | 58 | 70 | 40 | 59 |
| 1790s | 21 | — | 50 | 48 | 66 | 32 | 46 |
| 1820s | 20 | — | 39 | 49 | 73 | 21 | 46 |
| Average | | | | | | | |
| Chester | 12 | 10 | 37 | 31 | 59 | 19 | 30 |
| Fairfield | 25 | 23 | 35 | 42 | 52 | 31 | 38 |
| Kent | 19 | — | 53 | 51 | 70 | 29 | 50 |

*Note*: Averages are calculated using the number of cases in each category to weight the average.

*Source*: See "Probate Inventory Sources" (621).

What does this pattern mean? Until well after the American Revolution, most guns were British or French imports, and such imports increased during wars. Since guns seldom lasted too long, such wartime imports were more likely to have made their way into the probate inventories in the 1760s (after the Seven Years' War) and the late 1810s (after the War of 1812) than during the 1790s (as the Revolution was long over). By the early nineteenth century, state and federal armories produced a significant number of guns, but precisely because there was a war, most of these guns remained government property. Gun ownership was probably uniquely high in the 1760s, and then dropped thereafter to normal levels. In Chester, perhaps because of its Mennonite and Quaker

---

1820s the most expensive 10 percent of the guns averaged 54 shillings in Chester; 49 in Fairfield; and 188 in Kent. These values were a third higher than the values for the best guns in the earlier periods in Chester and Fairfield and more than three times the figure for Kent from the earlier periods. A cartouche box was a cartridge box, yet the frequent use of the French designation suggests the importance of captured and imported guns in early America.

Exhibit 21
Page 00414

population, the norm was extremely limited gun ownership. Yet there was a modest compensating trend, particularly in Kent and Fairfield, which saw the fashionable acquire increasingly valuable sporting guns. Utilitarian goods, which aged and lost value as circumstances changed, became for some useless symbols of status.[13]

The same pattern of acquisition and accumulation that characterized common consumer goods such as candlesticks and looking glasses applied to most other everyday amenities found in the probate inventories: teapots, coffee kettles, and much of the household furniture, for example. Yet some goods gained wider distribution from 1760 to 1820, and when such goods became more widely held, usually it was a matter of new production techniques, distinctive regional economies, or the jockeying for position between the genteel and those who longed to be.

In two clear cases, the rapid spread of a new consumer product reflected regionalized, local production (rather than the more generalized demand that had been met by the Atlantic economy throughout the consumer revolution). From 1760 to 1820 in Chester County, stoves went from being an imaginative curiosity to a standard household item. Before the 1760s Pennsylvanians had occasionally used "Holland stoves" (also called six-plate stoves) and "German stoves" (also called five-plate stoves), which were essentially iron boxes, often with medieval or rococo designs on the iron plates, standing on short iron legs, and with a hole in the top to connect a stove pipe through which smoke escaped. As simple as such stoves were to construct, most households were heated by fireplaces, which expelled smoke into the rooms, let heat escape up the chimney, and consumed large quantities of firewood. In 1744 Benjamin Franklin had published *An Account of the New Invented Pennsylvanian Fire-Place*, which promoted a more efficient open-faced iron stove. Though some modified Franklin stoves were made at Pennsylvania

[13] This interpretation draws on Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York, 2000). Bellesiles used probate records, manufacturing censuses, militia lists, and newspaper advertisements to argue that early America did not have a gun culture. Few early Americans, he concluded, owned guns, and those that did often could not use them effectively. People used fists, knives, swords, bayonets, and bows and arrows to carry out violent attacks more often than guns; see esp. chaps. 3, 5–6, 8, and 445–54. This article deals with the incidence of gun ownership and not directly with Bellesiles's concern with the cultural implications of ownership patterns, but where the studies overlap, this probate analysis furnishes general support (though different figures) for his claims (see his probate statistics, 445). For a critique of Bellesiles's work, see Robert H. Churchill, "Guns and the Politics of History," *Reviews in American History* 29, no. 3 (September 2001): 329–37. Drawing conclusions from the placement of items in the inventories is difficult, yet guns were almost never listed with clothing, watches, and currency at the head of an inventory but placed, presumably, alongside items in the same part of the house.

Exhibit 21
Page 00415

forges and furnaces, Franklin's design was not a commercial (or techno-logical) success. Stove production picked up in the postrevolutionary era, with the box stove (a modified ten-plate version that had a four-plate oven inside the basic box) and the open-faced Rittenhouse stove (a variation on Franklin's design presumably named for astronomer-philosopher David Rittenhouse), which were popular, locally made items; others imported stoves from Great Britain. Pennsylvania furnaces wholesaled ordinary stoves (usually to blacksmiths) for three to six pounds, depending on weight, and iron furnaces increasingly turned out elegantly decorated stove plates—in the rococo and, later, federal styles—to satisfy wealthier tastes. In 1786 Edward Burd, an ironmaster, wrote to a correspondent that he had finally found a carver skilled enough to design a stove plate in a way that "improved upon it both as the Beauty and real usefulness."[14]

The inventories illustrate this pattern: stoves were in few households in Chester County in the 1760s, and simply not found elsewhere (Table VIII). By the 1790s they were being used more generally, by about one household in four in Chester, and by the 1820s, they were found in most Chester estates and owned by a small but growing number of household-ers in Fairfield and Kent. The use of stoves, then, is a clear indication of how local manufacturing shaped distinctive regional consumer economies.

In the case of clocks, their acquisition was more general than stoves, but their spread beyond the households of the most prosperous Americans first occurred in Fairfield County, where mass production made cheaper versions available. Clocks were the most technologically sophisticated everyday product of the eighteenth century (their owner-ship suggested membership in an enlightened elite); they had obvious practical value (especially when they were fashioned with a dial to tell days), a value that would grow as people came to order life and work by consistent units of time; and they were an elegant piece of furniture, often displayed in the most public room in a household to testify to a family's status (Figure II). Clock works were imported and fashioned locally, then a cabinetmaker would fit them into a case. By the middle of the eighteenth century, there were clockmakers active in Fairfield and Chester counties, and their numbers grew thereafter. Most manufac-tured brass-movement, eight-day striking clocks that sold for from ten pounds (for the works alone) to thirty pounds or more (for a clock and

[14] The basic source for Franklin stoves is Samuel Y. Edgerton Jr., "Heating Stoves in Eighteenth Century Philadelphia," *Bulletin of the Association for Preservation Technology* 3, nos. 2–3 (1971): 15–104 (quotation, 64). See also Edgerton, "Supplement: The Franklin Stove," in I. Bernard Cohen, *Benjamin Franklin's Science* (Cambridge, Mass., 1990), 199–211.

Exhibit 21
Page 00416

TABLE VIII

OWNERSHIP OF STOVES ORGANIZED BY HOUSEHOLD STATUS IN PERCENTAGES
FOR CHESTER, FAIRFIELD, AND KENT COUNTIES, 1760S, 1790S, AND 1820S

|  | Nonhouseholder | Poor | Middling | Comfortable | Fashionable | Other | Average |
|---|---|---|---|---|---|---|---|
| Chester |  |  |  |  |  |  |  |
| 1760s | —% | —% | 3% | —% | 11% | —% | 3% |
| 1790s | — | — | 28 | 33 | 50 | 18 | 26 |
| 1820s | 50 | 50 | 50 | 71 | 90 | 50 | 64 |
| Fairfield |  |  |  |  |  |  |  |
| 1760s | — | — | — | — | — | — | — |
| 1790s | — | — | — | 3 | — | — | 1 |
| 1820s | — | — | 4 | 3 | 20 | 4 | 6 |
| Kent |  |  |  |  |  |  |  |
| 1760s | — | — | — | — | — | — | — |
| 1790s | — | — | — | — | — | — | — |
| 1820s | — | — | 13 | 5 | 8 | 11 | 7 |
| Average |  |  |  |  |  |  |  |
| Chester | 6 | 10 | 21 | 48 | 52 | 27 | 31 |
| Fairfield | — | — | 1 | 3 | 10 | 1 | 3 |
| Kent | — | — | 4 | 2 | 3 | 4 | 2 |

*Note*: Averages are calculated using the number of cases in each category to weight the average. There are only two cases for Chester in the 1820s in both the nonhouseholder and poor categories. One of these two in each category had a stove.

*Source*: See "Probate Inventory Sources" (621).

case). In the first decade of the nineteenth century, Connecticut artisan-entrepreneurs began mass-producing wooden clocks. They designed machines to cut the teeth of clock wheels and used water mills to power their lathes and teeth-cutting machines. By 1820 there were several clock factories in and around Plymouth (in Litchfield County, Connecticut), which turned out upwards of eight thousand wooden clocks annually. These lighter, smaller, and less expensive thirty-hour shelf clocks were distributed regionally by peddlers and shipped as far away as Virginia.[15]

[15] On clocks, see David S. Landes, *Revolution in Time: Clocks and the Making of the Modern World*, rev. ed. (Cambridge, Mass., 2000). On clocks in Fairfield and Chester, see Penrose R. Hoopes, *Connecticut Clockmakers of the Eighteenth Century* (Rutland, Vt., 1975); Arthur E. James, *Chester County Clocks and Their Makers*, 2d ed. (Exton, Pa., 1976). On mass-produced clocks, see John Joseph Murphy, "Entrepreneurship in the Establishment of the American Clock Industry," *Journal of Economic History* 26, no. 2 (June 1966): 169–86 (dealing primarily with Eli Terry). The 1820 manufacturing figure is from Murphy (184), but checked in the United States 1820 Census of Manufacturers, National Archives microcopy 279, roll 4 (Connecticut Schedule). The census lists five Litchfield manufacturers, who employed 66 men and 13 women and sold some 8,450 clocks annually (176).

Exhibit 21
Page 00417

CONSUMER CULTURE OF THE MIDDLE ATLANTIC                595



FIGURE II

Tall case clock, 1820, made by Jesse Anderson, Oxford Township, Chester County, Pa. Local craftsmen made most of the clocks in Chester, in contrast to Kent County, Md., where imports were more common, and Fairfield County, Conn., where less-skilled laborers, assisted by simple machines, began to turn out smaller, cheaper clocks in the late eighteenth century. Courtesy, Chester County Historical Society, West Chester, Pa., acc. no. 1981.526.33. A color version is available on http://www.historycooperative .org/journals/wm/62.4/clemens.html.

Exhibit 21
Page 00418

In the 1760s few in Fairfield or Kent owned clocks, and only three estates in twenty in Chester County included a clock. These numbers inched up by the 1790s (Table IX). Clocks remained relatively expensive consumer items in all three counties, with the best clocks to be found in Kent and the least expensive in Fairfield, presumably a reflection of the frequency with which Kent planters and Fairfield farmers bought imported, rather than locally made, clocks (Chester clocks, in contrast, were more often locally crafted). By the second decade of the nineteenth century, the number owning clocks jumped to about a third of the households in Chester and Fairfield, and one-fifth in Kent. The most dramatic change, clearly, was in Fairfield. Compared with the other two counties where clock values continued to rise, as recorded in the inventories, they fell sharply in Fairfield, and assessors began distinguishing wooden clocks (which averaged approximately seven dollars each) from brass clocks (which averaged twenty-seven dollars). The effect of factory-made clocks on the consumer market was reflected in Connecticut tax returns. In the postrevolutionary era, the state taxed luxury goods such as watches, silverware, carriages, and clocks. For Fairfield County, these tax ratable returns indicate that tax payers owned 226 clocks (12 percent of them wooden) in 1796–97; 1,086 (53 percent wooden) in 1811; and 1,755 (69 percent wooden) in 1817. Clocks, then, grew in importance as traditional, but increasingly desired, luxury goods (in Kent, the average value of a clock by 1815–20 was more than 50 percent above the prerevolutionary value) and as mass-produced, considerably less expensive household comforts. In Kent and Chester, with less access to cheaper, wooden clocks, the ownership of watches increased; in fact, the Chester households that did not have a clock quite often included a watch (Tables IX–X).[16]

[16] Clock values come from annual time series for each county of inventory item values. In shillings the Kent value of a clock went from 194 (1759–75), to 248 (1789–98), to 304 (1810–19); in Fairfield, the values were 134, 136, 99; in Chester, 184, 177, 263. The 1820 Census of Manufacturers valued wooden clocks at $4.50, brass and wooden clocks at $14.00, and brass clocks at $30.00 (United States 1820 Census of Manufacturers, National Archives, 176). Comparable prices for brass clocks can be found in Penrose R. Hoopes, *Shop Records of Daniel Burnap: Clockmaker* (Hartford, Conn., 1958), 52, 56. Fairfield clock numbers come from the Connecticut Grand Lists, 1797–1825, RG 8, Item 186, Connecticut State Library, Hartford (microfilm). The first lists are from 1796, with 1797 additions. Ratable lists for specific towns (from which the Grand Lists were compiled) have been located for Fairfield, Danbury, Stratford, and Newtown; these lists add detail to the overall picture but do not alter the interpretation. A published list, taken from town ratable returns, of Fairfield clock owners in 1805 (before mass-produced wooden clocks were available) appears in Winthrop D. Warren and Christopher B. Nevins, *Clocks and Clockmakers of Colonial Fairfield: Connecticut, 1736–1813* (n.p., 1993), 694–95 (repr. from *Bulletins of the National Association of Watch and Clock Collectors* [October,

Exhibit 21
Page 00419

TABLE IX

OWNERSHIP OF CLOCKS ORGANIZED BY HOUSEHOLD STATUS IN PERCENTAGES
FOR CHESTER, FAIRFIELD, AND KENT COUNTIES, 1760S, 1790S, AND 1820S

| | Nonhouseholder | Poor | Middling | Comfortable | Fashionable | Other | Average |
|---|---|---|---|---|---|---|---|
| Chester | | | | | | | |
| 1760s | —% | —% | 14% | 18% | 67% | 6% | 16% |
| 1790s | — | — | 21 | 43 | 63 | 14 | 26 |
| 1820s | — | — | 20 | 46 | 70 | 23 | 36 |
| Fairfield | | | | | | | |
| 1760s | — | — | — | 6 | 14 | — | 2 |
| 1790s | — | — | — | 8 | 34 | — | 7 |
| 1820s | 6 | 20 | 17 | 34 | 78 | 11 | 33 |
| Kent | | | | | | | |
| 1760s | — | — | — | 3 | 20 | — | 7 |
| 1790s | — | — | — | 7 | 32 | — | 11 |
| 1820s | — | 11 | — | 24 | 35 | 5 | 19 |
| Average | | | | | | | |
| Chester | — | — | 18 | 40 | 67 | 16 | 26 |
| Fairfield | 2 | 4 | 5 | 21 | 52 | 4 | 16 |
| Kent | — | 6 | — | 12 | 29 | 2 | 13 |

*Note*: Averages are calculated using the number of cases in each category to weight the average.

*Source*: See "Probate Inventory Sources" (621).

As production of stoves and clocks picked up, it became difficult to think of them as luxury goods or take them as unambiguous markers of status. There were goods, however, whose price and quality restricted ownership, and whose spread reinforced rather than blurred class lines before 1820. As with other consumer amenities, changes in ownership patterns occurred incrementally, yet were more restricted to those who lived profitable and comfortable lives. Riding carriages fell into this category. Carriages and coaches were among the most expensive consumer goods in America. In 1820 a Ridgefield, Connecticut, manufacturer listed coaches at $400–$600, gigs and riding chairs (both were two-wheeled vehicles drawn by one horse) at $200–$300, and sleighs at $40–$100, though, more commonly, manufacturers stated that coaches,

December 1993]). Clocks were listed by taxpayer, not by household, so the count is not directly comparable to probate record figures. Per capita and per household ownership probably increased at a slower rate than the number of clocks did. Also taxed were fireplaces, the number of which constitutes a crude proxy for the changing number of households. The number of clocks represented 2 percent of the number of fireplaces in 1796–97, 7 percent in 1811, and 11 percent by 1817.

Exhibit 21
Page 00420

TABLE X

OWNERSHIP OF WATCHES ORGANIZED BY HOUSEHOLD STATUS IN PERCENTAGES
FOR CHESTER, FAIRFIELD, AND KENT COUNTIES, 1760S, 1790S, AND 1820S

|  | Nonhouseholder | Poor | Middling | Comfortable | Fashionable | Other | Average |
|---|---|---|---|---|---|---|---|
| Chester |  |  |  |  |  |  |  |
| 1760s | 27% | —% | 3% | 36% | 44% | 19% | 19% |
| 1790s | — | 25 | 10 | 19 | 25 | 9 | 14 |
| 1820s | — | 50 | — | 23 | 20 | 23 | 20 |
| Fairfield |  |  |  |  |  |  |  |
| 1760s | 5 | — | 2 | 3 | 7 | — | 2 |
| 1790s | 5 | 27 | 5 | 6 | 28 | — | 9 |
| 1820s | 22 | 20 | 2 | 9 | 32 | 4 | 12 |
| Kent |  |  |  |  |  |  |  |
| 1760s | 13 | — | 3 | 22 | 30 | — | 17 |
| 1790s | 16 | 14 | 8 | 19 | 41 | 5 | 21 |
| 1820s | 27 | 11 | 17 | 29 | 63 | 21 | 35 |
| Average |  |  |  |  |  |  |  |
| Chester | 18 | 20 | 6 | 24 | 30 | 17 | 17 |
| Fairfield | 10 | 15 | 3 | 7 | 26 | 1 | 8 |
| Kent | 19 | 11 | 8 | 24 | 45 | 10 | 25 |

*Note:* Averages are calculated using the number of cases in each category to weight
the average.
*Source:* See "Probate Inventory Sources" (621).

chaises, and gigs were worth $100 to $250. Inventory evaluations—
which usually designate the type of carriage but not its quality—suggest
that vehicles could be bought (if only through estate sales) at consider-
ably less than these prices, but that the prices remained fairly constant
over time. A gig, the most frequently mentioned vehicle in Kent inven-
tories, was valued at an average of $110 around 1820, whereas carriages
and chaises averaged $40 each. In Fairfield during the same period,
chaises averaged $45 and carriages $50. At the low end of the scale, then,
a riding vehicle cost about what a brass clock did; at the high end, two
to three times as much.[17]

In all three counties, ownership of wheeled pleasure vehicles became
more common over time (Table XI). Through the 1790s in Kent, about
one in four estates included a chaise, carriage, gig, or other type of
horse-drawn riding vehicle; by 1820, the proportion had climbed to

[17] United States Census of Manufacturers, microcopy 279, roll 4 (Connecticut
Schedule), gives price ranges for coaches, gigs, carriages, sleighs, and farm wagons
for concerns in Ridgefield and Redding.

Exhibit 21
Page 00421

almost two in five. In Chester and Fairfield, ownership was considerably less common, yet here, too, more people acquired them over time. In the 1760s virtually no one owned a riding chair or a coach; by the 1790s, a few did, especially among the fashionable; and by the 1820s, ownership was common among the fashionable. Riding chairs, then, as they increased in popularity and usefulness, helped set off the genteel from other members of society: fashionable households in Fairfield were five times as likely as merely comfortable ones to have a riding chair; in Chester, four times; and in Kent (where riding chairs went with the ownership of slaves), three times.

The Connecticut ratable lists capture some of this change, though the results must be interpreted cautiously. In 1796–97, there were thirty-seven chaises (two-wheeled, two-seated vehicles) and sixty-nine chairs and sulkies (two-wheeled, one-seated) taxed in Fairfield County, making chaises and riding chairs about half as common as clocks. By 1806, when a more complicated taxation scheme was in place, there were almost four hundred carriages and chairs taxed, including eleven four-wheeled coaches and phaetons. By 1817 there were almost seven hundred taxed two- and four-wheeled vehicles, more than half not very elaborate riding chairs (making coaches and carriages, as in 1796–97, about half as common as clocks).[18]

In Connecticut consumer demand was being supplied by local manufacturing. As early as 1810, Connecticut manufacturers were building tour coaches, phaetons, chaises, and the like in New Haven, Fairfield, Litchfield, and Tolland Counties; in 1820, there were four carriage manufacturers in Fairfield County alone, which probably produced about one hundred riding vehicles a year. Only one of these firms used water power (for sawing and boring wood), but all employed boys and women as well as men, which suggests that these were more than mere artisan shops. In Maryland and Pennsylvania, there is no evidence of any new production techniques. Chester County account books make clear that carpenters and wheelwrights often sold riding chairs, and in Philadelphia, a number of concerns built pleasure carriages by the 1820s, yet it seems likely that many of the gigs and coaches used by the fashionable householders in Maryland and Pennsylvania were London imports (or shipped south from Connecticut).[19]

[18] Connecticut Grand Lists.
[19] For 1810, see Tench Coxe, *A Statement of the Arts and Manufactures of the United States of America* (Philadelphia, 1814), repr. in Thomas C. Cochran, ed., *The New American State Papers*, vol. 1, *Manufactures* (Wilmington, Del., 1972), 160–410. For 1820, see *Digest of Accounts of Manufacturing Establishments in the United States, and of Their Manufactures* (Washington, [D.C.], 1823) and 1820 Census of Manufacturers, microcopy 279, roll 4. The original schedules list three carriage

Exhibit 21
Page 00422

600   WILLIAM AND MARY QUARTERLY

TABLE XI

OWNERSHIP OF RIDING CHAIRS ORGANIZED BY HOUSEHOLD STATUS IN
PERCENTAGES FOR CHESTER, FAIRFIELD, AND KENT COUNTIES, 1760S, 1790S,
AND 1820S

| | Nonhouseholder | Poor | Middling | Comfortable | Fashionable | Other | Average |
|---|---|---|---|---|---|---|---|
| Chester | | | | | | | |
| 1760s | —% | —% | 3% | —% | —% | —% | 1% |
| 1790s | — | — | — | 5 | 13 | 9 | 5 |
| 1820s | — | — | — | 11 | 60 | 8 | 14 |
| Fairfield | | | | | | | |
| 1760s | — | — | — | 3 | 14 | — | 2 |
| 1790s | — | — | 3 | 10 | 31 | 5 | 9 |
| 1820s | — | — | — | 6 | 49 | 4 | 11 |
| Kent | | | | | | | |
| 1760s | — | — | 8 | 14 | 57 | — | 25 |
| 1790s | — | — | 17 | 31 | 45 | 11 | 25 |
| 1820s | 7 | 22 | 30 | 22 | 75 | 26 | 39 |
| Average | | | | | | | |
| Chester | — | — | 1 | 7 | 26 | 6 | 7 |
| Fairfield | — | — | 1 | 7 | 37 | 3 | 8 |
| Kent | 2 | 11 | 17 | 23 | 59 | 15 | 30 |

*Note*: Averages are calculated using the number of cases in each category to weight the average. "Riding chairs" includes all two- and four-wheel horse-drawn vehicles.

*Source*: See "Probate Inventory Sources" (621).

Stoves, clocks, watches, and riding carriages had their uses (providing warmth, telling time, facilitating travel), yet each was also something more, a luxury that most people had done well enough without through the mid-eighteenth century, and now a comfort that had spread from the fashionable to some ordinary householders, a process facilitated by technological improvement or primitive factory production. The well-off tended to have a greater number of these goods—a clock and a watch rather than one or the other, and, more mundanely, three looking glasses rather than just one—of more elegant design and greater cost, but mere possession of such goods was no longer an index of status. And at least some goods that reflected personal identity such as books, guns, and looking glasses were as often as not possessions of widows, laborers, itin-

manufacturers in Ridgefield and Redding that are not included in the published returns. A New Haven carriage manufacturer reported (in the returns, but not the published schedules) that the better part of its market was in the South.

Exhibit 21
Page 00423

erant artisans, and retired farmers, which connected rather than separated people, creating a consumer culture that cut across class lines.[20]

Except perhaps for cloth, no set of goods proved a better barometer of evolving consumer choices than tableware: wood, pewter, earthenware, porcelain, and silver. In the ways these goods were shaped by fashion (and in the resulting diversity of colors, patterns, and sizes), in the willingness of consumers to exchange one type of tableware for another, in the substitution of local for European production (and the reverse), and in the effects of a commercial economy that encircled the globe, the history of tableware helps chart the course of Middle Atlantic consumption in the late eighteenth and early nineteenth centuries. Yet if one were to enter the parlor of a typical late-eighteenth-century home, one would be struck first not by what was new, fashionable, or expensive—though all of that might be there—but rather by the ubiquitous presence of what had been there a century before: pewter.

Pewter was made from tin, usually with copper, antimony, or bismuth added to harden the metal. In cheaper varieties lead was sometimes added as well, which made the final product more malleable. Most was manufactured by craftsmen in local shops throughout England, and since virtually every household there as well as in North America had pewter plates, porringers, basins, or tankards, the market for the metal was large and expanding (Figure III). The English protected the industry by prohibiting the export of pure tin and unworked pewter, which left American craftsmen free to buy up old and damaged pewter, melt it down, perhaps adding more lead, refashion it into new products, and then sell it. Pewter lost little of its value, even with heavy use, and, to a limited extent, could serve as a relatively secure form of savings, capable of being converted to cash or credit if a family faced a financial emergency. This durability also meant that the stock of pewter, unlike that of other goods that were worn out or broken and then discarded, increased steadily, fed by continuous imports. In the 1760s Americans were importing about three hundred tons of finished pewter a year, or the equivalent of a million eight-inch plates.[21]

Pewter was serviceable, not fashionable. Well-polished pewter had the look of silver, but what it lacked compared with ceramics was an

---

[20] Desks, like clocks, also were a marker of status. In Fairfield, 57 percent of the fashionable owned desks and only 15 percent of other householders did. In Kent, 69 percent of the comfortable and fashionable households had desks, but only 34 percent of the middling; in Chester, these figures were 50 percent (comfortable and fashionable) and 24 percent (middling). On Connecticut desks, see Cooke, *Making Furniture*, 151–89.

[21] Charles F. Montgomery, *A History of American Pewter* (New York, 1973), 8. For the years 1768–72, the average annual importation of pewter through Maryland,

Exhibit 21
Page 00424



FIGURE III

Pewter porringers, dated 1816 and 1812, attributed to Samuel Pennock, active in Chester County, Pa., 1780s to 1843. Porringers were among the utilitarian and inexpensive pewter tablewares found in most Middle Atlantic households in the late eighteenth century, but somewhat less often in the early nineteenth century. Courtesy, Chester County Historical Society, West Chester, Pa., acc. nos. 1983.24.1–2.

ever-changing variety of shapes, patterns, and decorations. Plates could vary in size, from 7.5 to 10.0 inches, platters could be round or oval, porringers could have handles of different design, tankards could be tall or short, tableware could have distinct rim designs, yet the variation was not great and, to judge by probate appraisals and merchant accounts, never significant. Merchants sold pewter by weight, not shape or pattern, and evaluated it in pence per pound, distinguishing only between new (hard metal) and old (trifle metal) pewter. In some households, of course, individual pieces were prized because they bore the mark of a particular pewterer who fashioned them, yet such marks were assurances of quality or of status, not mass-marketing devices.

    Did every householder own pewter? The answer is no, but in the mid-eighteenth century, more owned it than any other type of tableware (Table XII). The regional variations are sharp. In mid-eighteenth-century Kent, more than nine out of ten inventories listed pewter. Among the middling sort, people ate their meals from pewter plates,

Exhibit 21
Page 00425

CONSUMER CULTURE OF THE MIDDLE ATLANTIC          603

TABLE XII

OWNERSHIP OF PEWTER IN PERCENTAGES BY WEALTH CLASS IN CHESTER,
FAIRFIELD, AND KENT COUNTIES, 1760S, 1790S, AND 1820S

|  | *Poorer* (£0–49.9) | *Middling* (£50–249.9) | *Wealthy* (£250– ) | *Average* |
|---|---|---|---|---|
| Chester |  |  |  |  |
| 1760s | 42% | 83% | 79% | 66% |
| 1790s | 48 | 69 | 85 | 66 |
| 1820s | 22 | 48 | 44 | 39 |
| Fairfield |  |  |  |  |
| 1760s | 47 | 86 | 100 | 69 |
| 1790s | 63 | 89 | 100 | 80 |
| 1820s | 64 | 77 | 74 | 72 |
| Kent |  |  |  |  |
| 1760s | 62 | 97 | 99 | 91 |
| 1790s | 40 | 73 | 94 | 73 |
| 1820s | 20 | 21 | 36 | 29 |
| Average |  |  |  |  |
| Chester | 38 | 66 | 69 | 57 |
| Fairfield | 58 | 84 | 87 | 74 |
| Kent | 40 | 62 | 74 | 63 |

*Notes*: Averages are calculated using the number of cases in each category to weight the average. No figure is based on less than one dozen inventories. The number of Chester County inventories in each category is Poorer: 31 (1760s), 19 (1790s), 27 (1820s); Middling: 35, 39, 40; Wealthy: 14, 20, 52. The number of Fairfield County inventories in each category is Poorer: 76, 86, 91; Middling: 72, 104, 122; Wealthy: 15, 20, 35. The number of Kent County inventories in each category is Poorer: 26, 42, 30; Middling: 33, 49, 42; Wealthy: 79, 64, 83. The wealth categories (0–50 pounds, 50–250 pounds, and 250 pounds and higher) are all calculated in 1790 Kent County values.

*Source*: See "Probate Inventory Sources" (621).

poured coffee from pewter pots, drank grog from pewter porringers, and even relieved themselves in pewter chamber pots. Among the wealthier residents of Kent, whose tableware was generally porcelain or delft, there was nonetheless an undifferentiated collection of pewter in virtually every household listing, and usually a few particularized items as well. With the Revolution British pewter became harder to obtain and it never recovered its position in Kent homes. Surprisingly, it was the poor who gave it up most readily, substituting considerably cheaper ceramic tablewares, whereas richer planters, especially the slave owners, retained pewter spoons and teapots. In general Kent planters, with greater wealth

Exhibit 21
Page 00426

and export earnings than their contemporaries in Chester and Fairfield, could better afford English pewter, yet after the war they also replaced it more quickly, with silver and porcelain among the wealthier, and with ceramics among the lesser householders.

In Chester the pattern of use was a variation on that in Kent. Farmers were not as wealthy; their market involvement was less intense. They initially owned less pewter than did Kent planters, and they gave it up less quickly (local industry having some role). As in Kent poorer farmers eventually substituted ceramics for pewter; wealthier farmers added ceramics and silver to their pewter. Only in Fairfield, where local pewterers kept the metal in circulation, was use about the same as before the Revolution and the metal distributed evenly among classes.

In the broadest terms, then, the ownership of pewter was an index of market involvement and a negative index of the allure of fashion. In the eighteenth century, wealth and market involvement made pewter more obtainable, yet over time market involvement also subjected ownership to the dictates of fashion. Pewter, even transformed in the late eighteenth century into thinner, harder, and lighter Britannia metal and repackaged as a substitute for silver, could not compete with the variety and dazzle of ceramics (nor with bonds and bank notes as a liquid cash reserve). In turn the dictates of local production and Atlantic markets shaped the regional and class distinctions that the inventories describe and with which the residents of the Middle Atlantic lived.

