Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE NGUYEN, et al., | Case No. 3:20-cv-02470-WQH-MMP |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| ROB BONTA, Attorney General of California, et al., | Date: To be set by the Court |
| Defendants. | Judge: Hon. William Q. Hayes |
| | Courtroom: 14B |

## Table of Contents

I.    Introduction………………………………………………………………1

II.   The Second Amendment Irrefutably Covers the Conduct at Issue…….2

III.  The Proper Historical Analysis Compels Striking Down the OGM Law…………………………………………………………………………..5

    A. The State's Claim About the Supposed Efficacies of the OGM Law Are Irrelevant to the Analysis, and They Are Wrong Anyway……5

    B. The State's Attempts to Avoid the Full Brunt of *Bruen* Are to No Avail……………………………………………………………………7

        1. There is Nothing "Presumptively Lawful" About the OGM Laws…………………………………………………………………..7

        2. Whatever Concerns the OGM Law is Designed to Address, They Are Not "Unprecedented" and Certainly Do Not Warrant Any Leniency……………………………………………………………9

        3. The State Cannot Claim "Historically Broad" General Police Powers in Attempting to Avoid or Water Down the Standards Either……………………………………………………………...13

    C. The Markedly *Dissimilar* Regulations that the State Proffers as "Analogues" Punctuate Just How Clear It is that This Law Cannot Stand……………………………………………………………………16

        1. Gunpowder Regulations……………………………………………16

        2. Restrictions on Sales and Trades with Native Americans………...17

        3. Restrictions on "Deadly Weapons"………………………………...19

        4. Taxing and Licensing Regulations…………………………………20

    D. The Freedom to Purchase Firearms Without any Limitation on Frequency or Quantity is the One True Tradition in this Case, and It is Dispositive. …………………………………………………………...23

IV.   Conclusion…………………………………………………………………25

## Table of Authorities

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871)……………………………………………...3

*California ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171 (9th Cir. 2010)……………15

*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………………………*passim*

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021)………………………...3

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)…………………………………3

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)……………………...15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)………………………...3, 4, 10, 16

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)…………..*passim*

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018)…………………………………………8

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)……………………...2, 3

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023)………………………………13

*United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017)…………………………………23

*United States v. Holton*, 639 F. Supp. 3d 704 (N.D. Tex. 2022)…………….....21, 22, 23

*United States v. Price*, 635 F. Supp. 3d 455 (S.D.W.V. 2022)………………….......23

*Yukutake v. Conners*, 554 F. Supp. 3d 1074 (D. Hawaii 2021)………………………...9

**Statutes**

18 U.S.C. § 922(k)……………………………………………………21, 22, 23

California Penal Code section § 27535……………………………………...5, 8

Fed. R. Evid. 703…………………………………………………………..15

Indian Trade and Intercourse Act (1790)………………………………………18

Tex. Const. art. I, § 13 (1869)…………………………………………...15

**Constitutional Provisions**

U.S. Const. amend. II……………………………………………………*passim*

# <u>Table of Authorities</u> (continued)

## Other Authorities

*Cramer, Clayton E., Colonial Firearms Regulation* (2016)……………………12, 22

Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and Not 1868* (Oct. 1, 2022)…………………………………………19

Merriam-Webster Dictionary Online……………………………………………….13

*Military Obligation: The American Tradition*, vol. 2 (Arthur Vollmer ed.)…………22

National Firearms Act Handbook………………………………………………...15

O. Ned Eddins, "Trade Guns," *Peach State Archaeological Society*………………..13

Randolph Roth, American Homicide 27 (2009)……………………………………11

Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65, 75-77 (2022)………………………………………..16

*Saul Cornell, Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions, SCOTUSblog (Jun. 27, 2022, 5:05 PM)*……………………16

Solomon K. Smith, "*Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*"…………………………………………13, 23, 24

Stephen Halbrook, *The Right to Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont, and Massachusetts*, Verm. L. Rev. at 291-92 (1985)…………………………………………………………………24

William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* (University of North Carolina Press 1996)………………………...14

# I.    Introduction

After almost three years of litigation, three rounds of dispositive briefing, and being on the cusp of yet another expansion of the 30-day commercial firearm purchase ban at issue here (the "OGM law"), a proper resolution is not just long overdue but of pressing need. The right outcome was clear way back before *Bruen*, when this case was first filed. *Heller* already set the stage and the standards that compel the fall of the OGM law. Indeed, even under the watered-down "means-end" form of scrutiny prolific in the Ninth Circuit before *Bruen*, the fate of the OGM law was clear. In having to comply with the then-prevailing "interest-balancing" standards, the parties developed voluminous evidence concerning the State's claims about the efficacies and supposed independent value of this law in attaining the stated legislative purposes. That's really no longer relevant after *Bruen*, which eliminated such interest-balancing by reaffirming the test in *Heller* that "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131 (2022). Under that test, the analysis leads quickly and straightforwardly to the conclusion Plaintiffs have sought all along: that the OGM law must be stricken as unconstitutional.

Yet, in moving for summary judgment under *Bruen*, the State unearths this bevy of evidence as part of a broader agenda to spare the OGM law the full brunt of the proper scrutiny, steer the analysis right back into the prohibited field of "means-end" scrutiny, and hopefully avoid its otherwise inevitable constitutional demise. Indeed, beyond all its efforts to prove the righteousness of the law in advancing California's stated legislative aims, the State takes multiple additional detours from the actual test, each of which is designed to eliminate or significantly lighten its constitutional burden. When it finally gets around to facing the actual test and proffering some "analogues" in defense of the law, the reason for all the previous hesitation becomes quite clear: it can point to nothing "relevantly similar" anywhere in the relevant history, because the OGM law is entirely alien to this Nation's historical tradition of firearm regulation.

