ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
JERRY T. YEN
Deputy Attorney General
State Bar No. 247988
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
  Fax: (916) 324-8835
  E-mail: Jerry.Yen@doj.ca.gov
*Attorneys for Rob Bonta, in his official capacity as California Attorney General, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE NGUYEN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of California and ALLISON MENDOZA, in her official capacity as Director of the Department of Justice Bureau of Firearms,**<br><br>Defendants. | Case No. 3:20-cv-02470-WQH-MMP<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**<br><br>Date: To be set by the Court<br>Judge: Hon. William Q. Hayes<br>Courtroom: 14B<br>Action Filed: Dec. 18, 2020 |

    Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 7.1.f.1, and the Court's Chamber Rules and Procedures, Defendants Rob Bonta, in his official capacity as Attorney General of California, and Allison Mendoza, in her

1

official capacity as the Director of the California Department of Justice Bureau of Firearms, submit the following Response to Plaintiffs' Statement of Undisputed Material Facts.

| | **Plaintiffs' Stated Undisputed Fact** | **Defendants' Response** |
|---|---|---|
| 1. | Defendants have enforced and are continuing to enforce California's OGM law. | Undisputed. |
| 2. | Individual Plaintiffs (Nguyen, Boguski, Medina, Colletti, Phillips, and Prince) are California residents and members of the Institutional Plaintiffs (Firearms Policy Coalition, Inc., San Diego Gun Owners PAC, and Second Amendment Foundation). | Undisputed. |
| 3. | None of the Individual Plaintiffs is disqualified from owning or possessing firearms under federal or state law. | Undisputed solely for purposes of establishing standing and ripeness in this litigation. |
| 4. | Institutional Plaintiffs bring this action on behalf their members and supporters similarly situated to Individual Plaintiffs. | Undisputed. |
| 5. | Each Individual Plaintiff actively desires and intends to purchase two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more of the | Undisputed. |

2

Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (3:20-cv-02470)

| | | |
|---|---|---|
| | same in a single transaction within a 30-day period from a licensed dealer, and each would do so but for California's OGM law. | |
| 6. | Plaintiffs Prince and Phillips are licensed firearms dealers for Retailer Plaintiffs, North County Shooting Center Inc. ("NCSC") and PWGG L.P. ("PWGG"), respectively. | Undisputed that Plaintiffs Prince and Phillips are listed as firearms dealers in the California DOJ's Centralized List of Firearms Dealers for Retailer Plaintiffs North County Shooting Center Inc. ("NCSC") and PWGG L.P. ("PWGG"), respectively. |
| 7. | Plaintiffs NCSC and PWGG are licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as Federal Firearms Licensees ("FFL"). | Undisputed. |
| 8. | Because of the OGM law, Retailer Plaintiffs are prevented from selling two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more of the same in a single transaction within a 30-day period to individuals not otherwise disqualified by federal or state law from owning or possessing firearms. | Undisputed. |

3

| | | |
|---|---|---|
| 9. | Assembly Bill No. 1621 will extend the same purchase prohibitions to all arms falling within an expanded definition of "firearm," so as to include "completed frames or receivers" and all other "firearm precursor parts," once it becomes effective on January 1, 2024. | Undisputed. |
| 10. | During the Founding era, "[t]here was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." | Disputed in part. Undisputed that Stephen Halbrook's Vermont Law Review article stated that "[t]here was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." Disputed that that were no laws that "interfered with the keeping or bearing of arms." *See, e.g.*, DX-18, Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-513 (2004) (listing eighteenth-century gun laws); Pltfs.' Ex. 10, Dkt. No. |

4

Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (3:20-cv-02470)

| | | |
|---|---|---|
| | | 60-14, at 16-18 (listing "restrictions on the use of firearms in the Colonial law"); Defendants' Summary Judgment Motion Memorandum of Points and Authorities at 14-23 (listing and discussing regulations on the sale and possession of firearms and gun powder). |
| 11. | "No colony or state restricted arms possession by males who were too young or too old for the militia, nor by females." | Disputed in part. Undisputed that the book *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* stated that "[n]o colony or state restricted arms possession by males who were too young or too old for the militia, nor by females." Disputed because evidence related to militia laws is not relevant to an individual's Second Amendment right. *See District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (explaining that the Second Amendment "protect[s] an individual right unconnected with militia service"); *see also id.* at 606-609. |

