Raymond M. DiGuiseppe
California State Bar No. 228457
THE DIGUISEPPE LAW FIRM, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE NGUYEN, et al., | Case No. 3:20-cv-02470-WQH-MMP |
| Plaintiffs, | **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| ROB BONTA, Attorney General of California, et al., | Date: To be set by the Court |
| | Judge: Hon. William Q. Hayes |
| Defendants. | Courtroom: 14B |

## Table of Contents

I.     Introduction……………………………………………………...1

II.    The State's "Textual" Argument Ignores the Plain Textual Coverage. …...1

III.   The State's Historical Arguments Only Bolster Plaintiffs' Case. …………2

    A.    Any Claim of "Presumptively Lawful" Status Cannot Save the OGM Law. ………………………………………………………2

    B.    The State Cannot Escape the Standards Under *Bruen* that Doom Its Law. ……………………………………………………………4

    C.    The State's Own Evidence Belies Its Unfounded Factual Claims. …6

    D.    The State's Resort to a Clear Distortion of *Heller* Spotlights the Problem. ………………………………………………………..9

IV.    Conclusion ……………………………………………………...10

## Table of Authorities

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871)……………………………………………...1

*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………………………*passim*

*Gamble v. United States*, __ U.S. __, 139 S. Ct. 1960 (2019)…………………………5

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)………………………5

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961)…………………………………5

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)…………..*passim*

*Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012)………………………………………3

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018)……………………………………2-4

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)……………………...1, 4

*Yukutake v. Conners*, 554 F. Supp. 3d 1074 (D. Haw. 2021)…………………………4

**Constitutional Provisions**

U.S. Const. amend. II…………………………………………………………*passim*

U.S. Const. amend. XIV…………………………………………………………4

# Table of Authorities (continued)

## Other Authorities

James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777 (2002)……………………………………………………..7, 8, 9

Kevin M. Sweeney, *Firearms, Militias and the Second Amendment, in The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* 314 (Saul Cornell & Nathan Kozuskanich, eds., University of Massachusetts Press, 2013)……...7

Kevin M. Sweeney, "*Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Press, 2019)…...8

Paul G. E. Clements, *The Consumer Culture of the Middle Atlantic*, 1760-1820, 52 Wm. & Mary Quarterly 591 (2005)……………………………………………………9

Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 Wm. & Mary Quarterly (2002)……………………………………………………………………………8

## I.      Introduction

Through the arguments and additional evidence that the State presents in opposition to Plaintiffs' Renewed Motion for Summary Judgment ("Opp. to P-RMSJ"), it has only succeeded in defeating its own cross motion ("D-RMSJ") by poignantly highlighting the unquestionably unconstitutional nature of the OGM law.

## II.     The State's "Textual" Argument Ignores the Plain Textual Coverage.

Despite its previous concession on the obvious point that the OGM law "implicates" the Second Amendment even under the overly lenient "interesting balancing" standards, the State continues to push its claim that now, *after* the decision in *Bruen*, the conduct targeted by the OGM law is not even "covered by 'the plain text' of the Second Amendment." Opp. at 1-2. Again, the State's argument here is self-defeating because (1) it ignores "the plain text" expressly securing the right to keep and bear *Arms*, in the plural, with no limitation on the frequency or quantity of firearm acquisitions—which " 'necessarily involves the right to purchase them,' " *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)), and (2) it conflates the textual prong with the historical prong of the analysis by focusing on the *effects* of and *justifications* for the OGM law—i.e., the "how and why" of the law, Opp. 1-2—which matter only to the question of whether the law may be "relevantly similar" to any historical analogue the State may be able to proffer in carrying its burden to prove the requisite historical consistency, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022). Moreover, the whole argument boils down to the premise that "[t]here is no Second Amendment" violation because Plaintiffs and those like them can pursue *other* avenues of acquiring more than one of the targeted arms within a 30-day period, Opp. at 2, which is entirely irrelevant to either prong of the analysis, *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008) ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").

Not only does the State pursue a hollow "textual" argument, but it also fails to even dispute the key point dispositive of the case: that the arms targeted by the OGM law are constitutionally protected arms in common use for lawful purposes, which necessarily means they are not "dangerous and unusual," and thus they cannot be subjected to a ban. *Heller*, 554 U.S. at 582, 627 (emphasis added) ("the Second Amendment extends, prima facie, to *all instruments* that constitute bearable arms," and no such protected instruments can be constitutionally banned unless they are both "dangerous and unusual"). And the OGM law does subject these arms to a ban: a 30-day ban on their commercial acquisition by law-abiding citizens. Accordingly, no further analysis is required to compel the inevitable conclusion that the law must fail.

