1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE NGUYEN, an individual; DOMINIC BOGUSKI, an individual; JAY MEDINA, an individual; FRANK COLLETTI, an individual; JOHN PHILLIPS, an individual; PWGG, L.P., a California Limited Partnership; DARIN PRINCE, an individual; NORTH COUNTY SHOOTING CENTER, INC., a California Corporation; FIREARMS POLICY COALITION, INC.; SAN DIEGO COUNTY GUN OWNERS PAC; and SECOND AMENDMENT FOUNDATION, | Case No. 3:20-cv-02470-WQH-MMP<br><br>**ORDER** |
| Plaintiffs, | |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of California; and LUIS LOPEZ, Director of the Attorney General's Department of Justice Bureau of Firearms, | |
| Defendants. | |

HAYES, Judge:

The matters before the Court are the renewed Cross-Motions for Summary Judgment (ECF Nos. 59, 60), and Defendants' renewed *Daubert* Motion to Preclude Testimony of George A. Mocsary (ECF No. 58).

1

## I.    BACKGROUND

2        On December 18, 2020, Plaintiffs initiated this action by filing a Complaint

3   challenging the constitutionality of the State of California's one-gun-a-month law

4   (the "OGM law"), Cal. Penal Code §§ 27535, 27540(g). (ECF No. 1.) At the time the

5   Complaint was filed, the OGM law prohibited individuals from "mak[ing] an

6   application to purchase more than one handgun or semiautomatic centerfire rifle

7   within any 30-day period," subject to certain exceptions.[1] Cal. Penal Code § 27535;

8   *see also* Cal. Penal Code § 27540(g) (prohibiting dealers from delivering such

9   firearms to individuals to whom Section 27535 applies when notified by the

10  California Department of Justice). Beginning on January 1, 2024, the OGM law

11  expanded to limit the purchase of *any* firearm, including "completed frames or

12

---

[1] The OGM law does not apply to:

13

(1) Any law enforcement agency.
14  (2) Any agency duly authorized to perform law enforcement duties.
(3) Any state or local correctional facility.
15  (4) Any private security company licensed to do business in California.
(5) Any person who is properly identified as a full-time paid peace officer, as
16  defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, and who
is authorized to, and does carry a firearm during the course and scope of employment
17  as a peace officer.
(6) Any motion picture, television, or video production company or entertainment
18  or theatrical company whose production by its nature involves the use of a firearm.
(7) Any person who may, pursuant to Article 2 (commencing with Section 27600),
19  Article 3 (commencing with Section 27650), or Article 4 (commencing with Section
27700), claim an exemption from the waiting period set forth in Section 27540.
20  (8) Any transaction conducted through a licensed firearms dealer pursuant to
Chapter 5 (commencing with Section 28050).
21  (9) Any person who is licensed as a collector pursuant to Chapter 44 (commencing
with Section 921) of Title 18 of the United States Code and the regulations issued
22  pursuant thereto, and has a current certificate of eligibility issued by the Department
of Justice pursuant to Article 1 (commencing with Section 26700) of Chapter 2.
23  (10) The exchange of a firearm where the dealer purchased that firearm from the
person seeking the exchange within the 30-day period immediately preceding the
24  date of exchange or replacement.
(11) The replacement of a firearm when the person's firearm was lost or stolen, and
25  the person reported that firearm lost or stolen pursuant to Section 25250 prior to the
completion of the application to purchase the replacement.
26  (12) The return of any firearm to its owner.
(13) A community college that is certified by the Commission on Peace Officer
27  Standards and Training to present the law enforcement academy basic course or
other commission-certified law enforcement training.
28

Cal. Penal Code § 27535(b).

receivers, or firearm precursor parts within the same 30-day period." Cal. Penal Code § 27535. The stated purpose of the OGM law is to "stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself. Such a transfer is referred to as a 'straw transaction.'" (ECF No. 59 at 11 (citing Assemb. B. 202, March 16, 1999 Assembly Committee on Public Safety Hearing, 1999–2000 Reg. Sess. (Cal. 1999).)

The Complaint alleges that Plaintiffs Michelle Nguyen, Dominic Boguski, Jay Medina, and Frank Colletti are individuals who desire and intend to purchase multiple handguns and/or semiautomatic centerfire rifles within a 30-day period but are prevented from doing so by Defendants' enforcement of the OGM law. The Complaint alleges that Plaintiffs John Phillips, PWGG, L.P., Darin Prince, and North County Shooting Center, Inc. are licensed firearms retailers who have been prevented by Defendants' enforcement of the OGM law from making firearms sales to customers. The Complaint alleges that Plaintiffs Firearms Policy Coalition, Inc., San Diego County Gun Owners PAC, and Second Amendment Foundation are non-profit entities focused on Second Amendment rights. The Complaint brings two 42 U.S.C. § 1983 claims: (1) violation of the Second Amendment right to keep and bear arms, as incorporated against states by the Fourteenth Amendment; and (2) violation of the Fourteenth Amendment right to equal protection. Plaintiffs seek declaratory and injunctive relief restraining the enforcement of the OGM law.