The alternatives to pewter were ceramic tablewares, which were chiefly English imports. In the 1760s pewter's rivals had been basic (red) earthenware, white, salt-glazed stoneware, and delft, with Chinese porcelain in command of the high end of the market. In the 1770s the introduction of creamware, most commonly queensware, established a new standard of luxury and convenience in tableware; after the Revolution, creamware remained popular for utilitarian kitchen pieces, but from it evolved a new decorated product, pearlware, that captured the American market. Porcelain retained its status as a luxury product, and pewter continued to be used in many households but was no longer imported in significant quantity.[22]

[22] For an overview of ceramics, see Ivor Noël Hume, *A Guide to Artifacts of Colonial America* (New York, 1969), 98–145, 276–85; Kenneth L. Ames and Gerald W. R. Ward, eds., *Decorative Arts and Household Furnishings in America, 1650–1920: An Annotated Bibliography* (Winterthur, Del., 1989), 179–219, esp. "English Ceramics in America," by George L. Miller and Ann Smart Martin (201–19); Robert Hunter, ed., *Ceramics in America* (Hanover, N.H., 2001).

The development of the market in America for English ceramics has been carefully traced in Ann Smart Martin, "'Fashionable Sugar Dishes, Latest Fashion Ware': The Creamware Revolution in the Eighteenth-Century Chesapeake," in *Historical Archaeology of the Chesapeake*, ed. Paul A. Shackel and Barbara J. Little

Exhibit 21
Page 00427

There were three basic types of ceramics: earthenware, delft, and stoneware. Earthen pottery was the utilitarian ware of the early American household. It was inexpensive and used most commonly for mundane tasks such as storage and dairying, and also fashioned into dishes, mugs, and tablewares. Earthenware pottery could be distinguished not only by material and function but also by its glaze—yellows, greens, and blacks were all common—as well as by colorful ornamentation applied beneath the glaze. Earthenware, however much a market product, bore the marks of a particular locale and even a particular potter. Its design and colors as much as its use made it desirable, yet did not make it, given its individuality, an object of emulation, nor, given the simplicity of its decoration, a signifier of status.[23]

Earthenware, much of it undecorated redware, was an inexpensive, all-purpose ceramic, the counterpart of pewter (Figure IV). Only one earthen product, delft, was distinctive enough at midcentury to be regularly noted in estate inventories. What distinguished delft was its white glaze, which combined an attractive simplicity with an ideal surface for painting. The process for making tin-glazed earthenware was of Near Eastern, not English, origin, and it sold initially as a luxury and a curiosity—a reflection of Islam and the Renaissance. Its practical use in England increased as its combination of beauty and delicacy seemed ideally matched to the mid-seventeenth-century discovery of East Indian drinks: tea, coffee, and chocolate. Production centered in London, Bristol, and Liverpool, which, not coincidentally, were the leading colonial ports. As production grew English potters competed with East India porcelain imports by adopting Chinese-style patterns for their wares. By the early eighteenth century, blue-and-white delft with Chinese designs was the exotic English standard, and most likely the article that American appraisers recognized as delft. Yet delft's success was transient. It chipped easily, which ill suited it for the elegance people wanted in tea ware; it cracked with sharp changes in temperature (it was better for beer than coffee or tea); and its colors tended to fade and rub off. In the

---

(Washington, D.C., 1994), 169–87; George L. Miller, Ann Smart Martin, and Nancy S. Dickinson, "Changing Consumption Patterns: English Ceramics and the American Market from 1770 to 1840," in *Everyday Life in the Early Republic*, ed. Catherine E. Hutchins (Winterthur, Del., 1994), 219–48.

[23] On earthenware, see Barbara Gorely Teller, "Ceramics in Providence, 1750–1800: An Inventory Survey," *Magazine Antiques* 94, no. 4 (October 1968): 570–77; Noël Hume, *Guide to Artifacts*, 102–5; Garry Wheeler Stone, J. Glenn Little III, and Stephen Israel, "Ceramics from the John Hicks Site, 1723–43: The Material Culture," in *Ceramics in America*, ed. Ian M. G. Quimby (Charlottesville, Va., 1973), 103–39; Gloria Seaman Allen, "Ceramics in Maryland," *American Ceramic Circle Journal* 6 (1988): 53–104.

Exhibit 21
Page 00428



FIGURE IV

Earthenware chamber pots, late seventeenth and early eighteenth centuries. These small (approximately five by seven inches), inexpensive, and functional pots were typical of everyday ceramics used in the Middle Atlantic, though surprisingly few household inventories actually list chamber pots. Courtesy, Colonial Williamsburg Foundation, Williamsburg, Va., acc. nos. 1975–113; 1973–370; 1977–28; 1992–89. A color version is available on http://www .historycooperative.org/journals/wm/62.4/clemens.html.

mid-eighteenth century, Americans who could not afford porcelain settled for delft; soon they would have better choices.[24]

English potters probably began making stoneware, the third common ceramic, in the late seventeenth century using methods developed in Germany more than two centuries earlier. Stoneware was a hard, durable form of earthenware that, like porcelain and unlike unglazed earthenware, would not sweat or leak when it held liquids. Refinements in the production process created the product known as white, salt-glazed stoneware that flooded the American market in the mid-eighteenth century. Stoneware was less expensive than porcelain, thinner than delft, and more useful than basic redware. By midcentury German stoneware and British white, salt-glazed stoneware were probably the most popular ceramics in British North America. They were the pre-

[24] On the styles and influences, see F. H. Garner and Michael Archer, *English Delftware*, 2d ed. (London, 1972), 6–44, esp. 16, 21, 37; and the photographic catalog in Louis L. Lipski, *Dated English Delftware: Tin-Glazed Earthenware, 1600–1800*, ed. Michael Archer (London, 1984).

Exhibit 21
Page 00429

ferred materials for mugs and tankards, rivaled red earthenware for utili-
tarian uses (such as chamber pots and storage basins), and competed suc-
cessfully with delft when it came to more elegant table and tea settings.
Even when they became less fashionable, stoneware ceramics would con-
tinue to be turned out for utilitarian storage and cooking vessels.[25]

It is striking how infrequently Middle Atlantic probate records list
basic ceramics. Earthenwares show up in only about half the 1760s
inventories in Chester and Fairfield and three-fourths of those in Kent
(Tables XIII–XV). Nor were ceramics merely the poor householder's
alternative to pewter; rather, it was among wealthier farmers that earth-
enware and stoneware were most commonly found, as utilitarian storage
vessels and complements to pewter tableware. Specific references to delft
and stoneware in Chester and Fairfield during the 1760s are few and far
between, and earthenware is usually listed by lot rather than differenti-
ated by type. Probably much of the undifferentiated dinnerware in the
inventories is ceramic, suggesting that it was so ordinary and cheap that
it was not worth the appraisers' trouble to itemize. By the 1790s the situ-
ation had changed somewhat. Earthenwares and stonewares were now
listed in most Fairfield homes, and, surprisingly, delft, very much out of
fashion by the 1790s, cropped up repeatedly in Chester estates. It is,
then, only in Kent that there is clear evidence of an early and wide-
spread use of earthenware and stoneware plates, pots, and vessels, and
even in the 1820s, when such ceramics were generally evaluated in undif-
ferentiated lots, they are still found in almost three-fourths of all estates
(Tables XIV–XV supply samples from Fairfield and Kent in the 1790s).[26]

At midcentury, then, stoneware was the predominant pottery prod-
uct in Great Britain, used frequently in the Chesapeake, but less visible
elsewhere in the Middle Atlantic; its ambiguous reign, ill-defined by the

[25] The most comprehensive study of the origins of English stoneware is Arnold
R. Mountford, *The Illustrated Guide to Staffordshire Salt-Glazed Stoneware* (London,
1971). See also Noël Hume, *Guide to Artifacts*, 114–23; Geoffrey Wills, *English
Pottery and Porcelain* (Garden City, N.Y., 1969), 67–89; Ivor Noël Hume, "The Rise
and Fall of English White Salt-Glazed Stoneware: Part 1," *Magazine Antiques* 97, no.
2 (February 1970): 248–55.
The following studies supply data on how often different types of ceramics
turned up in early American household inventories: Teller, *Magazine Antiques* 94;
Stone, Little, and Israel, "Ceramics from the John Hicks Site"; Marley R. Brown III,
"Ceramics from Plymouth, 1621–1800: The Documentary Record," in Quimby,
*Ceramics in America*, 41–74; James J. F. Deetz, "Ceramics from Plymouth, 1620–1835:
The Archaeological Evidence," ibid., 15–40; Allen, *American Ceramic Circle Journal* 6.
[26] These statements are based on counts in sample probate estates of the types of
ceramics in each county over time; results of these counts for Fairfield and Kent are
presented in Tables XIV–XV. Note that the distinction between probate estates and
households is particularly relevant here. The incidence of ownership among house-
holders was presumably significantly higher than among all probated decedents.

Exhibit 21
Page 00430

608                          WILLIAM AND MARY QUARTERLY

TABLE XIII

Ownership of Basic or Fine Earthenware in Percentages by Wealth
Class in Chester, Fairfield, and Kent Counties, 1760s, 1790s, and 1820s

|            | Poorer<br>(£0–49.9) | Middling<br>(£50–249.9) | Wealthy<br>(£250– ) | Average |
|------------|---------|-----------|---------|---------|
| Chester    |         |           |         |         |
| 1760s      | 29%     | 66%       | 86%     | 55%     |
| 1790s      | 34      | 51        | 70      | 50      |
| 1820s      | 33      | 80        | 78      | 65      |
| Fairfield  |         |           |         |         |
| 1760s      | 30      | 74        | 93      | 55      |
| 1790s      | 40      | 78        | 100     | 64      |
| 1820s      | 49      | 89        | 94      | 75      |
| Kent       |         |           |         |         |
| 1760s      | 42      | 88        | 95      | 83      |
| 1790s      | 45      | 73        | 97      | 75      |
| 1820s      | 50      | 71        | 88      | 76      |
| Average    |         |           |         |         |
| Chester    | 32      | 66        | 77      | 57      |
| Fairfield  | 40      | 82        | 96      | 66      |
| Kent       | 46      | 77        | 93      | 78      |

*Notes*: Averages are calculated using the number of cases in each category to
weight the average. No figure is based on less than one dozen inventories. The num-
ber of Chester County inventories in each category is Poorer: 31 (1760s), 19 (1790s),
27 (1820s); Middling: 35, 39, 40; Wealthy: 14, 20, 52. The number of Fairfield
County inventories in each category is Poorer: 76, 86, 91; Middling: 72, 104, 122;
Wealthy: 15, 20, 35. The number of Kent County inventories in each category is
Poorer: 26, 42, 30; Middling: 33, 49, 42; Wealthy: 79, 64, 83. The wealth categories
(0–50 pounds, 50–250 pounds, and 250 pounds and higher) are all calculated in 1790
Kent County values.
*Source*: See "Probate Inventory Sources" (621).

indifference of estate appraisers, was, in any case, transient. By the 1770s
creamware had taken its place (Figure V). In fact, creamware emerged
from the efforts of English potters to create a clayware more easily
molded and decorated than stoneware. Through the 1740s and 1750s,
English potters experimented with clays, firing techniques, molds,
glazes, and decorative patterns to develop a more marketable product
until, in the 1760s, Josiah Wedgwood fashioned what is now known as
creamware, a lead-glazed pale yellow earthenware. In the mid-1760s
Wedgwood furnished Queen Charlotte with creamware tea and dinner

Exhibit 21
Page 00431

CONSUMER CULTURE OF THE MIDDLE ATLANTIC                609

TABLE XIV

OWNERSHIP OF TABLEWARE BY NUMBER OF ESTATES IN
FAIRFIELD COUNTY, 1790S

|  | Porcelain | Delft | Stone | Queen | Earthen | Unidentified |
|---|---|---|---|---|---|---|
| Plates | 3 | 2 | 2 | 4 | 29 | 11 |
| Tea service | 4 |  |  | 1 | 5 | 34 |
| Mug or tankard | 1 |  |  |  | 2 | 2 |
| Pot or jug | 1 |  | 29 | 1 | 22 | 6 |
| Bowl | 2 | 4 |  | 1 | 13 | 9 |
| Dish |  | 1 |  | 1 | 1 |  |
| Dessert plates |  |  |  |  |  | 4 |
| Undifferentiated | 2 |  |  |  | 6 |  |
| None owned | 64 | 66 | 43 | 64 | 28 | 31 |

*Source*: Drawn from seventy-two Fairfield inventories from the 1790 sample (see "Probate Inventory Sources" [621]).

services and was soon calling himself "Potter to Her Majesty"; his tableware was dubbed queensware.[27]

Queensware became one of the marketing triumphs of the mid-eighteenth century. Wedgwood and his pottery even more so became household names. Wedgwood's career, however, was not so much exceptional as part of a more general transformation of individual craft shops supplying pottery for local markets into factories that distributed their wares nationwide, to continental Europe, and throughout the North Atlantic. The transformation had begun more than a century before Wedgwood's birth in 1730. The growth of the English population, the improvement of household incomes, especially among the middling sort, and the resulting increase in demand for utilitarian earthenware—the durable, inexpensive alternative to silver, porcelain, and pewter—drove the supply-side improvements in production and marketing engineered by Wedgwood and other Staffordshire potters. The tasks that before had been performed by a skilled potter were separated, simplified, and now undertaken by less skilled, poorly paid workers who turned out cheaper wares. Profits previously extracted by high markups on relatively scarce pieces were now a result of large volume sales of low-cost goods. Eventually, English factory owners would turn out pearlware

[27] Wills, *English Pottery and Porcelain*, 99–105; Ivor Noël Hume, "The Rise and Fall of English White Salt-Glazed Stoneware: Part 2," *Magazine Antiques* 97, no. 3 (March 1970): 408–13; Noël Hume, "The What, Who, and When of English Creamware Plate Design," *Magazine Antiques* 90, no. 2 (February 1972): 350–55 (quotation, 353). The phrase "creamware revolution" comes from Martin, "'Fashionable Sugar Dishes, Latest Fashion Ware.'"

Exhibit 21
Page 00432

WILLIAM AND MARY QUARTERLY

TABLE XV

OWNERSHIP OF TABLEWARE BY NUMBER OF ESTATES IN KENT COUNTY, 1790S

|  | Porcelain | Delft | Stone | Queen | Earthen | Unidentified |
|---|---|---|---|---|---|---|
| Plates | 4 | 4 | 6 | 9 | 3 | 11 |
| Tea service | 9 | 2 |  | 1 | 1 | 25 |
| Mug or tankard |  |  |  |  |  | 4 |
| Pot or jug |  |  | 17 |  | 12 | 5 |
| Bowl | 9 | 2 | 2 |  | 3 | 7 |
| Dish | 2 | 3 | 1 | 4 | 4 | 2 |
| Dessert plates |  |  |  |  |  | 4 |
| Undifferentiated | 2 |  | 4 | 4 | 20 | 1 |
| None owned | 38 | 46 | 30 | 38 | 20 | 26 |

*Source*: Drawn from fifty-two Kent inventories from the 1790 sample (see "Probate
Inventory Sources" [621]).

(generally known as blue-and-white ware) and decorate it with chinoiserie
transfer patterns, copied from Asian export porcelain, bringing exotic
and distinctive tableware within reach of ordinary consumers.[28]

Just as the history of ceramic production is more complicated than a
mere formulaic succession of types—delft, to stoneware, to creamware,
to pearlware—so, too, is the history of its use in the Middle Atlantic.
There is little indication that British efficiencies in production and mar-
keting standardized American tablewares, or that the wares of American
potteries replaced imports. Nor had the queensware revolution swept
away everything in its path. What is most striking about the postrevolu-
tionary period is the diversity of tablewares—there were queensware
plates, to be sure, but these were found alongside pewter, stoneware,
delft, common earthenware, and even wooden bowls. Given the rela-
tively low cost of ceramics (and even pewter was not that expensive),
householders in the 1790s had choices. Old styles lingered, passed down
from generation to generation, or bought at probate sales; new styles
became popular. Local production added to foreign imports.[29]

[28] On Wedgwood, see Neil McKendrick, "Josiah Wedgwood and Thomas
Bentley: An Inventor-Entrepreneur Partnership in the Industrial Revolution,"
*Transactions of the Royal Historical Society*, 5th ser., 14 (1964): 1–33. On Staffordshire,
see Lorna Weatherill, *The Pottery Trade and North Staffordshire, 1660–1760*
(Manchester, Eng., 1971). On the buildup of demand, see Cary Carson, "The
Consumer Revolution in Colonial British America: Why Demand?" in Carson,
Hoffman, and Albert, *Of Consuming Interests*, 483–697, esp. 495–524.

[29] Gloria Seaman Allen counted, using sixty inventories at twenty-year inter-
vals, the number of ceramic and porcelain pieces, by type (dishes, plates, etc.) and
material (earthenware, stoneware, etc.), in Kent County, Maryland, from 1740 to

Exhibit 21
Page 00433

CONSUMER CULTURE OF THE MIDDLE ATLANTIC          611



FIGURE V

Ceramic plates, eighteenth century. Clockwise from upper right: hard-paste porcelain plate, 1750–51, China; salt-glazed stoneware plate, eighteenth century; delft dinner service plate, ca. 1775, London; creamware plate, eighteenth century. Courtesy, Colonial Williamsburg Foundation, Williamsburg, Va., acc. nos. 1987-535,1; 1976-110,13; 1986-32,6; G1974-48,2. A color version is available on http://www.historycooperative.org/journals/wm/62.4/clemens.html.

Exhibit 21
Page 00434

By the 1820s some of this momentum seems to have been spent. The change may have been in the choices people had; the change was also in the way appraisers saw what they appraised, as the descriptions now noted lots and parcels more often than not. Matched sets were more commonplace; individualized pieces and an idiosyncratic jumble of styles probably were less the rule. There is still, however, some richness in the overall texture: no two households ever have quite the same bundle of wares. In Chester and Fairfield, fine ceramics had begun to rival pewter; the appraisers particularly noted queensware in Chester (no longer the fashionable tableware it had been in the 1790s) and green- and blue-edged ware, most likely pearlware, in Fairfield. In Kent, by contrast, there was actually less in the way of ceramics to go around, primarily because the wealthiest planters had more silver and less fine earthenware. The changes from the 1790s to the 1820s are difficult to gage with precision and are more qualitative than quantitative: a standardization of styles, the simplicity of neoclassic patterns, the blandness of cream-colored ceramics, the loss of what was once novel, curious, or exotic in enameled decorations. The inventories merely hint at these changes over time without supplying definitive answers.

The ultimate appeal of pearlware, as with queensware before it, was its promise to deliver the elegance of porcelain at a fraction of its cost, yet it was still porcelain that defined the high end of the market for tea and tablewares. Before the Revolution most of the porcelain reaching America was Chinese. In the fourteenth century, Islamic traders had begun selling reexported Chinese porcelain as well as indigenous ceramics decorated with Chinese patterns (chinoiserie) to Venetian merchants. In the sixteenth century, the Portuguese established trading outposts throughout the East Indies that gave them direct access to Islamic and Chinese merchants, and in the seventeenth century, the Dutch and English East India Companies arrived and dramatically increased the trade. Porcelain tableware and tea services from Jingdezhen pottery kilns began to arrive in significant quantity in England and continental Europe (the heavier porcelain being used as ballast in the East India tea ships). Queen Henrietta Maria's thirst for East India tea drunk from Chinese porcelain made the product fashionable, and its cost, relatively high in comparison to other tablewares, was low enough to create a mass market, one that by the early eighteenth century included British North America.[30]

1820. Her data for plates indicate the importance of delft in the 1760s (and its virtual disappearance thereafter); of stoneware in the 1780s; and of creamware in the 1800s. Earthenware and porcelain plates were common throughout the era. More generally, the figures suggest the unusual diversity of tableware in the immediate postrevolutionary period (Allen, *American Ceramic Circle Journal* 6).

[30] For an overview of the world marketing system, see Peter N. Stearns, Michael Adas, and Stuart B. Schwartz, *World Civilizations: The Global Experience*, 2d

Exhibit 21
Page 00435

The Chinese made what was called hard-paste porcelain from a combination of kaolin (also called "China clay") and crushed petuntse (a feldspar material). The hard, white, translucent body was then generally painted with cobalt blue and glazed; over the glaze the porcelain might be trimmed in red or gilded. The Chinese used elaborate indigenous designs for decoration, borrowed others from the Japanese, and increasingly incorporated European patterns from sketches and engravings supplied to them by English merchants. The mingling of Asian, European, and eventually American designs in the ceramic art work of Britain and China fueled demand for pottery and porcelain, even as that same demand resulted, at least by the eighteenth century, in a noticeable diminution of the quality of Chinese exports.[31]

Europeans did not concede porcelain production to the Chinese. Continental potters produced an imitation product, and British potters fashioned delft to imitate the blue-and-white porcelain that constituted the bulk of eighteenth-century East India imports. In the mid-eighteenth century, they produced a soft-paste porcelain of white clay and ground glass and then slowly refined it with various additives, most crucially bone ash, to create a product that had more of the look, strength, and resilience of Chinese porcelain. In the 1790s bone china became the British standard, and prohibitive tariff laws choked off the Chinese export trade.[32]

By then Americans had alternatives. An American porcelain factory had actually been established before the Revolution with the discovery of kaolin deposits in 1771 south of Philadelphia. Even more crucially, in 1784 direct trade began between the east coast ports of the newly independent United States and China. This new trade fed on established demand for tea (and the porcelain in which to drink it) and the same desire for the exotic—in ornaments, wallpaper, furniture, textiles—that had shaped European tastes during the eighteenth century.[33]

ed. (New York, 1996), 2: 148–71. On East India trade, see K. N. Chaudhuri, *The Trading World of Asia and the English East India Company: 1660–1760* (Cambridge, 1978), esp. 406–10; Kristof Glamann, *Dutch-Asiatic Trade: 1620–1740*, 2d ed. (The Hague, Netherlands, 1981). On Near Eastern porcelain, see Chaudhuri, *Asia before Europe: Economy and Civilisation of the Indian Ocean from the Rise of Islam to 1750* (Cambridge, 1990), 333–36. On the Chinese production of porcelain, see Janet L. Abu-Lughod, *Before European Hegemony: The World System, A.D. 1250–1350* (New York, 1989), 316–51; Michael Dillon, "Transport and Marketing in the Development of the Jingdezhen Porcelain Industry during the Ming and Qing Dynasties," *Journal of the Economic and Social History of the Orient* 35, no. 3 (August 1992): 278–90.

[31] R. J. Charleston, ed., *English Porcelain: 1745–1850* (London, 1965), 17–27; Noël Hume, *Guide to Artifacts*, 257–65; Regina Lee Blaszczyk, "Ceramics and the Sot-Weed Factor: The China Market in a Tobacco Economy," *Winterthur Portfolio* 19, no. 1 (Spring 1984): 7–19.

[32] Charleston, *English Porcelain*, 18–19; Geoffrey A. Godden, *British Porcelain: An Illustrated Guide* (New York, 1974), 21–25.

[33] Jonathan Goldstein, *Philadelphia and the China Trade, 1682–1846: Commercial, Cultural, and Attitudinal Effects* (University Park, Pa., 1978); Christina H. Nelson,

Exhibit 21
Page 00436

The alternative to porcelain as well as pewter was silver, the most prestigious and elegant of tableware. Silversmithing was highly skilled work and, for most of the colonial period, there were few capable colonists outside New England. Though silver had the same triple function in early American society as pewter—as utilitarian tea or tableware, as a relatively secure financial reserve or form of savings (in the colonies, silver vessels were generally fashioned from coin), and as a marker of status, distinction, and taste—it was a high-end product such as a watch or riding coach that identified its owner's place in society. Silver dignified the ever more elaborate tea-drinking rituals that shortly before midcentury Americans had begun to copy from their British cousins, and silver, even more than porcelain, was what one generation passed to the next to confirm continuity and denote social standing.

During the course of the nineteenth century, technological innovation radically changed the craft of silversmithing, and some of these changes were apparent before 1820. In the postrevolutionary period, smiths more often rolled out silver by machine rather than hammering it from ingots and produced the straight-lined, restrained vessels that fit the neoclassic tastes of the federal period by the relatively simple process of cutting and soldering. By the turn of the century, silversmiths used presses to stamp out forks and spoons, the most widely possessed and not coincidentally least expensive utilitarian silver products. Such production, of course, required significant capital investment, brought with it specialization of tasks, reduced the need for skilled labor, and further separated the world of urban merchant-silversmiths from that of rural tinker-smiths (all processes that had begun earlier in pottery and porcelain production). And though there is little doubt that new production processes helped meet the growing demand of the middling sort for silver spoons and silver tea services, the cost of the metal itself kept silver an elegant luxury and marker of status.[34]

Most of the silver that went into Middle Atlantic homes was not fashioned in the households of rural silversmiths or even in Philadelphia or New York shops; rather, it came from Great Britain. And even more so, it was British design that shaped American tastes. By responding to European fashion and influencing American, silversmiths worked as cultural brokers between Old World supply and New World demand. The transfer of sensibility, like the transfer of manufactured goods, was a

---

*Directly from China: Export Goods for the American Market, 1784–1930* (Salem, Mass., 1985).

[34] Stephen K. Victor, "'From the Shop to the Manufactory': Silver and Industry, 1800–1970," in *Silver in American Life: Selections from the Mabel Brady Garvan and Other Collections at Yale University*, ed. Barbara McLean Ward and Gerald W. R. Ward (Boston, 1979), 23–32.

Exhibit 21
Page 00437

CONSUMER CULTURE OF THE MIDDLE ATLANTIC                615

one-way street, but with a prestigious craft calling, ties to the American gentry, and the dual roles of artisan and import merchant, the better-off smiths of American urban centers helped fuel American desire to emulate and consume.[35]

In the rural Middle Atlantic, silver and porcelain remained luxury goods through the 1820s, defined by their relatively high cost, and silver was taxed as such in most places, just as riding carriages were. Everywhere the ownership of silver became more common over time, particularly among middling householders (the well-to-do were likely to have silver from the 1760s); yet many householders owned only one or two silver spoons rather than expensive teapots or cream bowls (Table XVI). For most, then, the significance of silver cannot have been practical—there was not enough to constitute savings or even to use conspicuously for ceremonial occasions—yet a silver spoon, set beside a porcelain cup and saucer and a ceramic teapot, could speak to the status of the owners and help transmit a sense of entitlement across generations (Figure VI). Porcelain, by contrast, was not used more widely over time; it began and remained a luxury product. Its use was restricted primarily to the wealthy, who generally, when they did own some, had considerably more porcelain than silver. Much of the porcelain probably served a decorative function, shelved visibly in a cupboard and brought down only for special dinners or festive teas, since the wealthy now had their Wedgwood earthenware for everyday use.

Tastes had changed and class mattered. Less well-to-do householders began with pewter and, after the Revolution, shifted to creamware. Price had something to do with this shift, but then so, too, must have greater availability. Probate sales and well-stocked stores made it possible for ordinary folks to eat and drink from much the same plates, cups, and mugs as more substantial residents did. Choice was possible, even for those with little wealth, because ceramic tablewares, relative to most other household necessities such as chairs, beds, clothing, and metalwares, cost so little. For the better off, pewter was and remained an essential tableware, yet it was always complemented by earthenware (initially delft, later creamware) and, among the gentry, silverware and porcelain as well. Even among the wealthy, however, one was as likely to find a set of silver spoons as a full tea service, and a porcelain teapot with cups and saucers, but without matching plates and dishes. There was, according to the probate evidence, both luxury and deprivation, but for most there was an evolving redefinition of necessity into modest

[35] Martha Gandy Fales, *Joseph Richardson and Family: Philadelphia Silversmiths* (Middletown, Conn., 1974), 77–91, 165–66; Frances Gruber Safford, *Colonial Silver: In the American Wing* (New York, 1983), 33–38.

Exhibit 21
Page 00438

WILLIAM AND MARY QUARTERLY

TABLE XVI

Ownership of Silverware in Percentages by Wealth Class in Chester,
Fairfield, and Kent Counties, 1760s, 1790s, and 1820s

|  | Poorer (£0–49.9) | Middling (£50–249.9) | Wealthy (£250– ) | Average |
|---|---|---|---|---|
| **Chester** | | | | |
| 1760s | —% | 9% | 43% | 11% |
| 1790s | 14 | 13 | 35 | 18 |
| 1820s | 15 | 35 | 39 | 29 |
| **Fairfield** | | | | |
| 1760s | 11 | 36 | 87 | 29 |
| 1790s | 22 | 35 | 95 | 35 |
| 1820s | 25 | 59 | 69 | 48 |
| **Kent** | | | | |
| 1760s | 19 | 12 | 58 | 40 |
| 1790s | 12 | 41 | 75 | 47 |
| 1820s | 17 | 40 | 72 | 53 |
| **Average** | | | | |
| Chester | 9 | 19 | 38 | 20 |
| Fairfield | 20 | 45 | 80 | 39 |
| Kent | 15 | 33 | 68 | 47 |

*Notes*: Averages are calculated using the number of cases in each category to weight the average. No figure is based on less than one dozen inventories. The number of Chester County inventories in each category is Poorer: 31 (1760s), 19 (1790s), 27 (1820s); Middling: 35, 39, 40; Wealthy: 14, 20, 52. The number of Fairfield County inventories in each category is Poorer: 76, 86, 91; Middling: 72, 104, 122; Wealthy: 15, 20, 35. The number of Kent County inventories in each category is Poorer: 26, 42, 30; Middling: 33, 49, 42; Wealthy: 79, 64, 83. The wealth categories (0–50 pounds, 50–250 pounds, and 250 pounds and higher) are all calculated in 1790 Kent County values.

*Source*: See "Probate Inventory Sources" (621).

comforts: tablewares that were inexpensive and useful, yet still a product of taste and choice.

More generally, the evolution of consumer culture in early America—a culture of ordinary objects—unfolded in three stages through 1820. In the early eighteenth century, with the era of rudimentary farm building over in most coastal settlements, households began accumulating the material goods that defined the emergence of a new consumer culture, which had already appeared in Great Britain. Initially, these goods were ordinary, undistinguished, and utilitarian. Only those who aspired to gentility made successful efforts to duplicate European tastes, and the distinction between the fashionable and merely

Exhibit 21
Page 00439

CONSUMER CULTURE OF THE MIDDLE ATLANTIC                617



FIGURE VI

Silver-plated (on copper) tablespoon, 1837–90, Wallingford, Conn. From a slightly later period than most of the objects discussed in this article, tablespoons such as this example were readily obtainable markers of gentility. Courtesy, Winterthur Museum, Ineson-Bissell Collection, acc. no. 1988.0026.

comfortable households remained sharp. Locally crafted objects could be found in every home, and regional patterns of use were distinctive. But the accumulation of European imports gradually worked a fundamental change in early American tastes that became apparent in the revolutionary disputes of the 1760s and early 1770s. Ordinary men and women rediscovered their European origins, and with it a taste for the everyday use of fashionable tea and tablewares and a need for the order and symmetry that matched sets of earthenware plates, cups, and saucers promised.[36]

The integration of the Middle Atlantic into an Atlantic economy continued despite the Revolution, but from then on, it was an evolutionary process. Atlantic trade introduced a marvelous diversity of goods—new shapes, patterns, colors, and styles—into the United States, as it had to late colonial America, yet quite gradually and without fundamentally changing the specific items that individual householders were likely to own. The interior of an 1820s household, then, did not look all that different from one in the 1760s. Books, earthenware, pewter, candlesticks, looking glasses, and even guns were still found in most homes, just as most householders did not own riding chairs and

[36] Deetz, "Ceramics from Plymouth," furnishes a useful periodization for the use of ceramics in New England through the revolutionary era. His periodization ends where this work begins. Marley R. Brown III's piece in the same volume evaluates Deetz's interpretation of archaeological evidence in light of probate inventory records from Plymouth (Brown, "Ceramics from Plymouth," 41–74). See also Ann Smart Martin, "Magical, Mythical, Practical, and Sublime: The Meanings and Uses of Ceramics in America," in Hunter, *Ceramics in America*, 28–46.