It has been a simple question to answer all along and based on nothing more than the analytical framework set out in *Heller* and the long-established legislative facts concerning the protected arms and conduct targeted by the OGM law.[1] And now, with the exceedingly robust record before the Court and *Bruen's* sharp rebuke of the Ninth Circuit's "interest-balancing" framework that controlled at the inception of this case, the result that Plaintiffs foretold and demanded almost three years ago is inevitable. The State can no longer avoid it, and certainly not based on the kind of generic and far-reaching "police" powers that it claims to hold over the good citizens of California. The test is the test, and it must be satisfied. Because the State cannot, never has, and never will be able to do so, its motion for summary judgment must be denied, and Plaintiffs' motion for summary judgment must be granted, putting an end to this law.

## II.     The Second Amendment Irrefutably Covers the Conduct at Issue.

Here, the textual analysis, which "focus[es] on the 'normal and ordinary' meaning of the Second Amendment's language," *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), is as straightforward as they come: just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms" for purposes of carrying firearms in public, *id.* at 2124-25, nothing in the text draws a frequency/quantity distinction with respect to this right for purposes of acquiring firearms in the first instance. Again, the Second Amendment expressly secures "the right of the people to keep and bear *Arms*," U.S. Const. amend. II (emphasis added), in the plural. And it's obvious that *acquisition* is among the "ancillary rights necessary to the realization of the core right to possess a firearm for self-defense," *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017), for

---

[1]     The State has renewed its previous motion to preclude the testimony of George A. Mocsary, Dkt. No. 58, on whom Plaintiffs had relied as an expert concerning certain historical matters. However, as Plaintiffs have made clear through their opening brief which relies on no such evidence, Dkt. No. 60-1, they no longer rely on the testimony of Professor Mocsary because the undisputed and indisputable legislative facts alone foreclose the possibility of finding that the OGM law is consistent with the Nation's history of firearm regulation. Therefore, the State's motion should be denied as moot.

"[t]he core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms," *id.*; *accord Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he right 'implies a corresponding right to acquire and maintain proficiency' with common weapons.") (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). And, in particular as it relates to the 30-day purchase ban at issue, " '[t]he right to keep arms, necessarily involves *the right to purchase them*, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.' " *Teixeira*, 873 F.3d at 678 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)) (emphasis added).

Having already "admit[ted] that California's OGM law implicates the Second Amendment" in the first round of summary judgment motions, Reply-SOUMF 1, No. 9 (Dkt. No. 37-1),[2] the State also admits in its renewed motion for summary judgment ("D-RMSJ") that "the ability to acquire firearms is necessary to keep and bear arms for self-defense," D-RMSJ at 7. And with that, the State has conceded the essential point: that "the Second Amendment's plain text covers" the proposed course of conduct, *Bruen*, 142 S. Ct. at 2126, which involves the commercial acquisition of more than of the firearms targeted under the OGM law within a 30-day period, R-SOUMF Nos. 1-8. Straightaway then, it's clear that "the Constitution presumptively protects that conduct" and the burden shifts to the State to "justify its regulation" of the conduct. *Bruen*, 142 S. Ct. at 2126. Yet, the State seeks to shirk this burden by going on to argue that Plaintiffs' Second Amendment claim fails "as a textual matter," "consistent with" the Supreme Court precedents in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). D-RMSJ at 8-9.

There's nothing "textual" about the State's argument here. Rather, it ignores the clear implications of the Second Amendment's plain text and focuses on what it

---

[2]     "Reply-SOUMF 1" refers to Plaintiffs' Reply to Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts ("SOUMF") in support of Plaintiffs' initial motion for summary judgment ("MSJ"). Similarly, "SOUMF 1" refers to Plaintiffs' SOUMF in support of their initial MSJ, while "R-SOUMF" refers to Plaintiffs' SOUMF in support of Plaintiffs' Renewed MSJ ("P-RMSJ").

characterizes as the not-so-burdensome *effects* of the OGM law when applied. Specifically, the State argues that "Plaintiffs cannot show that the text of the Second Amendment covers their proposed conduct" because they retain ability to acquire and own multiple firearms within 30 days outside the confines of the OGM law's purchase ban, and thus, so the rationale goes, the OGM law "does not prevent the Individual Plaintiffs or other 'people' from 'keep[ing]' or 'bear[ing]' 'Arms.' " D-RMSJ at 8. This conflates the textual prong with the historical prong of the *Bruen* analysis, as the nature and degree of the burden imposed is relevant only to the latter. *See Bruen*, 142 S. Ct. at 2133 (in determining whether regulations are "relevantly similar under the Second Amendment," "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense").

And by no means is such a rationale "consistent with" *Heller* and *McDonald*. It boils down to the "other options" argument that the Supreme Court squarely rejected in *Heller*. 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."). So too here: it is no answer to say—especially "as a *textual* matter"—that it is permissible to impose a 30-day ban on the commercial purchase of arms in common use for lawful purposes simply because the law does not cut off all other possible means to acquire more than one such firearm in a 30-day period. The text of the Second Amendment undoubtedly covers the acquisition activity at issue, such that burden shifts immediately to the State to *justify* this purchase ban through "relevantly similar" historical analogues that demonstrate "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

As Plaintiffs have maintained all along, the State cannot and would not be able to carry this burden and, as discussed further below, its brief in support of its renewed motion for summary judgment makes this reality plain as day. In fact, no historical analysis is even required to see that here. As the State's own brief further confirms, there is no dispute that the arms targeted by the OGM law under California Penal Code

section § 27535(a)-(b) are constitutionally protected arms, and nor could there be. As *Heller* made clear, "the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms,*" *Heller*, 554 U.S. at 582 (emphasis added), and no such protected instruments can be banned unless they are both "dangerous *and* unusual," *id.* at 627 (emphasis added). Handguns and semiautomatic centerfire rifles are indisputably in common use for lawful purposes and not "dangerous and unusual," *see* P-RMSJ 6-7 (listing supportive authorities)—and the State does not claim otherwise.