5

| | | |
|---|---|---|
| 12. | People in the colonial states commonly offered for sale and sought for purchase multiple firearms in single transactions | Disputed. During the founding era, the number of firearms available for purchase was very limited. DX-9[1] (Sweeney Expert Rept.) ¶¶ 6, 10; *see also* DX-19, William G. Merkel, Forum: Comment, *Mandatory Gun Ownership, the Militia Census of 1806, and Background Assumptions concerning the Early American Right to Arms: A Cautious Response to Robert Churchill*, 25 Law & Hist, Rev. 187, 192-93 (2007) ("militia eligible Americans . . . were unable to [arm themselves] because guns were scarce"). In addition, the cost of a firearm generally prevented people from purchasing more than one firearm at a time. DX-10 (McCutchen Expert Rept.) ¶ 15. Moreover, the statement is not supported by the underlying |

---

[1] "DX" followed by the exhibit number are citations to Defendants' exhibits accompanying the Declaration of Jerry T. Yen in support of Defendants' Motion for Summary Judgment (Dkt. No. 59) or the Declaration of Jerry T. Yen in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

6

Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (3:20-cv-02470)

| | | |
|---|---|---|
| | | evidence because dealer advertisements are not evidence of actual transactions. *See* Pltfs.' Ex. 5, Dkt. No. 60-9, at 266, 304 (merely discussing advertisements from dealers seeking to acquire and sell pistols). |
| 13. | The free citizenry commonly owned, possessed, and carried on their person more than one firearm during the Founding era. | Disputed. The majority of individuals owned either one gun or no gun at all. DX-9 (Sweeney Expert Rept.) ¶¶ 11, 18, and tbl. 1; *see also* DX-21, Paul G. E. Clements, *The Consumer Culture of the Middle Atlantic, 1760-1820*, 52 Wm. & Mary Quarterly 591, 622-624, tbls. VII, XVII, XVIII, and XIX (2005); Pls.' Ex. 8 at 1800; DX-20, Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 Wm. & Mary Quarterly 223, 228 (2002); DX-22, Kevin M. Sweeney, *Firearms, Militias and the Second Amendment*, *in* The Second Amendment on Trial: Critical |

| | | |
|---|---|---|
| | | Essays on *District of Columbia v. Heller* 324-325, 340-341, 346-347, 354-355, tbls. 4, 7, 8, and 9 (Saul Cornell & Nathan Kozuskanich, eds., University of Massachusetts Press, 2013).  In addition, the statement is not supported by the underlying evidence because it includes assertions made without citation to any sources, *see* Pltfs.' Ex. 5 at 291-292, or in the context of firearms purchases for the state militia, *see* Pltfs.' Ex. 7, Dkt. No. 60-11, at 132; Pltfs.' Ex. 5 at 295. |
| 14. | The colonies almost universally *required* firearm ownership. | Disputed.  Firearms ownership regulations were mainly targeted to militia.  *See* Pltfs.' Ex. 10.  In addition, the underlying evidence is an opinion stated in an article without citation to any other sources.  *See* Pltfs.' Ex. 9, Dkt. No. 60-13, at 1-2. |

| | | |
|---|---|---|
| 15. | The historical practices or patterns referenced in SOUMF Nos. 10, 11, 12, 13, and 14 were the genesis of militia regulations during the Founding era. | Disputed. The citations in Plaintiffs' Statement of Undisputed Material Facts Nos. 10, 11, 12, 13, and 14 do not discuss the "genesis of militia regulations during the Founding era." In addition, militia laws were an attempt by the state to protect and ensure the safety of communities. DX-18 at 498, 510 ("the militia served to protect communities" and "militia laws can be seen as another attempt by the state to guarantee the safety of the community"). Further, evidence related to militia laws is not relevant to an individual's Second Amendment right. *See District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (explaining that the Second Amendment "protect[s] an individual right unconnected with militia service"); *see also id.* at 606-609. |

Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (3:20-cv-02470)

| | | |
|---|---|---|
| 16. | The general aim of militia regulations was to ensure compliance with mandates of firearm ownership, possession, and use by all members of the free citizenry. | Disputed. Militia laws were an attempt by the state to protect and ensure the safety of communities. DX-18 at 498, 510 ("the militia served to protect communities" and "militia laws can be seen as another attempt by the state to guarantee the safety of the community"). In addition, the statement is not supported by the underlying evidence. *See* Pltfs.' Exh. 6, Dkt. No. 60-10, at 177-188 (no discussion on the purpose of militia regulations). Further, evidence related to militia laws is not relevant to an individual's Second Amendment right. *See District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (explaining that the Second Amendment "protect[s] an individual right unconnected with militia service"); *see also id.* at 606-609. |
| 17. | Several Colonies required their militiamen to be equipped and to keep with them at all times a "case of good pistols"—i.e., multiple firearms. | Disputed. Some colonies required their troops to be *provided with* a "case of good pistols." *See* Pls.' Exh. 10 at 7 (Massachusetts), 10 |