### III.   The State's Historical Arguments Only Bolster Plaintiffs' Case.

The State continues to pursue detours designed to eliminate or reduce its actual burden under the historical prong, further illustrating that it cannot justify this law.

### A.   Any Claim of "Presumptively Lawful" Status Cannot Save the OGM Law.

The State pushes the claim that the OGM law is "presumptively lawful" as "a condition or qualification on the commercial sale of firearms." Opp. at 3. For support, the State cites Judge Bybee's concurring and dissenting opinion in *Pena v. Lindley*, 898 F.3d 969, 1007–1009 (9th Cir. 2018). Opp. at 3. This is ironic. As Judge Bybee's opinion explains, "what constitutes a condition and qualification on commercial sales" must relate to "rules of *general* applicability"—i.e., "*ordinary* conditions on commercial sales generally" that go to "the cost of doing business," like "sales taxes," "commercial licenses," "zoning restrictions," and other "health and safety rules imposed on a commercial site"—because such rules "cover a broad range of activities and, hence, must have broad popular acceptance and support." *Id.* at 1008-09 (emphasis added). There is nothing "general," "ordinary," or of broadly popular acceptance or support about the historically nascent OGM law, which to this day appears in only a small handful of states. And it's certainly not enough to claim presumptively lawful status merely because the OGM law concerns *when* commercial firearm sales occur.

Opp. at 3; *see Pena*, 898 F.3d at 1009 (Bybee, J., concurring in part and dissenting in part) (the rules of "general applicability" typically "go to *where* and *when* commercial sales take place"). If it were, the State could enact a purchase ban that limits the number of commercial purchases to one per year, or even one per decade, simply because the regulation goes to "when" the sale may occur. Judge Bybee's opinion cautioned against creating any presumption of "broad construction" that "would serve to restrict rights guaranteed by the Bill of Rights." *Id.* at 1010. Again, this is not a mere "condition" or "qualification" on *the sale* of protected arms—it is a *ban* that prohibits their commercial sale or purchase whenever a law-abiding citizen has purchased *either* a handgun or a semiautomatic centerfire rifle within any previous 30-day period. The OGM law's 30-day purchase ban does not qualify for any such status, as underscored by the State's own authorities.[1]

Moreover, Judge Bybee's opinion thrice reiterates the requirement for *any* "presumptively lawful" condition or qualification on commercial sales that the State ignores—it must be *longstanding*. *Pena*, 898 F.3d at 1007 (the law must be "well-defined," "narrowly limited," "historic," and "long familiar"); *id.* at 1010 (this presumption may be applied to "a longstanding regulation of commercial sales of arms"); *id.* (the government must "show that its regulations are longstanding"); *see also Heller*, 554 U.S. at 626-27 (stating that nothing in the *Heller* opinion "should not be taken to cast doubt" as to "*longstanding* prohibitions" of the sort within the enumerated categories of regulations) (emphasis added). Not once does the State even attempt to claim that the OGM law satisfies the threshold "longstanding" requirement for any

---

[1]     The State's citation to *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012), is equally curious and unhelpful. Opp. at 4. There, the plaintiffs sued to enjoin an ordinance that they claimed prevented them from conducting gun shows on county fairgrounds. *Nordyke*, 681 F.3d at 1044. But the county ultimately conceded to an interpretation of the ordinance that allowed the plaintiffs to conduct such shows, on the sole condition that the firearms be "secured to prevent unauthorized use" while displayed for sale. *Id.* The Ninth Circuit's opinion followed this concession and upheld application of the ordinance to the plaintiffs "[w]ith that interpretation in mind." *Id.* The court also cited principles specific to "the government acting as proprietor," which presents a wholly different situation than when the government is exercising "the power to regulate or license, as lawmaker," *id.* at 1044-45, as the State is doing with the OGM law.

such presumption. It cannot do so with a law whose roots only extend back to the 1970s. *See Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1082 (D. Haw. 2021) ("[A] handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a 'longstanding' historical tradition of 'presumptively lawful' firearm prohibitions.").