On April 8, 2022, the parties filed their respective Cross-Motions for Summary Judgment. (ECF Nos. 23, 29.) On the same day, Defendants filed the *Daubert* Motion to Preclude Testimony of George A. Mocsary. (ECF No. 30.) On April 9, 2022, Plaintiffs filed the Motion for Leave to File Declaration in Support of the Exhibits to Plaintiffs' Motion for Summary Judgment. (ECF No. 31.)

On June 30, 2022, the Court issued an Order requesting supplemental briefing on the effect of the Supreme Court's decision in *N.Y. Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), on the resolution of the parties' Cross-Motions for

1   Summary Judgment. (ECF No. 38.)

2        On September 16, 2022, the parties filed Supplemental Briefs. (ECF Nos. 43,

3   44.) On October 10, 2022, the parties filed Responses to each other's respective

4   Supplemental Briefs. (ECF Nos. 47, 48.)

5        On January 5, 2023, the Court issued an Order denying Plaintiffs' Motion for

6   Summary Judgment, granting Defendants' Motion for Summary Judgment as to the

7   equal protection claim but otherwise denying the motion, denying Defendants'

8   *Daubert* Motion to Preclude Testimony of George A. Mocsary as premature, and

9   granting Plaintiffs' Motion for Leave to File Declaration in Support of the Exhibits

10   to Plaintiffs' Motion for Summary Judgment. (ECF No. 49.) The Court ordered that

11   "each party may engage in additional expert discovery concerning whether the

12   challenged law is consistent with the Nation's historical tradition of firearm

13   regulation." *Id.* at 11.

14        On September 15, 2023, the parties filed their renewed Cross-Motions for

15   Summary Judgment. (ECF Nos. 59, 60.) On the same day, Defendants filed the

16   renewed *Daubert* Motion to Preclude Testimony of George A. Mocsary. (ECF No.

17   58.) In their renewed Motion for Summary Judgment, Plaintiffs do not rely on the

18   expert testimony of George A. Mocsary. (*See* ECF No. 60-1.) Accordingly, the

19   renewed *Daubert* Motion to Preclude Testimony of George A. Mocsary (ECF No.

20   58) is denied as moot.

21        On October 13, 2023, the parties filed Responses in opposition to the renewed

22   Cross-Motions for Summary Judgment. (ECF Nos. 61, 62.)

23        On October 27, 2023, the parties filed Replies in support of their renewed

24   Cross-Motions for Summary Judgment (ECF Nos. 65, 67), and Defendants filed a

25   Reply in support of the renewed *Daubert* Motion (ECF No. 66.)

26        On December 6, 2023, the Court held oral argument on all pending motions.

27   / / /

28   / / /

## II.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542–43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. Nor does Rule 56(c) require that the moving party support its motion with affidavits or other similar materials negating the nonmoving party's claim.").

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 322, 324. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories,

1    and admissions on file, designate specific facts showing that there is a genuine issue

2    for trial." *Celotex Corp.*, 477 U.S. at 324 (quotations omitted). The nonmoving party

3    cannot defeat summary judgment merely by demonstrating "that there is some

4    metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*, 475

5    U.S. at 586; *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla

6    of evidence in support of the [nonmoving party's] position will be insufficient.").

7    The nonmoving party's evidence is to be believed, and all justifiable inferences are

8    to be drawn in its favor. *Anderson*, 477 U.S. at 256.

9         "[W]hen parties submit cross-motions for summary judgment, '[e]ach motion

10   must be considered on its own merits.'" *Fair Hous. Council of Riverside Cnty., Inc.*

11   *v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). "In

12   fulfilling its duty to review each cross-motion separately, the court must review the

13   evidence submitted in support of each cross-motion." *Id.*

14   **III.   DISCUSSION**

15     **A. Contentions**

16        Plaintiffs contend that the characterization of "laws imposing conditions and

17   qualifications on the commercial sale of arms" as "presumptively lawful" in *District*

18   *of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008) is inapplicable in this case.

19   (ECF No. 60-1 at 13 (internal quotations omitted).) Plaintiffs contend that the Second

20   Amendment covers the conduct at issue—i.e., "the purchase [of] two or more

21   handguns, two or more semiautomatic centerfire rifles, or a combination of two or

22   more handguns and semiautomatic centerfire rifles, in a single transaction within a

23   30-day period from a licensed dealer"—because the right to keep arms "necessarily

24   involves the right to purchase them." *Id.* at 3, 5 (emphasis and internal quotations

25   omitted). Plaintiffs contend that as a result, "Defendants must justify the OGM law"

26   by proving that "the regulation is consistent with this Nation's historical tradition of

27   firearm regulation." *Id.* at 13, 15 (emphasis and internal quotations omitted).