Exhibit 21
Page 00440

silverware. Change was an incremental process, one which occurred slowly enough to allow the residents of the Middle Atlantic to redefine the meanings of necessities, comforts, and luxuries as they gradually accumulated more and different objects. And in most cases, they bought goods cheaply, relative to the wheat or pork they were selling (or the silver tea services they were not buying). By the early 1820s, diversity had, in some measure, been replaced by sameness, and a third stage in the evolution of consumer society was taking shape. Clearly, the crucial factor was supply, with new production techniques that lowered costs. But these innovations did not yet constitute an industrial revolution. Individually crafted goods were still the norm. Pearlware, wooden clocks, and silver spoons demonstrated what the new production processes could create, and each helped flood the consumer market in the Middle Atlantic, yet in 1820 these were still the exceptions. The blandness of appraisers' evaluations demonstrates that the choices consumers had were more pedestrian.

In the 1820s, as in the 1760s, it was not the elegance or the luxury of genteel households that characterized consumer culture in the Middle Atlantic but the ordinariness of household furnishings, the way that inexpensive, simple, useful, and practical manufactured goods had found their way into so many households. Such goods were often more than merely useful or true necessities. They linked their owners to a transatlantic marketplace governed by European fashion and, to a degree scholars cannot fully measure, became a part of a personal identity fashioned from material possessions. Yet, viewed today through an investigation of probate inventories, the ordinariness of consumer goods is most impressive and easiest to overlook. When fashionable Europeans toured rural areas of the Middle Atlantic in the postrevolutionary era, they almost never commented (even to dismiss the subject) on the way the homes they visited were furnished. The region was of interest to the foreign traveler for its natural wonders—the well-bred livestock and the rutted carriage roads—as well as for its signs of progress, including grist mills, poorhouses, and colleges. Such blindness is instructive. The small luxuries of a provincial elite were unlikely to impress a genteel British or French sojourner, yet the blindness may have had deeper roots. It was not only class but also the spread of a world market—a market that still allowed much room for the unique, the unusual, and the serendipitous play of the imagination with textures, shapes, and colors—that had removed much of the mystery and exoticism from possessions. Objects, whether pearlware teapots or silver spoons, were surely individual expressions of particular tastes and personal identity, yet they were also more clearly now readily identifiable signs of participation in a common

Exhibit 21
Page 00441

culture that stretched across the Atlantic and drew into its orbit products of a world economy.[37]

Looking back historians can see the products of a world economy with deceptive clarity: a delft plate, fashioned from a Near Eastern process brought by way of Mediterranean culture and commerce to England; a stoneware mug, crafted in Cologne, shipped to England, reexported from Liverpool, alongside a tankard, copied from a Rhine counterpart, but turned and glazed in Fulham; or a tea ceremony in the northern Chesapeake, in which East India tea, sweetened with West Indian sugar, planted, harvested, and processed by Afro-Caribbean slaves, would be drunk from pearlware cups, turned out by the tedious labor of women and children in Staffordshire potteries and decorated with Chinese patterns that, by the mid-eighteenth century, reflected as often the designs and images Europeans had paid the Chinese to adopt as the creations of Cantonese porcelain painters. This long, complex web has many threads, each equally capable of making the consumer a participant in a distinctive, exotic culture and in a shared Atlantic marketplace.

Did early American householders see their possessions in these ways? Perhaps not. But as they used ceramics for more diverse purposes and bought more types, shapes, and decorative patterns of looking glasses, candlesticks, and tablewares, they just as surely acquired new sensibilities borne of Atlantic commerce and international exchange. From the traces left behind in probate inventories, what can scholars say about the sensibilities of those who participated in this evolving consumer culture? It is striking that appraisers noted among ceramics only two color patterns, blue-and-white (usually delft, though often porcelain and occasionally stoneware) and blue- or green-edged (probably pearlware), with any frequency. Archaeologists warn that much of the everyday ceramics excavated from colonial sites is undecorated. This lack of distinctiveness is generally the rule among other consumer goods as well. Guns, at certain times, and in one place, but not another, might be carefully described; candlesticks came in only two varieties, iron and brass, and even that distinction was not always made. Looking glasses were large or small and only occasionally further described as gilt-edged or with some other reference to style. Appraisers noted the number of iron plates (of practical consequence) on stoves, but not whether they came with baroque, rococo, or federal patterns.

Goods, then, bespoke change and continuity, as well as inclusion and exclusiveness. In the era of the American Revolution and the early

[37] See, for example, Duke de La Rochefoucault Liancourt, *Travels through the United States of North America, Canada, in the Years 1795, 1796, and 1797* . . . (London, 1799), 3: 536–67.

Exhibit 21
Page 00442

Republic, the Middle Atlantic householding population became ever more firmly enmeshed in a consumer culture. Periodically, this process was disrupted by war or credit contractions, yet these moments had a greater effect on transient consumables such as food, alcohol, and clothing than on the more durable goods analyzed here. Pewter, clocks, books, and the like were bought not merely to be possessed but to be accumulated, and though the probable life span of a silver watch was obviously longer than that of a creamware charger, each might remain for years, decades, or even generations within a household or extended family. The cultural work of converting luxuries into comforts was a slow, deceptive process that could occur without much conscious reflection, one in which change suggested continuity. It was also a process that created an easily forgotten past, creating a situation in which later changes would seem even more revolutionary.

This pattern of evolution continued at least through the 1870s. America remained a predominantly agricultural nation where economic growth was more extensive than intensive, and consumer culture changed slowly, incrementally, and almost unconsciously. The industrial growth of the late nineteenth century would, in the early twentieth century, be channeled into new consumer industries that would become another consumer revolution driven by new mass-market techniques. By targeting first-generation Americans and unleashing the repressed desires of native-born, comfortable, middle-class homeowners, marketing innovators were doing something new, yet they were also building on a long, seductive progression of market involvement by ordinary people.

Exhibit 21
Page 00443

## *Probate Inventory Sources*

This study used probate inventories and administrative accounts from three Middle Atlantic counties. Approximately two hundred variables were recorded from each inventory and the resulting data base analyzed with SPSS (a statistical software package). The accuracy of the recorded data was checked by (1) calculating the value of consumption goods for each inventory and comparing that figure with the difference between the total inventory value and the sum of all goods other than consumption goods, and (2) recording more detailed information (color, value, shape, metal, etc.) on ten selected consumption goods and comparing the results to the original recording of these goods. The construction of the price indexes used to compare inventories from different time periods and different counties is described in the appendix to Peter Wacker and Paul G. E. Clemens, *Land Use in Early New Jersey: A Historical Geography* (Newark, N.J., 1995), 297–303. The following describes the database of each county.

Chester County probate inventories are located in the Chester County Archives, West Chester, Pennsylvania. Each inventory is stored in a numbered packet, chronologically ordered, with other official papers (most important, administrative accounts, estate distributions, wills, and estate sales). The 253 inventories used for this study come from packet nos. 2147 to 2238 (1764–65); 4159 TO 4269 (1791–92); and 6881 to 6982 (1821). Only those inventories that were incompletely itemized were excluded. These inventories are available on microfilm through the Pennsylvania Historical and Museum Commission. The Chester County data in most tables are based on the distribution of inventories by household status (Table XVII).

Fairfield County probate records were kept by probate districts, similar to but not the same as towns. The Danbury, Fairfield, and Stamford districts were the largest and initially had administrative responsibility for most of the county; by 1820, many towns had their own probate district. All probate records for individual decedents were placed in packets (as in Chester County); these packets are today usually filed alphabetically. Probate materials were also copied, in more or less complete form, into chronologically arranged books. In most cases the original records are now at the Connecticut State Library, Hartford, where I consulted them. In a few cases, when I did my original research, the packets were still in local depositories, but presumably have now been transferred to Hartford. Both sets of records (chronological and alphabetical) have been microfilmed by the Genealogical Society of Utah.

Exhibit 21
Page 00444

TABLE XVII

DISTRIBUTION OF INVENTORIES BY HOUSEHOLD STATUS IN CHESTER
COUNTY, PENNSYLVANIA

|  | *1760s* | *1790s* | *1820s* | *Total* |
|---|---|---|---|---|
| Nonhouseholder | 11 | 4 | 2 | 17 |
| Nonhouseholder, poor | 4 | 4 | 2 | 10 |
| Middling | 29 | 29 | 10 | 68 |
| Comfortable | 11 | 21 | 35 | 67 |
| Fashionable | 9 | 8 | 10 | 27 |
| Nonhouseholder, comfortable | 16 | 22 | 26 | 64 |
| Total | 80 | 88 | 85 | 253 |

Because of the number of distinct probate districts that were used to build the data set of some 621 inventories, there is no simple way to list the inventories used in this study. I culled inventories from the Fairfield Probate District for the 1760s (including North Stratford, Norwalk, Redding, Stratford): vols. 13–14, to page 169 (1759–61); for the 1790s (including Norwalk, Weston): vols. 24–25 (1789–96); and for the 1820s (including Weston): all inventories for the years 1819–22 that came from the alphabetically arranged packets from nos. 2470 to 4653. I also used inventories from the Danbury Probate District for the 1760s (including Newtown, Ridgefield): vol. 1, to 222 (1760–62); for the 1790s (including Brookfield, New Fairfield, Newtown, Ridgefield): vol. 6, to 111 (1790–91); and for the 1820s (including Brookfield, New Fairfield, Newtown, Ridgefield): vol. 13 (1818–20). Additional inventories came from the Newtown Probate District for the 1820s: vol. 1 (1820–21); and from the Norwalk Probate District for the 1820s (including New Canaan, Wilton): vols. 3–4, 30 (1819–22). I also culled inventories from the Stamford Probate District for the 1760s: vols. 1–3 (1759–63); for the 1790s (including Greenwich): vol. 8 (1788–91); and for the 1820s (including Greenwich): vol. 12 (1819–20). Finally, inventories came from the Stratford Probate District for the 1790s: vol. 2, 142–267 (1790–93); and for the 1820s (including Bridgeport, Huntington, Trumball): vol. 7

Exhibit 21
Page 00445

CONSUMER CULTURE OF THE MIDDLE ATLANTIC                    623

TABLE XVIII
DISTRIBUTION OF INVENTORIES BY HOUSEHOLD STATUS IN
FAIRFIELD COUNTY, CONNECTICUT

|                              | 1760s | 1790s | 1820s | Total |
|------------------------------|-------|-------|-------|-------|
| Nonhouseholder               | 22    | 20    | 18    | 60    |
| Nonhouseholder, poor         | 10    | 11    | 5     | 26    |
| Middling                     | 56    | 65    | 54    | 175   |
| Comfortable                  | 33    | 63    | 102   | 198   |
| Fashionable                  | 14    | 29    | 41    | 84    |
| Nonhouseholder, comfortable  | 28    | 22    | 28    | 78    |
| Total                        | 163   | 210   | 248   | 621   |

(1820–21). The Fairfield County data in most tables are based on the dis-
tribution of inventories by household status (Table XVIII).

Kent County probate inventories are located in the Maryland State
Archives (formerly the Hall of Records), Annapolis. The original inven-
tories are stored individually, but almost all were copied into county
inventory books that were arranged chronologically (other probate
records have their own series of books). I used virtually all the complete
inventories from vols. 5–7, to 13 (1759–71); vols. 9–10, to 115 (1788–92);
and vols. 16–17, to 358 (1820–24). I also used the corresponding adminis-
trative account vols. 4–5, 8–9, 14. All these records are available on
microfilm; see the publication of the Maryland State Archives, *A Guide
to Maryland State Archives Holdings of Kent County: Records on Microfilm*
(Annapolis, Md., 1989). The Kent County data in most tables are based
on the distribution of inventories by household status (Table XIX).

Exhibit 21
Page 00446

TABLE XIX
DISTRIBUTION OF INVENTORIES BY HOUSEHOLD STATUS IN
KENT COUNTY, MARYLAND

|  | 1760s | 1790s | 1820s | Total |
|---|---|---|---|---|
| Nonhouseholder | 8 | 19 | 15 | 42 |
| Nonhouseholder, poor | 2 | 7 | 9 | 18 |
| Middling | 36 | 24 | 23 | 83 |
| Comfortable | 36 | 42 | 41 | 119 |
| Fashionable | 46 | 44 | 48 | 138 |
| Nonhouseholder, comfortable | 10 | 19 | 19 | 48 |
| Total | 138 | 155 | 155 | 448 |

Exhibit 21
Page 00447

# Exhibit 22

Exhibit 22
Page 00448



# The Second Amendment on Trial

..............................

## Critical Essays on *District of Columbia v. Heller*

Edited by Saul Cornell & Nathan Kozuskanich

University of Massachusetts Press
AMHERST AND BOSTON

☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆

Exhibit 22
Page 00449

☆ ☆ ☆ ☆

# Firearms, Militias, and the Second Amendment

Kevin M. Sweeney

☆ ☆ ☆ ☆

FEW IMAGES ARE more embedded in Americans' historical consciousness than that of the "embattled farmers" of Lexington and Concord who grabbed their guns and gathered to repel the British regulars on April 19, 1775. In particular, Daniel Chester French's 1875 sculpture of *The Minute Man* leaving his plow with musket firmly in hand has become iconic, literally so for the NRA. What limited military training these men had came from membership in the colonial militia, which is usually described as having included all males from sixteen to sixty. In spite of—or, as some believe, because of—their limited exposure to drill and martial discipline, these farmers succeeded in besting professional British soldiers. Familiarity with firearms from an early age and individual initiative are assumed to have trumped skills gained on parade grounds and European battlefields. The actions of these eighteenth-century Massachusetts minutemen have come to embody the American ideal of the citizen soldier, and to confirm a popular impression that most adult males in the American colonies possessed firearms and were skilled in their use in combat. But in reality, the performance of these militiamen was specific to a particular historical context and was not typical or representative of that more expansive and often mythic era that is today called "early America."[1]

The well-known image of *The Minute Man* is nevertheless a powerful one, as the majority opinion in *District of Columbia v. Heller* attests. The ruling by Justices Alito, Kennedy, Roberts, Scalia, and Thomas firmly locates its understanding of colonial militias, the uses of firearms during the colonial era, and the likely aims of the Second Amendment in a largely mythical time and place instead of actual eighteenth-century conditions and experiences. The majority opinion treats the use of the word "militia" in the Second Amendment as meaning "all able-bodied men"[2] or the "body of all citizens capable of military service,"[3] who constituted an unorganized "citizens' militia" or a "people's militia" which was primarily "a safeguard against tyranny."[4] It further assumes that the privately owned firearms of individuals were always the arms of the militia, maintaining that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty."[5] The handgun in particular is singled out as Americans' choice "to be the quintessential self-defense weapon," and is therefore most worthy of the Second Amendment's constitutional protection.[6]

This essay challenges these assumptions of the majority opinion by providing a historical overview of the colonial militias, the variable patterns of private gun ownership throughout the colonies, and the evolving understanding and use of what were seen as appropriate military firearms. Contrary to what the justices believe, there was no unorganized "citizens' militia" or a "people's militia."[7] In the 1600s and 1700s, militia service was compulsory, and militias existed only when and where governments passed laws specifying how they would be organized, armed, and disciplined.[8] To create and maintain militias, well over six hundred laws were passed by colonial and state governments during this period.[9] Despite these laws, not all able-bodied men wanted to or were required to serve in the militia: by the late 1600s, Virginia and Maryland had select militias; in a number of colonies, up to a third of their able-bodied white men from sixteen to sixty escaped militia service; and for most of the colonial period, Delaware and Pennsylvania did not have militias. Colonial militias decayed over the first half of the eighteenth century. During the War of Independence, state governments attempted to reverse this trend as demands on the militias increased and militia service expanded. At the same time, problems with organizing, disciplining, and arming the militias also increased dramatically and became a matter of concern and debate for military and political leaders.

Exhibit 22
Page 00450

Outside of the Delaware Valley (where militias were nonexistent or very weak), gun ownership appears to have been very common during the 1600s and remained widespread during the 1700s.[10] But there were still problems in arming the militias arising from costs and personal preferences. As a rule, colonists preferred guns better suited to hunting, pest control, and self-defense. As a rule these were smaller and lighter firearms, not necessarily well suited to military use in the field. By the third quarter of the eighteenth century, colonial governments and then revolutionary state governments wanted to arm both their regular forces and militiamen with heavy, large-caliber military muskets that fired a lead ball weighing about an ounce and accepted a bayonet. Weapons answering personal needs related to hunting, pest control, and self-defense were no longer considered desirable at muster nor appropriate on a battlefield. Pistols in particular had a limited military role at this time. This shift in expectations and standards created problems arming the militia during the War of Independence and in its immediate aftermath. Failure to arm, not a threat to disarm, endangered the survival of the state militias in the late 1700s and played a role in shaping provisions of the federal Constitution, informing the debate over its adoption and influencing provisions of the Second Amendment.

This essay's findings and arguments are rooted in recovering what could be called patterns of original experience. These patterns have emerged from a systematic examination of evidence gathered from probate inventories, militia returns, census data, and official and private correspondence. Each of these sources has its uses and its shortcomings. Probate inventories do not exist for every male decedent but disproportionately record the possessions of older men, especially in New England, and wealthier men, especially in the South. Still, they exist in great numbers throughout the colonies, making possible relative comparisons among regions and over time. They also provide details on the types and condition of privately owned firearms. Surviving militia returns that list weapons offer valuable, often detailed snapshots of the arms in the hands of actual militiamen, but they are specific to particular times and places, apply only to militiamen—not to the male population at large—and, unlike probate inventories, have not survived in large numbers. Even rarer and so far largely overlooked by scholars are certain census returns that list the number of males over age sixteen and the number of available firearms in private hands in a given colony or state at a particular point in time. All of the foregoing sources also dramatically broaden the pool of historically significant actors beyond the usual suspects and familiar documents. Finally,

TABLE 1. LISTINGS OF WEAPONS, VIRGINIA MUSTERS, 1620 AND 1625

| Year | Number of males | Peeces, snaphances, matchlocks | Pistols | Total of firearms | Average number of firearms per male colonist | Swords, rapiers, hangers | Average number of swords per male colonist |
|------|------|------|------|------|------|------|------|
| 1620 | 670 | 686 | Not reported | 686 | 1.02 | 516 | .75 |
| 1625 | 814 | 1,010 | 61 | 1,071 | 1.23 | 435 | .50 |

SOURCES:

1620: All information from William Thorndale, "The Virginia Census of 1619," *Magazine of Virginia Genealogy* 33 (1995): 168–70. Historians now believe that this census dates to 1620.

1625: For the numbers of firearms in 1625, see D. A. Tisdale, *Soldiers of Virginia Colony, 1607–1699* (n.p.: Dietz, 2000), 161. For an estimate of the number of males over fifteen in 1625, see Edmund S. Morgan, *American Slavery, American Freedom: The Ordeal of Colonial Virginia* (New York: Knopf, 1975), 402, 404 table 1.

these sources help one read and understand from new perspectives official and private correspondence, political tracts, and records of debates that still contain much information on organizing, arming, and disciplining the militia in the later 1700s.

The earliest colonial ventures often supplied their settlers with firearms. The Virginia Company shipped quantities of firearms to the colony when it was getting established.[11] A 1620 muster of the colony listed 670 "Able men" and 686 firearms of various sorts "besides pistols" (table 1). Not every individual owned a gun, but guns outnumbered the male colonists able to use them. In 1623 the company distributed its arms, which had been stored in several magazines, to the populace. A muster or census taken during the next two years reveals that the colony contained 1,010 muskets and 61 pistols for 814 males over age fifteen. Fifteen years later in 1640 the colony gave up on supplying its colonists with arms, and instead required masters to provide themselves and their white servants with guns at their own expense. In 1673 the assembly authorized county militia commissioners to purchase arms and ammunition that would be lent to militiamen on active duty. Not all counties appear to have complied: in Middlesex County in 1675, four companies of militia, no more than four hundred men, needed two hundred firearms and an equal number of swords and bandoliers.[12]

Exhibit 22
Page 00451

Most colonies relied primarily on colonists to arm themselves. The Massachusetts Bay Company did import firearms, which it appears to have sold to its residents. As late as 1644 the Massachusetts legislature "ordered the Surveyor General to import or otherwise obtain quality arms and to offer these arms at cost to all who might need decent guns."[13] From the beginning, New Haven Colony and the relatively poor Plymouth Colony required their militiamen to provide themselves with arms. Maryland did the same, placing the burden of arming its male population on individual settlers and the masters of servants, who had to furnish with "arms & munition" any able-bodied man between the ages of sixteen and fifty whom they transported to the colony.[14] In 1643 Maryland's council issued warrants to military commanders to go into colonists' houses and view all arms and ammunition.[15] Father Thomas Copley, the head of the Jesuits' mission in Maryland, owned thirty-six guns to arm twenty-one servants working on the order's plantation.[16] A Maryland law passed in 1649 required a master of a family to provide "every hired servant or other Sojourner also residing and dwelling in his house" with one fixed gun, two pounds of powder, and eight pounds of shot, for which the master could charge servants or "Soujourners."[17]

For most men, the cost of a firearm, which ranged between twenty and thirty shillings new (£1 to £1.5), was not prohibitive. These prices compared favorably to the cost of a yoke of oxen, which was about £11 to £12 (229 to 240 shillings); a cow, which was about £3 (60 shillings); and the cost of a joined oak chest, which could range between 10 and 15 shillings new. Even though a common sword or cutlass cost between 5 and 6 shillings, these less expensive edged weapons were present in smaller numbers than firearms in both of the Virginia censuses and in early probate inventories (tables 1 and 2).[18] References in probate inventories to pikes, which were in use at the time, were very rare; it appears that most pikes, unlike most firearms, were usually public, not private, arms.[19]

Evidence drawn from inventories dating to the mid-1600s suggests that the first English settlers in the Chesapeake region and in New England were probably more than adequately supplied with a variety of firearms (table 2). Firearms were found in approximately 60 percent of the probate inventories drawn from the Virginia counties of Accomack (the Eastern Shore) and York and the Maryland counties of St. Mary's (Western Shore) and Kent (Eastern Shore), which account for all of the surviving pre-1658 Maryland inventories. Most of these guns were shoulder arms: muskets or fowling pieces. Purely antipersonnel weapons such as pistols and swords were less common. Not all of these firearms were in working order. Between 1638 and 1658, takers of

TABLE 2. PROBATE INVENTORIES OF MALES CONTAINING GUNS, PISTOLS, AND SWORDS, NEW ENGLAND AND CHESAPEAKE COLONIES, MID-1600s

| Location and dates | Number of inventories in sample | % inventories with firearm* | % inventories with pistol | % inventories with sword |
|---|---|---|---|---|
| Maine, 1659–1669 | 36 | 52.7 | 2.7 | 16.6 |
| Essex County, Mass., 1641–1660 | 160 | 64.4 | 5.0 | 55.0 |
| Plymouth Colony, 1633–1660 | 91 | 74.7 | 12.1 | 51.6 |
| Hartford County, Conn., 1637–1660 | 91 | 74.7 | 7.0 | 45.1 |
| New Haven Colony, 1647–1664 | 71 | 73.2 | 7.0 | 70.4 |
| Maryland, 1638–1658 | 55 | 61.8 | 7.2 | 25.5 |
| Accomack County, Va., 1634–1645 | 22 | 59.0 | 9.0 | 13.6 |
| York County, Va., 1637–1660 | 54 | 66.7 | 9.3 | 16.6 |

*Includes inventories with pistols.

SOURCES:

Maine: *Province and Court Records of Maine*, vols. 1 and 2, ed. Charles Thornton Libby (Portland: Maine Historical Society, 1928, 1931).

Essex County: Frederick Dow, *The Probate Records of Essex County, Massachusetts*, vol. 1, 1635–1664 (Salem: Essex Institute, 1916).

Plymouth Colony: Plymouth Colony Probate Records (1620–1692), transcribed by Ann Yentsch, Catherine Marten, and Joy Stein, vol. 1, computer printout, Research Library, Plimoth Plantation, Plymouth, Mass.

Hartford County: "Wills and Inventories," in *Public Records of the Colony of Connecticut Prior to the Union with New Haven*, ed. J. Hammond Trumbull, vol. 1 (Hartford: Brown & Parsons, 1850), 442–508; Connecticut Colonial Records, Hartford District, vol. 2, microfilm, Historic Deerfield Library, Deerfield, Mass.

New Haven Colony: New Haven Probate Records, vol. 1, pt. 1, 1647–1666, microfilm, Historic Deerfield Library, Deerfield, Mass.

Maryland: *Archives of Maryland*, ed. William Hand Browne et al., 72 vols. (Baltimore: Maryland Historical Society, 1883–1972), vols. 4, 10, 41, 54.

Accomack County: *County Court Records of Accomack-Northampton, 1632–1640*, ed. Susie M. Ames (Washington, D.C.: American Historical Association, 1954); *County Court Records of Accomack-Northampton, 1640–1645*, ed. Susie M. Ames (Charlottesville: University Press of Virginia for the Virginia Historical Society, 1973).

York County: "York County Deeds, Orders, and Wills," vols. 1–3, typed transcript, Department of Historic Research, Colonial Williamsburg Foundation, Williamsburg, Va.

Exhibit 22
Page 00452

Case 3:20-cv-02470-WQH-MMP    Document 61-1    Filed 10/13/23    PageID.6546    Page 125 of 158

inventories in Maryland described about a third (31 percent) of the firearms they listed as being in parts or as "old," or "unfix," that is, in need of repair or adjustment and therefore unserviceable. In York County, Virginia, during the same period, the rate was 26 percent.

The frequency with which guns appeared in early New England inventories differed only slightly from that found in the Chesapeake. Inventories suggest that the residents of New England communities may have been better armed than those in the Chesapeake region. Over 70 percent of the inventories of males probated in the mid-1600s contained firearms in the colonies of Connecticut, New Haven, and Plymouth, which was "certainly by much the poorest colony"[20] (see table 2). A portion of these guns were not heavy matchlock muskets, which is what early militia laws usually specified, but lighter flintlock fowlers and birding pieces better suited to fowling and hunting.[21] Only in Maine and in Essex County, Massachusetts, did the percentages of inventories with firearms slip below 70 percent in New England. This difference can be attributed in part to the presence along the Maine coast and in the ports of Ipswich, Gloucester, Marblehead, and Salem, Massachusetts, of fishermen and mariners, who usually avoided or were excused from active participation in the militia and often did not own firearms. During this period, most male New Englanders from sixteen to sixty regularly drilled and mustered with their local militia companies.

The continuing fear of attack either by Natives or by the Dutch in New Netherland sustained widespread participation in the militias in most parts of New England into the later 1600s. Militia service remained a recognized public duty in the aftermath of King Philip's War (1675–1677) and with the commencement in 1688 of a continuing series of wars against the French in Canada and their Native allies. Outside of Maine, approximately two-thirds of the inventoried males sampled from parts of rural New England owned a firearm in the late 1600s (table 3). The quality of some of these firearms, which may have been hastily acquired during and in the immediate aftermath of King Philip's War, probably left something to be desired, for as the archaeologist Emerson Baker cautions, although these people were now "numerously armed . . . for they had lots of arms," they may not have been "well armed," for some of these firearms "were not particularly good."[22] Some of the firearms carried by Dorchester, Massachusetts, militiamen who participated in the 1690 attack on Quebec may have been "60 to 70 years old," and had been repaired and reworked.[23]

In Maryland and Virginia a very different pattern of militia service developed in the late 1600s and early 1700s as both of these colonies reconsidered

TABLE 3. PROBATE INVENTORIES OF MALES CONTAINING GUNS, PISTOLS, AND SWORDS, SELECTED AREAS OF NEW AND OLD COLONIES, LATER 1600S

| Location and dates | Number in sample | % inventories with firearm* | % inventories with pistol | % inventories with sword |
|---|---|---|---|---|
| Maine, 1678–1692 | 82 | 56.8 | 2.5 | 23.2 |
| Plymouth Colony, 1680–1691 | 225 | 68.0 | 2.2 | 27.6 |
| Hampshire County, Mass., 1681–1700 | 168 | 71.4 | 6.5 | 29.8 |
| New Haven County, Conn., 1692–1693 | 23 | 95.7 | 0.0 | 56.5 |
| New York, rural counties, 1677–1700 | 91 | 60.4 | 8.8 | 23.1 |
| New York City, 1677–1700 | 84 | 45.2 | 17.9 | 32.1 |
| Salem County, West Jersey, 1679–1692 | 55 | 56.4 | 3.6 | 5.5 |
| Rural Pennsylvania, 1692–1700 | 41 | 46.3 | 4.9 | 2.4 |
| City of Philadelphia, 1692–1700 | 58 | 32.8 | 6.9 | 3.4 |
| Maryland, 1687–1688 | 61 | 68.9 | 14.8 | 14.8 |
| York County, Va., 1691–1700 | 59 | 71.2 | 35.6 | 44.1 |
| South Carolina, 1693–1697 | 20 | 70.0 | 30.0 | 35.0 |

*Includes inventories with pistols.

SOURCES:

Maine: *York Deeds*, ed. William M. Sargent, bk. 5 (Portland: Brown Thurston & Company, 1889).

Plymouth Colony: Plymouth County Probate Records (1620–1692), transcribed by Ann Yentsch, Catherine Marten, and Joy Stein, vol. 2, computer printout, Research Library, Plimoth Plantation, Plymouth, Mass.

Hampshire County: Hampshire County Probate Records, vols. 1–3, microfilm, Historic Deerfield Library, Deerfield, Mass.

New Haven County: New Haven Records, vol. 2, 1688–1703, microfilm, Historic Deerfield Library, Deerfield, Mass.

New York rural counties and New York City: Inventories and Accounts, 1666–1822, New York (State), Court of Probates, microfilm, New York State Archives, Albany.

Salem County: Salem Wills and Administrations, 1679–1683; Salem Wills and Administrations, vol. 2, 1684–1687; Salem Wills and Administrations, vol. A, 1688–1698, Salem County, N.J., microfilm, Downs Library, Winterthur Museum, Winterthur, Del.

Rural Philadelphia and City of Philadelphia: Wills of the County of Philadelphia, Pennsylvania, vols. A–D, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.

Maryland: Prerogative Court, Inventories and Accounts, 1674–1718, vol. 10:1688–1692, SM 13, roll 65, Maryland Archives, in author's possession.

York County: York County Deeds, Orders, and Wills, vols. 9–11, typed transcriptions, Department of Historic Research, Colonial Williamsburg Foundation, Williamsburg, Va.

South Carolina: Charleston Will Book, 1692–1693, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.