These undisputed material facts alone make clear that the OGM law cannot survive constitutional scrutiny because *Heller* and *Bruen* have already established the relevant contours of the historical regulation that the Court must examine here, and under those contours the arms targeted by the OGM law cannot be subjected to the law's 30-day ban on commercial purchases by law-abiding citizens. That should be the end of the analysis, and the end of the road for the OGM law. However, given the State's arguments in support of its renewed motion for summary judgment, Plaintiffs will again examine this Nation's tradition of firearms regulation during the relevant period while explaining why the State's defense of the OGM law fails on every front.

### III.   The Proper Historical Analysis Compels Striking Down the OGM Law.

The State attempts several unpersuasive maneuvers around the actual historical test before finally addressing it, only to then proffer supposed historical analogues that come nowhere close to carrying the burden it must carry to save this law. Its motion for summary judgment simply further proves Plaintiffs' point that judgment must be entered in their favor and the OGM law must be struck down as unconstitutional.

### A.   The State's Claims About the Supposed Efficacies of the OGM Law Are Irrelevant to the Analysis, and They Are Wrong Anyway.

Throughout its brief, the State repeatedly emphasizes the stated interests and purported efficacies behind the OGM law in promoting public safety, unabashedly

intertwining its essential theory of the case and virtually all its supporting legal arguments with California's own policy judgments about the supposed need for and value of this law. D-RMSJ at 2-3, 9-10, 11, 13-15. In doing so, the State has anchored its position to the now legally-invalidated analytical framework of interest-balancing, sinking its case for summary judgment. *See Bruen*, 142 S. Ct. at 2133 & n.7 (that courts must consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified" under the *Bruen* framework "does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry").

Although it is clear that the government cannot "simply posit that the regulation promotes an important interest," *id.* at 2126, the State waives around its claimed interests like a banner, as if they are essential—if not dispositive—to the analysis. *See e.g.,* D-RMSJ at 11, 13-14 (devoting large swaths of its brief to proving up the notion that the OGM law is designed to and actually does promote "public safety" consistent with a government's police power to "generally regulate problems as they arise," irrespective of the goings-on during the relevant historical period). First and foremost, this is irrelevant. *Bruen*, 142 S. Ct. at 2133 & n.7 (quoting *Heller*, 554 U.S. at 635) (emphasis altered in *Bruen*) ("Again, the Second Amendment is the 'product of an interest balancing *by the people*,' " and analogical reasoning requires that we "apply faithfully the balance struck by the founding generation to modern circumstances").

Second, it's even wrong to say that the OGM law actually promotes the stated interests that the State takes such pain to prove it serves. In the prior round of cross-motions for summary judgment, Plaintiffs already exhaustively detailed the fallacies and material limitations of the State's claims about the supposed efficacies of the OGM law. Because the State now unearths these materials in support of its renewed motion, Plaintiffs incorporate their arguments and authorities in response to these claims. *See* Dkt. No. 34 at 12-23 (Plaintiffs' opposition to Defendants' initial MSJ); SOUMF 1 (Dkt. No. 37-1) ¶¶ 32-75. Plaintiffs also further address these efficacy claims in their

response to the State's Statement of Undisputed Material Facts in support of its renewed motion for summary judgment, Dkt. No. 59-1, contemporaneously filed with this opposition to the State's renewed motion. In short, as Plaintiffs' myriad responsive points plainly show, a litany of other state and federal regulatory schemes already address the same stated interests of reducing the incidence of illegal firearms trafficking and straw purchases, the State's studies about OGM laws are based on flawed and incomplete data, no other evidence reliably supports a finding that a 30-day purchase ban like California's is at all necessary much less effective in addressing these issues, and the State has flat out conceded that no evidence exists to support its claim in this litigation that OGM laws impact the incidence of "mass homicides." *Id.*

## B.   The State's Attempts to Avoid the Full Brunt of *Bruen* Are to No Avail.

On top of all its flagging about the supposed efficacies of the OGM law in promoting public safety, the State spills much additional ink developing three other arguments designed to either entirely eliminate the burden it must carry or reduce it to the point of gutting the essential protections infused into *Bruen's* historical framework: (1) that the OGM law is entitled to "presumptively lawful status," (2) that the law addresses "unprecedented societal concerns or dramatic technological changes," and (3) the State "has historically enjoyed broad authority to regulate the commercial sale of products, including firearms, to promote public safety." D-RMSJ at 9-11, 14-15.

### 1.   There is Nothing "Presumptively Lawful" About the OGM Law.

In more of the circular, interest-balancing logic that employs the stated interests behind the law as the means of proving its own legality, the State claims that the OGM law is entitled to a cloak of presumptive lawfulness because it "merely imposes" a " 'presumptively lawful regulatory measure[],' " D-RMSJ at 10 (quoting *Heller*, 554 U.S. at 626-27, 627 n.26), since the State's regulation of "when and where" the subject firearms may be purchased makes the law only a " 'condition on commercial sales,' "

*id.* (quoting *Pena v. Lindley*, 898 F.3d 969, 976, 1009 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part)). From there, the State leaps to the conclusion that this law may be "adopted consistent with the Second Amendment." D-RMSJ at 10. However, this is not a mere "condition" on the commercial *sale* of the protected arms—it is a *ban* on their *sale and purchase* by law-abiding citizens, which persists for 30 days and for no reason other than that the law-abiding citizen previously purchased *one* such arm—and that is, *either* a handgun or a semiautomatic centerfire rifle. Cal. Pen. § 27540(g) ("A handgun or semiautomatic centerfire rifle shall not be delivered whenever the dealer is notified by the Department of Justice that within the preceding 30-day period, the purchaser has made another application to purchase either a handgun or semiautomatic centerfire rifle and that the previous application to purchase did not involve any of the entities or circumstances specified in subdivision (b) of Section 27535."). Moreover, even if the law does constitute a "presumptively lawful regulatory measure," at most the upshot is that it is simply *presumed* to be lawful; it does not *evade* the necessary scrutiny under *Bruen*, as the State suggests in portraying this presumption as an independently dispositive basis on which to uphold the law. *See* D-RMSJ at 11 (proceeding to the historical analysis only after *assuming arguendo* that the OGM law "could not be considered a presumptively lawful condition on the commercial sale of firearms," as if the analysis could end right there).