10

Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (3:20-cv-02470)

| | | |
|---|---|---|
| | | (New Hampshire), 16 (New York), 22 (Virginia).  There was no requirement that they keep the "case of good pistols" with them at all times. *See id*.  In addition, evidence related to militia laws is not relevant to an individual's Second Amendment right. *See District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (explaining that the Second Amendment "protect[s] an individual right unconnected with militia service"); *see also id*. at 606-609. |
| 18. | Only four states (South Carolina, Virginia, Maryland, New Jersey) and the District of Columbia, have ever enacted such laws, and only those in Virginia, Maryland, and New Jersey are still in force. | Disputed in part.  Undisputed that South Carolina, Virginia, Maryland, and New Jersey have enacted OGM laws, and that the OGM laws in Virginia, Maryland, and New Jersey are still in force.  Disputed that the District of Columbia enacted an OGM law.  The District of Columbia enacted a law where a gun owner could not register more than one pistol in a 30-day period. D.C. Code § 7–2502.03(e) (2011). |

| | | |
|---|---|---|
| | | Disputed that only four states have enacted OGM laws.  California also enacted an OGM law and it is still in force.  Cal. Penal Code § 27535.  In addition, New York City also has also enacted an OGM law.  New York City Admin. Code § 10-302.1(b). |
| 19. | California's OGM law is the most restrictive of the jurisdictions with OGM laws as it targets both handguns and long guns. | Disputed in part.  Undisputed that California's OGM law currently applies to handguns and semiautomatic centerfire rifles. Cal. Penal Code § 27535.  Disputed that California's OGM law is the most restrictive.  *See, e.g.,* Md. Code Ann., Pub. Safety § 5-128(b) (Maryland's OGM law also applies to assault weapons); New York City Admin. Code § 10-302.1(b) (New York City's law applies to all firearms). |
| 20. | The stated purpose of the original OGM law as enacted under Assembly Bill No. 202 in 2000 was to "curtail the illegal gun market, disarm criminals, and save lives by preventing multiple purchases of handguns | Undisputed that this is one of the stated purposes of the OGM law. |

|  |  |  |
|---|---|---|
|  | through legitimate channels," on the rationale that "[p]reventing multiple purchases takes the profit out of black market sales and puts gun traffickers and straw purchasers out of business." |  |
| 21. | More specifically, the stated goal of the law was "to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself," in particular those who are underage, have a disqualifying prior conviction, a mental disorder, or are not residents. | Undisputed that this is one of the stated goals of the OGM law, and that the legislative record for Assembly Bill No. 202 stated that straw transactions typically involve "a third party who is under 21 years of age, has a disqualifying prior conviction, has a mental disorder, or is not a resident." |
| 22. | When the law was expanded to semiautomatic centerfire rifles effective July of 2021 under Senate Bill No. 61, the Legislature stated that AB 202 had been "intended to reduce the illegal flow of handguns by eliminating the opportunity to sell guns from bulk purchases on the black market" and that applying this same law to long guns "would be part of the solution in reducing gun violence." | Disputed.  The Ventura County Board of Supervisors made that statement in support of Senate Bill No. 61.  Plaintiffs' Exh. 11, Dkt. No. 60-15, at AG_Nguyen-0000034 |
| 23. | Throughout all relevant times, Defendants have implemented and | Undisputed that Defendants enforce California statutes and regulations |

13

Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (3:20-cv-02470)

| | | |
|---|---|---|
| | enforced a multitude of statutes, regulations, and policies that strictly regulate and criminalize the acquisition, possession, and use of firearms by all prohibited persons, including those who become prohibited after a lawful acquisition. *See e.g.*, Cal. Penal Code §§ 29800, 29805, 29815, 29825; 18 U.S.C §§ 922(b)(2), 922(d), 922(g). | on the acquisition and possession of firearms. |
| 24. | Throughout all relevant times, Defendants have also implemented and enforced a multitude of statutes, regulations, policies, and systems that collect, maintain, and monitor identifying information of those who are currently prohibited persons, who lawfully acquire, sale, and transfer firearms, and who later become prohibited persons, including, for example: Cal. Penal Code §§ 11101, 11105, 11106, 26150, 26185, 26195, 26225, 28220; the Dealer's Record of Sale (DROS) DROS Entry System (DES); the Armed Prohibited Persons System (APPS); Mental Health Reporting System (MHRS); Mental | Undisputed that Defendants enforce California statutes and regulations on the possession of firearms. |