And, contrary to the State's argument that a government can just invoke such status and be done with it, Opp. at 4, Judge Bybee's opinion reiterates that because " '[t]he language in *Heller* regarding the regulation of the commercial sale of arms … is sufficiently opaque with regard to that issue that, rather than relying on it alone …, we conduct a full textual and historical review [to determine if the regulation passes Second Amendment scrutiny].' " *Pena*, 898 F.3d at 1007 (quoting *Teixeira*, 873 F.3d at 682-83). Any presumption that *might* arise quickly evaporates under the necessary scrutiny as the rest of the analysis makes clear. Indeed, the only argument that the State makes in support of the notion that Plaintiffs "fail to rebut that presumption" is the same "other options" claim already rejected in *Heller*—that the State doesn't cut off *all other* avenues to acquire more than one of the targeted arms within a 30-day period. Opp. at 4. But it must justify *the purchase ban* it imposes. It cannot do so.

**B.    The State Cannot Escape the Standards Under *Bruen* that Doom Its Law.**

In a further attempt to avoid the full brunt of the *Bruen* standards, the State sets aside important underlying principles regarding the nature and scope of the relevant historical contours by characterizing them as mere gloss contrived from "cherry-pick[ed] statements" of the Supreme Court's opinion. Opp. at 5. The court meant what it said, and it said what it meant. The court was clear that "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. Foremost, " '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " *Id.* at 2137 (quoting *Heller*, 554 U.S. at 634-35). While "[s]trictly speaking," the States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, "we have generally

assumed that the scope of the protection applicable to the federal government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*  And while *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the Court's repeated holdings that (a) 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*, __ U.S. __, 139 S. Ct. 1960, 1976 (2019), and that (b) incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765.

The Supreme Court was clear that regulations hailing from later periods—like the mid-to-late 19th and 20th century periods that the State seeks to harness—are not part of the tapestry establishing "this Nation's historical tradition of firearm regulation" to the extent they are " '*inconsistent* with the original meaning of the constitutional text,' " *Bruen*, 142 S. Ct. 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)), or otherwise "contradict[] earlier evidence" of the meaning of the Second Amendment at the time was adopted, *id.* at 2153. This "original meaning" forms the Amendment's " 'unqualified command,' " *id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961)), which ultimately "demands our unqualified deference," *id.* at 2131. *See also id.* at 2040 n. 11 (while the 1686 *Sir John Knight's Case* may "only 'arguably' support[]" the view that the proper-cause requirement was inconsistent with the Nation's tradition, "[t]o the extent there are multiple plausible interpretations of *Sir John Knight's Case*, we will favor the one that is more consistent with the Second Amendment's command").

The *Bruen* opinion is equally clear in establishing the principle that a historical regulation cannot justify the challenged regulation when it was an "outlier" or an exception to the tradition prevailing within the vast majority of jurisdictions at the time, even if it may otherwise be "relevantly similar," contrary to what the State implies, Opp. at 6. *See* Dkt. No. 44 (Plntf. Supp. Brief in support of initial MSJ) (citing *Bruen*,

142 S. Ct. at 2142, 2144, 2147 n. 22, 2153, 2154, 2155, with parenthetical descriptions illustrating the court's repeated application of this principle). Similarly contrary to the State's suggestion, Opp. at 5, the same is true of any judicial decisions that labor "under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*," *id.* at 2155, or that contradict " 'the overwhelming weight of other evidence' " regarding the right, *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 632).

Although all this is evidently part of the State's effort to secure a "nuanced" and thus more lenient analysis for the OGM law, Opp. at 5, 6, 10, there is no "free pass" or relief valve: regardless of whether the challenged regulation is purportedly designed to address "unprecedented societal concerns or dramatic technological changes," "determining whether a historical regulation is a proper analogue for a distinctly modern firearm" *still* "requires a determination of whether the two regulations are 'relevantly similar,' " just the same as any other regulation. *Bruen*, 142 S. Ct. at 2132.