28   Plaintiffs contend that "nothing in the historical record could support the existence

of any tradition broadly prohibiting law-abiding citizens from commercially purchasing more than one handgun, semiautomatic rifle, or combination of the same within any 30-day period." *Id.* at 20.

Defendants contend that "Plaintiffs' challenge fails because the OGM law imposes a 'condition and qualification on the commercial sale of arms,' which makes the law among those 'presumptively lawful regulatory measures' that governments may adopt consistent with the Second Amendment." (ECF No. 59 at 18 (cleaned up).) Defendants contend that the proposed conduct at issue is the "purchas[e] [of] more than one handgun or one semiautomatic centerfire rifle from a licensed firearms dealer within a thirty-day period." *Id.* at 17. Defendants contend that the proposed conduct is not covered by the plain text of the Second Amendment because it "does not impact an individual's ability to 'keep' or 'bear' arms." *Id.* Defendants contend that "[e]ven if Plaintiffs could demonstrate that California's OGM law burdens conduct covered by the plain text of the Second Amendment and could not be considered a presumptively lawful condition on the commercial sale of firearms, the law is consistent with the Nation's historical tradition of firearm regulation under *Bruen*." *Id.* at 59.

**B. Analytical Framework**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

After the Supreme Court's 2008 decision in *Heller*, the Courts of Appeals "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Bruen*, 597 U.S. at 17. "At the first step, the government [could] justify its regulation by establishing that the challenged law regulate[d] activity falling outside the scope of the right as originally understood." *Id.* at 18 (quotation omitted). However, if the historical evidence was inconclusive or suggested that the regulated activity was protected,

courts would proceed to the second step, at which they would typically apply some level of heightened scrutiny based on an analysis of "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* (quotation omitted).

The Supreme Court recently "decline[d] to adopt that two-part approach" in *Bruen*, holding that, "[d]espite the popularity of this two-step approach, it is one step too many." *Id.* In the wake of *Bruen*, the standard for determining the constitutionality of a government regulation under the Second Amendment is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). Accordingly, a court analyzing a Second Amendment challenge must: (1) define the proposed course of conduct of the party that is challenging the regulation; (2) determine whether the plain text of the Second Amendment covers (i.e. presumptively protects) that conduct; and (3) if so, assess whether the government has shown that the challenged regulation is consistent with our Nation's historical tradition of firearm regulation. A court's analysis in "[d]efining the character" and "outer limits of the right," and "assessing the constitutionality of a particular regulation" must be "centered on constitutional text and history" and must not "invoke any means-end test." *Id.* at 22.

In *Bruen*, the Supreme Court analyzed the constitutionality of a New York licensing regime that required applicants who wished to obtain public-carry licenses to demonstrate proper cause (i.e., a special need for self-defense). The Court defined the petitioners' proposed course of conduct as "carrying handguns publicly for self-

defense." *Id.* at 32. The Court determined that the plain text of the Second Amendment protects this proposed course of conduct, reasoning that the definition of the term "bear arms" "naturally encompasses public carry," especially given that "self-defense is 'the *central component* of the [Second Amendment] right" and "confrontation can surely take place outside the home." *Id.* at 32–33 (alteration and emphasis in original). The Court then proceeded to assess whether New York's proper-cause requirement was consistent with the Nation's historical tradition of firearm regulation, and finding that it was not, ruled that the proper-cause requirement was unconstitutional.

## C. Presumptively Lawful Regulatory Measures

Defendants justify the OGM law in part on the basis that it is presumptively lawful as a regulation imposing conditions and qualifications on the commercial sale of arms. The Supreme Court's decision in *Heller* states:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27; *see also McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurance"). *Heller* further states in a footnote: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Heller*, 554 U.S. at 627 n.26.

Since *Heller*, courts have struggled to fit the presumption of lawfulness for the enumerated categories within the broader framework for analyzing Second Amendment challenges. *See Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018) ("In the decade since *Heller*, the courts of appeals have spilled considerable ink in trying to navigate the Supreme Court's framework."); *see also Nat'l Rifle Ass'n of Am., Inc.*