Exhibit 22
Page 00453

their efforts to promote near-universal participation in the militia and a widespread ownership of firearms. Political turmoil unleashed during the 1640s and 1650s by England's Civil Wars, the execution of King Charles I, and the establishment of the republican Commonwealth disrupted the Catholic Calvert family's hold on Maryland and led to political coups, rebellions, and plundering. Private arms were impressed and stolen, and the political loyalties of militia units and their officers became a matter of concern.[24] In 1658 the Maryland assembly passed a law requiring each county to maintain a list of all able-bodied men between sixteen and sixty, and authorities were to select from the lists "such persons to be of theyr constant Trayned Band as they shall judge fittest both for theyr ability of Body, Estate & Courage."[25] Left unstated was the Protestant-controlled government's concern with the fitness of the political loyalties of the men selected for these trained bands.

When the Calvert family regained control of Maryland, they secured passage in 1661 of a new militia law that continued the practice of selecting the militia from among all men aged sixteen to sixty.[26] Now loyalty to the Catholic proprietary family was the overriding, if unstated, criterion for determining who was "fit" to be in the militia. As Lord Proprietor Cecilius Calvert made clear in 1671, he wanted measures taken "for preventing and suppressing of all and all manner of Riots and seditions and Rebellions, Riotous seditious and Rebellious assemblies and meetings within our said Province."[27] During the same decade, the assembly authorized a mounted militia with each member supplying himself with a sword, carbine, pistols, holsters and ammunition.[28] In seventeenth-century England, the mounted arm of the militia, which consisted of gentlemen and their retainers, was considered particularly useful for suppressing civil disturbances, rebellions, and military mutinies, not for defending individuals' liberty, which many writers of the era's political tracts and later scholars assume to have been the sole purpose of a militia.[29]

To further improve the effectiveness of its militia, Maryland's government established a public magazine for storing ammunition and began setting up county arsenals in which firearms for arming the militia were stored.[30] While evidence drawn from seventeenth-century Maryland probate inventories indicates that firearms were found in over two-thirds of the sampled estates of males (table 3), it was also the case that at any given time, more than 40 percent of the male population over sixteen were young servants, and obtaining a firearm does not appear to have been a top priority for young planters.[31] The condition of a good portion of the firearms owned by males whose estates were probated in the late 1600s also left something to be desired: four in ten

of the firearms were old, unfixed, or in pieces. By 1678 the county arsenals in Ann Arundel, Calvert, Charles, and St. Mary's counties contained 463 muskets, 177 carbines, and 1 blunderbuss for the 3,616 tithables (males over sixteen) who resided in these four counties.[32] Other publicly owned firearms appear to have been in private hands.[33] In 1660 and again in 1676, Maryland's militia successfully faced down incipient rebellions.

Thirteen years later, in 1689, the colony's militia refused to stand by the Calvert family's proprietary government, and it was overthrown by rebels. After learning of William of Orange's successful invasion of England in 1688, Maryland officials sought to avoid trouble by calling in all publicly owned firearms, claiming that they had to be fixed. In a letter to Charles Calvert, the deputy governor made clear that the Catholic members of the governor's council had in fact recalled the public arms for repair and then intended "to distribute the same into such hands as shall faithfully serve the King [James II], your Lordship, and the Country."[34] Even without knowledge of the council's true intention, the action fanned fears of a "popish plot" and inspired a popular uprising. The victorious Protestant Association disarmed the colony's Catholics, whose arms were subsequently restored in 1694.[35] The Calvert family lost control of Maryland's government until 1715, by which time members of the family had joined the Church of England.[36]

In the aftermath of this rebellion, the 1696 Maryland assembly resolved once again that "the militia of this Province be modelled anew, it being deemed impossible that the present act in force about the same should be complied with by means of the poverty of the people."[37] This law required the arming and mustering of only "every fourth or fifth taxable," who would be chosen by their neighbors, whom the law "obligated to find a Trooper, Dragoon, or Footman, according as it shall be agreed upon with necessary arms."[38] Despite this new system, arming the Maryland militia remained a problem. In 1716 the assembly levied a tax of three pence per hogshead on all tobacco exports to purchase firearms for the colony's select militia, a practice that continued until 1745.[39] But in 1733, the legislature itself concluded that such efforts at reform "have not had the desired Effect in a proper Regulation of the Militia of this Province."[40] After political contention in the late 1600s had ended Maryland's inclusive, trained militia, decades of peace in the early 1700s sapped the military effectiveness of the remaining rump of a select militia.

In Virginia, Bacon's Rebellion in the summer of 1676 led to the destruction and eventual reorganization of its militia. In the later stages of this conflict, armed servants and slaves opposed Governor William Berkeley's forces,

Exhibit 22
Page 00454

reassert his authority. During the rebellion and in its immediate aftermath, private arms were impressed and stolen, hundreds of men were disarmed, and the organization of the militia disintegrated.[41] Residents protested the loss of their arms to the English commissioners sent over to investigate the causes of the rebellion. These losses were not made up by the king's shipment and the colony's distribution of "1200 snaphance Muskets [a type of flintlock] and Bandoliers," "300 Matchlocks and Bandoliers," "1000 Swords and Belts," and "300 Pikes."[42] Of Virginia's 8,568 militiamen in 1680, "scarce one half of them [were] armed, especially of the horse."[43] The historian William Shea has concluded that the "Virginia militia was never the same after 1676. It, too, was a victim of Bacon's Rebellion."[44]

This specter of servile rebellion in 1676 and tobacco-cutting riots in 1682 scared the colony's leaders and substantial planters, who rethought the wisdom of a broad-based militia and a widely armed populace.[45] In 1687 Virginia's government limited service in the militia to independent freemen who were householders and freeholders; freedmen without land and servants were no longer trained, and no special efforts were made to arm them.[46] The number of foot soldiers in the militia dropped from 7,268 in 1680 to 3,000 in 1689, plus 1,300 men in horse troops.[47] Governor Francis Nicholson's proposal in 1699 to enlarge the militia from 4,625 men and to restore all indentured servants to the ranks of the militia was opposed by members of the legislature who believed that controlling unarmed laborers was hard enough, but if they were armed and trained, they might rise up and kill their masters.[48]

During the later 1600s, publicly purchased firearms and accouterments continued to play an important role in arming Virginia's smaller select militia. This was true even though the legislature had encouraged private individuals to purchase their own militia weapons by guaranteeing that these private arms could not be "imprest" nor were they "lyable to be taken by any distress, seizure, attachment, or execution."[49] In fact, many of the colony's troopers probably obtained their "trooping arms" or "horse arms" from a shipment of seven hundred carbines and one thousand swords sent to the colony in the aftermath of Bacon's Rebellion and from subsequent purchases by the colonial and county governments.[50] In 1702 the royal government supplied Virginia with an additional one thousand muskets, four hundred carbines, and four hundred pairs of pistols with holsters.[51] County militia officers passed these arms on to their men, who in turn came to regard them as their private property.[52] The marked increase in the number of inventories listing both pistols and swords in the later 1600s in York County was probably due in part to the

distribution of this government largesse (table 3). And even though the overall percentage of inventories containing firearms in York County remained largely unchanged from the mid-1600s to the late 1600s, there appears to have been in Virginia a "relative decline in the number and distribution of firearms after mid-century."[53] In Surry County from 1690 to 1715, only 19 percent of the inventories of non-householders listed firearms; only 32 percent of those of the poorest householders mentioned guns.[54]

By the beginning of the eighteenth century, the efforts of colonies in both New England and the Chesapeake to create an armed populace and an inclusive body of organized and trained militiamen had begun to fall by the wayside. Both Maryland and Virginia had adopted militia systems in which only a minority of free white men between sixteen and sixty received regular training and were required to be equipped with arms provided by themselves, or in some instances by neighbors or from public stores of firearms. The reduction in the militia's role was in part possible because local Indian tribes no longer presented a military threat in the Chesapeake region. At the same time, there was also evidence of a growing concern about putting arms in the hands of all men, especially slaves, servants, and even free white men of uncertain disposition.

New England militias remained much more inclusive and better trained because of external threats. Still, by the later 1600s these colonies could also be quite selective when it became necessary to draft militiamen for active military service. During King Philip's War, town militia committees in Massachusetts tried to spare yeoman farmers, church members, and heads of families, choosing single, unmarried militiamen, who were likely to be younger sons and marginal members of the community.[55] When Massachusetts raised and impressed troops for offensive operations during Queen Anne's War (1702–1713), Governor Joseph Dudley characterized these soldiers as the colony's "loose people."[56] Even with the movement away from relying on an inclusive militia for military operations, private ownership of firearms remained widespread in New England and in the Chesapeake, where guns were also used for fowling, hunting, and killing vermin or "noxious animals."[57]

Serviceable firearms and militias were less common in the new English colonies that lay between Maryland and New England. The 1664 conquest of New Netherland had led to the creation of a series of English colonies in the area formerly occupied by the single Dutch colony that had controlled the coastline from Long Island to the Delaware Valley. New Amsterdam

Exhibit 22
Page 00455

New York, and joined to it were Long Island, Staten Island, and the settlements along the Hudson River to create the English colony of New York. New Netherland had had burgher guards in New Amsterdam and Albany, and the Puritan New Englanders on Long Island had had their own local militia companies, but as a rule the Dutch had relied on professional soldiers, volunteers, and Native allies to defend the colony.[58] English and Dutch New Yorkers living around New York City and on Long Island appear to have been a little less likely to own firearms than residents of New England, Maryland, and Virginia (table 3). This difference was a reflection of the prior colonial regime, the urban environment of New York City, their distance from French and Indian enemies, and the presence after 1664 of two to four companies of red-coated British regulars. In the later 1660s, one observer reported of the New York City militia that he had "never seen anything worse," while Governor Edmund Andros rated the colony's militiamen as "indifferently armed, [but] good firemen."[59] A later governor also considered the colony's people "generally expert in the use of firearms," which may have been a legacy of the Dutch tradition of holding competitions in marksmanship known as "shooting the parrot."[60]

In lands abutting the Delaware River, Quaker proprietors controlled the new English colonies of West Jersey, Pennsylvania, and Delaware. William Penn saw exemption from militia service as a matter involving liberty of conscience and took no steps to establish a militia in Pennsylvania despite the fact that his charter authorized him to do so. Because of the pacifist principles of the colony's influential Quaker community, efforts to pass a mandatory militia act in 1693 failed, and efforts to recruit voluntary military companies were not successful either.[61]

For most of the colonial period Pennsylvania did not have a militia, and in part because of this fact, the ownership of firearms as documented in samples of estate inventories generally ranged between 34 and 38 percent of the male population throughout the colonial period (tables 3, 4, and 7). Pennsylvanians' ownership of these firearms had little to do with defense and nothing to do with the militia. Persistence of this low incidence of gun ownership in Pennsylvania probate inventories was not due simply to the presence of Quakers, for they constituted a declining percentage of the colony's population over the course of the eighteenth century, and some Quakers did in fact own firearms to hunt and kill vermin.[62] Other Pennsylvanians who were not Quakers also opposed the creation of a militia because the absence of a militia released men from military training and a government-mandated requirement to obtain a firearm.

A somewhat similar situation existed along the east bank of the Delaware River. Quaker proprietors did not create a militia when they established their colony of West Jersey in 1677. Despite this fact, guns were present in 56 percent of the inventories of males who died in Salem County, New Jersey (table 3), during the 1680s and 1690s. But over time, the failure of a militia system to take root in this region appears to have affected the levels of private gun ownership. When a unified colony was created in 1702, a militia regiment was established in the western part of New Jersey, but the institution never took root. Continued opposition in the region to the militia extended beyond the Quakers, who "laughed at those [who] did [train and muster]; this made others murmur who were oblig'd to trayne and muster, and encouraged their refusing to do so; they clayming as much right to an examption from trayning as the Quakers."[63] As a result, militia companies did not muster and train in western New Jersey, and when militia officers died, they were not replaced. By the 1740s, only 33.3 percent of the probate inventories of males who died in Salem County contained a firearm, and these inventories lacked pistols and swords (table 4). In the 1740s, Governor Lewis Morris found "in the Eastern Division of this Province [New Jersey] the case is somewhat better. They have tryn'd much oftner, tho' but seldom, there are five regiments there of Militia, & I am in hopes to get them into some better Order than they have been for many yeares; but, they have been so long and so much neglected, the Militia Act so deficient and Armes so much wanted, that it will require time to do it."[64] By the 1730s, the entire colony of New Jersey had, in the opinion of the historian Edwin Tanner, "attained something more than the usual colonial standard of ineffectiveness in her militia system."[65]

The influence of Quaker principles was also felt in the Penn family's proprietary colony of Delaware, which was then known as the Three Lower Counties of Newcastle, Kent, and Sussex. Here again, the ownership of firearms had as a rule nothing to do with serving in a militia. Despite the expressed desire of some residents, the government of the Three Lower Counties did not create a militia. Several voluntary military companies mustered during the 1690s and formed again during the War of the Spanish Succession (1702–1713), but it wasn't until 1740 that the colony's assembly passed a law mandating enrollment in a militia for all males (except Quakers) from seventeen to fifty.[66] As it turned out, this law expired three years later, and because of this the colony did not have a militia when the French and Indian War began in 1754.[67] Even without a militia, about two-thirds of a sample of mid-eighteenth-century probate inventories belonging to males who died in Kent County [Delaware] contained a firearm (tables 4 and 7).

Exhibit 22
Page 00456

TABLE 4. PROBATE INVENTORIES OF MALES CONTAINING GUNS, PISTOLS, AND SWORDS, SELECTED AREAS OF THE BRITISH MAINLAND COLONIES, MID-1700s

| Location and dates | Number in sample | % inventories with firearm* | % inventories with pistol | % inventories with sword |
|---|---|---|---|---|
| Maine, 1740–1743 | 43 | 62.8 | 4.7 | 14.0 |
| Plymouth County, Mass., 1741–42 | 35 | 57.1 | 2.9 | 8.6 |
| Worcester County, Mass., 1741–1744 | 53 | 39.6 | 0.0 | 7.5 |
| Hampshire County, Mass., 1741–1745 | 80 | 60.0 | 5.0 | 17.5 |
| New Haven County, Conn., 1740–1742 | 36 | 61.1 | 2.8 | 16.7 |
| New York, rural counties, 1741–1750 | 75 | 36.0 | 1.3 | 20.0 |
| New York City, 1741–1750 | 16 | 37.5 | 6.3 | 25.0 |
| Salem County, N.J., 1740–1744 | 60 | 33.3 | 0.0 | 6.7 |
| Rural Philadelphia County, 1740–1744 | 64 | 37.5 | 1.6 | 1.6 |
| City of Philadelphia, 1740–1744 | 40 | 22.5 | 7.5 | 5.0 |
| Kent County, Del., 1741–1750 | 30 | 66.6 | 10.0 | 10.0 |
| Maryland, 1741–42 | 65 | 66.2 | 9.2 | 9.2 |
| York County, Va., 1741–1750 | 103 | 63.1 | 26.2 | 38.8 |
| Lunenburg County, Va., 1746–1750 | 14 | 71.4 | 0.0 | 0.0 |
| Augusta County, Va., 1746–1749 | 47 | 48.9 | 2.1 | 0.0 |
| South Carolina, 1742–43 | 118 | 77.1 | 39.0 | 50.0 |

*Includes inventories with pistols.

SOURCES:

Maine: York County Probate Records, vol. 5, 1735–1742, and vol. 6, 1742–1746, microfilm, in author's possession, Amherst College.

Plymouth County: Plymouth County Probate Records, vol. 8, 1738–1742, microfilm, Massachusetts Archives, Boston.

Worcester County: Worcester County Probate Records, vol. 2, 1739–1748, microfilm, Historic Deerfield Library, Deerfield, Mass.

SOURCES (CONTINUED):

Hampshire County: Hampshire County Probate Records, vol. 6, 1739–1745, microfilm, Historic Deerfield Library, Deerfield, Mass.

New Haven County: New Haven County Probate Records, vol. 6, pt. 2, 1737–1745, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.

Rural New York and New York City: New York (State), Court of Probates, microfilm J0301, New York State Archives, Albany.

Salem County: Salem County, N.J., Inventories, Wills, and Administrative Papers, 1740–1744, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.

Rural Philadelphia County and Philadelphia: Wills of the County of Philadelphia, vol. W, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.

Kent County: "A Random Sample of Kent County, Delaware, Estate Inventories, 1727–1775," complied by Richard L. Bushman and Anna L. Hawley (Newark, Del., 1987), in author's possession.

Maryland: Prerogative Court, Inventories, vol. 26, 1741–1742, and vol. 27, 1742–43, SR 4339, Maryland Archives, in author's possession.

York County: York County Deeds, Orders, and Wills, vols. 19–20, typed transcriptions, Department of Historic Research, Colonial Williamsburg Foundation, Williamsburg, Va.

Lunenburg County: Will Book no. 1, 1746–1762, microfilm, in author's possession, Amherst College.

August County: August County, Will Book no. 1, 1745–1753, microfilm, in author's possession, Amherst College.

South Carolina: Charleston County, Inventories, K–K, 1739–1743, microfilm, Historic Deerfield Library, Deerfield, Mass.

At the same time, the weakness or absence of colonial militias in the Middle Atlantic region does appear to have had a lasting impact on patterns of private gun ownership in much of the region. In Pennsylvania, the lack of a government mandate to arm oneself for militia service and the presence of Quakers were undoubtedly reflected in the lower percentages of inventories in which firearms were found from the time of the colony's establishment until the end of the eighteenth century. In neighboring Salem County, New Jersey, the absence of a strong militia tradition, the presence of Quakers, and the area's relative security can also be seen in the similarly low percentages of eighteenth-century inventories with firearms. The percentages of probate inventories with firearms in southern New York also declined over the course of the eighteenth century despite the presence of a somewhat more active militia. Still, the burden of the colony's defense did not fall on militiamen living around New York City and on Long Island, but was instead borne by warriors of the Iroquois League, British regulars, volunteers, impressed militiamen from New England, and those Dutchmen living around Albany, who may have been among the best bush fighters in the British colonies from the 1690s to the mid-1700s.

Exhibit 22

Page 00457

The militias that English proprietors and colonists established in the Carolinas in the late 1600s produced two rather different institutions as a result of differing social, economic, and strategic situations. These differences also appear to have influenced patterns of private gun ownership. South Carolina was a relatively wealthy colony threatened externally by Spanish and Native foes and internally by enslaved Africans, who outnumbered white colonists by the early 1700s. Evidence from surviving probate inventories of male decedents suggests that from the colony's first settlement, South Carolinians were well armed (tables 3 and 4). One resident bragged in 1710 that "everyone among us is versed in Arms, from the Governour to the meanest Servant, and are all so far from thinking it below them, that most People take Delight in Military Affairs."[68] To deal with the external threats, masters were actually obliged to arm slaves, some of whom trained with the militia, and several hundred armed slaves served in the war against the Yamasees from 1715 to 1717. The colony's practice of training and arming "trusted Negroes" was suspended, but not ended, when a group of slaves stole firearms and rebelled in 1739.[69] During the 1720s and 1730s, roughly a third to sometimes one-half of the colony's annual budget went to pay for soldiers who guarded the frontiers, volunteers raised for offensive operations, and militiamen who provided for local defense and maintained slave patrols.[70] Among the colony's outlays were regular purchases in England of hundreds of military-style muskets, usually with bayonets.[71] Until the late 1750s, these public arms appear to have remained in storage and were not as a rule distributed to militiamen, only to those called to active service.

Neighboring North Carolina, with its relatively poor, dispersed population, provided a striking contrast. The historian Wayne Lee has characterized its colonial militia as having been distinguished by "the chronic resistance or just plain apathy displayed by both officers and soldiers."[72] At the outbreak of the Tuscarora War (1711–1713), "neither the Province in general, nor the people themselves were sufficiently provided with powder, lead, and arms," and "some were to be ordered from elsewhere; but they did not know where to find the money."[73] The colony had to borrow guns from its well-armed southern neighbor to supply some of its militiamen, and in the end, only the intervention of volunteers from South Carolina with several hundred Native allies saved the colony.[74] Somewhat belatedly, North Carolina attempted to improve its defenses by passing its first militia law in 1712. But after this war ended, the colony's relatively secure location did little to sustain a viable militia. In 1744 a legislative committee discovered that the inhabitants of many counties had

for years refused to choose militia officers, assuming that in their absence no musters could be held.[75] The militia's lack of arms also remained a problem in the mid-1700s.[76]

Even when they did not face external threats, the militiamen of these and other southern colonies had to mount slave patrols and presumably depended on private arms for this duty. Over the course of the 1700s, the governments of South Carolina (1704), Virginia (1727), North Carolina (1753), and eventually Georgia (1757) formalized and codified their militias' patrol activities.[77] The patrols, in which both slave owners and non-owners served, looked for slaves without passes from their masters, for unauthorized gatherings of slaves, and for any other suspicious activities involving slaves. In 1734 the South Carolina legislature required every person serving in a slave patrol to "provide himself and always keep, a good horse, one pistol, and a carbine or other guns, a cutlass [and] a cartridge box with at least 12 cartridges in it."[78]

The outbreak of war between Britain and Spain in 1739 and renewal of war with France in 1744 found most of the British mainland colonies unprepared militarily. This situation existed despite the fact that private gun ownership appears to have remained widespread outside the middle colonies (table 4). Even though it raised an expeditionary regiment of paid volunteers in 1740, South Carolina and the recently founded colony of Georgia relied primarily on the presence of the red-coated British regulars of James Oglethorpe's Forty-second Regiment of Foot to defend them from 1737 to 1748 and to undertake offensive operations against the Spanish in Florida.[79] The militia of underpopulated Georgia was inconsequential, while the larger and better-armed population and militia of South Carolina focused more on controlling the colony's black slaves in the aftermath of the 1739 Stono Rebellion.

The militias of Maryland, Virginia, and North Carolina never faced any real threats during the 1740s. In 1746 North Carolina passed a new militia law but stipulated that its provisions would expire in three years.[80] Maryland reenacted its tax on tobacco exports to purchase public arms for the militia, and Virginia passed legislation allowing in time of danger "to arm part of the militia, not otherwise sufficiently provided, out of his majesty's magazine and other stores with this colony."[81] Such steps were taken even though firearms continued to appear in over 60 percent of the inventories probated in the tidewater counties during this period (table 4). Still, these samples of inventories, and especially those from inland counties, suggest that gun ownership was not universal, and that a number of these privately owned guns,

Exhibit 22

Page 00458

particularly in Maryland, appear to have been "very bad and scarcely fit for use."[82] An English traveler passing through Maryland, Virginia, and the Carolinas lamented that "the Musters of their Militia, would induce a Man to nauseate a Sash and hold a Sword, for ever in Derision," because of the "diversity of Weapons and Dresses, Unsizeableness of the Men, and Want of the least Grain of Discipline in their Officers."[83]

In 1747 and 1748 Pennsylvania and Delaware established voluntary military units known as Associators.[84] Inspired by voluntary military associations formed in Britain in 1745 to oppose the Jacobite army of Charles Edward Stuart, the Pennsylvania Military Association was, in the assessment of the historian Joseph Seymour, "neither a militia, nor paid levies, nor professional soldiers."[85] The Associators saw it as a temporary measure "until some more effectual Provision be made to answer the same good Ends and Purposes or until Peace shall be established between Great Britian and France."[86] Each member agreed to provide himself with "a good Firelock, Cartouch Box, and at least twelve Charges of Powder and Ball, and . . . with a good Sword, cutlass or Hanger."[87] Benjamin Franklin, the organizer of the Philadelphia Associators, sought to profit from the situation by offering for sale "a parcel of good Muskets, all well fitted with Bayonets, Belts and Cartouche Boxes, and Buff slings to cast over the shoulder, very useful to have to such as have occasion to ride with their Arms."[88]

The New England colonies, and to a lesser extent New York and New Jersey, shouldered most of the burden for King George's War (1744–1748). Despite the vitality of New England's militias in the seventeenth and early eighteenth centuries and what inventories suggest was probably widespread private ownership of firearms (table 4), these colonies were also not prepared for war in 1744. Two decades of peace that followed the conclusion of Governor Dummer's War (the Third English-Abenaki War) in 1725 had led to a noticeable decrease in military preparedness, and for three decades the Massachusetts legislature had passed no laws regarding the militia.[89] Evidence from probate inventories also suggests that by the 1740s there was a relative decline in the levels of private gun ownership in New England (tables 3 and 4), even though the levels remained well above those found in contemporary probate inventories from the colonies of New York and New Jersey.

Massachusetts officials realized that the colony and its residents did not have enough firearms both to defend the colony's frontiers and to mount offensive military expeditions against targets in New France. In Worcester County, a return for Colonel John Chandler's militia regiment reveals that

only three of his nineteen companies of foot were "well equipped" or "mostly equipped," while four were "intirely deficient as to arms," another was "greatly deficient," yet another was only "a quarter fitted," three were only half armed, one lacked a quarter of the arms needed, and another was short by one-fifth.[90] After reviewing his men, a chagrined militia captain in St. George's on the Maine frontier (then part of Massachusetts) reported, "I find them poorly provided in arms and amonission though they generally apeered on Training days under arms yet I find several of them was borrowed and now everyone must have their own."[91] Elsewhere in Maine another militia officer reported that of thirty-three recent German immigrants, "there is twenty foure of them that Have noe armes & there none of them has any amanishon."[92]

New England's colonial governments scrambled to address these conditions. To defend towns in the western part of the colony, Massachusetts constructed a line of forts just south of its northern border and garrisoned these posts with soldiers recruited, paid, and if necessary armed by the colony.[93] The colony also built and garrisoned posts along the Maine frontier. No longer was the first line of defense dependent on the men in local militia companies.

To undertake offensive operations against French targets such as Louisburg on Cape Breton Island and in Canada itself, the colonies also did not employ militia units but created provincial regiments of paid volunteers. As Benjamin Franklin explained to an English correspondent, these soldiers were "not militia, but what we call our provincial troops, being regularly enlisted to serve a term, and in the pay of the province." These units were authorized each year by colonial legislatures, the officers commissioned by royal governors or the legislatures, the enlisted men mustered into service during the spring and kept in pay until November, when they were usually discharged. Also, these provincial soldiers, unlike militiamen, were subject to regulations and punishments set forth in special laws enacted by colonial legislatures, and in 1754 Parliament extended the provisions of the Mutiny Act to include colonial troops raised for service with British forces in America.[94]

To arm those provincial soldiers who lacked firearms of their own, Massachusetts purchased "Five Hundred good Fire Arms Tower mark" from England and impressed guns from its residents, who were reimbursed. Connecticut faced similar shortages and took similar steps to respond to the problem.[95] To arm provincial troops in 1746, Connecticut and Rhode Island purchased firearms from their residents.[96] To avoid problems in a future conflict, the government of Massachusetts purchased an additional 2,500 military-style muskets from England in 1754.[97]

Exhibit 22
Page 00459

When fighting broke out again in 1754, most colonies and their residents were still not prepared for the scale of the fighting that lasted until 1763. Late in 1755, concerned British officials in London wrote to colonial governors in an effort to assess the state of the colonial militias. (A summary of the responses to these inquires that has been supplemented by information from other official sources can be found in table 6.) The overwhelming majority of men between the ages of sixteen and sixty were enrolled in the militias of New Hampshire and Massachusetts, and most appear to have been armed. In Connecticut there were some militiamen "too poor to buy sufficient arms."[98] At the same time, a smaller percentage of men over the age of sixteen were enrolled in Connecticut's militia because the colony limited militia service to men between sixteen and fifty, which was also the case in Rhode Island. In addition, the latter colony had a significant Quaker population, which accounted for perhaps one-eighth of its men over the age of sixteen and contributed to the large number of "men able to bear arms" but who were not required to join the militia. In Rhode Island there were 5,052 small arms in private hands, which would barely have provided a shoulder arm for each of the colony's militiamen even if they were all owned by just the men "enlisted" (that is, enrolled) in the militia, which of course they weren't (table 5).[99] Clearly, an indeterminate but not inconsequential minority of Rhode Island's militiamen who were required by law to own firearms did not, and this appears to have been the case elsewhere in New England, though probably to a lesser degree.

Increasingly, the suitability of the firearms owned by these militiamen was found wanting. Most of their guns were not muskets. Today, as a rule, all eighteenth-century muzzle-loading smooth-bore firearms are erroneously referred to as "muskets." But as Benjamin Franklin noted in 1747, "Musket" was "the Name of a particular Kind of Gun."[100] Specifically, a musket was a sturdy, large-caliber military firearm fitted to carry a bayonet.[101] The standard British military musket since the early eighteenth century, the Long Land Pattern Musket—popularly known as the Brown Bess—weighed about eleven pounds, had a .760- to .780-caliber barrel, and fired bullets weighing fourteen to the pound.[102]

Most New Englanders preferred a lighter firearm with a relatively smaller bore that could be used for hunting and killing vermin as well as military service.[103] Especially popular in New England were .60- to .65-caliber smoothbore fowlers and fusils made in New England or imported from England, which weighed six to seven pounds.[104] If they could obtain them, New Englanders also liked French hunting guns, which usually weighed six

TABLE 5. DATA FROM 1755 RHODE ISLAND CENSUS LISTING PRIVATE ARMS, PLUS PROBATE INVENTORY DATA FROM 1747–1754

| Categories | Small arms in private hands | Pistols in private hands | Total guns in private hands | Swords in private hands |
|---|---|---|---|---|
| Number of weapons | 5,052 | 624 | 5,676 | 2,418 |
| Average number of weapons per white man over age 16 (number of men: 9,177) | .55 | .07 | .62 | .26 |
| Average number of weapons per white man capable of bearing arms (number of men: 8,262*) | .61 | .09 | .69 | .29 |
| Average number of weapons per enlisted militiamen (number of men: 5,265) | .96 | .12 | 1.07 | .46 |
| Probate Inventory Data | Small arms | Pistols | Total firearms | Swords |
| Numbers of weapons found in 380 Rhode Island inventories, 1747–1754 | 196 | 35 | 231 | 55 |
| Average number of weapons per inventory | .52 | .09 | .61 | .15 |

* Total of men enlisted in the militia: 5,262, plus 2,997 "men able to bear arms exclusive of the militia."

SOURCES:

1755 census data: *Account of the people in the Colony of Rhode-Island, whites, blacks, together with the quantity of arms and ammunition in the hands of private persons,* Early American Imprints, no. 40794 (n.p., 1800).