The law readily fails the required scrutiny, as discussed below, obliterating any initial presumption of lawfulness to which it *might* be entitled. *See Pena*, 898 F.3d at 1005-08 (outlining case law of the federal circuits recognizing that any presumption of lawfulness arising under the general category of "conditions on commercial sales" is, like any other presumption, subject to rebuttal, since otherwise *any* "condition" could be attached, no matter how destructive to the right of armed self-defense). Further, the State improperly splices off the *additional* requirement that the regulation must be "longstanding" in order to even qualify at the threshold for any such classification. *See Heller*, 554 U.S. at 626-27 ("nothing in our opinion should be taken to cast doubt on

*longstanding* prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms") (emphasis added). As the State has repeatedly conceded throughout this litigation, and as this Court has already found, the first OGM law was not enacted until the 1970s.  Dkt. No. 49 at 7-8 (Order on initial MSJs). Again, fully consistent with the contours of the relevant history under the *Bruen* framework, even *early* 20th century regulations do not suffice to claim "presumptively lawful" status. *See Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1082 (D. Haw. 2021) ("[A] handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a 'longstanding' historical tradition of 'presumptively lawful' firearm prohibitions."). Surely, the handful of *late* 20th century OGM laws in a few other states do not suffice to claim any such status. In all events though, the OGM law must fall because the State cannot carry its fundamental burden of demonstrating it is consistent with this Nation's tradition of firearms regulation.

## 2.   Whatever Concerns the OGM Law is Designed to Address, They Are Not "Unprecedented" and Certainly Do Not Warrant Any Leniency.

In its second detour away from the actual analogical test required, the State digs for a "more nuanced approach" to the OGM law on the basis that it "addresses 'unprecedented societal concerns or dramatic technological changes' " in relation to the historical period that the *Bruen* court established as the relevant analytical parameters. D-RMSJ at 11 (quoting *Bruen*, 142 S. Ct. at 2131-32). At the outset, the State makes no attempt to claim any "dramatic technological changes" are in play here, limiting its argument to the purported existence of "unprecedented societal concerns." On that front, the State does not venture to explain exactly what this "more nuanced" approach looks like for laws supposedly addressing such concerns. However, it does attempt to justify the law in this context by arguing the principle that "[g]overnments

generally regulate problems as they arise." *Id*. Thus, the logic of the State's argument necessarily implies that governments can and should survive scrutiny under *Bruen* so long as they show the law at issue was enacted contemporaneously with the "problem" they seek to regulate, *irrespective* of the contours of the relevant history under *Bruen*.

The State puts far too much of a spin on the language of *Bruen* here: any such "approach" would gut the essential protections that the historical test is designed to secure. Although *Bruen* observed that some cases "implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" because "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation 1868," *Bruen*, 142 S. Ct. at 2132, at no point did the Court untether the analysis from the relevant historical period in such cases. In fact, the analytical foundation of this discussion regarding nuances was the Court's earlier explanation that " 'historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuance judgments about which evidence to consult and how to interpret it.' " *Id.* at 2130 (quoting *McDonald*, 561 U.S. at 803-04). It then distinguished the historical analysis as superior to any form of interest-balancing:

> [R]eliance on history to inform the meaning of constitutional text— especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise' in the field.

*Id.* (quoting *McDonald*, 561 U.S. at 790-91). And when the court specifically discussed the process of "determining whether a historical regulation is a proper analogue for a distinctly modern firearm," it reaffirmed that doing so ultimately "requires a determination of whether the two regulations are 'relevantly similar,' " just the same as any other regulation. *Id.* at 2132.

Thus, the State doesn't get a free pass or a watered-down test in cases "implicating unprecedented societal concerns." Moreover, the reality is this case does

not involve any "unprecedented societal concerns" so as to even invoke the "nuanced approach" aspect of *Bruen*. The basic problem the OGM law purports to address is to keep firearms out of the hands of those who cannot legally own or possess them. *See* D-RMSJ at 2-3. That problem is as old as the hills in the history of firearms regulation, as the State itself highlights in showcasing all the 17th century regulations designed to disarm Native Americans as "savages" during early colonial times. D-RMSJ at 18-19; Ex. 10 to D-RMSJ (McCutchen Report) at ¶¶5, 16, 17, 18, 19, 20, 21, 22, 23. Nor is the general problem of firearm violence anything new or unprecedented. *See* D-RMSJ at 2-3 (citing the stated purposes the OGM law as "curtail[ing] the illegal gun market, disarm[ing] criminals, and sav[ing] lives"); *Bruen*, 142 S. Ct. at 2131 (firearm violence is "a general societal problem that has persisted since the 18th century"). In fact, for most of the 17th century, the "peacetime murder rate for adult colonists . . . ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States" in 2009. RANDOLPH ROTH, AMERICAN HOMICIDE 27 (2009) (Ex. 1 in support of Plaintiffs' Opposition to D-RMSJ), available at https://www.hoplofobia.info/wp-content/uploads/2020/07/2009-Randolph_Roth-American_Homicide.pdf. Indeed, in its quest to spare the OGM law the full brunt of the historical test here, the State's focus on this aspect of the *Bruen* opinion can only further portend the law's inevitable constitutional demise.

As the Supreme Court explained in this context, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," as is the case here, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is *inconsistent* with the Second Amendment." 142 S. Ct. at 2131 (italics added). "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* We see that here too. The State's own evidence spotlights that the Founding generation dealt with the same basic problems, in particular disarming the Native American

population by criminalizing sales to or trades with them as "illegal arms trading," i.e., "*trafficking*,"[3] which led to "Native violence." Ex. 10 to D-RMSJ (McCutchen) at ¶¶ 20-23. Yet, nowhere among the battery of laws discussed in the State's brief, in its expert reports, or in the resources cited by the experts does anything like the OGM law appear. The *only* thing we see among it all is a single law that dealt with the problem through the "materially different means" by solely prohibiting colonists from carrying "more than one gun and ten charges of powder" at times when they were traveling "within any Indian town or three miles without the English plantations," for the purpose of reducing the potential for illegal trading with the Natives. *Id.* at ¶19 (citing a Virginia law from 1676). We see *no* general restrictions on *either* the frequency or the quantity of firearms law-abiding citizens could commercially acquire. To the contrary, as Plaintiffs previously detailed, not only was the Founding generation not subjected to quantity or frequency over time regulations, but the colonies almost universally *required* firearm ownership. R-SOUMF No. 14; *Cramer, Clayton E., Colonial Firearms Regulation* (2016) at 1, https://ssrn.com/abstract=2759961 or http://dx.doi.org/10.2139/ssrn.2759961 (Ex. 9 in support of P-RMSJ).