14

Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (3:20-cv-02470)

| | | |
|---|---|---|
| | Health Firearms Prohibition System (MHFPS); Prohibited Applicant (PA); and many other such regulatory programs. | |
| 25. | The legislative history of AB 202 and SB 61 recognized the existence of these various schemes and how they already compel ordinary law-abiding citizens to obtain special certification, pass a background check, wait ten days, and complete a safe handling demonstration as preconditions to any lawful purchase. | Undisputed that the legislative record for Assembly Bill 202 recognizes that there are other laws governing the purchase of firearms, including a background check, a ten-day waiting period, and a basic firearm safety certificate. |
| 26. | It also recognized the myriad state and federal laws that specifically criminalize straw purchasing and illegal firearms trafficking. | Undisputed that the legislative record for Assembly Bill 202 recognizes that there are California and federal laws prohibiting straw purchases and firearms trafficking. |
| 27. | State law separately "[p]rohibits the sale, loan, or transfer of a firearm to any person who is not the actual purchaser or transferee if the intent is to avoid the statutory requirements for lawful transfer," and "[t]he Federal Gun Control Act forbids straw transactions" because it "prevents a person from purchasing guns in a state | Undisputed that the legislative record for Assembly Bill 202 acknowledges that state law "[p]rohibits the sale, loan, or transfer of a firearm to any person who is not the actual purchaser or transferee if the intent is to avoid the statutory requirements for lawful transfer," "[t]he Federal Gun |

| | | |
|---|---|---|
| | with lax laws and then returning to his or her state of residency." | Control Act forbids straw transactions," and "[f]ederal law prevents a person from purchasing guns in a state with lax laws and then returning to his or her state of residency." |
| 28. | Further, all federal licensees must report to ATF and all related state law enforcement agencies all sales, transfers, or disposals of two or more handguns "at one time or during any five consecutive business days," and they must make this report "not later than the close of business on the day that the multiple sale or other disposition occurs." | Undisputed that 18 U.S.C. § 923(g)(3)(A) requires federal licensees submit a report to ATF "and to the department of State police or State law enforcement agency of the State or local law enforcement agency of the local jurisdiction" "whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totaling two or more." The report must be submitted "not later than the close of business on the day that the multiple sale or other disposition occurs." |
| 29. | The legislative history acknowledged that only the District of Columbia and three other states—Virginia, | Disputed. The legislative record for Senate Bill 61 lists California, the District of Columbia, Maryland, |

|   | | |
|---|---|---|
|   | Maryland, and New Jersey—have OGM laws, and they target only handguns, not handguns *and* long guns like California does. | and Virginia as having limits on the number of firearms that can be sold in one month. Plaintiffs' Exh. 11 at AG_Nguyen-0000052-54. Senate Bill 61 also notes that Maryland's limitation also includes assault weapons. *Id*. |
| 30. | The sole reference to a mass shooting in the legislative record is an argument in support of SB 61 from the Ventura County Board of Supervisors, which referenced one local mass shooting in 2018. | Undisputed that the legislative record for Senate Bill 61 includes a statement from the Ventura County Board of Supervisors referencing a mass shooting in November 2018. |
| 31. | And there is no indication that the shooter used multiple firearms—much less multiple firearms acquired within a 30-day period. | Undisputed that the statement from the Ventura County Board of Supervisors in the legislative record for Senate Bill 61 did not include information as to whether the mass shooter used multiple firearms. |

| | | |
|---|---|---|
| 1 | Dated: October 13, 2023 | Respectfully submitted, |
| 2 | | ROB BONTA<br>Attorney General of California |
| 3 | | ANTHONY R. HAKL<br>Supervising Deputy Attorney General |
| 4 | | |
| 5 | | |
| 6 | | */s/ Jerry T. Yen* |
| 7 | | JERRY T. YEN<br>Deputy Attorney General |
| 8 | | *Attorneys for Rob Bonta, in his official capacity as California Attorney General, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms* |

18

Defs.' Resp. to Pls.' Statement of Undisputed Material Facts (3:20-cv-02470)