## C.   The State's Own Evidence Belies Its Unfounded Factual Claims.

The State keeps up its attempt to distract and avoid its actual burden by devoting substantial effort to proving up the claim that "multiple firearms were not purchased in a single transaction nor were firearms commonly owned" during the historical period of concern, because "most people during the founding and Reconstruction eras could not even afford to purchase more than one gun at a time." Opp. 7. First, the State's focus on the whether people purchased multiple firearms *in a single transaction* distorts the issue since the OGM law goes much further than that: it prohibits the purchase of more than one handgun or semiautomatic centerfire rifle *within any 30-day period*. Second, any factors of a purely *economic* nature—i.e., then-prevailing dynamics of production, distribution, and costs that may have affected the availability or affordability of firearms—are beside the point. All that matters are *governmental regulations* imposed as restrictions on the frequency or quantity of commercial firearm purchases that could be made by ordinary, law-abiding citizens who otherwise would have remained at liberty to make such purchases at any time and in any quantity.

Moreover, whatever the economic conditions may have been, the evidence plainly shows that not only did the free citizens remain unrestricted in the number and frequency of their commercial firearms purchases throughout this period, but that firearm acquisitions and ownership were in fact prolific. Notably, much of the evidence that belies the State's factual assertions here comes straight out of its own corner.

Regarding the claim that people "could not even afford" to purchase multiple firearms during this period, Plaintiffs have already highlighted how multiple sources cited by the State's own expert, McCutchen, document that popular arms of the day were relatively "inexpensive," easy to produce, and "the main weapon of choice for both individual protection as well as defending the colony." Opp. to D-RMSJ at 23-24. The additional sources that the State has proffered in opposition to Plaintiffs' motion similarly rebut this claim. *See* DX-22 (Kevin M. Sweeney, *Firearms, Militias and the Second Amendment, in The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* 314 (Saul Cornell & Nathan Kozuskanich, eds., University of Massachusetts Press, 2013) ("*Critical Essays*") ("For most men, the cost of a firearm, which ranged between twenty and thirty shillings new […], was not prohibitive.").

Further, the idea firearms were not "commonly owned" during the Founding and Reconstruction eras is preposterous. The State acknowledges that Plaintiffs' evidence establishes "there was a 'high percentage of gun ownership' " during the Founding era, Opp. at 7 (quoting James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777, 1780 (2002) (Ex. 8 to P-RMSJ)). The State tries to discount this evidence in favor of a probate analysis by Kevin Sweeney, one of its experts, saying the former is mainly "based on probate data from 1774" while the latter is "based on more expansive data from the 1780s and 1790s." Opp. 7-8. But the actual scope of Lindgren and Heather's analysis extends through <u>1810</u>. Ex. 8 to P-RSMJ at 1838 ("Thus, everywhere and in every time period from 1636 through 1810, we found high percentages of gun ownership in probate inventories."). Nothing about

the "probate analysis" of Sweeney undermines this analysis.[2] In fact, in Sweeney's later publication that the State proffers as an additional exhibit, DX-22 (*Critical Essays*), he repeatedly documents findings that directly contradict the State's claims that people did not commonly own or purchase multiple firearms during this period.

Sweeney documents that a substantial majority of the probate inventories contained firearms from the mid-1600s through the eve of the American Revolution. DX-22 at 315, 317, 324, 332, 339 (Tables 2, 3, 4, 6, 7). He also details how throughout this period: (i) ordinary citizens "publicly purchased" firearms, *id.* at 320; (ii) governments required free citizens to "always keep" at least "one pistol, *and* a carbine or other guns," *id.* at 327 (emphasis added); (iii) governments supplied free citizens with arms, *id.* at 320, 330, 334, 337, 348, which included "pairs of pistols," *id.* at 337; (iv) people came to treat these arms as "their private property," *id.* at 320; (v) private ownership of firearms "remained widespread" throughout this entire period, *id.* at 321, 338, 362; (vi) "the number of public arms was still dwarfed by tens of thousands of privately owned firearms" in the late 18th century; *id.* at 338; and (vii) people at the time even "bragged" that "everyone among is versed in Arms," *id.* 326.