*v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) ("We admit that it is difficult to map *Heller*'s longstanding, presumptively lawful regulatory measures onto this two-step framework." (internal quotations and citation omitted)), *abrogated by N.Y. Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). This problem is particularly acute for the "opaque" category of laws imposing conditions and qualifications on the commercial sale of arms (i.e. the "commercial sales category"). *Teixeira v. County of Alameda*, 873 F.3d 670, 683 (9th Cir. 2017); *see Pena*, 898 F.3d at 976 ("Our circuit similarly has strained to interpret the phrase 'conditions and qualifications on the commercial sale of arms.'"). As a result, the Court of Appeals for the Ninth Circuit has often "avoided having to define the contours of the commercial sales category" by assuming without deciding that the challenged regulation was not presumptively lawful and instead upholding the regulation under the "the appropriate level of constitutional scrutiny" at step two of the pre-*Bruen* analysis. *Pena*, 898 F.3d at 976. However, further consideration of the scope of the commercial sales category and nature of the presumption of lawfulness is required in this case because *Bruen* has since rejected any form of means-end scrutiny.

Prior to *Bruen*, a circuit split emerged regarding the justification for *Heller*'s presumptively lawful categories—some circuits held that the enumerated types of regulations were presumptively lawful because they "regulate conduct outside the scope of the Second Amendment," while others concluded that the regulations instead "pass muster under any standard of scrutiny." *United States v. Marzzarella*, 614 F.3d 85, 91 (3rd Cir. 2010), *abrogated by N.Y. Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); *see Mai v. United States*, 952 F.3d 1106, 1114 (9th Cir. 2020) ("A law does not burden Second Amendment rights 'if it either falls within one of the 'presumptively lawful regulatory measures' identified in *Heller* or regulates conduct that historically has fallen outside the scope of the Second Amendment.'" (quoting *United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019))); *Jackson v. City &*

*Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) ("To determine whether a challenged law falls outside the historical scope of the Second Amendment, we ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*."). *But see Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) (holding that some commercial regulations "might burden conduct unprotected by the Second Amendment, while others might presumptively pass the applicable level of scrutiny"), *vacated*, 47 F.4th 1124 (9th Cir. 2022). However, *Bruen* made clear that, consistent with the former approach, the justification for any presumption of lawfulness must rest on the analysis of text and history as described in *Bruen*.

For a regulation to be afforded the protection of presumptive lawfulness, the Court must first determine that it is a longstanding regulation falling within one of *Heller*'s enumerated categories. This is a particularly challenging task in the context of the broadly worded and "opaque" commercial sales category. *Teixeira*, 873 F.3d at 683. As an initial matter, it is readily apparent that "the Supreme Court in *Heller* could not have meant that anything that *could* be *characterized* as a condition and qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny." *Pena*, 898 F.3d at 1007 (Bybee, J. concurring in part, dissenting in part). "If there were somehow a categorical exception" for all regulations that could be characterized as conditions and qualifications on the commercial sale of firearms, "it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms" entirely, which is an "untenable" result. *Marzzarella*, 614 F.3d at 92 n.8. However, the precise contours of the commercial sales category are not defined in *Heller*, and the Court of Appeals for the Ninth Circuit has not clarified the category's scope. *See Pena*, 898 F.3d at 1009 (Bybee, J. concurring in part, dissenting in part) (stating that there is "no particularly good solution to defining what is and what is not a condition and qualification on commercial sales.").

One approach, urged by Defendants (*see* ECF No. 59 at 19) and taken by the

Fourth Circuit prior to *Bruen*, is to treat a commercial regulation as "presumptively lawful" if it does not act as a "functional prohibition on buyers." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 417 (4th Cir. 2021). In determining whether a commercial regulation amounts to a functional ban, *Hirschfeld* instructs courts to consider the "severity" of the restriction and whether it "substantially burden[s] [a] group's rights." *Id.* at 417–18. However, this approach is inconsistent with *Bruen*, which repudiates any consideration of "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Bruen*, 597 U.S. at 18 (internal quotation omitted). *Bruen* suggests that the proper question in evaluating whether a regulation falls within the commercial sales category is not the extent of interference with the Second Amendment right, but instead whether the regulation historically would have been tolerated. *See id.* at 17–19. In the wake of *Bruen*, several Courts of Appeals have conducted the full text-and-history analysis when confronted with a regulation that falls within one of *Heller*'s enumerated categories. *See Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) (remanding the case to the district court to conduct the historical analysis required by *Bruen* for a challenge to the federal felon-in-possession statute); *National Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), *vacated*, *reh'g en banc granted*, 72 F.4th 1346 (11th Cir. 2023) (conducting the *Bruen* historical analysis before concluding that a Florida law imposing a minimum age qualification constituted a "qualification[] on the commercial sale of firearms" that *Heller* deemed "presumptively lawful"); *Range v. Att'y Gen.*, 53 F.4th 262, 269 (3d Cir. 2022) (per curium), *vacated*, *reh'g en banc granted*, 56 F.4th 992 (3d Cir. 2023) (conducting the *Bruen* historical analysis to an as-applied challenge to the federal felon-in-possession statute); *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) (same).