Probate inventory data: Bristol, Wills and Inventories, vol. 1; East Greenwich, Probate Records, vol. 2; Gloucester, Probate Records, vol. 1; Little Compton, Town Council and Probate Records, vol. 1; Newport, Town Council Records, vol. 9; Providence, Town Council Records, vols. 4–5; Scituate, Probate and Council Records, vol. 1; Smithfield, Probate Records, vol. 2; South Kingston, Town Council Records, vols. 4–5; Warwick, Wills, vol. 2; West Greenwich, Town Council Records, vol. 1; Westerly, Town Council and Probate Records, vol. 3. All on microfilm, Rhode Island Historical Society, Providence.

and a half to seven and a half pounds, had a .597- to .630-caliber barrel, and used bullets that weighed twenty to twenty-four to the pound.[105] As a result the firearms of militiamen in New Hampshire were considered to be "in general of the meanest Sort," and those in Connecticut "which belong to private persons [were] mostly poor and undersized and unfit for an expedition."[106]

Exhibit 22
Page 00460

TABLE 6. CONDITION OF COLONIAL MILITIAS, 1754–1756

| Colony | White males 16 and up | Enrolled militiamen | % in militia | Proportion armed | Quality of their arms | Number of public arms** |
|---|---|---|---|---|---|---|
| New Hampshire | 7,000 | 6,000 | 85.7% | "most armed" | "in general of the meanest Sort" | none |
| Massachusetts | 45,764 | 37,446 | 81.2% | — | — | 2,500 |
| Rhode Island | 9,177 | 5,265 | 56.7% | 5,052 small arms and 624 pistols in private hands | — | 436 |
| Connecticut | 28,000 | 20,000 | 71.4% | — | "poor and undersize" | none |
| New York | 19,825 | 12,000 | 60.1% | "some are . . . so indigent" that "they cannot purchase their proper arms" | "chiefly for the Indian Trade" | 1,000 belonging to NYC |
| New Jersey | 16,000 | 10,000 | 62.5% | — | — | none |
| Pennsylvania | 25,0000 | none | 0.0% | — | — | — |
| Delaware | 4,000 – 5,000 | none | 0.0% | — | — | — |
| Maryland | 26,000 | 16,500 | 63.5% | two-thirds | "very bad and scarcely fit for use" | 652 |
| Virginia | 45,000 | 28,000 | 62.2% | "not above one-half" | "are of different Bores" | 2,500 |
| North Carolina | 12,000* | 12,500* | 104.2%* | "not half armed" | "very bad" | 1,000 |
| South Carolina | unknown | 5,500 | n.a. | "every person in the province capable of bearing arms" | "already furnished with a good gun" | 2,000 |
| Georgia | unknown | 756 | n.a. | "many being unable to purchase arms" | "very badly armed" | none |

* Based on incomplete data which includes free blacks and mulattos.
** These public arms are all muskets.

SOURCES:

New Hampshire: White males sixteen and up: Evarts B. Greene and Virginia Harrington, *American Population before the Federal Census of 1790* (1981; New York: Columbia University Press, 1932), 72. Enrolled militiamen: "Population of the British Colonies," *Documents Relative to the Colonial History of the State of New York*, ed. E. B. O'Callaghan, 15 vols. (Albany: Weed, Parsons, 1853–1887), 6:993 (hereafter cited as *NYCD*). Proportion armed, quality of arms, number of public arms: "Blair Report on the State of the Colonies, July 20, 1756," in Louis K. Koontz, *The Virginia Frontier, 1754–1763* (Baltimore: Johns Hopkins University Press, 1925), 170.

Massachusetts: White males sixteen and up and enrolled militiamen for 1758: Greene and Harrington, American Population, 16. Number of public arms: *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay*, 21 vols. (Boston: Wright and Potter, 1869–1922), 15:722.

Rhode Island: White males sixteen and up, enrolled (enlisted) militiamen, and proportion armed: *Account of the people in the Colony of Rhode-Island, whites, blacks, together with the quantity of arms and ammunition in the hands of private persons*, Early American Imprints, no. 40794 (n.p., 1800). Number of public arms, June 1749: *General Assembly of the Governor and Company of the English Colony of Rhode-Island and Providence Plantations, in New England in America, held at Newport* [May 2, 1749–February 1750], Early American Imprints, no. 6411 [Newport, 1749–50].

Connecticut: White males sixteen and up: estimated from 1756 Connecticut Census; see Greene and Harrington, *American Population*, 50. Enrolled militiamen: Harold E. Selesky, *War and Society in Colonial Connecticut* (New Haven: Yale University Press, 1990), 166, n. 29. Quality of arms, number of public arms: Governor Thomas Fitch to Sir Thomas Robinson, Norwalk, August 1, 1755, in *Collections of the Connecticut Historical Society*, vol. 1 (Hartford: published for the Society, 1860), 267.

New York: White males sixteen and up from 1756 New York Census; see Greene and Harrington, *American Population*, 101. Enrolled militiamen: *NYCD*, 6:993. Proportion armed, quality of arms, number of public arms: "Blair Report," 171.

New Jersey: White males sixteen and up, number of public arms: "Blair Report," 171–72. Enrolled militiamen: NYCD, 6:993.

Pennsylvania: White males sixteen and up: 25,000 men capable of bearing arms, *NYCD*, 6:993.

Delaware: White males sixteen and up: estimate based on number of militia in 1757; see "An Address from the Assembly of the Lower Counties to the Governor," October 26, 1757, in *Pennsylvania Archives*, 1st. ser., ed. Samuel Hazard, vol. 3 (Philadelphia: Joseph Stevens & Co., 1853), 308–12.

Maryland: White males sixteen and up, enrolled militiamen, proportion armed, quality of arms: "Blaire Report," 168–69; number of public arms: *Archives of Maryland*, 50:510–11.

Virginia: White males sixteen and up, proportion armed, quality of arms, number of public arms: "Blair Report," 165–67. Enrolled militiamen, *NYCD*, 6:993.

North Carolina: White males sixteen and up, enrolled militiamen: Greene and Harrington, *American Population*, 157. Proportion armed, quality of arms, number of public arms: Governor Dobbs to Earl of Loudoun, New Bern, July 10, 1756, in *Colonial Records of North Carolina*, ed. William L. Saunders, vol. 5 (Raleigh: Josephus Daniels, printer to the State, 1887), 599. The number of militiamen appears to exceed the number of free white males sixteen and up because of tax evasion and because free blacks and mulattos served in the North Carolina militia.

South Carolina: Enrolled militiamen: Greene and Harrington, *American Population*, 175. Proportion armed, quality of arms, number of public arms: Lawrence Henry Gipson, *The Great War for Empire: The Years of Defeat, 1754–1757* (New York: Knopf, 1959), 50.

Georgia: Enrolled militiamen: Greene and Harrington, *American Population*, 181. Proportion armed, quality of arms, number of public arms: Governor John Reynolds to the Board of Trade, Georgia, January 5, 1756, in *Colonial Records of the State of Georgia: The Original Papers of Governor John Reynolds, 1754–1756*, ed. Kenneth Coleman and Milton Ready, vol. 27 (Athens: University of Georgia Press, 1977), 104.

Exhibit 22
Page 00461

Outside New England, most militias remained less inclusive and were, as a rule, inadequately armed in terms of quantity and quality, for here too men preferred firearms that were lighter than military muskets (table 6).[107] Pennsylvania and Delaware did not have militias in 1754, and the level of private gun ownership in Pennsylvania may have been lower than in any other colony.[108] After General Edward Braddock's defeat at the battle of the Monongahela in early July 1755, residents of Pennsylvania's Lancaster and Chester counties petitioned the colony's legislature to "furnish them with Arms and Amunition for Defence of their Houses and Families."[109] The Pennsylvania assembly responded by purchasing and distributing five hundred guns and a supply of ammunition to arm the exposed residents of Cumberland, York, and Lancaster counties.[110] Finally, in 1757 Pennsylvania's legislature passed a militia law that required all males (except Quakers, like-minded individuals, and Catholics) to be listed by the sheriff, to arm themselves, and to be formed into militia companies.[111] Delaware passed new militia acts in 1756 and 1757 that reestablished a militia for the duration of the war.[112]

The militias of New York, New Jersey, Maryland, and Virginia contained fewer than two-thirds of their eligible men, many of whom lacked adequate arms. New York's governor reported that "the Arms which are in the Possession of private People are Chiefly for the Indian trade," and "some of them [the militiamen] are so indigent, that they cannot purchase their proper arms."[113] Firearms produced for the Indian trade often weighed as little as five and a half pounds and had bores of .57 to .62 caliber and barrels only thirty-six to forty inches long.[114] At least one-third of Maryland's militia were "entirely destitute of Arms & many of the Guns that are the property of the Rest are very bad & scarcely fit for use," characterizations that are confirmed by the descriptions of a majority of guns found in samples of Maryland probate inventories during the mid-1700s.[115] In neighboring Virginia, "not above half" the militiamen were armed with firearms, and these had "different Bores."[116] During the French and Indian War it was sometimes necessary to arm some Maryland and Virginia militia companies with muskets from public stores.[117] Given these circumstances, it is not surprising that in 1758 Colonel Henry Bouquet, a regular officer, discovered that among "new recruits and provincials," who came primarily from Delaware, Maryland, Pennsylvania, North Carolina, and Virginia, "a great number had never seen a musket," by which he meant a heavy, large-caliber military firearm.[118]

Farther south the situation appears to have been even worse (table 6). By 1754, North Carolina's organized militia "was fallen much to decay" and "not near half armed and those [arms] they have very bad."[119] The colony's new governor, Arthur Dobbs, brought with him one thousand muskets, which he used to arm militiamen living on "the sea coast" and in "the exposed western Counties on the Frontier."[120] Still, he believed that members of the militia needed an additional two thousand firearms.[121] Even though Georgia had been founded in 1733, its militia was not put on a legal footing until 1751, and its first militia act was not passed until 1755.[122] In that year, Georgia's militia included most of its adult white males, but it was tiny and "very badly Armed, many being unable to purchase Arms, according to the militia act."[123] To address the latter problem, in 1757 the British Board of Ordnance sent Georgia five hundred muskets to arm its militiamen.[124]

Among the southern colonies, only South Carolina's militia appears to have been a credible institution in 1755.[125] Its strength of approximately six thousand men probably represented a near-universal enrollment of white males aged sixteen to sixty. In 1754 the colony's governor, James Glen, claimed, "There is no a single Person in this Province Capable of bearing a Gun but has one and we allow of no Indian Trading Guns,"[126] though in 1757 an unimpressed Colonel Bouquet asserted that "the Militia of this Province amounts to about six thousand badly armed Men."[127] In addition, the colony had on hand two thousand publicly owned muskets in storage.[128]

As it was, the colonies' militias played only supporting roles during what would prove to be the last colonial war, known today as the French and Indian War or the Seven Years' War. At various times from 1754 to 1758, Maryland, Pennsylvania, and Virginia used companies of militiamen to assist in frontier defense.[129] Many more militiamen volunteered to join provincial regiments, while untold others were conscripted into the provincial forces by local militia companies acting in essence as draft boards. Some militiamen had their firearms pressed into provincial service, so even though they themselves didn't go to war, their guns did. In Maryland, Virginia, and South Carolina the vast majority of militiamen served primarily to keep an eye on enslaved African Americans. Governor Robert Dinwiddie of Virginia claimed that the colony's slave population "alarms our People much and [they] are afr'd of bad consequences if the Militia are order'd to any great Distance from the presn't Settlem'ts."[130] In 1757 militiamen were briefly mobilized in Connecticut, Massachusetts, New York, and Rhode Island and marched toward New York's frontier after the fall of Fort William Henry in August. During 1760, when Cherokees and Creeks threatened Georgia, one-third of the colony's "whole Militia" found itself "on actual duty" for several months.[131] But as

Exhibit 27
Page 00462

by units of the colonial militias was unusual by the third quarter of the eighteenth century.

The burden of the fighting during the French and Indian War was borne not by militiamen but by units of provincial soldiers who came of age "as quasi-regular troops" during this conflict.[132] As a rule, colonial governments wanted their provincial soldiers to be equipped like British regulars.[133] The motley collection of fowlers, smaller-bore trade guns, and fusils that still armed most militiamen and had equipped many provincial soldiers in the 1740s were no longer considered appropriate for military service. As Governor Thomas Fitch of Connecticut observed, "these arms being all of the private property are very various in their sorts and sizes, according to the different occasions and humors of their owners and accordingly not at all adapted to the business of a campaign."[134] They were too light to hold up in the field. Musket balls fired by the smaller-caliber firearms lacked the stopping power of the heavier balls fired by muskets with larger bores, and they were usually not fitted to accept a bayonet.

Colonial authorities came to believe that an adequately armed soldier needed a heavy, large-caliber musket with a .70- to .80-inch bore, a bayonet, and a cartridge box.[135] Thus armed, a provincial soldier could, theoretically, fire devastating volleys and deliver a bayonet charge. Arming men with muskets of the same bore or caliber also reduced problems resulting from the need to supply troops with ammunition of varying sizes.[136] As a result, officials in all of the colonies attempted, with varying degrees of success, to obtain military muskets for their provincial forces[137]

The challenge of arming provincial soldiers was compounded by the fact that the men who joined provincial regiments came disproportionately from those segments of society least likely to own any kind of firearm. Governor Fitch of Connecticut had alluded to this problem in an earlier letter where he made the point that it was difficult to obtain firearms "for the use of such as, tho' able bodied effective men, are unprovided and unable to provide themselves."[138] Overwhelmingly, the men joining provincial regiments were in their late teens and early twenties, and not independent property owners. Outside of New England, a majority of enlistees in provincial forces—regardless of their ages—were laborers, immigrants, servants, and poorer men.[139] By way of contrast, Virginia's militia consisted of "chiefly Free-holders," who insisted "on th'r Privileges not to enlist [in the provincials] or serve but on imminent danger."[140] South Carolina only completed its provincial regiment raised in

1757 by empowering magistrates to enlist "all idle, lewd, disorderly men who have no visible means of support and all sturdy beggars."[141] Needless to say, such men were less likely to own any kind of firearm than those older, better-off men who have left behind most surviving probate inventories. Studies of colonial inventories suggest that, as a rule, only 40 percent of males under the age of twenty-five owned a gun, while among the poorest 20 percent who were probated and inventoried, regardless of their age, only 33 percent owned a firearm.[142]

Initially, existing colonial stores of public arms, though relatively small, played crucial roles in arming provincial regiments that took the field in 1755 in Rhode Island, Maryland, and Virginia.[143] In addition, Virginia lent firearms from its public stores to New Jersey and New York, and Maryland offered to lend arms to North Carolina.[144] In 1756 a shipment of ten thousand muskets from the Board of Ordnance provided two thousand firearms each to Connecticut and Massachusetts, three hundred each to Rhode Island and New Hampshire, six hundred to Pennsylvania, and one thousand each to New York and Virginia.[145] As a result, starting in 1756 if not before, Massachusetts, Connecticut, New York, and New Jersey also armed the majority of their provincial troops with public arms.[146] A second shipment of twelve thousand muskets and two hundred rounds of ammunition for each was sent from London in 1758 to help arm the 21,286 provincial troops raised in the colonies for the 1758 campaigning season. The arrival and distribution of this shipment of muskets helped overcome what historians have called the "Great Arms Crisis" of 1758, which had left colonial and British officials scrambling to find suitable firearms to equip provincial soldiers.[147] Almost all of the Pennsylvania provincials raised in 1758 had to be armed or rearmed with publicly owned muskets.[148] In the same year, British officers also had to call upon Maryland to help arm the provincial soldiers in the Second Virginia Regiment.[149]

In addition to these military muskets provided by the Board of Ordnance, colonial governments purchased 7,610 muskets between 1757 and 1760. New Jersey ordered two thousand stands of arms, each of which included musket, bayonet, and cartridge box.[150] Of the three thousand South Carolina bought, at least one thousand went to arm militiamen, not just provincial troops in the field. Private arms shipments, categorized as "For the Planters," during the years 1756 through 1763 still outstripped public purchases, designated "For the Province," since colonial merchants imported 36,592 shoulder arms and four thousand pairs of pistols.[151] Although some of these privately imported

Exhibit 22
Page 00463

arms resembled the publicly purchased arms in that they were muskets and bayonets with cartridge boxes, the majority of these guns for private sale were presumably the lighter fowlers and trade guns that colonists favored.

The wars of the mid-1700s marked a watershed in the development of colonial military institutions and in the arming of colonial military forces. Increasingly, when governments raised provincial soldiers for offensive operations, and even when they posted men to garrisons along the frontier stretching from Pennsylvania to Georgia, it became necessary to supply them with publicly owned muskets. Except for colonial cities, parts of the Delaware Valley, and some parts of the rural South, private ownership of firearms appears to have remained widespread in the third quarter of the eighteenth century. But the quality of these privately owned weapons, including those in the hands of militiamen, could not sustain military forces in the field. So even though the number of public arms was still dwarfed by tens of thousands of privately owned firearms, the approximately thirty thousand muskets that the British Board of Ordnance and colonial governments distributed to provincial troops had assumed a central role in each colony's ability to wage war by the late 1750s. In the southern colonies, especially in North Carolina, South Carolina, and Georgia, but also to some degree in Pennsylvania, Maryland, and Virginia, publicly owned muskets had also come to play a limited role in arming militiamen.

With the defeat of the French, the establishment of British control over all of North America east of the Mississippi River created a sense of security in which the military role of colonial militias appeared unnecessary. Pennsylvania's and Delaware's militias disappeared with the war's end.[152] Some Associator companies re-formed in eastern Pennsylvania in 1763 to oppose the march on Philadelphia of the Paxton Boys, though civil authorities also called on British regulars. Similarly, when faced with unrest among armed tenants in Albany, Dutchess, and Westchester counties in 1765, New York authorities also called in British regulars. By 1770 most New York militia companies had not trained for several years.[153] In fact New York's legislature failed to enact a militia law between 1768 and 1772.[154] Only in North Carolina in 1771 at the battle of the Alamance did militiamen prove capable of putting down armed civilian protesters who called themselves Regulators.[155]

Lax regulation was evident in the organization and discipline of other colonies' militias. In New Hampshire, the militia regulations were so little observed in the early 1770s that the governor "was sure there was not four

ounces of powder per man or one musket to every four men."[156] Even in neighboring Massachusetts there were signs that militia units had deteriorated and training had become infrequent.[157] Writing in 1773, Governor William Franklin of New Jersey confessed that of his colony's twenty thousand militiamen, "not above half that number are regularly mustered and trained according to the law."[158] In Virginia militia officers along the frontier had a hard time mobilizing and disciplining their men during Dunmore's War in 1774.[159] Georgia's militia law was not renewed in 1770 and lapsed until 1773, which led to confusion.[160]

Despite the continuing decay of the militia even in New England, patterns in the private ownership of firearms as indicated by their presence in samples of probate inventories of deceased males seem to have remained relatively consistent from the 1740s to the early 1770s (tables 4 and 7). The impressment and purchase of privately owned firearms during the war years were apparently offset by the movement of some publicly owned firearms into private hands and by the ongoing importation of firearms by merchants and their sale to private individuals. In western Massachusetts (Hampshire County), over 60 percent of inventories continued to list firearms, while in areas closer to the coast in Massachusetts—Plymouth, Essex, and rural Suffolk counties—and in Connecticut, levels of firearm ownership found in inventories ranged from one-half to two-thirds (tables 4 and 7). Probate inventories from inland Worcester County still recorded particularly low levels of firearm ownership. Inventories probated in ports such as Gloucester, Marblehead, Newburyport, and Salem in Essex County, which were home to fishermen, mariners, and transients, recorded even lower levels of firearm ownership in the mid-1770s (table 7).

Elsewhere in the mainland British colonies, the levels of private gun ownership found in probate inventories on the eve of the American Revolution document the persistence of patterns established earlier in the 1700s (table 7). In rural New York, percentages of gun ownership in surviving probate inventories were higher than those found in the 1740s (table 7). To the south in the region stretching from the Hudson River to the Delaware River Valley, the legacy of the Quaker proprietors persisted. In Pennsylvania and Delaware, raising provincial troops and the temporary establishment of militias during the Seven Years' War did not produce significant changes in the patterns of private gun ownership, which overall remained lower than those found in inventories from New England and the southern colonies. The percentage of inventories containing firearms ranged from 30 to 38 percent in Chester

Exhibit 22

TABLE 7. PROBATE INVENTORIES OF MALES CONTAINING GUNS, PISTOLS, RIFLES, AND SWORDS IN SELECTED AREAS OF THE BRITISH MAINLAND COLONIES ON THE EVE OF THE REVOLUTION.

| Location | Number in sample | % inventories with firearm* | % inventories with rifles | % inventories with pistols | % inventories with swords |
|---|---|---|---|---|---|
| Rural Essex County, Mass. | 50 | 64.0 | 0.0 | 8.0 | 24.0 |
| Ports in Essex County, Mass. | 42 | 30.9 | 0.0 | 0.0 | 16.7 |
| Rural Suffolk County, Mass. | 44 | 52.3 | 0.0 | 2.3 | 13.6 |
| Boston, Mass. | 50 | 43.1 | 0.0 | 12.0 | 18.0 |
| Plymouth County, Mass. | 31 | 58.1 | 0.0 | 3.2 | 19.4 |
| Worcester County, Mass. | 40 | 42.5 | 0.0 | 5.0 | 10.0 |
| Hampshire County, Mass. | 26 | 65.4 | 0.0 | 0.0 | 11.5 |
| Connecticut | 59 | 52.5 | 0.0 | 5.1 | 22.0 |
| Rural New York | 38 | 52.6 | 2.6 | 13.2 | 15.8 |
| New York City | 13 | 38.5 | 0.0 | 23.1 | 23.1 |
| Burlington County, N.J. | 21 | 33.3 | 0.0 | 0.0 | 0.0 |
| Salem County N.J. | 63 | 38.0 | 0.0 | 1.6 | 3.2 |
| Rural Philadelphia County | 67 | 40.0 | 0.0 | 3.0 | 4.6 |
| Philadelphia | 52 | 38.5 | 0.0 | 17.3 | 19.2 |
| Frontier Pennsylvania | 28 | 32.1 | 10.7 | 0.0 | 0.0 |
| Kent County, Del. | 25 | 64.0 | 4.0 | 8.0 | 0.0 |
| Maryland | 56 | 60.7 | 1.8 | 8.9 | 7.1 |
| York County, Va. | 55 | 56.4 | 1.8 | 16.3 | 16.3 |
| Lunenburg County, Va. | 15 | 80.0 | 20.0 | 6.7 | 13.4 |
| Augusta County, Va. | 30 | 70.0 | 13.3 | 6.7 | 0.0 |
| Halifax County, N.C. | 35 | 74.3 | 0.0 | 5.7 | 37.1 |
| Orange County, N.C. | 30 | 70.0 | 33.3 | 0.0 | 10.0 |
| Lowlands S.C. | 47 | 80.1 | 0.0 | 44.7 | 38.3 |
| Charles Town, S.C. | 25 | 48.0 | 0.0 | 24.0 | 28.0 |

* Includes pistols and rifles.

SOURCES:
Most of the data in this table are taken from inventories of male decedents, in American Colonial Wealth: Documents and Methods, ed. Alice Hanson Jones, 3 vols. (New York: Arno Press, 1977).

ADDITIONAL DATA HAVE BEEN OBTAINED FROM THE FOLLOWING SOURCES:
Rural New York and New York City, 1768–1774: Inventories of Estates from New York City and Vicinity, 1680–1844, microfilm, New York Historical Society; Inventories and Accounts, 1666–1822, New York (State), Court of Probates, microfilm, New York State Archives, Albany. Salem County, N.J., 1770–1775: Salem County, N.J., "Inventories, Wills, and Administrative Papers," 1770–1775, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.
York County, 1771–1775: York County Deeds, Orders and Wills, 22 vols., typed transcriptions, Department of Historic Research, Colonial Williamsburg Foundation, Williamsburg, Va.
Lunenburg County, 1770–1775: Will Book no. 2, 1762–1778, microfilm, in author's possession, Amherst College.
Augusta County, 1773–1774: Will Book no. 5, 1772–1778, microfilm, in author's possession, Amherst College.

New Jersey and from roughly 38 to 40 percent in eastern Pennsylvania. In frontier areas of Pennsylvania, which lacked significant Quaker populations, the percentage was actually lower, 32 percent. Most of these firearms were not military muskets but guns for fowling, hunting, and controlling vermin. Ironically, in Pennsylvania, only in the City of Brotherly Love does one find a noticeable minority of inventories with such antipersonnel weapons as pistols and swords.

The proportion of male decedents' estate inventories mentioning firearms in the tidewater region of the Chesapeake, in the Carolina lowlands, and in the uplands of the South ranged from 56 to 80 percent (table 7), comparable to the levels found in sampled inventories for most of the colonial period in this region. Evidence of gun ownership in probate inventories from Lunenburg and August counties in Virginia and Orange County, North Carolina (table 7), also provides some support for the historian Matthew Ward's suggestion that the Seven Years' War "may also have played a vital role in the 'arming' of the backcountry," whereas "before the war many backcountry settlers had no need for arms."[161] At the same time, the proportion of inventories listing guns dipped lower in more secure jurisdictions containing urban areas such as Charles Town, South Carolina, and York County, Virginia, which included Williamsburg, the colony's capital, and the river port of Yorktown.

Pistols were more likely to show up in inventories from southern cities such as Charles Town and Williamsburg and in those from the northern cities of Boston, New York, and Philadelphia (table 7). Of the 624 pistols listed in the

Exhibit 22
Page 00465

Case 3:20-cv-02470-WQH-MMP   Document 61-1   Filed 10/13/23   PageID.6559   Page 138 of 158

1755 Rhode Island census of private arms, 42.6 percent were found in Newport.[162] In urban environments, pistols, which had limited range and accuracy, could have provided their owners with some protection. In most rural areas of New England and the middle colonies, pistols usually appeared in less than 10 percent of the inventories. Probate inventories thus provide little support for the belief that "civilians commonly carried" pocket-sized pistols "for protection whenever traveling,"[163] or that handguns were in common use at the time even though they were less expensive than long arms. In southern colonies, pistols were found more frequently in rural regions than in the North, because southern militiamen rode on slave patrols. Militarily, the use of pistols was as a rule limited to horsemen and officers.[164] South Carolina did have a mounted militia regiment, which probably accounts for the unusually large percentage of this colony's rural probate inventories that contained pistols and swords.[165]

A personal firearm with a greater potential for military use was the long rifle, which could be found in inventories of upland areas such as Augusta, Lunenburg, and Orange counties (table 7). Originally based on heavier, shorter-barreled German hunting rifles, the longer-barreled, slender-stocked American long rifle evolved in Pennsylvania during the 1730s and 1740s as a firearm for hunting.[166] As a rule long rifles weighed between seven and eight pounds, had .58- to .62-inch bores, though some were even smaller, and fired balls, depending on the bore, that weighed from eighteen to thirty-six to the pound.[167] Because of the rifling of the barrel, these guns were more accurate than smoothbore muskets and outranged them as well, enabling a skilled marksman to hit a target at two to three hundred yards. But because of the barrel's rifling, the tight fit of its balls, and the use of a greased patch to enhance the ball's ability to grab the grooves in the rifled barrel, a long rifle took two to three times longer to load than a smoothbore musket. Rifles also could not be fitted with bayonets, and because of their slender stocks were more vulnerable to breakage on a battlefield. Despite their shortcomings as military arms, some of Pennsylvania's provincial soldiers carried rifles in the late 1750s.[168] Still, rifles, which were more expensive than smoothbore muskets, remained uncommon outside the backcountry of Pennsylvania and the southern colonies and were rare east of the Hudson River.

During the political agitation of the early 1770s, firearms and militias acquired a political importance that had previously been largely latent and unexpressed. Now it became overt as the mere display of guns came to

embody the political demands and inherent power of an aroused populace. In the assessment of the historian Lawrence Cress, colonists had actually been slow "to inject the citizen-soldier ideal into the ideological context developing in prerevolutionary America."[169] This situation was in large measure a result of the fact that by the mid-eighteenth century, colonial militias had assumed such a secondary role in defending the colonies, particularly the middle and southern colonies. It was only after the March 5, 1770, Boston Massacre that the militia entered the mainstream of public debate even in New England. After the passage of the Coercive Acts in 1774, the militia and the ideal of the citizen soldier came to be regarded as centrally important to an American ideology of republicanism.[170] By 1774, patriot leaders and legislative assemblies throughout the colonies were giving expression to this recently rediscovered ideal that "a well regulated militia, Composed of gentlemen and yeomen, is the natural strength and only security of a free government."[171] Not for the first time during the revolutionary era, ideology trumped practicality and history in discussions of the militia.

To put this rediscovered ideal into practice, colonists took over existing units of the colonial militias, revived the Associator tradition in Pennsylvania, and in some instances created new volunteer military units. In Massachusetts and New Hampshire, patriot leaders assumed control of existing militias by replacing, where necessary, uncooperative officers who had been appointed by royal governors.[172] To characterize this process as "individuals banding together in militias of association," or as a "resort to quasi-private and extralegal militias of association," slights the close resemblance between the prerevolutionary militias and their immediate predecessors.[173] The resemblance between the colonial and revolutionary militias was even closer in Connecticut and Rhode Island, where popularly elected colonial governments and the existing militias transferred their allegiance and along with it their authority to the patriot cause. In the southern colonies, patriots and the colonial legislatures that they controlled took over and breathed new life into their militias, though the process was not without conflicts as yeoman farmers in Virginia and loyalists in the Carolinas and Georgia resisted these efforts.[174] Eventually militias loyal to revolutionary state governments were created, though Georgia's militia proved to be "highly ineffective in stopping the constant raids from Florida, did not fill the ranks of the Continental Line, and did very little to contain the native Americans."[175]

The reorganization of Maryland's militia and its transformation are particularly well documented. In December 1774 Maryland's Provincial Convention

Exhibit 22
Page 00466

passed a new militia act that began by acknowledging that "a well regulated militia composed of the gentlemen, freeholders, and other freemen, is the natural strength, and only stable security of a free government."[176] This law was part of a conscious effort to create a military force that would be able to fight conventional set piece battles.[177] Responding to a call from the Continental Congress, Maryland passed a law in July 1775 that created forty companies of minutemen, who constituted a select militia of volunteers who were organized into separate units, armed by the state, and trained twice a week. Unlike the colonial militia, minutemen could be marched "to such places, either in this or the neighboring colonies and at such times as we shall be commanded by the Convention."[178] In January, yet another militia law reduced exemptions from service in the militia and set up a classing system that provided for calling out militiamen on a rotating basis for two-month periods of active service. Unlike its colonial predecessor, the resulting revolutionary militia was a "microcosm" of Maryland society in that exemptions no longer had a socioeconomic bias and the classing system distributed active service across all classes.[179] Those who did not enroll in the militia by March 1776 were systematically disarmed.[180]

Not surprisingly, patriot leaders and revolutionary governments in the colonies lying between Connecticut and Maryland faced greater challenges because of these colonies' lack of strong traditions of militia service and their current political divisions. Because of these divisions, popular actions in New York and New Jersey played prominent roles in forming voluntary military companies that initially stood outside the existing colonial militias.[181] Early in 1775, some residents of New York City "formed themselves into companies under officers of their own choosing [and] distributed the [public] arms."[182] At about the same time, a wary royal governor of New Jersey reported men "arming themselves, forming into companies, and taking uncommon pains to perfect themselves in Military Discipline."[183] During 1774 and 1775, patriots in Pennsylvania acting on their own revived the Associator tradition and created fifty-three battalions, which received legislative sanction in November 1775.[184] As a number of these units joined the Continental Army and the *rage militaire* that supported such voluntary efforts flagged, Pennsylvania passed a compulsory militia law early in 1777.[185] In 1775 Delaware's revolutionary legislature acknowledged, "We have for sometime past been carelessly negligent of military art and discipline, and are therefore the more exposed to the insult and ravages of our natural enemy."[186] Despite its best efforts, Delaware never really succeeded in overcoming these decades of neglect. In the assessment of

one historian, "the Delaware militia displayed markedly little enthusiasm for the war effort, and the state's citizenry seemed more intent on avoiding, not confronting, the advancing redcoats and Germans."[187]

The rebelling colonists sought to equip their militias and Continental regulars with military firearms and in doing so set a high bar. In July of 1775, the Continental Congress recommended to the states that each militiaman "be furnished with a good musket, that will carry an ounce ball, with a bayonet, steel ramrod, worm, priming wire and brush fitted thereto, a cutting sword or tomahawk, a cartridge-box, that will contain 23 rounds of cartridges, twelve flints and a knapsack."[188] Steel or iron ramrods, which were a relatively recent refinement in military long arms, were seen as an improvement over wooden ramrods that speeded up the process of loading: New York's Committee of Safety concluded that the city's store of military muskets "at present fitted with ordinary wooden rammers . . . cannot be of much use in case of necessity."[189] Not all contracts for producing muskets conformed to these specifications; calibers varied from .67 to .90 and weights ranged from nine to twelve pounds.[190] But as a rule, provincial congresses, Committees of Safety, and other officials specified a stand of arms consisting of a heavy, large-caliber musket, bayonet, and cartridge box.