Lastly, that *economic* factors and *market* conditions during the Founding era (and even Reconstruction era, although the former is the only period of significance, as detailed in Plaintiffs' opening brief) may have limited the free citizenry's ability to acquire "multiple firearms in single transactions" is certainly no cause for special treatment of the OGM law either, as the State portrays it. D-RMSJ at 12-13. Even if it's true "firearms were not widely available or purchased during the Founding and Reconstruction eras" because features of the industry and economy rendered them largely cost-prohibitive, *id.*, that cannot somehow transmogrify the OGM law into a

---

[3]     "Trafficking" simply means "the practice of dealing or trading in a commodity or service, often an illegal one." https://www.dictionary.com/browse/trafficking

regulation that tackles an "unprecedented" problem so as to warrant relaxed standards.[4] Indeed, conditions of an *economic* nature can in no way speak to the relevant inquiry. All that can matter here are *government regulations* imposed on the right to keep and bear arms—i.e., government-imposed limitations on the frequency and/or quantity of acquisition in the absence of which people would otherwise remain free of any such limitations. *Bruen*, 142 S. Ct. at 2126, 2132 (the question is "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" such that the latter is "consistent with this Nation's historical tradition of firearm regulation").

Ultimately, the only thing "unprecedented" in this case is the OGM law *itself*, and a law like this must bear the full brunt of the historical test under *Bruen*.[5]

### 3.   The State Cannot Claim "Historically Broad" General Police Powers in Attempting to Avoid or Water Down the Standards Either.

Again steering away from the actual historical test under *Bruen* and back towards a prohibited "framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," 142 S. Ct. at 2125, the State attempts to

---

[4]     Further, the thrust of this assertion is that firearms were too expensive for the average person to buy "in bulk." Ex. 11 to D-RMSJ (Rivas) ¶¶ 8, 25-29; Ex. 10 to D-RMSJ (McCutchen) ¶¶5-6, 9, 12, 26. However, sources cited in these reports rebut the notion that firearms of the day were generally cost-prohibitive. *See e.g.*, Ex. 10 to D-RMSJ ¶ 6 & n. 2 (citing O. Ned Eddins, "Trade Guns," *Peach State Archaeological Society*, documenting that settlers, trappers, and hunters in this era recognized "Indian trade guns" as "inexpensive game getter[s]"); *id.* ¶8 n. 9 (citing Solomon K. Smith, "*Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*" at 3, which documented that it was "relatively quick and inexpensive to produce individual guns" "by the end of seventeenth century"). And, of course, *anything* bought "in bulk" could be cost-prohibitive for many people at any given time, *see* https://www.merriam-webster.com/dictionary/bulk ("bulk" means "being in large quantities or not divided into separate units"), whereas here the concern is over the OGM law's prohibition against the commercial purchase of merely *more than one* of the subject firearms by law-abiding citizens within any given 30-day period.

[5]     The State's citation to *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) in this context, D-RMSJ at 13, is plainly inapt: that case concerned sentencing enhancements for those convicted of perpetrating violent crime with a firearm, whereas the OGM law imposes its purchase ban against *law-abiding* citizens like Plaintiffs who seek to make the prohibited purchases for lawful purposes and who have not even been shown to pose any kind of risk to society much less been convicted of any crimes.

justify the OGM law based on the principle that "the government has historically enjoyed broad authority to regulate the commercial sale of products, including firearms, to promote public safety." D-RMSJ at 14. Making no attempt to cite any "relevantly similar" analogues from the relevant time period, the State points to the existence of various unspecified commercial regulations on "numerous products," "from boards and shingles to beef and pork," *id.* at 14-15, which had nothing to do with constitutionally protected property and conduct and thus can say nothing about the rights at stake here. The few references that the State makes to the regulation of *firearms* are non-descript, entirely inapt, or based on improper opinion. The first reference is to a book by William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* (University of North Carolina Press 1996), Ex. 16 to D-RMSJ, where Novak simply says a single state (Massachusetts) enacted "regulations" on "gunpowder" and "firearms" in the early 1800s, with no description of the nature of these regulations or even a citation to code or book of statutes where they may be found. Any "gunpowder" regulations could not bear any relevant similarity to the OGM law in any event, as discussed below, and the "firearm" regulations are of zero relevance in the absence of any information demonstrating they are at all similar to the OGM law.

The second reference is to paragraphs 27 and 28 of McCutchen's report, which the State cites as support for the proposition that "it was well understood that state and local governments possessed the inherent police power to regulate the firearms and ammunition market to address public safety." D-RMSJ at 15. These paragraphs of McCutchen's report, however, discuss nothing more than "laws restricting the trade of goods like guns and gunpowder to Native peoples during the founding and Early Republic eras." Ex. 10 to D-RMSJ ¶¶ 28-29. The third reference is to paragraph 23 of Rivas's report, which the State cites as support for the same proposition. D-RMSJ at 15. In this part of his report, Rivas discusses National Firearms Act of *1934* in support an opinion that "[f]rom the nineteenth century well into the twentieth, the American

people, their legislatures, and their judges believed that sales regulations upon firearms were permissible strategies to protect the public from gun violence." Nothing in the National Firearms Act is "relevantly similar" to the OGM law based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2132-33, and the State doesn't claim otherwise.[6] Even if the Act bore some kind of similarity, a *20th century* law cannot serve as any kind of reliable source in justifying the restrictions of the OGM law, particularly when both the text of the Second Amendment and the rest of the relevant history directly contradict the implementation of such a regulation. *See id.* at 2137 (even "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence"); *id.* (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (" '[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.' "). Further, Riva's assertion about what "the American people, their legislatures, and their judges *believed*" at the time lacks foundation and is improper speculation. Fed. R. Evid. 703; *California ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171, 1181 n.4 (9th Cir. 2010) (" 'An expert's opinions that are without factual basis and are based on speculation or conjecture' are inadmissible at trial and are 'inappropriate material for consideration on a motion for summary judgment.' [Citation omitted].").