Yet another of the State's sources, DX-20 (Randolph Roth, *Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence*, 59 Wm. & Mary Quarterly (2002)), undermines its claims by corroborating Lindgren and Heather's conclusions about the prolific nature of firearms in early American. *See e.g.*, *id.* at 225, 228 (where Roth found that their conclusions "from the Providence data are consistent with those of other studies of gun ownership,"

---

[2]    The support that the State cites for this probate analysis consists of an unwieldy list of sources in a series of fine print footnotes, which provides no indication of which among the several footnotes contain the sources on which Sweeney relied. Opp. at 8. Further, many of these footnotes refer to inventories far outside the period to which Sweeney's probate analysis supposedly relates (e.g., 1447-1742, 1498-1659, 1536-1742, 1542-1689, 1550-1590, 1562-1591, 1620-1692, 1674-1718). *See* Kevin M. Sweeney, "*Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Press, 2019), 70-71.

and that their study of the Vermont probate records was "correct"). In fact, Lindgren and Heather emphasized that the vast majority of the numerous probate estates they analyzed had "*at least* one gun" in operable condition, Ex. 8 to P-RMSJ at 1811, 1838 (emphasis added), just as Roth found, DX-20 at 224, 226, and both noted that some of these numbers may have been "understated" since some of the states exempted firearms from attachment or execution for debts, Ex. 8 to P-RMSJ at 1782; DX-20 at 226.[3]

## D.  The State's Resort to a Clear Distortion of *Heller* Spotlights the Problem.

Lastly, in a further attempt to obscure the reality of the world that shaped the rights at stake, the State distorts *Heller* to claim that militia laws compelling firearm ownership throughout the colonies are "not relevant to an individual's Second Amendment right" because the Amendment " 'protect[s] an individual right unconnected with militia service.' " Opp. at 9 (quoting *Heller*, at 554 U.S. at 605). Of course, the point *Heller* made here was that this right did not *arise from or depend on* militia service because the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one." *Heller*, 554 U.S. at 603; *accord Bruen*, 142 S. Ct. at 2127. That is, " '[i]t is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence.' " *Heller*, 554 U.S. at 594 (quoting A Journal of the Times: Mar. 17, New York Journal, Supp. 1, Apr. 13, 1769, in Boston Under Military Rule 79 (O. Dickerson ed.1936) (reprinted 1970)). This right "was by the time of the founding understood to be an individual right protecting against both public and private violence." *Id.*

So, the militia laws clearly are relevant to the tradition of firearms regulation during the relevant historical period and, as already detailed by Plaintiffs, P-RMSJ at 17, and by the State's own evidence discussed above, several colonies supplied and

---

[3]  The State cites Paul G. E. Clements, *The Consumer Culture of the Middle Atlantic*, 1760-1820, 52 Wm. & Mary Quarterly 591 (2005) (DX-21), for the tables displayed at pages 622 to 624. Opp. 8. However, those tables provide no support for any proposition regarding gun ownership because they concern large groups of undifferentiated types of property owned by different classes of people during this period, without any detail as to how, if at all, it may relate to *firearm* ownership.

required free citizens to keep *multiple* firearms with them. When the State's own evidence documents that "*the main weapon of choice* for both individual protection as well as defending the colony," Solomon K. Smith, *Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*, 4 (cited in McCutchen's report at DX-10, ¶ 8 n. 9) (emphasis added), there can be no reasonable dispute that not only were firearm acquisitions and ownership prolific during the relevant period but that the quantity and frequency of acquisitions remained entirely *un*regulated.[4]

And this inevitably leads to the glaring void in the State's case that it tries to obscure through its distorted factual and legal arguments: *no* regulations limiting the frequency or quantity of commercial firearms purchases by law-abiding citizens have existed at *any time* in our Nation's history until the 1970s, and none of the very different laws and regulations to which the State points as purported "analogues" is anything close to the "how and why" of the OGM law, as detailed in Plaintiffs' opening brief, Opp. to D-RMSJ at 16-22. This law is entirely alien to our Nation's tradition of firearms regulation. Instead, both the conduct and the arms targeted by the OGM law fall squarely within "|the Second Amendment's 'unqualified command.' " *Bruen*, 142 S. Ct. at 2126. Thus, they are and must remain protected, regardless of the nature of California's stated interests in the law or the degree to which it supposedly promotes those stated interests. *Id.* Our "unqualified deference" to the balance of interests "struck by the traditions of the American people" compels striking down this law. *Id.* at 2131.

## IV.   Conclusion

Plaintiffs' motion for summary judgment should be granted.

Dated:  October 27, 2023                The DiGuiseppe Law Firm, P.C.

By  /s/ *Raymond M. DiGuiseppe*
   Raymond M. DiGuiseppe
   Attorneys for Plaintiffs

---

[4]     While the State's evidence can only bolster Plaintiffs' case, none of it is necessary for Plaintiffs to prevail. The existing record already compels that result.