The parties disagree on whether a full historical review is required based upon *Heller*'s statement that a presumptively lawful regulation must be "longstanding." Prior to *Bruen*, some Courts of Appeals held that a regulation could qualify as

longstanding despite originating in the twentieth century because several types of presumptively lawful regulations listed in *Heller* date to the early twentieth century. *See Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) ("On appeal, Sunnyvale and its *amici* point to several state regulations from the early twentieth century that restricted the possession of firearms based on the number of rounds that the firearm could discharge automatically or semi-automatically without reloading. Although not from the founding era, these early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record."); *see also Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue.... After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage."). However, the position that a purely twentieth century regulation can be considered "longstanding" in the absence of any relevant historical analogue at the time of the ratification of the Bill of Rights and/or Fourteenth Amendment is at odds with *Bruen*. *See Bruen*, 597 U.S. at 66 n.28 (refusing to address twentieth century evidence in determining the meaning of the Second Amendment). While the historical pedigree of *Heller*'s enumerated presumptively lawful categories is disputed, *Bruen* stated that *Heller*'s "longstanding" regulations had sufficiently "well-established and representative historical analogue[s]" in the analytically relevant time periods "to pass constitutional muster." *Id.* at 30 (further asserting that the sensitive places category is supported by analogous regulations prohibiting weapons in certain areas in the eighteenth and nineteenth centuries that were indisputably lawful).[2] As a result,

---

[2] Even if a purely twentieth century regulation could be considered longstanding absent some relevant historical analogue—a position inconsistent with *Bruen*—the parties agree that the first OGM law nationally was not passed until 1975, and California's law was passed in 1999. Caselaw within this Circuit and elsewhere establish that the OGM law would not qualify as "longstanding" even under the pre-*Bruen* approach. *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1255 (D.C. Cir. 2011) (stating that a District of Columbia law that prohibited

historical analysis is needed to determine whether any particular regulation that could be characterized as imposing conditions and qualifications on the commercial sale of arms is "longstanding" under *Bruen*. Based upon *Bruen* and subsequent caselaw, the Court concludes that the appropriate way to determine whether the OGM law passes constitutional muster is to "conduct a full textual and historical review." *Teixeira*, 873 F.3d at 683 (conducting a thorough review of the scope of the Second Amendment in lieu of relying on the "opaque" language of the commercial sales category); *Renna v. Bonta*, No. 20-cv-2190-DMS-DEB, 2023 WL 2846937, at *9– 10 (S.D. Cal. Apr. 3, 2023) (declining "the State's invitation to characterize [firearm] microstamping requirements as a law merely imposing conditions and qualifications on the sales of arms").

## D. Plaintiffs' Proposed Conduct and the Scope of Second Amendment Coverage

To identify whether the plain text of the Second Amendment covers the conduct at issue such that the conduct is presumptively protected from government regulation, the Court must first define Plaintiffs' proposed course of conduct. Plaintiffs contend that their proposed course of conduct should be defined as the "the purchase [of] two or more handguns, two or more semiautomatic centerfire rifles, or a combination of two or more handguns and semiautomatic centerfire rifles, in a single transaction within a 30-day period from a licensed dealer." (ECF No. 60-1 at 3.) Defendants contend that Plaintiffs' proposed course of conduct is the "purchas[e] [of] more than one handgun or one semiautomatic centerfire rifle from a licensed firearms dealer within a thirty-day period." (ECF No. 59 at 17.) Both parties' definitions mirror the language of the challenged statute. The Court defines

---

individuals from registering more than one pistol in a thirty day period was "not longstanding"); *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013) (stating that a law prohibiting domestic violence misdemeanants from possessing firearms was not longstanding because "domestic violence misdemeanants were not restricted from possessing firearms until 1996, with the passage of the Lautenberg Amendment to the Gun Control Act of 1968").

Plaintiffs' proposed course of conduct as acquiring multiple handguns and/or semiautomatic centerfire rifles within a 30-day period from a licensed dealer.

As an initial matter, the parties do not dispute that Plaintiffs are "people" protected by the Second Amendment or that the weapons at issue are subject to Second Amendment protection as "arms." Further, the right to "keep" arms necessarily encompasses ancillary rights, including a right to acquire arms, because the "right to keep and bear arms for self-defense" recognized by *Heller* and *Bruen* "'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d at 677 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *cf. Jackson*, 746 F.3d at 967 (holding that the Second Amendment implicitly protects ammunition). Finally, nothing in the text of the Second Amendment suggests that the Second Amendment right is limited to possession and acquisition of a single firearm, or that the acquisition of additional firearms is inherently subject to additional limitations—if anything, the usage of the term "arms" in plural suggests the opposite.