Just about everywhere, even in parts of New England, revolutionary officials encountered difficulties in obtaining such arms for their militias in 1774 and 1775. The problem was only compounded by the often competing efforts to raise and arm troops for the Continental Army starting in mid-1775. According to Governor Nicholas Cooke, Rhode Island's militiamen had by then "disposed of their arms so generally, that at the breaking out of the present war, the colony was in a manner disarmed." The state appointed twenty-nine men to take an account of all public and private "powder, arms, and ammunition" and "directed and empowered [them] to go to the house of each person in their respective towns; to take an account of the power, arms and ammunition."[191] In the end, reported Cooke, the state used "every method in our power, by purchasing, by employing manufacturers, and by importation, to procure a sufficient quantity, but are still deficient."[192] Governor Cooke's assessment appears to have exaggerated the situation. Fragmentary returns from a Rhode Island gun census conducted in late 1775 and early 1776 indicate that a little over 60 percent of the "Persons Able to Bear Arms" had some kind of firearm, which was actually somewhat better than the situation in Rhode Island in 1755 (table 5).[193] Still, in March 1776 the Rhode Island General Assembly voted to buy "two thousand stand of good fire-arms with

Exhibit 22
Page 00467

bayonets, iron ramrods and cartouche boxes," stamp them with C.R., and distribute them to the individual towns, and empowered the towns' councils "to determine what persons in their respective towns shall have the benefit and use of the arms provided."[194]

In New Hampshire the availability of firearms appears to have been about the same as in Rhode Island, though the figures varied dramatically from town to town (table 8).[195] Incomplete returns from a 1775 New Hampshire census reported that eighty towns with 8,443 males over the age of sixteen (and 6,790 between sixteen and fifty) had a total of 4,189 firearms but lacked 3,173 firearms to arm completely their 7,362 militiamen, suggesting that 56.9 percent of the men between sixteen and sixty had firearms. Viewed another way, eighty-eight New Hampshire towns with 9,505 men over the age of sixteen (and 7,664 between sixteen and fifty) indicate that they lacked 3,610 firearms, suggesting that 47.1 percent of these towns' total of approximately 8,288 militiamen (estimated as 87.2 percent of the men over 16) lacked guns.[196] Petitions from concerned residents of the state's towns show a variation ranging from less than a fifth, to half, to three-quarters armed.[197]

The militias of Massachusetts and Connecticut appear to have been better armed at the outset of hostilities. Even before any fighting had occurred, both colonies took steps to make up for shortfalls in militia arms. In November 1774 the Massachusetts Provincial Congress ordered fifteen thousand muskets, which, with the aid of Benjamin Franklin, were shipped from France to Boston via Philadelphia.[198] Connecticut and Massachusetts also ordered militia officers and local officials to recover public arms that had passed into private hands during and after the Seven Years' War.[199] Finally, both colonies resorted to pressing arms and compensating owners.[200] By April 1775 the "Warlike Stores" in Massachusetts included 21,549 firearms and 10,108 bayonets.[201] Scattered strength returns for militia units and minute companies from Massachusetts for the years 1775 and 1776 suggest that over 80 percent of the state's militiamen were armed, though not all of these arms appear to have been military muskets, and bayonets were lacking.[202] Fragmentary militia returns from Connecticut suggest that the state could equip somewhere between 60 and 75 percent of its able-bodied men.[203]

Because of internal divisions, severe fighting in 1776 and 1777, and sustained military occupation by British forces in some areas, it is difficult to reconstruct the degrees to which the militias of New York and New Jersey were armed before fighting began in this area. Patriots had seized public and royal

TABLE 8. DISTRIBUTION OF FIREARMS, NEW HAMPSHIRE, 1769–1771, FROM 1775 CENSUS AND PROBATE INVENTORY DATA.

| Number of towns | Number of males over 16 | Number of males 16–50 not in army | Number of guns found in town or inventory | Average number of guns per male over 16 | Average number of guns per male 16–50 | Number of guns wanting in town | Average number of guns wanting per male 16–50 |
|---|---|---|---|---|---|---|---|
| A. 27 towns with guns found | 3,162 | 2,462 | 1,872 | .59 | .76 | — | — |
| B. 80 towns with guns found and guns wanting | 8,443 | 6,790 | 4,189 | .50 | .62 | 3,173 | .47 |
| C. 107 towns = total rows A and B | 1,605 | 9,252 | 6,061 | .52. | .66 | — | — |
| D. 8 towns with guns wanting | 1,062 | 874 | — | — | — | 437 | .50 |
| E. 88 towns = total rows B and D | 9,505 | 7,664 | — | — | — | 3,610 | .47 |
| F. 18 towns with no returns for guns* | 3,166 | 2,562 | — | — | — | — | — |
| G. Inventories from rural New Hampshire, 1769–1773 | 88 | | 60 | .68** | | | |

*Portsmouth did not return data on guns and is included in this group of eighteen towns for which there are no useful returns. Because of this omission, Portsmouth probate inventories were excluded from the group of New Hampshire probate inventories 1769–1773.

**Average number of guns per probated male decedent, all of whom would have been over twenty-one. It is not surprising that a higher average since it does not include males between sixteen and twenty, who were less likely to own firearms.

SOURCES:

1775 census data from "Census of New Hampshire, 1775," in *Provincial Papers: Documents and Records relating to the Province of New Hampshire*, comp. and ed. Nathaniel Bouton, vol. 7 (Nashua: Green C. Moore State Printer, 1873), 724–79.

Probate data from New Hampshire Probate Records, vol. 5, 1700–1773, and vol. 26, 1769–1771, microfilm, Historic Deerfield Library, Deerfield, Mass.

Exhibit 22
Page 00468

arms in New York City in April and May 1775.[204] Scattered regimental returns for New York from 1776 and 1777 indicate that three-quarters of their officers and men were armed. Still, in July 1776 New York authorized county authorities to arm militia levies drafted into the Continental Army but "hav[ing] no arms by taking them from those [militiamen] not drafted and such other persons in the districts as have arms," a solution that only worsened the situation in local militia companies.[205] The next year, the Supreme Executive Council of New York reported that the militias of Tryon, Albany, Charlotte, Gloucester, and Cumberland counties (the latter two located in what is today Vermont) remained improperly armed when reviewed in February 1777.[206] Four years later some militiamen in this area "were occasionally supplied from the Cont'l [Continental] armory in this place [Albany]."[207] And by 1780 Colonel Samuel Drake's Westchester County militia regiment of 446 men had only 212 guns, 146 bayonets, 167 cartridge boxes, no powder, and no lead.[208]

New Jersey began the conflict with "a very considerable number of muskets and bayonets" that had been distributed "to Court-Houses, or some other particular places in each County."[209] This attracted the attention of New York authorities, who wanted to use these weapons to arm their own Continentals. Early in 1776, both New Jersey and New York had begun disarming loyalists and transferring their weapons to patriot militias and Continental regiments.[210] Two regimental returns for New Jersey—one from 1779 and another from 1780—report that three-quarters of these militiamen were armed.[211] Given the date of these returns, it's possible that they include firearms seized from loyalists and firearms provided from state and possibly Continental stores.[212]

East of the Delaware River, firearms in general were harder to obtain.[213] In Pennsylvania, patriots initially took up subscriptions to arm poor Associators, and the assembly called upon the counties to supply their citizens with a total of six thousand firearms.[214] Eventually, the assembly voted to order five thousand muskets with bayonets. Maryland contracted for 5,600 stands of arms.[215] In July 1776 Pennsylvania also disarmed non-Associators and ordered that their arms be given to Associators or units of the Continental Line.[216] Both states committed themselves to obtaining enough public arms to equip two classes of their militias when they were mobilized.[217] Over the course of the war, "many thousands of arms had been distributed to the militia of Pennsylvania especially throughout the very extensive frontier counties."[218] Despite these efforts, mobilized militiamen from Pennsylvania and Maryland

lacked the arms they needed to resist British troops in the late summer of 1777, when a British army under Sir William Howe invaded Pennsylvania.[219]

Farther south there is more evidence of serious shortfalls when it came to arming militiamen. Military arms were initially scarce in Virginia, where authorities refurbished seventeenth-century firearms, purchased rifles from men in the backcountry, and in one instance recovered some "eighty guns, some bayonets, swords, etc. from their slaves."[220] By late 1775 and early 1776, militia units in different parts of Virginia were reported as being "less than half armed," with "but few arms," "without arms," and "badly armed" because they had given their best arms "to the soldiers intended for their immediate protection."[221] Strength returns for regiments made up of mobilized militiamen from North Carolina and South Carolina taken in 1776 and 1778–79, respectively, suggest that over 80 percent of militiamen on active military service in the field were armed.[222] But evidence is lacking on the quantity and quality of arms found in units of militiamen in 1775 and early 1776 in the Carolinas. And according to James Biser Whisker, "Georgia's militiamen were poorly supplied, many being without blankets, canteens, knapsacks, shoes or firearms."[223]

These problems arose from the unprecedented mobilizations of manpower being attempted and because of the expanded military roles given to the organized militias. In recent years historians have tended to slight the militia's military role during the War of Independence, especially on the battlefield.[224] Instead they have emphasized the militia's political role in enforcing loyalty to the new state government and intimidating loyalists. Some have acknowledged the usefulness of the militia for preventing British forces from maneuvering, raiding, and, most important, foraging. Such activities by militiamen helped pen British forces in seaports, which created logistical nightmares for the government in London. But to make these efforts possible, militia call-ups and time spent on active service by mobilized militiamen expanded well beyond anything attempted since the late 1600s in New England, and in most other states exceeded anything ever attempted. Men enrolled in militia units were also called upon to serve outside their states and to face professional soldiers in battle, actions that were rarely if ever demanded of colonial militiamen.

The scale of the demands for manpower and the ages of those who enlisted or were called up placed strains on available supplies of firearms. In 1776 Connecticut called up 18,915 men, a figure that represented almost 70 percent of

Exhibit 22
Page 00469

its militia strength that year, and approximately 45 percent of its entire male population between the ages of sixteen and fifty.[225] A similar proportion of the colony's males between these ages may have been mobilized and served over the entire course of the French and Indian War from 1755 to 1763, but not in just one year. During the War of Independence, around half of Virginia's white men over the age of sixteen saw active service in the Continental Army or as activated militiamen. Of these Virginians, those who saw duty only as mobilized militiamen and spent no time in the Continental Army still accumulated on average a total of over a year in active service.[226] In Virginia and Massachusetts, those who served as mobilized militiamen, not just as Continentals, tended to be in their late teens and early twenties.[227] As was the case earlier, these younger men were less likely to own firearms, and the deficiency had to be made up from other sources.

The performance in the field of units composed solely of mobilized militiamen during actual campaigns and in battle varied according to fairly predictable patterns. During the 1776 New York campaign and the 1777 Philadelphia campaign, some militia regiments from New England to Maryland distinguished themselves, if at all, only by the speed with which they fled and on occasion threw away their firearms. Washington's complaints about the performance of most militia units in these two campaigns are well known.[228] But the usefulness of the militiamen improved as Washington learned how to work with them. The sustained performance in the field by New Jersey's militia in 1777 earned it praise from both patriots and its foes.[229] The same year also saw over twenty thousand New England militiamen mobilized, with most of them serving out of state in Rhode Island, Vermont, and upstate New York, where they contributed significantly to the American victories at Bennington and Saratoga.

The contrast between these militiamen and the performance of the militias of the middle states in the 1777 campaign around Philadelphia was not lost on Washington. He observed with envy that "the states of New York and New England resolving to crush Burgoyne, continued pouring in their militia, till the surrender of that army, at which time not less than 14,000 militia . . . were actually in General [Horatio] Gates's camp and those composed, for the most part, of the best yeomanry in the country, well armed, and in many instances, supplied with provisions of their own carrying."[230] Regimental returns support Washington's claims about the continued ability of a majority of New England's militiamen to arm themselves.[231]

The organized militias of the southern states saw less extended service during the early years of the War of Independence. North Carolina's militia defeated a gathering of partially armed loyalists at Moore's Creek Bridge in 1776, and militiamen in South Carolina had seen active service suppressing loyalists in 1775, campaigned against the Cherokees in 1776, and aided in repelling Henry Clinton's June 1776 attack on Charleston.[232] The situation changed abruptly in late 1778, when the British captured Savannah, and then in 1780, when they laid siege to Charleston. When the city fell on May 12, over six thousand Continentals and militiamen and their arms were lost. At Camden, South Carolina, on August 16, 1780, the British destroyed another newly created American army consisting of Maryland and Delaware Continentals, who fought valiantly, and of militiamen from North Carolina and Virginia, who threw down their guns and broke without firing a shot. Militiamen from the Carolinas and Virginia gave a better account of themselves in the American victories at King's Mountain and Cowpens in South Carolina and at the Battle of Guilford Court House in North Carolina. General Charles Cornwallis grudgingly acknowledged the effectiveness of some southern militiamen he had encountered, with qualified contempt: "I will not say much in praise of the Militia of the Southern Colonies but the list of British officers & Soldiers killed & wounded by them since last June [1780] proves but too fatally that they are not wholly contemptible."[233]

These battles in the Carolinas during 1780 and 1781 placed a great burden on Virginia and its militia. All of the state's Continental regiments and about a thousand of the state's muskets were captured at Charleston, and approximately four thousand more of Virginia's muskets had been sent to arm North Carolina's militia and were also lost.[234] During 1780 and 1781 British forces invaded Virginia three times, and for most of these years one-quarter of the state's militia was always in the field on active service.[235] Repeated calls to service exhausted the state's militiamen, and great quantities of both private and public firearms were lost.[236] To meet these demands, Governor Thomas Jefferson distributed public arms to militiamen and ordered militia officers to impress any usable firearms, which only compounded the problem.[237] By the spring of 1781 the situation had reached a crisis. Around Richmond, three hundred out of five hundred militiamen arrived unarmed, and another five hundred had to be discharged for "want of arms"; in the north along the Potomac River, only sixty of two hundred militiamen had arms; and along the North Carolina border, only fifty guns were reported in Brunswick County,

Exhibit 22
Page 00470

which mustered "upwards of six hundred Militia."[238] In September 1781, on the eve of the siege at Yorktown, eight hundred militiamen drawn from six counties had only 220 guns, of which 120 were "small guns" (probably trade guns and light fowlers) and not muskets.[239]

The lack of arms and increasing war weariness, combined with the Royal Navy's superior mobility, allowed the British to move through Virginia unopposed, laying waste to the countryside and destroying arms and matériel.[240] Militiamen proved unable "to repel . . . ravaging Parties of the Enemy," who were "armed only with swords and Pistols."[241] Former lieutenant governor John Page found it "to our eternal disgrace to be unarmed and undisciplined after five years [of] war [as] are our militia."[242]

While the situation in Virginia may have been extreme, it appears that eight years of war had removed a lot of firearms from private hands by the early 1780s (table 9). In some areas the percentages of probate inventories of male decedents listing firearms remained largely unchanged from those found in the early 1770s or actually increased a bit. In particular, these levels of ownership could be found in areas close to the fighting, where men in militia units often played active roles but were spared the effects of catastrophic defeats. Militiamen from Plymouth and Worcester counties in Massachusetts had been mobilized to contain the British in Newport, Rhode Island, while militiamen from Dutchess and Ulster counties in New York had helped defend the Hudson Highlands, and militiamen armed with rifles from Augusta County, Virginia, had served in a number of campaigns but as a rule did not have their special weapons impressed (table 9). It is also possible that militiamen serving in these situations were more likely to have benefited from the flow of firearms primarily from public stores into private hands that was produced by the distribution of public arms and the inevitable pilferage that went on.

In most instances, firearms moved from private hands into state or Continental stores, where increasingly they were stamped to indicate public ownership, regardless of the source.[243] Loyalists had been disarmed in most areas controlled by revolutionaries.[244] Where loyalists asserted or British forces reasserted royal authority, revolutionaries were disarmed.[245] Occupied cities had been disarmed beginning early in 1775, when General Gage got Boston's residents to surrender 1,778 muskets, 634 pistols, 978 bayonets, and 38 blunderbusses.[246] The percentages of inventories with firearms in both New York City and Philadelphia were much lower in the early 1780s than they had been in the early 1770s (tables 7 and 9). Both American and British forces had plundered homes for arms in war zones such as Westchester County, New York, and throughout the Carolinas,[247] where a significantly smaller percentages of inventories contained firearms by the early 1780s.

Elsewhere outside of war zones, some firearms had also apparently passed from private owners to Continental soldiers and activated militiamen. After the war the percentages of probate inventories containing firearms declined a bit in some areas that had experienced little or no fighting, such as western Massachusetts (Hampshire County), central Connecticut (Wethersfield), southern New Jersey (Salem County), and Lunenburg County, Virginia. Weapons had been lost in service elsewhere, and wastage had claimed other firearms. Preventing the wastage of weapons was a particular concern for Washington, who believed—somewhat counterintuitively—that a soldier or militiaman was harder on a privately owned firearm because "he is at liberty to use his own firelock as he pleases."[248] But decay and wastage were inevitable, especially in the field; the average life expectancy of an eighteenth-century British military musket is believed to have been eight to ten years.[249] During the economic downturn after the war, men may not have had the funds to purchase a new firearm or may not have seen a need to purchase one after independence had been secured.

The states were in no position to supply the militias' lack of arms during the 1780s. Writing during this period on the state of Virginia, former governor Jefferson explained that "the law requires every militia-man to provide himself with arms usual in regular service [i.e., Continental Army]. But this injunction was always indifferently complied with, and the arms they had have been so frequently called for to arm the regulars [the American Continentals], that in the lower parts of the country they are entirely disarmed. In the middle country a fourth or fifth part of them may have such firelocks as they had provided to destroy the noxious animals which infest their farms."[250] Near the end of the decade another former wartime governor, Patrick Henry, lamented, "We have learned by experience, that necessary as it is to have arms, and though our Assembly has, by a succession of laws for many years endeavored to have the militia completely armed, it is still far from being the case."[251] Militia returns confirm their assessment. By the early 1780s, only 37.2 percent of Virginia's militiamen carried private arms, another 9.2 percent had public arms, and the remaining 53.8 percent appear to have lacked the necessary firearms.[252]

Other state militias were probably in no better shape in the aftermath of the War of Independence. In Pennsylvania, some militiamen remained dependent on publicly supplied firearms and protested late in 1787 when their state

Exhibit 22
Page 00471

KEVIN M. SWEENEY

TABLE 9. PROBATE INVENTORIES OF MALES CONTAINING GUNS, RIFLES, PISTOLS, AND SWORDS, SELECTED AREAS, EARLY 1780s.

| Locations and dates | Number of inventories in sample | Percentage of inventories with firearm* | Percentage of inventories with rifles | Percentage of inventories with pistols | Percentage of inventories with swords |
|---|---|---|---|---|---|
| Plymouth County, Mass., 1784–85 | 42 | 54.8 | 0.0 | 2.4 | 9.5 |
| Worcester County, Mass., 1784–85 | 52 | 42.3 | 0.0 | 1.9 | 3.8 |
| Hampshire County, Mass., 1784–85 | 78 | 48.7 | 0.0 | 3.8 | 5.1 |
| Wethersfield, Conn., 1783–1785 | 26 | 30.8 | 0.0 | 0.0 | 23.1 |
| Hudson Valley, N.Y., 1783–1786 | 25 | 80.0 | 0.0 | 8.0 | 16.0 |
| Westchester County, N.Y., 1783–1786 | 37 | 21.6 | 0.0 | 0.0 | 2.7 |
| Long Island, N.Y., 1783–1786 | 33 | 51.5 | 0.0 | 18.2 | 21.2 |
| New York City, 1783–1786 | 37 | 24.3 | 0.0 | 5.4 | 5.4 |
| Salem County, N.J., 1784–85 | 40 | 27.5 | 0.0 | 0.0 | 5.0 |
| Rural Philadelphia County, 1784–85 | 78 | 32.1 | 1.3 | 3.8 | 3.8 |
| Philadelphia, 1784–85 | 55 | 10.9 | 0.0 | 1.8 | 7.3 |
| Maryland, 1784–85 | 59 | 54.2 | 0.0 | 0.0 | 5.1 |
| York County, Va., 1783–1785 | 23 | 61.0 | 0.0 | 8.7 | 8.7 |
| Lunenburg County, Va., 1783–1785 | 24 | 45.8 | 0.0 | 0.0 | 20.8 |
| Augusta County, Va., 1784–85 | 27 | 66.7 | 30.0 | 3.7 | 7.4 |
| South Carolina, 1784–85 | 77 | 44.2. | 1.3 | 9.0 | 10.4 |

*Includes inventories with pistols and rifles.

SOURCES:
Plymouth County: Plymouth County Probate Records, vol. 29, microfilm, Massachusetts Archives, Boston.
Worcester County: Worcester County Probate Records, vols. 18–19, microfilm, Massachusetts Archives, Boston.
Hampshire County: Hampshire County Probate Records, vols. 14–16, microfilm, Historic Deerfield Library, Deerfield, Mass.
Wethersfield: Photocopies of Wethersfield Probate Inventories, Research Files, Webb-Deane-Stevens Museum, Wethersfield, Conn. Made from the originals at the Connecticut State Library, Hartford.
Hudson Valley, Westchester County, Long Island, and New York City: New York (State), Court of Probates, microfilm J0301, New York State Archives, Albany.
Salem County: Salem County Inventories, Wills, and Administrative Papers, 1784–85, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.
Rural Philadelphia County and Philadelphia: Wills of the County of Philadelphia, Pennsylvania, 1784–85, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.
Maryland: Queen Anne County, Inventories and Accounts, vol. RW, no. 1, 1784–1786, Maryland Archives; Ann Arundel County, vol. TG, no. 1, 1780–1787, Maryland Archives, both in author's possession.
York County: York County Deeds, Orders and Wills, vols. 19–20, typed transcriptions, Department of Historic Research, Colonial Williamsburg Foundation, Williamsburg, Va.
Lunenburg County: Will Book, no. 3, 1778–1791, microfilm, in author's possession, Amherst College.
August County: Will Book, no. 6, 1778–1787, microfilm, in author's possession, Amherst College.
South Carolina: Charleston County, Inventories A, 1783–1787, microfilm, Historic Deerfield Library, Deerfield, Mass.

called them in to clean them and possibly redistribute them to the state's exposed frontier counties.[253] Three years later Pennsylvania and Kentucky militiamen were mobilized to join General Josiah Harmar's expedition against Natives in the Ohio Country. Major William Ferguson, a regular army officer who inspected their arms, found those of the Kentucky militiamen to be "generally very bad, and unfit for service."[254] The Pennsylvania militiamen "were equipped nearly as the Kentucky, but were worse armed, several were without any [firearms]. The General [Harmar] ordered all the arms in store to be delivered to those who had none, and those whose guns could not be repaired."[255] The quality of men also left much to be desired, "a great number of them *substitutes*, who probably had never fired a gun . . . and were so awkward, that they could not take their gunlocks off to oil them, and put them on again, nor could they put in their flints."[256]

It is also telling that in the fall and winter of 1786–87, both sides in the confrontation in western Massachusetts that came to be known as Shays's Rebellion appear to have lacked adequate supplies of firearms, or at least they at last

Exhibit 22
Page 00472

supplies of adequate firearms. Historians David Szatmary and Leonard Richards both claim that when Shays's men approached the arsenal in Springfield, Massachusetts, they had only "old guns and wooden clubs" or "old muskets, some with only swords and bludgeons."[257] Things were not much better on the government side. Letters written by militia general William Shepard revealed his desperate situation: he claimed that his mobilized militiamen were "not more than half armed" and "half of the Militia which will be in the field for the defense of the public stores, will not have arms so good as clubs."[258] It is not clear if he was complaining that only half of his men had firearms or that half their guns were worthless, or possibly both. Fragmentary militia returns from the late 1780s suggest that somewhere between 25 and 60 percent of the militiamen in central Massachusetts appeared armed at musters; only about one-fifth had a bayonet.[259]

Given the apparent inadequacy of available firearms, both sides were drawn to the central government's arsenal, with its seven thousand military muskets with bayonets and supplies of powder. General Shepard implored Henry Knox, the Confederation's secretary of war, to give him permission to use the arsenal's stores to arm his state militiamen. In response, Knox claimed that although he was "restrained from authorizing any appropriation of Arms and Stores for state purposes," he was of the opinion "that propriety & necessity would justify the action of taking part of the arms and ammunition for the defense of the remainder."[260] Taking the hint, Shepard armed his militiamen from the Confederation's store of firearms, rolled out three canons, and repelled the insurgents. Once more, as they had in North Carolina in 1771 and would again during the Whiskey Rebellion in 1794, militiamen put down armed citizens protesting what they saw as government oppression.

During this period, some military and political leaders sought to address the problems involving the organization and arming of state militias by establishing national standards and creating a select militia.[261] The most ambitious and detailed proposal was first put forth by Secretary Knox. In 1786 he published a plan calling for the classing of militia into an Advanced Corps consisting of men aged eighteen to twenty, a Main or Active Corps of men aged twenty-one to forty-five, and a Reserve Corps of men from forty-six to sixty. Each state's Advanced Corps, which in its purpose, composition, and training resembled the minutemen of 1775, was to train forty-two days a year and be ready when called upon to march anywhere in the United States.[262] Each new member of the Advanced Corps was to be presented "his arms by the general in the name

of the people of the state as indispensable appurtenances of his character as a free citizen."[263] These military muskets, which would conform to uniform specifications supplied by the United States government, would remain the "unalterable" property of the militiaman.[264] After receiving a favorable reception in the Confederation Congress, Knox's plan was not adopted.[265]

Still, other leaders also favored some system involving the creation of a select militia. George Mason of Virginia believed that "thirteen States will never concur in any one system if the disciplining of the Militia be left in their hands." He therefore proposed at the 1787 Constitutional Convention in Philadelphia that "if they [the states] will not give up the power over the whole, they probably will over part of a select militia," which he spoke in favor of.[266] Another delegate to the convention, Alexander Hamilton, agreed with Mason, arguing in Federalist No. 29 that "the scheme of disciplining the whole nation must be abandoned as mischievous or impractical," and therefore "the attention of the government ought particularly to be directed to the formation of a select corps of moderate size upon such principles as will really fit for service in case of need."[267] At the convention, Oliver Ellsworth of Connecticut argued against a select militia on practical, not ideological, grounds, fearing that it "would be followed by a ruinous declension of the great body of the Militia."[268]

Instead of providing for a select militia, the convention's Committee of Eleven reported a clause that empowered Congress "to make laws for organizing, arming & disciplining the Militia, and for governing such parts as may be employed in the service of the United States reserving to the States respectively, the appointment of officers, and the authority of training the militia according to the discipline prescribed."[269] A member of this committee, Rufus King of Massachusetts, offered by way of explanation that "by *organizing* the Committee meant, proportioning the officers & men—by *arming*, specifying the kind size and caliber of arms—& by *disciplining* prescribing the manual exercise evolutions &c."[270] An apparently concerned James Madison observed that "arming" as explained did not extend to furnishing arms, nor did the term "disciplining" to "penalties & Courts martial for enforcing them."[271] By way of reassurance, King "added, to his former explanation that *arming* meant not only to provide for uniformity of arms, but included authority to regulate the modes of furnishing, either by the militia themselves, the State Governments, or the National Treasury; that laws for *disciplining*, must involve penalties and every thing necessary for enforcing penalties." Madison emphasized that "the primary object is to secure an effectual discipline of the Militia," because he believed that "the States neglect their Militia now, and the more they are

Exhibit 22
Page 00473

consolidated into one nation, the less each will rely on its own interior provisions for its safety & the less prepare its Militia for that purpose."[272] Another delegate from Virginia, Edmund Randolph, echoed Madison's sentiments, "observing that the Militia were every where neglected by the State Legislatures, the members of which courted popularity too much to enforce a proper discipline. Leaving the appointment of officers to the States protects the people agst. every apprehension that could produce murmur."[273]

Other delegates at the convention remained skeptical of granting these powers over the state militias to Congress. Delegate Elbridge Gerry of Massachusetts asserted that "he had as lief let the Citizens of Massachusetts be disarmed, as to take the command from the States, and subject them to the Genl Legislature. It would be regarded as a system of Despotism."[274] Oliver Ellsworth offered an alternative militia clause providing Congress with the power "to establish an uniformity of arms, exercise & organization for the Militia, and to provide for the Government of them when called into the service of the U. States." The object of his substitute wording was "to refer the plan for the Militia to the General Govt. but leave the execution of it to the State Govts."[275] Maryland delegate Luther Martin was also "confident that the States would never give up the power over the Militia; and that, if they were (to do so) the militia would be less attended to by the Genl. than by the State Governments."[276] Still, the proposal to give Congress the power to make laws for organizing, arming, and disciplining the militia passed by a vote of nine to two, with the delegations of Connecticut and Maryland in opposition.

The adoption of the Constitution's militia clause as written did leave several concerns unresolved. Did the clause enable Congress to organize the militia by creating a select militia as Mason advocated and Hamilton and others favored? Did the clause commit the new central government and its "National Treasury" to furnishing military muskets to arm the various state militias? Just what powers were retained by the states to organize, arm, discipline, and employ their militias, particularly in the absence of action by the central government? As delegate Abraham Baldwin of Georgia observed a few years after the Constitutional Convention, "the subject of the Militia" was one of those areas "left a little unsettled," believing that they could "without any great risk, be settled by practice or by amendments."[277]

These unsettled matters concerning the militia clause served to fuel the fears of some who opposed the proposed federal Constitution. At least one critic warned against the possible creation of a select militia by the central government. A New York Anti-Federalist (probably Melancton Smith) writing

as Federal Farmer warned that "the constitution ought to secure a genuine and guard against a select militia, by providing that the militia shall always be kept well organized, armed, and disciplined and include, according to the past and general usage of the states, all men capable of bearing arms."[278] He was convinced that "the mind that aims at a select militia, must be influenced by a truly antirepublican principle."[279] In order "to preserve liberty," Federal Farmer argued," it is essential that the whole body of the people always possess arms, and be taught alike, especially when young how to use them."[280] But in Virginia, another prominent Anti-Federalist, William Grayson, praised England's "excellent militia law," which provided for "thirty thousand select militia," and he wanted to see something similar "established by the general government."[281] Not even all Anti-Federalists spoke with one voice on select militias.