Nor can the State create a "police power" exception for the OGM law by citing "expansive language" in a single, late day state constitution that declared the right to keep and bear arms was subject to "*such regulations as the Legislature may prescribe*." D-RMSJ at 15 (quoting Tex. Const. art. I, § 13 (1869)) (emphasis added in D-RMSJ). While the rationale of this argument—that a state has free rein to impose against the

---

[6]     *See* National Firearms Act Handbook, https://www.atf.gov/firearms/national-firearms-act-handbook.

right to keep and bear arms whatever regulations it likes—may suit California's "police state" and "means-end" theories for justifying the OGM law, it is clearly untenable. *See Bruen*, 142 S. Ct. at 2129 (quoting *Heller*, 554 U.S. at 634) (internal quotation marks omitted) ("*Heller* and *McDonald* expressly rejected the application of any judge-empowering interest-balancing inquiry that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' ").[7]

There is no escape hatch, loophole, or exception for whatever may "promote public safety." Like it or not, the State must go through the test laid out by *Bruen*.

## C.  The Markedly *Dissimilar* Regulations that the State Proffers as "Analogues" Punctuate Just How Clear It is that This Law Cannot Stand.

By the time the State begrudgingly takes on the real job of attempting to demonstrate the existence of a relevantly similar historical analogue, it points to nothing at all similar to the "how and why" of the OGM law it seeks to sustain.

### 1.    Gunpowder Regulations

The State attempts to make a viable analogue out of gunpowder regulations on the books in jurisdictions between the late 1700s and early 1900s, but only at the highest level of generality. D-RMSJ 15-18. The State claims these regulations imposed

---

[7]     As support for this broad claim to far-reaching regulatory powers, the State cites Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65, 75-77 (2022), Ex. 17 to D-RMSJ. Cornell is hardly a credible source on whom to rely in resolving any Second Amendment claim under the controlling standards of *Bruen*. He has authored multiple publications leveling strong criticism against *Heller*, *McDonald*, and *Bruen*, as well as against Justice Thomas personally, arguing the findings, conclusions, and holdings in these opinions should be rejected outright as "Fiction, Fantasy, and Mythology" and that Justice Thomas and his "ideological co-conspirators" are "[d]istorting the past to further [their] ideological agenda" and to pander to the interests of the Federal Society. *Saul Cornell, Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions, SCOTUSblog (Jun. 27, 2022, 5:05 PM), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/*

a "comparable burden" and were "comparably justified" in this context, because they "placed limits on the ownership and storage of gunpowder" without banning gunpowder altogether and they "served to promote public safety." *Id.* As the State has to admit, however, the purpose of these regulations was markedly different: they were designed to mitigate the risk of *accidental* explosions and fires posed by unregulated or otherwise unmonitored storage of large amounts of gunpowder, "especially in urban areas with wooden infrastructure" vulnerable to significant fire damage or casualties. *Id.* at 15-16. The OGM law, by stark contrast, imposes a 30-day purchase ban against law-abiding citizens like Plaintiffs seeking to acquire arms in common use for lawful purposes and, according to the State's own stated interests, this law has nothing to do with mitigating risks of explosions or fires in urban areas, but is instead designed to prevent gun *crimes* and other *intentional* misuse of firearms by "curtail[ing] the illegal gun market, disarm[ing] criminals, and sav[ing] lives." D-RMSJ 2-3. Further, unlike the OGM law, the gunpowder regulations did not impose any specific *quantity-over-time* limitations based on the supposition that *law-abiding* citizens could not be trusted to act lawfully with more than some arbitrarily-established amount. That the OGM law and these gunpowder regulations were both designed to "promote public safety" is surely not enough to bridge the otherwise great analogical divide between them, for the same could be said about almost any governmental regulation concerning the public welfare. *See Bruen*, 142 S. Ct. at 2131 (the government cannot "simply posit that the regulation promotes an important interest" in carrying its burden here).

### 2.    Restrictions on Sales and Trades with Native Americans

Even more remote from the requisite degree of similarity are the laws "regulating the trade and sale of firearms" to Native Americans that the State also pitches as analogues to the OGM law. D-RMSJ at 18-20. On the one hand, the State disclaims any effort to condone laws like these that wrongfully target people based on their race or ethnicity, but on other it says these laws "can confirm enduring traditions

of firearm regulation." *Id.* at 18 n.7. The State can't have it both ways—proffering these laws as purported analogues but divorcing itself from the motivations behind them—because those motivations necessarily form the basis for the "how and why" that must be considered in assessing the comparability of their burdens and justifications. *Bruen*, 142 S. Ct. at 2132-33. Those very specific and very different motivations necessarily preclude any logical, much less relevantly similar, connection. According to the State's own expert, these laws were motivated by sentiments that Native Americans were "very poisonous and destructive" to the white population, and thus sought to either disarm them completely or to ensure all traded weapons were "inferior to those owned by whites," such that the Natives were rendered dependent or subjugated to whites. Ex. 10 to D-RMSJ ¶¶5, 16, 17, 18, 19, 20, 21, 22, 23.