Nevertheless, Defendants contend that the proposed course of conduct does not fall within the scope of the Second Amendment because the OGM law "does not impact an individual's ability to 'keep' or 'bear' arms." (ECF No. 59 at 17.) Defendants contend that the OGM law "merely limits individuals to the purchase of one handgun or semiautomatic centerfire rifle every thirty days directly from licensed firearm dealers," and "does not prevent anyone from acquiring firearms for self-defense, keeping them for those purposes, and bearing the firearms for confrontation." *Id.*

However, the fact that the OGM law burdens Plaintiffs' Second Amendment right rather than outright prevents Plaintiffs' from keeping and bearing arms is not determinative of whether the proposed conduct is covered by the plain text of the Second Amendment. *See Bruen*, 597 U.S. at 31 (concluding that the conduct at issue was covered by the Second Amendment's plain text even though such conduct was not wholly barred by the challenged regulation); *see also Heller*, 554 U.S. at 629 ("It

is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."); *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023) ("But even though Maryland's law does not prohibit Plaintiffs from owning handguns at some time in the future, it still prohibits them from owning handguns *now*."). To the extent that the nature of the regulation's burden may be properly considered, the Supreme Court has cautioned that such consideration must be subsumed within the subsequent analysis of whether the regulation is consistent with the Nation's historical tradition of firearm regulation. *See Bruen*, 597 U.S. at 29 & n.7 (stating that "whether modern and historical regulations impose a comparable burden on the right" may be considered in determining whether the challenged regulation has relevant historical analogues but cautioning that "[t]his does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry"). The Court concludes that Plaintiffs' proposed conduct is presumptively protected because it is covered by the plain text of the Second Amendment.

### E. Historical Analysis

Because Plaintiffs' proposed conduct is covered by the plain text of the Second Amendment, Defendants must prove that the OGM law is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To carry their burden, Defendants must provide "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 27. When conducting this inquiry, "courts should not uphold every modern law that remotely resembles a historical analogue." *Id.* at 30 (internal quotation and citation omitted). On the other hand, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical twin." *Id.*

The historical analysis differs depending on whether the law addresses a novel societal issue, or one that was present during the Founding and Reconstruction eras.

For example, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. Likewise, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* 26–27. Further, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection would provide some probative evidence of unconstitutionality." *Id.* at 27.

On the other hand, "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Thus, regulations addressing "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* When confronted with "modern regulations that were unimaginable at the founding," the "historical inquiry that courts must conduct will often involve reasoning by analogy," which "requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28. In determining whether historical regulations are "relevantly similar," *Bruen* instructs courts to consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (quotations omitted).

Defendants contend that this "more nuanced approach" is appropriate in this case. (ECF No. 59 at 20 (quoting *Bruen*, 597 U.S. at 27).) Specifically, Defendants contend that the OGM law addresses the "unprecedented societal concerns" of firearms trafficking and straw purchases, problems that "did not exist during the

Founding or Reconstruction eras to the same extent that they exist today." *Id.* at 13. In support of this argument, Defendants rely on expert testimony stating that firearms were not widely owned or purchased during the Founding and Reconstruction eras. *See id.* at 21 (citing Exs. 9–11 to Yen Decl., ECF No. 59-4).) Thus, Defendants contend that the Founding and Reconstruction eras did not have to confront the "dangers associated with bulk purchases." *Id.* at 22.

For the purposes of the analysis below, the Court will assume that a "more nuanced approach" applies. *Bruen*, 597 U.S. at 27. Thus, to meet their burden, Defendants must produce historical regulations that are "relevantly similar" to California's OGM law. *Id.* at 28. Defendants offer historical regulations that fall into four categories: (1) gunpowder regulations; (2) restrictions on the sale of firearms to Native Americans; (3) restrictions on "deadly weapons"; and (4) taxing and licensing regulations.

## 1. Gunpowder Regulations

Defendants first point to laws regulating the storage, sale, and transport of gunpowder. Defendants cite a 1783 Massachusetts law prohibiting the storage of any firearm loaded with gunpowder in Boston, and a 1784 New York law regulating the storage of gunpowder in New York City. Defendants also cite three laws from the nineteenth century delegating authority to local governments to regulate gunpowder. Finally, Defendants cite several local laws from 1774 through 1901 regulating the storage and transportation of gunpowder within city limits. Three of these local laws also limited the quantity of gunpowder that could be available for sale.