More common were Anti-Federalist complaints about potential abuses of the militia clause that could arise from either overregulating or underregulating state militias. These warnings were all rooted in the claim that the proposed Constitution gave the central government exclusive power to organize, arm, and discipline the militia. William Grayson feared that "as the exclusive power of arming, organizing, &c. was given to Congress, they might entirely neglect them; or they might be armed in one part of the union, and totally neglected in another," which was the case in Great Britain, where Scotland and Ireland lacked militias.[282] Former convention delegate and Anti-Federalist Luther Martin also claimed that the central government could destroy the militia by deliberate inaction because it was granted "the powers by *which only* the militia can be organized and armed, and neglect of which they may be rendered utterly useless and insignificant, when it suits the ambitious purposes of government."[283] In almost the same breath, Martin suggested that this power could also be used to overdiscipline the militia "to improperly oppress and harass the militia, the better to reconcile them to the idea of regular troops, who might relieve them of the burden."[284] As Alexander Hamilton observed when discussing the constitution's militia clause in Federalist No. 29, "there is a striking incoherence in the objections which have appeared and sometimes from the same quarter, not much calculated to inspire a very favourable opinion of the sincerity or fair dealing of their authors."[285]

The most revealing exchanges on the possible threat to destroy the state militias by disarming them occurred at the Virginia ratifying convention during June 1788, for they clearly reflected in part concerns arising from its

Exhibit 22
Page 00474

own militia's critical need to obtain military muskets. At the Philadelphia convention, George Mason had been the delegate who originally proposed giving the central government the power "to make laws for the regulation and discipline of the Militia of the several states,"[286] but now he saw the proposed Constitution's militia clause as giving the central government the "power to abolish our militia."[287] He argued that "the militia may be here destroyed by that method which has been practised in other parts of the world before: that is, by rendering them useless by disarming them."[288] How would they be disarmed? By failing to provide them with needed arms: "Under various pretenses, Congress may neglect to provide for arming and disciplining the militia; and the state governments cannot do it, for Congress has an exclusive right to arm them &c."[289] Mason therefore wished "that, in case the general government should neglect to arm and discipline the militia, there should be an express declaration, that the state governments might arm and discipline them."[290]

The responses to Mason's arguments by those who supported the proposed Constitution made clear that they too regarded public arming of the militia as necessary, but had more faith in the central government's role in the process. Convention delegate James Madison asked rhetorically, "Have we not found that, while the power of arming and governing the militia has been solely vested in the state legislature, they were neglected and rendered unfit for immediate service?" He was confident that "the general government can do it more effectively."[291] If the general government did fail to do so, George Nicholas sought to reassure his fellow Virginians with the argument that "the states would have the power to arm them. The power of arming them is concurrent between the general and state governments."[292] Supporting Nicholas's belief in concurrent power, another delegate to the Virginia ratifying convention, John Marshall, had no doubt that "if Congress neglect our militia, we can arm them ourselves. Cannot Virginia import arms? Cannot she put them into the hands of her militiamen?"[293] To reassure further those who remained unconvinced, the Virginia convention adopted twenty recommended amendments to the new federal Constitution, the eleventh of which provided "that each State respectively shall have the power to provide for organizing, arming and disciplining its own militia, whensoever Congress shall omit or neglect to provide the same."[294]

To respond to Anti-Federalist critics of the Constitution and honor his personal pledge to his constituents, Congressman James Madison introduced at the first session of Congress a series of proposed amendments to the recently adopted Constitution. Included among his proposed amendments was one providing that "the right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person."[295] The House reversed the order of the first and second clauses, dropped the reference to "a well armed militia," and after "bear arms" added "for the common defence."[296] The Senate dropped the clause about religious scruples and also the phrase "for the common defence," probably because this language, found in the Articles of Confederation, referred specifically to the collective defense of the United States and could possibly be misconstrued to interfere with the individual states' ability to preserve internal order and suppress insurrections.[297]

The Senate also apparently attempted to include in the amendment language banning or limiting the federal government's ability to supply arms to the militia. After observing the Senate's consideration of the proposed amendment, the Virginian John Randolph informed his stepfather, St. George Tucker, that "a Majority of the Senate were for not allowing the militia arms & if two thirds had agreed it would have been an amendment to the Constitution."[298] This unsuccessful effort may have been a preemptive strike by senators from states with relatively well-armed militias to secure constitutional language that would prevent or limit the federal government's ability to arm state militias, particularly the poorly armed southern militias. As finally approved and adopted, the Second Amendment did seek to address the concerns of those who feared that Congress would either overregulate the militia or alternatively neglect to organize, arm, or discipline the militia. But it left unresolved for the time being the question whether the "National Treasury" would actually supply the state militias with needed military arms. This fight with clear regional preferences for and against federal funding did arise during debates over the 1798 federal militia act and again over the 1808 militia act, when Congress finally voted to begin appropriating annually $200,000 to enable the states to arm their militias.[299]

The War of Independence had greatly expanded the demands placed on the various state militias, inflated their reputations in some quarters, and increased their ideological importance without really solving the problems associated with their ongoing decay and with the quantity and quality of their firearms.[300] Outside of New England and South Carolina, the reality and ideal of an inclusive militia of well-armed yeoman farmers either had disappeared

Exhibit 22
Page 00475

by the early 1700s or had never even existed in practice. By the mid-1700s, all of the colonies needed considerable quantities of publicly supplied military muskets to arm their provincial soldiers in the field, and in some instances had to provide publicly owned firearms to some militiamen who lacked firearms. During this period the private ownership of firearms among adult males still appears to have remained widespread, though it was far from universal and in some areas may have been declining over the course of the eighteenth century. The problem of adequately arming troops in the field and in some instances arming militiamen became only more pronounced during the War of Independence, when the importation of over 100,000 military muskets—perhaps as many as 200,000—from France enabled the regiments of the Continental Army and many militiamen south of the Delaware River to carry on the fight.[301] The situation was if anything worse after the war ended because the quantities and quality of privately owned arms in the hands of militiamen had declined even further by the 1780s and 1790s.

So when most political leaders addressed questions about organizing, arming, and disciplining the militia during the 1780s and 1790s, they were more concerned with the arming or rearming of the existing state militias than with the possible disarming of some imaginary "citizens' militia" or "people's militia." And no one was threatening to take away people's rifles, squirrel guns, fowlers, and pistols.[302] Leaders were instead grappling with actual problems evident in the thirteen state militias, some of which no longer appeared to be capable of ensuring the "security of a free State" without improved organization, better training, and thousands of publicly supplied military muskets with bayonets. In 1798, a protest meeting in Kentucky captured this changed environment by resolving that "standing armies are dangerous to liberty and that a well regulated and well armed militia are the only natural and safe defenders of a republican government; that it was and is the duty of both the general and state government to provide arms for this purpose; that they have neglected to perform this duty; and that it is now incumbent on every freeman to furnish himself without delay, at his own expence."[303] Even on the American frontier in 1798, arming oneself for militia service was no longer regarded as the first and obvious choice.

Once one knows the real history of regulating and arming the militia that members of the founding generation knew, one appreciates the federal Constitution's concern "to provide for organizing, arming and disciplining" the state militias and understands the Second Amendment's effort to ensure that this was actually done. One also has to be aware that by the late 1700s, militia

arms were not all privately owned, and not all privately owned firearms, particularly pistols, were militia arms, nor had they ever been. And the Second Amendment was not about protecting handguns for self defense, but securing muskets for national defense.

## NOTES

The author thanks Saul Cornell, Jan Dizard, Clark Dougan, Evan Haefeli, Richard H. Kohn, Randoph Roth, Seanegan Scully, and John Servos for their comments and suggestions.

1. See David Hackett Fischer, *Paul Revere's Ride* (New York: Oxford University Press, 1994), for the best account and explanation of the performance of the Massachusetts minutemen and militiamen at Lexington and Concord on April 19, 1775. See also Charles Neimeyer, "'Town Born, Turn Out': Town Militias, Tories, and the Struggle for Control of the Massachusetts Backcountry," in *War and Society in the American Revolution: Mobilization and Home Fronts*, ed. John Resch and Walter Sargent (DeKalb: Northern Illinois University Press, 2007), 23–41.

2. *District of Columbia et al. v. Heller*, 554 U.S. (Prelim. Print 570), 596 (2008).

3. Ibid., 627.

4. Ibid., 599–600.

5. Ibid., 627.

6. Ibid., 629.

7. Until 1840 there was no such thing as the "unorganized" militia and, therefore, no distinction between the organized and the unorganized militia. After 1840 the states moved to militia systems that relied on voluntary uniformed militia companies, which became the only organized, active militias on the eve of the Civil War. All other men between the ages of eighteen and forty-five were enrolled in the inactive or "unorganized" militia, which did not train but could be called upon to defend the country during emergencies. See Lyle D. Brundage, "The Organization, Administration, and Training of the United States Ordinary and Volunteer Militia, 1792–1861" (Ph.D. diss., University of Michigan, 1958), ii, 88, 314–39.

8. Lt. Col. Marvin A. Kreidberg and 1st Lt. Merton G. Henry, *History of the Military Mobilization in the United States Army, 1775–1945* (Washington, D.C.: Department of the Army, 1955), 3. For two existing overviews of variations and changes in the colonial military institutions, see John Shy, *A People Numerous and Armed: Reflections on the Military Struggle for American Independence*, rev. ed. (Ann Arbor: University of Michigan Press, 1990), 29–41; and Don Higginbotham, "The Military Institutions of Colonial America: The Rhetoric and the Reality," in *Tools of War: Instruments, Ideas, and Institutions of Warfare, 1445–1871*, ed. John A. Lynn (Urbana: University of Illinois Press, 1990), 131–53.

Exhibit 22

Page 00476

9. Kreidberg and Henry, *History of the Military Mobilization*, 4.

10. For existing studies that suggest the variations in gun ownership over time and space, see James Lindgren and Justin Lee Heather, "Counting Guns in Early America," *William and Mary Law Review* 43 (2002): 1777–1842; Robert H. Churchill, "Gun Ownership in Early America: A Survey of Manuscript Militia Returns," *William and Mary Quarterly*, 3rd ser., 60.3 (July 2003): 615–42. Like these authors, I am critical of the approach and findings in Michael Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Knopf, 2000).

11. For evidence of arms shipments for particular plantations, see *Records of the Virginia Company of London*, ed. Susan Myra Kingsbury, vol. 3 (Washington, D.C.: Government Printing Office, 1906–1935), 94–98, 178–79.

12. William L. Shea, *The Virginia Militia in the Seventeenth Century* (Baton Rouge: Louisiana State University Press, 1983), 31, 54, 75, 92–93; Warren M. Billings, *Sir William Berkeley and the Forging of Colonial Virginia* (Baton Rouge: Louisiana State University Press, 2004), 226–27. For additional evidence of militia companies that were incompletely armed in the 1670s, see Philip Alexander Bruce, *Institutional History of Virginia in the Seventeenth Century*, 2 vols. (New York: G. P. Putnam's Sons, 1910), 2:39–40.

13. *Records of the Governor and Company of Massachusetts Bay in New England*, ed. Nathaniel Shurtleff, 5 vols. (Boston: W. White printer to the Commonwealth, 1853–54), 2:67.

14. *Archives of Maryland*, ed. William Hand Browne et al., 72 vols. (Baltimore: Maryland Historical Society, 1883–1972), 3:99–101.

15. Ibid., 3:132–33.

16. Timothy B. Riordan, *The Plundering Time: Maryland and the English Civil War, 1645–1646* (Baltimore: Maryland Historical Society, 2004), 209.

17. *Archives of Maryland*, 1:254–55.

18. For the cost of new guns and swords see *The Inconveniencies that have happened to some Persons which have transported themselves from England to Virginia . . .* (London: Felix Kyngston, 1622), broadside, and Harold L. Peterson, *Arms and Armor in Colonial America, 1526–1783* (1956; Mineola, N.Y.: Dover Publications, 2000), 321. Basing his conclusion on the assumption that new firearms cost £4 to £5, Michael Bellesiles claims that they were too expensive; see Bellesiles, *Arming America*, 106. Another scholar characterized seventeenth-century matchlock muskets as "relatively inexpensive." See Patrick M. Malone, *The Skulking Kind of War: Technology and Tactics among the New England Indians* (1991; Baltimore: Johns Hopkins University Press, 1993), 39.

19. In Plymouth Colony, towns supplied pikes. The colonies of New Haven and Connecticut also maintained "a large number of pikes." See Peterson, *Arms and Armor in Colonial America*, 99.

20. This was the assessment of commissioners from England in 1665. See *Calendar of State Papers Colonial*, ed. William N. Sainsbury et al. (London: Public Record Office, 1860–1994), 1661–1668, no. 1000, 300.

21. James Deetz and Patricia Scott Deetz, *The Times of Their Lives: Life, Love, and Death in Plymouth Colony* (New York: Anchor Books, 2001), 2; Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony," 1–11, and table pages, 1–4, http://plymoutharch.tripod.com/id71.html and http://plymoutharch.tripod.com/id73.html.

22. Emerson Baker, "The Archaeology of 1690, the Year of Living Dangerously in New England," 5, manuscript in the author's possession.

23. R. James Ringer, "Phips's Fleet," *National Geographic* 198.2 (August 2000): 80. See also Charles Bradley, Phil Dunning, and Gerard Gusset, "Material Culture from the Elizabeth and Mary (1690): Individuality and Social Status in a Late Seventeenth-Century New England Assemblage," in *Archéologiques, Collection Hors-Série 1: Mer et Monde; Question d'archéologie Maritime*, Association des Archéologues du Québec (2003): 150–70.

24. *Archives of Maryland*, 10:24, 40–41, 425, 429.

25. Ibid., 3:345.

26. Ibid., 1:412.

27. Ibid., 15:13.

28. Ibid., 7:55.

29. Roger B. Manning, *Apprenticeship in Arms: The Origins of the British Army, 1585–1702* (New York: Oxford University Press, 2006), 132.

30. *Archives of Maryland*, 7:18.

31. For percentages of servants in the population, see Lois G. Carr and David William Jordan, *Maryland's Revolution of Government, 1689–1692* (Ithaca: Cornell University Press, 1974), 182–83. For information on firearms ownership, see Gloria L. Main, *Tobacco Colony Life in Early Maryland, 1650–1720* (Princeton: Princeton University Press, 1982), 176, 242.

32. *Archives of Maryland*, 7:30.

33. Ibid., 8:56–57.

34. Ibid., 8:65; 8:56–57, 62–65, 67.

35. Ibid., 20:224.

36. Carr and Jordan, *Maryland's Revolution of Government*, 17, 46–47, 52–60.

37. *Archives of Maryland*, 19:508, 557.

38. Ibid.

39. Ibid., 30:628.

40. Ibid., 39:113.

41. On the impressment of firearms, see "Causes of Discontent in Virginia, 1676: Gloster County Grievances and Surry County Grievances" *Virginia Magazine of*

Exhibit 22
Page 00477

*History and Biography* 2.2 (October 1894): 168, 171–72; "Causes of Discontent in Virginia, 1676: Isle of Wight Grievances," *Virginia Magazine of History and Biography* 2.4 (April–October 1895): 387.

42. Tisdale, *Soldiers of Virginia Colony*, 166–68.

43. "A Copie of a Letter to the 20 Colonels in Virginia touching the Militia," November 20, 1680, in Sainsbury, *Calendar of State Papers Colonial*, 1677–1680, no. 1600, 634.

44. Shea, *Virginia Militia in the Seventeenth Century*, 121. For evidence of inadequately armed militia companies during the 1680s, see Bruce, *Institutional History*, 2:39, 44.

45. Shea, *Virginia Militia in the Seventeenth Century*, 120–21, 125–26, 127–30, 138–39.

46. "Order of the Governor and Council of Virginia, October 24, 1687," in *Executive Journal of the Council of Colonial Virginia*, ed. H. R. McIlwaine, vol. 1 (Richmond, 1925), 85.

47. For 1680, see "A Copie of a Letter to the 20 Colonels in Virginia touching the Militia"; for 1689, see Evarts B. Greene and Virginia Harrington, *American Population before the Federal Census of 1790* (1981; New York: Columbia University Press, 1932), 137.

48. Bruce, *Institutional History*, 2:7.

49. William W. Hening, ed., *Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, 13 vols. (Richmond, 1810–1823), 3:13–14.

50. Shea, *Virginia Militia in the Seventeenth Century*, 119–20; Bruce, *Institutional History*, 2:44.

51. *Calendar of Virginia State Papers and Other Manuscripts, 1652–1781*, ed. William P. Palmer [et al.], 11 vols. (1875–1893; New York: Kraus Reprint, 1968), 1:81.

52. Governor Alexander Spotswood to the Council of Trade, Virginia, July 26, 1712, in *The Official Letters of Alexander Spotswood, Lieutenant-Governor of the Colony of Virginia, 1710–1722*, 2 vols. (Richmond: Virginia Historical Society, 1882–1885), 1:166–67.

53. Shea, *Virginia Militia in the Seventeenth Century*, 139.

54. Anna L. Hawley, "The Meaning of Absence: Household Inventories in Surry County, Virginia, 1690–1715," in *Early American Probate Inventories: The Dublin Seminar for New England Folklife, Annual Proceedings, 1987*, ed. Peter Benes (Boston: Boston University, 1989), 28, table 1.

55. Kyle F. Zelner, *A Rabble in Arms: Massachusetts Towns and Militiamen during King Philip's War* (New York: New York University Press, 2009), esp. 141–80.

56. Governor Joseph Dudley to Council of Trade and Plantations, November 15, 1710, in *Calendar of State Papers Colonial*, ed. Cecil Headlam (London: Printed for His Majesty's Stationary Office, 1924), 1710–1711, no. 491, 268.

57. On the nonmilitary uses of firearms see Randolph Roth, "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence," *William and Mary Quarterly*, 3rd ser., 59.1 (January 2002): 230–31.

58. Japp Jacobs, *New Netherland: A Dutch Colony in Seventeenth-Century America* (Leiden: Brill, 2005), 366–71.

59. *Journal of Jasper Danckaerts, 1670–1680*, ed. Bartlett B. James and J. Franklin Jameson (New York, 1913), 239; Edmund Andros, "Copy of the Proceeding Answers to Inquiries Concerning New York," April 1678, in *Calendar of State Papers Colonial*, 1677–1680, no. 660, 237. According to the *Oxford English Dictionary*, at this time "fireman" referred to one who uses firearms; it was not until the early 1700s that "fireman" referred to one who extinguishes fires.

60. Governor George Clark to the Board of Trade, June 2, 1738, in *Documents Relative to the Colonial History of the State of New York*, ed. Edmund B. O'Callaghan and Berthold Fernow, 15 vols. (Albany: Weed, Parsons, 1856–1887), 6:120. On the tradition of "shooting the parrot," or wooden *papegaai* that sat on a pole, see Donna Merwick, *Possessing Albany, 1630–1710: The Dutch and English Experiences* (New York Cambridge University Press, 1990), 79.

61. William J. Frost, "Religious Liberty in Pennsylvania," *Pennsylvania Magazine of History and Biography* 105 (1981): 427, 442.

62. Richard R. Beeman, *The Varieties of Political Experience in Eighteenth-Century America* (Philadelphia: University of Pennsylvania Press, 2004), 206.

63. Governor Morris to the Duke of Newcastle, Burlington, October 18, 1740, in *Archives of the State of New Jersey*, 1st ser., ed. William A. Whitehead et al., 10 vols. (Newark: State of New Jersey, 1880–1928), 6:104.

64. Ibid., 6:105.

65. Edwin Platt Tanner, *The Province of New Jersey, 1664–1738* (New York: Columbia University Press, 1908), 559.

66. *Laws of the Government of New-Castle, Kent and Suffolk Upon Delaware* (Philadelphia: Benjamin Franklin, 1742), 171–78.

67. The 1740 militia law was not included in the 1752 compilation of the laws of Delaware. *Laws of the Government of New-Castle, Kent and Suffolk Upon Delaware* (Philadelphia: Benjamin Franklin and D. Hall, 1752).

68. Thomas Nairne quoted in Peter Wood, *Black Majority: Negroes in Colonial South Carolina from 1670 through the Stono Rebellion* (New York: Knopf, 1974), 126, n. 116.

69. Ibid., 124–30; Fitzhugh McMaster, *Soldiers and Uniforms: South Caroli-*

*Military Affairs, 1670–1775* (Columbia: University of South Carolina Press for the South Carolina Tricentennial Commission, 1971), 17. Slaves continued to serve in the South Carolina militia into the early 1770s. See Clyde R. Ferguson, "Functions of the Partisan-Militia in the South during the American Revolution: An Interpretation," in *The Revolutionary War in the South: Power, Conflict, and Leadership*, ed. W. Robert Higgins (Durham, N.C.: Duke University Press, 1979), 241.

70. Theodore Harry Jabbs, "The South Carolina Militia, 1663–1733" (Ph.D. diss., University of North Carolina, Chapel Hill, 1973), 411–14.

71. De Witt Baily, *Small Arms of the British Forces in America, 1664–1815* (Woonsocket, R.I.: Mowbray Publishers, 2009), 110–11, 113; De Witt Baily, "The Wilsons: Gunmakers to the Empire, 1730–1832," *American Society of Arms Collectors Bulletin*, no. 85 (April 2002): 11; McMaster, *Soldiers and Uniforms*, 11.

72. Wayne E. Lee, *Crowds and Soldiers in Revolutionary North Carolina: The Culture of Violence in Riot and War* (Gainesville: University Press of Florida, 2001), 130.

73. "De Graffenried's Manuscript," in *Colonial Records of North Carolina*, ed. William L. Saunders, 10 vols. (Raleigh: State of North Carolina, 1886–1890), 1:953.

74. James Biser Whisker, *The American Colonial Militia*, 5 vols. (Lewiston, N.Y.: Edwin Mellen Press, 1997), 5:98–99.

75. *Colonial Records of North Carolina*, 4:745.

76. Mathew Rowan to My Lords [of Trade], Cape Fear, June 3, 1754, ibid., 5:124–25; Governor Dobbs to the Board of Trade, Newbern, March 15, 1756, ibid., 5:571; Governor Dobbs to Earl of Loudon, Newbern, July 10, 1756, ibid., 5:599.

77. Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (Cambridge: Harvard University Press, 2003), 14–40; James M. Johnson, *Militiamen, Rangers, and Redcoats: The Military in Georgia, 1754–1776* (Macon: Mercer University Press, 1992), 29.

78. Quoted in Whisker, *American Colonial Militia*, 5:141.

79. McMaster, *Soldiers and Uniforms*, 38–41; Johnson, *Militiamen, Rangers, and Redcoats*, 1–16.

80. *State Records of North Carolina*, ed. Walter Clark, 16 vols. (Raleigh: P. M. Hale, 1886–1907), 13:244–47.

81. *Archives of Maryland*, 46:32, 34–35, 80, 97; Henning, *Statutes*, 6:118.

82. *Archives of Maryland*, 6:353.

83. "Observations in Several Voyages and Travels in America: From the London Magazine, July 1746," *William and Mary Quarterly* 15.3 (January 1907): 5–6.

84. Samuel J. Newland, *Pennsylvania Militia: The Early Years, 1669–1792* (Annville: Pennsylvania National Guard Foundation, 1997), 29–47; Joseph

Seymour, *The Pennsylvania Associators, 1747–1777* (Yardley, Penn.: Westholme, 2012), 30–60; Leon de Valinger Jr., *Colonial Military Organization in Delaware, 1638–1776* (Wilmington: Delaware Tercentenary Commission, 1938), 41–42.

85. Seymour, *Pennsylvania Asssociators*, 45.

86. "Form of Association," in *The Papers of Benjamin Franklin*, ed. Leonard W. Labaree et al., 40 vols. to date (New Haven: Yale University Press, 1959–), 3:208.

87. Ibid.

88. *Philadelphia Gazette*, March 8, 1748.

89. From 1712 to 1738 Massachusetts passed no laws to revise or render more effective its militia act. *Acts and Resolves, Public and Private, of the Province of Massachusetts*, 21 vols. (Boston: State of Massachusetts, 1869–1922), 1:697, 2:939–41.

90. "A List of Officers & Soldiers in the First Regiment in the County of Worcester Where of John Chandler Esq. is Col.," taken May 1744, dated June 1, 1744, in Mass. Collections, box 3, folder 4, Militia Returns, Officers' Commissions, and Misc. Papers, 1629–ca. 1869, American Antiquarian Society, Worcester, Mass. Five of the companies are cited as being "intirely deficient as to ammunition" or "want half their ammunition," but no mention is made of deficiencies in firearms.

91. Thomas Procter to Samuel Waldo, St. Georges [Maine], May 25, 1744, in Samuel Waldo Papers, Massachusetts Historical Society, Boston.

92. John Ulmer to Col. Arthur Noable, Broadbay, May 18, 1744, Samuel Waldo Papers, Massachusetts Historical Society, Boston.

93. For the forts, see Michael Coe, "The Line of Forts: The Archeology of the Mid-Eighteenth Century on the Massachusetts Frontier," in *New England Historical Archeology: Dublin Seminar for New England Folklife*, ed. Peter Benes (Boston: Boston University, 1977), 44–55. For examples of arming province soldiers serving on the line of forts with firearms paid for by the province with "gun money" or borrowed, see Elijah Williams, Account Book 1746–1756, vol. 2, "Old Soldiers' Book," 46, and 44 in the second series of page numbers near the back of the account book, Pocumtuck Valley Memorial Association, Deerfield, Mass.

94. John K. Mahon, *History of the Militia and the National Guard* (New York: Macmillan, 1983), 5; David Richard Millar, "The Militia, the Army, and Independency in Colonial Massachusetts" (PhD diss., Cornell University, 1967), 148–53.

95. *Acts and Resolves*, 13:370, 432–33, 563–64, 610, 665, 697, 706. The colony of Connecticut also impressed arms, finding that "a considerable number of the soldiers that have inlisted themselves to go on the intended expedition against Cape Breton are destitute of firearms and other accoutrements, and there not being a sufficient number to be purchased." See *Public Records of the Colony of Connecticut*, ed. Charles Hoadly, vol. 9 (Hartford: Case, Lockwood & Brainard,

Exhibit 22
Page 00479

1876), 95–96. At least 20 percent of the 516 men in the Connecticut regiment sent to Cape Breton had to be issued arms procured by the government. See *Collections of the Connecticut Historical Society*, vol. 13 (Hartford, 1911), 83–85.

96. Hezekiah Huntington's Accounts, 1746–47, ms. S-585, Massachusetts Historical Society, Boston; *Records of the Colony of Rhode Island and Providence Plantation in New England*, ed. John Russell Bartlett, 10 vols. (Providence: State of Rhode Island, 1856–1865), 5:172–73, 180, 236.

97. *Acts and Resolves*, 15:722. See also John R. Galvin, *The Minute Men: A Compact History of the Defenders of the American Colonies, 1645–1775* (New York: Hawthorne, 1967), 27. The colony of Connecticut had more difficulty arming its troops and had to impress arms. See Harold E. Selesky, *War and Society in Colonial Connecticut* (New Haven: Yale University Press, 1990), 152–53.

98. Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755, in *Collections of the Connecticut Historical Society*, vol. 1 (Hartford: published for the Society, 1860) 265–66.

99. *Account of the people in the Colony of Rhode-Island, whites, blacks, together with the quantity of arms and ammunition in the hands of private persons*, Early American Imprints, no. 40794 (n.p., 1800).

100. "Form of Association," *Franklin Papers*, 3:208.

101. Peterson, *Arms and Armor in Colonial America*, 14. See also George D. Moller, *American Military Shoulder Arms*, vol. 1: *Colonial and Revolutionary War Arms* (Boulder: University Press of Colorado, 1993), 99, 497.

102. Bill Ahearn, *Muskets of the Revolution and the French and Indian Wars* (Lincoln, R.I.: Andrew Mowbray, 2005), 176.

103. Baily, *Small Arms of the British Forces*, 123.

104. George C. Neumann, *Battle Weapons of the American Revolution: The Historian's Complete Reference* (Texarkana: Scurlock Publishing Company, 1998), 126, 142, 144, 145, 147; Tom Grinsdale, *Flintlock Fowlers: The First Guns Made in America* (Texarkana: Scurlock Publishing Company, 2005), 16, 21, 27, 31.

105. Steven C. Eames, *Rustic Warriors: Warfare and the Provincial Soldier on the New England Frontier, 1689–1748* (New York: New York University Press, 2011), 121–22; Neumann, *Battle Weapons of the American Revolution*, 206–10.

106. "Blair Report on the State of the Colonies," reprinted in Louis K. Koontz, *The Virginia Frontier, 1754–1763* (Baltimore: Johns Hopkins University Press, 1925), 170, hereafter cited as "Blair Report"; Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755, in *Collections of the Connecticut Historical Society*, 1:265–66.

107. Governor Henry Ellis to the Board of Trade, Georgia, May 25, 1757, in *Colonial Records of the State of Georgia: Original Papers of Governors Reynolds, Ellis, Wright, and Others, 1757–1763*, ed. Kenneth Coleman and Milton Ready,

vol. 28, part 1 (Athens: University of Georgia Press, 1976), 29; Baily, *Small Arms of the British Forces*, 121.

108. The 1740 militia law was not included in the 1752 compilation of the laws of Delaware, *Laws of the Government of New-Castle, Kent and Suffolk Upon Delaware* (1752).There is in fact no militia law in this collection of the laws then in force in Delaware.

109. Quoted in William Hunter, *Forts on the Pennsylvania Frontier, 1753–1758* (Harrisburg: Pennsylvania Historical and Museum Commission, 1960), 173.

110. Ibid.

111. Newland, *Pennsylvania Militia*, 82–83.

112. *Laws of the Government of New-Castle, Kent and Suffolk Upon Delaware* (Philadelphia: Benjamin Franklin and D. Hall, 1763), 10, 11–12. See also John A. Munroe, *Colonial Delaware: A History* (Millwood, N.Y.: KTO Press, 1978), 220–23.

113. "Blair Report," 171.

114. M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology, 1492–1792* (Washington, D.C.: Smithsonian Institution Press, 1980), 283; Neumann, *Battle Weapons of the American Revolution*, 203–5.

115. *Archives of Maryland*, 6:353. The sixty-five Maryland inventories included in Table 4 contained eighty-six firearms. Of these, fifty, or 58.1 percent, were old, broken, or in parts.

116. "Blair Report," 166.

117. René Chartrand, *Colonial American Troops, 1610–1774*, 3 vols. (Wellington, England: Osprey Publishing, 2002–2003), 1:34; Washington's Memoranda [Conegogee, June 13, 1758], in *Papers of Henry Bouquet*, vol. 2, *The Forbes Expedition*, ed. S. K. Stevens, Donald H. Kent, and Autumn L. Leonard (Harrisburg: Pennsylvania Historical and Museum Commission, 1951), 83.

118. Henry Bouquet to the Duke of Portland, Fort Du Quesne, December 3, 1758, in *Bouquet Papers*, 2:620.

119. Mathew Rowan to My Lords [of Trade], Cape Fear, June 3, 1754, in *Colonial Records of North Carolina*, 5:124–25; Governor Dobbs to Earl of Loudon, Newbern, July 10, 1756, ibid., 5:599. See also Governor James Glen to Governor Robert Dinwiddie, South Carolina, August 22, 1754, Colonial Records Office, British Archives, Kew, London, 5:14, 502.