Unless the State intends to argue that the OGM law is designed to establish firearm restrictions based on similarly bigoted or racist motives—something it appears to have expressly disclaimed—these restrictions against Native Americans speak for themselves in defeating any claim that they represent historical analogues that could justify the OGM law as part of "this Nation's historical tradition of firearm regulation." In fact, these Natives were not even considered part of the "People" during the Founding Era; hence the need for acts of Congress to authorize any lawful dealings in the trade or sell of property involving Native Americans. *See* Indian Trade and Intercourse Act (1790) § 5 ("And be it further enacted, That no sale of lands made by any Indians, or any nation or tribe of Indians with the United States, shall be valid to any person or persons, or to any State, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty held under the authority of the United States."), available at https://www.loc.gov/resource/rbpe.21401300/?sp=2&st=image. Thus, laws restricting their ability to purchase arms at the Founding can tell us nothing about the rights of Plaintiffs (who indisputably *are* part of "the people") today.

### 3.   Restrictions on "Deadly Weapons"

The State cites a small batch of post-Reconstruction era sales restrictions against certain knives, swords, spears, metal knuckles, and pistols in three states—Georgia (1837), Tennessee (1879), and Arkansas (1881)—and sales restrictions against slung slots and metal knuckles (with unspecified dates) in a handful of other states (Vermont, New York, Kentucky, Florida, Maryland, and Oklahoma), which these states classified as "deadly weapons" at the time. D-RMSJ at 19. The claim to relevant similarity here is nothing more than the generic interest in "address[ing] public safety risks." *Id.* at 20. Again, that is not enough. *Bruen*, 142 S. Ct. at 2131. Moreover, once again, the "how and why" of such laws are not even close. First, these laws come late in the game. *Id.* at 2137 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *see also* Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and Not 1868* (Oct. 1, 2022), available at https://bit.ly/3CMSKjw (Ex. 4 to P-RMSJ).[8]

Second, there's never been any claim that the weapons targeted by the OGM law are either "dangerous" or "unusual"—much less that they are *both* "dangerous and unusual" so as to be subject to any kind of weapons ban. *Heller*, 554 U.S. at 627. Rather, the State has not disputed the essential fact that the targeted arms are not subject to *general* prohibitions rendering them "unlawful to sell," D-RMSJ at 19, because they are in common use for lawful purposes. Nor can there be any reasonable dispute on this point. *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627) ("The Second Amendment protects the possession and use of weapons that are 'in common use at the time.' "); *id.* at 628-29 (the handgun is "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense).

---

[8]   Although the State doesn't rely on them, Rivas references another small group of restrictions on knives, brass knuckles, and slung shots, but they also come late, having been enacted between 1849 and 1899. Def. Ex. 11 (Rivas Report) at ¶ 19, 20.

For the same reason, just as colonial laws that "prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s" could "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today, laws from the mid to late 19th century that may have prohibited the sale of certain weapons deemed "dangerous" can provide no justification for a 30-day ban on the purchase of the arms targeted by the OGM law that are also "unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143. Lastly, whatever these laws established in their individual territories at the time, being from just a handful of jurisdictions they cannot establish any "historical tradition of firearm regulation." *See id.* at 2142 ("We doubt that three colonial regulations could suffice to show a tradition of public-carry regulation."); *id.* at 2155 (quoting *Heller*, 554 U.S. at 632) (rejecting "a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence").[9]

### 4.   Taxing and Licensing Regulations

The "taxing and licensing regulations" that the State cites in its last effort to proffer a viable historical analogue equally fail to compare in their "how and why." The first set of such regulations are licensing requirements enacted in the 18th century to control the sale and trade of arms with Native Americans based on the then-prevailing concerns over "arming potential hostile Native groups," D-RMSJ at 20-21, and are thus among the same lot of restrictions based on racist or bigoted motives that

---

[9]   In fact, the way that Rivas portrays these laws, they stemmed from a "general disdain" for "the habitual carrying of weapons in public spaces" or from a disdain for concealable weapons based merely on their inherent capability to cause harm. Ex. 11 to D-RMSJ ¶¶ 14, 17. To whatever extent this may have been true in those jurisdictions, *Bruen* has rejected any such sentiments towards public carrying as "outlier" laws, *Bruen*, 142 S. Ct. at 2156, and *Heller* already took account for the general concerns about the misuse of firearms in society, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution.").

self-evidently fail to constitute any sort of recognizable "historical tradition." The late 19th century licensing regulations are irrelevant as well, both because they come far too late to matter and because the requirement of a license to sell firearms *alone* is clearly beyond the scope of this challenge, in which the Plaintiffs simply seek to lift the OGM law's prohibition against purchasing more than one of the subject arms from *licensed* commercial dealers. Complaint (Dkt. No. 1) ¶ 33 ("In California, individuals are required to purchase and transfer firearms through state and federally licensed dealers in face-to-face transactions or else they face serious criminal penalties.").

As for the taxing regulations, the State cites only a handful of such regulations enacted between 1838 and 1867, D-RMSJ at 22, so they are also too late and too few to matter. Further, assuming the State is correct that these regulations were enacted for the specific purpose of "*limit[ing]* the availability and ownership of firearms," *id.* at 22, any such policy rationale is a misfit. Where the arms at issue are *constitutionally* protected as arms in common use for lawful purposes, they cannot be subjected to any form of regulation that is designed to effectively ban them from the hands of law-abiding citizens like Plaintiffs, whether by "increasing the costs of those weapons" so as to make their acquisition cost-prohibitive, *id.* at 22, or otherwise. Again, we are not dealing with "deadly weapons" of yesteryear that some jurisdictions sought to prohibit through various regulations generally limiting their "availability and ownership." We are dealing with firearms that are indisputably in common use throughout California and across the county for lawful purposes by law-abiding people like Plaintiffs. Like the rest of the colonial-time "deadly weapon" restrictions that the State cites, it's an apples-versus-oranges comparison with no "relevantly similar" connection at all.