Defendants contend that the gunpowder regulations impose a "comparable burden" to the OGM law because they "placed limits on the ownership and storage of gunpowder," but "did not completely prevent people from purchasing gunpowder." (ECF No. 59 at 27.) Defendants contend that the laws are "comparably justified" because, like the OGM law, the gunpowder regulations "served to promote public safety." *Id.*

Defendants' analogy fails. The purpose of the OGM law, the "why," is to "stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself." (ECF No. 59 at 11 (citing Assemb. B. 202, March 16, 1999 Assembly Committee on Public Safety Hearing, 1999–2000 Reg. Sess. (Cal. 1999).) By reducing "firearms trafficking," the OGM law, in turn, aims to "disarm criminals[] and save lives." *Id.* In contrast, the purpose of historical gunpowder regulations was to prevent accidental fires and explosions. *See Heller*, 554 U.S. at 632 (explaining that "gunpowder-storage laws" are "fire-safety laws"); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 510–12 (2004) (explaining that the purpose of eighteenth and nineteenth century laws regulating the storage and transport of gun powder was to "protect communities from fire and explosion"). Put simply, gunpowder regulations addressed fire-related risks, while the OGM law addresses risks associated with illegal gun trafficking and gun violence. Gunpowder restrictions and the OGM law are therefore not comparably justified.

The gunpowder laws also do not impose a comparable burden. The OGM law aims to prevent firearms trafficking and gun violence by "limiting the number of firearms that can be purchased" within a certain period of time. (ECF No. 59 at 27.) The gunpowder regulations, on the other hand, contain no temporal limitation on the acquisition of gunpowder, but simply limit the quantity of gunpowder that may be stored or transported. Thus, laws regulating the storage of gunpowder are not "relevantly similar" to the OGM law. *Bruen*, 597 U.S. at 29; *see Boland v. Bonta*, 662 F. Supp. 3d 1077, 1088 (C.D. Cal. 2023) (concluding that gunpowder storage laws are not analogous to a California law requiring handguns to have certain safety features because the "[h]ow and why these regulations burden a law-abiding citizen's right to armed self-defense are too different to pass constitutional muster"); *Renna*, 2023 WL 2846937, at *12–13 (concluding that gunpowder regulations are not "relevantly similar" to California's handgun "roster" requirements).

### 2. Restrictions on the Sale of Firearms to Native Americans

Defendants also identify examples of colonial-era laws restricting the sale and trade of firearms and gunpowder to Native Americans due to the risk of "Native violence." (Ex. 10 to Yen Decl., ECF No. 59-4 at 61.) Defendants cite a Virginia law prohibiting colonists from carrying more than one gun and ten charges of powder when traveling near any Native town or three miles away from an English plantation, a 1723 Connecticut law prohibiting colonists from lending guns and ammunition to Native Americans, a Maryland law limiting the amount of gunpowder sold to Native Americans, and a federal law that placed limits on trading guns with Native Americans. Defendants contend that these restrictions are "relevantly similar to California's OGM law" because both "placed limits on the ability of individuals to purchase or sell firearms to address the perceived risks to public safety." (ECF No. 59 at 29.)

As an initial matter, it is unclear whether it is permissible to rely on laws that, due to race or ethnicity-based classifications, "would be unconstitutional today." *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021); *see also Range v. Att'y Gen. of the U.S.A.*, 69 F.4th 96, 104 (3d Cir. 2023) (rejecting the argument that a tradition of status-based restrictions can justify disarming convicted felons because "restrictions based on race and religion would now be unconstitutional under the First and Fourteenth Amendments"). Further, "[l]aws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—i.e., written out of 'the people' altogether," and therefore, "[t]heir utility as historical analogous" is "dubious, at best." *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023).

But even if the Court were to consider such firearm restrictions on "dangerous" people, they do not impose a comparable burden to the OGM law. The identified historical laws targeted only a narrow subset of the population perceived as dangerous, while the OGM law, with limited exceptions, affects all people acquiring

handguns and semiautomatic centerfire rifles in California. *See* Cal. Penal Code §§ 27535, 27540(g); *Maryland Shall Issue, Inc.*, 86 F.4th at 1047 (concluding that historical arms-restrictions on "dangerous" people are not analogous to Maryland's licensing scheme requiring applicants to wait up to thirty days for approval because "Maryland's law burdens *all* people—even if only temporarily—rather than just a class of people whom the state has already deemed presumptively dangerous"). Further, laws restricting the sale of arms to Native Americans impose neither a quantity nor time limitation similar to that of the OGM law.

Among this group of regulations identified by Defendants, the regulation that comes closest to the OGM law is a colonial-era law prohibiting the carrying of more than one gun and ten charges of powder when traveling near any Native town or more than three miles away from an English plantation. This law imposes both a quantity limitation (carrying more than one gun and ten charges of powder) as well as a temporal limitation (when traveling near any Native town or three miles away from an English plantation). However, even assuming the law is sufficiently analogous to the OGM law, "one solitary statute is not enough to demonstrate a *tradition* of an arms regulation." *Teter v. Lopez*, 76 F.4th 938, 952 (9th Cir. 2023) (citing *Bruen*, 597 U.S. at 65); *see Bruen*, 597 U.S. at 65–66 ("As in *Heller*, we will not 'stake our interpretation of the Second Amendment upon a single law, … in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public.").