120. Governor Dobbs to the Board of Trade, Newbern, March 15, 1756, in *Colonial Records of North Carolina*, 5:571.

121. Governor Dobbs to Earl of Loudoun, New Bern, July 10, 1756, ibid., 5:599.

122. Johnson, *Militiamen, Rangers, and Redcoats*, 17, 26–28.

123. Governor John Reynolds to the Board of Trade, Georgia, January 5, 1756, in *Colonial Records of the State of Georgia: The Original Papers of Governor John*

Exhibit 22
Page 00480

*Reynolds, 1754–1756,* ed. Kenneth Coleman and Milton Ready, vol. 27 (Athens: University of Georgia Press, 1977), 104.

124. Governor Henry Ellis to the Board of Trade, London, October 5, 1756, ibid., 27:121–22; Henry Ellis to the Board of Trade, Georgia, May 25, 1757, ibid., 28: pt. 1, 29.

125. For a similar assessment, see Lawrence Henry Gipson, *The British Empire before the American Revolution: The Great War for Empire; Years of Defeat,* vol. 6 (1946; New York: Knopf, 1959), 50.

126. Governor James Glen to Governor Robert Dinwiddie, South Carolina, August 22, 1754, Colonial Office Records, British Archives, Kew, London, 5:14, 503.

127. Col. Henry Bouquet to the Earl of Loudon, Charles Town, August 25, 1757, in *Papers of Henry Bouquet,* vol. 1, ed. S. K. Stevens, Donald H. Kent, and Autumn L Leonard (Harrisburg: Pennsylvania Historical and Museum Commission, 1972), 175.

128. Gipson, *The Great War for Empire,* 6:50.

129. Frederick Stoke Aldridge, "Organization and Administration of the Militia System of Colonial Virginia" (Ph.D. diss., American University, 1964), 159–67.

130. Governor Robert Dinwiddie to the Earl of Loudoun August 9, 1756, in *Official Records of Robert Dinwiddie, Lieutenant Governor of the Colonial of Virginia, 1751–1758,* ed. Robert Alonzo Brock, 2 vols. (Richmond: Virginia Historical Society, 1884), 2:474; see also Aldridge, "Organization and Administration of the Militia System," 115–27.

131. Johnson, *Militiamen, Rangers, and Redcoats,* 32–33.

132. For characterizing the provincials as "quasi-regulars," see Chartrand, *Colonial American Troops,* 3, 34. For characterizing them as "quasi-standing forces" see Mahon, *History of the Militia,* 26.

133. Don Higginbotham, "The Second Amendment in Historical Context," *Constitutional Commentary* 16.2 (Summer 1999): 267; Franklin Thayer Nicholas, "The Organization of Braddock's Army," *William and Mary Quarterly,* 3rd ser., 4.2 (April 1947): 133; J. Luther Sowers and Ross M. Kimmel, "The Maryland Forces, 1756–59," *Military Collector and Historian* 31.2 (Summer 1979): 81.

134. Governor Thomas Fitch to Lords of Trade, Hartford, March 30, 1756, in *Collections of the Connecticut Historical Society,* 1:283. See also Baily, *Small Arms of the British Forces,* 121.

135. Governor Robert Dinwiddie to Sir Thomas Robinson, October 25, 1754, in *Dinwiddie Papers,* 1:353; Dinwiddie to Governor James DeLancy, May 3, 1755, in *Dinwiddie Papers,* 2:22.

136. *Archives of Maryland,* 32:26; "Blair Report," 166; see also Baily, *Small Arms of the British Forces,* 121.

137. For an overview of these efforts see Jim Mullins, *"Of Sorts for Provincials": American Weapons of the French and Indian War* (Elk River, Minn.: Track of the Wolf, 2008), 103–76.

138. Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755 in *Collections of the Connecticut Historical Society,* 1:267.

139. For Virginia, see James Titus, *The Old Dominion at War: Society, Politics, and Warfare in Late Colonial Virginia* (Columbia: University of South Carolina Press, 1981), 78–91, 176–77; for Pennsylvania, see R. S. Stephenson, "Pennsylvania's Provincial Soldiers in the Seven Years' War," *Pennsylvania History* 62 (1995): 204–9; for Delaware, see Munroe, *Colonial Delaware,* 223–25. For Virginia and Pennsylvania, see also Matthew C. Ward, *Breaking the Backcountry: The Seven Years' War in Virginia and Pennsylvania, 1754–1765* (Pittsburgh: University of Pittsburgh Press, 2003), 113–21.

140. Governor Robert Dinwiddie to Lord Halifax, February, 24, 1756, in *Dinwiddie Papers,* 2:346.

141. Quoted in McMaster, *Soldiers and Uniforms,* 42.

142. For gun ownership among the lowest 20 percent in terms of wealth, see Lindgren and Heather, "Counting Guns in Early America," chart 1, 1790; chart 7, 2002. For gun ownership among those under the age of twenty-five, see ibid., chart 4, 1802.

143. *Colonial Records of Rhode Island,* 5:420, 430–31.

144. "Blair Report," 166; *Archives of Maryland,* 50:534.

145. Governor William Shirley to Henry Fox, Boston, February 24, 1756, and Shirley to Fox, Boston, April 12, 1756, in *Correspondence of William Shirley, Governor of Massachusetts and Military Commander in America, 1731–1760,* ed. Charles Henry Lincoln, 2 vols. (New York: Macmillan, 1912), 2:401, 427; Baily, *Small Arms of the British Forces,* 120.

146. Brenton C. Kemmer, *Redcoats, Yankees, and Allies* (Bowie, Md.: Heritage Press, 1998), 57–58, 61–63, 67, 70–72, 73–76.

147. Baily, *Small Arms of the British Forces,* 121–23; John A. Schultz, "The Disaster of Fort Ticonderoga: The Shortage of Muskets during the Mobilization of 1758," *Huntington Library Quarterly* 14 (1951): 307–15.

148. Colonel Henry Bouquet to General John Forbes, Carlisle, May 25, 1758; Forbes to Bouquet, May 29, 1758; Bouquet to Forbes, Carlisle, May 30, 1758; and John St. Clair to Henry Bouquet, May 31, 1758, in *Papers of Henry Bouquet,* 1:361, 379, 395, 404; Bouquet to Forbes, [Carlisle, June 7, 1758], and Forbes to Bouquet [Philadelphia, June 6, 1758], ibid., 2:47, 103.

149. John St. Clair to Henry Bouquet, Winchester, June 9, 1758, ibid., 2:60.

150. Baily, *Small Arms of the British Forces,* 121.

151. Ibid., 215, 237, 303.

Exhibit 22
Page 00481

152. De Valinger, *Colonial Military Organization in Delaware,* 52.

153. Alan and Barbara Aimone, "New York's Provincial Militia," *Military Collector and Historian* 33.2 (Summer 1981): 60.

154. Arthur Vollmer, comp., *Backgrounds of Selective Service Military Obligation: The American Tradition; A Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation, 1789,* Special Monograph no. 1, vol. 2 (Washington D.C.: Government Printing Office, 1947), pt. 1:54, pt. 9:340–41.

155. Lee, *Crowds and Soldiers,* 46–96.

156. Governor John Wentworth quoted in Hugh Jameson, "The Organization of the Militia of the Middle States during the American War for Independence, 1775–1781" (Ph.D. diss., University of Michigan, 1936), 160.

157. Hugh Jameson, "Equipment for the Militia of the Middle States," *Journal of the American Military Institute* 3.1 (Spring 1939): 29; John R. Galvin, *The Minutemen: The First Fight: Myths and Realities of the American Revolution* (1989; repr., Washington, D.C.: Brassey's, 1996), 60.

158. Quoted in Jameson, "Organization of the Militia of the Middle States," 161.

159. Albert A. Tilson, "The Militia and Popular Culture in the Upper Valley of Virginia, 1740–1775," *Virginia Magazine of History and Biography* 94.3 (July 1986): 285–306.

160. Johnson, *Militiamen, Rangers, and Redcoats,* 28, 82.

161. Ward, *Breaking the Backcountry,* 258.

162. *Account of the people in the Colony of Rhode-Island.*

163. Neumann, *Battle Weapons of the American Revolution,* 230.

164. Ibid.

165. McMaster, *Soldiers and Uniforms,* 26–33.

166. Brown, *Firearms in Colonial America,* 263–72.

167. John W. Wright, "The Rifle in the American Revolution," *American Historical Review* 29.2 (January 1924): 293–99; Neil L. York, "Pennsylvania Rifle: Revolutionary Weapon in a Conventional War?" *Pennsylvania Magazine of History and Biography* 103.3 (July 1979): 302–24; Neumann, *Battle Weapons of the American Revolution,* 215–25.

168. Archibald Blaine to Henry Bouquet, Ligonier, March 2, 1759, in *The Papers of Henry Bouquet,* vol. 3, ed. Donald H. Kent, Louis M. Waddell, and Autumn L. Leonard (Harrisburg: Pennsylvania Historical and Museum Commission, 1976), 166–67.

169. Lawrence D. Cress, *Citizens in Arms: The Army and the Militia in American Society to the War of 1812* (Chapel Hill: University of North Carolina Press, 1982), 41.

170. For the best discussion of this surprisingly late development, see ibid., 17–52. See also Higginbotham, "Military Institutions of Colonial America," 147–48.

171. Patrick Henry in *Patrick Henry: Life, Correspondence, and Speeches,* ed. William Wirt Henry, 3 vols. (New York: Charles Scribner's Sons, 1891), 1:257–58.

172. For Massachusetts, see Ray Raphael, *The First American Revolution: Before Lexington and Concord* (New York: New Press, 2002), 57–168. See also Ronald L. Boucher, "The Colonial Militia as a Social Institution: Salem, Massachusetts, 1764–1775," *Military Affairs: Journal of the American Military Institute* 37 (December 1973): 127–29. For New Hampshire, see Whisker, *The American Colonial Militia,* 2:124–28.

173. Robert H. Churchill, *To Shake Their Guns in the Tyrant's Face: Libertarian Political Violence and the Origins of the Militia Movement* (Ann Arbor: University of Michigan Press, 2009), 36, 37.

174. Barry Windsor Fowle, "The Maryland Militia during the Revolutionary War: A Revolutionary Organization" (Ph.D. diss., University of Maryland, 1982), 11–40; Michael A. McDonnell, *The Politics of War: Race, Class, and Conflict in Revolutionary Virginia* (Chapel Hill: University of North Carolina Press, 2007), 34–134; Lee, *Crowds and Soldiers,* 146–58; Ferguson, "Functions of the Partisan-Militia," 243–47; Johnson, *Militiamen, Rangers, and Redcoats,* 103–25.

175. Whisker, *American Colonial Militia,* 5:176.

176. Quoted in Fowle, "Maryland Militia," 15.

177. Ibid., 13.

178. Quoted ibid., 38, n. 20.

179. Ibid., 41–52.

180. Ibid., 29–31.

181. Churchill, *To Shake Their Guns in the Tyrant's Face,* 38–40.

182. *Lloyd's Evening Post and British Chronicle,* June 14, 1775, quoted in Whisker, *American Colonial Militia,* 4:26.

183. Governor William Franklin to the Earl of Dartmouth, May 6, 1775, in *Archives of New Jersey,* 10:591–92.

184. Newland, *Pennsylvania Militia,* 125–56. For the struggles surrounding the Associator movement and its political significance, see Steven Rosswurm, *Arms, Country, and Class: The Philadelphia Militia and the "Lower Sort" during the American Revolution* (New Brunswick: Rutgers University Press, 1987).

185. Newland, *Pennsylvania Militia,* 146.

186. *American Archives,* ed. Peter Force, 9 vols. (Washington, D.C.: M. St. Claire Clarke and Peter Force, 1837–1853), 4th ser. 2:45.

Exhibit 22
Page 00482

187. Stephen R. Taaffe, *The Philadelphia Campaign, 1777–1778* (Lawrence: University Press of Kansas, 2003), 60.

188. *Journals of the Continental Congress, 1774–1789*, ed. Worthington Chauncey Ford et al., 35 vols. (Washington, D.C.: U. S. Government Printing Office, 1904–1976), 2:188.

189. New York Committee of Safety, May 9, 1775, in *American Archives*, 4th ser., 2:530.

190. Brown, *Firearms in Colonial America*, 307–11; Ahearn, *Muskets of the American Revolution*, 148–61; Neumann, *Battle Weapons of the American Revolution*, 131, 135, 137, 139, 147.

191. *Records of the Colony of Rhode Island and Providence Plantations*, 7:477.

192. Governor Nicholas Cooke to General George Washington, January 25, 1776, ibid., 7:501.

193. Robert H. Churchill, "Gun Ownership in Early America," *William and Mary Quarterly*, 3rd. ser. 60.3 (July 2003): 631, table 2.

194. *Records of the Colony of Rhode Island*, 7:478.

195. *Provincial Papers, Documents and Records relating to the Province of New Hampshire from 1764 to 1776*, ed. Nathaniel Bouton, vol. 8 (Nashua: Orren C. Moore, State Printer, 1873), 724–79.

196. Using a slightly different approach to the same data, Robert Churchill estimates that 58 percent of New Hampshire's "men able to bear arms" were armed. See Churchill, "Gun Ownership in Early America," 631, table 2.

197. Ibid., 626, table 1.

198. Moller, *American Military Shoulder Arms*, 1, 206.

199. For examples, see John Reed, Colonel of the Fourth Regiment, Reading, May 5, 1775, Bound Manuscripts, Massachusetts Historical Society, Boston. See also Churchill, "Gun Ownership in Early America," 623.

200. On the government's search for firearms in Massachusetts in 1775 and the need to impress arms, see Richard M. Ketchum, *Decisive Day: The Battle of Bunker Hill* (1962; New York: Henry Holt, 1999), 61, 64, 81, 94, 194, 201; Allen French, *First Year of the American Revolution* (1934; New York: Octagon Books, 1968), 85.

201. For "Warlike Stores" in "almost all the towns of the several counties of Massachusetts and Maine, except Dukes and Nantucket, April 14, 1775," see *Journals of the Provincial Congress of Massachusetts in 1774 and 1775 and of the Committee of Public Safety* (Boston: Dutton and Wentworth, 1838), 756.

202. My calculation, based on data in Churchill, "Gun Ownership in Early America," 626, table 1.

203. For the lower estimate, see Richard Buel Jr., *Dear Liberty: Connecticut's Mobilization for the Revolutionary War* (Middletown: Wesleyan University

Press, 1980), 357, n. 224. For the higher estimate, see Churchill, "Gun Ownership in Early America," 631, table 2.

204. Ahearn, *Muskets of the Revolution*, 57; Alan and Barbara Aimone, "Organizing and Equipping Montgomery's New Yorkers in 1775," *Military Collector and Historian* 28.2 (Summer 1976): 56.

205. *New York in the Revolution, State Archives*, vol. 1 (*Documents Relating to the Colonial History of the State of New York*, vol. 15), ed. Berthold Fernow (Albany: Weed, Parsons and Company, 1887), 122–23.

206. Ibid., 146.

207. General Peter Gansevoort to Governor George Clinton, Albany, April 14, 1781 *Public Papers of George Clinton, First Governor of New York, 1775–1795, 1801–1804*, ed. Hugh Hastings, 10 vols. (New York, 1899–1914), 6:765.

208. Return of Colonel Drake's Regiment of Militia, August 5, 1780, Ibid., 6:104.

209. Jameson, "Equipment for the Militia of the Middle States," 34–35.

210. John Hancock to Thomas Cushing, Philadelphia, February 1, 1776, Miscellaneous Bound Manuscripts, Massachusetts Historical Society, Boston; *Documents Relating to the Colonial History of New York*, 15, 127–28; Mark V. Kwasny, *Washington's Partisan War, 1775–1783* (Kent: Kent State University Press, 1996), 32; Jeffrey M. Dorwart, *Invasion and Insurrection: Security, Defense, and War in the Delaware Valley, 1621–1815* (Newark: University of Delaware Press, 2008), 119; Adrian C. Leiby, *Revolutionary War in the Hackensack Valley: The Jersey Dutch and the Neutral Ground* (1962; New Brunswick: Rutgers University Press, 1980), 87–88, 90; Jameson, "Organization of the Militia of the Middle States," 171.

211. Churchill, "Gun Ownership in Early America," 631, table 2.

212. Jameson, "Equipment of the Militia of the Middle States," 34–35.

213. The divide at the Delaware River, which persisted into the early 1800s, is also noted in Churchill, "Gun Ownership in Early America," 630, 636, table 4, 639.

214. Rosswurm, *Arms, Country, and Class*, 50–53; Newland, *Pennsylvania Militia*, 128, n. 9.

215. Jameson, "Equipment of the Militia of the Middle States," 28.

216. *Pennsylvania Archives, Second Series*, ed. John B. Linn and William H. Eagle, 19 vols. (Harrisburg: Clarence M Busch, 1896), 1:658.

217. Jameson, "Organization of the Militia of the Middle States," 163–64.

218. William Finley, speech, April 15, 1808, in *Annals of Congress*, 10th Cong., 1st sess., 18:2182.

219. Taaffe, *Philadelphia Campaign*, 60.

220. Ivor Noel Hume, *James Geddy and Sons, Colonial Craftsmen* (Williamsburg: Colonial Williamsburg Foundation, 1970), 18–19; McDonnell, *Politics of*

Exhibit 22
Page 00483

Case 3:20-cv-02470-WQH-MMP    Document 61-1    Filed 10/13/23    PageID.6577    Page 156 of 158

*War,* 186; Philip D. Morgan and Andrew Jackson O'Shaugnessy, "Arming Slaves in the American Revolution," in *Arming Slaves: From Classical Times to the Modern Age,* ed. Christopher Leslie Brown and Philip D. Morgan (New Haven: Yale University Press, 2006), 185.

221. Richard Henry Lee to George Washington, December 6, 1775, in *Papers of George Washington, Revolutionary War Series,* ed. Philander D. Chase et. al,. 21 vols. to date (Charlottesville: University Press of Virginia, 1985–), 2:500; *A Man Apart: The Journal of Nicholas Cresswell, 1774–1781,* ed. Harold B. Gill Jr. and George M. Curtis III (Lanham, Md.: Lexington Books, 2009), 106 (March 21, 1776); John Page to Richard Henry Lee, February 19, 1776, quoted in McDonnell, *Politics of War,* 180.

222. Churchill, "Gun Ownership in Early America," 631–32, table 2.

223. Whisker, *American Colonial Militia,* 5:173.

224. For informed and thoughtful discussions of the roles of the militia during the American Revolution, see Shy, *A People Numerous and Armed,* 163–79, 213–44; Walter Sargent, "The Massachusetts Rank and File of 1777," and John Resch, "The Revolution as a People's War," in Resch and Sargent, *War and Society in the American Revolution,* 42–69, 70–102; Kwasny, *Washington's Partisan War;* Jameson, "Equipment for the Militia of the Middle States," 26–38; Robert C. Pugh, "The Revolutionary Militia in the Southern Campaign, 1780–81," *William and Mary Quarterly,* 3rd. ser. 14.2 (April 1957): 154–75.

225. Buel, *Dear Liberty,* 77–80.

226. Allan Kulikoff, "The Political Economy of Military Service in Revolutionary Virginia," in Kulikoff, *The Agrarian Origins of American Capitalism* (Charlottesville: University Press of Virginia, 1992), 163, 168, table 4.

227. Ibid.; Sargent, "The Massachusetts Rank and File of 1777," 57–58, table 2.3.

228. Kwasny, *Washington's Partisan War,* 79.

229. For praise from a foe, see Johann Conrad Dohla, November 25, 1777, in *A Hessian Diary of the American Revolution,* trans. and ed. Bruce E. Burgoyne (Norman: University Press of Oklahoma, 1990), 61. For praise from a patriot leader, see James Innes to Thomas Jefferson, October 21[?], 1780), in *The Papers of Thomas Jefferson,* ed. Julian P. Boyd, Lyman H. Butterfield et al., 38 vols. (Princeton: Princeton University Press, 1950–), 4:55.

230. George Washington to Patrick Henry, November 13, 1777, in *Patrick Henry,* 1:542–44.

231. See Churchill, "Gun Ownership in Early America," 630–32, table 2.

232. Ferguson, "Functions of the Partisan-Militia," 247–52.

233. Earl Cornwallis to Sir Henry Clinton, June 30, 1781, quoted in Richard H. Kohn, "The Murder of the Militia System in the Aftermath of the American Revolution," in *The Human Dimensions of Nation Making: Essays on Colonial and*

*Revolutionary America,* ed. James Kirby Martin (Madison: The State Historical Society of Wisconsin, 1976), 309–10.

234. Statement of Arms and Men in Service, February 29, 1781, in *Papers of Jefferson,* 4:470–71.

235. John David McBride, "The Virginian War Effort, 1775–1783: Manpower Policies and Practices" (Ph.D. diss, University of Virginia, 1977), 38.

236. For a concise discussion of the collapse of the Virginia militia in 1780–81, see Kulikoff, "Military Service in Virginia," 171–79. For a good discussion of the problems arming the Virginia militia, see McBride, "Virginian War Effort," 185–90.

237. Thomas Jefferson to Steuben, Richmond, February 15, 1780 [1781]; Steuben to Jefferson, Chesterfield, February 15, 1781; Steuben to Jefferson, Ch[esterfield] Co., February 23, 3 O'clock PM; and Jefferson to the County Lieutenants of Chesterfield and Dinwiddie, Richmond, February 18, 1871, all in *Papers of Jefferson,* 4:695, 621–22, 624, 646.

238. Thomas Jefferson to Steuben, Richmond, April 24, 1/2 after 7 AM; Isaac and Abraham Van Bibber & Co. to Jefferson, Baltimore, March 22, 1781; and Edmund Read to Jefferson, Boyds Hole, on Potomack, April 10, 1871, ibid., 5:549, 210, 349; John Jones to Governor Thomas Nelson, July 27, 1781, in *Calendar of Virginia Papers,* 2:261.

239. Benjamin Blunt to General John Peter Gabriel Muhlenberg, September 11, 1781, in *Calendar of Virginia Papers,* 2:413.

240. Elizabeth Cometti, "Depredations in Virginia during the Revolution," in *The Old Dominion: Essays for Thomas Perkins Abernethy,* ed. Darrett B. Rutman (Charlottesville: University of Virginia Press, 1964), 143.

241. Inhabitants of Amelia to Governor Thomas Nelson, [summer] 1781, in *Calendar of Virginia Papers,* 2:684.

242. John Page to Colonel Theodore Blank, December 10, 1780, *Virginia Historical Register* 4 (1895): 195–99.

243. Brown, *Firearms in Colonial America,* 325–26. For examples of firearms acquired from foreign sources, public purchases, and private sources that have received "supercharges" or stamps of the United States, individual states, and even counties, see Ahearn, *Muskets of the Revolution,* 45–47, 67, 129–30, 145–47, 174–81, 184, 193, 196–97.

244. Richard F. Upton, *Revolutionary New Hampshire: And an Account of the Social and Political Forces Underlying the Transition from Royal Province to American Commonwealth* (Hanover: Dartmouth College Productions, 1936), 124; Jameson, "Equipment for the Militia of the Middle States," 31; McDonnell, *Politics of War,* 279. See also sources cited in note 200.

245. Lee, *Crowds and Soldiers,* 182, 311.

Exhibit 22
Page 00484

246. Paul Lockhart, *The Whites of Their Eyes: Bunker Hill, the First American Army, and the Emergence of George Washington* (New York: Harper, 2011), 75.

247. Lee, *Crowds and Soldiers*, 200–201.

248. George Washington to Governor Jonathan Trumbull, Head Quarters, Morris Town, February 6, 1777, in *The Writings of George Washington from the Original Manuscript Sources, 1745–1799*, ed. John C. Fitzpatrick, vol. 7 (Washington, D.C.: United States Government Printing Office, 1932), 112–13.

249. John A. Houlding, *Fit for Service: The Training of the British Army, 1715–1795* (New York: Oxford University Press, 1981), 140; Richard Holmes, *Redcoat: The British Soldier in the Age of Horse and Musket* (New York: Norton, 2001), 195.

250. Thomas Jefferson, *Notes on the State of Virginia*, ed. William Peden (New York: Norton, published for the Institute of Early American History and Culture, 1982), 88.

251. *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*, ed. Jonathan Elliot, vol. 3 (Philadelphia: J. B. Lippincott, 1859), 386.

252. Computed from table 3 in Churchill, "Gun Ownership in Early America," 634.

253. *The Documentary History of the Ratification of the Constitution* (hereafter cited as *DHRC*), ed. Merrill Jensen, John Kaminski, Gaspare Saladino et al., 25 vols. (Madison: State Historical Society of Wisconsin, 1976–2012), 17:239, 242, n. 6, 253, n. 6.

254. Josiah Harmar, defendant, in *Proceedings of a Court of Enquiry, Held at the Special Request of Brigadier General Josiah Harmar* (Philadelphia: Fenno, 1791), 2, Evans no. 23905.

255. Ibid.

256. Ibid.

257. David P. Szatmary, *Shays' Rebellion: The Making of an Agrarian Insurrection* (Amherst: University of Massachusetts Press, 1980), 99; Leonard L. Richards, *Shays's Rebellion: The American Revolution's Final Battle* (Philadelphia: University of Pennsylvania Press, 2002), 28.

258. William Shepard to Benjamin Lincoln, January 18, 1787, and William Shepard to Henry Knox, Springfield, January 12, 1787, Shays' Rebellion Papers, Historic Deerfield Library, Deerfield, Mass.

259. Militia returns for 1788 from Charlton, Dudley, and Sturbridge, Massachusetts, in Massachusetts Collection, box 5, folder 5, American Antiquarian Society, Worcester, Mass. The Massachusetts adjutant general's statewide annual return for 1790 reported 35,818 muskets for 57,940 militiamen, indicating that 61.8 percent of the men brought firearms to their musters. See Churchill, "Gun Ownership in America," 635n52.

260. Copy of letter to Major General Sheppard from Henry Knox, New York, January 21, 1787, Henry Knox Papers, microfilm, Massachusetts Historical Society, Boston.

261. Don Higginbotham, "The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship," *William and Mary Quarterly*, 3rd ser., 55.1 (January 1998): 39–58.

262. War Office [Henry Knox], *A Plan for the General Arrangements of the Militia of the United States* (New York, 1786).

263. *A Plan for the General Arrangements of the Militia*, 15.

264. Ibid.

265. *Journals of Continental Congress, 1774–1789*, 31:642.

266. *Records of the Federal Convention of 1787*, ed. Max Farrand, 3 vols. (New Haven: Yale University Press, 1911), 2:236, 331.

267. *The Federalist Papers by Alexander Hamilton, James Madison, and John Jay*, ed. Garry Wills (Bantam Books: New York, 1982), 140.

268. *Records of the Federal Convention*, 2:332.

269. Ibid., 2:384–85.

270. Ibid., 2:385.

271. Ibid., 2:385.

272. Ibid., 2:386–87.

273. Ibid., 2:387.

274. Ibid., 2:385.

275. Ibid., 2:386.

276. Ibid.

277. Abraham Baldwin, "Speech in the House of Representatives," March 14, 1796, ibid., 3:369–70.

278. Federal Farmer XVIII, in *DHRC*, 17:362.

279. Ibid.

280. Ibid.

281. Elliot, *Debates*, 3:418.

282. Ibid.

283. Luther Martin, Address no. 1, *Maryland Journal*, March 18, 1788, in *DHRC* 16:419.

284. Ibid.

285. Hamilton No. 29, in *The Federalist Papers*, 139. See also The Landholder No. 10 to the Honourable Luther Martin, Esqu., *Maryland Journal*, February 29, 1788, in *DHRC*, 16:267.

286. *Records of the Federal Convention*, 3:330.

287. Elliot, *Debates*, 3:380.

288. Ibid., 3:379.

Exhibit 22
Page 00485

289. Ibid. Jack Rakove has also pointed to the fact that some Anti-Federalists feared that the militia could be disarmed by federal failure to arm it. See Rakove, "The Second Amendment: The Highest Stage of Originalism," *Chicago-Kent Law Review* 76 (2002): 138–42, and Rakove, "Words, Deeds, and Guns: *Arming America* and the Second Amendment," *William and Mary Quarterly,* 3rd ser., 59.1 (January 2002): 209–10.

290. Elliot, *Debates,* 3:380.

291. Ibid., 3:382.

292. Ibid., 3:390–91.

293. Ibid., 3:421.

294. Helen E. Veit, Kenneth R. Bowling, and Charlene Bangs Bickford, eds., *Creating the Bill of Rights: The Documentary Record from the First Federal Congress* (Baltimore: Johns Hopkins University Press, 1991), 20.

295. Veit, Bowling, and Bickford, *Creating the Bill of Rights,* 12.

296. Ibid., 38.

297. Ibid., 38–39, n. 13.

298. John Randolph to St. George Tucker, September 11, 1789, New York, ibid., 293. Later, as a member of the House of Representatives, Randolph led the fight in 1807 and 1808 to secure federal funds for arming the state militias. See *Annals of the Congress of the United States: The Debates and Proceedings of the Congress,* vol. 18 (Washington, D.C.: Gales and Seaton, 1852), 1020–21, 1025–26, 1049–50, 2176–77, 2183–84, 2186–87, 2195–96.

299. *Annals of the Congress of the United States: The Debates and Proceedings of the Congress,* vol. 7 (Washington, D.C.: Gales and Seaton, 1851), 1384–86, 1928–34; *Annals of the Congress,* 18:1019–56, 2175–96.

300. This is also the conclusion reached by Jameson, "Equipment for the Militia of the Middle States," 27.

301. Moller, *American Military Shoulder Arms,* 1:291, 484–85.

302. For similar assessments see Rakove, "The Second Amendment," 110–11, 113, 154.

303. *Boston Independent Chronicle,* October 1–4, 1798.

☆ ☆ ☆ ☆

# Appendix A
# The Scholarly Landscape since *Heller*

Saul Cornell and Nathan Kozuskanich

☆ ☆ ☆ ☆

DISTRICT OF COLUMBIA V. HELLER has triggered an avalanche of writing since the case was decided in 2008. Activists, law review student editors, scholars, and judges have all contributed to this burgeoning literature. Almost all of the commentary on *Heller* has appeared in law journals. Unencumbered by the often lengthy process of peer review which limits publication turnaround in other scholarly journals, law reviews have been particularly well suited to respond quickly to this landmark case. Law reviews are well positioned to evaluate the impact *Heller* has had in the great American gun debate.[1] With over a thousand law reviews now published in the United States, and many of the top law reviews publishing online supplements to deal with hot issues, one might have predicted an explosion in writing on this issue. Indeed, nearly six hundred articles published between 2008 and 2012 mentioned the *Heller* decision. One thing seems certain: courts will be wrestling with the consequences of *Heller* for some time to come. Given this fact, it also seems a foregone conclusion that students, scholars, judges, and activists will continue to publish on this issue at the same brisk pace.

Although there has been an unrelenting stream of law review articles on *Heller,* to date the case has not attracted much interest from book publishers.

Exhibit 22