The State cannot narrow the divide here by pointing to an opinion of a judge in the northern district of Texas, addressing a Second Amendment challenge to the federal law criminalizing the knowing transport, shipment, receipt, or possession of a firearm whose original serial number has been removed, obliterated, or altered (18 U.S.C. § 922(k)). D-RMSJ at 23 (analogizing to *United States v. Holton*, 639 F. Supp. 3d 704

(N.D. Tex. 2022)). While the State characterizes the *Holton* case as "favorably citing the historical discussion of such regulations" so as to draw a meaningful connection between them and the OGM law at issue here, *id.* at 23, it does no such thing.

A law that in no way limits a person's ability to lawfully acquire a firearm and which only applies to *post*-acquisition *intentional wrongdoing* with a firearm hardly resembles the OGM law and its 30-day *purchase ban* that bars *law-abiding* citizens from making commercial purchases of constitutionally protected arms in the first place. With their own central purposes being fundamentally different, what may be relevantly similar to one cannot be said to be relevantly similarly to the other.

Whatever may be said of the relationship between 18 U.S.C. § 922(k) and historical regulations creating registration and record-keeping requirements for firearms *purchased and sold*, *Holton*, 639 F. Supp. 3d at 711, they can bear no relevantly similar relation to the OGM law's purchase ban. Indeed, the "mandatory muster" registration requirements cited by the court, *id.* at 711, call us back to the very point that Plaintiffs emphasized in their opening brief about the general tradition that serves as the most relevant backdrop for the OGM law: the free citizenry not only faced no restrictions on the frequency or quantity of firearm purchases, but the colonies almost universally *required* firearm ownership. R-SOUMF No. 14; Ex. 9 to P-RMSJ (*Cramer, Clayton E., Colonial Firearms Regulation* (2016)) at 1. Consistent with this general tradition, the free citizenry commonly owned, possessed, and carried on their person more than one firearm, R-SOUMF No. 13, and several colonies required their militiamen to be equipped and to keep with them at all times a "case of good *pistols*"— i.e., *multiple* firearms, R-SOUMF No. 17; (Ex. 10 to P-RMSJ) *Military Obligation: The American Tradition*, vol. 2 (Arthur Vollmer ed., 1947).

The other historical regulations cited in *Holton* were the same ones already discussed above, which imposed taxes and "prevent[ed] the sale of firearms to Indian

tribes," *Holton*, 639 F. Supp. 3d at 711, neither of which could serve as a relevantly similar analogue to the OGM law, or likely to § 922(k) either, for all reasons stated.[10]

**D.      The Freedom to Purchase Firearms Without Any Limitation on Frequency or Quantity is the One True Tradition in This Case, and It is Dispositive.**

The tradition of permitting the free citizenry to live free of any restrictions on the frequency or quantity of firearms they purchased, and in fact *mandating* the acquisition and possession of firearms, during the relevant time period is what matters most in analyzing the constitutionality of the OGM law. It is simply not true that "[t]he absence of restrictions on the number of firearms that could be purchased arises more from structural differences in the gun-making and distribution industries than from a nineteenth-century aversion to such a policy," Ex. 11 to D-RMSJ ¶ 31, as Rivas claims in attempting to render an improper opinion on how this case should be resolved, *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (an expert may not "undertake[] to tell the jury what result to reach" because such an opinion "attempts to substitute the expert's judgment for the jury's"). And it is also perverse to claim, as McCutchen does in rendering a similarly improper expert opinion, that during "the late colonial and founding / Early Republic eras" "individuals did not see the ownership of multiple firearms, or even professional repair services for their existing firearms, as necessary for their safety and protection." Ex. 10 to D-RMSJ ¶ 7. Indeed, McCutchen's own cited sources rebut this claim, recognizing that "firearms quickly became the main weapon of choice for both individual protection as well as defending the colony." Solomon K. Smith, "*Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture          in          Early          North          America*,"          4,

---

[10]      While the court in *Holton* upheld 18 U.S.C. § 922(k) against the Second Amendment challenge, finding the government had carried its burden in citing the above-referenced regulations, another district court opinion has reached the opposite conclusion and held the law unconstitutional based on the absence of any relevantly similar analogues. *United States v. Price*, 635 F. Supp. 3d 455, 464 (S.D.W.V. 2022).

Fortyninthparalleljournal.com, https://fortyninthparalleljournal.files.wordpress.com/2014/10/solomonsmithautumn2014.pdf (cited in McCutchen's report at ¶ 8 n. 9).

Again, "Vermont's founding fathers" "carried a gun and a brace [a pair] of pistols on their persons as a common practice." Stephen Halbrook, *The Right to Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont, and Massachusetts*, VERM. L. REV. at 291-92 (1985), available at https://www.stephenhalbrook.com/law_review_articles/state-bills.pdf (Ex. 5 to P-RMSJ). The essential, indisputable fact is that whatever firearm regulations *did* exist then, the OGM law was entirely alien to this world, as nothing even remotely like it appeared until 1975, and still to this day only a small handful of states have such restrictions. SOUMF 1 ¶¶ 13-17. "Pistols in the pocket and an arsenal at home were options available to every free citizen." *The Right to Bear Arms*, VERM. L. REV. at 295. It is "this balance" of individual freedoms, "struck by the traditions of the American people," "that demands our unqualified deference," *Bruen*, 142 S. Ct. at 2131—not the 20th and 21st century policy judgments of California's legislature that directly conflict with it, *see id.* at 2154 (Barrett, J., concurring) (quoting *Heller*, 554 U.S. at 614) (even *late-19th-century* laws that "conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive'").

No "well-established and representative" tradition of prohibiting any of the free citizenry from purchasing more than one firearm—of *any* type, much less of the *most popular* types—within 30 days exists here. Thus, nothing in the record reveals "a comparable burden on the right of armed self-defense" at any time during the relevant history, as the State must show to save this law. *Bruen*, 142 S. Ct. at 2132.

## IV.    Conclusion

For these reasons, Plaintiffs respectfully request this Court grant their motion for summary judgment and deny Defendants' motion for summary judgment.

Dated:  October 13, 2023                    The DiGuiseppe Law Firm, P.C.


                                            By   /s/ *Raymond M. DiGuiseppe*
                                              Raymond M. DiGuiseppe
                                              Attorneys for Plaintiffs