### 3. Restrictions on "Deadly Weapons"

The next group of laws Defendants identify are those prohibiting the sale of certain deadly weapons. Defendants cite mid-nineteenth century laws from Georgia and Tennessee prohibiting the sale of certain kinds of knives, pistols, and swords; laws from Vermont, New York, Kentucky, Florida, Illinois, Massachusetts, North Dakota, and Oklahoma prohibiting the sale of slung shots and metal knuckles; and an 1881 Arkansas law prohibiting the sale of pistols, knives, swords, spears, metal

knuckles, and razors. These laws targeted weapons used for criminal activity rather than self-defense. (*See* Ex. 11 to Yen Decl., ECF No. 59-4 at 80.)

Defendants contend that the OGM law and the historical prohibitions on deadly weapons are comparably justified because both aim to address "public safety." (ECF No. 59 at 29.) The historical regulations, however, impose a different burden. These regulations banned certain types of pistols and weapons that were "concealable" and specifically "associated with interpersonal violence and crime." (Ex. 11 to Yen Decl., ECF No. 59-4 at 80 ("Many nineteenth-century regulations, including some sales restrictions, confined themselves to these concealable deadly weapons.").) The OGM law, by contrast, burdens a broader class of arms that includes handguns, semiautomatic centerfire rifles, and, starting in 2024, all other firearms. *See* Cal. Penal Code §§ 27535, 27540(g). The OGM law is also a restriction on the frequency with which one may acquire a firearm, as opposed to a flat ban. Thus, because the OGM law acts through different means than the deadly weapons restrictions, it imposes a different burden. *See Maryland Shall Issue, Inc.*, 86 F.4th at 1047 ("The point is that different mechanisms often impose different burdens. And courts must consider the mechanism that the challenged law chooses to carry out its goal when evaluating whether it is 'relevantly similar' to a historical law.").

Further, the nineteenth century deadly weapons bans arose from "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626); *see State v. Huntley*, 25 N.C. 418, 418 (1843) (upholding conviction of a man who armed himself "with pistols, guns, knives and other dangerous and unusual weapons"); *English v. State*, 35 Tex. 437, 475 (1872) (concluding that the right to bear arms does not protect "dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives" which were "dangerous or unusual weapons"). Both *Bruen* and *Heller* instruct that the Second Amendment does not extend to such weapons, but rather only protects those weapons "in common use at the time," such as handguns. *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 47

("[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' … Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'"). Thus, to the extent these nineteenth century laws prohibited the sale of certain deadly weapons because they were "dangerous and unusual," they "provide no justification for laws restricting the [acquisition] of weapons that are unquestionably in common use today." *Bruen*, 597 U.S. at 47.

### 4. Taxing and Licensing Regulations

The final group of laws Defendants produce are taxing and licensing regulations during the Founding and Reconstruction eras. Defendants cite a 1763 Pennsylvania law and a 1790 federal law requiring a license to trade firearms with Native Americans, as well as nineteenth century laws from Tennessee and South Carolina requiring a license to sell certain firearms. Defendants also point to nineteenth century laws placing a tax on the sale of firearms and other deadly weapons. Defendants contend that these licensing and tax regulations are analogous to the OGM law because they "served to limit the availability and ownership of firearms in order to protect the public while minimally burdening the right to armed self-defense." (ECF No. 59 at 31.)

The taxing and licensing regulations are not "relevantly similar" to the OGM law. *Bruen*, 597 U.S. at 29. Unlike the OGM law, taxing and licensing regulations placed no limit on the quantity or frequency with which one could acquire firearms. In fact, the licensing regulations proffered by Defendants imposed no burden on the acquisition of firearms; they regulated only the seller. Accordingly, these laws do not establish a "tradition of firearm regulation" similar to the OGM law. *Id.* at 34.

Defendants have not met their burden of producing a "well-established and representative historical analogue" to the OGM law. *Bruen*, 597 U.S. at 30 (emphasis

omitted). The Court therefore concludes that Plaintiffs are entitled to summary judgment as to the constitutionality of the OGM law under the Second Amendment.

**IV.    CONCLUSION**

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (ECF No. 59) is denied and Defendants' *Daubert* Motion to Preclude Testimony of George A. Mocsary (ECF No. 58) is denied as moot.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (ECF No. 60) is granted. No later than seven (7) days from the date this Order is filed, the parties shall file a proposed judgment consistent with this Order and include language that enforcement of the judgment is stayed for thirty (30) days to facilitate an appeal.

Dated:  March 11, 2024

Hon. William Q. Hayes
United States District Court